# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| **SYSTEM FUELS, INC.,** on its own behalf and as agent for SYSTEM ENERGY RESOURCES, INC. and SOUTH MISSISSIPPI ELECTRIC POWER ASSOCIATION,<br><br>Plaintiff,<br><br>v.<br><br>**THE UNITED STATES,**<br><br>Defendant. | No. 03-2624C<br>(Judge Braden) |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON LIABILITY

Alex D. Tomaszczuk
**SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, Virginia 22102
(703) 770-7940
(703) 770-7901 (fax)
Counsel of Record for Plaintiff
System Fuels, Inc., on its own behalf and as agent for System Energy Resources, Inc. and South Mississippi Electric Power Association

Of Counsel:

Jay E. Silberg
Devon E. Hewitt
Michael G. Lepre
Daniel S. Herzfeld
Jack Y. Chu
**SHAW PITTMAN LLP**
2300 N Street, N.W.
Washington, D.C. 20037
(202) 663-8000
(202) 663-8007 (fax)

October 29, 2004

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..... ii

INDEX TO THE APPENDIX ..... iv

SUMMARY OF ARGUMENT ..... 1

ARGUMENT ..... 3

I. DOE HAS BREACHED ITS STANDARD CONTRACT WITH PLAINTIFF, AND THAT BREACH HAS CAUSED PLAINTIFF TO SUFFER DAMAGES ..... 3

A. DOE Breached Its Standard Contract With Plaintiff ..... 4

B. DOE's Breach Of Contract Resulted In Damages To Plaintiff ..... 7

II. WHETHER PLAINTIFF SUBMITTED A DELIVERY COMMITMENT SCHEDULE HAS NO BEARING ON THE QUESTION OF DOE'S LIABILITY FOR BREACH OF PLAINTIFF'S STANDARD CONTRACT ..... 11

A. Submission Of A DCS Form Was Not A Condition Precedent To DOE's Obligations Under The Standard Contract ..... 12

B. Because Of DOE's Breach, Plaintiff Was Never "Obligated" To Submit A DCS ..... 13

C. Plaintiff Was Not Required To Submit A DCS Form Because Doing So Would Have Been Futile ..... 14

D. Other Aspects Of The DCS Submittal Process Were Flawed ..... 16

III. PLAINTIFF'S CLAIM FOR PARTIAL BREACH SUPPORTS A LIABILITY RULING IN ITS FAVOR ..... 18

CONCLUSION ..... 23

## TABLE OF AUTHORITIES

### CASES

Chain Belt Co. v. United States, 115 F. Supp. 701 (Ct. Cl. 1953)........................................20, 21

City of Fairfax v. Wash. Metro Area Transit Auth., 582 F.2d 1321 (4th Cir. 1978).....................22

Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652 (2003) .............................12, 16, 17

Effects Assocs., Inc. v. Cohen, 908 F.2d 555 (9th Cir. 1990) .....................................................12

Hughes Communications Galaxy, Inc. v. United States, 271 F.3d 1060 (Fed. Cir. 2001)......19, 20

Indiana Mich. Power Co. v. U.S. Dep't of Energy, 88 F.3d 1272 (D.C. Cir. 1996).......................5

Indiana Mich. Power Co. v. United States, 57 Fed. Cl. 88 (2003) ..................................... *passim*

Indiana Mich. Power Co. v. United States, 60 Fed. Cl. 639 (2004) ......................................20, 21

Lorenz v. United States, 296 F.2d 746 (Ct. Cl. 1961) .................................................................14

Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1336 (Fed. Cir. 2000).......... *passim*

Morris v. United States, 33 Fed. Cl. 733 (1995)....................................................................14, 15

Naekel v. U.S. Dep't of Transp., 850 F.2d 682 (Fed. Cir. 1988).................................................19

Northern Heel Corp. v. Compo Indus., Inc., 851 F.2d 456 (1st Cir. 1988)..................................14

Northern States Power Co. v. U.S. Dep't of Energy, 128 F.3d 754 (D.C. Cir. 1997).......... *passim*

Omaha Pub. Power Dist. v. Employers' Fire Ins. Co., 327 F.2d 913 (8th Cir. 1964)...................14

R. A. Weaver & Assocs. v. Haas & Haynie Corp., 663 F.2d 168 (D.C. Cir. 1980).....................14

Robinson v. United States, 305 F.3d 1330 (Fed. Cir. 2002)...................................................11, 18

RT Computer Graphics, Inc. v. United States, 44 Fed. Cl. 747 (1999).......................................12

San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557 (Fed. Cir. 1997)...........20

Tenn. Valley Auth. v. United States, 60 Fed. Cl. 665 (2004)..........................................10, 11, 20

Yankee Atomic Elec. Co. v. United States, No. 98-126C, 2004 WL 1535688
(Fed. Cl. June 28, 2004)........................................................................................................19, 20

**STATUTES AND REGULATIONS**

10 C.F.R. § 961.11 ........ *passim*

42 U.S.C. § 10222 ........ 4

59 Fed. Reg. 27,007 (May 25, 1994) ........ 4, 19

60 Fed. Reg. 21,793 (May 3, 1995) ........ 4

**MISCELLANEOUS**

Dan B. Dobbs, Handbook on the Law of Remedies § 12.6 (1993) ........ 19

Restatement (Second) of Contracts § 245 (1981) ........ 13

Restatement (Second) of Contracts § 253 (1981) ........ 21, 22

Restatement (Second) of Contracts § 350 (1981) ........ 11, 18

24 Williston on Contracts, § 66.44 (4th ed. 1990) ........ 19

## INDEX TO THE APPENDIX


Description ..... Page

Deposition of David Zabransky, Excerpts ..... 1

1987 Annual Capacity Report (June 1987) (Appendices omitted) ..... 8

1988 Annual Capacity Report (June 1988) (Appendices omitted) ..... 30

1990 Annual Capacity Report (December 1990) (Appendices omitted) ..... 53

1991 Annual Capacity Report (December 1991) (Appendices omitted) ..... 78

1991 Instructions for Completing the Appendix C Delivery Commitment Schedule
- General Instructions ..... 96
- Specific Instructions ..... 100

