**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **SYSTEM FUELS, INC.,** on its own behalf and as agent for SYSTEM ENERGY RESOURCES, INC. and SOUTH MISSISSIPPI ELECTRIC POWER ASSOCIATION,<br><br>Plaintiff,<br><br>v.<br><br>**THE UNITED STATES,**<br><br>Defendant. | No. 03-2624C<br>(Judge Braden) |

**APPENDIX TO PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON LIABILITY**

Alex D. Tomaszczuk
**SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, Virginia 22102
(703) 770-7940
(703) 770-7901 (fax)
Counsel of Record for Plaintiff
System Fuels, Inc., on its own behalf
and as agent for System Energy Resources, Inc.
and South Mississippi Electric Power Association

Of Counsel:

Jay E. Silberg
Devon E. Hewitt
Michael G. Lepre
Daniel S. Herzfeld
Jack Y. Chu
**SHAW PITTMAN LLP**
2300 N Street, N.W.
Washington, D.C. 20037
(202) 663-8000
(202) 663-8007 (fax)

October 29, 2004

# INDEX TO APPENDIX

Description | Page

Deposition of David Zabransky, Excerpts ........ 1

1987 Annual Capacity Report (June 1987)(Appendices omitted) ........ 8

1988 Annual Capacity Report (June 1988)(Appendices omitted) ........ 30

1990 Annual Capacity Report (December 1990)(Appendices omitted) ........ 53

1991 Annual Capacity Report (December 1991)(Appendices omitted) ........ 78

1991 Instructions for Completing the Appendix C Delivery Commitment Schedule
General Instructions ........ 96
Specific Instructions ........ 100

Voided DCS Forms ........ 104

DOE Letters Stating DCS Forms Could Not be Approved or Disapproved ........ 114

Defendant's Response to Utility Plaintiffs' Request for Admissions (April 18, 2002) ........ 128

2004 Instructions for Completing the Appendix C Delivery Commitment Schedule ........ 132

Excerpt from GAO, Nuclear Waste: Operation of Monitored Retrievable Storage Facility is Unlikely by 1998 (Sept. 1991) ........ 138

2004 Acceptance Priority Ranking & Annual Capacity Report (July 2004)(Appendices omitted) ........ 140

Excerpt From 1995 Acceptance Priority Ranking & Annual Capacity Report (March 1995) ........ 148

Document #: 1303767 v.1

you see that?
A Yes.
Q Is that the contract or the form of contract that you reviewed in preparation for your deposition?
A This is the form of the contract. I may have reviewed a later version of this. I believe a '91 or a '92 version of this that was in the Federal Register that has modifications.
Q Okay. What modifications were done in 1991, can you tell me off the top of your head?
A In general there were modifications related to electricity generated and sold and allowances for credits or reductions due to energy losses not delivered to the ultimate consumer as a result of the litigation.
Q All those deal with how the fee is calculated? Is that correct?
A That's correct.
Q Are there any other differences that you know of between the standard contract that was promulgated in 1983 and the one that was contained or



the one you reviewed?
A Not that I recollect.
Q Have you seen this version of the contract before?
A Yes, I have.
Q What is the Department of Energy's obligation under that contract with respect to the quantity and rate of spent fuel acceptance?
MR. CRAWFORD: Objection. Calls for a legal conclusion.
A There's no rate of acceptance established in the contract.
Q Are you saying the Department of Energy does not have any obligation with respect to the rate of spent nuclear fuel acceptance?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
A I'm saying that the contract does not contain the rate.
Q And my question is what is the department's obligation under the contract with respect to the quantity of spent fuel it would accept in a particular



year from the utilities?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
A As a result of the contract the Department of Energy's obligation is as it appears on the approved delivery commitment schedules.
Q If a utility does not have an approved delivery commitment schedule, is it your testimony then that the DOE does not have any obligation to pick up spent fuel from that utility?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
A With respect -- if there's not a delivery commitment schedule approved for a given year, there's no obligation for that given year.
Q How does a utility go about getting a delivery commitment schedule approved?
A The contract stipulates how the utility does that.
Q When is the last time the Department of Energy approved a delivery commitment schedule?
A I don't recollect the exact date.



Q Has it had delivery commitment schedules submitted to it that it has neither approved or disapproved?
A That's correct.
Q Why is that?
MR. CRAWFORD: Objection. Vague.
Q Are you responsible for deciding whether a delivery commitment schedule gets approved or not?
A I'm responsible for reviewing them and making a technical recommendation to the contracting officer.
Q Do you know why delivery commitment schedules that have been submitted have not been approved or disapproved?
MR. CRAWFORD: Objection. Vague.
MR. BLANTON: I was asking if he knew.
MR. CRAWFORD: I know. Which DCS are you talking about?
MR. BLANTON: Any DCS.
MR. CRAWFORD: Well, objection. Vague.
A Repeat the question you asked me?
Q Do you know why any DCS that has been

41

Q Do you recall seeing that letter?
A **I don't recall the specific letter.**
Q Do you recall seeing letters like that?
A **I've seen -- yes, I have seen letters like this.**
Q Is that a standard form letter that the Department of Energy sends in response to DCS submittals?
MR. CRAWFORD: Well, objection. Vague.
Q Is Exhibit 3 to your deposition a standard form letter that the Department of Energy sends in response to DCS submittals?
MR. CRAWFORD: Objection. Vague.
A **A letter of this type has been sent in response to most of the submittals since we stopped processing them.**
Q Okay. And that letter indicates that the DCSs submitted by Southern Nuclear cannot be approved or that the department is unable to approve them. Is that correct?
MR. CRAWFORD: Objection. Best evidence.
A **The letter says what it says.**

42

Q I'm sorry. It does not say "unable." It says "Not able at this time to approve your DCS submittal." Is that correct?
A **That's what the letter says.**
Q Given the Department of Energy's current practice, is there any way for a utility to get a DCS approved at the current time?
A **Under the current guidance, no.**
Q And that guidance has been the same since the decision in 1996 that the Department of Energy had an unconditional obligation to accept spent fuel in 1998. Is that correct?
A **That is my recollection.**
Q Now, let me get you to look back at number two again. And referring you to DCS identification of the document with that DCS identification number that ends in 901, how does the utility know how many metric tons of uranium to put in line 2.5?
MR. CRAWFORD: Objection to the extent it calls for speculation.
Q If you know.
A **I don't know how Southern Nuclear knows.**

43

Q Well, let me rephrase my question then. Has the Department of Energy given instructions to utilities as to how they should complete these delivery commitment schedule forms?
A **Yes, it has.**
Q And what are those instructions with respect to the quantities of spent nuclear fuel that are included on a particular delivery commitment schedule?
MR. CRAWFORD: Objection. Best evidence.
A **I would have to review the instructions to find out exactly what it says.**
**(Deposition Exhibit Zabransky 4 was marked for identification and was attached to the transcript.)**
Q All right, sir, I'm going to hand you what's been marked as Exhibit 4 to your deposition, which is titled U.S. Department of Energy Instructions for Completing the Appendix C Delivery Commitment Schedule General Instructions. There's one for your lawyer.
A **Okay.**

44

Q All right, sir. Do those instructions indicate how a utility is to complete the delivery commitment schedule?
A **Yes.**
Q Do they indicate how the utility is to quantify on the delivery commitment schedule the amount of spent nuclear fuel that's to be picked up in a particular year?
A **Yes.**
Q What do they say about that?
A **They say in instruction 7A, When submitting DCSs purchasers should base their DCSs on allocations contained in the latest annual capacity report, ACR.**
Q All right. What is the latest annual capacity report? When was the latest annual capacity report issued?
A **I believe it was issued in March of '95.**
Q Okay.
(Deposition Exhibit Zabransky 5 was marked for identification and was attached to the transcript.)
Q Let me show you what I've marked as Exhibit

343

**saw.**
Q Do you know whether the '95 ACR that the Department of Energy issued assumed that the existing storage capacity restrictions imposed by the Nuclear Waste Policy Act of 1987 were still in effect even though the program plan did not include a monitored retrievable storage facility?
**A It assumed that the limitations were still in effect. I don't know for a fact that the program did not include a monitored retrievable storage facility.**
Q How did you pick the rates that went into the '95 ACR?
MR. OLSEN: Objection, foundation.
**A They were the same rates that were in the previous ACR.**
Q Okay. Was there any analysis done of whether the rates should change or stay the same from the previous ACR?
**A I don't believe so.**
Q Was there any discussion about whether the rates should go up or down?

344

**A I don't recollect that there was.**
Q Just cut and paste? Is that how you did the '95?
**A '95 was pretty much a reissue of the previous document from the ACR perspective. The APR changed.**
Q There's a sentence circled on this page that says "Due to the uncertainty associated with the date of commencement of operation of the waste management system, the annual nominal waste acceptance rates are presented by years of operation of the system rather than by specific calendar years." Do you see that?
**A I see that.**
Q And somebody has written out to the margin "move to page three." Do you see that?
**A Okay.**
Q And if you look at page three of the document it looks like there's an arrow for an insert, that says "insert page four." Do you see that?
**A I see that.**
Q What were the uncertainties associated with

345

the date of commencement of the operation of the waste management system at this point in time?
**A At that point in time in 1994 I believe the negotiator's office had been terminated. There was no active program looking for a voluntary MRS, and it became less certain that there was -- there was great uncertainty with respect to the '98 date.**
Q More certain that there would not be an MRS by 1998?
**A That's a fair statement.**
Q Is that a fair statement?
**A That's a fair statement.**
Q Do you recall any discussions within the Department of Energy about whether or not dates should be eliminated from the acceptance allocations in the '95 ACR?
**A Yes, I recall that discussion.**
Q Who was that with?
**A With Mr. Brownstein and Ms. Slater.**
Q And yourself?
**A And myself.**
Q Can you tell me who said what?

