83-1-31

JOHN J. KEARNEY, Senior Vice President

EDISON ELECTRIC INSTITUTE The association of electric companies

1111 19th Street, N.W.
Washington, D.C. 20036
Tel. (202) 828-7400

March 7, 1983

Mr. Robert Morgan
Project Director
Nuclear Waste Policy Act Project Office
Department of Energy
1000 Independence Avenue, S.W.
Room 7B-084
Washington, D.C. 20585

Re: Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste (10 CFR Part 961)

Dear Mr. Morgan:

On February 4, 1983, the Department of Energy (DOE) published in the Federal Register a notice of proposed rulemaking concerning the standard contract for disposal of spent nuclear fuel and/or high level radioactive waste. 48 Fed. Reg. 5458. The proposed contract would implement the authority granted to DOE by Section 302 of the Nuclear Waste Policy Act (Public Law 97-425), signed into law by the President on January 7, 1983. Under Section 302, DOE is authorized to enter into contracts for the disposal of spent nuclear fuel (SNF) and high-level radioactive waste (HLW) of domestic origin.

On behalf of the Edison Electric Institute and the Utility Nuclear Waste Management Group, we are pleased to comment on the proposed contract. The Edison Electric Institute (EEI) is the association of the nation's investor-owned utilities. The member utilities of EEI provide about 78 percent of the nation's electricity and serve over 67 million customers. The Utility Nuclear Waste Management Group (UNWMG) is comprised of 43 utilities with specific interests relating to nuclear waste management. EEI and UNWMG were pleased to testify at the March 3, 1983 public hearing held by DOE on the proposed contract. Both EEI and UNWMG, and their member utilities, have a vital interest in the proposed contract. Most of the SNF/HLW which will be disposed of pursuant to the standard contract will be generated in reactors owned and operated by these utilities. And most of the fees to be paid to DOE under the contract will come from these utilities and ultimately from

Although the contract is generally comprehensive and complete, there are two significant issues on which the proposed contract is silent -- DOE performance standards and purchaser remedies. Article II states that the disposal services shall commence not later than January 31, 1998, a provision consistent with the Nuclear Waste Policy Act. However, no other milestones are included. Nor does the contract commit DOE to accept any given quantity of SNF/HLW. And, of most significance to utilities, the contract provides no specific remedies in the event that DOE fails to meet the 1998 deadline. (A related difficulty is the absence in the contract of any guidelines for DOE's approval or disapproval of delivery commitment schedules and final delivery schedules.) We recognize that these issues are complicated ones and not easily resolved. On the other hand, they deserve serious study, even if their resolution comes after the draft contract has been promulgated. We would therefore strongly urge that DOE meet with purchasers to negotiate a mutually acceptable solution to these open items.

EEI and UNWMG commend you and your staff for the substantial effort which has gone into developing the proposed contract. We appreciate the opportunity to submit these comments and would be pleased to discuss them with you and your staff. Please consider these comments to be active and good faith negotiation on the part of the member utilities of EEI and UNWMG.

Very truly yours,

JOHN J. KEARNEY
Senior Vice President

Attachments

cc: Mr. Jeff Hill
Office of Information and
Regulatory Affairs
Office of Management and Budget

March 7, 1983

# ATTACHMENT A

## DETAILED COMMENTS ON DOE DRAFT DISPOSAL CONTRACT

### IDENTIFICATION OF PARTIES

In identifying the Purchaser, the wording should allow for those cases where the lead utility is acting on behalf of itself and its co-owners. This could be accomplished by adding at the end of the provision, "acting on behalf of itself and ____________________".

### WHEREAS CLAUSES

1. Third "Whereas" Clause: This clause states that the full cost recovery fee is to be collected from "any Purchaser". The implication is that each Purchaser's fee is to be the full cost for disposal of that Purchaser's spent nuclear fuel or high level waste ("SNF/HI ."). Under the Nuclear Waste Policy Act ("the Act"), full cost recovery is intended to be achieved from the total of all fees collected from all owners and generators of SNF/HLW. Also "any Purchaser" is an ambiguous term; the contract refers only to a single "Purchaser" for that particular

contract. The clause should therefore be modified by changing "any Purchaser" to "owners and generators".

The clause should also apply to all SNF/HLW, rather than "any such" SNF/HLW. As modified, the clause should read:

> "WHEREAS, DOE is required to collect a full cost recovery fee from owners and generators delivering to the DOE such spent nuclear fuel and/or high level radioactive waste."

2. The contract should include a recognition that DOE will design its facilities with the capacity to receive SNF/HLW at a rate commensurate with the amount of SNF/HLW then being generated together with the accumulated backlog of SNF/HLW. We believe that DOE should be able to take delivery of SNF/HLW equal to that year's generation plus a reasonable share of the backlog. While the contract may not be the appropriate place to commit DOE to a specific, numerical receiving rate, DOE should recognize, at least qualitatively, the need to have adequate annual receiving capacity to handle industry needs. This would be consistent with the direction of section 302(a)(5) of the Act that DOE take title to SNF/HLW as expeditiously as practicable upon request of the generator or owner. A new clause should be added:

> "WHEREAS, DOE recognizes that its ability to take delivery of spent nuclear fuel and/or high-level radioactive waste must be commensurate with the amount of such fuel and waste then being generated together with the amount of such fuel and waste previously generated, and consistent with its obligation to take title to such fuel and waste as expeditiously as practicable upon the request of the owner or generator of such fuel and waste."

