SNF would provide utilities with a planning base which they can use in committing resources for interim storage, if necessary, in order to meet their projected requirements. Without the proposed provision requiring DOE to meet its obligations or cover the utilities' extra costs, the utilities may be forced into the unenviable position of having to make emergency expenditures for interim storage many years after fuel is consumed, while continuing to pay millions in mandated fees to the Nuclear Waste Disposal Fund. Since utility regulatory commissions generally will have provided for spent fuel disposal costs in prior periods, the utilities may not be able to recover such additional unanticipated costs from their customers. It thus would be more equitable for the DOE to cover all costs incurred because of any DOE schedule slippage, using money in the Nuclear Waste Disposal Funds, and to then replenish the fund if necessary through fee adjustments on future generation as provided in the Act.

## 2.0 FEE FOR SPENT NUCLEAR FUEL DISCHARGED PRIOR TO APRIL 7, 1983

This issue has three aspects.

First, the fee must be fixed as of April 7, 1983, so that utilities in conjunction with regulatory bodies may provide for the orderly collection and payment of this fee for fuel previously utilitized.

Secondly, the fee must bear some relationship to the relative cost of disposal while at the same time satisfying the Nuclear Waste Policy Act requirement that "such fee shall be in an amount equivalent to an average charge of one mil per kilowatt hour for electricity generated by such spent nuclear fuel." We are in favor of the three tier approach based on exposure which has been presented in the DOE draft contract (Article XIII). This approach is the most

83-1-9

NSP

Northern States Power Company

414 Nicollet Mall
Minneapolis, Minnesota 55401
Telephone (612) 330-5500

March 3, 1983

Mr Robert Morgan
Project Director
Nuclear Waste Policy Act Project Office
Department of Energy
1000 Independence Avenue, S.W.
Room 7B-084
Washington, D.C. 20585

Dear Mr Morgan:

Northern States Power Company has reviewed the Draft Waste Disposal Contract and respectfully submits the following comments:

(1) DOE commitment -

"The context of the contract is inverted. Rather than a context of spent fuel "delivery commitments" as a binding obligation placed upon the utility, the contracts should be restated as in terms of "acceptance commitments" as a binding obligation placed upon DOE.

In this case, the utilities are making payments in advance for a "prospective service", rather than arranging in advance for a service for which "prospective payments" are to be made upon receipt of the service. Therefore, the context of the contract should be stated in terms of DOE "acceptance commitments", as the operative contract obligation in return for payments received.

Further, the contract should have a clear statement of intent that DOE shall incur a contract obligation to take delivery of all spent fuel and high level waste at the earliest practicable time upon the request of the owner or generator of such fuel and waste."

(2) Determination of fee for spent nuclear fuel discharge prior to April 7, 1983 -

Northern States Power Company feels the preferred calculation of the above fee is by determining the average burnup of all discharged fuel prior to April 7, 1983, calculating the dollar per kilogram for that average burnup equivalent to one mil per kilowatt hour, and applying that dollar per kilogram charge to all discharged fuel. We feel this method most closely follows the intent of the enacted legislation.

(6) Effective date for fees charged on electricity generated after April 6, 1983 -

The Purchaser should be allowed to prorate charges accumulated during the month of April on electricity generated over the Purchaser's normal accounting monthly time period to eliminate the possibility of requiring the Purchaser to maintain two sets of books. Such total prorated charge for the month of April shall be equivalent to the charges that would have been accrued if the effective date of the charges commenced on April 7, 1983.

(7) Audit rights covering the program and administration of the Waste Fund -

The Purchaser or its representative should have the right to perform any reasonable audits or inspections necessary to monitor DOE's conduct of the waste disposal program and the operation of the Nuclear Waste Fund.

(8) Costs of Military and Civilian Waste Programs -

Northern States Power Company feels accounting and control procedures should be established to separate all costs associated with the development and operation of the Military Waste Program from the Civilian Program. The Purchaser, should be assured, under the contract, that he will not bear any of the costs of the Military Waste Program in his fees.

(9) Exchanges of approved delivery commitment schedules among and within utilities -

The Purchaser should have the right to exchange approved delivery commitment schedules with parties to other contracts with DOE for disposal of Spent Nuclear Fuel and/or High Level Waste.

(10) Acceptance Priority Ranking System -

This system does not readily provide explicit priority to keep reactors operating, provide priority based upon the size of the Purchaser's total Spent Nuclear Fuel inventory, allow for "swapping" of delivery dates, and limits the Purchaser's flexibility as to which Spent Nuclear Fuel or High Level Waste it may ship by allowing the DOE only to accept the oldest Spent Nuclear Fuel and/or High Level Waste first. The contract should take these concerns into consideration.

(11) Annual acceptance allocation reports -

Northern States Power Company feels the Department of Energy should issue annual acceptance allocation reports starting not later than April 1, 1984 These reports are necessary to provide Northern States Power Company with an adequate planning horizon for interim storage.

(19) Interest on late Fee -

Interest should be levied according to the following formula:

$$\text{Interest} = \begin{matrix}\text{Amount due to DOE}\\ \text{for Assigned Three}\\ \text{Month Period}\end{matrix} \times \begin{matrix}\text{Quarterly}\\ \text{Treasury}\\ \text{Rate}\end{matrix} \times \frac{\text{Day(s) Late}}{\text{365 Days}}$$

(20) Non-Standard Fuel -

There should be only two categories of Spent Nuclear Fuel: (1) F that has to be canned (i.e., Spent Nuclear Fuel that must be encap prior to shipment) and (2) Fuel that does not.

With the above comments [noteable exceptions being comments (2) and (3)] States Power Company generally endorses the positions taken by the joint mitta1 of the Edison Electric Institute and the Utility Nuclear Waste Ma Group. If I may be of any help or if you wish further clarification of please feel free to contact me.

Sincerely,

D H Peterson
Manager
Fuel Supply Department

vf

83-1-10

Enclosure 1

Omaha Public Power District's (OPPD) Comments Concerning Draft Standard Contract For The Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste

1) The contract should include a recognition that DOE will design its facilities with the capacity to receive SNF/HLW at a rate commensurate with the amount of SNF/HLW then being generated together with the accumulated backlog of SNF/HLW. OPPD believes that DOE should be able to take delivery of SNF/HLW equal to that year's generation plus a reasonable share of the backlog.

2) The words "of domestic origin" should be deleted from the first whereas. Domestic origin may be taken to mean only spent nuclear fuel assemblies containing domestic origin uranium. OPPD has purchased and used foreign origin uranium.

3) The "Assigned Three-Month Period" (Article I.1) should be at Purchaser's option.

4) The definitions of both "Commission" (Article I.4) and "DOE" (Article I.10) should be modified to include successor agencies.

5) Since there may be a large positive cash flow to the waste fund for many years, the definition of the term "Full Cost Recovery" in Article I.12 should be expanded to clarify that earnings on revenues invested will be accounted for as part of the income to the fund.

6) "Shipping Lot", defined in Article I.17, should recognize that transportation of a quantity of SNF/HLW will not take place on a specified date, but will begin on a specified date. It shall also be structured in terms of delivery by Purchaser, rather than transportation.

