(9) Exchange of Delivery Schedule Commitments

DOE is requiring that utilities firm their delivery commitment five years prior to delivery and allows only minor changes within that five year period. Because the flexibility offered by DOE is not adequate, individual purchasers will need the right to exchange their delivery commitment schedules.

(10) Appendices

The appendices to the Contract containing descriptions and characterizations of fuel should serve only as a guide to the type of information that will be required by DOE. As the Waste Program progresses, the type and quantity of specific information needed can be expected to change. Incorporating specific appendices may then result in subsequent contract modifications to better clarify the actual requirements.

These comments are submitted in addition to those which we developed in conjunction with EEI. We are looking forward to working with you to have signed contracts to meet your schedules. Please contact our Mr. R.R. Calabro or Mr. A.W. Cretella at (203) 666-6911 if you wish further clarification of our comments.

Very truly yours,

Bernhardt W. Erk
Manager - Administration and
Nuclear Fuel Purchasing

BWE/lc

Mailing Address
Alabama Power Company
600 North 18th Street
Post Office Box 2641
Birmingham, Alabama 35291
Telephone 205 783-6081

F. L. Clayton, Jr.
Senior Vice President
Flintridge Building

83-1-25

Alabama Power
the southern electric system

March 4, 1983

Mr. Robert Morgan
Project Director
Nuclear Waste Policy Act
Project Office
Department of Energy
1000 Independence Avenue, S.W.
Room 7B-084
Washington, D.C. 20585

Re: <u>Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste</u>

Dear Mr. Morgan:

Alabama Power Company ("Alabama Power") is hereby submitting its comments on the proposed rulemaking contained in 48 <u>Federal Register</u> 5458 entitled "Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste." Alabama Power is a public utility providing electric service at retail and wholesale in a large portion of the State of Alabama, and owns and operates the Joseph M. Farley Nuclear Plant under licenses from the Nuclear Regulatory Commission. We are, therefore, vitally interested on behalf of our Company and its customers in the contract proposed to be adopted by the Department of Energy ("DOE") as the standard contract for disposal services to be provided pursuant to the authorization of the Nuclear Waste Policy Act of 1982 (the "Act").

In general, Alabama Power supports the comments filed in connection with this proposed rulemaking by the Edison Electric Institute ("EEI") and, in fact, we participated in their development. In a few instances, however, as pointed out below, as an individual utility we would suggest approaches different from the view supported by EEI. In other instances, we are commenting specifically on particular items in which our views coincide with those presented by EEI. Our additional comments are intended to highlight items of particular importance to us and not to suggest that other items on which EEI commented are not equally deserving of consideration.

of Purchasers against the risks of nuclear hazards arising from the performance by DOE of services under the contract. We understand that while the proposed contract addresses indemnification agreements between DOE and its contractors, no explicit indemnification exists in the proposed contract where DOE is providing the service and a contractor is not involved. DOE is clearly authorized under the Act to take full responsibility for all consequences of its disposal of spent nuclear fuel. To remedy this concern, we endorse the observations of EEI that DOE should obligate itself to provide Purchaser with protection equivalent to that which would have been provided under the Section 170(d) indemnity provisions if it operates the facility. Further, if Section 170(d) were to expire (without Congressional action on extension) on August 1, 1987, or should it otherwise expire, indemnity protection for nuclear hazards must be assured in some alternate manner. We concur with EEI's suggestion that DOE should obligate itself, in the event of expiration of Section 170(d) protection, to provide Purchaser protection equivalent to the protection afforded Purchaser under the Section 170(d) indemnity.

We would note in this connection the need to assure that the indemnity obligation survives the stated term of the contract. To achieve this, the following sentence should be added to Article III - Term:

> The provisions of DOE under Article XIV of this Agreement shall continue beyond the term of this Agreement.

