**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
(Electronically Filed on January 5, 2005)

**SYSTEM FUELS, INC.,** on its own behalf and as agent for SYSTEM ENERGY RESOURCES, INC. and SOUTH MISSISSIPPI ELECTRIC POWER ASSOCIATION,

Plaintiff,

v.

**THE UNITED STATES,**

Defendant.

No. 03-2624C
(Judge Braden)

**PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON LIABILITY AND RESPONSE TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT UPON COUNTS I AND II OF PLAINTIFF'S COMPLAINT**

Alex D. Tomaszczuk
**SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, Virginia 22102
(703) 770-7940
(703) 770-7901 (fax)
Counsel of Record for Plaintiff
System Fuels, Inc., on its own behalf and as agent for System Energy Resources, Inc. and South Mississippi Electric Power Association

Of Counsel:

Jay E. Silberg
Devon E. Hewitt
Michael G. Lepre
Walter F. Zenner
Daniel S. Herzfeld
Jack Y. Chu
**SHAW PITTMAN LLP**
2300 N Street, N.W.
Washington, D.C. 20037
(202) 663-8000
(202) 663-8007 (fax)

January 5, 2005

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ ii

ARGUMENT ........ 1

I. ALL UTILITIES IN THE ACCEPTANCE QUEUE SUFFERED DAMAGES DUE TO DOE'S NONPERFORMANCE ........ 3

II. DOE'S RENEWED AND UNILATERAL SUSPENSION OF THE DCS PROCESS DEMONSTRATES THE IRRELEVANCE OF THE ORIGINAL DCS PROCESS AND WILL INCREASE PLAINTIFF'S DAMAGES ........ 5

III. THERE IS SUFFICIENT EVIDENCE TO SUPPORT COUNT II, PLAINTIFF'S GOOD FAITH AND FAIR DEALING CLAIM ........ 8

IV. THE COURT SHOULD DENY THE GOVERNMENT'S REQUEST FOR RULE 56(F) DISCOVERY ........ 13

CONCLUSION ........ 15

# TABLE OF AUTHORITIES

## CASES

Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652 (2003) ..........9

Conoco, Inc. v. United States, 35 Fed. Cl. 309 (1996) ..........12

Essex Electro Eng'rs, Inc. v. Danzig, 224 F.3d 1283 (Fed. Cir. 2000) ..........11

Indiana Mich. Power Co. v. Dept. of Energy, 88 F.3d 1272 (D.C. Cir. 1996)..........12

Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1336 (Fed. Cir. 2000)..........8

Marathon Oil Co. v. United States, 177 F.3d 1331 (Fed. Cir. 1999)..........12

Marathon Oil Co. v. United States, 236 F.3d 1313 (Fed. Cir. 2000)..........12

Maxima Corp. v. United States, 847 F.2d 1549 (Fed. Cir. 1988)..........8

Mobil Oil Exploration & Producing S.E., Inc. v. United States, 530 U.S. 604 (2000) ..........12

Northern States Power Co. v. Dep't of Energy, 128 F.3d 754 (D.C. Cir. 1997) ..........12

Northern States Power Co. v. United States, 224 F.3d 1361 (Fed. Cir. 2000) ..........9

Orange Cove Irrig. Dist. v. United States, 28 Fed. Cl. 790, (1993)..........8

Rockwell Int'l Corp. v. United States, 147 F.3d 1358 (Fed. Cir. 1998)..........13

Sacramento Municipal Utility Dist. v. United States, 61 Fed. Cl. 438 (2004) ..........14

Solar Turbines, Inc. v. United States, 23 Cl. Ct. 142 (1991) ..........13

Tennessee Valley Auth. v. United States, 60 Fed. Cl. 665 (2004) ..........4, 9, 10, 11

Yankee Atomic Elec. Co. v. United States, 54 Fed. Cl. 306 (2002)..........11

Yankee Atomic Elec. Co. v. United States, 2004 WL 1535688
(Fed. Cl. June 28, 2004)..........11, 13

