IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SYSTEMS FUELS, INC., on its own behalf and as agent for SYSTEM ENERGY RESOURCES, INC. and SOUTH MISSISSIPPI ELECTRIC POWER ASSOCIATION, | ) | |
| Plaintiff, | ) | No. 03-2624C (Judge Braden) |
| v. | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S REPLY IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT UPON COUNTS I AND II OF PLAINTIFF'S COMPLAINT

Defendant, the United States, respectfully submits this reply to "Plaintiff's Reply In Support Of Its Motion For Summary Judgment On Liability And Response To Defendant's Cross-Motion For Summary Judgment Upon Counts I And II Of Plaintiff's Complaint," dated January 5, 2005.

ARGUMENT

I. THE GOVERNMENT IS ENTITLED TO SUMMARY JUDGMENT UPON SFI'S BREACH OF CONTRACT CLAIM BECAUSE SFI HAS SOUGHT DAMAGES BEFORE ANY RIGHT TO ACCEPTANCE OF ITS SNF BY DOE HAS ACCRUED

A. Incorrectly Assuming That "Breach" And "Liability" Are Synonymous Terms, SFI Has Failed To Present Any Evidence Of Damage Resulting From DOE's Delay In Beginning Spent Nuclear Fuel Acceptance From Other Contract Holders

In our cross-motion, we established that DOE's delay in beginning acceptance of SNF from the commercial nuclear industry, which the United States Court of Appeals for the Federal Circuit has held constitutes a partial breach of the Standard Contract, see Maine Yankee Atomic

Power Co. v. United States, 225 F.3d 1336, 1343 (Fed. Cir. 2000), does not itself create liability to any particular contract holder or establish that any particular contract holder has incurred damages as a result of the Government's partial breach of contract.[1] As we discussed in our cross-motion for summary judgment, dated December 6, 2004, the existence of a breach of contract is only one component of the issue of liability. See Def. Br. at 5-6 (citing cases).[2] The Court of Claims, the decisions of which are binding precedent upon this Court, see Rood v. United States, 63 Fed. Cl. 213, 215 n.2 (2004), has recognized that, before a contractor is entitled to judgment as to entitlement, it must establish as part of its proof that it suffered some damage, beyond mere speculation, because of the Government's actions. Puritan Assocs. v. United States, 215 Ct. Cl. 976, 978 (1977); see Def. Br. 6 (citing cases). When considering a summary judgment motion regarding liability, "evidence on damages or quantum is not totally excluded because there must be some evidence of damage to support a finding on liability" that is "sufficient to demonstrate that the issue of liability is not purely academic." Cosmo Constr. Co. v. United States, 196 Ct. Cl. 463, 469-70, 451 F.2d 602, 605-06 (1971).

---

[1] Recently, in Sacramento Municipal Utility District v. United States, No. 98-488C, 2005 WL 242130 (Fed. Cl. Jan. 19, 2005), this Court determined that the plaintiff in that case was entitled to a ruling that the Government was liable to the plaintiff for its January 31, 1998 breach of the Standard Contract, but reserved the question of "[w]hether damages, if any, were caused by the January 31, 1998 breach . . . ." Id. at *11. In this case, however, the plaintiff has not introduced any evidence that it was injured as a result of the January 31, 1998 partial breach. For the reasons explained below, although the evidence may establish the existence of a partial breach, the plaintiff here has not introduced any evidence that would entitle it to a liability order based upon that partial breach.

[2] "Def. Br. at __" refers to "Defendant's Response To Plaintiff's Motion For Summary Judgment On Liability, And Defendant's Motion For Summary Judgment Upon Counts I And II Of Plaintiff's Complaint," dated December 6, 2004. "Pl. Mtn. at __" refers to plaintiff's motion for summary judgment regarding liability, dated October 29, 2004. "Pl. Reply at __" refers to plaintiff's reply brief, dated January 5, 2005.

Although plaintiff, Systems Fuels, Inc. ("SFI"), relies upon Maine Yankee to establish the existence of a partial breach on January 31, 1998, it has not submitted any evidence to this Court of any resultant injury as a result of that partial breach. In its reply brief, SFI acknowledges that the Department of Energy ("DOE") was not obligated to begin accepting SFI's SNF by January 31, 1998, but, instead, that DOE was only obligated to begin accepting other nuclear utilities' SNF by that date. Pl. Reply at 14. Yet, SFI has not established when DOE was obligated to begin accepting SFI's SNF. In fact, SFI has never submitted a delivery commitment schedule ("DCS") to DOE for acceptance of its SNF and, under Annual Capacity Reports ("ACRs") that DOE issued in the early 1990s, SFI did not have any allocations for SNF acceptance within at least the first 10 years of SNF acceptance.[3] Accordingly, SFI has not identified any basis upon which it has suffered any monetary "damage" at this point in time from DOE's delay.

