# REPLY APPENDIX

# INDEX TO REPLY APPENDIX

| DOCUMENT | PAGE |
|---|---|
| Letters from M. Detmer, DOE Contracting Officer, to Gulf States Utilities Company and Detroit Edison Company, dated March 4, 1992, providing accompanying Delivery Commitment Schedule Instructions | 1 |
| Transcript of testimony of Christopher Kouts, DOE, from Yankee Atomic Electric Co. v. United States, No. 98-126C (Fed. Cl.), on August 2, 2004 | 5 |
| Transcript of testimony of Ronald A. Milner, DOE, from Yankee Atomic Electric Co. v. United States, No. 98-126C (Fed. Cl.), on August 10, 2004 | 14 |
| Transcript of testimony of Thomas Pollog, DOE, from Yankee Atomic Electric Co. v. United States, No. 98-126C (Fed. Cl.), on August 4, 2004 | 18 |
| Transcript of testimony of David Zabransky, DOE, from Yankee Atomic Electric Co. v. United States, No. 98-126C (Fed. Cl.), on August 5, 2004 | 30 |
| Memorandum from Ronald A. Milner, DOE, to John Bartlett, DOE, dated December 20, 1991 | 38 |
| Sample letter from DOE to contract holders, dated July 27, 2004 | 40 |
| Letter from John B. Carden III, TVA, to David Zabransky, DOE Contracting Officer, dated August 24, 2004 | 42 |
| Letter from David Zabransky, DOE Contracting Officer, to John B. Carden III, TVA, dated November 3, 2004 | 43 |

**Department of Energy**
Washington, DC 20585

MAR 04 1992

Mr. J. C. Deddens
Senior Vice President
River Bend Nuclear Group
Gulf States Utilities Company
P.O. Box 2951
Beaumont, TX 77704
Attn: Mr. J. J. Pruitt, Manager-Business
Systems, MA-3

Dear Mr. Deddens:

The Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste (10 CFR Part 961) provides that, beginning January 1, 1992, Purchasers shall submit to the Department of Energy (Department) Delivery Commitment Schedules (DCS). The DCS provides the Purchaser with the opportunity to inform the Department of plans regarding its allocation of projected Federal waste acceptance capacity. This information will assist the Department in meeting its contractual waste acceptance responsibilities and in the development of the Federal waste management system (FWMS).

The allocations in the 1991 Annual Capacity Report (ACR) should be the basis for the DCS submittals. An allocation is a specified acceptance capacity (measured in metric tons of uranium) in a particular year for an individual Purchaser. The 1991 Acceptance Priority Ranking has been used as the basis for the allocation of waste acceptance capacity to specific Purchasers in the 1991 ACR. These reports have been recently issued by the Department and sent to all Purchasers. Once a Purchaser has an allocation, any equivalent quantity of spent nuclear fuel (SNF) owned by the Purchaser can be designated for delivery within the limits of that allocation. A Purchaser may submit DCSs for as many of their allocations as they choose, throughout the 10 year period identified in the ACR. The Department requests that the Purchasers submit DCSs for as many allocations as possible to assist in the Department's planning of the FWMS. The enclosed DCS instructions are intended to assist the Purchaser in completing the DCS.

The Standard Contract provides that Purchasers shall submit DCSs to DOE at least 63 months prior to delivery. The Department recognizes that both the Purchaser's and Department's ability to commit to a specific delivery date over 63 months in the future is limited. Therefore, the Department suggests that the Purchasers designate only the year of delivery on the DCS. The actual date of delivery will be proposed by the Purchasers in their Final Delivery Schedule submittal. Two entries were added to the DCS form, identification number and contact person, to allow the Department to communicate more effectively with the Purchaser concerning their DCS submittal.

After a DCS has been approved, Purchasers may either use the DCS as the reference document for submittal of the Final Delivery Schedule, which is required 12 months prior to delivery, or use the DCS as the basis for exchanges with other

HQ0002187

Purchasers. Specific guidelines for submission of exchange requests are under development, but will not have an impact on the submission of DCSs for approval.

