# In the United States Court of Federal Claims

No. 03-2642C
Filed: July 29, 2005
**TO BE PUBLISHED**

| | |
|---|---|
| SYSTEM FUELS INC., on its own behalf and as agent for SYSTEM ENERGY RESOURCES INC. and SOUTH MISSISSIPPI ELECTRIC POWER ASSOCIATION, Plaintiff, v. THE UNITED STATES, Defendant. | Implied Covenant of Good Faith and Fair Dealing; Liability for Breach of Contract; Nuclear Waste Policy Act, 42 U.S.C. § 10101 *et seq.*; Repudiation; RESTATEMENT (SECOND) OF CONTRACTS §§ 235(2), 243(2)(3), 250 cmt. a, 257, 257 cmt. a, 350; Spent Nuclear Fuel; Standing; Summary Judgment; RCFC 56(c). |

**Alex D. Tomaszczuk,** Pillsbury Winthrop Shaw Pittman, L.L.P., Washington, D.C., counsel for plaintiff.

**Harold Dewitt Lester, Jr.** and **Heide Lynn Hermann**, United States Department of Justice, Civil Division, Commercial Litigation Branch, counsel for defendant.

## MEMORANDUM OPINION AND ORDER REGARDING SUMMARY JUDGMENT MOTIONS

**BRADEN,** ***Judge***

## FACTUAL BACKGROUND[1]

---

[1] The facts discussed herein are derived from: the November 5, 2003 Complaint ("Compl."); the Government's March 15, 2004 Answer ("Answer"); Plaintiff's October 29, 2004 Motion and Memorandum for Summary Judgment on Liability ("Pl. Motion for S.J."); the Government's December 6, 2004 Response thereto and Cross-Motion for Summary Judgment on Counts I and II ("Gov't Resp. and Cross-Motion for S.J."); the Government's December 6, 2004 Proposed Findings of Uncontroverted Fact ("Gov't Prop. Find. Fact"); Plaintiff's January 5, 2005 Reply ("Pl. Reply"); the Government's February 10, 2005 Reply in Support of Cross-Motion for Summary Judgment ("Gov't Reply"); February 15, 2005 Oral Argument ("TR"); and a March 3, 2005 Affidavit of

**A. The Nuclear Waste Policy Of 1982 Act Required The Federal Government To Provide For The Permanent Disposal Of High Level Radioactive Fuel.**

In 1982, Congress enacted the Nuclear Waste Policy Act, 42 U.S.C. § 10101 *et seq.* ("NWPA"), pursuant to which the federal government assumed the legal duty to "provide for the permanent disposal" of spent nuclear fuel[2] and/or high-level radioactive waste[3] from utilities across the country by providing for the long-term storage of such material. *See* 42 U.S.C. § 10131(a)(4) ("Congress finds that – . . . the Federal Government has the responsibility to provide for the permanent disposal of high-level radioactive waste and such spent nuclear fuel as may be disposed of in order to protect the public health and safety and the environment[.]"); *see also* 42 U.S.C. § 10131(b)(2) ("[T]o establish the Federal responsibility, and a definite Federal policy, for the disposal of such waste and spent fuel[.]"). Congress imposed the cost of such acceptance and disposal on SNF and HLW "generators" and "owners." *See* 42 U.S.C. § 10131(a)(4) ("Congress finds that – . . . the costs of such disposal should be the responsibility of the generators and owners of such waste and spent fuel.").

By June 30, 1983, the Department of Energy ("DOE") was required to enter into contracts with the generators and owners of SNF and HLW that required DOE to accept, transport, and dispose of such SNF and HLW. *See* 42 U.S.C. § 10222(b)(2) ("No [SNF or HLW] may be disposed of by the Secretary . . . unless the generator or owner of such [SNF or HLW] has entered into a contract with the Secretary under this section by not later than – June 30, 1983[.]"). Accordingly, DOE established a Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste and set the fee amounts to be paid by utilities into the Nuclear Waste Fund to fund acceptance and disposal of SNF (hereinafter the "Standard Contract"). *See* 42 U.S.C. § 10222(a)(1) ("[T]he

---

Charles B. Franklin (Manager, Project Management, Fleet Dry Fuel Storage for Entergy Services, the parent company for System Energy Resources) ("Franklin Aff.").

[2] Spent Nuclear Fuel ("SNF") is defined as fuel that "has been withdrawn from a nuclear reactor following irradiation, the constituent elements of which have not been separated by reprocessing." 42 U.S.C. § 10101(23). SNF contains toxic uranium and toxic byproducts, such as plutonium. "Moreover, SNF 'remains radioactive after it is removed from a nuclear reactor and must be isolated in safe disposal facilities for thousands of years.'" *Sacramento Municipal Utility District* v. *United States*, 63 Fed. Cl. 495, 496 (2005).

[3] High-level radioactive waste ("HLW") was defined by Congress as "highly radioactive material resulting from the reprocessing of spent nuclear fuel, including liquid waste produced directly in reprocessing . . . and other highly radioactive material that the [Nuclear Regulatory] Commission, consistent with existing law, determines by rule requires permanent isolation." 42 U.S.C. § 10101(12).

Secretary is authorized to enter into contracts with any person[[4]] who generates or holds title to high-level radioactive waste, or spent nuclear fuel, of domestic origin for the acceptance of title, subsequent transportation, and disposal of such waste or spent fuel. Such contracts shall provide for payment to the Secretary of fees pursuant to paragraphs (2) and (3) sufficient to offset expenditures described in subsection (d) of this section."); *see also* 10 C.F.R. § 961.11 (setting forth "the text of the standard contract for disposal of spent nuclear fuel and/or high-level radioactive waste[.]").

The Standard Contract provided, in return for the payment of fees from a utility,[5] that DOE would commence disposal of SNF no later than January 31, 1998 and continue such services until disposal of all SNF and HLW was completed. *See* 42 U.S.C. § 10222(a)(5)(B) ("[I]n return for the payment of fees established by this section, the Secretary, beginning not later than January 31, 1998, will dispose of the high-level radioactive waste or spent nuclear fuel involved as provided in this subchapter."); *see also* 10 C.F.R. § 961.11 at Art. II ("The services to be provided by DOE under this contract shall begin, after commencement of facility operations, not later than January 31, 1998 and shall continue until such time as all SNF and/or HLW from the civilian nuclear power reactors . . . has been disposed of."). To ensure that all utilities that utilized nuclear power participated in the system, Congress required that the utilities must either enter into a Standard Contract or forfeit their nuclear license to operate. *See* 42 U.S.C. § 10222(b)(1)(A) (prohibiting the Nuclear Regulatory Commission from renewing or issuing an operator's license unless such operator "has entered into a contract with the Secretary" or "is actively and in good faith negotiating with the Secretary for a contract.").

