**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
(Electronically Filed on August 18, 2006)

| | |
|---|---|
| **SYSTEM FUELS, INC.,** on its own behalf and as agent for SYSTEM ENERGY RESOURCES, INC. and SOUTH MISSISSIPPI ELECTRIC POWER ASSOCIATION, Plaintiff, v. **THE UNITED STATES,** Defendant. | No. 03-2624C (Judge Braden) |

**PLAINTIFF'S PRE-TRIAL MEMORANDUM OF LAW**


Of Counsel:
Jay E. Silberg
Daniel S. Herzfeld
Jack Y. Chu
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
2300 N Street, N.W.
Washington, D.C. 20037
(202) 663-8000
(202) 663-8007 (fax)

L. Jager Smith, Jr
**WISE CARTER CHILD & CARAWAY, P.A.**
1340 Echelon Parkway
Jackson, MS 39213
601-368-5572
601-368-5816 (fax)

Alex D. Tomaszczuk
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7940
(703) 770-7901 (fax)

Counsel of Record for Plaintiff System Fuels, Inc., on its own behalf and as agent for System Energy Resources, Inc. and South Mississippi Electric Power Association


August 18, 2006

TABLE OF CONTENTS

TABLE OF AUTHORITIES ……………………………………………………………….ii

I. PLAINTIFF'S EVIDENCE AT TRIAL WILL SATISFY THE WELL-ESTABLISHED AND NECESSARY ELEMENTS TO PROVE EXPECTATION DAMAGES IN THIS CASE ………………………………………………………..1

II. ALL OF THE COMPONENTS OF PLAINTIFF'S DAMAGES CLAIMS ARE DOCUMENTED BY BUSINESS RECORDS AND WILL BE SUPPORTED BY THE TESTIMONY OF SFI'S TRIAL WITNESSES...…………………………………..7

III. THE GOVERNMENT CANNOT MEET ITS BURDEN OF SHOWING THAT PLAINTIFF'S MITIGATION EFFORTS WERE UNREASONABLE, AND THE GOVERNMENT'S PROPOSED OFFSETS ARE SPECULATIVE AND FLAWED……………………….........................................................................................11

A. Dr. Hartman's proffered offsets are flawed and speculative…………………….13

B. To the extent that this Court needs to determine an acceptance rate, the alternative scenarios in the Government's expert reports lack merit..…………...17

CONCLUSION ……………………………………………………………………………….22

# TABLE OF AUTHORITIES

## Cases & Decisions

Alabama Power Co. v. U.S. Dep't of Energy,
307 F.3d 1300 (11th Cir. 2002) ....................21

Commonwealth Edison Co. v. United States,
56 Fed. Cl. 652 (2003) ....................3, 5, 13

Energy Capital Corp. v. United States,
302 F.3d 1314 (Fed. Cir. 2002)....................3, 6

Home Savings of Am. v. United States,
399 F.3d 1341 (Fed. Cir. 2005)....................11

Hughes Communications Galaxy, Inc. v. United States,
271 F.3d 1060 (Fed. Cir. 2001)....................2

Indiana Michigan Power Co. v. United States,
422 F.3d 1369 (Fed. Cir. 2005).................... *passim*

Indiana Michigan Power Co. v. United States,
57 Fed. Cl. 88 (2003) ....................20

In re Kellett Aircraft Corp.,
186 F.2d 197 (3d Cir. 1950)....................12, 16

Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,
456 U.S. 844 (1982)....................16

Ketchikan Pulp Co. v. United States,
20 Cl. Ct. 164 (1990) ....................11

Koby v. United States,
53 Fed. Cl. 493 (2003) ....................12

Locke v. United States,
151 Ct. Cl. 262 (1960) ....................6

Robinson v. United States,
305 F.3d 1330 (Fed. Cir. 2002)....................11

Sacramento Mun. Util. Dist. v. United States,
70 Fed. Cl. 332 (2006) ....................14, 17

Sys. Fuels, Inc. v. United States,
66 Fed. Cl. 722 (2005) ....................19

Tenn. Valley Auth. v. United States,
69 Fed. Cl. 515 (2006) ........................................................................................ *passim*

Wickham Constr. Co. v. Fischer,
12 F.3d 1574 (Fed. Cir. 1994)........................................................................................16

**Statutes, Rules & Regulations**

28 U.S.C. § 2516 .......................................................................................................16

**Other Authorities**

Restatement (Second) of Contracts § 347 (1981) ...............................................................2

Restatement (Second) of Contracts § 350 (1981) .............................................................11

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
(Electronically Filed on August 18, 2006)

| | | |
|---|---|---|
| **SYSTEM FUELS, INC.,** on its own behalf and as agent for SYSTEM ENERGY RESOURCES, INC. and SOUTH MISSISSIPPI ELECTRIC POWER ASSOCIATION, | ) | |
| Plaintiff, | ) | No. 03-2624C (Judge Braden) |
| v. | ) | |
| **THE UNITED STATES,** | ) | |
| Defendant. | ) | |

**PLAINTIFF'S PRE-TRIAL MEMORANDUM OF LAW**

Pursuant to this Court's Order dated February 27, 2006, Plaintiff System Fuels, Inc. ("SFI"), on its own behalf and as agent for System Energy Resources, Inc. ("SERI") and South Mississippi Electric Power Association ("SMEPA"), respectfully files this memorandum of contentions of law in support of its damages claim in the instant action.[1]

