No. 03-2624C
(Judge Braden)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

SYSTEM FUELS, INC., on its own behalf and as agent for SYSTEM ENERGY RESOURCES, INC. and SOUTH MISSISSIPPI ELECTRIC POWER ASSOCIATION,

Plaintiff,

v.

THE UNITED STATES OF AMERICA,

Defendant.

# DEFENDANT'S MEMORANDUM OF CONTENTIONS OF LAW

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

HAROLD D. LESTER, JR.
Assistant Director

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

SHARON A. SNYDER
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
ATTN: Classification Unit, 8th Floor
Washington, D.C. 20530

September 5, 2006

Attorneys for Defendant

## TABLE OF CONTENTS


TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

DEFENDANT'S MEMORANDUM OF CONTENTIONS OF LAW . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

I. SFI BEARS THE BURDEN OF ESTABLISHING ALL ELEMENTS OF ITS CLAIM, INCLUDING LIABILITY, CAUSATION, FORESEEABILITY, AND REASONABLE CERTAINTY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

A. SFI Has The Burden Of Proving All Elements Of Its Case . . . . . . . . . . . . 6

B. SFI's Burden Includes The Obligation To Establish A Reasonable "But For" World Against Which To Measure Whether DOE's Delay "Caused" It To Incur Incremental Costs . . . . . . . . . . . . . . . . . . . . . . . . . 8

C. SFI Has The Burden Of Demonstrating That Its Claimed Damages Were Foreseeable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

D. SFI Must Prove Its Damages With Reasonable Certainty . . . . . . . . . . . . 12

II. SFI'S CAUSATION THEORY FAILS BECAUSE IT CANNOT MEET ITS BURDEN OF PROVING THAT DOE WAS OBLIGATED TO ACCEPT SNF PURSUANT TO A TWO-PART TEST OR AT AN ANNUAL RATE OF 3,000 MTU . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

A. The NWPA Did Not Require Acceptance Of SNF At Any Particular Rate Or Under Any Particular Qualitative Standard . . . . . . . . . . . . . . . . 13

B. The Standard Contract Did Not Require Acceptance of SNF At Any Particular Rate Or Pursuant To Any Particular Test . . . . . . . . . . . . . . . . . 14

C. Causation And Resultant Damages Should Be Determined Against The Acceptance Obligations Developed Pursuant To The Schedule Mechanism In The Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

1. The Acceptance Schedule Was Established In The Dealings Between The Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

2. Some Of The Decisions Issued Concerning The Rate Of Acceptance Incorrectly Analyze The Standard Contract Schedule Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

III. SFI CANNOT ESTABLISH THE NECESSARY CAUSAL LINK BETWEEN CERTAIN OF ITS CLAIMED STORAGE COSTS AND DOE'S DELAY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

A. SFI's Claim Should Be Reduced To Account For Costs That It Would Have Incurred In The "But For" World . . . . . . . . . . . . . . . . . . . . . 21

B. Costs Of Loading SNF To DOE In The But-For World . . . . . . . . . . . . . 22

IV. SFI'S CLAIM FOR THE COST OF CAPITAL SIMPLY IS A LEGALLY UNSUPPORTED ATTEMPT TO RECOVER PREJUDGMENT INTEREST . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## TABLE OF AUTHORITIES

### CASES

Alaska Pulp Corp. v. United States,
59 Fed. Cl. 400 (2004) . . . . . 7

Barrow Utils. & Elec. Co. v. United States,
20 Cl. Ct. 113, 121 (1990) . . . . . 12

Bell v. United States,
404 F.2d 975 (Ct. Cl. 1968) . . . . . 24

Bluebonnet Sav. Bank, FSB v. United States,
67 Fed. Cl. 231 (2005) . . . . . 9, 22

Bluebonnet Sav. Bank, FSB v. United States,
339 F.3d 1341 (Fed. Cir. 2003) . . . . . 8, 9, 21

Bohac v. Department of Agric.,
239 F.3d 1334 (Fed. Cir. 2001) . . . . . 11

California Federal Bank v. United States,
395 F.3d 1363 (Fed. Cir. 2005) . . . . . 9, 23

Coast Fed. Bank, FSB v. United States,
48 Fed. Cl. 402 (2000) . . . . . 9

Commonwealth Edison Co. v. United States,
56 Fed. Cl. 652 (2003) . . . . . 18, 19, 20

Consolidated Gas Supply Co. v. Federal Energy Regulatory Comm'n,
745 F.2d 281 (4th Cir. 1984) . . . . . 15

DPJ Co. v. FDIC,
30 F.3d 247 (1st Cir. 1994)) . . . . . 21

Dravo Corp. v. United States,
594 F.2d 842 (Ct. Cl. 1979) . . . . . 24

England v. Contel Advanced Sys., Inc.,
384 F.3d 1372 (Fed. Cir. 2004) . . . . . 24

Glendale Fed. Bank, FSB v. United States,
239 F.3d 1374 (Fed. Cir. 2001) . . . . . . . . . . 9

Indiana Michigan Power Co. v. United States,
57 Fed. Cl. 88 (2003) . . . . . . . . . . 18, 19, 20

Indiana Michigan Power Co. v. United States,
422 F.3d 1369 (Fed. Cir. 2005) . . . . . . . . . . 7, 11, 18

J.D. Hedin Constr. Co. v. United States,
197 Ct. Cl. 782, 456 F.2d 1315 (1972) . . . . . . . . . . 9, 24, 25

Landmark Land Co. v. Federal Deposit Insur. Corp.,
256 F.3d 1365 (Fed. Cir. 2001) . . . . . . . . . . 11, 12

Library of Congress v. Shaw,
478 U.S. 310 (1986) . . . . . . . . . . 24

Maine Yankee Atomic Power Co. v. United States,
225 F.3d 1336 (Fed. Cir. 2000) . . . . . . . . . . 3, 7

Marshall v. United States,
164 F. Supp. 221 (Ct. Cl. 1958) . . . . . . . . . . 24

Modern Sys. Tech. Corp. v. United States,
979 F.2d 200 (Fed. Cir. 1992) . . . . . . . . . . 20

Myerle v. United States,
33 Ct. Cl. 1 (1897) . . . . . . . . . . 7, 8

Neeley v. Bankers Trust Co. of Tex.,
757 F.2d 621 (5th Cir. 1985) . . . . . . . . . . 20

Northern Helex Co. v. United States,
207 Ct. Cl. 862, 524 F.2d 707 (1975) . . . . . . . . . . 8, 11

Northern States Power Co. v. United States,
128 F.3d 754 (D.C. Cir. 1997) . . . . . . . . . . 3

PSEG Nuclear, LLC v. United States,
No. 05-5162 (Fed. Cir.) . . . . . . . . . . 3

