# APPENDIX

List of DOE Contractor Documents From Plaintiff's Trial Exhibit List Dated August 18, 2006

| Plaintiff's Exhibit No. | Description | Begin Bates | End Bates |
|---|---|---|---|
| 260 | Draft 1994 Acceptance Priority Ranking and Annual Capacity Report | EDB-001-0136 | EDB-001-0150 |
| 261 | Final Draft – "Preliminary Analysis of the Total System Life Cycle Cost of the Commercial High-Level Radioactive Waste Disposal Program" by Roy F. Weston, Inc. | PNL-020-1491 | PNL-020-1657 |
| 266 | Total System Life Cycle Cost for Site Recommendation Letter Report | CTR-158-2614 | CTR-158-2628 |
| 269 | Nuclear Waste Fund Fee Adequacy: An Assessment. Second Annual Report (Second Report of Series) | PNL-021-1190 | PNL-021-1198 |
| 272 | 1986 Annual Review of the Adequacy of the 1.0 mill per kWh Waste Disposal Fee | PNL-107-2117 | PNL-107-2223 |
| 295 | Spent Fuel Storage Requirements - An Update of DOE/NE-0002 (DOE/SR-0007) | PNL-168-4293 | PNL-168-4348 |
| 300 | January 24, 1984 Memo from J.F. Fletcher to R. J. Hall, Memo, Revised Waste Acceptance Schedule from Draft Mission Plan, Battelle Pacific Northwest Laboratories | N/A | |
| 305 | Pacific Northwest Laboratory, R. L. Engel, 1987 Annual Review of the Adequacy of the 1.0 mill per kWh Waste Disposal Fee, Prepared for the U.S. Department of Energy under Contract DE-AC06-76RLO 1830, PNL-6288, July 1987 | N/A | |
| 313 | Civilian Radioactive Waste Management System Throughput Rate Analysis, August 17, 1993, prepared by Systems Analysis for DOE, HQO.19961022.0005 | N/A | |

List of DOE Contractor Documents From Plaintiff's Trial Exhibit List Dated August 18, 2006

| | | | |
|---|---|---|---|
| 317 | 1999 Design Basis Waste Input Report for Commercial Spent Nuclear Fuel, December 1999, prepared for DOE by TRW Environmental Safety Systems, Inc. | N/A | |
| 326 | Operational Waste Stream Assumption for TSLCC Estimates, September 2000, prepared for DOE by TRW | N/A | |
| 330 | Bechtel SAIC Company, LLC, Calculation Method for the Projection of Future Spent Nuclear Fuel Discharges, TDR-WAT-NU-000002 Rev 1, February 2002 | N/A | |
| 352 | M.R. Shay, "How Much Fuel Should D.O.E. Commit To Accept," November 19, 1984, MOV.19990831.0021 | N/A | |
| 354 | L.L. Clark and S.M. Short, Preferred Repository Receipt Rates Based on Waste Management System Costs, Risk and Logistics Impacts, December 1986, prepared for DOE by Pacific Northwest Laboratory | N/A | |
| 355 | Lawrence Livermore National Laboratory, Spent Fuel Receipt Scenarios Study, Yucca Mountain Project, July 1990, MOL.19980623.0931 | N/A | |
| 356 | TRW Environmental Safety Systems, Inc., Throughput Rate Study, March 25, 1993, MOV.19960624.0047 | N/A | |
| 357 | Fluor Daniel, Inc., Throughput Rate Study, MOL.19990326.0004 | 20035 4222 | 20035 4231 |

(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
---------------------xSypolt)

McLean, Virginia
Wednesday, April 10, 2002

Continued deposition of ALAN BROWNSTEIN, a witness, recalled for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being previously duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman,



LLP, 1650 Tysons Boulevard, McLean, Virginia 22102-4859, at 9:26 a.m., Wednesday, April 10, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.



APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District:
ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) (770-7901)

On behalf of Plaintiff Sacramento Municipal Utility District:
DAVID S. NESLIN, ESQ.
Arnold & Porter
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301



APPEARANCES: (Continued)
On behalf of Plaintiffs Southern Nuclear Operating Company, Alabama Power Company, Georgia Power Company:
JEFFREY L. HANDWERKER, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-6101

On behalf of Plaintiff Wisconsin Electric Power Company:
DONALD J. CARNEY, ESQ.
Perkins Coie, LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2011
(202) 434-1675

On behalf of Plaintiff Commonwealth Edison Company:
NORMAN M. HIRSCH, ESQ.
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

Page 78

A. Let me just read it again.
Q. Sure.
(The witness reviewed the document.)
THE WITNESS: Okay. I agree it says it discusses it, yes.
BY MR. TOMASZCZUK:
Q. Okay. Was it your understanding that DOE's intention was to begin to dispose of spent fuel at a rate which would allow utilities starting in 1998 to store their discharges in their pools?
MR. BANES: Objection -- vague as to the meaning of intention.
THE WITNESS: I really don't understand the question. I need you to --
BY MR. TOMASZCZUK:
Q. It may not have been very artfully worded.
This document, and in particular the second and third sentences of the first paragraph, as I read them, suggest to me that DOE was considering a commitment to begin in 1998 removing spent fuel at a rate which would be sufficient to allow storage in those pools of subsequent reactor discharges.

Page 79

That's the subject we're talking about?
A. Yes.
Q. And my question to you is do you agree that that was DOE's intention at or about the time that this document was prepared in July of 1986?
MR. BANES: Objection -- vague.
THE WITNESS: I must tell you that contractor, contractors prepare a number of documents for many different parts of the organization to do many things.
I can agree with what this is. This is separate from the department policy.
Contractors do contractor work, provide input to the department. The department considers that.
So this is a contractor document, not a DOE document, and that's why I'm hesitating in your answers.
BY MR. TOMASZCZUK:
Q. Okay. Was it a goal of DOE at this time, July of 1986, that utilities would not need to expand their storage capacities after 1998?

Page 80

MR. BANES: Objection -- vague. Go ahead.
THE WITNESS: The best as I recall, the, you know, the goal of the department was, was to have the facilities available as soon as we could and start accepting waste as soon as we could and as much as we could.
That was a goal of the department.
BY MR. TOMASZCZUK:
Q. So it was not a specific goal, that the utilities would not need to expand their storage capacities after 1998?
A. That, that was a goal. That was a goal.
Q. And was that goal communicated to the utilities at any point in time?
A. To the best of my recollection, in, I believe that that may have been communicated in, for example, in Congressional testimony by the director of what the department's goals are.
It may have been reflected in documents.
I would have to look at them. It has been a long time.
(There was a pause in the proceedings.)

