IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| SYSTEM FUELS, INC., on its own behalf and as agent for SYSTEM ENERGY RESOURCES, INC. and SOUTH MISSISSIPPI ELECTRIC POWER ASSOCIATION, | |
| Plaintiff, | No. 03-2624 C |
| v. | (Judge Braden) |
| THE UNITED STATES OF AMERICA, | |
| Defendant. | |

**WRITTEN DIRECT TESTIMONY OF KENNETH P. METCALFE**

1. My name is Kenneth P. Metcalfe and I am the President of The Kenrich Group LLC ("The Kenrich Group" or "Kenrich"). The Kenrich Group is a national consulting firm of accounting, financial, and engineering professionals with experience and expertise in the preparation and evaluation of economic damages claims. Kenrich's professionals have substantial experience with damages, including that obtained in working on numerous matters related to the public utility industry, nuclear power plants, and government contracting. My business address is 1200 New Hampshire Avenue, NW; Suite 410; Washington, DC 20036. My hourly rate on this matter is $210.

2. I have been asked to provide analyses, opinions and expert testimony related to the quantification of damages resulting from the failure of the United States, acting through the United States Department of Energy ("DOE"), to perform its contractual obligation to remove spent nuclear fuel ("spent fuel") generated at the Grand Gulf Nuclear Station ("Grand Gulf").[1]

[1] I previously co-authored with Richard Sieracki an Expert Report entitled "Assessment Of Damages, Systems Fuels, Inc.'s, System Energy Resources, Inc.'s And South Mississippi Electric Power Association's Spent Nuclear Fuel Claim," dated November 18, 2005. I was asked by Counsel to prepare this testimony, which I understand will effectively supersede that Report.

3. Grand Gulf is owned by System Energy Resources, Inc. ("SERI"), a subsidiary of Entergy Corporation, and South Mississippi Electric Power Association ("SMEPA") and operated by Entergy Operations, Inc ("EOI").[2, 3] System Fuels, Inc. ("SFI") provides fuel services for Grand Gulf, and as agent for SERI and SMEPA, contracted with DOE for disposal of Grand Gulf's spent fuel and high level radioactive waste.[4]

4. The damages of SFI, SERI, and SMEPA (collectively, "Entergy Grand Gulf") contained in my testimony are based on the efforts that Entergy Grand Gulf has undertaken to address or mitigate the impacts of DOE's failure to accept Grand Gulf's spent fuel, as required by the "Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste" (the "Standard Contract").

5. To facilitate the Court's review of my testimony, I have prepared the Table of Contents that appears on the following pages.

[2] System Fuels, Inc. and SERI are both wholly-owned subsidiaries of Entergy Corporation.

[3] SERI owns 90% of Grand Gulf and the remaining 10% is owned by SMEPA.

[4] DOE Contract No. DE-CRO-183NE-44395 (the "Standard Contract" related to Grand Gulf).

Protected and Confidential Material to be Disclosed only in Accordance with
U.S. Court of Federal Claims Protective Order

**TABLE OF CONTENTS**

Page

I. Background And Qualifications ....5

II. Summary Of Opinions ....10

A. Context Of Damages Claim ....10

B. Elements And Value Of The Claim ....12

III. Overview Of Entergy Grand Gulf's Nuclear Plant And Spent Nuclear Fuel Issues ....14

A. Grand Gulf Nuclear Plant – General Background ....14

B. Technical Background ....15

C. Department Of Energy's Failure To Perform ....16

D. Spent Fuel Pool Operating Reserve ....16

E. Spent Fuel Storage Requirements ....17

F. Discussions With Knowledgeable Entergy Personnel And Industry Experts ....18

IV. Entergy Grand Gulf's Damages ....19

A. Overall Approach To Assessing Damages ....19

B. Summary Of Damages ....20

C. General Method For Determining Damages ....20

1. Identification Of Activities ....20

2. Identification Of Costs ....21

a. "Breach" Costs ....21

b. "Non-Breach" Costs ....22

3. Financing ....23

V. Discussion Of Entergy Grand Gulf's Spent Nuclear Fuel Damage Elements ....23

A. Costs Incurred Through August 31, 2005 ....23

1. Spent Fuel Storage Studies – Capital Work Order N31937 ("Long Term Spent Fuel Storage Options") ....24

2. ISFSI Design And Construction – Capital Work Order N32172 ("Dry Fuel Storage – Study/Design/Construction") ....25

3. Cask Fabrication Facility – Capital Work Order N32271 ("Dry Fuel Storage Cask Construction Pad") ....27

4. Dry Fuel Equipment Storage Building – Capital Work Order N32302 ("Turbine Generator Rotor/Dry Fuel Storage Building") ....27

5. ISFSI Electrical And Security Systems – Capital Work Order N32350 ("Install ISFSI Pad Electrical & Security Portions") ....28

6. Auxiliary Building Door Modification – Capital Work Order N32136 ("Dry Fuel Storage – Site Improvements") ....28

<u>Appendices</u>:

Appendix A Resume Of Mr. Kenneth P. Metcalfe

Appendix B Mr. Metcalfe's Testimony And Expert Reports

Appendix C1 Damages By Work Order

Appendix C2 Spent Fuel Pool Inventory – Non-Breach Scenario

Appendix C3 Spent Fuel Pool Inventory – Breach Scenario

Protected and Confidential Material to be Disclosed only in Accordance with
U.S. Court of Federal Claims Protective Order

## I. BACKGROUND AND QUALIFICATIONS

6. I graduated Cum Laude in 1982 from Georgetown University's School of Business with a Bachelor of Science in Business Administration, majoring in accounting. In addition to accounting (including government accounting) and auditing, I studied macro- and micro-economics, finance and statistics. I am a Certified Public Accountant, licensed in the Commonwealth of Virginia, as well as a Certified Valuation Analyst with the National Association of Certified Valuation Analysts. A Certified Valuation Analyst applies macro- and micro-economics, accounting and financial analysis to the various aspects of valuation, including in damages claims.

7. From 1982 to 1994, I was employed by Peterson Consulting, an international consulting firm which grew to over 500 professionals, where I focused primarily on business consulting and damages analyses in disputes. My initial position was a Staff Consultant and I had various promotions, ultimately to Vice President in 1989. At Peterson Consulting, I had significant responsibility for a number of consulting practice areas, including regulated industries, which encompassed electric utility work. My work focused very significantly in three areas: the first was regulated utilities, including the construction and operation of nuclear power plants; the second was government contracts, assisting on breach of contract claims, termination claims, and other related matters; and the third was the more general area of commercial litigation, including for example intellectual property and antitrust matters. While at Peterson Consulting, I performed hundreds of damages analyses related to preparing or evaluating damages claims.

