# INDEX TO THE APPENDIX


| Document | Page |
|---|---|
| Southern Nuclear Operating Company, Alabama Power Company, and Georgia Power Company v. United States, No. 98-614, Trial Transcript, (October 19, 2005) | 1 |
| Southern Nuclear Operating Company, Alabama Power Company, and Georgia Power Company v. United States, No. 98-614, Trial Transcript, (October 20, 2005) | 9 |
| Wisconsin Electric Power Co., v United States, No 00-697, Deposition of Eileen M. Supko, (June 27, 2006) | 57 |
| System Fuels, Inc., System Energy Resources, Inc. and South Mississippi Electric Power Association v. United States, 03-2426C, Deposition of Eileen M. Supko, (July 19, 2006) | 67 |

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

SOUTHERN NUCLEAR OPERATING :
COMPANY, ALABAMA POWER COMPANY, :
and GEORGIA POWER COMPANY, :NO. 98-614C
Plaintiffs :
vs. :
THE UNITED STATES, :
Defendant. :

Courtroom 5
Court of Federal Claims
717 Madison Place N.W.
Washington, D.C.

Wednesday, October 19, 2005

VOLUME 3

The parties met, pursuant to the notice of the Judge, at 10:10 a.m.

BEFORE THE HONORABLE JAMES F. MEROW

APPEARANCES:

ON BEHALF OF THE PLAINTIFFS:

M. STANFORD BLANTON, ESQ.
K.C. HAIRSTON, ESQ.
S. ALLEN BAKER, JR., ESQ.
Balch & Bingham
1710 Sixth Avenue North
Birmingham, Alabama 35203
(205) 226-3417

RONALD A. SCHECHTER, ESQ.
Arnold & Porter
555 12th Street, N.W.
Washington, D.C. 20004

ON BEHALF OF THE DEFENDANT:

JOHN EKMAN, ESQ.
HEIDE HERRMANN, ESQ.
MARIAN SULLIVAN, ESQ.
JOSHUA E. GARDNER, ESQ.
ALAN LO RE, ESQ.
STEPHEN FINN, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, DC 20530

***Index appears at end of transcript***

such as capacity factors, plant rated power, et cetera.

Q. Okay. Now, you mentioned that one of the inputs for your model was data from the RW-859 form?

A. Yes.

Q. What are those data?

A. The RW-859 database is required by the standard contract to be submitted on a, originally it was an annual basis, and now it is submitted periodically. RW-859 includes information about historical spent fuel discharges that would give the plant name, the location where the fuel is stored, how many fuel assemblies, the weight of the fuel assemblies, the discharge burnup, how much energy was generated by that fuel.

Q. And when you were modeling the overall industry acceptance rate in this case, which year RW-859 form did you use?

A. In modeling the overall acceptance rate, I used the 1998 RW-859 data originally.

Q. And in determining Southern Nuclear's acceptance rights, which year did you use?

A. I used the 2002 RW-859 database.

Q. Why did you use the '98 data on the first point rather than the 2002 data?

operating in 2010. And showed a ramp-up to 3,000 metric tons by 2015.

Q. So those 900, 900 and then 1800 to 3,000?

A. That's correct.

Q. And the fourth scenario?

A. The fourth scenario, back at the beginning of the program, the Department of Energy envisioned two repositories that would each have an overall acceptance capacity of 3,000 metric tons. I modeled a 6,000 metric ton acceptance rate scenario just to see what the effect of a higher acceptance rate scenario would have on a utility's spent fuel storage requirements.

Q. Okay. Now, at the bottom of page 12, the top of page 13, and on the next demonstrative you identify certain evaluation criteria that you use in your report. Could you please explain those to the Court?

A. I used three criteria to evaluate the different overall acceptance rates that I analyzed. The first was, first criteria was the amount of additional spent nuclear fuel storage that would be required after 1998. Based on the acceptance rate analyzed.

The second was the number of years of post

shut down spent nuclear fuel storage that would be required. The third criteria was the extent to which the steady state acceptance capacity, for example, the 3,000 metric ton acceptance capacity would be fully utilized over the life of the program.

