1998, doing other -- taking other actions prior to 1998 rather than implementing dry storage such as a rerack if possible, and they would be plant-specific.

Q. That's my question.

Have you done any plant-specific analysis to confirm whether a temporary rack was technically feasible for any of those 14 utilities you've identified?

A. No.

Q. Have you made any determination as to whether -- first of all, let me ask you this: Those 14 utilities that have additional storage needs in 1998, do you know of any of those utilities were already impinging upon full core reserve in 1998?

A. I don't recall.

Q. Would that matter?

A. It would, but they could have taken other actions prior to 1998 as I stated earlier. One of the alternatives is to impinge on full core reserve capability. That's not the only

would have been able to exercise.

Q. Correct me if I'm wrong: You've actually testified that even absent any flexibilities being utilized that 1,030 MTUs of additional at-reactor storage is a reasonable amount of additional at-reactor storage.

Correct?

A. I don't think it's unreasonable. It's a calculated amount based on the information that I used in my analysis.

Q. And you believe that that amount is a reasonable amount of additional at-reactor storage.

Correct?

A. The number is what it is. It's based on my analysis.

It's not unreasonable given that it's a small number of plants and a relatively -- again this is a calculated number. It's not necessarily what would have occurred had the industry believed DOE was coming.

Q. Is there a difference between not

unreasonable and reasonable?

You seem very hesitant to tell me that 1030 is reasonable.

A. I know that based on what I know makes up that number in terms of the number of nuclear power plants that -- whose additional requirements are calculated within that number and the amount of storage requirements calculated at those plants that that number is reasonable and could have been accommodated within the flexibilities that existed.

Q. And we've talked about this before I think most recently in perhaps South Carolina that your upper limit of reasonable additional at-reactor storage would be approximately one year's worth of discharge.

Correct?

A. Yes.

Q. Do you know under scenario 3, had the flexibilities been utilized, would there have been more than 2,000 MTUs of additional at-reactor storage?

A. I have not calculated that.

**Q. So you don't know?**

A. Well, as I stated under scenario 3, even if one were -- this is -- I'll characterize this as a qualitative analysis that I'm doing here as we sit -- that from -- from the period 2005 to 2009, 900 metric tons per year wouldn't have been enough to eliminate even using trading or only those companies who needed requirements would be able to ship their spent fuel.. It wouldn't have been enough to eliminate that.

**Q. But do you know if it would have been enough to get the amount of additional at-reactor storage to 2,000 MTU in total?**

A. I have not calculated that number.

MR. GARDNER: I'm having marked what is going to be exhibit number 14.

(Supko Exhibit No. 14 was marked for identification.)

BY MR. GARDNER:

**Q. Ms. Supko, do you recognize what**

going to increase, and they've done that for a long time in their analyses.

Q. I'm asking a different question.

My question is, have you done any analysis to determine whether the number you've calculated here, 1,031.5, would have been different had DOE begun performance in 1998?

A. No.

Q. Have you done any analysis to determine of these 14 utilities whether there would have been a cost for any of these utilities to accommodate those additional storage requirements that you've calculated?

A. No, I haven't.

Q. Now, you don't include shutdown utilities in this calculation.

Correct?

A. No.

This is only looking at operating plants.

Q. Do you know what the views are of, say, PG&E and Humboldt Bay with respect to when

expert opinion from the Yankee case?
A. That's correct.
Q. I take it since you don't know Mr. Graves or his analysis, you don't know if his analysis is consistent with yours.
Is that fair to say?
A. That's correct.
I don't know.
Q. If the court in these cases, Judge Lettow, Judge Braden, and Judge Weiss, if those judges conclude that they need to determine what rate the government is contractually obligated to perform at, you can't address that issue.
Correct?
A. I'm not qualified to make a legal conclusion, so I wouldn't be addressing that.
Q. Are you making an affirmative conclusion that scenario 3 is unreasonable?
A. My conclusion is that scenario 1 -- and I'll -- so I don't misquote myself -- which is a 3,000 metric tons per year rate of acceptance, and I'm looking at exhibit one page

23, would have limited the amount of additional storage capacity needed at nuclear power plants after 1998, kept up with the annual discharge rate of 2,000 metric tons per year, worked off the 37,000 metric tons backlog in storage at nuclear power plants to allow timely decommissioning, and that it was a reasonable rate of acceptance.

