then, and I updated my models from the 2004 the prior year. 0867 -- 587, whichever it is.

Q. I think you just -- I think in one of your answers you just used 2000. I think you indicated you started in 2002; is that right?

A. 1995 was the year of issuance --

Q. Correct.

A. -- of the acceptance.

Q. Right. I thought you said when you first started -- you first did this in 2002, your modeling. You would have used the 1995 --

A. That is correct.

Q. -- ACR?

MR. SMITH: Actually, you did say 2000. Did you mean 2002? You said something to the effect of, "In 2000, I used the '95 report."

A. I -- and when I started this, in 2002 -- get the years straight. In 2002, I used the 1995 data, which was the best available at time. Subsequent to that, in around sometime -- 2002 or so, there was a -- 2002 or 2003, there was a preliminary update to the RW 859s that was not officially issued, as far as I know.

But I obtained a copy from the DOE and used that to update from 1995 up through -- I

believe it was 1999, in terms of what was in the RW 859s. And then when the 2004 report came out, I further updated from 1999 to 2002, which was what that report covered.

BY MR. DAMELIN:

Q. So I think that the -- the last one you would have used would have been the July 2004 ACR?

A. That is correct. That's what's in my model today.

Q. Do you know or do you recall whether the annual rate of acceptance in the 1995 ACR was different than the annual rate of acceptance in the 2004 ACR?

A. I don't recall what the 1995 one was.

Q. Did you at any point since 2002 model or, I guess, analyze any rate of acceptance from any earlier ACRs, meaning ACRs that were issued prior to 1995?

A. No. I did not go prior to that.

Q. And just so I'm clear, was the -- is the impetus for doing this type of modeling, was this something that you undertook on your own, or were there instructions from others at Entergy to undertake this type of modeling?

A. I developed this on my own as part of

what I perceived my job duties.

Q. And why -- and can you just give me an explanation? I mean, I could probably figure it out, but just why you felt this was important or necessary for you to do as part of your job responsibilities?

A. Well, part of my job is to provide long-range information to senior management, and this was a tool that wasn't out there. So I developed it and improved on it. And it's -- it's still a living document, so to speak.

Q. I mean, just sitting here today, I mean, does -- does Ms. Supko -- I mean, just her modeling and what she, for instance, produced in this -- this litigation, which were two -- two separate Excel reports, are they substantially different in -- in what she's analyzing and modeling than what you're doing in your model?

A. I don't believe so.

Q. Now, when I asked you about -- I think this started when I was asking you about decommissioning studies. The work that you do for -- specifically for decommissioning studies for Entergy, are you asked or instructed to model a particular rate of acceptance?

A. Yes.

Q. And you can feel free to -- to read the -- the preceding paragraph if you'd like. But it -- there's a reference to the -- to the top regarding oldest-fuel-first methodology. Do you see that?

A. Yes.

Q. And is it your understanding that that is the methodology for accepting spent fuel from the nuclear utilities that's set out in the contract between the utilities and the federal government?

A. Let me read this paragraph.

Q. Sure.

A. Now, if you would ask me the question again, please.

Q. Sure. The oldest-fuel-first methodology that's referenced there --

A. Yes.

Q. -- is that -- is it your understanding that that is the methodology for acceptance of spent fuel from the different nuclear utilities that's included in the standard contract between the utilities and the federal government?

MR. SMITH: Let me just object to the

extent it calls for a legal conclusion. You can give your understanding.
A. I can't interpret the legal part of it.
BY MR. DAMELIN:
Q. Okay. Well, where -- do you know where the oldest-fuel-first methodology is contained that you would reference it in a document like this?
A. I'm trying to recall. I don't remember the specific area or section.
Q. Do you know whether it's in the contract that I'm referring between the utilities and the government?
A. I believe there's some statements in there to the effect that that's their proposed method.
Q. Does the -- the model that you run that's contained at the back of this exhibit, does it employ an oldest-fuel-first methodology?
A. Yes, it does.
Q. Now, the next line reads, "This methodology has not been agreed to by Entergy or the utility industry, nor has any court validated it. Nevertheless, DOE has used it for planning purpose -- purposes, and this assumption is the

CERTIFICATE OF DEPONENT

I, BEN FRANKLIN, deponent in the deposition taken in the herein styled and numbered cause, certify that I have examined the foregoing pages as to the correctness thereof, and that after reading said pages, I find them to contain a full and true transcript of the testimony as given by me on APRIL 19, 2006, in JACKSON, Mississippi.

