close.

Q. And do you know whether the Kenrich Group or Ms. Supko have run their models to determine a -- a rate other than 3,000 that may meet those objectives which you've identified?

A. I believe -- and if I recall from Ms. Supko's -- one of her expert reports, that she did run a higher rate than 3,000. And I don't recall if she ran any parametrics. But I believe her conclusion on the 6,000 was that it was too much, too fast and actually cost more money.

Q. Does your model or could your model take into account if there were new reactors constructed and built in the United States, that aspect of it, I mean, if you -- if you needed to add another facility with additional outputs?

A. Yes. I would add that to my database and go from there.

Q. And do you know, in terms of documents that you -- that you looked at or -- or relied upon in determining the reasonableness of this rate, did you look back at the -- the standard contract that I -- that I mentioned between the utilities and the federal government?

A. I don't recall that I looked back to

least not necessarily the System Fuels standard contract, but a contract?

A. I probably did it when I started this job, probably around late 2002 or 2003, again, as part of my self-education, not because anyone asked me.

Q. And prior to that, had you ever read the standard contract?

A. I don't recall that I had.

Q. Now, you were with Entergy back in 1981, started back in 1981. So you were here when the standard contract was -- would have been executed in 1983. That's right?

A. That's correct.

Q. Were you -- did you have any involvement in -- in any way in drafting or formulating the standard contract itself?

A. No, I did not.

Q. And what about the Nuclear Waste Policy Act, any role or involvement in developing or formulating that?

A. No, I did not.

Q. Did you have any involvement in drafting or writing comments that any of the Entergy companies -- I know they were not Entergy

companies at that point -- but predecessors to Entergy submitted to the Department of Energy to comment on the proposed standard contract back in early 1983?

A. No, I did not.

Q. Have you read any -- what I described as comments that were submitted by Entergy companies to DOE prior to the -- the execution of the standard contract?

A. No, I have not.

Q. Now, when you read either -- either the Entergy contract or a -- or another version of it from another utility, was there a rate of acceptance -- annual rate acceptance that you identified in those documents?

A. I didn't look for that specific part. I -- as I said, I scanned it.

Q. Do you know whether or not the rate of acceptance is in there, in terms of an identified rate of acceptance?

A. I did not look for it, no. I don't recall it being mentioned.

Q. Do you -- do you know what a delivery commitment schedule is in terms of the standard contract?

Q. And that is work that you put together yourself?

A. That's correct.

Q. Okay. Now, when you -- and beyond this -- the time when you did it for litigation -- you indicated you hadn't modeled this aspect prior to that?

A. That's correct. Best of my recollection, I did not do it for any other reason.

Q. And when you did that, were you modeling essentially going forward, or were you modeling a nonbreach world, if you will, had DOE begun acceptance in 1998?

A. I modeled a nonbreach world.

Q. And why did you do that?

A. Because I wanted to see what the minimum number of ISFSIs and casks we would have had to provided in a nonbreach world.

Q. And were you -- were you asked or directed to do that by anyone?

A. I don't recall that I was, but it may have come up from discussions with Kenrich, that they were going to start looking at it. And so I decided I should probably have something to verify

years.

Do you see that?

A. Yes, I do.

Q. During this 1996 period of time, were you doing any type of assessment or modeling of rate of acceptance or schedule of acceptance for the DOE program --

A. No.

Q. -- on behalf of Entergy?

A. No, I was not.

Q. Have you seen these type of -- of numbers before regarding acceptance of spent fuel from these Entergy facilities after the start of DOE program?

A. Not these numbers, no.

Q. Have you -- have you done any modeling or analysis that would -- for a particular rate of acceptance and schedule that would not include acceptances for Grand Gulf in the first ten years of the program?

A. Not that I recall, but I suspect that 900 would probably be fair.

Q. And do you know, from -- from the work, the modeling done, and/or review of DOE documents, that there are rates that if applied would result

parts of the memorandum.

"Further, because the spent fuel contract with DOE requires DOE to bring casks suitable for use at the utilities site, it is assumed that had DOE performed, it would have brought transportation casks that did not require stacking for loading and that did not require the door modification."

Do you see that?

A. That's -- I see that.

Q. And is your basis for concluding that DOE would bring casks, quote, unquote, suitable for use -- are you referencing the standard contract?

A. To my recollection, the standard contract, yes.

Q. Okay. Are -- do you have any other references or support for that -- for that sentence?

A. No, not that I recall.

Q. Now, in terms of that "suitable for use" term, would that preclude, in your view, DOE from bringing any cask to Grand Gulf for pickup of spent fuel that required any type of modification to the plant or site?

