No. 03-2624C
(Judge Braden)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

SYSTEM FUELS, INC., on its own behalf and as agent
for SYSTEM ENERGY RESOURCES, INC. and
SOUTH MISSISSIPPI ELECTRIC POWER ASSOCIATION,

Plaintiff,

v.

UNITED STATES,

Defendant.

---

# DEFENDANT'S MOTION IN OPPOSITION TO PLAINTIFF'S EXPERT WITNESS, EILEEN M. SUPKO

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

HAROLD D. LESTER, JR.
Assistant Director

SHARON A. SNYDER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, NW
Washington, D.C. 20530
Tel: (202) 616-0347
Fax: (202) 307-2503

Attorneys for Defendant

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

STEPHEN FINN
SCOTT R. DAMELIN
JOHN C. EKMAN
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

September 6, 2006

TABLE OF CONTENTS

PAGE

STATEMENT OF FACTS . . . . . 2

SUMMARY OF ARGUMENT . . . . . 4

ARGUMENT . . . . . 4

I. THE COURT HAS THE POWER AND THE DUTY TO GRANT MOTIONS TO LIMIT THE SCOPE OF TRIAL IN APPROPRIATE CIRCUMSTANCES . 4

II. A MOTION *IN LIMINE* IS APPROPRIATE IF A PROPOSED TESTIFYING EXPERT WITNESS LACKS THE QUALIFICATIONS TO SATISFY FEDERAL RULE OF EVIDENCE 702 OR THE STANDARDS SET BY THE SUPREME COURT IN *DAUBERT* AND *KUMHO TIRE* . . . . . 5

A. Federal Rule of Evidence 702 Requires That, To Be Admissible, Any Expert Witness Opinions Must Be Both Reliable And Relevant . . . . . 5

B. To Establish That Proposed Expert Testimony Is Reliable, The Party Proposing The Testifying Expert Must Establish That She Is Qualified To Render The Opinions At Issue . . . . . 6

C. If The Proponent Establishes That Its Expert Is Qualified, It Must Then Establish That The Methodology Underlying the Expert's Conclusions Is Reliable . . . . . 8

D. If The Expert's Proffered Opinion Is Reliable, The Court Must Still Determine Whether It Is Relevant, Including Whether It Is Helpful To The Trier Of Fact . . . . . 10

III. THE COURT SHOULD EXCLUDE EILEEN SUPKO'S OPINIONS CONCERNING THE "REASONABLENESS" OF A PARTICULAR RATE OF ACCEPTANCE . . . . . 12

A. Ms. Supko's Opinions . . . . . 12

B. The Court Should Reject Ms. Supko's Opinions Because They Are Neither Relevant Nor Reliable . . . . . 15

1. Ms. Supko's Opinions Are Not Relevant To Any Issue In This Case . . . . . 15

2. Ms. Supko's Opinions Should Not Be Afforded Any Weight Because They Are Not Reliable . . . . . . . . . . . . . . . . . . . . . . . . . . 19

C. The Court Should Disregard Ms. Supko's Opinions Because Her Model Lacks Evidentiary Support . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

D. Ms. Supko's Model Inconsistently Mixes Information From The "But For" And Actual Worlds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

E. Even If The Court Were To Accept Counsel's Assertion Concerning The Twin Objectives, A 3,000 MTU Rate Of Acceptance Does Not Satisfy These Twin Objectives Under Ms. Supko's Model . . . . . . . . . . . . . . . . . . 30

IV. THE COURT SHOULD EXCLUDE MS. SUPKO'S TESTIMONY REGARDING THE REQUIREMENTS OF THE NUCLEAR WASTE POLICY ACT AND STANDARD CONTRACT, AND REGARDING GENERAL SPENT FUEL STORAGE PRACTICES AND RELATED TECHNICAL ISSUES, BECAUSE THESE TOPICS HAVE NOT BEEN PROPERLY DISCLOSED AS SUBJECTS ABOUT WHICH MS. SUPKO WOULD TESTIFY . . . . . . . . . . . 34

A. Ms. Supko's Testimony Regarding The NWPA And Standard Contract Are Beyond The Scope Of Her Opinions As Disclosed In Her Expert Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

B. SFI Did Not Disclose Ms. Supko's Information Regarding General Spent Fuel Storage Practices And Related Technical Issues In The Nuclear Industry To The Government During Discovery . . . . . . 36

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

# TABLE OF AUTHORITIES

## CASES

Ancho v. Pentek Corp.,
157 F.3d 512 (7th Cir. 1998) .......... 11

Apostol v. United States,
838 F.2d 595 (1st Cir. 1988) .......... 7

Atkins v. County of Orange,
372 F.Supp.2d 377 (D.C.N.Y 2005) .......... 37

Berry v. City of Detroit,
25 F.3d 1342 (6th Cir. 1994), cert. denied, 513 U.S. 1111 (1992) .......... 7

Bluebonnet Sav. Bank, F.S.B. v. United States,
266 F.3d 1348 (Fed. Cir. 2001) .......... 25

Bluebonnet Sav. Bank v. United States,
339 F.3d 1341 (Fed. Cir. 2003) .......... 24

Boston Edison Company v. United States,
No. 99-447C (Fed. Cl.) .......... 2

Brown v. Wal-Mart Stores, Inc.,
402 F. Supp. 2d 303 (D. Maine 2005) .......... 21

Carroll v. Otis Elevator Co.,
896 F.2d 210 (7th Cir. 1990) .......... 7

Castle v. United States,
48 Fed. Cl. 187 (2000), aff'd in part, rev'd in part and remanded in part,
301 F.3d 1328 (2002) .......... 25

Commonwealth Edison Co. v. United States,
No. 98-621C (Fed. Cl.) .......... 2, 22

Daubert V. Merrell Dow Pharmaceuticals, Inc.,,
509 U.S. 579 (1993) .......... 8, 10, 15, 19

Dhillon v. Crown Controls, Inc.,
269 F.3d 865 (7th Cir. 2001) .......... 7, 11

Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.,
773 F.3d 1506 (9th Cir. 1985) .......... 24

Domingo v. T.K., M.D.,
289 F.3d 600 (9th Cir. 2002) .......... 8

Eagleston v. Guido,
41 F.3d 865 (2d Cir. 1994), cert. denied, 516 U.S. 808 (1995) .......... 7

Employers Reinsurance Corp. v. Mid-Continent Cas. Co.,
202 F. Supp. 2d 1212 (D. Kan. 2002) .......... 10

Ericsson, Inc. v. Harris Corp.,
352 F.3d 1369 (Fed. Cir. 2003) .......... 24

Fifth Third Bank v. United States,
55 Fed. Cl. 223 (2003) .......... 25, 26

Fuesting v. Zimmer, Inc.,
421 F.3d 528 (7th Cir. 2005) .......... 19, 21

General Elec. Co. v. Joiner,
522 U.S. 136 (1997) .......... 8

Genty v. Resolution Trust Corp.,
937 F.2d 899 (3d Cir. 1991) .......... 7

Glendale Fed. Bank, FSB v. United States,
43 Fed. Cl. 390 (1999) .......... 26

Guillory v. Domtar Indus. Inc.,
95 F.3d 1320 (5th Cir. 1996) .......... 28

Hamling v. United States,
418 U.S. 87 (1974) .......... 6

Hardin v. Ski Venture, Inc.,
50 F.3d 1291 (4th Cir. 1995) .......... 7

Hoffman v. Caterpillar, Inc.,
368 F.3d 709 (7th Cir. 2004) .......... 37

Home Sav. of Am. v. United States,
57 Fed. Cl. 694 (2003), aff'd in part, rev'd in part, 399 F.3d 1341 .......... 25

Indiana Michigan Power Co. v. United States,
60 Fed. Cl. 639 (2004) aff'd 422 F.3d 1369 (Fed. Cir. 2005) .................................... 2, 14

Jacobsen v. Deseret Book Co.,
287 F.3d 936 (10th Cir. 2002) ........................................................................... 37

Joy v. Bell Helicopter Textron, Inc.,
999 F.2d 549 (D.C. Cir. 1993) ........................................................................ 5, 6

Kidder, Peabody & Co. v. IAG Int'l Acceptance Group N.V.,
28 F. Supp. 2d 126 (S.D.N.Y. 1998) ................................................................. 25

Kumho Tire Co. v. Carmichael,
526 U.S. 137 (1999) ........................................................................... 5, 6, 8, 9. 19

LaSalle Talman Bank, F.S.B. v. United States,
45 Fed. Cl. 64 (1999), aff'd in part, rev'd in part, 317 F.3d 1363 (Fed. Cir. 2003) ........................................................................................................ 25

Lippe v. Bairnco Corp.,
No. 96-CIV-7600(DC), 2002 WL 15630 (S.D.N.Y. Jan. 7, 2002) ............................... 11

Marx & Co., Inc. v. Diners' Club, Inc.,
550 F.2d 505 (2d Cir. 1977), cert. denied, 434 U.S. 861 (1977) .................................. 11

Masters v. Hesston Corp.,
291 F.3d 985 (7th Cir. 2002) ................................................................... 5, 6, 8

Microstrategy Inc. v. Business Objects, S.A.,
429 F.3d 1344 (Fed. Cir. 2005) ........................................................................ 19

Needleman v. John Hancock Life Ins. Co.,
No. 03-1955, 2006 WL 842370 (N.D. Tex. Mar. 31, 2006) ........................................ 15

Nieves-Villanueva v. Soto-Rivera,
133 F.3d 92 (1st Cir. 1997) ............................................................................. 11

O'Conner v. Commonwealth Edison Co.,
13 F.3d 1090 (7th Cir. 1994) ............................................................................. 8

Oddi v. Ford Motor Co.,
234 F.3d 136 (3d Cir. 2000) ...................................................................... 21, 22

Owen v. Kerr-McGee Corp.,
698 F.2d 236 (5th Cir. 1983) ........................................................................... 11

