Q. And you are certainly not looking in terms of 1998 what particular utilities' intentions were with respect to seeking license extensions or not seeking license extensions, correct?

A. Again, the industry has moved forward and is operating their nuclear power plants despite the government's failure to begin acceptance and they are upgrading their plants. They would have done that had the government begun acceptance in 1998. So I am reflecting what has occurred at nuclear power plants.

Q. But the answer to my question is no, you are not looking in terms of 1998 as to what particular utilities would or would not have done with respect to license extensions, correct?

A. That's correct, I think it was, would have been difficult to determine in 1998.

Q. Okay. Now, in fact, in your industry-wide model, you assumed that utilities do not seek license extensions, correct?

A. That's right.

Q. But in calculating acceptance rights for Southern Nuclear, you do assume license extensions, correct?

A. I did, but, again, given the Indiana

Michigan decision regarding the calculation of damages, any of those projected discharges, whether it is through 40 years or through 60 years, don't come into play and don't matter.

Q. Well, whether or not they matter, Ms. Supko, you agree that for overall industry-wide acceptance, no license extensions are assumed, but for Southern Nuclear, you do assume license extensions, correct?

A. That's correct. And I did talk, I believe it was in the, my Southern Nuclear deposition, I did talk qualitatively about what the effect of license extension would have. And, in fact, since then I actually did look at it, I modeled it. And my qualitative discussion in my deposition was correct.

Q. Well, and I would like to talk with you about that, but before we do that, I have one other quick question.

Both analyses, the industry-wide analysis and the utility-specific analysis, they are both but-for nonbreach analyses, correct?

A. I'm sorry. Repeat that, please?

Q. Of course. Certainly. Both the utility-wide projection that you are doing or analysis that you are doing and the utility-specific, the Southern Nuclear analysis you are doing, are both

endeavoring to model a nonbreach but-for world, correct?

A. That's correct, that in both cases I model a nonbreach scenario, but I also model a breach scenario for the utility-specific calculation of acceptance rights.

Q. In this case?

A. Yes.

Q. Yes. Now, if you had modeled license extensions in your industry-wide analysis, your industry-wide model, you would expect the average post shutdown numbers, that's the number in the Plaintiff's demonstrative 6, that third box, average post shutdown storage time, you would expect that number to decrease, correct?

A. I believe what I stated in my deposition was that I believed that scenario 1 and scenario 4 post shutdown storage time would decrease somewhat and, in fact, that is what happens. Scenario 3 also decreased somewhat, but it was still, I want to say, maybe 12 or 13 years.

Q. So -- I'm sorry.

A. I'm sorry.

Q. Please.

A. In scenario 2 it actually increased.

Q. For scenario 3, that's the 1992 ACR rate, the number of average post shutdown storage time you think went from about 16.5 to, what, approximately 12?

A. I think it was 12 or 13. I don't recall the number.

Q. By the way, just so we're on the same page here, the reason these numbers decrease are because you are assuming 20 more years of time for DOE to work off the backlog, correct?

A. That's correct.

Q. I have maybe five more questions and then why don't we take a break. We have been going for a while.

A. The other thing that I also discussed qualitatively was that the, in my Southern Nuclear deposition regarding license extension was that the effect of, assuming license extension in this overall analysis, would be that the additional storage requirements in scenario 1 and scenario 4 wouldn't change, but they would increase in scenarios 2 and 3 and, that, in fact, does occur.

Q. Yes. Now, with respect to all your inputs, you would agree that the inputs you are using in your model are evolving, correct?

A. No. The historical discharges remain the

A. It is possible.

Q. And as that representation of that particular client stops, you may take out that particular utility's information, correct?

A. I'm not sure that I would.

Q. I mean, you did that with Commonwealth Edison, correct?

A. I did, because -- that was because I was updating my entire database. To the extent that the Department of Energy doesn't issue another RW-859 database for several years, I probably will not make major changes to the historical and projected discharges.

MR. GARDNER: Your Honor, may we take a ten-minute break now?

THE COURT: Sure. Why don't we return at 25 past.

