A. Yes.
Q. May I rely upon your previous testimony with respect to that topic?
A. I suppose that you can.
Q. Okay. For example, we have talked about how your calculations for additional extra storage, they ever changed from report to report; correct; the numbers have changed?
A. They changed from the SMUD report to the Southern Nuclear report and from the Southern Nuclear report to any report issued after that. But I believe that all of the numbers have been the same in reports issued from the middle of last year forward.
Q. Since South Carolina; correct?
A. Yes.
Q. Let me just make sure I have got this right. Your report changed from comment to SMUD, in terms of the numbers of additional at reactor storage?
A. I believe I did some additional analyses there.
Q. Then it changed from Southern Nuclear to South Carolina; correct?
A. That's correct. I did the analysis in a

different way.
Q. I can rely upon all your previous testimony about why it changed; correct?
A. Yes.
Q. We don't need to go into that?
A. Yes.
Q. Thank you.
A. I want to make sure I understood what you meant by rely upon.
Q. Just that I don't have to ask you the same questions about the issues you and I have already talked about?
A. I certainly endorse that.
Q. Me too. I do want to ask one question though. With respect to your opinions regarding the rate and schedule, the reports that you have offered in this case, have you conducted the same type of analysis as you conducted in South Carolina?
A. I don't understand the question.
Q. Well, your initial reports basically made the conclusion that at 3,000 rate of acceptance was reasonable because it satisfied what you understood to be two primary requirements; correct? The amount of additional at reactor storage and average post shutdown time; correct?

A. I believe that is correct.

Q. Okay.

A. I'll have to look at those reports.

Q. Sure. We can if you need to. My understanding is that in South Carolina you have actually done slightly different analysis where you just calculated under various rate assumptions how much additional at reactor storage there would be and what the average post shutdown time is; correct?

A. I performed the same analysis I believe or similar analysis. What I've done that is different in the report from South Carolina and any that I've completed after that was essentially to relate that to measures that were provided to me by counsel which was tell us how much additional a reactor storage would be required. And discussed timely decommissioning and how these various acceptance rates that I analyzed affect those two factors.

Q. You measured, you used the same two measurements in Commonwealth Edison, SMUD and Southern Nuclear; correct?

A. I did.

Q. What are you doing differently --

A. My analysis is the same, essentially the same. I'm just not discussing the requirements of

the contract in order to not make any legal arguments such as the many, many questions you are asking me, whether I was issuing a, making a legal opinion in earlier reports. I'm doing an analysis.

Q. Is it fair to say that one of the differences between some of your original opinions and say your post South Carolina opinions is that you are no longer offering an independent opinion about the two primary requirements?

MR. CARNEY: Objection. Mischaracterizes prior testimony.

A. I wasn't often an opinion about the primary requirements in Southern Nuclear report either. I believe I told you in the SMUD and Commonwealth that counsel had given me those primary requirements. I have just discussed them in the text of the report. I no longer discuss them in the text of the report.

Q. Okay. So for my purposes today you are not offering an independent opinion about the fact there are two primary requirements; correct? You are simply relying upon counsel?

A. That's correct.

Q. Okay. Are there any statements you've made either in deposition or trial testimony that

you believe are incorrect?
A. Not that I can recall.
Q. Okay. Now you have offered three separate reports in this case; correct?
A. Yes.
Q. You have offered two dealing with the written schedule of acceptance; correct?
A. Yes.
Q. You have offered one that calculates WEPCO's acceptance rights under a 3,000; correct?
A. That's correct.
Q. And you offered one given about the overall rate acceptance?
A. Yes.
Q. I think as you alluded to earlier you got a report dealing with the dual-purpose dry storage market; correct?
A. Yes.
Q. Why don't we mark all three of these.
(Deposition Exhibit Number 1-3 marked for purposes of identification.)
BY MR. GARDNER:
Q. I have handed you what has been marked as Exhibits 1, 2 and 3. Can you just confirm for me what those exhibits are.

WASHINGTON, D.C.

