**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
(Electronically Filed on September 11, 2006)

| | | |
|---|---|---|
| **SYSTEM FUELS, INC.,** on its own behalf and as agent for SYSTEM ENERGY RESOURCES, INC. and SOUTH MISSISSIPPI ELECTRIC POWER ASSOCIATION, | ) | |
| Plaintiff, | ) | No. 03-2624C |
| | ) | (Judge Braden) |
| v. | ) | |
| **THE UNITED STATES,** | ) | |
| Defendant. | ) | |

**PLAINTIFF'S REPLY TO DEFENDANT'S CONTENTIONS OF LAW**

Plaintiff System Fuels, Inc., on its own behalf and as agent for System Energy Resources, Inc. and South Mississippi Electric Power Association, respectfully files this reply to Defendant's (the "Government") September 5, 2006 memorandum of contentions of law ("Gov't Br."). The Government's pre-trial memorandum mischaracterizes both the well-established law of causation and the fundamental bargain underlying the Standard Contract. As a result, the Government's brief engages in a discussion of the acceptance rate that (1) ignores this Court's previous ruling on liability, (2) shirks its own burden of proof on this issue, and (3) at the same time, is also contrary to this Court's (and multiple appellate courts') prior rulings. Moreover, the central issue the Court must resolve in this case is not the acceptance rate, but rather whether Plaintiff has acted reasonably in mitigating damages by determining to design, license and construct the dry storage facility at the Grand Gulf Nuclear Station ("Grand Gulf"). The costs of that effort through August 2005 total $12.18 million, and those are the costs Plaintiff seeks to recover in this action as a result of the Government's wholesale failure to perform its contractual obligations to Plaintiff. As the

party in breach, the Government must establish that Plaintiff's mitigation efforts were unreasonable – a burden the Government seeks to avoid in its brief by focusing upon the acceptance rate and other peripheral issues. The Court should avoid the Government's efforts to sidetrack the purpose of this trial and focus instead upon the reasonableness of Plaintiff's mitigation efforts. As will be established at trial, Plaintiff's decision to build the dry storage facility at Grand Gulf was eminently reasonable, and the construction of that facility has been undertaken in a very cost-effective manner. Accordingly, judgment should be entered in favor of Plaintiff for $12.18 million.

## I. CONSIDERATION OF THE "BUT FOR" WORLD IS UNNECESSARY IN THIS CASE TO DETERMINE PLAINTIFF'S DAMAGES

As explained in Plaintiff's initial brief, breach of contract damages often include mitigation expenses of the non-breaching party, specifically its costs of arranging alternatives to the breaching party's required performance. Plaintiff's Pre-Trial Memorandum of Law at 1-2 (Aug. 18, 2006). The Government's suggestion that Plaintiff must establish a specific and detailed "but for" world in order to prove causation and recover mitigation damages is flawed. Requiring a non-breaching party to justify its actual mitigation efforts by retroactively constructing a hypothetical world where the breaching party actually performed, especially if determining this "but for" world would require speculation, is contrary to how this Court and the U.S. Court of Appeals for the Federal Circuit (the "Federal Circuit") have understood and applied the element of causation when adjudicating breach of contract claims.

As the Federal Circuit has consistently held, expectation damages are recoverable where: (1) the damages were reasonably foreseeable by the breaching party, (2) the breach is a substantial causal factor in the damages, and (3) the damages are shown with reasonable certainty. Indiana Michigan Power Co. v. United States, 422 F.3d 1369, 1373 (Fed. Cir. 2005). The evidence at trial

will indeed show that in order to mitigate the damaging effects of the Department of Energy's ("DOE") failure to begin acceptance of spent nuclear fuel ("SNF") in 1998, Plaintiff had no reasonable choice but to build a dry fuel storage facility at Grand Gulf. In other words, with regard to causation, Plaintiff must simply show that the Government's breach was a substantial causal factor in the construction of the facility. See Tenn. Valley Auth. v. United States, 69 Fed. Cl. 515, 527-28 (2006) ("[the plaintiff's] decision to build dry storage was made in direct response to DOE's breach"). This, in a nutshell, is Plaintiff's main evidentiary burden at trial.

