C&C Court Reporting

Certified and Registered Professional Reporters

# CONDENSED TRANSCRIPT

**IN RE:** Yankee Atomic Electric Co., et al. v. United States

United States Court of Federal Claims Case Nos. 98-126C, 98-154C, 98-474-C, 98-483C, 98-484C, 98-485C, 98-486C, 98-488C, 98-614C, 98-621C, 99-447C, 00-440C, 00-697C, 00-703C, 01-115C, 01-116C & 01-249C

---

# DEPOSITION OF

# ROBERT L. MORGAN

## Volumes 1 & 2

## March 21 & 22, 2002

---

*This is your complimentary condensed transcript. C & C also provides free complete word indexes with each full-sized transcript.*

541/485-0111 • 172 East 8th Avenue • Eugene, Oregon 97401
Salem Office 503/362-9193 • E-MAIL depos@ccreporting.com • INTERNET http://www.ccreporting.com
1-800/344-0983 • FAX 541/485-0926

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY )
CONNECTICUT YANKEE ATOMIC POWER COMPANY )
MAINE YANKEE ATOMIC POWER COMPANY )
FLORIDA POWER & LIGHT COMPANY )
NORTHERN STATES POWER COMPANY )
DUKE POWER, A Division of DUKE ENERGY CORP.)
INDIANA MICHIGAN POWER COMPANY )
SACRAMENTO MUNICIPAL UTILITY DISTRICT )
SOUTHERN NUCLEAR OPERATING COMPANY, et al. )
COMMONWEALTH EDISON COMPANY )
BOSTON EDISON COMPANY )
GPU NUCLEAR, INCORPORATED )
WISCONSIN ELECTRIC POWER COMPANY )
POWER AUTHORITY OF THE STATE OF NEW YORK )
OMAHA PUBLIC POWER DISTRICT )
NEBRASKA PUBLIC POWER DISTRICT )
TENNESSEE VALLEY AUTHORITY, )
Plaintiffs, )
v. )
UNITED STATES, )
Defendant. )

**DEPOSITION OF ROBERT L. MORGAN**

**March 21 and 22, 2002 Volume 1, Pgs. 1 - 212**



Case Nos.: 98-126C, 98-154C, 98-474C, 98-483C, 98-484C, 98-485C, 98-486C, 98-488C, 98-614C, 98-621C, 99-447C, 00-440C, 00-697C, 00-703C, 01-115C, 01-116C, 01-249C

THE DEPOSITION OF ROBERT L. MORGAN was taken as a witness on behalf of the Plaintiffs, pursuant to Rules of the Court of Federal Claims, at 9:30 a.m. on Thursday, the 21st day of March 2002, at the Eugene Hilton Hotel, 66 East 6th Avenue, in the City of Eugene, County of Lane, State of Oregon, before Eleanor G. Knapp, CSR-RPR, Certified Shorthand Reporter in and for the State of Oregon.

APPEARANCES

For Plaintiffs Southern Nuclear Operating Company, et al.:
BALCH & BINGHAM LLP
Attorneys at Law
1710 Sixth Avenue North
Birmingham, Alabama 35203
205/251-8100
BY: MR. M. STANFORD BLANTON
MR. K.C. HAIRSTON



A P P E A R A N C E S
(continued)

For Plaintiff Commonwealth Edison Company:
JENNER & BLOCK, LLC
Attorneys at Law
One IBM Plaza
Chicago, Illinois 60611-7603
312/222-9350
BY: MR. NORMAN M. HIRSCH

For Plaintiff Wisconsin Electric:
PERKINS COIE LLP
Attorneys at Law
1201 Third Avenue, 40th Floor
Seattle, Washington 98101-3099
206/583-8419
BY: MR. RICHARD W. OEHLER

(continued)



A P P E A R A N C E S

For Plaintiffs Florida Power & Light, et al.:
SHAW PITTMAN LLP
Attorneys at Law
1650 Tysons Boulevard
McLean, Virginia 22102-4859
703/770-7940
BY: MR. ALEX D. TOMASZCZUK

For Plaintiff Sacramento Municipal Utility District:
ARNOLD & PORTER
Attorneys at Law
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
303/863-2301
BY: MR. DAVID S. NESLIN

(continued)

APPEARANCES

For the Defendant:

UNITED STATES DEPARTMENT OF JUSTICE
Civil Division / Commercial Litigation
1100 L. Street, N.W.
Washington, D.C. 20530
202/353-0516
BY: MR. BRYANT S. BANES
MS. HEIDE L. HERRMANN
MR. R. ALAN MILLER

Reported by:

ELEANOR G. KNAPP, CSR-RPR
C & C COURT REPORTING
EUGENE 541/485-0111
SALEM 503/362-9193
TOLL FREE 800/344-0983



INDEX

| WITNESS | VOL. 1 | VOL. 2 |
|---|---|---|
| ROBERT L. MORGAN | | |
| By Mr. Blanton | 9, 173 | |
| By Mr. Banes | 169 | |
| By Mr. Hirsch | 176 | 221, 242 |
| By Mr. Banes | | 241 |
| By Mr. Tomaszczuk | | 243 |
| By Mr. Banes | | 301 |
| By Mr. Neslin | | 304 |

EXHIBITS:

| FOR IDENTIFICATION | | MARKED/REFERRED |
|---|---|---|
| 1 | Organizational charts | 25/25,64,79,311 |
| 2 | Proceedings for the 1983 Civilian Radioactive Waste Management Information Meeting | 38/38,47,170, 239 |
| 3 | Standard Contract, Proposed Rulemaking | 67/67,76,137, 228 |
| 4 | Standard Contract, Final Rule | 76/76,84,90,105,109, 130,138,301,304,313 |
| 5 | Report on Financing | 93/93,102,104 |

(continued)



INDEX

EXHIBITS:

| FOR IDENTIFICATION | | MARKED/REFERRED |
|---|---|---|
| 6 | 3/4/93 letter from Alabama Power | 106/106 |
| 7 | 4/8/83 memorandum re: final rulemaking | 117/117,284 |
| 8 | 9/7/84 letter to Senator Johnston | 144/144,180, 184 |
| 9 | 12/20/83 cover letter to Edison Electric | 149/149 |
| 10 | 12/20/83 draft, Mission Plan | 149/150,162,177, 221,224,261 |
| 11 | Mission Plan, Volumes I and II | 159/159,162 |
| 12 | U.S. Dept. of Energy's Spent Fuel Storage Policy and Activities | 185/185,190 |
| 13 | 1/28/83 memo, Morgan to staff | 194/194,227 |
| 14 | 3/1/83, Morgan's testimony before Congress | 199/199 |
| 15 | 5/20/83 letter to Morgan from Edison Electric Institute | 201/201 |
| 16 | 6/17/83 letter from Morgan to Edison Electric Institute | 201/202 |
| 17 | FY 1984 Program Guidance for NWF Evaluations | 204/205,226 |

(continued)



INDEX

EXHIBITS:

| FOR IDENTIFICATION | | MARKED/REFERRED |
|---|---|---|
| 18 | 6/21/83 memo to Secretary re: MRS | 229/229,274 |
| 19 | Remarks before IAEA, 10/12/83 | 230/231 |
| 20 | Letter to Governor Alexander | 275/275,279 |
| 21 | Draft letter to Governor Bryan | 278/278 |
| 22 | 3/3/83 letter from Northwest States Power Company | 281/281,301 |
| 23 | 2/8/83 comments from Duke Power Company | 282/283 |

INSTRUCTIONS NOT TO ANSWER:

Page 143, line 15 QUESTION: Would treating situations in which a delivery is needed to permit licensed reactor operations to continue a purpose of the Nuclear Waste Policy Act?

