277

A. This was relative to interim storage, not monitored retrievable storage. Similar letters were sent, in my recollection, to the governors of South Carolina, Illinois, and maybe Idaho.
MR. BANES: Object to this line of questioning as irrelevant since the federal interim storage provisions of the Act have now expired.
BY MR. TOMASZCZUK:
Q. Do you understand that the federal interim storage provisions of the Act have expired?
A. I beg your pardon?
Q. Do you understand that the federal interim storage provisions of the Nuclear Waste Policy Act have expired?
MR. BANES: Objection. Calls for a legal conclusion.
A. I don't know that.
BY MR. TOMASZCZUK:
Q. At the time you drafted this letter, the Nuclear Waste Policy Act had certain requirements with respect to interim storage. Is that correct?

278

A. Yes.
Q. In the second paragraph of this letter to Governor Alexander, you wrote, "By the year 2000, approximately 58,000 metric tons of fuel will have been discharged from commercial reactors." Do you see that?
A. Yes.
Q. Was that a true statement at the time you wrote it?
A. I believed it to be true at the time I wrote it -- or signed it.
Q. And the reason you sent this letter to Governor Alexander was the possibility, as reflected in the third paragraph of the letter --
A. That's correct.
Q. -- that federally-owned facilities which might be suitable for interim storage of spent fuel were those situated at Oak Ridge National Laboratories?
A. That's correct.
Q. I'm going to ask the court reporter to mark and hand you another document. This will be Morgan 21.
(Deposition Exhibit No. 21

279

marked for identification.)
BY MR. TOMASZCZUK:
Q. This is a document that appears to be a draft letter, and it has the Bates numbers PNL-086-0153 through -0155.
MR. BANES: The Government poses the same objection to this exhibit as the last.
MR. TOMASZCZUK: I'm sorry. For the record, just so I know, what is that objection?
MR. BANES: It's irrelevant because the terms of -- the federal interim storage terms of the Nuclear Waste Policy Act have expired and are now irrelevant.
BY MR. TOMASZCZUK:
Q. Can you identify this document for me, Mr. Morgan?
A. It says it's a draft to the governor of Nevada. And it shows my signature block down on the bottom, but it is unsigned.
Q. Do you know what the purpose of this draft letter was?
A. The same as Exhibit 19 -- 20. I thought that we sent that letter to all of the governors where there were federal facilities

280

that might be used for interim storage.
Q. In the second paragraph of this draft letter, the sentence -- the first sentence of the second paragraph reads, "With respect to this latter requirement, we note that by the year 2000, approximately 58,000 metric tons of fuel will have been discharged from commercial reactors."
Do you know whether that was a true statement at or about the time this draft was prepared?
A. I felt it was a true statement. I felt it was a true statement on the letter I signed. And I don't -- since you don't show me a copy of a signed one, I don't think this is relevant. Excuse me.
Q. My question was simply whether or not you believed that.
A. I answered that question relative to Exhibit 20. It's the same question and the same draft letter.
Q. If I had the final version, I would have provided it to you, but this is the draft that I have.
A. If I signed it, the answer would be

281

I believed it to be true if I signed it. I don't sign things I don't think are true. Excuse me.

Q. Okay. I'm going to ask the court reporter to mark and hand you another document.

(Deposition Exhibit No. 22 marked for identification.)

BY MR. TOMASZCZUK:

Q. This appears to be a letter from Northern States Power Company to you dated March 3, 1983. And it has in the lower right-hand corner the Bates numbers HQR-052-0163 through -0167.

A. Yes.

Q. Do you recall, Mr. Morgan, receiving these comments in or about March 1983?

A. I don't recall. We received many letters from many utilities. I don't specifically recall this one.

Q. I was going to ask you about the first page of these comments and, in particular, under the numerical heading 1, the third paragraph starting with the word "Further."

A. Yes.

Q. And this paragraph reads, "Further, the contract should have a clear statement of intent that DOE shall incur a contract obligation to take delivery of all spent fuel and high-level waste at the earliest practicable time upon the request of the owner or generator of such fuel and waste."

Do you know whether that comment was reflected in any way in the standard contract that was ultimately published by DOE?

MR. BANES: Objection. Calls for a legal conclusion. Asked and answered.

A. I believe that there is in the resolution process or -- whether it was in the first draft or the final rule -- that words "as early as practicable" I believe were in there.

But clearly there is no schedule for receipt or commitment that is covered in the contract.

BY MR. TOMASZCZUK:

Q. I'm going to hand you another document and ask the court reporter to mark it. And I believe we're up to No. 23.

(Deposition Exhibit No. 23 marked for identification.)

BY MR. TOMASZCZUK:

283

Q. Morgan 23 appears to be preliminary comments from Duke Power Company dated February 8th, 1983. And this exhibit is a three-page document which has in the lower right-hand corner HQR-052-0147 through -0149.

And, Mr. Morgan, do you recall receiving this document in or about February 1983?

A. No.

Q. I'd like to direct your attention to the third paragraph of these comments that starts with the word "second."

A. Yes.

Q. Do you see the reference there in the second and third lines to the effect that Duke believed it is appropriate that the purchaser be granted audit rights regarding DOE expenditures from the fund?

A. I see that here.

Q. Do you recall that issue being addressed at or about this time?

A. I don't see any cover letter that this was transmitted to the Nuclear Waste Policy Act Office. I can't deal with that. I don't recall. You haven't shown me that this was transmitted to the Department.

Q. That's a fair point. My question was whether or not you recall the issue of audit rights, of utility audit rights coming up.

A. Audit rights was involved in the resolution on the final rule. And it was denied.

Q. And do you recall why it was denied?

A. I think it's self-explanatory in the rule.

Q. In the lower right-hand corner of this document is the designation HQR. Do you know what that refers to?

A. No.

Q. If I said it stands for headquarters, would that sound right to you?

A. That would sound right for me.

Q. Do you know whether the document came from DOE headquarter files?

MR. BANES: Objection. Calls for speculation.

