[CONFORMED]

EXHIBIT B 1 (a)

# GRAND GULF NUCLEAR STATION

## Joint Construction, Acquisition and Ownership Agreement

between

Middle South Energy, Inc.

and

South Mississippi Electric Power Association

Dated as of May 1, 1980

TABLE OF CONTENTS


| | | PAGE |
|---|---|---|
| ARTICLE I - DEFINITIONS | | 2 |
| 1.01 | AEC | 2 |
| 1.02 | AFUDC | 2 |
| 1.03 | Application | 3 |
| 1.04 | Capacity | 3 |
| 1.05 | CFC | 3 |
| 1.06 | Closing | 3 |
| 1.07 | Commercial Operation | 3 |
| 1.08 | Construction Permit | 4 |
| 1.09 | Cost of Construction | 4 |
| 1.10 | Energy | 4 |
| 1.11 | Final Adjustment Date | 4 |
| 1.12 | Force Majeure | 5 |
| 1.13 | Good Utility Practice | 5 |
| 1.14 | Grand Gulf | 6 |
| 1.15 | Immediately Available Funds | 7 |
| 1.16 | Indemnification Agreement | 7 |
| 1.17 | MSE | 7 |
| 1.18 | MSE Affiliate | 8 |
| 1.19 | MSE Bank Loan Agreement | 8 |
| 1.20 | MSE Mortgage | 8 |
| 1.21 | MP&L | 8 |
| 1.22 | NRC | 8 |
| 1.23 | Nuclear Fuel | 8 |
| 1.24 | Operating Agreement | 9 |
| 1.25 | Operating License | 9 |
| 1.26 | Payment and Adjustment Date | 9 |
| 1.27 | REA | 9 |
| 1.28 | SEC | 9 |
| 1.29 | Service Agreement | 9 |
| 1.30 | SMEPA | 10 |
| 1.31 | SMEPA Mortgage | 10 |
| 1.32 | Substitute Power Agreement | 10 |
| 1.33 | SFI | 10 |
| ARTICLE II - ACQUISITION OF UNDIVIDED INTEREST IN GRAND GULF BY SMEPA | | 10 |
| 2.01 | Execution, Delivery, and Recording of Agreement; Closing | 10 |
| 2.02 | Payment and Adjustment Dates | 11 |
| 2.03 | Final Adjustment Date | 16 |
| 2.04 | Assignment of Contract Rights, Permits, Authorizations, Licenses or other Intangible Rights | 18 |
| 2.05 | Indemnification | 21 |
| 2.06 | Accounting for Cost of Construction | 22 |
| 2.07 | Excess Uranium Provision | 23 |


S305-0024-0176

| | | PAGE |
|---|---|---|
| ARTICLE III - CONSTRUCTION PERIOD | | 23 |
| 3.01 | Completion of Construction | 23 |
| 3.02 | Execution of Contracts | 25 |
| 3.03 | Progress Payment of Cost of Construction | 26 |
| 3.04 | MSE-SMEPA Grand Gulf Construction Account | 28 |
| 3.05 | No Delay in Payments by SMEPA | 28 |
| 3.06 | Contest of Payment of Cost of Construction; Waiver | 29 |
| 3.07 | Availability of Records; Annual Audit | 29 |
| 3.08 | Agent for Construction; Limitation of Liability | 30 |
| 3.09 | Information | 34 |
| 3.10 | Cooperation | 34 |
| 3.11 | Insurance | 35 |
| 3.12 | Nuclear Fuel | 37 |
| 3.13 | Pollution Control Facilities | 38 |
| ARTICLE IV - DELAY IN COMMERCIAL OPERATION | | 38 |
| 4.01 | Delay in Commercial Operation Caused by Force Majeure | 38 |
| 4.02 | Delay in Commercial Operation of Grand Gulf Unit No. 1 Not Caused by Force Majeure | 38 |
| 4.03 | Delay in Commercial Operation of Grand Gulf Unit NO. 2 Not Caused by Force Majeure | 39 |
| 4.04 | SMEPA's Remedies for Delay | 40 |
| 4.05 | Optional Capital Contribution | 42 |
| 4.06 | MSE's Optional Remedy for SMEPA's Failure to Provide Funds | 43 |
| 4.07 | Coordination of Financing | 48 |
| 4.08 | Federal Energy Regulatory Commission | 49 |
| ARTICLE V - REPRESENTATIONS AND WARRANTIES | | 49 |
| 5.01 | Representations and Warranties of SMEPA | 49 |
| 5.02 | Representations and Warranties of MSE | 53 |
| ARTICLE VI - GENERAL COVENANTS OF THE PARTIES | | 57 |
| 6.01 | No Adverse Distinction | 57 |
| 6.02 | Alienation and Assignment | 57 |
| 6.03 | Right to Mortgage | 59 |
| 6.04 | MSE's Right to Sell in Certain Cases | 60 |
| 6.05 | Right of Partition | 61 |
| 6.06 | Imposition of Liens | 61 |

| | | PAGE |
|---|---|---|
| 6.07 | Taxes | 61 |
| 6.08 | Commitment for Financing | 63 |
| 6.09 | Regulatory Approvals | 63 |
| 6.10 | Licensee | 63 |
| 6.11 | Rights of Mortgagees | 64 |
| 6.12 | Right of Eminent Domain | 65 |
| 6.13 | Sale of Land Under Certain Circumstances | 65 |
| ARTICLE VII - CONDITIONS PRECEDENT | | 66 |
| 7.01 | Conditions to Effectiveness of Agreement | 66 |
| 7.02 | Conditions Precedent to MSE's Closing Obligations at the Closing | 70 |
| 7.03 | Condition Precedent to SMEPA's Obligations at the Closing | 71 |
| ARTICLE VIII - DEFAULT; REMEDIES | | 73 |
| 8.01 | Obligation of Parties; Default | 73 |
| 8.02 | Special Remedies | 75 |
| 8.03 | Interest on Overdue Payments | 76 |
| 8.04 | Usury | 77 |
| ARTICLE IX - GENERAL CONDITIONS | | 78 |
| 9.01 | MSE's Right to Make Payments on Behalf of SMEPA | 78 |
| 9.02 | Survival | 78 |
| 9.03 | Further Assurances | 78 |
| 9.04 | Governing Law | 78 |
| 9.05 | Notice | 79 |
| 9.06 | Headings Not to Affect Meaning | 80 |
| 9.07 | No Partnership | 80 |
| 9.08 | Time of Essence | 80 |
| 9.09 | Amendments | 80 |
| 9.10 | Successors and Assigns | 80 |
| 9.11 | Counterparts | 81 |
| 9.12 | License Conditions | 81 |
| 9.13 | "AS IS" TRANSACTION; ASSUMPTION OF RISK | 81 |
| 9.14 | Good Utility Practice | 82 |
| 9.15 | Force Majeure | 82 |
| 9.16 | REA Approval | 82 |
| 9.17 | Entire Agreement | 83 |

