nection with Grand Gulf which would or could obligate MSE to any third party. The obligation of cooperation contained in this Section does not imply that MSE does not have full power of authority to execute applications and documents on behalf of SMEPA as contemplated by Section 3.08.

Section 3.11. Insurance. With respect to Grand Gulf, MSE shall carry in the name of MSE and SMEPA, and in proportion to their respective undivided ownership interests therein, builder's risk or installation floater insurance, and such other insurance, in an amount, with such deductible or self-insurance features and including such risks as is consistent with MSE's customary practices, provided such insurance is available. MSE shall also reasonably satisfy itself that all contractors, subcontractors, engineers and all equipment suppliers or manufacturers have adequate insurance and limits thereof, with carriers approved by MSE (to the extent permissible), for workmen's compensation, public liability, contractors' liability and such other hazards as MSE shall deem appropriate with respect to Grand Gulf, or MSE, at its option, may provide for such insurance in the nature of an overall owner-directed program, with the parties, including owners, contractors and subcontractors, involved in Grand Gulf being insured thereunder as their interest may appear. MSE will keep in force the nuclear liability insurance and the indemnity agreement with respect

to Grand Gulf as required by Section 170 of the Atomic Energy Act of 1954, as amended [42 U.S.C.A. Sec. 2210], and such other insurance as may be necessary to comply with any applicable regulations of the NRC or any other regulatory agency having jurisdiction, with MSE and SMEPA being named therein in proportion to their respective undivided ownership interests in Grand Gulf. The aggregate cost of all insurance procured pursuant to this Section, including without limitation any retrospective assessment, shall be considered a Cost of Construction and as such shall be apportioned between MSE and SMEPA pursuant hereto. SMEPA may at its sole expense purchase and take out any additional insurance for its sole use and benefit as SMEPA may deem necessary, provided the interests of MSE are not thereby adversely affected. SMEPA shall advise MSE of the terms of any such additional insurance prior to entering into any contract therefor. All of the insurance policies obtained by either party shall contain waivers of subrogation against the other party, if obtainable from the insurer. If not prohibited under the terms of the insurance contracts, MSE and SMEPA hereby waive their rights of recovery against each other to the extent that any loss experienced by MSE or SMEPA is covered by insurance carried by or on behalf of either party.

Section 3.12. Nuclear Fuel. MSE shall have the authority and shall use its best efforts to acquire and manage all Nuclear Fuel for Grand Gulf according to its sole discretion and judgment, including, without limitation, reloading, spent storage, reprocessing and waste disposal matters relating to Nuclear Fuel. MSE shall also have the right to enter into any arrangement, on its behalf and on behalf of SMEPA, for obtaining and financing, by purchase, lease or otherwise, Nuclear Fuel for Grand Gulf which MSE, in its sole discretion, shall deem desirable, and SMEPA agrees to cooperate with MSE and, subject to all required approval of the REA, to take all action required to consummate any such arrangements. MSE may acquire Nuclear Fuel from SFI or others, for itself and others. Each party shall have the right to mortgage, pledge or encumber its investment in Nuclear Fuel for Grand Gulf, without the consent of the other party, subject to the exclusive right of MSE to acquire and manage all Nuclear Fuel for Grand Gulf according to its sole discretion and judgment as provided in this Section 3.12. This Section applies only insofar as the cost of Nuclear Fuel is deemed a Cost of Construction in accordance with standard accounting practices applicable to MSE and only to the extent the Operating Agreement is not otherwise applicable.

Section 3.13. Pollution Control Facilities. MSE and SMEPA shall each have the right to enter into any separate arrangements for the purpose of financing their respective undivided ownership interests in facilities and equipment located at Grand Gulf for the control of environmental pollution through the issuance by Claiborne County, Mississippi, or its successors or assigns, or any other political subdivision, of its notes or bonds, or both, the interest of which shall be exempt from federal income taxes. Each party agrees to cooperate with the other and to take all action required to consummate any such financing of pollution control facilities and equipment for Grand Gulf.

ARTICLE IV - DELAY IN COMMERCIAL OPERATION

Section 4.01. Delay in Commercial Operation Caused By Force Majeure. If Commercial Operation of either Grand Gulf Unit No. 1 or Grand Gulf Unit No. 2 is delayed by reason of Force Majeure, neither MSE nor SMEPA shall incur any obligation to the other party.

Section 4.02. Delay in Commercial Operation of Grand Gulf Unit No. 1 Not Caused By Force Majeure. If Commercial Operation of Grand Gulf Unit No. 1 is delayed until after April 1, 1982 for any reason which is not Force Majeure, then there shall be made available to SMEPA through

Section 2.01 of the Substitute Power Agreement, Capacity and Energy in the manner and amount, and at the cost, determined pursuant to the Substitute Power Agreement. If such Capacity and Energy is not available to SMEPA under Section 2.01 of the Substitute Power Agreement, MSE shall, if it has available to it from sources other than Grand Gulf, Capacity and Energy equivalent to the amount of Capacity and Energy which would have been available to SMEPA under Section 2.01 of the Substitute Power Agreement which is excess to its needs, supply such excess Capacity and Energy to SMEPA at MSE's average cost thereof, but otherwise under the same terms and provisions as are set forth in Section 2.01 of the Substitute Power Agreement, as if MSE, rather than MP&L, were obligated to supply Capacity and Energy thereunder.

