to SMEPA, all of its right, title and interest in Grand Gulf, and all contracts, agreements or other instruments relating thereto. SMEPA shall use its best efforts to obtain the necessary regulatory approvals from any regulatory agency having jurisdiction over it and to obtain the necessary releases under any mortgage indenture, bond resolution or other security instrument to which it is a party, including without limitation the SMEPA Mortgage. Upon the completion of such conveyance, transfer and assignment, MSE shall pay to SMEPA an amount equal to the lesser of (i) SMEPA's net investment in Grand Gulf plus its AFUDC on the effective date of such termination or (ii) the then fair market value of SMEPA's ownership interest in Grand Gulf, less (iii) all amounts owed to MSE pursuant to the terms of Subsection (c) above. If the amount required to be deducted under clause (iii) of the preceding sentence is greater than the lesser of the amounts described in clauses (i) and (ii) of the preceding sentence, SMEPA shall remain liable for the deficiency.

<u>Section 8.03</u>. <u>Interest on Overdue Payments</u>. In addition to any other rights or remedies, legal or equitable, available to the parties, in the event either party fails to

make any payment to the other party when due pursuant to this Agreement or otherwise, whether or not due to Force Majeure, there shall be added to such overdue amount interest from the date such payment was due at an annual rate equal to either the then current average yield on outstanding obligations of the United States of America having a term of ninety (90) days or less, plus five percent (5%), or the owed party's incremental cost of short-term unsecured borrowed funds plus five percent (5%), whichever is the greater. Except in the event that Section 8.02 is applicable, each party shall also indemnify and hold the other harmless from and against any and all losses, costs, damages and expenses arising out of or resulting from the other party's failure to make such payments when due.

Section 8.04 Usury. Notwithstanding any other provision herein to the contrary, it is the intention of MSE and SMEPA that any amount paid as interest, whether it be characterized as interest, finance charge or otherwise, shall not be usurious; to that end, should any calculation of interest provided for hereunder result in an amount of interest or finance charge which would be usurious, or which is subsequently held to be usurious, the amount of interest to be charged hereunder shall be reduced so that the amount actually charged will not be usurious, or if interest has already been paid, the amount by which such interest or finance charge is held to be usurious shall be refunded.

## ARTICLE IX - GENERAL CONDITIONS

Section 9.01. MSE's Right to Make Payments on Behalf of SMEPA. In addition to all of the rights of MSE pursuant to Article VIII, MSE shall have the right, but not the obligation, to make any payment of interest or principal due and owing by SMEPA to the Federal Financing Bank, the REA, CFC or any other creditor of SMEPA in respect of a financing of SMEPA's obligations hereunder, which SMEPA fails to make when due and to be promptly reimbursed in full therefor by SMEPA, together with interest at the rate provided in Section 8.03 hereof.

Section 9.02. Survival. The agreements, covenants, representations and warranties contained in this Agreement shall survive the Closing.

Section 9.03. Further Assurances. From time to time after the Closing MSE and SMEPA will execute such instruments of conveyance and other documents, upon the request of the other, as may be necessary or appropriate to carry out the intent of this Agreement.

Section 9.04. Governing Law. The validity, interpretation and performance of this Agreement and each of its provisions shall be governed by the laws of the State of Mississippi.

Section 9.05. Notice. Any notice, request, consent or other communication permitted or required by this Agreement (including, without limitation, any offer or acceptance pursuant to Section 6.02 hereof) shall be in writing and shall be deemed given when deposited in the United States mail, Certified Mail prepaid, and if given to MSE shall be addressed to:

Middle South Energy, Inc.
c/o Mississippi Power & Light Company
Post Office Box 1640
Jackson, Mississippi 39205
Attention: President

with a copy addressed to:

Middle South Energy, Inc.
Post Office Box 61000
New Orleans, Louisiana 70161
Attention: President

and if given to SMEPA shall be addressed to:

South Mississippi Electric Power Association
Post Office Box 1589
Hattiesburg, Mississippi 39401
Attention: General Manager

unless a different officer or address shall have been designated by the respective party by notice in writing.

<u>Section 9.06</u>. <u>Headings Not to Affect Meaning</u>. The descriptive headings of the various Sections and Articles of this Agreement have been inserted for convenience of reference only and shall in no way modify or restrict any of the terms and provisions hereof.

<u>Section 9.07.</u> <u>No Partnership</u>. Notwithstanding any provision of this Agreement, MSE and SMEPA do not intend to create hereby any joint venture, partnership, association taxable as a corporation, or other entity for the conduct of any business for profit. All obligations of the parties arising under this Agreement are several and not joint. MSE and SMEPA agree that they do not intend to create a partnership under the Mississippi Uniform Partnership Act or any other statute of the State of Mississippi.

<u>Section 9.08</u>. <u>Time of Essence</u>. Time is of the essence with respect to this Agreement.

<u>Section 9.09</u>. <u>Amendments</u>. This Agreement may be amended by and only by a written instrument duly executed by each of the parties hereto.

<u>Section 9.10</u>. <u>Successors and Assigns</u>. This Agreement shall inure to the benefit of and be binding upon MSE and SMEPA and their respective successors and assigns, and, insofar as is permitted by law, on any receiver or trustee in bankruptcy, reorganization or receivership by either party. Nothing in this Agreement, expressed or

implied, is intended to confer upon any other person any rights or remedies hereunder, except as specifically provided herein in Section 3.02.

Section 9.11. Counterparts. This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

Section 9.12. License Conditions. The Construction Permit contains antitrust conditions which may be a part of subsequent licenses issued by the NRC for Grand Gulf. This Agreement is entered into by the parties in implementation of and is to be construed within the parameters of such conditions, and nothing contained herein shall be in violation thereof.

Section 9.13. "AS IS" TRANSACTION; ASSUMPTION OF RISK. TRANSACTION CONCERNS GRAND GULF "AS IS" AND "WHERE IS." MSE MAKES NO REPRESENTATION OR WARRANTY WHATSOEVER IN THIS AGREEMENT, EXPRESSED, IMPLIED OR STATUTORY, AS TO THE VALUE, QUANTITY, CONDITION, SALABILITY, OBSOLESCENCE, MERCHANTABILITY, FITNESS OR SUITABILITY FOR USE OR WORKING ORDER OF ANY OF GRAND GULF, NOR DOES MSE REPRESENT OR WARRANT THAT THE USE OR OPERATION OF GRAND GULF WILL NOT VIOLATE PATENT, TRADEMARK OR SERVICEMARK RIGHTS OF ANY THIRD PARTIES. SMEPA IS WILLING TO BECOME OWNER OF AN UNDIVIDED INTEREST IN GRAND GULF "AS IS" AND "WHERE IS" AND IN ACCORDANCE WITH THE TERMS

AND CONDITIONS OF THIS AGREEMENT. SMEPA HAS INSPECTED GRAND GULF TO THE EXTENT IT DEEMS NECESSARY UNDER THE CIRCUMSTANCES TO ENABLE IT TO ENTER INTO THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT AND IT EXPRESSLY ASSUMES ALL RISKS REFERRED TO IN THIS SECTION. Notwithstanding the foregoing, SMEPA shall have the benefit, in proportion to its interest in Grand Gulf, in all manufacturers' and vendors' warranties and all patents, trademark and servicemark rights running to MSE in connection with Grand Gulf.

Section 9.14. Good Utility Practice. MSE and SMEPA shall discharge any and all obligations under this Agreement in a prudent manner and in accordance with Good Utility Practice.

Section 9:15 Force Majeure. MSE shall not be in default in performance of any obligation or duty hereunder (other than any obligation to credit SMEPA with its allocable share of recoveries or overpayments of Cost of Construction owing at any time) if such failure of performance is due to Force Majeure. SMEPA shall not be in default in performance of any obligation or duty hereunder (other than any obligation to pay monies to or at the direction of MSE as provided in this Agreement) if such failure of performance is due to Force Majeure.

Section 9.16. REA Approval. This Agreement shall not be in force and effect until approved by the Administrator of the REA.

Section 9.17. Entire Agreement. This Agreement shall constitute the entire understanding between SMEPA and MSE, superseding any and all previous understandings between the parties pertaining to the subject matter contained herein.

Section 9.18. Construction Agent. MP&L is acting as agent for MSE under the Service Agreement in connection with the planning, design, licensing, acquisition, construction, completion, training for operation, startup, renewal, addition, replacement, decommissioning, entombment and disposal of Grand Gulf, and MP&L may act in such regard for both MSE and SMEPA after the Closing; MSE covenants that any substituted construction agent appointed by MSE in place of MP&L will be at least as competent and knowledgeable in these regards as MP&L.

Section 9.19. Portions of this Agreement Subject to Closing. SMEPA shall have no rights or obligations under the provisions contained in Sections 3.10 through 3.12, Article IV, Sections 6.01 through 6.07, and Article X until the Closing has been consummated pursuant to the terms of this Agreement.

Section 9.20. Covenants Running With The Land. All covenants contained herein shall be deemed covenants running with the land.



S305-0024-

Section 9.21. Environment. MSE shall construct Grand Gulf consistent with any Environmental Impact Statement issued by the NRC with respect to Grand Gulf, pursuant to the National Environmental Policy Act, and subject to such changes as have been approved by the NRC, provided REA is given notice prior to such changes.

Section 9.22. Kick-backs. In the acquisition, construction and completion of Grand Gulf pursuant to this Agreement, MSE shall comply with all applicable statutes, rules and regulations pertaining to the so-called "Kick-Back" Statute (48 Stat 948, 18 U.S.C. Sect. 874 and 40 U.S.C. Sect. 276C). MSE acknowledges that it is familiar with the Rural Electrification Act of 1936, as amended, the so-called "Kick-Back" Statute (48 Stat. 948), and regulations issued pursuant thereto, and 18 U.S.C. 287, 1001, as amended.

