# GRAND GULF NUCLEAR STATION

## Operating Agreement

between

Middle South Energy, Inc.

and

South Mississippi Electric Power Association

Dated as of May 1, 1980

# TABLE OF CONTENTS


| | PAGE |
|---|---|
| ARTICLE I - DEFINITIONS | 3 |
| 1.01 General | 3 |
| 1.02 Construction Agreement | 3 |
| 1.03 Cost of Operation or Costs of Operation | 3 |
| 1.04. Economic Reasons | 4 |
| 1.05 Force Majeure | 4 |
| 1.06 Operating Agreement | 5 |
| 1.07 System Agreement | 5 |
| ARTICLE II - GENERAL OBLIGATIONS AND RIGHTS OF THE PARTIES | 5 |
| 2.01 No Adverse Distinction | 5 |
| 2.02 Authority for Operation and Management | 6 |
| 2.03 Execution of Contracts | 7 |
| 2.04 Cooperation | 8 |
| 2.05 Operation, Agency, Conflict of Interest | 9 |
| 2.06 Limitation of Liability | 10 |
| 2.07 Nuclear Fuel | 12 |
| ARTICLE III - GENERAL FINANCIAL OBLIGATIONS OF MSE AND SMEPA | 13 |
| 3.01 Sharing of Cost of Operation | 13 |
| 3.02 Payment and Settlement of Cost of Operation | 14 |
| 3.03 Excess Uranium Provision | 18 |
| ARTICLE IV - AVAILABILITY OF CAPACITY AND ENERGY | 19 |
| 4.01 Sharing of Capacity and Energy | 19 |
| 4.02 Scheduling and Dispatching | 19 |
| 4.03 Sharing of Cost of Nuclear Fuel | 20 |
| 4.04 Transactions with Other Systems | 21 |
| 4.05 Federal Energy Regulatory Commission | 21 |

ARTICLE V - ACCESS TO GRAND GULF 22

5.01 Observation 22
5.02 Indemnity 23
5.03 Plant Tours 23
5.04 Information 23

ARTICLE VI - ASSIGNMENT, TERMINATION AND RETIREMENT 24

6.01 Assignment 24
6.02 Termination 25
6.03 Retirement Costs 25

ARTICLE VII - PENALTIES 26

7.01 Obligation of the Parties; Default 26
7.02 Interest on Overdue Payments 27
7.03 Usury 28
7.04 MSE's Right to Make Payments on Behalf of SMEPA 28

ARTICLE VIII - INSURANCE 29

ARTICLE IX - GENERAL 30

9.01 Governing Law 30
9.02 No Delay in Payments by SMEPA 30
9.03 Regulatory Agencies 31
9.04 Notice 31
9.05 Headings Not to Affect Meaning 32
9.06 Amendments 32
9.07 Successors and Assigns 32
9.08 Counterparts 33
9.09 Time of Essence 33
9.10 Good Utility Practice 33
9.11 Further Assurances 33
9.12 License Conditions 33
9.13 Conflict with Construction Agreement 34
9.14 Covenants Running with the Land 34
9.15 Force Majeure 34
9.16 REA Approval 34
9.17 Entire Agreement 34
9.18 Operating Agent 35
9.19 Environment 35

LIST OF EXHIBITS


| EXHIBIT | INITIAL REFERENCE |
|---|---|
| A - Excess Uranium Letter Agreement | 18 |
| B - List of Reports and Contracts | 23 |

GRAND GULF NUCLEAR STATION

Operating Agreement

between

Middle South Energy, Inc.

and

South Mississippi Electric Power Association

Dated as of May 1, 1980

THIS AGREEMENT, dated as of May 1, 1980, is between MIDDLE SOUTH ENERGY, INC., an Arkansas corporation ("MSE"), and SOUTH MISSISSIPPI ELECTRIC POWER ASSOCIATION, a Mississippi corporation ("SMEPA").

MSE and SMEPA have concurrently herewith entered into an agreement entitled "Joint Construction, Acquisition and Ownership Agreement" dated as of May 1, 1980 (the "Construction Agreement") pursuant to which this Operating Agreement is executed. SMEPA is empowered to engage in the business of generating, transmitting and distributing electric power and energy to its member electric power associations in the State of Mississippi. SMEPA presently supplies a part of the power requirements of its members, but upon the completion of Grand Gulf pursuant to the

Cc truction Agreement and the performance by the parties of th r respective obligations under this Operating Agreement, SM A represents that it will or is expected to be the sole and exclusive power supplier for each such member presently supplied by Mississippi Power & Light Company ("MP&L"), so that MP&L gradually will be relieved of any further obligation to supply electric power and energy to any member of SMEPA.

Pursuant to the Construction Agreement, SMEPA will acquire a ten percent (10%) undivided ownership interest in Grand Gulf (which percentage may change pursuant to the terms of the Construction Agreement). By this Operating Agreement, MSE and SMEPA intend to provide for the sole management, operation and maintenance of Grand Gulf subsequent to its Commercial Operation by MSE and for the use of Capacity and Energy from Grand Gulf and the sharing of the costs thereof in accordance with the respective undivided ownership interests of MSE and SMEPA.

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein set forth, MSE and SMEPA agree as follows:

ARTICLE I - DEFINITIONS

Section 1.01. General. Any term used herein which has a defined meaning in the Construction Agreement shall have the same meaning in this Operating Agreement, unless the context in which such term appears herein otherwise clearly indicates a contrary meaning is intended.

Section 1.02. Construction Agreement shall mean the "Joint Construction, Acquisition and Ownership Agreement," dated as of May 1, 1980, between MSE and SMEPA.

