# GRAND GULF NUCLEAR STATION

## OPERATING AGREEMENT

This Operating Agreement is made and entered into as of June 6, 1990, between System Energy Resources, Inc. (System Energy) and Entergy Operations, Inc. (Company).

WHEREAS, both of the parties hereto are wholly owned subsidiaries of Entergy Corporation; and

WHEREAS, pursuant to the provisions of the Joint Construction, Acquisition and Ownership Agreement and the Operating Agreement between System Energy and South Mississippi Electric Power Association (SMEPA), System Energy holds a ninety percent (90%) undivided ownership and/or leasehold interest and SMEPA holds a ten percent (10%) undivided ownership interest in the Grand Gulf Nuclear Station (GGNS), and System Energy has been authorized to act as the general agent for SMEPA with respect to construction and operation of GGNS and to appoint subagents for the purposes of fulfilling System Energy's responsibilities to SMEPA; and

WHEREAS, System Energy represents and Company acknowledges that System Energy is executing this Operating Agreement for itself and as agent for SMEPA and that System Energy and SMEPA are severally and not jointly liable for payments to Company that are properly chargeable to GGNS hereunder in proportion to System Energy's and SMEPA's respective undivided ownership interests in GGNS; and

p0000011.d19

WHEREAS, System Energy is an electric utility that currently operates GGNS Unit 1 and sells power at wholesale to operating companies in the Middle South Electric System pursuant to rates established by the Federal Energy Regulatory Commission (FERC); and

WHEREAS, System Energy, SMEPA and Mississippi Power & Light Company (MP&L) are the holders of Operating License No. NPF-29 for GGNS Unit 1 as issued and amended by the Nuclear Regulatory Commission and Construction Permit No. CPRR-119 for GGNS Unit 2 as issued and amended by the Nuclear Regulatory Commission; and

WHEREAS, System Energy desires that Company assume operating and construction responsibility for - but not ownership of - GGNS; and

WHEREAS, System Energy desires that such operating and construction responsibility be consistent with System Energy's obligations and responsibilities under all pertinent state and federal laws; and

WHEREAS, System Energy desires to contract with Company so as to enable Company to construct, possess, use and operate GGNS, and Company desires to undertake such responsibility, all subject to and in accordance with the terms and conditions set forth herein;

NOW THEREFORE, in consideration of the mutual obligations set forth herein, the parties hereto agree to the following:

p0000011.d19

# ARTICLE I

## DEFINITIONS

As used herein:

1.1 "Applications" means the Applications of System Energy, SMEPA, and MP&L (consented to by Company) before the Nuclear Regulatory Commission to amend the Operating License so as to authorize and reflect in the license the change from System Energy to Company as the licensee authorized to possess, use and operate GGNS Unit 1, and so as to amend the Construction Permit to authorize and reflect the change from System Energy to Company as the licensee authorized to construct GGNS Unit 2.

1.2 "GGNS" means the nuclear-powered electric generating station located in Claiborne County, Mississippi, near Port Gibson, Mississippi. As defined herein, GGNS includes the operating unit (Unit 1), the cancelled unit (Unit 2), the real property related to Unit 1 and Unit 2 and all structures, facilities and equipment located thereon.

1.3 "Capital Improvements" means improvements, additions, modifications or replacements of property at GGNS that are properly capitalized and recorded on System Energy's books of account as assets under the FERC Uniform System of Accounts and are in accordance with applicable rules and regulations of any regulatory authority having jurisdiction in the matter.

1.4 "Construction Permit" means Construction Permit No. CPRR-119 for GGNS Unit 2 and amendments thereto as issued from time to time by the NRC.

p0000011.d19

1.5 "Costs of Capital Improvements" means all costs of Capital Improvements as defined in Section 1.3 herein.

1.6 "Costs of Operation" or "Cost of Operation" means any Operating costs of GGNS which Company incurs pursuant to this Operating Agreement attributable or allocable to GGNS and properly recordable in expense accounts under the FERC Uniform System of Accounts. These costs shall not include any cost paid directly by System Energy including nuclear fuel expense, decommissioning expense, nuclear property and nuclear liability insurance expense, nuclear reserve accounting, nuclear maintenance reserve accounting, plant depreciation, property taxes, and allowance for funds used during construction. All Costs of Operation shall be calculated and allocation of such Costs of Operation shall be made, as the parties shall from time to time agree, in accordance with any applicable rules and regulations of the Securities and Exchange Commission under the Public Utility Holding Company Act of 1935, the FERC under the Federal Power Act and other regulatory authorities having jurisdiction in the matter.

1.7 "Effective Date" means the effective date of this Operating Agreement as determined pursuant to Section 8.1.

1.8 "FERC" means the Federal Energy Regulatory Commission or its successor.

1.9 "Force Majeure" means any act, delay or failure to act on the part of any state or federal governmental authority, whether legislative, executive, judicial or

administrative, including delay or failure to act by any governmental authority in the issuance of permits or licenses required in connection with GGNS, and the prohibiting of acts necessary to performance hereunder or the permitting of any such acts only subject to unreasonable conditions; acts of God, damage, accidents or disruptions, including, but not limited to, fire, flood, explosion, tornado, hurricane, earthquake, windstorm, or equipment breakdown, failure or delay beyond either party's reasonable control in securing necessary financing, materials, equipment, services or facilities; forced outages or forced unit deratings; labor difficulties such as strikes, slowdowns or shortages; delays in transportation, civil unrest, disturbances, demonstrations; or any other cause beyond the affected party's reasonable control.

1.10 "Good Utility Practice" means any of the practices, methods and acts engaged in or approved by a significant proportion of the electric utility industry at the time of the reference, or any of the practices, methods and acts which, in the exercise of reasonable judgment in light of the facts known at the time the decision was made, could have been expected to accomplish the desired result at a reasonable cost consistent with reliability, safety and expedition. Good Utility Practice shall apply not only to functional parts of GGNS, but also to appropriate structures, landscaping, signs, lighting and other facilities. Good Utility Practice is not intended to be limited to the optimum practice, method or act to the exclusion

p0000011.d19

of all others, but rather to be a spectrum of prudent and acceptable practices, methods or acts.