Voided DCS Forms ..... 104

DOE Letters Stating DCS Forms Could Not be Approved or Disapproved ..... 114

Defendant's Response to Utility Plaintiffs' Request for Admissions (April 18, 2002) ..... 128

2004 Instructions for Completing the Appendix C Delivery Commitment Schedule ..... 132

Excerpt from GAO, Nuclear Waste: Operation of Monitored Retrievable Storage Facility is Unlikely by 1998 (Sept. 1991) ..... 138

2004 Acceptance Priority Ranking & Annual Capacity Report (July 2004) (Appendices omitted) ..... 140

Excerpt From 1995 Acceptance Priority Ranking & Annual Capacity Report (March 1995) ..... 148

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **SYSTEM FUELS, INC.,** on its own behalf and as agent for SYSTEM ENERGY RESOURCES, INC. and SOUTH MISSISSIPPI ELECTRIC POWER ASSOCIATION,<br><br>Plaintiff,<br><br>v.<br><br>**THE UNITED STATES,**<br><br>Defendant. | No. 03-2624C<br>(Judge Braden) |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS**
**MOTION FOR SUMMARY JUDGMENT ON LIABILITY**

Plaintiff System Fuels, Inc. ("SFI"), on its own behalf and as agent for System Energy Resources, Inc. and South Mississippi Electric Power Association, respectfully submits this memorandum in support of its Motion For Summary Judgment On Liability, filed contemporaneously with this brief.[1]

**SUMMARY OF ARGUMENT**

The Court should grant Plaintiff's Motion For Summary Judgment On Liability. There is no question that the United States Department of Energy ("DOE") breached its Standard Contract for Disposal of Spent Nuclear Fuel and/or High-level Radioactive Waste ("Standard Contract") with Plaintiff. In violation of Article II of the Standard Contract, DOE did not begin

[1] In support of this filing, Plaintiff is submitting an "Appendix To Plaintiff's Memorandum In Support Of Its Motion For Summary Judgment On Liability" dated October 29, 2004. That Appendix is cited herein as "Pl. App." Additionally, Plaintiff is submitting proposed findings of uncontroverted fact in support of this memorandum. Those findings are cited herein as "PFF."

to accept Spent Nuclear Fuel ("SNF") from nuclear utilities as of January 1998. In fact, DOE has indicated that it will not begin to perform under the Standard Contract until 2010, at the earliest. The U.S. Courts of Appeals for the District of Columbia and Federal Circuits have found that DOE's failure to begin accepting SNF as of January 1998 resulted in a breach of the Standard Contract for all Standard Contract holders – the entire nuclear industry. In other words, those findings apply to Plaintiff's Standard Contract.

The Government will likely argue here, as it has in most other SNF cases, that Plaintiff suffered no damages as a result of DOE's breach because DOE was not specifically obligated to begin accepting SNF from Plaintiff in January 1998. DOE's breach of the Standard Contract did injure Plaintiff, even if Plaintiff was not at the front of the SNF acceptance queue established by DOE. Once DOE failed to begin accepting SNF from utilities as of January 1998, this delay created a domino effect resulting in DOE being unable to accept Plaintiffs' (and all other nuclear utilities') SNF in a timely manner under the Standard Contract. Due to this lengthy delay, Plaintiff has incurred – and continues to incur – substantial damages to store SNF that DOE was contractually obligated to take.

The Government will also likely argue that it has no liability to Plaintiff because Plaintiff did not submit to DOE a Delivery Commitment Schedule ("DCS") for Plaintiff's SNF, which DOE has alleged in other SNF cases was a condition precedent to DOE's obligation to accept SNF under the Standard Contract. That argument, if made here, should be rejected because (1) submission of a DCS form was not a condition precedent to DOE's acceptance of SNF deliveries; (2) even if submitting a DCS form was a condition precedent, once DOE breached the Standard Contract Plaintiff no longer had to satisfy that "condition;" (3) submitting a DCS would have been futile (because DOE stopped approving DCSs) and, therefore, was not required by

law; and (4) the DCS process as implemented by DOE was flawed and inconsistent with the Standard Contract.

Furthermore, based on positions it has taken in other SNF cases, the Government in this case is likely to claim that Plaintiff was required to allege "anticipatory repudiation" in order to seek pre-breach damages. This is an incorrect interpretation of the law. Non-breaching parties are entitled, indeed required, to mitigate losses when faced with a breach, including a partial breach. And pre-breach mitigation damages are recoverable for partial breach. Such a finding is supported by prior binding decisions of the Court of Claims and by recent decisions by this Court in other SNF damages cases.

For these reasons, Plaintiff respectfully requests that the court grant Plaintiff's Motion For Summary Judgment On Liability.

## ARGUMENT

### I. DOE HAS BREACHED ITS STANDARD CONTRACT WITH PLAINTIFF, AND THAT BREACH HAS CAUSED PLAINTIFF TO SUFFER DAMAGES

The Government has alleged in other SNF cases that DOE's failure to begin SNF acceptance from the commercial nuclear industry by January 31, 1998 did not create an injury to each and every member of the commercial nuclear industry. As a result, the Government will likely argue here that its delay has not injured Plaintiff, because DOE was not obligated to begin accepting SNF from Plaintiff by January 31, 1998. The Government will also likely contend that, before Plaintiff can seek a liability ruling, Plaintiff must establish that DOE had a specific obligation to accept Plaintiff's own SNF by the date of Plaintiff's Complaint and that DOE breached that obligation. For the reasons discussed below, these arguments are flawed.

**A. DOE Breached Its Standard Contract With Plaintiff**

There simply is no question that the Government breached Plaintiff's Standard Contract.