346

**A I believe there was -- Ms. Slater advocated removing dates, to my recollection, going back to how the ACRs used to be.**
Q Had there ever been one without dates on the years of allocations?
**A I believe so. Let me check. Like this one here which says, Year one, Year two, Year three.**
Q Let me see.
MR. OLSEN: Let the record reflect that Mr. Zabransky has pointed to exhibit number --
MR. BLANTON: Zabransky 36, which is the December 1991 ACR.
**A And the 1990 ACR also has year one, year two, year three.**
Q Look at page five of Zabransky 36.
**A Okay.**
Q There's a table there that has the rates for each year starting in 1998. Is that correct?
**A There is, yes.**
Q And we can go through this process, but do you remember that all the other ACRs have a similar table?

**sometime in the mid-nineties.**
MR. OLSEN: Stan, I think Dave needs a short little break. Would this be a good time?
MR. BLANTON: Sure.
(There is a recess from the record.)
Q If you would look back at page four of Exhibit 37. Do you have that in front of you?
**A Yes, I do.**
Q Do you recognize whose handwriting that is at the bottom of the page that's marked out, has a sentence that says "the waste management system" and then I can't -- I'm not sure what the rest -- envisions --
**A I don't.**
Q Any idea who wrote that?
**A No, I don't. It's like the rest of the -- appears to be the same writing as whoever wrote the rest of it, and I don't know who that is or where this document came from.**
Q Okay. Referring back to -- it's easier for us to both have the same language -- Exhibit 5, do the uncertainties associated with the date of commencement



of operation of the waste management system have anything to do with DOE's decision to stop processing DCS submittals?
MR. OLSEN: Objection. Vague.
**A I don't think that this statement here and this discussion here had anything to do with that decision.**
Q Okay. So the fact that you don't know when you could start to accept waste had anything to do with the DCS process being suspended?
**A I think the decision to suspend the process had to do with the determination that there was a commitment and that there was an uncertainty as to date, but it's not tied to this document at this time.**
Q I'm not asking if it's tied to the document. I'm asking if just the uncertainties associated with when a facility will be available is the reason you determined to suspend the DCS process?
MR. OLSEN: Objection. Vague.
**A Again, as I answered yesterday, there was a discussion; we were advised to suspend the DCS process for a number of reasons by counsel.**



Q Well, as -- did I interrupt your answer?
**A No.**
Q And as I understand it, you're taking the position that your liability to the utilities is limited by the suspension of the DCS process. Isn't it a fact?
MR. OLSEN: Objection, assumes facts not in evidence, and objection to the extent it calls for a legal conclusion.
**A I'm not -- I don't know what position you're referring to.**
Q You told me yesterday the first hour of your deposition that unless a utility has an approved DCS that the department has no obligation to that utility.
**A I did say that, yes.**
Q Because of the suspension of the DCS process it's impossible for a utility to have a DCS approved, correct?
**A That's correct.**
Q Why has the department suspended the DCS process?



MR. OLSEN: Objection. I believe this was asked and answered.
MR. BLANTON: No, he said on advice of counsel, and I think we're entitled to know why the DCS process has been suspended.
**A I'll answer the question. I think the belief was that approving DCSs committed the department to that obligation, and the decision was to suspend that commitment.**
Q What was the problem with committing the department to that obligation?
MR. OLSEN: Objection to the extent it calls for a legal conclusion.
**A Again, counsel advised us it would be appropriate, it would be the correct move to stop processing the DCSs.**
Q So you wouldn't have that obligation?
MR. OLSEN: I want to direct the witness not to answer to the extent that you're going to have to reveal attorney/client privileged conversations. Also calls for speculation.
MR. BLANTON: I think you put whatever the

363

Q Did the Department of Energy at any point starting with the time this document was published, March 1995, referring to Zabransky Exhibit 5, starting in March 1995 did the Department of Energy ever use the acceptance rates published in that document for its own planning purposes, for the purposes of planning for the operation of the waste management system?
**A The Department of Energy never used these rates for the planning for the operation of a repository facility.**
Q I'm not asking -- not my question.
**A Okay. Repeat the question.**
Q Did you ever use these rates beginning in March of 1995 for the planning for the federal waste management system?
**A No, we did not.**
Q Let me show you Exhibit 38.
(Deposition Exhibit Zabransky 38 was marked for identification and was attached to the transcript.)
Q Which is unsigned, but it has "official

364

file copy" on the second page and has your name down at the bottom of the second page. Do you know what this document is?
**A This is a draft of a transmittal letter that would have gone from Sam Rousso to the director, who at that time was Dan Dreyfus, recommending approval for the publication of the '95 ACR. I believe that's what it is. The '94 -- '94 ACR, published in March '95.**
Q Is that document the one that's marked Exhibit 5?
**A That's what this document refers to, yes.**
Q And all those initials to the right-hand side indicate various approvals of the document?
**A Right, to that point in time.**
Q Okay. Why did the Department of Energy publish a document to be used as the basis for delivery commitment schedules using rates which it was not using itself for the purpose of planning the system?
**A The department carried over the rates it had in the previous ACR and did not change them.**

365

Q Was the department trying to minimize the commitments it had to utilities who were parties to the standard contracts in using this document, in using Exhibit 5?
**A I believe that that was a consideration.**
Q Were there any other considerations that you can think of for using those rates?
**A There was no other basis to develop any other rates at that point in time.**
**(Deposition Exhibit Zabransky 39 was marked for identification and was attached to the transcript.)**
Q We have marked as Exhibit 39 to your deposition, Mr. Zabransky, a document entitled Analysis of a Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program. Are you familiar with that document?
**A I've seen this document. I'm not familiar with it, but I know what it is.**
Q Did you participate in any way, shape or form in either providing any of the information for the document or helping draft it?

366

**A No, I don't believe I did.**
Q Do you use it in the course of your duties in the Department of Energy?
**A I don't use this document in the course of my duties, no.**
Q Let me refer you to page eight of Exhibit 39, Mr. Zabransky.
**A Okay.**
Q You found it before I did.
**A I found it.**
Q Do you know where those receipt and placement rates came from?
**A I don't know specifically where they came from, no.**
Q As far as you know, were those the rates that the DOE was using for planning purposes as of September of 1995?
MR. OLSEN: Objection, vague.
Q Do you understand my question, Mr. Zabransky?
**A Those were the rates that were used to cost out a repository and its operations that were used in**

596

Q And why did you void this DCS which you approved one month previously?
MS. SULLIVAN: Objection to the extent it calls for attorney/client communication. I direct the witness not to answer as to any communications he had with counsel. Otherwise he may answer the question.
A **I was advised to void it.**
MS. SULLIVAN: You can testify as to by whom.
A **By counsel.**
Q At the Department of Energy?
A **Yes.**
Q Did you agree with that advice?
MS. SULLIVAN: Objection. Foundation.
A **I take my lawyer's advice.**
Q Prudent perhaps but doesn't quite answer my question. Did you agree with it?
MS. SULLIVAN: Same objection.
A **It doesn't matter what I thought about whether or not what the advice was. I followed the advice.**
Q Did you disagree with it?

597

MS. SULLIVAN: Objection. Foundation.
A **I wouldn't have done it myself.**
Q And why do you say that?
A **Because I wouldn't --**
MS. SULLIVAN: Objection. Vague.
A **I wouldn't have done it myself.**
Q Is there some reason for that testimony?
MS. SULLIVAN: Objection, vague.
A **I would not have done it. That is the answer.**
Q Did it bother you that you were instructed to void something that you previously approved?
MS. SULLIVAN: Objection. Foundation.
A **Didn't bother more than anything else I've had to do a lot of times in my life, no.**
MR. TOMASZCZUK: Let's mark as Zabransky 59 -- you want to take a break or want to keep going?
THE WITNESS: How long you going to be, 15 minutes?
(There is a recess from the record.)
Q Mr. Zabransky, can you detail for me the process by which a DCS at or about this time, 1995

598

let's say, was reviewed within DOE?
A **From memory I think at that point in time Ms. Slater had established a process where they were sent to the M&O for initial review. They would screen them against insuring the numbers were correct and then sent back to DOE with a recommendation to Ms. Slater and then they would be sent -- she would act upon the recommendation perhaps and then send it on through -- with a letter through counsel eventually through to Beth Tomasoni.**
Q And was that the same process that you followed when you served as COTR for purposes of reviewing DCS forms?
A **I think that's generally the same process. I think eventually we eliminated M&O from the review because it wasn't necessary to have them check numbers.**
Q Okay. Going back to Exhibit 58 for just a moment, which was the OPPD packet, can you direct your attention for a moment to page 414.
A **Yes, sir.**
Q Which is near the back, four pages from the

599

back I think.
A **Okay.**
Q And this appears to a letter from Ms. Tomasoni to Mr. Kloock dated March 13th, 1997.
A **That's correct.**
Q And the second paragraph is advising OPPD, is it not, that the department is not able to approve its DCS submittal?
A **That's what it says, yes.**
Q And the department is advising OPPD in this letter that it's waiving until further notice the contract requirement that it provide a revised schedule, correct?
A **That's correct.**
Q Did you have a role to play in the preparation of this letter?
A **I think -- yes, at some point I was involved in a draft of a letter, but it went through an extensive review process.**
Q Did you agree at the time that the department was not able to approve OPPD's DCS submittal?