<u>ARTICLE I - DEFINITIONS</u>

1. Terms which are defined should be capitalized throughout the contract, not just in Article I. This will help clarify when a term used in the contract is a defined term and when it is not.

2. The "Assigned Three-Month Period" (Article I.1) should, at Purchaser's option, be linked to Purchaser's normal monthly closing date for customer billing and internal recordkeeping purposes. This will avoid duplicate bookkeeping. The specification of the Assigned Three-Month Period, in Art. VIII.B.1, should be by mutually agreement, rather than "assigned by DOE." The definition should omit the underscored language in the phrase "kilowatt hours generated and sold <u>by Purchaser's nuclear power reactor</u>." That language (which in any event should have been the defined term "civilian nuclear power

reactor") is a part of the definition of "kilowatt hours generated and sold". Article I.14. As modified, the definition would read:

> "The term 'Assigned Three-Month Period' means the period specified in Article VIII.B.1 for purposes of reporting kilowatt hours generated and sold and for establishing fees due and payable to DOE."

3. The definitions of both "Commission" (Article I.4) and "DOE" (Article I.10) should be modified to include successor agencies.

4. The definition of "Delivery Commitment" (Article I.7) is unnecessary and should be deleted. "Delivery Commitment Schedule" is described in detail in Article IV.B and Appendix B. The definition adds nothing and could be inconsistent with Article IV.B and Appendix B.

5. The term "Delivery" (Article I.8) should include the concept of "transfer of custody <u>f.o.b. carrier</u>" and the requirement that DOE not unreasonably withhold its approval of Purchaser's designation of a domestic site other than Purchaser's reactor.

6. The definition of "DOE Facility" (Article I.11) should be broadened to include destinations other than the repository. As written, "DOE Facility" is a facility for "disposing of" SNF/HLW. Other portions

of the contract provide that Purchaser will prepare the SNF/HLW for transportation "to the DOE facility" (Article V.A.2(a)) and that DOE will ship the SNF/HLW "to the DOE facility" (Article V.B.2). The contract does not recognize the possibility that DOE might send SNF/HLW to an intermediate location (such as a monitored retrievable storage facility) before it goes to the repository. To accommodate this, the definition of "DOE Facility" should be broadened. This could be accomplished by adding "and such other DOE facility to which spent nuclear fuel and/or high level radioactive waste may be shipped prior to its transportation to a disposal facility".

7. "Full Cost Recovery" (Art. I.12) should include an offset for any interest income which the Nuclear Waste Fund might earn. This can be accommodated by adding the underscored wording:

> "The term 'Full Cost Recovery' means the recoupment by DOE, through Purchaser fees and interest earned by investments from the Nuclear Waste Fund, of all direct costs ...."

"Full Cost Recovery" is defined in a way that could be interpreted to allow expenditures from the Nuclear Waste Fund for purposes beyond those contemplated by the Act. For example, "cost" is defined to include "all other uses specified in the Act", whether or not

to delivery of SNF/HLW. The first sentence should therefore be modified accordingly:

> "This Contract applies to the delivery by Purchaser to DOE of SNF and/or HLW from civilian nuclear power reactors, acceptance of title by DOE to such SNF and/or HLW, subsequent transportation, and disposal of such SNF and/or HLW, and with respect to such material, establishes the fees to be paid ...."

2. The second sentence of Article II includes the phrase "SNF and/or HLW of domestic origin <u>from civilian nuclear power reactors</u>". The underscored words can be deleted since "SNF and/or HLW of domestic origin" is a defined term (Art. I.19) that includes the concept "from civilian nuclear power reactors".

3. The third sentence of Article II states that DOE's services will continue until the SNF/HLW "has been disposed of as provided for in this contract". Since the contract does not specify how disposal is to take place, the phrase "as provided for in this contract" could be deleted.

4. The third sentence of Article II states that "the disposal services" shall begin by January 31, 1998. Since DOE will be providing services other than disposal (<u>i.e.</u>, cask supply, transportation), the limitation to <u>disposal</u> services is too narrow. The phrase should read, "The services to be provided by

DOE under this contract shall commence on a schedule consistent with the commencement of disposal services not later than January 31, 1998 ...."

5. Article II should also recognize DOE's statutory obligation to expeditiously take delivery of SNF/HLW. Section 302(a)(5)(A) of the Act. The following sentence should be added:

> "Following commencement of operation of a DOE facility for the disposal of SNF and HLW, DOE shall take title to such material as expeditiously as practicable upon Purchaser's request."