7) "Spent Nuclear Fuel" (Article I.18) is defined in the same language as appears in the Act (Section 2(23). This definition does not explicitly deal with fuel which has been irradiated in the reactor, withdrawn, and stored in the spent fuel pool pending further irradiation in a later cycle. The definition would also characterize fuel which is temporarily off-loaded during an outage as SNF. Including this temporarily withdrawn fuel in the definition of SNF would have significant implications for OPPD's one-time fee since as of April 7, 1983, four partially burned fuel assemblies will be in the spent fuel pool with the intention of reinsertion into the next cycle. The definition should only include spent fuel which is discharged with no intent to later reinsert it in the reactor.

14) Article V.B.2 should require DOE to provide Purchaser with the necessary information, procedures, specifications needed for Purchaser to meet its responsibilities under Article V.A.2(c) to maintain, protect and preserve shipping casks while they are at Purchaser's site. The information should be provided sufficiently far in advance so that Purchaser will be adequately prepared. The provision should also recognize DOE's responsibility for normal cask maintenance and repair. Finally, Article V.B.2 should acknowledge that more than one cask may be involved.

15) Article V.B.5 should be expanded to allow Purchaser or an oversight group of Purchasers to periodically discuss with DOE plans and budgets for the use of Nuclear Waste Fund monies as well as technical briefings on activities supported by the Fund.

16) DOE's obligation to provide Purchaser with program cost projection information (Art. V.B.5) should specifically include a requirement that DOE inform Purchaser at the earliest possible date of a proposed increase in the fee.

17) In Article V.B, to allow Purchasers to plan for spent fuel storage, an annual report should be required which would provide DOE's projected annual receiving capacity and the annual acceptance allocation for all purchasers. The report should present data extending 10 years into the future. The ten year period would be consistent with the annual reports filed by purchasers pursuant to Article V.A.1.

18) If Purchaser has failed fuel which requires encapsulation prior to loading in the shipping cask, DOE should provide the cannisters, to assure that they are compatible with the casks. A new paragraph V.B.7 should be added.

19) The title of Article V.1, "Criteria for Disposal", is a misnomer. The Article sets forth procedures for DOE acceptance of SNF/HLW. A better title would be "Acceptance Procedures". There are essentially no acceptance criteria since DOE is obligated to accept all SNF/HLW. Thus, Article VI.B, now entitled "Acceptance Criteria", is also misnamed. A solution would be to delete the "V1.B - Acceptance Criteria" as a heading, and change subheadings V1.B1, V1.B.2, and V1.B3 to V1.B, V1.C and V1.D, respectively.

83-1-11

THE CINCINNATI GAS & ELECTRIC COMPANY

CINCINNATI OHIO 45201

March 4, 1983

Mr. Robert Morgan
Project Director
Nuclear Waste Policy Act
Project Office
Department of Energy
1000 Independence Avenue SW
Room 7B-084
Washington, D.C. 20585

Re: Notice of Proposed Rulemaking on Standard Contract for Disposal of Spent Nuclear and/or High-Level Radioactive Waste
48 Fed. Reg. 5458 (February 4, 1983)

Dear Mr. Morgan:

On February 4, 1983, the Department of Energy ("DOE") published in the Federal Register (48 Fed. Reg. 5458) a proposed new Part 961 to Title 10 of the Code of Federal Regulations. The Federal Register notice published for comment a proposed standard contract to be used by DOE in furnishing disposal services to the owners or generators of spent nuclear fuel and/or high-level radioactive waste and DOE's proposed procedures designed to implement §302 of the Nuclear Waste Policy Act of 1982. The proposed regulations would, among other things, establish the rights and duties of DOE and the owners and generators of spent nuclear fuel and/or high-level radioactive waste. The Department of Energy invited interested persons to comment on the proposed rulemaking by March 7, 1983.

The Cincinnati Gas & Electric Company hereby submits the following comments on the draft Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste. These comments are divided into two parts. The first part consists of general overview contract comments. The second part consists of detailed contract comments and are provided on an Article by Article basis for the text and appendices.

The proposed contract is comprised of three major areas:

1. Collection of fees from "Purchasers" to fund the Waste Disposal System.

ARTICLE III

7. The phrase "DOE has accepted SNF and/or HLW from" should be changed to "DOE has accepted and received all SNF and/or HLW generated at". This more clearly delineates ownership, generation, and location.

ARTICLE IV

8. In paragraph A., the phrase "for disposal thereof" may be better stated as "for ultimate disposal thereof. This would implicitly recognize DOE's option to reprocess SNF or to utilize Monitored Retrieval Storage prior to permanent disposal.

9. In paragraph B, after DOE's disapproval of the schedule and a Purchasers timely resubmission, a condition might occur in which the new schedule was not acceptable to the DOE. In order to accommodate such a condition, the following sentence should be included, "if this revised schedule is also found unacceptable by the DOE, the two parties shall promptly seek to negotiate a mutually acceptable schedule."

10. In paragraph B, the phrase in the second paragraph "the Purchaser may choose the specific assemblies to be delivered" is not sufficiently restrictive. It would be better in the form, "the Purchaser may substitute SNF/HLW of the same class, quantity and age to be delivered.

ARTICLE V

11. In paragraph A.1, the term "projected" should be replaced with "its best estimate of projected" in order to identfy that these projections may contain significant uncertainty, such as might be due to reactor delays, and that the fact is recognized in the forecast.

12. In paragraph A.1 the term "Purchaser" might better be "Generator".

13. Sentence A.1.b, which unduly penalizes the "Purchaser" if Appendix D is not properly submitted should be eliminated.

14. Sentence V.A.2.c, should be prefaced by, "while in his possession," and the word "maintenance" replaced by "incidental maintenance". In the second sentence, the phrase "except as otherwise provided hereunder" should be replaced by "when such cause of damage is due to Purchaser's negligence or gross negligence."

15. V.B.1 should read "DOE shall review and approve or disapprove delivery commitment in accordance with Aritcle IV.

83-1-12

COMMENTS BY

CONSUMERS POWER COMPANY ON

"CONTRACT FOR DISPOSAL OF SPENT NUCLEAR FUEL

AND/OR HIGH-LEVEL RADIOACTIVE WASTE"

Article I – Definitions

1. "Assigned Three-Month Period," Article I.1. It is not clear whether one three-month period will be assigned covering all of the Purchaser's reactors or one separate period assigned for each reactor. The former appears true from the wording of Paragraph B of Article VIII and the fact that Appendix "A" can cover more than one reactor. Also, defined terms should be used. For clarity the following definition is suggested:

> "The term 'Assigned Three-Month Period' means the period assigned to the Purchaser in paragraph B of Article VIII below for purposes of reporting Kilowatt Hours Generated and Sold that were generated by the Civilian Nuclear Power Reactors indentified in Appendix 'A' and for establishing fees due and payable to DOE."

2. Cask – Article I.2 should more appropriately be worded as follows:

> "The term 'Cask' means a container which meets all applicable regulatory requirements for shipping SNF and/or HLW."

3. The definitions of both "Commission" (Article I.4) and "DOE" (Article I.10) should be modified to include successor agencies.