5. <u>Acceptance Criteria, Article VI. B</u>

Consistent with DOE's obligation to take title to, to transport, and to dispose of all spent nuclear fuel and high level waste, there should be no waste nuclear material which will be ultimately unacceptable to DOE provided such material is properly identified, packaged, labeled, scheduled, and loaded by the Purchaser pursuant to applicable regulations. Accordingly, we specifically endorse EEI's comments regarding Article VI. B. of the proposed contract and EEI's comments regarding Appendix E and Appendix F. In particular, we want to emphasize that DOE's obligation to remove spent nuclear fuel under the contract should remain regardless of the form or condition of the spent nuclear fuel. Thus, even if the fuel is not structurally intact, the contract for disposal

services should contain a clear obligation on DOE to accept such fuel for disposal. This would include fuel pellets which have escaped from the cladding, fuel rods which have been consolidated, and other instances where fuel does not meet a standard specification. Moreover the contract should contain a clear obligation by DOE to provide appropriate containers as they may be required.

6. Delays Clause - Article IX

We are concerned by the possible ambiguity of Article IX of the proposed standard contract. This section of the proposed agreement is intended to excuse delays, not failures to perform. The first sentence of Article IX should be revised as follows:

> Neither the Government nor the Purchaser shall be liable under this contract for damages caused by delays in the performance of its obligations hereunder, if such delay arises out of causes beyond the control and without the fault or negligence of the party delayed.

This change will make this sentence consistent with the last sentence of Article IX which requires the parties to perform, notwithstanding excused delays, on an adjusted schedule.

7. Spent Fuel Receipt Rate at DOE Facility

The draft contract recognizes that the annual capacity of the DOE disposal facilities may not be adequate to handle the level of deliveries of spent nuclear fuel desired by the holders of such fuel. In this regard, we would like to emphasize the importance of the annual receipt rate of the disposal facility being designed, to the extent practicable, to be commensurate with the levels of spent nuclear fuel being generated annually and the need to also reduce the back-log of spent fuel as expeditiously as possible. Consistent with Section 302(a)(5) of the Act, the contract should express the intent of DOE to take title to spent nuclear fuel as expeditiously as practicable upon request of the generator or owner.

In addition, we support EEI's comments on the proposed priority system for allocation of spent fuel deliveries and

the concept of allowing exchanges of such allocations between different Purchasers. Clearly such allocation exchanges should at least be permitted between reactor units on Purchaser's own electric system.

CONCLUSION

Alabama Power appreciates the opportunity to provide comments on the draft standard contract. Since DOE has chosen to develop the standard contract through rulemaking with the stated intent to use the form contract to the maximum extent practicable, we consider these comments as our primary means of negotiating a final contract acceptable to both parties. We request that they be considered accordingly.

Yours very truly,

ALABAMA POWER COMPANY

F. L. Clayton, Jr.
Senior Vice President

83-1-21

KGE THE ELECTRIC COMPANY

KANSAS GAS AND ELECTRIC COMPANY

GLENN L. KOESTER
VICE PRESIDENT - NUCLEAR

March 1, 1983

Mr. Robert Morgan, Project Director
Nuclear Waste Policy Act Project Office
Room 7B-084
Department of Energy
1000 Independence Avenue, S.W.
Washington, D.C. 20585

KMLDOE 83-002
Re: Contract for Disposal of Spent Nuclear
Fuel and/or High-Level Radioactive Waste

Dear Mr. Morgan:

Attached please find the joint comments of Kansas Gas and Electric Company, Kansas City Power & Light Company and Kansas Electric Power Cooperative, Inc. to the subject draft contract published in the Federal Register as a proposed rule, 10CFR Part 961.

We appreciate the opportunity to comment and encourage you to consider our comments and those of the Edison Electric Institute.