**STATUTES AND REGULATIONS**

10 C.F.R. § 961.11 ..........9, 10

59 Fed. Reg. 27,007 (May 25, 1994) ..........11, 12

60 Fed. Reg. 21,793 (May 3, 1995) ..........12

**MISCELLANEOUS**

RCFC 56 ..........13

Restatement (Second) of Contracts § 205 ..........12

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **SYSTEM FUELS, INC.,** on its own behalf and as agent for SYSTEM ENERGY RESOURCES, INC. and SOUTH MISSISSIPPI ELECTRIC POWER ASSOCIATION, | ) | |
| Plaintiff, | ) | No. 03-2624C<br>(Judge Braden) |
| v. | ) | |
| **THE UNITED STATES,** | ) | |
| Defendant. | ) | |

**PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON LIABILITY AND RESPONSE TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT UPON COUNTS I AND II OF PLAINTIFF'S COMPLAINT**

Plaintiff System Fuels, Inc. ("SFI"), on its own behalf and as agent for System Energy Resources, Inc. and South Mississippi Electric Power Association, respectfully submits this Reply In Support Of Its Motion For Summary Judgment On Liability And Response To Defendant's (the "Government") Cross-Motion For Summary Judgment Upon Counts I And II Of Plaintiff's Complaint ("Gov't Cross-Motion").

**ARGUMENT**

The Court should grant Plaintiff's Motion For Summary Judgment On Liability and deny the Government's Cross-Motion For Summary Judgment Upon Counts I And II Of Plaintiff's Complaint. In its response and cross-motion, the Government does not appear to dispute that in violation of Article II of the Standard Contract, the Department of Energy ("DOE") did not begin to accept spent nuclear fuel ("SNF") from nuclear utilities as of January 1998. While DOE has indicated that it will not begin to perform under the Standard Contract until 2010 at the earliest,

even this projected date of performance appears impossible now. The Government's response and cross-motion also fail to demonstrate why decisions of the U.S. Courts of Appeals for the District of Columbia and Federal Circuits – finding that DOE's failure to begin accepting SNF as of January 1998 resulted in a breach of the Standard Contract for the entire nuclear industry, see Plaintiff's Memorandum In Support Of Its Motion For Summary Judgment On Liability ("SFI's Brief") at 5-7 – are not binding on this case.

There is no merit to the Government's argument that Plaintiff suffered no damages as a result of DOE's breach simply because DOE was not specifically obligated to begin accepting SNF from Plaintiff in January 1998. The Government's response and cross-motion fail to recognize that DOE's breach of the Standard Contract injured all Standard Contract holders (including Plaintiff), not just those utilities who were at the front of the SNF acceptance queue established by DOE. Once DOE failed to begin accepting SNF from utilities as of January 1998, this delay created a domino effect resulting in DOE being unable to accept Plaintiffs' (and all other nuclear utilities') SNF in a timely manner under the Standard Contract. Due to this lengthy delay, Plaintiff has incurred – and continues to incur – substantial damages to store SNF that DOE was contractually obligated to take.

The Government's arguments that it has no liability to Plaintiff because Plaintiff did not submit to DOE a Delivery Commitment Schedule ("DCS") for SNF at the Grand Gulf plant, which DOE has alleged is necessary for DOE to be obligated to accept SNF under the Standard Contract, are also flawed. As explained in SFI's Brief at 11-17, submission of a DCS form was not a condition precedent to DOE's acceptance of SNF deliveries and would have been futile in any event since DOE stopped approving DCSs – therefore, submission of DCSs was not required by law. Given DOE's recent (and second) unilateral suspension of the DCS process, the

Department will eventually have to restart the DCS process yet again, which indicates that the DCS process that was conducted in the 1990s was irrelevant and cannot possibly form the basis of DOE's waste acceptance obligations under the Standard Contract, as the Government has maintained in this and other SNF cases.