Nevertheless, SFI claims that, because DOE was obligated to begin SNF acceptance in 1998 from other utility contract holders and to continue that acceptance over time, a hypothetical "'domino' effect" necessarily has harmed every utility contract holder. Pl. Reply at 4. According to SFI, a 12-year delay in beginning the acceptance of SNF "will result in a 12-year delay in picking up the Grand Gulf SNF." Id. at 4. As an initial matter, even assuming that SFI has established that DOE will definitely delay accepting SFI's SNF by 12 years, SFI has presented nothing but attorney argument to support its assertion that SFI "will" definitely incur damages from that delay. It has not included in the appendices to its briefing any actual evidence that SFI

---

[3] In fact, even under the SNF acceptance rate that SFI claims DOE was required to implement in 1998, DOE would not have begun accepting SFI's SNF until 2005. Pl. Reply at 4.

has or will incur any particular damage in response to any particular delay.[4] "Argument and assertion of counsel cannot substitute for factual statements under oath that establish a genuine material issue of fact." Levi Strauss & Co. v. Genesco, Inc., 742 F.2d 1401, 1404 (Fed. Cir. 1984).[5] Regardless of the merits of SFI's arguments, SFI has failed to present any actual evidence to support an assertion that it has incurred damages as a result of DOE's partial breach of contract on January 31, 1998. Accordingly, it has no basis for obtaining a liability ruling that presupposes the existence of at least some showing of resultant injury.

Further, although SFI complains about the effect of "predictable cascading delays" and the "'domino' effect" of DOE's delay in beginning acceptance by January 31, 1998, Pl. Mtn. at 10 & Pl. Reply at 4, SFI cites nothing to support its allegation that there will be a definitive 12-year gap between the date that DOE was obligated to begin accepting SFI's SNF and the date upon which DOE will actually begin accepting SFI's SNF. SFI apparently has eliminated from its consideration the possibility that DOE will be able, in the future, to accept SNF at a rate faster than that required by the Standard Contract and will, in that manner, be able to reduce some of the effects of its initial delay in beginning SNF acceptance. SFI's speculation that DOE will not

---

[4] SFI maintains that its incurred costs include "amounts for the site study and design of a dry spent fuel storage facility at the Grand Gulf nuclear power plant, to allow the plant to accommodate spent nuclear fuel assemblies DOE would otherwise pick up." Pl. Mtn. at 10. Other than counsel's representations in SFI's brief, SFI has provided absolutely no evidence to support these assertions or to establish that they are anything but vague predictions of some future activity in which SFI may engage. Further, they fail to explain the reasons that, if DOE was not obligated to begin accepting SFI's SNF until sometime in the future, SFI has already been "required" to incur the alleged costs.

[5] See Avenal v. United States, 33 Fed. Cl. 778, 784 (1995) ("assertions of counsel cannot substitute for factual statements under oath that establish a genuine issue of material fact"), aff'd, 100 F.3d 933 (Fed. Cir. 1996); Hoch v. United States, 31 Fed. Cl. 111, 114 (1994) (counsel's assertions regarding fact at issue are insufficient to preclude summary judgment).

be able to do that, particularly without any evidence in the record, does not support its otherwise unsupported definitive assertions that a 12-year delay in the acceptance of SFI's SNF will occur.

B. SFI Cannot Recover Damages That It Currently Anticipates Incurring In The Future

Given the lack of evidence of present damages, it appears that the only manner in which SFI could recover damages now is by reference to damages that it anticipates it will incur in the future if DOE does not timely accept its SNF. Yet, it is far from clear that DOE will not be able to begin SNF acceptance from SFI when it otherwise would have been obligated to do so. Although DOE currently anticipates that it will not be able to begin SNF acceptance until at least 2010, it is always possible that, in response to world events, congressional action or other intervening factors could alter that limitation. Def. Reply App. 9-13. Similarly, DOE's increased acceptance of SNF could speed DOE's ability to meet its ability to accept SFI's SNF. It is premature to assume that DOE will partially breach future obligations to accept SFI's SNF.

In this case, SFI is claiming a partial, not a total, breach of contract. "While in the case of a total breach the injured party can at once get judgment for his entire injury," 9 A. Corbin, Corbin on Contracts § 946, at 720 (interim ed. 1979), the non-breaching party may be entitled to "elect to regard the breach as partial, proceed with his own performance, sue for the partial injury, and maintain a second suit in case a further breach occurs." Id., quoted in Indiana Michigan Power Co. v. United States, 60 Fed. Cl. 639, 648 (2004); see Coughlin v. Blair, 41 Cal. 2d 587, 598, 262 P.2d 305, 311 (1953) ("even if a breach is total, the injured party may treat it as partial, unless the wrongdoer has repudiated the contract"). "If the injured party elects to or is required to await the balance of the other party's performance under the contract, his claim is said

instead to be one for damages for partial breach. For example, an injured party who claims damages in addition to specific performance claims damages for partial breach." Restatement (Second) of Contracts § 236 cmt. b, at 214 (1981).