The enclosed DCS form will be submitted to the Office of Management and Budget (OMB) for approval shortly. The Department will transmit to the Purchasers the OMB approved DCS form as soon as possible.

If you have any questions concerning these instructions, please contact Nick Graham of my staff on (202) 586-9634 or Alan Brownstein of the Department's Office of Civilian Radioactive Waste Management on (202) 586-4973.

M. Detmer

M. Detmer
Contracting Officer
Office of Placement and
Administration

Enclosure

HQ0002188

**Department of Energy**
Washington, DC 20585

MAR 04 1992

Dr. Simon T. Hsieh
Supervisor, Nuclear Fuel Cycle
Detroit Edison Company
6400 N. Dixie Highway
Newport, MI 48166

Dear Mr. Smart:

The Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste (10 CFR Part 961) provides that, beginning January 1, 1992, Purchasers shall submit to the Department of Energy (Department) Delivery Commitment Schedules (DCS). The DCS provides the Purchaser with the opportunity to inform the Department of plans regarding its allocation of projected Federal waste acceptance capacity. This information will assist the Department in meeting its contractual waste acceptance responsibilities and in the development of the Federal waste management system (FWMS).

The allocations in the 1991 Annual Capacity Report (ACR) should be the basis for the DCS submittals. An allocation is a specified acceptance capacity (measured in metric tons of uranium) in a particular year for an individual Purchaser. The 1991 Acceptance Priority Ranking has been used as the basis for the allocation of waste acceptance capacity to specific Purchasers in the 1991 ACR. These reports have been recently issued by the Department and sent to all Purchasers. Once a Purchaser has an allocation, any equivalent quantity of spent nuclear fuel (SNF) owned by the Purchaser can be designated for delivery within the limits of that allocation. A Purchaser may submit DCSs for as many of their allocations as they choose, throughout the 10 year period identified in the ACR. The Department requests that the Purchasers submit DCSs for as many allocations as possible to assist in the Department's planning of the FWMS. The enclosed DCS instructions are intended to assist the Purchaser in completing the DCS.

The Standard Contract provides that Purchasers shall submit DCSs to DOE at least 63 months prior to delivery. The Department recognizes that both the Purchaser's and Department's ability to commit to a specific delivery date over 63 months in the future is limited. Therefore, the Department suggests that the Purchasers designate only the year of delivery on the DCS. The actual date of delivery will be proposed by the Purchasers in their Final Delivery Schedule submittal. Two entries were added to the DCS form, identification number and contact person, to allow the Department to communicate more effectively with the Purchaser concerning their DCS submittal.

After a DCS has been approved, Purchasers may either use the DCS as the reference document for submittal of the Final Delivery Schedule, which is required 12 months prior to delivery, or use the DCS as the basis for exchanges with other Purchasers. Specific guidelines for submission of exchange requests are under development, but will not have an impact on the submission of DCSs for approval.

HQ0002101

The enclosed DCS form will be submitted to the Office of Management and Budget (OMB) for approval shortly. The Department will transmit to the Purchasers the OMB approved DCS form as soon as possible.

If you have any questions concerning these instructions, please contact Nick Graham of my staff on (202) 586-9634 or Alan Brownstein of the Department's Office of Civilian Radioactive Waste Management on (202) 586-4973.

M. Detmer
Contracting Officer
Office of Placement and
Administration

Enclosure

HQ0002102

# UNITED STATES
# COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| YANKEE ATOMIC ELECTRIC | ) | |
| COMPANY, CONNECTICUT YANKEE | ) | Case Nos.: |
| ATOMIC POWER COMPANY, and MAINE | ) | 98-126C |
| YANKEE ATOMIC POWER COMPANY, | ) | 98-154C |
| Plaintiffs, | ) | 98-474C |
| v. | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

Pages: 3378 through 3660

Place: Washington, D.C

Date: August 2, 2004

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C. 20005-4018
(202) 628-4888
hrc@concentric.net

office in its waste acceptance function?