The priority of SNF and/or HLW acceptance was to be determined by the material's age, calculated as of the date of discharge from a nuclear power reactor. *See* 10 C.F.R. § 961.11 at Art. VI(B)(1)(a) ("[A]cceptance priority shall be based upon the age of the SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor."); *see also* Gov't Resp. at 8. DOE's acceptance of SNF and/or HLW would be prioritized, pursuant to Delivery Commitment Schedules ("DCSs") submitted by each utility and approved by DOE. *See* 10 C.F.R. § 961.11 at Art. V(B)(1) ("After DOE has issued its proposed acceptance priority ranking . . . the Purchaser shall submit to DOE the delivery commitment schedule(s) which shall identify all SNF and/or HLW the Purchaser wishes to deliver to DOE beginning sixty-three (63) months thereafter."); *see also* Gov't Resp. at 8-9. The Standard Contract further provided that DOE first would accept the oldest SNF and/or HLW. *See* 10 C.F.R. § 961.11 at Art. VI(B)(1)(A) ("DOE will first accept from Purchaser the oldest SNF and/or HLW for disposal in the DOE facility, except as otherwise provided for in paragraphs B and D of Article V."). A utility, however, had the right

---

[4] The "person [or entity] who generates or holds title to high-level radioactive waste, or spent nuclear fuel, of domestic origin" is referred to in the Standard Contract as the "Purchaser." 10 C.F.R. § 961.11.

[5] "Utility" or "utilities" refers to an entity or entities that generate or hold title to high-level radioactive waste, or spent nuclear fuel, of domestic origin, and have entered into a DOE Standard Contract.

to exchange approved DCSs with any other utilities that may hold a priority ranking for pickup of SNF and/or HLW, subject to DOE's approval. *See* 10 C.F.R. § 961.11 at Art. V(E) ("Purchaser shall have the right to exchange approved delivery commitment schedules with parties to other contracts with DOE for disposal of SNF and/or HLW; provided, however, that DOE shall, in advance, have the right to approve or disapprove, in its sole discretion, any such exchanges."). The Standard Contract also provided that DOE may grant priority for removal of SNF and/or HLW from nuclear reactors that are no longer operating and accept emergency deliveries prior to the date of acceptance. *See* 10 C.F.R. § 961.11 at Art. V(D) ("Emergency deliveries of SNF and/or HLW may be accepted by DOE before the date provided in the delivery commitment schedule upon prior written approval by DOE."); *see also* 10 C.F.R. § 961.11 Art. VI(B)(1)(b) ("[P]riority may be accorded any SNF and/or HLW removed from a civilian nuclear power reactor that has reached the end of its useful life or has been shut down permanently for whatever reason.").

On May 25, 1994, however, DOE announced that it would not be able to start accepting SNF from any nuclear utilities until 2010, at the earliest. *See* Office of Civilian Radioactive Waste Management: Waste Acceptance Issues, 60 FED. REG. 21,793, 21,794 (May 3, 1995) ("The DOE currently projects that the earliest possible date for acceptance of waste for disposal at a repository is 2010."); Report to the Congress by the Secretary of Energy on Reassessment of the Civilian Radioactive Waste Management Program (Nov. 29, 1989), at vii ("This schedule shows a significant slip for the expected start of repository operations – from the year 2003 to approximately 2010.").

## B. On June 30, 1983, System Fuels Inc. Entered Into A Department Of Energy Standard Contract For Disposal Of Spent Nuclear Fuel And/Or High-Level Radioactive Waste.

In 1983, the Nuclear Regulatory Commission ("NRC") issued a license to System Fuels, Inc. ("SFI") and the South Mississippi Power Association ("SMEPA") to operate Unit 1 of Grand Gulf Nuclear Station ("Grand Gulf"). *See* Compl. ¶ 2. On June 30, 1983, SFI entered into a Standard Contract with DOE on behalf of SFI, System Energy Resources ("SERI"), and SMEPA. *Id.* ¶¶ 2, 9. SERI and SMEPA own Grand Gulf, but SFI performs the duties of the Purchaser under the Standard Contract. *Id*. at n.1; *see also* Franklin Aff. ¶ 5. As of November 5, 2003, System Energy and SMEPA paid approximately $148 million into the Nuclear Waste Fund for the removal of SNF by the DOE, pursuant to the terms of the Standard Contract. *See* Compl. ¶¶ 1, 9, 23.

The operation of Grand Gulf Unit 1 generated and continues to generate SNF that is stored on site in a "wet pool.[6] *See* Compl. ¶ 2; Franklin Aff. ¶ 6. Because the Grand Gulf wet pool will reach capacity in April 2007, in 2002, SFI began to prepare for transfer of SNF from the wet pool to dry storage containers. *See* Franklin Aff. ¶¶ 6, 8. To accomplish this objective, SFI designed and currently is constructing an Independent Fuel Storage Installation ("ISFI") capable of holding dry storage containers until DOE removes SNF from Grand Gulf. *Id.* ¶ 6. SFI plans to store SNF in this

---

[6] Nuclear plants replace the nuclear fuel assemblies used to generate electricity approximately every 18 months and store those assemblies on site in pools of treated water referred to as "wet pools." *See Indiana Michigan Power Co.* v. *United States*, 60 Fed. Cl. 639, 640 (2004).

facility beginning in 2006. *Id*. ¶¶ 6, 8. As of March 3, 2005, SFI spent approximately $4.75 million on engineering studies, plant modifications, and ISFI construction for Grand Gulf. *Id*. ¶¶ 9, 10.

## PROCEDURAL HISTORY

On November 5, 2003, SFI, SERI, and SMEPA (hereinafter "SFI") filed a Complaint in the United States Court of Federal Claims alleging: a partial breach of the June 30, 1983 Standard Contract (Count I); and breach of the implied covenant of good faith and fair dealing (Count II). On that date, the case was assigned to the undersigned judge.[7]

On January 5, 2004, the Government filed an unopposed Motion to Stay, arguing that the Standard Contract did not set a mandatory minimum SNF acceptance rate, a prerequisite for any damage claim. The Government also argued there were outstanding summary judgment motions in similar SNF cases that were likely to impact this case. On March 4, 2004, the Government's Motion to Stay was denied. On March 15, 2004, the Government filed an Answer.