## I. PLAINTIFF'S EVIDENCE AT TRIAL WILL SATISFY THE WELL-ESTABLISHED AND NECESSARY ELEMENTS TO PROVE EXPECTATION DAMAGES IN THIS CASE

The adjudication of SFI's claim in this case should entail a straightforward application of established law on breach of contract damages. It is well-settled in this Court and in the U.S. Court of Appeals for the Federal Circuit (the "Federal Circuit") that the "remedy for breach of contract is damages sufficient to place the injured party in as good a position as it would have

[1] As previously instructed by the Court and agreed to by the parties, SFI is not filing separate contentions of fact. In accordance with RCFC Appendix A ¶ 15, it is filing its Exhibit and Witness Lists with this Memorandum. Drafts of the Exhibit and Witness Lists were exchanged with counsel for the Government on August 11, 2006.

been had the breaching party fully performed." Indiana Michigan Power Co. v. United States, 422 F.3d 1369, 1373 (Fed. Cir. 2005). Such damages often include mitigation expenses of the non-breaching party, specifically its costs of arranging alternatives to the breaching party's required performance. See Restatement (Second) of Contracts § 347, cmt. a, b (expectation damages include costs to "arrange a substitute transaction" and "costs incurred in a reasonable effort, whether successful or not, to avoid loss"); Hughes Communications Galaxy, Inc. v. United States, 271 F.3d 1060, 1067-68 (Fed. Cir. 2001).

Costs incurred to design, license, and construct a dry spent nuclear fuel storage facility at the Grand Gulf Nuclear Station – a project that Plaintiff reasonably undertook to store spent nuclear fuel ("SNF") that the Department of Energy ("DOE") was obligated but has failed to accept under the Standard Contract[2] – constitute the vast majority of Plaintiff's damages in this case. In November 2005, SFI submitted a report issued by The Kenrich Group, LLC (the "Kenrich Report")[3] determining that Plaintiff's damages through August 31, 2005 totaled $12.18 million. Kenrich Report at 5. For purposes of the instant action, the parties have agreed that damages are "cut off" as of August 31, 2005, with SFI retaining the right to bring future actions for damages incurred after this date as from the Government's continuing partial breach of the Standard Contract. See Indiana Michigan, 422 F.3d at 1377. To this end, SFI filed an

---

[2] On July 19, 2006, DOE announced that the "best-achievable" date to begin receipt of spent nuclear fuel is now March 31, 2017. Even this date, signifying a breach of at least nineteen years, is one that DOE characterizes as "aggressive" and assumes among other highly optimistic assumptions "the absence of litigation related delays." Statement of Edward F. Sproat III, Director, Office of Civilian Radioactive Waste Management, U.S. Department of Energy, before the Subcommittee on Energy and Air Quality, Committee on Energy and Commerce, U.S. House of Representatives, July 19, 2006.

[3] Kenneth P. Metcalfe and Richard J. Sieracki, ASSESSMENT OF DAMAGES, SYSTEM FUELS, INC.'S, SYSTEM ENERGY RESOURCES, INC.'S AND SOUTH MISSISSIPPI ELECTRIC POWER ASSOCIATION'S SPENT NUCLEAR FUEL CLAIM (Nov. 18, 2005).

amended and supplemental complaint on March 27, 2006 that pleaded damages through the August 31, 2005 "cut off" date agreed upon by the parties.

As the Federal Circuit has consistently held, expectation damages (the type of damages Plaintiff seeks in this case) are recoverable where: (1) the damages were reasonably foreseeable by the breaching party, (2) the breach is a substantial causal factor in the damages, and (3) the damages are shown with reasonable certainty. Indiana Michigan, 422 F.3d at 1373 (citing Energy Capital Corp. v. United States, 302 F.3d 1314, 1320 (Fed. Cir. 2002)). These three elements are questions of fact, and Plaintiff will present evidence at trial that establishes each of these elements for the entirety of its $12.18 million claim. Notably, this Court has issued several opinions in other SNF cases recognizing that the requisite elements of foreseeability, causation, and reasonable certainty can be readily satisfied given the magnitude and nature of the Government's breach.

First, this Court and the Federal Circuit have recognized that the costs of additional on-site storage at a plaintiff utility's plant were inherently foreseeable in the event of DOE nonperformance under the Standard Contract. Indeed, two of the main objectives underlying the Nuclear Waste Policy Act ("NWPA") and the Standard Contract were (1) ensuring that utilities would not have to build any additional at-reactor storage after 1998 and (2) working off the backlog of SNF already stored on-site as of 1998. See Indiana Michigan, 422 F.3d at 1375 ("Having been placed in a position where they are required to find alternate storage for SNF, the [plaintiff] utilities must *de facto* accept responsibility to guard against the environmental impact of improperly-disposed and maintained SNF, a situation which the NWPA was enacted to avoid"); Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652, 667 (2003) ("deposition testimony of several DOE officials involved with the SNF program supports plaintiff's assertion



400440404v3

that the intent of the NWPA and the parties was to avoid the construction by utilities of additional at-reactor storage"). Thus, this Court has found that "DOE also recognized that utilities might be forced to build additional on-site storage facilities if DOE were not successful in performing under its contracts for SNF disposal, as reflected by the fact that one of DOE's goals was to preclude the utilities' need to provide storage outside their spent fuel pools . . . In short, the court finds that *it was entirely foreseeable to DOE* that failure to perform under the Standard Contract would result in damages of the nature and magnitude that [the plaintiff] claims." Tenn. Valley Auth. v. United States, 69 Fed. Cl. 515, 528 (2006) ("TVA") (emphasis added). SFI respectfully submits that the underlying rationale of these decisions applies with equal force here.