Power Authority of New York v. United States,
2004 WL 3461071 (Fed. Cl. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Quiman, S.A. de C.V. v. United States,
39 Fed. Cl. 171 (1997), aff'd, 178 F.3d 1313 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . 8, 24

Ramsey v. United States,
121 Ct. Cl. 101 F. Supp. 353 (1951) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Ridge Runner Forestry v. Veneman,
28 F.3d 1058 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Roseburg Lumber Co. v. Madigan,
978 F.2d 660 (Fed. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 12

Rumsfeld v. Applied Cos.,
325 F.3d 1328 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Sacramento Mun. Util. v. United States,
70 Fed. Cl. 332 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 9, 12

San Carlos Irrig. & Drainage Dist. v. United States,
877 F.2d 957 (Fed. Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

San Carlos Irrigation & Drainage Dist. v. United States,
111 F.3d 1557 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Tennessee Valley Authority v. United States,
69 Fed. Cl. 515 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

United States v. Thayer-West Point Hotel Co.,
329 U.S. 585 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Wells Fargo Bank v. United States,
88 F.3d 1012 (Fed. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 12, 13

White v. Delta Constr. Int'l, Inc.,
285 F.3d 1040 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 21

Wickham Contracting Co., Inc. v. United States,
12 F.3d 1574 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

Willems Indus., Inc. v. United States,
155 Ct. Cl. 360, 295 F.2d 822 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

.

## FEDERAL STATUTES AND REGULATIONS

**Code of Federal Regulations**

10 C.F.R. § 961.11, Art. IX.A (emphasis added) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 5, 17

**United States Codes**

28 U.S.C. § 2516(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

42 U.S.C. §§ 10101-10270 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

42 U.S.C. § 10139 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

42 U.S.C. § 10168(d)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

48 Fed. Reg. 5458 (Feb. 4, 1983)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

## OTHER AUTHORITIES

Restatement of Contracts § 329 cmt. e . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Restatement (Second) of Contracts, § 351, cmt. a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Restatement (Second) of Contracts § 352 cmt. a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| SYSTEM FUELS, INC., on its own behalf and as agent for SYSTEM ENERGY RESOURCES, INC. and SOUTH MISSISSIPPI ELECTRIC POWER ASSOCIATION,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | No. 03-2624C<br>(Judge Braden) |

DEFENDANT'S MEMORANDUM OF CONTENTIONS OF LAW

Pursuant to this Court's order dated February 27, 2006, defendant, the United States, respectfully submits the following memorandum of contentions of law.

SUMMARY OF ARGUMENT

This case involves a damages claim by plaintiff, System Fuels, Inc. ("SFI"), on its own behalf and as agent for System Energy Resources, Inc. ("SERI") and South Mississippi Electric Power Association ("SMEPA"), for $12.178 million that it allegedly has incurred through August 31, 2005, at its Grand Gulf nuclear power plant associated with the storage of spent nuclear fuel ("SNF").[1] SFI's claim includes costs principally for the design, licensing, and fabrication of dry storage facilities at Grand Gulf. SFI contends that the Government is liable for

[1] SFI and SERI are wholly owned subsidiaries of Entergy Corporation ("EC"). Grand Gulf is owned by SFI and SERI and operated by Entergy Operations, Inc. ("EOI"), a wholly owned subsidiary of Entergy Corporation. Arkansas Nuclear One ("ANO"), another nuclear facility like Grand Gulf in the EC southern fleet, is owned by Entergy Arkansas, Inc., also a subsidiary of Entergy Corporation, and is operated by EOI.

all of these costs because the need for additional storage was caused by the Government's failure to begin accepting SNF from commercial nuclear reactors on January 31, 1998, pursuant to the "Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste" ("Standard Contract") between the Department of Energy ("DOE") and SFI.

SFI essentially premises its entire case upon two arguments: 1) the burden to establish the "but-for" world rests upon the Government; and 2) the Government was contractually obligated to accept SNF from the nuclear industry at a rate of 3,000 MTUs per year, even though no such term is contained in the express language of the Standard Contract. SFI has argued that it is simply too speculative to create a "but for" world (that is, a world in which DOE timely began SNF acceptance in 1998). To the extent that, as SFI argues, it is too speculative to create a "but for" world, SFI cannot meet its burden of proving causation for any claimed damages, as it would be unable to identify which of its claimed costs were "caused" by DOE's delay, as opposed to those costs that it would have incurred regardless of any delay. In any event, the evidence at trial will establish that the process, identified in the Standard Contract, to define the DOE's obligations with respect to particular utilities started in 1991 with the issuance of the 1991 Annual Capacity Report ("ACR"). Those utilities that had allocation rights in the first ten years, identified in the 1991 ACR, then submitted delivery commitment schedules ("DCSs") to the DOE to identify that spent nuclear fuel that they wished to have picked up. While Arkansas Nuclear One had an allocation within the first ten years and, following the established process, submitted a DCS in 1995, Grand Gulf did not have an allocation and did not submit a DCS. The 1991 ACR and subsequent approved DCSs of those utilities with an allocation in the first ten years of the repository or interim storage facility ("MRS") form the baseline for any damages

analysis. If the Court rejects that argument, a serious question would arise regarding the enforceability of the Standard Contract, given that the rate term, one of the most essential parts of the Standard Contract, would be rendered wholly indefinite.

If this Court disagrees with this position, the result will be the creation of a contract to which the parties did not mutually agree at the time of contract formation or through a contract amendment. To the extent that the Court finds the schedule terms of the Standard Contract undefined and indefinite, it cannot impose liability based upon obligations that are not contained in the contract itself.[2]

---

[2] As the Court is aware, the DOE contracting officer, in 1997, made a preliminary determination that DOE's delay was unavoidable under the "Unavoidable Delays" clause of the Standard Contract. That provision states that "[n]either the Government nor Purchaser shall be liable under this contract for damages caused by failure to perform its obligations hereunder, if such failure arises out of causes beyond the control and without the fault or negligence of the party failing to perform." 10 C.F.R. § 961.11, Art. IX.A (emphasis added). Included in the excusable bases for a failure to perform are delays in the scheduled delivery, acceptance, or transport of SNF arising out of causes beyond the "reasonable control of . . . [the Department of Energy ('DOE')]," including "acts of Government in either its sovereign or contractual capacity:" Id. The United States Court of Appeals for the Federal Circuit has held that DOE's delay in accepting spent nuclear fuel constitutes a "[f]ailure to perform." Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1336, 1343 (Fed. Cir. 2000). Nevertheless, following the contracting officer's issuance of her preliminary determination, the United States Court of Appeals for the District of Columbia Circuit issued a writ of mandamus, ordering DOE "to proceed with contractual remedies in a manner consistent with NWPA's command that it undertake an unconditional obligation to begin disposal of the SNF by January 31, 1998." Northern States Power Co. v. United States, 128 F.3d 754, 760 (D.C. Cir. 1997). The D.C. Circuit, after barring "DOE from concluding that its delay is unavoidable on the ground that it has not yet prepared a permanent repository or that it has no authority to provide storage in the interim," held that the "Unavoidable Delays" clause, "insofar as it is applied to DOE's failure to perform by 1998, is inconsistent with DOE's statutory obligation to assume an unconditional duty" and issued its writ to preclude DOE from relying upon that provision. Id. at 760-61.