Page 81

MR. TOMASZCZUK: I'm going to hand you, Ms. Reporter, and ask you to mark as Brownstein Exhibit 5 a document entitled, "OCRWM Mission Plan Amendment" dated June 1987.
And let me represent, Mr. Brownstein, that this is an excerpt from that rather lengthy document, and what I'm going to hand you is Appendix F to that mission plan amendment, which is entitled, "Waste-Acceptance Schedule."
THE WITNESS: Sure.
(Brownstein Exhibit No. 5 was marked for identification.)
THE WITNESS: Okay.
BY MR. TOMASZCZUK:
Q. Have you seen that document before today?
A. Yes.
Q. Mr. Brownstein; and have you used the document in your work at DOE?
A. I have.
Q. And in what context have you used the document?
A. I believe I used this as the waste

Page 319

going to be here a long time if you continue to make objections which I consider to be ill-advised and not consistent with the rules of the court.

I would encourage you to make your objection. Fine, go ahead make it.

MR. BANES: Are you just telling me that I just did something inconsistent with the rules of the court?

All I did was ask you to set a foundation for this document.

He doesn't remember it. He didn't write it, and he has testified that he doesn't know what it means other than just reading what it says.

That's a valid objection. If you want to ask him what something means, you need to lay a foundation for it first.

BY MR. TOMASZCZUK:

Q. At or about the time you received this document in August 14th, 1991, did you understand this to be a draft document?

A. This was a, this was, clearly was a contractor document.

Contractors prepare studies all the

Page 320

time at DOE's direction.

That automatically means to me that it was, it was a, it was something that DOE had not signed off on.

Now whether this was the first draft or the last draft, who knows? But it was a contractor document.

The contractor documents are regularly prepared. They regularly go through extensive review and modification before they're, if they're ever accepted as a DOE document.

Q. After you received the document, did you do anything other than read it?

A. I cannot specifically recall. My normal operation would be to, to read it.

If I had comments, I would make those comments either verbally or in writing. I use both.

Q. And do you recall sitting here today whether you made any comments on this particular document?

A. I honestly cannot recall.

Q. All right.

(There was a pause in the proceedings.)

Page 321

MR. TOMASZCZUK: Mr. Brownstein, let's mark as, and Ms. Reporter, as Brownstein Exhibit 30 the Annual Capacity Report dated December 1991.

It has on it the Bates stamp numbers HQR-001-2357 through 2373.

(Brownstein Exhibit No. 30 was marked for identification.)

THE WITNESS: Okay.

BY MR. TOMASZCZUK:

Q. And have you seen the document before today?

A. Yes.

Q. And were you responsible for preparing it?

A. Consistent with how I have testified about those documents, yes.

Q. All right. At Roman Numeral Five of the summary, there is a reference to, in the second paragraph, to statutory schedule linkages between the MRS facility and the repository set forth in the Nuclear Waste Policy Act, Nuclear Waste Policy of 1982 -- it looks like the word act is missing -- as amended will be modified.

Page 322

Are those, or when you wrote the term linkages there, were you referring to the linkages that I asked you about in your testimony this morning?

A. Yes.

Q. This paragraph goes on to state that during the first ten years following commencement, projected commencement of federal waste management system operation, the total quantity of SNF that could be accepted is projected to be 8,200 MTU.

And my question to you, Mr. Brownstein, is do you know what the source of that statement is or was.

(The witness reviewed the document.)

THE WITNESS: I don't specifically recall.

(There was a pause in the proceedings.)

BY MR. TOMASZCZUK:

Q. Mr. Brownstein, are you comparing this ACR to the previous ACR?

A. I am.

Q. And that would be, you would be comparing it to Brownstein Exhibit 24, the

(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
- - - - - - - - - - - - - - - - - - - -xSypolt)

McLean, Virginia
Thursday, April 11, 2002

Continued deposition of ALAN BROWNSTEIN, a witness, recalled for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being previously duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman,



LLP, 1650 Tysons Boulevard, McLean, Virginia 22102-4859, at 9:38 a.m., Thursday, April 11, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.



APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District:
ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 770-7901)

On behalf of Plaintiff Sacramento Municipal Utility District:
DAVID S. NESLIN, ESQ.
Arnold & Porter
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301



APPEARANCES: (Continued)
On behalf of Plaintiffs Southern Nuclear Operating Company, Alabama Power, Georgia Power:
JEFFREY L. HANDWERKER, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-6101

On behalf of Plaintiff Wisconsin Electric Power Company:
DONALD J. CARNEY, ESQ.
Perkins Coie, LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2011
(202) 434-1675

On behalf of Plaintiff Commonwealth Edison Company:
NORMAN M. HIRSCH, ESQ.
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

Page 560

me -- so I have nothing further at this time.
(Whereupon, at 12:05 o'clock, p.m., the deposition was recessed, to reconvene at 1:00 p.m. the same day.)

Page 561

AFTERNOON SESSION
(1:02 p.m.)
Whereupon,
ALAN BROWNSTEIN,
the witness on the stand at the time of recess, having been previously duly sworn, was further examined and testified as follows:^
EXAMINATION BY COUNSEL FOR PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT
BY MR. NESLIN:
Q. Mr. Brownstein, my name is Dave Neslin.
I'm an attorney representing Sacramento Municipal Utility District, also known an SMUD, which is another of the plaintiffs in these cases.
I'll be asking you questions, and I would like to follow the same ground rules that Mr. Tomaszczuk set up with you.
If you don't understand my question, please tell me, and I'll try to rephrase it. Okay?
And if you want to take a break at any point in time, just let me know, and we'll stop.
A. Okay

Page 562

(Brownstein Exhibit No. 50 was marked for identification.) ^
BY MR. NESLIN:
Q. Mr. Brownstein, you're being handed what's been marked as Exhibit 50 to your deposition.
It's an August 30, 1988 letter from Mr. B.M. Cole to Joseph Sutey with an attachment titled, "Delivery Commitment Schedule Processing, Approval, and Management Control System" stamped as Bates Numbers PNL-098-1106 through 1126.
Are you familiar with these documents?
(The witness reviewed the document.)
THE WITNESS: I vaguely recall seeing this.
BY MR. NESLIN:
Q. Was this work undertaken at your direction?
A. As I testified previously, PNL did, did a number of pieces of work, some at my direction, and some that they pursued on their own consistent with work tasks that we gave them.

Page 563

This was probably done at my direction.
Q. The upper right of the attached document, there is a date August 30, 1988, and then Rev 4.
Would that to your mind refer to Revision 4?
A. Yes.
Q. Did you typically comment on different drafts and revisions?
A. It could have gone one of two ways. It could have been because I commented on it and went through it, or because they went through their internal reviews before it was presented to DOE and went through revs.
It could have been either way.
Q. What was your practice as they were preparing work that you requested them to do, going through different drafts?
Was it your practice to provide input to them to review drafts?
A. It depended on time associated with a particular product.
If there was some time urgency, I would review an early draft.