8. In 1994, I became one of the original founders of Tucker Alan Inc., which also was a business consulting and damages analysis firm. From 1994 to 2004, I served as the Managing Vice President of Tucker Alan's Washington, DC office of approximately forty persons. At Tucker Alan I had significant responsibility for a number of consulting practice areas, again including regulated industries, as well as others, such as commercial litigation, financial institutions, government contracts and intellectual property.

Protected and Confidential Material to be Disclosed only in Accordance with
U.S. Court of Federal Claims Protective Order

9. In February 2004, after leaving Tucker Alan Inc., I co-founded The Kenrich Group LLC. As President of The Kenrich Group, I work primarily on client engagements. I also run the firm and manage approximately twenty employees in three offices, including the firm's headquarters in Washington, DC.

10. Throughout my consulting career, I have had three substantive areas of emphasis in my work: 1) business and management consulting—providing advice to clients on how to improve their management or business operations; 2) regulated industry consulting—assisting public utilities and government agencies regarding regulatory accounting, economic and other issues; and 3) causation and economic damages analysis in the context of business disputes, including analyzing, teaching and testifying on the proper economic methods to determine damages.

11. My experience consulting on electric power or public utility matters encompasses over two decades of work in areas that include regulatory consulting, prudence reviews, management consulting, and litigation consulting. For regulatory consulting matters, I have worked with utilities regarding compliance with state and federal regulatory requirements, including those of state public utility commissions and the Federal Energy Regulatory Commission, particularly from a cost accounting standpoint. I have also performed numerous analyses and prepared testimony for rate case proceedings (hearings to determine costs that utilities can charge to their ratepayers). For prudence reviews, I have provided consulting in situations where, among many other things, utilities are required to demonstrate that the costs they incur and want to charge through to ratepayers have been prudently (i.e., "reasonably") incurred. I have assisted utilities on various prudence investigations, primarily involving the construction and operations of nuclear power plants and other major assets. In the context of commercial litigation, I have also studied nuclear power plant construction and operations, including outage extensions and cost impacts related to plant work and maintenance orders, potential "repowering" options, replacement power costs, and the increased cost of operation due to defective equipment. I have also provided general business consulting in various areas of operations and analyses of least cost alternatives. Over my career, I have studied over 40 nuclear power plants located in over two dozen different states in

Protected and Confidential Material to be Disclosed only in Accordance with
U.S. Court of Federal Claims Protective Order

the U.S., each with its own regulatory state public utility commission, as well as plants in foreign countries.

12. I have also consulted on matters involving nuclear issues other than commercial nuclear power plants. As examples, I have studied costs and other issues related to the pricing of nuclear fuel (uranium) enrichment, nuclear reactor repair technology, and the cleanup (including of nuclear material) of a DOE site.

13. Regarding spent nuclear fuel disposal cases, in addition to the current series of spent nuclear fuel cases before the United States Court of Federal Claims, I was previously retained by Public Service of Colorado in the mid-1990s to assist with that utility's spent nuclear fuel dispute related to its Fort St. Vrain nuclear plant. I led a team of consultants and utility personnel in preparing a claim for the increased costs due to DOE's breach, including those costs resulting from constructing a dry storage facility, as well as for the costs of cask purchasing and loading and for the cost of operating and maintaining the dry storage facility and loaded casks. Our damages analysis was used by Public Service of Colorado to negotiate and ultimately settle the claim with DOE which, among other things, transferred the title to the Fort St. Vrain spent fuel and the dry storage facility to DOE.

14. I have also worked extensively on government contract matters, including those related to electric power generation, breach of contract cases (including multiple Winstar-related engagements), contract terminations (both for default and convenience), false claims investigations, and other disputes. In these government contract matters, the general focus of my work has been on accounting, financial and economic issues related to damages. These issues have included the proper application of accounting and economic concepts in determining damages, compliance with accounting procedures and controls and cost accounting standards, interpretation and application of financial and economics-related contractual terms, and contract change-related pricing issues. My cost accounting work in this area has generally involved consulting regarding the various regulations with which companies must comply (e.g., the Federal Acquisition Regulations and the Cost Accounting Standards) regarding their internal accounting

systems. Examples of government contract programs I have studied include those related to Federal Drug Administration testing lab construction, commissary scanner data, aircraft flight simulator production, liquid natural gas transport ships, energy co-generation facilities, and waste water treatment facilities, as well as nuclear fuel enrichment and nuclear research site cleanups.

15. I have worked for various Federal Government agencies. For example, I worked for the Federal Deposit Insurance Corporation and the Resolution Trust Corporation in analyzing failed savings and loans. I have worked for the Department of Justice and the Rural Utility Service agency on a matter involving the valuation of an electric utility co-operative in Louisiana, including its share of the River Bend Nuclear Power Plant. I was one of the lead officers on the team at Tucker Alan that was, at the recommendation of the Court, jointly retained to work for both the Department of Justice and a plaintiff in the areas of valuation and damages assessment on an intellectual property matter at the United States Court of Federal Claims. I have been retained by the government of the Republic of the Philippines to assist them over a period of several years in numerous analyses related to the Philippine Nuclear Power Plant.

16. I have worked for many United States public electric (and other) utilities and I have worked for numerous Fortune 500 and other companies, agencies, and others, including: Amgen; former Federal Reserve Chairman, Paul Volcker in his review of the Holocaust accounts in Switzerland; the Public Oversight Board (for former U.S. Comptroller General, Charles Bowsher); Canadair; the American Legacy Foundation; Bank of America; Hoffman-La Roche; Raytheon; Lockheed Martin; Unisys; the Bank of New York and others.

17. I have lectured or given numerous seminars during my career covering accounting, finance, economics and damages issues, including to graduate students in Stanford University's Construction, Engineering and Management Program; on cost issues in the Trial Advocacy Program sponsored by the Public Contracts Section of the American Bar Association; and to various attorney forums, as well as to project owners, contractors and financiers at the annual Forbes Conference in New York.