Q. Why did you consider these evaluation criteria relevant?

A. Well, the criteria that I have used to evaluate spent fuel acceptance scenarios for more than a decade. And they are based on issues that are of real concern to nuclear operating companies with respect to when and how fast would DOE be removing fuel from their sites.

The first is the amount of additional storage required after 1998. Utilities wanted to know how much that would be, and because it is a cost item and it would have to be included in their cost of operating their nuclear power plants.

Q. Okay.

A. The issue of how many years after a plant shuts down for decommissioning spent fuel would have to remain onsite is also key, particularly to plants that have already shut down, but also to operating plants because they have to budget for that in their

them to accommodate it? Would they have needed additional dry storage?

A. As I said earlier, I looked at the numbers for the plants, the additional requirements were typically under 100 metric tons, in some cases one or two reloads of spent nuclear fuel. That type of quantity could have been accommodated by providing additional racks and just some of the flexibilities, unracked areas of the pool, providing temporary racks, for example, in the spent fuel cask. That's been done at some plants.

Using part of the full core discharge capability, there are a wide range of things that could have been done, had they believed performance was going to occur.

Q. Okay. Moving down now to the average post -- you were talking about scenario 1 and walking us through the chart. Tell us what the results are for -- first of all, average post shutdown storage is obviously an industry-wide average?

A. It is an average over all of the plants. There are 70 some sites, so this is based on each site. Some sites have more than one reactor operating.

The range of numbers in this ranges from

five years of post shutdown storage to approximately 12 or 14 years for operating nuclear power plants.

Q. And that's under scenario 1?

A. Under scenario 1, yes.

Q. Could you continue with your discussion of scenario 1, please?

A. Yes. The years maximum acceptance capacity utilized, 28 years, that means that from the start of waste acceptance in 1998, DOE would pick up 3,000 metric tons per year for a total of 28 years over about a 40 year period. So that's about three-quarters of the program.

Q. And what are your views in terms of scenario 1 in terms of its efficiency?

A. The fact that it does minimize the amount of additional storage requirements and it provides a reasonable time post shutdown storage and it provides what I would consider to be an efficient and a practicable time period for utilizing the system capacity, I think this is a reasonable rate of acceptance that would have been practicable.

Q. How about scenario 2?

A. Scenario 2 is the flat 900 metric ton rate. I calculated additional storage requirements after 1998 of 13,130 metric tons. This is more than

CERTIFICATE OF REPORTER

DOCKET NO.: 98-614C

CASE TITLE: Southern Nuclear Operating Co v U.S.

HEARING DATE: October 19, 2005

LOCATION: Washington, D.C.

I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the United States Court of Claims.

Date: 10/19/05

Karen Brynteson, RMR, CRR
Official Reporter
Heritage Reporting Corp.
Suite 600
1220 L Street, N.W.
Washington, D.C. 20005-4019

# UNITED STATES
# COURT OF FEDERAL CLAIMS

| | |
|---|---|
| SOUTHERN NUCLEAR OPERATING | : |
| COMPANY, ALABAMA POWER COMPANY, | : |
| and GEORGIA POWER COMPANY, | :NO. 98-614C |
| Plaintiffs | : |
| vs. | : |
| THE UNITED STATES, | : |
| Defendant. | : |

Pages: 723 through 1006

Place: Washington, D.C.

Date: October 20, 2005

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C. 20005-4018
(202) 628-4888
hrc@concentric.net

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

SOUTHERN NUCLEAR OPERATING :
COMPANY, ALABAMA POWER COMPANY, :
and GEORGIA POWER COMPANY, :NO. 98-614C
Plaintiffs :
vs. :
THE UNITED STATES, :
Defendant. :

Courtroom 5
Court of Federal Claims
717 Madison Place, N.W.
Washington, D.C.

Thursday, October 20, 2005

VOLUME 4

The parties met, pursuant to the notice of the Judge, at 10:00 a.m.