**Q. Ms. Supko, now can you answer my question?**

MR. SILBERG: Can you restate your question, please.

BY MR. GARDNER:

**Q. Are you making an affirmative conclusion that scenario 3 is unreasonable?**

A. My expert report does not make a conclusion that scenario 3 is unreasonable.

However, what I do state is that scenario 3 would have resulted in nuclear operating companies needing to add approximately 6200 metric tons of additional storage capacity and that the average number of years spent fuel

would have to be stored at plants after being shut down for decommissioning is 16.5 years.

I don't state that that's unreasonable, but I don't believe that it is reasonable.

**Q. Now, I'm completely confused.**

**So you're not offering an opinion that it is unreasonable, but you believe it is reasonable?**

A. I was asked to provide an opinion on the impact of DOE's spent fuel acceptance -- rate of acceptance and to look at the aggregate amount of additional at-reactor storage that would be required and the ability to timely decommission reactors. 6200 metric tons of additional spent fuel storage requirements is more than 3 years of annual discharges.

That is a number that could not be easily accommodated within the rate of acceptance that underlies scenario 3 and an average postshutdown storage time of 16.5 years results in -- I don't recall if there were any, if so

very few plants, that would have been able to decommission their nuclear power plant within a short period of time, 5 to 9 years after the plant shut down.

Q. Let's go back to what your opinion is or is not in this case, because now I'm absolutely baffled.

Are you offering an affirmative opinion in this case that your scenario 1 constitutes a reasonable rate of acceptance?

A. Yes.

Q. Are you also offering an opinion in this case that scenario 3 is an unreasonable rate of acceptance?

Yes or no.

A. No.

Q. Okay. So you're offering no opinions in this case other than -- or cases other than that scenario 1 happens to be reasonable?

MR. SILBERG: Objection, mischaracterizes the report, mischaracterizes her

testimony.

BY MR. GARDNER:

Q. When I say, opinions, just so we have a clear record, I'm not talking about the projections for each particular utility.

I'm talking about your overall opinion now.

A. As I just read, my opinion is stated on page 23 of exhibit 1.

I won't re-read it, but it essentially says that the 3,000 metric tons rate, scenario 1, would have limited the amount of additional storage and allowed timely decommissioning and that it was reasonable.

That is in essence my opinion.

Q. So you're offering no opinions at all that scenario 2, 3, and/or 4 are unreasonable.

Correct?

A. I analyzed them and discussed the analysis within my report regarding those other scenarios.

For example with respect to scenario 4, I believe I state that -- which is a 6,000 metric tons overall rate of acceptance -- that it would have resulted in a system that was overbuilt and could have only have been -- the 6,000 metric tons could only have been used for 6 years, and then the Department of Energy would only have been picking up 2,000 metric tons per year.

Q. So scenario 4 you are offering an opinion is unreasonable?

A. I've offered analyses regarding them.

Q. I got to say, I don't want to beat a dead horse here. I think my questions are fairly simple. If you can't answer them, just tell me why and I'll try to rephrase them.

I can tell you're being resistant to say that you're not offering opinions that scenario 3 is unreasonable, so I want to just go back.

You're offering, one, an opinion

that scenario 1, which is your 3,000 rate, is a reasonable rate of acceptance.
Correct?
A. Yes.
Q. You're not offering any opinion that scenarios 2, 3, and 4 of your opinions are unreasonable rates.
Correct?
A. That's correct.
Q. Thank you.
You may recall in the past you've told me that there may be other rates lower than scenario 1 that could be reasonable.
Do you recall that?
A. I haven't analyzed any.
Q. But you believe that it is a possibility that that could be the case?
A. It's possible. I haven't analyzed them, so I can't state definitively that there are.
Q. Now, we've talked quite a bit in this deposition, in my other depositions, the