Subject to those corrections listed below, if any, I find the transcript to be the correct testimony I gave at the aforestated time and place.

| Page | Line | Comments |
| --- | --- | --- |
| | | See errata pages - Corrections for Transcript of |
| | | Ben Franklin's April 19, 2006 Deposition |
| | | |
| | | |

This the 22 day of May, 2006.

Ben Franklin
BEN FRANKLIN

State of Mississippi
County of Hinds

Subscribed and sworn to before me, this the 22 day of May, 2006.

My Commission Expires:

MISSISSIPPI STATEWIDE NOTARY PUBLIC
MY COMMISSION EXPIRES JAN. 3, 2007
BONDED THRU STEGALL NOTARY SERVICE

[signature]
Notary Public

ORIGINAL

Corrections for Transcript of Ben Franklin's April 19, 2006 Deposition

| Page No. | Line No. | Original | Corrected |
|---|---|---|---|
| 10 | 2 | SURI | Surry |
| 10 | 3 | Northann | North Anna |
| 22 | 7, 13 | Manager project management | Manager, project management |
| 24 | 12 | BNRC | The NRC |
| 24 | 19 & 20 | New Start | NuStart |
| 25 | 13 & 24 | Ropeson | Ropson |
| 25 | 16, 20 & 24 | Kiter | Keuter |
| 31 | 25 | NEC | NRC |
| 36 | 5 | operatings | operating |
| 54 | 3 | Blunt | Blount |
| 64 | 2 | Eichenburger | Eichenberger |
| 64 | 10 | Klevenger | Clevenger |
| 65 | 7 & 21 | Dorch | Dortch |
| 66 | 4 | Dorch | Dortch |
| 70 | 1 | Hielichs | Hinrichs |
| 72 | 23 | Eichenburger | Eichenberger |
| 73 | 11 | Eichenburger | Eichenberger |
| 80 | 22 | hall | haul |
| 84 | 8 | Eichenburger | Eichenberger |
| 85 | 8 | Document | documents |
| 91 | 1 | Plant | Plan |
| 95 | 4 | Eichenburger | Eichenberger |
| 105 | 8 | 911 | 9/11 |
| 120 | 13 | New Start | NuStart |
| 124 | 19 | MPNC | MP&C |
| 142 | 17 | Broadband | Broadbent |
| 168 | 17 | Stafford | Stanford |
| 170 | 11 | Stafford | Stanford |
| 170 | 17 | Metcaffe | Metcalfe |
| 172 | 19 | Metcaffe | Metcalfe |
| 172 | 22 | Stafford | Stanford |
| 173 | 2 | Silberth | Silberg |
| 173 | 3 | Tomaschek | Tomaszczuk |
| 173 | 13 | Stafford | Stanford |
| 173 | 16 | Metcaffe | Metcalfe |
| 181 | 13 | House | cost |
| 188 | 8 | Refuelling | refueling |
| 188 | 10 | four quarters | full core |
| 189 | 19 | Up rates | uprates |

| | | | |
|---|---|---|---|
| 190 | 9,13,15,22 | Up rates | uprates |
| 199 | 24 | Refuelling | refueling |
| 200 | 20 | ERW8 59s | RW 859s |
| 201 | 2 | Refuelling | refueling |
| 228 | 22 | Allen | Alan |
| 229 | 25 | Refuelling | refueling |
| 235 | 10 & 12 | 587 | 567 |
| 235 | 12 | RW 0867 | RW 0567 |
| 236 | 2 | 0867 -- 587 | 0867 -- 567 |
| 241 | 16 | planned | Plan |
| 241 | 17 | year | Years |
| 254 | 13 | ACR | FCR |
| 256 | 14 | Mr. Rives yourself | Mr. Rives and yourself |
| 258 | 13 | Sites | cites |
| 265 | 8 | NPC | MPC |
| 270 | 20 | Fontain | Fontan |
| 271 | 2 | Dubello | Dabello |
| 271 | 5, 7 &8 | Hauselauer | Haslauer |
| 282 | 12 | Hence | Hintz |
| 287 | 9 | Hence | Hintz |

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

SYSTEM FUELS, INC., ON ITS OWN BEHALF A
AND AS AGENT FOR SYSTEM ENTERGY
RESOURCES, INC. AND SOUTH MISSISSIPPI
ELECTRIC POWER ASSOCIATION PLAINTIFF
VERSUS NO. 03-2624C
(JUDGE BRADEN)
UNITED STATES OF AMERICA DEFENDANT

************************************************

DEPOSITION OF BEN FRANKLIN
VOLUME TWO

************************************************

APPEARANCES NOTED HEREIN

TAKEN AT INSTANCE OF: DEFENDANT
DATE: APRIL 20, 2006
PLACE: ENTERGY CORPORATION
1340 ECHELON PARKWAY
JACKSON, MISSISSIPPI
TIME: 9:05 a.m.