A. That's what I --

MR. SMITH: Let me object to the extent that that may call for a legal opinion, but you're free to give your opinion on that.

A. I will give a technical -- technical opinion. And it's my belief that suitable for use means to show up with a cask that our plant could bring right in without having to make any modifications to the plant, a cask that would fit the plant.

BY MR. DAMELIN:

Q. So I think your answer is, is that that would mean that there -- if the cask was suitable for use, that there should not be any type of modifications that would need to be done?

A. That's my technical opinion, yes.

Q. Okay. Well, reading -- I mean, you rely upon the standard contract language here. Do you have a nontechnical opinion?

A. It's the same. Based on my nonlegal expertise, that's the way I would interpret "suitable for use."

Q. Now, the -- the document also makes reference to an LCO, which I believe is limiting condition for operation; is that right?

CERTIFICATE OF DEPONENT

I, BEN FRANKLIN, deponent in the deposition taken in the herein styled and numbered cause, certify that I have examined the foregoing pages as to the correctness thereof, and that after reading said pages, I find them to contain a full and true transcript of the testimony as given by me on APRIL 19, 2006, in JACKSON, Mississippi.

Subject to those corrections listed below, if any, I find the transcript to be the correct testimony I gave at the aforestated time and place.

| Page | Line | Comments |
|---|---|---|
| ____ | ____ | See errata pages - Corrections for Transcript of |
| ____ | ____ | Ben Franklin's April 19, 2006 Deposition |
| ____ | ____ | |
| ____ | ____ | |

This the 22 day of May, 2006.

Ben Franklin
BEN FRANKLIN

State of Mississippi
County of Hinds

Subscribed and sworn to before me, this the 22 day of May, 2006.

My Commission Expires: [signature]

MISSISSIPPI STATEWIDE NOTARY PUBLIC
MY COMMISSION EXPIRES JAN. 3, 2007
BONDED THRU STEGALL NOTARY SERVICE

Notary Public

ORIGINAL

**Corrections for Transcript of Ben Franklin's April 19, 2006 Deposition**

| Page No. | Line No. | Original | Corrected |
|---|---|---|---|
| 10 | 2 | SURI | Surry |
| 10 | 3 | Northann | North Anna |
| 22 | 7, 13 | Manager project management | Manager, project management |
| 24 | 12 | BNRC | The NRC |
| 24 | 19 & 20 | New Start | NuStart |
| 25 | 13 & 24 | Ropeson | Ropson |
| 25 | 16, 20 & 24 | Kiter | Keuter |
| 31 | 25 | NEC | NRC |
| 36 | 5 | operatings | operating |
| 54 | 3 | Blunt | Blount |
| 64 | 2 | Eichenburger | Eichenberger |
| 64 | 10 | Klevenger | Clevenger |
| 65 | 7 & 21 | Dorch | Dortch |
| 66 | 4 | Dorch | Dortch |
| 70 | 1 | Hielichs | Hinrichs |
| 72 | 23 | Eichenburger | Eichenberger |
| 73 | 11 | Eichenburger | Eichenberger |
| 80 | 22 | hall | haul |
| 84 | 8 | Eichenburger | Eichenberger |
| 85 | 8 | Document | documents |
| 91 | 1 | Plant | Plan |
| 95 | 4 | Eichenburger | Eichenberger |
| 105 | 8 | 911 | 9/11 |
| 120 | 13 | New Start | NuStart |
| 124 | 19 | MPNC | MP&C |
| 142 | 17 | Broadband | Broadbent |
| 168 | 17 | Stafford | Stanford |
| 170 | 11 | Stafford | Stanford |
| 170 | 17 | Metcaffe | Metcalfe |
| 172 | 19 | Metcaffe | Metcalfe |
| 172 | 22 | Stafford | Stanford |
| 173 | 2 | Silberth | Silberg |
| 173 | 3 | Tomaschek | Tomaszczuk |
| 173 | 13 | Stafford | Stanford |
| 173 | 16 | Metcaffe | Metcalfe |
| 181 | 13 | House | cost |
| 188 | 8 | Refuelling | refueling |
| 188 | 10 | four quarters | full core |
| 189 | 19 | Up rates | uprates |