Palmerin v. City of Riverside,
794 F.2d 1409 (9th Cir. 1986) .......... 4

Primavera Familienstifung v. Askin,
130 F. Supp. 2d 450 (S.D.N.Y. 2001)) (brackets in original .......... 12

Rink v. Cheminova, Inc.,
400 F.3d 1286 (11th Cir. 2005) .......... 15

Sacramento Municipal Utility District v. United States,
70 Fed. Cl. 332 (2006) .......... 2, 14, 23

Seaboard Lumber Co. v. United States,
308 F.3d 1283 (Fed. Cir. 2002) .......... 15

Sherbert v. Alcan Aluminum Corp.,
66 F.3d 965 (8th Cir. 1995) .......... 10

Southern Pac. Communications Co. v. AT&T,
556 F. Supp. 2d 825 (D.D.C. 1982) .......... 25

Suess v. United States,
52 Fed. Cl. 221 (2002) .......... 26

Summers v. Missouri Pacific R.R. Sys.,
132 F.3d 599 (10th Cir. 1997) .......... 10

Surace v. Caterpillar, Inc.,
111 F.3d 1039 (3rd Cir. 1997) .......... 7

Taylor v. Evans,
No. 94-CIV-8425, 1997 WL 154010 (S.D.N.Y. Apr. 1, 1997) .......... 12

Tolerico v. Home Depot,
205 F.R.D. 169 (D.C.Pa. 2002) .......... 37

White Mountain Apache Tribe of Az. v. United States,
10 Cl. Ct. 115, 116 (1986) .......... 4

Zaremba v. General Motors Corp.,
360 F.3d 355 (2d Cir. 2004) .......... 21, 22

Zenith Electronics Corp. v. WH-TV Broadcasting Corp.,
395 F.3d 416 (7th Cir. 2005) .......... 9, 20, 21

## STATUTES


Fed. R. Civ. P. 16 .......... 1, 4

Fed. R. Civ. P. 26(a) .......... 37

Fed. R. Civ. P. 37 .......... 37

Under Fed. R. Civ. P. 37 .......... 37

Fed. R. Evid. 702 .......... 5, 6

Fed. R. Evid. 704 .......... 11


## MISCELLANEOUS


Wisconsin Electric Power Co. v. United States, 00-697C (Fed. Cl.) .......... 2

Omaha Public Power Co. v. United States, 01-115C (Fed. Cl.) .......... 2

Energy Northwest v. United States, 04-10C (Fed. Cl.) .......... 2

System Fuels Inc. (Arkansas) v. United States, 03-2623C (Fed. Cl.) .......... 2

Duke Power v. United States, 98-485C (Fed. Cl.) .......... 2

Acceptance Rate Report at 19 .......... passim

1 J. Strong, McCormick on Evidence § 12, at 49 n.11 (4th ed. 1992) .......... 10, 11

Restatement (Second) of Contracts § 347(c) .......... 24

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| SYSTEM FUELS, INC., on its own behalf and as agent for SYSTEM ENERGY RESOURCES, INC. and SOUTH MISSISSIPPI ELECTRIC POWER ASSOCIATION<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA<br><br>Defendant. | No. 03-2624C<br>(Judge Braden) |

DEFENDANT'S MOTION IN OPPOSITION TO
PLAINTIFF'S EXPERT WITNESS, EILEEN M. SUPKO

Pursuant to Rule 16 of the Rules of the Court of Federal Claims ("RCFC") and the Court's scheduling order dated September 14, 2005, as amended, defendant, the United States, respectfully files this objection to plaintiff's proposed expert witnesses, Eileen M. Supko, and requests that the Court enter an order excluding Ms. Supko as a witness at the forthcoming trial concerning her opinions regarding the rate of acceptance at which the Department of Energy ("DOE") is obligated to accept spent nuclear fuel ("SNF"), including the reasonableness of a 3,000 metric tons of uranium ("MTU") per year steady-state acceptance rate. In addition, the United States requests that the Court enter an order excluding Ms. Supko's proffered expert testimony regarding the Nuclear Waste Policy Act ("NWPA") and the Standard Contract, as well as fact witness testimony concerning general spent fuel storage practices and related technical issues in the nuclear industry.

STATEMENT OF FACTS

In support of its damages claims, System Fuels, Inc. ("SFI"), retained Ms. Supko to prepare a report pursuant to RCFC 26(a)(2)(B) regarding "the impact of the DOE's rate of acceptance of SNF assemblies from the nuclear industry as a whole on two" issues: (1) the aggregate additional at-reactor storage capacity that nuclear utilities would need to provide to continue operations after January 31, 1998; and (2) the ability of the utilities timely to decommission their nuclear power plants. Expert Report Regarding Determination of the U.S. Department of Energy's Overall Spent Nuclear Fuel Acceptance Rate ("Acceptance Rate Report"), submitted September 18, 2005, at 1.[1]

Ms. Supko opines in her report that a 3,000 MTU per year steady-state acceptance rate, with a 400-600-1200-2000 MTU ramp up rate, is "reasonable." Acceptance Rate Report at 19 and 23. Further, Ms. Supko determines that, if DOE had begun acceptance of SNF by January 31, 1998, an overall "steady-state" acceptance rate of 3,000 MTU per year by DOE, with a five-year ramp-up period, would have limited the amount of additional storage capacity needed at nuclear plants after that date, would have kept up with the utilities' annual discharge rate of 2,000 MTU of SNF, would have worked off the 37,000 MTU backlog of SNF in storage at

[1] To date, Ms. Supko has also filed reports pursuant to RCFC 26(a)(2)(B) in the following spent nuclear fuel cases: Indiana Michigan Power Co. v. United States, 60 Fed. Cl. 639 (2004) aff'd 422 F.3d 1369 (Fed. Cir. 2005); Sacramento Municipal Utility District v. United States, 70 Fed. Cl. 332 (2006) ("SMUD"); Southern Nuclear Operating Co. v. United States, No. 98-614C (Fed. Cl); Commonwealth Edison Co. v. United States, No. 98-621C (Fed. Cl.); Wisconsin Electric Power Co. v. United States, No. 00-697C (Fed. Cl.); Omaha Public Power Co. v. United States, No. 01-115C (Fed. Cl.); Energy Northwest v. United States, No. 04-10C (Fed. Cl.); South Carolina Electric & Gas Co. v. United States, No. 04-101C (Fed. Cl.); System Fuels Inc. (Arkansas) v. United States, No. 03-2623C (Fed. Cl.); Boston Edison Company v. United States, No. 99-447C (Fed. Cl.); and Duke Power v. United States, No. 98-485C (Fed. Cl.).

nuclear plants to allow timely decommissioning, and would have ensured that DOE's waste management system was fully utilized and not overbuilt or underutilized. Acceptance Rate Report at 1, 18-19, and 23.

SFI also retained Ms. Supko to prepare a second report regarding the rate at which DOE would accept spent nuclear fuel from SFI's Grand Gulf Nuclear Power Station that she calculates at the 3,000 MTU per year, with a five-year ramp-up, acceptance rate. Expert Report Regarding Spent Fuel Acceptance Rights for Grand Gulf Nuclear Power Station ("Acceptance Rights Report"). In her Acceptance Rights Report, Ms. Supko calculates the acceptance rights for SFI's Grand Gulf Nuclear Power Station from 1998 through 2006 assuming a 3,000 MTU steady state acceptance rate with a five year ramp-up. Acceptance Rights Report at 1.

On December 15, 2005, SFI provided the Government its RCFC26(A)(1) disclosures. Ms. Supko was not included as an individual "likely to have discoverable information" that SFI may use to support its claim. On August 11, 2006, SFI notified the government that Ms. Supko will provide testimony "regarding general spent fuel storage practices and related technical issues in the nuclear industry." Plaintiff's Witness List at 9. Moreover, SFI also notified the Government that Ms. Supko would provide expert testimony at trial "regarding the rate at which DOE would have accepted spent nuclear fuel from Grand Gulf, had DOE begun acceptance of spent nuclear fuel in accordance with the NWPA and the Standard Contract." Id. Ms. Supko did not provide an opinion or discussion regarding the NWPA or the Standard Contract in either expert report submitted in this case.

## SUMMARY OF ARGUMENT

Ms. Supko's opinions regarding the so-called DOE acceptance rate requirements and acceptance rights are simply not relevant to any issue in this case, are not based upon a reliable or testable methodology, and are inconsistent with the plaintiff's theory of DOE's contractual obligations. Further, SFI failed to disclose that Ms. Supko had discoverable information independent of her expert opinions, as required under RCFC 26(a), and that she would be offering an opinion regarding the rate at which DOE would have accepted SNF from Grand Gulf, had DOE begun acceptance of spent nuclear fuel in accordance with the NWPA and the Standard Contract.

## ARGUMENT

### I. THE COURT HAS THE POWER AND THE DUTY TO GRANT MOTIONS TO LIMIT THE SCOPE OF TRIAL IN APPROPRIATE CIRCUMSTANCES

This Court has acknowledged that "[a] motion *in limine* is a recognized method under [RCFC 16] and Fed. R. Civ. P. 16 for obtaining a pretrial order simplifying issues for trial." White Mountain Apache Tribe of Az. v. United States, 10 Cl. Ct. 115, 116 (1986); see Baskett v. United States, 2 Cl. Ct. 356, 367-68 (1983); Palmerin v. City of Riverside, 794 F.2d 1409, 1413 (9th Cir. 1986). In fact, the Court has a duty to exercise its power to exclude testimony or evidence in appropriate cases:

> There is no question under [RCFC] 16, that this court, as a trial court, has the power to issue pretrial orders simplifying issues for trial. Not only does this court have such power, it has a duty to exercise it in appropriate cases. This power allows the court, *inter alia*, to define the issues, facts, and theories actually in contention and to weed out extraneous issues. Too, this court also has the authority to issue pretrial rulings concerning the admissibility at trial of proposed testimony and documentary evidence.