MR. GARDNER: That would be great.

(A recess was taken at 11:11 a.m., after which the trial resumed at 11:31 a.m.)

BY MR. GARDNER:

Q. Ms. Supko, you would agree that you are an advocate for the nuclear industry, correct?

A. I'm a nuclear engineer. I have worked in the nuclear industry for 20 years. I serve as an

advisor to Pennsylvania State University's nuclear engineering program. Yes, of course I'm an advocate for nuclear power and nuclear energy.

Q. I would like to turn now from the inputs of your model which you have been talking about this morning to the outputs of your model. In other words, the numbers that we had started to talk about a little bit.

Now, you are offering an opinion in this case about what you believe to be a reasonable overall spent fuel acceptance rate had DOE begun accepting spent fuel in 1998, correct?

A. Yes.

Q. But you are not offering an opinion concerning what rate of acceptance is required by the standard contract, right?

A. That's correct.

Q. And you are not offering an opinion about what rate of acceptance is required by the Nuclear Waste Policy Act, correct?

A. That's correct.

Q. But you agree that a 3,000 MTU rate of acceptance is not included in either the standard contract or the Nuclear Waste Policy Act?

A. Yes, that's correct.

Q. In fact, you would agree that there is no rate of acceptance at all mentioned in either the standard contract or the Nuclear Waste Policy Act?
A. There is not.
Q. Now, you had no involvement in the formation of the standard contract; isn't that right?
A. Yes, that's correct.
Q. And you are not offering an opinion in this case concerning what the intent of DOE's spent fuel program is, correct?
A. That's correct.
Q. And, in fact, you would agree with me that the intent of the program has no relevance to the opinions you are offering in your expert report, correct?
A. I was asked by counsel to offer opinions regarding what rate of acceptance would meet the requirements that were described to me by counsel. And those were what counsel said were the requirements of the standard contract in the Nuclear Waste Policy Act, and then also to project spent fuel acceptance rights for Southern Nuclear. I'm not sure if that answers your question. I wanted to be clear in what it was I was offering opinions on.
Q. And I appreciate that. I just want to make

1998, correct?

A. I'm not.

Q. And you weren't involved in the development of the Nuclear Waste Policy Act, correct?

A. That's correct.

Q. But you are familiar with the Nuclear Waste Policy Act?

A. Yes.

Q. You have read it before?

A. Yes.

Q. You have worked on issues associated with it?

A. Yes.

Q. And you are aware that the Nuclear Waste Policy Act doesn't contain any reference to the two primary requirements that you are modeling in this case, isn't that right?

A. I believe you just asked me that question a few minutes ago and I said yes.

Q. I think I asked a slightly different question but as long as we're on the same page, we will let it be.

A. Okay.

Q. And just so we're clear as to the scope of the opinions you are offering here, you are not

discharge rate, correct?

A. I'm sorry, I don't understand what you are talking about.

Q. Well, let me reask it and I will try to be clearer. When you are determining the amount of additional at-reactor storage that would or would not be reasonable, you are benchmarking that against the annual discharge rate, correct?

A. That's the annual discharge rate which is 2,000, approximately 2,000 metric tons per year, is one of the benchmarks. But in addition, I also look at the underlying data to see how many plants and how much storage would be required at each. It is not just a simple look at the overall number.

Q. Okay. And, by the way, I think you just said this, did you say that 2,000 is an average, right, annual discharge rate?

A. It has increased in recent years. It is probably a bit above that.

Q. I think it could go as high as 2100, correct?

A. It could go as high as 23 or 2400.

Q. And it could also go as low as 1800 at times, correct?

A. Historically, it has. I would say in

today's environment, it is rare that -- just because of the fact that utilities are operating at fairly high capacity factors and with more and more operating in two-year cycles, it typically doesn't dip below to 1800.

Q. And sitting here today, you can't identify how far above 2,000 the amount of additional at-reactor storage could be and still satisfy the first primary requirement, correct?

A. I don't understand your question.

Q. Okay. We just discussed 2,000 and that is one of the things that you look at to determine reasonableness, correct, among other factors?