NOTARY PUBLIC, to wit:

I, Ronald E. Bennett, a Notary Public of the District of Columbia, do hereby certify that the within-named witness personally appeared before me at the time and place herein set out, and after having been duly sworn by me according to law, was examined by counsel.

I further certify that the proceedings were recorded stenographically by me and this transcript is a true record of the proceedings.

I further certify that I am not of counsel to any of the parties, nor in any way interested in the outcome of this action.

As witnessed my hand and notarial seal this 13 day of July, 2006.

Ronald E Bennett

Ronald E. Bennett,

Notary Public

My commission expires:

February 14, 2010

UNITED STATES COURT OF FEDERAL CLAIMS

NORTHERN STATES POWER COMPANY,)
Plaintiff, )
v. ) No. 98-484C
THE UNITED STATES, )
Defendant. )
and )
SYSTEMS FUELS, INC., et al., )
Plaintiff, )
v. ) No. 03-2623C
THE UNITED STATES, )
Defendant. )DEPOSITION OF
and )EILEEN M. SUPKO
SYSTEMS FUELS, INC., etc., ) July 19, 2006
Plaintiff, )
v. ) No. 03--2624C
THE UNITED STATES, )
Defendant. ) Job No. 175436

The deposition of EILEEN M. SUPKO commenced at 9:00 AM, at the UNITED STATES DEPARTMENT OF JUSTICE, CIVIL DIVISION, COMMERCIAL LITIGATION BRANCH, 1100 L Street, N.W.,


de02e399-46a7-4ce4-9e1f-986d2da58ed3

Washington, D.C., before Cheryl A. Lord, Registered Professional Reporter, Certified Realtime Reporter, and Notary Public for the District of Columbia.

APPEARANCES

For Plaintiff:

Jay E. Silberg, Esquire
PILLSBURY WINTHROP SHAW PITTMAN LLP
2300 N Street, N.W.
Washington, D.C. 20037-1128
(202) 663-8000

For Defendant:

Joshua E. Gardner, Esquire
Alan J. Lo Re, Esquire
UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION COMMERCIAL LITIGATION BRANCH
1100 L Street, N.W.
Washington, D.C. 20530
(202) 307-0226

APPEARANCES CONTINUED

For Xcel Energy:

Kerry C. Koep, Esquire
XCEL ENERGY
Assistant General Counsel
414 Nicollet Mall, Suite 500
Minneapolis, MN 55402
(612) 215-4583

Also present:

Eric Heintz and Ted Lunsford

15 minutes, every hour and a half, although if you ever need a break at any time, please let me know and we'll take one.

Is that fair?

A. Yes.

Q. The only request I have is, is that if there's a question pending, you answer the question, and then we'll go on break.

Okay?

A. Yes.

(Mr. Lunsford entered the room.)

BY MR. GARDNER:

Q. Now, I'm sure you recall that several weeks ago, I took your deposition in the Wisconsin Electric case.

Correct?

A. Yes.

Q. Is it fair to say that the answers you gave in that case with respect to the rating schedule would apply equally to your opinions in this case or these cases?

A. I believe they would.

BY MR. GARDNER:

Q. Why don't I reask it, and tell me what part you're having difficulty with.

Do you have an understanding as to the rate of acceptance that DOE would be obligated to maintain under the standard contract?

A. There is no rate of acceptance in the standard contract specified.

Q. Okay. So you have, then, I presume no understanding, then, as to what rate DOE is obligated to perform that?

MR. SILBERG: Objection.

That calls for a legal conclusion.

A. As I said, there's no rate in the contract.

BY MR. GARDNER:

Q. So the answer is no, you have no understanding as to the rate of acceptance that DOE is obligated to perform that?

MR. SILBERG: Same objection.

A. I'm not going to offer an opinion as

to what their obligations are.

BY MR. GARDNER:

Q. I understand you're not going to offer an opinion.

Do you have an understanding?

Just yes or no.

A. Yes.

Q. Yes, you do have an understanding, is that correct?

Yes, you have an understanding to what DOE's obligations are with respect to rate under the standard contract?