The Government, on the other hand, takes an unnecessarily strained interpretation of how utility plaintiffs may establish causation in the SNF damages cases. Gov't Br. at 9 ("SFI must establish the 'but for' world so that the Court can identify whether SFI's claimed damages are, in fact, *incremental* to DOE's partial breach") (emphasis added).[1] The term "incremental," as used by the Government, reflects an excessively narrow theory of damages recovery given how the Federal Circuit and its predecessor court have understood the concept of causation. As the Court of Claims stated, a plaintiff must demonstrate that its damages were incurred as a direct result of the defendant's breach. Myerle v. United States, 33 Ct. Cl. 1, 27 (1897). The Federal Circuit has subsequently ruled, however, that "other factors operating in confluence with the breach will not necessarily preclude recovery based on the breach." California Fed. Bank, FSB v. United States, 395 F.3d 1263, 1268 (Fed. Cir. 2005), cert. denied, 126 S. Ct. 344 (2005).

[1] The Government's reliance on cases where this Court and the Federal Circuit required that plaintiffs establish "but for scenarios" is misleading at best. Gov't Br. at 9 (citing Coast Fed. Bank, FSB v. United States, 67 Fed. Cl. 231, 238-39 (2005); Glendale Fed. Bank, FSB v. United States, 239 F.3d 1374, 1380 (Fed. Cir. 2001)). These Winstar plaintiffs were seeking potentially speculative lost profits as damages in their cases, and constructed cost models showing the alleged effect of the Government's breach on future profits. In stark contrast, due to the Federal Circuit's mandate in Indiana Michigan that precludes the recovery of future damages in partial breach suits, Plaintiff is seeking to recover in the instant action costs that *have already been incurred*. See 422 F.3d at 1376. Simply put, comparing costs in the actual world to "but for" scenarios is an unnecessary exercise here, given that Plaintiff would not have built the dry storage facility at Grand Gulf at all had the Department of Energy performed.

Plaintiff can readily establish that the Government's breach was the central and driving factor in the decision to build a dry fuel storage facility at Grand Gulf. At the time the dry storage decision was made, DOE had already abandoned for several years the publication of Annual Capacity Reports ("ACR") and the Delivery Commitment Schedule ("DCS") process that under DOE's theory of the case might have theoretically formed the "baseline" of performance in the non-breach world. See System Fuels, Inc. v. United States, 65 Fed. Cl. 163, 176 (2005) (finding that a utility plaintiff may recover costs incurred "to mitigate its losses after DOE suspended the DCS process . . . it had become evident that the January 31, 1998 deadline would not be met"). Hence, in most circumstances, consideration of how DOE may have performed in the "but for" world should be unnecessary to a prudent operating utility facing the need for additional on-site storage capacity in the actual world. Moreover, given that the costs in Plaintiff's damages claim are actual costs and not potential lost profits, any comparisons to a "but for" world (especially scenarios that are not grounded in any reasonable certainty) are also unnecessary. Satisfying the Myerle test – showing that the breach directly led to Plaintiff's decision to incur mitigation costs – is sufficient. Once Plaintiff establishes at trial that the decision to build a dry fuel storage facility at Grand Gulf was in direct response to DOE's continued nonperformance, the Government bears the burden of showing that such a decision was unreasonable. See, e.g., Robinson v. United States, 305 F.3d 1330, 1333 (Fed. Cir. 2002) (injured party must make "reasonable efforts" to mitigate); Ketchikan Pulp Co. v. United States, 20 Cl. Ct. 164, 166 (1990) ("Mitigation does not require prescience; it requires reasonableness").