Page 179, line 15 QUESTION: Was Table II-1 in this document the schedule or the acceptance rate that DOE had determined at that point was sufficient to prevent the utilities from having to provide additional on-site storage after 1998?

ROBERT L. MORGAN,

as a witness on behalf of Plaintiffs Southern Nuclear Operating Company, et al., having been first duly sworn to testify the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

E X A M I N A T I O N

BY MR. BLANTON:

Q. Mr. Morgan, we met off the record. My name is Stan Blanton. I am a lawyer representing Alabama Power Company, Georgia Power Company, and Southern Nuclear Operating Company in litigation pending in the United States Court of Federal Claims styled Yankee Atomic Electric Company, et al., v United States. We're in a consolidated discovery proceeding, and your deposition is being taken in that proceeding.

MR. HIRSCH: You mean "coordinated"?

MR. BLANTON: Coordinated. Whatever. What did I say? Consolidated? Strike "consolidated." Coordinated.

BY MR. BLANTON:



Q. I understand you are being represented today by Mr. Banes and the other Government lawyers. Is that correct?

A. That's correct.

Q. In the course of your deposition today, you'll most likely be shown documents that are subject to a protective order jointly entered by the parties in this litigation restricting the disclosure of the contents of material that's been marked confidential.

I understand that you have not had an opportunity to review that order, so what I'm going to do now is hand you the pleading titled Joint Motion for Entry of Agreement and Protective Order. Attached to that as Exhibit A is an agreement and protective order, and I specifically direct your attention to page 3, paragraph 5, of the order and ask if you would review that, please, sir.

A. All right.

Q. All right, sir. Have you read the order?

A. Yes, I have.

Q. Have you got any questions about it?

A. None.



Q. Do you agree to maintain the confidentiality of any documents you are shown today?

A. Yes.

Q. Have you ever had your deposition taken before today?

A. Yes.

Q. So you know that the court reporter here is going to take down your answers. And you need to answer my questions verbally. She can't take down nods or shakes of the head.

A. I understand.

Q. Do you also understand that if I ask you a question that you either don't understand or that you think in some way mischaracterizes something you have said previously, you have the right to stop me, make me restate my question until you have one you understand and can answer correctly?

A. I understand.

Q. Any time you want to take a break today, as long as there's not a pending question, just let me know and we can take a break.

A. Fine.



Q. Are you currently employed, Mr. Morgan?

A. No.

Q. Are you retired?

A. Yes.

Q. How long have you been retired?

A. I retired from the Government in 1988, worked for a small 8(a) company in Washington, D.C., for five years after that, and have consulted with several people and companies up until last year.

Q. Let's go backwards. Who have you consulted for since you worked for the 8(a) company? Let me ask you a different way since that rocked you back in your chair.

A. There are numerous companies and corporations.

Q. On what subjects have you consulted?

A. Mainly defense program activities within the Department of Energy.

Q. Have you consulted for any electric utilities that you know of?

A. Yes.

Q. Who are they?

A. It was the V.G. Sumner plant in

South Caroline when they were proposing to use their reactor for tritium production.
Q. All right, sir. Anybody else?
A. Any other utilities?
Q. Yes, sir.
A. None.
Q. Have you consulted at all with the United States Department of Energy?
A. Indirectly for their contractors.
Q. For which DOE contractors have you consulted?
A. Kaiser in Los Alamos. Sandia in Albuquerque. I can't recall of any other directly for Department of Energy.
Q. Since you left the 8(a) company, have you consulted with any entity on issues that involve the management, storage, or disposal of spent nuclear fuel?
A. I have not.
Q. What was the 8(a) company that you worked for?
A. Meta, M-e-t-a.
Q. What business is it in?
A. We were doing environmental assessments for the Department of Energy.



Q. And the years you worked for Meta, that was 1988 through 1993? Is my math right?
A. I think there was a year in between -- or two years that I consulted. I started working for them in 1990 and ended in 1995.
Q. Did any of your work for Meta involve spent nuclear fuel in any way?
A. It did not.
Q. Is there a two-year period between '88 and '90 when you also consulted? Did I understand that correctly?
A. Yes. That's correct.
Q. Did any of your consulting work during that period involve spent nuclear fuel?
A. No.
Q. Did any of that work -- was any of that work for electric utilities during that period of time?
A. I think it was that period of time that I did the consulting at the V.G. Sumner plant.
Q. On tritium production?
A. Yes. I'm not sure of the dates.
Q. Does that take us back to the date of your retirement from the Government?



A. Yes.
Q. What was your position when you retired from the Government?
A. Manager, the Savannah River Operations Office in Aiken, South Carolina.
Q. What does the Savannah River site -- What is the Savannah River site?
A. What is it?
Q. Yes, sir. What is it?
A. It's basically a material production site for the production of plutonium and tritium for nuclear weapons. It ran four production reactors, two separation canyons, waste tank area, and tritium loading facilities.
Q. Are there other resource and development activities that go on at Savannah River other than weapons production?
A. No.
Q. How long were you in that job?
A. Seven years.
Q. So that takes us back to 1981?
A. That's correct. No. Excuse me. Eight years. Eight years as manager, then seven years as deputy manager. So I was at Savannah River for 15 years.



During that period I had various details to Washington, D.C., where I commuted.
Q. Describe for me, if you would, what a "detail" is in U.S. Government parlance?
A. A detail is an assignment to a specific job at another location.
Q. Check my math, but in some form or fashion you were at Savannah River either as manager or deputy manager from 1973 to 1988. Is that accurate?
A. '73 to '88. Yes. Yes, that's correct.
Q. What details were you assigned to during that 15-year period away from Savannah River?
A. Acting Assistant Secretary for Defense Programs on two occasions.
Q. Do you remember the dates?
A. No, I don't.
Q. All right, sir.
A. I think I can construct that for you. The first time was in February after the inauguration of President Reagan. And I held that job for about six months until a political appointment was made.

17

I was detailed to Washington just after the passage of the Nuclear Waste Policy Act from February -- I guess it was 1983 -- through the about one-year period.

I was again detailed as Acting Assistant Secretary for Defense Programs, again awaiting a new appointee in that position, and that lasted for approximately six months.

Q. What was the scope of your authority as Acting Assistant Secretary for Defense Programs? What does that include?

A. The entire weapons complex, which included the laboratories -- Sandia, Livermore, Los Alamos -- and all the weapon production facilities, which included Savannah River; Rocky Flats; Richland; Oak Ridge, Tennessee. And that's all I can -- oh, Pantex plant in Amarillo and Bendix plant in Kansas City. Approximately about a $5 billion operation.

Q. After your detail to -- your second detail as Acting Assistant Secretary for Defense Programs, did you return to Savannah River?

A. Yes, I did.

Q. And did you stay at Savannah River until your retirement?

18

A. That's correct.

Q. There were no further details after that?

A. No.

Q. As Acting Assistant Secretary for Defense Programs, were you involved at all in the issues of spent nuclear fuel management or storage?