A. I have no idea.

BY MR. TOMASZCZUK:

Q. I'd like you to now turn to an exhibit that was used yesterday, I believe, with

Mr. Blanton. And that would be Morgan Exhibit 7. Do you have that?
A. Yes.
Q. I believe, for the record, this was an action memo that -- from your office to the Secretary dated April 8, 1983.
A. Yes.
Q. I'd like to direct your attention to the very last page of this document, Bates stamp ZAB-001-0902.
A. Yes.
Q. Actually, you can go back to the previous page if you like. I'm going to ask you to direct your attention to paragraph seven there entitled Utilities Rights to Audit the Waste Disposal Fund with the words "rights" and "audits" in quotes.
A. That's on the bottom of page -901.
Q. Yes, sir.
A. Yes.
Q. And continues on to page -902.
A. Yes.
Q. At page -902 appears the sentence, "Additionally, the utilities will be able to get programmatic access from several other sources."



Do you see that?
A. Where is that located?
Q. At the very last page of the document, -0902, in the middle of the page there, the sentence starting with the word "Additionally" --
A. I see it.
Q. -- "the utilities will be able to get programmatic access from several other sources," colon, and then there's listed what appear to be several sources there.
A. Yes.
Q. What do you understand to be meant by the term "programmatic access" as that term is used here?
A. Access to the program is what we are doing, what are the activities to carry out the implementation of the Nuclear Waste Policy Act.
Q. And it's stated here that utilities will be able to get access to information relating to your office's activities. Is that fair?
A. That's fair.
Q. How was that information provided to the utilities?



MR. BANES: Objection. Calls for speculation and lack of foundation.
A. Beg your pardon?
BY MR. TOMASZCZUK:
Q. How was this reference to programmatic access met?
MR. BANES: Objection. Lack of foundation. The witness has not testified that he has worked for either the DOE IG, GAO, or the OMB.
BY MR. TOMASZCZUK:
Q. Do you understand my question?
A. No. Would you repeat it, please?
MR. TOMASZCZUK: I would ask the court reporter to read it back.
(The question appearing on page 287, lines 5 - 6, was read as follows: QUESTION: How was this reference to programmatic access met?)
MR. BANES: Objection.
A. But it says the utilities will be able to get programmatic access from several other sources. It says that that's available if they ask for it.
I don't know if there were any



requests from the utilities for programmatic access or programmatic information that they hadn't already gotten from me.
We shared all the program planning documents with the utilities initially. And I don't think that this was ever kicked in because I don't think the utilities ever were denied anything relative to programmatic access.
BY MR. TOMASZCZUK:
Q. And do I understand this paragraph to essentially conclude that because the utilities would be able to get programmatic access, there was not going to be an audit provision put in the contract for the benefit of the utilities?
A. I think that the --
MR. BANES: Objection. Asked and answered.
A. It says, "Out of sheer history, there is clearly no precedent for the private sector to audit the Federal Government."
I believe that was what -- the reason that it was denied. And then it went on to say where you could get information if you weren't getting it from the program office.

289

BY MR. TOMASZCZUK:
Q. One of the sources of information that's referenced there is "legislatively mandated waste fund report on an annual basis to the Congress."
A. Yes.
Q. Do you know what report that's referring to?
A. It's an annual report to Congress required by the Nuclear Waste Policy Act.
Q. And did you have a hand or role in preparing any such annual report?
A. I don't recall. And I don't recall whether there was an annual report submitted to Congress during my tenure.
Q. We haven't covered such an annual report or looked at one in the course of the various documents that you've looked at in the course of your deposition, have we?
My question was: During the various documents that we've used with you during your deposition, have you seen such an annual report?
A. No, I have not.
Q. Did I understand your testimony late in the day yesterday, Mr. Morgan, to draw a

290

distinction between planning goals as set forth in the mission plans that Counsel asked you about and policy?
MR. BANES: Objection. Vague.
A. I really don't understand the question.
BY MR. TOMASZCZUK:
Q. That's fair. I had understood you late in the day yesterday to draw a distinction between planning goals as set forth in the mission plan -- You recall that subject. Right?
A. Yes.
Q. You said that on several occasions.
A. Yes.
Q. The mission plan had planning goals in it.
A. Right.
Q. I thought you had attempted to draw a distinction late in the day yesterday between planning goals and official DOE policy.
Now, maybe I'm wrong -- and if so, please correct me -- but I thought you were drawing a distinction between those two concepts.
A. I know I was drawing a distinction

291

between the mission plan and the contract. Okay? I do not understand what you mean by "policy."
Q. Well, the transcript may or may not show the use of that term. My notes reflect it, and maybe I misunderstood.
I thought you were drawing that distinction, and I'm simply trying to understand it. If there isn't one, then fair enough.
MR. BANES: Objection. Vague. I think the witness --
BY MR. TOMASZCZUK:
Q. Do you draw in your mind a distinction between planning goals and DOE policy?
MR. BANES: Objection. Vague. I think the witness has testified he doesn't know what you mean by "policy."
A. Yeah. DOE policy is to comply with the Nuclear Waste Policy Act, you know? And I don't know what type of policy issues that you are trying to reflect.
And if I used the word, I probably misused it. And I'd be happy to go back and clarify if we could pull up that testimony.

292

BY MR. TOMASZCZUK:
Q. All right. But in any event, you were attempting to draw and still believe that there's a distinction between planning goals as reflected in the mission plan and perhaps other documents --
A. Right.
Q. -- and then DOE's contractual obligations. Is that right?
A. And/or Congressional requirements.
Q. So there's a distinction between, on the one hand, planning goals and then Congressional requirements on the other?
A. Yes. Yes.
Q. And there's a distinction between planning goals and contractual requirements in your mind as well?
A. Yes. Yes.
Q. Do you know whether that distinction was ever communicated to the utilities?
A. Oh, I believe that it was.
Q. When?
A. I -- I just can't believe that when we were dealing with the contract and didn't put a schedule in that because of the uncertainties

that I could see in the schedule -- and I
certainly, you know --
It was communicated clearly in the response to the comments from the proposed contract.
Q. Please direct me to where that was communicated clearly in any of the documents in front of you.
MR. BANES: We would object. It's probably not limited to the documents contained in front of him. There's probably numerous documents that do that.
BY MR. TOMASZCZUK:
Q. Is that distinction drawn in any of the documents used with you in your testimony? Let's start there.
A. I haven't read all the documents that have been handed me. If you want me to take the time to read every document to see if I can find that, I'd be happy to.
Q. Sitting here today, you don't recall where such a distinction appears in any of the documents that have been shown to you?
MR. BANES: Objection. The witness has not had sufficient opportunity to