| | | PAGE |
|---|---|---|
| 9.18 | Construction Agent | 83 |
| 9.19 | Portions of this Agreement Subject to Closing | 83 |
| 9.20 | Covenants Running with The Land | 83 |
| 9.21 | Environment | 84 |
| 9.22 | Kick-backs | 84 |
| 9.23 | Equal Opportunity Clause | 84 |
| 9.24 | Nonsegregated Facilities | 88 |
| ARTICLE X - ADMINISTRATION | | 89 |
| 10.01 | Administrative Committee | 89 |
| 10.02 | Membership | 90 |
| 10.03 | Meetings | 90 |
| 10.04 | Functions | 90 |
| 10.05 | Records | 91 |
| 10.06 | Expenses | 91 |
| ARTICLE XI - TERM AND TERMINATION | | 91 |
| 11.01 | Termination | 91 |
| 11.02 | Retirement Costs | 92 |
| ARTICLE XII - ADDITIONAL GENERATING UNIT OR UNITS | | 92 |


LIST OF EXHIBITS


| EXHIBIT | INITIAL REFERENCE |
|---|---|
| A - Description of Land in which SMEPA Obtains an Undivided Ownership Interest | 6 |
| B - Description of Land in which SMEPA obtains Easement Rights | 6 |
| C - Form of Operating Agreement | 9 |
| D - Form of Substitute Power Agreement | 10 |
| E - Form of Easement Agreement (for Delivery at Closing) | 11 |
| F - Form of Special Warranty Deed, Conveyance and Adjustment Agreement (for Delivery on each Payment and Adjustment Date) | 13 |

| | PAGE |
|---|---|
| G - List of Contracts, Permits, Authorizations, Licenses and Other Intangible Rights Assigned to SMEPA at the Closing | 18 |
| H - Excess Uranium Letter | 23 |
| I - List of Reports and Contracts | 34 |
| J - Form of Partnership Tax Returns | 62 |

GRAND GULF NUCLEAR STATION

Joint Construction, Acquisition and Ownership Agreement

between

Middle South Energy, Inc.

and

South Mississippi Electric Power Association

Dated as of May 1, 1980

THIS AGREEMENT, dated as of May 1, 1980, is between MIDDLE SOUTH ENERGY, INC., an Arkansas corporation (MSE), and SOUTH MISSISSIPPI ELECTRIC POWER ASSOCIATION, a Mississippi corporation (SMEPA).

MSE is presently constructing, through its agent, Mississippi Power & Light Company (MP&L), the Grand Gulf Nuclear Station located in Claiborne County, Mississippi, pursuant to Construction Permits issued to it and MP&L by the United States Atomic Energy Commission (predecessor of the Nuclear Regulatory Commission). Upon the completion of the Grand Gulf Nuclear Station, MSE expects to operate the station, through its agent MP&L, so as to generate electricity for sale, primarily to companies of the Middle South System. As one of the conditions of the Construction Permits MSE was required to make available to certain "entities," as defined

in the Construction Permits, the opportunity to become owners of undivided interests in the Grand Gulf Nuclear Station. This Agreement is entered into for the purpose of providing a means by which SMEPA can obtain a 10% undivided ownership interest in the Grand Gulf Nuclear Station, and for the further purpose of providing for the continued construction and ownership of the Grand Gulf Nuclear Station.

NOW, THEREFORE, IN CONSIDERATION of the premises, and the mutual covenants herein set forth, MSE and SMEPA agree as follows:

## ARTICLE I - DEFINITIONS

Section 1.01. AEC shall mean the United States Atomic Energy Commission.

Section 1.02. AFUDC ("Allowance for Funds used During Construction") shall mean an allowance to compensate either MSE or SMEPA, as the case may be, for all costs incurred on funds advanced to pay the Cost of Construction calculated in accordance with applicable rules and regulations, provided that such allowance as accrued and recorded in the financial records of MSE shall be increased by an amount equal to any reduction in AFUDC for tax benefits, through Final Adjustment Date.

Section 1.03. Application shall mean the application of MP&L and MSE before the NRC for the ownership, construction, and operation of Grand Gulf which is Docket No. 50-416 as to Grand Gulf Unit No. 1 and Docket No. 50-417 as to Grand Gulf Unit No. 2, as heretofore or hereafter supplemented or amended.

Section 1.04. Capacity shall mean the capability of producing (or consuming) energy and is measured in megawatts.

Section 1.05. CFC shall mean the National Rural Utilities Cooperative Finance Corporation, a District of Columbia private not-for-profit cooperative association.

Section 1.06. Closing shall mean July 1, 1980, or such other date as may be set by MSE and SMEPA, which date in any event shall be subsequent to the execution and delivery of this Agreement, the Operating Agreement, the Substitute Power Agreement and the Indemnification Agreement, at which time SMEPA shall advance to MSE the Cost of Construction for the month following the Closing, and the parties shall meet the other conditions provided in this Agreement for the Closing.

Section 1.07. Commercial Operation shall mean the period of time commencing at 12:01 a.m. of the day following the successful completion of "the 100-hour steam output per-

formance test" provided for in agreements between MSE and General Electric Company relating to the nuclear steam supply system of Grand Gulf Unit No. 1 or Grand Gulf Unit No. 2, as the case may be.