Section 4.03. Delay In Commercial Operation of Grand Gulf Unit No. 2 Not Caused By Force Majeure. If Commercial Operation of Grand Gulf Unit No. 2 is delayed until after April 1, 1986 for any reason which is not Force Majeure, then there shall be made available to SMEPA through Section 2.02 of the Substitute Power Agreement, Capacity and Energy in the manner and amount, and at the cost, determined pursuant to the Substitute Power Agreement. If such Capacity and Energy is not available to SMEPA under Section 2.02 of the Substitute Power Agreement, MSE shall, if it has available to it from sources other than Grand Gulf, Capacity and

Energy equivalent to the amount of Capacity and Energy which would have been available to SMEPA under Section 2.02 of the Substitute Power Agreement which is excess to its needs, supply such excess Capacity and Energy to SMEPA at MSE's average cost thereof, but otherwise under the same terms and provisions as are set forth in Section 2.02 of the Substitute Power Agreement, as if MSE, rather than MP&L, were obligated to supply Capacity and Energy thereunder.

Section 4.04. SMEPA's Remedies for Delay. If Grand Gulf Unit No. 1 is not in Commercial Operation by January 1, 1983, or if Grand Gulf Unit No. 2 is not in Commercial Operation by January 1, 1987, or if MSE notifies SMEPA at any time that either Unit of Grand Gulf will not be in Commercial Operation by such respective dates, then MSE will, at SMEPA's option, which option must be exercised in writing within 30 days after January 1, 1983, with respect to Grand Gulf Unit No. 1, within 30 days after January 1, 1987 with respect to Grand Gulf Unit No. 2 or within 30 days of receipt of the above mentioned notice, as the case may be, subject to securing approval of REA and any regulatory authority having jurisdiction thereof, and to the extent permitted by the MSE Mortgage and MSE Bank Loan Agreement, borrow such amounts from SMEPA as may be necessary to complete the construction of Grand Gulf Unit No. 1 or Grand Gulf Unit No. 2, as the case may be, and MSE shall proceed

expeditiously toward such completion. Any such borrowing shall be evidenced by first mortgage bonds issued pursuant to a supplemental indenture to the MSE Mortgage, or such other securities as MSE may be able to issue, and MSE will in good faith negotiate with its bond holders under the MSE Mortgage toward accomplishing such financing agreement as herein agreed to. MSE agrees that the rate of interest on any such borrowings will equal the effective interest rate paid by SMEPA on SMEPA's borrowings effected to obtain the funds to be advanced to MSE hereunder; provided, however, SMEPA agrees that it will not, without the advance written consent of MSE, effect borrowings which would result in MSE paying an interest cost (calculated in accordance with accepted financial practice) in excess of the rate provided in Section 8.03. In effecting such borrowings, SMEPA shall use its best efforts to obtain the lowest cost of money practicable under the circumstances. The supplemental indenture or other loan agreement pursuant to which any such borrowings are made shall provide that within 180 days following the expiration of five (5) years from the earlier of (1) the Commercial Operation of both Grand Gulf Unit No. 1 and Grand Gulf Unit No. 2, or (2) the Commercial Operation of either unit of Grand Gulf and the abandonment of construction of the other unit, or (3) the abandonment of construction of Grand Gulf, SMEPA may require MSE to redeem

at par from SMEPA all such borrowings. If MSE is then unable to effect such redemption, SMEPA may, subject to obtaining all necessary regulatory approvals, surrender its first mortgage bonds or other securities to MSE and acquire an increased ownership interest in Grand Gulf. The amount of the increase in SMEPA's ownership interest shall be the quotient obtained by dividing the total Cost of Construction of Grand Gulf incurred to the date of the calculation into the aggregate principal amount of MSE's bonds which SMEPA is surrendering to MSE. The increase of ownership interest thus acquired by SMEPA shall be subject to the MSE Mortgage unless released therefrom, and MSE commits itself in good faith to cooperate with SMEPA in obtaining such release. If Grand Gulf Unit No. 1 is not in Commercial Operation by January 1, 1983 or Grand Gulf Unit No. 2 is not in Commercial Operation by January 1, 1987 because of any delay (a) in commencing Commercial Operation of either Unit of Grand Gulf occasioned by Force Majeure, (b) concurred in by SMEPA, or (c) during which SMEPA is in default of any of its material obligations to MSE under this Agreement or the Operating Agreement, the date on which SMEPA may require MSE to borrow from it shall be advanced by the amount of such delay.

Section 4.05. Optional Capital Contribution. If adequate financing on reasonable terms is not available to MSE and such unavailability may result in delay of Commercial

Operation of either Unit of Grand Gulf (whether due to Force Majeure or otherwise) MSE may, at its option, request SMEPA to lend its funds to MSE to permit the continuation of construction, and SMEPA agrees to lend MSE such funds as it may have available and as it deems desirable to lend.

Section 4.06. MSE's Optional Remedy For SMEPA's Failure to Provide Funds. In the event SMEPA is unable to pay its share of the Cost of Construction owing at any time, MSE may, but shall not be obligated, in lieu of treating such failure as a default by SMEPA for which the remedies provided in Article VIII of this Agreement are available, pursue the following arrangements at any time subsequent to SMEPA's default.