Section 9.23. Equal Opportunity Clause. The following equal opportunity clause is included in this Agreement pursuant to Executive Order No. 11246 and Department of Labor OFCCP Regulations, is effective only to the extent required by such Executive Order and Department of Labor OFCCP Regulations, and is not intended to create any independent obligations between MSE and SMEPA. MSE will comply only with those provisions of Executive Order 11246 and the rules, regulations and relevant orders of the Secretary of Labor referred to in Section 9.23 (iv) as are applicable

to it. Nothing in this Section shall be construed to prevent MSE from resisting, challenging, contesting or appealing any law, statute, regulation or decision of any federal, state or local government or agency which MSE claims to be invalid, unlawful, arbitrary, capricious or inapplicable. MSE agrees as follows:

(i) MSE will not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin. MSE will take affirmative action to ensure that applicants are employed, and that employees are treated during employment without regard to their race, color, religion, sex, or national origin. Such action shall include, but not be limited to, the following: Employment, upgrading, demotion or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. MSE agrees to post in conspicuous places, available to employees and applicants for employment, notices setting forth the provisions of this Nondiscrimination Clause.

(ii) MSE will, in all solicitations or advertisements for employees placed by or on behalf of MSE, state that all qualified applicants will

receive consideration for employment without regard to race, color, religion, sex or national origin.

(iii) MSE will send to each labor union or representative of workers with which it has a collective bargaining agreement or other contract or understanding, a notice to be provided advising the said labor union or workers' representatives of MSE's commitments under this Section, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(iv) MSE will comply with all provisions of Executive Order 11246 of September 24, 1965, and of the rules, regulations and relevant orders of the Secretary of Labor.

(v) MSE will furnish all information and reports required by Executive Order 11246 of September 24, 1965, and by rules, regulations and relevant orders of the Secretary of Labor, or pursuant thereto, and will permit access to its books, records and accounts by the administering agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations and orders.

(vi) In the event of MSE's noncompliance with the nondiscrimination clauses of this Agreement or with any of the said rules, regulations or orders, this Agreement may be cancelled, terminated or suspended in whole or in part and MSE may be declared ineligible for further Government contracts or federally assisted construction contracts in accordance with procedures authorized in Executive Order 11246 of September 24, 1965, and such other sanctions may be imposed and remedies invoked as provided in said Executive Order or by rule, regulation or order of the Secretary of Labor, or as otherwise provided by law.

(vii) MSE will include the words, "During the performance of this contract, the contractor agrees as follows:" followed by the provisions of paragraphs (i) through (vii) in every subcontract or purchase order (with the word "MSE" changed to the word "Contractor") unless exempted by the rules, regulations or orders of the Secretary of Labor issued pursuant to Section 204 of Executive Order 11246 of September 24, 1965, so that such provisions will be binding upon such action with respect to any subcontract or purchase order as the administering agency may direct as a means of

enforcing such provisions, including sanctions for noncompliance; provided, however, that in the event MSE becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a result of such direction by the administering agency, MSE may request the United States to enter into such litigation to protect the interests of the United States.

Section 9.24. Nonsegregated Facilities. MSE certifies that it does not maintain or provide for its employees any segregated facilities at any of its establishments, and that it does not permit its employees to perform their services at any location, under its control, where segregated facilities are maintained. MSE certifies further that it will not maintain or provide for its employees any segregated facilities at any of its establishments, and that it will not permit its employees to perform their services at any location, under its control, where segregated facilities are maintained. MSE agrees that a breach of this certification is a violation of the Equal Opportunity Clause in this Agreement. As used in this certification, the term "segregated facilities" means any waiting rooms, work areas, restrooms and washrooms, restaurants and other eating areas, timeclocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas,

transportation, and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, color, religion, or national origin, because of habit, local custom, or otherwise. MSE agrees that (except where it has obtained identical certifications from proposed subcontractors for specific time periods) it will obtain identical certifications from proposed subcontractors prior to the award of subcontracts exceeding $10,000 which are not exempt from the provisions of the Equal Opportunity Clause, and that it will retain such certification in its files.

## ARTICLE X - ADMINISTRATION

Section 10.01. Administrative Committee. It is recognized that from time to time various administrative and technical matters may arise in connection with the terms and conditions of this Agreement which will require the cooperation of the parties and the exchange of information. As a means of providing for such exchanges, an Administrative Committee is hereby established; however, it is understood that such Committee shall not diminish in any manner the responsibility and authority of MSE as set forth in this Agreement.

Section 10.02. Membership. Each party shall be represented on the Administrative Committee by one (1) member. Within sixty (60) days after the Closing, each party shall designate its representative with written notice thereof to the other party. Thereafter, each party shall notify the other promptly of any change in the designation of its representative on the Committee. The Chairman of the Administrative Committee shall be the MSE representative, who shall be responsible for calling meetings and establishing agenda.

Section 10.03. Meetings. The Administrative Committee shall meet annually on a date and at a location to be announced by the Chairman one month in advance. Such other meetings as are reasonably required may be called by either member with as much advance notice as is practical. Attendance at meetings shall not be limited to members.

Section 10.04. Functions. The Administrative Committee shall have the following functions, among others:

(a) Provide liaison among the parties at the management level and exchange information with respect to significant matters of licensing, design and construction of Grand Gulf.

(b) Appoint sub-committees, the members of which need not be members of the Administrative Committee, as necessary to perform detailed work

and conduct studies regarding matters requiring investigation.

(c) Review and discuss disputes arising under this Agreement.

(d) Provide liaison among the parties with respect to the financial and accounting aspects of progress, performance and completion of construction of Grand Gulf.

(e) Perform such other functions and duties as may be assigned to it.

Section 10.05. Records. The Administrative Committee shall keep written records of all meetings.

Section 10.06. Expenses. Each party shall be responsible for the personal expenses of its representative or other attendees. All other expenses incurred in connection with the performance by the Administrative Committee of its duties shall be allocated and paid as determined by the Committee.

## ARTICLE XI - TERM AND TERMINATION

Section 11.01. Termination. This Agreement shall terminate (1) at the expiration of the initial term of the operating licenses for Grand Gulf Unit Nos. 1 and 2 or any renewal or extension of either such license or (2) at such

time as both Grand Gulf Unit Nos. 1 and 2 are retired from service, decommissioned and all requirements of Federal, state or local law relating to the safe deactivation of such Units have been met, whichever is later.

Section 11.02. Retirement Costs. All capital costs associated with retirement of Grand Gulf Unit Nos. 1 and 2, including, without limitation, decommissioning, security, maintenance, monitoring, razing of structures and disposing or storing of debris and spent Nuclear Fuel, and the cost of fulfilling all governmental requirements for safe deactivation of Grand Gulf Unit Nos. 1 and 2 shall, to the extent they are not covered under the terms of the Operating Agreement, be deemed a Cost of Construction and be borne by the parties in proportion to their respective undivided ownership interests. Payments for these costs shall be made in accordance with the provisions of Article III.

## ARTICLE XII- ADDITIONAL GENERATING UNIT OR UNITS

MSE or others in conjunction with MSE shall have the right to construct, install, modify and operate on the land, described in Exhibit A and in Exhibit B, one or more additional electric generating units, whether or not nuclear-fueled, and necessary appurtenances thereto, or other faci-

lities relating to the electric utility business, provided such additional electric generating unit or units or other facilities shall not be so constructed, installed, modified or operated as unreasonably to burden or interfere with Grand Gulf. In the event MSE exercises its right to construct, install, modify and operate such additional electric generating unit or units or other facilities, then the following shall apply:

(a) The land described in Exhibit A and in Exhibit B, the improvements thereon (such as service roads, rail spurs and buildings), and other facilities installed as part of Grand Gulf may, subject to obtaining all necessary regulatory approvals, be used in connection with the construction, modification and operation of the additional electric generating unit or units or other facilities (such property and facilities so used being hereinafter called "Common Facilities"), and the Common Facilities may be adapted to permit such use, provided that (i) such use and adaptation do not unreasonably burden or interfere with Grand Gulf, (ii) the cost of any such adaptation is borne by the owner or owners of the additional electric generating unit or units or other facilities, and, (iii) in exchange for such use, each of the parties hereto shall be compensated for an appropriate portion of its share of the original cost of the Common Facilities by the owner or owners of the additional electric generating unit or units or other facilities.

(b) To provide for the construction, modification and operation of the additional electric generating unit or units or other facilities on the land described in Exhibit A and in Exhibit B, the owner or owners of the additional electric generating unit or units or other facilities, at its or their expense, may, subject to obtaining all necessary regulatory approvals, relocate previously installed Grand Gulf facilities, provided that such relocation does not unreasonably burden or interfere with Grand Gulf. SMEPA shall grant to MSE all easements, licenses, permits and other rights and interests required by MSE to enable it to construct, install, operate and maintain such additional electric generating unit or units or other facilities.

(c) If SMEPA becomes a co-owner with MSE of any additional electric generating unit or units or other facilities located on the land described in Exhibit A or in Exhibit B, MSE agrees, subject to obtaining all necessary regulatory approvals, to convey to SMEPA at no additional cost to SMEPA other than the consideration hereof, an undivided ownership interest, equal to SMEPA's undivided ownership interest expressed as a percentage in such additional generating unit or units or other facilities, as the case may be, as tenant in common with MSE and any other participant in such unit or units or facilities, in such real property as MSE deems necessary for the construction,

installation, maintenance, or operation of such unit or units or facilities.

(d) The parties hereto shall execute and deliver such amendments to this Agreement and the Operating Agreement as may be appropriate to provide for the additional electric generating unit or units or other facilities at Grand Gulf.

(e) SMEPA shall not have by virtue of this Agreement any right to participate in any additional electric generating unit or units or other facilities installed on the land included in Grand Gulf. SMEPA shall use its best efforts to obtain any necessary regulatory approvals from any regulatory agency having jurisdiction over SMEPA, and to obtain any such necessary releases under any mortgage indenture to which SMEPA is a party, for the purpose of any such relocation, modification or joint use. This provision shall not abrogate, abridge, or impair any rights SMEPA should now or in the future have to acquire an interest in any future nuclear unit or units under the laws of the United States of America, or pursuant to an order or regulation promulgated by any agency or department of the United States of America having jurisdiction over the licensing, operation or sale of future nuclear units.

IN WITNESS WHEREOF, the undersigned parties hereto have duly executed this Agreement as of the date first above written.

MIDDLE SOUTH ENERGY, INC.