Section 1.03. Cost of Operation or Costs of Operation shall mean all management, control, maintenance, repair and operation costs and related taxes incurred under or with respect to this Operating Agreement and attributable or allocable to Grand Gulf, including production expenses, production supervision, cost of Nuclear Fuel, insurance and liability payments, employee pensions and benefits, payroll and other taxes and appropriate allocations of expenses classified as administrative and general expenses, and any other cost incurred in connection with Grand Gulf after the date of Commercial Operation which is not a Cost of Construction, all of which shall be calculated in accordance with any applicable rules and regulations.

Section 1.04. Economic Reasons shall mean that under the pooling agreement pursuant to which MSE's share of Capacity and Energy from Grand Gulf is being sold (at present such agreement is expected to be the System Agreement), Grand Gulf is not being operated because lower cost sources of energy are available to the companies which are parties to such agreement.

Section 1.05. Force Majeure shall mean any act, delay or failure to act on the part of any state or federal governmental authority, whether legislative, executive, judicial or administrative, including delay or failure to act by any governmental authority in the issuance of permits or licenses required in connection with Grand Gulf and the prohibiting of acts necessary to performance hereunder or the permitting of any such acts only subject to unreasonable conditions; acts of God; damage, accidents or disruptions including but not limited to fire, flood, explosion, tornado, hurricane, earthquake, windstorm or equipment breakdown; failure or delay beyond either party's reasonable control in securing materials, equipment, services or facilities; labor difficulties such as strikes, slow-downs or shortages; delays in transportation; civil unrest, disturbances, demonstrations; or any other cause beyond either party's control.

Section 1.06. Operating Agreement shall mean this agreement between Middle South Energy, Inc. and South Mississippi Electric Power Association.

Section 1.07. System Agreement shall mean the Agreement dated April 16, 1973, and effective July 2, 1973, together with all service schedules thereto, among Arkansas Power & Light Company, Arkansas-Missouri Power Company, Louisiana Power & Light Company, MP&L, New Orleans Public Service Inc. and Middle South Services, Inc., as the same may from time to time be amended or supplemented in accordance with the applicable provisions thereof.

## ARTICLE II - GENERAL OBLIGATIONS AND RIGHTS OF THE PARTIES

Section 2.01. No Adverse Distinction. Notwithstanding any other provision of this Operating Agreement, neither MSE nor MP&L, as its agent under this Agreement, shall make any distinction adverse to Grand Gulf between Grand Gulf and any other generating unit because of MSE's co-ownership of Grand Gulf with SMEPA, and neither MSE nor MP&L, as its agent under this Agreement, shall be under any obligation to make any distinction favorable to Grand Gulf between Grand Gulf and any other generating unit because of MSE's co-ownership of Grand Gulf with SMEPA.

Section 2.02. Authority for Operation and Management. MSE shall have the sole authority and responsibility to manage, control, maintain, repair and operate Grand Gulf, and it shall take all steps which it deems necessary or appropriate in accordance with Good Utility Practice for such purpose. MSE shall maintain all accounting and other records and shall prepare or cause to be prepared all partnership tax returns under laws pursuant to which co-ownership is treated as the equivalent of a partnership for tax purposes and all other tax returns which must be filed on behalf of MSE and SMEPA jointly; provided however, except as required by law, MSE and SMEPA shall separately report and pay taxes, if any. To the extent that participation of SMEPA in any of such activities is necessary or appropriate, SMEPA hereby irrevocably appoints MSE as its agent to act on its behalf in all such activities in connection with Grand Gulf, provided, however, MSE shall have no authority under this Operating Agreement to sell or otherwise dispose of SMEPA's proportionate share of Capacity and Energy from Grand Gulf for SMEPA's account, except as provided in Section 7.01. MSE accepts such appointment. MSE, further, shall have the authority to appoint agents for the purpose of discharging any of the obligations imposed upon MSE hereunder or revoke such agencies, subject to all necessary regulatory approvals, (it being understood that

MP&L is presently empowered to act as MSE's general agent under the Service Agreement in connection with Grand Gulf to the extent and in the manner permitted therein), provided that no such appointment shall relieve MSE of any obligation to SMEPA hereunder.

Section 2.03. Execution of Contracts. After the Closing, any contract covering management, control, maintenance, repair and operation of Grand Gulf, including (to the extent not provided for in the Construction Agreement) any contract for the acquisition of materials, inventories, supplies, spare parts, equipment, fuel, Nuclear Fuel, or services therefor, shall be executed solely by MSE, or by MSE for itself and on behalf of SMEPA. MSE will use its best efforts, consistent with the objective of economic and timely completion of Grand Gulf, to obtain in each such contract entered into after the Closing, wherein the aggregate contract price is estimated to exceed $1,000,000, the inclusion of a provision providing for several but not joint liability of MSE and SMEPA under such contracts in proportion to their respective undivided ownership interests in Grand Gulf. Each such contract may provide for separate invoicing to SMEPA in accordance with its undivided ownership interest in Grand Gulf. Whether or not any such contract is entered into in the name of both parties, after the Closing each party shall, except as otherwise expressly

provided in this Operating Agreement, (a) be severally and not jointly responsible for its share of all amounts which are payable under or with respect to such contracts, (b) indemnify and reimburse the other party for payments made by such other party with respect to or on account of any part of the share of such amounts owed by the indemnifying or reimbursing party, and (c) take title to the property included in Grand Gulf and covered by such contracts in proportion to its undivided ownership interest in Grand Gulf. In order to induce third parties to contract with MSE with regard to the performance of MSE's obligations to SMEPA under this Agreement, SMEPA hereby agrees to indemnify any such contracting party to the extent of any liability arising under such contract in proportion to SMEPA's undivided ownership interest in Grand Gulf, notwithstanding the fact that such contract may be made only in the name of MSE.

Section 2.04. Cooperation. MSE and SMEPA will cooperate with each other in all activities relating to Grand Gulf, including, without limitation, the execution and filing of applications for authorizations, permits and licenses and the execution of such other documents as may be reasonably necessary to carry out the provisions of this Operating Agreement. Except at the written request of MSE, SMEPA shall not incur any obligation or do any other act in

connection with Grand Gulf which would or could obligate MSE to any third party. The obligation of cooperation contained in this Section shall not imply that MSE does not have full power of authority to execute applications and documents on behalf of SMEPA as contemplated in Section 2.02.