1.11 "Gross Negligence and/or Willful Misconduct" means any act or omission by, or authorized by, a party's officers, persons reporting directly to such officers, or its Board of Directors that is performed, authorized or omitted consciously with prior actual knowledge or with reckless disregard of facts indicating that such conduct or omission is likely to result in actionable damages or injury to persons or property or to result in a violation of laws or regulations.

1.12 "MP&L" means Mississippi Power & Light Company.

1.13 "NRC" or "Nuclear Regulatory Commission" means the United States Nuclear Regulatory Commission or its successor having responsibility for administration of the licensing and regulation of the operation of nuclear utilization facilities under the Atomic Energy Act of 1954 and amendments thereto.

1.14 "Nuclear Fuel" means any source, special nuclear or by-product material as defined in the Atomic Energy Act of 1954 and any amendments thereto, including any ores, mined or unmined, uranium concentrates, natural or enriched uranium hexafluoride, or any other material in process containing uranium, and any fuel assemblies or parts thereof, any of which are required for the generation of electricity at GGNS.

1.15 "Operate" and its derivatives means to possess, construct, use, manage, control, maintain, repair, operate and decommission.

p0000011.d19

1.16 "Operating License" means the Operating License No. NPF-29 for GGNS Unit 1 and amendments thereto as issued from time to time by the NRC.

ARTICLE II

COMPANY'S AUTHORITY AND RESPONSIBILITY
WITH RESPECT TO OPERATION OF GGNS

2.1 Authority for Operation. Company and System Energy agree that Company shall take all actions necessary to make Capital Improvements to GGNS in accordance with Good Utility Practice and in the best interest of System Energy. Company shall take all action necessary to Operate GGNS in accordance with Good Utility Practice, and Company is solely responsible for the manner of Operation of GGNS, the manner of accomplishing the work, shall use its own methods in Operating GGNS and is not subject to the control of System Energy in any respect with regard to the performance of the Operation of GGNS. System Energy hereby grants Company the authority to take any and all action, in System Energy's name and on System Energy's behalf, necessary to obtain and/or maintain all licenses and permits issued by the NRC or other regulatory bodies relating to GGNS and necessary to comply with all applicable regulations of the NRC and other governmental bodies having jurisdiction over any aspect of the Cost of Operation, Cost of Capital Improvements, making of Capital Improvements and/or Operation of GGNS. Without limiting the foregoing delegation, Company shall act as the agent for System Energy and SMEPA in all matters related to NRC licensing of GGNS. Furthermore, Company shall provide System Energy with

data and assistance as may be requested by System Energy to enable System Energy to satisfactorily discharge, as a co-owner of GGNS and agent of SMEPA, its responsibilities with regard to GGNS, including its responsibilities to its securities holders, to SMEPA, to regulatory authorities and others. Company shall Operate, and make Capital Improvements at, GGNS in accordance with the Operating License, the Construction Permit and applicable laws and regulatory requirements and shall have sole authority, as the Operator of GGNS, to make all decisions relating to public health and safety. Subject to the provisions of Sections 2.2 and 2.3 herein, in order to enable Company fully and effectively to perform its duties hereunder, Company shall have, and System Energy does hereby grant to Company, the power and authority to exercise in accordance with applicable laws, the rights of System Energy under and to execute, modify, amend or terminate any contracts, including, without limitation, leases, easements, agreements, purchase orders, licenses, permits and privileges relating to the Operation of, and making of Capital Improvements to GGNS, as agent for System Energy and SMEPA. Company may perform its duties hereunder through its employees or non-affiliated persons. Except as provided in Section 11.5 hereof, the duties of System Energy and Company hereunder shall be subject in all events to receipt of any further necessary consents or regulatory approvals. Subject to Company's obligations and responsibilities under this Operating Agreement, the Operating License, the Construction Permit and applicable

p0000011.d19

laws and regulatory requirements, Company agrees that it shall comply with directions from System Energy relating to the making of Capital Improvements (including the costs thereof) at GGNS.

2.2 Limitation of Company's Authority. Notwithstanding Section 2.1 above, Company shall have no authority under this Operating Agreement without the written approval of System Energy, which approval shall not be unreasonably withheld, (a) to obligate System Energy to pay Costs of Capital Improvements and Costs of Operation that are either materially different from or in excess of the expenditures to be agreed upon pursuant to Section 5.1 herein, (b) to obligate System Energy to pay Costs of Capital Improvements that have not been approved pursuant to System Energy's policy with respect to its Board of Director's approval of capital expenditures, (c) to modify, amend or terminate any contracts executed by System Energy that are existing and were in effect prior to the Effective Date and that are presently or in the future will be categorized as material by System Energy, (d) to sell, encumber or otherwise dispose of any real property or any equipment or personal property comprising GGNS, and/or (e) to sell or otherwise dispose of capacity and energy from GGNS. In addition, System Energy shall have exclusive authority to define the economic life and to determine when the economic life of GGNS has ended and, in its sole discretion, may direct Company, in writing, to complete, to cancel, to retire, entomb or salvage, or to retire and decommission all or any part of GGNS Unit 1 and/or

p0000011.d19

Unit 2 or to Operate GGNS Unit 1 at reduced capacity and/or to place GGNS Unit 1 in a safe shutdown condition; provided, however, Company shall take such action in a manner which it determines, in its sole judgment, is consistent with public health and safety, the Operating License, the Construction Permit and applicable laws and regulations. In addition, Company is authorized to Operate GGNS Unit 1 at a reduced capacity or otherwise to place GGNS Unit 1 in a safe shutdown condition at any time Company determines such action is necessary to comply with the Operating License and applicable laws and regulations. All costs incurred by Company in taking such action relating to decommissioning or shutdown of GGNS Unit 1 and/or Unit 2 shall be considered Costs of Operation or Costs of Capital Improvements, as the case may be. With respect to acquisitions by Company, as agent for System Energy and SMEPA, of Capital Improvements and other equipment or property, including, but not limited to, materials, supplies and spare parts inventories, for GGNS, System Energy's Treasurer may provide Company from time to time as necessary with instructions or guidelines as to the preferred financial structure of such acquisitions (i.e. purchase, lease, etc.), which shall be used in implementing such acquisitions.