Under the Nuclear Waste Policy Act of 1982 ("NWPA"), DOE was required to begin disposing of the nation's commercially-generated SNF "not later than January 31, 1998," in return for the payment of fees by utilities and others that generated or held title to SNF. See 42 U.S.C. § 10222(a)(5)(B). As also required under the NWPA, in 1983 DOE drafted the Standard Contract. See 42 U.S.C. § 10222(a); 10 C.F.R. § 961.11. Each of the nation's nuclear utilities, including Plaintiff, executed a Standard Contract with DOE. See Department of Energy's Final Interpretation of Nuclear Waste Acceptance Issues, 60 Fed. Reg. 21,793, 21,794 (May 3, 1995); PFF ¶ 1. Plaintiff's Standard Contract – indeed all of the Standard Contracts – embodies the reciprocal obligations mandated by the NWPA, pursuant to which Plaintiff agreed to pay fees in return for DOE's obligation to begin disposing of SNF no later than January 31, 1998. Specifically, Article II of the Standard Contract states: "[t]he services to be provided by DOE under this contract shall begin, after commencement of facility operations, not later than January 31, 1998 and shall continue until such time as all SNF . . . has been disposed of." Standard Contract, Art. II; 10 C.F.R. § 961.11; PFF ¶ 2.

In 1994, however, "[DOE] announced that it could not begin disposing of nuclear waste by January 31, 1998, as the [Standard] [C]ontract required, because the repository it planned to build to store the waste would not be available until at least 2010." Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1336, 1338 (Fed. Cir. 2000); see Notice of Inquiry, 59 Fed. Reg. 27,007, 27,007-08 (May 25, 1994). In 1995, DOE issued a Final Interpretation of Nuclear Waste Acceptance Issues ("Final Interpretation"), expressly denying that DOE had a statutory and contractual obligation to begin disposing of SNF by January 31, 1998. See 60 Fed. Reg. 21,793. In the Final Interpretation, DOE stated that, since passage of the NWPA, it "has become

apparent that neither a repository nor an interim storage facility constructed under the [NWPA] will be available by 1998." Id. at 21,794. DOE projected that the "earliest possible date for acceptance of waste for disposal by DOE would be 2010." Id.

The United States Court of Appeals for the District of Columbia Circuit has found that DOE's failure to begin disposing of SNF by January 31, 1998 violated the Standard Contract. In Indiana Michigan Power Co. v. U.S. Dep't of Energy, 88 F.3d 1272, 1276 (D.C. Cir. 1996), the D.C. Circuit ruled that DOE's obligation under the NWPA to commence SNF acceptance no later than January 31, 1998, was "without qualification or condition." The D.C. Circuit rejected DOE's argument that the 1998 deadline was conditioned upon the operation of a repository under the NWPA, finding that such an interepretation of the Standard Contract "blue-pencil[ed] out" the 1998 deadline, destroying the "*quid pro quo* created by Congress." Id. According to the D.C. Circuit, DOE's proposed "treatment of [the NWPA] is not an interpretation but a rewrite." Id. The D.C. Circuit concluded that the NWPA, and similarly the Standard Contract, required DOE to "begin disposing of [SNF] by a day certain." Id.; PFF ¶¶ 3-5.

Despite the D.C. Circuit's ruling in Indiana Michigan, DOE nevertheless announced that it would not begin disposing of SNF by the January 31, 1998 deadline. PFF ¶ 6. As a result, a number of utilities, including Plaintiff, petitioned the D.C. Circuit for a writ of mandamus seeking to compel DOE's compliance with the D.C. Circuit's decision in Indiana Michigan. In that case, Northern States Power Co. v. U.S. Dep't of Energy, 128 F.3d 754 (D.C. Cir. 1997), the D.C. Circuit reiterated its finding in Indiana Michigan that DOE had an "unconditional duty" under the Standard Contract to being disposing of utilities' SNF by January 31, 1998. In fact, the D.C. Circuit remarked: "[w]e would have expected that the Department would proceed as if it

had just been told that it had an unconditional obligation to take the nuclear materials by the January 31, 1998, deadline. Not so." Id. at 757.

Similarly, the Federal Circuit has held that DOE breached the Standard Contract. According to the Federal Circuit in Maine Yankee, Congress found DOE's obligation to begin disposal of Nuclear Waste by January 31, 1998 "so important" when it promulgated the NWPA that Congress "took the unusual action of specifying that all contracts must contain this explicit requirement." Maine Yankee, 225 F.3d at 1341-42. Thus, the Federal Circuit found, DOE's breach of its obligation to begin disposing of spent nuclear fuel by January 1998 "*involved all the utilities that had signed the contract – the entire nuclear electric industry*." Id. at 1342 (emphasis added); PFF ¶ 7-8. Accordingly, under Indiana Michigan, Northern States, and Maine Yankee, when the Government failed to begin accepting SNF as of January 1998 as required under Article II of Plaintiff's Standard Contract, the Government breached that Contract. In fact, in every spent nuclear fuel case in which the Court of Federal Claims has resolved the question,[2] it has found the Government liable for breach of the Standard Contract.

The Government will likely assert here that Plaintiff's Motion For Summary Judgment On Liability cannot rely on the Federal Circuit's decision in Maine Yankee. In other SNF cases, the Government has argued that Maine Yankee did not constitute *stare decisis* regarding whether DOE breached the Standard Contract as to Plaintiffs who did not submit DCS forms. As

---

2 Northern States Power Co. v. United States, No. 98-484C (Wiese, S.J.); Florida Power & Light Co. v. United States, No. 98-483C (Sypolt, J.); Commonwealth Edison Co. v. United States, No. 98-621C (Hewitt, J.); Yankee Atomic Elec. Co. v. United States, No. 98-126C (Merow, S.J.); Connecticut Yankee Atomic Power Co. v. United States, No. 98-154C (Merow, S.J.); Maine Yankee Atomic Power Co. v. United States, No. 98-474C (Merow, S.J.); Indiana Mich. Power Co. v. United States, No. 98-486C (Hodges, J.); Tenn. Valley Auth. v. United States, No. 01-249C (Lettow, J.); Southern Nuclear Operating Co. v. United States, No. 98-614C (Merow, S.J.); and Wisconsin Elec. Power Co. v. United States, No. 00-697C (Merow, S.J.).

explained in this brief, however, whether or not Plaintiffs submitted a DCS to DOE has no bearing on the Government's liability for breach of contract. Section II, *infra*. Moreover, the Maine Yankee decision clearly stated that the Government breached "all" the Standard Contracts, for "the entire nuclear electric industry." Maine Yankee, 225 F.3d at 1342. The Federal Circuit did not limit that finding to utilities who had submitted DCSs.