**A That was a true statement.**
Q It's true that that was the department's position at the time, correct?
**A That's true.**
Q Was it your personal view as well?
**A From a technical perspective, I could have approved this submittal.**
Q But were instructed not to?
**A That's correct.**
MR. TOMASZCZUK: Can we mark as Zabransky Number 59 a set of DCS forms and related correspondence to and from GPU Nuclear.
(Deposition Exhibit Zabransky 59 was marked for identification and was attached to the transcript.)
Q The first question I have for you, Mr. Zabransky, is the first page of this Exhibit 59 appears to be a letter from John Vincent at GPU to the Department of Energy contracting officer, correct?
**A It is, yes.**
Q And is this the same Mr. Vincent that you alluded to in your earlier testimony?



**A That's correct.**
Q The second page of this exhibit appears to reflect a letter back to Mr. Vincent approving a DCS that had been previously submitted. Is that a fair statement?
**A That's correct.**
Q Okay. If I could direct your attention to Bates page 361 in this exhibit, is this your signature in Section 4.0 at the bottom of this page?
**A Yes.**
Q All right. And on this page there is typed-in language which appears similar to what we saw in the previous exhibit. Do you see that?
**A I see that.**
Q With the double asterisk.
**A I see that.**
Q And it appears to state "The proposed delivery date is dependent upon the existence of an operational repository or an inter" -- and then that word appears to be cut off. Do you know what word is?
**A I believe it's interim.**
Q Thank you. -- "storage facility



constructed under the act." That's what the notation says, right?
**A That's correct.**
Q And do you know who put that notation on the document?
**A I don't know precisely who put that on, no.**
Q Is it your understanding today that that was placed on here at the direction of counsel?
MS. SULLIVAN: Objection. Direct the witness not to answer as to communications with counsel. But he may answer the question otherwise.
**A Yes.**
Q And a similar notation appears on the following page of the exhibit, Bates page 362.
**A Yes.**
Q And turning back to page 364 of this exhibit.
**A Yes.**
Q And is that your signature that appears at the bottom under Section 4.0?
**A Yes, it is.**
Q And it appears here that you approved the



DCS on December 30, 1996?
**A That's what it says, yes.**
Q Does the word "void" appear above the COTR title on this document?
**A Yes, it does.**
Q And is that your handwriting?
**A Yes, it is.**
Q And does it appear to reflect that you voided your approval on March 27, 1997?
**A I think it's February 27th but.**
Q Oh, I'm sorry. Thank you.
**A I don't write very well.**
Q I appreciate that. So you believe it was February 27, 1997?
**A I believe so.**
Q And why did you void this DCS that you previously approved?
MS. SULLIVAN: Objection to the extent it calls for attorney/client communication. I direct the witness not to answer as to any communications with counsel. Otherwise you may answer the question.
**A I was advised to so void the documents at**

604

**that point.**
Q And was that advice given to you by counsel?
**A Yes.**
Q Was that advice given to you orally or in writing?
MS. SULLIVAN: Objection to the extent it calls for attorney/client communication.
**A I don't recollect any written communications.**
Q Did you ask for advice or was it given to you?
MS. SULLIVAN: Objection. Calls for attorney -- to the extent it calls for attorney/client communication I direct the witness not to answer.
**A I don't recollect how this came about, the approval of the documents that were going through the process.**
Q Sitting here today do you recall at any time soliciting legal advice with respect to your approval or disapproval of this DCS?
MS. SULLIVAN: Objection. Calls for

605

attorney/client communications. I direct the witness not to answer as to communications with counsel.
**A All the correspondence like this is run through counsel.**
Q Do I understand that in this circumstance that you approved this and then the document would have physically left your office?
**A Documents like this were prepared in packages, the packages went through counsel's office. After counsel they went to the contracting officer's office.**
Q And what I'm trying to find out is a step earlier in the process you got this packet and presumably approved it on or about December 30, 1996. Is that right? I'm at page 364.
**A Yes.**
Q And what happened to the package after you approved it on or about December 30, 1996?
**A It would have gone through what the approval process was, through counsel and then it would have come back to me and gone back -- based upon counsel's comments I would have acted and brought it**

606

**back to Ms. Tomasoni subsequent to counsel's approval.**
Q At or about the time you approved this particular DCS on December 30, 1996, do you recall whether at the time you approved it you made any request for legal advice from counsel for the Department of Energy?
MS. SULLIVAN: Objection to the extent it calls for attorney/client communication. I would direct the witness not to answer regarding discussions with counsel.
**A I don't recall any specific request beyond the normal approval process.**
Q Have you finished your answer?
**A Yes.**
MR. TOMASZCZUK: I would like marked as Zabransky 60 a package of DCS forms from New York Power Authority and related correspondence.
(Deposition Exhibit Zabransky 60 was marked for identification and was attached to the transcript.)
Q Do you recognize any of these documents, Mr. Zabransky?

607

**A No. Not until we get back to this dated in 1995.**
Q Okay. It's fair to say that some of these predated your arrival at DOE, right?
**A Yes, they did.**
Q With respect to those that predated your arrival at DOE, do you have any recollection of having seen them before today?
**A Just when I was going through the files.**
Q That's something you were doing within the last few months?
**A Last -- I don't know how many months ago it was but the last, last several months, whatever it was.**
Q All right. Okay. I direct your attention to Bates page 442, which appears to be a letter from Ms. Tomasoni to Mr. Taylor dated January 25th, 1996.
**A Uh-huh.**
Q Do you have that?
**A I have that.**
Q And in the first paragraph, the second sentence, Ms. Tomasoni is writing Mr. Taylor and

DOE/RW-0146

*Office of Civilian Radioactive Waste Management*

# Annual Capacity Report

***June 1987***

***U.S. Department of Energy***
*Office of Civilian Radioactive Waste Management*

This report has been reproduced directly from the best available copy.

Available from the National Technical Information Service, U.S. Department of Commerce, Springfield, Virginia 22161.

Price: Printed Copy
Microfiche A01

Codes are used for pricing all publications. The code is determined by the number of pages in the publication. Information pertaining to the pricing codes can be found in the current issues of the following publications, which are generally available in most libraries: *Energy Research Abstracts, (ERA); Government Reports Announcements* and Index (*GRA* and I); *Scientific and Technical Abstract Reports (STAR);* and publication, NTIS-PR-360 available from (NTIS) at the above address.

DOE/RW-0146

Office of Civilian Radioactive Waste Management

# Annual Capacity Report

*June 1987*

U.S. Department of Energy
Office of Civilian Radioactive Waste Management
Washington, D.C. 20585

**Department of Energy**
Washington, DC 20585

This Annual Capacity Report is the first in a series to be published by the Department of Energy. The report, required by the Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste, provides, for planning purposes, the projected annual receiving capacity and annual acceptance rankings for the first 10 years of waste management system operations.

The projections in this initial report are based on current plans and best available information; they are not contractually binding. Nevertheless, this first report represents a significant milestone -- it starts the essential process of communicating to owners and generators of spent nuclear fuel and high-level radioactive waste how the Department intends to discharge its responsibilities under the Contract. Even more importantly, it activates a mechanism through which Contract holders can express their views on how the waste management system can achieve maximum efficiency, while assuring equity among the parties. In a full-cost recovery program such as that mandated by the Nuclear Waste Policy Act of 1982, this represents no small challenge.

As the waste management system evolves, we will need to cooperate closely to ensure that the decisions that are made serve us well in the years ahead. I am confident that, together, we will succeed.

Ben C. Rusche
Ben C. Rusche, Director
Office of Civilian Radioactive
Waste Management

CONTENTS

SUMMARY.................................................... v

1.0 INTRODUCTION.......................................... 1
 1.1 STANDARD DISPOSAL CONTRACT REQUIREMENT FOR AN ANNUAL CAPACITY REPORT.......................... 1
 1.2 THE ROLE OF THE ANNUAL CAPACITY REPORT............ 2
  1.2.1 Expanded Scope of the Annual Capacity Report.................................... 2
  1.2.2 The Annual Capacity Report Approach........ 3
  1.2.3 Submittal of Comments on the Annual Capacity Report........................... 4

2.0 PROJECTED WASTE ACCEPTANCE CAPACITY.................. 7

3.0 ALLOCATION OF THE WASTE MANAGEMENT SYSTEM ANNUAL ACCEPTANCE CAPACITY.................................. 9
 3.1 PROCEDURE FOR ALLOCATION OF ANNUAL ACCEPTANCE CAPACITY............................................. 9
 3.2 BASIS FOR ACCEPTANCE CAPACITY AVAILABLE FOR ALLOCATION........................................... 10

4.0 ISSUES WHICH MAY AFFECT ANNUAL ACCEPTANCE CAPACITY, ALLOCATION OF CAPACITY, DELIVERY SCHEDULES, AND ACCEPTANCE CRITERIA.................................. 13
 4.1 ANNUAL ACCEPTANCE CAPACITY......................... 13
 4.2 ALLOCATION OF CAPACITY............................. 14
 4.3 DELIVERY SCHEDULES................................. 14
 4.4 ACCEPTANCE CRITERIA................................ 15

REFERENCES.................................................. 17

APPENDIX A - ANNUAL ACCEPTANCE RANKING OF DOE CONTRACTS FOR THE DISPOSAL OF SPENT NUCLEAR FUEL.............A.1

APPENDIX B - LISTING OF SPENT NUCLEAR FUEL BY DATE OF DISCHARGE...................................B.1

SUMMARY

The Standard Contract for Disposal of Spent Nuclear Fuel (SNF) and/or High-Level Radioactive Waste (HLW) requires the U.S. Department of Energy (DOE) to issue, by July 1, 1987, an Annual Capacity Report (ACR) for planning purposes. The ACR will set forth the projected annual receiving capacity of the Waste Management System (WMS) for 10 years following the expected commencement of facility operation, and the annual acceptance ranking of SNF and/or HLW to be received by the WMS. This report is the first in the series of ACRs to be published by DOE.