<u>ARTICLE III - TERM</u>

The term of the contract expires when "DOE has accepted SNF and/or HLW from the civilian nuclear power reactors specified in Appendix 'A'". Under Article VI.B.1, the SNF/HLW would still be at Purchaser's site when acceptance takes place. (DOE's acceptance occurs when the SNF/HLW is ready for transportation and DOE has taken custody f.o.b. carrier.) The contract should remain in effect at least until <u>all</u> SNF/HLW has left Purchaser's site. The provision should be reworded as follows:

> "The term of this contract shall be from the date of execution until such time as DOE has accepted and transported from Purchaser's site(s) all SNF and/or HLW from the civilian nuclear power reactors specified in Appendix 'A'."

ARTICLE IV - DELIVERY OF SNF AND/OR HLW

1. Article IV.A provides a general statement of Purchaser's obligation to deliver SNF/HLW to DOE and DOE's obligation to take it. For purposes of clarity, the title of Article IV.A should be changed to "Delivery of SNF and/or HLW" rather than "Description of SNF and/or HLW". Also, DOE's obligation should be to 'accept" the material rather than to "receive" it. This change would be consistent with the language elsewhere in the contract. See, e.g., Articles II, III, IV.D, V.B.3, VI.A.1, etc.

2. Article IV.B states that "After DOE has issued its proposed acceptance ranking, described in [Article V.B.6]", Purchaser shall submit delivery commitment schedules 63 months before proposed delivery dates. The quoted language is confusing and should be deleted. It could mean that prior to DOE's issuance of its first acceptance ranking (which, according to Article V.B.6, will occur on April 1, 1991) no delivery commitment schedules can be submitted. Or, it could mean that prior to DOE's first annual acceptance ranking, the 63 month minimum advance notice does not apply. If the first interpretation were accepted, a shipment date earlier than July 1996

would not be permitted (April 1, 1991 plus 63 months), even if a DOE facility were available. If the second interpretation were correct, purchasers would have no guidance on the timing for submittal of delivery commitment schedules prior to April 1, 1991. In either case, the quoted language is not necessary. If Purchaser submits a delivery commitment schedule proposing a delivery before the first DOE facility is available, DOE would simply disapprove it. (Note that the comment on Article VI.B.3 proposes that "acceptance ranking" be changed to "acceptance allocation").

3. If DOE is to be able to establish a reasonable planning basis for its delivery commitments, it should receive proposed delivery commitment schedules from all purchasers at the same time and covering the same time frame. Unless delivery commitment schedules are submitted on a consistent basis, DOE will not be able to plan on a consistent basis. Retaining the 63 month timetable, all purchasers should submit delivery schedules by July 1 covering any deliveries they wish to make during the fiscal year commencing 63 months later. This can be accomplished by modifying the second sentence of Article IV.B as follows:

> "... the Purchaser shall submit, not later than 63 months prior to the start of any fiscal year, delivery commitment schedule(s) specifying all deliveries that Purchaser wishes to make during that fiscal year."

For clarity a definition of "fiscal year" should also be included in Article I or elsewhere in the contract.

4. Under Article IV.B, if DOE disapproves a delivery commitment schedule, Purchaser shall resubmit a revised schedule within 30 days. No time limit is provided for DOE's response to the resubmitted schedule. Presumably a period of not more than 30 days would be adequate. If DOE were also to disapprove the resubmitted schedule, it should propose an alternate schedule. If Purchaser does not accept DOE's alternate, the contract could provide for mandatory negotiation among the parties to arrive at an acceptable schedule. Appropriate language should be inserted before the last sentence in the first paragraph of Section IV.B as follows:

> "DOE shall approve or disapprove such revised schedule(s) within thirty (30) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall submit its proposed schedule(s). If these are not acceptable to Purchaser, the parties shall promptly seek to negotiate mutually acceptable schedule(s)."

A similar comment applies to the Final Delivery Schedule provision (Article IV.C).

5. Article IV.B should allow delivery schedule flexibility of "±2 months" instead of "+2 months".

6. The second paragraph of Article IV.B allows the Purchaser to "change the specific assemblies to be delivered so long as the SNF meets the acceptance criteria of the contract". The relationship between this provision and the acceptance priority ranking (Article VI.B.3) is unclear. Since the acceptance priority ranking does not appear to be part of the "acceptance criteria of the contract", the paragraph could mean that Purchaser, having been given an acceptance priority for a given fuel assembly based on its age, could substitute for that assembly one of Purchaser's newer assemblies which otherwise would not qualify for delivery. The paragraph could also be interpreted to allow several Purchasers to "swap" delivery schedules. A "swap" system should be permitted by the contract. So should the authority for Purchaser to determine which of his fuel assemblies are to be delivered to DOE and the order in which they are delivered. However, a more explicit authorization should be included to assure that exchanges among and within utilities will be

permitted. The second paragraph of Article IV.B should be deleted and a new provision added as Article IV.E:

> "E. Exchanges.
>
> Purchaser shall have the right to determine which SNF and/or HLW is delivered to DOE, provided that Purchaser complies with the requirements of Article V.A.2(b) as to such SNF and/or HLW. Purchaser shall have the right to exchange approved delivery commitment schedules with parties to other contracts with DOE for disposal of SNF and/or HLW, provided that DOE shall have the right to approve such exchanges, based upon the feasibility of necessary transportation arrangements, which approval shall not be unreasonably withheld."