4. The definition of "Delivery" (Article I.8) should include the concept of "transfer of custody f.o.b. carrier" (Article VI, B.1) and the requirement that DOE not unreasonably withhold its approval of Purchaser's designation of a domestic site other than Purchaser's reactor.

ARTICLE III - TERM

1. The term of the contract expires when DOE has accepted SNF and/or HLW from the civilian nuclear power reactors specified in Appendix "A". Under Article VI.B.1, the SNF/HLW would still be at Purchaser's site when acceptance takes place. The contract should remain in effect at least until all SNF/HLW has left Purchaser's site. The provision should be reworded as follows:

> "The term of this contract shall be from the date of execution until such time as DOE has accepted delivery of and transported from Purchaser's Site(s), all SNF and/or HLW from the Civilian Nuclear Power Reactors specified in Appendix 'A'."

Article IV - Delivery of SNF and/or HLW

1. The term "receive" in the third line of paragraph A should be changed to "accept delivery of" to be consistent with wording of Articles III and V.B.3.

2. Under Article IV.B, if DOE disapproves a delivery commitment schedule, Purchaser shall resubmit a revised schedule within 30 days. No time limit is provided for DOE's response to the resubmitted schedule. Presumably a period of not more than 30 days would be adequate. If DOE were also to disapprove the resubmitted schedule, it should propose an alternate schedule. If Purchaser does not accept DOE's alternate, the contract could provide for mandatory negotiation among the parties to arrive at an acceptable schedule. Appropriate language should be inserted before the last sentence in the first paragraph of Section IV.B as follows:

> "DOE shall approve or disapprove such revised schedule(s) within thirty (30) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of

7. Paragraph V.B.3 should be reworded to read, "DOE shall accept delivery at the Purchaser's Site of <u>all</u> SNF and/or HLW meeting the Acceptance Criteria set forth in Article VI of this contract."

8. Article V.B.6 describes DOE's annual priority ranking of SNF/HLW eligible for receipt at the DOE facility. Consistent with Article VI.B.3, the ranking scheme is based solely on the age of the SNF/HLW. Our comments on Article VI.B.3 recommend a somewhat different allocation system, partially based on age and partially on inventory share. To allow Purchasers to plan for spent fuel storage, the annual report should provide DOE's projected annual receiving capacity and the annual acceptance allocation for all purchasers. The report should present data by fiscal year, extending 10 years in the future. The ten-year period would be consistent with the annual reports filed by purchasers pursuant to Article V.A.1. Article V.B.6 should be changed accordingly:

> "Beginning not later than April 1, 1991, DOE shall issue an annual acceptance allocation report. The report shall set forth the projected annual receiving capacity for each DOE Facility and the annual acceptance allocation for each Purchaser under a DOE contract for the disposal of SNF and/or HLW. The report shall provide such capacity and allocation information for each of the immediately succeeding ten fiscal years."

9. If Purchaser has failed fuel which requires encapsulation prior to loading in the cask, DOE should provide the canisters, to assure that they are compatible with the cask. A new paragraph V.B.7 should be added:

> "In the event that SNF must be encapsulated prior to shipment, DOE, on a mutually acceptable schedule, shall provide Purchaser with canisters suitable for use at Purchaser's Site and compatible with the Cask furnished pursuant to paragraph B.2 above, together with the specifications of such canisters."

Article VI - Criteria For Disposal

1. Article VI.A.1 states that DOE will accept only SNF/HLW which "has been approved for delivery in advance by DOE..." The nature of the approval process is detailed in VI.B.1 and the specifications are outlined in Appendix "E". The reference to approval "in advance" is confusing. Also, the necessity for meeting Appendix E and having DOE verification is covered under "Acceptance Criteria" in VI.B, and V.B.3 requires DOE to accept SNF/HLW meeting the acceptance criteria. It is therefore unclear what VI.A.1 adds. We suggest that it be deleted.

2. The second sentence of VI.B.1 should be clarified as follows:

> "DOE shall accept delivery of, for disposal, all SNF and/or HLW that (1) meets the General Specifications set forth in Appendix 'E' annexed hereto, (2) it verifies to be consistent with the required description pursuant to Appendix 'F' and (3) it determines is properly loaded (etc) for transportation f.o.b. carrier at the Purchaser's Site."

3. The Acceptance Priority Ranking system established by the contract (Article VI.B.3) could be improved in several respects. It does not unambiguously authorize Purchaser exchange of delivery dates (see Comment 4 to Article IV), it does not provide explicit priority to keep reactors operating, it does not provide priority based upon the size of Purchaser's total SNF inventory, and it might remove Purchaser's flexibility as to which SNF/HLW it will ship ("DOE will first accept from Purchaser the oldest SNF and/or HLW"). To remedy these shortcomings, the contract should provide for the exchange system proposed above. In addition, it should allocate a portion -- perhaps one-half -- of DOE's annual receiving capacity based on SNF/HLW age, the remainder to be based upon the

MI0283-0033A-FS02

Appendix "B"

1. To be consistent with Article IV.B, the second sentence in Appendix "B" should be changed to read:

> "This Delivery Commitment Schedule shall be submitted by Purchaser to DOE for approval not later than sixty-three (63) months prior to the estimated date of delivery."

2. "Reactor Name" should be changed to "Reactor/Facility Name." The delivery point may be a reprocessing plant, storage facility, etc.

3. The final paragraph should be deleted and replaced by the following statement: "The Purchaser hereby certifies that the SNF to be delivered pursuant to this Delivery Commitment Schedule has been discharged from a Civilian Nuclear Power Reactor and that Purchaser has the legal right to deliver such SNF to DOE for disposal." Proof of ownership could be difficult to produce in some cases, unnecessarily increases the paperwork required, or may change between the time the Delivery Commitment Schedule is executed and actual delivery occurs. DOE is required, in any event, to take all SNF and HLW derived from Civilian Nuclear Power Reactors (as that term is defined in Article I(3)). The proposed certification assures DOE that Purchaser has the legal right to deliver the SNF to DOE and that the SNF is eligible for delivery to DOE pursuant to the Contract.

Appendix "C"

1. "Reactor Name" should be changed to "Reactor/Facility Name." See Comment 2 with respect to Appendix "B" above.

2. It is unclear what information DOE has requested in the blank designated "Delivery to be Made to DOE from Purchaser's Site."

Attachment to
P-83088

PUBLIC SERVICE COMPANY OF COLORADO
COMMENTS ON PROPOSED RULE 10 CFR PART 961
STANDARD CONTRACT FOR DISPOSAL OF SPENT NUCLEAR FUEL
AND/OR HIGH LEVEL RADIOACTIVE WASTE

General Comment

On July 1, 1965, PSC entered into a contract (No. AT(04-3)-633) with the U. S. Atomic Energy Commission (now DOE) and General Dynamics Corporation (now Valley Pines Associates) under which each of the parties undertook to perform certain specified obligations associated with the development, design, construction and operation of a commercial-sized prototype high temperature, gas-cooled reactor (HTGR). Under Modification M010 (Supplement Agreement to Contract No. AT(04-3)-633), entered into and effective April 1, 1980, PSC is authorized to deliver to DOE and DOE is obligated to accept a total of eight discharged fuel segments from the plant. DOE is obligated to accept this material without any payments from PSC. In PSC's view, it is very important that DOE's existing contractual obligations be recognized in the standard contract in a way that preserves PSC's rights with regard to the disposal of spent nuclear fuel and/or high level radioactive waste.