Yours very truly,

Glenn L. Koester

GLK:hb
Attach

cc: DTMcPhee, w/a
JMulholland, w/a

078

201 N. Market — Wichita, Kansas — Mail Address: P.O. Box 208 / Wichita, Kansas 67201 — Telephone: Area Code (316) 261-6451

## CONTRACT FOR DISPOSAL OF SPENT NUCLEAR FUEL and/or HIGH-LEVEL RADIOACTIVE WASTE

### IDENTIFICATION OF PARTIES

In identifying the Purchaser, the wording should allow for those cases where the lead utility is acting on behalf of itself and its co-owners. This could be accomplished by adding at the end of the provision, "acting on behalf of itself and ____________".

### ARTICLE V - RESPONSIBILITIES OF THE PARTIES

1. Article V.A.2(c) assigns to Purchaser the responsibility for "maintenance, protection and preservation of any and all shipping casks furnished to Purchaser by DOE for the performance of this contract". This language could be interpreted to require Purchaser to provide the kinds of routine maintenance for the casks which would normally be the responsibility of the cask supplier. Purchaser's maintenance responsibility should be limited to incidental maintenance. The provision should also apply only while the casks are in Purchaser's custody.

2. Article V.B.2 should require DOE to provide Purchaser with the necessary information, procedures, specifications needed for Purchaser to meet its responsibilities under Article V.A.2(c) to maintain, protect and preserve shipping casks while they are at Purchaser's site. The information should be provided sufficiently far in advance so that Purchaser will be adequately prepared. The provision should also recognize DOE's responsibility for normal cask maintenance and repair.

3. DOE's obligation to provide Purchaser with program cost projection information (Art. V.B.5) should specifically include a requirement that DOE inform Purchaser at the earliest possible date of a proposed increase in the fee. Utilities will need as much advance notice as possible in order to assure appropriate rate treatment through their public utility

charges. The provision should thus be amended to read:

> "In the event of any delay in the delivery, acceptance or transport of SNF and/or HLW to DOE caused by circumstances within the reasonable control of either the Purchaser or DOE or their respective contractors or suppliers, the schedules specified by this contract will be equitably adjusted."

OTHER CLAUSES

Modification. The contract should include a provision for its modification or amendment. A provision similar to that used in enrichment contracts would be appropriate:

> "The provisions of this contract have been developed in the light of the uncertainties necessarily attendant to long-term contracts. Accordingly, at the request of either DOE or Purchaser, the parties will negotiate and, to the extent mutually agreed, amend this contract without additional consideration to eliminate or reduce restrictive provisions which the parties determine are unequitable, discriminatory or are no longer required to protect their interests or to add provisions which the parties determine are necessary to carry out the purposes of this contract and the Act."

83-1-28

**Iowa Electric Light and Power Company**

March 3, 1983
NG-83-873

LARRY D. ROOT
ASSISTANT VICE PRESIDENT
NUCLEAR GENERATION

Robert Morgan, Project Director
Nuclear Waste Policy Act Project Officer
Department of Energy
1000 Independence Avenue, S. W.
Room 7B-084
Washington, D. C. 20585

Subject: Comments on the Proposed DOE Waste Disposal Services Contract
File: J-70c

Dear Mr. Morgan:

On February 4, 1983, the Department of Energy (DOE) published in the Federal Register a proposed standard contract to be used in furnishing disposal services to the owners or generators of spent nuclear fuel and/or high-level radioactive waste (48 Fed. Reg.). Iowa Electric Light & Power Company (Iowa Electric) has reviewed a draft of contract comments being submitted by the Edison Electric Institute (EEI) and generally endorses them. However, we would offer the following comments which vary in some degree from those submitted by EEI.

First, it is important to emphasize that the contract is unusual in that most of its operative provisions do not come into play for many years. In addition, the contract prescribes relationships between DOE and Purchasers which will extend over decades and involve waste handling and disposal techniques which have yet to be fully developed.