For these reasons, Plaintiff respectfully requests that the court grant Plaintiff's Motion For Summary Judgment On Liability and deny the Government's Cross-Motion For Summary Judgment On Counts I And II Of Plaintiff's Complaint. The Government's request for discovery pursuant to RCFC 56(f) should also be denied.

## I. ALL UTILITIES IN THE ACCEPTANCE QUEUE SUFFERED DAMAGES DUE TO DOE'S NONPERFORMANCE

The Government's response and cross-motion is fundamentally based on the premise that DOE's failure to begin SNF acceptance from the commercial nuclear industry by January 31, 1998 could not create an injury to each and every member of the commercial nuclear industry, because only utilities that had approved DCSs for 1998 could have suffered damages from a government breach of the Standard Contract. As explained below and in SFI's Brief, this premise is meritless – the Government's reliance on the DCS process as a method of limiting its liability to Plaintiff and other utilities is inconsistent with the purpose of the Standard Contract and ignores the practical reality of how DOE has unilaterally and repeatedly manipulated the DCS process since the 1990s.

DOE's failure to begin accepting SNF from utilities on January 31, 1998, as required by the Standard Contract, necessarily affected when and how SNF would be accepted from all utilities in the acceptance queue – not just those at the front who were scheduled to have their SNF picked up in 1998. As explained in SFI's Brief at 9, any utilities whose SNF deliveries would fall sometime after January 1998 would have their deliveries delayed by the amount of

time at least equal to DOE's delay in beginning its overall performance. For example, had DOE begun performance in 1998 using the appropriate rate of acceptance, DOE would have begun accepting SNF from Grand Gulf no later than 2005 – in the eighth year of the waste management system's operation. SFI's Brief at 9; 2004 Acceptance Priority Ranking & Annual Capacity Report ("APR/ACR") at 2 & 3 (referencing "Systems Energy Resources, Inc." for allocation in eighth year of operation), Appendix To Plaintiff's Memorandum In Support Of Its Motion For Summary Judgment On Liability ("Pl. App.") (Oct. 29, 2004) at 144-45. Based on the 2004 APR/ACR, which assumes that DOE will begin to accept SNF in 2010, DOE assumes it will begin picking up the Grand Gulf SNF no later than 2017. See 2004 APR/ACR at 2 & 3 (referencing "Systems Energy Resources, Inc." for allocation in eighth year of operation), Pl. App. at 144-45. Thus, the Government's 12-year delay in beginning acceptance of SNF (i.e., 2010 instead of 1998), not surprisingly will result in a 12-year delay in picking up the Grand Gulf SNF. In other words, once DOE failed to accept SNF under the Standard Contract in 1998, any delay for a utility at the front of the acceptance queue would lead to corresponding delays for all other utilities later in the queue (i.e., a "domino" effect).

Utilities such as Plaintiff, faced with such a precarious scenario, needed to prepare for this eventuality accordingly by incurring costs to mitigate the damages that would otherwise be caused by DOE's nonperformance. SFI's Brief at 10. Given the lead times that are required for nuclear utilities to plan, design, and construct alternative methods of storing their SNF, Plaintiff necessarily had to incur those costs in the past (and continues to incur such costs), rather than wait until DOE actually fails to pick up SNF at Grand Gulf as scheduled. As Judge Lettow found in Tennessee Valley Authority v. United States, 60 Fed. Cl. 665 (2004) ("TVA"), plaintiff utilities may take affirmative steps to avoid unnecessary loss due to the Government's ongoing,

partial breach of the Standard Contract – including the construction of dry storage facilities and even if DOE was not specifically obligated to accept that utility's SNF in 1998. Id. at 674-5. Hence, the Government cannot reasonably maintain here that Plaintiff, despite its relative position in the acceptance queue, has suffered no damages as a result of DOE's nonperformance beginning in January 1998.