When a plaintiff elects to treat a breach of contract only as a partial breach, "[i]t has been thought that where there has been no repudiation, the plaintiff can recover damages for his injury only to the date of the writ – that he must treat the breach as only 'partial.'" 9 A. Corbin, supra, § 956, at 747 (emphasis added). Specifically, if the non-breaching party elects to treat a breach as a partial breach, "he is entitled to maintain an action for damages sustained from breaches up to the time of the institution of the action, and the judgment does not preclude a further action by him for a breach occurring after that date." Restatement (Second) of Judgments § 26 cmt. g, at 241 (1982) (emphasis added); see Kaiser v. Northwest Shopping Ctr., Inc., 587 S.W.2d 454, 457 (Tex. Civ. Ct. 1979) (under Texas state law, plaintiffs seeking damages for partial breach may recover damages incurred through date of filing the pleading).[6] To the extent that SFI's claim is based upon damages that it may incur in the future from future failures of DOE to accept its SNF, those damages and those future partial breaches are not at issue in this case.

---

[6] In Indiana Michigan Power Co. v. United States, 60 Fed. Cl. 639 (2004), this Court held that damages in a partial breach case could be recovered up to the date of trial, rather than the date of the filing of the complaint. Id. at 648 (citing cases). Given that this Court's jurisdiction is determined by the circumstances existing upon the date that the complaint is filed, see Lujan v. Defenders of Wildlife, 504 U.S. 555, 571 n.4 (1992) (post-filing conduct cannot create jurisdiction that did not exist at outset of litigation); Newman-Green, Inc. v. Alfonzo-Larrain, 490 U.S. 826, 830 (1989) ("[t]he existence of federal jurisdiction ordinarily depends on the facts as they exist when the complaint is filed"), and given the problems that will always arise in identifying and verifying claimed damages incurred between the conclusion of fact discovery and the commencement of trial, the rules identified in the Restatement (Second) of Contracts and Restatement (Second) of Judgments, establishing an end date for damages for a partial breach at the filing of a complaint, appear correct.

C. Even If SFI Had Established Some Damage Under Its Theory Of DOE's Obligations, Its Theory Of DOE's Obligations Is Incorrect

In addition to SFI's failure to identify any evidence of damage, SFI's arguments regarding its rights to SNF acceptance are wrong. As we have established, any injury that SFI could incur from delays in SNF acceptance would result from DOE's failure to accept SFI's SNF as identified in SFI's approved delivery commitment schedules ("DCSs"). Def. Br. 8-13. The contract provision defining the contract's "Scope" expressly states that any SNF to be accepted "shall be specified in a [DCS] as provided in Article V . . . ." 10 C.F.R. § 961.11, Art. II. Yet, SFI did not submit any DCSs that required DOE to begin SNF acceptance under SFI's Standard Contract. Although SFI seems to complain that the DCS process envisioned by the Standard Contract is meaningless and unenforceable, SFI has failed to identify any other means by which the activities contemplated by the Standard Contract could ever proceed. Under SFI's theory, DOE will magically know when each contract holder wants SNF accepted; each contract holder's desires will magically correspond to the "oldest fuel first" requirements of the Standard Contract; DOE will have no problems simply taking SNF from every contract holder when they want acceptance regardless of space, capacity, staffing, or transportation limitations; and DOE will have no problem with the significant financial repercussions and waste that it will suffer if a contract holder is not prepared to deliver SNF to DOE when DOE arrives at the contract holder's site with the appropriate transportation casks contemplated by the Standard Contract. By reading the DCS process out of the Standard Contract, SFI has eliminated the only mechanism that would allow

the parties to plan for, and commit themselves to, actual performance under the Standard Contract. Without enforcement of the DCS provisions, the Standard Contract cannot work.[7]

Similarly, SFI insinuates that the Court should ignore the 1995 Acceptance Priority Ranking/Annual Capacity Reports ("APR/ACR"), which identified the SNF allocations that DOE anticipated it would be able to commit itself to satisfying during the first 10 years of SNF acceptance and which did not identify any allocations for SFI in the first 10 years of SNF acceptance. Pl. Reply at 3-4; see 10 C.F.R. § 961.11, Art. IV.B.5 (identifying requirement for issuance of APR and ACR). The plaintiff's argument regarding the 1995 APR/ACR is based essentially upon its theory that, once DOE began acceptance and after a short ramp-up period, DOE was contractually obligated to accept 3,000 Metric Tons Uranium ("MTUs") of SNF from contract holders every year. Pl. Reply at 4. Yet, it has identified no contract language containing any such requirement, and this Court has recently stated, in response to four SNF plaintiffs' requests that "the contract be reformed to provide an allegedly 'reasonable' post-1998 annual industry-wide acceptance rate of 3,000" MTUs, that this assertion appears unfounded:

> Plaintiffs appear to provide no objection basis for this reformation, relying instead on equitable principles and a widely-shared impression, among jurists and others, that the agency should be punished for transgressing against public safety. None of the demanded terms is found in the contract; and it is clear that the parties shared no meeting of the minds regarding those terms, as was made clear to all during contract negotiations.