A Essentially, it gives us guidance to -- in terms of what the receipt rate of the system would be. It also gives various policy guidance to the program as a whole.

Q Is your office responsible for the preparation of this document?

A I -- yes. I manage changes to this. And I basically do that for the director of the program.

Q Could we go to page 15 of this document, please. Mr. Kouts, are you familiar with the centralized interim storage facility mentioned on this page?

A Yes, I am.

Q How are you familiar with that facility?

A As I mentioned, when I went through my history within the program, I was responsible for developing the design of a centralized interim storage facility that essentially met these requirements.

Q What type of facility did DOE plan to build as the centralized interim storage facility?

A It was a, essentially a canister handling facility that could meet the ramp-up rates identified in -- in table 3 here.

Q Okay. And the rates in table 3, do you have

THE COURT: Okay. Go forward.

MS. SULLIVAN: Thank you, Your Honor.

BY MS. SULLIVAN:

Q Mr. Kouts, what was -- do you have an understanding what the source of the rates were for the facilities that were set forth in this document?

A Yes.

Q And what was your understanding?

A There were several bills that were winding their way through Congress that would have directed the Department, should they have been passed, to deploy a facility to essentially begin to take materials from utilities for storage purposes.

These ramp-up rates were basically rates that were contained in those bills.

Q I'm sorry. Let me just clarify. You say bills were pending in the Department. Did you mean bills pending in Congress?

A Bills pending in Congress.

Q And did you have an understanding as to what the legislation called for, generally?

A The -- the legislation went through a variety of mutations. The initial form of the legislation was for the Department to build a -- an interim storage facility or centralized interim

storage facility at, potentially in Nevada, next to where the Yucca Mountain site is right now. And there were also other options in terms of where that facility could be deployed.

Q How was the centralized interim storage facility different from the MRS designed by DOE in the early '80s -- in the 1980s and early '90s?

A In the mid-'80s, we were looking at a facility that had a great deal more capability. It was one that basically had packaging capability that would essentially do some of the packaging that a repository typically would have done.

It also had rod consolidation. It also had the flexibility to develop disposal-ready canisters for any of the three sites that we were considering at that time, which were the basalt site in Hanford, Washington, the tuff site, t-u-f-f, volcanic tuff site in Nevada, and also the Deaf Smith bedded salt site in Texas.

Q Was the facility, the centralized interim storage facility set forth on this page ever constructed?

A No, it was not.

Q Why not?

A The legislation was never passed and the

Department never received any authorizations to proceed on it.

Q Could there be a similar congressional initiative today that would allow or mandate acceptance of spent nuclear fuel prior to 2010?

A If Congress passed that legislation, then the Department would be authorized to implement it, yes.

Q Are you aware of the spent nuclear fuel storage issue that arose in connection with the NRC's budget last year?

A Yes, I am.

Q And what was the initiative discussed in that budget submission?

A I believe there was a set amount of funds that was supposed to be distributed from the Nuclear Regulatory Commission budget to the National Academy of Sciences, where they were to undertake a study to look at the -- the safety, if you will, of fuel that's currently stored in spent fuel pools, at reactors, and also that's in dry storage at reactor sites, and to provide the Academy's views on the safety of both types of storage mechanisms.

Q Do you have an understanding as to what initiatives could result from this study?

A There have been various considerations on Capitol Hill as to initiatives that would use Homeland Security funds to essentially fund the reactors to put their -- the pool -- the materials that they're now managing in the pools, the high-level waste materials, the spent fuel into dry storage casks, and undertake that initiative.

Q Mr. Kouts, are you familiar with the material known as Greater Than Class C radioactive waste?

A Yes.

Q Do you understand that GTCC radioactive waste is generated by commercial nuclear utilities?

A Yes.

Q Is GTCC radioactive waste one of the waste materials that DOE will accept pursuant to the standard contract?

A No.

Q Is DOE designing the repository to accept GTCC radioactive waste generated by commercial nuclear facilities?

A No, it is not.

Q Could DOE accept GTCC radioactive waste at the repository?