As of April 14, 2004, forty-five SNF cases were pending in the United States Court of Federal Claims. The Government filed a "Motion to Stay all Proceedings or, in the Alternative, for Coordinated Discovery Regarding the Rate and Schedule Issues" in almost half of the pending SNF cases. On that date, however, the court issued an Order requiring SFI to submit a report specifying discovery plans and objectives, including, but not limited to: the nature and scope of discovery anticipated to respond to the Government's standard dispositive motion on the rate of acceptance; any circumstance that may affect the timing of discovery or trial; if known, whether discovery, including depositions, previously provided in the old cases on the same issues, would suffice in this case (if the Government consented to full use of the depositions in the new case); and additional responses to the issues raised in the Government's motion to stay or coordinate discovery. The court also required that the Government issue a report presenting views on the same matters, including, but not limited to, information regarding: how the Government proposes, either with or without a "coordination order," to provide access to and use of the material produced in the old SNF cases to the new SNF cases; any conditions that it would impose on the use of such materials in the new SNF cases; the nature, extent, and schedule of any discovery the Government anticipates requesting from

[7] Prior to that time, a considerable amount of procedural maneuvering took place in other SNF cases. In January 2001, in *Yankee Atomic Electric Co.* v. *United States,* No. 98-126C (Fed. Cl. July 30, 2003), the Government had filed a Motion to Consolidate all of the SNF cases before the United States Court of Federal Claims. The Honorable Diane G. Sypolt assumed the responsibilities of overseeing a consolidated discovery. After the conclusion of discovery in *Yankee Atomic*, the Government renewed the Motion to Consolidate, which Chief Judge Edward J. Damich stayed pending the issuance of decisions in six SNF cases, designated as "lead" or "accelerated" cases for resolution of certain issues. On July 30, 2003, the Government had filed a Renewed Motion to Consolidate in *Yankee Atomic*. On January 4, 2004, Chief Judge Damich denied that motion.

any SNF plaintiff, old or new, before the trials are concluded in the lead cases; and comments on SFI's responses to its Motion for a Stay or Coordination.

On April 23, 2004, SFI filed a Response opposing a stay of this case. In addition, the court was advised that SFI would file a Motion for Summary Judgment on the issue of liability, pursuant to *Northern States Power Co.* v. *United States*, 224 F.3d 1361 (Fed. Cir. 2000) and *Maine Yankee Atomic Power Co.* v. *United States,* 225 F.3d 1336 (Fed. Cir. 2000). On the same day, the Government filed a Report in Response to Notice of Pre-Discovery Conference to be Convened on April 30, 2004, again requesting that the court stay this case, or in the alternative, require coordinated discovery and schedule the case in the order that it was filed relative to the other SNF cases.

On October 29, 2004, SFI filed a Motion for Summary Judgment on Liability and Proposed Findings of Uncontroverted Facts in support thereof. On December 6, 2004, the Government filed a Response and Cross-Motion for Summary Judgment. On January 5, 2005, SFI filed a Reply in Support of the Motion for Summary Judgment on Liability and Response to Defendant's Cross-Motion for Summary Judgment. On February 10, 2005, the Government filed a Reply.

On February, 25, 2005, the court held an argument on the pending summary judgment motions, during which SFI agreed to provide evidence of damages incurred arising directly from the DOE's partial breach of the Standard Contract. On March 4, 2005, SFI filed an affidavit of Charles B. Franklin to verify that approximately $4.75 million had been incurred as of that date, as a result of the breach caused by DOE's failure to accept SFI's SNF, as required by the Standard Contract.

## DISCUSSION

### A. Jurisdiction.

The United States Court of Federal Claims has "jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). The Tucker Act, however, is only a "jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages." *United States* v. *Testan*, 424 U.S. 392, 398 (1976). Therefore, in order to pursue a substantive right, a plaintiff must identify and plead an independent contractual relationship, constitutional provision, federal statute, and/or executive agency regulation that provides a substantive right to money damages for the court to have jurisdiction. *See Todd* v. *United States*, 386 F.3d 1091, 1094 (Fed. Cir. 2004) ("[J]urisdiction under the Tucker Act requires the litigant to identify a substantive right for money damages against the United States separate from the Tucker Act."); *see also Roth* v. *United States*, 378 F.3d 1371, 1384 (Fed. Cir. 2004) ("Because the Tucker Act itself does not provide a substantive cause of action, . . . a plaintiff must find elsewhere a money-mandating source upon which to base a suit."); *Kahn* v. *United States,* 201 F.3d 1375, 1377 (Fed. Cir. 2000) (quoting *James* v. *Caldera*, 159 F.3d 573, 580 (Fed. Cir. 1998) ("The plaintiff 'must assert a claim under a separate money-mandating

constitutional provision, statute, or regulation, the violation of which supports a claim for damages against the United States.'").

In this case, SFI properly plead a contractual relationship with the Government. *See Trauma Service Group* v. *United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997) ("To show jurisdiction . . . [Plaintiff] must show that either an express or implied-in-fact contract underlies its claim."). Therefore, the court has determined that it has jurisdiction to adjudicate SFI's claims in this case.

## B. Standing.

The lower federal courts have been advised to "decide standing questions at the outset of a case. That order of decision (first jurisdiction then the merits) helps better to restrict the use of the federal courts to those adversarial disputes that Article III defines as the federal judiciary's business." *Steel Co.* v. *Citizens for a Better Env't*, 523 U.S. 83, 111 (1998) (Breyer, J. concurring). Plaintiff, the party invoking federal jurisdiction, has the burden of proof and persuasion to satisfy the constitutional requirements of Article III standing. *See FW/PBS, Inc.* v. *Dallas*, 493 U.S. 215, 231 (1990) (holding that the burden is on the party seeking to exercise jurisdiction by clearly alleging facts sufficient to establish jurisdiction).

Since standing is a component of jurisdiction that the court has the authority to raise *sua sponte*, the issue will be addressed. *See Folden* v. *United States*, 379 F.3d 1344, 1354 (Fed. Cir. 2004) ("Subject-matter jurisdiction may be challenged at any time by the parties or by the court *sua sponte*."). A signatory to a contract has standing to allege a breach thereof. *See, e.g., Anderson* v. *United States*, 344 F.3d 1343, 1351 (Fed. Cir. 2003) ("[A] signatory to the contractual documents may bring a direct suit for breach of contract[.]"); *Castle* v. *United States*, 301 F.3d 1328 (Fed. Cir. 2002) (holding that direct parties to the contract have standing to allege breach of contract claims based upon the contract). Since there is no evidence in the record that SFI sold or assigned rights under the June 30, 1983 Standard Contract, the court has determined that SFI has standing to bring this action.