Second, with regard to causation, SFI will establish that it had no reason, other than the Government's breach, to build a dry fuel storage facility at Grand Gulf. In other words, DOE's breach was not just a "substantial causal factor," it was the central and driving factor in SFI's decision to build dry storage at Grand Gulf. See TVA, 69 Fed. Cl. at 515 ("[the plaintiff's] decision to build dry storage was made in direct response to DOE's breach"). To the extent that the Government contends that Plaintiff would have needed to build a dry storage facility even if DOE had performed in 1998, and that the costs Plaintiff has claimed are therefore not "incremental" to the Government's breach, the Government's position is not supported by logic, common sense, or any credible evidence. The linchpin – and flawed premise – of the Government's defense to SFI's claims here is that DOE would have taken SNF from utilities at artificially low acceptance rates in the hypothetical, "non-breach" world. As explained in Section III.B *infra*, the Government bears, but here cannot meet, the burden of establishing that DOE would have performed at these unsupported rates absent breach. Just as importantly, this

Court has repeatedly rejected the Government's arguments on the acceptance rate. See, e.g., Commonwealth Edison, 56 Fed. Cl. at 663-67.

Based upon review of the Government's expert reports, the Government appears to concede that Plaintiff's decision to build a dry fuel storage facility in the *actual* world was a direct result of the breach, but claims that the facility would also have been necessary in the speculative, hypothetical "non-breach" world and that the Government is entitled to a setoff reflecting those "non-breach" world costs. Upon close analysis, however, there is no real disagreement between the parties regarding actual "causation" in this case.[4] See TVA, 69 Fed. Cl. at 530-31 ("The government frames this argument as one of causation . . . but in the circumstances of this case, it realistically is a contention aimed at limiting the amount of damages [the plaintiff] may recover as a result of its mitigation efforts. The government contends that [the plaintiff's] damages should be constrained to the difference between the costs of building the dry storage facilities in the present (breach) world versus the costs of building the facilities later in the but-for, non-breach world . . . Because the government seeks to limit the non-breaching party's recovery for mitigation, the government bears the burden of proof") (citations omitted). Here, as in TVA, the Government does not challenge that Plaintiff is building a dry storage facility to mitigate the effects of the Government's breach, but rather that the Government should not pay the amount SFI seeks in its claim. At trial, SFI will prove both that the Government's breach is the direct cause of the decision to build a dry fuel storage

[4] If the Government indeed suggests, as the report by at least one of its proposed experts has alleged, that the dry fuel storage facility at Grand Gulf is not "incremental" to the breach, this argument simply implies that if Plaintiff recovered costs associated with a facility that would have built regardless of the breach, it would be put in a better position than if the Standard Contract had been performed. Setting aside the merits of such an argument, however, it does not pertain to "causation" as this Court and the Federal Circuit have applied the term (but rather, arguably, to other general principles of damages law).

facility, and that the amount of SFI's claim here is eminently reasonable (and, indeed, represents a bargain to the Government).

Third, regarding "reasonable certainty," the Federal Circuit's predecessor court held that certainty is "sufficient if the evidence adduced enables the court to make a fair and reasonable approximation of the damages." Locke v. United States, 151 Ct. Cl. 262, 267-68 (1960). Moreover, "[i]f a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery." Id. Although Plaintiff expects to present further evidence at trial regarding the reasonable certainty of its damages, the Kenrich Report's methodology, on its face, meets the "fair and reasonable approximation" standard in Locke:[5]

> The process used to identify and quantify [Plaintiff's] damages generally included the following steps. First, events or activities related to spent fuel storage were identified. Second, for each identified event or activity, a determination was made as to whether that event or activity was caused by the failure of DOE to perform under the Standard Contract and whether it caused and/or will cause [Plaintiff] to incur increased costs. Third, [Plaintiff's] reported "breach" costs related to such past events and activities were compiled based on actual recorded costs and other available supporting information. Similarly, the budget [Plaintiff] developed for the projected cost to complete the dry storage facility and contracts [Plaintiff] has entered into with outside vendors and contractors were reviewed.

Kenrich Report at 11 (emphasis in original). Moreover, because the damages sought in this case are "cut off" as of August 31, 2005, they have already been incurred and are by definition more reasonably certain than the future lost profits of a new venture that the Federal Circuit affirmed in Energy Capital Corp. v. United States, 302 F.2d at 1320.

---

[5] The costs underlying the Kenrich Report were derived from Entergy Services, Inc.'s ("Entergy") PowerPlant accounting system. In the interests of advancing the "just, speedy, and inexpensive determination" of the instant action, see RCFC 1, SFI has proposed and is prepared to reach a stipulation with the Government regarding the authenticity and/or admissibility of accounting documents and records that Entergy compiled in support of the damages claim in this case. If the parties cannot stipulate on this matter, Plaintiff reserves its right, as specified in the witness list filed contemporaneously with this brief, to call various witnesses from Entergy's accounting department who will verify the documentation underlying the claim and that $12.18 million represents a "fair and reasonable" approximation of the damages in this case.

In summary, the principles underlying the elements of foreseeability, causation, and reasonable certainty are well-settled in SNF cases before this Court and the Federal Circuit. SFI respectfully requests that the Court apply this traditional methodology in adjudicating the damages claim at issue.