We have consistently argued, most recently in briefing before the Federal Circuit in PSEG Nuclear, LLC v. United States, No. 05-5162 (Fed. Cir.), that the D.C. Circuit overstepped its jurisdiction and authority in issuing this writ of mandamus (given that the judicial review provision of the NWPA, 42 U.S.C. § 10139, does not permit the D.C. Circuit to review contract

Nevertheless, assuming that the parties sufficiently definitized the schedule for SNF acceptance through the DCS process, we expect to show at trial that the proper rate of acceptance for the Court to apply in evaluating damages claims is that which was developed pursuant to the terms of the Standard Contract and in accordance with the constraints upon DOE's acceptance of SNF imposed by Congress. As required by the Standard Contract, this rate was first set forth in the 1991 ACR. Based upon SFI's allocations pursuant to this rate, and the oldest-fuel-first acceptance queue established by the Standard Contract, SFI would have required additional on-site storage at Grand Gulf in 2006, prior to DOE's first acceptance of Grand Gulf SNF no earlier than 2012. Under that rate of acceptance, SFI would have been obligated to pay the costs to design and implement its dry fuel storage project. Therefore, there is no damage to SFI because it would have needed dry fuel storage even if DOE had begun acceptance of SNF from the industry in January 1998.

In its brief, SFI asserts that DOE would have accepted the first SNF from Grand Gulf beginning in 2005, thus obviating any need for it to build dry storage. However, this fuel acceptance date is premised upon the incorrect contention that the Standard Contract obligated

---

administration matters) and, further, that the "Unavoidable Delays" clause in the Standard Contract was wholly appropriate and legal. The D.C. Circuit has eliminated one of the central provisions of the Standard Contract that governs the parties' liability in the event of delays in SNF acceptance. With this clause, DOE would have had the ability to present an absolute defense to liability in this case. The effect of the D.C. Circuit's elimination of at least a portion of this contract clause from the Standard Contract, 14 years after the contract was entered, has a staggering effect upon the United States: rather than excusing DOE's liability for the course of the unavoidable delay, DOE now faces billions of dollars in damages claims. The writ of mandamus wholly changes the nature of the Standard Contract, essentially and inappropriately creating a contract (one without an "Unavoidable Delays" clause) between the parties to which DOE never agreed, further bringing into question the appropriateness of a liability finding here. Nevertheless, because the D.C. Circuit's writ of mandamus is continuing, we are barred from attempting to invoke the "Unavoidable Delays" clause.

DOE to accept SNF at a rate that 1) would ensure that utilities would not need to build at-reactor storage after January 1998, and 2) would work off the backlog of SNF stored at commercial nuclear reactors. Indeed, during contract formation, DOE expressly rejected language requested by utilities and industry advocates that would have tied the acceptance rate to a reduction of the backlog and avoidance of at-reactor storage. Based upon the myriad uncertainties associated with the development of a first-of-a-kind program and performance under a contract 15 years removed from its execution, the Standard Contract contains neither a defined acceptance rate nor an objective measurement for performance. In fact, the Standard Contract expressly recognizes this uncertainty and states that "[t]he provisions of this contract have been developed in light of uncertainties necessarily attendant upon long-term contracts." 10 C.F.R. § 961.11, Art. XV. Instead, the Standard Contract contains a mechanism for the development of an acceptance rate in the early 1990s – a point in time when DOE would have a clearer picture both as to its expected available facility and the capacity of the system in 1998.

At trial, SFI must establish that it has properly accounted for costs that would have been incurred had DOE performed beginning in 1998. Sacramento Mun. Util. Dist. v. United States ("SMUD"), 70 Fed. Cl. 332, 360-61 (2006). As part of that legal obligation, SFI bears the burden of proving that its damages were foreseeable, were caused by DOE's partial breach, and are reasonably certain. SFI also must show that its actions were actually intended to mitigate its damages. This legal burden is real, and SFI must do more at trial than simply identify costs that it has incurred in connection with the storage of SNF and shift to the Government the burden of disproving foreseeability, causation, and reasonable certainty. SMUD, 70 Fed. Cl. at 360 ("there must be a direct causal relationship between the breach and any claimed losses"). SFI apparently

intends to characterize all of its claimed costs as "mitigation efforts" in an attempt to place the burden upon the Government to disprove their reasonableness, without ever establishing as an initial matter that the need for these efforts was actually caused by DOE's delay and would not have been necessary in the "but for" world. It has no basis for avoiding its own need to meet its own burden of proof. In fact, SFI's damages claim is characterized by its total failure to define a "but for" world. Indeed, SFI abdicates any responsibility for establishing that its damages accurately reflect the difference between the costs that SFI actually incurred and the costs that SFI would have incurred had DOE begun performance upon an industry-wide basis in 1998.

If the Court were to agree with SFI's contention that the rate of acceptance in the "but for" world would have been 3,000 MTUs per year, after a short ramp-up, SFI would have had its first acceptance right in 2005 and would not have needed dry fuel storage at Grand Gulf. However, even under that scenario, SFI's claim requires adjustment for certain activities that were not caused by DOE's partial breach and for costs avoided as a result of the partial breach. These adjustments include costs associated with activities that would have been performed by SFI in the "but for" world (i.e., certain facility modifications and loading SNF to DOE) and costs that are not supported by admissible evidence (i.e., certain internal labor and overhead costs).