Page 564

If there wasn't, it would go through the normal course of internal reviews.
That's how I recollect it.
Q. Would others at DOE have reviewed drafts PNL prepared as well?
A. As I testified yesterday, you know, my office evolved from sort of a one-man place to, to a branch and then a division.
I have to go back and think about whether in 1988, I was still a one man, or I had staff.
If I had staff at that time, they would review it, yes.
Q. Do you recall reviewing this attached document?
A. I don't have a specific recollection of that.
Q. If I could ask you to turn to page 6 of the attachment, and would you review lines 24 through 31?
(The witness reviewed the document.)
THE WITNESS: Okay.
BY MR. NESLIN:
Q. Mr. Brownstein, 24 through 32 state exchange requests should be approved if, and

Page 565

then they set forth in bullets five criteria.
Would you agree that an exchange should be approved if it meets these criteria?
MR. BANES: Objection. Calls for a legal conclusion.
THE WITNESS: Those were important criteria.
There may be other things that we would want to have considered, and I don't recall those now, but, but these, these criteria were appropriate.
I agree with them.
BY MR. NESLIN:
Q. Let me ask again if an exchange request meets these four criteria, should it be approved?
MR. BANES: Objection -- asked and answered.
THE WITNESS: I think I did answer that, and the reason for the hesitation is upon review of this, and upon discussion with others in the department ranging from the contracting officer, my peers, my superiors, we may have -- it's conceivable that this, these contractor-proposed criteria may have evolved,

Page 566

been modified, added to, deleted.
BY MR. NESLIN:
Q. Do you recall discussing these criteria with anyone else at the department, these criteria set forth on page 6?
A. I don't have a specific recollection of that.
Q. Do you recall discussing them with the contractor PNL?
A. The only way I can answer you is I don't specifically recall, but that's not saying that I did not.
Q. Do you recall discussing these criteria with anyone at the utility, at the utility?
A. I can't recall whether in the ACR initial resolution process, which was subsequent to this date, whether we discussed, you know, that issue or not.
I don't specifically recall, but again, I don't want to testify that I absolutely never did.
Q. Let me direct you to lines 28 through 29.
That sets forth as one of the criteria

Page 567

that the transportation system and receiving facilities have the capacity to meet the revised commitments?
A. Yes.
Q. What does that mean to you?
A. Okay.
MR. BANES: Objection. Calls for speculation, and lack of foundation.
Go ahead.
THE WITNESS: Okay. When the DCSs were approved, I believe we -- we can go back to it, but I believe one of the pieces of information that we requested from the utilities was that the type of transportation cask that would be required.
One of the concerns we had in this criteria, as I recall, is -- let's take an example.
If we had approved, you know, let's say we had approved 90 percent of our DCSs for a, they would accommodate PWR rail casks.
If somebody wanted to do, you know, exchanges at the last minute, we may have gone through the procurement process to procure the type of casks to be available for who we thought

Page 568

we were going to serve, and we, and that could have affected our ability.
If somebody wanted a BWR truck cask, and we had ordered, you know, too many of the other kind based on the information provided in the DCS, because the utilities were acting on the DCS, so were we, so that was the intent.
BY MR. NESLIN:
Q. So if, if sufficient casks were available to accommodate the exchange, would this criteria be met, to your mind?
A. No. I used that as an example. To says receiving facilities, there may have been other characteristics that, that could have influenced that.
Q. Okay. What, can you think of what those characteristics would be?
A. Well, beyond just the casks, you had to have the, the infrastructure to serve that.
Some utilities may only be able to accommodate a truck operation as opposed to a rail, and so, you know, that's an example.
Q. Let me ask this then. If you had sufficient casks and if the utilities involved in the exchange and the facility had sufficient

Page 569

infrastructure to accommodate the exchange, would this criteria be satisfied?
A. Could I extend your analysis one step in answering?
Q. Certainly.
A. If the information on a DCS of the two DCSs between two utilities that were approved by us came to us and they were identical, then it would be met. Then that criteria would be met.
Q. By information, what information are you referring to?
A. Can we go back to the DCS, please?
Q. Yes.
MR. HANDWERKER: The instructions.
MR. NESLIN: The instructions.
THE WITNESS: Yes. That's the form I'm thinking of.
MR. HANDWERKER: Thirty-four.
THE WITNESS: You can see on the form under 2.0 -- I'm looking at the actual form itself -- it asks things like number of assemblies and type, PWR, BWR, proposed shipping mode, type cask required, including maximum loading lifting weight.
Those, those are the types of things

Page 570

that I'm referring to.
There are others? There are two. The date of discharge potentially could be important.
BY MR. NESLIN:
Q. Mr. Brownstein, would they have to be identical, or would the transportation system and receiving facilities simply have to have the capacity to accommodate the exchanged spent nuclear fuel?
A. We were talking about this one.
MR. BANES: Go ahead.
THE WITNESS: This one criteria; no, I used identical as an example, as an extreme.
No, they would not have to be identical.
BY MR. NESLIN:
Q. So they could involve different number of fuel assemblies?
MR. BANES: Objection. Calls for speculation.
THE WITNESS: I really, it really does call for speculation because we had never gotten that, that far, that detailed, to my recollection.

Page 571

We were never faced with a DCS exchange process, and I would be speculating about the answer, you know, specific intricacies.
BY MR. NESLIN:
Q. Mr. Brownstein, would it be your testimony that you don't recall DOE considering the specific details of how these criteria might apply to a given exchange?
A. No. What I'm saying is you're asking if, if, if there was a one-assembly difference, would that affect it?
That's getting down to a gradation that we never got to.
We did consider a number of things, but that's a fine gradation.
Q. Let me ask it a different way. Would the fact that there is a different --
A. Okay.
Q. Number of fuel assemblies automatically lead an exchange request not to be approved?
A. If that was the only difference, that would not be an automatic disapproval in my mind.

Page 572

Q. The fact that a, if requested, exchange might involve a different size or type of fuel assembly wouldn't automatically lead it to be disapproved to your mind?
A. Well, that could because that could affect the cask, the availability of the cask.
Other certain, certain facilities have, you know, for example, very long fuel, and that could affect it.
Q. Would the fact that a proposed exchange might involve DCSs which involve different modes of shipment, would that necessarily lead to, a requested exchange to be denied?
A. It could, but not necessarily.
Q. I would like to direct you to lines 30 and 31.
A. I just want to clarify all these questions you're asking me were all hypotheticals?
Q. I'm asking you a series of hypothetical questions, sir.
I'm asking for your opinion on how they would apply.
A. Right.