Protected and Confidential Material to be Disclosed only in Accordance with
U.S. Court of Federal Claims Protective Order

18. I have testified as an expert in deposition, trial and arbitration on approximately twenty occasions, including on nuclear power-related matters. I have also submitted several expert reports to date and testified in deposition and at trial on various other spent nuclear fuel matters currently before the United States Court of Federal Claims. I also worked extensively on the analyses and testimony presented at the United States Court of Federal Claims in a recently settled, multi-year matter regarding nuclear fuel enrichment. On spent nuclear fuel matters specifically, I previously testified as an expert at the United States Court of Federal Claims in the matter of *Southern Nuclear Operating Company, Alabama Power Company And Georgia Power Company v. The United States* (Case No. 98-614C) before Senior Judge Merow, where I was admitted as an expert in accounting, finance, and economics related to damages and other related issues with respect to regulated utilities, nuclear power plants and government contracts. I have also testified in deposition on a breach of contract matter before Judge Bruggink at the United States Court of Federal Claims, which subsequently settled prior to trial. Throughout my career, on litigation matters I have worked for both plaintiffs and defendants, relatively equally. My resume and my list of testimony and expert reports (Appendix A and Appendix B) provide additional details on my background and qualifications as an expert in these matters.

19. For this case, I was asked to provide testimony regarding overall damages theory approach, the Kenrich fuel management and damages models underlying Entergy Grand Gulf's claim, the accounting and economic damages variables and assumptions (e.g., past cost of capital, inflation) underlying the claim, and the propriety of the cost elements incorporated in the Kenrich model and Entergy's claim. I have also been asked to testify regarding the individual components of Entergy Grand Gulf's damages claim, and in particular the determination and support for Entergy Grand Gulf's costs in the actual and non-breach worlds that relate to spent fuel pool modifications and dry fuel storage-related costs at Grand Gulf.

20. In preparation for my testimony, along with other Kenrich personnel, I worked closely with the Chief Executive Officer of The Kenrich Group, Richard J. Sieracki. Mr. Sieracki holds a Bachelor of Science in Civil Engineering from University

Protected and Confidential Material to be Disclosed only in Accordance with
U.S. Court of Federal Claims Protective Order

of Illinois and has extensive experience working in the nuclear industry, as well as analyzing and preparing damages claims in the nuclear and various other industries.[5]

## II. SUMMARY OF OPINIONS

### A. Context Of Damages Claim

21. Pursuant to the Nuclear Waste Policy Act of 1982, DOE is required to dispose of the spent fuel discharged by all United States commercial nuclear reactors, including Grand Gulf. The deep geologic disposal facility in which DOE intends to permanently dispose of this spent fuel is currently expected to be located at Yucca Mountain, Nevada. On June 30, 1983, SFI, Middle South Energy, Inc.,[6] and SMEPA entered into the Standard Contract with DOE for disposal of the spent fuel and high-level radioactive waste that would be discharged from Grand Gulf. According to the terms of the Standard Contract between Entergy Grand Gulf and DOE, as well as between other commercial nuclear electric utilities ("nuclear utilities") and DOE, the costs of disposal attributed to nuclear utilities' spent nuclear fuel are funded through a fee collected by the Government from nuclear utilities. That fee is equal to one tenth of one cent (i.e., one "mill") per kilowatt hour of electricity generated and sold from each nuclear plant (plus an equivalent per kilowatt hour fee for spent nuclear fuel discharged before April 7, 1983). As of June 30, 2006, Entergy Grand Gulf had already paid approximately $176 million into the Nuclear Waste Fund and continues to pay fees of approximately $10 million annually into the fund as electricity from Grand Gulf is generated and sold.

22. The Standard Contract between nuclear utilities (including Entergy Grand Gulf) and DOE requires DOE to begin disposing of spent fuel from commercial nuclear utilities no later than January 31, 1998. DOE has not yet removed any spent fuel from nuclear plants in accordance with the Standard Contract, and according to this Court's July 29, 2005 Order, DOE has partially breached its contractual obligations. This breach, or nonperformance, has caused and will continue to cause nuclear utilities to incur

---

[5] Mr. Sieracki was deposed in the Entergy Grand Gulf matter on July 20, 2006.

[6] In 1986, the name of Middle South Energy, Inc. was changed to System Energy Resources, Inc.

Protected and Confidential Material to be Disclosed only in Accordance with
U.S. Court of Federal Claims Protective Order

significant costs in order to store substantially greater quantities of discharged spent fuel onsite at their nuclear plants than they would have stored had DOE performed under the Standard Contract.

23. To calculate the amount of damages that Entergy Grand Gulf has incurred each year for spent fuel storage due to DOE's failure to remove spent fuel as required by the Standard Contract, I have considered certain assumptions, including when DOE would have begun performing, as well as how much spent fuel DOE would have removed each year had it fulfilled its obligations under the Standard Contract. The Standard Contract also required DOE to remove fuel generally following a spent fuel acceptance "queue" (i.e., the sequential order in which spent fuel would be removed from commercial nuclear plants across the United States) based on an "oldest fuel first" priority ranking. For purposes of the damages calculations, I have relied upon the acceptance rate and acceptance queue most recently published by DOE and supported by the expert testimony prepared by Eileen M. Supko of Energy Resources International, Inc. in this proceeding.

24. This damages analysis is based on an annual, steady-state rate of acceptance of 3,000 metric tons of uranium ("MTUs") after a short ramp-up period. DOE has specified this acceptance rate in numerous documents, including its December 1998 and May 2001 "Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program," as well as in its July 2004 "Acceptance Priority Ranking & Annual Capacity Report." As described more fully below, performance of the Standard Contract by DOE at the assumed rate of acceptance would have allowed Entergy Grand Gulf to continue to operate Grand Gulf without the necessity of constructing expensive dry cask[7] storage facilities and purchasing related required equipment.

---

[7] A cask is a container for shipping or storing spent fuel. A dry cask system can be a combination of a canister and an overpack or vault, or a one-piece cask. A cask can be used for storage and transportation of spent fuel, depending on the license approved by the United States Nuclear Regulatory Commission ("NRC"). Depending on their design, overpacks, which hold and protect the canister, can be used for transportation or storage.

25. The annual acceptance rates set forth in DOE publications cited in the preceding paragraph all achieve a steady state of 3,000 MTUs after a short ramp-up period. In the first year of removal, DOE has stated that it will remove 400 MTUs from commercial nuclear plants, 600 MTUs in the second year, 1,200 MTUs in the third year, 2,000 MTUs in the fourth year, and 3,000 MTUs in the fifth year and each year thereafter. According to Eileen M. Supko, DOE's published rates of removal would have limited the amount of additional spent fuel storage facilities needed by nuclear utilities after January 31, 1998 and would have worked off the backlog of spent fuel to allow timely nuclear plant decommissioning.[8]

26. Further, DOE's July 2004 "Acceptance Priority Ranking & Annual Capacity Report" shows the order of spent fuel removal from all nuclear plants in the country for the first ten years of spent fuel repository operations based on the oldest-fuel-first requirement. This schedule, or "queue," is consistent with the Standard Contract requirement that acceptance rights, with limited exceptions, are based on the oldest spent fuel first.