BEFORE THE HONORABLE JAMES F. MEROW

APPEARANCES:

ON BEHALF OF THE PLAINTIFFS:

M. STANFORD BLANTON, ESQ.
K.C. HAIRSTON, ESQ.
S. ALLEN BAKER, JR., ESQ.
Balch & Bingham
1710 Sixth Avenue North
Birmingham, Alabama 35203
(205) 226-3417

RONALD A. SCHECHTER, ESQ.
Arnold & Porter
555 12th Street, N.W.
Washington, D.C. 20004

BENTINA TERRY, ESQ.
Southern Nuclear
P.O. Box 1295
Birmingham, Alabama 35201

APPEARANCES:

ON BEHALF OF THE DEFENDANT:

JOHN EKMAN, ESQ.
HEIDE HERRMANN, ESQ.
MARIAN SULLIVAN, ESQ.
JOSHUA E. GARDNER, ESQ.
ALAN LO RE, ESQ.
STEPHEN FINN, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, DC 20530

***Index appears at end of transcript***

the reasonableness of a particular rate of acceptance, you are claiming expertise in spent nuclear fuel management, correct?

A. Yes.

Q. Now, with respect to your claimed expertise in spent fuel management, you would agree there are not many peer reviewed publications in that area, correct?

A. Probably not.

Q. In fact, I believe you had told me previously that the only peer reviewed publication was the proceedings of the American Nuclear Society, correct?

A. That and an international high-level radioactive waste management meeting, which is also run by the American Nuclear Society.

Q. And that's also a peer-reviewed publication?

A. It is a peer-reviewed meeting, yes.

Q. Peer-reviewed meeting. Now, I believe that you told me in the past that you have published four peer-reviewed articles; isn't that correct?

A. I don't recall the number.

Q. You don't recall the number? Does that sound approximately correct?

A. To date, yes. I probably have several

that will be published during the next year.

Q. Okay. But to date around four?

A. Yes.

Q. Now, and you agree that none of these approximately four peer-reviewed articles discuss the methodology for determining the reasonableness of a particular rate of acceptance, correct?

A. That's correct.

Q. Now, with respect to methodology, Ms. Supko, you would agree with me that you are essentially comparing various rates of acceptance based upon how they meet the two primary requirements identified by counsel, correct?

A. It is not quite that simple. First, I am projecting spent fuel discharges based on my knowledge of the nuclear power plant, operating plans, cycle lengths, fuel supply, the types of fuel that they use. And then projecting spent nuclear fuel discharges and projecting a spent fuel acceptance queue.

That queue then, I apply the different acceptance rates that I am modeling to that queue to determine pickup rates from the various reactors. The comparison comes at the end after a significant amount of work is done to determine what the

Q. I understand, Ms. Supko, it is your belief that these are important factors to consider in the nuclear waste program. But my question to you is slightly different.

All I am simply asking you is if those two factors are rejected by the Court, you would need new assumptions, correct, to measure the various rates against?

A. I suppose that's true.

Q. And, in fact, sitting here today, you can't identify an alternative methodology that you would utilize to determine the reasonableness of a particular rate, correct?

A. As I said, the amount of additional storage at nuclear power plants and how long spent nuclear fuel remains at those sites are the important factors from the nuclear industry perspective.

They are factors that the Department of Energy itself has kept track of. Yes, you are right, I don't know what else one would evaluate.

Q. You had spoken a little bit yesterday about the ERI computer model. Do you recall that testimony?

A. Yes.

Q. And the ERI computer model, that was created

Q. Now, you talked about this a little bit yesterday. You agreed that the amount of additional at-reactor storage that you have identified has changed over the course of the various expert reports you have offered in spent nuclear fuel cases, correct?

A. It has changed, yes.

Q. If we put -- Kristin, would you please put up the demonstrative and just for the record this is going to be, this is Plaintiff's demonstrative 6 for Ms. Supko.

Ms. Supko, you recognize this chart from yesterday, correct?

A. Yes.

Q. Now, in the Commonwealth Edison case, which we talked about a few minutes ago, you assumed that under the 3,000 rate, that scenario 1 right there, that there would be 1600 MTUs of additional at-reactor storage, correct?