trials, many times here about reasonableness.
Define "reasonableness" for me as you understand that term.
A. I believe that reasonable goes back to what it was that I was asked to evaluate in my expert report, which was the amount of additional at-reactor storage needed at plants after 1998 and timely -- working off the backlog to allow timely decommissioning.
Q. So it's reasonable -- your reasonableness determination is predicated upon the outcome of your model when you compare it to the 2 benchmarks counsel have asked you to model.
Correct?
A. Yes.
And it's based on my analysis of the DOE program over the past 15 years and the analyses that I performed regarding acceptance rates and their effect on nuclear operating companies.
Q. In the past you've told me that you think 3,000 is reasonable because it's

**transit?**

A. Turn-around time.

**Q. What else?**

A. And using that plus some downtime was able to calculate based on an annual rate of acceptance of 3,000 metric tons approximately how many casks would be needed.

**Q. What rampup did you assume for that analysis?**

A. It was either -- it was the rampup rate that was in legislation, so it depended upon the legislation.

**Q. Do you recall the different rates, the rampup rates?**

A. I know that the very first rampup rate was consistent with the 1990 ACR shown in table 4 of exhibit 1. The rest of them I don't recall.

**Q. And what was the -- was your analysis -- you say that you did it on NEI; is that correct?**

A. Yes.

Q. Was the purpose of that for NEI to demonstrate that 1020 was a good idea?
Is that kind of the purpose behind that?
MR. SILBERG: Objection, calls for speculation.
A. It also included a cost analysis, because part of the discussion was what would the impact on budget be.
MR. GARDNER: Off the record.
(Recess.)
BY MR. GARDNER:
Q. Ms. Supko, now, I want to change gears a bit and talk about exchanges, specifically not intracompany exchanges, but intercompany exchanges.
And I believe that one way utilities could have additional storage requirements after 1998 met was through the use of exchanges.
Correct?
A. Could you repeat that?
Q. Sure.

That one way that utilities -- the numbers you've calculated for additional at-reactor storage after 1998, one way that could be met is through the use of exchanges.

Correct?

A. This is a flexibility in the contract, yes.

Q. Do you think exchanges would cost money?

A. I don't know.

Q. You haven't done any analysis to determine what a potential exchange would cost.

Correct?

A. No.

Q. Do you think they'd be free?

A. I don't know.

Q. Have you ever thought about it?

A. Not in any level of detail.

Q. You've never done any analysis to determine how much a utility would be willing to pay to engage in an exchange.

Is that fair to say?

A. That's correct.
I have not.
Q. Have you done any analysis to determine how exchanges would actually work?
A. Since the current system where the government is not coming now until 2017 or 2018 if we're lucky, it's highly unlikely that anybody would exchange acceptance rights.
Q. Let me be clear: I'm talking about the but-for world and you're running but-for world scenarios.
My question relates to have you conducted any exchanges analysis in these but-for worlds that --
A. I have not.
Q. I presume you'd agree that an analysis could be done to determine what an exchange marketplace would have looked like in the but-for world.
Correct?
A. I suppose so.
Q. Do you believe that you've got the

expertise to develop such an exchanges model?

A. I haven't thought about it.

Q. So you don't know one way or the other?

A. No.

Q. Hypothetical question for you: Let's take Boston Edison. They come to you and say, Ms. Supko, could you model exchange rights across the industry.

Would you be able to do that for them?

A. I don't know if I would be able to do it. I don't know that I would be willing to do it.

Q. Why wouldn't you be willing to do it?

A. There are a lot of variables and factors involved in such an analysis, and I think it would be difficult to try to capture all of those variables and factors.

Q. I'm curious, what do you view as being the different variables and factors that

would go into an exchange analysis?
A. I haven't thought about it.
Q. I had thought previously you had testified and maybe it was the Southern Nuclear trial. Maybe it was SMUD -- I can't remember -- but I recall that in the past you had said you had run an analysis of exchanges; is that correct?
A. I ran analyses of decommissioning shutdown reactor priority in the early 1990s.
Q. Offering -- in other words, taking the OFF queue as it exists but affording priority to the Yankees and SMUDs of the world?
A. Yes.
Q. Then I'm misremembering that you have not engaged in any type of analysis exchanges?
A. I don't recall that I've ever done any.
Q. Based on -- you've read the standard contract many times.
Correct?