ORIGINAL

REPORTED BY: TODD J. DAVIS, CSR, RPR

---

DAVIS COURT REPORTING
POST OFFICE BOX 16147
JACKSON, MISSISSIPPI 39236
601-991-0079

APPEARANCES:

FOR THE PLAINTIFF

L. Jager Smith, Jr., Esquire
Wise, Carter, Child & Caraway
1340 Echelon Parkway
Jackson, Mississippi 39213

FOR THE DEFENDANT

Sharon A. Snyder, Esquire
U. S. Department of Justice
1100 L Street, N.W., Room 12144
Washington, DC 20530

Scott Damelin, Esquire
U.S. Department of Justice
1100 L Street, N.W., Room 12020
Washington, DC 20530

REPORTED BY: TODD J. DAVIS
CSR #1406, RPR

**********************************************************

DAVIS COURT REPORTING
POST OFFICE BOX 16147
JACKSON, MISSISSIPPI 39236
601-991-0079

that one of the documents that you used at some point when you were doing these models that you referenced?

A. Yes. I think it is a document that I would have looked at.

Q. Now, I think yesterday you had referenced a '95 ACR, I think a later document that you were using. And then there was, I thought, a third document that you had indicated there might have been another rate.

Do you know whether this is what you're referring to when you said -- I think you -- you do not recall a specific name. You said it might have come from DOE. It wasn't a final document. I believe that's what you said.

A. It was a CD-ROM that I received which contained a part of the 859 data. It was not as a -- as far as I know, an official publication by DOE, but it was public record.

Q. So it sounds like it's probably not this same document?

A. Definitely not this document.

Q. Do you know why this document -- or why you were asked to use this particular document?

MR. SMITH: The document is --

MR. DAMELIN: Meaning -- thank you.
BY MR. DAMELIN:
Q. Meaning this total system description and the rate, which apparently was included in it?
A. I don't know. I don't want to speculate.
Q. You don't have a recollection of that?
A. No, I don't.
Q. If I can refer you to the second page of Exhibit 10, which is the original E-mail of the chain. It's a January 29th, '03 E-mail Bill Cloutier. And Mr. Cloutier is a TLG employee; is that correct?
A. That's correct. Or at least was at this time. I don't know if he's still there or not. I believe he is, though.
Q. If you could just take look at the -- the text of that E-mail.
A. Okay. I've read it.
Q. Okay. Now, my reading of the E-mail was prior to -- like I said, the date of this E-mail which would have been '03. Was Entergy using this 900 MT receive rate in its decommissioning studies for ANO?
A. I have no knowledge of that.

Q. Do you have knowledge of what rates they were using in the past in terms of DOE acceptance rates in their decommissioning cost estimates or studies?

A. No. I did not get involved with any of that prior to probably this E-mail.

Q. Now, prior to -- and I think your answer was yesterday, prior to becoming a project manager, your current position, the information or the work that you provided related to decommissioning cost estimates -- did you do any work prior to 2002 in that area?

A. No. Not that I recall.

Q. Now, the last line of the -- of the E-mail, the January 29th, 2003, Mr. Cloutier writes, "I also don't want to generate any conflicts with Entergy's plans for the sites" -- or "for the site."

Do you know what he was talking about in terms of -- in terms of -- the terms of his E-mail, meaning not wanting to generate any conflicts with Entergy's plan for the site?

A. No, I do not.

Q. And do you recall around this time, other than being asked to -- to maybe model these

rates, being involved in any discussions about which rate of acceptance -- DOE rate of acceptance should be used in decommissioning cost studies for ANO?

MR. SMITH: I'm going to object to the extent the question calls for attorney/client communications. But other than that, you can answer if you know anything.