| | | | |
|---|---|---|---|
| 190 | 9,13,15,22 | Up rates | uprates |
| 199 | 24 | Refuelling | refueling |
| 200 | 20 | ERW8 59s | RW 859s |
| 201 | 2 | Refuelling | refueling |
| 228 | 22 | Allen | Alan |
| 229 | 25 | Refuelling | refueling |
| 235 | 10 & 12 | 587 | 567 |
| 235 | 12 | RW 0867 | RW 0567 |
| 236 | 2 | 0867 -- 587 | 0867 -- 567 |
| 241 | 16 | planned | Plan |
| 241 | 17 | year | Years |
| 254 | 13 | ACR | FCR |
| 256 | 14 | Mr. Rives yourself | Mr. Rives and yourself |
| 258 | 13 | Sites | cites |
| 265 | 8 | NPC | MPC |
| 270 | 20 | Fontain | Fontan |
| 271 | 2 | Dubello | Dabello |
| 271 | 5, 7 &8 | Hauselauer | Haslauer |
| 282 | 12 | Hence | Hintz |
| 287 | 9 | Hence | Hintz |

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

SYSTEM FUELS, INC., AND
ENTERGY ARKANSAS, INC. PLAINTIFFS

VERSUS NO. 03-2623C
(JUDGE LETTOW)

THE UNITED STATES DEFENDANT

**************************************************

DEPOSITION OF BEN FRANKLIN

**************************************************

APPEARANCES NOTED HEREIN

TAKEN AT INSTANCE OF: DEFENDANT
DATE: AUGUST 2, 2006
PLACE: ENTERGY CORPORATION
1340 ECHELON PARKWAY
JACKSON, MISSISSIPPI
TIME: 9:02 a.m.

REPORTED BY: TODD J. DAVIS, CSR, RPR

DAVIS COURT REPORTING
POST OFFICE BOX 16147
JACKSON, MISSISSIPPI 39236
601-991-0079

ORIGINAL

APPEARANCES:

FOR THE PLAINTIFFS

SAM MORRIS, ESQ.
Wise, Carter, Child & Caraway
1340 Echelon Parkway
Jackson, Mississippi 39213

FOR THE DEFENDANT

JOSHUA GARDNER, ESQ.
U. S. Department of Justice
1100 L Street, N.W., Room 12144
Washington, DC 20530

Also Present: Allyson Reed
Dave Tondi

REPORTED BY: TODD J. DAVIS, CSR #1406, RPR

*************************************************

DAVIS COURT REPORTING
POST OFFICE BOX 16147
JACKSON, MISSISSIPPI 39236
601-991-0079

suitable for the site?

MR. MORRIS: Same objection.

A. As a licensee, yes, they're responsible for their licensing basis.

BY MR. GARDNER:

Q. And same thing with the 7248 analysis?

A. Yes.

Q. Okay.

(An off-the-record discussion was held.)

BY MR. GARDNER:

Q. Okay. Back on. Ready?

Now, Mr. Franklin, I'm going to ask you what I guess is obviously a hypothetical question. Let's say DOE brought to the ANO site a four-assembly truck cask. The cask was suitable for the site, in that it wouldn't require any plant modifications at all.

In your view, would ANO have the right to demand a larger cask that's also suitable for the site?

MR. MORRIS: Objection to form. Speculation.

A. I can't speculate. I think that's asking me a legal question. I can't answer it.

BY MR. GARDNER:
Q. Okay. Because -- and when you say that you think it's asking for a legal question, is that because you'd have to look at the standard contract and make that determination?
A. That would be correct, yes.
Q. Now, since we've -- we've already looked at the standard contract. I've got one other question for you about the standard contract, and it was the page that we were previously on, which is 0169.
Now, I see where it says under B-2 that, "Such casks shall be furnished sufficiently in advance to accommodate scheduled deliveries. Such casks shall be suitable for use at the purchaser's site."
Now, where, Mr. Franklin, do you understand that suitable for the site means no plant modifications?
A. That's my interpretation.
Q. Okay. So you have to -- you read into "suitable for use at purchaser's site" as meaning no plant modifications; is that correct?
A. That's correct.
Q. Okay. All right. Mr. Franklin, I'm

Now, we talked a little bit earlier about the -- the model that you would have created back in, I believe, the 2002 time frame, correct?

A. That's correct.

Q. Okay. And I understand -- and I understand that your model is used for a variety of purposes, correct?

A. That is correct.

Q. And one reason, obviously, is the litigation, correct?

A. That's correct.

Q. And I understand another purpose -- and I think you testified about this earlier -- is decommissioning cost estimate work, correct?