Baskett, 2 Cl. Ct. at 359 (emphasis added).

II. A MOTION *IN LIMINE* IS APPROPRIATE IF A PROPOSED TESTIFYING EXPERT WITNESS LACKS THE QUALIFICATIONS TO SATISFY FEDERAL RULE OF EVIDENCE 702 OR THE STANDARDS SET BY THE SUPREME COURT IN *DAUBERT* AND *KUMHO TIRE*

A. Federal Rule of Evidence 702 Requires That, To Be Admissible, Any Expert Witness Opinions Must Be Both Reliable And Relevant

Federal Rule of Evidence ("FRE") 702, as amended in 2000, provides that expert witness testimony is admissible only if the proposed expert witness is qualified as an expert "by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. To be admissible, the testimony of the proposed expert also must satisfy the other requirements of the rule:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

FRE 702 imposes upon the Court a special "gatekeeping obligation" to prevent the introduction of certain expert testimony that is irrelevant or unreliable. See, e.g., Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999); Joy v. Bell Helicopter Textron, Inc., 999 F.2d 549, 569 (D.C. Cir. 1993). Specifically, the Supreme Court's decisions in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and Kumho Tire, 526 U.S. 137 (1999), require "judges to determine that scientific testimony," as well as technical or other specialized expert testimony, "offered under Federal Rule of Evidence 702 is both relevant and reliable." Masters

v. Hesston Corp., 291 F.3d 985, 991 (7th Cir. 2002). Further, the party proposing to introduce expert opinion testimony "has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence." Advisory Committee Notes, 2000 Amendments, Fed. R. Evid. 702 (citing Bourjaily v. United States, 483 U.S. 171 (1987)).

The United States Supreme Court has rejected the familiar refrain that it has sufficient safeguards against irrelevant or unreliable expert testimony in the opponent's ability to present its own expert testimony or to cross-examine each other's experts at trial. Daubert, 509 U.S. at 596; see Joy v. Bell Helicopter Textron, Inc., 999 F.2d 549, 569 (D.C. Cir. 1993) (rejecting "'let it all in' philosophy" of expert testimony). The Supreme Court requires Federal courts to exercise greater care to prevent the admission of unreliable or irrelevant expert opinion because "Federal Rules of Evidence 702 and 703 grant expert witnesses testimonial latitude unavailable to other witnesses upon the 'assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline.'" Kumho Tire, 526 U.S. at 138 (quoting Daubert, 509 U.S. at 592).

B. To Establish That Proposed Expert Testimony Is Reliable, The Party Proposing The Testifying Expert Must Establish That She Is Qualified To Render The Opinions At Issue

As the first step in analyzing whether proposed expert testimony is reliable, the Court must determine whether the expert rendering the opinion is "qualified" in the relevant field to do so, by reason of her "knowledge, skill, experience, training, or education." Fed. R. Evid. 702; see Masters, 291 F.3d at 991. Trial courts have broad discretion in deciding whether a witness qualifies as an expert. Hamling v. United States, 418 U.S. 87, 108 (1974). However, the party proffering the witness as a expert has the burden of laying a foundation that establishes that the

witness is qualified. See, e.g., Genty v. Resolution Trust Corp., 937 F.2d 899, 917 (3d Cir. 1991); Apostol v. United States, 838 F.2d 595, 599 (1st Cir. 1988). The Court's special "gatekeeping obligation" demands that the Court require the plaintiff to meet this burden before qualifying the expert, "only admitting such testimony after receiving satisfactory evidence of its reliability." Dhillon v. Crown Controls, Inc., 269 F.3d 865, 869 (7th Cir. 2001).

Further, the mere fact that an expert may be qualified in one area does not necessarily mean that she is qualified to testify in other technical or specialized areas. Qualification to testify as an expert requires that the area of the witness's competence matches the subject matter of the witness's testimony. "Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." Carroll v. Otis Elevator Co., 896 F.2d 210, 212 (7th Cir. 1990); see Berry v. City of Detroit, 25 F.3d 1342, 1351 (6th Cir. 1994) ("issue with regard to expert testimony is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question"), cert. denied, 513 U.S. 1111 (1992). Courts have frequently precluded a witness from testifying as an expert where the witness has specialized knowledge upon one subject, but seeks to opine upon a different subject. See, e.g., Surace v. Caterpillar, Inc., 111 F.3d 1039, 1055-1056 (3rd Cir. 1997); Hardin v. Ski Venture, Inc., 50 F.3d 1291, 1296 (4th Cir. 1995); Eagleston v. Guido, 41 F.3d 865, 873-74 (2d Cir. 1994), cert. denied, 516 U.S. 808 (1995).

### C. If The Proponent Establishes That Its Expert Is Qualified, It Must Then Establish That The Methodology Underlying the Expert's Conclusions Is Reliable

"To gauge reliability, the [trial] judge must" not only determine whether the expert is qualified in the relevant field, but must also determine "whether the methodology underlying the expert's conclusions is reliable." Masters, 291 F.3d at 991. FRE 702 expressly incorporates the requirements for admission of expert testimony established by the United States Supreme Court in Daubert, 509 U.S. 579 (1993), and Kumho Tire, 526 U.S. 137 (1999). Pursuant to those decisions, "[p]roposed testimony must be supported by appropriate validation--i.e., 'good grounds', based on what is known." Daubert, 509 U.S. at 590, 593-94; see Advisory Committee Notes, 2000 Amendments, Fed. R. Evid. 702; Kumho Tire, 526 U.S. at 149-50.

As the Supreme Court explained in Daubert, 509 U.S. at 590, expert "'knowledge' connotes more than subjective belief or unsupported speculation." Accord O'Conner v. Commonwealth Edison Co., 13 F.3d 1090, 1106 (7th Cir. 1994). "[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). "The reasoning between steps in a theory must be based on objective, verifiable evidence and scientific" or other "methodology of the kind traditionally used by experts in the field." Domingo v. T.K., M.D., 289 F.3d 600, 607 (9th Cir. 2002). In some cases, reliability will depend upon the "scientific foundations" of the opinion testimony, while, in other cases, "the relevant reliability concerns may focus upon personal knowledge or experience." Kumho Tire, 526 U.S. at 150. However, "it will at times be useful to ask even of a witness whose expertise is based purely on experience, say, a perfume tester able to distinguish among

140 odors at a sniff, whether his preparation is of a kind that others in the field would recognize as acceptable." Id.

In a recent decision, the United States Court of Appeals for the Seventh Circuit concluded that the district court properly excluded proffered expert testimony concerning lost profits because the expert lacked a sufficient methodology. In Zenith Electronics Corp. v. WH-TV Broadcasting Corp., 395 F.3d 416 (7th Cir. 2005), plaintiff, an electronics manufacturer, sued WH-TV, a digital television broadcaster, to recover payments for converter boxes that WH-TV had ordered. WH-TV filed breach of contract and fraud counterclaims alleging defective merchandise and seeking lost profits. WH-TV proposed to rely upon an expert's opinion that its business would have grown rapidly, and its profits greatly increased, had the plaintiff's product been delivered as promised. Id. at 417-418. However, rather than basing his opinions on the actual sales numbers and shares of digital broadcasting business in other markets, the expert "proposed to testify that [the San Juan market] is 'unique' and that all experience in other markets is irrelevant." Id. at 418. When asked to identify the methods that he had used to generate his projections that defendant's business would have grown rapidly, the expert repeatedly answered "my expertise" or "my industry experience" or made other similar statements. Id. The court concluded that this "is to say that [the proffered expert] either had no method or could not describe one. He was relying on intuition, which we won't do." Id. (citations omitted). The court stated that, if a witness "could or would not explain how his conclusions met [Rule 702] requirements, he was not entitled to give expert testimony." Id.

D. If The Expert's Proffered Opinion Is Reliable, The Court Must Still Determine Whether It Is Relevant, Including Whether It Is Helpful To The Trier Of Fact

Assuming that the methodology used by the expert in reaching his opinion is proven to be reliable, it is not admissible unless it is relevant:

> Rule 702 further requires that the evidence or testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." This condition goes primarily to relevance. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." The consideration has been aptly described by Judge Becker as one of "fit." "Fit" is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes.

Daubert, 509 U.S. at 590-91 (citations omitted). Thus, whenever expert testimony is offered, the Daubert inquiry must be conducted, including an inquiry into whether the opinion is relevant and "tied to the facts" of a particular "case."

As part of this relevance inquiry, the Court must determine whether the proffered expert testimony is helpful to the trier of fact. See, e.g., Daubert, 509 U.S. at 591 (helpfulness goes primarily to relevance); Summers v. Missouri Pacific R.R. Sys., 132 F.3d 599, 603 (10th Cir. 1997) ("the second element, helpfulness to the trier of fact, evaluates relevancy"); Employers Reinsurance Corp. v. Mid-Continent Cas. Co., 202 F. Supp. 2d 1212, 1215 (D. Kan. 2002) ("[t]he touchstone of Rule 702 is helpfulness of the expert testimony [to the trier of fact], a condition that goes primarily to relevance"). The opinion of an expert is not "helpful" to the Court, and therefore is not admissible, if it answers a question that the fact-finder could answer without the purported expert opinion. See Sherbert v. Alcan Aluminum Corp., 66 F.3d 965, 967-968 (8th Cir. 1995). "[A]n expert . . . must testify to something more than what is 'obvious to

the layperson' in order to be of any particular assistance to the jury" or the Court. Ancho v. Pentek Corp., 157 F.3d 512, 519 (7th Cir. 1998); see Dhillon, 269 F.3d at 871 (expert opinion must be more than "common sense").