A. Yes.

Q. But sitting here today, you cannot tell me how far above 2,000 the additional storage number would be and still satisfy this first primary requirement identified for you, correct?

A. I modeled acceptance rates, overall acceptance rates that I found in Department of Energy documents. I didn't attempt to do -- I don't know if you would call it a break-even analysis, so, no, I have not modeled a scenario that attempts to determine what level.

Q. Okay. Now, if you assumed all the other

numbers in your analysis for scenario 1, the 3,000 rate, you would agree that it is possible that if the number of additional at-reactor storage were, say, as high as 1999 MTUs, that could still satisfy the first primary requirement, correct?

A. I'm sorry, I did not understand your question.

Q. That's fine. Kristin, could you please put up Plaintiff's demonstrative, I believe it is 4, I believe. I'm sorry, it was 6. Ms. Supko, I have put on the screen Plaintiff's demonstrative 6 again, the same slide we were looking at earlier.

My question is you have got three categories here, additional SNF storage requirements, average post shutdown storage time, years maximum acceptance capacity utilized.

Hypothetically, if average post shutdown remained at 9 and the years maximum acceptance capacity remained at 28, if the first number were as high as 1999, that might still satisfy the first primary requirement, correct?

A. It might. It would depend upon a wide range of things such as, as I said earlier, looking at the underlying numbers, how many plants, how much additional storage, but 2,000 metric tons is, I

the first primary requirement, correct?

A. Again, having an understanding of what the underlying data was that rolled up into that calculated additional storage requirement is important.

Q. And, by the way, when we're talking about the flexibilities, you do not know how much the amount of additional at-reactor storage could be decreased by if all the flexibilities were utilized, correct?

A. Well, I calculated the intra-utility rights, which I believe was in one of the later demonstratives yesterday. I don't recall the number. I think it was 600 something.

And then the other would be inter-utility trading, which is something that I have not modeled, which is when one company essentially swaps their rights with another through some process.

Q. Like exchanges?

A. Exchanges, yes. And the third was the plus or minus 20 percent. And I looked at that in a qualitative manner.

Q. So, in other words, you don't know how much the at-reactor storage could be decreased by if all the flexibilities were utilized, correct, you just haven't looked at that issue?

A. If we could pull up the demonstrative from yesterday for the sensitivity analysis, can we do that?

Q. Of course. You want the one for the intra-utility?

A. Yes.

MR. GARDNER: Mr. Schechter, do you know what number that is?

MR. SCHECHTER: I do in a minute. I believe that is 11.

BY MR. GARDNER:

Q. I have put on the screen PX-11. Is this the screen you wanted to refer to?

A. Yes, thank you.

Q. Now, my question to you was whether or not you know how much the total amount of additional storage requirements would decrease by if all the flexibilities were utilized.

A. Well, I discussed in my report both quantitatively and qualitatively two of the three flexibilities that I talked about yesterday. The 690 metric tons would reflect the intra-utility use of acceptance rights.

If just those plants that required additional storage outside of their one full core

reserve utilized the plus 20 percent flexibility, that 690 would go down to 552. So I quantified those two numbers. I did not model the inter-utility exchanges.

Q. I see. So you don't know how much further those numbers would get with exchanges, in other words, you haven't done that analysis?

A. No, and, in addition, there are other flexibilities that companies have on their own.

Q. And you haven't looked at those flexibilities. And those flexibilities, by the way, as I think you talked about yesterday, are things like how they manage the full core reserve policies, whether or not they want to add racks, things of that nature, correct?

A. Yes.

Q. And you haven't endeavored in this case to model how those flexibilities affect these numbers on Plaintiff's demonstrative 11, correct?

A. That's correct.

Q. Now, in the South Carolina case, you determined that under the 1991 ACR rate, there would be 4980 MTUs of additional at-reactor storage once intra-utility exchanges are applied, correct?

A. Yes.

Q. And that's, again, reflected in Plaintiff's demonstrative 11. But you don't know sitting here today if it is possible under this 1991 ACR rate to bring the additional at-reactor storage numbers from 4980 to, say, 2,000, if all the flexibilities were exercised, correct?