A. As I stated, there is no rate in the standard contract.

That's my understanding.

Q. So is the answer to my question, no, you do not have an understanding as to DOE's obligations with respect to the rate of acceptance under the standard contract?

MR. SILBERG: Asked and answered.

A. I answered your question that the contract doesn't have a rate in it.

That's my understanding.

BY MR. GARDNER:

Q. Okay. And therefore if the contract doesn't contain a rate, then you have no understanding otherwise as to what rate DOE's obligated to perform at under the standard contract; is that correct?

MR. SILBERG: Objection, legal conclusion, asked and answered.

A. I don't know how else to answer your question other than to tell you what I know.

MR. GARDNER: I'm going to have marked what will be exhibit number 7.

(Supko Exhibit No. 7 was marked for identification.)

BY MR. GARDNER:

Q. All right. Ms. Supko, I've handed you what's been marked as exhibit number 7.

And before I describe the document, have you ever seen that document before?

I'll represent to you it's an

excerpt, because I'm trying to save the environment today.

A. I don't recall.

Q. I'll describe it to you.

It is plaintiff's -- and this is Northern States now.

This is plaintiff's objections and responses to the defendant's first set of interrogatories and requests for production of documents. This is basically a pretrial discovery document, and we -- which we asked the plaintiff for certain information, and they purport to give us that information through written responses.

And if you turn to the second page of this document, the excerpt -- actually page number 7 on the bottom, you'll see there's an interrogatory number 7 on the top.

Do you see that?

A. M-hm.

Q. And the interrogatory -- this is an interrogatory by the way -- this is a question

that the government has asked NSP.

And we ask the following question: Identify those persons both within plaintiff's organization and outside of plaintiff's organization who are the most knowledgeable about the parties' understanding at any time subsequent to the execution of plaintiff's contract as to the rate and/or sequence of SNF and/or HLW acceptance that DOE would be obligated to maintain under the standard contract.

And then it goes on to list some subparts.

Now, if you go to page 7 D, which is the next page of this document, NSP has identified Eileen Supko, which of course is you.

Correct?

A. Yes.

Q. Now, Ms. Supko, do you agree that you are one of the most knowledgeable persons with respect to the rate and/or sequence of SNF that DOE would be obligated to maintain under the standard contract?

MR. SILBERG: Objection, vague and ambiguous.

You can answer it if you understand it.

A. I'm aware of the fact that NSP identified me as such a person.

It also states that the plaintiff's, NSP's, response to this was that the interrogatory was overly broad, et cetera, but they did identify individuals with the most knowledge of these issues, which is the acceptance rate and rate and sequence of spent fuel acceptance.

BY MR. GARDNER:

Q. That's actually a nonresponsive answer, Ms. Supko.

My question is, do you consider yourself to be one of the most knowledgeable persons with respect to DOE's obligations concerning the rate schedule of acceptance under the standard contract.

MR. SILBERG: Objection,

mischaracterizes the document.

A. I consider myself to be one of the most knowledgeable persons associated with an understanding of the rate and sequence of spent fuel acceptance by DOE.

Whether or not it would be an obligation under the standard contract is a legal issue.

BY MR. GARDNER:

Q. Let me ask you, do you have any knowledge about the rate and/or sequence of SNF that DOE would be obligated to maintain under the standard contract?

MR. SILBERG: Objection, legal conclusion.

(Discussion off the record.)

BY MR. GARDNER:

Q. Ms. Supko, I'm going to read back the last question, because I think there was -- there's some separation.

(Reading the realtime screen:) Let me ask you, do you have any knowledge about the

**rate and/or sequence of SNF that DOE would be obligated to maintain under the standard contract?**

A. I believe that I answered the question that discussing DOE's obligation is a legal issue, and I'm not making a legal conclusion.

I'm fully aware of acceptance rates that the Department of Energy has used over the lifetime of the program, and I've analyzed those rates, as you know, in my expert reports.