## II. MULTIPLE COURTS HAVE REJECTED THE GOVERNMENT'S UNDERSTANDING OF THE ACCEPTANCE RATE ISSUE AND THE STANDARD CONTRACT GENERALLY

As explained above, the consideration of a "but for" scenario is unnecessary when establishing causation for actual costs in a damages claim. Hence, the adjudication of a SNF acceptance rate in the non-breach world is moot in this case. However, to the extent that the Government argues that DOE's SNF acceptance obligations are set forth in the 1991 ACR and and some (but not all) subsequent publications, this position is contrary to the *quid pro quo* established between DOE and utility contract holders in the Nuclear Waste Policy Act (the "NWPA") and the Standard Contract. See Indiana Michigan Power Co. v. Dep't of Energy, 88 F.3d at 1272, 1276 (D.C. Cir. 1996). If the Government raises the acceptance rate issue as a defense, it bears the burden to prove any proposed rate once Plaintiff has established causation. For reasons explained in its initial brief, Plaintiff is nonetheless prepared to present evidence that 3,000 MTU is the rate most likely to achieve the NWPA's and the Standard Contract's twin objectives of (1) ensuring that utilities would not have to build any additional at-reactor storage after 1998, and (2) working off the backlog of SNF already stored on-site as of 1998. Plaintiff's Pre-Trial Memorandum of Law at 18-21.

The Government's suggestion that the NWPA and Standard Contract were not adopted to achieve these twin objectives is wrong. One of the principal purposes of the NWPA was the protection of the public from the hazards posed by spent nuclear fuel and high-level radioactive waste. See 42 U.S.C. § 10131(b)(1) (2000) (stating that the NWPA's purpose was to "provide a reasonable assurance that the public and the environment will be adequately protected from the hazards of nuclear waste"). The "hazards of nuclear waste" to which Congress was referring in the NWPA was "the sudden and unanticipated liability in the form of spent fuel stored at reactor sites with no near-term destination" which resulted when the Government eliminated reprocessing

as an alternative for disposing of SNF. H.R. REP. NO. 97-491, PT. 1 (1982); see also 42 U.S.C. § 10131(b)(1) (2000) (reflecting Congressional recognition that "a national problem had been created by the accumulation of . . . spent nuclear fuel from nuclear reactors"). As Representative Michel explained in urging Congress to pass the NWPA:

> The need for producing a coherent plan for nuclear waste management is urgent. Spent fuel storage congestion is now rapidly building up at power reactor sites, a situation that will become absolutely critical . . .

128 Cong. Rec. 26,311 (1982); see also DOE, Mission Plan for the Civilian Radioactive Waste Management Program (Jun. 1985) ("The growing accumulation of [SNF] in temporary storage poses potential health and safety problems for the public").

Thus, in passing the NWPA, Congress clearly intended to address the accumulation of SNF at nuclear reactor sites and to do it by a date certain: January 31, 1998. See, e.g., Remarks of Rep. Bereuter, 128 Cong. Rec. 27,775 (1982) ("Waste storage cannot continue in the temporary, unsafe fashion that it has maintained for these decades"). Similarly, preventing additional on-site storage and reducing the backlog of SNF already accumulated on-site is certainly consistent with Congress' intent – explicitly written into the NWPA – that the public and the environment be protected against the hazards of nuclear waste. DOE representatives and DOE program documents further indicate that an annual acceptance rate of 3,000 MTU was and is the rate most likely to achieve both these objectives.

To the extent that the Government argues that the oral and written representations made by DOE were not contractually binding but rather were mere statements of DOE's "hopes" and "objectives" for the civilian radioactive nuclear waste program, the Government misses the point. Plaintiff is not arguing that DOE's oral and written statements over the past two decades themselves establish a contractual obligation on the part of DOE to accept SNF at a particular acceptance rate or according to a specific schedule. Rather, DOE statements amount to clear

evidence of DOE's conduct, intentions, and plans with respect to accepting SNF pursuant to the Standard Contract.