A. Only the spent nuclear fuel from the defense program activities. Nothing to do with commercial fuel.

Q. All right. At that time was defense spent fuel intended to be part of the DOE program that was initiated under the Nuclear Waste Policy Act?

A. During the last detail, that's correct.

Q. That would have been from the first quarter of '84 until --

A. Mid -- until mid --

Q. I didn't get how long that lasted.

A. I think that one was about six months.

Q. As manager of the Savannah River site, did you also have some involvement with

19

spent fuel produced in weapons production?

A. Yes.

Q. In that job did you have any involvement in the DOE spent fuel program at all?

A. The commercial spent --

Q. Yes, sir.

A. None.

Q. All right. Prior to Savannah River, just briefly describe your career for me, prior to 1973.

A. I had graduated from the Military Academy in 1952, was commissioned, spent 13 years in the Army Corps of Engineers.

First assignment was the Korean War; second in Japan; third, 82nd Airborne at Fort Bragg; fourth was a year in Indonesia as a special assistant to the Ambassador for Civic Action; and then resigned my commission in 1965 and went to work for the DOE -- or the Atomic Energy Commission at that time.

Q. What was your job at the AEC?

A. Director of the heavy water organic tool reactor program at Savannah River for one year from '65 to '66.

20

1966, I joined the reactor development program, Canoga Park, California, and stayed there seven years.

And then in '73 went to work for Savannah River.

Q. Are you an engineer by training?

A. Yes. The Army Corps of Engineers sent me to MIT for two years, and I have a master's in civil and a master's in nuclear.

MR. OHLER: What was that last master's in, sir?

THE WITNESS: Nuclear engineering.

BY MR. BLANTON:

Q. During your time in the Service, were you involved in nuclear weapons issues?

MR. BANES: Objection. Irrelevant.

A. I was not. I had a detail of four years to the Atomic Energy Commission in Idaho Falls in reactor development for Army reactor programs.

BY MR. BLANTON:

Q. Mr. Morgan, have you talked to anybody other than your attorneys today to

21

prepare for this deposition?
A. I made a call -- After I first got a call from someone that said some lawyers were looking for me and that I should call a lawyer in Washington before I call that lawyer -- all he knew was about the Nuclear Waste Policy Act.
I called Mike Lawrence, and he told me there was litigation and he had a deposition. And that that was the extent of that discussion.
Q. I'm sorry. I didn't understand what Mike Lawrence said about a deposition.
A. He said he had been deposed regarding a lawsuit and that it was regarding the Nuclear Waste Policy Act. No further details were discussed.
Q. When was that conversation, if you recall?
A. Prior to my call to the lawyers in Washington, DOE.
Q. Weeks? Months? Or how long ago was it, do you think?
A. I have no idea. Probably three months, four months, something like that.
Q. Did Mr. Lawrence tell you anything about the issues --

22

A. No.
Q. -- in the case?
A. No.
Q. Did he tell you anything about -- Did he say that he had been deposed?
A. Yes.
Q. Did he tell you what he had been asked?
A. No.
Q. Have you looked at any documents in preparation for your deposition today?
A. Yes.
Q. What documents have you looked at?
A. The documents given to me by counsel.
Q. You recall what they were?
A. I have them with me.
Q. Okay.
A. Proceedings of the 1983 Civilian Radioactive Waste Management Information Meeting, December 12th through 15th, dated February 1984.
December 20 memorandum of 1991, Approval of Publication of the 1991 Annual Capacity Report.

23

A compilation of comments from various utilities relative to the contract with the utilities.
And then the last item was the Federal Register of Monday, April 18th, 1983, Part II, Department of Energy.
And I happened to find in my files the old Public Law 97-425, January 7, 1983.
Q. Is that the Nuclear Waste Policy Act?
A. Yes.
Q. Do you have any other personal files that involve the Nuclear Waste Policy Act other than just the old copy of the Act?
A. That's it.
Q. Do you recall having seen any of these other documents before preparing for your deposition today? Do you recall seeing them at the time they were published?
A. I did review them during the time that I was acting as director.
Q. How about -- I think you mentioned the 1991 cover letter to the ACR.
A. Yes.
Q. Did you mention that?

24

A. December 20th, 1991?
Q. Yes, sir.
A. Had I seen this?
Q. Had you seen that before preparing for your deposition?
A. No. No.
Q. Have you told me now about all the documents you've looked at?
A. Yes.
Q. Mr. Morgan, at the time you were detailed to DOE just after the passage of the Nuclear Waste Policy Act, what was your title?
A. Director, Nuclear Waste Project Office, as I recall.
Q. What were your duties?
A. Implementation of the Nuclear Waste Policy Act within DOE.
Q. At some point in time did the name of the office become Office of Civilian Radioactive Waste Management?
A. Yes. That was when the political appointee was confirmed by the Senate. So it was after -- it was -- when I left, the name changed.
Q. Do you recall who the political

can't recall whether I had unanimity in certain things, but I would say that not everyone felt the same way about every part of the Act.

So I was ultimately responsible for the definition of what was in there.

BY MR. BLANTON:

Q. What did you decide it meant?

A. Pardon?

Q. What did you decide that the Act meant?

MR. BANES: Objection. Vague. Compound.

A. I really don't understand the question. In other words, the Act as written is what we tried to implement. And there were some interpretations, and we interpreted it a given way.

BY MR. BLANTON:

Q. What problem did you determine that the Act was attempting to solve?

A. What problem?

Q. What problem? Or was there a problem that the Act was trying to solve?

A. Yes, the storage of the nuclear waste from the commercial establishment. That's



what the whole act was about.

(Deposition Exhibit No. 2 marked for identification.)

BY MR. BLANTON:

Q. Mr. Morgan, I've handed you a document marked Exhibit 2 to your deposition, the first page of which is titled Proceedings of the 1983 Civilian Radioactive Waste Information Management Meeting, December 12 through 15, 1983, Washington, D.C., and then it has February 1984 below that.

And then following that we've included the forward and table of contents but we've not included all the papers listed in the table of contents. But we have included the last two pages titled Program Overview. Do you see that in the document?

A. Yes.

Q. First of all, when we -- In reviewing the cover of the document, there are two dates on it. One is December 12 through 15 of '83, and one is February of 1984. Do you know what those two dates refer to?

A. The February 1984 is the date it was published.



Q. And December of '83?

A. The December 12 through 15 of '83 was the time that the meeting took place.

Q. Do you recall this meeting?

A. Yes.

Q. Did you go? Were you there?

A. Yes.

Q. What was the purpose of the meeting?

A. It was basically, as I recall, an information as to what we were doing within DOE and what were some of the issues that we were looking at. And it was basically an overview for those that had interest, including the utilities.

Q. All right, sir. Now, at the time of this meeting, what had happened in the program since the passage of the Act? What progress had you made toward implementing the Act at this point?

A. Okay. The first -- within the first month there were letters that I had the Secretary sign to all the governors as to the process we were about.

We had completed the draft contract as required with the utilities.



Then we had resolved those issues and the Federal Register notice that I referred to before.

And the rest of it was just getting a mission plan outlined as to what our goals were and how we intended to get there.

That was the purpose of this meeting, an information meeting.