read in detail every one of the documents handed to him.
MR TOMASZCZUK: That wasn't my question. You want to read my question back?
(The question appearing on page 293, lines 21 - 23, was read as follows:)
QUESTION: Sitting here today, you don't recall where such a distinction appears in any of the documents that have been shown to you?)
A. I have not read the documents -- all of the documents, every page of what's been handed to me or shown to me today. So I would -- so I can't answer the question.
BY MR. TOMASZCZUK:
Q. Well, during your testimony during the last day and a half, you don't recall seeing such a reference in any of the testimony that you've provided?
MR. BANES: Objection. Irrelevant.
A. I don't recall.
BY MR. TOMASZCZUK:
Q. Now, I asked you earlier this morning about your meetings and communications



with representatives of the utilities. Do you recall that?
A. Yes.
Q. And you didn't recall anything about drawing this distinction between planning goals and contractual requirements in that testimony, did you?
MR. BANES: Objection.
A. Excuse me. You don't have to be a rocket scientist to look at the draft mission plan and the contract and say that there's clearly a distinction between an acceptance rate that we had in here and the contract does not reflect that.
That's obvious to me, and it should be obvious to everyone else reading those two documents.
BY MR. TOMASZCZUK:
Q. And my question to you, sir, is: Did you communicate that to the utilities?
MR. BANES: Objection. Asked and answered.
BY MR. TOMASZCZUK:
Q. And if so, when and how?
MR. BANES: Objection. Asked and



answered.
A. The two documents had been transmitted to them.
The resolution of the rulemaking clearly said we don't have an acceptance rate in the contract while there is one in the draft. Anybody reading those two documents ought to be able to understand that.
And if that isn't communication, I don't know what is.
BY MR. TOMASZCZUK:
Q. My question, though, sir, wasn't limited to acceptance rate. I was trying to get at this distinction that you drew between contractual requirements and policy and whether or not that distinction --
A. I thought we dealt with this as to what policy was.
MR. BANES: Objection. Irrelevant.
BY MR. TOMASZCZUK:
Q. I'm sorry. Contractual requirements and planning goals. Excuse me. I misspoke.
A. Yes.
MR. BANES: Objection. Overbroad

and beyond the scope of the schedule issues. We are talking about acceptance rates in this deposition. If the question goes beyond that, then it's irrelevant.

BY MR. TOMASZCZUK:
Q. I understood your last answer, Mr. Morgan, to refer to acceptance rates, and I was asking perhaps a slightly different question. And I just wanted to make sure I understood your answer.
And my question is: Was the distinction between contractual requirements and planning goals provided to the utilities?
MR. BANES: Objection. Asked and answered.
A. The distinction is evident from the two documents, the contract and the mission plan. I don't think I can make it any clearer.
MR. BANES: Do you have much more, Alex? Do you want to take a break?
MR. TOMASZCZUK: If you want to take a break, that's fine with me.
THE WITNESS: Thank you.
(A recess was taken.)
BY MR. TOMASZCZUK:



Q. Mr. Morgan, were the utilities to rely in any way upon the planning documents that your office issued?
MR. BANES: Objection. Vague.
A. I really don't understand your question.
BY MR. TOMASZCZUK:
Q. All right. Well, it's fair to say that during your testimony you referred to planning documents. Right?
A. That's correct.
Q. And there are a bunch of them, aren't there? There are extensive planning documents?
A. The mission plan is the primary planning document.
Q. A document of substantial size just in terms of its physical size. Right?
A. Yes.
Q. What were the utilities supposed to do with it when they got these documents, these planning documents?
A. This was to inform them of what our plans were relative to reaching the goals that we felt were appropriate for the Nuclear Waste



Policy Act.
Q. Was it your understanding that the utilities would rely on those planning documents to manage their own spent nuclear fuel requirements?
MR. BANES: Objection. Lack of foundation and vague.
A. I think this outlined meeting the goals that were established by the Nuclear Waste Policy Act as to the identification of the repository, the date and time and selection process, and informed them how we were trying to get someplace.
I think that it was clear that -- the uncertainties relative to this document. I think clearly they have been stated as representing optimistic goals, difficult to meet, and that it was a document that -- as time progressed, there would be adequate time for the utilities to provide for on-site storage until the repository or MRS were opened.
BY MR. TOMASZCZUK:
Q. Do you know whether today the utilities are indeed providing on-site storage?
MR. BANES: Objection. Lack of



foundation.
A. I have no idea.
BY MR. TOMASZCZUK:
Q. Between the time your deposition adjourned last night and when it recommenced this morning, did you discuss your testimony with anyone?
MR. BANES: Objection to the extent it calls for discussions with counsel.
A. I didn't discuss it with anyone because when I left here I went to my room, later went to dinner by myself, and I did not meet with anyone.
I had a phone call with my wife. I told her that I was, you know, still in the deposition and I probably would leave here by noon today, to inform her of when she could expect me home.
MR. TOMASZCZUK: I don't have any further questions at this time, Mr. Morgan. I, like my colleagues, need to reserve the right to call you back. So I'm adjourning the deposition pending receipt of additional documents relevant to your testimony.
THE WITNESS: I understand.

301

MR. TOMASZCZUK: I want to thank you again for participating today. I know the process can be difficult, and I appreciate your efforts to answer my questions.
THE WITNESS: You're welcome.
MR. BANES: Thank you, sir. The Government reserves the same right to object to reopening it.

E X A M I N A T I O N

BY MR. BANES:
Q. And I just have a couple of questions for Mr. Morgan. Sir, could you turn back to Morgan Exhibit 22 for a moment. And I'd ask you also to get out Morgan Exhibit 4.
Earlier Mr. Tomaszczuk asked you about the third paragraph under number 1 on Exhibit 22.
A. Yes.
Q. I'd like you to look at page -1072 of Exhibit 4. I'm looking at the number on the bottom right-hand corner. This is the standard contract, and there are some "Whereas" clauses listed on the left-hand side of the page.
I'd like you to look at the second