Section 1.08. Construction Permit shall mean the permits issued September 4, 1974, by the AEC authorizing MP&L and MSE to build Grand Gulf; as to Grand Gulf Unit No. 1 the construction permit is number CPPR-118; as to Grand Gulf Unit No. 2 the construction permit is No. CPPR-119.

Section 1.09. Cost of Construction shall mean all costs incurred in connection with the planning, design, licensing, acquisition, construction, completion, training for operation, startup, renewal, addition, replacement, decommissioning, entombment or disposal of Grand Gulf or any portion of Grand Gulf, calculated in accordance with any applicable rules and regulations.

Section 1.10. Energy shall mean the quantity of electricity produced (or consumed) over a period of time and is measured in megawatt hours.

Section 1.11. Final Adjustment Date shall mean the date as of which the respective undivided ownership interests of MSE and SMEPA are determined to reflect, pursuant to the terms of this Agreement, that MSE's undivided ownership interest in Grand Gulf is 90% and SMEPA's undivided ownership interest in Grand Gulf is 10%. Unless otherwise agreed, the

Final Adjustment Date shall be determined as soon as practicable subsequent to the month during which SMEPA's aggregate payments of Cost of Construction and its accrued AFUDC thereon equal 10% of the aggregate Cost of Construction plus MSE's and SMEPA's aggregate AFUDC.

Section 1.12. Force Majeure shall mean any act, delay or failure to act on the part of any state or federal governmental authority, whether legislative, executive, judicial or administrative, including delay or failure to act by any governmental authority in the issuance of permits or licenses required in connection with Grand Gulf and the prohibiting of acts necessary to performance hereunder or the permitting of any such acts only subject to unreasonable conditions; acts of God; damage, accidents or disruptions including but not limited to fire, flood, explosion, tornado, hurricane, earthquake, windstorm or equipment breakdown; failure or delay beyond either party's reasonable control in securing materials, equipment, services or facilities; labor difficulties such as strikes, slow-downs or shortages; delays in transportation; civil unrest, disturbances, demonstrations; or any other cause beyond either party's control.

Section 1.13. Good Utility Practice shall mean any of the practices, methods and acts engaged in or approved by a significant proportion of the electric utility industry at the time of the reference, or any of the practices,

methods and acts which, in the exercise of reasonable judgment in light of the facts known at the time the decision was made, could have been expected to accomplish the desired result at the lowest reasonable cost consistent with reliability, safety and expedition. Good Utility Practice shall apply not only to functional parts of Grand Gulf, but also to appropriate structures, landscaping, painting, signs, lighting and other facilities and public relations programs reasonably designed to promote public enjoyment, understanding and acceptance of Grand Gulf. Good Utility Practice is not intended to be limited to the optimum practice, method or act to the exclusion of all others, but rather to be a spectrum of acceptable practices, methods or acts.

Section 1.14. Grand Gulf shall mean all property which is a part of the Grand Gulf Nuclear Station in Claiborne County, Mississippi including (1) the land described in Exhibit A and easements and other rights in the land, described in Exhibit B; (2) Unit No. 1 and Unit No. 2, including the nuclear power reactors, the turbine generators, the buildings housing the same, and the associated auxiliaries and equipment, all as more particularly described in the Application (each Unit being designated herein as Grand Gulf Unit No. 1 or Grand Gulf Unit No. 2, respectively); (3) inventories of materials, supplies, fuel, Nuclear Fuel, tools, equipment and other property for use in connection with Grand Gulf;



8305-0024-0186

and (4) such additional land or rights therein as may be acquired, and any additional facilities and other property (including but not limited to initial Nuclear Fuel) as may be acquired, constructed, installed or replaced in connection with Grand Gulf, provided that such additional land or rights therein or such additional facilities or other property shall have been acquired, constructed, installed or replaced for the common use of MSE and SMEPA under and subject to the provisions of this Agreement, such additional land or rights therein shall be evidenced by appropriate revisions to Exhibit A or Exhibit B, as the case may be, and duly recorded in appropriate official offices.

Section 1.15. Immediately Available Funds shall mean funds good and available to the payee on the day when paid.

Section 1.16. Indemnification Agreement shall mean the agreement between MSE and SMEPA entered into concurrently herewith providing indemnification of MSE by SMEPA of additional taxes measured by income payable by MSE as a result of the treatment of SMEPA's acquisition of a 10% interest in Grand Gulf as the equivalent of a sale or other disposition subject to income tax.

Section 1.17. MSE shall mean Middle South Energy, Inc., an Arkansas corporation.

Section 1.18. MSE Affiliate shall mean Middle South Utilities, Inc. and any "subsidiary company" thereof, as such term is defined in Section 2(a)(8) of the Public Utility Holding Company Act of 1935, as amended, 15 U.S.C.A. Sec. 79(b)(a)(8)(1).

Section 1.19. MSE Bank Loan Agreement shall mean the Amended and Restated Bank Loan Agreement dated as of June 30, 1977 among MSE, the Banks listed in Schedule 1 thereto, and Manufacturers Hanover Trust Company, as Agent for such Banks, as heretofore or hereafter amended, restated or extended.

Section 1.20. MSE Mortgage shall mean the Mortgage and Deed of Trust dated as of June 15, 1977, between MSE and United States Trust Company of New York and Malcolm J. Hood, Trustee, as heretofore or hereafter supplemented.

Section 1.21. MP&L shall mean Mississippi Power & Light Company, a Mississippi corporation.

Section 1.22. NRC shall mean Nuclear Regulatory Commission.

Section 1.23. Nuclear Fuel shall mean any source, special nuclear or by-product material as defined in the Atomic Energy Act of 1954, as amended and as may be amended from time to time, including any ores, mined or unmined, or concentrates from which any such material can be obtained, and any fuel assemblies, any of which are acquired by MSE for Grand Gulf.

Section 1.24. Operating Agreement shall mean the agreement between MSE and SMEPA entered into concurrently herewith providing for the operation of Grand Gulf Unit No. 1 and Grand Gulf Unit No. 2, or either of them, upon their being placed in Commercial Operation, the form of which is attached hereto as Exhibit C, as hereafter supplemented or amended.