(a) First, MSE may elect to lend SMEPA and SMEPA may elect to borrow from MSE an amount equal to SMEPA's share of the Cost of Construction so that construction of Grand Gulf may continue according to the desired schedule and SMEPA's undivided ownership interest therein shall (1) increase in accordance with Section 2.02 if such loans are made prior to the Final Adjustment Date, or (2) remain constant in accordance with Section 2.03 and Section 3.03 if such loans are made subsequent to the Final Adjustment Date. Each advance by MSE to SMEPA, on the terms hereafter provided, shall excuse, pro tanto, each separate default by SMEPA in advancing such funds to MSE but shall in no way operate to

excuse or release SMEPA from any future failure to advance its share of the Cost of Construction or any other default under this Agreement. Any such borrowing shall be evidenced by first mortgage notes issued pursuant to a supplemental mortgage to the SMEPA Mortgage, and SMEPA will in good faith negotiate with its noteholders under the SMEPA Mortgage toward accomplishing such financing agreement as herein agreed to. SMEPA agrees that the rate of interest on any such borrowings will equal the effective capital cost incurred by MSE to obtain the funds to be lent to SMEPA hereunder; provided, however, MSE agrees that it will not, without the advance written consent of SMEPA, incur capital costs which would result in SMEPA paying an interest cost (calculated in accordance with accepted financial practice) in excess of the rate provided in Section 8.03. In obtaining such capital, MSE shall use its best efforts to obtain the lowest cost of money practicable under the circumstances. The first mortgage notes issued by SMEPA to MSE hereunder will be secured by a direct first mortgage lien on SMEPA's undivided ownership interest in Grand Gulf and shall have such other terms and provisions as the parties may mutually agree to at the time. The foregoing arrangements shall be subject to SMEPA obtaining all necessary regulatory approvals and the approval of the REA and the CFC.

(b) Second, whether or not the arrangements set forth in paragraph (a) are permissible or practicable at the time, MSE may, subject to obtaining all necessary regulatory approvals, elect to provide funds in respect of each separate default by SMEPA in advancing its share of the Cost of Construction, which funds will be applied to the Cost of Construction so that construction of Grand Gulf may continue according to the desired schedule. Each amount so provided by MSE will excuse, pro tanto, each separate default by SMEPA in advancing such funds to MSE, but shall in no way operate to excuse or release SMEPA from any future failure to advance its share of the Cost of Construction or any other default under this Agreement. Each amount so provided by MSE will also increase MSE's undivided ownership interest in Grand Gulf (expressed as a percentage) to the quotient obtained by dividing the total Cost of Construction of Grand Gulf incurred to the date of the calculation, net of MSE's and SMEPA's accrued depreciation thereon, if any, plus MSE's and SMEPA's AFUDC thereon, into the sum of the Cost of Construction theretofore incurred by MSE, net of MSE's accrued depreciation thereon plus MSE's AFUDC thereon, and the amount advanced by MSE on behalf of SMEPA. SMEPA's undivided ownership interest in Grand Gulf (expressed as a percentage) will decrease by the amount of each increase in MSE's undivided ownership interest in Grand Gulf (expressed

as a percentage) as determined in accordance with this paragraph (b). No such decrease in SMEPA's undivided ownership interest in Grand Gulf (expressed as a percentage) will diminish or adversely affect the lien of the SMEPA Mortgage. Subsequent to each such change in the amount of the respective undivided ownership interests in Grand Gulf owned by MSE and SMEPA, all provisions of this Agreement and the Operating Agreement referring to the undivided ownership interests of the parties in Grand Gulf [including but not limited to provisions concerning sharing of Cost of Construction and Cost of Operation (as such term is defined in the Operating Agreement), sharing of liability, Capacity and Energy entitlements and sharing of contracts] shall be deemed amended to reflect the new undivided ownership interests of the parties in Grand Gulf. MSE and SMEPA agree to take all further action which is necessary or desirable to effect a satisfactory readjustment of their respective undivided ownership interests in Grand Gulf subsequent to each recalculation in accordance with the provisions of this paragraph (b). Subject to obtaining any necessary consent or approval of the REA or the CFC, SMEPA agrees to obtain the release from the lien of the SMEPA Mortgage of any part of its undivided ownership interest in Grand Gulf acquired by MSE as a result of the occurrence of any recalculation contemplated by this paragraph (b), including but not limited

to any real property comprising a part of Grand Gulf. By written notice to MSE, SMEPA may, subject to obtaining all necessary regulatory approvals, exercise the option to purchase from MSE such additional ownership interest in Grand Gulf, which resulted from MSE providing funds, pursuant to this Subsection 4.06(b), for SMEPA's share of Cost of Construction, at a price equal to the original cost to MSE of such additional ownership interest, including AFUDC on MSE's additional ownership in Grand Gulf, plus all reasonable fees, costs, and expenses of MSE associated with MSE's providing funds for SMEPA's share of Cost of Construction and acquiring an increased ownership interest in Grand Gulf; less related accumulated depreciation to the date of such transfer of ownership determined in accordance with rates of depreciation approved for MSE by the Mississippi Public Service Commission. Such notice must be given to MSE within six (6) months from the date of each separate increase in MSE's undivided ownership interest in Grand Gulf, which occurs pursuant to this Subsection 4.06(b). The purchase price for each such additional undivided ownership interest in Grand Gulf shall be payable to MSE in Immediately Available Funds and must be paid to MSE within one (1) year from the date of each separate increase in MSE's undivided ownership interest in Grand Gulf, which occurs pursuant to this Subsection 4.06(b). Upon receipt of such payment, MSE shall

execute such instruments as may be necessary to perfect, subject to the rights of the trustee of the MSE Mortgage, the undivided ownership interest to which SMEPA is restored hereunder. MSE will use its best efforts to obtain a release from the lien of the MSE Mortgage of the undivided ownership interest in Grand Gulf to which SMEPA is restored hereunder. If the notice is not given within the six (6) month period referred to above or if such payment is not made to MSE within the one (1) year period referred to above, MSE shall retain the portion of its undivided ownership interest which resulted from the additional investment in the Cost of Construction of Grand Gulf made by MSE under this subsection and SMEPA shall have no other or further right to reacquire said interest.