SEAL

BY: /s/ D. C. Lutken
D. C. LUTKEN
VICE PRESIDENT

ATTEST:

/s/ D. E. Stapp
SECRETARY

SOUTH MISSISSIPPI ELECTRIC POWER ASSOCIATION

SEAL

BY: /s/ R. D. Morrow, Sr.
R. D. MORROW, SR.
PRESIDENT

ATTEST:

/s/ D.R. Ware
SECRETARY

STATE OF MISSISSIPPI

COUNTY OF HINDS

Personally appeared before me, a Notary Public in and for the jurisdiction aforesaid, the within named D. C. LUTKEN, who acknowledged that he is a Vice President of Middle South Energy, Inc., a corporation, and that in his capacity herein set forth he signed and delivered the foregoing instrument on the corporation's behalf as of the day and year therein mentioned, being duly authorized so to do.

GIVEN UNDER MY HAND AND OFFICIAL SEAL this the 5th day of May, 1980.

/s/ Debra Mitchell
NOTARY PUBLIC

My Commission Expires:
January 18, 1984

STATE OF MISSISSIPPI

COUNTY OF Rankin

Personally appeared before me, a Notary Public in and for the jurisdiction aforesaid, the within named R. D. MORROW, SR., who acknowledged that he is the President of South Mississippi Electric Power Association, a corporation, and that in his respective capacity herein set forth he signed and delivered the foregoing instrument on the corporation's behalf as of the day and year therein mentioned, being duly authorized so to do.

GIVEN UNDER MY HAND AND OFFICIAL SEAL this the 15th day of May, 1980.

/s/ Carolyn L. Williams
NOTARY PUBLIC

My Commission Expires:
October 13, 1982

EXHIBIT A

DESCRIPTION OF LAND IN WHICH
SMEPA OBTAINS A 10%
UNDIVIDED OWNERSHIP INTEREST

A tract of land containing 103.97 acres, located 6 miles Northeast of Port Gibson, in District 2, Claiborne County, Mississippi, situated in Section 12, T-12-N, R-2-E, and bounded on all sides by lands owned by Middle South Energy, Inc., formerly owned by Mary Lee Hamilton Trimble. A detailed description, taken from a survey performed December 6, 1979, using the Mississippi State Plane Coordinate system - West Zone, with a grid North bearing that is 0°23' West of True North, is as follows:

Beginning at a point on the Range 2 East line, a corner common to Section 4 and 5 in Range 1 East and Section 11 and 12 Range 2 East, all in T-12-N, having coordinate values of Y549,628.13, X275,113.08, thence N74°16'53"E a distance of 3434.06 feet to the Northwest corner of the 103.97 acre tract, Y550,558.73, X278,419.68, said Northwest Corner is a point near the centerline of the access road to the tract from the Grand Gulf - Port Gibson road, and witnessed by a concrete monument with an embedded brass cap, set flush with grade on the East shoulder of the access road, that bears S60°00'00"E 26.23 feet from the Northwest Corner, and thence from the Northwest corner, S30°00'00"W a distance of 2790.00 feet to the Southwest corner, Y548,142.52, X277,024.68, said Southwest Corner is a concrete monument with an embedded brass cap set flush with grade, on a small knoll, and witnessed by a 14" Oak, marked $\stackrel{X}{\equiv}$, that bears North 60°40'00"East 21.0 feet from the Southwest Corner, thence from the Southwest corner, S60°00'00"E - 1623.33 feet to the Southeast corner, Y547,330.85, X278,430.52, said Southeast Corner is a point in a concrete lined diversion ditch on the Northerly descending slope of the ditch, and witnessed by a concrete monument with an embedded brass cap set flush with grade, that bears N30°00'00"E - 6.33 feet from the Southeast Corner, thence from the Southeast corner, N30°00'00"E 2790.00 feet to the Northeast corner, Y549,747.06, X279,825.52, said Northeast Corner is a concrete monument with an embedded brass cap set flush with grade, and witnessed by a 40" Oak, marked $\stackrel{X}{\equiv}$, that bears S77°20'00"E - 36.90 feet from the Northeast Corner, thence from the Northeast corner N60°00'00"W - 1623.53 feet to the Northwest corner, the point of beginning.

AND ALSO

A tract of land containing 7.49 acres, located 6 miles Northeast of Port Gibson, in District 2, Claiborne County, Mississippi, situated in Sections 12, 5, 4 and 2, T-12-N, R-1-E and R-2-E, and bounded on all sides by lands owned by Middle South Energy, Inc. generally described as being a 50' wide strip of land, in which there is presently existing a 48" water supply pipeline and a 54" water discharge pipeline, to and from the Grand Gulf Nuclear facility, said pipelines being adjacent and parallel from the facility to a point near the Mississippi River, where the discharge pipeline terminates at a concrete headwall constructed at point of discharge into a barge slip in the East bank of the River, said water pipelines are 10 feet apart measured center to center and the following described property lines are generally 20 feet Northerly and Southerly of each water line, for a nominal 50' width. The following description is taken from a survey performed in December 1979, using the Mississippi State Plane Coordinate System - West Zone, with a Grid North Bearing that is 0°23' West of True North:

Beginning at a point in the Westerly boundary of the Grand Gulf Nuclear Facility Plant Site that is N30°00'00"E - 1131.02 feet from the Southwest Corner of the Plant Site. The southwest corner is a brass cap set in a concrete monument having Mississippi State Plane Coordinate - West Zone values Y548,142.52', X277,024.68', thus begin the 50' wide strip at Y549,122.01', X277,590.19', the aforementioned point of beginning;

Thence N65°20'40"W - 637.84 feet to Y549,388.09', X277,010.50',
Thence N64°17'13"W - 1069.56 feet to Y549,852.13', X276,046.85',
Thence N29°42'12"W - 1625.24 feet to Y551,263.82', X275,241,53',
Thence N46°13'16"W - 1662.12 feet to Y552,413.80', X274,041.45',
Thence N58°42'16"W - 1202.26 feet to Y553,038.32', X273,014.12',

Thence crossing the 48" water supply pipeline, which leaves its parallel with the 54" water discharge line,

N41°16'17"W - 45.45 feet to Y553,072.48', X272,984.14',
Thence N47°29'21"W - 319.93 feet to Y553,288.67', X272,748.30',
Thence N42°30'29"E - 40.00 feet to Y553,318.16', X272,775.33',
Thence S47°28'13"E - 333.54 feet to Y553,092.70;, X273,021.12',
Thence S58°42'16"E - 1230.41 feet to Y552,453.56', X274,072.50',
Thence S46°13'19"E - 1674.11 feet to Y551,295.30', X275,281.25',
Thence S29°42'16"E - 1617.66 feet to Y549,890.21', X276,082.84',
Thence S64°17'13"E - 1053.33 feet to Y549,433.21', X277,031.87',
Thence S65°19'39"E - 642.04 feet to Y549,165.20', X277,615.30',
Thence S30°00'00"W - 50.22 feet to Y549,122.01', X277,590.19',

to the point of beginning.

AND ALSO

A tract of land containing 5.12 acres, located 6 miles Northeast of Port Gibson, in District 2, Claiborne County, Mississippi, situated in Sections 2 and 4, T-12-N, R-1-E, and being bounded by lands owned by Middle South Energy, Inc. and in places, by the East bank of the Mississippi River, generally described as a 40 foot wide strip of land being 20 feet each side of a water supply pipeline and lateral water lines from each of 3 radial type water wells located on the East bank of the Mississippi River, from a point on a 50' wide parcel previously described as a 7.49 acre tract for a 54" discharge and 48" water supply pipeline, to and enclosing each radial wellhead.

The following description is taken from a survey performed in December 1979, using the Mississippi State Plane Coordinate System - West Zone, with a Grid North Bearing that is 0°23' West of True North:

Beginning at a point south of the crossing intersection of the 48" supply and 54" discharge water pipeline that is 20' South of the 54" line and 20' East of the 48" at Y553,038.32', X273,014.12',
thence paralleling the supply line,
S72°41'37"W - 648.22 feet to Y552,845.49', X272,395.25',
thence S19°56'37"W - 622.22 feet to Y552,260.59', X272,183.01',
thence S23°11'15"W - 1600.69 feet to Y550,789.20', X271,552.75',
thence S26°28'32"W - 1055.63 feet to Y549,844.28', X271,082.13',
thence S32°38'27"W - 1047.29 feet to Y548,962.39', X270,517.25',
and thence to enclose radial well number 1,
N57°21'24"W - 127.00 feet to Y549,030.89', X270,410.31',
to the East bank of the Mississippi River, and with the bank,
thence N32°38'36"E - 46.00 feet to Y549,069.62', X270,435.12',
thence leaving the East bank,
S57°21'24"E - 87.00 feet to Y549,022.69', X270,508.38',
which ends the enclosure of radial well number 1 and lateral lines, and resuming the parallel with the water supply mainline,
N32°38'36"E - 994.84 feet to Y549,860.39', X271,045.00',
thence N26°28'34"E - 951.21 feet to Y550,711.84', X271,469.07',
and thence to enclose radial well number 3,
N63°31'26"W - 106.00 feet to Y550,759.10', X271,374.19',
to the East bank of the Mississippi River, and there along top bank,
N26°28'34"E - 46.00 feet to Y550,800.27', X271,394.70',
and thence leaving the East bank,
S63°31'26"E - 106.00 feet to Y550,753.01', X271,489.58',
which ends the enclosure of radial well number 3 and lateral lines and resumes parallel with the water supply mainline,

N26°28'34"E - 55.00 feet to Y550,802.24', X271,514.10',
thence N23°11'14"E - 1598.53 feet to Y552,271.65', X272,143.50',
thence N19°56'34"E - 640.74 feet to Y552,873.97', X272,362.04',
thence N72°31'20"E - 169.00 feet to Y552,924.73', X272,523.24',
and thence to enclose radial well number 5 and lateral lines,
N17°28'21"W - 38.40 feet to Y552,961.36', X272,511.71',
thence N29°09'00"W - 172.84 feet to Y553,112.31', X272,427.52',
thence N66°33'33"W - 64.91 feet to Y553,138.13', X272,367.97',
thence N23°23'17"E - 46.00 feet to Y553,180.35', X272,386.23',
thence S66°33'33"E - 80.48 feet to Y553,148.33', X272,460.07',
thence S29°09'00"E - 192.84 feet to Y552,979.91', X272,554.00',
thence S17°28'21"E - 42.83 feet to Y552,939.06', X272,566.86',
which ends the enclosure of radial well number 5 and lateral supply lines, and resumes parallel with the water supply mainline,
thence N72°16'08"E - 438.09 feet to Y553,072.48', X272,984.14',
thence S41°16'17'E - 45.45 feet to Y553,038.32', X273,014.12',
the point of beginning.