Section 2.05. Operation, Agency, Conflict of Interest. As the sole manager and predominant owner of Grand Gulf, MSE will manage, control, maintain and operate Grand Gulf in all respects as if MSE were the sole owner of Grand Gulf. If MSE ceases to operate Grand Gulf without the concurrence of SMEPA for Economic Reasons there will be made available to SMEPA through Article III of the Substitute Power Agreement, Capacity and Energy in the manner and amount, and at the cost, determined pursuant to the Substitute Power Agreement. MSE will reimburse MP&L for any net operating loss incurred by MP&L as a result of furnishing Capacity and Energy to SMEPA at the cost determined pursuant to Article III of the Substitute Power Agreement. If such Capacity and Energy is not available to SMEPA under Article III of the Substitute Power Agreement, MSE shall, if it has available to it from sources other than Grand Gulf Capacity and Energy equivalent to the amount of Capacity and Energy which would have been available to SMEPA under Article III of the Substitute Power Agreement which is excess to its needs, supply such excess Capacity and Energy

to SMEPA under the same terms and provisions as are set forth in Article III of the Substitute Power Agreement. Any reduction in the output of Grand Gulf which is caused by Force Majeure must be shared proportionately by the parties. In discharging its obligations hereunder, MSE shall have the right, either on its own behalf, or on its own behalf and on behalf of SMEPA, to provide by itself, or to contract with any MSE Affiliate for the purchase, at cost, of, any equipment, facilities or Nuclear Fuel or for the performance of services, at cost, in connection with Grand Gulf.

Section 2.06. Limitation of Liability. To the extent permitted by law, SMEPA shall not be entitled to recover from MSE, its agents, employees or insurers (except to the extent it shall be entitled to share in insurance recoveries obtained by MSE hereunder) for any damage resulting from negligence, error or delay in the management, control, maintenance, repair or operation of Grand Gulf, or for any damage thereto, any curtailment of power, or any damages of any kind, including consequential damages, occurring during the course of management, control, maintenance, repair or operation of Grand Gulf or otherwise arising out of the performance of this Operating Agreement, unless such damages (other than consequential damages, which shall not be recoverable in any event) shall have resulted from gross negligence of MSE, its agents or employees; but all such damages (other than

consequential damages, which shall not be recoverable in any event), other than those resulting from gross negligence of MSE, shall be shared by MSE and SMEPA as a Cost of Operation in proportion to their respective undivided ownership interests in Grand Gulf. In no event shall MSE be liable to SMEPA for any such loss in an amount greater than SMEPA's uninsured loss. SMEPA shall be entitled to share in any such damages which may be recovered by MSE from any third party, including insurers, in accordance with its undivided ownership interest in Grand Gulf. As used in this Section, the term "consequential damages" shall include but not be limited to damage or loss of other property or equipment, loss of profits or revenue, loss of use of power system, cost of capital, cost of purchased or replacement power, or claims of customers for service interruption. The duty of MSE to perform its obligations under this Operating Agreement in a prudent manner and in accordance with Good Utility Practice shall be construed or modified to the extent necessary to give full effect to the provisions of this Section, but this Section shall not excuse a breach of this Operating Agreement constituting gross negligence. Each party hereto shall individually bear, and shall indemnify the other party against, all costs, losses, liabilities and expenses resulting from its own gross negligence, but in the event MSE or SMEPA, in the

performance by MSE of its duties under this Operating Agreement, otherwise incur any liability to any third party, any amount paid by MSE or SMEPA on account of such liability shall be considered a Cost of Operation and apportioned between the parties in accordance with their respective undivided ownership interests in Grand Gulf.

Section 2.07. Nuclear Fuel. MSE shall have the authority and shall use its best efforts to acquire and manage all Nuclear Fuel for Grand Gulf according to its sole discretion and judgment, including, without limitation, reloading, spent storage, reprocessing and waste disposal matters relating to Nuclear Fuel. MSE shall also have the right to enter into any arrangement, on its behalf and on behalf of SMEPA, for obtaining and financing, by purchase, lease or otherwise, Nuclear Fuel for Grand Gulf which MSE, in its sole discretion, shall deem desirable, and SMEPA agrees to cooperate with MSE and, subject to any required approval of the REA, to take all action required to consummate any such arrangements. MSE may acquire Nuclear Fuel from SFI or others, for itself and others. This Section applies only insofar as the cost of Nuclear Fuel is deemed a Cost of Operation in accordance with standard accounting practices applicable to MSE and only to the extent the Construction Agreement is not otherwise applicable.

## ARTICLE III - GENERAL FINANCIAL OBLIGATIONS OF MSE AND SMEPA

Section 3.01. Sharing of Cost of Operation. Except as otherwise provided in this Article III, MSE and SMEPA shall be responsible for sharing the Cost of Operation of Grand Gulf in the following manner:

(a) with respect to those Costs of Operation which are fixed and do not vary with the amount of Energy produced by Grand Gulf (other than any such costs of Nuclear Fuel), MSE's share of such Costs of Operation shall be 90% and SMEPA's share of such Costs of Operation shall be 10%;

(b) with respect to those Costs of Operation which vary with the amount of Energy produced (other than any such costs of Nuclear Fuel), the parties shall share the Costs of Operation in proportion to the Energy that each obtains from Grand Gulf for its own benefit; and

(c) with respect to the cost of Nuclear Fuel the provisions of Section 4.03 shall apply, except insofar as the provisions of Section 3.03 may apply.