2.3 <u>Execution; Disclosures in Third-Party Contracts</u>. Contracts relating to the Operation of GGNS, including, without limitation, any contracts for Capital Improvements or contracts for the sale, lease or acquisition of materials, inventories, supplies, spare parts, equipment, fuel, Nuclear Fuel (excluding

p0000011.d19

contracts for the financing through lease or otherwise for Nuclear Fuel) or services, shall be executed by Company, as agent for System Energy and SMEPA, or by System Energy, upon Company's reasonable request. If a contract subject to Section 2.1 relates to both GGNS and one or more other power plants that are Operated by Company, such contracts ("Multi-Plant Contracts") shall be executed by System Energy at Company's request on reasonable grounds or by Company on behalf of System Energy, SMEPA and the owners of the other applicable plants. Company further agrees that with respect to Multi-Plant Contracts, Company will not enter into such Multi-Plant Contracts without the prior written consent of System Energy unless such contract contains a provision for several but not joint liability of the owners of the plants under such Multi-Plant Contracts in proportion to the costs allocated to the various power plants under such contracts. In order to induce third parties to contract with Company with regard to the performance of Company's obligations under this Operating Agreement, System Energy hereby expressly agrees to be bound by the terms of all contracts executed by Company in accordance with its agency authority as described herein (including, without limitation, any provisions that limit or protect against a third party's liability, provisions granting indemnity to third parties and limitations or exclusions of warranties) to the same extent as if System Energy were an original signatory to such contract. In addition, if System Energy's signature is deemed by Company to be necessary to induce

p0000011.d19

a third-party to contract with Company, System Energy agrees to not unreasonably refuse to execute such additional third-party agreements as Company may request from time to time. It is further agreed that the Treasurer of System Energy shall notify Company in writing of the contracts or types of contracts related to GGNS that are to be executed by Company, in its capacity as System Energy's agent, that System Energy desires to review in order for System Energy to monitor and evaluate the potential impact on System Energy of such contracts and to advise Company of such impact so that Company shall take all steps to protect System Energy's interest. Accordingly, Company agrees to provide or make available to System Energy copies of such contracts within a reasonable time prior to Company's proposed execution thereof.

2.4 Enforcement of Rights.

A. System Energy hereby recognizes that, except with respect to facts and circumstances existing, or litigation instituted by or against System Energy prior to the Effective Date, Company has complete and exclusive authority with respect to the handling of the defense, prosecution and/or settlement of disputes with third parties relating in any way to GGNS, provided that Company shall obtain System Energy's written consent prior to instituting or settling any lawsuit, claim, proceeding or action relating to GGNS which is of a type categorized as material by System Energy.

p0000011.d19

B. With respect to litigation relating to GGNS that arises out of facts or circumstances existing prior to the Effective Date, System Energy shall in consultation with Company decide upon the appropriate manner of defending, prosecuting or settling such litigation.

C. Subject to Article VI, it is further agreed that to the extent Company incurs any liability to a third party in performing its duties under this Operating Agreement, amounts paid by Company on account of such liability and Company's expenses in defending claims by third parties or prosecuting claims against third parties shall be considered Costs of Operation.

2.5 Company's Responsibilities at Other Plants. Company's duties and responsibilities under this Operating Agreement shall not be construed to interfere with Company's authority and responsibility to Operate any other plants for which it has operating responsibility; provided, however, that Company hereby agrees that it will not knowingly take any action or fail to take any action in connection with GGNS that is inconsistent with Good Utility Practice and puts System Energy at a disadvantage to the owners of such other plants.

ARTICLE III

SYSTEM ENERGY'S RESPONSIBILITY AND OBLIGATIONS

3.1 Payment. In consideration of the services rendered by Company hereunder, and subject to the provisions of this Operating Agreement, System Energy hereby agrees to pay to

Company the Costs of Operation and Costs of Capital Improvements pursuant to Article V hereof.

3.2 Site Access and Control. In order for Company to Operate GGNS in accordance with the Operating License, the Construction Permit, and other applicable regulatory requirements, System Energy grants Company possession and use of the property constituting GGNS and agrees to provide Company, its agents, employees and contractors unrestricted access to the property constituting GGNS, including, without limitation, the real property and the switchyard, facilities, equipment and personal property located on the GGNS site. As required by the Operating License and applicable statutes, and NRC regulations, System Energy further agrees that Company shall have authority to exercise complete control over the Exclusion Area as defined in the Updated Final Safety Analysis Report for GGNS and to determine all activities within that area. Toward this end, as part of the delegation of authority to Company to exercise certain contract rights of System Energy, as granted pursuant to Section 2.1 herein, Company shall act as System Energy's agent and shall exercise exclusion area control with respect to certain specified properties owned by MP&L, as designated in the MP&L and System Energy Agreement on Switchyard and Transmission Interface, a copy of which is attached hereto as Exhibit A, as said Agreement may be hereafter supplemented or amended.

3.3 Support Services Through System Energy. System Energy agrees that it will cooperate with Company in a manner so

p0000011.d19

that Company may exercise its authority and fulfill its responsibilities pursuant to this Operating Agreement. In this connection, as part of the delegation of authority to Company to exercise certain contract rights of System Energy, as granted pursuant to Section 2.1 herein, Company shall act as System Energy's agent in enforcing the rights and performing the obligations of System Energy under various contracts with third parties that have agreed to provide support services for GGNS. Without limiting the generality of the preceding sentence, it is specifically recognized that Company shall exercise the rights and perform the obligations of System Energy, as System Energy's authorized agent, including all rights to modify or amend, the following contracts to be entered into between System Energy and MP&L concurrently with the execution of this Operating Agreement that provide support for GGNS: (1) The MP&L and System Energy Agreement on Switchyard and Transmission Interface, a copy of which is attached hereto as Exhibit A, as such Agreement may be hereafter supplemented or amended, and (2) the Support Agreement between MP&L and System Energy that provides for support for the GGNS Emergency Plan and emergency training and drills, and other essential services as agreed upon from time to time by the parties, a copy of which is attached hereto as Exhibit B, as such Agreement may be hereafter supplemented or amended. Subject to its reasonable capability and availability, System Energy agrees to provide additional services or assistance required by Company and agreed to by System Energy in writing in connection with

p0000011.d19

operation of GGNS, including, without limitation, services as may be required in order to allow Company to conduct safe, economic and efficient operations at GGNS.