The Government's *stare decisis* arguments in other SNF cases also have conveniently ignored the two D.C. Circuit decisions – Northern States and Indiana Michigan – on which Plaintiff also relies to establish the Government's breach. *Plaintiff was a petitioner* in Northern States, as were other utilities who had not submitted DCSs. As explained above, the D.C. Circuit in Northern States reaffirmed its Indiana Michigan holding that DOE had "an unconditional obligation to begin disposing of high-level radioactive waste and spent nuclear fuel … by January 31, 1998." Northern States, 128 F.3d at 755. The D.C. Circuit did not limit its finding to those petitioners who had submitted DCSs. Accordingly, federal appeals court decisions make it clear that DOE breached Plaintiff's Standard Contract.

**B. DOE's Breach Of Contract Resulted In Damages To Plaintiff**

Notwithstanding the Government's likely arguments to the contrary, Plaintiff has been injured as a result of the Government's breach.

The Standard Contracts state that DOE will issue Annual Capacity Reports ("ACR") and annual Acceptance Priority Rankings ("APR"). Standard Contract Arts. IV.B.5(a) and (b); 10 C.F.R. § 961.11. The ACR, to be used "for planning purposes," was to set forth the projected annual receiving capacity for DOE's spent fuel storage facility(ies) and the annual acceptance ranking for the disposal of SNF. Id., Art. IV.B.5(b). The APR, in turn, was to identify and prioritize the SNF to be stored based on the age of the SNF. Id., Art. IV.B.5(a). Specifically, the

APR, with a few exceptions,[3] gives "[t]he oldest fuel or waste . . . the highest priority for acceptance." Id., Art. IV. B.5(a). In this way, the APR establishes a queue of utilities, the order of which was to reflect the "annual receiving capacity for DOE facility(ies)" and the age of SNF currently stored by the various contract holders. Id.

Based on the Government's arguments in other SNF cases, the Government in this case will likely claim that, if DOE had started to accept SNF from Standard Contract holders in 1998 pursuant to DOE's 1995 APR/ACR (which was the last APR/ACR issued by the Government before Plaintiff filed its Complaint), DOE would not have begun accepting SNF from Plaintiff until after January 2008 at the earliest. The Government may claim, therefore, that the first breach that could have caused an injury to Plaintiff would not have occurred until sometime after January 2008, when Plaintiff's SNF would have been given some allocation rights based upon the age of its SNF. Following this line of reasoning, the Government has argued that, under the "oldest fuel first" allocation methodology, DOE has not yet breached its contractual obligation to Plaintiff. Those arguments, however, are not supported by the facts.

As an initial matter, the SNF allocations used by the Government in the 1995 APR/ACR were counterfeit. That allocation was based on the assumption that DOE would accept Standard Contract holders' SNF at a maximum rate of 900 MTU annually, utilizing the capacity of a Monitored Retrievable Storage Facility ("MRS") that was no longer an option by the time DOE issued the 1995 APR/ACR, and which was never constructed. See Indiana Mich. Power Co. v. United States, 57 Fed. Cl. 88, 99 (2003); deposition of David Zabransky, Apr. 17, 2002 ("Zabransky Dep.") at 345, Pl. App. at 3 ("At that point in time in 1994 . . . [t]here was no active

---

3 The Standard Contracts provide that, notwithstanding the age of SNF, priority may be given to SNF removed from a reactor that "has reached the end of its useful life and has been shut down permanently for whatever reason." Id., Art. VI.B.1(b).

program looking for a voluntary MRS"). A 3000 MTU annual acceptance rate, as reflected in the APR/ACR DOE recently issued in 2004 (See 2004 APR/ACR at 3, Table 1, Pl. App. at 144), and in virtually all other DOE documents relating to the nuclear waste program, would have been the appropriate rate necessary, at a minimum, to meet the program's objectives. See Indiana Mich., 57 Fed. Cl. at 99-100 (rejecting the 900 MTU rate, and adopting a 3000 MTU rate based upon "uniform support" for such a finding). Had DOE used the appropriate rate, Plaintiff, in fact, would have had its first deliveries accepted by DOE no later than 2005[4] (in the eighth year of the waste management system's operation). See 2004 APR/ACR at 2 (Tbl. 1) & 3, Pl. App. at 144-45.

Assuming, however, for the sake of argument that Plaintiff's deliveries would not have started until January 2008 at the earliest, Plaintiff nevertheless suffered damages at the time the Complaint was filed in this case. As explained above, the APR/ACR process was designed to establish a queue of utilities, based on the age of each utility's fuel. While Plaintiff did not have a place in the front of the queue, Plaintiff was nonetheless damaged by DOE's failure to begin taking SNF from utilities by January 1998. Once DOE breached its obligation to begin disposing of SNF from the first utility in the queue by January 1998, that breach caused a domino effect on DOE's ability to timely accept delivery of SNF from all other utilities in the queue. Accordingly, any utility whose deliveries would fall sometime after January 1998 necessarily would have their deliveries delayed by the amount of time at least equal to DOE's delay in beginning its overall performance.

---

4 System Energy Resources, Inc., which operates the Grand Gulf Nuclear Station and on whose behalf Plaintiff has brought the instant action, is one of the "Purchaser" utilities listed in the 2004 APR/ACR as holding allocations for SNF acceptance by DOE. 2004 APR/ACR at 3 (Tbl. 2), Pl. App. at 145.