The system configuration used as the basis for this report is defined in the Mission Plan Amendment. It includes a Monitored Retrievable Storage (MRS) facility as an integral system component. DOE's proposal for such a facility, as required by Section 141 of the Nuclear Waste Policy Act, was submitted to Congress on March 31, 1987. The illustrative waste acceptance schedule for this configuration reflects the amended first repository schedule and the proposed schedule for the MRS facility. The schedule presumes Congressional approval of DOE's MRS proposal. During the first 10 years of WMS operation, the total quantity of spent fuel that could be accepted is 18,600 metric tons uranium (MTU). By starting WMS operations in 1998, the MRS facility could accept 6000 MTU of spent fuel by the time repository operations are projected to begin in 2003. The allocation of "acceptance rights" is currently based on the projected annual capacity of the WMS to receive SNF and the age of permanently discharged spent fuel as determined from 1985 data provided to the Energy Information Administration by the Purchasers of waste disposal services on the 1986 Nuclear Fuel Data Form, RW-859. The allocations are based on the oldest fuel having the highest priority.

Section 1.0 provides a discussion of the requirement for the ACR and the role the ACR will play in DOE's interaction with the Purchasers in implementing the provisions of the Standard Disposal Contract. The currently projected annual acceptance capacity to be allocated is discussed and presented in Section 2.0. Section 3.0 discusses the procedure and basis for allocation of this capacity (acceptance rights). Allocation will be based on the chronological listing of spent fuel assemblies

and equivalent MTU, as summarized in Appendix A and detailed in Appendix B. Some of the contingencies which may have an impact on Contract implementation and system operation considerations which could affect the projected annual capacity and its allocation are identified in Section 4.0.

## 1.0 INTRODUCTION

The Nuclear Waste Policy Act of 1982[1] (the Act) assigns responsibility to the Federal Government to provide for the permanent disposal of spent nuclear fuel (SNF) and high-level radioactive waste (HLW). The Director of the Department of Energy's (DOE) Office of Civilian Radioactive Waste Management (OCRWM) is responsible for carrying out the functions of the Secretary of Energy under the Act. Section 302(a) of the Act authorizes the Secretary to enter into contracts* for disposal services with owners or generators** of commercial SNF and/or HLW. The Standard Disposal Contract[2] represents the sole contractual mechanism for DOE disposal of SNF or HLW. It establishes the requirements and operational responsibilities of the signatories in the areas of administrative matters, fees and terms of payment for disposal services, waste acceptance criteria, and waste acceptance procedures. The Standard Disposal Contract provides for the acquisition of title to the SNF and HLW by DOE, its transportation and subsequent disposal. Article II of the Contract indicates these services are scheduled to begin "...after commencement of facility operations, not later than January 31, 1998...."

### 1.1 STANDARD DISPOSAL CONTRACT REQUIREMENT FOR AN ANNUAL CAPACITY REPORT

Under the terms of the Standard Disposal Contract [Article IV.B.5(b)], an Annual Capacity Report (ACR) will be issued by DOE, beginning not later than July 1, 1987, setting forth "...the projected annual receiving capacity for the DOE facility(ies) and

---

* Individual contracts are based upon the Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste (10 CFR Part 961.11) which will be referred to as the "Standard Disposal Contract" or "Contract" for subsequent discussion in this report.

** Owners and generators of SNF and HLW who have entered into agreements with DOE for purchase of disposal services are referred to as "Purchasers."

the annual acceptance ranking relating to DOE contracts for the disposal of SNF and/or HLW including, to the extent available, capacity information for ten (10) years following the projected commencement of operation of the initial DOE facility." As specified in the Contract, the ACR is for planning purposes only and, thus, is not contractually binding on either DOE or the Purchasers. The ACR will be published each year through 1990.

Beginning in 1991, the ACR acceptance ranking will be converted into an Annual Priority Ranking for receipt of SNF/HLW. In 1992, based on this priority ranking, the Purchasers will submit to DOE for approval, Delivery Commitment Schedules identifying the SNF/HLW that Purchasers propose to deliver to the DOE waste management system (WMS). Once approved, these schedules will become the basis for Final Delivery Schedules to be submitted by the Purchasers not less than 12 months before the date of DOE's anticipated acceptance of title to the SNF/HLW and subsequent transport to a DOE facility.

## 1.2 THE ROLE OF THE ANNUAL CAPACITY REPORT

DOE recognizes that the Standard Disposal Contract may not provide sufficient detail and guidance to enable DOE and the Purchasers to carry out all of their contractual responsibilities and/or for the Purchasers to make certain spent fuel management decisions. Additional information, beyond that required by the Contract, could facilitate long-range waste management planning. Consequently, future ACRs will be expanded to include documentation of the resolution of Contract-related issues and WMS decisions which might affect the Purchasers' planning and operational decisions.

### 1.2.1 Expanded Scope of The Annual Capacity Report

This report identifies several topics that go beyond the scope of the ACR reporting requirements. Additional Contract guidance may be needed to fully address such issues as the criteria and procedures for acceptance of consolidated SNF, fuel storage containers, nonfuel-bearing components, or dual-purpose casks. DOE also expects to develop and report on procedures for submittal and criteria for approval of Delivery Commitment

Schedules, exchanges of approved Delivery Commitment Schedules, Final Delivery Schedules, and criteria for evaluation of requests for emergency deliveries and changes to the acceptance priority.

In addition, DOE will identify issues and system considerations which could affect annual acceptance capacity. For example, capacity used to accommodate changes in SNF quantities resulting from the Contract's provision for a 20 percent adjustment to approved Delivery Commitment Schedules would reduce the capacity available for allocation. DOE will also address instances when overall WMS efficiency considerations may affect delivery quantities. If it is determined that casks used for shipping SNF need to be fully loaded when accepted for transport, reductions in the acceptance capacity available for allocation to some Purchasers in a given year may be required. In the interest of operational efficiency, it may also be appropriate to delay the acceptance of SNF/HLW which requires special handling. Such delays would not result in changes to the acceptance ranking.

DOE acknowledges that uncertainty with regard to the waste acceptance schedule and the integrated WMS derives, in part, from decisions yet to be made by Congress. DOE has presented the appropriate issues to Congress in the form of the OCRWM Mission Plan Amendment.[3]

DOE also recognizes that the development of procedures for effective and equitable implementation of the WMS is an iterative process that requires the cooperative efforts of both DOE and the Purchasers. DOE intends to work with the Purchasers or their representatives to develop these procedures and to issue appropriate guidance to Purchasers for their use in planning for at-reactor storage and ultimate delivery of SNF/HLW to the WMS. This ACR is intended as a major step in that process.

### 1.2.2 The Annual Capacity Report Approach

Since the configuration and operational details of the WMS are still at the stage of conceptual design, this initial ACR uses a projected waste acceptance schedule for an illustrative

system configuration as defined in the Mission Plan Amendment (discussed in Section 2.0). The waste acceptance schedule presumes Congressional approval of DOE's MRS proposal[4] and reflects DOE's plans to integrate an MRS facility into the WMS to begin waste acceptance in 1998.

DOE is required to accept all SNF and HLW for permanent disposal. However, since acceptance capacity is limited in any given year, a ranking or sequencing process is necessary for allocating available capacity. Using the "oldest fuel first" (OFF) criterion (discussed in Section 3.0), the ranking is based on 1985 date-of-discharge data supplied to the Energy Information Administration (EIA) by the Purchasers on the 1986 Nuclear Fuel Data Form, RW-859. Tables in Appendix A list the Purchasers and their quantities of SNF for each year based on this ranking and current estimates of the available waste acceptance capacity. The table in Appendix B lists eligible SNF (that SNF currently included in contracts with DOE) for the same 10-year period.

DOE has begun the process of identifying issues or questions that need to be resolved for efficient and equitable waste acceptance. The identification and resolution of these issues is expected to be a cooperative and interactive effort between DOE and the Purchasers. It is expected that mutual understanding of issues and their impacts will strengthen the waste management planning base and will result in system improvements. Subsequent ACRs will document the progress made in issue resolution. If such resolutions require Contract interpretations, clarifications or amendments, the Contracting Officer would then initiate the appropriate contractual action. In those cases where adoption of a change would not be consistent with the Contract, formal rulemaking procedures would be followed.

1.2.3 Submittal of Comments on the Annual Capacity Report

Written comments are requested, specifically from the Purchasers, on the content of this initial ACR. Comments received will be used to identify issues that need to be addressed and will be considered in the development of the following year's ACR. The data in Appendix B, used for the

acceptance ranking and annual allocations in this report, reflect DOE's interpretation of the information supplied by the Purchasers on the Form RW-859. Purchasers are urged to carefully review the data in Appendix B.