7. Article IV.D should use the phrase "delivery commitment schedule" instead of "Delivery Commitment".

ARTICLE V - RESPONSIBILITIES OF THE PARTIES

1. Article V.A.1 requires Purchaser to submit an annual report of actual and projected discharges (the title of this section could more accurately read "Discharge Information"). The provision should expressly state that information in this report is not a firm commitment on Purchaser's part. This caveat appears on the Appendix D form (although not on Enclosure 1 to that form). However, it more properly belongs in the contract. Appropriate wording should be added at the end of Article V.A.1(a);

DOE-supplied cask handling equipment, an improper procedure furnished by DOE, or even a flaw in the cask itself. Only in the event of Purchaser's negligence should there by any liability. The provision also includes "expenses incidental to such loss or damage", a vague phrase which could include consequential damages. The provision should be redrafted as follows:

> "Purchaser shall not be liable for any loss of or damage to such casks while such casks are in the possession and control of Purchaser, except for loss or damage caused by Purchaser's negligence."

8. Article V.B sets forth DOE's responsibilities under the contract. DOE's major functions are to accept title to SNF/HLW, arrange for transportation and to dispose of this material. Although the acceptance and transportation functions appear in Article V.B, a single provision summarizing DOE's primary responsibilities should be added:

> "1. DOE shall accept title to all SNF and/or HLW generated by the civilian nuclear power reactors specified in Appendix 'A', provide necessary transportation for such material to the DOE facility, and dispose of such material, in accordance with the terms of this contract."

9. Article V.B.1 sets forth DOE's responsibilities to approve or disapprove delivery commitment schedules

and final delivery schedules within 90 days of receipt. This provision is inconsistent with Articles IV.B and C which allow DOE 3 months and 45 days to approve or disapprove delivery commitment schedules and final delivery schedules, respectively. In any event, the provisions of Article IV.B and C make Article V.B.1 redundant. Article V.B.1 should therefore be deleted.

10. Article V.B.2 should require DOE to provide Purchaser with the necessary information, procedures, specifications needed for Purchaser to meet its responsibilities under Article V.A.2(c) to maintain, protect and preserve shipping casks while they are at Purchaser's site. The information should be provided sufficiently far in advance so that Purchaser will be adequately prepared. The provision should also recognize DOE's responsibility for normal cask maintenance and repair. Article V.B.2 should acknowledge that more than one cask may be involved. Finally, the cask(s) to be provided must be compatible with the transportation capabilities to and at the site, as well as suitable for use at the site. The following revised Article V.B.2 meets these objectives:

13. DOE's obligation to provide Purchaser with program cost projection information (Art. V.B.5) should specifically include a requirement that DOE inform Purchaser at the earliest possible date of a proposed increase in the fee. Utilities will need as much advance notice as possible in order to assure appropriate rate treatment through their public utility commissions. An appropriate additional sentence should be added to Article V.B.5:

> "DOE shall promptly notify Purchaser when it has information suggesting that an adjustment to the fee established hereunder may be appropriate, and shall afford Purchaser the opportunity to comment on a suggested fee adjustment before transmitting a proposed fee adjustment to Congress pursuant to Section 302(a)(4) of the Act. DOE shall promptly notify Purchaser of a proposed adjustment to the fee."

14. Under Article V.B.6, DOE issues an annual priority ranking of SNF/HLW eligible for receipt at the DOE facility. We believe that the 1991 date for the first of these reports does not provide utilities with sufficient advance notice so that they can adequately plan their SNF storage needs. DOE will be developing information on schedules, capacities, receiving rates, etc. in connection with its development of the mission plan required by section 301 of the Nuclear Waste Policy Act. DOE will also

be receiving information on actual and future SNF discharges beginning in October, 1983. DOE should therefore provide an annual report, setting out its schedules, projected receiving rates, and projected allocations for all purchasers, starting at about the time that DOE submits the mission plan to Congress (i.e., June 7, 1984). The report should cover at least 10 years of repository operation. Of course, the report would be based upon the best information then available to DOE. Consistent with our comments on Article VI.B.3, the provision would reflect an allocation system partially based on age and partially on inventory share. Article V.B.6 should be changed accordingly:

> "Beginning not later than July 1, 1984, DOE shall issue an annual capacity allocation report. The report shall set forth the projected annual receiving capacity for the DOE facility or facilities and the annual acceptance allocation for each party to a DOE contract for the disposal of SNF and/or HLW. The report shall provide such capacity and allocation information, to the extent available, for ten fiscal years following the projected commencement of operation of the initial DOE facility."

15. If Purchaser has failed fuel which requires encapsulation prior to loading in the shipping cask, DOE should provide the cannisters, to assure that they

schedules exchanged pursuant to Article IV.E."