The final rule should recognize and preserve these contractual arrangements and adopt only those portions of the standard contract not covered by said contractual arrangements.

Article I - Definitions

Disposal--The phrase "...with no foreseeable intent of recovery" is not compatible with the design intent of the fuel used in the Fort St. Vrain Nuclear Generating Station. The standard contract should provide for utilities to receive a credit for the recovery of fissionable materials in the event reprocessing of spent nuclear fuel is ever allowed and becomes economically viable. The amount of the credit for recovery of fissionable materials would have to be determined after deducting all costs for reprocessing the material and disposing of the associated high level radioactive wastes.

High Level Radioactive Waste--The phrase "...that contains fission products in sufficient concentrations" is too vague and should be redefined with greater preciseness.

Article II - Scope

Even though the Scope alludes to it, the standard contract should contain a specific provision (under DOE Responsibilities) obligating DOE to accept all spent fuel from civilian nuclear power reactors that utilities wish to deliver to DOE. This DOE obligation should recognize no exceptions provided that the utilities pay the required fees and submit the proper descriptions and notices. In addition, the standard contract should specify in detail DOE's responsibility for: (1) accepting initial spent nuclear fuel shipments from each utility by January 31, 1998 (or some other mutually agreeable earlier date), and (2) accepting ongoing spent nuclear fuel shipments from each utility at a rate not less than the rate at which each utility is producing

spent nuclear fuel. The contract spent fuel acceptance rate should further require DOE to accept each utility's total inventory of spent nuclear fuel within a reasonable period of time following the end of the useful life of that utility's nuclear power plants. If DOE fails to meet these responsibilities, the contract should contain provisions obligating DOE to provide or pay for interim storage of the spent nuclear fuel DOE fails to accept, regardless of any good faith efforts by DOE to avoid delays in accepting the spent nuclear fuel.

Article IV - Delivery of SNF and HLW

Delivery Commitment Schedule--The standard contract requires utilities to commit to spent nuclear fuel delivery schedules more than five years in advance of delivery, with the option of extending the delivery commitment date by only two months. Such a restriction on delivery scheduling is entirely unwarranted, especially considering that utility funding of all DOE waste disposal efforts will be forthcoming regardless of waste disposal shipping dates. Long term waste delivery schedules (5 to 8 year advance projections) should specify waste deliveries only to the nearest year, with the option of shifting waste deliveries to later years as actual plant operations become known. (Utilities cannot be expected to commit to deliveries of spent nuclear fuel if plant operations are delayed and the fuel has not been discharged from the reactor in time to support the committed delivery date.) Identification of a projected delivery month 12 to 30 months in advance of delivery, with the option of postponing delivery to a later month selected by mutual agreement, should satisfy the scheduling requirements of both DOE and utilities. The standard contract should provide for this degree of scheduling flexibility.

Article V - Responsibilities of the Parties

Purchaser's Responsibilities--The standard contract should stipulate that if the as-received spent fuel shipping equipment furnished by DOE or DOE's contractors requires maintenance and/or repairs prior to use, any costs incurred by a utility for this purpose should be subject to reimbursement from the Nuclear Waste Fund. The cost of necessary cask maintenance repairs or decontamination work should not be borne by the utility.

DOE's Responsibilities--Some utilities such as PSC own spent fuel shipping casks and other spent fuel shipping equipment which may be of considerable value to DOE in fulfilling its spent fuel transporting obligations. The standard contract should require DOE to utilize such equipment whenever possible and to provide utilities with an equitable credit for the use by DOE or DOE's contractors of utility-owned spent fuel shipping equipment.

The standard contract should require that DOE obtain utility approval of the spent fuel shipping equipment designs which are proposed to be furnished by DOE or DOE's contractors. DOE should have the obligation to provide a design that is compatible with the utility's spent fuel configuration and shipping facilities.

CLEVELAND ELECTRIC ILLUMINATING COMPANY

COMMENTS ON DOE WASTE DISPOSAL CONTRACT

IDENTIFICATION OF PARTIES

The Company strongly recommends modification of the first paragraph of the draft contract to identify as parties to the contract all the companies which are owners of the nuclear unit specified in Appendix A and are, therefore, owners or generators of the SNF or HLW. The Company advocates a stronger identification of these parties than that suggested by EEI, making all such owners signatories to the contract, with the unit's Operating Company acting for itself and as agent for the other companies. A suitable model for such language is that contained in the contracts for enriching services between the Companies and DOE.

ARTICLE I - DEFINITIONS

1. If Article I-7 is not deleted as recommended by EEI, the Company proposes that it be changed to read:

"The term 'Delivery Commitment' means a promise by the Purchaser to have spent nuclear fuel and/or high level radioactive waste available for delivery to DOE." The reason for this change is that Purchaser's obligation is to make the SNF or HLW available for transportation by DOE.

ARTICLE IV - DELIVERY OF SNF AND/OR HLW

1. The title of Article IV.B. should be changed for the sake of additional clarification to "Preliminary Delivery Commitment Schedule," and the word "preliminary" appended before the words "delivery commitment schedule(s)" in the paragraph.

2. In Article IV.B., Delivery Commitment Schedule, the Company concurs in EEI's comments, but recommends that, for clarity, the last sentence in the first paragraph should read, "Purchaser shall have the right to adjust the quantities of SNF and/or HLW by up to ±20% and the delivery schedule by up to ±2 months, exercisable up to the submission of the final delivery schedule."

3. To establish a streamlined procedure covering the case in which DOE and Purchaser do not agree on schedule, the last two sentences of Article IV.C. should be replaced by "DOE shall approve or propose an alternate delivery schedule within forty-five (45) days after receipt. If the final delivery schedule submitted by Purchaser falls within the limits set forth in the Preliminary Delivery Commitment Schedule, then approval shall be automatic unless DOE expects to experience a substantial change in its ability to accept delivery of SNF or HLW. If the alternate delivery schedule proposed by DOE is not acceptable to Purchaser, the parties shall promptly seek to negotiate mutually acceptable schedule."

ARTICLE V – RESPONSIBILITIES OF THE PARTIES

1. Since DOE is required to make all arrangements for shipment off-site, the first sentence in Article V.A.2(a) should be changed to read "The Purchaser shall arrange for all preparation, packaging, required inspections and loading activities necessary for loading the cask(s) with SNF or HLW."

2. In Article V.B.2., the Company agrees with EEI's comments. However, to clarify the responsibility for cask maintenance, EEI's third recommended sentence should read:

> "Such casks shall be suitable for use at Purchaser's site, and DOE shall provide routine maintenance on them."

3. In order to define minimal DOE responsibilities, a new paragraph should be added to Article V.B., DOE Responsibilities, as follows:

> "DOE shall have a repository in operation by January 31, 1998 capable of receiving SNF and/or HLW at a rate at least equivalent to the rate at which such material is being discharged in the year 1998 by all civilian nuclear power reactors covered by contracts."