Under such circumstances, modifications in the contract will undoubtedly be required to accommodate technological changes as well as those of a commercial nature. These will likely be required both in general, and on a case-by-case basis with respect to individual utilities. The "deviations" provisions of Section 961.4, however, tend to impede modifications. In addition, the section does not appear to contemplate changes which are probably as likely to emanate from DOE as from its customers. For these reasons, and in view of the fact that it is unnecessary, Section 961.4 should be eliminated. As a corollary to this point, inclusion of the contract text as part of the rule complicates the process of making desirable changes by requiring a rulemaking in connection therewith. This introduces an unnecessary rigidity in modifying the contract. Although the standard contract should be publicly available in published form, it need not and should not be incorporated as a part of 10 CFR 961.



General Office • P.O. Box 351 • Cedar Rapids, Iowa 52406 • 319/398-4411

Second, Iowa Electric believes that Article VI.B.3(a) should be modified to afford priority on the basis of cumulative fuel discharged per MWe of net unit generating capacity. This provides a more equitable method of allocating priorities (rather than a system based in whole or in part on fuel age) because it takes into account the factor of facility size and, hence, relative storage capabilities. When coupled with the provision on exchange of priorities, as suggested by EEI, a desirable degree of flexibility is introduced which should operate to the benefit of Purchasers with no additional burden on DOE.

We suggest further that the contract include a provision under which DOE would commit, within constraints of cost and other limitations, to accept all fuel from a given facility once the priority for that facility is "called up". We believe that it will be more cost-effective to both DOE and its customers to remove as much available fuel as possible in one relatively continuous process. Larger, less frequent shipments avoid multiple operational disruptions at reactor sites and optimize the use of DOE's resources in terms of transportation and the skilled employees required for such operations.

Third, the proposed fee for fuel utilized prior to April 7, 1983, as presented in Article VIII.A.2 (the "three tiered" system) requires a number of arbitrary decisions, appears to be unnecessarily complicated and unrelated to actual cost. We suggest the basic fee schedule be based on a simple 1 mil/kWh charge on an individual reactor basis. This would provide a uniform method for calculating fees applicable to both new and old reactors. In addition, the same approach could and should be used for calculating the disposal fee attributable to partially burned fuel which is still in-core as of April 7, 1983.

Fourth, Iowa Electric agrees that, as provided in Article IX.B of the proposed contract, both charges and schedules should be equitably adjusted in the case of avoidable delays. This, in turn, will reflect any estimated additional costs incurred by the party not responsible. It may be true that a charge adjustment for a particular utility may ultimately affect the cost of furnishing services to all customers but charge adjustments serve to dilute the risk of harm to any single generator or owner of spent fuel by spreading the financial impact among all Purchasers.

In addition to being protected against potentially severe impacts of delay, Iowa Electric also believes that individual Purchasers should receive the benefit of any work they perform which reduces the costs of disposal. While a uniform fee has merit, it provides no incentive for Purchaser initiatives to reduce the cost of disposal. If, for example, a utility reduces DOE's costs by disassembling fuel or, pursuant to an

agreement under Article V.B.2, provides shipping casks, the fee should be adjusted appropriately.

Fifth, Iowa Electric wishes to emphasize that adequate indemnification is essential to a workable waste disposal program. The current provisions in Article XIV of the proposed contract contain a number of deficiencies. These should be addressed in accordance with the E.E.I. comments.

Finally, we strongly urge that DOE undertake to meet from time to time with a purchaser/user group to facilitate communication between DOE and its customers. We believe that industry can play a useful role in offering comments and suggestions on the technical and commercial aspects of the operation of the Waste Fund which will be beneficial to all parties.

Iowa Electric commends DOE for these initial steps in implementation of the Nuclear Waste Policy Act of 1982. Iowa Electric believes, in particular, that adoption of a standard form contract based on DOE's proposed contract as modified in accordance with the Edison Electric Institute comments and those we suggest, will represent a significant achievement in the program mandated by the waste policy legislation.