## II. DOE'S RENEWED AND UNILATERAL SUSPENSION OF THE DCS PROCESS DEMONSTRATES THE IRRELEVANCE OF THE ORIGINAL DCS PROCESS AND WILL INCREASE PLAINTIFF'S DAMAGES

As noted in SFI's Brief, DOE recommenced the Delivery Commitment Schedule process in July 2004, which process DOE unilaterally suspended in the mid-1990s. SFI's Brief at 17 n.9. In December 2004, however, DOE once again abruptly and unilaterally suspended the DCS process and implied that DOE would not meet its 2010 target date for commencement of SNF acceptance at a repository. Thus, DOE's renewed suspension of its DCS process – a process upon which the Government relies heavily in responding to Plaintiff's motion for summary judgment and in cross-moving for summary judgment on Counts I and II – again demonstrates that the Government cannot reasonably use this DCS process to dispute in this case the substantial damages Plaintiff has suffered as a result of the Government's breach.

In July 2004, DOE restarted the DCS process by sending new instructions to Standard Contract holders directing utilities to submit DCSs "to inform DOE of their plans for utilizing their allocations of projected Civilian Radioactive Waste Management System (CRWMS) acceptance capacity." 2004 DCS Instructions ¶ 1, Pl. App. at 132. In doing so, DOE "recognize[d] that many Purchasers have submitted and DOE has approved DCSs based upon the January 31, 1998 operations date included in the Standard Contract. Purchasers should submit new DCSs based upon the currently planned operation date of 2010." 2004 DCS Instructions ¶ 7(a), Pl. App. at 133. In addition to these DCS instructions, DOE issued in July

2004 its "Acceptance Priority Ranking & Annual Capacity Report." Pl. App. at 140-47. This was the first APR/ACR that the Department has published since 1995 and was explicitly based upon a 2010 planned start of DOE's acceptance of spent fuel. See Pl. App. at 129-30.

Less than five months later, however, DOE abruptly reversed course and stopped the DCS process. In letters to Standard Contract holders, DOE stated that, despite having received DCS forms from utilities as requested in July 2004, "recent developments relating to the FY 2005 budget along with other issues have led the Department to conclude that the resumption of the DCS process was premature." E.g., Letter from Dave Zabransky to Frank B. Rives received Dec. 1, 2004 (attached hereto as Exhibit A). DOE returned any DCS forms that utilities had submitted in response to the Department's July 2004 instructions, and concluded in this December 2004 letter that once "the Department has determined a revised date for the initial operation of the Yucca Mountain repository, it will resume the DCS process in accordance with the provisions of the Standard Contract." Id.

The fact that DOE has for a second time suspended the Delivery Commitment Schedule process again demonstrates the untenability of the Government's position that a plaintiff utility's approved DCSs (or lack thereof) form the basis of the Government's liability for breach of contract damages in this and other SNF cases. Here, as in several other SNF cases, the Government has argued that Plaintiff suffered no damages as a result of DOE's breach of the Standard Contract because DOE was not specifically obligated to begin accepting Plaintiff's SNF in January 1998. Gov't Cross-Motion at 2-4. Rather, the Government suggests that Plaintiff would not have had any allocation in at least the first ten years of DOE's acceptance of SNF, since Plaintiff never submitted any DCSs to DOE for acceptance of its SNF. Id. at 12-13. As demonstrated above and in SFI's Brief, however, the DCS process as implemented by DOE

was flawed from the outset and has been administered in a manner inconsistent with the parties' obligations under the Standard Contract. DOE's recent unilateral re-suspension of the DCS process powerfully reinforces this point.

As Plaintiff previously noted, in issuing a new set of DCS instructions to Standard Contract holders in July 2004, DOE effectively acknowledged that the entire DCS process conducted in the 1990s is irrelevant. SFI's Brief at 17 n.9. Now that DOE will – at some unknown point in the future – have to restart the DCS process yet again, perhaps with yet a third set of DCS instructions, the DCS process that was conducted in the 1990s becomes even more irrelevant and cannot possibly form the basis of DOE's waste acceptance obligations under the Standard Contract, as the Government has maintained. In this regard, this Court has repeatedly rejected DOE's attempt to use the DCS process as a basis for limiting its liability for damages and/or breach of contract in other spent nuclear fuel cases. See SFI's Brief at 12 n.5.