---

[7] SFI suggests that the submission of "a DCS form was not a condition precedent" to DOE's obligation to take SNF from SFI under the Standard Contract. Pl. Reply at 2. Yet, absent SFI's submission of a DCS and DOE's approval of it, SFI has not identified any practical manner in which activities contemplated under the Standard Contract, including the significant development time necessary for DOE to prepare transportation casks and coordinate their use for SNF acceptance from various contract holders, see 10 C.F.R. § 961.11, Art. IV.B.2, could ever be performed.

Florida Power & Light Co. v. United States, No. 98-483C, slip op. at 22-23 n.12 (Fed. Cl. Jan. 31, 2005) (Sypolt, J.) (published order).

Further, the acceptance rates contained in various planning documents to which SFI cites at page 4 of its reply brief, including the recently issued 2004 APR/ACR, are generally based upon an assumption that an operating repository will be available when SNF acceptance begins. See also Def. Reply App. 41-42 ("Receipt rates in this table are only applicable if a CISF is approved"). However, as the United States Court of Appeals for the District of Columbia has recognized, DOE was not obligated to have an operating repository available in 1998. Indiana Michigan Power Co. v. Department of Energy, 88 F.3d 1272, 1276, 1277 (D.C. Cir. 1996). Instead, it was obligated only to begin SNF acceptance in 1998 in some type of facility, such as an MRS facility, and the Standard Contract expressly permits DOE to accept SNF for delivery to a facility other than a repository. 10 C.F.R. § 961.11, Art. I(10) (defining "DOE facility"); see 48 Fed. Reg. 16590, 16591 (Apr. 18, 1983) (preamble to final rule creating Standard Contract terms: "The definition of 'DOE facility' (Article I.10) was expanded to expressly state, in accordance with the Act, that there may be an interim storage facility (or facilities) which DOE may utilize prior to emplacement in a repository"). DOE expressly informed contract holders in early ACRs that, beginning with the 1991 ACR, DOE would issue a firm waste acceptance schedule which would be the basis for the submission of delivery commitment schedules ("DCSs") by the purchasers. Each of the ACRs from 1987 through 1990 contained the following, or substantially similar, language:

> Beginning in 1991, the ACR acceptance ranking will be converted into an Annual Priority Ranking for receipt of SNF/HLW. In 1992, based on this priority ranking, the Purchasers will submit to DOE

> for approval, Delivery Commitment Schedules identifying the SNF/HLW that Purchasers propose to deliver to the DOE waste management system (WMS). Once approved, these schedules will become the basis for Final Delivery Schedules to be submitted by the Purchasers not less than 12 months before the date of DOE's anticipated acceptance of title to the SNF/HLW and subsequent transport to a DOE facility.

Pl. Reply App. 16 (1987 ACR); see Pl. Reply App. 38 (1988 ACR), 60 (1990 ACR); Def. App. 204 (1985 Mission Plan), 408 (1991 ACR), 38-40; see also Def. App. 209 (1987 ACR: "projections in this initial report are based on current plans and best available information; they are not contractually binding"). Given that DOE was entitled under the Standard Contract to accept SNF at an MRS facility in 1998, rather than directly at a repository, proposed rates for SNF acceptance at a repository do not somehow become contractually binding obligations upon DOE. See National By-Products, Inc. v. United States, 186 Ct. Cl. 546, 558-59, 405 F.2d 1256, 1263 (1969) ("[b]efore a representation can be contractually binding, it must be in the form of a promise or undertaking . . . and not a mere statement of intention, opinion, or prediction"). Accordingly, SFI cannot base its theory of liability upon DOE's obligation to use higher acceptance rates than those that DOE had proposed to use for SNF acceptance at an MRS.[8]

In any event, SFI never contested or complained about those allocations until it filed this lawsuit in late 2003. It suggests that it can wait 12 years after the issuance of those acceptance allocations in 1991 and then, and only then, complain that the allocations granted were

---

[8] SFI suggests that the Court should use the 2004 ACR that DOE recently published as establishing the mandatory minimum annual acceptance rate to impose into the Standard Contract. Pl. Reply at 4. However, the 2004 ACR assumes the existence of a repository in 2010, and the acceptance rates that it contains are based upon that assumption. Pl. Reply App. 144 ("projected nominal acceptance rate is based on the assumption of SNF acceptance beginning in 2010 at the Yucca Mountain Geologic Repository"); Def. Reply App. 29. It certainly is irrelevant to a "mandatory" rate applicable to SNF acceptance at an MRS in 1998.