A Theoretically it could. It would require, I

Q And this is the actual -- actually the current version, the revision 5 is the -- is that the current actual planning document that the program is working off of?

A DCN 5; that's correct, yes.

Q Now, in your testimony, there was a brief reference to the possibility of legislation by Congress that could have an effect on the 2010 start date. Do you recall discussing that?

A In my testimony?

Q Today.

A This morning?

Q Yeah.

A I believe I was asked by Ms. Sullivan a question about whether Congress would consider similar legislation or could consider similar legislation to what they considered in the mid-'90s. My sense is Congress can do what they want to do.

Q Did you mean to imply by that that it's possible that DOE could accept spent nuclear fuel from commercial reactors prior to 2010 if Congress passes some legislation?

A Depending on what the legislation is and what it directs, that's certainly a possibility.

Q That is a possibility?

A Yes.
Q You did mean to imply that?
A I believe I responded to a question from counsel, and I -- I don't know whether or not I implied it or not. I answered the question that counsel asked.
Q I'm asking you now whether you meant to imply that DOE, if Congress passes some kind of legislation -- we'll get to that in a moment -- Department of Energy could -- did you mean to testify that DOE could accept commercial spent nuclear fuel from commercial reactors prior to 2010?
A As I said earlier, depends on what that legislation directed. If it provided certain relief from various aspects of procedural considerations from the NRC, from NEPA and so forth, then, yes, that's certainly possible.
Q When would that be that DOE would be able to accept that fuel prior to 2010?
A Again, you have to be clear as to what the specifics of the legislation were, what they were asking, what specifics that they required. It's difficult for me to answer your question unless you're a little bit more specific in terms of specific directions from Congress.

Q Let's say you drafted the dream legislation yourself, whatever you -- when would DOE prior to 2010 be able to accept commercial spent nuclear fuel?

A I don't have dreams about legislation. My sense is that, if you wanted to expedite the receipt of materials from commercial reactors, I would not avoid the licensing process, primarily because I think that gives a perspective to the public, and there is a technical review that needs to be done.

In terms of the simplicity of the facility, if it was just to store fuel only, I think one of those facilities could be built relatively rapidly. So I think construction could be done very quickly.

Again, we get to the National Environmental Policy Act issues. And depending on whether Congress would address those, I think you could, after a review by the Nuclear Regulatory Commission, deploy a facility fairly rapidly.

Q How likely is relief from review by the Nuclear Regulatory Commission over a facility operated by DOE for the storage of spent fuel?

A I didn't suggest in my quote-unquote dream legislation that there would not be NRC review.

Q There would be NRC review?

A Yes.

# UNITED STATES
# COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| YANKEE ATOMIC ELECTRIC COMPANY, | ) | |
| CONNECTICUT YANKEE ATOMIC POWER | ) | Case Nos.: |
| COMPANY, and MAINE YANKEE ATOMIC | ) | 98-126C |
| POWER COMPANY, | ) | 98-154C |
| Plaintiffs, | ) | 98-474C |
| v. | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

Pages: 4365 through 4613

Place: Washington, D.C

Date: August 10, 2004

## HERITAGE REPORTING CORPORATION

*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C. 20005-4018
(202) 628-4888
hrc@concentric.net

A Yes, I do.

Q Can we go back to page 1 of this document, that first paragraph again? Mr. Milner, in that paragraph there's a reference to report to Congress on reassessment of the Civilian Radioactive Waste Management Program issued by the Secretary of Energy in November of 1989.

A Yes.

Q Do you recall that reassessment?

A Yes, I do.

Q Do you recall what the result of that reassessment was?

A I think principal result of that reassessment was the repository would not be able to be opened until the your 2010.

Q Okay. As a result of that reassessment, was there a date by which the MRS was to be opened?

A 1998.

Q Can we go to pages 4 and 5? Could I ask you to read the highlighted sentences into the record?

A The TSLCC estimates presented in this report are updated estimates from the May 1989 TSLCC analysis which reflect the changes in the system outlined in the secretary's reassessment of the Waste Management Program. As such, these estimates are