## C. Standard For Decision On Summary Judgment.

On a motion for summary judgment, if there is no genuine issue as to any material fact, the moving party is entitled to judgment as a matter of law. *See American Pelagic Fishing Co.* v. *United States*, 379 F.3d 1363, 1370-71 (Fed. Cir. 2004) ("Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law."). In the United States Court of Federal Claims, summary judgment, albeit "interlocutory in nature, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages." RCFC 56(c); *see also Winstar Corp.* v. *United States*, 518 U.S. 839, 910 (1996) (affirming grant of partial summary judgment on contract liability and remanding the determination of the appropriate measure or amount of damages, if any). Only genuine disputes of material facts that might affect the outcome of the suit will preclude entry of summary judgment. *See Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) ("As to materiality, the

substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. . . . That is, while the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs."). The existence of "some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Id*. Therefore, there is no issue for the court to adjudicate unless the nonmoving party puts forth evidence sufficient for a jury to return a verdict for that party; but "if the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id*. at 249-50 (citations omitted).

The burden of demonstrating the absence of any genuine issue of material fact is on the party moving for summary judgment. *See Celotex Corp.* v. *Catrett*, 477 U.S. 317, 325 (1986) (holding that the moving party may meet its burden "by 'showing' – that is, pointing out to the [trial court] that there is an absence of evidence to support the nonmoving party's case."). A motion for summary judgment may be made without supporting affidavits and rely "solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" *Id*. at 324. Once the moving party demonstrates the absence of a genuine issue of material fact, however, the burden shifts to the non-movant to show the existence of a genuine issue for trial. *See Novartis Corp.* v. *Ben Venue Laboratories*, 271 F.3d 1043, 1046 (Fed. Cir. 2001) (explaining that, once the movant has demonstrated the absence of a genuine issue of material fact, "the burden shifts to the nonmovant to designate specific facts showing that there is a genuine issue for trial."). A dispute over a material fact is "genuine" where a reasonable fact-finder could find for the non-movant. *See Anderson*, 477 U.S. at 248.

A trial court is required to resolve all doubt over factual issues in favor of the non-moving party. *See Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 587 (1987). And, all reasonable inferences and presumptions must be resolved in favor of the non-moving party. *See Anderson*, 477 U.S. at 255; *Caterpillar Inc.* v. *Deere & Co.*, 224 F.3d 1374, 1379 (Fed. Cir. 2000) ("When ruling on a motion for summary judgment, all of the nonmovant's evidence is to be credited, and all justifiable inferences are to be drawn in the nonmovant's favor."); *Gasser Chair Co., Inc.* v. *Infanti Chair Mfg. Corp.*, 60 F.3d 770, 773 (Fed. Cir. 1995) (requiring the trial court to view the evidence in a light most favorable to the non-moving party and to draw all reasonable inferences in favor of the non-moving party).

When evaluating cross-motions for summary judgment, as are presented in this case, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Mingus Constructors, Inc.* v. *United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987).

**D. Resolution Of Plaintiff's October 29, 2004 Motion For Summary Judgment Establishing Liability.**

**1. The United States Court Of Appeals For The Federal Circuit Has Settled The Issue Of Whether The Government Breached The Standard Contract On January 31, 1998.**[8]

The United States Court of Appeals for the Federal Circuit has settled the legal issue of whether the Government's failure to begin accepting nuclear waste by January 31, 1998, constituted a breach of contract. *See Maine Yankee Atomic Co.*, 225 F.3d at 1343 (internal quotations omitted) (holding that "[t]he government does not, and could not, deny that it failed to meet the contractual requirement to begin accepting nuclear waste no later than January 31, 1998. . . . Accordingly, DOE

---

[8] The United States Court of Federal Claims has issued a number of opinions and orders in SNF cases regarding the Government's liability based on this precedent. *See, e.g., Sacramento Municipal Utility Dist.* v. *United States*, 65 Fed. Cl. 180, 183 (2005) (requiring the parties to show cause why the court should not hold the Standard Contract void and order the Government to refund all money paid by the plaintiff into the Nuclear Waste Fund); *Sacramento Municipal Utility Dist.*, 63 Fed. Cl. at 507 (granting plaintiff's motion for partial summary judgment on liability but reserving the question of "[w]hether damages, if any, were caused by the January 31, 1998 breach[.]"); *Wisconsin Electric Power Co.* v. *United States*, No. 00-697 (Fed. Cl. Oct. 8, 2004) (Merow, J.) (granting plaintiff's motion for partial summary judgment on liability but "any specific item(s) of damages claimed remains open for resolution[.]"); *Tennessee Valley Authority* v. *United States*, 60 Fed. Cl. 665, 674-75, 679 (2004) (Lettow, J.) (granting plaintiff's motion for summary judgment, in part, and holding that the Government breached the TVA Contract, but if TVA is able to show damages incurred as a result of DOE's failure to collect SNF and failure to act upon proposed DCSs, TVA may recover those damages); *Southern Nuclear Operating Co.* v. *United States*, No. 98-614 (Fed. Cl. April 17, 2004) (Merow, J.) (granting plaintiff's motion for summary judgment on contract liability "to the extent that defendant's failure by January 31, 1998, to commence disposal of SNF and/or HLW covered by the Standard Contract executed with APC and GPC shall comprise a partial breach of these contracts for which defendant is liable."); *Indiana Michigan Power Co.* v. *United States*, No. 98-486 (Fed. Cl. Jan. 17, 2003) (Hodges, J.) (entering judgment for plaintiffs on the issue of contract liability); *Florida Power & Light Co.* v. *United States*, No. 98-483 (Fed. Cl. Jan. 11, 2002) (Wilson, J.) (granting plaintiff's motion for summary judgment on liability based on *Maine Yankee* and *Northern States Power*); *Commonwealth Edison Co.* v. *United States*, No. 98-483 (Fed. Cl. Aug. 1, 2001) (Hewitt, J.) (granting plaintiff's motion for partial summary judgment on the issue of liability, following the Government's acknowledgment of a partial breach of the Standard Contract); *Northern States Power Co.* v. *United States*, No. 98-484 (Fed. Cl. July 31, 2001) (Wiese, J.) (granting plaintiff's renewed motion for summary judgment on the issue of liability); *but see Power Authority of the State of New York*, No. 00-703 (Fed. Cl. Sept. 30, 2004) (Damich, C.J.) (denying plaintiff's motion for summary judgment on liability, because plaintiff's actual injury depends on whether DOE failed to meet any obligation to accept plaintiff's SNF prior to the date of plaintiff's sale of the facilities).