## II. ALL OF THE COMPONENTS OF PLAINTIFF'S DAMAGES CLAIMS ARE DOCUMENTED BY BUSINESS RECORDS AND WILL BE SUPPORTED BY THE TESTIMONY OF SFI'S TRIAL WITNESSES

As outlined in page 12 of the Kenrich Report, Plaintiff's $12.18 million damages claim consists of six major components, the largest of which pertains to costs for designing and constructing a dry fuel storage facility (or "ISFSI") at Grand Gulf;[6] that project is currently underway, and SFI expects to complete the ISFSI in October 2006 and to begin cask loading operations in November 2006. The breakdown of ISFSI costs that Plaintiff seeks in this action is as follows:

| | |
|---|---|
| Spent fuel storage studies: | $0.50 million |
| ISFSI design and construction: | $9.46 million |
| Cask fabrication facility: | $0.53 million |
| Dry fuel equipment storage building: | $0.88 million |
| ISFSI electrical and security systems: | $0.03 million |
| Auxiliary building door modification: | $0.78 million |
| Total amount of claim (in 2006 dollars): | $12.18 million |

[6] By way of background, the Grand Gulf Nuclear Station is a single-reactor plant located approximately 25 miles south of Vicksburg, Mississippi, on the east bank of the Mississippi River. Kenrich Report at 7. Grand Gulf began commercial operation in July 1985. SERI owns or leases 90 percent of Grand Gulf, while SMEPA owns the remaining 10 percent interest in the plant. First Amended Complaint and Supplemental Complaint ¶ 2.

By working with SFI personnel and analyzing Entergy's financial records pertaining to Grand Gulf and other information maintained in the normal course of business, Plaintiff's experts at Kenrich determined the actual costs that Plaintiff incurred through August 31, 2005 related to SNF storage beyond the costs for operation of the spent fuel pool at Grand Gulf. Kenrich Report at 14. Incurred costs were identified through discussions with Entergy personnel and review of, *inter alia*, invoices, employee time sheets, and expense reports. Kenrich reviewed the cost documentation with the appropriate Entergy personnel – several of whom will testify at the damages trial in this case – to identify those costs that directly resulted from the Government's partial breach of the Standard Contract. In other words, Plaintiff will satisfy the "reasonable certainty" requirement discussed above by providing ample evidence for the Court to make a "fair and reasonable" approximation of the damages in this case.

With respect to causation and foreseeability, Plaintiff anticipates that various individuals such as William A. Eaton (the Vice President of Engineering at Entergy Operations, Inc.), Charles B. Franklin (the Manager of Project Management at Entergy Services, Inc.), and John McGaha (the President of Entergy Operations, Inc.) will testify at trial that as a result of the Government's breach, Plaintiff needed to build a dry fuel storage facility at Grand Gulf in order to mitigate any further loss. As explained above, because Plaintiff's Standard Contract with DOE and the NWPA contemplated that one of the major purposes of the contract was to prevent the need for SNF storage outside the Grand Gulf spent fuel pool, it was certainly foreseeable to DOE that its failure to begin performance in 1998 would result in the need to build a dry storage facility at Grand Gulf. See TVA, 69 Fed. Cl. at 528. Mr. Frank B. Rives (the Director of Nuclear Fuels at Entergy Services, Inc.) is expected to testify about Entergy's expectations concerning DOE's performance and the various steps Entergy has taken to ameliorate the effects

of the Government's breach. These Entergy employees and officials will also testify that if DOE had performed in 1998, a dry fuel storage facility would not have been necessary and would never have been built at Grand Gulf.

Once Plaintiff made the decision to build a dry fuel storage facility at Grand Gulf, certain modifications to the plant became necessary – most notably to the auxiliary building that contains the spent fuel pool – to accommodate the transfer of SNF in dry fuel storage casks from the spent fuel pool to the ISFSI pad. Mr. Warren, as the manager of the dry fuel storage project, will explain why, as a technical and practical matter, Plaintiff needed to make these modifications to, *inter alia*, the auxiliary building's door and electrical systems. See also Kenrich Report at 20-21. Similarly, Mr. Warren and other Entergy employees will explain that these modifications would not have been made if DOE had commenced performance of its Standard Contract obligations in 1998.

With respect to the construction of the ISFSI pad itself, Plaintiff contracted with Enercon Services, Inc. to design, size, and locate the pad. Kenrich Report at 17. The design and location of the pad required Enercon to perform certain geotechnical studies to support the design of the ISFSI, and to design the haul path that connects the auxiliary building to the ISFSI pad and the ISFSI pad to the cask construction pad. Id. at 18. With others, Mr. Warren is expected to testify that if the Government had not breached the Standard Contract, none of the ISFSI pad construction or haul path modifications described above would have been necessary.

Furthermore, as various witnesses will explain at trial, Plaintiff needed to design and construct a building that would maintain and store the equipment used to handle the SNF removed from the Grand Gulf spent fuel pool and the equipment used to transport the fuel from the auxiliary building to the ISFSI pad. Mr. Warren and Mr. Edwin E. Rogers (the

Superintendent of Maintenance Support at the plant) are expected to testify, *inter alia*, that Plaintiff contracted with Stone & Webster for construction of the dry fuel storage equipment building and the ISFSI pad. Pursuant to contract, Stone & Webster performs most if not all of the craft labor services necessary at Grand Gulf – for both the dry fuel storage project and other activities at the plant. To the extent the Government contends that some of the Stone & Webster costs were fixed costs that Plaintiff would have incurred regardless of the breach (and therefore are not "incremental"), Plaintiff will provide documentation and testimony identifying the Stone & Webster costs that were specifically attributable to the dry fuel storage project efforts. Mr. Warren and Mr. Rogers (and, if necessary, others) will identify and describe the work orders that authorized Stone & Webster's construction of the dry fuel storage equipment building and the auxiliary building modifications described above. Moreover, Mr. Kenneth P. Metcalfe, a Certified Public Accountant and President of The Kenrich Group, will testify as an expert that indirect charges from Stone & Webster that Plaintiff has claimed as damages in this case are properly allocable to the projects that they supported.