## DISCUSSION

### I. SFI BEARS THE BURDEN OF ESTABLISHING ALL ELEMENTS OF ITS CLAIM, INCLUDING LIABILITY, CAUSATION, FORESEEABILITY, AND REASONABLE CERTAINTY

#### A. SFI Has The Burden Of Proving All Elements Of Its Case

"To recover for breach of contract, a party must allege and establish: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty,

and (4) damages caused by the breach." San Carlos Irrig. & Drainage Dist. v. United States, 877 F.2d 957, 959 (Fed. Cir. 1989). We acknowledge that, in Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1336 (Fed. Cir. 2000), the United States Court of Appeals for the Federal Circuit held that, at least in the SNF cases at issue there and where the plaintiffs had paid all of their fees, DOE's failure to begin accepting SNF from the nuclear utility contract holders by January 31, 1998, constituted a breach of contract. However, as the Federal Circuit recently recognized, the mere fact of DOE's breach of the Standard Contract does not "perforce" make all of a utility's costs "to store its SNF recompensable: [a plaintiff] must prove foreseeability, causation, and reasonableness," Indiana Michigan Power Co. v. United States, 422 F.3d 1369, 1376 (Fed. Cir. 2005), and it must prove these three elements "by a preponderance of the evidence." Alaska Pulp Corp. v. United States, 59 Fed. Cl. 400, 413-14 (2004). According to the precedent of this circuit, SFI bears the burden of introducing clear proof that it was injured as a direct result of DOE's delay in accepting its SNF. Myerle v. United States, 33 Ct. Cl. 1, 27 (1897). Further, the "measure of damages to be applied in the particular case is irrelevant until the claimant has established the fact of losses that were the natural and proximate result of the breach of contract." Willems Indus., Inc. v. United States, 155 Ct. Cl. 360, 376, 295 F.2d 822, 831 (1961). "Absent tangible proof of damages, [a party] may not recover for an alleged injury." Roseburg Lumber Co. v. Madigan, 978 F.2d 660, 667 (Fed. Cir. 1992).

The parties agree that "[t]he remedy for breach of contract is damages sufficient to place the injured party in as a good a position as it would have been had the breaching party fully performed." Pl. Br. 1-2 (citing Indiana Michigan, 422 F.3d at 1373). Conversely, "the non-breaching party should not be placed in a better position through the award of damages than

if there had been no breach."[3] Bluebonnet Sav. Bank, F.S.B. v. United States, 339 F.3d 1341, 1344-45 (Fed. Cir. 2003) (citing White v. Delta Constr. Int'l, Inc., 285 F.3d 1040, 1043 (Fed. Cir. 2002) ("the non-breaching party 'should on no account get more than would have accrued if the contract had been performed.'" ). Although "the effort is made to put the injured party in as good a position as that in which he would have been put by full performance of the contract," that effort must be "at the least cost to the defendant and without charging him with harms that he had no sufficient reason to foresee when he made the contract." Northern Helex Co. v. United States, 207 Ct. Cl. 862, 875, 524 F.2d 707, 713 (1975) (quoting Restatement of Contracts § 329 cmt. e), cert. denied, 429 U.S. 866 (1976).

### B. SFI's Burden Includes The Obligation To Establish A Reasonable "But For" World Against Which To Measure Whether DOE's Delay "Caused" It To Incur Incremental Costs

SFI must establish that, "but for" the breach of contract, the asserted harm would not have been suffered. San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1997). SFI also must introduce clear proof that it was injured as a direct result of the defendant's breach. Myerle, 33 Ct. Cl. at 27 (1897); Quiman, S.A. de C.V. v. United States, 39 Fed. Cl. 171, 183 (1997), aff'd, 178 F.3d 1313 (Fed. Cir. 1999). "For a damage to be direct there must appear no intervening incident . . . ; the cause must produce the effect inevitably and naturally, not possibly nor even probably." Ramsey v. United States, 121 Ct. Cl. 426, 434, 101 F. Supp. 353, 357 (1951). "There must not be two steps between cause and damage." Myerle, 33 Ct. Cl. at 27.

[3] To the extent that SFI asserts that the "but for" world is speculative and, therefore, not susceptible of proof, and given SFI's burden of proof, it is unclear how SFI will meet that burden.

In its pre-trial brief, SFI asserts first that it had no other reason than the Government's breach to build dry storage at Grand Gulf. Pl. Br. 4. Plaintiff asserts that the Government's breach was not just a "substantial factor" in its increased costs, but the "central and driving factor." Pl. Br. 4. However, in a recent decision, the Federal Circuit reaffirmed that the "but for" test is still the required burden for a plaintiff to prove causation. California Federal Bank v. United States, 395 F.3d 1363, 1367-68 (Fed. Cir. 2005). The well-established contract law test for causation in contract cases before this Court is whether the claimed damages were "attributable solely to," J.D. Hedin Constr. Co. v. United States, 197 Ct. Cl. 782, 808, 456 F.2d 1315, 1330 (1972), and, thus, "directly related" to, the breach. Wells Fargo Bank v. United States, 88 F.3d 1012, 1022 (Fed. Cir. 1996); SMUD, 70 Fed. Cl. at 360.

Further, to prove causation, SFI must establish the "but for" world so that the Court can identify whether SFI's claimed damages are, in fact, incremental to DOE's partial breach. Bluebonnet Sav. Bank, FSB v. United States, 67 Fed. Cl. 231, 238-39 (2005); see Coast Fed. Bank, FSB v. United States, 48 Fed. Cl. 402, 403 n.25 (2000) (plaintiffs bear burden of propounding realistic "but for" scenario); Glendale Fed. Bank, FSB v. United States, 239 F.3d 1374, 1380 (Fed. Cir. 2001) (plaintiffs bear burden of demonstrating "what might have been . . . ."). A plaintiff cannot recover as damages from the Government any costs that it would have incurred regardless of DOE's breach of contract. See Bluebonnet Sav. Bank, 339 F.3d at 1345. Without establishing that "but for" world, SFI leaves the Court with no mechanism by which to determine whether SFI's claimed costs were incremental to the Government's partial breach.

In its pre-trial brief, SFI attempts to shift the burden of proof concerning causation to the Government. SFI asserts that the rate of acceptance goes to mitigation and not causation and,

and further argues that the Government bears the burden of establishing the rate. Pl. Br. 17-18. However, the rate of acceptance, which defines when responsibility for particular SNF assemblies transfers from SFI to DOE in the "but for" world, is at the heart of causation. Indeed, the rate of acceptance is the baseline upon which damages in this case are measured, as it represents how DOE would have been contractually obligated to perform in the "but for" world. It is only by determining DOE's minimum performance required by the Standard Contract, and the costs that SFI would have incurred in that "but for" world, that the Court may determine what damages, if any, SFI suffered as a result of DOE's delay in accepting SNF. Consequently, the burden to prove the rate in the "but for" world, as part of proving causation, squarely falls upon SFI.[4] Pl. Br. 5.