Page 573

Q. Lines 30 and 31 state that the exchange, another criteria in the exchange will not impact WMS performance in a way that would delay acceptance of waste from other purchasers.
What does that mean to you?
MR. BANES: Objection -- lack of foundation.
Calls for speculation. Go ahead.
THE WITNESS: The best way I can try to explain it is by example, if that's okay with you.
If a utility were to give us failed fuel, that might influence the decision.
BY MR. NESLIN:
Q. And why would that influence the decision?
A. Again, hypothetically, there would probably be a preference in the early stages of system operation to, to try to use standard fuel to minimize the opportunity for, for us having to employ some contingencies.
In other words, failed fuel, we might have to do some repackaging that we would have rather not have done on the opening day.
Q. Would, would that necessarily delay

Page 574

the acceptance of waste from other purchasers?
A. It could, but not necessarily. It was a concern.
There may have been other concerns associated with that criteria that at this moment, I can't recall.
Q. Do you recall the basis of these criteria?
A. Well, the basis of the criteria was that PNL was, was tasked to think about this and develop suggestions to the department.
It was a normal course of business, and so I viewed this as contractor input to the department that, you know, certainly the department did not take a position.
One, as I said, hadn't gone through to my knowledge, you know, the necessary concurrence and evaluation by a range of people within RW that would need to have, you know, evaluated it.
Q. Evaluated it for what purpose?
A. Of whether that was appropriate or acceptable to the department; in other words, this is not departmental policy.
Q. You're saying that for something to be

Page 575

adopted as department policy, additional people would have to review it and approve it?
A. What I'm saying is that a contractor product is not departmental policy.
Q. How would a contractor product become departmental policy?
A. One way it would become that would be for it to be issued under DOE letterhead.
Q. By issue, what do you mean?
A. Number of ways -- issued could be instructions or it could be a report.
It could be a letter by a program official or, or contracting officer.
Those are three ways.
Q. So if it were incorporated into a DOE document or a DOE letter, then it could become departmental position, departmental position?
A. Sure.
Q. How was this information, this report used, do you recall, by the department, used by the department?
A. I don't recall.
Q. Do you recall whether you did anything in response to this report?
A. That's a good question. There are 14

Page 576

years between the report and now, and I just don't recall.

(There was a pause in the proceedings.)

MR. NESLIN: Can we go off the record for a second?

(A discussion was held off the record.)

MR. NESLIN: Mark that as 51.

(Brownstein Exhibit No. 51 was marked for identification.) ^

BY MR. NESLIN:

Q. You've been handed what's been marked as Exhibit 51 to your exhibit -- to your deposition.

This is a document entitled, "Guidebook for Standard Contract for Disposal," stamped preliminary draft.

MR. BANES: Do you have several copies of that?

MR. NESLIN: Yeah. Sorry, counsel.

MR. BANES: No problem. Is this 51?

MR. NESLIN: Fifty-one.

BY MR. NESLIN:

Page 577

Q. Mr. Brownstein, are you familiar with this document?

A. You have to give me a chance at least to glance at it.

(The witness reviewed the document.)

THE WITNESS: I don't recall, I do not recall ever seeing this before.

BY MR. NESLIN:

Q. Do you recall any discussion at OCRWM about preparing a guidebook for the standard contract?

A. Guidebook does not ring any bells. I have no recollection of that.

Q. This includes information, turning to the Table of Contents, this includes information on the ACR issue resolution process?

A. Yes.

Q. On the Delivery Commitment Schedule process, on the delivery commitment, on the Delivery Commitment Schedule exchanges?

A. Um-hm.

Q. Do you recall any discussion at OCRWM about providing written guidance on those issues collectively in a document of this sort, whether it was called guidebook or not?

Page 578

A. As I testified, we had something called this ACR resolution process with the utilities, and there were a number of issues that were identified, and those would be subject to, you know, discussions at meetings.

I would normally have requested a contractor to prepare such things as suggested -- well, analysis of the issue, and potentially suggested positions for DOE recommendations, so these issues are familiar to me.

Responding to your question, I never saw it in this form or this guidebook, but as I have testified previously, contractors may have worked on this as a way to present this to me, but I don't recall the document.

Q. Mr. Brownstein, I've just looked at several pages, for example.

A. Sure.

Q. Pages 1 and 2, 3, have numbering along the left side of the text?

A. The left? You're talking about these?

Q. Yes.

A. Yeah. Yes.

Q. But by these, you're pointing to the

Page 579

numbers along the left side of the page?

A. Yes.

Q. Does that begin --

MR. BANES: Page, on page 2017.

BY MR. NESLIN:

Q. Does that indicate anything to you about the, who might have prepared this document?

A. As I have testified before, this was a characteristic normally employed by PNL.

Q. If I could ask you to turn to page 37? This would be Bates Number CTR-001-2050 in the lower right-hand corner.

A. Okay.

Q. I would ask you to review lines 13 through 20 on the page.

(The witness reviewed the document.)

THE WITNESS: Okay. I'm sorry. You said to 30?

BY MR. NESLIN:

Q. Thirteen through 20.

A. I have read that, yes; 1 through 28, I didn't.

MR. BANES: Just note for the record line 21 and 22 don't seem to be readable.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - x

YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.) :
Plaintiffs, :
v. :
THE UNITED STATES, :
Defendant. :

- - - - - - - - - - - - - - - - - - - - x

Washington, D.C.
Thursday, May 23, 2002

Deposition of ALAN BROWNSTEIN, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being duly sworn by JAN A. WILLIAMS, a Notary Public in and for the District of Columbia, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., 20005-3305, at 8:40 a.m., Thursday, May 23, 2002, the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.

Page 138

BY MR. STOUCK:
Q. At the time the list was developed which I think was about the time of the '90 or '91 --
A. No.
Q. When was it?
A. The list of 34 issues?
Q. Yes.
A. My recollection is that was done earlier.
Q. Much earlier?
A. Yeah.
Q. Whatever time it was developed, at that time RW thought that those issues had to be resolved before the department could commence acceptance of spent fuel pursuant to the contracts; is that right?
MR. CRAWFORD: Objection to the foundation; objection to the extent it calls for a legal conclusion.
THE WITNESS: We thought it was important. I don't think anybody made the distinction between important versus, if it did not happen, could we not move forward.
BY MR. STOUCK:
Q. Okay. That's fair. I understand that and I thank you for that clarification.
Take a look at page 4 of Exhibit 35. And

Page 139

there's a paragraph numbered 12 there. Do you see that?
A. Yes.
Q. It's a proposed change to the definition of high-level radioactive waste. Would you please review that and I've got a question for you about it or two maybe. Let me ask the question, it might help you as you read it.
A. Okay.
Q. The question is going to be, aside from what you read on this piece of paper, do you have a recollection of proposals to change the definition of high-level radioactive waste in a way that would affect GTCC? You know, if you read this, I think you will see that this is a proposal to change it in a way that would affect GTCC waste. But independent of this do you recall that there were proposals to change the contract in that manner?
MR. CRAWFORD: Let me object just to best evidence.
BY MR. STOUCK:
Q. Would you answer the question.
A. By who? I mean this is --
Q. By RW. I mean this is a proposal --
A. Oh, no oh, no.