27. Applying DOE's published industry-wide rate of removal to the industry-wide queue of oldest fuel first beginning with the contractually required performance date of January 31, 1998, results in DOE removing spent fuel from Grand Gulf beginning in 2005.[9]

## B. Elements And Value Of The Claim

28. DOE's failure to perform has caused Entergy Grand Gulf to incur significant monetary damages. Further, as DOE has admitted that it does not intend to commence performance until 2017 at the earliest,[10] Entergy Grand Gulf will be forced to store increasing amounts of spent fuel in dry casks and potentially expand its onsite dry

---

[8] See Section V.A., paragraph 71 from the written direct testimony of Eileen M. Supko, Energy Resources International, Inc.

[9] See Section V.B., paragraph 74 from the written direct testimony of Eileen M. Supko, Energy Resources International, Inc.

[10] In a DOE press release dated July 19, 2006, DOE stated that "if requested legislative changes are enacted, the repository will be able to accept spent nuclear fuel and high-level waste starting in early 2017."

storage facilities, currently under construction. Thus, Entergy Grand Gulf expects to incur substantially increasing damages in the future. However, for purposes of this proceeding, the damages summarized in my testimony represent only those costs that Entergy Grand Gulf has incurred as of August 31, 2005.[11]

29. Given the assumptions provided, the damages discussed in my testimony represent the nominal and present value of costs incurred by Entergy Grand Gulf through August 31, 2005 that would not have been incurred by Entergy Grand Gulf had DOE begun to dispose of spent fuel from the nuclear industry in 1998.[12] I understand that Entergy Grand Gulf plans to pursue in one or more subsequent proceedings the damages that it will continue to incur after August 31, 2005 as a result of DOE's nonperformance.

30. I have determined that Entergy Grand Gulf's total incurred damages through August 31, 2005 are approximately $10.6 million in nominal dollars and $12.2 million in 2006 dollars.[13] Table I summarizes the damages for Grand Gulf.

---

[11] This damages claim includes costs incurred through August 31, 2005. I understand the trial is currently scheduled to begin on September 18, 2006. My November 18, 2005 Expert Report (co-authored with Richard Sieracki) also included an estimate of the damages Entergy Grand Gulf expected to incur from September 1, 2005 through August 31, 2006. However, in its March 27, 2006 amended complaint, Entergy Grand Gulf subsequently agreed that "[t]he amount of these damages (through August 31, 2005) is to be determined at the trial scheduled to commence in September 2006. System Energy and SMEPA reserve all rights to recover damages incurred after that date as a result of the continuing partial breach of SFI's Standard Contract and continuing taking of System Energy's and SMEPA's property without just compensation by the Government."

[12] Throughout my testimony, the term "nominal dollars" means the actual dollars spent in each of the relevant years. Nominal dollars are unadjusted for the effects of financing (past) or the time value of money (future). Nominal dollars are restated to present value by applying an appropriate weighted average cost of capital from the middle of each year in which damages were incurred through September 11, 2006. At the time of my November 18, 2005 Expert Report, the anticipated trial commencement date was September 11, 2006.

[13] Throughout my testimony, the term 2006 dollars means September 11, 2006 dollars, which was the scheduled trial commencement date.

Protected and Confidential Material to be Disclosed only in Accordance with
U.S. Court of Federal Claims Protective Order

**Table I**
**Summary Of Damages Incurred Through August 31, 2005**
**(In Thousands)[14]**

| | Nominal Dollars | 2006 Dollars[15] |
|---|---|---|
| Damages Incurred Through August 31, 2005 | $10,591 | $12,178 |

31. After August 31, 2005, Entergy Grand Gulf has incurred and will continue to incur certain costs relating to DOE's breach, including those costs associated with completing the design and construction of its dry storage facility, the purchase and loading of dry storage casks, the potential of a further expansion of onsite dry storage and the related operation and maintenance of the dry storage facilities. However, these costs are not currently being claimed in this proceeding.

32. The opinions and analyses discussed in my testimony are based on currently available information. My testimony is supplemented by certain illustrative exhibits provided as Appendices, as well as my work papers, which were produced to the Government on November 18, 2005.

## III. OVERVIEW OF ENTERGY GRAND GULF'S NUCLEAR PLANT AND SPENT NUCLEAR FUEL ISSUES

### A. Grand Gulf Nuclear Plant – General Background

33. Entergy Corporation owns and operates ten nuclear power reactors across the United States. Grand Gulf is a single-reactor plant located approximately 25 miles south of Vicksburg, Mississippi, on the east bank of the Mississippi River. Grand Gulf began commercial operation in July 1985 and is currently licensed to operate through

---

[14] All dollar amounts presented within my testimony are rounded to the nearest thousand.

[15] Throughout my testimony, past damages are restated in 2006 dollars by applying an appropriate weighted average cost of capital from the middle of each year prior to 2006 in which damages were incurred through September 11, 2006. The cost of capital was calculated by weighting each co-owner's actual or estimated annual after-tax weighted average cost of capital by its ownership percentage.

Protected and Confidential Material to be Disclosed only in Accordance with
U.S. Court of Federal Claims Protective Order

November 1, 2024.[16] Grand Gulf uses a General Electric design boiling water reactor to generate electricity.

### B. Technical Background

34. Nuclear power plants generate electricity through the nuclear fission of uranium contained in nuclear fuel. The energy released by the fission process boils water to produce steam that turns turbine generators, thereby generating electricity. The fuel used in nuclear reactors is fabricated from enriched uranium. The enriched uranium is processed and formed into small cylindrical ceramic uranium dioxide pellets that are stacked inside long metal tubes called fuel rods. Fuel rods are joined into a square array referred to as a fuel "assembly." After several operating cycles in the reactor, an assembly has expended its usable energy and is replaced with new fuel. The replaced ("spent") fuel assemblies are initially stored vertically in spent fuel storage "racks" in specially constructed pools of water ("spent fuel pool" or "pool"). These racks are designed to allow safe storage of the fuel in a relatively compact environment. Spent fuel is highly radioactive and the underwater storage of spent fuel in pools protects workers and the environment from the radioactivity and assists in removing heat from the spent fuel. Once the fuel has been sufficiently cooled in the pool, it can be removed from the pool and transferred to DOE or stored outside the pool in dry casks until such time as DOE removes the fuel from the site.