A. Yes.

Q. And in the SMUD report, which was the very next report you authored, that number dropped down to 600, correct?

A. Yes. I changed the way I was modeling the calculation of additional storage requirements.

Q. And specifically, the reason for that drop

by 100 MTUs, that was the result of a failure to consider linking a utility that had dry storage in 1998 with its wet pool, correct?

A. That's correct.

Q. So just so we're clear here, so it went from 1600 in scenario 1, 3,000, then it dropped down to 600 for SMUD, correct?

A. That's correct.

Q. Okay. And the report that you issued in this case, you, again, determined that there would be 600 MTU of additional at-reactor storage under 3,000 MTU?

A. That's correct.

Q. So scenario 1, SMUD, Southern Nuclear stay at 600. And then as I believe you testified yesterday, in the next report you authored, South Carolina, which is the very next report, that number then jumped up to 1030, correct?

A. That's correct.

Q. And the reason for the 430 MTU differential between Southern Nuclear and South Carolina was because you made a change to the coding in the spent fuel database, correct?

A. No, that's not correct.

Q. Okay. Then explain to me why that's

incorrect.

A. As I explained yesterday briefly, what I did was I decided to export data that was calculated by the SPNTFUEL program into an Excel spreadsheet. The reason that I did that was during, I believe it was during my Southern Nuclear deposition, based on questions that were asked me by counsel for the government, it appeared that there were questions such as, well, where is the output from the model? And I said, well, they are in the output files, but it seemed as though it wasn't 100 percent clear as to how it was that the model worked.

And so I thought I would be more transparent and export the results and calculate the additional requirements for each plant so that you could see, everybody knows or most people are very familiar with Excel, and Excel spreadsheets, I would calculate the additional requirements in an Excel spreadsheet.

In doing that, I discovered that I did the calculation differently in the spreadsheet than the code had been using and discovered that I had, what is the word I am looking for -- basically underestimated the requirements at the eight sites that had dry storage prior to 1998. I

underestimated their requirements post-1998 because of the way I had linked things in the model.

In my spreadsheet, it was very clear the way that I calculated it that these results were a better reflection of what would happen at sites not only that had dry storage before 1998 but those that did not.

Q. That was very helpful, thank you, Ms. Supko. And, in fact, stated another way, you have in this case underestimated the amount of storage requirements for those utilities that had dry storage as of 1998, correct?

A. Yes. There were, I believe, about eight sites.

Q. About eight sites. And then yesterday you endeavored to correct that oversight by using the numbers that you used in subsequent reports such as South Carolina, correct?

A. That's correct. It doesn't change my opinion. The numbers are different.

Q. And, in fact, none of the changes in the numbers over the course of the iterations of your report have changed your conclusion about the reasonableness of the 3,000 rate, correct?

A. No. If you look at the various acceptance

Q. Doesn't change the overall result, fair enough.

And with regard to pool capacities generally, your model is not always utilizing pool capacity for utilities as they existed in 1998, correct?

A. That's correct. I think there may be a dozen or so pool capacities that had been upgraded after 1998. Again, it wouldn't change -- I think we discussed this qualitatively in my South Carolina Electric & Gas deposition.

It wouldn't change the overall results because if I modified the pool capacities, all of the scenarios would potentially increase additional storage capacities or additional storage requirements somewhat, and you would have the same relative difference.

Q. Sure. And just so I'm clear, so, in other words, your model utilizes certain pool capacities that were modeled after or modified after 1998, correct?

A. It does, yes.

Q. For example, you include Plant Hatch's post-1998 rack addition in your model in this case, correct?

A. I did include that, yes.

Q. Okay. And, in fact, you also used South Carolina's 2002 post rerack capacity in your acceptance rate model, correct?

A. I did. And it is interesting, that doesn't come into play or it wouldn't come into play if I used the lower capacity in scenario 1 or scenario 4 because South Carolina Electric & Gas would have had plenty of capacity at their old rerack, at their old pool capacity, had DOE begun acceptance at either the scenario 1 or scenario 4 rates.