A. Yes.

Q. Based on your reading of the standard contract, what is actually being exchanged if you know?

A. I'd have to look at the contract.

Q. Why don't we do that.

For the record, I am going to give you New England states standard contract. I'll represent to you it's my understanding that they should be identical between all 3 sites and in fact all the 103 reactors I suppose.

MR. GARDNER: This will be exhibit 15.

(Supko Exhibit No. 15 was marked for identification.)

BY MR. GARDNER:

Q. Ms. Supko, I've handed you what's been marked as exhibit 15, which I'll represent to you is the standard contract between Northern States and the United States Department of Energy.

Have you seen the standard contract before?

A. This specific one?

Q. I knew you were going to ask that.

No. More generally.

A. I have seen the standard contract as it's identified in part 961 of title 10 of the United States Code of Federal Regulations.

Q. Okay. Fair enough.

If you could turn to page 12 of the document. It's got a Bates label of COF double 0 21679.

You should see a section there entitled, E exchanges.

Do you see that?

A. Yes.

Q. The second paragraph says: Purchaser shall have the right to exchange approve delivery commitment schedules with parties to other contracts for disposal of SNF or HLW.

Do you see that?

A. Yes.

Q. And is that consistent with your recollection that in fact exchanges would have taken place between approved delivery commitment schedules?

A. Honestly, I haven't thought about it much. That's what the language in the contract says.

Q. But you haven't really thought about exchanges?

A. I haven't analyzed it other than to know that it is a flexibility that does exist.

Q. Do you know -- if we can go back to your spreadsheet, which is exhibit 14, do you know which of these utilities that you've identified as having additional storage requirements have approved DCSs?

A. I don't.

Q. Okay. Ms. Supko, do you have an opinion as to when the market for exchanges would have developed?

MR. SILBERG: Objection, vague and

ambiguous.

We're referring to the but-for world, I assume?

A. I haven't thought about it.

BY MR. GARDNER:

Q. Do you remember in the Southern Nuclear trial Judge Merrill asked you that exact question?

A. I recall he asked me a question about exchanges and whether I thought they would have been possible.

Q. Do you recall giving a time frame for that?

A. I don't.

Q. I assume sitting here today you haven't really given any thought as to the timing of when that market would have developed.

Is that fair to say?

A. Well, if the government had performed in '98 -- and I believe this is what I said to Judge Merow -- if they had performed at a 3,000 metric tons rate of acceptance and if in

fact it appeared that performance was going to continue uninterrupted, the market most likely would have developed.

Q. When?

A. After 1998.

It could have happened before. I have not really thought about it, but there would have been sufficient flexibility in the system to allow exchanges once the rampup rate started increasing.

Q. You do no analysis to determine the timing at which a market would have developed?

A. I have not.

Q. You also recall -- this goes back to the SMUD trial I think -- that you offered testimony that you thought an exchanges market would work similar to a uranium enrichment exchanges market.

Do you recall that?

That was in your written direct testimony.

A. Yes.

The companies have exchanged uranium in its various forms since the mid-1980s. And it works in a fairly seamless way.

**Q. When were the uranium enrichment contracts originally signed?**

A. Well, there have been a range of them.

Are you talking about the enrichment contracts with the Department of Energy, with USEC, with European --

**Q. When you've made the conclusion in your written direct testimony before Judge Braden that you think that exchanges of acceptance rates would work like exchanges of uranium enrichment contracts, to what were you referring?**

A. At the time, it was associated with toll enrichment services under Department of Energy contracts. Those no longer exist. Companies still do exchange and borrow material from time to time.

**Q. So were you basing your conclusion about the similarities between those 2 markets to**

My question is to you --

MR. SILBERG: Excuse me.

Allow her to finish her answer, please.