A. Could you repeat the question?

BY MR. DAMELIN:

Q. Sure. Do you recall around this time -- in the -- say 2003 or possibly earlier -- being involved in discussions regarding what rate of acceptance -- DOE rate of acceptance should be used in decommissioning cost estimates for ANO?

A. I don't recall at this time. But this is probably the time it started for me.

Q. In terms of your involvement with decommissioning cost --

A. Yes.

Q. -- estimates?

Since you've been involved with them, have -- have you -- meaning decommissioning cost estimates. Have you been involved in discussions regarding which rate of acceptance or

schedule acceptance to use in these decommissioning cost estimates for any other plants?

MR. SMITH: Same objection.

A. I could answer yes, with -- with my attorney.

BY MR. DAMELIN:

Q. Outside of attorney/client communications, have you had discussions regarding which rate of acceptance or schedule acceptance to use for decommissioning cost estimates?

A. I discussed it with Frank Rives and Alan Smith.

Q. Yes. And when did those discussions occur?

A. They've probably been ongoing since about this time.

Q. And I think that's what I was getting at in my earlier question. The reference in this E-mail from Mr. Cloutier -- at least my reading of it seems to discuss not using a 900 rate, but a -- but a different rate. The one he references there is a Yucca Mountain Design receipt rate, a ramp-up to 3,000 metric tons within the first five years of operation. And that's in his January 29th,

2003 E-mail.

I'm a little confused by your earlier answer. Were you involved in discussions regarding -- with Mr. Smith and Mr. Rives regarding the rate of acceptance to be used in decommissioning cost estimates apart from just this ANO 1?

MR. SMITH: That's Alan Smith?

BY MR. DAMELIN:

Q. Alan Smith.

A. I don't recall specifically.

Q. Well, let me ask it this way: The rates you were being asked to model here are, you know, the ramp-up to 3,000. Is it fair to assume that you had not modeled that rate before for the ANO decommissioning cost estimate if you were being asked to model it in February 2003?

A. This would have been the first time I would have been asked to model for ANO. So the answer would -- no. I had not used any other rates.

Q. And prior to that, you wouldn't have had any involvement in which rates to use?

A. That's correct.

Q. Now, subsequent to that, though, were

you involved in discussions to -- within Entergy that involved around using a 3,000 MT rate of acceptance in decommissioning cost estimates?

A. As I grew into this position and learned more and got more involved with this aspect of spent fuel storage, yes, I did get involved.

Q. And what was the reasons for those, I guess, discussions or your involvement in identifying or choosing which rate of acceptance would be used in these decommissioning cost estimates?

A. As I began to get requests to do these kind of things and also began to get involved with the litigation.

Q. Okay. So was -- so part of it was the litigation?

A. Yes.

Q. And you're referencing the spent fuel litigation, just so we're clear?

A. That's correct.

Q. And then part of it was what else?

A. Would be this.

Q. You mean your decommissioning cost --

A. Decommission cost estimates, due diligence work that I might have gotten involved

which I think partially answers your question. Thomas Garrett. Who's Mr. Garrett?

A. Thomas Garrett? I don't recall a Thomas Garrett.

Q. And the -- the rate of acceptance we would be using in these decommissioning cost estimates, that is something that Entergy would provide to TLG. TLG would not make that decision as to which rate of acceptance to use. Is that a fair statement?

A. I believe that's correct.

Q. Now, just so I can try to separate your involvement in the issue. You indicated also that one -- I guess one of the reasons or part of your involvement was regarding the rate of acceptance -- was related to the ongoing litigation; is that correct?

A. That's correct.

Q. Your involvement with the litigation, at what point did the issue of rate of acceptance or selecting a particular rate of acceptance become an issue? I want to try to separate out the decommissioning cost estimate work you did versus litigation and how the rate of acceptance factored into your work that you were doing.

Can you put a kind of a -- give me a time frame on that?

MR. SMITH: Did you understand the question?

THE WITNESS: No. I'm not sure I do understand the question.

BY MR. DAMELIN:

Q. The issue of which rate of acceptance to use in decommissioning cost estimates -- at least your involvement would have begun around this early 2003/late 2002 period, correct?

A. That's correct.

Q. Apart from this, can you describe your involvement in identifying rates of acceptance for -- for the DOE program that were used within Entergy for other purposes apart from decommissioning cost estimates?