A. That's correct.

Q. And I think I read you also use it for due diligence for nuclear plant acquisitions?

A. That's correct.

Q. Okay. And which acquisitions have you been involved with with your model?

A. All acquisitions since 2003, I guess.

Q. Okay. So you wouldn't have been involved in Pilgrim, correct, because that was in '99?

A. I was involved in Pilgrim, but not from

Okay. So the oldest fuel first dictates the order that the fuel is going to be accepted, correct?

A. The order and the amount.

Q. And the amount. Exactly. And then in terms of the schedule, do you know how that is determined under the standard contract?

A. No. I'm not really involved with that piece of it.

Q. Okay. So in other words -- and when I say schedule, for example, the rate of acceptance. You don't have any understanding as to the rate of acceptance that's required under the standard contract, correct?

A. My understanding is that there is no rate of acceptance in the contract.

Q. Okay. So in terms of your knowledge about acceptance rates under the standard contract, that doesn't include anything about the rate of acceptance. Is that fair to say?

A. Repeat that, please.

Q. Sure. You've been identified as acceptance rates under the standard contract including the rate -- it says right here the rate and trading. But I take it from what you're

would trade with other utilities?
A. Not to my knowledge, no.
Q. Okay. Now, based upon what you have been identified as having knowledge about, the detailed area relevant to the claim, and based upon your previous testimony, I just want to make sure that I understand this.
You're not -- well, let me back up. Do you have an understanding -- or let me strike that.
Do you know what Entergy's understanding is of DOE's obligation regarding the rate of acceptance?
A. I'm not sure I understand the question.
Q. Okay. And I appreciate that because that was a horribly worded question. So thank you for forcing me to do my job.
Do you know what Entergy's understanding is of DOE's obligation with respect to the rate of acceptance?
A. I can give you my opinion of what our position is.
Q. Okay. Why don't we break this up then. What's your opinion?
A. My opinion is that it is DOE's

obligation to pick up the fuel at a rate such that all the fuel is taken from our sites within six to seven years of shutdown of those sites.

Q. Okay. Anything -- anything else? Any other obligations?

A. No. That's -- take your fuel.

Q. Sure. But in terms of the rate of acceptance, the only -- only opinion you have is that DOE must accept all fuel within six to seven years of shutdown. Is that fair to say?

A. That's my understanding and interpretation, yes.

Q. Okay. And where do you get the six to seven years from?

A. Well, based on my review of DOE documents, the acceptance rate of approximately 3,000 metric tons per year is the acceptance rate that meets that criteria.

Q. Okay. Now, which documents are you referring to?

A. Well, most recently the 2004 acceptance report.

Q. The acceptance capacity?

A. Yes. I think it was RW 6567, I believe it was, 678, something like that.

A. That's correct.
Q. Okay. And then what other documents are you referring to?
A. There's another document that was issued in 2004, I believe, September of 2004, signed by Margaret Chu, also mentioning that rate.
Q. Do you know what document that is?
A. I'll have get it. I don't -- I can get it at the break.
Q. That would be great. Thank you.
Anything else?
A. Many of the technical reports that DOE has issued in the 2000/2001 time frame. When I first started on this job, I started going back and reading that. Those all discuss the 2000 -- 3,000 rate.
Q. Okay. Did you look at any documents that predated 1998?
A. The only document that I looked at was -- well, actually, there are two documents I looked at that are DOE documents. One is the 1995 acceptance capacity report, and the other is a 1993, I guess, acceptance capacity report. I don't think it's actually an acceptance capacity report, but it's more like a regurgitation of the

RW 859s at the time, and it has a lot of detailed information on plants and fuel types and those kind of things.

Q. Now, the 1995 ACR contains a 900 rate of acceptance, correct?

A. That's what I recall, yes.

Q. Okay. The 1993 document, which I will confess, I'm not exactly sure what document you're talking about.

Does that also contain the 900 MTU rate of acceptance?

A. That does not -- I don't recall have an -- any acceptance rate or date in it at all. It's mostly information on plants.

Q. Okay. It's fair to say that your involvement with the issue of rate and schedule really started in 2002, correct?

A. That's correct.

Q. Okay. Are you familiar at all -- and I'm going to use this term, and then I can define it for you if you don't understand.

Are you familiar with the administrative record concerning the promulgation of the standard contract?

A. No, I'm not.

Q. Okay. Do you understand what I mean when I say administrative record?

A. I believe you're talking about discussions that went on prior to contract --

Q. That's right. Exactly.

A. -- signing.

Q. Okay. So you're not familiar with those discussions?

A. I'm not familiar with those discussions, no.

Q. Do you have any knowledge as to whether, at the time of contract formation, DOE expressly rejected the inclusion of a rate of acceptance in the contract?