Further, although an expert's opinion may be admissible even if it "embraces an ultimate issue to be decided by the trier of fact," Fed. R. Evid. 704, the fact that an expert's opinion may involve an ultimate issue in a case does not bestow upon an expert carte blanche to express any opinion that he or she wishes. "The fact that an opinion or inference is not objectionable because it embraces an ultimate issue does not mean . . . that all opinions embracing the ultimate issue are admissible." 1 J. Strong, McCormick on Evidence § 12, at 49 n.11 (4th ed. 1992). "Both Federal Rules of Evidence 701 and 702 embody the criterion of helpfulness for lay and expert witnesses." Id.; see Nieves-Villanueva v. Soto-Rivera, 133 F.3d 92, 100 (1st Cir. 1997); Marx & Co., Inc. v. Diners' Club, Inc., 550 F.2d 505, 511 (2d Cir. 1977), cert. denied, 434 U.S. 861 (1977).

Additionally, Federal Rule of Evidence 704 does not permit experts to render opinions that are nothing more than an expression of his or her belief on how a case should be decided. Owen v. Kerr-McGee Corp., 698 F.2d 236, 240 (5th Cir. 1983); see Marx & Co., 550 F.2d at 510 (admission of expert opinion as to which party should prevail is inappropriate because it gives appearance that court is shifting to witness the responsibility to decide the case); 1 J. Strong, McCormick on Evidence § 12, at 49 n.11 (4th ed. 1992) ("[t]hus, an opinion that plaintiff should win is rejected as not helpful"). Specifically, "[a]n expert may properly testify as to 'the customs and standards of an industry, and [] opine as to how a party's conduct measured up against such standards." Lippe v. Bairnco Corp., No. 96-CIV-7600(DC), 2002 WL 15630, at *2 (S.D.N.Y.

Jan. 7, 2002) (quoting Primavera Familienstifung v. Askin, 130 F. Supp. 2d 450, 529 (S.D.N.Y. 2001)) (brackets in original). However, "while an expert may base his opinions on his own experience, 'he must do more than aver conclusorily that his experience led to his conclusion,' and he must do more than 'propound a particular interpretation of [a party's] conduct.'" Id. (quoting Primavera, 130 F. Supp. 2d at 530).

Further, "expert witnesses may not offer opinions on relevant events based upon their personal assessment of the credibility of another witness' testimony." Id. (quoting United States v. Scot, 856 F.2d 135, 142 (2d Cir.), rev'd on other grounds, 856 F.2d 5 (2d Cir. 1988)). In addition, "musings as to defendants' motivations would not be admissible if given by any witness – lay or expert." Taylor v. Evans, No. 94-CIV-8425, 1997 WL 154010, at *2 (S.D.N.Y. Apr. 1, 1997). In determining whether an expert opinion is admissible, this Court must recognize the distinction between an opinion that "embraces" an ultimate issue and therefore helps the trier of fact and an opinion that merely attempts to direct a verdict for one party, in essence supplanting the trier of fact.

## III. THE COURT SHOULD EXCLUDE EILEEN SUPKO'S OPINIONS CONCERNING THE "REASONABLENESS" OF A PARTICULAR RATE OF ACCEPTANCE

### A. Ms. Supko's Opinions

In support of its contention that a 3,000 MTU rate of acceptance meets the objectives of the Nuclear Waste Policy Act and the Standard Contract, SFI propounds the testimony of Eileen Supko. Ms. Supko submitted two expert reports in this case. First, Ms. Supko opines that had DOE begun to accept spent nuclear fuel by January 31, 1998, at a 3,000 MTU steady-state rate, after a five-year ramp-up period, the amount of additional at-reactor storage would have been

limited, kept pace with the annual discharge rate, and allowed for timely decommissioning of nuclear power plants. In addition, the 3,000 MTU rate would have ensured the waste management system capacity would not be overbuilt or under utilized. Acceptance Rate Report at 1. Further, Ms. Supko also opines that the 3,000 MTU steady-state rate of acceptance is "reasonable." Id. at 19, 23.

Ms. Supko explains that her methodology consisted of using her SPNTFUEL model to perform an analysis of a range of acceptance rates and reviewing various program documents that DOE had published over the years. Id. at 4. In determining the "reasonableness" of a particular rate of acceptance, Ms. Supko has explained that she measures different rates of acceptance based upon how they compared to three different criteria: the amount of additional spent nuclear fuel storage that would have been required after 1998 had DOE begun acceptance in 1998, the number of years of post-shut down spent nuclear fuel storage that would have been required, and the extent to which the maximum annual steady state acceptance capacity would have been fully utilized over the life of the program. Id. at 9-10; see A. 4-5 [2] (Southern Nuclear Operating Company v. United States, No. 98-614 (Fed. Cl.) trial testimony of Eileen Supko, 677:14-678:6).[3] In her Acceptance Rate Report, Ms. Supko modeled four different rate "scenarios," including a 3,000 MTU steady-state rate (Scenario 1), a 900 MTU steady-state rate (Scenario 2),

---

[2] "A. ___" is a reference to the attached appendix.

[3] Ms. Supko has been identified as an expert witness in several SNF cases. In her deposition in this case, she testified that her past testimony in these other cases with regard to rate and schedule issues is equally applicable to her opinions in this case and that her past deposition and trial testimony remains accurate. A. 60-65, 70 (Deposition of Eileen Supko, July 19, 2006, 10; see Wisconsin Electric Power Company v. United States, No. 00-697C (Fed. Cl.) deposition testimony of Eileen Supko, June 27, 2006, 11-16).

a 900 MTU rate of acceptance that ramped up to 3,000 MTU by 2015 (Scenario 3), and a 6,000 MTU steady-state rate of acceptance (Scenario 4). Acceptance Rate Report at 7-9. Ms. Supko ultimately opined that it is "reasonable" to use the 3,000 MTU steady-state rate of acceptance, after a brief ramp-up, because it is conservative and consistent with DOE's current planning basis for waste acceptance. Id. at 1, 19, 23.

In her second report, Ms. Supko calculated SFI's acceptance rights under a 3,000 MTU rate of SNF acceptance. Acceptance Rights Report at 1. With respect to the methodology that she used to reach the conclusions in her Acceptance Rights Report, Ms. Supko used DOE's historical and projected future discharges through 2002 contained in certain DOE forms called "RW-859s," and then reviewed future projected discharges that SFI provided to Ms. Supko in connection with this case. Id. at 3-5.

Notably, the Court in Indiana Michigan Power Co. v. United States, 60 Fed. Cl. 639 (2004), aff'd, 422 F.3d 1369 (Fed. Cir. 2005), rejected Ms. Supko's opinions concerning a prediction as to when DOE would open a repository, concluding that "[s]he did not present a 'methodology' that could be used by experts in such a field." Id. at 647. Similarly, in SMUD, Ms. Supko offered the same opinions related to the "reasonableness" of the 3,000 MTU rate of acceptance that she offers in this case. The Court did not qualify Ms. Supko as an expert and, instead, concluded that "the evidence presented on the acceptance rate under the terms of the Standard Contract [is] highly speculative, therefore, the court declines to make any determination of the acceptance rate based on this record." SMUD, 70 Fed. Cl. at 375 n.40.

B. The Court Should Reject Ms. Supko's Opinions Because They Are Neither Relevant Nor Reliable

1. Ms. Supko's Opinions Are Not Relevant To Any Issue In This Case

The United States Court of Appeals for the Federal Circuit has explained that, under the Supreme Court's decision in Daubert v. Merrill Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), the Court has an obligation to screen expert testimony for both relevance and reliability. Seaboard Lumber Co. v. United States, 308 F.3d 1283, 1301 (Fed. Cir. 2002). The standard articulated by the Supreme Court in Daubert must be met even in non-jury cases such as this one. Seaboard Lumber Co., 308 F.3d at 1302. The burden of demonstrating Ms. Supko's satisfaction of the Daubert standards lies squarely upon SFI. Daubert, 509 U.S. at 592 n.10 (citation omitted); Rink v. Cheminova, Inc., 400 F.3d 1286, 1292 (11th Cir. 2005).

With respect to the first prong of the Daubert inquiry, Ms. Supko's testimony is not relevant to any issue in this case. It is axiomatic that under FRE 702, as well as Daubert and its progeny, the Court may only admit expert testimony that is relevant to determine a fact in issue. See Rink, 400 F.3d at 1291; Needleman v. John Hancock Life Ins. Co., No. 03-1955, 2006 WL 842370, at *10 (N.D. Tex. Mar. 31, 2006) (holding that expert testimony was not relevant to resolution of issues in case).

Whether a particular rate of acceptance is "reasonable" is simply not at issue in this case. The issue before the Court is the requirements of the NWPA and the Standard Contract, as they relate to damages in this case. First, Ms. Supko has conceded that she had no involvement in the formation of the Standard Contract or the NWPA. A. 37-38 (Southern Nuclear Operating Company v. United States, No. 98-614 (Fed. Cl.) trial testimony of Eileen Supko, 789:5-7,

791:3-5). Second, Ms. Supko also concedes that a 3,000 MTU rate of acceptance is not contained in the Standard Contract. A. 71-72, 86 (Deposition of Eileen Supko, July 19, 2006, 18-19, 62). Third, Ms. Supko asserts that she is not offering any opinions concerning the DOE's obligations under Standard Contract. A. 71-72, 94 (Id. at 18-19, 142).

Nevertheless, despite her representation that she is not offering an opinion regarding DOE's obligations, Ms. Supko's "reasonableness" opinion is predicated upon the outcome of her model when compared to the twin objectives that SFI claims relate to the NWPA and the Standard Contract. A. 101 (Id. at 149); Plaintiff's Pre-Trial Memorandum of Law at 19. Ms. Supko states that the "objectives" were identified by the utilities at the beginning of DOE's civilian radioactive waste program, A. 83 (see Deposition of Eileen Supko, July 19, 2006, 30), but it is irrelevant to Ms. Supko that the utilities expressed their understanding of the objectives to DOE at the time of contract formation. A. 84-85 (Id. at 36-37). Ms. Supko's "reasonableness" determination does not take into account the fact that DOE rejected SFI's "twin objectives." A. 87-88 (Id. at 102-103). Furthermore, Ms. Supko has admitted that the NWPA does not contain any reference to the "twin requirements" or objectives against which counsel for SFI asked her to model various acceptance rates. A. 38 (Southern Nuclear Operating Company v. United States, No. 98-614 (Fed. Cl.) trial testimony of Eileen Supko, 791:14-19).