A. Well, I have reviewed the underlying numbers associated with the rollup of the numbers, the 4980 metric tons, and it is on the order of about 30 plants, 25 or 30 plants, several hundred metric tons per plant of additional capacity.

I haven't modeled how far down that number could come, that's correct, but the other factors that also have to be considered is you don't just look at additional at-reactor storage requirements. One of the other important factors is the average post shutdown storage time of 16.5 years.

That means that, on average, plants would be storing spent fuel for 16 and a half years after they shut down for decommissioning. In some cases, it is 20 years or longer. That's one of the other factors that I also considered. It is not just looking at the additional storage requirements line.

Q. Of course, by the way, if you had assumed license extensions in your model, as I think you

testified earlier, that 16.5 drops down to 12, correct?

A. On average, but, again, the numbers range from 10 to probably, probably still 20 and higher for some plants.

Q. Sure. But, in any event, just to get back to my initial question, you haven't, you don't know sitting here today whether it is possible under the 1991 ACR rate -- or here you used the 1992 ACR rate, called it scenario 3, you don't know whether it is possible to bring that 4980 number for additional storage down to 2,000 if all the flexibilities are exercised, correct?

A. I have not modeled that.

THE COURT: Do you know what would happen if they are probably already shut down plants?

THE WITNESS: I haven't done that in this, Your Honor, but in the early 1990s, that was an issue that was discussed quite extensively in the industry, and I did actually model shutdown reactor priority.

And what I found at that time was that a 3,000 metric ton acceptance rate would help the fuel to move not just from shutdown plants, but would also prevent adding additional storage at operating

plants. It helped everybody.

Whereas under the scenario 3 rates, which is one of the rates that I modeled at that time, giving shutdown plants priority helped the shutdown plants, but it increased at-reactor storage at the operating plants. It was, it was kind of an unfair tradeoff.

And so even in -- I think I did this analysis in 1992. The 3,000 metric ton rate made sense both for meeting the needs of shutdown plants and operating plants.

BY MR. GARDNER:

Q. Ms. Supko, as of 1998 you would agree that there were a few thousand MTUs in storage at shutdown reactors?

A. Yes.

Q. Somewhere approximately in the neighborhood of 3,000 to 4,000 MTUs?

A. That sounds correct.

Q. That would include plants like Yankee, for example, correct?

A. Yes.

Q. SMUD?

A. Yes.

Q. Trojan?

A. Yes.

Q. Among others. And when you consider additional at-reactor storage, you do not include within that number those utilities that shut down prior to 1998 but built dry storage, correct?

A. That's correct, because the[ -- some of those plants are actually storing their fuel in their pools. And in 1998 they were all storing their fuel in their pools and they had enough capacity to store their fuel.

Q. So, for example, just for illustrative purposes, Yankee wouldn't be in your additional storage requirements numbers, correct?

A. That's correct. This is modeling operating plants.

Q. Now, if you were to include, just hypothetically, if you were to include the shutdowns and do the additional at-reactor storage number, that could make the amount of additional at-reactor storage as high as 4600 under your 3,000 scenario, correct?

A. I suppose so, but that's not what I was modeling. I was modeling the effect of DOE's acceptance rate on operating plants in terms of their capacity to store spent nuclear fuel in their pools. The average post shutdown storage time does

capacity in their pool had DOE come in 1998 at the scenario 1 or scenario 4 rates.

But it would have affected the -- and increased the storage requirements in scenarios 2 and 3.

Q. Let me see if I understand this. If I am mischaracterizing, please correct me. Is it your opinion then that whether or not the addition of a rerack after 1998 constitutes additional at-reactor storage is the effect upon the numbers represented in Plaintiff's demonstrative 11? I am not sure I understand. What is the dividing line then, Ms. Supko, between whether a post 1998 rerack or adding additional racks is additional at-reactor storage or is not additional at-reactor storage?

A. Well, it is providing additional at-reactor storage. I was just putting it into context with my analysis.

Q. Now, I think you testified yesterday that under a 3,000 MTU rate, there would be approximately 12 utilities with at-reactor storage after 1998, correct?