Q. **Outside of your expert reports, do you have any understanding as to the rate and/or sequence of SNF that DOE would be obligated to maintain under the standard contract?**

MR. SILBERG: Objection, asked and answered.

A. From the beginning of the program, the intent of the program was to have an acceptance rate set such that utilities, nuclear operating companies would not be required to add additional storage capacity after 1998, and to

work off the backlog to allow timely decommissioning, and a rate that does that is a rate that reaches 3,000 metric tons with a fairly short 5- to 6-year rampup period.

BY MR. GARDNER:

**Q. So is the answer to my question, no, that you have no knowledge about the rate and/or sequence that DOE would be obligated to maintain under the standard contract?**

MR. SILBERG: Objection, asked and answered.

A. I stated I have -- that I believe discussing what DOE's obligation is is a legal issue, and that's not something that I'm opining on.

BY MR. GARDNER:

**Q. I understand you're not opining.**

**I'm asking if you have an understanding.**

**Do you have any knowledge?**

A. I know that my client, NSP -- I don't recall if Entergy or System Fuels Inc. has

submitted reports regarding -- briefs regarding the Department of Energy's -- the facts associated with DOE's obligations regarding spent fuel acceptance.

I know there were many briefs filed. I know that NSP did in fact file one, and their opinion is they were required to pick up spent nuclear fuel at a rate that would have limited the amount of spent fuel storage such that no one would have to add additional storage after '98.

**Q. Now, that's in their brief.**

**I'm asking for your view.**

**Outside of this expert report, do you have any understanding or knowledge about the rate and/or sequence that DOE would be obligated to maintain under the standard contract?**

MR. SILBERG: Objection, asked and answered.

She gave you the information.

A. As I said, whether DOE is obligated is a legal issue. That's all that I can tell you.

BY MR. GARDNER:

Q. Okay. So you have no knowledge about that?

MR. SILBERG: Asked and answered.

A. I have no legal knowledge about it, no, I don't.

BY MR. GARDNER:

Q. Do you have any nonlegal knowledge about the DOE's obligations under the standard contract?

A. It's a legal issue.

Q. Okay. So the answer is, no, you have no knowledge?

A. No.

Q. Thank you.

Ms. Supko -- and I think you testified to this. You certainly said this in your report -- that the notion of no additional at-reactor storage was a key issue identified by utilities.

Correct?

A. Yes.

Q. Now, that's in fact what you say in your expert report.

Correct?

I believe it's page 1.

MR. SILBERG: Excuse me.

We're referring to the overall --

MR. GARDNER: Yeah.

Why don't we go to exhibit 1 as an illustrative example.

BY MR. GARDNER:

Q. The very first paragraph, it looks like the middle of the paragraph, you say --

A. I don't say that no additional storage.

I say that counsel asked me to provide an opinion on the DOE's rate of acceptance of spent nuclear fuel on -- as a whole on 2 key issues identified by DOE in the nuclear industry.

One of those is the aggregate amount of additional storage that would be required.

Q. Now, are you just relying upon

counsel for the notion that DOE and nuclear utilities identified these issues, or are you -- do you have independent knowledge that DOE and the utilities identified these as key issues?

A. I have independent knowledge that those are key issues.

Q. Now, when did utilities identify what you refer to as this key issue about additional at-reactor storage?

A. In the beginning of the program.

Q. Can you be more specific?

A. There were communications between the industry and the Department of Energy when the standard contract was being formulated. And the expectation was that after 1998, utilities would not need to add additional storage capacity because the DOE had begun picking up spent nuclear fuel.

Q. Can you identify any specific documents in which utilities were making their intentions known to DOE?

A. I believe there were responses to

agree that the draft mission plan was promulgated after the final version of the standard contract was promulgated.

Correct?

A. Yes.

Q. Because the final standard contract -- and in fact the standard contracts were signed in approximately June of 1983.

Correct?

A. Yes.

Q. The draft mission plan came in December of '83.

Correct?