Nonetheless, the Government relies heavily on DOE's "repeated rejection" of industry comments seeking to include in the Standard Contract language regarding a SNF acceptance rate or some other qualitative test. Gov't Br. at 14-15.[2] At the same time, however, the Government ignores the fact, demonstrated by the DOE's own fee adequacy studies and total system life cycle cost analyses, that DOE set the fee charged to utilities based on a waste management system designed around a steady state rate of 3,000 MTU annually. Without this reciprocal obligation, the *quid pro quo* that the U.S. Court of Appeals for the District of Columbia Circuit (the "D.C. Circuit") identified in Indiana Michigan would be destroyed. Here, the parties' respective interpretation and performance of a contract "before the advent of controversy, is often more revealing than the dry language of the written agreement by itself." Macke Co. v. United States, 467 F.2d 1323, 1325 (Ct. Cl. 1972); see also Crown Laundry & Dry Cleaners, Inc. v. United States, 29 Fed. Cl. 506, 516 (1993) ("there is no surer way to find out what the parties meant, than to see what they have done") (quoting Ins. Co. v. Dutcher, 95 U.S. 269, 273 (1877)). Thus, while DOE's past statements and representations may not be considered equivalent to contractual obligations, they are vital in determining DOE's intent with respect to the acceptance rate it planned to adopt when it began to dispose of SNF under the Standard Contract.

The Government's attempt to evade prior rulings of this Court that rejected its arguments on the acceptance rate is unavailing. Gov't Br. at 19-21. In advancing its position that the 1991 ACR and subsequent DCS submissions should define DOE's acceptance rate obligations, the

[2] Interestingly, while the Government points to industry requests to include an acceptance rate in the Standard Contract, it cites no Government pronouncement explicitly rejecting those requests. At best, the Government can merely argue that DOE ignored the requests from the nuclear industry. Gov't Br. 14-15.

Government suggests that rejection of such a process would leave this Court "with no mechanism in the Standard Contract" for determine how, when, and where DOE would have accepted SNF in the non-breach world or will accept SNF in the actual world. These concerns are unfounded.

When determining whether a contract is too indefinite to be enforced, a court first looks to whether the parties intended to create a contract. Aviation Contractor Employees, 945 F.2d 1568, 1572 (Fed. Cir. 1991) (citing, 1A. Corbin, Corbin on Contracts at 97 (1963) ("once it is determined that the parties did indeed intend to create a contract, courts should be slow to deny enforcement on the basis of indefiniteness in the contract")). Thus, even the omission of the contract's price, usually a contract's most essential term, "does not vitiate contract formation if the parties otherwise manifested their mutual assent to the agreement and the terms of that agreement are sufficiently definite." Atacs Corp. v. Trans World Communications, Inc., 155 F.3d 659, 667 (3d Cir. 1998). Although the acceptance rate term is missing from the Standard Contract, the most critical obligations – Plaintiff's obligation to pay money into the Nuclear Waste Fund and DOE's corresponding obligation to begin disposing of SNF as of January 31, 1998 – are clearly set forth in the Standard Contract and are sufficiently definite to make the contract enforceable.

There simply is no plausible basis for this Court to find that the parties to the Standard Contract did not intend to enter into a contract, or that the parties' obligations thereunder were too indefinite to be enforceable. The NWPA directed the parties to enter into contracts to formalize the Government's obligation to dispose of SNF. Accordingly, every commercial nuclear utility in the United States did just that. For more than two decades, utilities have paid, and continue to pay, in excess of $10.5 billion into the Nuclear Waste Fund pursuant to the Standard Contract. See Alabama Power Co. v. Dep't of Energy, 307 F.3d 1300, 1303 (11th Cir. 2002). Moreover, the D.C. and Eleventh Circuits have recognized that the Standard Contract created an "unconditional" obligation on the part of the Government – to dispose of the utilities' SNF. Indiana Michigan, 88

F.3d at 1276-77; Northern States Power Co. v. Dep't of Energy, 128 F.3d 754, 759-60 (D.C. Cir. 1997); Alabama Power, 307 F.3d at 1304.[3] The Federal Circuit has likewise found that DOE had an obligation under the Contract, which it breached, by not beginning to accept, transport, and dispose of SNF by January 31, 1998. Maine Yankee, 225 F.3d at 1343. These decisions remove any possible doubt concerning the enforceability of the Standard Contract.