Q. And for context, the Act was signed by the President in January of '83. Is that right?

A. That's correct.

Q. So you had -- at the time of this meeting, you had been in your job in the Office of Civilian Radioactive Waste Management -- or Nuclear Waste Office or whatever it was -- basically a year?

A. Just about. It was February that I -- that I recall being asked to take the job. I don't have the dates. Close to a year.

Q. Turning to the page of the exhibit that's marked SN069599, it has the title Program Overview, and then under that it has Robert Morgan, Acting Director of Civilian Radioactive Waste Management. Was that you?

A. Yes.
Q. Did you write this paper?
A. I gave the first initial outline, it was filled in, and then I reviewed it.
Q. Who filled it in for you?
A. As I recall, it was Mike Lawrence and other people on the staff.
Q. Did they produce drafts and then bring the draft back to you and you would edit it and give it back to them?
A. I think it was just the one sequence that we used. I'm not sure. But I think I outlined it. We gave it to the people. They sent in the information. I reviewed it and edited it and presented it.
Q. So do I understand correctly that you actually addressed the group verbally and said what's in this paper?
A. That's my recollection.
Q. Who were the attendees at this meeting?
A. I have no idea.
Q. In general. Was it open to the public?
A. Utilities. Utilities, people from



the Hill, staffers. It was an open meeting.
Q. Let me direct your attention, Mr. Morgan, to the seventh paragraph. That paragraph starts, "I would like to talk a little bit about the strategy as laid out in the mission plan and what we intend to do." Do you see that?
A. Yes.
Q. I'm going to give you a chance to read that whole paragraph before I ask you any questions about it.
(Pause.)
A. All right.
Q. The fourth and fifth sentences of that paragraph say, "In fact, if we accepted one spent fuel element in 1998, we would technically be in accordance with the Act. However, we did not believe that that meets the intent of the Act."
My question is: With respect to what DOE was required to do in January of 1998, what did you believe at this time was the intent of the Act?
A. We put a mission plan together to where hopefully -- again, this was in the



mission plan. I think it's summarized in the last paragraph of the statement on the next page.
Q. What was the source of your understanding of what the intent of the Act was?
A. I don't recall.
Q. The last two sentences of the -- what did I say that was, the seventh paragraph? -- states that, "The basic strategy which we've outlined in the mission plan is that beginning in 1998 utilities will not have to provide any additional storage facilities on site."
Do you see that sentence?
A. Yes.
Q. How did that basic strategy come about?
A. That was my input.
Q. Why did you decide that that was the strategy?
A. That's what I felt was the intent of the Congress. And I think listening to some of the staffers is how I got to that conclusion. But it was my conclusion.
Q. And did the drafts or the outline of the mission plan -- Strike that. Do I



understand you correct that the mission plan, in the state it was when you left, was designed to implement that strategy?
A. That's correct.
Q. So in your view as director of the program, was the mission plan -- Strike that.
Did the mission plan, when you left as director, effectuate the intent of Congress as expressed in the Nuclear Waste Policy Act in your view?
A. I believe so.
Could I add a couple of things to the answer of "I believe so"? There was not unanimity within Congress on the mission plan. I was getting stones from both sides of the aisle and from both houses on the Hill -- or the House and the Senate.
And I felt that as long as we are getting stoned from both directions that we were about in the right place.
So I don't think that I can state what the intent of Congress was. I can tell you that the intent of Congress was not unanimous. Some of the members of the Senate wanted me to put more emphasis on the MRS program, monitored

213

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY )
CONNECTICUT YANKEE ATOMIC POWER COMPANY )
MAINE YANKEE ATOMIC POWER COMPANY )
FLORIDA POWER & LIGHT COMPANY )
NORTHERN STATES POWER COMPANY )
DUKE POWER, A Division of DUKE ENERGY CORP.)
INDIANA MICHIGAN POWER COMPANY )
SACRAMENTO MUNICIPAL UTILITY DISTRICT )
SOUTHERN NUCLEAR OPERATING COMPANY, et al. )
COMMONWEALTH EDISON COMPANY )
BOSTON EDISON COMPANY )
GPU NUCLEAR, INCORPORATED )
WISCONSIN ELECTRIC POWER COMPANY )
POWER AUTHORITY OF THE STATE OF NEW YORK )
OMAHA PUBLIC POWER DISTRICT )
NEBRASKA PUBLIC POWER DISTRICT )
TENNESSEE VALLEY AUTHORITY, )
Plaintiffs, )
v. )
UNITED STATES, )
Defendant. )

DEPOSITION OF ROBERT L. MORGAN

March 21 and 22, 2002 Volume 2, Pg 213 - 330

214

Case Nos.: 98-126C, 98-154C, 98-474C, 98-483C, 98-484C, 98-485C, 98-486C, 98-488C, 98-614C, 98-621C, 99-447C, 00-440C, 00-697C, 00-703C, 01-115C, 01-116C, 01-249C

THE DEPOSITION OF ROBERT L. MORGAN was taken as a witness on behalf of the Plaintiffs, pursuant to Rules of the Court of Federal Claims, at 9:30 a.m. on Thursday, the 21st day of March 2002, at the Eugene Hilton Hotel, 66 East 6th Avenue, in the City of Eugene, County of Lane, State of Oregon, before Eleanor G. Knapp, CSR-RPR, Certified Shorthand Reporter in and for the State of Oregon.

APPEARANCES

For Plaintiffs Southern Nuclear Operating Company, et al.:
BALCH & BINGHAM LLP
Attorneys at Law
1710 Sixth Avenue North
Birmingham, Alabama 35203
205/251-8100
BY: MR. M. STANFORD BLANTON
MR. K.C. HAIRSTON

215

A P P E A R A N C E S
(continued)

For Plaintiff Commonwealth Edison Company:
JENNER & BLOCK, LLC
Attorneys at Law
One IBM Plaza
Chicago, Illinois 60611-7603
312/222-9350
BY: MR. NORMAN M. HIRSCH

For Plaintiff Wisconsin Electric:
PERKINS COIE LLP
Attorneys at Law
1201 Third Avenue, 40th Floor
Seattle, Washington 98101-3099
206/583-8419
BY: MR. RICHARD W. OEHLER

(continued)

216

A P P E A R A N C E S

For Plaintiffs Florida Power & Light, et al.:
SHAW PITTMAN LLP
Attorneys at Law
1650 Tysons Boulevard
McLean, Virginia 22102-4859
703/770-7940
BY: MR. ALEX D. TOMASZCZUK

For Plaintiff Sacramento Municipal Utility District:
ARNOLD & PORTER
Attorneys at Law
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
303/863-2301
BY: MR. DAVID S. NESLIN

(continued)

## A P P E A R A N C E S

For the Defendant:

UNITED STATES DEPARTMENT OF JUSTICE
Civil Division / Commercial Litigation
1100 L. Street, N.W.
Washington, D.C. 20530
202/353-0516
BY: MR. BRYANT S. BANES
MS. HEIDE L. HERRMANN
MR. R. ALAN MILLER

Reported by:

ELEANOR G. KNAPP, CSR-RPR
C & C COURT REPORTING
EUGENE 541/485-0111
SALEM 503/362-9193
TOLL FREE 800/344-0983



## I N D E X


| WITNESS | VOL. 1 | VOL. 2 |
|---|---|---|
| ROBERT L. MORGAN | | |
| By Mr. Blanton | 9, 173 | |
| By Mr. Banes | 169 | |
| By Mr. Hirsch | 176 | 221, 242 |
| By Mr. Banes | | 241 |
| By Mr. Tomaszczuk | | 243 |
| By Mr. Banes | | 301 |
| By Mr. Neslin | | 304 |