302

"Whereas" clause that starts, "Whereas the Department has the responsibility."
A. Yes, sir.
Q. Now, in reading that clause, is it your understanding that DOE did not commit itself to any specific rate in the standard contract --
MR. TOMASZCZUK: Objection. Leading.
BY MR. BANES:
Q. -- prior to the commencement of operation of a repository or MRS?
MR. TOMASZCZUK: Objection. Leading.
A. DOE made no commitment.
BY MR. BANES:
Q. Was that "Whereas" clause that we just discussed consistent, in your mind, with the Nuclear Waste Policy Act?
A. Yes.
Q. Mr. Tomaszczuk asked you about some discussions with utility representatives.
Let's start with Mr. Mills. Did you ever represent to Mr. Mills, Mr. Loring Mills, that DOE committed itself to any specific rate

303

of spent nuclear fuel or high-level waste acceptance in the contract in exchange for the payment of fees to the nuclear waste fund?
MR. TOMASZCZUK: Objection. Leading.
A. No.
BY MR. BANES:
Q. Did you make such a representation to any other utility representative to your knowledge?
A. No.
MR. TOMASZCZUK: Same objection.
MR. BANES: Thank you, sir. No further questions.
MR. TOMASZCZUK: No redirect.
MR. OEHLER: I believe Mr. Neslin will have some questions. I just want to note for the record, I don't have any questions for Mr. Morgan at this time. But I'm adjourning the deposition and keeping it open for any additional questions that I may have after review of documents the Government produced this week and documents the Government may produce in the future, particularly some of those identified in the Government's privilege log.

304

MR. BANES: Reserve the same right to object.
(A discussion was had off the record.)

E X A M I N A T I O N

BY MR. NESLIN:
Q. Mr. Morgan, my name is Dave Neslin. I'm counsel for another of the plaintiffs in this case, Sacramento Municipal Utility District. I have some additional questions for you.
If I could ask you to refer to Exhibit 4 to your deposition?
A. 4?.
Q. Number 4.
A. Yes, sir.
Q. If you could turn to page 16601, at the top.
A. 16601.
Q. Yes, sir. The third column, heading E, Exchanges. You previously testified --
A. Beg your pardon? What reference are you at?
Q. Article V. E. Exchanges, bottom of

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

------------------------------X

YANKEE ATOMIC ELECTRIC :
COMPANY, CONNECTICUT YANKEE :
ATOMIC POWER COMPANY, MAINE :
YANKEE ATOMIC POWER COMPANY, :
Plaintiffs, :
v. : No. 98-126C
UNITED STATES OF AMERICA, : 98-154C
Defendant. : 98-474C

------------------------------X

Eugene, Oregon

Monday, June 25, 2002

Deposition of ROBERT L. MORGAN, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by DEBORAH SOLHEIM, Oregon Certified Shorthand Reporter, at 9:25 a.m., June 25, 2002, and the proceedings taken down by DEBORAH SOLHEIM, CRR, with computer-aided transcription and prepared under her direction.

Page 2

APPEARANCES:

On behalf of the Plaintiffs
JERRY STOUCK, ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Ninth Floor
Washington, D.C. 20005-3305
(202) 898-5800

On behalf of the Defendant:
R. ALAN MILLER, ESQ.
United States Department of Justice
Civil Division
1100 L. Street, N.W.
Washington, D.C. 20530
(202) 305-7594

Page 3

CONTENTS


WITNESS EXAMINATION BY COUNSEL FOR PLAINTIFFS
ROBERT L. MORGAN
By Mr. Stouck Page 5

Afternoon Session - Page 91


EXHIBITS

| EXHIBIT | | PAGE |
|---|---|---|
| 24 | Organization Chart, DB 100228 | 16 |
| 25 | 1-24-83 Eileen Peerless memo, TV 1226-1235 | 47 |
| 26 | 1-21-83 letter to Dillon from Hobart, SP 109687-701 | 47 |
| 27 | 5-3-83 DOE hearing transcript, DC 107987-108041 | 52 |
| 28 | 4-29-83 letter to Yankee Atomic Electric from Keefe, RA 103094-96 | 63 |
| 29 | 5-27-83 letter to Yankee Atomic Electric from Keefe, RA 103207-210 | 63 |
| 30 | 1-28-83 DOE memorandum, DE 106951-55 | 80 |
| 31 | 8-19-83 DOE memorandum, DE 106917-919 | 80 |
| 32 | 5-21-84 DOE letter to Senator Johnston, from Rabben, DE 105113-123 | 80 |
| 33 | 3-4-83 letter to Morgan from Soucy, PA 189728-732 | 102 |
| 34 | 3-3-83 letter to Morgan from Erk, CDB 021 0180-0184 | 105 |
| 35 | 5-23-78 letter to Holloway and Askew from Morgan, DE 104744-746 | 106 |
| 36 | 8-19-83 letter to Yankee Atomic Electric from Morgan, YDK 026 102921-924 | 111 |
| 37 | 10-26-83 letter to Morgan from Davis, DER 002 2095-97 | 116 |
| 38 | 5-13-83 statement of Robert L. Morgan, DE 100456-474 | 121 |
| 39 | Defendant's witness list | 125 |
| 40 | 9-15-83 DOE memorandum from Williamson, PNL 173 1282-1288 | 147 |
| 41 | 12-22-83 DOE memorandum from Charles Head, HQZ 19870304.0814.0001-02; EDB 004 1963-1969 | 160 |
| 42 | 4-9-84 letter to Frei from Bates, ZAB 001 1304-1308 | 163 |

Page 4

Page 5

PROCEEDINGS

Whereupon,
ROBERT L. MORGAN,
was called as a witness by counsel for Plaintiffs, and having been duly sworn by the reporter, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFFS
BY MR. STOUCK:

Q. Mr. Morgan, good morning. My name is Jerry Stouck. We met briefly before we started here. I'm a lawyer. I represent three utility companies in this litigation: Yankee Atomic Electric Company, Connecticut Yankee Atomic Power Company, and Maine Yankee Atomic Power Company.
A. Right.
Q. And as you may know or you may recall, each of these three companies has only one nuclear plant that is currently shut down permanently and in the process of decommissioning. They have that in common.
I want to thank you for coming today. I know you've been through this before. I have been through the transcript of the prior deposition sessions, and I do have a couple of follow-up questions to that. But it's not my intent, certainly, to ask you the same

Page 6

questions again.
I just have a couple of follow-ups, and then I'm going to try to cover some new material. In view of the prior sessions, I think we can get through this -- I hope we can get through this quickly today and get you out of here.
You're represented by counsel today?
A. Yes.
Q. Mr. Miller?
A. Yes.
Q. Okay. And have you done anything since the last deposition sessions, which were, I believe, according to the transcript, on March 21 and 22 of this year, have you done anything since then to prepare for today?
A. Yes, I reviewed the transcript.
Q. All right. Anything else?
A. Nothing.
Q. Okay. Did you discuss this with Mr. Miller or anyone else from the Department of Justice?
A. No. He told me your name and who you represented, and that was the extent of it.
Q. All right. I notice you've got some materials that you brought with you today.
A. Yes.