Section 1.25. Operating License shall mean the operating license or licenses for which applications are being made before the NRC.

Section 1.26. Payment and Adjustment Date shall mean each date (except the Closing Date) on which SMEPA advances to MSE the Cost of Construction for the next succeeding month and on which the undivided ownership interests of MSE and SMEPA in Grand Gulf are adjusted pursuant to the terms of this Agreement to reflect their respective payments of Cost of Construction and AFUDC accounts. Unless otherwise agreed, the Payment and Adjustment Date shall be the first business day of each month.

Section 1.27. REA shall mean Rural Electrification Administration.

Section 1.28. SEC shall mean Securities and Exchange Commission.

Section 1.29. Service Agreement shall mean the Service Agreement dated June 21, 1974, between MP&L and MSE, as hereafter supplemented or amended.

Section 1.30. SMEPA shall mean South Mississippi Electric Power Association, a Mississippi corporation.

Section 1.31. SMEPA Mortgage shall mean the Supplemental Mortgage and Security Agreement dated as of November 1, 1977 by and between SMEPA, CFC and the United States of America acting through the Administrator of the REA, as heretofore or hereafter supplemented.

Section 1.32. Substitute Power Agreement shall mean the agreement among MP&L, MSE, and SMEPA entered into concurrently herewith providing for the supplying of Capacity and Energy by MP&L to SMEPA under certain circumstances, the form of which is attached hereto as Exhibit D, as hereafter supplemented or amended.

Section 1.33. SFI shall mean System Fuels, Inc., a Louisiana corporation.

## ARTICLE II - ACQUISITION OF UNDIVIDED INTEREST IN GRAND GULF BY SMEPA

Section 2.01. Execution, Delivery and Recording of Agreement; Closing. It is contemplated that MSE and SMEPA will execute and deliver this Agreement, the Operating Agreement and the Indemnification Agreement and that MSE, MP&L and SMEPA will execute and deliver the Substitute Power Agreement contemporaneously and that this Agreement and

Operating Agreement will be recorded prior to the Closing in the property records of Claiborne County, Mississippi, and in each other official office where the parties deem it to be necessary. Subsequent thereto, SMEPA will promptly submit this Agreement and all other necessary documentation to the REA for final approval by REA and shall use its best efforts to obtain such approval at the earliest practicable time. Subject to the terms and conditions hereof, at the Closing provided for herein, SMEPA will advance sufficient monies to pay 100% of the Costs of Construction which MSE estimates will be incurred during the month following the Closing. SMEPA's payments will be made in Immediately Available Funds to the "MSE-SMEPA Grand Gulf Construction Account" at any bank designated by MSE to SMEPA. As agent for the parties, MSE shall draw down such funds as needed to pay the Cost of Construction. MSE will deliver to SMEPA at the Closing an Easement Agreement in the form of Exhibit E hereto, pursuant to which SMEPA will have the right (subject to this Agreement) to locate, maintain and remove its undivided ownership interest in that portion of Grand Gulf located on the land described in Exhibit B.

Section 2.02. Payment and Adjustment Dates.

(a) On or before the first day of each month, commencing with the month following the Closing, MSE will

notify SMEPA of the Cost of Construction anticipated to be incurred during the succeeding calendar month plus any adjustments for Cost of Construction incurred in prior months but not previously charged or credited to SMEPA. MSE may, without liability to SMEPA, at any time before the date payment into the MSE-SMEPA Grand Gulf Construction Account is due, cancel the call for such funds. The date designated by MSE to SMEPA for SMEPA's monthly payment of the Cost of Construction is the Payment and Adjustment Date. On each Payment and Adjustment Date, SMEPA will pay the amount designated by MSE in the notice in Immediately Available Funds to the MSE-SMEPA Grand Gulf Construction Account at any Bank designated by MSE to SMEPA, and the undivided ownership interests of MSE and SMEPA in Grand Gulf will be adjusted in accordance with the following formula:

$$A = \frac{B + B^1 + C}{D + B^1 + E} \times 100\%, \text{ and } A^1 = 100\% - A, \text{ where}$$

$A$ = Undivided ownership interest entitlement of SMEPA, ______%.

$A^1$ = Undivided ownership interest entitlement of MSE, ______%.

$B$ = Contribution of SMEPA to cost of Construction to beginning of the month preceding the Payment and Adjustment Date, $____________.

$B^1$ = Contribution of SMEPA to Cost of Construction during the month preceding the Payment and Adjustment Date, $______.

C = AFUDC of SMEPA with respect to B, $_____.

D = Total contribution of MSE and SMEPA to Cost of Construction to the beginning of the month preceding the Payment and Adjustment Date, $_____.

E = AFUDC of MSE and SMEPA with respect to D, $______.

That portion of "D" in the above formula consisting of MSE's contribution to the Cost of Construction shall be derived from or based upon MSE's financial statements at December 31, 1979 audited by its independent certified public accountants Deloitte Haskins & Sells plus MSE's additional expenditures for Cost of Construction during each month subsequent thereto prior to the Closing. MSE will advise SMEPA of making any change in its accounting methods or practices which could increase the Cost of Construction accruals made for periods subsequent to December 31, 1979 over the amounts which would have been accrued had MSE followed the accounting methods and practices used to derive the amounts shown on its December 31, 1979 financial statements.

(b) On each Payment and Adjustment Date or at such other time as MSE and SMEPA deem it desirable, MSE and SMEPA will transfer, convey and warrant specially, by the Special Warranty Deed, Conveyance and Adjustment Agreement substantially in the form of Exhibit F hereto, undivided ownership interests in Grand Gulf, including the real property

described in Exhibit A hereto, free and clear of all liens and mortgages, other than those expressly permitted by the terms of such Special Warranty Deed, Conveyance and Adjustment Agreements, so that, as of each Payment and Adjustment Date or at such other time as any Special Warranty Deed, Conveyance and Adjustment Agreement is delivered, MSE and SMEPA will each own, as tenants in common, the undivided ownership interest in Grand Gulf derived by application of the above formula. Such Special Warranty Deed, Conveyance and Adjustment Agreement will also confirm the adjustment to their respective undivided ownership interests in Grand Gulf and each such Agreement shall be promptly and duly recorded wherever counsel to MSE and SMEPA may deem it appropriate and necessary. Subsequent to each such change, all provisions of this Agreement, the Indemnification Agreement and the Operating Agreement referring to the undivided ownership interests of the parties in Grand Gulf shall be deemed amended to reflect the new undivided ownership interests of the parties in Grand Gulf.