Section 4.07. Coordination of Financing. If under the provisions of Section 4.04 or 4.05 financing arrangements are not accomplished so that Grand Gulf Units 1 or 2 are not or will not be in Commercial Operation prior to January 1, 1983 and January 1, 1987, respectively, MSE will use its reasonable best efforts to permit the continuation of construction by coordinating the joint efforts of MSE, SMEPA, MSE's first mortgage bond holders and other interested parties to arrange additional financing by SMEPA, subject to all Governmental and regulatory approvals, and to assist SMEPA in obtaining an increased ownership interest in Grand Gulf free and clear of the lien of the MSE Mortgage.

Section 4.08. Federal Energy Regulatory Commission. The rates and charges for the purchase and sale of Capacity and Energy to be provided by MSE to SMEPA pursuant to Sections 4.02 and 4.03 of this Agreement are subject to amendment and change, and each party reserves the right to seek unilaterally amendments, changes and increases in the rates and charges set forth herein in accordance with law from any regulatory agency having jurisdiction thereof. If and to the extent that this Agreement or any part hereof shall be required to be filed, or shall be filed with any regulatory agency, including, without limitation the Federal Energy Regulatory Commission, as a rate or rate schedule, nothing in this Agreement shall be construed as affecting in any way the right of MSE to make application unilaterally to such agency for a change in rates, charges, classifications, or service, or any rule, regulation, or contract relating thereto under applicable laws and regulations. To the extent that MSE makes any such filing, SMEPA reserves the right to intervene in any proceeding involving such a filing by MSE and shall have the right to object to any proposed change.

ARTICLE V - REPRESENTATIONS AND WARRANTIES

Section 5.01. Representations and Warranties of SMEPA. On and as of the Closing, SMEPA represents, warrants and covenants to MSE as follows:

(i) SMEPA is a corporation duly organized, validly existing and in good standing under the laws of the State of Mississippi and has corporate power and authority to carry on its business as it is now being conducted and as it is contemplated to be conducted after the Closing. SMEPA has delivered to MSE a true and complete copy of its Certificate of Incorporation and Bylaws as amended to the date Closing.

(ii) The execution, delivery and performance of this Agreement (including without limitation, Section 3.02), the Operating Agreement, the Substitute Power Agreement, the Indemnification Agreement and each Special Warranty Deed, Conveyance and Adjustment Agreement and compliance with their respective terms (1) will not violate any provision of any law or regulation or of any order, writ, judgment or decree of any court or governmental instrumentality applicable to SMEPA (except that various consents, permits, licenses and approvals of governmental regulatory authorities must be obtained in connection with the performance of certain provisions of this Agreement and the Operating Agreement to be performed after the date on which this representation is made), (2) will

not violate any provision of the Certificate of Incorporation or Bylaws of SMEPA, and (3) will not violate any provision of, or constitute a default under, or result in the creation or imposition of any lien, charge or encumbrance on or security interest in any of the assets of SMEPA pursuant to the provisions of, any mortgage, indenture, contract, agreement or other undertaking to which SMEPA is a party or which purports to be binding upon SMEPA or upon any of its assets, except that SMEPA's undivided ownership interest in Grand Gulf will be subject to the terms and provisions of this Agreement, each Special Warranty Deed, Conveyance and Adjustment Agreement and the Operating Agreement, and to the terms and provisions and lien of the SMEPA Mortgage.

(iii) There is no action, suit, proceeding or investigation (whether or not purportedly on behalf of SMEPA) pending or threatened against or affecting SMEPA, or its assets, which questions the validity of, or the result of which will have a materially adverse effect on the transactions contemplated by, this Agreement, the Operating Agreement, the Substitute Power Agreement, the Indemnification Agreement and each Special War-

ranty Deed, Conveyance and Adjustment Agreement or any action taken or to be taken pursuant to any such Agreement; and, except as disclosed in a letter to be delivered to MSE at least seven (7) days before the Closing, there is no action, suit, proceeding or investigation (whether or not purportedly on behalf of SMEPA) pending or threatened against or affecting SMEPA, or its assets, which individually or in the aggregate with other such actions, suits, proceedings or investigations, would have a materially adverse effect on the financial condition, business or operations of SMEPA.

(iv) The execution, delivery and performance of this Agreement, the Operating Agreement, the Substitute Power Agreement, the Indemnification Agreement, and each Special Warranty Deed, Conveyance and Adjustment Agreement, and compliance with their respective terms, by SMEPA have been duly and effectively authorized by all requisite corporate, membership, governmental and regulatory action.

(v) This Agreement, the Operating Agreement, the Substitute Power Agreement, and the Indemnification Agreement have been and each Special Warranty Deed, Conveyance and Adjustment

Agreement, when executed and delivered by SMEPA, will be, duly and validly executed and delivered by SMEPA and each constitutes (or will constitute, as the case may be,) a valid and binding obligation of SMEPA enforceable against it in accordance with their respective terms, subject to any limitation of bankruptcy and insolvency laws.

(vi) SMEPA will maintain its corporate existence during the term of this Agreement, the Operating Agreement, the Substitute Power Agreement, the Indemnification Agreement and each Special Warranty Deed, Conveyance and Adjustment Agreement or any extensions of any thereof.

Section 5.02. Representations and Warranties of MSE. On and as of the Closing, MSE represents and warrants to SMEPA as follows:

(i) MSE is a corporation duly organized, validly existing and in good standing under the laws of the State of Arkansas and has corporate power and authority to carry on its business as it is now being conducted and as it is contemplated to be conducted after the Closing. MSE has delivered to SMEPA a true and complete copy of its Articles of Incorporation and Bylaws as amended to the date of Closing.