# EXHIBIT B

## DESCRIPTION OF LAND IN WHICH SMEPA OBTAINS CERTAIN EASEMENT RIGHTS

A tract of land containing 2328.5 acres, more or less, located about seven (7) miles Northwest of Port Gibson in District 2, Claiborne County, Mississippi, situated in Sections 1, 2, 3, 4, 5, 6 and 32, Township 12 North, Range 1 East, and Sections 7, 8, 11, 12 and 30 in Township 12 North, Range 2 East. This property and additional rights, title, claim of ownership and riparian rights were conveyed to Mississippi Power & Light Company by the following referenced deeds:

| | | |
|---|---|---|
| 1. | Shippey Tract | - Deed dated September 20, 1972 and recorded in Deed Book 8-S, page 464. |
| 2. | White Tract | - Deed dated August 31, 1972 and recorded in Deed Book 8-S, page 396. |
| 3. | Graves & Tracey Tract | - Deed dated October 27, 1972 and recorded in Deed Book 8-Y, page 21. |
| 4. | Terrell Tract | - Deed dated March 23, 1973, and recorded in Deed Book 8-Y, page 399. |
| 5. | Hatcher Tract | - Deed dated March 13, 1973 and recorded in Deed Book 8-Y, page 363. |
| 6. | Slay Tract | - Deed dated August 11, 1972 and recorded in Deed Book 8-S, page 328. |
| 7. | Glodjo-Wedgeman Tract | - Deed dated January 19, 1973 and recorded in Deed Book 8-Y, page 227. |

8. Trimble Tract - Deed dated September 30, 1972 and recorded in Deed Book 8-S, page 501.

9. Hamilton Tract - Deed dated November 1, 1972 and recorded in Deed Book 8-Y, page 134.

10. Nelson Tract - Deed dated September 12, 1972 and recorded in Deed Book 8-S, page 417.

11. Arnold Tract - Deed dated June 19, 1973 and recorded in Deed Book 8-Z, page 105.

A more detailed description, taken from a plat entitled "GG-1," drawn April 4, 1972, latest revision dated April 29, 1974, prepared from a survey performed in February - March 1972, using the Transverse Mercator Mississippi West Zone Coordinate System, with a grid bearing that is 0° 23' West of true North, is as follows, to-wit:

Beginning at a 3/4" iron pipe set on the South line of Section Three (3), Township Twelve (12) North, Range One (1), East, this pipe being South 88° 58' 00" West 720.95 feet from the Southeast corner of said Section Three (3) which is a 30" Sycamore marked "XIII", located at the intersection of a painted line and fence that run East and South from said Sycamore; this pipe, at point of beginning, has coordinates of Y:547,843.19 feet, X:269,446.56 feet, and is 10 feet East along said South line from the top bank of the Mississippi River; witnessed by a 26" Cypress "XX" that bears North 77° 23' East at 132.2 feet and a 24" Box Elder "XX" that bears South 73° 23' East at 52.2 feet; thence traversing northerly along the East bank of the Mississippi River North 50° 05' 25" East a distance of 275.92 feet to a point, at this, and all subsequent points along the River, a measurement to the top bank is shown thusly: top bank bears North 29° 54' 35" West at 103 feet; thence North 39° 22' 39" East a distance of 267.38 feet to a point, top bank bears North 50° 37' 21" West at 60 feet; thence continuing on same bearing a distance of 609.11 feet to a point, top bank bears North 50° 37' 21" West at 145 feet; thence North 38° 36' 40" East a distance of 821.51 feet to a point, top bank bears North 51° 23' 20" West at 178 feet; thence North 24° 51' 18" East a distance of 440.02 feet to a point, top bank bears North 65° 08' 42" West at 137 feet; thence North 24° 12' 34" East a distance of 700.80 feet to a point, top bank bears

North 65° 47' 26" West at 95 feet; thence North 24° 29' 46" East a distance of 413.36 feet to a point, top bank bears North 65° 30' 14" West at 66 feet; thence North 26° 30' 05" East a distance of 794.32 feet to a point, top bank bears North 63° 29' 55" West at 70 feet; thence continuing on same bearing a distance of 470.70 feet to a point, top bank bears North 63° 29' 55" West at 132 feet; thence North 19° 30' 09" East a distance of 682.03 feet to a point, top bank bears North 70° 29' 51" West at 153 feet; thence continuing on same bearing a distance of 419.82 feet to a point, top bank bears North 70° 29' 51" West at 146 feet; thence North 13° 15' 11" East a distance of 699.79 feet to a point, top bank bears North 76° 44' 49" West at 121 feet; thence continuing on same bearing a distance of 301.16 feet to a point, top bank bears North 76° 44' 49" West at 117 feet; thence North 10° 15' 17" East a distance of 1,107.03 feet to a point, top bank bears North 79° 44' 43" West at 83 feet; thence North 6° 15' 17" East a distance of 1,087.58 feet to a point, top bank bears North 83° 44' 43" West at 69 feet; thence North 14° 05' 47" East a distance of 626.27 feet to a point, top bank bears North 75° 54' 13" West at 95 feet; thence North 11° 49' 02" East a distance of 334.35 feet to a point, top bank bears North 78° 10' 58" West at 143 feet; thence North 6° 18' 48" West a distance of 440.60 feet to a point, top bank bears South 83° 41' 12" West at 79 feet; thence North 20° 38' 07" East a distance of 302.37 feet to a point, top bank bears North 69° 21' 53" West at 81 feet; thence North 32° 31' 35" East a distance of 847.33 feet to a point, top bank bears North 57° 28' 25" West at 122 feet; thence continuing on same bearing a distance of 375.01 feet to a point, top bank bears North 57° 28' 25" West at 97 feet; thence North 33° 46' 33" East a distance of 567.83 feet to a point, top bank bears North 56° 13' 27" West at 90 feet; thence North 28° 00' 12" East a distance of 178.16 feet to a point, top bank bears North 61° 59' 48" West at 80 feet; thence North 32° 37' 22" East a distance of 190.58 feet to a point, top bank bears North 57° 22' 38" West at 97 feet; thence North 28° 52' 03" East a distance of 323.93 feet to a point, top bank bears North 61° 07' 57" West at 182 feet; thence North 14° 51' 50" West a distance of 192.77 feet to a point, top bank bears South 75° 08' 10" West at 71 feet; thence North 25° 39' 46" East a distance of 394.14 feet to a point, top bank bears North 64° 20' 14" West at 57 feet; thence North 42° 05' 15" East a distance of 165.47 feet to a point, top bank bears North 57° 54' 45" West at 109 feet; thence North 13° 48' 54" East a distance of 472.34 feet to a set 1-1/2" iron pipe; ending the traverse with the top bank of the Mississippi River, from said pipe having coordinates of X:274,787.77 and Y:560,952.43, the top bank of the Missis-

si River bears North 34° 02' West at 134 feet; witnessed by 4" Red Oak "XX" that bears South 86° 55' East at 24.8 fee and an 18" Red Oak that bears North 19° 59' East at 44. feet; thence with Hatcher's line, South 34° 02' 00" Eas a distance of 1,914.14 feet, along an old fence line, to a found buggy axle; thence South 35° 00' 00" East a distance of 843.26 feet to a set 1" iron pipe at the North corner of Square Twenty-four (24), Town of Grand Gulf; thence South 55° 00' 00' West a distance of 300.00 feet to a set 1" iron pipe at the West corner of said Square Twenty-four (24); thence South 35° 00' 00" East a distance of 300.00 feet to a set 1" iron pipe at the South corner of said Square Twenty-four (24), said pipe being South 55° 00' 00" West a distance of 360 feet from a found buggy axle at the South corner of Square Twenty-three (23), Town of Grand Gulf; thence North 55° 00' 00" East a distance of 37.26 feet to a set 1" iron pipe; thence South 35° 00' 00" East a distance of 53.24 feet to a fence corner; thence traversing with the fence South 8° 48' 58" East a distance of 166.05 feet to a tree where fence corners; thence South 36° 43' 59" East a distance of 440.00 feet to a tree where fence corners; thence South 69° 14' 48" East a distance of 14.62 feet to a tree where fence corners; thence North 52° 30' 24" East a distance of 195.56 feet to a tree where fence corners; thence South 31° 48' 22" East a distance of 42.35 feet to a fence corner at the right-of-way line of the Grand Gulf-Port Gibson Road, ending the traverse of said fence; thence continuing on same bearing a distance of 56.24 feet to a railroad spike "X" in the centerline of said road; thence traversing along the centerline of said road, South 14° 16' 37" West a distance of 15.00 feet to a railroad spike "X"; thence South 10° 00' 08" West a distance of 58.09 feet to a railroad spike "X"; thence South 8° 04' 02" West a distance of 54.01 feet to a railroad spike "X"; thence South 6° 38' 33" West a distance of 2,206.83 feet to the point of curvature of a 10° curve to the left; thence along said curve a distance of 361.59 feet to the point of tangency, a railroad spike "X"; thence along the centerline, South 29° 24' 02" East a distance of 557.67 feet to a railroad spike "X" on the point of curvature of a 12° curve to the left; thence along said curve a distance of 300.09 feet to a railroad spike "X" on the point of tangency; thence South 65° 43' 27" East a distance of 629.24 feet to a railroad spike "X" on the point of curvature of a 3° curve to the left; thence along said curve a distance of 160.06 feet to a railroad spike "X" on the point of tangency, and leaving FAP S-1302-(2) B, and beginning SAP 11 (11); thence South 70° 31' 35" East a distance of 460.03 feet to a railroad spike "X" on the point of curvature of a 6° curve to the right; thence along