MSE and SMEPA shall share all Cost of Operation incurred in connection with Grand Gulf, and not otherwise expressly provided for in this Operating Agreement, in the proportions set forth in Subsection 3.01(a), and in the event of any doubt whether a particular cost, obligation or liability is provided for in this Operating Agreement such cost, obligation or liability shall be so shared. SMEPA's obligation to pay its share of the Cost of Operation shall be absolute, and SMEPA shall make all such payments when due, without any right of set off against MSE or any other person.

Section 3.02. Payment and Settlement of Cost of Operation. MSE shall be responsible for making, and shall have sole authority on behalf of SMEPA to make, payment to third parties of all Cost of Operation, direct and indirect, in connection with Grand Gulf. The parties shall make their payments of Cost of Operation in accordance with the following procedures:

(a) At least fifteen (15) days prior to the Closing, and thereafter at least fifteen (15) days prior to the end of each calendar quarter, MSE will furnish SMEPA the best estimate reasonably available as to the anticipated Cost of Operation by calendar quarter for the next succeeding four calendar quarters.

(b) MSE will, on or before the first day of each month, commencing the month immediately preceding the Closing, notify SMEPA of the Cost of Operation of Grand Gulf anticipated to be due and payable during the succeeding calendar month, plus any adjustments to Cost of Operation made in prior months but not previously charged or credited to SMEPA, with separate computations as to Grand Gulf Unit No. 1 and Grand Gulf Unit No. 2. SMEPA shall pay an amount equal to ten percent (10%) of such anticipated Cost of Operation as so adjusted on the first day of such succeeding month (or on such other day or days in such month as shall be designated in such notice) to an account at any bank designated by MSE and called the "MSE-SMEPA Grand Gulf Operating Account," and MSE shall, on such date, pay 90% of such Cost of Operation into said account. All such payments shall be in Immediately Available Funds. As agent for the parties MSE shall draw down such funds as needed to pay the Cost of Operation. Funds in said account may be invested, and shall be invested to the extent practicable, at MSE's direction and for the benefit of both parties, in United States bonds, bills, Treasury notes or certificates,

certificates of deposit of Mississippi banks and other investments permitted by law, and profits and losses from said investments shall be shared by the parties in accordance with their undivided ownership interests in Grand Gulf, provided that should SMEPA object to the type of investments made by MSE, then from and after 90 days after such objection, SMEPA's 10% of such funds shall be invested in such type of investments as shall be designated by SMEPA; profits and losses therefrom shall be allocated solely to SMEPA; and SMEPA shall have no share in the profits and losses from investments made in respect of MSE's payments. Each such notification made by MSE of anticipated Cost of Operation and adjustments to Cost of Operation shall be accompanied and adjusted by an accounting of Cost of Operation incurred and credits, if any, received for the preceding months. MSE shall provide SMEPA with such information as is reasonably required for SMEPA to account for the payment of Cost of Operation on its books. No payment made pursuant to this Section 3.02(b) shall constitute a waiver of any right of SMEPA to question or contest, pursuant to the following sentence, the correctness of that

portion of the Cost of Operation charged to SMEPA by MSE. SMEPA shall have until the 180th day after the end of each calendar year to question or contest the correctness of any charge or adjustment made in the preceding calendar year, after which time the correctness of such charge or adjustment shall be conclusively presumed, provided that MSE shall credit SMEPA with an allocable share of recoveries, whenever received, from third parties and shall charge or credit SMEPA with its allocable share of underpayments or overpayments of Cost of Operation, as the case may be, discovered by MSE at any time. Force Majeure shall not excuse failure by MSE to credit SMEPA with its allocable share of recoveries or overpayments of Cost of Operation owing at any time.

(c) MSE will permit SMEPA, at SMEPA's expense, to examine all records regarding operation of Grand Gulf. At the end of each calendar year, SMEPA may, at its option, conduct, or cause to be conducted, an audit of the books and records of MSE relating to Grand Gulf, and such audit shall be completed within ninety (90) days of the end of the calendar year. Further,

MSE shall make available to SMEPA a copy of any routine annual audit report prepared at MSE's request concerning the books and records of MSE relating to Grand Gulf and the cost of preparing such audit report shall be a Cost of Operation. If SMEPA desires information from MSE's auditors in addition to that normally contained in the annual audit report, SMEPA may, at its expense, obtain such information.

Section 3.03. Excess Uranium Provision. As an exception to the requirement of Section 3.01(c) that the cost of Nuclear Fuel be shared in accordance with the provisions of Section 4.03, it is agreed that MSE will bear 100% of the Cost of Operation relating to any Excess Uranium, as such term is defined in the letter agreement dated June 15, 1978 by and between System Fuels, Inc. and Arkansas Power & Light Company, a copy of which is attached hereto as Exhibit A, which it may acquire from time to time, and no such costs will be chargeable as a Cost of Operation to SMEPA. Any such Excess Uranium shall not be considered part of the Nuclear Fuel comprising a part of Grand Gulf, and the Cost of Operation for Energy delivered to SMEPA under this Operating Agreement shall at all times reflect only the cost, or the assumed cost, of Nuclear Fuel constituting a part of Grand Gulf.

MSE shall make available to SMEPA a copy of any routine annual audit report prepared at MSE's request concerning the books and records of MSE relating to Grand Gulf and the cost of preparing such audit report shall be a Cost of Operation. If SMEPA desires information from MSE's auditors in addition to that normally contained in the annual audit report, SMEPA may, at its expense, obtain such information.

Section 3.03. Excess Uranium Provision. As an exception to the requirement of Section 3.01(c) that the cost of Nuclear Fuel be shared in accordance with the provisions of Section 4.03, it is agreed that MSE will bear 100% of the Cost of Operation relating to any Excess Uranium, as such term is defined in the letter agreement dated June 15, 1978 by and between System Fuels, Inc. and Arkansas Power & Light Company, a copy of which is attached hereto as Exhibit A, which it may acquire from time to time, and no such costs will be chargeable as a Cost of Operation to SMEPA. Any such Excess Uranium shall not be considered part of the Nuclear Fuel comprising a part of Grand Gulf, and the Cost of Operation for Energy delivered to SMEPA under this Operating Agreement shall at all times reflect only the cost, or the assumed cost, of Nuclear Fuel constituting a part of Grand Gulf.