3.4 No Changes to Facilities, Procedures or Practices. So that Company will be capable of Operating GGNS in accordance with the Operating License and other applicable regulatory requirements, System Energy agrees that it will not make any changes to facilities, procedures or practices that affect compliance with NRC regulations or commitments. It is further recognized that System Energy has obtained the agreement from MP&L that MP&L will not make physical changes to the switchyard and associated transmission lines and equipment which could affect offsite power supply to GGNS and that MP&L will not make any changes to its procedures or practices that affect compliance with NRC regulations or commitments without prior consultation with and written consent from System Energy or its designated agent. Company hereby agrees that, acting as System Energy's designated agent, it shall not unreasonably withhold consent to any such changes in facilities, procedures or practices as may be requested by MP&L.

3.5 Offsite Power Supply. Concurrently with the execution of this Operating Agreement, System Energy and MP&L have entered into an Agreement on Switchyard Transmission and Interface, a copy of which is attached hereto as Exhibit A, whereby MP&L has agreed that it shall provide GGNS with an

assured source of offsite power in accordance with procedures to be agreed upon, from time to time, by the parties.

ARTICLE IV

ENTITLEMENT TO CAPACITY AND ENERGY

4.1 Entitlement and Delivery of Capacity and Energy. System Energy (subject to any rights of Meridian Trust Company and Stephen M. Carta, owner trustees, as owners of a portion of GGNS presently leased to System Energy) and SMEPA, at all times during the term of this Operating Agreement, shall be and remain the owners of, and shall be entitled to all of, the capacity and energy from GGNS.

4.2 Determination of Output. Net positive output of GGNS shall be the gross generation of GGNS, less station service requirements, and less adjustments for losses experienced. In the event the output is negative (i.e., station service and losses exceed the gross generation) System Energy, through MP&L, shall be responsible for providing necessary power at GGNS during such period in accordance with Good Utility Practice and Section 3.5 herein.

ARTICLE V

PAYMENT; AUDIT AND INSPECTION RIGHTS

5.1 Payment Obligation. On or before November 1 (or such other dates as may be agreed to by the parties) of each year during the term of this Operating Agreement, (1) Company will submit for System Energy's review and approval the total annual capital budget for GGNS, the annual operating and capital

programs (as used herein the term "annual operating and capital programs" shall include details of the budgeted costs for those programs) for GGNS, and the components of Company's five-year business plan that relate to GGNS, and (2) Company and System Energy will agree in writing upon maximum amounts to be paid, within parameters of the then-current Company five-year business plan, by System Energy for the following budget year pursuant to this Operating Agreement with respect to (i) Costs of Capital Improvements and (ii) Costs of Operation. System Energy and Company recognize that mutually agreeable adjustments may be made to such maximum amounts to be paid and/or to the previously approved capital budget, operating and capital programs or the components of Company's five-year business plan relating to GGNS, from time to time during any budget year, to reflect the impact of Force Majeure, unforeseen circumstances, financial constraints or other events. Without limiting System Energy's obligations under Article VI, System Energy agrees to pay any and all Costs of Operation and Costs of Capital Improvements within such maximum amounts to be paid and consistent with the previously approved capital budget and operating and capital programs, but System Energy shall not be obligated to pay Costs of Operation and Costs of Capital Improvements in excess of the applicable maximum expenditure limitations or which differ materially from the types of expenditures reflected in the capital budget and operating programs previously approved by System Energy, except for any such excess or different Costs of Operation and Costs of

p0000011.d19

Capital Improvements that System Energy agrees to pay. It is further agreed that Company will keep System Energy timely informed and obtain System Energy's approval regarding projects which are reasonably anticipated to cause a material change to the components of the then-current Company five-year business plan that relate to GGNS as previously approved by System Energy.

5.2 Payment and Billing. Subject to Section 5.1 above and in accordance with procedures to be agreed upon in writing by the parties, Company hereby agrees to furnish System Energy, at such times as may be required by System Energy, estimates of the Costs of Operation and Costs of Capital Improvements expected to be owed by System Energy for the next succeeding period. System Energy shall promptly deposit in the bank account(s) to be established pursuant to Section 5.3 such funds as shall be adequate to pay Company, and third parties on a timely basis with respect to Costs of Capital Improvements and Costs of Operation. In addition, System Energy will pay for costs incurred under any contracts relating to GGNS with respect to which Company, as agent for that purpose, has approved and has directed the third party to provide direct billing to System Energy. Payments of the Costs of Capital Improvements and Costs of Operation specified herein shall be made notwithstanding the availability or lack of availability of GGNS to produce power. No payment made pursuant to this Operating Agreement shall constitute a waiver of any right of System Energy to question or

contest the correctness of Costs of Capital Improvements and Costs of Operation charged to System Energy.

5.3 Bank Accounts. The parties agree that one or more special bank accounts may be established and maintained in one or more banks of System Energy's choice, in a manner that will indicate the custodial nature of the accounts, for the deposit by System Energy and disbursement by Company or System Energy of Costs of Capital Improvements and Costs of Operation.