Due to these predictable cascading delays, many utilities situated later in the queue, such as Plaintiff, have already incurred costs resulting from DOE's breach. In Plaintiff's case, these costs include, for example, amounts for the site study and design of a dry spent fuel storage facility at the Grand Gulf nuclear power plant, to allow the plant to accommodate spent nuclear fuel assemblies DOE would otherwise pick up. Thus, Plaintiff has in fact suffered damages resulting from DOE's breach. Moreover, adopting the Government's argument would lead to absurd results. If Plaintiff cannot suffer injury until DOE actually fails to pick up Plaintiff's SNF, DOE could forever avoid Plaintiff's breach claims (and the breach claims of every other utility falling later in the queue) simply by never starting to take deliveries under the Standard Contract.

Plaintiff is *not* arguing that the Government was obligated to begin accepting Plaintiff's own SNF by January 31, 1998. Rather, as discussed above, Plaintiff contends that DOE's breach of its obligation to begin taking deliveries from nuclear utilities as of January 1998 postponed DOE's ability to begin taking deliveries from Plaintiff in a timely manner, resulting in a breach of Plaintiff's Standard Contract that caused Plaintiff to incur damages.

Plaintiff's position has been adopted by this Court in other SNF cases. In Tenn. Valley Auth. v. United States, 60 Fed. Cl. 665, 674 (2004), for example, Judge Lettow noted that Tennessee Valley Authority ("TVA") was not entitled to have its own SNF removed beginning in January 1998, and that the earliest scheduled pickup of TVA's SNF would not have occurred until July of 2002. Nevertheless, Judge Lettow has determined that TVA is entitled at trial to show that the Government's breach of the January 1998 deadline damaged TVA.

As Judge Lettow points out, DOE notified all utilities in 1995 that it would not begin collecting SNF on time. Id. at 674. Thus, "[w]hen it became obvious to TVA that DOE would

not perform under the contract, TVA was justified, indeed obligated, to take steps to minimize its losses in light of DOE's imminent non-performance." Id. As Judge Lettow finds, under the Restatement: "Once a party has reason to know that performance by the other party will not be forthcoming . . . he is expected to take such affirmative steps as are appropriate in the circumstances to avoid loss by making substitute arrangements or otherwise." Id., quoting Restatement (Second) of Contracts § 350 cmt. b; see also Robinson v. United States, 305 F.3d 1330, 1334 (Fed. Cir. 2002) ("Reasonable efforts in the form of affirmative steps are required to mitigate damages.").

Applying these principles, Judge Lettow found that TVA's construction of dry storage facilities for spent nuclear fuel "must be viewed as an affirmative step toward mitigation to avoid loss for the government's partial, ongoing breach." TVA, 60 Fed. Cl. at 674. Judge Lettow, therefore, held that TVA would be permitted to recover costs for dry storage facility construction, to the extent TVA can demonstrate at trial a causal connection between those costs and DOE's breach. Id. at 674-65. Similarly, the Court here should allow Plaintiff the opportunity at trial to show that its damages were due to DOE's breach of the Standard Contract, even though DOE was not obligated to begin accepting Plantiff's own SNF by January 1998.

## II. WHETHER PLAINTIFF SUBMITTED A DELIVERY COMMITMENT SCHEDULE HAS NO BEARING ON THE QUESTION OF DOE'S LIABILITY FOR BREACH OF PLAINTIFF'S STANDARD CONTRACT

In other SNF cases, the Government has set forth its interpretation regarding how the APR/ACR process and the submittal of DCS forms would operate under the Standard Contract. In many of these instances, the Government has alleged that a utility's submission of a DCS was a condition precedent to DOE's obligation to accept SNF from any particular contract holder. According to the Government, if a plaintiff did not submit a DCS, DOE has no liability for breach of that plaintiff's contract.

Such arguments, which the Government is likely to assert again here, are flawed because (1) submission of a DCS form was not a condition precedent to DOE's obligations under the Standard Contract; (2) even if submission of a DCS was a condition precedent, once DOE breached the Standard Contract Plaintiff no longer had an obligation to submit a DCS; (3) submitting a DCS would have been futile (because DOE suspended the DCS process) and, therefore, was not required by law; and (4) the DCS submittal process as implemented by DOE was flawed and inconsistent with the Standard Contract. Moreover, on every occasion in which it addressed the issue, this Court has rejected DOE's attempt to use the APR/ACR and DCS process as a basis for limiting its liability.[5]

### A. Submission Of A DCS Form Was Not A Condition Precedent To DOE's Obligations Under The Standard Contract

Submission of a DCS form was not a condition precedent to DOE's obligation to take SNF from Plaintiff under the Standard Contract. Conditions precedent generally are disfavored by courts and "will not be read into a contract unless required by the plain, unambiguous language." Effects Assocs., Inc. v. Cohen, 908 F.2d 555, 559 n.7 (9th Cir. 1990); accord RT Computer Graphics, Inc. v. United States, 44 Fed. Cl. 747, 756 (1999). Nothing in the Standard Contract suggests that submission of a DCS by Plaintiff is a condition precedent to DOE's obligation to take SNF.

Article V of the Standard Contract addressed "Delivery of SNF and/or HLW." That article states that a utility shall "deliver to DOE and DOE shall, as provided in this contract,

---

5 See, e.g., Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652, 666 (2003) (finding that the ACR and the DCS submissions were for planning purposes and "[t]he parties could not have expected that planning documents would create binding contractual obligations"); Indiana Mich., 57 Fed. Cl. at 98 ("The Contract does not use Annual Capacity Reports and Delivery Commitment Schedules to determine the Acceptance Rate. The Department of Energy did not consider these forms to be binding.").

accept the SNF and/or HLW." Standard Contract, Art. V.; 10 C.F.R. § 961.11. The article does *not* state that DOE's obligation is contingent upon a utility first submitting a DCS. DOE's obligation to take SNF from utilities also is referenced in several other Standard Contract articles, none of which conditions the obligations expressed therein upon the submission of a DCS. See Standard Contract, Arts. II, IV.B. & VI.; 10 C.F.R. § 961.11.

**B. Because Of DOE's Breach, Plaintiff Was Never "Obligated" To Submit A DCS**

Even if submission of a DCS constituted a condition precedent to DOE's performance – which it clearly did not – Plaintiff's "obligation" to submit a DCS never arose.