Comments on this ACR should be addressed to:

Mr. Alan Brownstein
Office of Civilian Radioactive Waste Management
U.S. Department of Energy
RW-13
1000 Independence Avenue, S.W.
Washington, D.C. 20585

## 2.0 PROJECTED WASTE ACCEPTANCE CAPACITY

The waste acceptance schedule in this ACR is consistent with the schedule from the Mission Plan Amendment.* This schedule is only an approximation of how the system may operate and is subject to uncertainties that are recognized in the Mission Plan Amendment. DOE will further define and specify the system operating and waste acceptance parameters as the program progresses. The schedule will serve as a basis for planning and will be updated annually consistent with the latest forecasts of waste disposal requirements. The projected waste acceptance schedule for the first 10 years of operations is summarized in Table 2.1.

TABLE 2.1

Illustrative Waste Acceptance Schedule for the First 10 Years of Facility Operation

| Year | System Receipt Rate Metric Tons Uranium (MTU) |
|---|---|
| 1998 | 1,200 |
| 1999 | 1,200 |
| 2000 | 1,200 |
| 2001 | 1,200 |
| 2002 | 1,200 |
| 2003 | 2,000 |
| 2004 | 2,650 |
| 2005 | 2,650 |
| 2006 | 2,650 |
| 2007 | 2,650 |
| | 18,600 |

Source: OCRWM Mission Plan Amendment (DOE/RW-0128), June 1987 (extracted from Appendix F, Table F-1).

* The waste acceptance schedule for HLW is not included since the Mission Plan Amendment does not specify acceptance of HLW during the 10-year period covered by this report.

The number of Purchasers whose Final Delivery Schedules may be accommodated in any given year will be constrained by the capacity of the WMS to accept SNF. The acceptance capacity available for allocation to the Purchasers will equal the system operating capacity, unless part of that operating capacity is used to accommodate contingencies, e.g., emergencies, the Contract's 20 percent adjustment provision, and cask loading considerations. To the extent that such capacity would be needed, the remaining acceptance capacity available for allocation to Purchasers in a given year would be reduced. For purposes of this initial ACR, acceptance capacity is assumed to equal the system operating capacity, as shown in Table 2.1.

## 3.0 ALLOCATION OF THE WASTE MANAGEMENT SYSTEM ANNUAL ACCEPTANCE CAPACITY

Acceptance capacity allocation in this report is based on the oldest fuel having the highest priority (OFF). An example of the results of this allocation using the first 10 years of the illustrative waste acceptance schedule is presented in Appendix A.

### 3.1 PROCEDURE FOR ALLOCATION OF ANNUAL ACCEPTANCE CAPACITY

The allocation process assigns WMS annual acceptance capacity to the Purchasers. The Standard Disposal Contract stipulates that this allocation will be based on an OFF priority. The age of a particular fuel assembly discharged from a specific reactor determines the Purchaser's acceptance "rights" expressed in equivalent metric tons uranium (MTU) of acceptance capacity. The SNF data used as the basis for allocating annual acceptance rights include both the historical data on SNF discharges available through December 1985 and Purchaser projections of future SNF discharges through 2007.

The SNF assemblies were first listed in order of date of discharge* from the reactor (see Appendix B) consistent with the Standard Disposal Contract provisions [Article IV.B.5(a)] for acceptance priority based on OFF. The "date of discharge" of an assembly was assumed to be the date the reactor went subcritical prior to discharge. All SNF, regardless of its subsequent classification for delivery,** qualifies for acceptance rights based on an OFF priority.

---

* Since the day of the month of discharge was not supplied for 35 percent of the SNF listed in the 1985 data base, only the month and year of discharge were used for ordering. For this ACR, where the month and year were the same for more than one reactor, the order was randomly selected.

** The Standard Disposal Contract requires the Purchaser to classify SNF prior to delivery in accordance with the classification definitions of Appendix E of the Contract.

After the SNF was listed by date of discharge, it was divided into groupings whose totals were consistent with the annual acceptance capacity to be allocated. The annual groupings were then summed for each reactor and aggregated by Purchaser. The results are presented in Appendix A.

The exact chronological order of deliveries within each year is not specified in the Appendix A tables because the dates in the Final Delivery Schedules to be submitted to DOE for approval will be arranged to accommodate both the Purchasers' and DOE's operational requirements. Grouping the listing of Purchasers into annual capacity segments provides a basis for initiating planning for delivery. The tables, therefore, list the Purchasers alphabetically with a sublisting of the reactors that were the source of the qualifying SNF assemblies, the number of qualifying assemblies, and their equivalent MTU (acceptance rights).

## 3.2 BASIS FOR ACCEPTANCE CAPACITY AVAILABLE FOR ALLOCATION

The waste acceptance schedule presented in this ACR represents the projected WMS capacity available for allocation to the Purchasers. The projected WMS capacity equals the system operating capacity unless part of that operating capacity is used to accommodate contingencies, e.g., emergencies, the 20 percent adjustment provision, or cask loading considerations, as discussed in Section 2.0. Section 4.0 provides a discussion of the potential impacts of such contingencies.

This initial ACR does not assign priority to non-light-water reactor spent fuel, Federally owned SNF being used for research and development activities, HLW, nonfuel-bearing wastes, or SNF from future Purchasers. If required, adjustments to priority listings, resulting from the inclusion of these wastes, will be reported in future ACRs.

Appendix B contains more data than are required for the priority listing and annual capacity allocation. However, as the WMS develops, the accuracy of these data will become more important since they reflect DOE's interpretation of information

in Form RW-859. The data will also be used to establish compatibility between the Purchasers' transport requirements and DOE's transportation system.

## 4.0 ISSUES WHICH MAY AFFECT ANNUAL ACCEPTANCE CAPACITY, ALLOCATION OF CAPACITY, DELIVERY SCHEDULES, AND ACCEPTANCE CRITERIA

Many issues will require analysis and resolution to ensure optimization of the waste acceptance process and the WMS. This section identifies selected examples of these issues. DOE plans to evaluate alternative solutions for these issues and examine their potential impacts on the Purchasers and the overall efficiency of the WMS.

### 4.1 ANNUAL ACCEPTANCE CAPACITY

Annual acceptance capacity is dependent on the annual receiving capacity of the WMS that is ultimately developed. The Standard Disposal Contract does not specify the annual acceptance capacity that will be available for allocation. Thus, the WMS acceptance schedule presented as the basis for the Acceptance Priority Ranking due in 1991 may differ from the illustrative waste acceptance schedule presented in this initial ACR. Any changes could affect the annual acceptance capacity available for allocation.

The introduction of a Federal Interim Storage (FIS) facility into the WMS, although not presently anticipated by DOE, could also have an impact on the annual acceptance capacity available to Purchasers during the early years of facility operation. All acceptance schedules would be affected since the Act requires that all SNF stored at an FIS facility (up to 1900 MTU) be shipped to the first receiving facility (repository or MRS) within 3 years of the start of operations of that facility. In this case, allocation of acceptance capacity to the Purchasers could be reduced by the acceptance capacity required to serve the FIS facility during this 3-year period.

In its proposal for the construction of an MRS facility, DOE has asked Congress to limit the MRS storage capacity to 15,000 MTU and to prohibit receipt of SNF at an MRS until the Nuclear Regulatory Commission (NRC) has authorized construction of the first repository. These provisions were requested to emphasize that the MRS facility is an integral part of the WMS and is not

intended to become a substitute for a permanent repository. If Congress adopts the DOE-proposed provisions, and if the NRC authorization to construct a repository is not received by the time the MRS facility becomes operational, the WMS would be unable to accept any SNF in 1998. Under such circumstances, the current DOE position, as stated in the Mission Plan Amendment, is that utilities will continue to be responsible for storing their SNF.

## 4.2 ALLOCATION OF CAPACITY

The Standard Disposal Contract makes provisions for granting acceptance priority for emergency deliveries of SNF. The Contract also provides the Purchasers with the right to adjust the SNF quantities proposed for delivery in their Delivery Commitment Schedules by ± 20 percent. However, no guidance on establishment of an acceptance capacity reserve for such contingencies has been specified. Establishment of an acceptance capacity reserve would result in a reduction in the annual capacity available for allocation to the Purchasers and may affect the year in which the Purchasers are served.

The Contract makes no provisions for the minimum amount of SNF that DOE will accept and transport in a given period. For this report, the system acceptance capacity has been defined and allocated on an annual (12-month) basis for planning and analysis purposes. Operational considerations may suggest a more efficient method of allocation and subsequent delivery--such as 18- to 24-month periods or other methods to approximate reactor discharge patterns. While the SNF priority listings would not change under such alternatives, larger quantities of acceptance rights would accrue to the Purchasers over a longer time interval. This approach may reduce the impact on the Purchasers at the reactor sites as well as minimize the handling equipment changes at the DOE receiving facility, while maximizing the use of the cask fleet.

## 4.3 DELIVERY SCHEDULES

The Contract requires DOE to provide casks and transportation of SNF from the Purchaser's site to the DOE facility. System operating efficiencies may indicate that SNF shipping casks

should be fully loaded when accepted by DOE for transport. If a Purchaser's allocated acceptance rights are not compatible with the capacities of the cask(s), minor adjustments to the quantities of SNF listed in the delivery schedules may be required. The resulting increase or decrease in the actual quantity of SNF delivered may affect future allocations and require adjustments to schedules for other Purchasers.

The Contract also makes provision for the possible priority acceptance of SNF from reactors that have reached the end of their useful life or that have been permanently shut down for whatever reason. The granting of such priority would result in a reordering of the Final Delivery Schedules.

## 4.4 ACCEPTANCE CRITERIA

The Standard Disposal Contract states that "DOE will first accept from Purchaser the oldest SNF/HLW for disposal in the DOE facility ..." [Article VI.B.1(a)], unless otherwise requested by the Purchaser in accordance with Article VI.B. Further evaluation of WMS performance and Purchaser fuel management considerations is required to determine the basis for DOE approval of modifications to this guidance.