7. Article VI.B.3(b) gives a priority to SNF/HLW from permanently shutdown reactors. As explained above, we do not support this priority system and recommend that it be deleted.

<u>ARTICLE VII - TITLE</u>

1. The first sentence refers to "Title to all SNF and/or HLW <u>accepted by DOE for disposal</u>" passing to DOE "upon acceptance". The phrase "accepted by DOE for disposal" is surplusage and should be deleted.

2. For clarity, the second sentence should refer to responsibility for the material shifting upon "passage of title" instead of upon DOE's "assuming title."

3. In the event that DOE subsequently chooses to use or process the SNF and/or HLW for purposes other than disposal, an appropriate credit should be provided. This credit should flow to the Nuclear Waste Fund, since the selection of a particular purchaser's SNF/HLW is likely to be essentially arbitrary. Crediting the Fund will spread the benefit to all purchasers. This credit can be accomplished by adding a proviso at the end of the section:

APPENDIX B

1. To be consistent with Article IV.B., the second sentence in Appendix B should be changed to read: "This Delivery Commitment Schedule shall be submitted by Purchaser to DOE for approval not later than sixty-three (63) months prior to the estimated date of delivery."

2. "Reactor Name" should be changed to "Reactor/Facility Name." The delivery point may be a reprocessing plant, storage facility, etc.

3. "Type reactor -- PWR/BWR" should be deleted. The designation of the reactor type is not necessarily indicative of the type of fuel assemblies which may be shipped from a reactor's storage pool, since there may have been a transshipment of PWR fuel to a BWR Plant or vice versa.

4. We presume the "Shipping Lot No." will be assigned by DOE. A parenthetical statement to that effect might be added.

5. "Discharge Date" should be "Range of Discharge Dates (Earliest To Latest)."

6. "Metric Tons Uranium" should be modified by the addition of "(Initial)." This is to clarify that the quantity of uranium to be reported is the quantity at the time the fuel assembly was initially loaded upon fabrication.

7. After "Number of Assemblies" there should be three blanks -- one designated "BWR", one designated "PWR", and one designated "Other". More than one type of assembly could be shipped from the same reactor or facility.

8. "Proposed Shipping Mode" should include "(Rail/Truck/Barge)."

9. The penultimate paragraph is unnecessary. Article V.A.2.(b) requires that Appendix F -- "Detailed Description of Purchaser's Fuel" -- be submitted for each shipping lot sixty (60) days prior to scheduled transportation.

10. The final paragraph should be deleted and replaced by the following statement: "Purchaser hereby certifies that the Spent Nuclear Fuel to be delivered pursuant to this Delivery Commitment Schedule has been discharged from a Civilian Nuclear Power Reactor and that Purchaser has the legal right to deliver such Spent Nuclear Fuel to DOE for Disposal." Proof of ownership could be difficult to produce in some cases, would unnecessarily increases the paperwork required, may be subject to dispute, or may change between the time the Delivery Commitment Schedule is executed and actual delivery occurs. DOE is required, in any event, to take all SNF and HLW derived from civilian nuclear power reactors (as that

term is defined in Article I(3)). The proposed certification assures DOE that Purchaser has the legal right to deliver the SNF to DOE and that the SNF is eligible for delivery to DOE pursuant to the Contract.

11. "Approved for DOE" should be changed to "Approved by DOE."

APPENDIX C

1. The information to be provided in Appendix C should be submitted on a separate form for each delivery site designated by Purchaser.
2. "Reactor Name" should be changed to "Reactor/Facility Name." See Comment 2 with respect to Appendix B above.
3. Delete the entry "Type Reactor -- PWR/BWR". See Comment 3 with respect to Appendix B above.
4. We presume the "Shipping Lot No." will be assigned by DOE. A parenthetical statement to that effect might be added.
5. "Discharge Date" should be "Range of Discharge Dates (Earliest To Latest)."
6. "Metric Tons Uranium" should be modified by the addition of "(Initial)." See Comment 6 with respect to Appendix B above.

## APPENDIX 'B'

SAMPLE

### DELIVERY COMMITMENT SCHEDULE

In accordance with the contract for disposal of spent nuclear fuel and/or high-level radioactive waste between Purchaser and DOE, the following delivery commitment schedule is submitted by Purchaser to DOE. This delivery commitment schedule shall be submitted by Purchaser to DOE for approval not later than sixty-three (63) months prior to the estimated date of delivery.

Purchaser ______________________

Contract Number ________ Date ____ / ____ / ____
Mo Day Yr

Reactor/Facility Name ______________________

Location:

Street ______________________

City ______________________

County/State ________ / ________

Zip Code ________

Shipping Lot Number (Assigned by DOE) ________ Type Cask Required: ________

DOE Assigned Delivery Commitment Year ________

Proposed Shipping Mode: Truck ☐ Rail ☐ Barge ☐

Range of Discharge Date(s) (Earliest to Latest) ____ / ____ / ____ To ____ / ____ / ____
Mo. Day Yr. Mo. Day Yr.