CLEVELAND ELECTRIC ILLUMINATING COMPANY

COMMENTS ON APPENDICES TO

DOE DISPOSAL CONTRACT

Appendix A, two (or more) nuclear units at the same site, and with the same Operating Company (agent Company) may have different ownerships. This situation in fact exists for CAPCO's two Beaver Valley units. Therefore, we recommend that separate contracts be permitted (but not required) for each of two or more Civilian Nuclear Power Reactors operated by a single utility.

Appendix B, the Company supports EEI's suggestion to delete the language in Article IV.B. tying the submission of Delivery Commitment Schedules to DOE's acceptance rankings. However, if that change is not adopted, the language in Appendix B should conform with the terms of the paragraph. Appendix B should say, "This Preliminary Delivery Commitment Schedule shall be submitted by Purchaser at least sixty-three (63) months prior to the delivery date specified in DOE's most recent proposed acceptance ranking." Note deletion of the words "and approved."

APPENDIX E – ACCEPTANCE CRITERIA AND GENERAL SPECIFICATIONS

1. In Appendix E, Paragrpah B.1, it is not clear whether the dimensions refer to unirradiated fuel. If the reference is to irradiated fuel, then the unchanneled fuel bundle requires a storage module square cross-section of 6.050 inches or greater for GE BWR/6 fuel because of bowing.

83-1.15

GULF STATES UTILITIES COMMENTS
ON 10 CFR 961:

STANDARD CONTRACT FOR DISPOSAL OF
SPENT NUCLEAR FUEL AND/OR
HIGH LEVEL RADIOACTIVE WASTE

PROPOSED 10 CFR 961.5

This paragraph should more directly state its content will only apply to non-defense, commercial-equivalent spent fuel and/or HLW.

TEXT OF CONTRACT

PROPOSED 10 CFR 961.11

Preamble

First Paragraph

Appropriate blank space should be provided for identification of lead utility acting on behalf of itself and other participants by adding "acting on behalf of itself and ______________________."

Third "Whereas" clause: Change to "Whereas, DOE is required to collect a fuel cost recovery fee from owners and/or generators delivering to the DOE such spent nuclear fuel and/or high level radioactive waste."

Add: new "Whereas" clause: "Whereas, DOE recognizes that its ability to take delivery of spent nuclear fuel and/or high level radioactive waste must be commensurate with the amount of such fuel and waste then being generated together with the amount of such fuel and waste previously generated, and consistent with its obligation to take title to such fuel and waste as expeditiously as practicable upon the request of the owner or generator of such fuel and waste."

ARTICLE I

General

Terms which are defined should be capitalized throughout the contract.

1. "Assigned Three-Month Period": Change to "the period specified in Article VIII.B.1 by mutual consent for purposes of reporting kilowatt hours generated and sold and for establishing fees due and payable to DOE."

4. "The term 'Commission' means the U.S. Nuclear Regulatory Commission or its successor agencies."
7. Delete definition of 'Delivery Commitment".
8. "'Delivery" means the transfer of custody f.o.b. carrier . . . . . . as may be designated by the Purchaser and approved by DOE, whose approval will not unreasonably be withheld."
10. 'DOE" Add "or its successor agencies."
11. 'DOE Facility" Add "and such other DOE facility to which spent nuclear fuel and/or high level radioactive waste may be shipped prior to its transportation to a disposal facility."
12. "Full Cost Recovery" Add "interest earned by investments from the nuclear waste fund and net proceeds from any by-product recovery from spent fuel and high level radioactive waste to the aforesaid fund" after "through Purchaser fees" in first sentence.
Change the second sentence to read "As used herein, the term 'Cost' means the application of fees to those uses expressly authorized in sections 302(d) and (e) of the said Act."
14. "Kilowatt Hours Generated" Change to "The term 'Kilowatt Hours Generated ~~and Sold' means electricity generated by nuclear~~ fuel at civilian nuclear power reactors specified in Appendix 'A' hereto, as measured at the station busbar, net of all station uses, including the electricity equivalent of any process heat generated by the reactors and used other than at the reactors."

17. "Shipping Lot" Change to "The term 'Shipping Lot' means a specified quantity of spent nuclear fuel or high-level radioactive waste designated by Purchaser for delivery to DOE beginning on a specified date."
18. "Spent Nuclear Fuel" Change to "The term 'Spent Nuclear Fuel' (SNF) means fuel that has been withdrawn from a nuclear reactor following irradiation, without the intent to reinsert it in the reactor, and whose constituent elements have not been separated by reprocessing."

19. "Spent Nuclear Fuel of Domestic Origin" Change to "The term 'SNF and/or HLW of Domestic Origin' means SNF and/or HLW from civilian nuclear power reactors."

ARTICLE II

Change first part of first sentence to read "This contract applies to the delivery by Purchaser to DOE of SNF and/or HLW from civilian nuclear power reactors, acceptance of title by DOE to such SNF and/or HLW, subsequent transportation, and disposal of such SNF and/or HLW, and with respect to such material, establishes the fees to be paid ...."

Change third sentence to begin to read "The services to be provided by DOE under this contract shall be made available not later than January 31, 1998 ..."

Add new last sentence "Following commencement of operation of a DOE facility for the disposal of SNF and HLW, DOE shall take title to such material as expeditiously as practicable upon Purchaser's request."

ARTICLE III

Change to "The term of this contract shall be from the date of execution until such time as DOE has accepted and transported from Purchaser's site (s) all SNF and/or HLW from the civilian nuclear power reactors specified in Appendix 'A'."

ARTICLE IV

A. Change "receive" in first sentence to "accept".

B. Delete the initial dependent clause of the second sentence. Add this sentence before the last sentence of first paragraph: "DOE shall approve or disapprove such revised schedule(s) within thirty (30) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall submit its proposed schedule(s). If these are not acceptable to Purchaser, the parties shall promptly seek to negotiate mutually acceptable schedule(s)."

Change "+ 2 months" in last sentence of first paragraph to " ± 2 months."
Delete 2nd paragraph.

C. Ditto major change noted in "B".

E. Add new "E" as follows:

"E. Exchanges

Purchaser shall have the right to determine which SNF and/or HLW is delivered to DOE, provided that Purchaser complies with the requirements of Article V.A.2(b) as to such SNF and/or HLW. Purchaser shall have the right to exchange approved delivery commitment schedules with parties to other contracts with DOE for disposal of SNF and/or HLW, provided that DOE shall have the right to approve such exchanges, based upon the feasibility of necessary transportation arrangements, which approval shall not be unreasonably withheld."

ARTICLE V

A.1.a. Add at end "The information provided will include estimates and projections and is not Purchaser's firm commitment with respect to discharges or deliveries."

A.1.b. Delete all of this section.

A.2(a) Change second sentence to:
Add "reasonable" between "afford" and "access" in last sentence.

A.2(c) Change first sentence to:
"The Purchaser shall be responsible for incidental maintenance, protection and preservation of any and all casks furnished to the Purchaser by DOE for the performance of this contract while such casks are in Purchaser's possession and control."
Change second sentence to:
"Purchaser shall not be liable for any loss of or damage to such casks while such casks are in the possession and control of Purchaser, except for loss or damage caused by Purchaser's negligence."