Very truly yours,

Larry D. Root
Larry D. Root
Assistant Vice President
Nuclear Generation

LDR/ls*

cc: S. Tuthill
D. McGaughy
W. Hodean

83-1-29

MISSISSIPPI POWER & LIGHT COMPANY
*Helping Build Mississippi*
P. O. BOX 1640, JACKSON, MISSISSIPPI 39205

March 4, 1983

NUCLEAR PRODUCTION DEPARTMENT

Mr. Robert Morgan
Project Director
Nuclear Waste Policy Act Project Office
Department of Energy
1000 Independence Avenue, S.W.
Washington, D.C. 20585

Dear Mr. Morgan:

SUBJECT: Grand Gulf Nuclear Station
Units 1 and 2
File: 0321/15162/N155.0/L860.0
Comments re Standard Contract for
Disposal of Spent Nuclear Fuel and/or
High Level Radioactive Waste
APO-83/0210

On February 4, 1983, the Department of Energy (DOE) published in the Federal Register (48 Fed. Reg. 5458) a proposed contract for the disposal of spent nuclear fuel and/or high level radioactive waste pursuant to certain provisions of the Nuclear Waste Policy Act of 1982 (Pub. L. 97-425).

Mississippi Power & Light Company hereby submits the attached comments on the proposed contract on behalf of itself as licensee and as agent for Middle South Energy, Inc. and South Mississippi Electric Power Association who are also licensees and the joint owners of the Grand Gulf Nuclear Station. Thank you for the opportunity to extend these comments. If you have any questions, please call Mr. Charles L. Tyrone, Manager of Nuclear Fuels at (601) 969-2631.

Very truly yours,

L. F. Dale
Manager of Nuclear Services

CLT/LFD:rg
Attachment

cc: Mr. J. B. Richard (w/a)
Mr. N. L. Stampley (w/a)
Mr. T. H. Cloninger (w/a)
Mr. J. P. McGaughy (w/a)
Mr. T. E. Reaves (w/a)
Mr. C. K. McCoy (w/a)
Mr. J. F. Pinto (w/a)
Mr. R. B. McGehee (w/a)
Mr. T. H. Conner (w/a)
Mr. G. B. Taylor (w/a)
File (w/a)

Attachment to APO-83/0210
Page 1

1. Recitals, paragraph 1 identifying the signatory parties – Provision would need to be made to describe the joint ownership of the Grand Gulf Nuclear Station (GGNS) by Middle South Energy, Inc. and South Mississippi Electric Power Association (MSEI and SMEPA) and recognize their several liability. We suggest the first sentence of the contract be completed as follows and that the following additional language be included:

> ". . . and Middle South Energy, Inc., a corporation organized and existing under the laws of the State of Arkansas (hereinafter referred to as the "Purchaser)."
>
> "Pursuant to the provisions of the Joint Construction Acquisition and Ownership Agreement between Purchaser and South Mississippi Electric Power Association (SMEPA) dated as of May 1, 1980, as amended ("Ownership Agreement"), SMEPA owns a ten percent (10%) undivided ownership interest in the Grand Gulf Nuclear Station. DOE acknowledges the Purchaser is executing this Contract for itself and as agent for SMEPA pursuant to the provisions of the Ownership Agreement and that Purchaser and SMEPA are severally and not jointly liable to DOE in proportion to their respective undivided ownership interests in the Grand Gulf Nuclear Station."

2. Recitals, third "whereas" clause – The term "any purchaser" implies DOE is to recover all disposal costs from each individual purchaser. We believe the Act intends full cost recovery to be achieved through the total of all fees from all purchasers. Revise to read:

> "Whereas, DOE is required to collect a full cost recovery from owners and generators delivering to the DOE such spent nuclear fuel and/or high level waste; and"

3. Article I, general comment – Terms which are defined should be capitalized throughout the Contract and not just in Article I.