Moreover, contrary to the Government's assertions and as discussed above, DOE's breach of the Standard Contract did injure Plaintiff, even if Plaintiff was not at the front of the SNF acceptance queue established by DOE. Once DOE failed to begin accepting SNF from utilities as of January 1998, this delay created a domino effect resulting in DOE being unable to accept Plaintiff's (and all other nuclear utilities') SNF in a timely manner under the Standard Contract. SFI's Brief at 9. Due to this delay, Plaintiff has incurred (and continues to incur) substantial damages to store SNF that DOE was contractually obligated to take. Id. at 10. Now that it appears beyond doubt that the initial operation of the Yucca Mountain repository will be delayed beyond the 2010 date[1] that DOE has officially and repeatedly stated as its "target" over

[1] Indeed, given that DOE requires utilities to submit DCSs "at least 63 months prior to [the] requested delivery year [for its SNF]," Pl. App. at 132, it would appear that SNF deliveries for any utility in 2010 (or earlier) are no longer even theoretically possible.

the past decade, the "domino effect" of DOE's delay will extend even further and Plaintiff's damages as a result of the Government's breach will almost certainly increase as well. For this reason also, the Government's suggestion that Plaintiff has not suffered any damages is incorrect.

## III. THERE IS SUFFICIENT EVIDENCE TO SUPPORT COUNT II, PLAINTIFF'S GOOD FAITH AND FAIR DEALING CLAIM

According to the Government, Plaintiff's claim that the Government breached the Standard Contract's covenant of good faith and fair dealing should be dismissed because that cause of action "is nothing more than an allegation that the Government breached the Standard Contract." Gov't Cross-Motion at 19; see also Gov't Cross-Motion at 21. However, Plaintiff can show by clear and convincing evidence that DOE breached the Standard Contract's implied covenant of good faith and fair dealing.[2] For example, DOE's failure to properly implement the DCS process, its eventual cancellation of the DCS process, its failure to publish annual APR/ACRs as required by Article IV.B. of the Contract, and other actions regarding its failure to begin taking SNF as of January 1998 show clear and convincing intent to injure Plaintiff that each justifies a finding of a breach of the Standard Contract's covenant of good faith and fair dealing.[3] In fact, at least two Judges of this court have found that DOE's actions provided

[2] "Every contract, including those in which the Government is a party, contains an implied covenant of good faith and fair dealing." Orange Cove Irrig. Dist. v. United States, 28 Fed. Cl. 790, 800 (1993) (citation omitted); Maxima Corp. v. United States, 847 F.2d 1549, 1556 (Fed. Cir. 1988) ("The need for mutual fair dealing is no less required in contracts to which the government is a party, than in any other commercial arrangement. It is no less good morals and good law that the Government should turn square corners in dealing with the people than that the people should turn square corners in dealing with their government.") (internal quotation marks omitted).

[3] To the extent the Government is asserting that Plaintiff may not maintain claims for both breach of contract and breach of the implied covenant of good faith and fair dealing, the Federal Circuit has already rejected such reasoning. See Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1336, 1342-43 (Fed. Cir. 2000) (allowing utility to maintain good faith

evidence of such a breach. Commonwealth Edison v. United States, 56 Fed. Cl. 652, 665 (2003); TVA, 60 Fed. Cl. at 674.

In the instant case (and in all of the SNF cases), the Government acted contrary to the implied covenant of good faith and fair dealing by failing to meet the justified expectations of the parties to the Standard Contract. First, as Judge Hewitt recognized in Commonwealth Edison, DOE may have breached the implied covenant of good faith and fair dealing of the Standard Contract through its implementation of the DCS process. Commonwealth Edison, 56 Fed. Cl. at 665.