"counterfeit" and that damages should be based upon some scenario not in existence 12 years earlier. Established precedent of this Court and its predecessor, the Court of Claims, requires the contractor to protest a material breach of contract upon learning of that breach, or else waive the breach. Ling-Temco-Vought, Inc. v. United States, 201 Ct. Cl. 135, 146, 475 F.2d 630, 637 (1973) (quoting Northern Helex Co. v. United States, 197 Ct. Cl. 118, 125-26, 455 F.2d 546, 551 (1972)); see Aleutian Constructors v. United States, 24 Cl. Ct. 372, 384 (1991); Government Sys. Advisors, Inc. v. United States, 21 Cl. Ct. 400, 411, vacated on other grounds, 25 Cl. Ct. 554 (1990). SFI asks this Court to create a legal fiction excusing its failure to take action in response to the 1991, 1992, or 1995 ACRs. To obtain any basis for SNF acceptance in 1998, 1999, or any other year, SFI would have had to have submitted a DCS at least 63 months in advance of the desired SNF acceptance date. 10 C.F.R. § 961.11, Art. V.B.1. Accordingly, for acceptance in 1998, SFI had to submit a DCS in 1992. SFI, in essence, asks this Court to ignore its failure to protest and its failure to submit any DCSs. SFI fails to explain how it ever could have obtained acceptance rights for specific amounts of SNF on specific dates without having complied with the contractual requirements. It has identified no basis for forgiving its failure to protest.

D. SFI's Reference To DOE's Issuance And Suspension Of Renewed DCS Submissions In 2004 Is Irrelevant To Its Liability Motion

SFI correctly states in its reply brief that the Government believes that the contract provisions providing for the submission and approval of DCSs and final delivery schedules ("FDSs") constitute the sole contractual mechanism through which DOE's obligations to accept SFI's SNF would be defined and that the Court cannot define those obligations without reference to the Standard Contract's acceptance scheduling provisions. Yet, it insinuates that DOE's

issuance of a new ACR in 2004, as well as a subsequent December 2004 decision that it was premature to request new DCSs from contract holders, somehow eliminates that contractual mechanism. It claims that the December 2004 DOE letter somehow proves that the DCS process "was flawed from the outset and administered in a manner inconsistent with the parties obligations under the Standard Contract." Pl. Reply at 7. SFI further asserts that the new DCS instructions distributed by DOE in July 2004 constitute an acknowledgment that the entire DCS process undertaken in the 1990s is irrelevant today. Id. SFI's assertions are unfounded.

In July 2004, in a precursor letter to the December 2004 letter, DOE sent correspondence to each utility explaining that the DCS process would resume since the Yucca Mountain repository was scheduled to begin operation in 2010. See Exhibit 1 (Sample Letter from David Zabransky, DOE Contracting Officer, to utilities, dated July 27, 2004). Pursuant to the Standard Contract, if SFI wanted DOE to begin accepting its SNF in 2010, it was required to submit a DCS to DOE by no later than September 30, 2004. Id. at 1. DOE also encouraged "the submittal of DCSs for all the years in which you have allocations." Id. Further, DOE requested information from each utility "to assist us in our waste acceptance and transportation planning process" and stated that "[w]e recognize that your response to this information request is voluntary, and that any information provided will be non-binding on either party." Id. SFI did not submit a DCS for 2010, or for any other future years. SFI never responded to that letter.

However, SFI now complains that the December 2004 DOE letter somehow proves that the DCS process is horribly wrong and has been so since its inception. SFI never explains its blanket statement that the DCS process is flawed and never explains why the process is inconsistent with the parties' obligations under the Standard Contract. There is no evidence in

the record that SFI ever objected to the DCS process during the 1990s when the DOE issued its Annual Priority Ranking ("APR") and Annual Capacity Report ("ACR") in 1991, 1992 and 1995. There is also no evidence that SFI has objected to the process since 1995.