has breached the contract."); *see also id.* at 1342 (holding that the Government's breach concerned "all the utilities that had signed the [standard] contract – the entire nuclear electric industry."). Subsequently, in *Northern States Power Co.*, 224 F.3d at 1367, the United States Court of Appeals for the Federal Circuit addressed similar arguments and again held that the unavoidable delay provisions of the Standard Contract did not bar a suit for damages caused by the Government's "failure to begin performance at all by the statutory and contractual deadline of January 31, 1998."[9]

SFI's June 30, 1983 Standard Contract also required that the Government begin accepting nuclear waste from utilities by January 31, 1998. *See* Compl. ¶ 5. This requirement was not conditioned on the occurrence of any other event. *See Northern States Power Co.*, 128 F.3d at 757 (citing *Indiana Michigan Power Co.*, 88 F.3d at 1273) ("We held [in *Indiana Michigan*] that DOE's obligation to meet the 1998 deadline is 'without qualification or condition,' and identified DOE's duty to 'perform its part of the contractual bargain.'").

The Government does not dispute that SFI has paid approximately $148 million to date, pursuant to the applicable fee schedule. *See* Answer ¶ 9; Gov't Prop. Find. Fact ¶¶ 5, 28. Nor does the Government dispute that DOE has not begun to accept, transport, and dispose of any SNF, including that of SFI. *See* Office of Civilian Radioactive Waste Management: Waste Acceptance Issues, 59 FED. REG. 27,007, 27,008 (May 25, 1994) ("The Department currently projects that the earliest possible date for acceptance of waste for disposal at a repository is 2010."); *see also Maine Yankee Atomic Power Co.*, 225 F.3d at 1343 ("The Government does not, and could not, deny that it failed to meet the contractual requirement to begin accepting nuclear waste no later than January 31, 1998."); *Winstar Corp.* v. *United States*, 64 F.3d 1531, 1545 (Fed. Cir. 1995), *aff'd* 518 U.S. 839 (1996) ("Failure to perform a contractual duty when it is due is a breach of the contract.");

---

[9] The United States Court of Appeals for the D.C. Circuit also has discussed the requirements of the Standard Contract in *Indiana Michigan Power Co.* v. *Dept. of Energy*, 88 F.3d 1272, 1276 (D.C. Cir. 1996), wherein it held that DOE's duty was "conditioned on the payment of fees by the owner and is triggered, at the latest, by the arrival of January 31, 1998." Subsequently, in *Northern States Power Co.* v. *Dept. of Energy*, 128 F.3d 754, 758 (D.C. Cir. 1997), that federal appellate court clarified that "DOE's duty to take the materials by the 1998 deadline is . . . an integral part of the Standard Contract, which provides that the Department 'shall begin' disposing of the SNF by January 31, 1998."

The NWPA provided that "contracts entered into under this section shall provide that – . . . in return for payment of fees established by this section, the Secretary, beginning not later than January 31, 1998, will dispose of the HLW or SNF[.]" 42 U.S.C. § 10222(a)(5)(B). Therefore, after the utility paid the requisite fees, DOE had both a statutory and contractual duty to begin accepting SNF by January 31, 1998. *See Indiana Michigan Power Co.*, 88 F.3d at 1276 ("Under the plain language of the statute, the utilities anticipated paying fees 'in return for [which] the Secretary' had a commensurate duty. [The Secretary] was to begin disposing of the high-level radioactive waste or SNF by a day certain.").

RESTATEMENT (SECOND) OF CONTRACTS ("RESTATEMENT") § 235(2) ("When performance of a duty under a contract is due any non-performance is a breach.").

Therefore, the Government admitted on February 10, 2005 that "DOE's delay in beginning acceptance of SNF from the commercial nuclear industry . . . constitutes a partial breach of the Standard Contract[.]" *See* Govt. Reply at 1; *see also* TR at 29-30. Accordingly, the court has determined that the Government breached the June 30, 1983 Standard Contract with SFI on January 31, 1998.

**2. As A Matter Of Law, The Date Of The Government's Breach Is Not Determined By The Annual Capacity Report Or Delivery Commitment Schedules.**

The Standard Contract also required DOE to issue an Annual Capacity Report ("ACR") "for planning purposes" to set forth the projected annual receiving capacity for the DOE facility(ies) and the annual acceptance ranking for the disposal of SNF and/or HLW. *See* 10 C.F.R. § 961.11 at Art. IV(B)(5)(b) ("Beginning not later than July 1, 1987, DOE shall issue an annual capacity report for planning purposes. The report shall set forth the projected annual receiving capacity for the DOE facility(ies) and the annual acceptance ranking relating to DOE contracts for the disposal of SNF and/or HLW including, to the extent available, capacity information for ten (10) years following the projected commencement of operation of the initial DOE facility."). In addition, the Standard Contract required DOE to issue an annual acceptance priority ranking, based on the age of the SNF and/or HLW, with the oldest fuel having the highest priority. *See* 10 C.F.R. § 961.11 at Art. IV(B)(5)(a) ("Beginning on April 1, 1991, DOE shall issue an annual acceptance priority ranking for receipt of SNF and/or HLW at the DOE repository. . . . The oldest fuel will have the highest priority for acceptance, except as provided in paragraphs B and D of Article V and paragraph B.3 of Article VI hereof.").

After the ACR was issued, the utilities were to submit DCSs that identified "all SNF and/or HLW the Purchaser wishes to deliver to DOE beginning sixty-three (63) months thereafter." *See* 10 C.F.R. § 961.11 at Art. V(B)(1) ("After the DOE has issued its proposed acceptance priority ranking . . . the Purchaser shall submit to DOE the [DCSs] which shall identify all SNF and/or HLW the Purchaser wishes to deliver to DOE beginning sixty-three (63) months thereafter."). The DCSs required approval by DOE. *Id.* ("DOE shall approve or disapprove such schedules within three (3) months after receipt."). In the event of disapproval of a DCS, the parties could seek to negotiate a mutually acceptable schedule. *Id.* at Art. V(B)(2) (stating that if revised schedule(s) are not approved by DOE, DOE "shall submit its proposed schedule. . . . If these are not acceptable to the Purchaser, the parties shall promptly seek to negotiate mutually acceptable schedule(s)."). Final delivery schedules were to be submitted and approved by DOE for delivery of SNF and/or HLW covered by an approved DCS. *Id.* at Art. V(C) ("The Purchaser shall submit to DOE final delivery schedules not less than twelve (12) months prior to the delivery date specified therein. DOE shall approve or disapprove a final delivery schedule within forty-five days (45) days after receipt.").