Lastly, in addition to contracting with Stone & Webster and Enercon, Plaintiff required the additional services (including overtime) of many Entergy employees at Grand Gulf for the dry fuel storage project. These employees include engineering and other plant personnel who worked directly with Enercon and Stone & Webster to execute the various tasks comprising the project. Mr. Eaton and Mr. Warren will testify that Entergy personnel charged to work orders (i.e., project codes) established by SFI to capture such labor costs; these witnesses will also testify that Entergy needed to reallocate personnel and other resources to meet the various requirements of the dry storage project – actions that would not have occurred absent breach.

In summary, at trial, Plaintiff expects to present witnesses and documentary evidence establishing that all aspects of the dry fuel storage project at Grand Gulf satisfy the necessary elements of foreseeability, causation, and reasonable certainty for recovery of the damages comprising its $12.18 million claim.

## III. THE GOVERNMENT CANNOT MEET ITS BURDEN OF SHOWING THAT PLAINTIFF'S MITIGATION EFFORTS WERE UNREASONABLE, AND THE GOVERNMENT'S PROPOSED OFFSETS ARE SPECULATIVE AND FLAWED

SFI's $12.18 million claim for damages actually incurred through August 31, 2005 reflects the prudent actions of an operating utility doing its level best to mitigate the direct and foreseeable harm that resulted from the Government's breach of the Standard Contract. As the non-breaching party, Plaintiff has a duty to mitigate losses that could have been avoided by "reasonable efforts." Robinson v. United States, 305 F.3d 1330, 1333 (Fed. Cir. 2002) (citing Restatement (Second) of Contracts § 350 cmt. b). Therefore, assuming the other elements required to prove damages are met, if Plaintiff's efforts are reasonable, they are recoverable. See Indiana Michigan, 422 F.3d at 1375 ("we see no reason why efforts to avoid damages in contemplation of a partial breach should not also be recoverable").

Whether the injured party's mitigation efforts are reasonable is determined under the circumstances. Home Savings of Am. v. United States, 399 F.3d 1341, 1353 (Fed. Cir. 2005). However, in damages actions before this Court, the Government bears the burden of proving that a plaintiff's mitigation efforts were *unreasonable*. See TVA, 69 Fed. Cl. at 528; Ketchikan Pulp Co. v. United States, 20 Cl. Ct. 164, 166 (1990) (reasonableness of the injured party's mitigation action is "judged by the facts and circumstances at the time the action is taken"); id. (injured party does not have to undertake extraordinary efforts to "ferret out the single best situation which will absolutely minimize the breaching party's damages"). Moreover, where a choice is

required between two reasonable courses of action, the party that caused the injury may not complain that one course, rather than the other, was chosen. See Koby v. United States, 53 Fed. Cl. 493, 497 (2002) (citing In re Kellett Aircraft Corp., 186 F.2d 197, 198-99 (3d Cir. 1950)) ("The rule of mitigation of damages may not be invoked by a contract breaker as a basis for hypercritical examination of the conduct of the injured party, or merely for the purpose of showing that the injured person might have taken steps which seemed wiser or would have been more advantageous to the defaulter")).

Where appropriate, this Court must also determine whether mitigation damages require an offset, so as not to put the injured party in a better position than if the breach had not occurred. See, e.g., TVA, 69 Fed. Cl. at 533-543 (evaluating each of the Government's requested offsets to TVA's damages claim). In June 2006, one of the Government's proposed experts, in response to the Kenrich Report, proposed offsets to Plaintiff's claim such that the damages in this case would range from zero to $4.34 million at the most. The Government submitted a report issued by Dr. Raymond Hartman[7] determining that "the increased costs incurred by SFI that therefore can be claimed as *damages resulting from the delay are zero*." Hartman Report at 1 (emphasis in original). Alternatively, assuming that Plaintiff would not have needed to build a dry fuel storage facility at Grand Gulf absent breach, after accounting for three alleged "analytical errors . . . the cost submission that reasonably can be attributed to the delay through August 2005 cannot exceed $4.34 million." Id.

In sum, Dr. Hartman makes a deduction of $7.84 million from Plaintiff's $12.18 damages claim based on the following offsets:

---

[7] EXPERT REPORT OF RAYMOND S. HARTMAN (the "Hartman Report"), served by the Government on the undersigned counsel on June 2, 2006.

| | |
|---|---|
| Deferral of cask loading costs: | $2.81 million |
| Brewer and Peterson technical "corrections": | $3.44 million[8] |
| "Prejudgment interest": | $1.59 million |
| Total deduction: | $7.84 million |

For reasons explained below, however, the offsets that Dr. Hartman has proposed in his report are themselves speculative and flawed. Furthermore, his "zero damages" conclusion is completely dependent on the direction from Government counsel that DOE would have taken SNF from plaintiff utilities in the non-breach world at one of several artificially low rates of acceptance proposed by the Government. Not only is a determination of the acceptance rate unnecessary to an adjudication of Plaintiff's damages claim, this Court has repeatedly rejected the Government's acceptance rate arguments in other SNF cases. See, e.g., Commonwealth Edison, 56 Fed. Cl. at 663-67.