SFI's view of the speculativeness of the "but for" world is situational, depending solely upon whether it is seeking to increase its damages or to avoid decreases in its damages based upon the "but for" world. In fact, when SFI seeks to increase its damages, the "but for" world appears to be anything but speculative. It is only when the Government challenges the inclusion

---

[4] SFI's conclusion that the Government bears the burden of demonstrating the "but for" world relies primarily on the recent Court of Federal Claims decision, Tennessee Valley Authority v. United States, 69 Fed. Cl. 515 (2006). In TVA, the Court held that the Government had the burden of proving that TVA's actions to mitigate DOE's partial breach were unreasonable. Id. at 528. However, the Court applied this principle to the demonstration of the "but for" world, stating that, "[b]ecause the government seeks to limit the non-breaching party's recovery for mitigation, the government bears the burden of proof." Id. at 530. The Court in TVA appears to conflate the Government's burden of disproving the reasonableness of the plaintiff's mitigation with the plaintiff's burden to demonstrate the incrementality of its claimed damages – a demonstration that only can be done by establishing the difference in costs between the "but for" and the actual worlds. In fact, the determination of the "but for" world has little relationship to the reasonableness of particular mitigation, but, rather, relates to the determination of whether an activity is a "damage" in the first instance. The decision in TVA plainly conflicts with established Federal Circuit precedent.

of non-incremental costs in SFI's damages claim – and seeks to eliminate those costs from damages – that SFI asserts that the Government has the burden of proving the "but for" world and that such a world is overly speculative. For example, the Government will offer at trial the testimony of Warren Brewer, a nuclear engineer with almost 30 years experience, concerning activities undertaken by Grand Gulf that are non-incremental to the breach. Specifically, Mr. Brewer has identified certain modifications to the Grand Gulf facility that SFI would have needed to make had DOE begun SNF acceptance upon an industry-wide basis. To the extent SFI claims that such an analysis is "overly speculative," SFI simply wants to have it both ways. Indeed, if the "but for" world truly is "overly speculative," as SFI appears to contend, this Court has no basis upon which to award SFI damages, as it will have no baseline for determining which of SFI's claimed damages were "caused" by DOE's partial breach.

C. SFI Has The Burden Of Demonstrating That Its Claimed Damages Were Foreseeable

SFI also must establish that its damages were foreseeable. Indiana Michigan, 422 F.3d at 1376. Foreseeability is measured based upon what the parties contemplated at the time of contract formation, rather than from the date of breach. See Northern Helex, 207 Ct. Cl. 682, 524 F.2d at 714; Bohac v. Department of Agric., 239 F.3d 1334, 1340 (Fed. Cir. 2001). As part of the foreseeability determination, SFI must demonstrate that both the magnitude and type of damages were foreseeable at the time of contract formation. See Landmark Land Co. v. Federal Deposit Insur. Corp., 256 F.3d 1365, 1378 (Fed. Cir. 2001) (affirming trial court's denial of damages because the magnitude of damages was not foreseeable). "The mere circumstance that some loss was foreseeable, or even that some loss of the same general kind was foreseeable, will

not suffice if the loss that actually occurred was not foreseeable." Restatement (Second) of Contracts, § 351, cmt. a (cited in Landmark Land, 256 F.3d at 1378).[5]

D. SFI Must Prove Its Damages With Reasonable Certainty

SFI also has the burden to establish "reasonable certainty" as to each item within its damages claims. Wells Fargo, 88 F.3d at 1023; see Restatement (Second) of Contracts § 352 cmt. a ("[a] party cannot recover damages for breach of a contract for loss beyond the amount that the evidence permits to be established with reasonable certainty"). To support its claim, SFI must provide appropriate documentary or other support from its records to establish its damages claims. See Roseburg Lumber, 978 F.2d at 667 (plaintiff must provide adequate support for claimed costs). A contractor's failure to present any documentary support for its assertions that it incurred costs, precluding the Government from verifying that the costs were incurred and the reasons for their incurrence, precludes any recovery of those costs. Barrow Utils. & Elec. Co. v. United States, 20 Cl. Ct. 113, 121 (1990). Without proper records, SFI's cannot meet its burden of establishing reasonable certainty.

[5] The cost of the cask and dual-purpose cannister system provided by Holtec International for the Grand Gulf dry fuel storage project is not included in plaintiff's costs through August 31, 2005, but will be sought in a subsequent case. As this Court has previously recognized, the cost of dual-purpose dry storage was not foreseeable to the Government and, therefore, should not be recoverable by plaintiff. SMUD, 70 Fed. Cl. 332, 373-74 (2006).

## II. SFI'S CAUSATION THEORY FAILS BECAUSE IT CANNOT MEET ITS BURDEN OF PROVING THAT DOE WAS OBLIGATED TO ACCEPT SNF PURSUANT TO A TWO-PART TEST OR AT AN ANNUAL RATE OF 3,000 MTU

### A. The NWPA Did Not Require Acceptance Of SNF At Any Particular Rate Or Under Any Particular Qualitative Standard

"Because the purpose of a damages award is to put the non-breaching party 'in as good a position as [it] would have been in had the breaching party fully performed,' the logical starting point for a damages analysis is an understanding of the breaching party's obligations under the contract." Rumsfeld v. Applied Cos., 325 F.3d 1328, 1336 (Fed. Cir. 2003) (brackets in original) (quoting Wells Fargo Bank, N.A. v. United States, 88 F.3d 1012, 1021 (Fed. Cir. 1996)). In this case, the rate of acceptance is the lynchpin to any causation analysis.

SFI has asserted in its pre-trial brief at least two distinct contract obligations that the NWPA allegedly imposes upon DOE. 42 U.S.C. §§ 10101-10270. First, SFI alleged that the NWPA obligated DOE to begin accepting SNF in a manner that would obviate the need for any Standard Contract holder to incur additional costs related to on-site storage of SNF after January 31, 1998. Pl. Br. 3, 19. Second, SFI asserted that DOE was obligated to accept SNF at a rate that reduced the backlog of SNF at reactor sites prior to January 31, 1998. Pl. Br. 3, 19. Simply stated, the NWPA is devoid of any requirement that DOE begin acceptance at any particular level, let alone a level that would obligate DOE to meet any two-part obligation set forth by SFI in its pre-trial brief.

B. The Standard Contract Did Not Require Acceptance of SNF At Any Particular Rate Or Pursuant To Any Particular Test

Moreover, contrary to SFI's assertions, the Standard Contract does not require such a dual obligation. The parties' understanding that DOE was not obligated to accept SNF at any particular rate continued through the development of the Standard Contract. On February 4, 1983, DOE published a notice of proposed rulemaking in the Federal Register, proposing terms for the Standard Contract (48 Fed. Reg. 5458 (Feb. 4, 1983)), which identified a mechanism for determining the order and rate at which SNF would be accepted. The Government will show at trial that, in January 1983, Edison Electric Institute ("EEI"), an association of the nuclear power industry that submitted comments regarding the Standard Contract, received an advance draft contract and submitted to DOE its own draft contract for DOE to use in its Federal Register notice. EEI's draft contract included language obligating DOE to begin accepting SNF at a rate tied to the amount of SNF that was being generated plus work off the backlog, and there was no mention in this submission of avoiding on-site storage.