Page 140

Q. You don't recall that?
A. No, no, wait a second.
Q. What am I not understanding?
A. This is a contractor document. Contractors make suggestions and recommendations to the department all the time. Because a contractor says something doesn't mean, you know, the department either wanted it or agrees with it. This was a contractor input.
Q. I understand that. That's fair enough. And this contractor input apparently is suggesting or at least describing a change to the definition of high-level radioactive waste?
A. That's correct.
Q. Do you know -- maybe I don't have to preface it by saying independent of this document. Even not independent of this document, do you know whether that kind of change was ever discussed, making that change was ever discussed within RW; that is, a change to the standard contract to the meaning of the term high-level radioactive waste that would affect coverage of GTCC?
A. We talked about this subject before and there was testimony before. And I think you asked a similar question. I told you --

Page 141

Q. Well --
A. There were two people I talked about.
Q. Okay.
A. And this was something that I didn't believe in, didn't accept, and, you know, I had discussions with two people as I recall. Probably staff too.
Q. I thought what you said you didn't believe in or accept before was that GTCC was covered by the contract. This is a little bit different question which is do you recall whether there were any discussions that you were part of or any effort at RW to amend the contract in a manner that would affect GTCC waste? That's what I'm asking now.
A. Sorry. As I recall, when I read this, I may have discussed it with Nancy and my staff. But I know that I did not take this thing forward because I didn't believe --
Q. What is it that you didn't believe?
A. I didn't believe that we should or needed to make a change to the contract.
Q. Because it was clear in your mind that it wasn't covered?
A. That's correct.


Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

1104

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
------------------x
YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C
------------------X
(Caption continued on the next page)

Continued Deposition of LAKE H. BARRETT
Washington, D. C.
Friday, May 10, 2002
8:06 a.m.

Job No.: 11792-11
Pages 1104 to 1437, Volume 5
Reported by: Diane Gomez, RPR

1105

DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
------------------X

1106

Continued Deposition of LAKE H. BARRETT, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public in and for the District of Columbia.

1107

APPEARANCES

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:
DEVON E. HEWITT, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 847-5097

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:
HOWARD CAYNE, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004-1206
(202) 942-5000

because of short-cooled fuel"?
MS. HERRMANN: Objection. Speculation.
A **No.**
Q Do you understand the term "derate"?
A **I understand the term as I use it. How the author is using it I don't know.**
Q How would you use it?
A **It is to reduce the design capacity or reduce the output.**
Q And do you understand the term "short-cooled fuel"?
A **Yes.**
Q What does that mean?
A **Lower megawatt days per metric ton on the fuel.**
Q Based on the understanding of those two terms you just expressed, if the author of that sentence used those two terms in the way you just explained them, do you understand this sentence?
MS. HERRMANN: Objection. Speculation.
A **No.**
**(Deposition Exhibit Barrett 57 was marked**



**for identification and was attached to the transcript.)**
Q Mr. Barrett, the court reporter has handed you a document marked for identification as Exhibit 57. It is captioned Determination of Cost-effective Waste Management Receipt Rates. It is by R.W. McKee, M-c-K-e-e. It starts at Bates PA-221971. And it continues through PA-221980. Do you have that document before you?
A **I believe so. I can't read the Bates number at the bottom, but go ahead. Yes.**
Q And you'll see that the first two pages of this consecutively-Bates-numbered document appear to be the same other than the fact that the first page looks as if a buck slip covered over a portion of the left-hand column, correct?
A **Correct.**
Q Do you know a person named R.W. McKee?
A **No.**
Q Have you ever heard of that person?
A **I've heard the name.**
Q Are you familiar with Pacific Northwest



Laboratory?
A **Yes.**
Q What is Pacific Northwest Laboratory?
A **It's a contractor in Richland, Washington.**
Q Were those contractors relied on often by the Department of Energy in connection with the development, design, and construction of the waste management system?
MS. HERRMANN: Objection. Vague.
A **We use them as advisors and analysts for the waste management system.**
Q Do you continue to so use them through today?
A **No.**
Q Through when did you use them?
A **Through the late eighties.**
Q There's also another name at the top of the first page, H.D. Huber, H-u-b-e-r. Do you know that individual?
A **No.**
Q Did you ever rely on the work of Pacific Northwest Laboratory?



MS. HERRMANN: Objection. Vague.
A **I used it as input.**
Q For what purposes?
A **For advice on systems analysis.**
Q Did you ever personally assign work out to be performed by Pacific Northwest Laboratory?
A **I don't remember me personally, but my staff did.**
Q Did you authorize your staff to assign work out to Pacific Northwest Laboratory?
A **Yes.**
Q I take it then you considered the work of Pacific Northwest Laboratory to be competent?
A **Yes.**
Q I turn your attention to page Bates number PA-221972. It's the second page of the document. Actually, returning to the first page, do you see the buck slip on the first page? It says, '91 HLRWM conference papers, volume two, "high priority."
A **I see it.**
Q Is that your writing?
A **No.**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - - - - X

YANKEE ATOMIC ELECTRIC COMPANY, (98-126C) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY (98-154C) :
MAINE YANKEE ATOMIC POWER COMPANY (98-474C) :
FLORIDA POWER & LIGHT COMPANY (98-483C) :
NORTHERN STATES POWER COMPANY (98-484C) :
DUKE POWER, A Division of DUKE ENERGY CORP. (98-485C) :
INDIANA MICHIGAN POWER COMPANY (98-486C) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT (98-488C) :
SOUTHERN NUCLEAR OPERATING COMPANY, et al., (98-614C) :
COMMONWEALTH EDISON COMPANY (98-621C) :
BOSTON EDISON COMPANY (99-447C) :
GPU NUCLEAR, INCORPORATED (00-440C) :
WISCONSIN ELECTRIC POWER COMPANY, (00-697C) :
POWER AUTHORITY OF THE STATE OF NEW YORK (00-703C) :
OMAHA PUBLIC POWER DISTRICT (01-115C) :
NEBRASKA PUBLIC POWER DISTRICT (01-116C) :
TENNESSEE VALLEY AUTHORITY (01-249C) :
Plaintiffs, :
v. :
UNITED STATES OF AMERICA, :
Defendant. :

\- - - - - - - - - - - - - - - - - - - - X

Washington, D.C.
Friday, May 3, 2002

Continued Deposition of RONALD MILNER, a witness herein, called for examination by counsel for

A. No.
(Milner Exhibit No. 53 was marked for identification.)
BY MR. NESLIN:
Q. Mr. Milner, you've been handed what's Exhibit 53 to your deposition. This is a March 31st, 1994 letter from James Blandford to you. And an attachment consisting of a preliminary draft of a document captioned, DCS Exchange Network, Software Recommendation.
Are you familiar with this document?
A. I don't recall it specifically, no.
Q. Cover letter states that the attached report provides a recommendation for software on the DCS Exchange Network which will be a computer-based, menu-driven system providing information on approved Delivery Commitment Schedules for their use in assessing opportunities for DCS exchanges with other purchasers.
Do you recall the DOE or its contractors doing any work on a DCS exchange network?
A. What I recall is in general terms a program considering whether or not it should take an active role in encouraging exchanges or simply react to utility requests. And if it ultimately chose to



take an active role, how might that be accomplished.
Q. Who at the Department was involved in that consideration?
A. Well, I guess it would have been myself, members of my staff, the director of the program.
Q. Who on your staff?
A. At this point in time, Alan Brownstein, I see two staff members, one name crossed out and the other one, I can't recall what point in time which one left or which one was there, but one of the two, either Nancy Slater or Mary Payton were staff members.
Q. Anyone else?
A. Not that I can recall offhand.
Q. During what period would the Department have been considering this question?
A. In March 31st, 1994.
Q. Do you, sitting here today do you recall over what period of time that consideration extended?
A. No, I don't.
Q. And did the Department reach a decision as to whether it should take an active role in encouraging exchanges or simply respond to utilities?
MR. SHULTIS: Objection, Mr. Milner's not a 30(b)(6) witness.