35. I understand that the original design and capacity of Grand Gulf's spent fuel pool and associated racks would have been sufficient for an indefinite period of plant operation if, in accordance with the Standard Contract, the spent fuel had been regularly removed from the pool by the DOE and permanently disposed of by the federal government.[17]

---

[16] Entergy currently expects to prepare and submit an application to the NRC seeking approval to extend Grand Gulf's operating license.

[17] See Section V.B., paragraph 75 from the written direct testimony of Eileen M. Supko, Energy Resources International, Inc.

Protected and Confidential Material to be Disclosed only in Accordance with
U.S. Court of Federal Claims Protective Order

**C. Department Of Energy's Failure To Perform**

36. DOE has failed to begin to remove and dispose of Entergy Grand Gulf's spent nuclear fuel as contractually required. Further, DOE has stated that it will not begin to perform until 2017, at the earliest. As a direct result, Entergy Grand Gulf has incurred and will continue to incur significant costs associated with procuring, operating and maintaining additional spent fuel storage and performing other actions necessitated by DOE's failure to begin picking up fuel.

37. As stated previously, had DOE begun to remove and dispose of spent fuel from commercial plants by January 31, 1998, and performed at the assumed annual acceptance rate of 3,000 MTUs (after the ramp-up period previously described), DOE would have started to accept spent fuel from Grand Gulf in 2005. Had this occurred, the inventory of spent fuel at Grand Gulf would have never exceeded the capacity of the spent fuel pool, nor challenged the ability to maintain an adequate reserve for offloading the full core of fuel from the reactor, and DOE would have picked up a sufficient amount of the spent fuel such that Grand Gulf would have avoided the need to construct an onsite dry storage facility.

**D. Spent Fuel Pool Operating Reserve**

38. I understand that a spent fuel pool has a licensed capacity (i.e., licensed by the NRC) for a specific number of storage locations. These storage locations hold spent fuel assemblies until the assemblies can be shipped offsite for disposal or moved to another storage facility. In addition, spent fuel pools also provide temporary storage locations for new and partially burned fuel prior to and during refueling outages. At no time can the total number of new, partially burned, or spent fuel assemblies in the pool exceed the licensed capacity of the pool.

39. The number of unoccupied storage locations available for temporary storage of fuel assemblies for outage and maintenance activities is generally referred to as the "reserve." I understand that the maintenance of reserve in a spent fuel pool reflects a nuclear utility's strategy regarding risk mitigation and operational efficiency, and is

Protected and Confidential Material to be Disclosed only in Accordance with
U.S. Court of Federal Claims Protective Order

largely based on the perceived benefit of maintaining such reserve as compared to the cost. A spent fuel pool with sufficient reserve to hold all the assemblies in the reactor has "full core discharge capability," or "full core reserve."

**E. Spent Fuel Storage Requirements**

40. Grand Gulf has an upper containment pool and a spent fuel pool. The upper containment pool has a total installed capacity of 710 fuel assemblies and is generally used during refueling outages for the staging of new (or fresh) fuel assemblies and temporary storage of partially burned fuel that will be reinserted back into the reactor.[18] The spent fuel pool has a total installed capacity of 4,348 assemblies and is used for storage of spent fuel assemblies at all times, including during power operation.

41. Certain storage locations (or "cells") in the Grand Gulf upper containment and spent fuel pools are not usable (i.e., they are blocked or otherwise restricted). The current total number of usable cells in the upper containment pool is 580 (i.e., 710 total cells less 130 unusable cells). The total number of usable cells in the spent fuel pool is 3,931 (i.e., 4,348 total cells less 417 unusable cells).

42. In 1999, Entergy Grand Gulf projected that Grand Gulf's spent fuel pool would accommodate spent fuel discharges only through 2005.[19] After thoroughly analyzing its options, Entergy Grand Gulf determined that the most efficient and cost effective means to store the increasing amount of spent fuel was to store spent fuel in dry casks. However, in 2005, as an interim measure, Grand Gulf completed work to recover 180 storage locations in the spent fuel pool that were previously inaccessible or otherwise unusable, allowing Grand Gulf to operate for an additional operating cycle with sufficient reserve in its spent fuel pool, prior to the addition of dry fuel storage. Entergy Grand Gulf now expects to commence loading dry casks in Fall 2006, prior to the Spring 2007 outage.

---

[18] Per Grand Gulf's technical specifications, the upper containment pool cannot be used for storing spent fuel during power operation.

[19] Following the fall 2005 refueling outage, the spent fuel pool would no longer have had sufficient available storage spaces to permit a complete offloading of the reactor core into the pool (i.e., full core reserve would no longer exist).

Protected and Confidential Material to be Disclosed only in Accordance with
U.S. Court of Federal Claims Protective Order

43. Entergy Grand Gulf began plant modifications to facilitate dry fuel storage in 2002 and began work on the design and construction of its dry storage facility in 2003. Entergy Grand Gulf will be implementing the Holtec HI-STORM system at Grand Gulf.[20] The HI-STORM system for boiling water reactors utilizes a 68-assembly, welded, dual-purpose metal canister which is placed vertically in a concrete storage overpack.[21]

44. The Grand Gulf dry storage facility (or "Independent Spent Fuel Storage Installation" or "ISFSI") is located east of the Combination Shop and north of the existing northern Protected Area fence. Entergy Grand Gulf plans to load four HI-STORM dry storage containers starting in October of 2006. The currently installed spent fuel dry storage pad at the facility is designed to accommodate up to 44 dry casks. Based on its current discharge projections, Entergy Grand Gulf expects it will need to expand the size of the Grand Gulf dry fuel storage facility in the future if the DOE does not commence performance prior to 2016.

45. Had DOE begun to remove and dispose of spent fuel from commercial plants by January 31, 1998, and performed at the annual rate of 3,000 MTUs (after the ramp-up rate described previously), DOE would have started removing spent fuel from Grand Gulf by 2005. Had this occurred, there would have been no need for dry storage or recovery of additional storage locations in the spent fuel pool at Grand Gulf.[22]

## F. Discussions With Knowledgeable Entergy Personnel And Industry Experts

46. In addition to relying on numerous accounting and other cost-related documents, operational records and other data in performing the Entergy Grand Gulf

---

[20] In September 2000, Entergy Operations Inc. ("EOI") contracted with Holtec International ("Holtec") to supply dry storage containers and ancillary equipment on a "fleet-wide" basis for Entergy's multiple plants which require dry storage.

[21] The HI-STORM system's welded metal canister is designed and licensed for both storage and transportation of spent fuel.

[22] See Section V.B., paragraph 75 from the written direct testimony of Eileen M. Supko, Energy Resources International, Inc.

damages analysis, I have toured the Grand Gulf ISFSI construction site and obtained information provided by knowledgeable Entergy personnel and nuclear industry experts, including Eileen M. Supko of Energy Resources International, Inc.