It would have increased the scenario 2 and 3 rates and by and large I think that's the case for most of the pool capacities in which I used the newer capacities.

Q. But, of course, you do agree, though, using these post-1998 storage additions was simply an oversight in terms of the inputs you were placing into your model, correct?

A. I didn't go back and attempt to try to see what the world looked like for every pool in 1998. That would have required my going into the Nuclear Regulatory Commission's docket for every nuclear power plant and looking at license amendments.

Q. And that would be a pretty big burden, huh?
A. I didn't believe that it was necessary.
Q. And, by the way, while we are on this topic, you include Plant Hatch's second bathtub rack in your calculation for Southern's pool capacity, correct?
A. Yes, I did.
Q. And you are aware that Plant Hatch never installed that rack, correct?
A. They did not, but my understanding in talking to staff at Southern Nuclear, had DOE, had it looked like DOE was going to perform in 1998, they would have used that additional rack if they needed to.
Q. And so you have simply included that in your analysis of the 1998 would-have-been world acceptance rate, correct?
A. Yes.
Q. In fact, if you omitted that second bathtub rack from your analysis, you would agree that Southern would have had to add additional at-reactor storage after 1998, isn't that correct?
A. Not necessarily. I don't recall, I don't know what the number of assemblies would have been outside of one full core reserve, but there would have been alternatives that Southern Nuclear had at

yes.

Q. And, in fact, that number would be even bigger if you took out the first additional rack they did, correct, that calculated number?

A. I suppose that's correct.

Q. And so you are relying on post-1998 pool modifications in modeling what you believe the additional at-reactor storage requirements would look like in a 1998 acceptance world; isn't that right?

A. For a fraction of the plants. As I said, I believe there were about a dozen plants that I used the current pool capacities for because that was the information that I maintained in my database.

We have 103 operating nuclear plants, there are 104 licensed nuclear power plants, 122 total plants with spent nuclear fuel. So 100 of the plants, as I said, it was about a dozen, would have been affected, which is a fraction. It really doesn't -- I'm an engineer. In terms of the analysis and my results, it doesn't affect the outcome.

Q. And whether it affects your outcome or not, the answer to my question is yes, you are relying upon post-1998 pool modifications modeling a 1998

acceptance right, correct?

A. For a fraction of the pools.

Q. And you would agree that, in fact, as you continue to change the pool capacities for particular utilities, based upon the information you received from your clients, it is possible these numbers could change again in the future, correct?

A. It is -- if I get new information and I believe that information is useful, I will use it.

Q. Sure. Even if those changes occurred after 1998, correct?

A. I'm sorry, I don't understand that.

Q. Even if those utilities added additional at-reactor storage after 1998, if you received that information in the course of your representation of those clients, you may include those in your 1998 model, correct?

A. I'm not sure that I would. It depends on what it is and how I believe it would affect the analysis. I would use my judgment.

Q. So it is situational when you would choose to use a utility that had that additional at-reactor storage, whether you would put that into your 1998 model?

A. Well, there are plants that are adding or

Q. Well, in fact, Ms. Supko, you would agree that the use of the update of the 2002 RW-859 data could affect the amount of additional storage requirements that you calculate, correct?

A. It would most likely have an effect on scenarios 2 and 3. It likely wouldn't have an effect on scenarios 1 and, in fact, it didn't have an effect on scenarios 1 and 4.

Q. Now, utilities would have submitted the 1998 RW-859s after DOE was already obligated to begin accepting spent nuclear fuel from the utilities, isn't that right?

A. That information was reported through December 31st, '98, so yes.

Q. And, in fact, utilities also submitted RW-859s in the 1990 and 1991 time frame?

A. Prior to 1998, the next earliest was in 1995.

Q. But they also did it, utilities also submitted in the 1990 and 1991 time frame, correct?

A. Absolutely.

Q. This was about the time that DOE issued the 1991 annual capacity report, correct?

A. Yes.

Q. And the RW-859 forms the utilities submitted

in the 1990 and 1991 time frame reflected cumulative projected future discharges of 86,000 MTUs, isn't that right?