A. I'm just referring back to one of the exhibits you gave me earlier with the letter from Consolidated Edison.

BY MR. GARDNER:

Q. From 1985.

A. Yes. Exhibit 10.

Where Con Ed is asking, is it still Department of Energy's plan to begin removing spent nuclear fuel by January 1998.

Q. And the answer in that response was, yes, it's still our intention?

A. Yes, but there were continuous questions from the industry from the beginning of the program regarding the viability of that.

Q. Is it fair to say that you can't tell me when you understand the but-for world to end and the actual world to begin?

A. DOE was -- my understanding is that

they were formally in breach of contract January 31, 1998. Whether or not the but-for world started prior to that, I suppose is going to be specific to an individual company's viewpoint on when -- what they saw with respect to their own circumstances.

Q. So the breach is all relative kind of?

A. I suppose so.

Q. I'm not asking for a legal opinion.

I'm asking, when you characterize your conversations as basically being in the actual world, you obviously are benchmarking that against the but-for world.

Correct?

A. I don't understand that question.

Q. For you to make the conclusion that you've had a conversation about something in the actual world presupposes in my mind that you're no longer in the but-for world.

Correct?

A. I suppose.

taking that 20 percent from another utility.
Correct?
A. It doesn't make an assumption per se.
It just assumes that those companies who had additional requirements could potentially have requirements that were 20 percent less. I didn't analyze the effect on an annual basis.
Q. You've done no analysis, then, as to what would happen if DOE were to grant a particular utility's request for an additional 20 percent, what impact that would have on other purchasers as that term is used in the standard contract.
Correct?
A. I did not.
Q. It's your understanding that utilities that have approved delivery commitment schedules may adjust their allocations by 20 percent in either direction subject to DOE approval.
Correct?

Q. And then it says: The total systemwide spent fuel arisings are projected to be approximately 86,000 MTUs.
Do you see that?
A. Yes.
Q. Does your analysis in these spent fuel cases assume these same assumptions or make these same assumptions?
A. No.
Q. How have your assumptions changed between, say, this private fuel storage analysis in 2000 and the analysis you're doing for this litigation?
(Pause.)
A. I don't wish to misspeak as to what my current assumptions are, and I don't have them committed to memory, so I'll give you some approximate answers.
BY MR. GARDNER:
Q. Okay.
A. The overall analysis that I've done for the various clients assumes 40-year licenses,

but I've also done the analysis assuming license extension for all plants. And I believe that analysis has been provided to you.

Q. I want to take them one at a time.

The license extension analysis you're not offering that in your actual opinion.

Right?

A. I didn't change my opinion. It doesn't change my opinion. The results are similar.

Q. You don't even provide that analysis in any of your reports.

Correct?

A. It's not in the report, no.

It is a sensitivity to show that my opinion wouldn't change.

Q. So 40-year licenses you still assume that for what I'll call your base case?

A. The overall analysis, yes.

Q. That assumption will stay the same.

A. For the projection, although it doesn't matter for the projection of acceptance

Q. Is it fair to say though that in preparation for today's litigation, you didn't review any documents associated with the certificate of need?

MR. SILBERG: Today's deposition?

BY MR. GARDNER:

Q. Today's deposition.

A. I did not review any documents.

Q. Now, Ms. Supko, NSP is one of those 14 utilities that would have needed additional storage under your scenario 1.

Correct?

A. I calculated that Prairie Island would have needed 21 metric tons.

Q. So the answer is yes?

A. Well, that's outside of -- that's assuming they maintained full core reserve.

Q. Do you know what NSP's policy is with respect to full core reserve?

A. I don't.

Q. But in any event, based on your calculation, Prairie Island has additional

CERTIFICATE OF COURT REPORTER

UNITED STATES OF AMERICA )
DISTRICT OF COLUMBIA )

I, CHERYL A. LORD, the reporter before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was sworn by me; that the testimony of said witness was taken by me in machine shorthand and thereafter transcribed by computer-aided transcription; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially or otherwise interested in the outcome of this action.

Cheryl Lord

CHERYL A. LORD
Notary Public in and for the
District of Columbia