A. I'm still not sure I quite understand the question.

Q. Okay. Let's do it this way: Are you aware in this particular case that Entergy is claiming in its litigation that DOE would have accepted spent nuclear fuel at a particular rate as part of its program?

A. Yes. I am aware of that.

Q. And do you know what rate in its litigation Entergy is claiming DOE would have performed at?

A. I'm assuming it's 3,000, but I don't recall the specific document. I haven't read the -- the legal aspects of it.

Q. And your earlier statement, I believe -- or I thought related to work you had done in litigation when I was asking about what other work you had done regarding identifying the DOE rate of acceptance. Is that what you answered earlier?

A. Please repeat.

Q. The -- when I asked you earlier about work you had done regarding identifying or selecting a DOE -- a rate of acceptance that DOE would have performed at -- and I thought part of your -- your answer was you did some of this work related to decommissioning cost estimates, and some of the work was related to litigation.

A. If I understand your question, the work I did for decommissioning I did based on directive of, this is the rate to use. There was no discussion that I was party to that said use another rate.

For litigation, part of what I did

was go back and review DOE documents. And this is one of the documents I did review, and that had this rate in it.

Q. And when you say this is one of the documents that you reviewed, you're talking about --

A. This -- the total system cost description. So the total system description, revision two.

Q. And what did you do with that information?

A. I fed it into my model.

Q. And was the model -- and I know that you described it yesterday. But the model that you were using and I believe was included in Exhibit No. 7, that management plan -- was that created just for the purposes of litigation, the model, that is?

A. No. Actually, it was created for other reasons, and it just became available, a good tool to use.

Q. And the decision, at least at some point, to use this total system description -- I believe that's -- that's what you just said, the rates there. In your model, did you do that at

some point?

A. Yes. As I said yesterday, I used a range as well.

Q. Now, did you make the decision on your own based on just your review of documents to include or reference this particular document, the total system description, and the rate included in that and use it in your model?

A. Yes, I did.

Q. Was there anyone else involved with you or helping you decide, in fact, to use that particular document and rate in your model?

A. Not that I recall.

Q. And the use of that particular document and the rate included in it, do you know whether -- you ran that model, correct?

A. Yes.

Q. Do you know whether that particular model, based on the rate from this total system description, was used in this litigation by Entergy?

A. I guess -- it's my understanding that the model of record that's being used in this litigation is Eilleen Supko's model, not my model.

Q. And do you know how the model you're

Q. No. That's a different --

A. The 1,800 -- the 900 and the 3,000 are two numbers that I have heard. I don't recall seeing the 900 published anywhere, but I probably have. But I do recall seeing the 3,000 published, not just in that document, but most recently in the 2004 annual capacity report. And that confirmed my feeling that 3,000 was the right number to use.

Q. And why did -- why do you say that, in terms of 3,000 was the right number to use?

A. That's an official DOE document.

Q. Are there -- are there other DOE documents that you looked at that had rates other than that identified and other than that 3,000 rate that we'd been talking about?

A. Not any documents since that -- this 2001 report. I don't recall seeing any documents from that date on. I didn't go back and do a historical search.

Q. So other than -- than that as a basis for selecting 3,000, your basis for that was it was in official DOE document; is that fair?

A. Documents, yes.

Q. Documents. Okay. And the 1,800 rate

outputs of your model to Kenrich Group?

A. I believe I have provided some for their comparison purposes. They have their own model.

Q. Do you know -- well, let me ask you this: When did you provide them your model, and what exactly did you provide them?

A. I provided them -- I actually provided them when I -- the actual Excel model probably a year and a half ago. I don't believe they have the current version that I use today.

But I provided them -- we exchanged models for comparison and -- and consistency, sanity checks, those kind of things. The models are fairly complicated, so it's a good idea to get somebody to -- with a different model to take a look at what you're doing.

Q. I think I asked you yesterday about a Kenrich fuel management model. I thought your answer was you weren't sure what that was. Or maybe I'm -- I don't want to put words in your mouth.

Are you talking -- is that what you referenced when you were comparing with what Kenrich might have done? I call it the fuel management model. I believe that's what you call

it.

A. If you call -- if that's what you mean by it, yes, that's the comparison. I don't recall them ever calling it a fuel management model.

Q. I could be calling it the wrong thing, but I -- I think we're talking about the same thing.

The -- what was the result of any comparison that was done between Kenrich and -- and you regarding this type of model?