A. No, I don't.

Q. Okay. Would you agree, is it fair to say -- and I don't mean this pejoratively at all. But is it fair to say that you're not the right person to talk to if I want know what Entergy's understanding of DOE's contract obligations are with respect to rate of acceptance? Is it fair to say that you're not the right person to talk to about that?

A. From a legal aspect, yes.

Q. Yes? It is fair to say that?

have been performance in your view?
A. I can't answer that because I haven't studied it.
Q. Okay. Do you know, Mr. Franklin, how DOE, under the standard contract, was supposed to set the rate of acceptance? Was there a process contained in the standard contract for that; do you know?
A. Not that I recall.
Q. Okay. You're familiar with the annual capacity reports, correct? I think you testified to that?
A. That's correct.
Q. Are you familiar with a document called the acceptance priority ranking or APR?
A. That's usually part of the ACR, yes.
Q. Sometimes DOE publishes them together, and sometimes they publish separate documents, correct?
A. I've only seen them published together, so...
Q. Okay. Do you have any understanding as to how those two documents are to be used under the standard contract?
A. It's my understanding that that document

is to be used with a part of the contract that I'm not very familiar with, and that's the -- whatever, those commitment delivery schedules or whatever?

Q. The delivery commitment schedules?

A. Okay.

Q. Right. Is that what we're talking about?

A. I believe so, yes.

Q. Okay. I'm not trying to be tricky. I making sure we're talking about the same thing.

A. That would be -- yes.

Q. Okay. It's fair to say that you're not really the right person to talk to about that process, under the --

A. That's correct. That would be Frank Rives.

Q. Got you.

Now, Mr. Franklin, you may recall in your previous deposition in Mississippi, you discussed some of your work concerning ANO's decommissioning cost estimates.

Do you recall that?

A. Yes.

Q. Okay. I want to show you a document.

Q. Now, the Kenrich report appears to be giving the government credit for 15 casks through 2000; whereas, based upon Exhibit 7, in your model, there would have been 16 casks loaded through 2000. Do you know why there's a difference?
A. Well, the Kenrich model is the model of record. The damages aren't based on my model.
Q. No. I understand that. But I guess my question is, based upon your model, there are 16 casks loaded by 2000, correct?
A. If we read those numbers right, yes.
Q. Yeah. And I guess my question is, do you know why Kenrich comes up with 15 casks rather than the 16 you came up with?
A. My guess is the reason is their model is better than mine.
Q. Do you know how it's better, or do you have any sense as to why it's better?
A. I believe they modeled the spent fuel pool better than I did.
Q. Okay. And when you mean they modeled the spent fuel pool better, what do you mean by that?
A. I believe they took Dr. McCoy's numbers

and input those in specifically and based it on that.

Q. Okay. So your numbers that you used for the spent fuel pool, where did you get your numbers from?

A. I took the 260 -- or the 237 number I believe was the number for 2005 from Dr. McCoy. The preceding years, I didn't make any. This model -- this version of the model didn't have that detail, and took it -- took it as one number.

Q. So -- okay. So in other words, you didn't alter the full core reserve year to year is what you're saying?

A. That's correct.

Q. But Dr. McCoy, in providing the information to Kenrich, went year to year to reflect what full core reserve was, correct?

A. I believe that's true, yes.

Q. Okay. And so based upon, you think, Dr. McCoy providing a year-by-year breakdown of full core reserve, you think that might explain the difference between your projection of 16 casks and Kenrich's projection of 15 casks by 2000?

A. That's right. That and a timing issue. It's always a timing issue. Do you load before or

CERTIFICATE OF COURT REPORTER

I, Todd J. Davis, Court Reporter and Notary Public in and for the County of Hinds, State of Mississippi, hereby certify that the foregoing pages contain a true and correct transcript of the testimony of BEN FRANKLIN, as taken by me in the aforementioned matter at the time and place heretofore stated, as taken by stenotype and later reduced to typewritten form under my supervision to the best of my skill and ability by means of computer-aided transcription.

I further certify that under the authority vested in me by the State of Mississippi that the witness was placed under oath by me to truthfully answer all questions in this matter.

I further certify that I am not in the employ of or related to any counsel or party in this matter and have no interest, monetary or otherwise, in the final outcome of this matter.

Witness my signature and seal this the 5TH day of AUGUST, 2006.

TODD J. DAVIS, CSR #1406

TODD J. DAVIS NOTARY PUBLIC HINDS COUNTY, MS

My Commission Expires:
April 29, 2009