Not only is Ms. Supko's "reasonableness" determination entirely unfounded, it is also misleading and a waste of time. Ms. Supko defines the 3,000 MTU rate as "reasonable" but is unable to identify any rate as "unreasonable:"

> Q. Are you making an affirmative conclusion that scenario 3 is unreasonable?

A. My conclusion is that scenario 1 – and I'll -- so I don't misquote myself -- which is a 3,000 metric tons per year rate of acceptance, and I'm looking at exhibit one page 23, would have limited the amount of additional storage capacity needed at nuclear power plants after 1998, kept up with the annual discharge rate of 2,000 metric tons per year, worked off the 37,000 metric tons backlog in storage at nuclear power plants to allow timely decommissioning, *and that it was a reasonable rate of acceptance.*

* * *

Q. Are you making an affirmative conclusion that scenario 3 is unreasonable?

A. My expert report does not make a conclusion that scenario 3 is unreasonable. However, what I do state is that scenario 3 would have resulted in nuclear operating companies needing to add approximately 6200 metric tons of additional storage capacity and that the average number of years spent fuel would have to be stored at plants after being shut down for decommissioning is 16.5 years. *I don't state that that's unreasonable, but I don't believe that it is reasonable.*

* * *

Q. So you're not offering an opinion that it is unreasonable, but you believe it is reasonable?

A. I was asked to provide an opinion on the impact of DOE's spent fuel acceptance -- rate of acceptance and to look at the aggregate amount of additional at-reactor storage that would be required and the ability to timely decommission reactors. 6200 metric tons of additional spent fuel storage requirements is more than 3 years of annual discharges. That is a number that could not be easily accommodated within the rate of acceptance that underlies scenario 3 and an average postshutdown storage time of 16.5 years results in -- I don't recall if there were any, if so very few plants, that would have been able to decommission their nuclear power plant within a short period of time, 5 to 9 years after the plant shut down.

Q. Are you offering an affirmative opinion in this case that your scenario 1 constitutes a reasonable rate of acceptance?

A. Yes.

Q. Are you also offering an opinion in this case that scenario 3 is an unreasonable rate of acceptance? Yes or no.

A. No.

* * *

Q. So you're offering no opinions at all that scenario 2, 3, and/or 4 are unreasonable. Correct?

A. I analyzed them and discussed the analysis within my report regarding those other scenarios. For example with respect to scenario 4 I believe I state that -- which is a 6,000 3 metric tons overall rate of acceptance -- that it would have resulted in a system that was overbuilt and could have only have been -- the 6,000 metric tons could only have been used for 7 years, and then the Department of Energy would only have been picking up 2,000 metric tons per year.

Q. So scenario 4 you are offering an opinion is unreasonable?

A. I've offered analyses regarding them.

* * *

Q. You're offering, one, an opinion that scenario 1, which is your 3,000 rate, is a reasonable rate of acceptance. Correct?

A. Yes.

Q. You're not offering any opinion that scenarios 2, 3, and 4 of your opinions are unreasonable rates. Correct?

A. That's correct.

A. 94-100 (Deposition of Eileen Supko, July 19, 2006, 142-148).

Simply put, Ms. Supko is offering an opinion as to what she believes is “reasonable,” without reference to the Government’s contractual obligations. Yet, by ignoring the actual

contract requirements, which form the only basis for evaluating the Government's contract liability, Ms. Supko's analysis lacks any foundation for any issue properly presented in this case. Because Ms. Supko's opinion fail to address any relevant issue in this case, Ms. Supko's opinions are of no assistance to the Court in determining the Government's contractual obligations concerning the SNF acceptance rate and schedule. Consequently, Ms. Supko's opinions fail to satisfy the first part of the Daubert test.

2. Ms. Supko's Opinions Should Not Be Afforded Any Weight Because They Are Not Reliable

Because Ms. Supko has not employed any scientific or readily testable methodology in determining what would be a "reasonable" rate of acceptance under the Standard Contract, her opinions lack any indicia of reliability. Possessing requisite credentials is insufficient to render expert testimony admissible. See Kumho Tire, 526 U.S. at 153 (affirming trial court's exclusion of expert and noting that, despite the trial court's acceptance of expert's qualifications, the expert lacked a reliable methodology); Fuesting v. Zimmer, Inc., 421 F.3d 528, 535 (7th Cir. 2005). Rather, the Federal Circuit has explained that the trial court must ensure that the expert testimony is reliable. Microstrategy Inc. v. Business Objects, S.A., 429 F.3d 1344, 1355 (Fed. Cir. 2005) (affirming trial court's exclusion of expert witness that used flawed methodology in reaching conclusions). Consequently, to accept Ms. Supko's opinion in this case, the Court must first determine whether Ms. Supko's opinions are reliable.

The Court in Daubert set forth the following, non-exclusive list of factors for lower courts to consider in determining whether an expert's opinion is reliable: (1) whether the scientific theory can be and has been tested; (2) whether the theory has been subjected to peer review and

publication; (3) the theory's known or potential rate of error when applied; and (4) whether the theory has been "generally accepted" in the scientific community. Daubert, 509 U.S. at 593-94. At bottom, "[a]n expert must offer good reason to think that his approach produces an accurate estimate using professional methods, and this estimate must be testable. Someone else using the same data and methods must be able to replicate the result." Zenith Electronics Corp. v. WH-TV Broadcasting Corp., 395 F.3d 416, 419 (7th Cir. 2005), cert. denied, 125 S. Ct. 2978 (U.S. June 27, 2005). Ms. Supko's opinions fail to satisfy any of these criteria.

First, Ms. Supko's methodology concerning the "reasonableness" of a rate of acceptance is simply a determination of whether a particular rate of acceptance satisfies the "key issues" identified by counsel, Acceptance Rate Report at 18-19; A. 62-64 (Wisconsin Electric Power Company v. United States, No. 00-697C (Fed. Cl.) deposition testimony of Eileen Supko, June 27, 2006, 13-15), and consequently is not subject to any type of scientific testing. Whether any particular rate of acceptance is "reasonable" is a subjective judgement call made by Ms. Supko. It is not possible to test such a theory, because it is not science.[4] Indeed, Ms. Supko essentially has conceded as much. Although Ms. Supko utilizes the annual discharge rate as a benchmark for determining the reasonableness of the amount of additional at-reactor storage after 1998, Ms. Supko has not endeavored to determine how far above that annual discharge rate the amount of additional at-reactor storage number could be and still be deemed "reasonable." A. 40, 90-92, 93

[4] Indeed, Ms. Supko admitted at trial in Southern Nuclear that, were the Court to reject the two "requirements" (which are essentially the same as the "twin objectives" of the instant case) upon which she modeled various acceptance rates, she would need to utilize new assumptions against which to measure various rates. A. 15 (Southern Nuclear Operating Company v. United States, No. 98-614 (Fed. Cl.) trial testimony of Eileen Supko, 739:5-9). However, Ms. Supko was unable to identify any alternative evaluative criteria that could be used to evaluate the "reasonableness" of various DOE acceptance rates. A. 15 (Id. at 739:10-21).

(Deposition Testimony of Eileen Supko, July 19, 2006, 119-121, 139; Southern Nuclear Operating Company v. United States, No. 98-614 (Fed. Cl.) trial testimony of Eileen Supko, 808:15-24). Any such determination would necessarily be based upon nothing more than a subjective judgment incapable of scientific testing. Courts have not hesitated to exclude proposed expert testimony based upon subjective judgments or "intuition" such as the testimony that Ms. Supko intends to offer in this case. See Zenith Electronics, 395 F.3d at 418-19 (affirming exclusion of expert economist who based conclusions solely upon "expertise" without an articulation of testable methodology); Brown v. Wal-Mart Stores, Inc., 402 F. Supp. 2d 303, 309 (D. Maine 2005) (rejecting expert opinion that "merely places an expert sheen on common sense," without employing any testable methodology).

Second, Ms. Supko has acknowledged that she has never subjected her methodology concerning the reasonableness of a particular rate of acceptance to peer review. A. 13-14 (Southern Nuclear Operating Company v. United States, No. 98-614 (Fed. Cl.) trial testimony of Eileen Supko, 735:1-736:8). Although "[p]ublication, which is an element of peer review, 'is not a sine qua non of admissibility,'" it may suggest "good science." Oddi v. Ford Motor Co., 234 F.3d 136, 145 (3d Cir. 2000) (quoting Daubert, 509 U.S. at 593); see Zaremba v. General Motors Corp., 360 F.3d 355, 358 (2d Cir. 2004) (affirming trial court's exclusion of expert where expert had not subjected methodology to peer review or publication); Fuesting, 421 F.3d at 537 (affirming trial court's exclusion of expert witness based, in part, upon lack of peer review of opinion or methodology offered by expert). The lack of peer review or publication highlights the fact that Ms. Supko's opinion concerning the "reasonableness" of a particular rate of acceptance is nothing more than a subjective judgment that is incapable of testing.

Third, there is no support that Ms. Supko's methodology is one that is "generally accepted" in the relevant scientific community. "Widespread acceptance can be an important factor in ruling particular evidence admissible, and a known technique which has been able to attract only minimal support with the community may properly be viewed with skepticism." Oddi, 234 F.3d at 145 (quoting Daubert, 509 U.S. at 594); see Zaremba, 360 F.3d at 358 (affirming trial court's exclusion of expert where party tendering expert failed to demonstrate that expert's opinion or methodology was generally accepted). In this case, SFI, the party with the burden of proof, adduced absolutely no evidence that Ms. Supko's methodology in determining the "reasonableness" of a particular rate of acceptance possesses widespread acceptance in the relevant community.