A. I believe that's what I said.

Q. And that number, by the way -- and it is an approximation, I understand that -- that number

Q. So are your workpapers incorrect here when it represents there are 14?

A. No, this is modeling that they would have had to have done something, but it wasn't adding on-site additional capacity.

Q. Okay. But they would have had to have done something after 1998?

A. Yes.

Q. By the way, Ms. Supko, since you mentioned transshipments, are there any costs associated with transshipment of spent nuclear fuel?

A. There is.

Q. Do you know how much?

A. Well, it depends. Particular reactors involved here actually own their own spent fuel transportation casks and have for more than a decade. So it would be the operating costs associated with loading fuel and transferring it.

Q. Ms. Supko, turning to what I just provided to you from your workpapers, by my count there are four utilities here, four reactors, I should say, with over 100 MTUs of maximum additional storage required, correct?

A. Yes.

Q. In fact, one of those, I believe it is Palo

Verde Number 1 has 184.9 MTUs of additional storage, correct? It is the Number 2 plant.

A. Yes, I see it.

Q. Is that correct?

A. That's correct. But those are actually three nuclear power plants with three separate pools, which would average about 61 metric tons per pool, which is a reload and a half maybe.

Q. By the way, with 184.9 MTUs, if they had to go to dry storage, that could be as much as 18 casks, correct, if you assume ten MTUs per cask?

A. Well, actually 15 metric tons per cask is probably a more reasonable number today.

Q. Okay, 15.

A. But I would say that a plant, and just looking at each individual pool, as I said, let me calculate it back, 184.9 divided by 3 is approximately 62 metric tons per pool. I can't imagine that any utility would build on-site dry storage to ship -- or, excuse me, to store just 61 metric tons. There would have been other alternatives that would have made more sense.

Q. And do you know what Palo Verde is doing?

A. They are storing their spent fuel in dry storage today, but that is in the breach world where

number that I calculated in my workpapers because it was a good representation of the range.

Q. One moment, Your Honor.

THE COURT: Surely.

MR. SCHECHTER: Before you start, Mr. Gardner, could I ask approximately how much longer you expect to go? Because I think if we're going to go much longer, we might want to take at least a little break and come back. If you are almost done --

MR. GARDNER: Why don't we take a little break, Your Honor.

THE COURT: Okay. Why don't we break now and return at 20 minutes of.

(A recess was taken at 12:35 p.m.)

THE COURT: Whenever you are ready.

BY MR. GARDNER:

Q. Ms. Supko, you testified a little earlier that the generation rate of spent nuclear fuel in nuclear utilities is approximately 2,000 MTUs per year, correct?

A. Yes.

Q. And at a rate of 2,000 MTUs per year -- sorry, strike that.

A rate of 2,000 MTU would keep up with the

generation rate, correct?

A. A rate -- what do you mean?

Q. A rate of acceptance of the 2,000 MTUs per year, it would keep up with the generation rate, correct?

A. Roughly. The number is higher in some years, so --

Q. And lower in others, correct?

A. Right.

Q. So it would approximately keep up with the generation rate?

A. Yes.

Q. But it is also your belief that the DOE acceptance rate must also accept a portion of the backlog of each year or some amount above 2,000, correct?

A. Could you repeat that?

Q. Sure. Not only must the generation -- or not only must the acceptance rate keep up with the generation rate -- sorry, not only must the acceptance rate keep up with the generation rate, it also, you believe, requires it to work off the backlog, correct?

A. It is not my opinion. That's the requirements that were identified to me by counsel. The second issue identified was that spent fuel

utilities here?
A. No.
Q. So, for example, your analysis would allow Georgia Power to exchange acceptance rates with Alabama Power, correct?
A. Southern Nuclear Operating Company is the operator of those three plants within that operating system, yes.
Q. And so Southern could decide that Georgia Power could get the acceptance rights of Alabama Power under your analysis; is that right?
A. I modeled that the three sites for Southern Nuclear, that Southern Nuclear operates could, in fact, use those rights at any of the sites.
Q. They could share rights?
A. Yes.
Q. Now, you would agree that the decision to engage in intra-utility trades is very company-specific, correct?
A. Yes.
Q. It is also very region-specific?
MR. SCHECHTER: I will object on vagueness. I don't know what region-specific means.
THE COURT: Does the witness know?

purport to represent that it is everywhere.