A. Yes.

Q. So I'm talking now about the rule making related to the promulgation of the standard contract.

My question to you is: If you assume my hypothetical that no utility during that rule making had made a request that DOE accept a rate that precluded at-reactor storage, would that fact be important to your analysis in

this case?

A. No.

Q. Why is that?

A. Because the industry considered adding additional storage after 1998 to be an important issue since the beginning of the program whether or not there were specific comments related to the standard contract.

Q. So outside of whether or not those intentions were expressed to DOE at the time the contracts were being formulated, that's irrelevant for your analysis.

Correct?

A. It is.

Q. I'm going to hand you what is being marked as exhibit number 8.

(Supko Exhibit No. 8 was marked for identification.)

BY MR. GARDNER:

Q. All right. Ms. Supko, I've handed you what's been marked as exhibit number 8.

of SNF equal to the year's generation rate plus a reasonable share of the backlog, to be tantamount to a request that the rate be sufficient to preclude all additional at-reactor storage?

A. That would be the result of doing it, yes.

Q. But of course, even under your analysis, there are utilities that required additional at-reactor after 1998.

Correct?

A. My calculation as we've discussed many times before is based on an oldest fuel first analysis. The -- one of the sensitivity analyses that I do examines the use of acceptance rights within a company at any reactor that that company owns, and it reduces the number fairly significantly such that with the flexibilities in the system, that number -- the amount of additional storage would approach zero, or could approach zero.

Q. So I just want to be sure.

Your opinion is that under the

**analysis you conduct, no utility needs additional at-reactor storage after 1998?**

A. That's not what I said.

**Q. I'm asking you, is that in fact the case?**

A. My calculations in the way that I calculate additional at-reactor storage requirements do show that there would be some amount of additional at-reactor storage.

Looking at exhibit 1, table 3, which is a sensitivity analysis that includes intracompany use of acceptance rights, I calculated 690 metric tons of spent nuclear fuel. That was at maybe a dozen or so nuclear power plants that would require that.

**Q. It's 14, actually, isn't it?**

MR. SILBERG: Excuse me.

If you could let her finish her answer.

A. That may be. I said approximately.

And the additional storage requirements could be accommodated -- they don't

A. The document -- the TVA document said they didn't accept it. It's not in the contract.

BY MR. GARDNER:

Q. So the answer is, that is consistent with your view?

MR. SILBERG: Objection, vague and ambiguous.

What is inconsistent?

A. DOE didn't include a rate in the contract, so TVA is saying that DOE didn't accept it is consistent with what occurred.

BY MR. GARDNER:

Q. I'm handing you what is going to be marked exhibit 10.

(Supko Exhibit No. 10 was marked for identification.)

BY MR. GARDNER:

Q. Now I've handed you what's been marked as exhibit number 10, which despite being on Consolidated Edison letterhead, was produced

consistent with scenario 3.
Correct?
A. Yes.
Q. Now, Ms. Supko, you've stated earlier and we've talked about this that your ultimate opinion in this case is that a 3,000-MTU rate of acceptance is reasonable.
Correct?
A. Yes.
Q. Why in your view is it reasonable to apply a rate of acceptance or hold DOE to these 2 standards when the government expressly rejected any qualitative standards at the time of contract formation?
MR. SILBERG: Objection, lack of foundation, mischaracterizes the documents.
A. I don't know why the government rejected including a rate in the contract.
BY MR. GARDNER:
Q. That's not my question.
They did project a rate of acceptance in the contract.

So my question to you is: Your reasonableness determination does not take into account the fact that DOE rejected the utilities' request for the inclusion of a particular schedule rate of acceptance.
Correct?
A. I suppose that's correct.
Q. Ms. Supko, we've talked about this before too and probably even today: Part of the way you determined the intent or objectives of the DOE program is by reliance upon the December 1983 draft mission plan.
Correct?
A. How I determined the requirements of the program?
Q. How you -- I think you actually say this. You've confirmed the intent of the program -- I believe it's the second footnote in your opinion -- that while counsel may have instructed you to assume the 2 requirements you model, the additional at-reactor storage and the backlog for timely decommissioning, you say in