In summary, the Government's pre-trial memorandum recites a litany of arguments that this Court, the Federal Circuit, and the D.C. Circuit have consistently rejected over the last ten years. More importantly, the issues raised in these arguments are unnecessary to the adjudication of Plaintiff's damages claim in this case.

[3] As the Court is aware, in the Northern States case, the D.C. Circuit issued a writ of mandamus prohibiting DOE from relying on the Standard Contract's "Unavoidable Delays" clause to excuse its nonperformance due to the lack of a repository or interim storage options. The Government has gratuitously noted that it recently argued to the Federal Circuit that the D.C. Circuit "overstepped its jurisdiction and authority in issuing this writ of mandamus." Gov't Br. at 3-4 n.2. Although the Federal Circuit appeal in PSEG Nuclear, LLC v. United States, No. 05-5162, dealt strictly with the unrelated issue of this Court's jurisdiction in the SNF cases, the Government engaged in a collateral attack of the D.C. Circuit's proper exercise of jurisdiction in Northern States. The Government's position is untenable for at least three reasons. First, Section 119 of the NWPA provided the D.C. Circuit with jurisdiction to review the challenged agency action leading to the writ of mandamus in Northern States. Second, the Government previously argued to the Federal Circuit that the D.C. Circuit's decision in Northern States should have preclusive effect. Third, the Federal Circuit has effectively rejected the Government's substantive arguments regarding the "Unavoidable Delays" clause. See Northern States Power Co. v. United States, 224 F.3d 1361, 1367 (Fed. Cir. 2000) ("we hold that the unavoidable delays provision deals with delays arising after performance of the contract has begun, and does not bar a suit seeking damages for the government's failure to begin performance at all by the statutory and contractual deadline of January 31, 1998"); Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1336, 1341-42 (Fed. Cir. 2000) (concluding that breach of contract claim does not "arise under" the contract because the Standard Contract's provisions would not provide adequate relief and that DOE breached all the utilities' contracts).

## CONCLUSION

For reasons explained above, Plaintiff may establish causation in this case simply by showing that the Government's continuing partial breach of the Standard Contract led to its decision to build a dry fuel storage facility at Grand Gulf. Plaintiff is entitled to meet this burden without consideration of any hypothetical "but for" scenario. Rather, the Government must show that Plaintiff's decision to mitigate was unreasonable under the circumstances. Although Plaintiff's mitigation efforts are not dependent on the adjudication of a DOE acceptance rate in the non-breach world, Plaintiff is prepared to show that a 3,000 MTU steady-state rate fulfills the objectives of the NWPA and reflects the *quid quo pro* underlying the Standard Contract. Thus, Plaintiff respectfully submits that the evidence at trial will support a judgment in its favor for the amount of $12.18 million.

Dated: September 11, 2006

Respectfully submitted,

s/ Alex D. Tomaszczuk by s/ Jack Y. Chu
Alex D. Tomaszczuk
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7940
(703) 770-7901 (fax)

Counsel of Record for Plaintiff
System Fuels, Inc., on its own behalf
and as agent for System Energy Resources, Inc.
and South Mississippi Electric Power Association

OF COUNSEL:
Jay E. Silberg
Daniel S. Herzfeld
Jack Y. Chu
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
2300 N Street, N.W.
Washington, D.C. 20037
(202) 663-8000
(202) 663-8007 (fax)

L. Jager Smith, Jr.
**WISE CARTER CHILD & CARAWAY, P.A.**
1340 Echelon Parkway
Jackson, MS 39213
601-368-5572
601-368-5816 (fax)