EXHIBITS:

| FOR IDENTIFICATION | | MARKED/REFERRED |
|---|---|---|
| 1 | Organizational charts | 25/25,64,79,311 |
| 2 | Proceedings for the 1983 Civilian Radioactive Waste Management Information Meeting | 38/38,47,170, 239 |
| 3 | Standard Contract, Proposed Rulemaking | 67/67,76,137, 228 |
| 4 | Standard Contract, Final Rule | 76/76,84,90,105,109, 130,138,301,304,313 |
| 5 | Report on Financing | 93/93,102,104 |


(continued)



## I N D E X


EXHIBITS:

| FOR IDENTIFICATION | | MARKED/REFERRED |
|---|---|---|
| 6 | 3/4/93 letter from Alabama Power | 106/106 |
| 7 | 4/8/83 memorandum re: final rulemaking | 117/117,284 |
| 8 | 9/7/84 letter to Senator Johnston | 144/144,180, 184 |
| 9 | 12/20/83 cover letter to Edison Electric | 149/149 |
| 10 | 12/20/83 draft, Mission Plan | 149/150,162,177, 221,224,261 |
| 11 | Mission Plan, Volumes I and II | 159/159,162 |
| 12 | U.S. Dept. of Energy's Spent Fuel Storage Policy and Activities | 185/185,190 |
| 13 | 1/28/83 memo, Morgan to staff | 194/194,227 |
| 14 | 3/1/83, Morgan's testimony before Congress | 199/199 |
| 15 | 5/20/83 letter to Morgan from Edison Electric Institute | 201/201 |
| 16 | 6/17/83 letter from Morgan to Edison Electric Institute | 201/202 |
| 17 | FY 1984 Program Guidance for NWF Evaluations | 204/205,226 |


(continued)



## I N D E X


EXHIBITS:

| FOR IDENTIFICATION | | MARKED/REFERRED |
|---|---|---|
| 18 | 6/21/83 memo to Secretary re: MRS | 229/229,274 |
| 19 | Remarks before IAEA, 10/12/83 | 230/231 |
| 20 | Letter to Governor Alexander | 275/275,279 |
| 21 | Draft letter to Governor Bryan | 278/278 |
| 22 | 3/3/83 letter from Northwest States Power Company | 281/281,301 |
| 23 | 2/8/83 comments from Duke Power Company | 282/283 |


INSTRUCTIONS NOT TO ANSWER:

Page 143, line 15 QUESTION: Would treating situations in which a delivery is needed to permit licensed reactor operations to continue a purpose of the Nuclear Waste Policy Act?

Page 179, line 15 QUESTION: Was Table II-1 in this document the schedule or the acceptance rate that DOE had determined at that point was sufficient to prevent the utilities from having to provide additional on-site storage after 1998?

241

we think that's repetitive or not.

But I have a few questions for Mr. Morgan.

E X A M I N A T I O N

BY MR. BANES:

Q. Mr. Morgan, can you turn to -- Let me ask this. With respect to your testimony regarding the Nuclear Waste Policy Act, did you believe that the Nuclear Waste Policy Act imposed or required the Department of Energy to accept spent nuclear fuel or high-level waste at any particular or specific rate prior to the opening of a repository or MRS?

A. No, it did not.

MR. HIRSCH: Objection. Asked and answered and beyond the scope of what I asked.

MR. BANES: Well, I disagree with that, but fine.

BY MR. BANES:

Q. Let's see. With respect to the standard contract, do you believe -- did you believe that it imposed or it required the Department of Energy to accept spent nuclear

242

fuel or high-level waste at a particular or specific rate --

A. No, it did not.

Q. -- of acceptance prior to the opening of a repository or MRS?

A. It did not.

Q. Have any of the documents Mr. Hirsch has showed you today changed that testimony for you?

A. No.

MR. HIRSCH: I have one question based on those questions.

E X A M I N A T I O N

BY MR. HIRSCH:

Q. Did the standard contract require the utility parties who had signed it to continue to pay the 1 mill per kilowatt hour nuclear waste fee whether the repository was opened or not?

MR. BANES: Objection. Calls for a legal conclusion. Answer it if you can.

A. There was the backup, which was the monitored retrievable storage program which could accept fuel and would be covered by the

243

one mill per kilowatt hour -- or as modified in the future if it needed to be changed.

BY MR. HIRSCH:

Q. But my question for you, Mr. Morgan, was: Isn't it correct that the utilities under the contract were required to continue paying the one mill per kilowatt hour fee regardless of whether there was a repository available or not?

A. That's correct.

MR. BANES: Objection. Calls for a legal conclusion.

MR. HIRSCH: I have no further questions at this time, subject to the reservation I made earlier.

MR. BLANTON: We talked about it before we went on the record, but we will make the same reservation on the record regarding additional documents that might be produced.

MR. BANES: We reserve the right to make the same objection we made before.

MR. BLANTON: So reserved.

E X A M I N A T I O N

BY MR. TOMASZCZUK:

Q. Mr. Morgan, good morning. My name

244

is Alex Tomaszczuk. I represent various utilities that are plaintiffs in these cases. And in particular, for the record, I represent Duke Energy Corporation, Indiana Michigan, Florida Power & Light Company, Northern States Power Company, Nebraska Public Power District, Omaha Public Power District, Boston Edison, GPE Nuclear, New York Power Authority, and Public Service Electric & Gas Company.

I want to thank you for making yourself available yesterday and today.

A. You're welcome.

Q. I have a few follow-up questions based on the testimony you've given, and then I have a few documents I want to go over with you as well.

The same ground rules that Mr. Blanton discussed with you yesterday apply here. If you don't understand my question, please let me know. I'll try to rephrase it so we have a common understanding of my question and your answer.

I believe you testified yesterday that you had been previously deposed.

A. Yes.

Q. Can you tell me when your deposition has been taken previously.
A. I cannot recall. It was not relative to the Nuclear Waste Policy Act.
Q. You don't recall, sitting here today, when you've been previously deposed or in what context?
A. No. It was a number of years ago.
Q. Was it in connection with your work for the Department of Energy?
MR. BANES: Objection. Irrelevant.
A. Wait a minute. I had a deposition in Washington, D.C., by the Office of Special Counsel.
BY MR. TOMASZCZUK:
Q. What was the context of that deposition?
MR. BANES: Objection. Irrelevant.
A. It was regarding my activities in Washington, D.C., during the transition of the Secretary of -- Secretary Edwards coming in.
Q. The deposition was taken by the Office of Special Counsel of which agency?