Page 7

Q. May I ask what that is?
A. These were the things that were given to me before the last deposition.
Q. Okay. I see a letter from the Department of Justice. I guess I'll leave that out, then.
A. Right, these are the things that were in the record which I had received prior to the first deposition.
Q. Fine. And you just brought them back with you today?
A. I just brought them with me.
Q. All right. Have you submitted your errata sheet from the prior transcript?
A. Have I what?
Q. Typically when --
A. Yes. A revised sheet, yes, I have.
Q. If there are any changes or corrections, you have submitted those already?
A. Yes. I noted one other error when I read it last night, but it's insignificant.
Q. Okay. Do you want to just mention it for the record?
A. I think it's on page -- let me see if I can find it.
Q. I've got a copy for you. Okay. You've got

Page 8

your copy.
A. Page 19.
Q. Uh-huh.
A. Line 24. The first word is tool. It should be cooled. C O O L, cooled.
Q. All right. But other than that, the changes, any changes and corrections that you wanted to make, you've noted on your -- on the other sheet, and you've signed the transcript?
A. Yes, and I forwarded that.
Q. Okay. As long as we've got that out, let me -- I would like to ask you, just as I said, a few follow-up questions about the prior testimony. And then we'll move on to some other things.
A. All right.
Q. I have a copy of this, which I guess, if you have a copy of the transcript, it doesn't much matter. Why don't we just -- why don't you use the copy that you have and I'll use the copy that I have.
A. All right.
Q. Presumably they are all the same. Alan has a copy.
On page 21, starting on line 2, this is when you were first contacted, I guess, by Mr. Johnson about this deposition.

Page 9

A. Yes.
Q. It says, "After I first got a call from someone that said some lawyers were looking for me and that I should call a lawyer in Washington" -- do you see that?
A. Yes.
Q. -- "before I called that lawyer."
It was just unclear to me. Was that a suggestion that you call the Department of Justice lawyers?
A. No, it was a Department of Energy lawyer that was looking for me. And I think that name is listed somewhere in the deposition.
Q. Okay. So that was just part of the process of finding you.
A. Yes.
Q. Okay. I wasn't clear if there was a suggestion that you contact your own lawyer.
A. No.
Q. Okay.
A. They gave me the name, or the name of the person that was looking for me, and I called that person.
Q. Fine. Thank you.
You were questioned, I think rather

Page 10

extensively in the prior sessions, about acceptance rates in the contract.
A. Yes.
Q. Do you recall that?
A. Yes.
Q. And as I said, I do not intend to go over the same ground again. But there were a couple of questions in that area that were not answered, at least to my satisfaction, by the transcript.
So if I could direct your attention to page 57. And actually, the question, I believe, begins way back on page 55 at the very bottom. And you can look back at the reference. But line 23 of page 55 says, "Do you recall any specific items that were discussed," and this is in the context of developing a standard contract.
And then on page 57.
A. Right.
Q. Are you there?
A. Yeah.
Q. Let me show you what I'm interested in, and you can look at whatever you like.
A. What line, please?
Q. Seven?
A. Okay.

Page 11

Q. "The other time discussed was the rate of acceptance, whether we should have a rate of acceptance or not. And it was decided that we would not put in a rate of acceptance in the contract."
Do you see that?
A. Yes.
Q. Okay. And there's a couple of references to this. I'm going to point your attention to them and then ask my follow-up question.
On page 130 --
A. 130?
Q. 130. On line 4, this is in the context of discussing comments that you got from various utilities on the notice of proposed rulemaking for the standard contract. Your answer here was, "We had those comments from the utilities."
And you can look back and see it was a reference to comments about acceptance rates and what not.
"We had those comments from the utilities and chose not to accept and put in the contract a given rate."
Do you see that?
A. Yes.
Q. And there are other references in this

Page 12

transcript.
My question for you is, why at that time in early 1984 when you were developing the standard contract, why did the department decide not to put into the standard contract a specific provision or a specific rate, you know, specify a rate of acceptance in the contract?
A. Okay. It was not required by the Nuclear Waste Policy Act. And we felt that there were uncertainties as to the schedule, potential litigation, the site selection of the repository, not knowing what media it would be in. Certainly excavation in granite is going to take longer than excavation in salt. And there were uncertainties relative to NRC licensing.
And we felt it was inappropriate at that time, because of the uncertainties in meeting the schedule when we had no designs of a facility, that there's no way that I could commit to an acceptance rate.
Q. Okay. When you say uncertainties as to schedule in your answer --
A. Yes.
Q. -- you're referring to uncertainties as to the schedule for developing the repository or other facilities?
A. Yes.

Page 13

Q. Okay. Did you anticipate at that time that there would come a time when the department would be in a position to commit to a specific rate?
A. Yes.
Q. Okay. And when would that time come? I mean, not the date, but what would have to occur for that time to arrive when a schedule could be committed to?
A. I think when the licensing requirements were established, when a specific site was selected, one could then consider an acceptance rate.
Q. Okay. And that, as far as you were concerned in 1983, was at some indefinite point in the future?
A. It was several years off, in my mind.
Q. Okay. Thank you.
And this was -- what you've just told me, were these considerations discussed at that time in connection with this question of should we put a specific rate in the contract?
A. Yes.
Q. Okay. Within DOE and those that were working with on you developing this contract.
A. Yes.
Q. Okay.
A. That's my understanding.
Q. Okay.