(c) The advances by SMEPA of 100% of the Cost of Construction will continue until such date as the accumulated sum of all such advances, together with SMEPA's AFUDC accrued thereon, equals 10% of the aggregate advances of MSE and SMEPA of the Cost of Construction plus the respective amounts of MSE's and SMEPA's AFUDC accrued thereon. MSE and SMEPA

will provide each other with current information on their respective AFUDC accruals so that all necessary computations can be made on a timely and appropriate basis.

(d) On or prior to Closing, MSE will have obtained a release from the lien of the MSE Mortgage of at least 5% of its ownership interest in Grand Gulf on such date. On or prior to the date on which SMEPA shall have acquired hereunder a 4% undivided ownership interest in Grand Gulf, MSE will obtain a release from the lien of the MSE Mortgage of an additional 5% of its undivided ownership interest in Grand Gulf. All of SMEPA's obligations hereunder are contingent upon MSE obtaining such releases at the times specified above.

(e) To the extent that MSE or any corporation with which it files a consolidated Federal income tax return actually obtains any tax benefits attributable to the deduction for tax purposes of any portion of MSE's AFUDC included within the "E" portion of the formula set forth in this Section 2.02 as applied at any Payment and Adjustment Date or upon the Final Adjustment Date, the amount of such tax benefit shall be deducted from "E" for purposes of computing SMEPA's undivided ownership interest in Grand Gulf. To the extent tax benefits are not obtained prior to the Final Adjustment Date but are thereafter obtained prior to completion of construction, SMEPA's obligation to make contributions to

the Cost of Construction shall be reduced by 10% of such obtained benefit. To the extent such tax benefits are not obtained prior to the completion of construction of Grand Gulf but are obtained thereafter, MSE shall pay SMEPA an amount equal to 10% of such obtained benefit. For the purpose of this Section "tax benefits" refer to reductions in Federal income tax payments or increases in Federal income tax refunds attributable to deduction of any portion of AFUDC prior to Final Adjustment Date. For the purpose of this Section "obtained" refers to actual adjustment in tax as determined when a taxable year has administratively been settled by MSE and the IRS or court proceedings for such tax year have been finally resolved.

Section 2.03. Final Adjustment Date. As of the Final Adjustment Date (a) MSE and SMEPA will each make a final transfer, exchange and conveyance in accordance with the procedures specified in Section 2.02 so that, as of the Final Adjustment Date, MSE and SMEPA will own 90% and 10%, respectively, of Grand Gulf as constructed to such date, (b) SMEPA will pay to MSE the sum of $1,500,000, which MSE and SMEPA agree compensates MSE for all costs incurred, past, present and future, relating to Grand Gulf that have not been capitalized, such as planning, negotiation, education and similar unallocated administrative and general expenses, and such payment shall not be used thereafter in calculating

SMEPA's undivided ownership interest in Grand Gulf, and (c) MSE will credit toward SMEPA's obligations to contribute to future Cost of Construction any payments by SMEPA to the MSE-SMEPA Grand Gulf Construction Account not allocable to SMEPA's 10% undivided ownership interest in Grand Gulf. From time to time after the Final Adjustment Date, MSE and SMEPA shall execute such other instruments of conveyance and transfer as may be necessary or appropriate to vest in MSE and SMEPA their respective undivided ownership interests in Grand Gulf. The parties intend that from and after the Final Adjustment Date, MSE and SMEPA, by virtue of this Agreement or any special conveyance or transfer of title provided for herein, will each take title to Grand Gulf as tenants in common in proportion to their respective undivided ownership interests therein, and that unless otherwise expressly provided in this Agreement, neither party will have any title in or to the undivided ownership interest in Grand Gulf owned by the other party. To facilitate the financing of Nuclear Fuel by MSE for itself and SMEPA in accordance with Section 3.12, it is agreed that SMEPA shall pay for and acquire title to an undivided ownership interest in Nuclear Fuel only upon the execution and delivery by MSE to SMEPA of an appropriate instrument of conveyance and transfer of title identifying the specific Nuclear Fuel to be conveyed and transferred to SMEPA.

Section 2.04. Assignment of Contract Rights, Permits, Authorizations, Licenses or other Intangible Rights.

(a) It is understood that MSE has, prior to the date hereof, executed or obtained in its own name, certain contracts, permits, authorizations, licenses or other intangible rights relating to Grand Gulf, including without limitation the contracts, permits, authorizations, licenses or other intangible rights listed on Exhibit G hereto. MSE covenants that it will revise Exhibit G prior to the Closing so that, to the best of its knowledge, the contracts listed on Exhibit G will be all such agreements entered into or obtained by or on behalf of MSE as of the Closing date wherein the aggregate contract price is estimated to exceed $1,000,000.

(b) Exhibit G also lists (i) certain contracts entered into, or which may be entered into, by MSE with certain companies affiliated with it in the Middle South Utilities System, which relate to the financing of, or sale of Capacity and Energy from, Grand Gulf, and (ii) certain contracts relating to Nuclear Fuel expected to be integrally related to any financing of Nuclear Fuel by MSE for itself and SMEPA in accordance with Section 3.12. It is agreed SMEPA shall have rights and obligations under the contracts referred to in Section 2.04(b)(i) and Section 2.04(b)(ii) and any similar contracts now existing or hereafter entered

into by MSE only upon the execution and delivery by MSE to SMEPA of an appropriate instrument of assignment identifying the specific contract to be assigned to SMEPA.