(ii) The execution, delivery and performance of this Agreement, the Operating Agreement, the Substitute Power Agreement, the Indemnification Agreement and each Special Warranty Deed, Conveyance and Adjustment Agreement and compliance with their respective terms (1) will not violate any provision of any law or regulation or of any order, writ, judgment or decree of any court or governmental instrumentality applicable to MSE (except that various consents, permits, licenses and approvals of governmental regulatory authorities must be obtained in connection with the performance of certain provisions of this Agreement, the Operating Agreement, the Substitute Power Agreement, the Indemnification Agreement and each Special Warranty Deed, Conveyance and Adjustment Agreement to be performed after the date on which this representation is made); (2) will not violate any provision of the Articles of Incorporation or Bylaws of MSE; and (3) will not violate any provision of, or constitute a default under, or result in the creation or imposition of any lien, charge or encumbrance on or security interest in any of the assets of MSE pursuant to the provisions of, any mortgage, indenture, contract, agreement

or other undertaking to which MSE is a party or which purports to be binding upon MSE or upon any of its assets, except that MSE's undivided ownership interest in Grand Gulf will be subject to the terms and provisions of this Agreement, the Operating Agreement and each Special Warranty Deed, Conveyance and Adjustment Agreement.

(iii) There is no action, suit, proceeding or investigation (whether or not purportedly on behalf of MSE) pending or threatened against or affecting MSE, or its assets, which questions the validity of, or the result of which will have a materially adverse effect on the transactions contemplated by, this Agreement, the Operating Agreement, the Substitute Power Agreement, the Indemnification Agreement or each Special Warranty Deed, Conveyance and Adjustment Agreement or any action taken or to be taken pursuant to any such Agreement; and, except as disclosed in a letter to be delivered to SMEPA at least seven (7) days before the Closing, there is no action, suit, proceeding or investigation (whether or not purportedly on behalf of MSE) pending or threatened against or affecting MSE, or its assets, which, individually or in the aggregate with other such

actions, suits, proceedings or investigations, would have a materially adverse effect on the financial condition, business or operations of MSE.

(iv) The execution, delivery and performance of this Agreement, the Operating Agreement, the Substitute Power Agreement, the Indemnification Agreement and each Special Warranty Deed, Conveyance and Adjustment Agreement, and compliance with their respective terms, by MSE have been duly and effectively authorized by all requisite corporate, governmental and regulatory action.

(v) This Agreement, the Operating Agreement, the Substitute Power Agreement and the Indemnification Agreement have been and each Special Warranty Deed, Conveyance and Adjustment Agreement, when executed and delivered by MSE, will be, duly and validly executed and delivered by MSE and each constitutes (or will constitute, as the case may be,) a valid and binding obligation of MSE enforceable against it in accordance with their respective terms, subject to any limitation of bankruptcy and insolvency laws.

ARTICLE VI - GENERAL COVENANTS OF THE PARTIES

Section 6.01. No Adverse Distinction. Notwithstanding any other provision of this Agreement, neither MSE nor MP&L, as its agent under this Agreement, shall make any distinction adverse to Grand Gulf between Grand Gulf and any other generating unit because of MSE's co-ownership of Grand Gulf with SMEPA, and neither MSE nor MP&L, as its agent under this Agreement, shall be under any obligation to make any distinction favorable to Grand Gulf between Grand Gulf and any other generating unit because of MSE's co-ownership of Grand Gulf with SMEPA.

Section 6.02. Alienation and Assignment. During the useful life of Grand Gulf, except with the prior written consent of the other, and except as hereinafter provided in Sections 6.03 and 6.04, neither MSE nor SMEPA shall have the right to sell, lease, convey, transfer, assign, encumber or alienate in any manner whatsoever its ownership interest, or any portion or portions thereof, in Grand Gulf or any rights under this Agreement without first offering, subject to all requisite regulatory approvals, including, without limitation, approval of the SEC and the NRC, such sale, lease or other conveyance to the other party upon the same terms and conditions as may be proposed for a sale, lease or conveyance to a third party. Any such offer shall be made in the form

of a proposed contract which shall be open for acceptance by the other party for a period of 90 days. In the event such an offer is accepted, both parties shall proceed to a closing pursuant to the terms of such contract in an expeditious manner, subject to obtaining all necessary regulatory approvals. In the event such offer is not accepted by the other party within the aforesaid 90 day period and the offering party does not consummate a sale, lease or other conveyance of such interest within a period of one year after the date of its offer to the other party, no such sale, lease or other conveyance may be consummated without re-offering the sale, lease or conveyance to such other party. In no event shall the offering party sell, lease or convey such interest to any third party on any terms at variance from those set forth in the aforesaid proposed contract. In the event of any sale, conveyance, transfer, assignment or alienation (other than solely as security for an indebtedness) by MSE or SMEPA of its ownership interest, or any portion or portions thereof, in Grand Gulf, MSE or SMEPA, as the case may be, shall, subject to obtaining all necessary regulatory approvals, cause such transferee to become a party to this Agreement and assume pro rata the obligations and the rights of the transferor hereunder. Notwithstanding the foregoing, MSE shall be under no obligation in such event to assign, proportionately or otherwise, any part of its authority and

responsibility under Section 3.01 to plan, design, license, acquire, construct, complete, train for operation, startup, renew, add to, replace, decommission, entomb and dispose of Grand Gulf or any authority and responsibility related thereto under this Agreement. The "first refusal" rights of SMEPA provided in this Section shall not be enforceable against MSE so long as and to the extent either the MSE Mortgage or the MSE Bank Loan Agreement prohibit the creation of such a right in SMEPA.