said curve a distance of 459.28 feet to a railroad spike "X" on the point of tangency; thence South 42° 58' 53" East a distance of 2,673.58 feet to a railroad spike "X" on the point of curvature of a 2° curve to the right; thence along said curve a distance of 259.25 feet to a railroad spike "X" on the point of tangency; thence South 37° 24' 27" East a distance of 161.04 feet to a railroad spike "X" marking the Northwest corner of a tract of land conveyed to Mississippi Power & Light Company by Wiley H. Hatcher by virtue of deed dated March 13, 1973, recorded in the office of the Chancery Clerk of Claiborne County, Mississippi in Deed Book 8-Y, at page 363; thence continue South 37° 24' 27" East a distance of 802.10 feet to the point of curvature of a 7° curve to the left; thence along the centerline of said curve a distance of 295.12 feet to a point of tangency, a railroad spike "X"; thence South 58° 03' 12" East a distance of 328.54 feet to the point of curvature of a 5° curve to the right; thence along the centerline of said curve a distance of 138.09 feet to a railroad spike on the point of curve marking the Northeast corner of a tract of land conveyed to Mississippi Power & Light Company by Mary Lee Hamilton Trimble by virtue of deed dated September 30, 1972, recorded in the office of the Chancery Clerk of Claiborne County in Deed Book 8-S, at page 501; thence leaving the Highway, South 18° 57' 30" West a distance of 49.99 feet to a set 3/4" iron pipe at the right-of-way line of said Highway, the South end of a highway culvert bears North 10° 58' West at 23.7 feet; thence continuing on same bearing and within Trimble property, a distance of 615.42 feet to a marked 13" Elm "V"; thence continuing on same bearing a distance of 846.41 feet to a 14" Hackberry "V"; thence continuing on same bearing a distance of 266.68 feet to a 12" Elm "V"; thence continuing on same bearing a distance of 874.94 feet to a 17" Elm "V"; thence continuing on same bearing a distance of 588.54 feet to a set 1" iron pipe in the centerline of Waterloo Road witnessed by a Red Oak "XX" that bears North 56° 37' West at 61.3 feet, and a Red Oak "XX" that bears North 2° 27' West at 22.9 feet; thence traversing along the centerline of said road these courses: North 61° 44' 44" West a distance of 47.64 feet to a point, South 61° 58' 34" West a distance of 239.27 feet to a point, South 54° 42' 02" West a distance of 104.03 feet to a point, South 63° 21' 07" West a distance of 252.99 feet to a point, South 84° 56' 38" West a distance of 73.87 feet to a point, South 68° 15' 03" West a distance of 99.56 feet to a point, South 55° 03' 37" West a distance of 135.20 feet to a point, South 48° 59' 08" West a distance of 101.23 feet to a point, South 49° 45' 44" West a distance of 297.00 feet to a point, South 69° 10' 40" West a distance of 64.00 feet to a point, South 68° 55' 08" West a distance

of 100.00 feet to a point, South 77° 54' 15" West a distance of 101.07 feet to a point, South 79° 55' 54" West a distance of 63.72 feet to a point, North 77° 31' 45" West a distance of 100.95 feet to a point, North 61° 02' 37" West a distance of 94.54 feet to a point, North 48° 32' 14" West a distance of 100.51 feet to a point, North 46° 15' 47" West a distance of 51.00 feet to a point, thence North 45° 40' 50" West a distance of 31.78 feet to a point marking the North most corner of that tract conveyed to Mississippi Power & Light Company by A. L. Arnold, Jr., by virtue of deed dated June 19, 1973, recorded in the office of the Chancery Clerk of Claiborne County, Mississippi in Deed Book 8-Z, at Page 105; thence leaving the centerline of Waterloo Road run South 21° 47' 11" East a distance of 604.45 feet to an iron pin on the southerly right-of-way of a proposed road - SAP 11 (23); thence with the southerly right-of-way of the proposed road, South 45° 05' 08" West a distance of 220.40 feet to an iron pin, on a point of curve, of a curve to the right; thence with the curve a distance of 400.39 feet, the chord of this curve bearing South 63° 42' 30' West 393.38 feet to an iron pin on the point of tangency; thence South 80° 47' 52" West a distance of 196.62 feet to an iron pin; thence South 82° 40' 14" West a distance of 510.03 feet to an iron pin; thence South 77° 45' 33" West a distance of 212.84 feet to an iron pin; thence South 89° 21' 55" West a distance of 49.95 feet to an iron pin; thence North 80° 38' 18" West a distance of 230.97 feet to an iron pin on a point of curve, of a curve to the left; thence with the curve a distance of 357.11 feet, the chord of this curve bearing South 74° 00' 58" West 352.91 feet to an iron pin on the point of tangency; thence South 31° 06' 44" East a distance of 34.47 feet to an iron pin; thence South 69° 23' 18" West a distance of 190.57 feet to an iron pin; thence South 58° 49' 34" West a distance of 249.93 feet to an iron pin; thence South 40° 25' 08" West a distance of 105.09 feet to an iron pin; thence South 69° 04' 47" West a distance of 101.68 feet to an iron pin; thence South 63° 04' 55" West a distance of 199.75 feet to an iron pin; thence South 58° 50' 25" West a distance of 91.40 feet to an iron pin on a point of curve, of a curve to the left; thence with the curve a distance of 476.21 feet, the chord of this curve bearing South 38° 36' 05" West a distance of 466.29 feet to an iron pin on the point of tangency; thence South 10° 14' 40" East a distance of 94.32 feet to an iron pin, thence South 21° 15' 22" West a distance of 97.41 feet to an iron pin on a point of curve, of a curve to the left, thence with the curve a distance of 183.06 feet, the chord of this curve bearing South 05° 40' 26" East 182.47 feet to an iron pin on the point of tangency; thence South 05° 37' 14" East a distance of 87.29 feet to an iron

AND ALSO, a tract of land comprising 82.53 acres, more or less, consisting of seven (7) separate tracts, said property being the property previously conveyed by Mississippi Power & Light Company to Middle South Energy, Inc. by Warranty Deed recorded in Book 9-B at Page 601 and correction deeds recorded in Book 9-F at Page 114 and Book 9-R at Page 199 in the office of the Chancery Clerk of Claiborne County, Mississippi, as follows:

Hamilton Tract 1 and Hamilton Tract No. 2, being a tract of 6.47 acres, more or less, in Section 12, Township 12 North, Range 2 East, and a tract of 2.22 acres, more or less, in Section 12, Township 12 North, Range 2 East, as described in that certain Warranty Deed from Robert L. Hamilton and Mildred C. Hamilton to Mississippi Power & Light Company, dated June 6, 1974, and recorded in the records of the Chancery Clerk of said County in Book 9-B, at Page 110.

Trimble Tract, being a tract of 21.40 acres, more or less, in Section 12, Township 12 North, Range 2 East, as described in that certain Warranty Deed from Mary Lee Hamilton Trimble to Mississippi Power & Light Company, dated May 17, 1974, and recorded in the records of the Chancery Clerk of said County in Book 9-A, at Page 491.

Cornforth Tract No. 1 and Cornforth Tract No. 2, being a tract of 21.21 acres, more or less, in Section 12, Township 12 North, Range 2 East, and a tract of 0.06 acres, more or less, in Section 12, Township 12 North, Range 2 East, as described in that certain Deed from Mary Lee Hamilton Trimble, as Guardian of Dorothy Hamilton Cornforth, to Mississippi Power & Light Company, dated June 13, 1974, and recorded in the records of the Chancery Clerk of said County in Book 9-B at page 21.

Buckner Tract, being a tract of 8.11 acres, more or less, in Section 12, Township 12 North, Range 2 East, as described in that certain Warranty Deed from C. B. Buckner and Gladys F. Buckner to Mississippi Power & Light Company, dated May 17, 1974, and recorded in the records of the Chancery Clerk of said County in Book 9-A at Page 498.

Allen Tract, being a tract of 23.06 acres, more or less, in Section 12, Township 12 North, Range 2 East, as described in that certain Warranty Deed from J. U. Allen and Julia Mae L. Allen to Mississippi Power & Light Company, dated June 27, 1974, and recorded in the records of the Chancery Clerk of said County in Book 9-B at Page 101.

pin, in the northerly fence line of the Waterloo Plantation - Port Gibson Gravel Road; thence North 34° 55' 32" West a distance of 203.20 feet to an iron pin, also in this fence line and on a point of curve, of a curve to the right; thence with the curve a distance of 265.03 feet, the chord of this curve bearing North 03° 36' 19" East 263.66 feet to an iron pin on the point of tangency; thence North 22° 32' 54" West a distance of 93.54 feet to an iron pin, on a point of curve, of a curve to the left; thence with the curve a distance of 182.13 feet, the chord of this curve being South 78° 47' 43" West 172.24 feet to an iron pin on the point of tangency; thence South 45° 22' 20" West a distance of 4.05 feet; thence North 35° 51' 38" West a distance of 26.45 feet; thence North 85° 44' 10" West a distance of 16.23 feet to point at the intersection centerline of the Waterloo Plantation Gravel Road, the proposed "turnout" of SAP 11(23) and the presently existing gravel road; thence continuing with the centerline of Waterloo Road, South 44° 20' 41" West a distance of 38.33 feet to a point, South 44° 20' 18" West a distance of 292.08 feet to a point, South 50° 13' 02" West a distance of 100.32 feet to a point, South 64° 50' 33" West a distance of 257.96 feet to a point, South 46° 01' 04" West a distance of 115.45 feet to a point, South 49° 20' 24" West a distance of 86.62 feet to a point, South 6° 26' 20" East a distance of 183.43 feet to a point, South 12° 42' 44" East a distance of 100.02 feet to a point, South 4° 32' 24" West a distance of 119.13 feet to a point, South 9° 34' 34" West a distance of 100.21 feet to a point, South 15° 50' 33" West a distance of 164.51 feet to a point, South 31° 11' 05" West a distance of 100.95 feet to a point, South 39° 30' 42" West a distance of 568.69 feet to a point, South 26° 06' 04" West a distance of 102.74 feet to a point, South 16° 40' 06" West a distance of 140.33 feet to a point, South 3° 40' 42" West a distance of 300.21 feet to a point, South 3° 50' 17" East a distance of 101.44 feet to a point, South 33° 10' 30" West a distance of 339.37 feet to a point, South 42° 06' 42" West a distance of 79.71 feet to a set 3/4" iron pipe ending the traverse of the centerline of said Waterloo Road, witnessed by a 15" Sweet Gum "XX" that bears North 57° 15' West at 37.0 feet; thence North 45° 31' 14" West a distance of 14.79 feet to a fence corner; thence along a fence line North 68° 49' 51" West a distance of 526.36 feet to fence corner; thence traversing said fence with painted trees, North 35° 57' 45" West a distance of 52.53 feet to a point, North 30° 28' 53" West a distance of 295.71 feet to a point, North 28° 58' 37" West a distance of 173.23 feet to a point, North 19° 20' 17" West a distance of 201.82 feet to a point, North 20° 14' 09" West a distance of 163.32 feet to a point, North 24° 42' 11" West a distance of 102.27 feet to a point, North 23°