## ARTICLE IV - AVAILABILITY OF CAPACITY AND ENERGY

Section 4.01. Sharing of Capacity and Energy. Subject to the provisions of Section 4.03 hereof, MSE and SMEPA shall each be entitled to 90% and 10%, respectively, of the Capacity of, and Energy generated by Grand Gulf in kind available at any given time. If the output of Grand Gulf is negative, MSE shall obtain any necessary Capacity and Energy for the operation of Grand Gulf and the cost thereof shall be a Cost of Operation.

Section 4.02. Scheduling and Dispatching. MSE shall have sole authority for the hourly scheduling and dispatching of Grand Gulf generation, in accordance with MSE's standard scheduling and dispatching procedures. So long as Grand Gulf is operating both parties may schedule up to whatever amount of Capacity and Energy can then be effectively generated from their respective undivided ownership interests in Grand Gulf. Each party may schedule Capacity and Energy from the other party's entitlement which is excess to such other party's needs and requirements, but only after taking the full amount of Capacity and Energy to which the scheduling party's undivided ownership interest in Grand Gulf entitles it. Each party shall use its best efforts to schedule such maximum amount of Capacity and Energy to which each is entitled at any given time. If

either party schedules less than such amount of Capacity and Energy, it shall use its best efforts to schedule at least that percentage of the share of the Capacity and Energy to which it is entitled which, if such percentage were applied to all of the Capacity and Energy of Grand Gulf then available, would result in generation of the minimum amount of Energy required by regulation or practical considerations to keep Grand Gulf in operation. The foregoing two sentences shall not be deemed in any way to limit the sole authority of MSE to schedule and dispatch Grand Gulf generation in accordance with its standard scheduling and dispatching procedures or to manage, control, maintain and operate Grand Gulf in all respects as if MSE were the sole owner of Grand Gulf, as provided in Section 2.05.

Section 4.03. Sharing of Cost of Nuclear Fuel. It is understood that MSE and SMEPA may own, lease or otherwise have the right to the use of and be responsible for the cost of Nuclear Fuel either in proportion, or other than in proportion, to their respective undivided ownership interests in Grand Gulf at any given time. For any period, each party shall bear all costs of Nuclear Fuel by the ratio which the quantity of Energy taken by the party to be charged bears to the total Energy generated by Grand Gulf for the same period. The total cost of Nuclear Fuel to a party for any given time shall include the total variable

operating expense related to that party's total share of Energy for such period plus (a) that party's own separable share of fixed investment, leasing and other carrying costs of Nuclear Fuel related to such Energy, and (b) an allocable share of the other party's own separable share of fixed investment, leasing and other carrying costs of Nuclear Fuel related to the Energy taken by the first party, and such other party shall be reimbursed by the first party for such expense. MSE and SMEPA shall exchange from time to time as necessary such information with respect to their interests in Nuclear Fuel as will enable the computations referred to above to be made. MSE will render the appropriate resulting charge or credit to SMEPA in accordance with Article III.

Section 4.04. Transactions with Other Systems. MSE and SMEPA shall each be entitled to dispose of its proportionate share of the Capacity and Energy of Grand Gulf through scheduled transactions with other systems or by any other method deemed by either party to be practical and feasible.

Section 4.05. Federal Energy Regulatory Commission. If and to the extent that this Operating Agreement or any part hereof shall be required to be filed, or shall be filed with any regulatory agency, including, without limitation the Federal Energy Regulatory Commission, as a rate or rate schedule, nothing in this Operating

Agreement shall be construed as affecting in any way the right of MSE to make application unilaterally to such agency from time to time for a change in rates, charges, classifications, or service, to reflect changes in its actual costs or for a change in any rule, regulation, or contract relating to changes in its actual costs under applicable laws and regulations. To the extent that MSE makes any such filing, SMEPA reserves the right to intervene in any proceeding involving such a filing by MSE and shall have the right to object to any proposed change.

## ARTICLE V - ACCESS TO GRAND GULF

Section 5.01. Observation. Authorized representatives of SMEPA and its mortgagees will be permitted at reasonable times and in accordance with limitations of licenses and other regulatory authority to visit Grand Gulf to observe operation and maintenance, including refueling activities, being performed by MSE, and to examine and copy all records and papers maintained by MSE with respect to the ownership, operation and maintenance of Grand Gulf. None of the rights provided in this Section 5.01 shall be exercised in such a way as, in the judgment of MSE, would unreasonably interfere with the safe and efficient operation of Grand Gulf.

Section 5.02. Indemnity. Regardless of fault, SMEPA shall indemnify and hold MSE harmless, to the extent permitted by law, against any claim for personal injury or death made by an employee, officer, agent or other representative of SMEPA, or its mortgagees, their heirs, representatives, successors, and assigns, which may be based upon or arise out of the presence of such employee, officer, agent or other representative at the site of Grand Gulf other than those arising out of the gross negligence of MSE or its agents or employees.

Section 5.03. Plant Tours. Upon prior approval of MSE, SMEPA may conduct plant tours and visits at Grand Gulf, subject to the rules and regulations of regulatory authorities.

Section 5.04. Information. MSE shall make all reasonable effort to inform SMEPA as to the management, control, maintenance, repair and operation of Grand Gulf and shall furnish SMEPA such reports and contracts as are related thereto at such times as are indicated on Exhibit B hereto. No failure by MSE to provide information pursuant to the provisions of this Section shall release SMEPA from any obligation hereunder.