5.4 Audit and Adjustments. Company shall maintain books and records to support the Costs of Capital Improvements and Costs of Operation for such period of time as System Energy shall direct. From time to time, System Energy may, and Company shall permit, at System Energy's option and expense as appropriate, in accordance with any applicable Middle South Electric System established auditing policies (excluding any such policy that would limit or preclude the right of System Energy to conduct such audits), conduct or cause to be conducted by others, including regulatory authorities having jurisdiction and SMEPA, audits of the books and records of Company. Such audits shall be conducted at reasonable mutually agreed upon times, with agreement not being unreasonably withheld. Further, Company shall make available to System Energy a copy of any audit reports prepared by or at the request of Company concerning its books and records relating to the Operation of GGNS, and the cost of preparing such audit reports shall be a Cost of Operation payable pursuant to this Article V. Company shall credit System Energy

with recoveries, whenever received, from third parties and shall charge or credit System Energy with any underpayments or overpayments of Costs of Capital Improvements and Costs of Operation, as the case may be. Force Majeure shall not excuse failure by Company to credit System Energy with third-party recoveries or overpayments of Costs of Capital Improvements and Costs of Operation owing at any time.

ARTICLE VI

LIMITATION OF LIABILITY

Release and Limitation of Liability. To the fullest extent permitted by applicable law, System Energy shall not be entitled to recover from and hereby expressly releases Company, its agents, officers, directors, shareholders or employees (except to the extent System Energy shall be entitled to share in insurance recoveries obtained by Company hereunder) from or for any damages, claims, causes of action, losses and/or expenses of whatever kind or nature, including, but not limited to, attorneys' fees, that are in any way, directly or indirectly, connected with Company's Operation of GGNS or for any damage thereto, whether arising in tort, fraud, contract, strict liability, negligence or any other theory of legal liability or as a result of fines or other penalties imposed by the NRC or other governmental authority, unless such damages, claims, causes of action, losses and/or expenses shall have resulted from the Gross Negligence and/or Willful Misconduct of Company. In no event shall Company or its agents, officers, directors,

shareholders or employees be liable to System Energy for any loss or damage suffered by System Energy in connection with Company's performance under this Operating Agreement in an amount greater than System Energy's uninsured loss. The duty of Company to perform its obligations under this Operating Agreement in accordance with Good Utility Practice shall be construed or modified to the extent necessary to give full effect to the provisions of this Article VI.

ARTICLE VII

INSURANCE

7.1 With respect to GGNS, Company will provide Workers Compensation coverage in accordance with all applicable laws. Company will also, acting for itself or acting as System Energy's agent, provide and maintain or cause to be provided and maintained, in the name of and on behalf of System Energy and Company, as their respective interests may appear, protection through insurance or otherwise covering Company's and System Energy's obligations to pay damages because of personal injury, death, or property damage, including, without limitation, protection through insurance or otherwise covering nuclear property and nuclear liability, and other insurance and financial protection in accordance with customary industry practice and as necessary to comply with all applicable laws and regulations. Company, subject to direction from System Energy, shall determine the coverage limits and deductibles for any insurance policies obtained pursuant to this Agreement.

7.2 Company will establish necessary procedures, cooperate with the insurers and otherwise comply with requirements of the insurers to maintain coverages in effect and to obtain payment of claims recoverable under such insurance applicable to GGNS.

ARTICLE VIII

TERM AND TERMINATION

8.1 Term. This Agreement shall become effective as of June 6, 1990, and unless sooner terminated as provided hereinafter, it shall remain in effect, subject to Section 8.2 below, until GGNS shall have been retired and decommissioned in accordance with all applicable regulatory and governmental requirements, and the parties hereto agree in writing, with agreement not to be unreasonably withheld, that all responsibilities hereunder have been fulfilled.

8.2 Termination. This Operating Agreement may be terminated prior to the expiration of the term as set forth in Section 8.1 above, subject to receipt of any and all necessary regulatory approvals, upon (1) agreement of the parties hereto or (2) either party giving the other party at least three hundred sixty-five (365) days prior written notice of the intention to effect such termination. In addition, this Operating Agreement shall be cancelled to the extent and from the time that performance hereunder may conflict with any rule, regulation or order of the Securities and Exchange Commission adopted before or after the execution hereof. Company agrees that any and all

licenses, permits, records, books, privileges or rights acquired by Company relating to Operation of GGNS shall be assigned or otherwise transferred to System Energy upon termination of this Operating Agreement.

8.3 Survival. The release and limitation of liability provisions contained in Article VI shall survive termination to the extent they pertain to events giving rise to such release and liability that occurred during the term of this Operating Agreement. Further, it is agreed that in no event shall this Operating Agreement terminate unless all payments required to have been made by System Energy to Company or by Company to System Energy, as the case may be, shall have been made and all necessary regulatory approval for transfer of responsibility for GGNS shall have been obtained.

ARTICLE IX

INFORMATION PROVIDED TO SYSTEM ENERGY

9.1 Reports to System Energy. When required by System Energy, Company shall provide data and/or reports to System Energy to support Costs of Capital Improvements and Costs of Operation payable by System Energy so as to allow System Energy to comply with any applicable laws and any rules and regulations promulgated by regulatory authorities. Company shall also comply with any other reasonable reporting requirements.

9.2 Site Access. System Energy, or its designee, shall have access to GGNS, subject to Company's obligation to limit such access pursuant to the Operating License and the

p0000011.d19

applicable rules and regulations of the NRC or other regulatory authorities.

ARTICLE X

TRANSFERS OF PERSONNEL

10.1 Transfer. System Energy non-bargaining unit employees who are selected by Company and System Energy as being necessary or appropriate for the Operation of GGNS will be transferred to the employ of Company as of the Effective Date of this Operating Agreement. Transfers, after the initial transfer, will be carried out in accordance with the then-current Middle South Electric System policy.

Company agrees to adopt the collective bargaining agreement currently in effect at GGNS. Upon the stated expiration date of the current collective bargaining agreement, Company will assume the responsibility for bargaining with the union on contract renewal. All System Energy applicable bargaining unit employees will be transferred to the employ of Company as of the Effective Date of this Operating Agreement.