The Government has frequently argued that Standard Contract holders were to submit DCS forms after DOE issued an APR/ACR. The DCS form was to identify the SNF that the contract holder wished to deliver to DOE "beginning sixty-three months thereafter." Id.; Standard Contract, Art. V.B.1.; 10 C.F.R. § 961.11. However, DOE's 1995 APR/ACR (which was the last APR/ACR DOE issued before Plaintiff filed this lawsuit) contained no allocation to Plaintiff[6] through "Year 10." See 1995 APR/ACR at 6; Pl. App. at 149. Given that, under DOE's calculations, Plaintiff had no delivery allocation until after January 2008, Plaintiff did not need to submit a DCS form until mid-to-late 2002 (i.e., 63 months before delivery) at the earliest. As discussed above, by the mid-1990s at the latest it was clear that DOE would not meet the mandated start date, and by January 1998 DOE in fact had not begun to perform. Because DOE breached the January 1998 deadline, any "obligation" of Plaintiff to submit a DCS form was extinguished long before the date on which such DCS would have been due. See Restatement (Second) of Contracts § 245 (1981) ("Where a party's breach by non-performance

6 Mississippi Power & Light, the predecessor of Entergy Mississippi, Inc., is listed as one of the "Purchasers" in the 1995 APR/ACR.

contributes materially to the non-occurrence of a condition of one of his duties, the non-occurrence is excused."); Northern Heel Corp. v. Compo Indus., Inc., 851 F.2d 456, 461 (1st Cir. 1988).

As the court noted in Northern Heel, a breaching party relinquishes "any right to disclaim the contract because of the victim's failure to satisfy conditions precedent." 851 F.2d at 461-62; see also R.A. Weaver & Assocs. v. Haas & Haynie Corp., 663 F.2d 168, 176 (D.C. Cir. 1980); Omaha Pub. Power Dist. v. Employers' Fire Ins. Co., 327 F.2d 913, 916 (8th Cir. 1964). According to the court in Omaha Public Power, the "theory underlying this rule appears to be based on the equitable maxim that one cannot profit from or escape liability for his own wrongdoing." 327 F.2d at 916. Thus, given DOE's breach, Plaintiff was never obligated to submit DCS forms (even if the submission of such forms was a condition precedent to DOE's performance).

### C. Plaintiff Was Not Required To Submit A DCS Form Because Doing So Would Have Been Futile

Moreover, any effort by Plaintiff to submit a DCS form and seek DOE's approval after 1995 would have been futile. And the law does not require the performance of a futile act. Northern Heel, 851 F.2d at 461 ("[t]he law should not be construed idly to require parties to perform futile acts or to engage in empty rituals"); see also Lorenz v. United States, 296 F.2d 746, 748 (Ct. Cl. 1961) ("It is not to be presumed that the law requires the doing of a futile act."); Morris v. United States, 33 Fed. Cl. 733, 751 n.16 (1995).[7]

---

[7] In Morris, for example, the plaintiff contracted to buy a parcel of land from the Small Business Administration ("SBA"), with closing set for September 6, 1991. Prior to the closing date the SBA advised Plaintiff that it would be unable to close until November 1991. In rejecting the Government's argument that the plaintiff's failure to tender payment in accordance with the contract relieved the government of liability, the court stated:

The Standard Contract required DOE to approve or disapprove DCS forms within three months of their submission. Standard Contract, Art.V.B.1.; 10 C.F.R. § 961.11. Notwithstanding this express contract obligation, DOE, in fact, refused to approve or disapprove DCS forms submitted by utilities in 1996 and thereafter. See Zabransky Dep. at 32 (Apr. 17, 2002) (admitting that DOE had delivery commitment schedules submitted to it that it has neither approved nor disapproved), Pl. App. at 1. Beginning in March 1997, DOE issued letters to nearly all utilities in which DOE stated that it could not approve or disapprove their DCS forms. See DOE Letters, Pl. App. at 114-27. Furthermore, around the same time that DOE began to "hold" DCS forms submitted by utilities, DOE also unilaterally voided a number of DCS forms that had been submitted by utilities in 1996 and had been previously approved. See Voided DCS Forms, Pl. App. at 104-13; Zabransky Dep. at 596, 603-04 (Apr. 19, 2002), Pl. App. at 5-7.

DCS forms submitted after 1995 would not have been approved by DOE.[8] It would have been futile, therefore, for Plaintiff to submit such forms, even if required to do so under DOE's

---

> While technically Mr. Morris' tender of payment was a condition precedent to the Government's obligation to convey, both parties knew and agreed that the government was unable to convey the property at the appointed time. Therefore, tender was not required to put the government in breach as the law will not require the doing of a futile act.

See Morris, 33 Fed. Cl. at 751 n.16 (citations omitted).

[8] Indeed, Mr. David Zabransky – DOE's current Contracting Officer and former Contracting Officer's Technical Representative – admitted that it would be impossible for a utility to obtain an approved DCS at this time:

Q. Because of the suspension of the DCS process it's impossible for a utility to have a DCS approved, correct ?

A. That's correct.

Zabransky Dep. at 353 (Apr. 18, 2002), Pl. App. at 4; see also Zabransky Dep. at 42 (Apr. 17, 2002), Pl. App. at 2 (admitting that, given the Department of Energy's "current guidance" at that time, it was not possible for a utility to get a DCS approved).

process (which Plaintiff was not). For that reason, whether or not Plaintiff submitted DCS forms is irrelevant to the question of the Government's liability for breach.

**D. Other Aspects Of The DCS Submittal Process Were Flawed**

Although the Government has placed considerable emphasis on the role of DCSs in other SNF cases, in reality, the entire DCS process as implemented by DOE was flawed and inconsistent with the Standard Contract.