The Contract states that delivery of SNF designated by the Purchaser as other than standard SNF will be subject to confirmation of handling procedures and delivery schedules. Since it is possible that not all nonstandard and/or failed SNF will require special handling by the WMS, it may be unnecessary to subject all such fuel to special handling procedures and delivery schedules. Consequently, DOE must establish specific criteria identifying which fuel will require special handling and define procedures for acceptance of such fuel.

The Contract states that DOE is to provide specifications on Purchaser-furnished canisters for containment of failed fuel, but additional criteria compatible with the needs of both DOE and the Purchasers have yet to be developed. Similarly, no criteria have been established for the acceptance of consolidated SNF or nonfuel-bearing components or for their associated canister configurations.

The Contract states that the Purchasers have the right to exchange approved Delivery Commitment Schedules, with DOE's approval. However, if exchanges result in substitutions of such characteristics as fuel age, fuel type (PWR/BWR), or transport mode (rail/truck), system efficiencies may be affected. Further study is needed to evaluate system impacts and establish criteria for DOE approval/disapproval of exchange requests.

## REFERENCES


1. Public Law 97-425, "Nuclear Waste Policy Act of 1982," (January 7, 1983).

2. U.S. Department of Energy, "Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste," Code of Federal Regulations, Title 10, Part 961, (1986).

3. U.S. Department of Energy, OCRWM Mission Plan Amendment, DOE/RW-0128, Washington, D.C., (June 1987).

4. U.S. Department of Energy, Monitored Retrievable Storage Submission to Congress, DOE/RW-0035/1-Rev 1, Washington, D.C., (1987).

DOE/RW-0191

Duplicate Copy

Office of Civilian Radioactive Waste Management

# Annual Capacity Report

June 1988

U.S. Department of Energy
Office of Civilian Radioactive Waste Management

Available from:

U.S. Department of Energy
Office of Scientific and Technical Information
Post Office Box 62
Oak Ridge, TN 37831

DOE/RW-0191

*Office of Civilian Radioactive Waste Management*

# Annual Capacity Report

***June 1988***

***U.S. Department of Energy***
*Office of Civilian Radioactive Waste Management*
*Washington, DC 20585*

Department of Energy
Washington, DC 20585

This Annual Capacity Report (ACR) is the second in a series to be published by the Department of Energy. The report, required by the Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste, provides, for planning purposes, the latest estimate of projected annual receiving capacity and an annual acceptance ranking for the first 10 years of waste management system operation. The projections in this year's ACR are based on the Draft 1988 Mission Plan Amendment issued in June 1988, in conformance with the changes mandated by the Nuclear Waste Policy Amendments Act of 1987.

I want to thank Contract holders for their positive response to the Department's offer in the 1987 ACR to work cooperatively in identifying and resolving Contract-related issues. The Department fully supports this effort. As the waste management system evolves, we will need to move forward in this same spirit of cooperation to ensure that the decisions that are made reflect, to the extent possible, the interests of all parties to the Contract.

Charles E. Kay

Charles E. Kay, Acting Director
Office of Civilian Radioactive
Waste Management

CONTENTS

SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

1.0 INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
1.1 STANDARD DISPOSAL CONTRACT REQUIREMENT FOR AN ANNUAL CAPACITY REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
1.2 EXPANDED SCOPE OF THE ANNUAL CAPACITY REPORT . . . . . . . . . 2
1.3 THE ANNUAL CAPACITY REPORT ISSUE RESOLUTION PROCESS . . . . . 3
1.4 SUBMITTAL OF COMMENTS ON THE ANNUAL CAPACITY REPORT . . . . . 3

2.0 PROJECTED WASTE ACCEPTANCE CAPACITY . . . . . . . . . . . . . . . . 4
2.1 WASTE ACCEPTANCE SCHEDULE . . . . . . . . . . . . . . . . . . . . 4
2.2 IMPACTS OF THE NUCLEAR WASTE POLICY AMENDMENTS ACT OF 1987 . . 6

3.0 ALLOCATION OF THE WASTE MANAGEMENT SYSTEM'S ANNUAL ACCEPTANCE CAPACITY . . . . . . . . . . . . . . . . . . . . . . . . . 8
3.1 PROCEDURE FOR ALLOCATION OF ANNUAL ACCEPTANCE CAPACITY . . . . 8
3.2 BASIS FOR CAPACITY AVAILABLE FOR ALLOCATION . . . . . . . . . . . 9

4.0 THE ANNUAL CAPACITY REPORT ISSUE RESOLUTION PROCESS . . . . . . . . 10
4.1 STATUS OF THE ANNUAL CAPACITY REPORT ISSUE RESOLUTION PROCESS 10
4.2 WRITTEN COMMENTS ON THE 1987 ANNUAL CAPACITY REPORT . . . . . 11

REFERENCES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

APPENDIX A - ANNUAL ACCEPTANCE RANKING FOR DISPOSAL OF SPENT NUCLEAR FUEL. . . . . . . . . . . . . . . . . . . . . . . A.1

APPENDIX B - LISTING OF SPENT NUCLEAR FUEL BY DATE OF FINAL DISCHARGE . . . . . . . . . . . . . . . . . . . . . . . B.1

SUMMARY

The Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste (10 CFR 961) requires the U.S. Department of Energy (DOE) to issue an Annual Capacity Report (ACR) for planning purposes. The ACR sets forth the projected annual receiving capacity of the Waste Management System (WMS) for 10 years following the projected commencement of facility operation, and the annual acceptance ranking of spent nuclear fuel (SNF) and/or high-level waste (HLW) to be received by the WMS. This report is the second in the series of ACRs to be published by DOE.

The system configuration used as the basis for this year's report is the authorized system defined in the Draft 1988 Mission Plan Amendment. It includes a Monitored Retrievable Storage (MRS) facility as an integral system component. The illustrative waste acceptance schedule for this WMS configuration reflects the amended first repository schedule and a proposed schedule for the MRS facility. This schedule provides only an approximation of when and how the system may operate and is subject to changes as recognized in the draft Mission Plan Amendment. During the first 10 years of WMS operation, the total quantity of spent fuel that could be accepted is projected to be 24,100 metric tons uranium (MTU). The allocation of acceptance rights is currently based on the projected annual capacity of the WMS to receive SNF and the age of permanently discharged spent fuel as determined from 1986 data provided by the Purchasers of waste disposal services on the 1987 Nuclear Fuel Data Form, RW-859. The allocations are based on assigning the highest priority to the oldest fuel on an industry-wide basis.

The ACR allocates only that portion of the WMS capacity assigned to SNF and HLW originating from commercial reactors and covered by the Contract and/or for which disposal fees have been paid. Commercial and defense high-level waste, spent fuel from non-commercial reactors, and nonfuel wastes are not currently addressed.

Section 1.0 of the ACR provides a discussion of the requirement for the ACR and the role it plays in DOE's interaction with the Purchasers in implementing the provisions of the Standard Disposal Contract. The currently projected annual acceptance capacity to be allocated and a discussion of some of the impacts the Nuclear Waste Policy Amendments Act of 1987 may have on the Purchasers, DOE, and the Contract are presented in Section 2.0. Section 3.0 discusses the basis and procedure for allocating this capacity (acceptance rights). The status of the ACR Issue Resolution Process and DOE responses to comments on the 1987 ACR are discussed in Section 4.0. Annual capacity allocations, based on the chronological listing of spent fuel assembly final discharge dates, are summarized in Appendix A and detailed in Appendix B.

## 1.0 INTRODUCTION

The Nuclear Waste Policy Act of 1982 (NWPA)[1] assigns the Federal Government responsibility to provide for the permanent disposal of spent nuclear fuel (SNF) and high-level radioactive waste (HLW). The Director of the Department of Energy's (DOE) Office of Civilian Radioactive Waste Management (OCRWM) is responsible for carrying out the functions of the Secretary under the NWPA. Section 302(a) of the NWPA authorizes the Secretary to enter into contracts* with owners or generators** of commercial SNF and/or HLW. The Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste[2] represents the sole contractual mechanism for DOE acceptance and disposal of SNF or HLW. It establishes the requirements and operational responsibilities of the parties to the Contract in the areas of administrative matters, fees, terms of payment for disposal services, waste acceptance criteria, and waste acceptance procedures. The Standard Disposal Contract provides for the acquisition of title to the SNF and/or HLW by DOE, its transportation to DOE facilities, and its subsequent disposal.

### 1.1 STANDARD DISPOSAL CONTRACT REQUIREMENT FOR AN ANNUAL CAPACITY REPORT

Under the terms of the Standard Disposal Contract (Article IV), the Annual Capacity Report (ACR) is to project the DOE's annual receiving capacity and present the annual acceptance ranking of SNF and/or HLW for disposal for 10 years following the projected commencement of operations of the DOE receiving facilities. As specified in the Contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or the Purchasers. The ACR will be published each year through 1990.

---

*Individual contracts are based upon the Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste (10 CFR Part 961) which will be referred to as the "Standard Disposal Contract" or "Contract" for subsequent discussion in this report.

**Owners and generators of SNF and HLW who have entered into agreements with DOE and/or have paid fees for purchase of disposal services are referred to as "Purchasers".