Metric Tons Uranium (Initial) ________ Number of Assemblies:

BWR ________

PWR ________

Other ________

Purchaser hereby certifies that the Spent Nuclear Fuel to be delivered pursuant to this Delivery Commitment Schedule has been discharged from a Civilian Nuclear Power Reactor and that Purchaser has the legal right to deliver such Spent Nuclear Fuel to DOE for Disposal.

By Purchaser ________ Approved by DOE ________

Title ________ Contracting Officer ________

Date ____ / ____ / ____ Date ____ / ____ / ____
Mo Day Yr Mo Day Yr

SAMPLE

APPENDIX 'C'

FINAL DELIVERY SCHEDULE

(To be submitted to DOE by Purchaser for each designated Delivery site not later than twelve (12) months prior to estimated date of first delivery.)

Purchaser: ____________________

Contract Number __________ Date ___ / ___ / ___ (Mo / Day / Yr)

Reactor/Facility Name ____________________

Location:

Street ____________________

City ____________________

County/State __________ / __________

Zip Code

Shipping Lot Number (Assigned by DOE) __________

Type(s) of Cask(s) to be Used: __________

Shipping Mode: Truck ☐ Rail ☐ Barge ☐

# Assemblies per cask ___

Metric Tons Uranium - Initial ______

Range of Discharge Date(s) (Earliest to Latest) ___ / ___ / ___ (Mo / Day / Yr) To ___ / ___ / ___ (Mo / Day / Yr.)
(From approved commitment schedule)

Number of Assemblies
BWR ______
PWR ______
Other ______

Purchasers Delivery Estimate First ___ / ___ / ___ (Mo / Day / Yr) Last ___ / ___ / ___ (Mo / Day / Yr)

Purchaser hereby certifies that the Spent Nuclear Fuel to be delivered pursuant to this Final Delivery Schedule has been discharged from a Civilian Nuclear Power Reactor and Purchaser has the legal right to deliver such Spent Nuclear Fuel to DOE for Disposal.

To confirm acceptability of delivery date.

Note:

Purchaser Contact __________ Title __________ Phone __________

DOE Contact __________ Title __________ Phone __________

By Purchaser __________ Approved by DOE __________

Title __________ Contracting Officer __________

Date ___ / ___ / ___ (Mo / Day / Yr) Date ___ / ___ / ___ (Mo / Day / Yr)

provided should be simply the total nuclear kilowatt hours generated and sold during the assigned three month period. In all cases, that number will not simply be read from a continuous meter, but may require calculations.

2. In the "Instructions for Completing DOE Remittance Advice," Section II, the first sentence should read: "Based on inventory of SNF and/or HLW from SNF discharged from a civilian nuclear power reactor prior to April 7, 1983, times the kilogram fee."

3. "Instructions for Completing DOE Remittance Advice," Section III, the first sentence should read: "Based upon electricity generated and sold on or after April 7, 1983 times the current fee of one mil per kilowatt hour." The second sentence should read: "Schedules should be attached specifying the net amount of kilowatt hours generated by each nuclear unit during the assigned period."

FENDIX H

1. The suggested Disputes Clause in Appendix H to the draft DOE Disposal Contract appears generally to be patterned after the old Disputes Clause in uranium enrichment contracts, developed prior to the Contract Disputes Act cf 1978. DOE has subsequently determined that the enrichment contracts are governed by

the Contract Disputes Act. However, it is not clear that the statutory jurisdiction of the Contract Disputes Act would include the DOE Disposal Contract, which provides for services by the Government only. Nonetheless the disputes mechanism set forth in the Contract Disputes Act provides a model for the Disputes Clause that we recommend.

2. Our recommended Disputes Clause (attached hereto) provides: (1) In the event of a dispute or claim arising under or related to the Contract, the Purchaser would file a claim with the Contracting Officer. (2) The Contracting Officer must decide the claim in writing within 60 days. (3) The Purchaser could appeal the Contracing Officer's decision either to the DOE Board of Contract Appeals (within 90 days), or the Claims Court (within 1 year). (5) Arbitration would be available if both parties agree. (6) Pending final decision of a claim, DOE and the Purchaser would proceed diligently with performance of those aspects of the Contract not in dispute.

3. We propose deleting the certification of claims requirement for claims in excess of $50,000. This provision was designed for contracts where a contractor may be claiming money is owed under a supply contract. Here claims are more likely to be for schedule adjustments or regarding delivery

commitments rather than claims for money. The certification requirement is not necessary to protect the government from frivolous claims.

4. An arbitration provision was added as a disputes resolution mechanism where both parties agree and where consistent with Government Contracts Law. Both parties may prefer an expert in the field to arbitrate certain highly technical matters. The "Umpire" provision in uranium enrichment contracts is an example of such an arbitration mechanism.