B.1 Delete present section and substitute this one:
"DOE shall accept title to all SNF and/or HLW generated by the civilian nuclear power reactors specified in Appendix 'A',

B.6 Change to: "Beginning not later than April 1, 1991, DOE shall issue an annual acceptance allocation report. The report shall set forth the projected annual receiving capacity for the DOE facility or facilities and the annual acceptance allocation for each party to a DOE contract for the disposal of SNF and/or HLW. The report shall provide such capacity and allocation information for each of the following ten fiscal years."

B.7 Add this new section: "In the event that SNF must be encapsulated prior to shipment, DOE on a mutually acceptable schedule shall provide Purchaser with cannisters suitable for use at Purchaser's site and compatible with the cask furnished pursuant to paragraph B.2 above, and appropriate information and documentation."

ARTICLE VI

A.4 Delete this section.

B.1 Change to: "Prior to acceptance by DOE of SNF and/or HLW for transportation to the DOE facility, DOE shall have the right to verify the description of such SNF and/or HLW, and to determine that the material is properly loaded, packaged, marked, labeled and ready for transportation. DOE shall accept all SNF and/or HLW properly described loaded, packaged, marked and labeled pursuant to applicable regulations."

B.2(a) Delete last sentence and add: "Once such SNF and/or HLW has been properly described, DOE shall accept such material in accordance with the previously approved schedule unless it was not technically feasible to transport or dispose of such material on that schedule. Where that schedule is not technically feasible, the parties shall negotiate a mutually acceptable alternate schedule."

B.3 Change "Priority" to "Allocation". Delete all of B3(b) and substitute this for all of B.3. "Delivery commitment schedules for SNF and/or HLW may request the delivery to DOE of more material than can be accommodated by the annual receiving capacity of the DOE facility (or facilities). In this event, one-half of such annual receiving capacity shall be allocated based on annual

production of SNF and/or HLW and one-half based on Purchaser's share of the total inventory of SNF and/or HLW.

(a) The share of annual capacity based on SNF and/or HLW discharge shall be apportioned based on the annual average per unit discharge of the SNF and/or HLW

(b) The share of annual capacity based on inventory share shall be determined by the formula:

$$\text{Purchaser's share} = \frac{(.5)\ (\text{DOE annual capacity})\ (A)}{(B)}$$

Where (A) is the amount of SNF (including SNF which was the source of HLW) discharged from the civilian nuclear power reactors in Appendix "A" (without the intent to reinsert) more than five years prior to the delivery year, and (B) is the amount of all SNF (including SNF which was the source of HLW) discharged from all civilian nuclear power reactors (without the intent to reinsert) more than five years prior to the delivery year."

ARTICLE VII

Add this at end of last sentence: "provided that in the event that DOE uses or processes the SBF and/or HLW, the Nuclear Waste Fund will be credited with (1) the net proceeds from the sale of the materials used or the recovered products, or (2) the net value of any such materials or products which are not sold".

ARTICLE VIII

A.4 Change to: "For fuel which was in the core of Purchaser's civilian nuclear power reactor (s) as of April 7, 1983, fuel that was temporarily removed from such reactor (s) as of that date, or fuel that had been withdrawn prior to that date with the intent to reinsert it in the reactor(s) after that date, that portion of the fuel which was used to generate electricity prior to April 7, 1983, shall be subject to a one-time fee as calculated in accordance with the formula:

85-1-16

CONTRACT FOR THE DISPOSAL OF SPENT NUCLEAR FUEL

AND/OR HIGH LEVEL RADIOACTIVE WASTE

Comments by Wisconsin Public Service Corporation

WPS has reviewed the DOE proposed contract as specified in the Federal Register of February 4, 1983, and has reviewed the February 17, 1983, draft comments by EEI/UNWMG. We are in general agreement with the majority of these comments. The following discussion addresses the significant issues as determined by WPS.

I) The contract must provide the purchaser with an incentive to explore cost reducing alternatives. This can be accomplished by an article that provides for a negotiated credit when the purchaser provides services, equipment, or material of value to the parties.

II) The contract must allow the purchaser to utilize current corporate accounting practices. In particular:

A) Payment by wire transfer should not be required. A wire transfer was established to provide an efficient way to move money from one bank account to another; both accounts being to the same organization. Wire transfers are expensive, inconvenient, and lack control of third party transactions. They were not intended by the Federal Reserve System for routine invoice payments. Their use is frowned on by Purchasing, Accounting, Treasury, and Auditing areas. Invoices should be paid by check.

B) If the option to pay for SNF generated prior to April 7, 1983, is over a 40 quarter schedule as suggested in Article VIII, B.2, the calculated interest should be part of the fee. Consideration should also be given to a reduction of this fee if the purchaser elects to accelerate the payments.

III) The contract must not require the purchaser to make untimely or unreviewed commitments.

A) It is not necessary that the purchaser chose the payment option for discharged SNF (Article VIII, B.2) "at the time of contract execution." Rate implications will have to be reviewed with the Public Service Commission prior to making the appropriate choice. Tax aspects will also have to be analyzed.

B) Schedules for delivery should not be over-restrictive. Changes should be routinely allowed and "swaps" between customers should be encouraged.

IV) The contract cannot impose abnormal penalties for non-compliance occurrences.

A) The Article VIII.C, Interest on Late Fees, is abnormally punitive if set at the Quarter'y Treasury Rate plus 6% when the Quarterly Treasury Rate is low.

B) Article X.1, Suspension, should not allow DOE to suspend the entire contract on purchaser's "failure to perform its obligations hereunder" if that failure is not corrected after notice from DOE and does not arise from causes beyond the purchaser's control. This authority is too broad.

83-1-20

Telephone (617) 872-8100
TWX 710-380-7619

# YANKEE ATOMIC ELECTRIC COMPANY

1671 Worcester Road, Framingham, Massachusetts 01701

March 4, 1983

Mr. Robert Morgan, Project Director
Nuclear Waste Policy Act Project Office
US Department of Energy
1000 Independence Avenue, SW, Room 7B-084
Washington, DC 20585

Subject: Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste (48 F. R. 5458; Friday, February 4, 1983; 10 CFR 961)

Dear Mr. Morgan:

By Notice of Proposed Rulemaking published in the Federal Register on February 4, 1983 (48 Federal Regulations, 5458), the Department of Energy (DOE) requested comments on a proposed standard contract to be used by DOE in furnishing disposal services for spent fuel and/or high-level radioactive waste to the owners and generators of such material. In addition, comments were also solicited on DOE's proposed procedures for implementing Section 302 of the Nuclear Waste Policy Act of 1982. Yankee Atomic Electric Company ("Yankee") hereby respectfully submits for DOE's consideration its comments on the proposed standard contract. Ten copies of Yankee's comments are enclosed.