4. Article I, Definition 4 – Add "... Nuclear Regulatory Commission <u>or any successor thereto</u>."

5. Article I, Definition 7 – The definition of "Delivery Commitment" is unnecessary and should be deleted. Article IV.B and Appendix B describe in detail the "Delivery Commitment Schedule." If the definition must remain we suggest it be revised as follows: ". . . within a specified year, <u>and a promise by DOE to receive such deliveries within a specified year in accordance with Article IV.B.</u>"

6 Article I, Definition 8 – Insert ". . . transfer of custody <u>f.o.b. carrier</u> . . ."

7. Article I, Definition 10 – Revise to read ". . . Department of Energy (<u>or any successor thereto</u>) or any . . . including the

16. Article IV.A, general comment - The title of Article IV.A should read "Delivery of SNF and/or HLW."

17. Article I , first sentence - Revise to read ". . . DOE shall, as provided in this contract, accept and transport the SNF and/or HLW . . ." This change is needed for consistency with language used elsewhere in the Contract.

18. Article IV.B, first paragraph, second sentence - This sentence confuses the timing of the submission of the Delivery Commitment Schedule(s). Does this mean that prior to April 1, 1996, which according to Article V.B.6 is when the first acceptance rankings will be made, that no Delivery Commitment Schedules can be submitted? Another interpretation is also possible. Does this mean no shipments will be accepted by DOE until 63 months after the issuance of the first acceptance ranking?

19. Article IV.B, first paragraph, last sentence - Change to read "... + or - 25% and the delivery schedule + or - 3 months, up to and with the submission of the final delivery schedule."

20. Article IV.B and C, general comments - DOE should provide both approval and disapproval of schedule submittals in writing. Appendix C asks for a "Contact/Title/Phone." This seems to indicate approvals may be given by phone. Verbal communication alone is unacceptable. Further, if DOE disapproves a delivery commitment schedule, Purchaser must resubmit a revised schedule within 30 days. The contract, however, provides no time limit for DOE's response to the revised schedule. If DOE then again disapproves the revised schedule, Purchaser should have the right to negotiate an acceptable schedule with DOE. We suggest that the following language be used in Articles IV.B and C:

> "DOE shall approve or disapprove in writing such revised schedule(s) within thirty (30) days after receipt. In the event of disapproval, DOE shall advise the Purchaser of the reasons for disapproval and shall submit its proposed schedule(s). If these are not acceptable to Purchaser, the parties shall promptly seek to negotiate mutually acceptable schedule(s)."

Finally, Articles IV.B and C would be more equitable if they based DOE's disapproval of proposed schedules on some objective standards such as the priority ranking (or our proposed allocation scheme), transportation availability, etc. In any event, the Articles should affirm that DOE's approval of submitted schedules shall not be unreasonably withheld.

21. Article IV.B, second paragraph - This paragraph would properly allow the Purchaser to change assemblies in a shipment without regard to the acceptance ranking described in Article V.B. We believe that an "acceptance allocation" based on equitable distribution of DOE's receiving capacity for the contemplated time period and giving weight to those nuclear power plants exhausting their spent fuel storage capacity should be proposed. These factors seem more relevant than a ranking system based on the age of SNF/HLW alone. If such an allocation scheme were devised, the Purchaser could ship

M7rg3

negligence. Liability and risk of loss transfer from DOE to the Purchaser upon Purchaser's receipt and acceptance of DOE's cask at the Purchaser's site. Liability and risk of loss revert to DOE when the cask and its contents are transferred to DOE f.o.b. DOE's carrier."

31. Article V.B.1, general comment - Revise this to be consistent with Article IV.B and C as follows: "... approve or disapprove ... proposed delivery schedules as specified in Article IV." The approvals or disapprovals are to be made within 90 days for the delivery commitment schedule and within 45 days for the final delivery schedule.

32. Article V.B.2, general comment - Add "DOE shall provide drawings, instructions, procedures and any other such descriptive technical information as well as any special tools or equipment necessary for Purchaser to make use of DOE's cask in accordance with all applicable regulatory requirements and other procedures and instructions. Purchaser shall have the right to request from DOE specific cask types from among those available." The provision should also state that casks shall arrive in good condition and good repair and shall be subject to receipt inspection and acceptance by the Purchaser, such acceptance shall not be unreasonably withheld.