As noted in SFI's Brief at 16-17, DOE did not allow utilities to identify "all SNF and HLW [they wished] to deliver to DOE," as permitted by the Standard Contract. Standard Contract, Art. V.B.1.; 10 C.F.R. § 961.11; see id., Art. V.B.2. ("Purchaser shall have the right to adjust the quantities of SNF and/or HLW plus or minus (+/-) twenty percent (20%) . . . until the submission of the final delivery schedule."). Instead, DOE issued instructions to Plaintiff (and other utilities) informing utilities that "the total quantity of SNF designated for delivery must not exceed the allocation in the [1991] ACR; exceeding the allocation will result in disapproval of the DCS(s)." Commonwealth Edison, 56 Fed. Cl. at 665 (quoting the DCS Instructions); 1991 DCS Specific Instructions at ¶ 2.7, Pl. App. at 101. Judge Hewitt stated that "DOE's use of the 1991 ACR to limit the amount of SNF requested by the utilities in their DCS Submissions may be a breach of defendant's duty of good faith and fair dealing." Commonwealth Edison, 56 Fed. Cl. at 665. Judge Hewitt also found that "Defendant's use of the 1991 ACR to limit the utilities' DCS submissions does not appear to be consistent with the 'justified expectations' of plaintiff . .

---

and fair dealing claim despite Government's assertion that the claim was a "renamed" contract claim to avoid the disputes clause); Northern States Power Co. v. United States, 224 F.3d 1361, 1367 (Fed. Cir. 2000).

. ." Id. Moreover, further demonstrating bad faith, the Government's allocation rates in its 1995 APR/ACR were based on construction of an MRS (which was no longer an option at that time), in order to minimize the Government's liability to utilities.[4]

Second, the Government's actions in voiding DCSs and suspending the DCS process further violated the Standard Contract's implied covenant of good faith and fair dealing. As discussed in SFI's Brief at 15, DOE improperly failed to follow the requirement of the Standard Contract that it approve or disapprove a DCS. Standard Contract, Art. V.B.1.; 10 C.F.R. § 961.11. Judge Lettow concluded that DOE's failure to approve or disapprove DCSs commensurate with the Standard Contract consisted of a breach of the implied covenant of good faith and fair dealing. TVA, 60 Fed. Cl. at 671 n.7 ("Because there is no dispute as to the facts surrounding DOE's inaction on TVA's DCS submissions, and because the TVA Contract specifically requires DOE's performance, the Court grants TVA's request for summary judgment insofar as DOE breached its obligation to act on TVA's DCSs in good faith and ultimately to accept, transport, and dispose of TVA's SNF.").[5]

---

[4] See Zabransky Dep. at 364-65 (Apr. 18, 2002); Pl. App. at 4A:

Q. Why did the Department publish a document to be used as the basis for delivery commitment schedules [the 1995 ACR] using rates which it was not using itself for the purpose of planning the system?
A. The Department carried over the rates it had in the previous ACR and did not change them.
Q. Was the department trying to minimize the commitments it had to utilities who were parties to the standard contracts in using [the 1995 ACR]?
A. I believe that was a consideration.
Q. Were there any other considerations that you can think of for using those rates?
A. There was no other basis to develop any other rates at that point in time.

[5] Also, the Standard Contract requires DOE to issue an ACR annually. Standard Contract, Art. IV.B.5(b); 10 C.F.R. § 961.11. DOE abruptly stopped issuing ACRs in 1996 and failed to issue another ACR until 2004. This inaction similarly left Plaintiff without a key document for planning purposes in attempting to forecast its needs in mitigating DOE's breach. Thus, this breach also implicates the covenant of good faith and fair dealing.