SFI has provided no insight into its claim that this system of accepting the oldest fuel first from contract holders was not a responsible process that would provide an orderly way for DOE to accept and dispose of SNF from utilities, especially given potential limitations upon the actual amount of SNF that DOE can accept in any given year. In fact, the mechanisms established in the Standard Contract provide a reasonable method by which DOE will begin accepting SNF. See Def. Br. at 8-13. SFI's challenge is especially puzzling given that other utilities responded to the DOE July 2004 letter with either comments or the submission of a new DCS. For example, Tennessee Valley Authority ("TVA") indicated that it would not submit a DCS for allocations in 2010 because the schedule set forth in the July 2004 Acceptance Priority Ranking/Annual Capacity Report (APR/ACR) did not "provide TVA with a waste acceptance allocation for the year 2010." Exhibit 2 (Correspondence from John Carden, TVA Contract Manager, to David Zabransky, dated August 24, 2004). Mr. Carden indicated that TVA would submit DCSs for the allocations set forth in the 2004 APR/ACR, "in accordance with the schedule set forth in our contract." Id. In response to this TVA correspondence, DOE explained that the method for allocating acceptance positions prior to the submission and approval of DCSs used in the 2004 APR/ACR is exactly the same as that used in the 1995 APR/ACR. See Exhibit 3 (Correspondence from David Zabransky to John Carden, dated November 3, 2004). DOE explained further that "both the 1995 APR/ACR and the 2004 APR/ACR utilize an 'oldest fuel first' method of allocating acceptance positions in the acceptance queue as provided by the

Standard Contract" and that the "method of allocation has not changed and is not expected to change, absent some future amendment to the Standard Contract." Id.

DOE also explained that, while there is a difference in the acceptance rates identified in the 1995 APR/ACR and the 2004 APR/ACR, because of the fact that different repositories were contemplated, because DOE anticipates utilizing the Yucca Mountain repository (rather than a monitored retrievable storage facility or "MRS"), the acceptance rates in the 2004 APR/ACR are higher than the earlier acceptance rates. Id. at 2. Because of the increased acceptance rate identified in 2004, the new DCSs were intended to replace, rather than supplement, any prior DCS that had been submitted. Id. However, DOE recognized that its prior approval of DCSs in the 1990s had created commitments under the Standard Contract "to accept specific amounts of SNF from specific Purchasers during specific periods of time" and that, "prior to approving new DCSs from Purchasers with previously approved DCSs," DOE would seek "an agreement in writing" that the new DCSs "replace, rather than supplement." the previously approved DCSs. Id.

Thus, the 2004 DCS process is identical to the prior DCS process, except that the acceptance rates identified by DOE in 2004 are different, based upon the fact that, when DCSs were being submitted and approved in the 1990s, SNF acceptance was contemplated in a Monitored Retrievable Storage ("MRS") facility rather than directly at a repository. The original DCS process in the 1990s determined which contract holder would have had SNF accepted by DOE within the first ten years of SNF acceptance.[9] SFI has failed to establish any reason that the

[9] To determine in the first instance if any damages have been incurred and then correctly measure damages, if any, for those utilities which did have allocations in the first ten years, we would identify and calculate the costs of operating the nuclear facilities in both the actual world

original DCS process did not define DOE's obligations to individual contract holders for at least the first several years of contract performance.

E. SFI's Explanations About The Reasons It Never Submitted A Delivery Commitment Schedule Are Unsupported

SFI further argues that the Court should not tie any liability ruling to the DCS provisions of the Standard Contract because, it says, any attempt to submit a DCS after 1996 would have been futile because, beginning in 1997, DOE refused to approve or disapprove submitted DCSs. Pl. Reply at 2. Yet, SFI could have submitted DCSs in every year beginning in 1992 through early 1997, if it had thought that DOE should dispose of its SNF within the first ten years of SNF acceptance. In fact, many other utilities did just that, beginning in 1992, to establish the amount of SNF that DOE would accept within 63 months of submission of the DCS, beginning January 31, 1998. SFI has submitted no evidence that it declined to submit DCSs because it would be "futile" or because the DCS process was somehow flawed, as it now argues. Instead, SFI had no allocations in the first 10 years of SNF acceptance, Def. App. 415, 477, and did not utilize the Standard Contract's disputes resolution process to challenge the lack of allocations. 10 C.F.R. § 961.11, Arts. V.B.1, V.B.2, & XVI.A. SFI's failure to submit a DCS and challenge any denial of that DCS under the contract's "Disputes" provision is fatal to its argument here that the Court should allow it to recover damages on some basis other than DCSs.[10]

---

(the breach world) and the but-for world (the world where DOE started accepting SNF in January, 1998). A fundamental component of that calculation must be the year of initial acceptance for each utility in the but-for world.

[10] To the extent that this Court's decision in Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652 (2003), conflicts with this position, we respectfully disagree with the Court's conclusions in that case. Further, in that case, the plaintiff had actually submitted DCSs to DOE in the 1990s. Here, SFI simply took no action until it filed this lawsuit in late 2003.