The submission, review, and approval of DCSs also included an additional step that involved final delivery schedules. *Id.* ("Final delivery schedule(s) . . . for delivery of SNF and/or HLW covered by an approved delivery commitment schedule shall be furnished to DOE by Purchaser."). There also is no evidence that the process set out in Article V of the Standard Contract was ever completed, since final delivery schedules were not issued. *See Maine Yankee Atomic Power Co.*, 225 F.3d at 1342 ("At present there are no schedules containing specific dates for disposing of the waste of particular companies. It is uncertain when they will be adopted and to what extent, if any, they will, or could effectively reflect the Department's breach of the contract.").

In fact, DOE unilaterally refused in 1996 to approve or disapprove any new DCSs and voided the DCSs from utilities that previously had been approved. *See* Pl. Motion for S.J. at 15. Thus, according to DOE's current Contracting Officer, it would have been impossible for a nuclear utility to obtain approval for their DCSs during that time period. *Id.* at 4. Although DOE resumed the DCS process in July of 2004, those activities were suspended again in December 2004, when DOE informed the industry that "resumption of the DCS process was premature" and that DOE would not resume the DCS process until after the Yucca Mountain repository began operating. *See* Pl. Reply Ex. A; *see also Entergy Nuclear Indian Point 2, LLC* v. *United States*, 64 Fed. Cl. 515, 519-520 (2005) (discussing suspension of the DCS process); *Entergy Nuclear Generation Company* v. *United States*, 64 Fed. Cl. 336, 341 (2005); *Consumer's Energy* v. *United States*, 65 Fed. Cl. 364, 368 (2005).

Since SFI never submitted a DCS to DOE for approval, the Government argued that DOE had no commitment to accept any SNF from SFI. *See* Gov't Resp. at 7. In the alternative, the Government argued that since DOE was not scheduled to accept SFI's SNF and/or HLW prior to 2008 and SFI did not ask DOE to accept the fuel outside of the "oldest fuel first" acceptance queue, DOE could not have breached SFI's Standard Contract before 2008. *See* Gov't Resp. at 2-3.[10]

As a matter of law, however, the Government cannot amend the terms of the Standard Contract *sua sponte* and without separate consideration evidencing acceptance of new terms. *See Cal. Fed. Bank* v. *United States*, 245 F.3d 1342, 1346 (Fed. Cir. 2001) (quoting *Massie* v. *United States*, 166 F.3d 1184, 1188 (Fed. Cir. 1999)) (holding that an agreement constitutes a contract only if it meets three requirements: "mutual intent to contract including an offer and acceptance, consideration, and a Government representative who had actual authority to bind the Government."). Indeed, if the ACR and DCSs superceded obligations under the Standard Contract, as the Government argues, then the DOE's repeated unilateral and indefinite suspensions effectively would void the Standard Contract. *See* 1 CORBIN ON CONTRACTS ("CORBIN") § 145 (1963) ("If what appears to be a promise is an illusion, there is no promise . . . . By the phrase 'illusory promise' is

---

[10] Some plaintiffs in *Maine Yankee* and *Northern States* filed DCSs after the January 31, 1998 deadline for DOE to begin collecting nuclear waste from the utilities. *See Sacramento Municipal Utility Dist.*, 63 Fed. Cl. at 504 n.9. In those cases, the Government did not argue that the date set out in a DCS established the date of breach. In this case, the Government has taken a different position.

meant words in promissory form that promise nothing; they do not purport to put any limitation on the freedom of the alleged promisor, but leave his future action to his own future will, just as it would have been had he said no words at all."); *see also Ridge Runner Forestry* v. *Sec'y of Agric.*, 287 F.3d 1058, 1062 (Fed. Cir. 2002) ("It is axiomatic that a valid contract cannot be based upon the illusory promise of one party[.]"); *New Valley Corp.* v. *United States*, 119 F.3d 1576, 1584 (Fed. Cir. 1997) (internal quotations omitted) ("[A] party may not reserve to itself a method of unlimited exculpation without rendering its promises illusory and the contract void.").

There is absolutely no evidence in the record that the ACR and DCSs were binding on either party nor were they intended to create a separate contract between the parties. In fact, the Standard Contract provided that the ACRs were only created "for planning purposes." *See* 10 C.F.R. § 961.11 at Art. IV(B)(5)(b); *see also Commonwealth Edison Co.* v. *United States*, 56 Fed. Cl. 652, 666 (2003) (observing that "[d]efendant eventually conceded at oral argument that the ACRs were for planning purposes" and that "[t]he parties could not have expected that planning documents would create binding contractual obligations.").[11]

Therefore, the court has determined that, as a matter of law, the ACR and DCSs did not amend the Standard Contract and SFI's failure to submit a DCS is irrelevant and does not alter the Government's obligation under the Standard Contract to accept and store SNF.

---

[11] In addition, DCS approval was contingent upon the setting of an ACR. *See* 10 C.F.R. § 961.11 at Art. V(B)(1). Several decisions of the court have held that DOE's obligation to accept SNF under Article II of the Standard Contract is not dependent upon the existence of an ACR or upon a commitment for the DOE to accept SNF from a particular party before or after the January 31, 1998 breach. *See e.g., Sacramento Municipal Utility Dist.*, 63 Fed. Cl. at 504-06 (holding that the DCSs were not relevant to DOE's breach and plaintiff's submission of DCSs did not alter DOE's contractual obligations); *Consumer's Energy*, 65 Fed. Cl. at 369-70 (emphasis in original) (holding that "any delay in the start of the DOE's SNF acceptance *as of January 31, 1998*, negatively implicated the acceptance dates of every contract holder down the line" and that the DOE was therefore liable for breach on that date, even though the plaintiff did not have SNF acceptance dates until 1999 according to its DCSs); *Commonwealth Edison*, 56 Fed. Cl. at 663 ("[T]here is no evidence that the exchange of DCSs was intended to create a contract between the parties."); *Entergy Nuclear Generation Company*, 64 Fed. Cl. at 340 (stating that it "seems dubious" that the DCS system governs the DOE's responsibility to accept SNF under the Standard Contract, in light of the decisions in *Northern States*, *Maine Yankee*, and *Indiana Michigan*); *Maine Yankee Atomic Power* v. *United States,* 42 Fed. Cl. 582, 583 (1998), *aff'd on other grounds,* 225 F.3d at 1336 (holding that the DOE's obligation was "without qualification or condition–*i.e.*, is not qualified by or conditioned on either the information DOE includes in the APR/ACRs or the existence of a permanent repository constructed pursuant to the NWPA."). Furthermore, other decisions of the court are in accordance with this decision. *But see Boston Edison Company* v. *United States*, 64 Fed. Cl. 167, 185 (2005) ("The date of breach [of the plaintiff's Standard Contract] is an issue to be determined at trial. The date of breach may have been in 1997 when the government first suspended the DCS process, or on January 31, 1998, or on a different date not currently before the court.").