**A. Dr. Hartman's proffered offsets are flawed and speculative**

One "analytical error" upon which Dr. Hartman based a $2.81 million offset to Plaintiff's damages claim was that "SFI's analysis has not accounted in any way for the financial benefits accruing to SFI for the deferral of but-for world costs of loading casks to DOE in 2005," the year in which DOE was originally scheduled to begin accepting SNF from Grand Gulf. Hartman Report at 1. Dr. Hartman theorizes that these hypothetical cask loading costs should be subtracted from Plaintiff's damages claim. This offset is unsupportable for at least several reasons.

[8] Two of the Government's other proposed experts, Messrs. Warren Brewer and Robert Peterson, issued reports in June 2006 opining that certain costs associated with the dry fuel storage project at Grand Gulf are either unsupported or not "incremental" to the Government's breach. Plaintiff strongly disagrees, and will present evidence at trial that supports each of these costs questioned by the Government's experts.

First, this Court has already rejected the principle that cask loading costs may be treated as an offset in SNF damages cases and found that a determination of such costs is speculative at best. In TVA, Judge Lettow ruled that

> the government claims that in the non-breach, but-for world, [the plaintiff] would have had to incur costs in loading casks with SNF for delivery to DOE. As a result of DOE's breach, the government claims that [the plaintiff] has temporarily avoided these costs, that [the plaintiff] has received a benefit as a result, and that the government should be credited with an offset to [the plaintiff's] damages to reflect this benefit . . . The alleged benefit stems purely from timing; both DOE and [the plaintiff] contemplate that DOE will still perform under the contract at some future date. As matters now stand, any benefit inhering in [the plaintiff] because of delayed loading costs would be entirely speculative. It is not possible to ascertain the method DOE will ultimately use for SNF acceptance. The size and type of casks to be used to transport the SNF are not known; no casks have been approved for the purpose. The mode of transport has not been determined. Additionally, the date at which DOE will begin to perform in the future cannot even be estimated, let alone determined with reasonable certainty.

TVA, 69 Fed. Cl. at 542. The Court held similarly in Sacramento Mun. Util. Dist. v. United States, 70 Fed. Cl. 332, 372 (2006) ("SMUD"), that because "DOE and [the plaintiff] both contemplate that DOE will still perform under the Standard Contract at some future date, any benefit to SMUD, because of delayed loading costs, would be entirely speculative." These two rulings are fully consistent with the Federal Circuit's view that "recovery for speculative damages is precluded." Indiana Michigan, 422 F.3d at 1373. Therefore, the cask loading "benefits" that Dr. Hartman proposes as a setoff here are similarly too speculative to satisfy the standards in Indiana Michigan. See TVA, 69 Fed. Cl. at 542.

Second, Dr. Hartman fails to follow his own stated methodology of "properly identifying and calculating but-for costs and netting them against actual costs." Hartman Report at 6. Assuming that DOE does perform its Standard Contract obligations at some future point, cask loading costs will have been incurred at Grand Gulf in both the actual and the non-breach worlds (even though the quantum of such costs, as explained above, remains highly speculative at this

time). Applying Dr. Hartman's approach of taking but-for costs and netting them against actual costs, DOE cask loading should have no net effect on Plaintiff's damages claim. Furthermore, as a purely economic matter, the inclusion of DOE cask loading costs as an offset is appropriate *only* if Plaintiff claims such costs in the future as damages (given DOE's continuing nonperformance, no such costs have been claimed in this case, which is limited to damages incurred as of August 31, 2005). Dr. Hartman completely ignores the possibility that Plaintiff will not claim DOE cask loading costs in future damages actions in this Court, and the evidence will show that he has no knowledge about Plaintiff's intentions in this regard. In short, the Government's claim that it is entitled to treat non-breach world cask loading costs as an offset against Plaintiff's damages claim in this case is highly speculative. See TVA, 69 Fed. Cl. at 542.[9]

Another "analytical error" alleged in Dr. Hartman's report pertains to $3.44 million of Plaintiff's dry fuel storage costs that the Government's two other proposed experts have deemed as not "incremental" to the breach. As an initial matter, the Government's attempt to have its experts opine on whether or not certain costs in Plaintiff's damages claim are "incremental" to the Government's breach is inappropriate. Whether or not the evidence in the record supports the recoverability of certain costs in a plaintiff's claim is a matter reserved for the trier of fact (here, the Court). In other words, the Court – not the Government's proposed troika of experts – is tasked with rendering findings of fact on the three elements required to recover damages,

[9] Interestingly, in this case Dr. Hartman has apparently changed his approach from TVA (in which he was admitted as an expert witness for the Government) regarding the calculation of cask loading cost offsets. In TVA, Dr. Hartman based his cask loading offset solely on the time value of the deferral from the time DOE would have loaded casks in the non-breach world and when DOE will load casks in the actual world. 69 Fed. Cl. at 542. In this case, however, Dr. Hartman opted to deduct from Plaintiff's claim the *entire cost* of cask loading, not just the time value of its deferral. Hartman Report at 23. This change in Dr. Hartman's approach appears to increase the Government's proposed offset in this case by approximately $2 million.

including the key element of causation. See, e.g., Inwood Laboratories, Inc. v. Ives Laboratories, Inc., 456 U.S. 844, 856 (1982) ("Determining the weight and credibility of the evidence is the special province of the trier of fact").