Despite the requests of EEI – and others – to include specific obligations in the Standard Contract, DOE elected not to obligate itself to satisfy any particular rate of acceptance or qualitative test in the contract. Uncertainties surrounding the waste acceptance program that was to commence 15 years in the future prevented DOE from committing to any particular rate of acceptance.[6] Instead of including a rate of acceptance or qualitative test in the contract, DOE

---

[6] After DOE issued the draft contract, EEI provided member utilities with comments upon the draft. A February 18, 1983 letter reflected EEI/UNWMG's consideration that the inclusion of a "repository receiving rate adequate to cover current generation plus working of the backlog on a reasonable schedule" was among the "significant issues" to be addressed in their comments to the draft contract. However, in a March 7, 1983 letter from Mr. Loring Mills of EEI transmitting the formal EEI/UNWMG comments to the draft Standard Contract, EEI

included a provision that obligated DOE to begin issuing an Annual Priority Ranking ("APR") and Annual Capacity Report ("ACR") as the date for commencement drew closer. The Standard Contract obligated DOE to begin publishing ACRs in 1987. The clauses tied to the issuance of the APRs and ACRs defined for contract holders the manner by which DOE would commit to acceptance.

Even after the promulgation and execution of the Standard Contract, representatives of EEI and UNWMG continued to request that DOE add to the Standard Contract an obligation concerning the rate of acceptance. However, DOE did not accept any industry request for a minimum receiving rate for SNF. Despite the repeated rejection of its request for inclusion of a rate into the Standard Contract, EEI continued to press the matter. As late as December 1992, EEI continued to advocate that contract holders request the inclusion of a rate of acceptance in the Standard Contract.

The evidence will demonstrate that, not only did the Standard Contract not obligate DOE to accept SNF at any particular rate or consistent with any particular test, DOE rejected, both before and after contracting, repeated attempts by the industry to include such terms. These repeated requests, and DOE's rejection of the requests, is unequivocal evidence that the terms were not included in the contract. Consolidated Gas Supply Co. v. Federal Energy Regulatory Comm'n, 745 F.2d 281, 289 (4th Cir. 1984) (unilateral statements of position before an integrated contract is entered do not become part of contract when party arguing for their

---

requested that DOE permit Standard Contract holders to negotiate with DOE regarding the rate of acceptance after the promulgation of the Standard Contract.

inclusion was unable to secure adoption of statements in contract). SFI should not be allowed to obtain through litigation what it failed to obtain through the contract formation process.

C. Causation And Resultant Damages Should Be Determined Against The Acceptance Obligations Developed Pursuant To The Schedule Mechanism In The Contract

1. The Acceptance Schedule Was Established In The Dealings Between The Parties

Although SFI asks the Court to impose into the Standard Contract an obligation for DOE to accept 3,000 MTUs of SNF every year soon after 1998, to do so, the Court would have to ignore the actual language of the Standard Contract. That language, instead of creating an obligation to accept 3,000 MTU per year, contains a scheduling provision that ultimately allows DOE to select the appropriate SNF acceptance rate, subject only to a review for abuse of discretion by the Energy Board of Contract Appeals ("EBCA"). Pursuant to this scheduling mechanism, DOE issued the 1991 ACR and requested DCSs from utilities, many of which it then approved, thereby defining the schedule of performance beginning in 1998. If the Court disregards these provisions and the actions of the parties in accordance with these provisions, the Court is left with no method by which to assess damages arising from DOE's delay.

Instead of agreeing to a specific minimum acceptance rate or creating standards that would obligate DOE to satisfy a minimum rate, the Standard Contract recognizes the uncertainties inherent in the development of the waste management program and, accordingly, creates a contractual mechanism for the development of a specific acceptance schedule that establishes, in essence, a two-phase process. First, the Standard Contract's schedule terms seek to obtain the agreement of the parties to a specific schedule for the acceptance of an individual contract holder's SNF and HLW. Pursuant to the terms of the Standard Contract, DOE was to

issue, beginning not later than July 1, 1987, "an annual capacity report [("ACR")] for planning purposes," identifying "projected annual receiving capacity" at any DOE facilities and annual acceptance ranking for acceptance of contract holders' SNF and/or HLW for the first 10 years "following the projected commencement of operation of the initial DOE facility." 10 C.F.R. § 961.11, Art. IV.B.5(b). Subsequently, beginning on April 1, 1991, DOE was to issue "an annual acceptance priority ranking" ("APR") for receipt of the contract holders' SNF, "based on the age of SNF and/or HLW as calculated from [its] date of discharge." Id., Art. IV.B.5(a).

Second, the contract holder, "[a]fter DOE has issued its proposed acceptance priority ranking" on April 1, 1991, and no earlier than January 1, 1992, would submit a delivery commitment schedule ("DCS") identifying "all SNF and/or HLW the [contract holder] wishes to deliver to DOE beginning sixty-three (63) months thereafter," for DOE's approval or disapproval. 10 C.F.R. § 961.11, Art. V.B.1 (emphasis added). If DOE approves the DCS, the parties have effectively agreed and defined the amount of SNF that DOE will accept from that contract holder 63 months later. Id. If DOE disapproves the first DCS submission, the contract holder is entitled to make a second DCS submission, again for DOE's approval or disapproval. Id. If DOE approves the second DCS submission, the parties have, as stated above, effectively defined the amount of SNF that DOE will accept from that contract holder 63 months later.[7] Id.

[7] If DOE disapproves the second submission, DOE responds with its own proposed schedule, which the contract holder may accept or, alternatively, may attempt to negotiate with DOE. 10 C.F.R. § 961.11, Art. V.B.2. The contract holder may then submit its dispute to the contracting officer for a decision, the contracting officer issues a decision on the schedule, and the contracting officer's final decision upon the DCS "shall be final and conclusive" until, within 90 days, the contract holder appeals to the Energy Board of Contract Appeals. Id., Art. XVI.A.

DOE and the utilities acted in accordance with these provisions to develop the schedule for waste acceptance beginning in 1998. As we anticipate establishing at trial, the rates of SNF acceptance identified in the 1991 ACR were predicated upon the requirements of the 1987 NWPA amendments, which precluded DOE from accepting more than 10,000 MTUs of SNF for storage at an MRS prior to the operation of a Federal repository. 42 U.S.C. § 10168(d)(1). When developing the 1991 ACR, and anticipating operation of a repository in 2010, DOE divided the 10,000 MTU acceptance limitation across the 12-year period from 1998 (when it anticipated that MRS operations would begin) to 2010.[8]

DOE then drafted, with the assistance of the utilities, the instructions for the submission of DCSs. After the instructions were issued, numerous utilities submitted DCSs that were then approved by DOE. In fact, in compliance with this procedure, EOI submitted a DCS for the Arkansas Nuclear One facility in 1992, for delivery of 23.3 MTUs to DOE in 2001, consistent with the 1991 ACR, and without objection or complaint about its submission or the fact that Grand Gulf did not have a submission.