THE WITNESS: I don't recall the Department ever actually taking a position. In essence it became a moot point because we never received a request.
BY MR. NESLIN:
Q. And is it your understanding that you never received a request in part because of the uncertainties that arose in the 1990s as to when a repository would become operational?
MR. SHULTIS: Objection, calls for speculation.
THE WITNESS: I have no such understanding.
BY MR. NESLIN:
Q. Do you believe that, is it your opinion that the uncertainties and delays associated with the start-up date for a repository had no effect on utilities' actions in deciding whether to submit exchange requests?
MR. SHULTIS: Same objection.
THE WITNESS: No, I don't have that opinion. I have no idea why none were submitted.
BY MR. NESLIN:
Q. In considering how the Department might take an active role, what sorts of actions did you



consider?
A. I recall maintaining a list of approved DCS's and looking at that list versus utilities which we might be aware were running out of pool space which had a lower priority ranking than another which had sufficient pool space.
And, you know, the potential of in essence brokering something between the two utilities.
Q. And do you recall any consideration of developing a computerized system for providing information among utilities on approved DCSes?
A. I do now reading this.
Q. But you don't have any independent recollection beyond this document?
A. No, I don't.
Q. If I could turn you to the first page of the attached draft report. Do you know whether this report was ever finalized?
A. I don't recall whether it was or not. In any event this is a contractor report which would never relate to a position the Department took, simply input data to it.
Q. You say it would never relate to a position?
A. It would never reflect, I'm sorry; not

Page 444

relate, it would never reflect the Department's position, it would simply input data to it.
Q. The Department would have to subsequently take a separate position which might or might not approve or reflect what the contractor recommended?
A. The Department would take a position based on information from a number of sources including its contractor's input.
Q. I see the last sentence of the second paragraph on this page states that, the next to the last sentence, "Based on the preliminary evaluations of the cost, complexity, maintenance requirements, and the accuracy and timeliness of the information provided through these various options, the Department has decided to develop a PC-based electronic bulletin board system, the DCS exchange network."
A. I'm sorry; what paragraph are you reading from?
Q. The second paragraph under introduction, sir.
A. Okay.
Q. The next to the last sentence. You see it states that the Department has decided to develop a PC-based electronic bulletin board system?

Page 445

A. Okay, yes.
Q. Do you know, did the Department ever make such a decision?
A. I don't recall that.
Q. Do you know why the contractor would have included a statement like this?
MR. SHULTIS: Calls for speculation.
THE WITNESS: No, I don't.
BY MR. NESLIN:
Q. In your opinion, did the Department have an interest in providing this kind of information to purchasers to assist them in assessing exchange opportunities?
A. To the best of my recollection the Department certainly considered providing that information, I don't know I would characterize it as interest.
Q. It's something the Department considered doing?
A. Yes. Oftentimes the Department considered a number of things, and discussed that with industry representatives, and no longer considered it based on their input.
Q. Do you recall receiving any input from the industry indicating they weren't interested in a

Page 446

system of this sort?
A. On that specific issue, I don't recall, no.
MR. SHULTIS: Are we moving on to a different document, Dave?
MR. NESLIN: Yeah.
MR. SHULTIS: Do you think we could take a break, please?
MR. NESLIN: If you'd like to, sure.
(Recess.)
BY MR. NESLIN:
Q. Mr. Milner, before we get to another document, let me ask you just a couple of follow-up questions. You mentioned that you had, in considering the exchange provision, you had maintained a list of approved DCS's and compared those to utilities which might be needing more pool space?
A. We certainly maintained a list of approved DCS's, I don't recall whether we actually ever got into any analysis of looking at utilities that might be potential exchanges, I don't recall that.
Q. You don't recall --
A. No.
Q. -- that comparison?

Page 447

A. No.
Q. I thought that you testified that you also considered the potential for brokering exchanges between utilities?
A. Yeah, as a concept, yes.
Q. What do you mean, what do you mean by as a concept?
A. We were -- well, looking at the concept of was it appropriate for the Department to do that sort of thing.
Q. What was your opinion?
A. My personal opinion was that it potentially could serve a useful purpose if the utilities desired such an activity.
Q. And what do you mean by useful purpose, what would that purpose be?
A. Well, certainly one purpose could have been if one utility that was needing to build a dry storage that was farther down in the queue, and another utility that had a higher priority that either didn't at that particular time or perhaps even life of plant storage, which I don't recall anybody was that high in the queue that they had life of plant, but you could preclude the need for constructing dry storage if such an exchange were

Page 1826

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-------------------------------x

SACRAMENTO MUNICIPAL UTILITY :
DISTRICT. :
:NO. 98-488C
Plaintiff :
vs. :
UNITED STATES. :
Defendant. :
------------------------------- :

Courtroom 5
National Courts Building
715 Madison Place
Washington, D.C.

Tuesday, March 29, 2005

VOLUME 7

The parties met, pursuant to the notice of the Judge at 9:00 a.m.

BEFORE THE HONORABLE SUSAN G. BRADEN

Page 1827

APPEARANCES:

ON BEHALF OF PLAINTIFF:
DAVID S. NESLIN, ESQ.
TIMOTHY R. MACDONALD, ESQ.
Arnold & Porter LLP
370 Seventeenth Street
Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

HOWARD N. CAYNE, ESQ.
Arnold & Porter LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5656

Page 1828

APPEARANCES (Continued:)

ON BEHALF OF THE DEFENDANT:
ALAN J. LO RE, ESQ.
JOSHUA E. GARDNER, ESQ.
TODD J. COCHRAN, ESQ.
SCOTT DAMELIN, ESQ.
RUSSELL SHULTIS, ESQ.
ELIZABETH THOMAS, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20036

ALSO PRESENT:
STEVEN M. COHN, ESQ.
STEVE J. REDEKER
THOMAS POLLOG

***Index appears at end of transcript***

Page 1829

P R O C E E D I N G S

THE COURT: Let's go.

Whereupon--

DAVID ZABRANSKY

a witness, called for examination, having previously been duly sworn, was examined and testified further as follows:

CROSS-EXAMINATION (Resumed)

BY MR. CAYNE:

Q. Good morning, Mr. Zabransky.

A. Good morning.

Q. I'd like to turn your attention to Plaintiff's Exhibit 121. I believe that will be in the first binder, one out of three. Do you have that document before you, sir?

A. Yes. I see it.

Q. And is this document a memorandum from you to -- was this a memorandum from you, sir?

A. It's an e-mail from me to Mr. -- I believe it's Auke Piersma.

Q. And who is that person?

A. Mr. Piersma used to be with a group called Public Citizen.

Q. And there's also a CC?

A. Yes.

one entity. So essentially, the vast majority of contracting that the program does in order to conduct its activities, both at the repository, through the transportation, the waste acceptance area, for instance, and other areas, systems area, for instance, that I manage, are also done by Bechtel SAIC Corporation, with the help of subcontractors.