## IV. ENTERGY GRAND GULF'S DAMAGES

### A. Overall Approach To Assessing Damages

47. My general approach to assessing damages in this case is based on the underlying premise that Entergy Grand Gulf should be reimbursed for the economic harm caused by DOE's failure to begin picking up spent fuel from the nuclear industry in 1998 and from Grand Gulf, as contractually required. Entergy Grand Gulf's damages include those costs that it has incurred through August 31, 2005 as a result of DOE's failure to perform. In this damages analysis, the economic harm to Entergy Grand Gulf is measured in nominal and 2006 dollars.

48. The process used to identify and quantify Entergy Grand Gulf's damages generally included the following steps. First, events or activities related to spent fuel storage were identified. Second, for each identified event or activity, a determination was made as to whether that event or activity was caused by the failure of DOE to perform under the Standard Contract and whether it caused and/or will cause Entergy Grand Gulf to incur increased costs. Third, Entergy Grand Gulf's reported "breach" costs related to such past events and activities were compiled based on actual recorded costs and other available supporting information. Similarly, the budget Entergy Grand Gulf developed for the projected cost to complete the dry storage facility and contracts Entergy Grand Gulf has entered into with outside vendors and contractors were reviewed. Fourth, the extent to which the government is entitled now to claim any offsets for "non-breach" costs—those costs that would have been incurred by Entergy Grand Gulf had DOE honored its contractual obligation and begun disposing of Entergy Grand Gulf's spent fuel per Entergy Grand Gulf's Standard Contract—was considered. Fifth, damages were calculated as the difference between the "breach" and "non-breach" costs, given the assumptions provided. Finally, calculations were performed to take into account the time value of money for damages, resulting in a measurement of Entergy Grand Gulf's

Protected and Confidential Material to be Disclosed only in Accordance with
U.S. Court of Federal Claims Protective Order

damages in 2006 dollars. As directed by counsel for this proceeding, damages are calculated based on the costs to be incurred through August 31, 2005. I understand that Entergy Grand Gulf plans to seek damages it has incurred and will continue to incur after that date in future proceedings.

## B. Summary Of Damages

49. The damages to Entergy Grand Gulf resulting from DOE's failure to begin picking up spent fuel from the nuclear industry in 1998 that are being sought in this proceeding are those that were incurred through August 31, 2005. The major components of Entergy Grand Gulf's damages are summarized in the following table:

**Table II**
**Damages Incurred Through August 31, 2005**
**(In Thousands Of Dollars)**

| Damage Element | Nominal Dollars | 2006 Dollars |
|---|---|---|
| Spent Fuel Storage Studies | $ 341 | $ 506 |
| ISFSI Design And Construction | 8,367 | 9,458 |
| Cask Fabrication Facility | 465 | 527 |
| Dry Fuel Equipment Storage Building | 798 | 877 |
| ISFSI Electrical And Security Systems | 31 | 34 |
| Auxiliary Building Door Modification | 589 | 776 |
| **Total Damages** | $10,591 | $12,178 |

## C. General Method For Determining Damages

### 1. Identification Of Activities

50. A team of Kenrich and Entergy personnel identified the events and activities required to be performed by Entergy Grand Gulf to address the spent fuel storage requirements. The process included review of specific Entergy Grand Gulf records, review of information related to nuclear industry practices and experience, and discussions with Entergy and industry personnel.

51. Kenrich and Entergy personnel identified and accumulated relevant documents and other information required to determine the specific activities performed and their related costs. Kenrich personnel then analyzed the information to be used as a basis for the damage calculations (i.e., to verify that the costs identified were those that would not have otherwise been incurred had the DOE begun picking up spent fuel from the nuclear industry in 1998). Kenrich personnel also worked with Entergy Grand Gulf to gather additional support, as necessary.

52. In addition to the tasks identified above, Kenrich developed a model used to assess and summarize spent fuel storage requirements and related costs at Grand Gulf. This model considered factors such as projected spent fuel discharges, the DOE spent fuel acceptance rate, and the activities and related costs for spent fuel storage.[23] The model was used to assess Entergy Grand Gulf's spent fuel storage costs and damages, in conjunction with required safety and technical considerations. Entergy personnel have reviewed the assumptions and outputs of our model, and confirmed that they are reasonable and accurate.

53. Entergy Grand Gulf has continued to perform design and construction activities related to its onsite dry storage facilities and the preparation for cask loading operations at Grand Gulf.

## 2. Identification Of Costs

### a. "Breach" Costs

54. By analyzing various Entergy Grand Gulf financial records and other information, Kenrich determined the actual costs that Entergy Grand Gulf has incurred and will continue to incur related to spent fuel storage beyond the costs for operation of the spent fuel pool. The records reviewed and relied upon are generally those that are maintained by Entergy Grand Gulf in the normal course of business.

[23] Eileen M. Supko of Energy Resources International, Inc. provided the projected spent fuel discharges and DOE acceptance rights (based on the "oldest fuel first" priority ranking) for Entergy Grand Gulf.

Protected and Confidential Material to be Disclosed only in Accordance with
U.S. Court of Federal Claims Protective Order

55. Incurred costs were identified through discussions with Entergy personnel and the review and analysis of documents and other information, such as contracts, invoices, employee time sheets, expense reports, and accounting system information. Kenrich reviewed the cost documentation with appropriate Entergy personnel to identify those costs associated with the activities related to DOE's failure to begin picking up spent fuel from Grand Gulf in accordance with DOE's contractual obligations.

56. One of the key documents related to the spent fuel storage projects at Grand Gulf is the "Capital Work Order." For significant plant modifications, Entergy establishes a Capital Work Order having a unique account number. Contractor and vendor charges, as well as payroll, materials and supplies, and other costs are captured in this account. The Capital Work Order tool is used by Entergy Grand Gulf management in the normal course of business to track costs for particular activities and was also used by Kenrich to identify the costs pertaining to the spent fuel storage-related projects.

57. In addition, Kenrich requested that Entergy Grand Gulf provide contracts, invoices, canceled checks, and other documentation for each transaction with a value greater than $15,000, as well as support for sample transactions under $15,000. Kenrich reviewed those documents as part of a process to confirm that the amounts recorded in the Entergy Grand Gulf accounting database were accurate and could be traced to underlying source documents. Kenrich also reviewed canceled checks or wire transfer confirmations to determine that Entergy Grand Gulf had actually paid the contractors and vendors for the work performed or materials supplied. In addition, Kenrich and Entergy personnel reviewed the invoices and contracts to determine that the scope of services provided related to the dry fuel storage efforts.