A. Yes.

Q. And to date the cumulative projected discharges is approximately 90,000 MTUs, right?

A. That's correct.

Q. Now, Ms. Supko, you are endeavoring to model a nonbreach acceptance right scenario, correct?

A. That's correct.

Q. In other words, what reasonable industry-wide acceptance would have looked like had DOE begun accepting spent fuel beginning in 1998?

A. Yes.

Q. But you are utilizing RW-859 information submitted by utilities to DOE after January 31st, 1998, correct?

A. That's correct, but if DOE had begun acceptance in 1998, the program or the nuclear operating companies wouldn't have stood still in what they were doing for fuel management, in upgrading their reactor powers, in increasing capacities. All of those things would have happened and -- in fact, they have happened.

Capacities have changed, capacity factors

have increased dramatically since the early 1990s and to not model what's actually occurred because it would have occurred, whether they picked up fuel or they didn't pick up fuel, would have been incorrect.

So of course I model the way the nuclear industry has proceeded and will continue to proceed.

Q. So, in other words, I mean, simply put, you are utilizing this post-1998 information in determining what a reasonable nonbreach world would look like, correct?

A. As I said, I don't believe that the nuclear industry would have done anything differently than they have done in terms of the reactor operations, whether DOE picked up fuel or didn't. So, yes, of course.

Q. Of course. Let's talk for a second about future projected discharges. We touched on it a little bit and I think you might have mentioned it to Mr. Schechter yesterday.

Another input that's changed in your various expert reports is utility projected future discharges, correct?

A. It has changed somewhat, yes.

Q. The base line that you utilize to determine future projected discharges is the RW-859 information

reserve per pool or one full core reserve per plant.

So in an instance where you have two plants sharing one pool, I could either assume one full core reserve per plant, which would effectively be two full core reserves for that pool, or one full core reserve for the pool. And I have used one full core reserve per pool in all of these analyses that I have done regarding the overall acceptance rate.

Q. Okay. And it is one full core reserve per pool per plant, correct?

A. No.

Q. No, that's not correct?

A. No.

Q. So explain to me one more time.

A. If you have two plants sharing one pool, it is one full core reserve for that pool.

Q. Okay. Got it. And in this case, your model for Southern Nuclear utilizes one full core reserve per pool, correct?

A. Yes.

Q. I think we're on the same page now. This is great.

So your acceptance model doesn't take into account what a particular utility's full core reserve policy is, correct?

MR. SCHECHTER: Thanks.

BY MR. GARDNER:

Q. You are not endeavoring to determine what each utility's full core reserve policies were as of 1998, correct?

A. As I said, I am making an assumption that each pool would reserve one full core reserve of fuel.

Q. So the answer to my question is no, correct?

A. That's correct.

Q. So if you were to increase full core reserve beyond one full core, that would potentially push someone into requiring additional at-reactor storage early, correct?

A. If I increased the amount of reserve in pools, it could result in the calculated additional -- outside of that number, storage increasing, it would depend upon the pool capacity, et cetera.

But, again, that's a calculated number. It is not a hard and fast number and they actually would have had the ability to store more fuel in the pool.

Q. But, in any event, under let's say, let's take scenario 1, for example, if you were to increase a full core reserve policy for a particular plant,

that could push that particular plant into that number going up for that particular utility, correct, potentially?

MR. SCHECHTER: I'm sorry. If you understand what he means by that number when he was pointing at the screen, go ahead and answer, but I'm not sure that I do.

BY MR. GARDNER:

Q. Thank you, Mr. Schechter, I appreciate that. The additional storage requirement number for scenario 1 --

MR. SCHECHTER: Is that 1030, Mr. Gardner?

BY MR. GARDNER:

Q. I will represent 600 or 1030, whichever way you would like to take it, Ms. Supko.

A. Okay.

Q. Whatever that number is, and of course that's an aggregate number, on a utility-specific basis, if you were to increase full core reserve beyond one full core, that could push the number for additional storage requirements for that particular utility to increase that number, correct?

A. It might. It might not. It would depend upon the inventory in the pools, the existing capacity.