A. Usually we -- we had minor disagreements, as one would expect because we may have made some slightly different assumptions, but we were pretty much close together in terms of number of cask, timing, those kind of things.

Q. Do you recall any specific differences or inconsistencies between you and Kenrich on -- on the modeling?

A. I don't recall any specifics, but I know we had some. And in either case, usually the discrepancy was due to one of us had made an input error.

Q. Now, when you say that -- that what they received -- you think they received the Excel model a year and a half ago. It's not the current

utilities and the federal government provides on that issue?

A. I don't recall what it says on that issue.

Q. Would you -- in doing this, would the standard contract have been a document you would have gone back and referred to to try to understand what were the obligations of the utilities and DOE in that context?

A. No. I did not do that.

Q. And did you look at any other documents -- and I'll just specifically refer to the rounding up or the -- or the next cask up we just talked about. Any other documents regarding -- regarding that issue, or is this just something that you thought of might be an issue at the time of DOE performance?

A. Yes. That's correct. I thought it would been an issue. It's a potential issue, and I'd like to know what the answer was.

Q. Did you speak to anyone else about this issue in terms of adding it or developing it as part of your model?

A. I believe I discussed it with Kenrich.

Q. Now, at the time that you -- you would

have provided them your model, did that -- I'll just call it a capability or aspect of it -- was not part of the model, correct?

A. I don't believe it was.

Q. Do you know whether it was part of the Kenrich model?

A. I don't recall whether -- and they may have been the trigger for me to do it, having seen it in their model or not. I don't recall. But I think it is in their model now. I don't recall when it appeared.

Q. And, again, given the timing, I'm assuming that conversation would have occurred in last year?

A. I believe so, yes.

Q. Do you know how Ms. Supko's model addresses that issue or handles it?

A. No, I don't.

Q. And in terms of specifically contacts you would have had with the Kenrich Group regarding this modeling issue, was there someone you were dealing with directly on specifically modeling-type issues?

A. It was either Teresa Kilpatrick or Mark Stafford. Those are the two primary people I

discussed these kind of things with.

Q. Did you have discussions -- and I'm talking apart from the meetings we talked about yesterday. Did you have discussions with Mr. Metcaffe or Sieracki about this type of issue?

A. No, I did not.

Q. You also, I think, had mentioned a couple other issues, and I could not write them all down. In addition to this, the rounding up of the cask, what other issues -- and you talked about the -- the capability of modeling the available spent fuel pool.

What else was kind of added to or included in the more current version?

A. There were some extra columns added for things like -- that tracked the number of assemblies in the pool and the margin.

MR. SMITH: Tracks?

THE WITNESS: Well, calculates based on the information --

MR. SMITH: Track, T-R-A-C-K?

THE WITNESS: Yes. Yes.

MR. SMITH: Sorry.

A. Based on the information that -- that's

identified between what they were doing in terms of modeling and what you were doing?

A. Not that I recall. We both come at it from different directions and apparently arrived at pretty close to the same results.

Q. And given the -- what your model does, how would you describe what -- the direction that their model comes from?

A. Well, I say -- maybe that's -- maybe that's a little bit of misstatement because there are only so many ways you can do this, and you probably all have to follow closely along the same path. It's a question of how much sophistication you put into your model.

Q. Well, how would you describe, I guess, the sophistication and the methodology that they use versus what you're doing?

A. I would think they're probably close to equivalent.

Q. And would you -- would you describe or could you describe there to be any differences in methodology between the two?

A. Not in general, I don't think.

Q. Well, I mean, are there any differences in methodology that you can identify?

discharges, work off the backlog that's in the pools, such that within five to eight years of shutdown of a plant all the fuel is gone, and you could commence with decommissioning. That's what I would call a reasonable rate.

3,000 is a reasonable rate because the current annual discharges are around 2,100 metric tons per year, 2,000 to 2,100. And that gives you between 900 and a thousand excess rate to pick up the backlog and work it down to where end of life, the fuel is gone.

Q. Now, is -- I want to ask you about the word "reasonable." Is that your characterization of the 3,000 rate?

A. That's my characterization based on also reading some DOE documents which talk about keeping the repository open for a certain period of years. If you run at a lower rate than that, the repository has to stay open 80, 100, 150 years, depending on the rate, which I don't consider a reasonable time frame.

Q. So it's fair to say -- I know you're just referencing DOE documents. But the assessment of the reasonableness is also your personal view of -- of the rate; is that fair?