Finally, and perhaps most significantly, with respect to the rate of error in Ms. Supko's methodology, as Ms. Supko has conceded, Ms. Supko has continuously revised her analysis based upon previous significant errors in her model. Although Ms. Supko has, to date, authored expert reports on behalf of 12 plaintiffs in spent nuclear fuel cases, the numbers, or outputs, from Ms. Supko's model in each of these reports have changed – and, in many instances, changed significantly. These changes, which were made after recognition that her model was producing flawed results, call into question the reliability of her overall conclusions in this case.

For example, although Ms. Supko has offered the same opinion concerning the reasonableness of a 3,000 MTU steady-state rate in virtually every acceptance rate report that she has authored to date, the amount of additional at-reactor storage that she calculates has changed dramatically over the course of her reports. In Ms. Supko's expert report in Commonwealth Edison v. United States, No. 98-621C, Ms. Supko concluded that there would be 1,600 MTUs of

additional at-reactor storage under a 3,000 MTU steady-state rate. A. 16 (Southern Nuclear Operating Company v. United States, No. 98-614 (Fed. Cl.) trial testimony of Eileen Supko, 744:14-19). In Ms. Supko's next expert report in Sacramento Municipal Utility District v. United States, 98-488C, however, Ms. Supko concluded that there would be 600 MTUs of additional at-reactor storage under a 3,000 MTU steady-state rate. Ms. Supko has admitted that the reason for this 1,000 MTU decrease in her calculation of additional storage requirements was her failure to consider linking a utility that had dry storage in 1998 with that utility's wet pool. A. 16-17 (Southern Nuclear Operating Company v. United States, No. 98-614 (Fed. Cl.) trial testimony of Eileen Supko, 744:25-745:4).

Significantly, Ms. Supko has admitted that she committed an error in her calculations and had underestimated the amount of additional at-reactor storage under a 3,000 MTU steady-state rate of acceptance by 430 MTUs. A. 17 (Id. at 745:14-19). Ms. Supko concluded that there would be 600 MTUs of additional at-reactor storage under a 3,000 MTU steady-state rate of acceptance. However, Ms. Supko conceded that, in a report that she subsequently authored for another SNF client in South Carolina Electric & Gas Co. v. United States, No. 04-101C, she calculated 1,030 MTUs of additional at-reactor storage under a 3,000 MTU steady-state rate. A. 17 (Southern Nuclear Operating Company v. United States, No. 98-614 (Fed. Cl.) trial testimony of Eileen Supko, 745:14-19). Ms. Supko has explained that the reason that she has increased her calculation of the amount of additional at-reactor storage by 430 MTUs after the issuance of her report in this case was because she had "underestimated the requirements at the eight sites that had dry storage prior to 1998. I underestimated their requirements post-1998 because of the way that I linked things in the model." A. 18-19 (Id. at 746:2-747:7). Tellingly,

and despite these drastic changes in the amount of additional at-reactor storage that Ms. Supko has calculated, Ms. Supko has never modified her opinion concerning the reasonableness of a 3,000 MTU steady-state rate of acceptance. Indeed, Ms. Supko has conceded that the numbers which she has calculated regarding additional at-reactor storage may change yet again in the future as she receives updated information from utilities whom she represents as clients. A. 24 (Id. at 756:3-9). Yet, this tremendous variance in at-reactor storage – from a high of 1,600 MTU to a low of 600 MTU – calls into serious question the reliability of the results of Ms. Supko's analysis in this case.

### C. The Court Should Disregard Ms. Supko's Opinions Because Her Model Lacks Evidentiary Support

In determining whether a hypothetical model such as the one that Ms. Supko offers provides a sufficient basis for an award of damages, plaintiff must establish a realistic and complete "but for" world. See Ericsson, Inc. v. Harris Corp., 352 F.3d 1369, 1379-80 (Fed. Cir. 2003) (patentee seeking lost profits for infringement must account for the effects of "hypothetically increased price" in "but for" world); Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc., 773 F.3d 1506, 1512 (9th Cir. 1985) ("[i]n projecting free market profits, antitrust plaintiffs are not entitled to assume favorable aspects of an anticompetitive market"); Restatement (Second) of Contracts § 347(c); cf. Bluebonnet Sav. Bank v. United States, 339 F.3d 1341, 1345-46 (Fed. Cir. 2003) (requiring trial court to determine costs that plaintiff would have incurred in absence of breach). Where, as here, SFI attempts to prove that it has suffered damages using a "computer [model] of the hypothetical 'but for'" world premised upon a number of critical assumptions, the "failure to establish the reasonableness of these assumptions is fatal"

to the damage claim. Southern Pac. Communications Co. v. AT&T, 556 F. Supp. 2d 825, 1076 (D.D.C. 1982); see Bluebonnet Sav. Bank, F.S.B. v. United States, 266 F.3d 1348, 1358 (Fed. Cir. 2001); LaSalle Talman Bank, F.S.B. v. United States, 45 Fed. Cl. 64, 93-95 (1999), aff'd in part, rev'd in part, 317 F.3d 1363 (Fed. Cir. 2003); Kidder, Peabody & Co. v. IAG Int'l Acceptance Group N.V., 28 F. Supp. 2d 126, 134 (S.D.N.Y. 1998). SFI's damages model may not be based upon mere speculation or hypotheticals. Home Sav. of Am. v. United States, 57 Fed. Cl. 694, 727 (2003), aff'd in part, rev'd in part, 399 F.3d 1341 (Fed. Cir. 2005) (citing Franklin Fed. Sav. Bank v. United States, 55 Fed. Cl. 108 (2003); Willems Indus., Inc. v. United States, 155 Ct. Cl. 360, 295 F.2d 822 (1961)).

This Court has repeatedly rejected expert models that lack evidentiary foundation, on the grounds that such models are improperly speculative. In Castle v. United States, 48 Fed. Cl. 187 (2000), aff'd in part, rev'd in part and remanded in part, 301 F.3d 1328 (2002), this Court rejected the expert's model because it was based upon assumptions that were contrary to facts in the record. Id. at 206. Specifically, this Court held, "[a] claim whose basic structural components lack such factual foundation is simply speculation." Id.

Likewise, in Fifth Third Bank v. United States, 55 Fed. Cl. 223 (2003), the Court rejected plaintiff's damages model, explaining that:

> Plaintiff's model ignores the presence of competitors similarly unfettered by the breaching provisions of FIRREA. But the most outstanding flaw is the assumption that the But-for-Bank would, even if it could, engage in the same type of activities without identifying any specific investments or opportunities, and that these activities would produce the same results (discounted to be conservative) as the actual business activities in which plaintiff engaged. The court agrees with defendant that this deficiency renders plaintiff's model speculative as a matter of fact and law.

Id. at 241; accord Southern Nat'l Corp. v. United States, 57 Fed. Cl. 294, 305 (2003); see also Glendale Fed. Bank, FSB v. United States, 43 Fed. Cl. 390, 399 (1999), aff'd in part, vacated in part, remanded on other grounds, 239 F.3d 1374 (Fed. Cir. 2001) ("The court believes that plaintiff's lost profits model suffers from serious defects, which undercut the basis for using it as a credible model for ascertaining lost profits . . . ."); Suess v. United States, 52 Fed. Cl. 221, 228 (2002) (rejecting damages model is "premised on unrealistic assumptions").

Ms. Supko's hypothetical model of the "but for" world is not based upon actual facts, but, rather, is based upon industry-wide assumptions which, in many instances, bear no relation to the "but for" world. For example, despite Ms. Supko's concession that the determination of a full core operating reserve is utility-specific, Ms. Supko has not endeavored to apply individual utilities operating reserve policies in her industry-wide acceptance rate model. A. 104 (Deposition of Eileen Supko, July 19, 2006, 262). Rather, regardless of what an individual utility's operating reserve policy actually is, and despite the fact that Ms. Supko has endeavored to model what reasonable acceptance would have looked like in the "but for" world, Ms. Supko has simply assumed one full core reserve per pool for each utility. A. 28 (Southern Nuclear Operating Company v. United States, No. 98-614 (Fed. Cl.) trial testimony of Eileen Supko, 777:17-20). Ms. Supko admitted that, had she increased her full core reserve assumption beyond one full core, it could potentially increase the amount of additional at-reactor storage that she has calculated. A. 29, 30 (Id. at 779:11-17; 780:17-25).

Another uniform assumption that Ms. Supko has made in her model is the use of license extensions. A. 103-104 (Deposition Transcript of Eileen Supko, July 19, 2006, 207-208).

Although they both purport to be "but for" analyses, Ms. Supko has made entirely inconsistent assumptions between her industry-wide acceptance model and her SFI acceptance rights model. A. 32-33 (Southern Nuclear Operating Company v. United States, No. 98-614 (Fed. Cl.) trial testimony of Eileen Supko, 783:22-784:6). For example, Ms. Supko has assumed that, for purposes of her industry-wide model, no utility seeks a license extension. A. 31 (Id. at 782:18-21). Yet, for purposes of modeling SFI's acceptance rights, Ms. Supko assumes that SFI seeks and obtains a license extension for its plants. A. 31 (Id. at 782:22-25).[5]

Had Ms. Supko assumed license extensions on an industry-wide basis, this assumption would have had a significant effect upon her opinions in this case. Ms. Supko has testified that, if she assumed license extensions in her industry-wide acceptance model, the amount of average post-shutdown storage time would decrease in Scenarios 1, 3, and 4 and would increase in Scenario 2. A. 33 (Id. at 784:9-21). The reason for the decrease in the average post-shutdown storage time if Ms. Supko assumed license extensions is because, with extension and assuming the requirements for SNF that SFI allege, DOE would have 20 more years to work off the "backlog" of SNF generated by utilities. A. 34 (Id. at 785:6-10). Ms. Supko has stated that, if she had assumed license extensions in her industry-wide model, the amount of average post-shutdown storage time with respect to Scenario 3 would decrease from 16.5 years to approximately 12 or 13 years. A. 34 (Id. at 785:1-5). Ms. Supko also explained that, under a 3,000 MTU rate of acceptance, which she claims is "reasonable," the range of average post-

[5] Ms. Supko had not endeavored to model whether, in 1998, a particular utility would have sought a license extension. A. 31 (Southern Nuclear Operating Company v. United States, No. 98-614 (Fed. Cl.) trial testimony of Eileen Supko, 782:12-17). Indeed, Ms. Supko testified that it "would have been difficult to determine in 1998" whether a particular utility would have sought and received a license extension. A. 31 (Id. at 782:16-17).

shutdown storage is "approximately 12 or 14 years for operating nuclear power plants." A. 6-7 (Id. at 689:25-690:2).