THE WITNESS: No, I don't believe that I state that.

BY MR. GARDNER:

Q. Have you stated that in other reports, Ms. Supko?

A. Not that I recall. What I state on page 17 of my report is that if nuclear operating companies exercised the provision in the standard contract that allows 20 percent flexibility in the amount of spent fuel delivered to DOE, it is possible that the additional storage requirements summarized in table 2 would be at least 20 percent lower.

That's not saying that every nuclear operating company who has acceptance rights in 1998, 1999, whenever, is going to increase their requirements. I was only looking at that portion who had additional storage requirements calculated.

Q. And, by the way, just as utilities could request 20 percent more spent nuclear fuel, they could also request 20 percent less spent nuclear fuel to be accepted, correct?

A. It is a plus or minus 20 percent flexibility, yes.

CERTIFICATE OF REPORTER

DOCKET NO.: 98-614C

CASE TITLE: Southern Nuclear Operating Co v U.S.

HEARING DATE: October 20, 2005

LOCATION: Washington, D.C.

I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the United States Court of Claims.

Date: 10/20/05

Karen Brynteson, RMR, CRR
Official Reporter
Heritage Reporting Corp.
Suite 600
1220 L Street, N.W.
Washington, D.C. 20005-4019

Page 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

----------------------------x

WISCONSIN ELECTRIC POWER COMPANY, :

Plaintiff :

vs. : NO. 00-697 C

THE UNITED STATES :

Defendant :

----------------------------x

The deposition of EILEEN M. SUPKO was held on Tuesday, June 27, 2006, commencing at 9:22 a.m., at the U.S. Department of Justice, 1100 L Street, N.W., Washington, D.C., before Ronald E. Bennett, Notary Public.

REPORTED BY: Ronald E. Bennett

CERTIFIED CO[illegible]

APPEARANCES

DONALD J. CARNEY, ESQUIRE
Perkins Coie LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2011
Tel: 202-434-1675
Fax: 202-434-1690
E.mail: Dcarney@perkinscoie.com
On behalf of Plaintiff

JOSHUA E. GARDNER, ESQUIRE
U.S. Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D.C. 20530
Tel: 202-305-7583
Fax: 202-514-8624
E.mail: joshua.e.gardner@usdoj.gov
On behalf of Defendant

ALSO PRESENT: Ted Lunsford, Navigant
Hugh Hill and Rachel Anglin, Interns

INDEX

Deposition of EILEEN M. SUPKO

June 27, 2006


| Examination by: | | Page |
|---|---|---|
| Mr. Gardner | | 4 |

| No. | Description | Marked |
|---|---|---|
| 1-3 | Documents | 16 |
| 4 | Retention Agreement | 17 |
| 5 | Invoice | 25 |
| 6 | Rebuttal Report | 98 |
| 7 | Document | 121 |
| 8 | Document | 129 |
| 9 | Concept Paper | 142 |
| 10 | Document | 209 |

they have large number of plants. They may have benefits, I've not seen what everybody's contract looks like. I have a snapshot of it, but it's hard to say.

Q. Is it fair to say that in the dry storage industry that all dry storage projects are basically negotiated projects? In other words, there's no off-the-price shelf or no off-the-shelf price regarding storage; is that fair to say?

A. I don't know. The dual purpose casks themselves are typically very similar from site to site, if you are using the same product cask with the same certification. However, the individual sites will, in terms of building a facility, will differ dramatically.

Q. Does that mean that obviously the prices would vary from utility to utility in terms of dry storage cost?

A. They might.

Q. Do you know if they do?

A. I don't.

Q. We have spoken I think at extraordinary lengths about your model, your fuel management models, and your opinions about the 3,000 rate. You recall that, of course?