MR. BANES: Objection. Irrelevant.
A. Office of Special Counsel is a separate entity, in my recollection.
BY MR. TOMASZCZUK:
Q. Within the United States Government?
A. Yes.
Q. It's a separate entity within the United States Government?
A. Yes.
Q. And within the United States Government, what agency does that office operate?
A. I have no idea.
Q. What was the purpose of that deposition?
MR. BANES: Objection. Irrelevant.
A. Answering questions regarding accusations by Congressman Dingle.
BY MR. TOMASZCZUK:
Q. Accusations by Congressman Dingle against whom, sir?
A. Beg your pardon?
Q. Against whom were those accusations



made?
A. Me.
MR. BANES: Objection. Irrelevant.
BY MR. TOMASZCZUK:
Q. What was the nature of those accusations?
MR. BANES: Same objection.
A. My recollection is that Congressman Dingle thought that I was running the Department of Energy in certain areas and that I was the shadow secretary or something like that.
All those accusations, by the way -- the Special Counsel has absolved me of any of the accusations. I have that in writing someplace.
BY MR. TOMASZCZUK:
Q. Do you recall the year in which these accusations were made and your deposition was taken?
MR. BANES: Objection. Irrelevant.
A. It was regarding activities in early, let's see, 1981. And the deposition was subsequent to that, of course. And I can't



recall the date.
BY MR. TOMASZCZUK:
Q. So this would have been prior to your taking the position as acting director of the Nuclear Waste Project Office?
A. It had --
MR. BANES: Objection. Irrelevant.
A. It was before I was acting director of the Nuclear Waste Policy Project Office, and it had nothing to do with my activities in the Nuclear Waste Policy Act.
BY MR. TOMASZCZUK:
Q. Other than the deposition that you've just described with reference to the accusations by Congressman Dingle, have you been deposed on other occasions?
A. I believe so.
Q. Can you briefly tell me what those occasions were?
A. No. I don't recall. I think one was an automobile accident to which I was a witness, as one. And that's a number of years ago. I don't believe that I was in the Department of Energy or Atomic Energy Commission

at that time.
Q. Now, we've seen through some of the documents that my colleagues have shown you and asked you about that you've testified on the Hill. Is that correct?
A. Yes, I have.
Q. Do you know how many times you've testified on the Hill with respect to your work at DOE?
MR. BANES: Objection.
A. Probably up to a dozen times.
BY MR. TOMASZCZUK:
Q. And of those dozen times you've testified, how many instances related to the Nuclear Waste Policy Act work that you've done?
A. Three or four, to my recollection.
Q. Do you recall which committees those -- that testimony was given to?
A. Udahl, Ottinger, Bennett Johnston, I believe.
Q. So it was both the House and Senate side?
A. Yes.
Q. And do you recall when?
A. No. That's a matter of record.



I'm sorry. I don't recall the dates.
Q. Would it have been in 1983 and 1984?
A. Yes. Those associated with the Nuclear Waste Policy Act would be in '83 and '84.
Q. After you left your position as director of the Nuclear Waste Policy Act Project Office, did you have occasion to testify before any Congressional committee with respect to the Nuclear Waste Policy Act?
A. I don't believe I did.
Q. You testified yesterday, Mr. Morgan, about the position of acting director of the Nuclear Waste Policy Act Project Office being offered to you and then the short period of time within which you had to consider that opportunity. Is that right?
A. I don't think I had an opportunity to consider it.
Q. And why do you say that, sir?
A. Because when I said I'd like to think about it, I was told that the Secretary was going to announce it on Monday at the staff meeting.
Q. So you understood that you were



essentially being told to take the job?
A. That was my understanding at the time.
Q. Were you concerned about that?
MR. BANES: Objection. Vague.
BY MR. TOMASZCZUK:
Q. Do you understand my question?
A. One is always concerned about the responsibilities associated with a change of job -- and the responsibility of the Nuclear Waste Policy Act, because of the -- what I considered the obstacles that were in the way.
Q. What were those obstacles as you perceived them at the time?
A. Potential litigation, change of legislation, not a conference report on the legislation that existed for the Nuclear Waste Policy Act, the licensing requirements by NRC, the schedule, the process that was outlined in the Nuclear Waste Policy Act.
I think those were the areas that I considered extremely difficult.
Q. Do you know why you were tapped to take the position?
A. I have no idea. That would be



speculative. I think I answered that yesterday.
Q. I think you said because you were a good guy, as I recall.
A. That was a smart-ass remark.
Q. And I was trying to find out if there was some other reason of which you were aware that you could testify.
A. Evidently it was based on my job performance and reputation.
Q. At that point in time at which the position had been offered to you, how long had you known Secretary Hodel?
A. I don't recall the date that Jim Edwards left and Don Hodel came in. I don't recall.
Q. My question was how long had you known Secretary Hodel at the time the position was offered to you.
A. I would -- I did not know Secretary Hodel until he became the Secretary of Energy. I did not have any previous contacts or exposure to him at all.
Q. At the time you took the job, was there some understanding that you would be in it for a certain period of time or was it

open-ended?
A. The understanding is that I would be in this position until a presidential appointee was confirmed by the Senate. And that, in my opinion, is open-ended.
Q. And so it turned out that you were in the position roughly 15 months or so. Do I have that right?
A. I think it was less than that. I'm not sure of the date that I left -- left the Office of the Nuclear Waste Policy Act and went to the job of Acting Assistant Secretary for Defense Programs. I'm sure that's a matter of record somewhere in the Department of Energy.
Q. At the time you left the job, did you have any discussions with Secretary Hodel or anyone else at DOE about your performance in it?
A. After I left? Is that the question?
Q. At or about the time you were leaving, did you have any discussions with Secretary Hodel concerning your performance in the position?
A. I received a special award for performance, cash award.
Q. And that award was presented to you



by the Secretary?
A. I'm sure that he passed on it.
Q. Was there an award ceremony of some kind?
A. I had received numerous awards of cash from the Department, and there had been ceremonies. I don't know if there was one specifically associated with the Nuclear Waste Policy Act.
Q. Who are the individuals that you most relied upon while you were serving as acting director of the Nuclear Waste Policy Act Project Office?
A. The key people in the organization: Mike Lawrence, McElvey, and then the three other people, Rosselli, and Bennett.
Q. Now, those were all direct hire employees of the Department of Energy. Correct?
A. Yes.
Q. Did you rely on any contractors?
A. We had a support service contract -- contractor. And we used the various on-site contractors such as PNL for certain activities and we used their input.
Q. And within that group of



contractors, were there any individuals on which you personally relied upon?
MR. BANES: Objection. Vague.
A. I -- I don't recall.
BY MR. TOMASZCZUK:
Q. Sitting here today, no one that stands out in your memory as providing a particular service to you or was particularly helpful to you?
MR. BANES: Objection. Vague.
A. No.
BY MR. TOMASZCZUK:
Q. At the time you assumed the position of acting director, how many people reported to you?
A. I do not recall.
Q. 100?
A. I don't believe it was that high initially, but it did -- in other words, when the office opened, I had X number of people, but that number did grow.
Again, that's a matter of record within the Department of Energy in the management and administration division.
Q. Did your office have some



alphabetical or numerical designation? Let me explain by way of background.
I believe you testified in response to a question by Mr. Hirsch this morning that your office was not S-10. Do you recall that testimony?
A. Yes.
Q. Was there some alphabetical or numeric --
A. I think it was RW. I think it was RW. I know that it was RW after the OCRWM designation.
Q. I understood you to testify yesterday, Mr. Morgan, about a PERT chart. Do you recall that testimony?
A. Yes.
Q. Did I understand you to say that you had prepared a PERT chart to brief Secretary Hodel with respect to the Nuclear Waste Policy Act obligations?
A. Yes.
Q. Was that a written document?
A. A PERT chart is a network arrangement. It's like a critical path layout that you use in construction -- what activities

257

that you can do in parallel, what activities have to follow another activity and then what leads from that. It's a network analysis.