Pillsbury
Winthrop
Shaw
Pittman LLP

1650 Tysons Boulevard Tel 703.770.7900
McLean, VA 22102-4859 Fax 703.770.7901
www.pillsburylaw.com

Alex D. Tomaszczuk
Phone: 703.770.7940
alex.tomaszczuk@pillsburylaw.com

July 20, 2006

**By Facsimile & U.S. Mail**

Heide L. Herrmann, Esq.
Sharon Snyder, Esq.
Joshua Gardner, Esq.
Trial Attorneys
Commercial Litigation Branch, Civil Division
U.S. Department of Justice
1100 L Street, N.W.
Washington, DC 20530
Attn: 8th Floor Classification Unit

**Re:** ***Northern States Power Co. v. United States*, No. 98-484C**
***System Fuels, Inc. v. United States*, No. 03-2624C**
***System Fuels, Inc. v. United States*, No. 03-2623C**
**Depositions of Government Witnesses**

Dear Ms. Herrmann, Ms. Snyder, and Mr. Gardner:

I write to request dates in August and September 2006 regarding the availability for deposition of the following Government witnesses: (1) Christopher Kouts; (2) David Zabransky; (3) Thomas Pollog; and (4) Robert Morgan. We expect the Government to call these witnesses in the upcoming trials in the above-referenced cases. Counsel for these plaintiffs' last opportunity to depose these witnesses occurred over two years ago (and over four years ago in the case of Mr. Morgan). Therefore, pursuant to RCFC 26 & 30, we request the opportunity to conduct short depositions of each of these witnesses to update their prior depositions and to ask questions concerning their knowledge as to each of these specific cases. Our current expectation is that each of these depositions should last no longer than a half day.

400428497v1

Please contact me at 703.770.7940 (or 213.488.7110) or alex.tomaszczuk@pillsburylaw.com with proposed dates or any questions.

Sincerely,

Alex Tomaszczuk by Jan Hofgard EP

Alex D. Tomaszczuk
Counsel for Plaintiffs
Northern States Power Company
System Fuels, Inc., *et al.*

cc: Kerry Koep, Esq.
L. Jager Smith, Esq.

**U.S. Department of Justice**

Civil Division

PDK:DMC:HDL:MESullivan
154-98-484, -03-2624, -03-2623

Telephone:
(202) 307-0365

*Washington, D.C. 20530*

August 9, 2006

VIA FACSIMILE AND UNITED STATES MAIL

Alex D. Tomaszczuk
Pillsbury, Winthrop, Shaw Pittman, LLP
1650 Tysons Blvd.
McLean, Virginia 22102-4859

Re: *Northern States Power Co. v. United States*, No. 98-484C (Fed. Cl.);
*System Fuels, Inc. v. United States*, No. 03-2624C (Fed. Cl.); and
*System Fuels, Inc. v. United States*, No. 03-2623C (Fed. Cl.)

Dear Mr. Tomaszczuk:

The purpose of this letter is to respond to your letter dated July 20, 2006, requesting dates for the continued depositions of Messrs. Morgan, Kouts, Pollog, and Zabransky. Because these individuals have been deposed extensively already, we cannot agree to re-open the depositions of these individuals absent an explanation as to why the existing exhaustive record of deposition testimony is not sufficient to meet plaintiffs' trial preparation requirements. Moreover, according to the Rules of the Court of Federal Claims ("RCFC"), plaintiffs must obtain leave of the Court to re-depose these individuals. RCFC 30(a)(2)(B).

Pursuant to RCFC 30(a)(2)(B), "[a] party must obtain leave of the Court, which shall be granted to the extent consistent with the principles stated in RCFC 26(b)(2), . . . if (B) the person to be examined already has been deposed in the case." In applying the principles of Rule 26(b)(2) of the Federal Rules of Civil Procedure, upon which the Rules of the Court of Federal Claims are based, courts will examine whether "(1) the discovery sought is cumulative or can be obtained more conveniently from some other source; (2) the party seeking the discovery has already had a full opportunity to obtain the information; and (3) the burden and expense of the proposed discovery outweigh its likely benefit." <u>Keck v. Union Bank of Switzerland</u>, No. 94-civ-4912, 1997 WL 411931, at *1 (S.D.N.Y. July 22, 1997)(citing RCFC 26(b)(2); Hurley v. JARC Builders, Inc., 164 F.R.D. 39, 40 (E.D. Pa. 1995)). Courts often grant leave to re-open depositions only upon a showing that there is new information that was not available at the time of the original deposition. <u>See</u>, <u>e.g.</u>, Miller v. Federal Express Corp., 186 F.R.D. 376, 389 (W.D. Tenn. 1999) ("Although the re-opening of depositions is disfavored as a general rule, existing case

law, as well as common sense, supports allowing redeposal where a party fails to disclose relevant information in its Rule 26(a) disclosure which it later reveals only after an intervening deposition has occurred."). Moreover, when supplemental depositions are allowed, the requesting party is only allowed a supplemental deposition that is very limited in scope. See, e.g., Jade Trading, LLC v. United States, 64 Fed. Cl. 85, 87 (2005); Dixon v. Certainteed Corp., 164 F.R.D. 685, 692 (D. Kan. 1996).

We understand that, of the three cases identified in the subject line of this letter, only the plaintiff in Northern States was officially a party to the coordinated discovery proceedings. Nevertheless, the transcripts of those proceedings are available in the two System Fuels cases, and the witnesses that you want to depose do not have any information that is directly related solely to the System Fuels contracts, as opposed to all of the Standard Contracts. Because all of the spent nuclear fuel cases concern the same subject matter – partial breach of the Standard Contract – and plaintiffs represented by the same counsel have already conducted extensive depositions of these individuals, the Court should determine that these individuals have already been deposed in System Fuels, Inc. v. United States, No. 03-2624C, and System Fuels, Inc. v. United States, No. 03-2623C. RCFC 32(a)(4)("when an action has been brought in any court of the United States or of any stated and other action involving the same subject matter is afterward brought between the same parties or their representatives or successors in interest, all depositions lawfully taken and duly filed in the former action may be used in the latter as if originally taken therefor"); Paramount Payphones, Inc. v. Branch, 256 B.R. 341, 342-43 (M.D. Fla. 2000).