(c) By execution of this Agreement MSE shall, as of the Closing, be deemed to have granted, conveyed, and assigned to SMEPA, to the extent permitted by law, contract, or otherwise, an undivided ownership interest in such contracts, permits, authorizations, licenses, or other intangible rights and any other contracts, permits, authorizations, licenses, or other intangible rights entered into or obtained prior to the Closing, with respect to Grand Gulf, whether or not listed on Exhibit G hereto, other than those expressly excepted in Exhibit G or by the provisions of this Section 2.04(b), equal to the undivided ownership interest of SMEPA in Grand Gulf determined from time to time under Section 2.02 and Section 2.03, and SMEPA shall be deemed as of each Payment and Adjustment Date and the Final Adjustment Date to have been granted such an undivided ownership interest of the benefits, and to have accepted and assumed a proportionate share of the obligations, of all such contracts, permits, authorizations, licenses, or other intangible rights.

(d) Without regard to whether any contract, permit, authorization, license, or other intangible right relating to Grand Gulf (other than those expressly excepted in Exhibit G or by the provisions of this Section 2.04(b))

is deemed assigned pursuant to this Section, after the Closing, (i) except as otherwise provided in Section 2.03, title to property which comprises, or is intended to comprise, a part of Grand Gulf shall be acquired directly by, and by virtue of this Agreement, shall vest directly in, MSE and SMEPA as tenants in common in accordance with their undivided ownership interests in Grand Gulf, and (ii) SMEPA agrees to be bound by the terms of all contracts, permits, authorizations or licenses relating to Grand Gulf (including any provisions that limit or protect against liability, nuclear and non-nuclear, or exclude any warranties) to the same extent as if SMEPA were an original signatory to such contract, permit, authorization or license or otherwise a party thereto, provided that SMEPA's liability under any such contracts shall be in proportion to its undivided ownership interest in Grand Gulf determined from time to time under the provisions of this Agreement. SMEPA shall indemnify and hold MSE harmless against any liability resulting from SMEPA's breach of the foregoing covenant.

(e) Further, after the execution of this Agreement, SMEPA, in order to induce parties who have contracted with MSE to agree to the transfer to SMEPA of an undivided ownership interest in Grand Gulf or in any part thereof or to an assignment to SMEPA of an interest in any contract, permit, authorization, license or other intangible right, shall,

upon request of MSE, enter into an agreement with any such party consenting, with respect to and in proportion to its undivided ownership interest in Grand Gulf, to be bound by the provisions of any such contract, permit, authorization, license or other intangible right in the same manner and to the same extent as MSE and making such other representations as may be reasonably required by such party. After the Closing, MSE and SMEPA shall be severally (but not jointly) responsible for their respective share of all amounts payable under or with respect to all contracts, permits, authorizations, licenses, or other intangible rights.

Section 2.05. Indemnification. SMEPA agrees to indemnify and reimburse MSE for all of MSE's taxes of all types, except those taxes for which SMEPA has agreed to indemnify or reimburse MSE under Section 6.07, including all costs, expenses, and fees in connection with such taxes of all types (any taxes measured by income being computed at statutory rates without reduction for credits and grossed up in accordance with the statutory rates at which they are imposed), together with interest and penalties, incurred in or resulting from the transactions contemplated by Sections 2.01 through 2.04 of this Agreement, regardless of whether incurred, imposed or paid before, on or after the Final Adjustment Date. No indemnification shall be required under this Section 2.05 for taxes of all types of MSE with respect

to the payment, under Section 2.03 of this Agreement, of $1,500,000 by SMEPA for costs relating to Grand Gulf that have not been capitalized, such as planning, negotiation, education and similar unallocated administrative and general expenses. Insofar as the indemnification or reimbursement of taxes measured by income is specifically set forth in the Indemnification Agreement, no indemnification shall be required under this Section 2.05 except as required under the terms of the Indemnification Agreement.

Section 2.06. Accounting for Cost of Construction. Subsequent to the Closing, at such reasonable times as SMEPA may request, MSE shall furnish SMEPA such information as SMEPA shall reasonably require in order to verify all SMEPA's payments of Cost of Construction and MSE's AFUDC. Both SMEPA and MSE shall have until the 180th day after the Final Adjustment Date to question or contest the correctness of the payments made prior thereto, after which time the correctness of such payments shall be conclusively presumed. In the event of an error in the calculation of any such payments or the undivided ownership interests of MSE and SMEPA in Grand Gulf, SMEPA or MSE shall, following notice of such erroneous calculation from the other party, within 30 days of agreeing as to the amount of the error, reimburse the other party for the amount charged or failed to be charged in error or otherwise rectify the error.

Section 2.07. Excess Uranium Provision. As an exception to the requirements of Sections 2.01 through 2.03 that MSE and SMEPA will have undivided ownership interests in Grand Gulf proportionate to their contributions to Cost of Construction plus their respective accrued AFUDC, it is agreed that MSE will own 100% of any Excess Uranium, as such term is defined in the letter agreement dated June 15, 1978 by and between System Fuels, Inc. and Arkansas Power & Light Company, a copy of which is attached hereto as Exhibit H, which it may acquire from time to time, and SMEPA will have no undivided ownership interest or any other right therein under the terms of this Agreement. MSE will assume all of the cost and expense of acquiring, storing, processing and disposing of Excess Uranium, and no such costs will be chargeable as a Cost of Construction to SMEPA.