Section 6.03. Right to Mortgage. Notwithstanding the provisions of Section 6.02 MSE and SMEPA each shall have the right to create a mortgage lien or security interest in its proportionate ownership interest in Grand Gulf, or any part thereof, to secure bonds or other obligations issued or to be issued as part of a financing program, without the approval of the other party. In addition, notwithstanding the provisions of Section 6.02, both MSE and SMEPA shall each have the right to sell, subject to obtaining all necessary regulatory approvals, in connection with a sale and leaseback transaction, their undivided ownership interest in any construction equipment to be used during the construction phase of Grand Gulf, office space and transportation, data processing or communications equipment comprising a part of Grand Gulf.

Section 6.04. MSE's Right to Sell in Certain Cases. Subject to obtaining all necessary regulatory approvals, MSE shall have the right to sell, lease, convey, transfer, assign, encumber or alienate all or any part of its interest in Grand Gulf or all or any of its rights under this Agreement (a) to any MSE Affiliate, (b) to any "entity" as defined in the Construction Permit, pursuant to the terms thereof, (c) for the purpose of complying with an order or orders of a governmental body having jurisdiction in the premises, or (d) to any governmental or political subdivision in connection with the financing of pollution control facilities, in all cases without obtaining the consent of SMEPA and without complying with the "first refusal" provisions of Section 6.02, and any sale, conveyance or transfer by MSE of an ownership interest in Grand Gulf, wherein the purchaser assumes the obligations of MSE under this Agreement, the Operating Agreement, the Substitute Power Agreement, the Indemnification Agreement and each Special Warranty Deed, Conveyance and Adjustment Agreement in proportion to the ownership interest sold, conveyed or transferred, shall operate as a release, pro tanto, of MSE from any further obligation under this Agreement, the Operating Agreement, the Substitute Power Agreement, the Indemnification Agreement and each Special Warranty Deed, Conveyance and Adjustment Agreement.

Section 6.05. Right of Partition. MSE and SMEPA hereby expressly waive and renounce for the useful life of Grand Gulf, for themselves, their successors, transferees, assigns and mortgagees, all rights as tenants in common in Grand Gulf to require partition or division of Grand Gulf, except as herein expressly stated.

Section 6.06. Imposition of Liens. Both MSE and SMEPA shall notify each other in writing as soon as possible after either of them learns that any lien or security interest (which lien or security interest in the case of MSE only is in respect of an obligation or liability in excess of $100,000) other than the liens of the MSE Mortgage and the SMEPA Mortgage, or any security interest created thereby, or any liens or security interests which would be permitted or excepted encumbrances under either such instrument, has been or will be imposed upon its respective ownership interest in Grand Gulf or has reason to believe that such a lien or security interest will be imposed.

Section 6.07. Taxes. MSE and SMEPA shall separately (except as required by law to file other than separately) report, file returns with respect to, be responsible for and pay all real property, franchise, business, or other taxes or fees, arising out of the acquisition by MSE and SMEPA of undivided ownership interests in Grand Gulf and their co-ownership of Grand Gulf; provided that for federal income

tax purposes and for purposes of other taxes measured by income pursuant to which co-ownership is treated as the equivalent of a partnership, no election will be made to be excluded from the partnership provisions of the applicable statutes, a separate agreement shall be entered into concerning such taxes and partnership returns shall be filed by MSE in a form similar to Exhibit J hereto, and provided, that to the extent that taxes or fees may be levied or assessed against MSE and SMEPA in such a manner so as to make impossible the carrying out of the foregoing provisions of this Section 6.07, or upon the agreement of the parties, or at the election of MSE, MSE shall pay such taxes or fees and SMEPA shall immediately reimburse MSE for such payments as if they were a Cost of Construction. MSE shall have no obligation to contest or to seek refund of such taxes or fees provided however that MSE may, by its personnel or counsel of its selection, pursue administrative or court proceedings determined by MSE. SMEPA shall on request pay MSE a share of the costs of such proceedings determined in proportion to SMEPA's obligation to reimburse MSE for taxes and fees and shall share in the savings resulting from such proceedings in the same proportion. Insofar as the indemnification or reimbursement of taxes measured by income is specifically set forth in the Indemnification Agreement, no indemnification shall be required under this Section 6.07

except as required under the terms of the Indemnification Agreement. In the event that ad valorem taxes are assessed with respect to more than MSE's undivided ownership interest in Grand Gulf, SMEPA shall pay such additional ad valorem taxes. (For example, if ad valorem taxes are assessed with respect to ninety-five percent (95%) of Grand Gulf and MSE's undivided ownership interest at that time is ninety percent (90%), SMEPA shall pay 5/95ths of the ad valorem taxes.)

Section 6.08. Commitment for Financing. SMEPA shall obtain on or before the Closing, a commitment notice satisfactory to MSE of a Federal Financing Bank loan with an REA guarantee or other financing source satisfactory to MSE, providing for not less than $325 million for financing SMEPA's undivided ownership interest in Grand Gulf.

Section 6.09. Regulatory Approvals. MSE and SMEPA shall use their best efforts to obtain as quickly as possible all requisite government, regulatory and vendor approvals of the consummation of the transactions contemplated hereby.