29' 10" West a distance of 408.65 feet to a point, North 21° 08' 19" West a distance of 568.15 feet to a point, North 21° 10' 36" West a distance of 183.12 feet to a point, North 22° 16' 06" West a distance of 215.52 feet to a point, North 0° 08' 47" West a distance of 527.91 feet to a point; thence South 88° 58' 00" West a distance of 19.62 feet to a found 10" Pignut marked "XIII", being the Southwest corner of Lot Eleven (11) (as now designated) of Section Six (6). Township Twelve (12) North, Range One (1) East; thence with International Paper Company's painted and blazed line North 0° 00' 33" East a distance of 2,829.47 feet to a 36" Pignut marked "XIII", being the Northern "quarter corner" of said Section Six (6); thence with International Paper Company's painted and blazed line, generally along an old fence, and near the West end, running along and in a gravel road, North 89° 34' 56" West a distance of 2,692.25 feet to a 30" Sycamore marked "XIII", being the Northwest corner of said Section Six (6); thence with H. B. Wood heirs' line, South 88° 58' 00" West a distance of 720.95 feet to the point of beginning, a 3/4" iron pipe.

The area herein traversed is calculated to be 2,295.86 acres, and the area between the traverse along the Mississippi River and the top bank thereof at the time of the traverse is calculated to be 34.74 acres, thus the total acreage is 2,330.6 more or less, less and except a 2.10 acre tract conveyed by Mississippi Power & Light Company to Dwight O. Glodjo and Myrtle Glodjo by Deed dated January 17, 1973 and recorded in Book 8-Y at Page 231 in the office of the Chancery Clerk of said Claiborne County, therefore the net total acreage is 2,328.5. The plat of survey referred to above is attached to and made a part of a Warranty Deed from Mississippi Power & Light Company to Middle South Energy, Inc. dated June 25, 1974 and recorded in Book 9-B at Page 74 in the office of the Chancery Clerk of said Claiborne County.

Reference in aid of description is made to all of the above mentioned deeds, which are recorded in the deed records of Claiborne County, Mississippi.

Reference in aid of description is also made to plat which encompasses and shows all of the above listed acquisitions with the exception of the one designated as Arnold Tract, which plat is of record in Plat Book 1, page 42 in the records in the office of the Chancery Clerk of said Claiborne County (and which plat does not show the Terrell tract separately, but the same is included within the boundaries of the "Estelle Shippy" tract as shown on said plat.)

AND ALSO, a tract of land comprising 82.53 acres, more or less, consisting of seven (7) separate tracts, said property being the property previously conveyed by Mississippi Power & Light Company to Middle South Energy, Inc. by Warranty Deed recorded in Book 9-B at Page 601 and correction deeds recorded in Book 9-F at Page 114 and Book 9-R at Page 199 in the office of the Chancery Clerk of Claiborne County, Mississippi, as follows:

Hamilton Tract 1 and Hamilton Tract No. 2, being a tract of 6.47 acres, more or less, in Section 12, Township 12 North, Range 2 East, and a tract of 2.22 acres, more or less, in Section 12, Township 12 North, Range 2 East, as described in that certain Warranty Deed from Robert L. Hamilton and Mildred C. Hamilton to Mississippi Power & Light Company, dated June 6, 1974, and recorded in the records of the Chancery Clerk of said County in Book 9-B, at Page 110.

Trimble Tract, being a tract of 21.40 acres, more or less, in Section 12, Township 12 North, Range 2 East, as described in that certain Warranty Deed from Mary Lee Hamilton Trimble to Mississippi Power & Light Company, dated May 17, 1974, and recorded in the records of the Chancery Clerk of said County in Book 9-A, at Page 491.

Cornforth Tract No. 1 and Cornforth Tract No. 2, being a tract of 21.21 acres, more or less, in Section 12, Township 12 North, Range 2 East, and a tract of 0.06 acres, more or less, in Section 12, Township 12 North, Range 2 East, as described in that certain Deed from Mary Lee Hamilton Trimble, as Guardian of Dorothy Hamilton Cornforth, to Mississippi Power & Light Company, dated June 13, 1974, and recorded in the records of the Chancery Clerk of said County in Book 9-B at page 21.

Buckner Tract, being a tract of 8.11 acres, more or less, in Section 12, Township 12 North, Range 2 East, as described in that certain Warranty Deed from C. B. Buckner and Gladys F. Buckner to Mississippi Power & Light Company, dated May 17, 1974, and recorded in the records of the Chancery Clerk of said County in Book 9-A at Page 498.

Allen Tract, being a tract of 23.06 acres, more or less, in Section 12, Township 12 North, Range 2 East, as described in that certain Warranty Deed from J. U. Allen and Julia Mae L. Allen to Mississippi Power & Light Company, dated June 27, 1974, and recorded in the records of the Chancery Clerk of said County in Book 9-B at Page 101.

AND

An easement in, on, over and across a tract of 4.20 acres, more or less, in Section 12, Township 12 North, Range 2 East, as described in that certain Conveyance of Easement from Mary Lee Hamilton Trimble to Mississippi Power & Light Company, dated October 2, 1974, and recorded in the records of the Chancery Clerk of said County in Book 9-B, at Page 398.

LESS AND EXCEPT, the following described property which has heretofore been conveyed by MISSISSIPPI POWER & LIGHT COMPANY to the GRAND GULF MILITARY MONUMENT COMMISSION by that certain deed recorded in Book 9-B at Page 56, in the office of the Chancery Clerk of Claiborne County, Mississippi, reference to which said deed is hereby made for all purposes, and which said land and property lying and being situated in Claiborne County, Mississippi, is more particularly described as follows, to-wit:

A tract of land located in District 2, Claiborne County, Mississippi, situated in Section 1, Township 12 North, Range 1 East, and in Sections 7 and 8, Township 12 North, Range 2 East, a more particular description (taken from a plat drawn March 31, 1974, that was prepared from a survey performed in March, 1972, and in September, 1973, using the Transverse Mercator Mississippi West Zone Coordinate System, with a grid bearing that is 0 degrees 23 Minutes West of true North), of which is as follows, to-wit:

Beginning at a railroad spike "X" on the centerline of the Port Gibson to Grand Gulf Highway above a 10' x 8' concrete box culvert, and being a point on the East boundary of that tract of land conveyed to Mississippi Power & Light Company by Estelle H. Shippey by virtue of deed dated September 20, 1972, recorded in the office of Chancery Clerk of Claiborne County, Mississippi, in Deed Book 8-S at Page 464 (said point of beginning having coordinates Y:555,219.86 feet, X:276,577.59 feet and being 5,591.73 feet NOrth of and 1,464.51 feet East of the of the southernmost corner of Section 5, Township 12 North, Range 1 East, which is a corner common to Sections 11 and 12, Township 12 North, Range 2 East, and Sections 4 and 5, Township 12 North, Range 1 East, a painted 30" oak in a fence line); run thence from point of beginning along the centerline of the Port Gibson - Grand Gulf Highway on a 10 degree curve to the right a distance of 213.40 feet to the point of tangency; thence traversing along the centerline of said road, North 6 degrees 38 minutes 33 seconds East 2,206.83 feet to a railroad spike

AND ALSO, a tract of land comprising 82.53 acres, more or less, consisting of seven (7) separate tracts, said property being the property previously conveyed by Mississippi Power & Light Company to Middle South Energy, Inc. by Warranty Deed recorded in Book 9-B at Page 601 and correction deeds recorded in Book 9-F at Page 114 and Book 9-R at Page 199 in the office of the Chancery Clerk of Claiborne County, Mississippi, as follows:

Hamilton Tract 1 and Hamilton Tract No. 2, being a tract of 6.47 acres, more or less, in Section 12, Township 12 North, Range 2 East, and a tract of 2.22 acres, more or less, in Section 12, Township 12 North, Range 2 East, as described in that certain Warranty Deed from Robert L. Hamilton and Mildred C. Hamilton to Mississippi Power & Light Company, dated June 6, 1974, and recorded in the records of the Chancery Clerk of said County in Book 9-B, at Page 110.

Trimble Tract, being a tract of 21.40 acres, more or less, in Section 12, Township 12 North, Range 2 East, as described in that certain Warranty Deed from Mary Lee Hamilton Trimble to Mississippi Power & Light Company, dated May 17, 1974, and recorded in the records of the Chancery Clerk of said County in Book 9-A, at Page 491.

Cornforth Tract No. 1 and Cornforth Tract No. 2, being a tract of 21.21 acres, more or less, in Section 12, Township 12 North, Range 2 East, and a tract of 0.06 acres, more or less, in Section 12, Township 12 North, Range 2 East, as described in that certain Deed from Mary Lee Hamilton Trimble, as Guardian of Dorothy Hamilton Cornforth, to Mississippi Power & Light Company, dated June 13, 1974, and recorded in the records of the Chancery Clerk of said County in Book 9-B at page 21.

Buckner Tract, being a tract of 8.11 acres, more or less, in Section 12, Township 12 North, Range 2 East, as described in that certain Warranty Deed from C. B. Buckner and Gladys F. Buckner to Mississippi Power & Light Company, dated May 17, 1974, and recorded in the records of the Chancery Clerk of said County in Book 9-A at Page 498.