## ARTICLE VI - ASSIGNMENT, TERMINATION AND RETIREMENT

Section 6.01. Assignment. If, pursuant to the Construction Agreement, either MSE or SMEPA makes a sale, transfer or assignment of any portion or portions of its undivided ownership interest in Grand Gulf (other than solely for any reason contemplated by Sections 6.03 and 6.04(d) of the Construction Agreement) such party shall, subject to obtaining all necessary regulatory approvals, also assign, and shall cause the transferee to assume the rights and obligations of such party hereunder in proportion to the interest so transferred, and any sale, conveyance, or transfer by MSE of an ownership interest in Grand Gulf, as contemplated by Section 6.04 of the Construction Agreement, wherein the purchaser assumes the obligations of MSE under this Operating Agreement or under the Construction Agreement in proportion to the ownership interest sold, conveyed or transferred, shall operate as a release pro tanto, of MSE from any further obligation under this Operating Agreement or under the Construction Agreement. Notwithstanding the foregoing, MSE shall be under no obligation in such event to assign, proportionately or otherwise, any part of its authority and responsibility under Section 2.01 to manage, control, maintain, repair and operate Grand Gulf or any authority and responsibility related thereto under this

Operating Agreement. No other assignment of this Operating Agreement shall be permitted, except with the consent of both MSE and SMEPA. SMEPA hereby expressly consents to the pledge by MSE of this Operating Agreement under the MSE Mortgage in accordance with the provisions of Section 4.07(b) of the First Supplemental Indenture, dated as of June 15, 1977, to the MSE Mortgage and of any comparable Section of any subsequent Supplemental Indenture.

Section 6.02. Termination. Unless such date is extended with the consent of MSE, if the Closing under the Construction Agreement has not occurred by October 1, 1980, then this Operating Agreement shall be deemed void and of no effect. This Operating Agreement shall terminate upon the later to occur of (1) the expiration of the initial term of the operating licenses for Grand Gulf Unit Nos. 1 and 2 or any renewal or extension of either such license or (2) both Grand Gulf Unit Nos. 1 and 2 being retired from service, de-commissioned and all requirements of Federal, state or local law relating to the safe deactivation of such Units having been met.

Section 6.03. Retirement Costs. All costs as-sociated with retirement of Grand Gulf Unit Nos. 1 and 2, including, without limitation, decommissioning, security, maintenance, monitoring, razing of structures and disposing or storing of debris and spent Nuclear Fuel, and the cost of

fulfilling all governmental requirements for safe deactivation of Grand Gulf Unit Nos. 1 and 2 shall, to the extent they are not covered under the terms of the Construction Agreement, be deemed a Cost of Operation and be borne by the parties in proportion to their respective undivided ownership interests. Payments for these costs shall be made in accordance with the provisions of Article III.

## ARTICLE VII - PENALTIES

Section 7.01. Obligation of the Parties: Default. MSE and SMEPA hereby agree that they shall pay all monies and carry out all other duties and obligations agreed to be paid or performed by them pursuant to all of the terms and conditions of this Operating Agreement. In addition to any other rights or remedies, legal or equitable, available to a party which is not in default, in the event SMEPA at any time fails to make any payment when due or perform any other duty under this Operating Agreement or the Construction Agreement, the non-performance of which has or is expected materially to hinder, obstruct or delay the management, control, maintenance, repair or operation of Grand Gulf, MSE shall have the right, at its option, to give written notice of such failure to SMEPA, and in the event such failure

continues for a period of thirty (30) days after the giving of such notice, to withhold from SMEPA and use for its own account SMEPA's proportionate share of Capacity of and Energy from, Grand Gulf until such payment has been made, but with appropriate credit being given to SMEPA in respect of its undivided ownership interest in Grand Gulf for use of such Capacity and Energy. If the credits for such Capacity and Energy exceed the amounts due MSE, MSE will pay SMEPA monthly for the difference thereof. If the amounts due MSE exceed such credits, MSE shall have a right to receive interest on the difference thereof during the period such amounts were due, at the rate determined pursuant to Section 7.02. A party which is in default shall indemnify and hold the party which is not in default harmless from and against any and all losses, costs, damages and expenses arising out of or resulting from the defaulting party's failure to make such overdue payments when due.

Section 7.02. Interest on Overdue Payments. In addition to any other rights or remedies, legal or equitable, available to the parties, in the event either party fails to make any payment to the other party when due pursuant to this Operating Agreement or otherwise, whether or not due to Force Majeure, there shall be added to such overdue amount interest from the date such payment was due at an annual rate equal to either the then current average

yield on outstanding obligations of the United States of America having a term of ninety (90) days or less, plus five percent (5%), or the owed party's incremental cost of short-term, unsecured, borrowed funds, plus five percent (5%), whichever is the greater.

Section 7.03. Usury. Notwithstanding any other provision herein to the contrary, it is the intention of MSE and SMEPA that any amount paid as interest, whether it be characterized as interest, finance charge or otherwise, shall not be usurious; to that end, should any calculation of interest provided for hereunder result in an amount of interest or finance charge which would be usurious, or which is subsequently held to be usurious, the amount of interest or finance charge to be charged hereunder shall be reduced so that the amount actually charged will not be usurious, or if interest has already been paid, the amount by which such interest or finance charge is held to be usurious shall be refunded.

Section 7.04. MSE's Right to Make Payments on Behalf of SMEPA. In addition to all of the rights of MSE pursuant to Sections 7.01 and 7.02, MSE shall have the right, but not the obligation, to make any payment of interest or principal due and owing by SMEPA to the Federal Financing Bank, the REA, CFC or any other creditor of SMEPA in respect of a financing of SMEPA's obligations hereunder,

which SMEPA fails to make when due and to be promptly reimbursed in full therefor by SMEPA, together with interest at the rate provided in Section 7.02 hereof.