10.2 Benefit Plans. It is the objective of the parties hereto that Company will assume, as of the date when an individual is transferred from the employ of System Energy to Company, the obligations, if any, of System Energy to such employee for accrued benefits under System Energy's Employee Benefit Plans (as defined in Section 3(3) of the Employee Retirement Income Act of 1974) in effect at the time of such transfer, and System Energy will make appropriate provision (by

p0000011.d19

the transfer of funds to a trustee under an Employee Benefit Plan established by Company, the reservation of funds in the existing trust fund under an Employee Benefit Plan sponsored by System Energy or otherwise) for the payment of such accrued benefits to the extent that they have been funded as of the date of such employee transfer. Consistent with that objective, System Energy and Company agree that, in determining benefits payable by Company under any Employee Benefit Plan established by it to an employee transferred to it by System Energy, Company shall give credit for service by such employee with System Energy as if such service had been performed by such transferred employee for Company unless System Energy shall make provision for the direct payment by it of such benefits to the transferred employee. If System Energy decides to effect a transfer of assets and liabilities attributable to the accrued benefits of transferred System Energy employees to an Employee Benefit Plan maintained by Company, System Energy and Company shall determine the amount of assets to be transferred to meet the then-current accrued liabilities (determined in accordance with Section 414(1) of the Internal Revenue Code of 1986 and the regulations thereunder) of such transferred employees. The plans and documentation to achieve this objective shall be established by the Boards of Directors of System Energy and of Company.

p0000011.d19

ARTICLE XI

MISCELLANEOUS

11.1 Confidentiality. Either party may, from time to time, come into possession of information of the other party that is confidential or proprietary (including, without limitation, Safeguards Information as defined in 10 C.F.R. Part 73). Each party having any such information which the other party has advised it is confidential or proprietary will not reproduce, copy, or disclose (except upon prompt and prior notification to the other party of the event precipitating such disclosure and upon agreement of the parties that such disclosure is required by law) any such information in whole or in part for any purpose without the prior written consent of the other party. Safeguards Information relative to GGNS shall be controlled and protected in accordance with 10 C.F.R. 73.21.

11.2 Restricted Data. Company and System Energy agree that, unless otherwise required by law, they will not permit any person to have access to Restricted Data, as defined in 42 U.S.C. § 2014.y, until the federal Office of Personnel Management shall have made an investigation and report to the NRC on the character, associations and loyalty of such person and the NRC shall have determined that permitting such person to have access to Restricted Data will not endanger the common defense and security.

11.3 Assignment and Successors. This Operating Agreement shall not be assignable by either party hereto without

p0000011.d19

the prior written consent of the other party and without first obtaining all necessary regulatory approval, and any attempted assignment without such consent and approval shall be void. Subject to the preceding sentence, this Operating Agreement shall be binding upon and shall inure to the benefit of the parties and their respective successors and assigns.

11.4 Governing Law. The validity, interpretation and performance of this Operating Agreement and each of its provisions shall be governed by the laws of the State of Mississippi.

11.5 No Delay in Payments. No disagreement or dispute of any kind between the parties concerning any matter, including, without limitation, the amount of any payment due from System Energy to Company or from Company to System Energy, as the case may be, or the correctness of any charge made to System Energy or Company, or any reason, excuse or circumstance, including Force Majeure, shall permit either party to delay or withhold payment due and owing under this Operating Agreement, except that System Energy shall have the right to make any payments required of it under protest and to reserve its rights to conduct audits in accordance with Section 5.4.

11.6 Notices. Any notice, request, consent or other communication permitted or required by this Operating Agreement shall be in writing and shall be deemed to have been given when deposited in the United States mail, first class, postage prepaid

p0000011.d19

and, until written notice of a new address is given, shall be addressed as follows:

If to Company:

Entergy Operations, Inc.
Echelon One
1340 Echelon Parkway
Jackson, Mississippi 39213
Attention: President

If to System Energy:

System Energy Resources, Inc.
Post Office Box 31995
Jackson, Mississippi 39286-1995
Attention: President

11.7 Amendments. This Operating Agreement may be amended only by a written instrument duly executed and delivered by both of the parties hereto and with any and all necessary regulatory approvals previously obtained.

11.8 Relationship. Nothing herein shall be construed to create a partnership or joint venture between Company and System Energy or to impose a trust, fiduciary or partnership duty, obligation or liability upon Company or System Energy or to create any agency relationship except as expressly granted herein.

11.9 Counterparts. This Operating Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

11.10 Force Majeure. Company shall not be in default in performance of its obligations or duties hereunder (other than any obligation to credit System Energy with its recoveries or

p0000011.d19

overpayments of Costs of Operation owing at any time) if such failure of performance is due to Force Majeure. System Energy shall not be in default in performance of any duties or obligations hereunder (other than any obligation to pay monies to or at the direction of Company as provided in this Operating Agreement) if such failure of performance is due to Force Majeure.

11.11 Good Utility Practice. The parties hereto shall discharge any and all obligations under this Operating Agreement in accordance with Good Utility Practice.

11.12 Entire Agreement. This Operating Agreement, including Exhibits A and B shall constitute the entire understanding and agreement between the parties superseding any and all previous understandings and agreements between the parties with respect to the subject matter hereof.

IN WITNESS WHEREOF, the parties have executed this Operating Agreement by their duly authorized representatives.

SYSTEM ENERGY RESOURCES, INC., for itself and as agent for South Mississippi Electric Power Association

By: [signature]
Donald C. Hintz
Executive Vice President
and Chief Operating Officer

Date: June 6, 1990

ENTERGY OPERATIONS, INC.

By: [signature]
William Cavanaugh, III
President and
Chief Executive Officer

Date: June 6, 1990

EXHIBIT A TO
GRAND GULF NUCLEAR STATION
OPERATING AGREEMENT

MP&L/SYSTEM ENERGY AGREEMENT
ON
SWITCHYARD AND TRANSMISSION INTERFACE

This Agreement is executed by and between Mississippi Power & Light Company, a Mississippi Corporation ("MP&L"), and System Energy Resources, Inc., an Arkansas corporation ("System Energy"), and is dated as of June 6, 1990.