For example, contrary to Standard Contract requirements, DOE did not allow utilities to submit DCSs identifying "all SNF and or HLW [they wished] to deliver to DOE." Standard Contract Art. V.B.1.; 10 C.F.R. § 961.11. Rather, in the 1991 ACR and in separate instructions to utilities DOE required that utilities submit DCS forms identifying for delivery *only* those SNF allocations reflected in DOE's most recent ACR. DOE Annual Capacity Report December 1991 ("1991 ACR") at 7, Pl. App. at 90; 1991 DOE Instructions for Completing the Appendix C Delivery Commitment Schedule ("1991 DCS Instructions") at ¶ 7(a), Specific Instructions at ¶ 2.7, Pl. App. at 97, 101. Those directions, however, were completely at odds with the procedures set forth in the Standard Contract. As Judge Hodges held in another spent fuel damages case, "the Standard Contract does not permit defendant to limit plaintiff's substantive rights in the guise of 'instructions.'" Indiana Mich., 57 Fed. Cl. at 98. In a different spent fuel damages case, Judge Hewitt commented that DOE's efforts to limit the amount of SNF requested by utilities in their DCSs "may be a breach of DOE's duty of good faith and fair dealing." Commonwealth Edison, 56 Fed. Cl. 652 at 665.

The argument that a SNF plaintiff is not entitled to damages because it did not submit a DCS form also ignores the fact that DOE itself did not consider DCSs to be binding. The ACRs upon which utilities were asked to rely when completing their DCSs expressly stated that the information contained therein "is not contractually binding on either DOE or the Purchasers."

DOE Annual Capacity Report June 1987 at 2, Pl. App. at 16; 1991 ACR at 1-2, Pl. App. at 84-85. Similarly, in the 1991 instructions issued by DOE to utilities regarding the completion of the DCS forms, DOE again explicitly advised utilities that "all DCSs previously approved by DOE may need to be reevaluated by DOE and the Purchasers." 1991 DCS Instructions at ¶ 7(c), Pl. App. at 97. DOE, in fact, *did* reevaluate previously-approved DCS forms.[9] As set forth above, in the first quarter of 1997 DOE unilaterally voided a number of previously-approved DCS submissions. Moreover, this Court has recognized that DOE did not consider the ACR and DCSs binding, stating:

> The Contract contemplated that DOE would use these reports for planning purposes only. The Capacity Reports disclaimed any other purpose, stating that they were not binding on either party.

Indiana Mich., 57 Fed. Cl. at 98 (citation omitted); Commonwealth Edison, 56 Fed. Cl. at 663 (concluding that the ACR and DCS "mechanism does not create a contractually binding obligation for either party").

DOE's faulty implementation of the DCS process, and the explicitly non-binding nature of the DCS submittals, doom any argument that the Government is likely to make here – in the heat of litigation – that the submission of DCS forms determines whether DOE is liable for breach of Plaintiff's Standard Contract.

---

[9] In 2004, DOE issued new instructions (along with the new 2004 APR/ACR) directing utilities to submit DCSs and effectively acknowledging that the entire process conducted in the 1990s is irrelevant. 2004 DCS Instructions, Pl. App. at 132-37. In particular, the 2004 DCS Instructions state, "DOE recognizes that many Purchasers have submitted and DOE has approved DCSs based upon the January 31, 1998 operations date included in the Standard Contract. Purchasers should submit new DCSs based upon the currently planned operation date of 2010." 2004 DCS Instructions ¶ 7(a), Pl. App. at 133.

## III. PLAINTIFF'S CLAIM FOR PARTIAL BREACH SUPPORTS A LIABILITY RULING IN ITS FAVOR

In other SNF cases, the Government has argued that it is not liable for partial breach of the Standard Contract because (1) a plaintiff cannot recover damages that are incurred before a partial breach; and (2) no partial breach has in fact occurred. Specifically, the Government has stated in these other cases that in order to recover pre-breach damages the non-breaching party must establish that the breaching party anticipatorily repudiated the contract. These arguments, if raised here, should be rejected because they have no basis in fact or law.

First, as discussed at length above, the Government *has* committed a partial breach of Plaintiff's Standard Contract. When DOE breached its obligation to begin accepting deliveries from Standard Contract holders no later than January 1998, DOE breached every Standard Contract. That breach included Standard Contracts entered into between DOE and utilities whose deliveries were likely to begin after January 1998. For that reason alone, the court should grant Plaintiff's Motion For Summary Judgment On Liability.

Second, the Government is wrong when it claims that the law does not recognize pre-breach mitigation damages for partial breach of contract. Under well-established legal principles, when one party is faced with a breach, the non-breaching party is required to mitigate further losses. According to the Restatement, "[o]nce a party has reason to know that performance by the other party will not be forthcoming, . . . he is expected to take such affirmative steps as are appropriate in the circumstances to avoid loss by making substitute arrangements or otherwise." Restatement (Second) of Contracts § 350 cmt. b (citation omitted). The Federal Circuit has recognized this principle, finding that "[r]easonable efforts in the form of affirmative steps are required to mitigate damages." Robinson, 305 F.3d at 1334. In addition, it is clear that mitigation costs are a proper component of a non-breaching party's damages. See

Naekel v. U.S. Dep't of Transp., 850 F.2d 682, 685 (Fed. Cir. 1988) (holding that plaintiff is entitled to recover costs incurred to mitigate damages) (citing Dan B. Dobbs, Handbook on the Law of Remedies § 12.6 (1993)). And mitigation costs are recoverable for partial breach. 24 Williston on Contracts § 66.44, at 610-13 (4th ed. 1990) (noting that "a buyer can obtain cover damages even if it has not cancelled the contract and has accepted a partial delivery . . .")[10]; see also Yankee Atomic Elec. Co. v. United States, No. 98-126C, 2004 WL 1535688 at *7 (Fed. Cl. Jun. 28, 2004). ("Damages for partial breach include the costs incurred by the seller in mitigation.").

As described in Section I.A. of this brief, at least as early as 1994 DOE announced that it could not begin disposing of any utility's SNF by January 31, 1998, as required under the Standard Contact. See 59 Fed. Reg. at 27,007-08. By 1995, DOE stated that it did not have a statutory or contractual obligation to accept waste from utilities absent a repository or interim facility. Maine Yankee, 225 F.3d at 1338. Thus, "the utilities had at minimum a good idea that the [January 31, 1998] deadline would not be met in 1994, 1996 at the latest." Yankee Atomic, 2004 WL 1535688 at *6 (footnote omitted). Accordingly, by at least the mid-1990s utilities were justified in incurring "pre-breach" mitigation costs.