According to the Contract, beginning in 1991, the ACR acceptance ranking will be converted into the Annual Acceptance Priority Ranking for receipt of SNF/HLW. The Contract specifies that, based on this priority ranking, the Purchasers shall, in 1992, submit to DOE for approval, Delivery Commitment Schedules identifying the SNF/HLW that Purchasers propose to deliver to the DOE waste management system (WMS). The Contract provides that, once approved, these schedules will become the bases for Final Delivery Schedules to be submitted by the Purchasers not less than 12 months before the actual date of DOE's anticipated acceptance of title to the SNF and subsequent transport to a DOE facility.

## 1.2 EXPANDED SCOPE OF THE ANNUAL CAPACITY REPORT

DOE recognizes that there is a need for DOE and the Purchasers to coordinate in the implementation of the Standard Disposal Contract to enable DOE and the Purchasers to carry out all of their responsibilities and/or for the Purchasers to make certain spent fuel management decisions. DOE acknowledges that the configuration and operating details of the WMS are still at the conceptual design stage and subject to uncertainty.

DOE also recognizes that the identification and resolution of Contract-related issues and the development of procedures for effective and equitable implementation of the WMS are elements of an iterative process that requires the cooperative efforts of both DOE and the Purchasers. DOE has identified a number of issues and system considerations which could affect the annual capacity available for allocation, as well as instances when overall WMS efficiency considerations may affect delivery quantities. DOE has expressed its intention to work with the Purchasers' representatives to address these issues and provide guidance, as appropriate, to the Purchasers for their use in planning for at-reactor storage and ultimate delivery of SNF/HLW to the WMS.

## 1.3 THE ANNUAL CAPACITY REPORT ISSUE RESOLUTION PROCESS

In response to DOE's offer in last year's ACR[3] to cooperate with the Purchasers, the Utility Nuclear Waste Management Group (UNWMG) and the U.S. Council for Energy Awareness (USCEA), jointly representing 64 of the 66 commercial owners/generators of SNF who are parties to the Contract, began a cooperative effort with DOE to identify, prioritize, address and evaluate solutions to issues of mutual concern arising from implementation of the Contract. Interactions over the past year indicate a desire by both parties to proceed with the process. Section 4.1 discusses the status of this initiative.

## 1.4 SUBMITTAL OF COMMENTS ON THE ANNUAL CAPACITY REPORT

Written comments are again requested, especially from the Purchasers, on the content of the ACR. Comments received will be used to identify issues that need to be addressed and will be considered in the development of the following year's ACR. Appendix B contains more data than are required for the priority listings and annual capacity allocation. These data will assist in establishing compatibility between the Purchasers' transport cask handling capabilities and DOE's transportation system. As the WMS develops, the accuracy of these data becomes more important since they reflect DOE's interpretation of information provided by the Purchasers through their submittal of Nuclear Fuel Data Form, RW-859. Purchasers are urged to carefully review the data in Appendix B.

Comments on this ACR should be addressed to:

Mr. Alan Brownstein
Office of Civilian Radioactive Waste Management, RW-13
U.S. Department of Energy
1000 Independence Avenue S.W.
Washington, DC 20585

## 2.0 PROJECTED WASTE ACCEPTANCE CAPACITY

Since the configuration and operational details of the WMS are still at the conceptual design stage, this ACR uses a projected waste acceptance schedule for the authorized system configuration defined in the Draft 1988 Mission Plan Amendment[4]. The authorized system includes an MRS facility and reflects DOE's plans to integrate that facility into the WMS. This schedule provides only an approximation of when and how the system may operate and is subject to change as recognized in the draft Mission Plan Amendment. DOE will further define and specify the system operating and waste acceptance parameters as the program progresses.

### 2.1 WASTE ACCEPTANCE SCHEDULE

Article II of the Contract indicates that "The services to be provided by DOE under this Contract [acceptance of title, subsequent transportation, and disposal of SNF and/or HLW] shall begin after the commencement of facility operations, not later than January 31, 1998..." DOE recognizes that, under current conditions, operations of and waste acceptance at a DOE facility probably cannot begin in 1998. The delay in the repository schedule first noted in the OCRWM Mission Plan Amendment[5] published in June 1987 and the conditions imposed on the siting and construction of an MRS facility by the Nuclear Waste Policy Amendments Act of 1987 (the Amendments Act)[6] make it unlikely that DOE will be able to start accepting SNF significantly before 2003. As recognized in the draft Mission Plan Amendment, earlier waste acceptance would require additional Congressional action or an acceleration of the system development schedule by some other means. Under current conditions, the owners and generators of SNF will continue to be responsible for storing their spent fuel until acceptance by DOE. The DOE will continue working with the Purchasers to expedite the effective use of available storage and the development of additional storage at reactor sites.

A waste acceptance schedule presented in the draft Mission Plan Amendment indicating operations beginning in 2003 is considered to be achievable, assuming repository construction is authorized in 1998. Conditions which may

allow acceleration of this schedule are discussed in Section 2.2. Although the draft Mission Plan Amendment projects a 5-year delay in WMS operation, the projected waste acceptance rate has been increased because it is assumed that the MRS facility and the repository will commence operation simultaneously. Accordingly, the illustrative waste acceptance schedule for the first 10 years of WMS operation, summarized in Table 2.1, projects a total increase of 5,500 MTU over the schedule presented in last year's ACR.

TABLE 2.1.

Illustrative Waste Acceptance Schedule for Spent Nuclear Fuel

| Year | SNF (MTU) |
|---|---|
| 2003 | 1,200 |
| 2004 | 1,200 |
| 2005 | 2,000 |
| 2006 | 2,000 |
| 2007 | 2,700 |
| 2008 | 3,000 |
| 2009 | 3,000 |
| 2010 | 3,000 |
| 2011 | 3,000 |
| 2012 | 3,000 |
| TOTAL | 24,100 |

Source: Draft 1988 Mission Plan Amendment (DOE/RW-0187), June 1988 (extracted from Table 2-2, P. 19).

The number of Purchasers whose Final Delivery Schedules may be accommodated in any given year will be constrained by the capacity of the WMS to accept SNF. As in last year's ACR, acceptance capacity available for allocation to the Purchasers equals the system operating capacity as shown above in Table 2.1. The capacity available for allocation to Purchasers in a given year may be reduced should any of that capacity be used to accommodate contingencies (e.g. for emergencies, the Contract's 20 percent adjustment provision, or cask loading considerations).

## 2.2 IMPACTS OF THE NUCLEAR WASTE POLICY AMENDMENTS ACT OF 1987

The Amendments Act of 1987 could affect both the Purchasers and DOE in implementing the Contract. Among the provisions of the Amendments Act are authorization of an MRS subject to certain conditions and an evaluation of the use of at-reactor dry cask storage of SNF until a repository is operational. The potential implications of these provisions are briefly discussed below.

Although the MRS was authorized by the Amendments Act, its development is subject to conditions imposed on its siting and construction. The survey, evaluation, and identification of potentially suitable sites may not begin until the MRS Review Commission established by the Amendments Act has submitted a report on its study concerning the need for an MRS facility to Congress by June 1, 1989. The acceptance capacity used in this ACR (Table 2.1) assumes that an MRS will not be able to receive SNF until 5 years following repository construction authorization, even though it may be possible to begin acceptance of SNF 2 to 3 years earlier through phased construction of the MRS. The recommendations of the MRS Commission will be included, as appropriate, in a subsequent ACR once they become available.

The Amendments Act specifies that "The Secretary may not select a [MRS] site...until the Secretary recommends to the President the approval of a site for development as a repository...," and that "Construction of such facility may not begin until the [Nuclear Regulatory] Commission has issued a license for the construction of a repository..." Current system development plans, based on the construction schedule presented in the MRS Proposal to Congress,[7] indicate that the MRS facility would be available no later than 2003. The repository would also begin accepting waste in 2003.

The Amendments Act directs that "...the quantity of spent nuclear fuel or high-level radioactive waste at the site of such a [MRS] facility at any one time may not exceed 10,000 metric tons of heavy metal until a repository under this Act first accepts spent nuclear fuel or solidified high-level

radioactive waste..." Should the start of repository operations be delayed for any reason, waste acceptance at the MRS is to be limited to 10,000 MTU. The maximum capacity of the MRS is limited to 15,000 MTU by the Amendments Act.

A delay in the planned start of WMS facility operations from 1998 to 2003 will increase the Purchasers' need for at-reactor storage. As mandated by the Amendments Act, DOE is conducting an evaluation of the impacts of dry cask storage of SNF at reactor sites. The study is to consider the costs, the impacts on health, the environment and transportation, and the extent to which Nuclear Waste Fund monies can and should be used to support at-reactor dry cask storage. A summary of the study results and any subsequent actions by the Congress will be reported, as appropriate, in the ACR when available.

Although the provisions of the Amendments Act make operations of and waste acceptance at a DOE facility significantly before 2003 unlikely, there are certain conditions under which the initial waste acceptance could be advanced. DOE is also investigating the feasibility of developing the MRS facility in phases which may make it possible to shorten the time between the start of MRS construction and the start of waste acceptance through phased construction of the MRS (i.e., a storage-only phase followed by a processing and preparation phase). As the WMS evolves beyond the conceptual design stage, any adjustments in the waste acceptance schedule will be reported in subsequent ACRs.