5. The disputes clause in Appendix H to the draft DOE Disposal Contract provides that "In connection with any appeal proceeding under this clause, the Purchaser shall proceed diligently with the performance of the Contract and, in accordance with the Contracting Officer's decision." The meaning of this provision is not clear. It may mean that during the pendency of an appeal, Purchaser shall continue to perform under the Contract. If this is its meaning, the clause is one-sided. An appropriate substitute found in Paragraph D of our proposed Disputes Clause would be: "Pending final decision of a claim hereunder, Purchaser and DOE shall proceed diligently with the performance of those aspects of the contract not in dispute."

RECOMMENDED DISPUTES CLAUSE

DISPUTES

A. Except as otherwise provided in this Contract, all disputes or claims arising under or relating to this Contract, including the performance or nonperformance thereunder, shall be resolved in accordance with this clause.

B. (1) As used herein, "claim" means a written demand or assertion by one of the parties seeking, as a matter of right, the payment of money, adjustment, or interpretation of contract terms, or other relief, arising under or relating to this Contract, including the performance or nonperformance by either party hereunder.

(2) A claim by the Purchaser shall be made in writing and be submitted to the Contracting Officer for decision. A claim by the Government against the Purchaser shall be subject to an initial decision by the Contracting Officer.

(3) The Contracting Officer must decide the claim in writing within sixty (60) days of his receipt of the claim from the Purchaser.

(4) The Contracting Officer's decision shall be final unless the Purchaser files an appeal or initiates legal action pursuant to Paragraph C herein.

C. An appeal of the Contracting Officer's decision may be taken by the Purchaser as follows:

(1) Upon agreement of the two parties and where authorized by law, the appeal of a Contracting Officer's decision may be submitted to binding arbitration. Such an appeal shall be initiated within ninety (90) days of Purchaser's receipt of the Contracting Officer's decision by notice to the Contracting Officer. The parties shall attempt to designate as arbitrator a person qualified by training and experience to pass upon the matter in dispute. If the parties cannot agree upon an arbitrator, each party shall designate one arbitrator and the two arbitrators so designated shall select a third arbitrator. The arbitration shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association. Arbitration proceedings shall be held in Washington, D.C., and judgment upon any arbitration award may be entered in any court having jurisdiction thereof in the District of Columbia or the State of ____________, the parties hereto consenting to the jurisdiction of such courts for this purpose, or any other court having jurisdiction thereof. The decision of the arbitrator(s) shall be in writing. The parties shall share the procedural costs of arbitration equally unless the arbitrator(s) decides otherwise. Each party shall pay its own attorney fees and costs incurred in connection with the arbitration. This agreement to arbitrate shall be specifically enforceable.

(2) The Purchaser may elect to appeal to the DOE Board of Contract Appeals ("Board"). The Purchaser shall take an appeal to the Board by a written notice of appeal addressed to the Board and the Contracting Officer within ninety (90) days of Purchaser's receipt of the Contracting Officer's decision. The appeal shall be governed by the DOE rules applicable to contract claims not subject to the Contract Disputes Act of 1978 (P.L. 95-563). The decision of the Board shall be final and conclusive unless determined by a court of competent jurisdiction to have been fraudulent, or capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence. In any such appeal, the Purchaser shall be afforded an opportunity to be heard and to offer evidence in support of its appeal.

(3) The Purchaser may elect to appeal to the United States Claims Court by filing suit with the Claims Court within one year of Purchaser's receipt of the Contracting Officer's decision.

D. Pending final decision of a claim hereunder, Purchaser and DOE shall proceed diligently with the performance of those aspects of the Contract not in dispute.

PRESENTATION BY MR. MICHAEL COOK, VICE PRESIDENT, CONTRACTS, FUELS AND CORPORATE DEVELOPMENT, FLORIDA POWER AND LIGHT

MR. COOK: Thank you. Before I get into my testimony, there are prepared copies available to you, and I will elaborate and amend to some extent that. And I would like to thank you also for having given us, Florida Power and Light, the opportunity to meet previously with the staff to negotiate on the specific terms of the Florida Power and Light contract as well.

For the record, I am Michael Cook, Vice President of Contracts, Fuels and Corporate Development for Florida Power and Light.

Among my duties is contracting for the elements of the nuclear fuel cycle in support of our four nuclear plants. And certainly the safe disposal of the spent nuclear fuel and high level waste is a major concern to our company and the 2.4 million customers we serve.

There are six areas I would like to discuss, specifically, and before I go into that though I would like to comment that, in general, Florida Power and Light Company endorses the extensive efforts made by the Edison Electric Institute and the Utility Nuclear Waste Management Group in the preparation of written comments on this contract.

The utility industry recognizes the great importance of this rule making and has mounted an extensive

effort to provide significant input into this document, using the expertise of the entire industry. These comments that you will be receiving represent a broad consensus of opinion on what is required to most effectively implement the activities mandated by the Act. And I think the Department should recognize these as a very serious and honest effort and give them extremely heavy weight in determining the final contract language.

Florida Power and Light will also provide detailed comments on the draft contract, and I expect, in general, to adopt the EEI/UNWMG comments in addition to those I previously submitted to the Department. And, in fact, if any inconsistencies exist between the previous comments I made and those that you will be receiving from EEI/UNWMG, I would actually give preference to the EEI version since they do represent the industry concensus.