Yankee recognizes that the Nuclear Waste Policy Act of 1982 requires the collection by the DOE of fees for disposal of spent nuclear fuel (SNF) and high-level radioactive waste (HLW). Before commenting on particular terms of DOE's proposed contract, Yankee has a basic general concern. We are being required to make substantial advance payments for nuclear waste disposal long before the DOE has an operating disposal facility or even an approved plan or site for such a facility. Yankee's advance payments will be included in the cost of power from its plant and will ultimately be paid by electric customers throughout New England. We have a duty to these customers to assure that DOE is fulfilling its end of our bargain. Although Yankee would be contractually required to begin making payments to DOE in mid-1983, DOE will not be required to begin fulfilling its obligations until 1998. In order for this contract to be a serious commitment for all parties, we believe that DOE should use its best and most expedient efforts to construct and operate a disposal facility, as soon as possible. Signing of this contract by United States utilities does not alleviate the need for an expeditious resolution of the waste disposal issue. The DOE should not have 1998 as a goal but rather as an outer limit. Therefore, we request that DOE include in this contract best effort commitments to meet a progress schedule that results in operation of a waste disposal facility before the 1998 deadline.

We endorse the comments prepared by the Edison Electric Institute in cooperation with representatives of the utility industry, including

Please give all due consideration to inclusion of the substance of these comments in the final version of the waste contract.

Respectfully yours,

A. R. Soucy
Treasurer

JMB/dd

83-1.21

PSE&G Public Service Electric and Gas Company

80 Park Plaza, Newark, NJ 07101 / 201 430-6468 MAILING ADDRESS / P.O. Box 570, Newark, NJ 07101

Richard Fryling, Jr. Assistant General Solicitor • T5E

March 3, 1983

Robert Morgan, Project Director
Nuclear Waste Policy Act
Project Office
Department of Energy
1000 Independence Avenue, S.W.
Room 7B-084
Washington, D.C. 20585

Re: **Nuclear Waste Policy Act of 1982**
**Standard Contract for Disposal of**
**Spent Nuclear Fuel and/or**
**High Level Radioactive Waste**
**Notice of Proposed Rulemaking**
**10 CFR Part 961**
**48 F.R. No. 25 at pp. 5458, *et seq.***

Dear Mr. Morgan:

Please accept this letter as our comments in response to the Federal Register notice referenced above.

These comments are being submitted by PSE&G as licensee and operator of Salem Nuclear Generating Station Units 1 and 2, and as licensee and co-owner of Peach Bottom Atomic Power Station Units 2 and 3.

By way of general comment, PSE&G favors the concept contained in the Act providing for the Federal Government to accept, transport and dispose of spent nuclear fuel and high level wastes. The law requires that the Department of Energy dispose of the spent nuclear fuel and that the generators of such fuel fund the program. It is in the interest of the electrical consumers who will ultimately bear these costs that the program be mutually developed by the Federal Government and the electric utilities so that cost benefit assessment be mutually determined.

The fee associated with the waste disposal program should be equitable to all those making payments and, therefore, the means of assessing this fee should be uniform. The fee on fuel subsequent to April 7, 1983 at one mill per kilowatt hour appears to accomplish this objective. However, the fee on fuel discharged prior to April 7, 1983 seems to be causing confusion as to the true intent and the means of being able to evaulate the several options. For discharged fuel, it would seem most appropriate to use a unit value in dollars per kilogram Heavy Metal that reflects the burnup associated with the fuel. For fuel in service as of April 7, 1983, or partially burned and awaiting reinsertion, it is possible to attribute electrical generation to this fuel and obtain a corresponding financial obligation by multiplying the burnup by an industry-wide constant approximating equivalent electrical energy.

The Energy People

The options for payment of prior fuel are unclear as to their calculations and will require time to analyze the financial effects once they are defined. Therefore, the requirement to identify a specific payment option at the time of contract signing is impracticable.

Although expressed by DOE personnel, there is no mention of credits brought about by consolidation of spent fuel assemblies or by reduction of material handled attributable to reprocessing. Credit for reprocessing of spent nuclear fuel may become an issue when it becomes a reality. Presently, the draft contract does not allow for reprocessing credits and talks about "full costs" as opposed to "full net costs" which would net out credited value for reprocessed spent nuclear fuel. Contract language should be incorporated to mention these credits into the waste disposal program.

Listed below are PSE&G's specific comments related to the sections indicated.

## Article I – Definitions

The definition of "Generator" and "Purchaser" should be modified such that it is clear that the contracting party, i.e., the "Purchaser", when a joint ownership is involved, is the operator of a civilian nuclear power plant. As the terms are presently defined, they include any person licensed to use the utilization facility. Since joint owners of nuclear power plants are all deemed to be licensed by the NRC, a strict reading would require each owner to execute a contract and pay the fee. The obvious intent is that the operator, or the one owner responsible to act on behalf of all of the owners, would be the contracting party and the burden would be on the operator to determine allocation of costs among the several owners. Although the definitions do not appear in the contract per se, they are set forth at the proposed Section 961.3 and should be modified to assure that where more than one licensee is involved for a particular facility, only one licensee authorized to act on behalf of all owners would be the necessary contracting party.

Section 14 defines generation as "net of all station uses". Appendix G, Section III, indicates that schedules should be provided specifying the gross amount of power metered through each plant. It appears that the wording in the Appendix should correspond to that of Section 14 to be consistent.

## Article III – Term

Article II provides that the disposal services continue until DOE has accepted SNF and/or HLW from purchasers. Article III does not use the word "all". Therefore, the word "all" should be inserted after the phrase "until such time as DOE has accepted".

## Article IV – Delivery SNF and/or HLW

Section B, Delivery Commitment Schedules, and Section C, Final Delivery Schedules, and Appendix B contain conflicting data for approvals. In addition, the lead time of 63 months for submittal of a delivery commitment schedule, with a permissible adjustment of only plus or minus 20% of quantity and plus two months for delivery dates, does not allow sufficient flexibility. We do not understand how this long of a lead time and this inflexibility of a schedule are necessary on the part of the DOE.

In Section D, Emergency Deliveries, the term "Emergency" is not defined. It is assumed that this involves a situation necessitating the removal of spent nuclear fuel in order to allow for the licensed operation of a reactor, but this should be specified.

## Article VI - Criteria for Disposal

### A. General Requirements

Under this Section, it should be stated that the DOE will accept all spent nuclear fuel and high level wastes as provided in the Act, the delivery of which shall be arranged for upon mutually agreed terms, conditions, and schedules.

### B. Acceptance Criteria

The acceptance criteria contained in the Appendices appear to have been formulated without sufficient input from the parties who will be providing the material. It is recommended that definitive terms and conditions not be made part of this contract at this time.

## Article VIII - Fees and Terms of Payment

### A. Fees and Terms of Payment

A. Fees

For the one-time fee, it is understood that there is support for the position that the Act provides such fee to be fixed on April 7, 1983 and that the amount to be paid at any time in the future should be the fixed fee plus the time value of money at the Federal Government interest costs. Aside from Federal income taxes, while it is desirable to allow flexibility in the time of payment, one could contend that it does not seem reasonable to permit the fee for prior fuel to be adjusted annually and thereby expose purchasers to unknown future costs. While the flexibility of two payment options, 40 quarterly payments or a single payment, may be appropriate from a Federal income tax standpoint, the fee for either option should be fixed as of April 7, 1983. It would appear that the fee should be increased only by the Government's actual cost of money until the time of payment.