33. Article V.B.3, second sentence - Revise to read "Prior to such acceptance DOE shall verify that all SNF and/or HLW conforms with the procedures and criteria contained in Article VI of this contract."

34. Article V.B, general comment - Add an additional responsibility to require that DOE will assume responsibility for and perform all activities relating to the transport and disposal of SNF and/or HLW in accordance with all applicable laws and regulations upon acceptance of the shipment f.o.b. DOE's carrier. The Act also stipulates DOE shall take title to SNF and/or HLW generated by civilian nuclear powerplants. This responsibility should be included.

35. Article V.B.5, general comment - To assist in planning, DOE should provide in its reports 10 year forward projections of its receiving capacity and purchaser allocations of that capacity. DOE should also provide annually a detailed financial statement rendering the status of the Nuclear Waste Fund. DOE should periodically meet with the Purchaser to discuss plans and budgets for the Nuclear Waste Fund and technical plans and schedules for the waste disposal program. Finally, DOE should provide to Purchaser the results of any research funded by the Nuclear Waste Fund.

36. Article V.B.6, general comment - As pointed out in comment number 21, we believe an acceptance ranking based solely on the age of SNF/HLW is inappropriate. We suggest instead an allocation system which would equitably distribute DOE storage capacity and give it on a priority basis to those nuclear powerplants exhausting their site storage capacity.

M7rg5

37. Article VI.A.1 – Revise to read ". . . DOE shall accept hereunder only such SNF and/or HLW which has been approved for delivery in accordance with Article IV by DOE . . ."

38. Article VI.B.1, general comment – This section states conclusively that DOE will verify the description of SNF and/or HLW in the shipping lot. Article V.A.2(a) says DOE may designate a representative to observe the preparatory activities for shipping implying verification may be optional. Should DOE elect not to provide a representative, how will verification for acceptance of the shipment be accomplished?

39. Article VI.B.2 (a), general comment – A provision should be added to permit Purchaser reasonable time to correct any improper descriptions prior to DOE's refusing to accept the shipment.

40. Article VI.B.2(a), last sentence – The last sentence seems to give DOE unlimited rights to impose "other such arrangements" which may be above and beyond the Purchaser's obligation to describe properly the SNF/HLW. Delete the last sentence and add a new sentence as follows:

> "Once such SNF and/or HLW has been properly described, DOE shall accept such material in accordance with the previously approved schedule unless it is not technically feasible to transport or dispose of such material on that schedule. Where that schedule is not technically feasible, the parties shall negotiate a mutually acceptable alternate schedule."

41. Article VI.B.3(a), general comment – See comments 21 and 36 suggesting an allocation scheme rather than an acceptance priority ranking.

42. Article VI.B.3(b), general comment – Depending on the circumstances and method of decommissioning, standing priority to permanently shutdown reactors may not always be appropriate.

43. Article VI, general comment – Since DOE may use contractors for some of these activities, it should be made clear throughout this article which activities are solely DOE's and which may be performed by DOE or DOE's contractor.

44. Article VII, first sentence – Revise as follows: ". . . nor shall DOE or the Government be obligated to compensate directly the Purchaser for such material provided that in the event that DOE uses or processes the SNF and/or HLW the Nuclear Waste Fund will be credited with (1) the net proceeds from the sale of materials used or the recovered products, or (2) the net value of any such materials or products which are not sold."