Furthermore, as noted in SFI's Brief at 14-16, DOE's suspension of the DCS approval process made it impossible and futile for Plaintiff to submit and have a DCS approved. The implied covenant of good faith and fair dealing prohibits one party from interfering with the other party's performance. See Essex Electro Eng'rs, Inc. v. Danzig, 224 F.3d 1283, 1291 (Fed. Cir. 2000) ("Every contract, as an aspect of the duty of good faith and fair dealing, imposes an implied obligation that neither party will do anything that will hinder or delay the other party in performance of the contract.") (internal quotation marks omitted). DOE breached the implied covenant of good faith and fair dealing by preventing and hindering Plaintiff's ability to submit DCSs and, thereby, Plaintiff is excused from any such condition that may have been required by the Standard Contract. See TVA, 60 Fed. Cl. at 672.

Third, as alleged in Plaintiff's Complaint ¶ 27, DOE further breached its implied covenant of good faith and fair dealing by denying throughout the 1990s that it had any obligation to perform the Standard Contract beginning in 1998, pressing this theory in the Federal Register and the D.C. Circuit. See Yankee Atomic Elec. Co. v. United States, 2004 WL 1535688, at *6 (Fed. Cl. June 28, 2004) ("[T]he utilities had at minimum a good idea that the deadline would not be met in 1994, 1996 at the latest."); see also Yankee Atomic Elec. Co. v. United States, 54 Fed. Cl. 306, 316 (2002) (recognizing that it was "fairly foreseeable" as early as 1991 that DOE would face litigation regarding its inability to begin timely acceptance of SNF).

In 1994, DOE issued a "Notice of Inquiry" stating DOE's preliminary view that it was not unconditionally obligated to begin accepting spent nuclear fuel beginning in 1998 and that DOE would not begin to do so until 2010 at the earliest. Notice of Inquiry, 59 Fed. Reg. at 27,007, 27,008 (May 25, 1994). In the Notice, DOE recognized that utilities had "implemented

long term waste management plans" based on the utilities' understanding that DOE was required to begin accepting SNF in 1998. Id. Nonetheless, in 1995, DOE finalized its interpretation denying it had any obligation to begin accepting SNF in 1998 as required by the NWPA and Standard Contract. 60 Fed. Reg. 21,793, 21,794 (May 3, 1995). DOE's theory was challenged in the D.C. Circuit and rejected. Indiana Mich. Power Co. v. Dep't of Energy, 88 F.3d 1272, 1277 (D.C. Cir. 1996). DOE ignored the D.C. Circuit ruling, the utilities again challenged DOE in the D.C. Circuit, and DOE's interpretation was again rejected. Northern States Power Co. v. Dept. of Energy, 128 F.3d 754, 757 (D.C. Cir. 1997) ("After issuing our decision in Indiana Michigan, we would have expected that the Department would proceed as if it had just been told that it had an unconditional obligation to take the nuclear materials by the January 31, 1998, deadline. Not so. Quite to the contrary, the Department informed the utilities and the states that it would be unable to comply with the statutory deadline that this court had just reaffirmed.").

DOE's actions throughout the 1990s evaded the spirit of the bargain of the Standard Contract and further frustrated Plaintiff's reasonable expectations under the Standard Contract. See Restatement (Second) of Contracts § 205 cmt. d (noting that "evasion of the spirit of the bargain" can constitute bad faith); Conoco, Inc. v. United States, 35 Fed. Cl. 309, 324 n.9 (1996) (citing Restatement (Second) of Contracts § 205 cmt. d), rev'd sub nom, Marathon Oil Co. v. United States, 177 F.3d 1331 (Fed. Cir. 1999), rev'd sub nom, Mobil Oil Exploration & Producing S.E., Inc. v. United States, 530 U.S. 604 (2000), on remand aff'd sub nom, Marathon Oil Co. v. United States, 236 F.3d 1313 (Fed. Cir. 2000). DOE acted in bad faith by allowing Plaintiff (and all nuclear utilities) to twist in the wind even though DOE realized that the utilities were relying on DOE to begin performance. See 59 Fed. Reg. at 27,008. While DOE asserted it had no obligation to take any contract-holder's SNF prior to 2010, Plaintiff had to create and

implement a plan to store the SNF that DOE would not begin picking up as required by the Standard Contract. See Yankee Atomic, 2004 WL 1535688, at *6. DOE's actions evaded the spirit of the bargain and constituted bad faith.