## II. SFI'S GOOD FAITH AND FAIR DEALING CLAIM FAILS AS A MATTER OF LAW BECAUSE IT IS BASED UPON A DELAY IN CONTRACTUAL PERFORMANCE AND SFI CANNOT PRESENT "WELL-NIGH IRREFRAGABLE PROOF" TO OVERCOME THE PRESUMPTION THAT THE GOVERNMENT ACTED IN GOOD FAITH

SFI's response to the Government's cross-motion upon its claim for breach of the implied covenant of good faith and fair dealing fails to address the standard for such a claim, as set forth in the Government's response brief. Def. Br. at 19-21. In its reply, SFI alleges that it has established that "DOE acted in bad faith . . . ." Pl. Reply at 12. Yet, as the Court held in Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1240 (Fed. Cir. 2002), the presumption that the Government acted in good faith can only be overcome by "clear and convincing evidence" of bad faith, which "has been equated with evidence of some specific intent to injure the plaintiff." Indeed, as more fully explained in the Government's cross-motion, the Federal Circuit has long recognized that "the requirement of 'well-nigh irrefragable' proof [] sets a high hurdle for a challenger seeking to prove that a government official acted in bad faith." Id. (quoting Caldwell & Santmyer, Inc. v. Glickman, 55 F.3d 1578, 1581 (Fed. Cir. 1995)). SFI does not appear to contest this established standard. However, SFI has not produced, and cannot produce, any evidence that any actions taken by DOE were motivated by some form of malice or animus toward plaintiff, or that DOE's delay in accepting SNF was in bad faith.

Since SFI filed its reply brief, the Federal Circuit has addressed the implied covenant of good faith and fair dealing in Centex Corp. v. United States, 2005 WL 95687 (Jan. 19, 2005). That decision is not final. Moreover, in Centex, the Court did not purport to overrule its previous decisions with regard to the presumption that the Government acts in good faith, and the weighty burden associated with proving otherwise.

In addition, an examination of SFI's complaint reveals that its claim for breach of the implied covenant of good faith and fair dealing is based upon what SFI calls DOE's "failure to act." Compl. ¶ 28. More specifically, SFI refers to DOE's failure to meet the contractual deadline for accepting fuel and its alleged attempt to avoid its contractual obligations. Id. ¶ 27. As we have discussed in our cross-motion, all of SFI's allegations are, in essence, allegations that DOE partially breached the Standard Contract through its delay in acceptance of SNF. A partial breach of an express contractual promise does not implicate the implied covenant of good faith and fair dealing. Finally, and more importantly, the Court in Centex found that Congress had deprived plaintiff of the benefits of its contract with the Federal Savings and Loan Insurance Corporation. In this case, SFI alleges a partial breach of the contract. SFI still expects DOE to accept all of its SNF for disposal. In other words, while there has been a delay in DOE's performance, SFI will reap the benefits of its contract. DOE has not purposefully robbed SFI of the benefits of its bargain, and it certainly has not acquired the benefits for itself. SFI's contribution to the Nuclear Waste Fund is intact, and DOE will perform its obligations.

Now adding allegations that were not found in its complaint, SFI attempts to bolster its good faith and fair dealing claim by reference to DOE's decision to void some DCSs and suspend the DCS process. However, as SFI admits, SFI never submitted any DCSs. See Plaintiff's Response To Defendant's Proposed Findings Of Uncontroverted Fact ¶ 38. dealing.[11] Given that

[11] Further, no approved DCSs were ever "voided." As Mr. Zabransky, now the DOE contracting officer for the Standard Contract, has testified, when DOE determined that it would not be able to begin SNF acceptance in 1998, it stopped making commitments to accept SNF. Def. Reply App. 32-33. A few DCSs were in the process of being approved when that determination was made had not yet completed the approval process, either not yet having been approved by the contracting officer or not yet having been communicated to the contract holder. See Pl. App. 104-13; Def. Reply App. 33-34. "[I]t has never been doubted that any public officer

SFI had no acceptance allocations in at least the first 10 years of the SNF acceptance program, see Def. App. 415, and that SFI never submitted a DCS, SFI cannot support an allegation that the suspension of the process was directed with any malicious intent at SFI. Therefore, the actions that DOE took, or failed to take, with regard to submitted DCSs from other contract holders cannot support SFI's claim that DOE breached the covenant of good faith and fair dealing.

In support of its argument that DOE's actions with regard to the Standard Contract constitute a breach of the implied covenant of good faith and fair dealing, SFI cites Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652 (2003), and Tennessee Valley Authority v. United States, 60 Fed. Cl. 665 (2004). It is important to note that the Court did not explicitly find a tortious breach of the implied covenant of good faith and fair dealing in either case. Rather, the Court in both cases engaged in a discussion of good faith and fair dealing within the context of consideration of DOE's motion for summary judgment as to the rate of acceptance of SNF. Commonwealth Edison, 56 Fed. Cl. at 665; TVA, 60 Fed. Cl. at 670-73. Moreover, both cases involved plaintiffs that, unlike SFI, had submitted DCSs to DOE. Indeed,