**3. As A Matter Of Law, SFI Has Proffered Sufficient Evidence Of Damages To Establish Liability For A Breach Of Contract.**

A long lead time is required to plan and construct SNF dry storage facilities due to the extremely hazardous nature of SNF, the logistical problems associated with storing it safely, and the significant public interest in safely storing such materials. *See* 42 U.S.C. § 10131. Therefore, SFI began planning and developing an ISFS in 2003 to prepare for the time when the wet pool at Grand Gulf will reach capacity in 2007. *See* Franklin Aff. ¶¶ 6, 7. As of March 4, 2005, SFI alleges to have spent approximately $4.75 million in order to build an ISFS for SNF storage as a result of the Government's breach. *Id.* ¶¶ 9-10.

The United States Court of Appeals for the Federal Circuit requires evidence of a breach and at least a non-*de minimus* amount of damages to establish liability for a breach of contract. *See Entergy Nuclear Generation Company*, 64 Fed. Cl. at 523 (quoting *Puritan Assocs.* v. *United States*, 215 Ct. Cl. 976, 978 (1977)) ("[E]ven if, as here, the assessment of damages is reserved for the quantum phase of the case, the plaintiff as part of its proof of entitlement, must show it was damaged to some extent, by defendant's derelictions.")); *see also Reynolds* v. *United States*, 158 F. Supp. 719, 725 (Ct. Cl. 1958) ("The time when performance should have taken place is the time as of which damages are measured.").

Therefore, under the precedent binding the court, SFI has proffered sufficient evidence of damage to establish liability for a breach of contract. *See, e.g., Puritan Assocs*., 215 Cl. Ct. at 978. The actual causation and final determination of damages due, if any, has not been adjudicated and can only be determined after an evidentiary hearing.

**4. As A Matter Of Law, SFI's Election To Continue Performance Under The Standard Contract Does Not Bar The Recovery Of Damages Caused By A Partial Breach.**

SFI has elected not to treat DOE's failure to comply with the January 31, 1998 date to commence collection of SNF as a total breach of the June 30, 1983 Standard Contract.

It has been settled by the United States Court of Appeals for the Federal Circuit that:

> A material breach does not automatically and ipso facto end a contract. It merely gives the injured party the right to end the agreement; the injured party can choose between canceling the contract and continuing it. If he decides to close the contract and so conducts himself, both parties are relieved of their further obligations and the injured party is entitled to damages at the end of the contract term (to put him in the position he would have occupied if the contract had been completed). If he elects instead to continue the contract, the obligations of both parties remain in force and the injured party may retain only a claim for damages for partial breach.

*Cities Service Helex, Inc.* v. *United States*, 543 F.2d 1306, 1313 (Ct. Cl. 1976); *see also Northern Helex Co.* v. *United States*, 455 F.2d 546, 551 (Ct. Cl. 1972) (recognizing that a "special set of qualifying facts" would allow a non-breaching party to continue to perform after a material breach without waiving the right to recovery including a unilateral breach of contract by the Government).

Therefore, as a matter of law, SFI's election to continue performance under the Standard Contact does not bar SFI from the recovery of damages caused by DOE's partial breach.

**E. Resolution Of The Government's December 6, 2004 Cross-Motion For Summary Judgment.**

**1. On Count I–Genuine Issues Of Material Fact Are At Issue As To Whether The Government Has Repudiated The Standard Contract.**

The Government seeks summary judgment on Count I (Partial Breach of Contract) arguing that SFI may recover damages only if the Government repudiated the Standard Contract, rendering it void. *See* Gov't. Resp. and Cross-Motion for S.J. at 17-19. SFI denies that the Government repudiated the Standard Contract and instead asserts that the Government only delayed performance. *See* Pl. Motion S.J. at 18-19. Repudiation is a "statement by the obligor to the obligee indicating that the obligor will commit a breach that of itself would give the obligee a claim for damages for total breach." *Mobil Oil Exploration & Produc. Southeast, Inc.* v. *United States*, 530 U.S. 604, 608 (2000) (quoting RESTATEMENT § 250). Where such a statement "accompanies a breach by non-performance that would otherwise give rise only to a claim for damages for partial breach, it may give rise to a claim for damages for total breach instead." RESTATEMENT § 250 cmt. a (internal citations omitted); *see also* 9 CORBIN § 973 at 805 ("The renunciation that constitutes a breach is the renunciation of a duty and declaration of intent not to perform it. Its essence lies in a declaration of intention not to perform a duty that actually exists."). To evidence repudiation, "a party's language must be sufficiently positive to be reasonably interpreted to mean that the party will not or cannot perform." RESTATEMENT § 250 cmt. b; *see also United States* v. *Dekonty Corp.*, 922 F.2d 826, 828 (Fed. Cir. 1991) ("[A] contracting officer may terminate a contract for anticipatory breach in the event of a positive, definite, unconditional, and unequivocal manifestation of intent . . . on the part of the contractor . . . not to render the promised performance . . . when the time fixed . . . by the contract shall arrive[.]"); RESTATEMENT § 243(2)(4) ("[A] breach by non-performance accompanied or followed by a repudiation gives rise to a claim for total damages for breach," and only gives rise to a claim for total breach "if it so substantially impairs the value of the contract to the injured party at the time of the breach that it is just in the circumstances to allow him to recover damages based upon all of his remaining rights to performance.").

Despite the Government's assertions to the contrary, as a matter of law, a "[t]he injured party does not change the effect of a repudiation by urging the repudiator to perform in spite of his repudiation." RESTATEMENT § 257; *see also* 9 CORBIN § 981 at 830 ("[The] doctrine that an anticipatory repudiation is not a breach until accepted as such by the injured party has been repudiated."). The rationale behind this doctrine is that "the repudiator has a power of retraction as long as there has been no substantial change of position by the injured party; and the latter's

continuing to urge performance may be properly held to keep this power of retraction alive." CORBIN § 981 at 831. Thus, "[a]ny possibility that the injured party might unfairly mislead the repudiator is avoided by the duty of good faith and fair dealing." RESTATEMENT § 257 cmt. a (internal citations omitted).