To the extent that the Government argues that it is sufficient or appropriate for its proposed experts to specify a smorgasbord of "non-breach" scenarios to support their damages offsets, these offsets should be subject to at least the same evidentiary burden discussed in Section I *supra* (e.g., "reasonable certainty"), if not a more rigorous standard. Otherwise, Plaintiff, as the non-breaching party, would bear an unjustifiably disproportionate risk at trial regarding proof of damages as compared to the Government. See In re Kellett Aircraft, 186 F.2d at 198-99 (rejecting the breaching party's "hypercritical examination of the conduct of the injured party").

Lastly, with regard to Dr. Hartman's proposed $1.59 million offset for Plaintiff's cost of capital that counsel for the Government directed him to assume as "prejudgment interest," Hartman Report at 8, this Court has recognized that the cost of capital may be recoverable in appropriate circumstances. In particular, Judge Lettow ruled that an Allowance for Funds Used During Construction ("AFUDC") may be recovered against the Government in a SNF damages case, despite the general prohibition against recovery of interest against the Government set forth in 28 U.S.C. § 2516(a). See TVA, 69 Fed. Cl. at 541-42. The Federal Circuit recognized the recovery of AFUDC in Wickham Constr. Co. v. Fischer, 12 F.3d 1574 (Fed. Cir. 1994), holding that 28 U.S.C. § 2516(a) "does not bar an interest award as part of an equitable adjustment under a fixed-price contract if the contractor has actually paid interest because of the government's delay in payment." Wickham, 12 F.3d at 1582-83. In TVA, Judge Lettow found that because the facts in the case were conceptually indistinguishable from those in Wickham, and because

the plaintiff utility established "its use of a widely-accepted, FERC-mandated standard for calculating the cost of the funds used in building the dry storage facilities," its AFUDC costs were recoverable as damages against the Government. TVA, 69 F.3d at 542. Here, the evidence will show that Plaintiff's incurred cost of capital in building the dry fuel storage facility at Grand Gulf, like the AFUDC costs in TVA, were similarly indistinguishable from the type of interest award that the Federal Circuit permitted in Wickham.

Thus, for the foregoing reasons, the damages offsets that the Government's proposed experts have proffered to reduce Plaintiff's $12.18 million claim are not only inconsistent with this Court's rulings in other SNF cases, but also contrary to the evidentiary standards this Court and the Federal Circuit have established regarding proof of damages. Plaintiff respectfully submits that these offsets should be rejected.

### B. To the extent that this Court needs to determine an acceptance rate, the alternative scenarios in the Government's expert reports lack merit

Once Plaintiff has satisfied at trial the required elements of foreseeability, causation, and reasonable certainty (as detailed in Section I *supra*) for recovery of expectation damages, it is no longer necessary for this Court to make any legal or factual determinations regarding the rate at which DOE would have accepted SNF from plaintiff utilities in the non-breach world. As the Court ruled in SMUD, evidence presented regarding the acceptance rate was "highly speculative" and therefore no determinations were made on the issue. 70 Fed. Cl. at 375. To the extent that the Government argues that a finding on the acceptance rate is necessary to adjudicate Plaintiff's damages claim, or to establish that Plaintiff's mitigation efforts (i.e., the Grand Gulf dry fuel storage project) were unreasonable, the evidentiary burden rests on the Government to



400440404v3

establish the validity of the acceptance rates that it directed Dr. Hartman to assume in issuing his report.

In his report, Dr. Hartman stated that counsel for the Government directed him to assume three "Alternative But-For World Scenarios," upon which he determined that Plaintiff would have needed to build a dry fuel storage facility at Grand Gulf even if DOE had not breached its Standard Contract obligations. Hartman Report at 8. Absent these assumptions, Dr. Hartman essentially concedes that a dry fuel storage facility is necessary at Grand Gulf due to the Government's breach of its contractual obligation. As detailed below, none of the Government's alternative but-for world scenarios have merit. Among other serious flaws, they are wholly inconsistent with the purposes underlying the NWPA and the Standard Contract and with the Government's actual plans for carrying out its contractual obligation. Hence, the dry fuel storage facility that Plaintiff is building at Grand Gulf is solely attributable to the Government's breach and represents a reasonable mitigation effort.

In an attempt to limit its liability in this and other SNF cases, the Government has advanced an interpretation of the contract suggesting that DOE was and is allowed to decide for itself the extent and nature of DOE's performance required under the Standard Contract. The Government has defended this extreme position often by arguing that the language of the Standard Contract authorizes DOE to proceed in whatever manner it chooses – for example, that the Annual Capacity Reports ("ACRs") and the Delivery Commitment Schedules ("DCSs") are, by their very terms, "rate-setting" documents. However, as DOE expressly stated in the Standard Contract, in the ACRs and DCSs, and in resultant legal proceedings, the ACRs and

DCSs were merely planning tools and were never intended to produce a binding acceptance rate.[10]

At trial, utilizing the expert testimony of Ms. Eileen Supko and other evidence, SFI is prepared to show that 3,000 MTU is the rate most likely to achieve the NWPA's and the Standard Contract's twin objectives of (1) ensuring that utilities would not have to build any additional at-reactor storage after 1998, and (2) working off the backlog of SNF and/or HLW already stored on-site as of 1998. DOE documents since the enactment of the NWPA and up to its most recent analyses have (aside from a single exception in 1990) consistently assessed the adequacy of the fees charged the utilities under the Standard Contract based on an assumption that DOE would take SNF from utilities at a steady-state rate of 3,000 MTU annually. Because SFI and other plaintiff utilities paid their fees under the Standard Contract based on this assumption, DOE's reciprocal obligation should similarly be to take SNF at this rate. Any contrary understanding would disturb the bargain reached by the parties. Additionally, the design of the repository itself has been and continues to be based on a steady-state acceptance rate of 3,000 MTU per year.