[8] SFI's proposal to obligate DOE to accept 3,000 MTUs of SNF annually after a five-year ramp-up period would have placed DOE in direct conflict with the statutory limitations imposed by the 1987 amendments to the NWPA, which precluded DOE from accepting more than 10,000 MTUs of SNF prior to the operation of a repository. In 1989, DOE informed nuclear utility contract holders that it did not anticipate that a Federal repository would be available until 2010, but that it anticipated being able to begin SNF acceptance at an MRS in 1998.

2. Some Of The Decisions Issued Concerning The Rate Of Acceptance Incorrectly Analyze The Standard Contract Schedule Provisions

SFI relies upon the Court's decisions in Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652 (2003), and Indiana Michigan Power Co. v. United States, 57 Fed. Cl. 88 (2003), in support of its rate argument.[9] However, plaintiff reads Commonwealth Edison too broadly. The Commonwealth Edison court merely rejected the Government's arguments, upon a motion for partial summary judgment, that the schedule provisions contained in the Standard Contract provide the mechanism for determining the SNF acceptance schedule. The Court ruled that it could not determine the rate of acceptance as a matter of law. The Court did not reach a conclusion about the possible applicability of either the 900 MTU rate or 3,00 MTU rate, finding that there was a "fact-specific inquiry" necessary to such a determination. Id. at 667; see also Power Authority of New York v. United States, No. 00-703C, 2004 WL 3461071, at *1 (Fed. Cl. Sept. 30, 2004) (unpublished) (denying plaintiff's motion for summary judgment on rate because "fact-laden inquiry" could not be decided on summary judgment).

In Indiana Michigan, the Court of Federal Claims stated that its "obligation is to provide a rate of [SNF] acceptance that the Department of Energy would have employed in absence of the breach." 57 Fed. Cl. at 100 (emphasis added). With all due respect, that focuses upon the wrong question. The issue presented requires a determination of the rate of SNF acceptance that

[9] The Court's decision in Indiana Michigan upon the Government's motion for summary judgment regarding the rate of acceptance was not necessary to the appeal to the Federal Circuit. The Federal Circuit dismissed the Government's cross-appeal of the decision, stating that the "trial court's rate calculation determination was not necessary to the judgment." Indiana Michigan Power Co. v. United States, No. 04-5139, 2004 WL 2429837, at *1 (Fed. Cir. Oct. 13, 2004) (unpublished opinion).

DOE was contractually obligated to satisfy in the "but for" world. DOE cannot be held financially responsible in damages for a failure to take actions that it might have elected voluntarily to perform, even though it was not required to do so. The only damages that the Court can properly award are those based upon DOE's breach of its obligation to perform actions that it was contractually obligated to perform. Accordingly, the Court's finding in Indiana Michigan that "[n]othing in the record supports the collection rate that defendant would use – 900 metric tons per year," id. at 98, is not only factually incorrect, but also irrelevant to the identification of the rate at which DOE was contractually obligated to accept SNF.

If the trial court's decisions in Commonwealth Edison and Indiana Michigan eliminate the existing schedule terms from the Standard Contract, the Court is left with no mechanism in the Standard Contract for determining the quantity of SNF that DOE would have accepted, when DOE would have accepted that SNF, and from which utility the SNF would have been accepted had DOE begun timely performance.[10] Further, given that SFI and the other utilities still expect performance upon the Standard Contract, DOE also is left with no mechanism for determining when, how, or where DOE will accept SNF and/or HLW in the future. The contract, however, contains a mechanism that was implemented in 1991 and worked until 1995, when DOE finally

---

[10] A court cannot make contracts for the parties. To be valid and enforceable, "a contract must have both consideration to ensure mutuality of obligation . . . and sufficient definiteness so as to 'provide a basis for determining the existence of a breach and for giving an appropriate remedy.'" Ridge Runner Forestry v. Veneman, 28 F.3d 1058, 1061 (Fed. Cir. 2002) (citations omitted). If an agreement is missing one or more essential terms, an agreement to agree upon those terms is unenforceable because it lacks mutuality of intent and sufficient definiteness to determine the rights and liabilities of the parties. See Modern Sys. Tech. Corp. v. United States, 979 F.2d 200, 204 (Fed. Cir. 1992). "Courts refuse to enforce agreements that contain indefinite promises or terms they deem essential because judicial clarification of the uncertainty entails great danger of creating intentions and expectations that the parties themselves never entertained." Neeley v. Bankers Trust Co. of Tex., 757 F.2d 621, 628-29 (5th Cir. 1985).

announced that it could not meet the 1998 acceptance date at the MRS. Going forward, DOE will use the mechanism that generated the 1991 ACR and subsequent DCS submission and approval process to define the rate of acceptance in the future.[11]

As we will establish at trial, the parties followed that mechanism for a significant period of time. As a result, a schedule exists that the Court should view as the contractual "schedule" for purposes of assessing damages. Absent the Court's reliance upon that prior schedule, we cannot identify any basis upon which the Court could justify its imposition of its own schedule into this contract.

## III. SFI CANNOT ESTABLISH THE NECESSARY CAUSAL LINK BETWEEN CERTAIN OF ITS CLAIMED STORAGE COSTS AND DOE'S DELAY

### A. SFI's Claim Should Be Reduced To Account For Costs That It Would Have Incurred In The "But For" World

As discussed above, SFI should not be placed in a better position than it would have been had DOE performed under the Standard Contract and SFI cannot recover any of its alleged damages unless it establishes that it would not have incurred those costs had DOE timely begun SNF acceptance. See Bluebonnet, 339 F.3d at 1344-45. Even if the Court applies the 3,000 MTU rate, "the non-breaching party 'should on no account get more than would have accrued if the contract had been performed.'" White, 285 F.3d at 1043 (quoting DPJ Co. v. FDIC, 30 F.3d 247, 250 (1st Cir. 1994)). There are costs SFI claims that it would have incurred even if DOE had begun accepting SNF from Grand Gulf in 2005.

---

[11] DOE clearly plans to use ACRs and DCSs to define DOE's acceptance obligations in the future. By letter dated July 28, 2004, DOE's contracting officer, David Zabransky, issued a new ACR and DCS instructions and requested that SFI and other utilities submit DCSs in anticipation of performance in 2010. This process was later suspended when DOE concluded it would not begin accepting SNF in 2010.

Adjustments for costs that SFI would have expended will be presented at trial by Robert Peterson, the Government's accounting expert, Warren Brewer, the Government's technical expert, and Raymond Hartman, the Government's economic and damages expert. Mr. Brewer will identify activities that would have been required of SFI had DOE commenced acceptance of SNF from Grand Gulf in 2005, including: (1) modifications to the Auxiliary Building; (2) preparation of a portion of the Haul Path; (3) dose assessment; and (4) operational sequence assessment. Mr. Peterson will testify as to how the costs for these activities are quantified.