Q. Now, in terms of your job, how do you use the contractors that you reference, both the M&O and subcontractors?

A. Well, we have an annual task statement with them under which they do individual studies for us, and when there are specific guidance that we want to give them about a specific report, we will issue a technical direction letter asking them to conduct a certain study for us, and then they provide those studies, and we review them, provide comments, and that's essentially their role.

Q. Are those considered deliverables under this contract?

A. Yes, they are.

Q. Now, how does DOE – I assume, are these written products that you're referencing as studies?

A. That's correct.

Q. How does DOE regard these types of reports



prepared by contractors?

A. They're essentially the view of the contractor, and unless the Department issues its own report under its own letterhead, with the DOE stamp, as well as a document number, that's not DOE position or DOE policy.

THE COURT: Right. You're just getting advice?

THE WITNESS: Right, that's correct.

BY MR. DAMELIN:

Q. And in terms of, I think you said putting it on DOE letterhead or the equivalent of that, who makes that decision regarding a contractor report or study or document?

A. It's typically a DOE official, and that's routed through our senior management, and a decision is made that that document is acceptable and will be issued under a DOE letterhead. Let me give you an example. For instance, when we went through the site recommendation process, we went through many, many drafts of documents that were related to the Secretary's recommendation. And those drafts were prepared by contractors, but it wasn't until the Department issued those final documents that became part of the



site recommendation that we adopted and we accepted the language in those reports, and therefore, it was issued under a DOE identification number, and it was considered a DOE document.

Q. Within OCRWM, who is responsible for setting policy regarding the Civilian Radioactive Waste Management Program?

A. It's the director of the program.

Q. Now, your description of, I guess, the type of approval needed for – or that you view for contractor reports or documents, would that also apply to verbal statements by contractors?

A. Verbal statements by contractors have no binding influence on the department. It's just their views of the world as they see it.

Q. Now, Mr. Kouts, you had mentioned, I believe, in your description of your background, the first position or job that you had within OCRWM related to an MRS proposal to Congress. Can you describe for the Court what your job entailed in that position?

A. Okay. Section 141 of the Nuclear Waste Policy Act basically requested the Department submit a proposal on monitored retrievable storage to the Congress for its consideration, so when I joined the



program, there was a small MRS team that was tasked with putting together that proposal. And that's – my specific responsibilities had to do with the needs and feasibility analysis of the, of the MRS, which was contained in volume two of the proposal. That volume two was an environmental assessment, which was also required by Congress, the needs and feasibility analysis, which was also required by Congress, and a program plan, which was volume three of that. So those were basically my responsibilities. I worked as a member of that team.

Q. And was that team part, or included as part of OCRWM?

A. Yes, it was a small group that worked for an office director within OCRWM at that time.

Q. And just so I'm clear, the Section 141 you reference, that was to the Nuclear Waste Policy Act?

A. That's correct.

Q. Now, as part of this team that you mentioned you were working on, what steps did DOE take to address the MRS provision of the Nuclear Waste Policy Act?

A. Well, the, the, there was fairly specific guidance given in Section 141. They requested a combination of at least five facilities and the – or

QA: N/A

WBS 9.1.3

**Civilian Radioactive Waste Management System**
**Management and Operating Contractor**

**Total System Life Cycle Cost for Site Recommendation**
**Letter Report**

**TDR-CRW-AD-000001 REV 00**

**February 2002**

Prepared for:
U.S. Department of Energy
Office of Civilian Radioactive Waste
Management
1000 Independence Avenue SW
Washington, D.C. 20585

Prepared by:
Bechtel SAIC Company, LLC
955 L'Enfant Plaza SW
Suite 8000
Washington, D.C. 20024-2108

Under Contract DE-AC08-01RW12101

ALL-STATE LEGAL®
PLAINTIFF'S
EXHIBIT
026
Southern Nuclear, et al. v. U.S., No. 98-614C

PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER CTR158 2614



PLAINTIFF'S
EXHIBIT # 266

**DISCLAIMER**

This report was prepared as an account of work sponsored by an agency of the United States Government. Neither the United States Government nor any agency thereof, nor any of their employees, nor any of their contractors, subcontractors or their employees, makes any warranty, express or implied, or assumes any legal liability or responsibility for the accuracy, completeness, or any third party's use or the results of such use of any information, apparatus, product, or process disclosed, or represents that its use would not infringe privately owned rights. Reference herein to any specific commercial product, process, or service by trade name, trademark, manufacturer, or otherwise, does not necessarily constitute or imply its endorsement, recommendation, or favoring by the United States Government or any agency thereof or its contractors or subcontractors. The views and opinions of authors expressed herein do not necessarily state or reflect those of the United States Government or any agency thereof.



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER CTR158 2615

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| YANKEE ATOMIC ELECTRIC | ) | Case Nos. |
| COMPANY, CONNECTICUT YANKEE | ) | 98-126C |
| ATOMIC POWER COMPANY, and MAINE | ) | 98-154C |
| YANKEE ATOMIC POWER COMPANY, | ) | 98-474C |
| Plaintiffs, | ) | |
| v. | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

Courtroom Number 5

National Courts Building



717 Madison Place, Northwest

Washington, D.C.

Wednesday, August 11, 2004

VOLUME 21

The parties met, pursuant to the notice of the Judge, at 10:06 a.m.

BEFORE: THE HONORABLE JAMES F. MEROW

JUDGE MEROW: Take a ten-minute break? Is that enough?

MS. SULLIVAN: Yes, thank you.

JUDGE MEROW: Back on the hour then.

MS. SULLIVAN: Okay, thank you.

(Recess taken from 3:48 p.m. through 4:06 p.m.)

MS. SULLIVAN: I apologize, Your Honor.

JUDGE MEROW: Oh, no problem. Continue when ready.

MS. SULLIVAN: Thank you.

Your Honor, I'd first like to ask a couple questions that have been raised in a pleading that Plaintiff's counsel has filed, I believe, today that I



meant to make part of my direct. Certainly, Mr. Shapiro can cross-examine on those questions.

REDIRECT EXAMINATION

BY MS. SULLIVAN:

Q Mr. Milner, do you know what the Pacific National Laboratory is?

A It's one of the national laboratories in the DOE system.

Q And who runs PNL?

A A contractor, an M and O contractor.

Q And what does an M and O contractor do, to

your understanding?
A In the indication of a lab, they operate the entire lab.
Q Has PNL done work for the Office of Civilian Radioactive Waste Management?
A It has, yes, uh-huh.
Q Okay. And are the reports that PNL has provided for the Office of Civilian Radioactive Waste Management the statements of DOE?
A No, they -- they would be treated like another contractor, any other contractor report.
Q And how is that?
A Which is input to -- to the department for -- for consideration.