**b. "Non-Breach" Costs**

58. "Non-breach" costs refer to those costs that would have been incurred had DOE begun accepting spent fuel from commercial nuclear utilities in 1998, in accordance with the Standard Contract. For example, had DOE performed under the Standard Contract beginning in 1998, Entergy Grand Gulf would have incurred costs related to the loading of DOE-supplied containers starting in 2005. Because such costs are expected to

be incurred in the future (i.e., when DOE does in fact start to perform), and given the uncertain status of the DOE's permanent disposal at Yucca Mountain, the premature nature of DOE's existing plans for accepting spent fuel, and the lack of information as to DOE's plans for container size and configuration, I have been asked by counsel to assume no offsets for costs that Entergy Grand Gulf may have incurred to load DOE containers had DOE performed in accordance with the Standard Contract.

### 3. Financing

59. An additional element of damages is the increased financing costs associated with the amounts incurred by Entergy Grand Gulf to address the impacts of DOE's failure to begin picking up spent fuel from the nuclear industry in 1998. SERI and SMEPA have had to finance the costs Entergy Grand Gulf has incurred related to DOE's failure to perform in accordance with its contractual obligations from the time those costs were incurred. Appropriate historical annual after-tax weighted average cost of capital rates were used to calculate these increased financing costs.[24] Appropriate applicable annual rates were applied to the total nominal damages incurred each year from the middle of that year through September 11, 2006.

## V. DISCUSSION OF ENTERGY GRAND GULF'S SPENT NUCLEAR FUEL DAMAGE ELEMENTS

### A. Costs Incurred Through August 31, 2005

60. The following table summarizes the costs that Entergy Grand Gulf has incurred through August 31, 2005 for onsite storage of its spent fuel. These costs would not have been incurred had DOE begun picking up spent fuel from the nuclear industry in 1998.

[24] Each entity's annual after-tax weighted average cost of capital was multiplied by its ownership percentage and then the two entities' weighted rates were used to develop the appropriate rate for calculating financing costs at Grand Gulf. SERI's cost of capital rates were provided by EOI Regulatory Accounting and SMEPA's cost of capital rates were obtained from that entity's Annual Reports.

Protected and Confidential Material to be Disclosed only in Accordance with
U.S. Court of Federal Claims Protective Order

**Table III**
**Summary Of Costs Incurred Through August 31, 2005**
**(In Thousands Of Dollars)**

| | Damage Element | Work Order | Nominal Dollars | 2006 Dollars |
|---|---|---|---|---|
| 1. | Spent Fuel Storage Studies | N31937 | $ 341 | $ 506 |
| 2. | ISFSI Design And Construction | N32172 | 8,367 | 9,458 |
| 3. | Cask Fabrication Facility | N32271 | 465 | 527 |
| 4. | Dry Fuel Equipment Storage Building | N32302 | 798 | 877 |
| 5. | ISFSI Electrical And Security Systems | N32350 | 31 | 34 |
| 6. | Auxiliary Building Door Modification | N32136 | 589 | 776 |
| | **Total** | | $10,591 | $12,178 |

### 1. Spent Fuel Storage Studies – Capital Work Order N31937 ("Long Term Spent Fuel Storage Options")

61. As previously discussed, in 1998, Entergy Grand Gulf began studying its options to address its long-term spent fuel storage needs. At that time Entergy personnel opened Capital Work Order N31937 for the purpose of capturing the costs related to studying and evaluating potential options for additional onsite storage of Grand Gulf's spent nuclear fuel. Entergy Grand Gulf contracted and worked with Enercon to evaluate numerous options, including re-racking, rod consolidation, transshipping Grand Gulf spent fuel to another Entergy nuclear plant, and several alternative dry storage systems.

62. Entergy Grand Gulf ultimately determined that the most effective long-term strategy for addressing Grand Gulf's spent fuel storage needs was to pursue onsite dry storage.[25] Because of DOE's nonperformance, which caused dry storage to be required at several plants within the "fleet" of nuclear plants that Entergy owns and operates, Entergy undertook a coordinated effort to identify a dual-purpose dry spent fuel storage system that would be suitable for the utility's multiple nuclear plant sites. Ultimately, Entergy signed a contract with Holtec to supply the HI-STORM system to all of Entergy's plants requiring spent fuel dry storage.

[25] The study also recommended that Entergy pursue the recovery of certain restricted storage locations (or "cells") in the spent fuel pool as a first step. Recovery of restricted cells would postpone the need for dry storage.

Protected and Confidential Material to be Disclosed only in Accordance with
U.S. Court of Federal Claims Protective Order

63. Entergy Grand Gulf incurred approximately $341,000 against Capital Work Order N31937 through August 31, 2005. Additional costs have been and will continue to be incurred against this work order in connection with ongoing coordination of Grand Gulf's spent fuel storage activities with Entergy's fleet-wide spent fuel storage planning and implementation.

**2. ISFSI Design And Construction – Capital Work Order N32172 ("Dry Fuel Storage – Study/Design/Construction")**

64. In 2003, based on the decision to implement dry fuel storage at Grand Gulf and the "fleet-wide" decision to utilize the Holtec system, Entergy Grand Gulf opened Capital Work Order N32172 to further study, design, and ultimately construct an ISFSI at Grand Gulf. Entergy Grand Gulf contracted Enercon, a private engineering firm, to design, size, and locate the ISFSI Pad. The ISFSI Pad was ultimately sited east of the Combination Shop and north of the existing northern Protected Area fence and designed to accommodate 44 casks.[26,27] Expansion of the Protected Area and other site preparation work (e.g., excavation and fill) for the ISFSI was performed in order to accommodate the addition of a second 44-cask capacity pad in the future, as may be necessary.

65. In connection with its work on the ISFSI, Enercon was tasked to perform geotechnical investigations to locate and support the design of the ISFSI, design the haul path (the haul path extends from the Auxiliary Building to the ISFSI Pad and from the ISFSI Pad to the Cask Construction Pad), perform an initial assessment of the operational sequence of loading casks, and design a foundation for the Dry Fuel Storage Equipment/Turbine-Generator Rotor Storage building (i.e., for maintaining and storing spent fuel handling equipment).

---

[26] The ISFSI Pad was initially planned to be located inside the existing "Protected Area." The Protected Area is a plant security boundary controlled through the use of physical barriers and electronic surveillance equipment. Due to soil conditions and close proximity to the deep foundation of the Unit 2 Turbine Building, the ISFSI was relocated to an area outside of the previously established Protected Area, which required expansion of the Protected Area to encompass the ISFSI.