Ms. Supko has admitted that, despite the fact that she is endeavoring to model a "but for" acceptance scenario, as she represents more utilities in the SNF litigation, it is possible that she will continue to change her model to reflect those utilities' pool capacities, future projected discharges, and other utility-specific information. A. 35-36 (Id. at 787:20-788:1). This concession simply highlights the malleability inherent in her model, its lack of a relationship to the "but for" world, a world which would have been fixed at some point prior to January 31, 1998, and Ms. Supko's willingness to modify her analysis and factual assumptions to appease whichever client she happens to be working for at a given moment. Consequently, the Court should reject Ms. Supko's conclusions because they fail to properly account for the "but for" world. See Guillory v. Domtar Indus. Inc., 95 F.3d 1320, 1330 (5th Cir. 1996) (limiting expert testimony because it was not "sufficiently grounded in scientific methodology or the facts as presented in the testimony of other witnesses").

D. Ms. Supko's Model Inconsistently Mixes Information From The "But For" And Actual Worlds

Though Ms. Supko is purporting to model the "but for" world, she inconsistently – and inexplicably – mixes information from the "but for" and actual worlds. First, Ms. Supko's model does not consistently assume pre-1998 pool capacity, despite the fact that she is endeavoring to model a "but for" acceptance rate scenario. A. 20, 22 (Southern Nuclear Operating Company v. United States, No. 98-614 (Fed. Cl.) trial testimony of Eileen Supko, 751:1-7; 753:14-17). Instead, Ms. Supko's model utilizes certain pool capacities that were modified after 1998 in

determining what the additional at-reactor storage requirements would have been in a world in which DOE began acceptance in 1998. A. 20, 23 (Id. at 751:18-22; 755:6-10). For example, Ms. Supko has included both Southern Nuclear's post-1998 rack addition at Plant Hatch, as well as the second bathtub rack for Plant Hatch, in her "but for" model. A. 20-21, 23 (Id. at 751:23-752:1; 753:3-6). Similarly, Ms. Supko utilizes South Carolina Electric & Gas's 2002 rerack of its spent fuel pool in her model for purposes of modeling DOE performance beginning in 1998. A. 20-21 (Id. at 751:23-752:5). Ms. Supko admitted that she is using post-1998 pool capacity modifications for "about a dozen" plants. A. 23 (Id. at 755:10-14). When asked why she used post-1998 actual additional storage for purposes of determining what the "but for" world would have looked like in 1998, Ms. Supko candidly admitted that she did not "go back and try to see what the world looked like for every pool in 1998. That would have required my going back into the Nuclear Regulatory Commission's docket for every nuclear power plant and looking at license amendments." A. 21 (Id. at 752:21-25). Yet, that is precisely the type of analytical rigor expected from an expert. Ms. Supko has also failed to perform any analysis regarding the use of temporary storage racks for wet storage of spent nuclear fuel for the 14 utilities that required additional storage or whether utilities were impinging on full core reserve in 1998. A. 89 (Deposition of Eileen Supko, July 19, 2006, 109). Ms. Supko's failure to properly model the "but for" world simply reflects a flaw in her overall analysis and calls into question her overall opinions in this case.

Second, although Ms. Supko is endeavoring to determine what "reasonable" industry-wide acceptance would have looked like had DOE begun accepting SNF beginning in 1998, Ms. Supko is utilizing the 1998 RW-859s, which includes information submitted by utilities to DOE

after January 31, 1998. A. 25, 26, 27 (Southern Nuclear Operating Company v. United States, No. 98-614 (Fed. Cl.) trial testimony of Eileen Supko, 762:9-14 ; 763:15-18; 764:7-15). RW-859s are forms that DOE collects from commercial utilities, pursuant to the Standard Contract, that contain information from utilities such as historical discharges of SNF, the characteristics of their SNF, the initial enrichment of the SNF, and projected future discharges. A. 3 (Id. at 661:6-15). Notably, utilities submitted RW-859 forms during the 1990 and 1991 time frame, which was during the time when DOE issued the 1991 Annual Capacity Report. A. 25 (Id. at 762:19-24). The RW-859 forms during the 1990/1991 time frame reflected cumulative projected discharges of 86,000 MTU. A. 25 (Id. at 762:25-763:4). Currently, the cumulative projected discharges are approximately 90,000 MTU – a difference of 4,000 MTU, or two years' worth of annual cumulative industry SNF discharges. A. 26, 51 (Id. at 763:5-7, 830:18-22).

E. Even If The Court Were To Accept Counsel's Assertion Concerning The Twin Objectives, A 3,000 MTU Rate Of Acceptance Does Not Satisfy These Twin Objectives Under Ms. Supko's Model

Even if the Court were to accept the extra-contractual "twin objectives" that SFI articulates in this case, the outputs of Ms. Supko's model do not satisfy the allege objectives. Indeed, Ms. Supko's analysis demonstrates that, even with the fast ramp-up rates assumed by her model, a 3,000 MTU steady-state rate of acceptance beginning in the fifth year of the DOE program violates SFI's proffered views of both the NWPA and the Standard Contract, because the rate results in additional at-reactor storage after 1998. Indeed, under the plaintiffs' theory of DOE's contractual obligations, Ms. Supko's modeling establishes that performance by DOE under the 3,000 MTU rate of acceptance constitutes a breach of the Standard Contract with respect to numerous contract-holders.

SFI claims that the twin objectives of the NWPA and the Standard Contract were to ensure the utilities would not have to build any additional at-reactor storage after 1998 and work off the backlog of SNF already stored at the site as of 1998. Plaintiff's Pre-Trial Memorandum of Law at 19. Ms. Supko's conclusion in this case, that under a 3,000 MTU rate of acceptance there would be 690 MTUs of additional at-reactor storage and nine years of average post shutdown storage time, Acceptance Rate Report at 10-11, plainly violates the "twin objectives" of the NWPA and the Standard Contract as SFI has articulated them. Indeed, Ms. Supko concedes that under Scenario 1 (the 3,000 MTU rate), approximately 14 utilities would have to add additional at-reactor storage after 1998. A. 49, 86-87 (Deposition of Eileen Supko, July 19, 2006, at 49-50; Southern Nuclear Operating Company v. United States, No. 98-614 (Fed. Cl.) trial testimony of Eileen Supko, 820:19-23).[6] However, Ms. Supko has not performed any analysis as to the effect of DOE performance in 1998 or whether there would have been any costs to these utilities for additional at-reactor storage. A. 95 (Deposition of Eileen Supko, July 19, 2006, 139).

Further, in an attempt to make the amount of at-reactor storage after 1998 appear smaller, Ms. Supko has deliberately excluded SNF generated by reactors that shut down prior to 1998. Ms. Supko stated that there was approximately 3,000-to-4,000 MTUs in storage at shutdown utilities as of 1998. A. 47 (Southern Nuclear Operating Company v. United States, No. 98-614

[6] Of the approximately 14 utilities that Ms. Supko has identified as requiring additional at-reactor storage after 1998 even under a 3,000 MTU steady-state rate of acceptance, four of those utilities had over 100 MTUs of additional at-reactor storage. A. 50 (Southern Nuclear Operating Company v. United States, No. 98-614 (Fed. Cl.) trial testimony of Eileen Supko, 823:19-24). For example, Palo Verde Number 1 had 184.9 MTUs of additional at-reactor storage even under Ms. Supko's 3,000 MTU steady-state rate of acceptance. A. 50-51 (Id. at 823:25-824:5).

(Fed. Cl.) trial testimony of Eileen Supko, 816:13-19). This SNF would have included, among others, Sacramento Municipal Utility District, Yankee Atomic, and Trojan. A. 47 (Id. at 816:20-25). Had Ms. Supko included the SNF contained at shutdown utilities after 1998 in her calculation of additional at-reactor storage, her number under Scenario 1 (the 3,000 MTU steady-state rate) could be has high as 4,600 MTU. A. 48 (Id. at 817:16-21). Of course, such a result would violate both objectives that Ms. Supko models, and which SFI claims both the NWPA and the Standard Contract require.

Further, Ms. Supko's analysis reflects that a rate of acceptance lower than 3,000 MTU per year could satisfy these "objectives." First, with respect to the first prong of SFI's objectives – the amount of additional at-reactor storage after 1998 – Ms. Supko explained that one of the benchmarks that she utilizes to determine whether the amount of additional at-reactor storage after 1998 is reasonable is how that number compares to the annual cumulative discharge rates of commercial reactors. A. 39 (Id. at 807:3-14). Notably, Ms. Supko has admitted that a 2,000 MTU rate of acceptance would generally keep up with the annual discharge rate. A. 53 (Id. at 831:3-12). Further, Ms. Supko has testified that the amount of additional at-reactor storage after 1998 could be as high as 1,999 MTU and still satisfy the first "objective" identified by counsel. A. 41 (Id. at 809:17-22).[7] Indeed, although Ms. Supko testified that the amount of additional at-reactor storage number would decrease if utilities utilized certain contract provisions such as

[7] The amount of "reasonable" additional at-reactor storage could potentially be even higher under Ms. Supko's analysis because, although Ms. Supko utilizes the annual discharge rate as a benchmark for determining the "reasonableness" of the amount of additional at-reactor storage after 1998, she has not endeavored to determine how far above that annual discharge rate the amount of additional at-reactor storage number could be and still be deemed reasonable. A. 40 (Southern Nuclear Operating Company v. United States, No. 98-614 (Fed. Cl.) trial testimony of Eileen Supko, 808:15-24).