Q. And is that a document that you prepared?

A. Let's say that I did the first level and then other people filled in the subsequent level two and three.

Q. And was the document finalized at some point in time?

A. By reference into a bar chart that we used at a later point in time showing the schedule of activities in bar graphs.

Q. And you used the final version of this PERT chart to brief the Secretary?

A. Yes.

Q. You've been shown various documents yesterday and today. Does that PERT chart appear in any of the documents you've been shown?

A. I have not seen it in the documents that have been provided.

Q. Do you, by chance, have a copy of it?

A. Beg your pardon?

Q. Do you have a copy of the PERT

258

chart?

A. No, I do not.

Q. Do you know where it might be located?

A. I have no idea.

Q. Was it physically in your office at the time you left to assume your position down in Savannah River?

A. I don't know.

Q. Did you --

A. By the way, I left not to go back to Savannah River. I left to take the job as Assistant Secretary for Defense Programs.

Q. I'm sorry. I thought you were physically located in Savannah River at that time. I misunderstood.

A. No. My physical assignment was manager of Savannah River.

The Assistant Secretary for Defense Programs is located in the DOE headquarters in the Forestall Building.

Q. I apologize for the misunderstanding. I appreciate the clarification.

A. Thank you.

259

Q. Did the Secretary's office keep a copy of the PERT chart?

MR. BANES: Objection. Calls for speculation.

A. I have no idea.

BY MR. TOMASZCZUK:

Q. Do you know who in your office would have had a copy?

A. Probably Mike Lawrence.

Q. Did he help prepare it?

A. Yes.

Q. Other than Mr. Lawrence and yourself, who worked on or helped prepare the PERT chart?

A. There was input on the third and fourth levels, you know, when it went down where I know Bennett and Rosselli would have played.

And there was a similar one for an MRS. There was one for a repository and one for the MRS.

Q. How many pages would have compromised the PERT chart?

A. I have no recollection. There's level one that goes on one page, and then level two and three are a blow-up from that so that it

260

would amount to several pages.

Q. And would the pages have been on 8 1/2-by-11 paper or a different size?

A. We started out -- when you start drawing bubbles -- I call it a bubble machine -- you use a sheet of paper. That's full desk size, like a pull-off chart, you know, 3 foot by 4 foot.

Q. To the best of my knowledge, Mr. Morgan, we have not received a copy of the PERT chart that you've just described.

MR. TOMASZCZUK: And I would like to respectfully request that we receive a copy of that.

MR. BANES: To the extent such documents exist, we believe it's already been provided.

MR. TOMASZCZUK: Do you know in what production or where I might find the PERT chart? Because we have not been able to locate it.

MR. BANES: Nor have we.

MR. TOMASZCZUK: So it's not been produced, I gather, because if you haven't located it, it obviously hasn't been provided to

261

us. Just so I'm clear.
MR. BANES: Yeah. We don't have it either -- at least we haven't identified it. If it's in the documents, we have not identified it yet, although we have tried.
BY MR. TOMASZCZUK:
Q. You --
A. Let me interrupt you. If you would look at Exhibit No. 10, in the back of that there's a bar chart called SN045236.
MR. BANES: That's the Bates stamp number in that document.
MR. BLANTON: Is that the mission plan, Mr. Morgan?
THE WITNESS: Draft mission plan I just pulled the first document.
MR. BANES: Exhibit 10?
MR. TOMASZCZUK: Yes.
A. That's a bar chart. Okay? I'm on -36. I don't know what that page was, that page you just had.
BY MR. TOMASZCZUK:
Q. That appeared to be page 4-4 of what I understand to be Morgan Deposition Exhibit 10.
MR. OHLER: Can we go off the

262

record for a minute?
(A discussion was had off the record.)
A. That and --
BY MR. TOMASZCZUK:
Q. When you say that, you are referring to page 3-B-5 of Morgan Deposition Exhibit 10?
A. This page (indicating).
Q. Yes.
A. That's a bar chart, bar graph, of milestones and activities. To generate --
Q. And this particular figure relates to the MRS. Correct?
A. To generate such a chart, the precursor to that is a network analysis that tells you when you can start and when you stop an event.
This is a graph showing the activities, as an example, for the MRS. Behind this, as a working document -- in order to get these things laid out in time schedule, you have to have a network analysis that shows what you can do in parallel and what you can do or what you can't do sequentially. That's a -- that's a network analysis process. This is the result of

263

that process.
I don't know if the PERT charts, backing up similar schedules that would have been published, are still in existence.
These were things that were published. It's very difficult to publish a PERT chart because they will end up as big as this table when you get to about a level four. And if you try to reduce that in size, you lose it. It's a management technique.
Q. And your testimony is that three of these charts were prepared, one for the contract itself or the -- I'm sorry -- for the Nuclear Waste Policy Act obligations of DOE. Correct?
MR. BANES: Objection. Mischaracterizing testimony.
A. I don't know -- I don't know --
BY MR. TOMASZCZUK:
Q. I'm not trying to mischaracterize your testimony. I just want to understand.
A. I believe you have mischaracterized it.
Q. All right. Tell me how.
A. The Nuclear Waste Policy Act has specific items required in it. Those are

264

milestones that exist. You don't need a PERT chart to lay that out. You can lay that out in a page. Okay?
But the activities that you must do -- the site characterization, the drilling, all the exploratory work -- that has to go in a sequence. You drill a hole, you drill side trenches, and all the other things. That, in my mind, always starts out with a network analysis, a, quote, PERT chart.
The use the word "PERT" is a step beyond it. It's a probability analysis, so I better correct it and say it was a network analysis rather than a PERT chart. But it lays out the network.
So there was one for the MRS and one for the repository that I recall participating in.
Q. So there were two of these PERT network analyses prepared?
A. Yes.
Q. And there was not a third one prepared with respect to DOE's obligations under the Nuclear Waste Policy Act?
MR. BANES: Objection. Calls for

speculation. Vague as to time.
A. Absolutely not. I'm sorry. I'm getting hot.
MR. BANES: Do you want to take a break?
THE WITNESS: Yes. I'd appreciate it.
(A recess was taken.)
BY MR. TOMASZCZUK:
Q. Mr. Morgan, my notes reflect that Mr. Hirsch asked you whether or not you had occasion to discuss spent nuclear fuel management issues with any representative of Commonwealth Edison, his client in this case. Do you recall that?
A. Yes.
Q. I believe you said no, that you had not had any such discussions with representatives of Commonwealth.
A. I don't recall.
Q. Do you recall, sitting here today, any discussions of spent nuclear fuel management issues with any representatives of any utilities?
A. Oh, yes.