In your letter, you state only that you seek to "update" the prior depositions of these individuals and ask these individual about "their knowledge as to each of these specific cases." You have not identified any new information that has been made available by the Government that requires the re-opening of these depositions or any area about which you could not have asked about in previous depositions. In addition, the subject matter of these individuals' expected testimony at trial – the Government's understanding and implementation of its obligations regarding the rate and pace of acceptance – was clearly known at the time of the coordinated discovery depositions and subsequent depositions because the Government had filed its summary judgment motion regarding the rate of acceptance at the time of these depositions. You recognized this fact in status reports filed in the System Fuels cases, wherein you represented that "[i]f the Government has not altered its position regarding the acceptance rate and Greater-Than-Class-C waste issues that was proffered in the partially dispositive motions that it filed in [2001] . . ., then any discovery in this case on acceptance rate issues may potentially be a waste of time and resources – as it would likely yield information that is largely duplicative of what the various parties produced in the coordinated discovery proceedings between 2001 and 2002." Plaintiff's Status Report, filed in System Fuels, Inc. v. United States, No. 03-2624C(Lettow, J.) at 3 (Apr. 23, 2004); Plaintiff's Status Report, filed in System Fuels, Inc. v. United States, No. 03-2624C(Braden, J.) at 3 (Apr. 23, 2004). Moreover, review of these individuals' previous trial testimony will reveal that these individuals do not testify about individual utility claims or other utility-specific topics. Thus, questioning them about their general knowledge of the "specific cases" will not lead to "the discovery of admissible evidence." Finally, while Messrs. Kouts, Pollog, and Zabransky continue to be involved in the

development of the program, Mr. Morgan's involvement ended in 1984. There cannot be anything new to ask Mr. Morgan that counsel could not have asked Mr. Morgan in the three days of deposition that were conducted in 2002.

The burden to the individuals of re-opening these depositions far outweighs the likely benefit to plaintiffs. As you know, and as indicated in the attached log, each of these gentlemen has been deposed repeatedly in the spent nuclear fuel cases pending before the United States Court of Federal Claims. Messrs. Pollog and Zabransky have already been deposed for 12 and 18 days, respectively. The repeated depositions of Messrs. Kouts, Pollog, and Zabransky takes time away from their primary responsibility, which is to ensure that DOE begins performance under the Standard Contract. Mr. Morgan retired from the Government in 1988 and does not live in the Washington, D.C., area. Re-opening Mr. Morgan's deposition, absent a compelling need, is clearly an undue burden to Mr. Morgan. In short, absent an explanation by plaintiffs regarding the new information that can only be obtained from these individuals, the Government will likely oppose any motion made by plaintiffs to re-open the depositions of these individuals, pursuant to RCFC 30(a)(2)(B). Alternatively, we may ask the Court to require that any further depositions of these individuals be coordinated with all of the cases that were not part of the coordinated discovery and preclude the use of any coordinated discovery depositions in those cases.

Please call me at (202) 307-0365, if you have any questions or would like to discuss this matter further.

Sincerely,

MARIAN E. SULLIVAN
Trial Attorney
Commercial Litigation Branch

| Deponent | Case | Date | Court Reporter |
|---|---|---|---|
| KOUTS, CHRISTOPHER A. | YANKEE | 06/04/99 | ALDERSON |
| KOUTS, CHRISTOPHER A. | INDIANA MICHIGAN/ COMMONWEALTH EDISON | 01/30/04 | CAPITAL REPORTING |
| KOUTS, CHRISTOPHER A. | INDIANA MICHIGAN/ COMMONWEALTH EDISON | 02/19/04 | CAPITAL REPORTING |
| KOUTS, CHRISTOPHER A. | COMMONWEALTH EDISON | 03/12/04 | ESQUIRE |
| KOUTS, CHRISTOPHER A. | SOUTHERN NUCLEAR/SCE&G | 04/11/05 | L.A.D. |
| | | | |
| MORGAN, ROBERT L. | COORDINATED DISCOVERY | 03/21/02 | C&C |
| MORGAN, ROBERT L. | COORDINATED DISCOVERY | 03/22/02 | C&C |
| MORGAN, ROBERT L. | YANKEE | 06/25/02 | ALDERSON |
| | | | |
| POLLOG, THOMAS E. | COORDINATED DISCOVERY | 02/19/02 | ALDERSON |
| POLLOG, THOMAS E. | COORDINATED DISCOVERY | 04/11/02 | ALDERSON |
| POLLOG, THOMAS E. | COORDINATED DISCOVERY | 04/12/02 | ALDERSON |
| POLLOG, THOMAS E. | COORDINATED DISCOVERY | 05/14/02 | ALDERSON |
| POLLOG, THOMAS E. | YANKEE | 05/15/02 | ALDERSON |
| POLLOG, THOMAS E. | YANKEE | 05/16/02 | ALDERSON |
| POLLOG, THOMAS E. | YANKEE | 05/22/02 | ALDERSON |
| POLLOG, THOMAS E. | INDIANA MICHIGAN | 12/17/03 | CAPITAL REPORTING |
| POLLOG, THOMAS E. | COMMONWEALTH EDISON | 02/24/04 | ESQUIRE |
| POLLOG, THOMAS E. | COMMONWEALTH EDISON | 02/25/04 | ESQUIRE |
| POLLOG, THOMAS E. | COMMONWEALTH EDISON | 02/25/04 | ESQUIRE |

| | | | |
|---|---|---|---|
| POLLOG, THOMAS E. | PG&E | 11/01/05 | CAPITAL |
| | | | |
| ZABRANSKY, DAVID K | YANKEE | 02/10/99 | ATKINS-BAKER |
| ZABRANSKY, DAVID K | COORDINATED DISCOVERY | 04/17/02 | L.A.D. |
| ZABRANSKY, DAVID K | COORDINATED DISCOVERY | 04/18/02 | L.A.D. |
| ZABRANSKY, DAVID K | COORDINATED DISCOVERY | 04/19/02 | L.A.D. |
| ZABRANSKY, DAVID K. | COORDINATED DISCOVERY | 04/26/02 | L.A.D. |
| ZABRANSKY, DAVID K | YANKEE | 06/05/02 | ALDERSON |
| ZABRANSKY, DAVID K | YANKEE | 06/06/02 | ALDERSON |
| ZABRANSKY, DAVID K. | INDIANA MICHIGAN/ COMMONWEALTH EDISON | 01/28/04 | CAPITAL REPORTING |
| ZABRANSKY, DAVID K. | INDIANA MICHIGAN/ COMMONWEALTH EDISON | 01/29/04 | CAPITAL REPORTING |
| ZABRANSKY, DAVID K. | INDIANA MICHIGAN/ COMMONWEALTH EDISON | 02/26/04 | CAPITAL REPORTING |
| ZABRANSKY, DAVID K. | INDIANA MICHIGAN/ COMMONWEALTH EDISON | 02/26/04 | CAPITAL REPORTING |
| ZABRANSKY, DAVID K. | INDIANA MICHIGAN/ COMMONWEALTH EDISON | 02/27/04 | CAPITAL REPORTING |
| ZABRANSKY, DAVID K. | YANKEE | 05/04/04 | OVERNIGHT |
| ZABRANSKY, DAVID K. | SOUTHERN NUCLEAR | 04/12/05 | L.A.D. |
| ZABRANSKY, DAVID K. | WEPCO | 10/20/05 | MILLER |
| ZABRANSKY, DAVID K. | WEPCO | 10/21/05 | MILLER |
| ZABRANSKY, DAVID K. | PG&E | 11/01/05 | CAPITAL REPORTING |
| ZABRANSKY, DAVID K. | PG&E | 06/01/06 | CAPITAL REPORTING |