ARTICLE III - CONSTRUCTION PERIOD

Section 3.01. Completion of Construction. MSE shall have the sole authority and responsibility for the planning, design, licensing, acquisition, construction, completion, training for operation, startup, renewal, addition, replacement, decommissioning, entombment and disposal of Grand Gulf or any portion of Grand Gulf. MSE will use its reasonable best efforts fully to comply with all require-

ments of all applicable statutes and the rules and regulations of the NRC and such other regulatory agencies as shall have competent jurisdiction over the planning, design, licensing, acquisition, construction, completion, training for operation, startup, renewal, addition, replacement, decommissioning, entombment and disposal of Grand Gulf or of any portion of Grand Gulf. MSE will use its reasonable best efforts in accordance with Good Utility Practice to proceed with the construction and completion of Grand Gulf Units No. 1 and No. 2. MSE is presently scheduling Grand Gulf Unit No. 1 for Commercial Operation by April 1, 1982, and Grand Gulf Unit No. 2 for Commercial Operation by April 1, 1986. The construction schedule for each Grand Gulf Unit may be revised from time to time by MSE to reflect actual progress in the planning, designing, licensing, acquiring, construction, completion, training for operation, and startup for each Unit, and MSE shall not be liable or responsible to SMEPA for any delay in commencement of Commercial Operation of either Grand Gulf Unit No. 1 or Grand Gulf Unit No. 2 beyond such dates, except as provided in Article IV. Costs incurred in connection with, or as a result of, the rescheduling of the construction of Grand Gulf, or any part thereof, in accordance with the provisions of this Agreement shall be shared by MSE and SMEPA in accordance with their respective undivided ownership interests in Grand Gulf. MSE

shall promptly notify SMEPA of all material changes in the construction schedule for each Unit of Grand Gulf.

Section 3.02. Execution of Contracts. After the Closing any contract covering design, engineering, procurement, construction and installation services and major components of Grand Gulf, including any contract for the acquisition of materials, inventories, supplies, spare parts, equipment, fuel, Nuclear Fuel, or services therefor, shall be executed solely by MSE, or by MSE for itself and on behalf of SMEPA. Also, the firm or firms responsible for the engineering and construction of Grand Gulf, including but not limited to Bechtel Power Corporation, may be authorized by MSE to sign contracts as agent for MSE and SMEPA relating to the design, engineering, procurement, construction and installation of Grand Gulf. MSE will use its best efforts, consistent with the objection of economic and timely completion of Grand Gulf, to obtain in each such contract entered into after the Closing, wherein the aggregate contract price is estimated to exceed $1,000,000, the inclusion of a provision providing for several but not joint liability of MSE and SMEPA under such contracts in proportion to their respective undivided ownership interests in Grand Gulf. Each such contract may provide for separate invoicing to SMEPA in accordance with its undivided ownership interest in Grand Gulf. Whether or not any such contract is entered

into in the name of both parties, after the Closing each party shall, except as otherwise expressly provided in this Agreement, (a) be severally and not jointly responsible for its share of all amounts which are payable under or with respect to such contracts, (b) indemnify and reimburse the other party for payments made by such other party with respect to or on account of any part of the share of such amounts owed by the indemnifying or reimbursing party, and (c) take title to the property included in Grand Gulf and covered by such contracts in proportion to its undivided ownership interest in Grand Gulf. In order to induce third parties to contract with MSE with regard to the performance of MSE's obligations to SMEPA under this Agreement, SMEPA hereby agrees to indemnify any such contracting party to the extent of any liability arising under such contract in proportion to SMEPA's undivided ownership interest in Grand Gulf, notwithstanding the fact that such contract may be made only in the name of MSE. To the extent feasible and desirable, no contract contemplated by this Section shall provide for retention by a supplier of title to major components purchased for Grand Gulf after the delivery of such components at the Grand Gulf site.

Section 3.03. Progress Payment of Cost of Construction. At all times after the Final Adjustment Date and whether prior to or after Commercial Operation of either

Unit, SMEPA shall pay to MSE an amount equal to 10% of the Cost of Construction of Grand Gulf Unit No. 1 and Grand Gulf Unit No. 2, as the case may be, payable as follows: MSE will, on or before the first day of each month, commencing with the month immediately preceding the Final Adjustment Date, notify SMEPA of the Cost of Construction anticipated to be incurred by MSE during the succeeding calendar month plus any adjustments for Cost of Construction incurred in prior months but not previously charged or credited to SMEPA. SMEPA shall pay an amount equal to 10% of such anticipated Cost of Construction as so adjusted on the first day of such succeeding month (or on such other day or days in such month as shall be designated in the notice) to the MSE-SMEPA Grand Gulf Construction Account, and MSE shall, on such date, pay 90% of such Cost of Construction into said account. The first of such payments shall be made at the Final Adjustment Date. All such payments shall be in Immediately Available Funds. As agent for the parties MSE shall draw down such funds as needed to pay the Cost of Construction. MSE may, without liability to SMEPA, at any time before the date payment into the MSE-SMEPA Grand Gulf Construction Account is due, cancel the call for such funds. MSE will provide SMEPA with such information as is reasonably required by SMEPA in order for SMEPA to account for the payment of the Cost of Construction on its books and for

retirement of Grand Gulf. MSE will give SMEPA as much notice as is reasonably practicable of any major anticipated costs.

Section 3.04. MSE-SMEPA Grand Gulf Construction Account. Funds in the MSE-SMEPA Grand Gulf Construction Account may be invested, and shall be invested to the extent practicable, at MSE's direction and for the benefit of both parties, in United States bonds, bills, Treasury notes or certificates, certificates of deposit of Mississippi banks and other investments permitted by law, and profits and losses from said investments shall be shared by the parties in accordance with their undivided ownership interests in Grand Gulf; provided that should SMEPA object to the type of investments made by MSE, then from and after 90 days after such objection, SMEPA's share of such funds shall be invested in such type of investments as shall be designated by SMEPA; profits and losses therefrom shall be allocated solely to SMEPA; and SMEPA shall have no share in the profits and losses from investments made in respect of MSE's payments.

Section 3.05. No Delay in Payments by SMEPA. No disagreement or dispute of any kind between MSE and SMEPA concerning any matter, including without limitation, the amount of any payment due from SMEPA or the correctness of any charge made to SMEPA, or any other reason, excuse or circumstance, including Force Majeure, shall permit SMEPA to



S305-0024-

delay or withhold any payment due and owing under this Agreement, provided, however, SMEPA shall have the right to make any payment required of it under protest and reserve its rights under Section 3.06.