Section 6.10. Licensee. SMEPA, at its own expense, will become, prior to the Closing, a licensee of the NRC and any other regulatory agency having jurisdiction over Grand Gulf, where such approvals are necessary. SMEPA hereby appoints MSE as its agent to handle the application by SMEPA to become a licensee as provided herein.

other mortgage or deed of trust granted by SMEPA on Grand Gulf pursuant to Section 6.03, provided, however, that in the event SMEPA enters into a new or substituted mortgage or deed of trust, SMEPA shall take such steps as are necessary to assure that the trustees and bondholders under such new or substituted mortgage or deed of trust have no greater power to affect the rights of MSE under this Agreement than the trustees and bondholders under the SMEPA Mortgage have at present.

Section 6.12. Right of Eminent Domain. During the term of this Agreement and the Operating Agreement, and any extension of either, SMEPA and MSE, to the extent not prohibited by law, hereby waive any power of eminent domain that either may have as to any of the property or assets of the other situated at Grand Gulf.

Section 6.13. Sale of Land under Certain Circumstances. If MSE in its sole discretion and for any reason, decides to sell an ownership interest in any of its real property described in Exhibit B, and such sale does not unreasonably burden or interfere with Grand Gulf, SMEPA agrees to use its best efforts to obtain the necessary releases for the purpose of such sale under any mortgage indenture to which it is a party and subject to obtaining the prior approval of REA and at no additional cost to MSE other than the consideration hereof, to release to MSE, for

the purpose of such sale, any easements, servitudes, licenses, or other rights it may have in such real property.

## ARTICLE VII - CONDITIONS PRECEDENT

Section 7.01. Conditions to Effectiveness of Agreement. Contemporaneously with the Closing, and as a condition to the effectiveness of this Agreement, the Operating Agreement, the Substitute Power Agreement and the Indemnification Agreement:

(i) SMEPA is causing to be delivered to MSE an opinion from John K. Keyes, Esq., of Collins, Mississippi, counsel for SMEPA (or other satisfactory counsel), addressed to MSE and dated the Closing date, to the effect provided in subsections (i) (other than the last sentence thereof) through (v) of Section 5.01; except that, as to matters referred to in Section 5.01(ii)(3), the opinion need relate only to those mortgages, indentures, contracts, agreements or undertakings known to such counsel; as to actions, suits, investigations or proceedings threatened against or affecting SMEPA referred to in Section 5.01(iii), the opinion need only be to the best knowledge of such counsel, having made due inquiry with respect thereto; and

as to the Agreements constituting valid and binding obligations of SMEPA enforceable against it according to their terms, referred to in Section 5.01(v), the opinion may be made subject to applicable equitable principles, which may affect certain remedies provided therein, which equitable principles, however, in the opinion of such counsel, do not make the remedies provided therein inadequate for the realization of the benefits provided therein; in providing all such opinions, John K. Keyes, Esq., may rely, to the extent he deems proper, on opinions of counsel rendered to him as to certain matters of Federal law or laws of the Commonwealth of Kentucky;

(ii) SMEPA is causing to be delivered to MSE certified copies of proceedings of SMEPA and related bodies, if any, relevant orders of governmental authorities and such other documentation as counsel for MSE shall reasonably require;

(iii) MSE is causing to be delivered to SMEPA certified copies of resolutions of its Board of Directors relating to the authorizations of MSE to execute and deliver this Agreement and any agreement attached as an exhibit hereto, to which MSE is a party; and

(iv) MSE shall have received an opinion from Messrs. Wise Carter Child & Caraway, of Jackson, Mississippi, (or other satisfactory counsel), for delivery to the Trustees under the MSE Mortgage, to the effect set forth in Section 4.07(b) of the First Supplemental Indenture, dated as of June 15, 1977, to the MSE Mortgage and in any comparable section of any subsequent Supplemental Indenture.

(v) there shall have been issued orders, consents or permits satisfactory in form and substance to MSE and SMEPA authorizing (if and only to the extent each such body may have jurisdiction) the execution, delivery and performance of this Agreement, the Operating Agreement, the Indemnification Agreement, each Special Warranty Deed, Conveyance and Adjustment Agreement, and the Substitute Power Agreement, by the Federal Energy Regulatory Commission, the Mississippi Public Service Commission, NRC and SEC;

(vi) the holders of bonds issued under the MSE Mortgage shall have given any necessary approvals to the transactions contemplated by this Agreement; and

(vii) MSE is causing to be delivered to SMEPA an opinion from Messrs. Wise Carter Child & Caraway,

of Jackson, Mississippi, counsel for MSE (or other satisfactory counsel), addressed to SMEPA and dated the Closing date, to the effect provided in subsections (i) (other than the last sentence thereof) through (v) of Section 5.02; except that, as to matters referred to in Section 5.02(ii)(3), the opinion need relate only to those mortgages, indentures, contracts, agreements or undertakings known to such counsel; as to actions, suits, investigations or proceedings threatened against or affecting MSE referred to in Section 5.02(iii), the opinion need only be to the best knowledge of such counsel, having made due inquiry with respect thereto; and as to the Agreements constituting valid and binding obligations of MSE enforceable against it according to their terms, referred to in Section 5.02(v), the opinion may be made subject to applicable equitable principles, which may affect certain remedies provided therein, which equitable principles, however, in the opinion of such counsel, do not make the remedies provided therein inadequate for the realization of the benefits provided therein; in providing all such opinions, Messrs. Wise Carter Child & Caraway may rely, to the extent they deem proper, on opinions

of counsel rendered either to such counsel or to MSE as to certain matters of Federal law or laws of the states of Arkansas and Louisiana.

Section 7.02. Conditions Precedent to MSE's Obligations at the Closing. All obligations of MSE under this Agreement, the Operating Agreement, the Indemnification Agreement and the Substitute Power Agreement are subject to the fulfillment, prior to or at the Closing, of each of the following conditions (or the waiver in writing of any such condition by MSE):

(i) MSE shall not have discovered any material error, misstatement or omission in the representations and warranties made by SMEPA in this Agreement.