Allen Tract, being a tract of 23.06 acres, more or less, in Section 12, Township 12 North, Range 2 East, as described in that certain Warranty Deed from J. U. Allen and Julia Mae L. Allen to Mississippi Power & Light Company, dated June 27, 1974, and recorded in the records of the Chancery Clerk of said County in Book 9-B at Page 101.

"X"; run thence North 8 degrees 04 minutes 02 seconds East 54.01 feet to a railroad spike "X"; run thence North 10 degrees 00 minutes 08 seconds East 58.09 feet to a railroad spike "X"; run thence North 14 degrees 16 minutes 37 seconds East 15.00 feet to a railroad spike "X", ending the traverse along the centerline of said road; run thence North 31 degrees 48 minutes 22 seconds West 56.24 feet to a fence corner at the right of way line of said road; thence traversing with a fence North 31 degrees 48 minutes 22 seconds West 42.35 feet to a tree where fence corners; run thence South 52 degrees 30 minutes 24 seconds West 195.56 feet to a tree where fence corners; run thence North 69 degrees 14 minutes 48 seconds West 14.62 feet to a tree where fence corners; run thence North 36 degrees 43 minutes 59 seconds West 440.00 feet to a tree where fence corners; run thence North 8 degrees 48 minutes 58 seconds West 166.05 feet, and ending the traverse along fence; run tnence North 35 degrees 00 minutes 00 seconds West 53.24 feet to a set 1" iron pipe; run thence South 55 degrees 00 minutes 00 seconds West 37.26 feet to a set 1" iron pipe at the South corner of Square twenty-four (24), Town of Grand Gulf, said pipe being South 55 degrees 00 minutes 00 seconds West a distance of 360 feet from a found buggy axle at the South Corner of Square twenty-three, Town of Grand Gulf; run thence North 35 degrees 00 minutes 00 seconds West 300.00 feet to a set 1" iron pipe at the West corner of said square twenty-four (24); run thence North 55 degrees 00 minutes 00 seconds East 300 feet to a set 1" iron pipe at the North corner of said square twenty-four (24); run thence North 35 degrees 00 minutes 00 seconds West 843.26 feet to a found buggy axle; run thence North 34 degrees 02 minutes 00 seconds West along an old fence line a distance of 1,914.14 feet to a set 1 1/2" iron pipe (March 1972) having coordinates of X:274,787.77 and Y:560,952.43, from said iron pipe, the top bank in March 1972 was located North 34 degrees 02 minutes West a distance of 134 feet; thence traversing southerly along the East bank of the Mississippi River as it existed in March of 1972, (this traverse line in April of 1974 was located in the channel of the Mississippi River due to bank erosion) South 13 degrees 48 minutes 54 seconds West a distance of 472.34 feet to a point, at this, and all subsequent points along the River, a measurement to the top bank as it existed in March of 1972 is shown thusly - top bank bears North 57 degrees 54 minutes 45 seconds West at 109 feet; run thence South 42 degrees 05 minutes 15 seconds West 165.47 feet, to a point; top bank bears North 64 degrees 20 minutes 14 seconds West at 57 feet; run thence South 25 degrees 39 minutes 46 seconds West 394.14 feet to a point, top bank bears South 75 degrees 08 minutes 10 seconds West at 71 feet; run thence South 14

degrees 51 minutes 50 seconds East 192.77 feet to a point, top bank bears North 61 degrees 07 minutes 57 seconds West at 182 feet; run thence South 28 degrees 52 minutes 03 seconds West 323.93 feet, top bank bears North 57 degrees 22 minutes 38 seconds West at 97 feet; run thence South 32 degrees 37 minutes 22 seconds West 190.58 feet to a point, top bank bears North 61 degrees 59 minutes 48 seconds West at 80 feet; run thence South 28 degrees 00 minutes 12 seconds West 178.16 feet to a point, top bank bears North 56 degrees, 13 minutes 27 seconds West at 90 feet, run thence South 33 degrees 46 minutes 33 seconds West 289.02 feet to a point, top bank bears North 35 degrees 00 minutes 00 seconds West at approximately 100 feet, ending the traverse of the East bank of the Mississippi River, run thence South 35 degrees 00 minutes 00 seconds East 4,599.70 feet to the point of beginning. It is noted that the area within the traverse of this tract is calculated to be 159.12 acres, and that the area between the traverse and the top bank of the Mississippi River at the time of the survey, (March 1972) is calculated to be 5.15 acres, thus the total acreage of the tract is 164.27 acres. ALSO, any and all land and property, and any and all rights, title and claim of ownership in the adjacent land to the West of the above particularly described 164.27 acre tract, being within the extension of the northerly and southerly lines, as adjusted in relation to the riparian ownerships, and which lies adjacent to and westerly of the westerly line of the above described land, and which line as hereinabove described ran along the top bank of the Mississippi River in March of 1972, and running Westerly from said line to the thalweg of the stream; together with all of the riparian rights appurtentant thereto.

AND LESS AND EXCEPT, the following described property which has heretofore been conveyed by Middle South Energy, Inc. to Mississippi Power & Light Company by that certain deed recorded in Book 9-R at page 177 in the office of the Chancery Clerk of Claiborne County, Mississippi, reference to which said deed is hereby made for all purposes, and which said land and property lying and being situated in Claiborne County, Mississippi, is more particulary described as follows, to-wit:

A parcel of land located in District 2, Claiborne County, Mississippi, situated in Section 12, Township 12 North, Range 2 East. A metes and bounds description, using the Transverse Mercator Mississippi West Zone Coordinate System, with a grid bearing that is 0 degrees 23 minutes west of true north, is as follows, to-wit:

Beginning at the intersection of the northerly right of way line of SAP-11 (23) and the Eastern boundary of that property conveyed to Middle South Energy, Inc. by virtue of Warranty Deed dated June 27, 1974, and recorded in the office of the Chancery Clerk of Claiborne County in Deed Book 9B at Page 74 (said point of beginning having coordinates of North 547,304.39; East 280,818.41 and being located 1251.03 feet north of and 5670.11 feet east of the northwest corner of Section 30, Township 12 North, Range 2 East, a corner common to Section 11 and 30, Township 12 North, Range 2 East, marked by a 1-1/2" iron pipe); run thence north 18 degrees 57 minutes 30 seconds east along said Eastern boundary line a distance of 101.93 feet to a point; run thence north 22 degrees 15 minutes west 921.24 feet to a point on the north-east fence corner of Mississippi Power and Light Company's 500 KV Switchyard; run thence north 60 degrees 00 minutes west along said fence 1789.5 feet to a point, run thence south 30 degrees 00 minutes west 988.00 feet to a point, run thence south 60 degrees 00 minutes east 1908.58 feet to a point, run thence south 16 degrees 34 minutes east 279.79 feet to a point on the north right of way of SAP-11(23) Station 168+27.21; run thence north 69 degrees 33 minutes 49 seconds east along said right of way 629.68 feet to a point of curvature on SAP-11(23) Station 174+56.89; run thence in an easterly direction on a 5 degrees 9 minutes 21 seconds curve to the left a distance of 39.5 feet to the point of beginning, the cord of which bears north 68 degrees 32 minutes east and a distance of 39.5 feet to the point of beginning containing 52.37 acres more or less, all as shown as Parcel No. 1 on the plat attached marked Exhibit "A" to the above referenced deed.

AND LESS AND EXCEPT, the following described three (3) tracts of property:

I.

A tract of land containing 103.97 acres, located 6 miles Northeast of Port Gibson, in District 2, Claiborne County, Mississippi, situated in Section 12, T-12-N, R-2-E, and bounded on all sides by lands owned by Middle South Energy, Inc., formerly owned by Mary Lee Hamilton Trimble. A detailed description, taken from a survey performed December 6, 1979, using the Mississippi State Plane Coordinate system - West Zone, with a grid North bearing that is 0°23' West of True North, is as follows:

Beginning at a point on the Range 2 East line, a corner common to Section 4 and 5 in Range 1 East and Section

11 and 12 Range 2 East, all in T-12-N, having coordinate values of Y549,628.13, X275,113.08, thence N74°16'53"E a distance of 3434.06 feet to the Northwest corner of the 103.97 acre tract, Y550,558.73, X278,419.68, said Northwest Corner is a point near the centerline of the access road to the tract from the Grand Gulf - Port Gibson road, and witnessed by a concrete monument with an embedded brass cap, set flush with grade on the East shoulder of the access road, that bears S60°00'00"E 26.23 feet from the Northwest Corner, and thence from the Northwest corner, S30°00'00"W a distance of 2790.00 feet to the Southwest corner, Y548,142.52, X277,024.68, said Southwest Corner is a concrete monument with an embedded brass cap set flush with grade, on a small knoll, and witnessed by a 14" Oak, marked ≚ , that bears North 60°40'00"East 21.0 feet from the Southwest Corner, thence from the Southwest corner, S60°00'00"E - 1623.33 feet to the Southeast corner, Y547,330.85, X278,430.52, said Southeast Corner is a point in a concrete lined diversion ditch on the Northerly descending slope of the ditch, and witnessed by a concrete monument with an embedded brass cap set flush with grade, that bears N30°00'00"E - 6.33 feet from the Southeast Corner, thence from the Southeast corner, N30°00'00"E 2790.00 feet to the Northeast corner, Y549,747.06, X279,825.52, said Northeast Corner is a concrete monument with an embedded brass cap set flush with grade, and witnessed by a 40" Oak, marked ≚ , that bears S77°20'00"E - 36.90 feet from the Northeast Corner, thence from the Northeast corner N60°00'00"W - 1623.53 feet to the Northwest corner, the point of beginning.

II.