ARTICLE VIII - INSURANCE

With respect to Grand Gulf, MSE shall carry in the name of MSE and SMEPA, and in proportion to their respective undivided ownership interests therein, insurance covering workmen's compensation, general public liability, nuclear property and nuclear liability insurance, and other such insurance in an amount, with such deductible or self-insurance features and including such risks as is consistent with MSE's customary practices, provided such insurance is available. MSE will keep in force the nuclear liability insurance and the indemnity agreement with respect to Grand Gulf as required by Section 170 of the Atomic Energy Act of 1954, as amended [42 U.S.C.A. Section 2210], and such other insurance as may be necessary to comply with any applicable regulations of the NRC or any other regulatory agency having jurisdiction, with MSE and SMEPA being named therein in proportion to their respective undivided ownership interests in Grand Gulf. The aggregate cost of all insurance procured pursuant to this Section, including without limitation any retrospective assessment,

shall be considered a Cost of Operation and as such shall be apportioned between MSE and SMEPA pursuant hereto. SMEPA may at its sole expense purchase and take out any additional insurance for its sole use and benefit as SMEPA may deem necessary, provided the interests of MSE are not thereby adversely affected. SMEPA shall advise MSE of the terms of any such additional insurance prior to entering into any contract therefor. All of the insurance policies obtained by either party shall contain waivers of subrogation against the other party, if obtainable from the insurer. If not prohibited under the terms of the insurance contracts, MSE and SMEPA hereby waive their rights of recovery against each other to the extent that any loss experienced by MSE or SMEPA is covered by insurance carried by or on behalf of either party.

## ARTICLE IX - GENERAL

Section 9.01. Governing Law. The validity, interpretation and performance of this Operating Agreement and each of its provisions shall be governed by the laws of the State of Mississippi.

Section 9.02. No Delay in Payments by SMEPA. No disagreement or dispute of any kind between MSE and SMEPA concerning any matter, including, without limitation, the

an  nt of any payment due from SMEPA or the correctness of any charge made to SMEPA, or any other reason, excuse or circumstance, including Force Majeure, shall permit SMEPA to delay or withhold any payment due and owing under this Operating Agreement; provided, however, SMEPA shall have the right to make any payment required of it under protest and reserve its rights under Section 3.02.

Section 9.03. Regulatory Agencies. This Operating Agreement is subject to the approval and lawful regulations of any regulatory authority having jurisdiction over this Operating Agreement or any party hereto.

Section 9.04. Notice. Any notice, request, consent or other communication permitted or required by this Operating Agreement shall be in writing and shall be deemed given when deposited in the United States mail, Certified Mail prepaid, and if given to MSE shall be addressed to:

Middle South Energy, Inc.
c/o Mississippi Power & Light Company
Post Office Box 1640
Jackson, Mississippi 39205
Attention: President

with a copy addressed to



S305-0023-0170

Middle South Energy, Inc.
Post Office Box 61000
New Orleans, Louisiana 70161
Attention: President

and if given to SMEPA shall be addressed to:

South Mississippi Electric Power Association
Post Office Box 1589
Hattiesburg, Mississippi 39401
Attention: General Manager

unless a different officer or address shall have been designated by the respective party by notice in writing.

Section 9.05. Headings Not to Affect Meaning. The descriptive headings of the various Sections and Articles of this Operating Agreement have been inserted for convenience of reference only and shall in no way modify or restrict any of the terms or provisions hereof.

Section 9.06. Amendments. This Operating Agreement may be amended by and only by a written instrument duly executed by each of the parties hereto.

Section 9.07. Successors and Assigns. This Operating Agreement shall inure to the benefit of and be binding upon MSE and SMEPA and their respective successors and assigns, and, insofar as permitted by law, on any receiver or trustee in bankruptcy, reorganization or receivership of either party. Nothing in this Operating Agreement,

express or implied, is intended to confer upon any other person any rights or remedies hereunder, except as specifically provided herein in Sections 2.03 and 2.05.

Section 9.08. Counterparts. This Operating Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

Section 9.09. Time of Essence. Time is of the essence with respect to this Operating Agreement.

Section 9.10. Good Utility Practice. MSE and SMEPA shall discharge any and all obligations under this Operating Agreement in a prudent manner and in accordance with Good Utility Practice.

Section 9.11. Further Assurances. From time to time after the Closing MSE and SMEPA will execute such instruments of conveyance and other documents, upon the request of the other, as may be necessary or appropriate, to carry out the intent of this Operating Agreement.

Section 9.12. License Conditions. The Construction Permit contains antitrust conditions which may be a part of subsequent licenses issued by the NRC for Grand Gulf. This Operating Agreement is entered into by the parties in implementation of and is to be construed within the parameters of such conditions, and nothing contained herein shall be in violation thereof.

Section 9.13. Conflict with Construction A ement. This Operating Agreement is entered into in c unction with the Construction Agreement between the pa ies hereto. In case of any conflict between the Co truction Agreement and this Operating Agreement, the te s of the Construction Agreement shall prevail.

Section 9.14. Covenants Running with the Land. Th covenants of the parties hereto shall be deemed to be co enants running with the land.

Section 9.15. Force Majeure. MSE shall not be in default in performance of any obligation or duty hereunder if such failure of performance is due to Force Majeure (other than any obligation to credit SMEPA with its allocable share of recoveries or overpayments of Cost of Construction owing at any time). SMEPA shall not be in default in performance of any duty or obligation hereunder (other than any obligation to pay monies to or at the direction of MSE as provided in this Operating Agreement) if such failure of performance is due to Force Majeure.

Section 9.16. REA Approval. This Operating Agreement shall not be in force and effect until approved by the Administrator of the REA.

Section 9.17. Entire Agreement. This Operating Agreement shall constitute the entire understanding between SMEPA and MSE, superseding any and all previous

u rstandings between the parties pertaining to the subject ma er contained herein.

Section 9.18. Operating Agent. MSE has appointed MP& to act as its agent (as provided by Section 2.02 of thi Agreement) in connection with the management, control, mai tenance, repair, and operation of Grand Gulf; MSE covenants that any substituted operating agent appointed by MSE in place of MP&L will be at least as competent and knowledgeable in these regards as MP&L.