WHEREAS, in December, 1986, the Nuclear Regulatory Commission ("NRC") amended the Grand Gulf Nuclear Station ("GGNS") Operating License and Construction Permit so as to substitute System Energy for MP&L with respect to construction and operation of GGNS; and

WHEREAS, prerequisite to amending the GGNS Operating License and Construction Permit in 1986 as described above, the NRC requested that MP&L express a commitment to support GGNS with respect to the GGNS Switchyard and Transmission activities, and the parties entered into a Memorandum of Understanding dated as of December 1, 1986 setting forth their respective commitments and responsibilities regarding the GGNS switchyard and related transmission matters; and

WHEREAS, concurrently with the execution of this Agreement, System Energy has entered into an Operating Agreement with Entergy Operations, Inc. ("EOI") pursuant to which EOI will construct, use, possess and operate GGNS as the agent for System Energy, South Mississippi Electric Power Association ("SMEPA") and the other GGNS co-owners.

NOW, THEREFORE, effective from and after the Effective Date as defined in the Operating Agreement, MP&L and System Energy agree as follows:

1. Exclusion Area Control, Switchyard Access and Security

1.1. MP&L agrees to provide System Energy's Designated Agent, as defined in Section 10 herein, unrestricted access to the real property owned by MP&L at or adjacent to the GGNS site and to the switchyard, facilities, equipment and personal property located on that property.

1.2. As necessary to comply with federal regulations, System Energy's Designated Agent shall have authority to exercise complete control over MP&L property and easements in the Exclusion Area, as defined in the GGNS Updated Final Safety Analysis Report, and to determine all activities within that area (including exclusion of MP&L personnel, contractors, visitors, guests and other persons from the plant and the switchyard). To the extent practicable, System Energy's Designated Agent will exercise this control in such a fashion that normal MP&L use and access to the switchyard will not be restricted.

1.3. System Energy's Designated Agent shall have authority to exercise complete control over the switchyard and other MP&L property in the vicinity of the switchyard for purposes of providing security. This authority includes the authority to conduct interactions with law enforcement agencies which are deemed necessary by System Energy's Designated Agent and the

p02-0005.d19

authority to file associated civil or criminal complaints against third parties as deemed necessary by System Energy's Designated Agent. The parties will cooperate in good faith as jointly determined appropriate to support prosecution of any such complaints.

1.4. The parties shall maintain switchyard perimeter fence gates in a locked condition except when attended or to allow ingress or egress.

1.5. System Energy's Designated Agent will make a regular routine security patrol of the switchyard fence perimeter.

1.6. System Energy's Designated Agent will notify MP&L of problems requiring maintenance, repair or replacement of the switchyard perimeter fence, gates, locks, lights or other security related devices or equipment or of other conditions which may affect security.

1.7. MP&L will provide such maintenance or effect repair or replacement or correct the condition in a reasonable time period.

1.8. System Energy's Designated Agent will provide an appropriate security response to an increased threat situation including potential situations caused by needed maintenance, repair or replacement of security devices or equipment.

1.9. Key control for the switchyard and substation gates will be maintained as follows:

a. MP&L and System Energy's Designated Agent will be allowed to possess keys to all switchyard and

substation gates except MP&L will not possess keys allowing access to the plant.

b. Keys will be issued only to personnel with an identified need for switchyard access.

c. Each party will maintain a list of personnel to whom keys have been issued.

d. MP&L will provide System Energy's Designated Agent with a copy of its list of keys and the personnel to whom the keys have been issued. Changes to this list will be provided to System Energy in a timely manner.

e. System Energy's Designated Agent will maintain a master list of keys and personnel to whom issued.

1.10. Authorized personnel entering the switchyard or substation for the performance of duties or activities which could have any direct effect on power supply to GGNS including routine maintenance of switchyard or substation equipment will advise the on-duty shift superintendent of entry and anticipated duration of stay. Entry for performance of inspections, routine rounds or patrols, and other activities such as retrieving vehicles or equipment stored in the switchyard or to report for duty or meet work crews or other activities associated purely with use of the switchyard as a crew headquarters does not require such notification.

1.11. MP&L will not exercise its right to explore or recover minerals in any area within the Exclusion Area or convey or lease

p02-0005.d19

its mineral rights within the Exclusion Area to any third party without System Energy's Designated Agent's approval. Further, MP&L will cooperate with System Energy and its Designated Agent as necessary to assist in control of mineral exploration or recovery activities in the Exclusion Area.

2. Operation

2.1. System Energy's Designated Agent will make regular rounds of the switchyard and carry out the following activities:

a. make observations of equipment and facilities.

b. obtain readings of appropriate equipment parameters.

c. conduct other routine activities at the request of MP&L.

d. provide MP&L with appropriate reports as to findings during these activities.

2.2. The parties will operate equipment located in the switchyard as follows:

a. System Energy's Designated Agent will be the exclusive operator of the main generator output breakers and associated generator disconnect switch except for maintenance activities as designated in 2.3 below.

b. MP&L will normally operate all 500 kV switchyard breakers and associated equipment other than the main generator output breakers and associated

p02-0005.d19

generator disconnect switch (or provide for their operation) remotely or locally, but System Energy's Designated Agent will operate any such breakers or other equipment locally in the switchyard at MP&L request.

c. System Energy's Designated Agent will operate 34 kV breakers and disconnects to remove equipment from service, tag out equipment removed from service, and return equipment to service.

d. System Energy's Designated Agent will provide other operating support for the switchyard at the request of MP&L.

2.3. MP&L will operate switchyard equipment as necessary for maintenance to be performed in accordance with Section 3 below and may return equipment to service upon completion of maintenance.

3. Maintenance

3.1. System Energy's Designated Agent will maintain (including necessary repair or replacement) GGNS ESF and BOP transformers and associated equipment regardless of location.

3.2. System Energy's Designated Agent will maintain (including necessary repair or replacement) the main output transformers.

3.3. Upon request by System Energy's Designated Agent, MP& will review maintenance arrangements between System Energy's

p02-0005.d19

Designated Agent and its contractors for major maintenance, repair or replacement activities with respect to the main output transformers, and will provide oversight of those maintenance activities.