In another spent nuclear fuel case, this Court rejected the Government's argument that utilities must allege anticipatory repudiation in order to recover pre-breach mitigation damages. Id. In Yankee Atomic, Judge Merow denied the Government's request to limit plaintiffs' damages to those expenditures that occurred after DOE's breach. According to Judge Merow, the Yankee Atomic plaintiffs could not be required to have waited until DOE failed to begin

---

10 The Federal Circuit has recognized that contract principles governing the sale of goods provide "useful guidance" when evaluating service contracts. Hughes Communications Galaxy, Inc. v. United States, 271 F.3d 1060, 1066 (Fed. Cir. 2001).

performing before deciding what to do with their nuclear waste. Id. Rather, "the utility 'was justified, indeed obligated, to take steps to minimize losses in light of DOE's imminent non-performance.'" Id. (quoting TVA, 60 Fed. Cl. at 674). Given that "[c]ontract damages are 'to place the injured party in as good a position as he or she would have been had the breaching party fully performed,'" Judge Merow allowed the plaintiffs at trial to present evidence of their pre-breach mitigation damages. Yankee Atomic, 2004 WL 1535688 at *7 (quoting Hughes, 271 F.3d at 1066); see also San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557, 1562-63 (Fed. Cir. 1977).[11]

There is simply no basis in the law for finding that a party must establish a total breach through anticipatory repudiation before it can recover pre-breach damages. In fact, the Court of Claims has held just the opposite – finding that pre-breach damages were available for a breach of contract claim where the breach was not total or due to repudiation. See Chain Belt Co. v. United States, 115 F. Supp. 701, 713-14 (Ct. Cl. 1953).

In Chain Belt, the defendant sold property to the plaintiff and the defendant agreed to remove its machinery from the property by December 10, 1946. "By November 1946, it was apparent that under no circumstances could defendant move out all its machinery by December 10, as provided in the contract." Id. at 713. In response to this impending partial breach, plaintiff incurred expenses before December 10, 1946 to move some of defendant's machinery. After December 10, 1946, defendant removed its remaining machinery. In June 1947, plaintiff filed a breach of contract suit which included a claim for its pre-breach moving costs, and other

[11] The Government in other SNF cases has cited Judge Hodges's decision in Indiana Michigan, 60 Fed Cl. 639 (2004) (appeal pending) to support its argument that pre-breach damages are not available to parties alleging partial breach. Plaintiff respectfully submits that Judge Hodges incorrectly interpreted the law, as discussed in this section of Plaintiff's brief.

damages caused by defendant's breach. The defendant argued that the pre-breach mitigation damages were not recoverable. The Court of Claims disagreed and awarded pre-breach mitigation expenses. Id. at 714. According to the Court of Claims:

> Plaintiff was under an obligation to avoid by a reasonable effort any damages which it should have foreseen and, having done so, it may recover as damages the expense incurred in such reasonable effort to avoid harm . . . . It makes no difference whether the breach has already occurred, or where (as was the case of the work done prior to December 10) it is merely impending under the circumstances such that it was not reasonable for plaintiff to expect defendant to prevent the harm.

Id. at 714. Chain Belt, therefore, makes it clear that pre-breach mitigation damages are available for a partial breach of contract claim.[12]

Furthermore, additional "support" cited by the Government in other spent fuel cases for its tortured theory regarding pre-breach damages is unavailing. For instance, the Government has frequently argued that comment b of Restatement (Second) Contracts § 253 supports the Government's position that a non-breaching party must establish anticipatory repudiation in order to recover pre-breach damages. The Restatement comment, however, states that a repudiation can only give rise to a claim for total breach, and that an anticipatory repudiation cannot be predicated on a partial breach; the comment has no bearing on the relevant question of whether mitigation damages are available when partial breach (not repudiation) is alleged. In fact, the comment also states that "a breach by non-performance" – which is what Plaintiff has

---

[12] In Indiana Michigan, Judge Hodges recently distinguished Chain Belt from the spent fuel damages case before him, based on his conclusion that Chain Belt "was a total breach claim in a lost profits case that may have involved repudiation." 60 Fed. Cl. at 649. This is an incorrect characterization of Chain Belt. The primary purpose of the contract at issue in Chain Belt was for the sale of real property. The building *was sold* to the plaintiff for a $1.4 million purchase price (i.e., the contract *was* performed). Chain Belt, 115 F. Supp. at 705. In addition, the defendant eventually fulfilled its obligation to remove the equipment. Id. at 707. Chain Belt, therefore, did not involve total breach or repudiation.

alleged – "can generally give rise to *either a claim for partial breach or to one for total breach*." Restatement (Second) Contracts § 253 cmt. b (emphasis added). Moreover, although a case often cited by the Government, City of Fairfax v. Washington Metro. Area Transit Auth., 582 F.2d 1321 (4th Cir. 1978), states that an anticipatory repudiation cannot give rise to a partial breach claim, that point (whether or not it is true) is irrelevant here. Plaintiff has not alleged that the Government repudiated the Standard Contract; Plaintiff is seeking pre-breach mitigation damages for partial non-performance. And, as established above, such damages are recoverable.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court grant Plaintiff's Motion For Summary Judgment On Liability.

Dated: October 29, 2004

Respectfully submitted,

s/ Alex D. Tomaszczuk by s/ Jack Y. Chu

Alex D. Tomaszczuk
**SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, VA 22102
(703) 770-7940
(703) 770-7901 (fax)

Counsel of Record for Plaintiff
System Fuels, Inc., on its own behalf
and as agent for System Energy Resources, Inc.
and South Mississippi Electric Power Association

Of Counsel:

Jay E. Silberg
Devon E. Hewitt
Michael G. Lepre
Daniel S. Herzfeld
Jack Y. Chu
**SHAW PITTMAN LLP**
2300 N Street, N.W.
Washington, D.C. 20037
(202) 663-8000
(202) 663-8007 (fax)