## 3.0 ALLOCATION OF THE WASTE MANAGEMENT SYSTEM'S ANNUAL ACCEPTANCE CAPACITY

DOE is required to accept commercial SNF and/or HLW for permanent disposal from owners and generators who are parties to the Standard Disposal Contract. However, since acceptance capacity is limited in any given year, a ranking or sequencing process is necessary for annually allocating available acceptance capacity. Using the "oldest fuel first" (OFF) criterion, the ranking is based on 1986 date-of-final-discharge data supplied by the Purchasers. Tables in Appendix A list the Purchasers and the sum of their quantities of eligible SNF for each of the first 10 years of WMS operations. The table in Appendix B lists all eligible SNF chronologically for the same 10-year period.

### 3.1 PROCEDURE FOR ALLOCATION OF ANNUAL ACCEPTANCE CAPACITY

The allocation process apportions the WMS annual SNF acceptance capacity to the Purchasers. The Standard Disposal Contract stipulates that this allocation will be based on an OFF priority (Article IV). The age* of a particular fuel assembly discharged from a specific reactor is the basis for determining the Purchaser's place in the ranking. Acceptance "rights" are expressed in MTU of allocated acceptance capacity. The SNF data used as the basis for allocating annual acceptance rights for the first 10 years include both the historical data on SNF discharges available through December 1986 and Purchaser projections of future SNF discharges. All SNF, regardless of its subsequent classification for delivery,** qualifies for acceptance rights based on an OFF priority. These data do not include provisions for assigning priority ranking to Purchaser-furnished canisters of nonfuel wastes, non-LWR

---

* The age of SNF is based on the date of final discharge as indicated on the Purchaser's Form RW-859 submittal. Since the day of the month of discharge was not supplied for 28 percent of the SNF data, only the month and year of discharge were used for ordering. Where the month and year were the same for more than one reactor, the order was randomly selected.

** The Standard Disposal Contract (Appendix E) requires the Purchaser to classify SNF prior to delivery.

SNF, or commercial high-level waste. DOE will examine alternative bases for the inclusion of these wastes in the allocation queue.

After the SNF was listed by date of discharge, it was divided into ten annual groupings whose cumulative total MTU equaled the projected annual acceptance capacity to be allocated. The annual groupings were then summed for each reactor and aggregated by Purchaser. The results are presented in the tables in Appendix A.

The exact chronological order of deliveries within each year is not specified in the Appendix A tables because the dates in the Final Delivery Schedules to be submitted to DOE for approval will be arranged to accommodate, to the extent possible, both the Purchasers' and DOE's operational requirements. Grouping the list of Purchasers into annual capacity segments provides a basis for initiating planning for delivery. The tables, therefore, list the owners of the SNF alphabetically with a sublisting of the reactors that were the source of the qualifying SNF assemblies, the number of qualifying assemblies, and their equivalent MTU.

### 3.2 BASIS FOR CAPACITY AVAILABLE FOR ALLOCATION

The waste acceptance schedule presented in this ACR represents the total projected WMS SNF operating capacity available for allocation to the Purchasers. The projected WMS SNF capacity available for allocation will equal the system operating capacity unless part of that operating capacity is used to accommodate contingencies, e.g., emergencies, the 20 percent adjustment provision, or cask loading considerations.

Adjustments to the priority ranking resulting from the inclusion of DOE-owned SNF from commercial reactors for which disposal fees have been paid are reported for the first time in this ACR (see appendices). Other Federally-owned SNF, e.g. partial assemblies and SNF from high temperature gas-cooled reactors stored at DOE facilities and fuel from research and university reactors, have not been included. The ACR does not assign priority at this time to non-light-water reactor spent fuel, canistered nonfuel-bearing wastes, or SNF from potential future Purchasers.

## 4.0 THE ANNUAL CAPACITY REPORT ISSUE RESOLUTION PROCESS

Last year's ACR indicated that many issues will require analysis and resolution so that the WMS can achieve maximum efficiency, while attempting to assure equity among the parties. Last year's report presented selected examples of Contract-related issues that could affect the capacity available for allocation, capacity allocation, delivery schedules and acceptance criteria. These examples ranged from technical waste acceptance specifications to management-related issues. As indicated in Section 1.3, DOE and the Purchasers' representatives have begun a cooperative effort to address and ultimately resolve these issues through the ACR Issue Resolution Process. These staff-to-staff technical exchanges are neither contractual negotiations nor binding agreements. DOE fully supports the objectives of these technical exchanges as an aid in resolving Contract-related issues.

This Section details the ACR Issue Resolution Process, progress made to date in its implementation, and also provides DOE's responses to written comments received from the Purchasers on last year's ACR.

### 4.1 STATUS OF THE ANNUAL CAPACITY REPORT ISSUE RESOLUTION PROCESS

In the 1987 ACR, DOE offered to work cooperatively with the Purchasers in resolving Contract-related issues. This offer was reiterated in an October 2, 1987 letter from the Contracting Officer, responding to a request from the UNWMG for interpretations, clarifications, and/or amendments to the Standard Disposal Contract. The UNWMG, in cooperation with the USCEA, established an ACR Steering Committee to represent the Purchasers in the ACR Issue Resolution Process with DOE. Purchasers who are not members of either industry group were contacted by the UNWMG and offered the opportunity to participate. Of those contacted, only two Purchasers elected not to be represented on the ACR Steering Committee. The Steering Committee (composed of 47 Purchasers affiliated with UNWMG and 17 Purchasers affiliated with or represented by USCEA) is represented by an ACR Response Team in its interactions with DOE.

On November 10, 1987, DOE was invited by the UNWMG and USCEA to participate in a two-phase process for addressing Contract-related issues. The first phase of the process would be staff-to-staff technical exchanges to identify, prioritize, and exchange views on the issues. These exchanges will assist DOE staff in preparing recommendations for issue resolution to be submitted to DOE management. The second phase would be formal implementation by the Contracting Officer through rulemaking or other appropriate means.

On December 8 and 9, 1987, DOE participated in a meeting with the ACR Response Team, at its invitation, to initiate the staff-to-staff technical discussions. DOE presented draft preliminary results of work to date on issues identified in Section 4.0 of last year's ACR. Each issue was explained so that the ACR Response Team could better understand DOE's concerns. The DOE discussion emphasized two issues whose early resolution would enable the Purchasers to make near-term decisions on SNF management issues which may significantly affect future WMS design and operation. The two issues were the development of canister specifications for packaging failed fuel, consolidated SNF, and nonfuel wastes, and the clarification of interpretations of OFF for delivery of SNF.

On March 3, 1988, DOE was invited to meet with the Nuclear Power Executive Advisory Committee (NPEAC) of the Edison Electric Institute to review the status of the ACR Issue Resolution Process. Both DOE and the NPEAC expressed their support for the process.

DOE and the ACR Response Team are currently evaluating the issues presented at the meetings and plan to select a subset of the issues to begin the process of intensive study and evaluation. The next meeting has tentatively been scheduled for September 1988.

## 4.2 WRITTEN COMMENTS ON THE 1987 ANNUAL CAPACITY REPORT

Six Purchasers responded to DOE's request for written comments on last year's ACR. DOE utilized these comments to assist in the ACR Issue Resolution

Process. The following Purchaser questions and suggestions are paraphrased as "Comments," and the DOE responses reflect current DOE positions.

Comment

One Purchaser proposed that the age of SNF for acceptance ranking on an OFF priority be based on the date of initial discharge (for fuel planned for reinsertion), rather than the date of final discharge.

Response

Reinsertion of fuel assemblies is a fuel management decision at the sole discretion of the Purchaser. The fuel defined in the Contract for acceptance ranking on an OFF priority basis is that fuel designated by the Purchaser as "spent" nuclear fuel; fuel designated for reinsertion is defined in the Contract (Article VIII) as "in-core" fuel and, therefore, should not be considered for priority ranking purposes until it is designated as SNF by the Purchaser (as reflected in the Purchaser's RW-859 submittal).

Comment

One Purchaser submitted a letter advising DOE of changes to the reactor-specific data in Appendix B subsequent to the publication of the 1987 ACR.

Response

The basis for the listing in Appendix B is the Purchaser's latest submittal of the RW-859 Form. The Purchaser's changes should be reflected in its next RW-859 submittal. Subsequent ACRs will update this listing based on the most recent RW-859s. This ACR uses the 1987 RW-859 data (CY 1986 data). DOE encourages the Purchasers to review the data in the ACR appendices to ensure accuracy, and to correct or modify the data in subsequent submittals of the RW-859. Corrections or modifications submitted in the RW-859s through 1990 will be reflected in the April 1991 acceptance priority ranking of SNF.

Comment

One Purchaser expressed a need to use the allocation of "acceptance rights" accrued by the SNF discharged from one reactor in its system for shipments of SNF from another reactor in its system.

Response

This comment implies that the Purchaser wishes to designate which SNF in its system could be delivered when the Purchaser exercises its acceptance rights. DOE appreciates the Purchaser's desire to utilize acceptance capacity allocations to minimize operational problems. DOE will attempt to approve all Delivery Commitment Schedules that are submitted in compliance with the Contract. However, approval may be withheld if, for example, a Purchaser requests delivery of SNF which the WMS operation cannot accommodate at the requested delivery date.

Comment

One Purchaser suggested that if the ACR is to be the vehicle for providing information on criteria and procedures for acceptance of spent fuel, it needs to be published more frequently than once a year.

Response

It is DOE's intent to involve the Purchasers and/or their representatives in a cooperative and iterative effort to identify issues that arise in the implementation of the Contract. The time needed to obtain concurrences and secure approval of recommendations is likely to extend beyond the ACR publication cycle. The status of these activities will be documented in the ACR, but the policy, criteria, and/or procedures resulting from the ACR Issue Resolution Process will be formally communicated to the individual Purchasers by the Contracting Officer or through rulemaking.