But let me now take this opportunity to comment on six areas which I think are very significant. And I would invite you, in fact, if you want to ask questions on any of these areas, if it's more convenient for you, to go ahead and interrupt as I cover the issues.

One of these important areas is performance standards. In general, it's a feature of all contracts to include a description of what's to be done by the party, when the specific activities are to be performed, and the

remedy in the event of nonperformance of the party.

The proposed contract is actually silent or, in some cases, vague on these aspects. It was clearly the legislative intent of Congress to provide for the safe disposal of spent fuel and high level waste and do this through the Department of Energy. It, in fact, requires the Department of Energy to prepare a Mission Plan detailing its schedule for the construction of repositories and their capacities.

And what I'm proposing is that once this Mission Plan has been approved by the Congress it become the standard by which the contract performance by the Department of Energy is judged.

And what I'm suggesting is that Article V B (3) of the contract be modified to include a statement such as: "Should the DOE fail to meet the schedule and capacities detailed in the approved DOE Mission Plan, because of Force Majeure or other causes, DOE shall, to the extent permitted by the Nuclear Waste Policy Act of 1982, as it may be amended from time to time, bear the reasonable and necessary incremental costs of storage or alternative disposal costs incurred by the Purchaser."

This approved Mission Plan and the annual acceptance ranking for the spent nuclear fuel will be the basis on which the utilities will plan their commitments of

resources for interim storage, if necessary, in order to meet their own projected discharge requirements. Without a provision of the type I've suggested requiring DOE to meet its obligations or cover the utilities' extra costs, the utilities could be forced into the unenviable position of having to make emergency expenditures for interim storage many years after the fuel is actually consumed, while continuing to pay millions in mandated fees to the Waste Disposal Fund.

Yet, since the utility regulatory commissions generally will have provided for a recovery of spent fuel disposal costs in prior periods, the utilities might be faced with being unable to recover these additional unanticipated costs from their customers.

So I think it's less more equitable for the Department to cover all the costs incurred because of any DOE schedule slippage, regardless of the cause of the slippage, using money in the Nuclear Waste Dispoal Funds, and then to replenish the Fund if necessary through fee adjustments on future generation in the manner provided in the Act.

The second issue I'd like to discuss is the fee for spent nuclear fuel discharged before April 7th, 1983, and there are several aspects there. One of these is that it's very important the fee be fixed as of April 7th, 1983 so that

83-1-1

UNITED STATES OF AMERICA
DEPARTMENT OF ENERGY

| | |
|---|---|
| In the Matter of<br>10 CFR Part 961 —<br>Standard Contract for Disposal of Spent Fuel and/or High Level Radioactive Waste | 48 Fed. Reg. 5458 |

STATEMENT OF
M.C. COOK
VICE PRESIDENT, CONTRACTS, FUELS AND CORPORATE DEVELOPMENT
ON BEHALF OF
FLORIDA POWER & LIGHT COMPANY

MARCH 1, 1983

I am Michael C. Cook, Vice President of Contracts, Fuels and Corporate Development for Florida Power & Light Company. Among my duties is contracting for all elements of the nuclear fuel cycle in support of our four nuclear power plants. The safe disposal of spent nuclear fuel and high level waste is a major concern of our Company and the 2.4 million Floridians we serve.

I want to briefly discuss six areas of concern with respect to the draft disposal contract:

1. Need for a performance standard;
2. Fee basis for spent nuclear fuel discharged prior to April 7, 1983;
3. Requirement for flexibility in the disposal contract;
4. Relationships with existing contracts for disposal obligations;
5. Indemnification; and
6. Credits for activities performed to reduce DOE's responsibilities and costs.

this opportunity to speak about the following major areas which need additional refinement:

1.0 PERFORMANCE STANDARDS

A common feature of all contracts is a description of what is to be done by each party, when the specific activities will be performed, and remedies in the event of nonperformance by a party. The proposed disposal contract is silent or at best vague on these aspects. It was clearly the legislative intent of Congress to provide for the safe disposal of spent fuel and high level waste in an expeditious manner on a timetable which would relieve the uncertainty associated with the present situation. The Nuclear Waste Policy Act specifically requires the Department of Energy to prepare a Mission Plan detailing a schedule for the construction of repositories and their capacities (Section 301). It is proposed that once this Mission Plan has been approved by Congress (18 months after the enactment of the Nuclear Waste Policy Act), it becomes the standard by which contract performance by the DOE is judged. It is suggested that Article V B (3) be modified to include the statement "Should the DOE fail to meet the schedule and capacities detailed in the approved DOE Mission Plan, because of Force Majeure or other causes, DOE shall, to the extent permitted by the Nuclear Waste Policy Act of 1982, as it may be amended from time to time, bear the reasonable and necessary incremental costs of storage or alternative disposal incurred by the Purchaser."

The approved Mission Plan and the annual acceptance ranking for receipt of