The Proposed Rule Summary outlines three alternatives for the calculation of the one-time fee for fuel used in generating electricity prior to April 7, 1983. The draft contract does not contain the three alternatives. In addition, the power ranges referenced in the Summary are undefined. This fee structure should be resolved and stated in the contract. Item 3's last sentence states that, "the adjustment to the fee will not be retroactive to previously generated electricity". This appears to be in conflict with B. Payment, 2(a) Option 1, and (b) Option 2 where the payment will be at the fee schedule rate in effect at time of payment.

### B. Payment

Item 1

The draft contract specifies that for electricity generated after April 7, 1983, the first payment shall be due on July 7, 1983. We recommend for clarification this be revised to read as follows. "The first payment shall be due on July 7, 1983, and payable no later than August 31, 1983". The basis of this obligation should be specified.

Article IX B of the draft contract refers to avoidable delays by purchaser or DOE and provides that charges specified by the contract will be equitably adjusted to reflect any additional costs incurred by the party not responsible for or contributing to the delay. The "all events test" for a current deduction should be able to withstand this consideration of the possibility of later adjustment. More significantly, Artice X 2. provides that DOE reserves the right to suspend disposal service in the event that a national emergency requires that priority be given to government programs to the exclusion of work under the contract. In the event of such a suspension, DOE shall refund that portion of payments representing services not delivered as determined by the government contracting officer to be an equitable adjustment. Federal tax law deals with substance and not form; nevertheless, we would suggest that the language be modified to avoid any appearance of refund of payments and, thus, detract from the "fixed and ascertainable" nature of the earlier payment.

<u>CONCLUSION</u>

We wish to thank you for this opportunity of commenting upon this proposed standard form of contract. As indicated above, we are wholly in support of the program whereby DOE will make available nuclear waste disposal services. In addition to our own comments contained herein, PSE&G also joins in and supports the comments being submitted by the Edison Electric Institute.

Very truly yours,

Richard Fryling, Jr.

RF:mbb

83-1.22

LILCO LONG ISLAND LIGHTING COMPANY
175 EAST OLD COUNTRY ROAD • HICKSVILLE, NEW YORK 11801

Direct Dial Number

March 3, 1983

Mr. Robert Morgan
Project Director Nuclear Waste Policy
Act Project Office
Department of Energy
1000 Independence Avenue, S.W.
Room 7B-084
Washington, D.C. 20585

"Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste"

ar Mr. Morgan:

The draft standard contract for disposal of spent nuclear fuel and/or high level radioactive waste, published in the Federal Register on February 4, 1983, has been reviewed by the Long Island Lighting Company (LILCO). LILCO is a member of the Edison Electric Institute and supports the Edison Electric Institute comments except where those comments conflict with the comments that follow.

To facilitate your review of our comments, we have arranged them to follow the structure of the draft contract.

Article 5 - Responsibilities of the Parties

B.4 This is satisfactory if the contractors are under DOE supervision and are required to follow all DOE procedures. The following words should be added:

"or subcontractors, acting solely under the supervision and control of DOE."

B.6 It is obvious that the startup of the first Federal waste repository will not immediately solve the problem of interim storage of spent fuel. The need for at-reactor storage will continue until the backlog of spent fuel is disposed of. Therefore, a vital part of this contract is the method of allocation of disposal capacity available to DOE. The proposed method of establishing priorities based

solely on the age of spent fuel does not meet the Congressional mandate set forth in Section 132 which requires the Secretary to take such action necessary to encourage and expedite the effective use of available storage, and necessary additional storage at the site of each civilian nuclear power reactor. To the contrary, it is likely to maximize the need for additional at-reactor storage.

A method of allocating available disposal capacity should be established which meets the following objectives:

1. Minimize the need for additional storage capacity at operating reactors.

2. Equitably spread burden of continued storage until backlog is eliminated.

3. Minimize potential trans-shipment between reactor storage facilities.

4. Provide a firm planning base so customers know what their storage needs will be.

5. Provide for emergency needs.

To meet these objectives, there is a need to phase in the allocation of available repository receiving capacity. It is recommended that receiving capacity of the first repository be allocated such that each reactor with spent fuel at least 10 years old be allocated an amount equivalent to an annual year's discharge, thus placing a cap on the need for additional storage for those reactors that will have already made a substantial commitment to storage facilities. Excess receiving capacity should be allocated to reduce the inventory of old fuel. It is recommended that the receiving capacity of the second repository be allocated such that all reactors with spent fuel at least 5 years old be allocated an amount equivalent to an annual year's discharge with excess receiving capacity allocated to reduce inventory of old fuel.

Combining this contractual commitment for allocation with allowing customers to swap allocations should result in an equitable sharing of the burden of interim storage of spent fuel.

83-1.23

**NORTHEAST UTILITIES**

THE CONNECTICUT LIGHT AND POWER COMPANY
THE HARTFORD ELECTRIC LIGHT COMPANY
WESTERN MASSACHUSETTS ELECTRIC COMPANY
HOLYOKE WATER POWER COMPANY
NORTHEAST UTILITIES SERVICE COMPANY
NORTHEAST NUCLEAR ENERGY COMPANY

Purchasing Offices • Selden Street, Berlin Connecticut
P.O. BOX 270
HARTFORD, CONNECTICUT 06101
(203) 666-6911

RALPH O. SMITH
VICE PRESIDENT

March 3, 1983

Mr. Robert Morgan
Project Director Nuclear Policy
Act Project Office
Department of Energy
1000 Independence Avenue, S.W.
Room 7B-084
Washington, D.C. 20585

Re: Contract For Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste; 10 CFR Part 961

Dear Mr. Morgan:

It is our understanding that DOE plans to finalize the Contract by April 7, 1983 after receiving comments from the industry and will change the terms and conditions based on comments received. While we recognize that DOE is working under a very short time schedule to complete this contract by June 1983, sufficient time for careful review is necessary for a major contract which will be in effect for over thirty (30) years. Recognizing that DOE has requested comments on the contract in the broad sense, we have not reviewed the detailed contract language and thus our silence on specific terms does not constitute an acceptance of that language. Prior to the signing of a contract, it is our corporate policy that specific language be reviewed in detail and approved by legal counsel in addition to similar reviews by other NU disciplines. We have not, at this time, performed such legal review due to the very short notice period and the high likelihood that the published draft contract will be modified.

As provided for in the Notice of Proposed Rulemaking published in the Federal Register on February 4, 1983 (49 FR 5458), Northeast Utilities (NU), acting on behalf of The Connecticut Light and Power Company (CL&P), Western Massachusetts Electric Company (WMECO) and Connecticut Yankee Atomic Power Company (CYAPC), hereby submits its preliminary comments on 10 CFR Part 961 - Standard Contract for Disposal of Spent Nuclear and/or High-Level Radioactive Waste. In accordance with the Comment Procedures in the Federal Register Notice, ten copies are enclosed.

The NU System has 22 years of nuclear experience, including operating both pressurized water and boiling water reactors. For the past six years, NU has been actively involved in both technical and legislative solutions to the high-level waste issue. We were delighted to see the passage of the Nuclear Waste Act which assures a timely solution to this issue. Our comments therefore reflect our interest in assuring that the intent of the Act, as we