45. Article VIII.A.3, general comment – DOE should provide 120 days' advance notice to the Purchaser of its intention to submit to Congress a fee adjustment by publication of such notice in the Federal Register or by other appropriate means. The Purchaser should have the opportunity to discuss with DOE the appropriateness and necessity of the fee adjustments. Further, should fee adjustments be approved, the Purchaser should be allowed reasonable time

M7rg6

83-1-30

Portland General Electric Company

March 4, 1983

Mr. Robert Morgan
Project Director
Nuclear Waste Policy Act
Project Office
Department of Energy
Room 7B-084 S-10
1000 Independence Av SW
Washington DC 20585

Dear Mr. Morgan:

Re Comments and Recommendations Concerning DOE's Draft Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste

Portland General Electric Company (PGE) is an investor-owned electrical utility in the state of Oregon which serves a total of 501,710 customers. PGE operates the Trojan Nuclear Plant, which is located 40 miles north of Portland, Oregon. Trojan has a maximum dependable capacity of 1,080 megawatts electric and is a major electrical generating resource in the Northwest.

PGE has completed its review of both DOE's draft contract for disposal of spent nuclear fuel and/or high-level radioactive waste and the comments to be submitted to DOE by the Edison Electric Institute (EEI) and the Utility Nuclear Waste Management Group. In general, PGE endorses the comments and recommendations submitted to DOE by the EEI and the Utility Nuclear Waste Management Group and urges DOE to consider their adoption. In addition, PGE wishes to provide DOE with its own comments on the draft contract which are contained in this letter. PGE's comments can be classified as either (1) a reemphasis of support for EEI comments and recommendations on what we perceive are the important issues (emphasis), (2) comments on issues where PGE finds itself in disagreement with EEI comments (disagree) and, (3) comments on issues not covered by EEI (uncovered).

Comment 1: Sizing DOE's Receiving Capacity for SNF/HLW (emphasis)

PGE suggests that DOE recognize in the contract its obligation to size the annual spent nuclear fuel/high-level waste (SNF/HLW) receiving capacity for its facilities to handle the industry's annual needs plus work off a reasonable share of the industry's backlog. One way of accomplishing this is by adding the following clause developed by EEI:

Portland General Electric

Mr. Robert Morgan
March 4, 1983
Page Two

"Whereas, DOE recognizes that its ability to take delivery of spent nuclear fuel and/or high-level radioactive waste must be commensurate with the amount of such fuel and waste then being generated, together with the amount of such fuel and waste previously generated, and consistent with its obligation to take title to such fuel and waste as expeditiously as practical upon the request of the owner or generator of such fuel and waste."

Comment 2: <u>Definition of Term "Disposal" (uncovered)</u>

The definition of the term "disposal" should allow DOE the option to recover and reprocess spent nuclear fuel following emplacement in retrievable storage. If the credits obtained from the reprocessed fuel exceeds the cost of reprocessing, then such credits should be assigned to a nuclear waste fund.

Comment 3: <u>Definition of "High-Level Radioactive Waste" (uncovered)</u>

Article I.13 of the contract should specify that the purchaser retains the right to reprocess its spent fuel and deliver high-level radioactive waste to DOE under this contract.

Comment 4: <u>Definition of "Spent Nuclear Fuel" (uncovered)</u>

The definition of "spent nuclear fuel" in Article I.18 should explicitly state that "spent nuclear fuel" can be either whole fuel assemblies or consolidated encapsulated fuel rods.

Comment 5: <u>DOE's Commitment to Provide Disposal Services Not Later Than January 31, 1998 (uncovered)</u>

In Article II, DOE commits to providing disposal services under this contract no later than January 31, 1998. This article should be expanded to include a statement of what action DOE would take if a repository was not operational by January 31, 1998; in particular, PGE would expect DOE to provide interim storage for utilities requiring additional storage space to maintain operations beginning on that date.

Comment 6: <u>Scope of Contract (emphasis)</u>

PGE agrees with EEI that the scope of the contract as described in Article II should be expanded from "an acceptance by DOE" of SNF/HLW to "an acceptance by DOE of title, subsequent transportation, and disposal of such SNF and/or HLW."

Comment 7: <u>Term of Contract (emphasis)</u>

DOE inadvertently left the word "all" out of this article, thereby changing its meaning. The word "all" should be reinserted as follows: "The term. . . DOE has accepted <u>all</u> SNF and/or HLW. . ."