The court should deny the Government's motion for summary judgment on Plaintiff's good faith and fair dealing claim. As set forth above, not only is there sufficient evidence to allow that claim to proceed to trial, see, e.g., Solar Turbines, Inc. v. United States, 23 Cl. Ct. 142, 156 (1991) (precluding summary judgment based on some evidence that Government breached covenant of good faith and fair dealing), there is a strong likelihood Plaintiff will establish at trial that the Government violated the Standard Contract's implied covenant of good faith and fair dealing.

## IV. THE COURT SHOULD DENY THE GOVERNMENT'S REQUEST FOR RULE 56(f) DISCOVERY

The Government asks that it be permitted to take limited discovery under RCFC 56(f), in the event the court would otherwise grant Plaintiff's Motion for Summary Judgment on Liability. Gov't Cross-Motion at 22-23. The Government indicates that it would like the opportunity to seek evidence supporting the Plaintiff's supposed argument that it was "entitled to acceptance of its own SNF in 1998 or in an acceptance queue developed outside of the 'oldest fuel first' requirement of the Standard Contract." Id. at 22. The Government's request should be denied.

Generally, summary judgment is appropriate when there is no genuine issue of material fact. RCFC 56(c); Rockwell Int'l Corp. v. United States, 147 F.3d 1358, 1361 (Fed. Cir. 1998). There is no genuine issue of material fact here regarding the Government's liability for breach. Even the Government itself does not, nor could it, dispute the fact that it failed to begin taking deliveries of SNF on January 31, 1998 as required in the Standard Contract. The only outstanding factual issue is the measure of damages, which must be resolved at trial.

Accordingly, it is neither necessary nor proper for the court to allow the Government to conduct additional discovery before ruling on Plaintiff's Motion for Summary Judgment on Liability.

In addition, as also discussed above, Plaintiff is *not* claiming that DOE was obligated contractually to accept Plaintiff's own SNF in 1998 or otherwise outside of the Standard Contract's "oldest fuel first" structure.[6] Whether Plaintiff was first or later in the queue for SNF deliveries is irrelevant; the Government breached each utility's Standard Contract. See SFI's Brief at 4-7. Therefore, there is no reason for the court to order discovery on the only matter identified by the Government in support of its request.

[6] The Government has plucked a quote from Plaintiff's Complaint ¶ 32 and asserts that this is evidence that Plaintiff is seeking contract damages outside the "oldest fuel first" methodology embodied in the Standard Contract. Gov't Cross-Motion at 13. However, paragraph 32 of Plaintiff's Complaint relates to Plaintiff's *takings claim* not its breach claims. Indeed, the Government has not challenged Plaintiff's takings claim in this case, which real property takings claim is similar to the one this Court allowed to proceed in Sacramento Mun. Utility Dist. v. United States, 61 Fed. Cl. 438, 442-43 (2004).

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court grant Plaintiff's Motion For Summary Judgment On Liability and deny the Government's Cross-Motion For Summary Judgment On Counts I And II Of Plaintiff's Complaint.

Dated: January 5, 2005

Respectfully submitted,

s/ Alex D. Tomaszczuk by s/ Jack Y. Chu

Alex D. Tomaszczuk
**SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, VA 22102
(703) 770-7940
(703) 770-7901 (fax)

Counsel of Record for Plaintiff
System Fuels, Inc., on its own behalf
and as agent for System Energy Resources, Inc.
and South Mississippi Electric Power Association

Of Counsel:

Jay E. Silberg
Devon E. Hewitt
Michael G. Lepre
Walter F. Zenner
Daniel S. Herzfeld
Jack Y. Chu
**SHAW PITTMAN LLP**
2300 N Street, N.W.
Washington, D.C. 20037
(202) 663-8000
(202) 663-8007 (fax)