---

in the Departments may correct his own errors, and open, reconsider, and reverse in whole or in part any case decided by himself." Rollins v. United States, 23 Ct. Cl. 106, 123 (1888); see Cotton v. United States, 29 Ct. Cl. 207, 225 (1894) ("[w]e have always understood that a public officer could open and reconsider any decision made by himself, like a court"). Even when a final decision is deemed "irrevocable" pursuant to statute or regulation, it becomes irrevocable only when the action described in the final decision has become an "accomplished fact," having been communicated to the interested party and implemented. See, e.g., Comptroller General Warren to the Secretary of War, B-28964, 22 Comp. Gen. 291, 292-93 (1942) ("[s]uch an action may be rescinded at any time before it is consummated by the giving of official notice thereof to the employee, but not thereafter"); Decision by Comptroller General, 3 Comp. Gen. 942, 944, 1924 WESTLAW 1178, at 3 (1924) ("before a deduction has been certified to this office for the purpose of raising a charge against the contractor, the Postmaster General may correct his own errors and open, reconsider, and reverse in whole or in part any case decided by himself"). SFI's insinuation that DOE's actions were improper is wholly unsupported. In any event, SFI has made no allegation that DOE voided its DCSs.

the Court's opinion in TVA dealt specifically with DOE's decision neither to approve nor to disapprove the plaintiff's submitted DCSs. TVA, 60 Fed. Cl. at 671 ("Rather, TVA argues, DOE's unilateral decision neither to approve nor reject TVA's DCS submissions was either a breach of the government's implied duty of good faith and fair dealing or an active step designed to prevent TVA from enjoying the benefits of the contract."). Not having submitted any DCSs, SFI does not have a similar problem.

Finally, SFI argues that DOE has breached the implied covenant of good faith and fair dealing by taking the position, which was ultimately rejected by the United States Court of Appeals for the District of Columbia Circuit, that the Standard Contract did not require DOE to begin accepting SNF in the absence of an operational repository. Pl. Reply at 11-12. SFI has cited no authority for the proposition that the Government's pursuance of a legal theory in a court of law can constitute a breach of the covenant of good faith and fair dealing.

## III. TO THE EXTENT THAT THE COURT WOULD OTHERWISE GRANT THE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON LIABILITY, THE COURT SHOULD GRANT THE UNITED STATES DISCOVERY PURSUANT TO RULE 56(f) BEFORE DECIDING THAT MOTION

Plaintiff argues that the Government should not be permitted to conduct discovery because there is no genuine issue of material fact regarding the Government's liability for breach. Pl. Reply at 13. As its sole basis for this assertion, SFI asserts that "[e]ven the Government itself does not, nor could it, dispute the fact that it failed to begin taking deliveries of SNF on January 31, 1998 as required in the Standard Contract." Id. As we have explained at length in our cross-motion and above, while DOE did not begin acceptance of SNF on or before January 31, 1998, SFI has not shown that this delay in acceptance establishes liability to SFI.

SFI now makes clear that it "is not claiming that DOE was obligated contractually to accept SFI's own SNF in 1998 or otherwise outside of the Standard Contract's 'oldest fuel first' structure." Pl. Reply at 14. This claim, which appeared in SFI's complaint, is not the only issue upon which the Government seeks discovery. Rather, it is one of several issues that must be resolved before a liability determination can be made.

SFI acknowledges that the "measure of damages" is an outstanding factual issue which must be resolved at trial. Pl. Reply at 13. In addition, however, the very existence of damages flowing from DOE's delayed acceptance of SFI's SNF has not been established. Without a showing of damages, plaintiff cannot establish liability. SFI bases its damages claim upon what it terms an "appropriate rate of acceptance." Pl. Reply at 4. The Government is entitled to discovery as to whether, at the time of the formation of the contract, it was the intent of the parties to establish such a rate as a contractual obligation. Indeed, the rate of acceptance is crucial to determining whether any of SFI's storage expenses are a result of DOE's delay in acceptance of SNF. It is possible that, assuming a different rate of acceptance, SFI would have had to find a solution to its storage problems <u>long before</u> DOE was scheduled to accept any of its fuel, even if DOE had begun acceptance by January 31, 1998. If that is the case, SFI has not incurred damages related to DOE's breach, and it cannot establish liability. The Government is entitled to discovery to make this determination, <u>before</u> the Court makes a liability determination.

<u>CONCLUSION</u>

For the foregoing reasons, the Court should grant our motion for summary judgment upon Counts I and II of plaintiff's complaint.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Harold D. Lester. Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/ Heide L. Herrmann
HEIDE L. HERRMANN
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
ATTN: Classification Unit, 8th Floor
Washington, D.C. 20530
Tel: 202-305-3315
Fax: 202-307-2503

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

February 10, 2005

CERTIFICATE OF FILING

I hereby certify that on February 10, 2005, a copy of the foregoing "DEFENDANT'S REPLY IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT UPON COUNTS I AND II OF PLAINTIFF'S COMPLAINT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Heide L. Herrmann