In this case, the Government does not admit to repudiation, although the public record raises serious questions as to whether the Standard Contract is void in fact. *See Sacramento Municipal Utility Dist.*, 65 Fed. Cl at 183 (Show Cause Order Why The Standard Contract Is Not Void). On December 1, 2004, the industry was informed that DOE unilaterally was suspending the DCS process, which it would resume "in accordance with the provisions of the Standard Contract" only "[a]fter the Department has determined a revised date for the initial operation of the Yucca Mountain repository." *See* Plaintiff's Reply at 5-6, Ex. A; Gov't Resp. at 12; *see also Consumers Energy*, 65 Fed. Cl. at 368. Because the DCS process requires at least 63 months notice to reduce the costs, DOE's failure to resume the process as of this date certainly raises an additional issue as to whether DOE will be ready to accept SNF, even by 2010. *See* Gov't Resp. at 14; *see also* 10 C.F.R. § 961.11 at Art. V(B). In fact, DOE has not set any specific date for SNF acceptance, other than to say that it will not begin acceptance until "sometime during or after 2010." *See* 60 FED. REG. at 21794. Therefore, performance by DOE is at best unknown, if not unknowable.[12]

One additional comment is in order. SFI's strategy not to claim that DOE repudiated the Standard Contract is not without risk, because the party that has not repudiated a contract can take "reasonable efforts in the form of affirmative steps . . . to mitigate damages." *Robinson* v. *United States*, 305 F.3d 1330, 1334 (Fed. Cir. 2002). Moreover, "[o]nce a party has reason to know that performance by the other party will not be forthcoming, . . . he is expected to take steps that are appropriate in the circumstances to avoid loss by making substitute arrangements or otherwise." RESTATEMENT § 350 cmt. b. Instead, SFI seeks relief via contract damages incurred because of injury caused by DOE's breach of the Standard Contract. Whether causation may prove an issue remains to be seen. And, although DOE also continues to aver that it will perform under the Standard Contract, consideration of further evidence may lead the court to conclude that in fact there has been a repudiation. At this juncture, however, genuine issues of material fact are in dispute. Therefore the Government's Cross-Motion for Summary Judgment on Liability on this basis must

---

[12] Although DOE was scheduled to begin acceptance in 1998, DOE does not anticipate accepting any SNF from Grand Gulf prior to 2010. *See* 60 FED. REG. at 21794. SFI argued that DOE would have begun acceptance of SNF from their facility in 2005. *See* Pl. Motion for S.J. Liability at 9. The Government countered, however, that regardless of any breach, it would not have retrieved any SNF from Grand Gulf before 2008. *See* Gov't Response at 12. Regardless of which party is correct, at present it appears that DOE will not accept SFI's SNF until at least seven years after the date DOE begins performing under the Standard Contract. *See* Pl. Reply at 4. DOE's suggestion that it might accelerate acceptance immediately after it commences performance is unconvincing, in light of DOE's inability to complete a storage facility after more than 15 years of planning and commencement of construction. *See* Gov't Reply at 4.

be denied.[13] The Government, however, may pursue whatever discovery it deems appropriate in light of this ruling.

**2. On Count II–Breach Of The Implied Covenant Of Good Faith And Fair Dealing.**

The Complaint also alleged that the Government breached the implied duty of good faith and fair dealing under the Standard Contract by: DOE's implementation and cancellation of the DCS process; DOE's failure to publish annual APR/ACRs; DOE's use of the ACR process to unilaterally limit the amount of SNF/HLW it would accept from each utility; and the arguments made in the various spent nuclear fuel lawsuits since the 1990's. *See* Compl. ¶¶ 26-30; *see also* Pl. Reply 8-13. SFI, however, has failed to proffer sufficient evidence to overcome the presumption that the relevant government officials have acted in good faith. *See Am-Pro Protective Agency* v. *United States*, 281 F.3d 1234, 1239 (Fed. Cir. 2002) ("[T]he clear and convincing standard most closely approximates the language traditionally used to describe the burden for negating the good faith presumption [afforded to Government officials.]"); *see also Sanders* v. *United States Postal Service*, 801 F.2d 1328, 1331 (Fed. Cir. 1986) ("There is a strong presumption in the law that administrative actions are correct and taken in good faith."); Where there is an allegation of bad faith by the Government, the court usually requires evidence of "some specific intent to injure the plaintiff." *Id*. at 1240 (quoting *Kalvar Corp., Inc.* v. *United States*, 543 F.2d 1298, 1302 (Ct. Cl. 1976)); *see also Caldwell & Santmyer, Inc.* v. *Glickman*, 55 F.3d 1578, 1581 (Fed. Cir. 1995) ("A contractor can overcome [the presumption that the Government acts in good faith] only if it shows through 'well nigh irrefragable proof' that the government had a specific intent to injure it.").

SFI relies exclusively on the testimony of David Zabransky, the DOE Contracting Officer, that DOE did not change the ACR rates from year to year because it was attempting to minimize the commitments under the Standard Contract. *See* Pl. Reply at 10 n.4. This testimony, however, is not clear and convincing evidence of any intent by DOE specifically to harm SFI. At best, it indicates only an employee's opinion that DOE was attempting to limit its contractual responsibilities and any potential liability. *See Am-Pro Protective Agency*, 281 F.3d at 1240 ("[T]he requirement of 'well-nigh irrefragable' proof . . . sets a high hurdle for a challenger seeking to prove that a government official acted in bad faith."). Therefore, SFI has failed to overcome the presumption that the Government acted in good faith.

Therefore, the Government's Cross-Motion for Summary Judgment on Count II–Breach of the Implied Covenant of Good Faith and Fair Dealing, set forth in Paragraphs 26-30 of the Complaint, is granted.

[13] The Government's alternative legal bases for seeking summary judgment were rejected by the court, as discussed herein.

## CONCLUSION

For the reasons discussed herein, SFI's October 29, 2004 Motion for Entry of an Order that the Government is liable for a partial breach of SFI's June 30, 1983 Standard Contract is granted. Whether any specific damages were caused by the Government's partial breach and the final determination of damages due, if any, has not been adjudicated and can only be determined after an evidentiary hearing. Therefore, the Government's December 6, 2004 Cross-Motion for Summary Judgment on Count I and Request for Rule 56(f) Discovery on the Issue of Liability are denied.

The Government's December 6, 2004 Cross-Motion for Summary Judgment on Count II–breach of implied covenant of good faith and fair dealing, however, is granted.

The Clerk of the Court is hereby ordered to enter partial summary judgment in accordance with this Memorandum Opinion and Order.

**IT IS SO ORDERED.**

s/**SUSAN G. BRADEN**
**Judge**