Furthermore, this court has previously rejected arguments by the Government that the Court should give little weight to DOE's prior representations regarding an annual acceptance

---

[10] Another reason the Court should not rely on the ACRs or submitted DCSs in assessing damages in this case is because the ACR and DCS process cannot determine with any reasonable certainty how DOE would have actually performed. As the Court noted in its decision on liability in this case, DOE stopped issuing the ACRs in 1995 and unilaterally suspended the DCS process thereafter. 66 Fed. Cl. at 722. DOE released a new APR/ACR in July 2004, but then re-suspended the process several months later in December 2004. Id. The ACRs also only covered a ten-year period, from 1998 to 2007. As noted above, DOE has publicly announced that it will not begin to take SNF from utilities until 2017 under the most optimistic scenario. The ACR and DCS process, therefore, would not provide the Court with any benchmark for damages for years 2007 through 2017 and beyond. For these additional reasons, the ACR and DCS process established by DOE cannot serve as any basis for determining Plaintiff's damages in this case.

rate of 3,000 MTU. For example, according to the Court, even if the 3,000 MTU rate was just a goal or a target and not a contract term:

> [i]t is the number most often used by Congress and by parties to the Standard Contract. It is a reasonable and responsible rate that represents the parties' intent. It accomplishes the purposes of the Nuclear Waste Policy Act and the Contract authorized by that statute.

Indiana Michigan Power Co. v. United States, 57 Fed. Cl. 88, 99 (2003). Moreover, this Court found that the record "contain[ed] uniform support" for the assertion that DOE believed that acceptance of SNF at a steady-state rate of 3,000 MTU annually was necessary to address the goals of preventing additional on-site storage after 1998 and to begin to eliminate the on-site backlog of SNF.[11] Id.

In summary, the Court should reject the premises that inspired the Government's "Alternative But-For World Scenarios" – that the only purpose underlying the NWPA and the Standard Contract was the collection of fees from utilities and ensuring that DOE's costs of running the nuclear waste program were borne by the nuclear utilities. As the United States Court of Appeals for the Eleventh Circuit remarked, in view of previous findings that DOE had breached the Standard Contract and consistent with the "quid pro quo" arrangement set forth

[11] To the extent that the Government argues that the "But-For.2" alternative scenario in Dr. Hartman's report does endorse a 3,000 MTU acceptance rate, such a characterization would be misleading at best and only superficially consistent with the purposes of the NWPA and Standard Contract. Under "But-For.2," DOE would begin acceptance of SNF "in 1998 under APR/ACR rates through 2009, continues at 1,800 MTUs in 2010 through 2014 and continues at 3,000 MTUs starting in 2015 until all SNF is removed." Hartman Report at 8. The central difference between "But-For.2" and the 3,000 MTU acceptance scenario set forth in DOE documents is that the DOE documents overwhelmingly contemplate a 5 or 6-year ramp-up to a 3,000 MTU steady-state rate. By contrast, under "But-For.2," it would take 17 years before DOE would actually begin to address the SNF backlog at plaintiff utility sites in any meaningful way. Thus, not only does "But-For.2" lack significant evidentiary support, it does not reflect the bargain struck between DOE and Plaintiff.

therein, "the ultimate burden of the government's breach [should] fall on the government, not [the] other utilities." Alabama Power Co. v. U.S. Dep't of Energy, 307 F.3d 1300, 1314 (11th Cir. 2002). Therefore, to the extent that this Court needs to render any finding of law or fact on the acceptance rate issue, it should be a rate that reflects the Standard Contract's *quid pro quo* arrangement. In other words, Plaintiff and other utilities are entitled to a tangible, concrete and commensurate obligation on the part of DOE in return for the substantial sums of money – over $171 million in this case alone – that have been and continue to be paid by the utilities to DOE.

## CONCLUSION

As detailed above, the adjudication of Plaintiff's mitigation damages claim requires a straightforward application of the law on breach of contract damages. Once Plaintiff has established foreseeability, causation, and reasonable certainty (elements that this Court has readily found in other SNF damages cases), the Government bears the heavy burden of showing that the way Plaintiff planned, designed, licensed, and is constructing the dry fuel storage facility at Grand Gulf represents an unreasonable response to the Government's breach of the Standard Contract. Absent rampant speculation, the Government cannot sustain this burden. Plaintiff respectfully submits that the evidence at trial will fully support its $12.18 million damages claim in this case, and that judgment should be rendered by the Court for SFI in that amount.

Dated: August 18, 2006

Respectfully submitted,

s/ Alex D. Tomaszczuk by s/ Jack Y. Chu
Alex D. Tomaszczuk
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7940
(703) 770-7901 (fax)

Counsel of Record for Plaintiff
System Fuels, Inc., on its own behalf
and as agent for System Energy Resources, Inc.
and South Mississippi Electric Power Association

OF COUNSEL:
Jay E. Silberg
Daniel S. Herzfeld
Jack Y. Chu
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
2300 N Street, N.W.
Washington, D.C. 20037
(202) 663-8000
(202) 663-8007 (fax)

L. Jager Smith, Jr.
**WISE CARTER CHILD & CARAWAY, P.A.**
1340 Echelon Parkway
Jackson, MS 39213
601-368-5572
601-368-5816 (fax)