In addition, Mr. Peterson will testify as to fixed cost allocations, including payroll loader, materials loader and capital suspense loader allocations, that would have been incurred by SFI even if DOE had started accepting SNF from the nuclear industry in January 1998, which should be excluded from the damages. Mr. Peterson will also testify as to those costs that were not related to the dry cask storage project which should be excluded from the damages.

B. Costs of Loading SNF To DOE In The But-For World

Using Grand Gulf's own estimates, Mr. Brewer will offer expert testimony at trial that the cost of loading SNF to DOE in the "but for" world would be $300,000 per cask. Dr. Hartman will testify that a total of $2.81 million is associated with the value of loading nine casks to DOE in the but-for world – had DOE begun accepting SNF from SFI in 2005, as plaintiff argues it would have. As discussed above, SFI has the burden of demonstrating the scope of activities in the "but for" world and that the costs it incurred in the actual world are incremental to DOE's delay in acceptance. Bluebonnet, 67 Fed. Cl. at 238-39 (plaintiffs must establish plausible "but-for world" as part of causation analysis). However, SFI's damages expert, Mr. Metcalfe, has assumed for purposes of SFI's damages claim that there should be no

offsets for loading SNF to DOE had performance begun upon an industry-wide basis in 1998. We will demonstrate at trial that the correct damages methodology requires the offset of those loading costs. Contrary to SFI's argument, the methodology used by Dr. Hartman demonstrated that establishing offsets for the loading costs is not speculative at all. Moreover, SFI is reduced to inventing uncertainty in an attempt to cast doubt on Dr. Hartman's methodology by suggesting that SFI "will not claim DOE cask loading costs in future damages actions in this Court." Pl. Br. 15. However, the Government will demonstrate at trial that such a scenario is disingenuous at best when the same plaintiff is currently seeking the cost of loading fuel at the Arkansas Nuclear One facility in parallel litigation.

The $2.81 million for cask loading should be deducted from SFI's damages claim, as it is a cost that SFI would have incurred in the "but for" world that it avoided in the actual world. See California Fed., 395 F.3d at 1268 (holding that non-breaching party may not "be awarded more than it would have received if the contract had been performed").

IV. SFI'S CLAIM FOR THE COST OF CAPITAL SIMPLY IS A LEGALLY UNSUPPORTED ATTEMPT TO RECOVER PREJUDGMENT INTEREST

Plaintiff states in its pre-trial brief that it should be able to recover $1.578 million in what it has categorized as "cost of capital," basically alleging that the facts of this case are "indistinguishable" from Wickham Contracting Co., v. United States, 12 F.3d 1574 (1994), also citing to the TVA case. Pl. Br. 16-17. Plaintiff fails to identify in its pre-trial brief the similarities to which it refers. However, the law is clear on this point -- cost of capital, or pre-judgment interest, or AFUDC, is not recoverable against the Government, except in limited, well-defined instances not applicable here.

The Government will show at trial that SFI has improperly included $1.587 million in its

damages claim associated with its cost of capital to increase past costs so as to account for the time value of money. Because these alleged costs simply are a thinly-veiled attempt to recover prejudgment interest, SFI is precluded from recovering these costs as a matter of law. See 28 U.S.C. § 2516(a) (interest upon a claim against the United States is precluded unless permitted under a contract or Act of Congress.).

"[I]nterest on borrowed money is not recoverable in suits against the Government unless it is called for in the contract itself or in the governing statute." Marshall v. United States, 164 F. Supp. 221, 224 (Ct. Cl. 1958); see Library of Congress v. Shaw, 478 U.S. 310, 314 (1986); Dravo Corp. v. United States, 594 F.2d 842, 846 (Ct. Cl. 1979). Further, a provision requiring the Government to pay interest "must be affirmative, clear-cut, [and] unambiguous." United States v. Thayer-West Point Hotel Co., 329 U.S. 585, 590 (1947). "The no-interest rule is an aspect of the basic rule of sovereign immunity" and "has been construed to apply broadly to claims for interest." England v. Contel Advanced Sys., Inc., 384 F.3d 1372, 1379 (Fed. Cir. 2004). Accordingly, "[i]nterest paid on bank loans made because of financial stringency resulting from a breach by the Government of a contract between it and the borrower is not recoverable as an item of damage." J.D. Hedin Constr. Co. v. United States, 456 F.2d 1315, 1330 (1972); see Contel Advanced, 384 F.3d at 1379; Quiman, S.A. de C.V. v. United States, 39 Fed. Cl. 171, 187 (1997), aff'd, 178 F.3d 1313 (Fed. Cir. 1999) (table).

The TVA decision, upon which plaintiff relies, relied upon a line of cases involving a contract clause – the "Changes" clause contained in most Federal procurement contracts – authorizing recovery of incurred interest charges in extremely limited circumstances. However, the Federal Circuit and its predecessor, the Court of Claims, have held in the context of equitable

adjustments under the "Changes" clause that, "[a]lthough interest on equity capital is not recoverable, a contractor may recover interest actually paid on funds borrowed because of the government's delay in payments and used on the delayed contract," Wickham Contracting Co., 12 F.3d at 1582, reasoning that the "Changes" clause authorizes such a recovery. Bell v. United States, 404 F.2d 975, 984 (Ct. Cl. 1968). Nevertheless, without a "Changes" clause or similar contractual provision, the statutory provision barring recovery of interest from the Government, 28 U.S.C. § 2516(a), "and its policy" continue to "apply to demands for damages in 'breach' claims against the United States . . . ." Bell, 404 F.2d at 984. Here, SFI's contract contains no "Changes" or similar clause, and SFI is seeking breach damages, not an equitable adjustment. Accordingly, without any statutory or contractual waiver of sovereign immunity regarding the recovery of interest, SFI's claim for prejudgment interest should be denied as a matter of law. See J.D. Hedin, 456 F. 2d at 1330.

## CONCLUSION

For the reasons outlined above, the Government respectfully requests that the Court enter judgment in the Government's favor.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/Harold D. Lester Jr.
HAROLD D. LESTER, JR.

Assistant Director

s/Sharon A. Snyder
SHARON A. SNYDER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington D.C. 20530
Tele: (202) 616-0347
Fax: (202) 307-2503

Attorneys for Defendant

OF COUNSEL:

SCOTT R. DAMELIN
JOHN EKMAN
STEPHEN FINN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D.C. 20530

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

September 5, 2006

CERTIFICATE OF FILING

I hereby certify that on this 5th day of September, 2006, a copy of foregoing "DEFENDANT'S MEMORANDUM OF CONTENTIONS LAW" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Sharon A. Snyder