Q Thank you.
Mr. Milner, could -- could I direct your attention -- do you have the binder of your deposition in front of you?
A Yes.
Q Could you go to the first tab and just have one -- the first day of your deposition, May 1st, page 73. Okay. Do you have that in front of you?
A Yes, uh-huh.
Q And Mr. Shapiro asked you about a statement that you had made at your deposition

Page 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - X

YANKEE ATOMIC ELECTRIC :
COMPANY, :
Plaintiff, : Case No. 98-126C
v. : Senior Judge
: Merow
THE UNITED STATES, :
Defendant. :

- - - - - - - - - - - - - - - X

Washington, D.C.
Friday, June 4, 1999

Deposition of CHRISTOPHER A. KOUTS, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn by MARY GRACE CASTLEBERRY, a Notary Public in and for the District of Columbia, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 10:00 a.m., Friday, June 4, 1999, and the proceedings being taken down by Stenotype by MARY GRACE CASTLEBERRY, RPR, and transcribed under her direction.

Page 2

APPEARANCES:

On behalf of the Plaintiff:
GLENN S. GREENE, ESQ.
ROBERT L. SHAPIRO, ESQ.
JERRY STOUCK, ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5854

On behalf of the Defendant:
TERRY M. PETRIE, ESQ.
Trial Attorney
Commercial Litigation Branch
U.S. Department of Justice
1100 L Street, N.W., Room 10150
Washington, D.C. 20530
(202) 307-6289
and
JANE TAYLOR, ESQ.
U.S. Department of Energy
1000 Independence Avenue, N.W.
Washington, D.C. 20585
(202) 586-7530

Page 3

CONTENTS


| WITNESS | EXAMINATION BY COUNSEL FOR PLAINTIFF |
|---|---|
| CHRISTOPHER A. KOUTS | |
| By Mr. Greene | 5 |

Afternoon Session - Page 77


EXHIBITS


| KOUTS EXHIBIT NO. | | PAGE NO. |
|---|---|---|
| 1 | Letter 3/1/99 | 7 |
| 2 | OCRWM Organization Chart | 48 |
| 3 | Annual Capacity Report March 1995 | 70 |
| 4 | Revision 01 Total System Descrip. | 80 |
| 5 | Determ. Cost-effect. Receipt Rates | 94 |
| 6 | Prelim. Anal. Spent Fuel Scenarios | 99 |
| 7 | Annual Capacity Report June 1988 | 103 |
| 8 | Requirements Document Revision 05 | 107 |
| 9 | Throughput Rate Analysis 8/17/93 | 115 |
| 10 | Rev. 02 Contingency Study 12/18/98 | 120 |
| 11 | Rev. 00 Contingency Study 9/24/98 | 130 |
| 12 | Contract DE-CR01-83NE44428 | 141 |
| 13 | Waste Acceptance Schedules | 150 |
| 14 | Facility Inter. Capab. Assessment | 158 |
| 15 | Memo 3/29/91 HQ0003944-46 | 164 |
| 16 | Draft Instr. For compl. Appendix | 165 |


Page 4

EXHIBITS


| KOUTS EXHIBIT NO. | | PAGE NO. |
|---|---|---|
| 17 | Memo, Meeting Notes 7/21/87 | 169 |
| 18 | Memo, attachments HQ0013354-71 | 174 |
| 19 | Memo, 10/13/98 Meeting Minutes | 180 |
| 20 | Meeting Minutes, attendance list | 183 |
| 21 | OCRWM Transportation Program | 189 |
| 22 | Meeting Agenda 10/3/90 | 192 |
| 23 | Two memos HQ0014780-83 | 195 |
| 24 | Letter, Briefing document diagram | 199 |

Page 93

A. Can you repeat the question?
Q. Do you have an understanding as to whether the shipping schedule that DOE is going to use once this program begins is going to be the schedule that's reflected in Table 8 of the total system description or the rate that's reflected in Table 1 of the 1995 annual capacity report?
A. I think the Department will probably plan for the higher rates because these rates that I see in Table 8 are probably also in our system requirements documents. So those would be the ones that the Department will attempt to try to reach. And assuming we reach those, then these would be also dealt with.
Q. But these waste receipt rates reflected in Table 8 are not necessarily binding?
MR. PETRIE: Objection, calls for a legal conclusion.
BY MR. GREENE:
Q. You can answer, if you know.
A. I'm not a lawyer. I couldn't tell you.
Q. But these rates, it's your sense that this is the target that DOE is shooting at?

Page 94

A. The rates in Table 8, my understanding is that these are also in our systems requirements documents, which means that the people who are designing our facilities and who would operate our transportation system would try to meet these rates as identified in Table 8.
(Kouts Exhibit No. 5 was marked for identification.)
BY MR. GREENE:
Q. Do you recognize this document?
A. It's a contractor report to the program by Pacific Northwest Laboratories. I may have seen it in the past. I don't remember exactly. It doesn't bring anything to mind at this point. It's one of many studies that's been done by the program.
Q. Is Pacific Northwest Labs still in operation?
A. PNL? Yes, it is. It's a contracting lab that works out of Richland, Washington.
Q. Do they still currently work for the Department of Energy?
A. For the Department of Energy? Yes. I don't believe they work for our program except in a very minor way right now.

Page 95

Q. I'm going to direct your attention to page 1151 in the second column. The column is headed Logistics and Cost Calculations and I'm looking at the second paragraph in that which says as follows: "The initial ramp-up to the design acceptance rates at the MRS and repository in the first two years of operations, was assumed to be one-fourth and one-half of the design acceptance rate, respectively."
A. Okay.
Q. Taking into account the current thinking as far as the repository is concerned, would it be possible to have a ramp-up similar to that with the current system that DOE is contemplating, the current plan?
A. I go back to my earlier statement. If the resources are available and the lead time is available, potentially it can be done. But there are just so many variables, it's just hard to say.
Q. But generally speaking, with the resources and the lead time, it's achievable?
A. Again, if a great deal of resources are available and management attention, yes, things can be done. You know, America went to the

Page 96

moon.
Q. Turning to page -- it's actually marked as -- it's page 1156. In the first column under the heading Conclusions, it says that, "Receipt rates higher than the current 3,000 MTU per year planning base appear to be economically justified for both the repository and in MRS." Do you have any understanding as to whether that statement would still hold true today?
MR. PETRIE: Objection. There has no foundation been laid to show that Mr. Kouts has an understanding as to what the underlying assumptions were that went into this statement that apparently formed the basis for that statement, much less being able to respond to the question that up just now formulated.
BY MR. GREENE:
Q. I'll reformulate the question. Do you have an understanding as to whether a receipt rate that's higher than 3,000 MTUs per year would be economically justified today?
A. Without undertaking an analysis of all the variables and so forth, it's just too difficult for me to say. It's possible, and it may not be possible. I just can't say at this

**CERTIFICATE OF FILING**

I hereby certify that on September 6, 2006, a copy of foregoing "DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE FROM TRIAL DOCUMENTS PREPARED BY GOVERNMENT CONTRACTORS" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Scott R. Damelin