[27] The ISFSI Pad has sufficient area to accommodate 48 dry casks; space equivalent to the area required for four dry casks will be reserved for dry cask handling.

Protected and Confidential Material to be Disclosed only in Accordance with
U.S. Court of Federal Claims Protective Order

66. Project personnel prepared and submitted a capital expenditure request ("Investment Proposal") for the dry fuel storage project, which was approved by EOI's Chief Executive Officer in 2004. Subsequent to that approval, the detailed design and construction efforts began; and construction is currently scheduled to be completed prior to loading the first dry cask in or about October 2006. While Entergy personnel are performing project management, design review, and construction oversight activities, Stone & Webster was contracted by Entergy Grand Gulf to provide craft personnel to construct the facilities.

67. As of August 31, 2005, a significant portion of the Dry Fuel Storage project was complete. For example, construction of the ISFSI Pad was substantially complete and construction of the haul path to the ISFSI outside the Protected Area was approximately 30% complete. In addition, demolition of the existing Turbine-Generator Rotor Storage building, necessary to accommodate the required location of the ISFSI, was also completed.[28] Other continuing activities included the development of the final design for the haul path inside the Protected Area, installation of the security and electrical systems related to the expansion of the Protected Area, construction of the haul path to the Cask Construction Pad, and procurement of the Low Profile Transporter that will be used to move loaded casks from inside the Auxiliary Building to where the Vertical Cask Transporter ("crawler") can pick the casks up.

68. As previously discussed, in order to delay the construction of dry fuel storage for an additional operating cycle, Entergy Grand Gulf performed the necessary analyses and other work required to recover 180 previously unusable storage cells in the upper containment and spent fuel pools in 2005. The activities related to recovering these storage cells included the necessary analyses to effect changes to operating procedures allowing for use of the recovered cells, as well as other modifications to remove interferences which restricted physical access to certain storage cells. The costs for this effort were also charged to this work order.

---

[28] Work associated with construction of a replacement storage facility (i.e., the "Turbine-Generator Rotor/Dry Fuel Storage Building") is discussed below under Capital Work Order N32302.

69. Entergy Grand Gulf had incurred approximately $8,367,000 against Capital Work Order N32172 as of August 31, 2005, and has continued to incur costs against this Capital Work Order prior to trial.

**3. Cask Fabrication Facility – Capital Work Order N32271 ("Dry Fuel Storage Cask Construction Pad")**

70. In 2004, Entergy Grand Gulf began construction of the Cask Construction Pad.[29] The Cask Construction Pad is located outside the Protected Area and is the area where the final fabrication of the Holtec HI-STORM overpacks is completed.

71. The detailed design of the Cask Construction Pad was performed by Entergy engineers and Stone & Webster constructed the facility.

72. As of August 31, 2005, work under Capital Work Order N32271 has been completed at a cost of approximately $465,000.

**4. Dry Fuel Equipment Storage Building – Capital Work Order N32302 ("Turbine Generator Rotor/Dry Fuel Storage Building")**

73. In 2005, Entergy Grand Gulf authorized Capital Work Order N32302 for the construction of a single new building to store tools and handling equipment used during dry cask loading operations and to provide storage that the Turbine-Generator Rotor Storage building had previously provided. In order to provide the necessary space for the ISFSI Pad and given the constraints in locating the ISFSI, Entergy Grand Gulf was forced to demolish an existing Turbine-Generator Rotor Storage building.[30]

74. As of August 31, 2005, Entergy Grand Gulf has completed construction of the new storage building at a total cost of approximately $798,000.

[29] The Cask Construction Pad is used to complete the fabrication of the Holtec concrete overpacks onsite. Entergy engineers performed the detailed design of the Cask Construction Pad.

[30] Costs to remove the turbine-generator rotor building were charged to Capital Work Order N32172, as previously described.

Protected and Confidential Material to be Disclosed only in Accordance with
U.S. Court of Federal Claims Protective Order

**5. ISFSI Electrical And Security Systems – Capital Work Order N32350 ("Install ISFSI Pad Electrical & Security Portions")**

75. In 2005, Entergy Grand Gulf authorized Capital Work Order N32350 to extend the Grand Gulf Protected Area to encompass the ISFSI and install all electrical wiring associated with the ISFSI Pad, as well as a temperature monitoring system for the storage casks. This work order covers the costs of installing additional security fencing, passive vehicle barrier systems, bullet resistant enclosures, intrusion detection equipment, lighting and closed circuit electronic monitoring equipment, among other items required to expand the protected area to encompass the ISFSI. Additionally, this work order covers the installation of conduit, cabling, and other component parts of the temperature monitoring system.

76. As of August 31, 2005, procurement and installation of these systems had just begun and Entergy Grand Gulf had incurred approximately $31,000 against Capital Work Order N32350. Entergy Grand Gulf has continued to incur significant costs related to these systems prior to trial.

**6. Auxiliary Building Door Modification – Capital Work Order N32136 ("Dry Fuel Storage – Site Improvements")**

77. Beginning in 2002, Entergy Grand Gulf began to modify the Auxiliary Building Bay Door to accommodate dry cask loading operations. Specifically, because of the physical space requirements for loading the Holtec dry casks, the existing "secondary containment" boundary had to be expanded from the 166-foot level floor of the Auxiliary Building to the Auxiliary Building Bay Door (at the 133-foot level). In order to function as part of the "secondary containment" boundary (and meet the applicable NRC licensing requirements), the door had to be structurally modified.[31]

---

[31] Secondary containment minimizes the opportunity for the leakage of contamination in an accident condition. Secondary containment allows for a negative (or vacuum) pressure to be drawn into the Auxiliary Building in an accident condition, and thus minimizes the opportunity for leakage of contamination from the building. The old door was not capable of withstanding the required pressure. The structurally modified door is now capable of withstanding the negative pressure.

Protected and Confidential Material to be Disclosed only in Accordance with
U.S. Court of Federal Claims Protective Order

78. Had DOE performed in accordance with the contract by providing transportation containers suitable for Grand Gulf, the Auxiliary Building Bay Door would not have had to have been modified.

79. Entergy Grand Gulf incurred approximately $589,000 in costs against this work order from 2002 through 2004. Subsequent efforts related to the modification of the Auxiliary Building Bay Door and the related costs have been charged to work order N32172.

Protected and Confidential Material to be Disclosed only in Accordance with
U.S. Court of Federal Claims Protective Order

Kenneth P. Metcalfe | 9/6/06
Date