"exchanges, " Ms. Supko has not endeavored to model how the additional at-reactor storage number would decrease had exchanges been utilized. A. 42-44, 104-116, (Deposition of Eileen Supko, July 19, 2006, 157-168; Southern Nuclear Operating Company v. United States, No. 98-614 (Fed. Cl.) trial testimony of Eileen Supko, 811:6-813:9).

Similarly, although Ms. Supko claimed that the amount of additional at-reactor storage number could be even lower depending upon individual utilities' decisions regarding matters such as full core reserve policies and the management of pool capacities and wet racks, Ms. Supko admitted that she did not endeavor to model how that number would be affected had utilities made such decisions. A. 44 (Id. at 813:10-20).[8] For example, Ms. Supko acknowledged that she did not know whether the total amount of additional at-reactor storage under Scenario 3 (900-to-3,000) could go from 4,980 to 2,000 MTU if all of the flexibilities that Ms. Supko claimed could occur did, in fact, occur. A. 45 (Id. at 814:1-13). Ms. Supko simply did not endeavor to model such a scenario for Scenario 3. A. 46 (Id. at 815:6-14). Ms. Supko also admitted that, had she assumed license extensions in her utility-wide analysis, under Scenario 3,

[8] Similarly, although Ms. Supko has performed a "sensitivity" analysis in which she models intra-utility exchanges of acceptances rights (i.e., trading of acceptance rights between common owners), she admitted that the decision to engage in intra-utility trades is very company-specific. A. 54 (Southern Nuclear Operating Company v. United States, No. 98-614 (Fed. Cl.) trial testimony of Eileen Supko, 849:18-21).

Although Ms. Supko opined that the amount of additional at-reactor storage may decrease if utilities utilized the plus/minus 20 percent provision of the Standard Contract, she admitted that she did not analyze how the 20 percent provision would work on a specific utility-by-utility basis. A. 118 (Deposition of Eileen Supko, July 19, 2006, 184). Indeed, Ms. Supko did not offer an opinion in this case as to the effect of the plus/minus 20 percent provision on any particular utility. Further, Ms. Supko has admitted that utilities could also request that DOE accept 20 percent less fuel under the plus/minus 20 percent provision of the Standard Contract. A. 55 (Southern Nuclear Operating Company v. United States, No. 98-614 (Fed. Cl.) trial testimony of Eileen Supko, 856:20-25).

the amount of average post-shutdown time that would decrease from 16.5 years to approximately 12 years, a period of time she deemed "reasonable" under the 3,000 MTU rate. A. 6-7, 45 (Id. at 689:25-690:2; 814:24-5).

In short, Ms. Supko's opinions are irrelevant to any issue in this case, lack any indicia of reliability, and are entirely inconsistent with SFI's purported understanding of DOE's obligations under the NWPA and the Standard Contract. Indeed, even accepting the standards articulated by Ms. Supko, a rate less than 3,000 MTU would plainly satisfy the artificial and extra-contractual obligations that she utilized. The Court should reject Ms. Supko's opinions in this case.

## IV. THE COURT SHOULD EXCLUDE MS. SUPKO'S TESTIMONY REGARDING THE REQUIREMENTS OF THE NUCLEAR WASTE POLICY ACT AND STANDARD CONTRACT, AND REGARDING GENERAL SPENT FUEL STORAGE PRACTICES AND RELATED TECHNICAL ISSUES, BECAUSE THESE TOPICS HAVE NOT BEEN PROPERLY DISCLOSED AS SUBJECTS ABOUT WHICH MS. SUPKO WOULD TESTIFY

### A. Ms. Supko's Testimony Regarding The NWPA And Standard Contract Are Beyond The Scope Of Her Opinions As Disclosed In Her Expert Reports

SFI's witness list indicates that Ms. Supko will testify as an expert "regarding the rate at which DOE would have accepted spent nuclear fuel from Grand Gulf, had DOE begun acceptance of spent nuclear fuel in accordance with the Nuclear Waste Policy Act and Standard Contract." Plaintiff's Witness List at 9. RCFC 26(a)(2) requires an expert witness to provide a report with "a complete statement of all opinions to be expressed and the basis and reasons therefor." "A party that without substantial justification fails to disclose information required by RCFC 26(a) . . . is not, unless such failure is harmless, permitted to use as evidence at trial, at a hearing, or on a motion any witness or information not so disclosed." RCFC 37(c)(1).

Ms. Supko has not offered an opinion, either in her expert report or deposition in this case, regarding DOE's obligations under the NWPA or the Standard Contract. Notwithstanding Ms. Supko's prior testimony regarding the NWPA and Standard Contract, when deposed in this case Ms. Supko refused to offer opinions on this point because she now claims it is a legal issue:

> Q. Do you have an understanding as to the rate of acceptance that DOE would be obligated to maintain under the standard contract?
>
> A. *There is no rate of acceptance in the standard contract specified.*
>
> Q. Okay. So you have, then, I presume no understanding, then, as to what rate DOE is obligated to perform that?
>
> MR. SILBERG: Objection. That calls for a legal conclusion.
>
> A. *As I said, there's no rate in the contract.*
>
> Q. So the answer is no, you have no understanding as to the rate of acceptance that DOE is obligated to perform that?
>
> MR. SILBERG: Same objection.
>
> A. *I'm not going to offer an opinion as to what their obligations are.*
>
> Q. I understand you're not going to offer an opinion. Do you have an understanding? Just yes or no.
>
> A. Yes.
>
> Q. Yes, you do have an understanding, is that correct? Yes, you have an understanding to what DOE's obligations are with respect to rate under the standard contract?
>
> A. *As I stated, there is no rate in the standard contract. That's my understanding.*

> Q. So is the answer to my question, no, you do not have an understanding as to DOE's obligations with respect to the rate of acceptance under the standard contract?
>
> * * *
>
> A. *I answered your question that the contract doesn't have a rate in it. That's my understanding.*

A. 71-82 (Deposition of Eileen Supko, July 19, 2006, 18-29).

Further, Ms. Supko limited her opinion to the twin objectives identified by counsel. Acceptance Rate Report at 1. By limiting her opinion in this manner, Ms. Supko did not offer any opinion in this case on the requirements of the NWPA or the Standard Contract. Given Ms. Supko's deposition testimony and the lack of any statement or opinions in her expert report regarding the rate of acceptance under the NWPA and the Standard Contract, her proffered testimony beyond the disclosures provided to the Government in this case should be excluded.

### B. SFI Did Not Disclose Ms. Supko's Information Regarding General Spent Fuel Storage Practices And Related Technical Issues In The Nuclear Industry To The Government During Discovery

SFI's witness list indicates that Ms. Supko will also testify "regarding general spent fuel storage practices and related technical issues in the nuclear industry." Plaintiff's Witness List at 9. RCFC 26(a)(1)(A) requires the parties to provide the names and contact information of individuals "likely to have discoverable information that the disclosing party may use to support its claims . . . identifying the subjects of the information." As previously discussed, "[a] party that without substantial justification fails to disclose information required by RCFC 26(a) . . . is not, unless such failure is harmless, permitted to use as evidence at trial, at a hearing, or on a motion any witness or information not so disclosed." RCFC 37(c)(1).

Under Fed. R. Civ. P. 37, a trial court may only allow evidence violating Fed. R. Civ. P. 26(a) "if the violation was justified or harmless." Jacobsen v. Deseret Book Co., 287 F.3d 936, 953 (10th Cir. 2002). The Advisory Committee Notes to Fed. R. Civ. P. 37 describe the sanctions under the Rule as "self-executing" and "automatic." The nondisclosing party bears the burden to demonstrate that the failure to disclose was substantially justified or harmless. Atkins v. County of Orange, 372 F.Supp.2d 377 (D.C.N.Y 2005): Tolerico v. Home Depot, 205 F.R.D. 169 (D.C.Pa. 2002). Moreover, Courts have rejected the argument that the disclosure requirements of Fed. R. Civ. P. 26 are pointless formalities. Hoffman v. Caterpillar, Inc., 368 F.3d 709, 714 (7th Cir. 2004). In determining whether a violation was substantially justified or harmless the trial court should consider:

> (1) the prejudice or surprise to the party against whom the testimony is offered;
> (2) the ability of the party to cure the prejudice;
> (3) the extent to which introducing such testimony would disrupt the trial; and
> (4) the moving party's bad faith or willfulness.

Jacobsen, 287 F.3d at 953.

Until submitting its witness list, SFI did not disclose Ms. Supko as a fact witness or any information about which she would be testifying other than that which is found in her expert reports. Her expert reports do not contain discussions "regarding general spent fuel storage practices and related technical issues in the nuclear industry." In addition, Ms. Supko has not specifically testified on this topic in the past or offered a similar expert opinion. At this late date in the pre-trial process, SFI's identification of new subjects of testimony by Ms. Supko is not

harmless to the Government in the preparation of its defense, and her testimony should be excluded.

CONCLUSION

For the foregoing reasons, the Government respectfully requests that this Court exclude the opinions of Ms. Supko as a witness at the forthcoming trial concerning the DOE’s rate of acceptance, including the reasonableness the 3,000 MTU per year steady-state acceptance rate. In addition, the United States requests that the Court enter an order excluding Ms. Supko’s proffered expert testimony regarding the Nuclear Waste Policy Act and the Standard Contract, as well as her proposed fact witness testimony concerning general spent fuel storage practices and related technical issues in the nuclear industry.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/Sharon A. Snyder by Stephen Finn
SHARON A. SNYDER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 616-0347
Fax: (202) 307-2503

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

STEPHEN FINN
SCOTT R. DAMELIN
JOHN C. EKMAN
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D.C. 20530

September 6, 2006

Attorneys for Defendant