Q. What do you recall about your discussions of spent nuclear fuel management issues with utility representatives?
A. I recall several discussions regarding comments from the utility representatives -- or representative that they felt that the waste fund that was the contribution of the one mill per kilowatt hour was their money and that they wanted to participate in the management of the program.
I advised that person that it was the ratepayers' money, that they were charging to the ratepayers, and that the Nuclear Waste Policy Act did not give them any management of the program.
And I met, at one case I know, in a large conference room with representatives from utilities, a large group in a conference room someplace -- it might have been at EEI or elsewhere -- to where there was an exchange and discussions. I don't recall the content of those.
Q. The discussion that you had with the utility representative regarding the use of the waste fund and the monies therein, do you recall



with whom you had that discussion?
A. Loring Mills.
Q. Who was Mr. or Ms. Mills? Was it Mr. or Ms. Mills?
A. Loring, Mr. He was a representative of EEI.
MR. BANES: L-o-r-i-n-g.
BY MR. TOMASZCZUK:
Q. Did you have discussions with other utility representatives along the lines of that that you had with Mr. Mills?
A. I don't recall.
Q. And you don't recall any specifics about the meeting that you had with representatives of the utilities?
A. I don't recall.
Q. How would you characterize these conversations and meetings? Were they pleasant?
MR. BANES: Objection. Vague as to time.
BY MR. TOMASZCZUK:
Q. Unpleasant? How would you characterize them?
A. I would say most of them were pleasant.



I got tired of hearing some of the same litany from one person, Mr. Mills, and I guess I'd have to say that they became unpleasant with him.
Q. How did they become unpleasant with Mr. Mills?
A. Covering the same subject, wanting to tell me how to run the program.
Q. What was the basis for your statement to Mr. Mills that the monies in the waste fund belonged to the ratepayers?
A. That was my interpretation of where the money was coming from.
Q. Was that based on some analysis you had done?
A. No. The utilities, in my mind, were going to pass on to the ratepayers any additional revenues that they had to disburse under the waste fund.
Q. What was the basis for that knowledge?
A. My understanding.
Q. At the point in time that you had that understanding, had you ever had occasion to work for a commercial utility?

MR. BANES: Objection. Irrelevant.

A. I consulted with South Carolina Electric & Gas. I consulted for them on the V.G. Sumner plant.

BY MR. TOMASZCZUK:

Q. But that was after you left Government service. Correct?

A. Yes.

Q. I was trying to find out at the time that you had this understanding that you testified about with respect to the ratepayers' money into the nuclear waste fund, had you ever worked for a commercial utility?

A. No.

Q. I believe you testified yesterday that you had gotten a call from Ed Johnson with respect to your deposition.

A. Yes.

Q. And do I understand your testimony that Mr. Johnson called you?

A. Yes.

Q. And he --

A. My recollection of that phone call was that he was -- that someone in DOE was



trying to locate me. And I had known Ed, and he chased me down through someone. And I don't know who it was.

And he said I'm going to -- it was a lawyer about some litigation and that he was going to call them and let them know where I was and that I should expect a call from someone.

Q. Were you surprised to get his phone call?

A. Yes.

Q. You then had a subsequent conversation with Mr. Lawrence? Do I understand that correctly?

A. Yes.

Q. Did you contact Mr. Lawrence?

A. Yes.

Q. And that was after Mr. Johnson contacted you?

A. Yes.

Q. All right. What did you say to Mr. Lawrence?

MR. BANES: Objection. Asked and answered.

A. What did I say?



BY MR. TOMASZCZUK:

Q. As best you can recall.

A. I asked him -- I said, "Have you been contacted, you know, about some litigation?" He said yes, and it was regarding the Nuclear Waste Policy Act.

And that was about the end of the conversation.

Q. I think the transcript will reflect and my notes reflect that Mr. Lawrence said that he had been deposed.

A. Yes.

Q. And did he say that he had been deposed in connection with these cases or some other matter?

A. No. He had been deposed on this case.

Q. And did he say by whom?

A. No.

Q. What, if anything, else did he say about that deposition?

A. Nothing. We both recognized that it was a situation that we should not discuss, quite honestly.

Q. Why was that?



A. Because I think it would be improper for him to discuss a deposition with me.

Q. Why do you have that understanding?

A. Common ethics and conduct, professional conduct.

Q. Did you have a discussion with him to the effect that you shouldn't discuss what had been the subjects on which he had been deposed about?

A. I don't recall how it happened, but -- whether we both understood or just said that okay, that's enough, thank you very much. I think I cut it off with that.

Q. After you had the discussion with Mr. Lawrence, what happened next with respect to your either preparation for or attendance at this deposition?

A. First I was contacted by a lawyer in DOE who is, as I understand, the person that talked to Ed Johnson. And then I was called by attorneys from the Department of Justice.

Q. Do you recall the name of the lawyer at DOE that contacted you?

A. No.

Q. Was it a man or a woman? Do you

273

remember?
A. It was a man.
Q. Are you searching for a document or a note to --
A. A note that I made -- might have made at the time. I have a note, "Contacted by Dave Zicranski" (phonetic).
Q. Could that be Dave Zibranski?
A. I don't know. I wrote it down as Z-a-c-r-a-n-s-k-i. Telephone number 202-586-9198, which I believe is a DOE headquarters exchange.
MR. BANES: The Government will represent that is Dave Zibranski's number.
THE WITNESS: Pardon me?
MR. BANES: That is Dave Zibranski's number.
BY MR. TOMASZCZUK:
Q. When were you contacted by Mr. Zibranski?
A. I don't recall the date. Within a day or two of my phone call with Ed Johnson.
Q. And what did Mr. Zibranski say to you?
A. He asked me if I was the Morgan that

274

was in charge of the Nuclear Waste Policy Act thing. And then he told me I would be contacted by office -- or the Department of Justice.
Q. Did he talk at all about the substance of the case?
A. Not that I recall.
Q. Short conversation, then, I presume.
A. Yes.
Q. Have you ever heard of a term "nuclear waste disposal task force"?
A. I don't recall that name.
Q. While you were serving as acting director, do you recall setting up or creating a nuclear waste disposal task force?
A. No.
Q. In one of the documents that Mr. Hirsch showed you this morning -- I believe it was Exhibit 18 -- the subject of interim storage was addressed.
A. Yes, monitored retrievable storage.
Q. What was your role and involvement during your tenure as acting director with respect to the development of an MRS system?
A. That was totally under my direction.
Q. And in that regard, what did you do

275

to pursue that issue?
A. Many things.
Q. Tell me about them.
A. Well, I don't understand -- you know, I don't understand your question.
Q. Okay.
A. I think it's too broad, and I just don't want to deal with it.
Q. Well, were you involved in any way in studying the feasibility of creating an MRS?
A. Yes.
Q. And what was your personal involvement in that effort, if any?
MR. BANES: Objection. Irrelevant.
A. I recall, again, working on a network analysis on schedule, talking about the layout, some of the things that would have to be done.
I met with Bennett Johnston and staff members regarding his high level of interest in monitored retrievable storage to ensure that that was not hurt at the expense of a repository. In other words, he wanted to make sure it was appropriately funded and supported.

276

BY MR. TOMASZCZUK:
Q. I'd like to hand you a document, Mr. Morgan, and ask the court reporter to mark it as Exhibit 20.
(Deposition Exhibit No. 20 marked for identification.)
BY MR. TOMASZCZUK:
Q. This appears to be a two-page document with the Bates number PNL-089-2195 and the second page is -2196.
A. Yes.
Q. And it has stamped in the upper right-hand corner April 6, 1983?
A. Yes.
Q. This is a letter from you, Mr. Morgan, to Lamar Alexander --
A. Yes.
Q. -- the then governor of Tennessee?
A. Yes.
Q. Do you recall this letter?
A. Yes.
Q. Did you draft it?
A. I signed it.
Q. Okay. Do you recall why you were sending this letter to Governor Alexander?