**U.S. Department of Justice**

Civil Division

PDK:DMC:HDL:MESullivan
154-98-484, -03-2624, -03-2623

Telephone:
(202) 307-0365

*Washington, D.C. 20530*

September 26, 2006

VIA FACSIMILE AND UNITED STATES MAIL

Alex D. Tomaszczuk
Pillsbury Winthrop Shaw Pittman LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859

Re: *Northern States Power Co. v. United States*, No. 98-484C (Fed. Cl.); *System Fuels, Inc. v. United States*, No. 03-2624C (Fed. Cl.); and *System Fuels, Inc. v. United States*, No. 03-2623C (Fed. Cl.)

Dear Mr. Tomaszczuk:

The purpose of this letter is to further the parties' discussions regarding the re-opening of the depositions of Messrs. Morgan, Kouts, Pollog and Zabransky, in the above-referenced cases. In light of the Court's guidance at the pre-trial conference conducted on September 12, 2006 in System Fuels, Inc. v. United States, No. 03-2624C (Braden, J.), we will agree to allow the limited depositions of Messrs. Kouts, Pollog, and Zabransky, pursuant to the terms discussed with the Court. However, based upon our understanding of the Court's guidance, we cannot allow the re-opening of the deposition of Mr. Morgan, and we ask that you withdraw the notice for Mr. Morgan's continued deposition.[1]

As you know, the Court in System Fuels has stated an expectation that the Government would make these individuals "available on a limited basis" and that you would not seek to repeat the depositions that have already been taken.[2] Transcript of Pre-Trial Conference, Sept.

[1] We note that you failed to subpeona Mr. Morgan and, instead, simply noticed his deposition to occur in Washington D.C. Because Mr. Morgan is a third party, any continued deposition would have to occur within the 100-mile limit of his home in Monument, Colorado, pursuant to a properly served subpoena.

[2] In your discussion with the Court on this issue, you noted that the Department of Energy had resumed and then suspended the "ACR process" in 2004, and that "[t]here has been essentially no discovery on that issue." Transcript, 15:7-9. Contrary to your representations to

12, 2006, 27:21-25. You represented to the Court that you would require approximately two hours for each deposition. Transcript, 13:18. Accordingly, the Government will make Messrs. Kouts, Pollog, and Zabransky available for two hours of deposition each on topics that have not been covered in previous depositions. Messrs. Pollog and Zabransky are available for deposition at any time on October 11 or 12, 2006, in Washington, D.C. Mr. Kouts is available in the morning on either October 11 or 12, 2006.

Given the Court's guidance that the depositions are to be limited to topics not previously covered, we do not understand why the re-opening of Mr. Morgan's deposition is necessary or should be allowed. In three days of deposition conducted in 2002, Mr. Morgan was questioned extensively about his knowledge of events that occurred during his tenure as the Director of the office that became the Office of Civilian Radioactive Waste Management ("OCRWM"). Since those depositions, Mr. Morgan has testified about those same matters in trials conducted in Yankee Atomic Electric Co. v. United States, No. 98-126C (Merow, S.J.), Tennessee Valley Authority v. United States, No. 01-115C (Lettow, J.), and Pacific Gas & Electric Co. v. United States, No. 04-74C (Hewitt, J.). As Mr. Morgan has testified, he left OCRWM in 1984 and had no involvement with that office or commercial spent nuclear fuel matters since that time.[3] Moreover, as I explained in my August 9, 2006 letter and Mr. Lester explained to the Court during the pre-trial conference in System Fuels, re-opening Mr. Morgan's deposition represents a tremendous burden to Mr. Morgan. Absent an explanation as to what matters have not been adequately covered in Mr. Morgan's previous testimony, we cannot agree to re-open Mr. Morgan's deposition.

Please contact me no later than tomorrow, Wednesday, September 27, 2006, to advise me as to whether you will withdraw the deposition notice for Mr. Morgan and agree to conduct the limited depositions of Messrs. Kouts, Pollog, and Zabransky, pursuant to the parameters

---

the Court, Messrs. Pollog and Zabransky have both been deposed about this process in depositions since that time. Moreover, as we noted to the Court in our objections to exhibits and other matters, the resumption of the delivery commitment schedule process in 2004 is irrelevant to the matters to be decided by the Court. Accordingly, we would consider further questioning on this topic to be beyond the permitted scope of these depositions.

[3] During the pre-trial conference in System Fuels, you premised your need to re-open these depositions upon the fact that the Government had opposed the designation of deposition testimony by System Fuels. Transcript, 13:12-15. The Government's opposition to System Fuels' designations is separate and apart from our concerns about the re-opening of these depositions. The Government opposes the designation of testimony for Mr. Morgan by System Fuels because Mr. Morgan was not a Government employee at the time of his deposition. Accordingly, his testimony cannot be admitted as an admission of a party opponent, which was System Fuels' stated basis for admission. FRE 801(d)(2). The Government opposes the designation of testimony of Messrs. Kouts, Pollog, and Zabransky because these individuals are expected to testify in the Government's case-in-chief.

discussed with the Court in System Fuels. Absent agreement, the Government plans to seek a protective order from the Court regarding these matters.

Sincerely,

MARIAN E. SULLIVAN
Trial Attorney
Commercial Litigation Branch
Civil Division

CERTIFICATE OF FILING

I hereby certify that on this 3rd day of October 2006, a copy of foregoing "DEFENDANT'S MOTION FOR A PROTECTIVE ORDER TO PRECLUDE THE RE-OPENING OF THE DEPOSITION OF MR. ROBERT MORGAN" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Marian E. Sullivan