Section 3.06. Contest of Payment of Cost of Construction; Waiver. No payment made pursuant to Section 3.03 shall constitute a waiver of any right of SMEPA to question or contest, pursuant to the following sentence, the correctness of that portion of the Cost of Construction charged to SMEPA by MSE. SMEPA shall have until the 180th day after the end of each calendar year to question or contest the correctness of any charge or adjustment made in the preceding calendar year, after which time the correctness of such charge or adjustment shall be conclusively presumed; provided that MSE shall credit SMEPA with its allocable share of recoveries, whenever received, from third parties and shall charge or credit SMEPA with its allocable share of underpayments or overpayments of Cost of Construction, as the case may be, discovered by MSE at any time. Force Majeure will not excuse failure by MSE to credit SMEPA with its allocable share of recoveries or overpayments of Cost of Construction arising at any time.

Section 3.07. Availability of Records; Annual Audit. MSE will permit SMEPA, at SMEPA's expense, to examine all records regarding construction of Grand Gulf. At the

end of each calendar year SMEPA may, at its option, conduct, or cause to be conducted, an audit of the books and records of MSE relating to Grand Gulf, and such audit shall be completed within ninety (90) days of the end of the calendar year.

Section 3.08. Agent for Construction; Limitation of Liability. SMEPA hereby irrevocably appoints MSE its agent in connection with Grand Gulf to act on its behalf in the planning, design, licensing, acquisition, construction, completion, training for operation, startup, renewal, addition, replacement, decommissioning, entombment and disposal of Grand Gulf or any portion of Grand Gulf and authorizes MSE in the name and on behalf of SMEPA to take all reasonable actions which, in the discretion and judgment of MSE, it deems necessary or advisable to effect the planning, design, licensing, acquisition, construction, completion, training for operation, startup, renewal, addition, replacement, decommissioning, entombment and disposal of Grand Gulf or any portion of Grand Gulf. MSE accepts such appointment. Without limiting the generality of the foregoing, acting for itself and SMEPA, MSE may:

(i) in conformity with the provisions of Section 3.02, make such agreements and modifications of existing or future agreements and take such other action, including settlement of claims and disputes, as MSE deems necessary or appropriate,

in its sole discretion, or as may be required under the regulations or directives of the NRC or such other regulatory agencies having jurisdiction, with respect to the planning, design, licensing, acquisition, construction, completion and training for operation of Grand Gulf, the procurement, replacement, modification or renewal of all or any part thereof, and if necessary, the retirement, decommissioning, entombment, disposal or salvaging of all or any part thereof, whether before or after Commercial Operation; and

(ii) execute and file with the NRC, or other regulatory agency having jurisdiction, applications, amendments, reports and other documents and filings in or in connection with licensing and other regulatory matters with respect to Grand Gulf; and

(iii) receive on SMEPA's behalf any notice or other communication from the NRC or other regulatory agency having jurisdiction, as to any licensing or other regulatory matter with respect to Grand Gulf; and

(iv) appoint agents for the purpose of discharging any of the obligations imposed upon it in this Agreement or revoke such agencies, subject to all necessary regulatory approvals, (it being

understood that MP&L presently acts as MSE's general agent under the Service Agreement in connection with Grand Gulf to the extent and in the manner permitted therein), provided that no such appointment shall relieve MSE of any obligation to SMEPA hereunder.

In discharging its obligations hereunder, MSE shall have the right, either on its own behalf or on its own behalf and on behalf of SMEPA, to contract with itself or any MSE Affiliate for the purchase, at cost, of any equipment, facilities, Nuclear Fuel or for the performance of services, at cost, in connection with Grand Gulf. To the extent permitted by law, SMEPA shall not be entitled to recover from MSE, its agents, employees or insurers (except to the extent it shall be entitled to share in insurance recoveries under Section 3.11) for any damage resulting from negligence, error or delay in the planning, design, licensing, acquisition, construction, completion, training for operation, startup, renewal, addition, replacement, decommissioning, entombment and disposal of Grand Gulf or any portion of Grand Gulf, or for any damage thereto, any curtailment of power, or any damages of any kind, including consequential damages, occurring during the course of planning, licensing, design, construction, acquisition, completion, startup, decommissioning, entombment or disposal of Grand Gulf or otherwise arising out of the

performance of this Agreement, unless such damages (other than consequential damages, which shall not be recoverable in any event) shall have resulted from gross negligence of MSE, its agents or employees; but all such damages (other than consequential damages, which shall not be recoverable in any event), other than those resulting from gross negligence of MSE, shall be shared by MSE and SMEPA as a Cost of Construction in proportion to their respective undivided ownership interest in Grand Gulf. In no event shall MSE be liable to SMEPA for any such loss in an amount greater than SMEPA's uninsured loss. SMEPA shall be entitled to share in any such damages which may be recovered by MSE from any third party, including insurers, in accordance with its undivided ownership interest in Grand Gulf. As used in this Section, the term "consequential damages" shall include but not be limited to damage or loss of other property or equipment, loss of profits or revenue, loss of use of power system, cost of capital, cost of purchased or replacement power, or claims of customers for service interruption. The duty of MSE to perform its obligations under this Agreement in a prudent manner and in accordance with Good Utility Practice shall be construed or modified to the extent necessary to give full effect to the provisions of this Section, but this Section shall not excuse a breach of this Agreement constituting gross negligence. Each party hereto shall

individually bear, and shall indemnify the other party against, all costs, losses, liabilities and expenses resulting from its own gross negligence, but in the event MSE, in the performance of its duties under this Agreement, otherwise incurs any liability to any third party, any amount paid by MSE on account of such liability shall be considered a Cost of Construction and apportioned between the parties in accordance with their respective undivided ownership interests in Grand Gulf.

Section 3.09. Information. MSE shall make all reasonable efforts to inform SMEPA as to the planning for and progress of construction, acquisition, completion, and startup of Grand Gulf and shall furnish SMEPA such reports and contracts as are related thereto at such times as are indicated on Exhibit I hereto. No failure by MSE to provide information pursuant to the provisions of this Section, shall release SMEPA from any obligation hereunder.

Section 3.10. Cooperation. MSE and SMEPA will cooperate with each other in all activities relating to Grand Gulf, including without limitation, the execution and filing of applications for authorizations, permits and licenses and the execution of such other documents as may be reasonably necessary to carry out the provisions of this Agreement. Except at the written request of MSE, SMEPA shall not incur any obligation or do any other act in con-