(ii) SMEPA's representations and warranties contained in this Agreement shall be true in all material respects at the time of the Closing; SMEPA shall have performed and complied with all agreements, covenants and conditions required by this Agreement to be performed or complied with by it prior to or at the Closing; and MSE shall have been furnished with a certificate of the General Manager of SMEPA, dated the date of the Closing, certifying in such detail as MSE may reasonably request to the fulfillment to the foregoing conditions.

(iii) The condition specified in Section 6.08 shall have been fulfilled and satisfactory evidence thereof provided to MSE.

(iv) The Closing shall occur on or before July 1, 1980, at the offices of Mississippi Power & Light Company, Jackson, Mississippi, or at such other time and place as may be agreed upon by the parties; if the Closing has not occurred by October 1, 1980, unless such date is extended with the consent of MSE, then this Agreement, the Operating Agreement, the Indemnification Agreement and the Substitute Power Agreement shall be deemed void and of no effect.

Section 7.03. Conditions Precedent to SMEPA's Obligations at the Closing. All obligations of SMEPA under this Agreement, the Substitute Power Agreement, the Indemnification Agreement and the Operating Agreement are subject to the fulfillment, prior to or at the Closing, of each of the following conditions (or the waiver in writing of any such condition by SMEPA):

(i) SMEPA shall not have discovered any material error, misstatement or omission in the representations and warranties made by MSE in this Agreement.

(ii) MSE's representations and warranties contained in this Agreement shall be true in all material respects at the time of the Closing; MSE shall have performed and complied with all agreements, covenants and conditions required by this Agreement to be performed or complied with by it prior to or at the Closing; and SMEPA shall have been furnished with a certificate of the President or a Vice President of MSE, dated the date of the Closing, certifying in such detail as SMEPA may reasonably request to the fulfillment of the foregoing conditions.

(iii) SMEPA shall have obtained a commitment, satisfactory to REA, for title insurance relating to SMEPA's undivided ownership interest in Grand Gulf which it proposes to acquire.

(iv) SMEPA and REA shall have received a certificate of the President or a Vice President of MSE certifying that in the performance of this Agreement (1) at least 10% of the total cost of the unmanufactured articles, materials and supplies used or to be used in the construction of or otherwise made a part of Grand Gulf shall have been mined or produced in the United States, and (2) at least 10% of the total cost of the manu-

factured articles, materials and supplies used or to be used in the construction of or otherwise made a part of Grand Gulf shall have been manufactured in the United States substantially all from articles, materials or supplies mined, produced or manufactured, as the case may be, in the United States. If any article, material or supplies are partially mined, produced or manufactured in the United States (said part being hereinafter called the "American Made Portion") and partially mined, produced or manufactured somewhere other than in the United States, then only the cost of the American Made Portion shall be used in determining whether the requirements of the preceding sentence have been satisfied. Upon completing the construction of Grand Gulf, MSE shall certify to SMEPA and REA that Grand Gulf was constructed in accordance with the requirements of the first sentence of this paragraph.

ARTICLE VIII - DEFAULT; REMEDIES

Section 8.01. Obligation of Parties; Default. MSE and SMEPA hereby agree that they shall pay all monies and carry out all other duties and obligations agreed to be

paid or performed by them pursuant to all of the terms and conditions of this Agreement. In addition to any other rights or remedies, legal or equitable, available to a party which is not in default, in the event SMEPA at any time fails to pay any amounts owing under this Agreement or the Operating Agreement for more than twelve months or to perform any other obligation imposed by this Agreement or the Operating Agreement, the non-performance of which has or is expected to materially hinder, obstruct or delay the construction or maintenance of Grand Gulf, for more than twelve months from the date of a written demand for payment or performance, as the case may be, addressed to SMEPA, MSE may, in addition to any other rights or remedies MSE may have against SMEPA, by written notice to SMEPA, declare SMEPA to be in default of this Agreement and the Operating Agreement and terminate all rights of SMEPA under this Agreement and the Operating Agreement on the date specified in such notice, which date shall be not less than thirty days after the giving of such notice. If the failure of SMEPA to pay occurs before Commercial Operation of either Unit No. 1 or Unit No. 2 of Grand Gulf, MSE shall be relieved of the obligation under Section 3.01 with respect to construction, completion and placing in Commercial Operation of either such Unit for such period as may be reasonably related to the period in which such failure has not been remedied by SMEPA.

Section 8.02. Special Remedies. Upon the effectiveness of such termination,

(a) SMEPA shall cease to have any rights in the Capacity and Energy of Grand Gulf or any other rights under the Operating Agreement or this Agreement except as set forth in this Article VIII; (b) MSE shall succeed to all of SMEPA's rights under this Agreement and the Operating Agreement and all other contracts, agreements and other instruments relating to Grand Gulf, including, without limitation, the Substitute Power Agreement; (c) SMEPA shall be obligated to pay to MSE all amounts then owed by SMEPA under the terms of this Agreement and the Operating Agreement together with interest thereon, computed as provided in Section 8.03 and (i) the amount of any legal or other expenses incurred, and (ii) the actual damages suffered, by MSE in connection with such default or the termination of SMEPA's rights under this Agreement and the Operating Agreement; (d) subject to obtaining all necessary regulatory approvals and necessary approvals of REA and CFC, SMEPA shall convey, transfer and assign to MSE, free and clear of all liens and encumbrances other than those which existed at the time of conveyance