A tract of land containing 7.49 acres, located 6 miles Northeast of Port Gibson, in District 2, Claiborne County, Mississippi, situated in Sections 12, 5, 4 and 2, T-12-N, R-1-E and R-2-E, and bounded on all sides by lands owned by Middle South Energy, Inc. generally described as being a 50' wide strip of land, in which there is presently existing a 48" water supply pipeline and a 54" water discharge pipeline, to and from the Grand Gulf Nuclear facility, said pipelines being adjacent and parallel from the facility to a point near the Mississippi River, where the discharge pipeline terminates at a concrete headwall constructed at point of discharge into a barge slip in the East bank of the River, said water pipelines are 10 feet apart measured center to center and the following described property lines are generally 20 feet Northerly and Southerly of each water line, for a nominal 50' width. The following description is taken from a survey performed in December 1979, using the Mississippi

State Plane Coordinate System - West Zone, with a Grid North Bearing that is 0°23' West of True North:

Beginning at a point in the Westerly boundary of the Grand Gulf Nuclear Facility Plant Site that is N30°00'00"E - 1131.02 feet from the Southwest Corner of the Plant Site. The southwest corner is a brass cap set in a concrete monument having Mississippi State Plane Coordinate - West Zone values Y548,142.52', X277,024.68', thus begin the 50' wide strip at Y549,122.01', X277,590.19', the aforementioned point of beginning;

Thence N65°20'40"W - 637.84 feet to Y549,388.09', X277,010.50',
Thence N64°17'13"W - 1069.56 feet to Y549,852.13', X276,046.85',
Thence N29°42'12"W - 1625.24 feet to Y551,263.82', X275,241,53',
Thence N46°13'16"W - 1662.12 feet to Y552,413.80', X274,041.45',
Thence N58°42'16"W - 1202.26 feet to Y553,038.32', X273,014.12',

Thence crossing the 48" water supply pipeline, which leaves its parallel with the 54" water discharge line,

N41°16'17"W - 45.45 feet to Y553,072.48', X272,984.14',
Thence N47°29'21"W - 319.93 feet to Y553,288.67', X272,748.30',
Thence N42°30'29"E - 40.00 feet to Y553,318.16', X272,775.33',
Thence S47°28'13"E - 333.54 feet to Y553,092.70;, X273,021.12',
Thence S58°42'16"E - 1230.41 feet to Y552,453.56', X274,072.50',
Thence S46°13'19"E - 1674.11 feet to Y551,295.30', X275,281.25',
Thence S29°42'16"E - 1617.66 feet to Y549,890.21', X276,082.84',
Thence S64°17'13"E - 1053.33 feet to Y549,433.21', X277,031.87',
Thence S65°19'39"E - 642.04 feet to Y549,165.20', X277,615.30',
Thence S30°00'00"W - 50.22 feet to Y549,122.01', X277,590.19',

to the point of beginning.

III.

A tract of land containing 5.12 acres, located 6 miles Northeast of Port Gibson, in District 2, Claiborne County, Mississippi, situated in Sections 2 and 4, T-12-N, R-1-E, and being bounded by lands owned by Middle South Energy, Inc. and in places, by the East bank of the Mississippi River, generally described as a 40 foot wide strip of land being 20 feet each side of a water supply pipeline and lateral water lines from each of 3 radial type water wells located on the East bank of the Mississippi River, from a point on a 50' wide parcel previously described as a 7.49 acre tract for a 54" discharge and 48" water supply pipeline, to and enclosing each radial wellhead.

The following description is taken from a survey performed in December 1979, using the Mississippi State Plane Coordinate System - West Zone, with a Grid North Bearing that is 0°23' West of True North:

Beginning at a point south of the crossing intersection of the 48" supply and 54" discharge water pipeline that is 20' South of the 54" line and 20' East of the 48" at Y553,038.32', X273,014.12',
thence paralleling the supply line,
S72°41'37"W - 648.22 feet to Y552,845.49', X272,395.25',
thence S19°56'37"W - 622.22 feet to Y552,260.59', X272,183.01',
thence S23°11'15"W - 1600.69 feet to Y550,789.20', X271,552.75',
thence S26°28'32"W - 1055.63 feet to Y549,844.28', X271,082.13',
thence S32°38'27"W - 1047.29 feet to Y548,962.39', X270,517.25',
and thence to enclose radial well number 1,
N57°21'24"W - 127.00 feet to Y549,030.89', X270,410.31',
to the East bank of the Mississippi River, and with the bank,
thence N32°38'36"E - 46.00 feet to Y549,069.62', X270,435.12',
thence leaving the East bank,
S57°21'24"E - 87.00 feet to Y549,022.69', X270,508.38',
which ends the enclosure of radial well number 1 and lateral lines, and resuming the parallel with the water supply mainline,
N32°38'36"E - 994.84 feet to Y549,860.39', X271,045.00',
thence N26°28'34"E - 951.21 feet to Y550,711.84', X271,469.07',
and thence to enclose radial well number 3,
N63°31'26"W - 106.00 feet to Y550,759.10', X271,374.19',
to the East bank of the Mississippi River, and there along top bank,
N26°28'34"E - 46.00 feet to Y550,800.27', X271,394.70',
and thence leaving the East bank,
S63°31'26"E - 106.00 feet to Y550,753.01', X271,489.58',
which ends the enclosure of radial well number 3 and lateral lines and resumes parallel with the water supply mainline,
N26°28'34"E - 55.00 feet to Y550,802.24', X271,514.10',
thence N23°11'14"E - 1598.53 feet to Y552,271.65', X272,143.50',
thence N19°56'34"E - 640.74 feet to Y552,873.97', X272,362.04',
thence N72°31'20"E - 169.00 feet to Y552,924.73', X272,523.24',
and thence to enclose radial well number 5 and lateral lines,
N17°28'21"W - 38.40 feet to Y552,961.36', X272,511.71',
thence N29°09'00"W - 172.84 feet to Y553,112.31', X272,427.52',
thence N66°33'33"W - 64.91 feet to Y553,138.13', X272,367.97',
thence N23°23'17"E - 46.00 feet to Y553,180.35', X272,386.23',
thence S66°33'33"E - 80.48 feet to Y553,148.33', X272,460.07',
thence S29°09'00"E - 192.84 feet to Y552,979.91', X272,554.00',
thence S17°28'21"E - 42.83 feet to Y552,939.06', X272,566.86',
which ends the enclosure of radial well number 5 and lateral supply lines, and resumes parallel with the water supply mainline,
thence N72°16'08"E - 438.09 feet to Y553,072.48', X272,984.14',
thence S41°16'17'E - 45.45 feet to Y553,038.32', X273,014.12',
the point of beginning.

The conveyance of this easement is subject to:

1. Right of way for public roads along the edges of, or traversing portions of the property.

2. Unrecorded easements for utility lines.

3. Right of way for transmission line purposes conveyed by Middle South Energy, Inc. to Mississippi Power & Light Company by instrument recorded in Book 9-R at Page 177 in the office of the Chancery Clerk of Claiborne County, Mississippi.

4. Easement for public road purposes from Middle South Energy, Inc. to Claiborne County, Mississippi, dated September 17, 1974, recorded in Book 9-F at Page 27 in the office of the Chancery Clerk of Claiborne County, Mississippi.

5. Construction easement from Middle South Energy, Inc. to Claiborne County, Mississippi, dated December 10, 1974, recorded in Book 9-F at Page 139 in the office of the Chancery Clerk of Claiborne County, Mississippi.

EXHIBIT "E"

(To Be Delivered at "Closing")

Easement Agreement

Dated as of ___________, 1980

Between

Middle South Energy, Inc.

and

South Mississippi Electric Power Association

Pursuant to the provisions of Section 2.01 of the Joint Construction, Acquisition and Ownership Agreement (Construction Agreement) between Middle South Energy, Inc. (MSE) and South Mississippi Electric Power Association (SMEPA), dated as of May 1, 1980, and recorded on _____________, 1980, in Book ___, at page ___, in the office of the Chancery Clerk of Claiborne County, Mississippi, which is incorporated herein by reference and made a part hereof, MSE, in consideration of SMEPA's agreements made in the Construction Agreement and other good and valuable consideration, receipt of which is hereby acknowledged, hereby assigns, conveys and warrants specially to SMEPA a non-exclusive easement ("Easement" for entombment of Grand Gulf and for locating, occupying, situating, connecting, owning, selling, leasing, operating,

maintaining, replacing, renewing, repairing, storing, removing and building all equipment and property comprising Grand Gulf including roads, railroads, telephones, electric transmission lines and systems, electric substations, water wells, pipelines, sewer and water lines, systems for nuclear and other waste disposal as permitted by law and all appurtenances thereto, and for all related purposes, subject, however, to all applicable provisions of the Construction Agreement, its undivided ownership interest, as now owned or hereafter acquired, in and to Grand Gulf (as such term is defined in the Construction Agreement), in, on, over, under, across and through the following described property which is owned by MSE:

(Insert Exhibit B Description)

This Easement is for the benefit of and appurtenant to Grand Gulf including the real property described as follows:

(Insert Exhibit A Description)

MSE represents that the Easement is free from the lien of the MSE Mortgage, as such term is defined in the Construction Agreement.

During the term of the Construction Agreement, SMEPA agrees that it will not, without the prior written consent of MSE, assign, grant or convey any part of its interest in this Easement to any other person except to any mortgagee under the SMEPA Mortgage, as such term is defined in the Construction Agreement.

This Easement shall terminate upon the date when SMEPA shall have no interest, contingent or otherwise, in Grand Gulf.

This Easement Agreement is hereby made expressly subject to all applicable terms, conditions, exceptions, reservations, and covenants set forth in the Construction Agreement.

IN WITNESS WHEREOF, MSE has duly executed this Easement in Jackson, Mississippi as of the date first above written.

MIDDLE SOUTH ENERGY, INC.

BY: ______________________________
VICE PRESIDENT

STATE OF MISSISSIPPI

COUNTY OF HINDS

Personally appeared before me, a Notary Public in and for the jurisdiction aforesaid, the within named D. C. Lutken, who acknowledged that he is a Vice President of Middle South Energy, Inc., a corporation, and that in his capacity herein set forth he signed and delivered the foregoing instrument on the corporation's behalf as of the day and year therein mentioned, being duly authorized so to do.

GIVEN UNDER MY HAND AND OFFICIAL SEAL, this the ____ day of ________________, 1980.

______________________________
NOTARY PUBLIC

My Commission Expires:

______________________________