Section 9.19. Environment. MSE shall operate Grand Gulf consistent with any Environmental Impact Statement issued by the NRC with respect to Grand Gulf, pursuant to the National Environmental Policy Act, and subject to such changes as have been approved by the NRC, provided REA is given notice prior to such changes.

IN WITNESS WHEREOF, the undersigned parties hereto have duly executed this Agreement as of the date first above written.

MIDDLE SOUTH ENERGY, INC.

BY: ______________________
D. C. LUTKEN
VICE PRESIDENT

SEAL

ATTEST:

______________________
SECRETARY



S305-0023-0174

SOUTH MISSISSIPPI ELECTRIC POWER ASSOCIATION

BY: ______________________
R. D. MORROW, SR.
PRESIDENT

SEAL

ATTEST:

______________________
SECRETARY

STATE OF MISSISSIPPI

COUNTY OF HINDS

Personally appeared before me, a Notary Public in and for the jurisdiction aforesaid, the within named D. C. LUTKEN, who acknowledged that he is a Vice President of Middle South Energy, Inc., a corporation, and that in his capacity herein set forth he signed and delivered the foregoing instrument on the corporation's behalf as of the day and year therein mentioned, being duly authorized so to do.

GIVEN UNDER MY HAND AND OFFICIAL SEAL, this the 5th day of May, 1980.

______________________
NOTARY PUBLIC

My Commission Expires:

My Commission Expires Jan. 18, 1984



S305-0023-0175

STATE OF MISSISSIPPI

COUNTY OF RANKIN

Personally appeared before me, a Notary Public in and for the jurisdiction aforesaid, the within named R. D. MORROW, SR., who acknowledged that he is the President of South Mississippi Electric Power Association, a corporation, and that in his capacity herein set forth he signed and delivered the foregoing instrument on the corporation's behalf as of the day and year therein mentioned, being duly authorized so to do.

GIVEN UNDER MY HAND AND OFFICIAL SEAL, this the 15th day of May, 1980.

Carolyn L. Williams
NOTARY PUBLIC

My Commission Expires:
My Commission Expires Oct. 31, 1982

EXHIBIT A

SYSTEM FUELS, INC. / BOX 61532 / NEW ORLEANS, LA. 70161 / (504) 586-1975

JOHN L. PRENDERGAST
PRESIDENT AND
CHIEF EXECUTIVE OFFICER

June 15, 1978

Mr. Arch P. Pettit
President
Arkansas Power & Light Company
P. O. Box 551
Little Rock, Arkansas 72203

Dear Mr. Pettit:

System Fuels, Inc. (SFI) is engaged in planning and implementing programs for the procurement of fuel supplies for the Middle South System and as a part of such programs is undertaking to arrange for an adequate inventory of nuclear fuel for the Middle South System. Arkansas Power & Light Company (AP&L) presently owns 992,060 pounds of $U_3O_8$ or $U_3O_8$ equivalent, including 105,000 pounds of $U_3O_8$ and 887,060 pounds of $U_3O_8$ equivalent as $UF_6$ (339,060 kilograms of U as $UF_6$) ("Excess Uranium"), which uranium is in excess of that required by AP&L in the near future for the operation of its Arkansas Nuclear One Generating Station. The Excess Uranium was acquired by AP&L under the terms of contracts dated September 20, 1971 and July 14, 1970 between AP&L and Eldorado Nuclear Limited and AP&L and Kerr McGee Corporation, respectively.

This is to confirm the understanding between us that AP&L is willing to sell the Excess Uranium to SFI, and SFI is willing to purchase the Excess Uranium from AP&L, upon and subject to the following terms and conditions:

1. SFI will purchase the Excess Uranium from AP&L for an amount in cash equal to the actual cost incurred by AP&L for the Excess Uranium, plus applicable allowance for funds used during construction to date of the purchase by SFI, it being understood that as of December 31, 1977 this amounted to $12,747,257.42 (including $678,616.96 of allowance for funds used during construction);

2. SFI will place the Excess Uranium in its inventory of $U_3O_8$ or $U_3O_8$ equivalent and arrange for the necessary storage, conversion and enrichment thereof;

3. SFI will make the enriched Excess Uranium available for sale to AP&L or any other subsidiary of Middle South Utilities, Inc. for fabrication into and use as nuclear fuel at a price equal to the cost thereof to SFI, including applicable conversion, enrichment, transportation and storage costs, fixed charges, and interest and general administrative expenses, all of which shall be determined in accordance with the provisions of Rule 91 promulgated by the Securities and Exchange Commission under the Public Utility Holding Company Act of 1935; and

4. If all or part of the enriched Excess Uranium is sold to a party other than AP&L, the purchasing party shall, as a condition to such sale, agree to make available to AP&L energy in the amount equivalent to the amount of energy generated through the use of enriched Excess Uranium so purchased by such party from SFI at a fuel cost based upon the cost of the enriched Excess Uranium so purchased by such party from SFI.

If this letter correctly sets forth the understanding between us and is acceptable to you, please sign and return the enclosed copy thereof. Upon

the receipt of all requisite regulatory approvals, the documents necessary to consummate the proposed transaction will be prepared, signed and delivered.

Very truly yours,

President

The foregoing correctly sets forth the understanding between us and is acceptable to us

ARKANSAS POWER & LIGHT COMPANY

By
President

[redacted]

## EXHIBIT B

## REPORTS AND CONTRACTS

| CONTRACTS | | FREQUENCY |
|---|---|---|
| 1. | Contracts in which SMEPA has an undivided ownership interest, wherein the aggregate contract price is estimated to exceed $1,000,000. | Quarterly |

Note: The Reports to be furnished to SMEPA relating to the management, control, maintenance, repair and operation of Grand Gulf will be added to this Exhibit B, as they become available.