3.4. MP&L will maintain (including necessary repair or replacement) all other equipment located in the switchyard and substation and regardless of ownership including but not limited to:

a. 500 kV breakers and transformers and related equipment.

b. 115 kV breakers and transformers and related equipment.

c. 34 kV breakers and transformers and related equipment.

3.5. MP&L will analyze transformer oil samples and provide the results to System Energy's Designated Agent when requested by System Energy.

3.6. Maintaining an appropriate inventory of spare parts for equipment will be the responsibility of the company owning the equipment.

4. Coordination

4.1. System Energy's Designated Agent will coordinate planned plant outages with MP&L. MP&L and the system dispatcher will be informed at a minimum.

p02-0005.d19

4.2. MP&L will coordinate all activities which will directly affect power supply to GGNS with System Energy's Designated Agent. At a minimum, the operations superintendent or designee will be informed by the system dispatcher or MP&L dispatcher or maintenance crew during the planning of these activities. Activities which cannot be planned in advance and the detailed conduct of planned activities will be coordinated with the on-duty shift superintendent or shift supervisor. These activities include but are not limited to:

a. removal from service of any transmission line terminating in the 500 kV switchyard or the 115 kV substation located adjacent to GGNS.

b. breaker switching which can affect power supply to GGNS (i.e., switching of lines identified in Item (a) above out to and including breakers in the first switchyard outside of the GGNS site.

c. maintenance activities which can affect power supply to GGNS out to and including maintenance activities in adjacent bays of the first switchyard outside of the GGNS site.

d. 500 kV switching operations in the GGNS switchyard and substation.

5. Review and Approval

5.1. MP&L will obtain System Energy's Designated Agent's review and approval of procedure changes, design changes, tests

or changes in the conduct of other activities which might affect compliance with regulatory requirements and commitments involving the switchyard and associated transmission lines and equipment which could affect offsite power supply to GGNS prior to implementing such changes or commencing such tests. Changes or tests at or beyond the first major switching station outside of the GGNS switchyard are not included unless indefinitely de-energizing one of the transmission lines serving GGNS is involved.

5.2. System Energy's Designated Agent will review these proposed changes and tests in accordance with applicable commitments and regulatory requirements and will obtain prior NRC approval if required.

6. Procedures

MP&L agrees to provide GGNS with an assured source of offsite power in accordance with procedures to be agreed upon, from time to time, by the parties. MP&L recognizes that it must respond to the critical need to provide power in an emergency and will assure that procedures are in place to make operating and maintenance personnel aware of such need.

7. Training

7.1. System Energy's Designated Agent will provide regular training (on a schedule jointly agreed to by MP&L and System Energy's Designated Agent) to MP&L dispatcher personnel to

p02-0005.d19

explain the critical need for power at GGNS during emergencies, and the legal requirements associated with GGNS power supply.

7.2. MP&L will make appropriate dispatcher personnel available to receive training on a schedule jointly agreed to by MP&L and System Energy's Designated Agent.

8. Compensation

8.1. To the extent that MP&L's costs in performing any duties and responsibilities as delineated in this Agreement have previously been reimbursed by System Energy pursuant to the Partial Termination of Service Agreement between MP&L and System Energy, dated December 1, 1986, which is terminated and superseded by the Support Agreement to be executed concurrently herewith by MP&L and System Energy, such activities shall continue to be reimbursable in accordance with and pursuant to such Support Agreement and any successor to such Support Agreement.

8.2. Except as provided in paragraph 8.3 below, neither System Energy nor its Designated Agent shall be entitled to reimbursement from MP&L for performance of its duties as delineated in this Agreement.

8.3. It is understood and agreed that in the event any switchyard equipment or components thereof must be replaced during maintenance and repair activities, the owner of the repaired equipment shall be responsible for the costs of the replacement.

p02-0005.d19

9. Amendments

Modifications or amendments to this Agreement must be executed by an authorized officer of both parties. Prior to execution of any such modification or amendment to this Agreement, System Energy and its Designated Agent will review the proposed change to assure that it is in compliance with licensing commitments and regulatory requirements applicable to nuclear power plants. If NRC approval is needed, System Energy and its Designated Agent will obtain that approval prior to execution of the modification or amendment.

10. Designated Agent

Pursuant to separate agreements between System Energy and SMEPA, System Energy acts as the general agent for SMEPA with respect to construction, use, possession and operation of GGNS, and System Energy has the right to appoint agents and revoke such agencies relating to construction, use, possession and operation of GGNS for itself and on behalf of SMEPA. For purposes of this Agreement, the term "System Energy's Designated Agent" refers to the entity with authority to construct, use, possess and operate GGNS as the agent of System Energy and SMEPA as reflected in the then-current GGNS Operating License issued by the Nuclear Regulatory Commission. System Energy hereby confirms that EOI has been appointed as its Designated Agent to exercise any and all rights it may have under all contracts, agreements

and purchase orders, including this Agreement, relating to the design, construction, operation and maintenance of GGNS and that, therefore, with regard to this Agreement:

a. All communications shall be between MP&L and EOI, and all instructions, approvals, acceptances, notices and other communications received by MP&L from EOI in connection with this Agreement shall be deemed to be received from and on behalf of System Energy.

b. MP&L shall be entitled to rely upon the actions, decisions and instructions of EOI with respect to this Agreement without verifying or otherwise confirming the concurrence of System Energy.

Such agency appointment and designation shall continue in full force and effect until such time as MP&L shall have received from System Energy written notice sufficient to revoke said agency relationship.

11. <u>Governing Law</u>

This Agreement shall be governed and construed in accordance with the laws of the State of Mississippi.

p02-0005.d19

IN WITNESS WHEREOF, the parties have executed this Agreement.

MISSISSIPPI POWER & LIGHT COMPANY

By: ______________________
Jerry L. Maulden
Chairman and Chief Executive Officer

June 6, 1990
Date

SYSTEM ENERGY RESOURCES, INC.,
for itself and as agent for
South Mississippi Electric
Power Association

______________________
Donald C. Hintz
Executive Vice President and
Chief Operating Officer

June 6, 1990
Date