No. 03-2624C
(Judge Braden)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

SYSTEM FUELS, INC., on its own behalf and as agent for
SYSTEM ENERGY RESOURCES, INC. and SOUTH MISSISSIPPI
ELECTRIC POWER ASSOCIATION,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS RULE 52(c) MOTION

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

HAROLD D. LESTER, JR.
Assistant Director

SHARON A. SNYDER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, NW, 8th Floor
Washington, D.C. 20530
Telephone: (202) 514-4325
Facsimile: (202) 514-7969

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., SW
Washington, D.C. 20585

December 20, 2006

Attorneys for Defendant

## TABLE OF CONTENTS


TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I. THE STANDARD OF REVIEW UNDER RCFC 52(c) . . . . . . . . . . . . . . . . . . . . 2

II. SFI BEARS THE BURDEN OF ESTABLISHING ALL ELEMENTS OF ITS CLAIM, INCLUDING LIABILITY, CAUSATION, FORESEEABILITY, AND REASONABLE CERTAINTY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III. SFI FAILED AS AN INITIAL MATTER TO MEET ITS BURDEN OF PROVING THAT DOE WAS OBLIGATED TO ACCEPT SNF PURSUANT TO A TWO-PART TEST AT AN ANNUAL RATE OF 3,000 MTU . . . . . . . . 5

A. SFI Failed To Establish That DOE Was Obligated To Accept SNF At A Rate Sufficient To Preclude Additional At-Reactor Storage And To Accept Some "Backlog" Of Utility-Stored SNF . . . . . . . . . . . . . . . . . . . . 5

B. The NWPA Did Not Require Acceptance Of SNF At Any Particular Rate Or Under Any Particular Qualitative Standard . . . . . . . . . . . . . . . . . . . . . 6

C. The Standard Contract Did Not Require Acceptance Of SNF At Any Particular Rate Or Pursuant To Any Particular Test . . . . . . . . . . . . . . . . . 7

D. SFI's Reliance Upon DOE Planning Documents To Support Its Assertion That DOE Was Obligated To Accept SNF At A Rate Of 3,000 MTUs Is Misplaced As A Matter Of Law And Fact . . . . . . . . . . . . . . . . . . . . . . . . 10

1. SFI's Reliance Upon Program Documents Fails As A Matter Of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

2. SFI Improperly Relies Upon The 1985 Mission Plan . . . . . . . . . 13

E. SFI's Reliance Upon A Document That It Did Not Receive Until 2001 To Substantiate Its Expectation Of SNF Acceptance In 1998 Is Misguided . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

IV. EVEN ASSUMING THAT DOE WOULD HAVE ACCEPTED SNF FROM SFI AT A 3,000 MTU RATE, SFI FAILED TO ESTABLISH THE COSTS IT WOULD INCUR IN THE BUT-FOR WORLD, AND THEREFORE, IT HAS FAILED TO MEET ITS BURDEN OF PROVING CAUSATION . . . . . . . . . 16

A. SFI Bears The Burden Of Establishing That Its Costs Were Incurred As A Result Of The Breach And Would Not Have Been Incurred In The "But For" World . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

B. Plaintiff Mistakenly Couches Its Damages Claim As Mitigation And Attempts to Shift The Burden to The Government . . . . . . . . . . . . . . . . . . 17

V. SFI PROFFERED NO EVIDENCE AT TRIAL UPON WHICH THIS COURT COULD MAKE ANY FINDINGS REGARDING ITS DAMAGES BASED UPON ITS TAKINGS CLAIM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

A. SFI Did Not Identify Any Basis For A Taking Of Its Real Property Because Any Rights To Require DOE To Accept Their SNF And/Or HLW Were Created Through The Standard Contract . . . . . . . 19

B. Assuming That SFI Has Established A Taking Of Its Real Property, It Failed To Establish The Fair Value Of That Property . . . . . . . . . . . . . 21

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

## TABLE OF AUTHORITIES

### CASES

**PAGE(S)**

Allenfield Associates v. United States,
40 Fed. Cl. 471 (1998) . . . . . . . . . . 21

American Pelagic Fishing Co., L.P. v. United States,
55 Fed. Cl. 575 (2003), rev'd on other grounds, 379 F.3d 1363, cert. denied,
125 S. Ct. 2963 (2005) . . . . . . . . . . 21

Barron Bancshares, Inc. v. United States,
366 F.3d 1360 (Fed. Cir. 2004) . . . . . . . . . . 12

Bass Enters. Prod. Co. v. United States,
48 Fed. Cl. 621 (2001) . . . . . . . . . . 21

Bass Enters. Prod. Co. v. United States,
133 F.3d 893 (Fed. Cir. 1998) . . . . . . . . . . 21

Bluebonnet Sav. Bank, F.S.B. v. United States,
67 Fed. Cl. 231 (2005) . . . . . . . . . . 4, 16

Bluebonnet Sav. Bank, F.S.B. v. United States,
339 F.3d 1341 (Fed. Cir. 2003) . . . . . . . . . . 4, 16, 18

Branch v. United States,
69 F.3d 1571 (Fed. Cir. 1995) . . . . . . . . . . 20

Branhill Realty Co. v. Montgomery Ward & Co.,
60 F.2d 922 (2d Cir. 1932) . . . . . . . . . . 13

California Sand & Gravel, Inc. v. United States,
22 Cl. Ct. 19 (1990), aff'd, 937 F.2d 624 (Fed. Cir. 1991)..........14

Castle v. United States,
48 Fed. Cl. 187 (2000), rev'd in part on other grounds, 301 F.3d 1328 (2002) . . . . . . 20

Coast Fed. Bank, F.S.B. v. United States,
48 Fed. Cl. 402 (2000) . . . . . . . . . . 4, 16

**TABLE OF AUTHORITIES (cont'd)**

**PAGE(S)**

Columbia First Bank, F.S.B. v. United States,
60 Fed. Cl. 97 (2004) . . . . . . . . . . 3

Commercial Metals Co. v. United States,
176 Ct. Cl. 343, 349 (1966) . . . . . . . . . . 13

Dravo Corp. v. United States,
594 F.2d 842 (Ct. Cl. 1979) . . . . . . . . . . 1

FDIC v. United States,
342 F.3d 1313 (Fed. Cir. 2003) . . . . . . . . . . 20

First Heights Bank, F.S.B. v. United States,
422 F.3d 1311 (Fed. Cir. 2005) . . . . . . . . . . 18

Fleet Nat'l Bank v. Anchor Media Television, Inc.,
45 F.3d 546 (1st Cir. 1995) . . . . . . . . . . 18

Florida Power & Light Co. v. United States,
64 Fed. Cl. 37 (2005), vacated on other grounds, 66 Fed. Cl. 93 (2005) . . . . . . . . . . 9

Glendale Fed. Bank, F.S.B. v. United States,
239 F.3d 1374 (Fed. Cir. 2001) . . . . . . . . . . 16

Home Sav. of America, F.S.B. v. United States,
51 Fed. Cl. 487 (2002) . . . . . . . . . . 19, 20

Indiana Michigan Power Co. v. United States,
422 F.3d 1369 (Fed. Cir. 2005) . . . . . . . . . . 3, 17, 18

Joseph L. DeClerk & Assocs., Inc. v. United States,
26 Cl. Ct. 35 (1992) . . . . . . . . . . 2

LaVan v. United States,
382 F.3d 1340 (Fed. Cir. 2004) . . . . . . . . . . 20

**TABLE OF AUTHORITIES (cont'd)**

**PAGE(S)**

Library of Congress v. Shaw,
478 U.S. 310 (1986) . . . . . . . . . . 1

Marshall v. United States,
164 F. Supp. 221 (Ct. Cl. 1958) . . . . . . . . . . 1

Massachusetts Bay Transp. Auth. v. United States,
129 F.3d 1226 (Fed. Cir. 1997) . . . . . . . . . . 4

McDonnell Douglas Corp., ASBCA No. 26747,
83-1 BCA ¶ 16,377 (1983) . . . . . . . . . . 9

Modern Leasing, Inc. v. Falcon Man. of California, Inc.,
888 F.2d 59 (8th Cir. 1989) . . . . . . . . . . 18

National By-Prods., Inc. v. United States,
186 Ct. Cl. 546, 405 F.2d 1256 (1969) . . . . . . . . . . 12

Pacific Gas & Elec. Co. v. United States,
73 Fed. Cl. 766 (2006) . . . . . . . . . . 6, 11

Pacific Gas & Elec. Co. v. United States,
73 Fed. Cl. 333 (2006) . . . . . . . . . . passim

Pettro v. United States,
47 Fed. Cl. 136 (2000) . . . . . . . . . . 21

Rumsfeld v. Applied Cos.,
325 F.3d 1328 (Fed. Cir. 2003) . . . . . . . . . . 6

Sacramento Mun. Util. Distr. v. United States,
No. 98-488C, 2006 WL 3490940 (Fed. Cl. Dec. 1, 2006) . . . . . . . . . . 6, 11, 14

San Carlos Irrigation & Drainage Dist. v. United States,
111 F.3d 1557 (Fed. Cir. 1997) . . . . . . . . . . 3

Southern California Fed. Sav. & Loan Assoc. v. United States,
422 F.3d 1319 (Fed. Cir. 2005) . . . . . . . . . . 12

**TABLE OF AUTHORITIES (cont'd)**

**PAGE(S)**

Southern Nuclear Operating Co. v. United States,
No. 98-614C (Fed. Cl. Apr. 7, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Stearns v. Beckman Instruments, Inc.,
737 F.2d 1565 (Fed. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Yuba Natural Resources, Inc. v. United States,
904 F.2d 1577 (Fed. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**STATUTES**

10 C.F.R. § 961.11, Art. IV.B.5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 9

42 U.S.C. §§ 10133, 10161-69 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

42 U.S.C. § 10221(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

42 U.S.C. § 10222(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**MISCELLANEOUS**

Am. Jur. 2d Damages § 698 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| SYSTEM FUELS, INC., on its own behalf and as agent for SYSTEM ENERGY RESOURCES, INC. and SOUTH MISSISSIPPI ELECTRIC POWER ASSOCIATION,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | No. 03-2624C<br>(Judge Braden) |

DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS RULE 52(c) MOTION

Pursuant to Rule 52(c) of the Rules of this Court ("RCFC"), and instructions from the Court at the close of plaintiff's case-in-chief, defendant, the United States, respectfully files this Motion for Judgment on Partial Pleadings.

SUMMARY OF ARGUMENT

System Fuels, Inc. ("SFI") is seeking $12.2 million for damages[1] it allegedly incurred through August 31, 2005, as a result of the Department of Energy's ("DOE") delay in accepting spent nuclear fuel ("SNF") from the nuclear industry beginning in January 1998, pursuant to the Standard Contract. SFI's claim is entirely predicated upon the premise that DOE was obligated

[1] SFI is claiming $10.59 million in nominal dollars which it clams is $12.2 million in 2006 dollars. Written Direct Testimony of Kenneth Metcalfe at ¶¶ 48-49. By applying a weighted cost of capital to the nominal dollars, SFI calculates its 2006 damages. Id. at 23. This is a thinly veiled attempt to collect pre-judgment interest from the Government which is prohibited, with few exceptions, by law. Marshall v. United States, 164 F. Supp. 221, 224 (Ct. Cl. 1958) ("[I]nterest on borrowed money is not recoverable in suits against the Government unless it is called for in the contract itself or in the governing statute."); see Library of Congress v. Shaw, 478 U.S. 310, 314 (1986); Dravo Corp. v. United States, 594 F.2d 842, 846 (Ct. Cl. 1979).

to begin accepting spent nuclear fuel at a rate of 3,000 MTUs per year. As we explain in detail below, plaintiff has failed to establish such a requirement and indeed, there is no such obligation in the Standard Contract. Further, even if the Court finds that the Government was somehow bound to perform at the 3,000 MTU, SFI has not provided the Court with the correct damages analysis upon which to rule in its favor. SFI failed to establish, as it must, what might have been had DOE begun acceptance in January 1998. Because SFI is seeking expectation damages, it must develop that "but for" analysis, so that the Court may ensure that SFI does not recover costs here that it would have incurred even had the contract been timely performed. Thus, under either scenario, SFI had failed to meet its burden of proof, and the Government requests that the Court find that SFI's evidence does not provide any basis for a finding of damages here.

## ARGUMENT

### I. THE STANDARD OF REVIEW UNDER RCFC 52(c)

This Court can enter judgment in favor of the Government pursuant to RCFC 52(c), "first, when a plaintiff has not demonstrated, in fact or in law, the elements of a claim as filed and has, therefore, failed to substantiate entitlement to relief; or, second, when a plaintiff's own evidence establishes one of the defendant's defenses, as a matter of law." Joseph L. DeClerk & Assocs., Inc. v. United States, 26 Cl. Ct. 35, 40-41 (1992). "A dismissal under Rule 52(c) differs from a directed verdict because, on a Rule 52(c) motion, the court does not have to decide that the defendant is entitled to judgment as a matter of law. Instead, the court, as the finder of fact, may resolve disputed issues of fact." DeClerk, 26 Cl. Ct. at 41. "The trial judge . . . may weigh and consider the evidence and sustain defendant's motion even though plaintiff's evidence establishes a prima facie case that would preclude a directed verdict for defendant in a jury

case." Stearns v. Beckman Instruments, Inc., 737 F.2d 1565, 1567-68 (Fed. Cir. 1984); see Columbia First Bank, FSB v. United States, 60 Fed. Cl. 97, 101 (2004) ("in responding to a RCFC 52(c) motion, this court may weigh the evidence and is not required to resolve all credibility issues and make all reasonable inferences in favor of plaintiff, as is required by a motion for a directed verdict under Fed. R. Civ. P. 50(a)"). "The trial may end at the close of a plaintiff's case if a plaintiff has failed to maintain its claim . . . because '[a] plaintiff has no automatic right to cross-examine a defendant's witnesses for the purpose of proving what the plaintiff failed to establish during the presentation of its case.'" Columbia, 60 Fed. Cl. at 101 (quoting Cooper v. United States, 37 Fed.Cl. 28, 35 (1996)). For the reasons explained below, because plaintiff's own testimony establishes the invalidity of its claim, we respectfully request that the Court grant our motion pursuant to RCFC 52(c).

## II. SFI BEARS THE BURDEN OF ESTABLISHING ALL ELEMENTS OF ITS CLAIM, INCLUDING LIABILITY, CAUSATION, FORESEEABILITY, AND REASONABLE CERTAINTY

As we established in our brief regarding the proper burden of proof to be applied by the Court here, filed simultaneously with this brief,[2] because plaintiff is seeking expectancy damages, it must demonstrate that, but for the breach, it would not have incurred the alleged damages. See San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1997). The mere fact of the partial breach of the Standard Contract by the Department of Energy ("DOE") does not "perforce" make all of a utility's costs "to store its SNF recompensable: [a plaintiff] must prove foreseeability, causation, and reasonableness." Indiana Michigan Power Co. v. United States, 422 F.3d 1369, 1376 (Fed. Cir. 2005). "One of the basic

[2] Defendant incorporates by reference that brief into this Rule 52 (c) motion.

principles of contract damages is that 'damages for breach of contract shall place the wronged party in as good a position as it would have been in, had the breaching party fully performed its obligation.'" Bluebonnet Sav. Bank, F.S.B. v. United States, 339 F.3d 1341, 1344-45 (Fed. Cir. 2003) (quoting Massachusetts Bay Transp. Auth. v. United States, 129 F.3d 1226, 1232 (Fed. Cir. 1997)).

"To derive the proper amount for the damages award, the costs resulting from the breach must be reduced by the costs, if any, that the plaintiff's would have experienced absent the breach." Bluebonnet, 339 F.3d at 1345 (emphasis added). "Because plaintiffs in this case are seeking expectancy damages, it is incumbent upon them to establish a plausible 'but-for' world." Bluebonnet Sav. Bank, FSB v. United States, 67 Fed. Cl. 231, 238-39 (2005); see also Pacific Gas & Elec. Co. v. United States, 73 Fed. Cl. 333, 386 ( 2006) (plaintiff must establish "what might have been" with reasonable certainty had the contract been performed); Coast Fed. Bank, FSB v. United States, 48 Fed. Cl. 402, 403 n.25 (2000) (plaintiffs bear burden of propounding realistic "but for" scenario). As the Court has found in another SNF case, this rule places upon the plaintiffs the "burden of proving that, had DOE performed the Standard Contract by beginning to accept the utilities' spent fuel on January 31, 1998, it would have (or could have) used a 3,000 MTU/year acceptance rate." Pacific Gas & Electric, 73 Fed. Cl. at 386.

Plaintiff asserted at trial that DOE would have begun accepting spent fuel from the industry at a rate of 3,000 MTUs, after a short ramp-up. Even assuming for the moment that SFI's understanding of the proper rate of acceptance is correct, which we will demonstrate below plaintiff failed to establish, plaintiff must determine what costs it would have expended had DOE started accepting spent fuel from the industry beginning in January 1998. Because plaintiff has

completely failed to meet its burden of proof by providing the Court with costs it would have incurred had DOE started picking up fuel from Grand Gulf in 2005, plaintiff has failed, as a threshold matter, to withstand the Government's Rule 52 (c) motion. Simply put, plaintiff has not established causation and its claim must, therefore, fail in its entirety.

## III. SFI FAILED AS AN INITIAL MATTER TO MEET ITS BURDEN OF PROVING THAT DOE WAS OBLIGATED TO ACCEPT SNF PURSUANT TO A TWO-PART TEST AT AN ANNUAL RATE OF 3,000 MTU

### A. SFI Failed To Establish That DOE Was Obligated To Accept SNF At A Rate Sufficient To Preclude Additional At-Reactor Storage And To Accept Some "Backlog" Of Utility-Stored SNF

The fundamental assumption that underlies all of SFI's damages claims is that DOE was obligated to accept SNF beginning in 1998 at an annual rate of 3,000 MTU, after a short five-year "ramp-up" period. At a 3,000 MTU rate, SFI contends that DOE would have started accepting SNF from Grand Gulf in 2005, thus obviating SFI's need to construct dry fuel storage at that facility. Supko Written Direct Testimony at ¶ 74. If necessary, the Government will demonstrate in its case-in-chief, through the testimony of DOE employees Christopher Kouts and David Zabransky, and former DOE employee Robert Morgan, that DOE was under no such obligation. We will show that the 1991 Annual Capacity Report ("ACR") set forth the rates of acceptance – 400 MTUs in the first year, 600 MTUs in the second year, and 900 MTUs for the remaining eight years – for acceptance at a repository or monitored retrievable storage facility ("MRS"). In that 1991 ACR, in conjunction with the 1991 Annual Priority Ranking ("APR"), DOE began making firm acceptance commitments to individual utilities. Under those rates, Grand Gulf did not have an allocation, or pick-up, in the first ten years of the program and, thus,

would have been required to build dry fuel storage, even had DOE delayed acceptance of SNF. See DX 140 at 9.

SFI appears to contend that DOE contractually obligated itself to accept SNF at a rate that (1) would eliminate the need for utilities to provide additional on-site storage after January 31, 1998, [Tr. 1094:22-1095:4 (Rives); Tr. 1184: 14-22 (Rives)] and (2) would work off the backlog of SNF already stored by utilities up until that deadline. Tr. 1137: 13-19 (Rives). SFI asserts that, to meet this goal, DOE would have to accept SNF at a rate of 3,000 MTUs per year, after a short five-year "ramp-up" period. Tr. 1093:17- 1094 (Rives):18; Tr. 1184: 14-22 (Rives). However, as this Court has already found in two companion SNF cases, SFI's basic assumptions are wholly in error and unsupported by either the Standard Contract, the NWPA, or contemporaneous DOE or industry documents. See Sacramento Mun. Util. Distr. v. United States ("SMUD"), No. 98-488C, 2006 WL 3490940 at * 2 (Fed. Cl. Dec. 1, 2006); Pacific Gas & Electric, 73 Fed. Cl. at 378-95.

B. The NWPA Did Not Require Acceptance Of SNF At Any Particular Rate Or Under Any Particular Qualitative Standard

"Because the purpose of a damages award is to put the non-breaching party 'in as good a position as [it] would have been in had the breaching party fully performed,' the logical starting point for a damages analysis is an understanding of the breaching party's obligations under the contract." Rumsfeld v. Applied Cos., 325 F.3d 1328, 1336 (Fed. Cir. 2003) (brackets in original) (quoting Wells Fargo Bank, N.A. v. United States, 88 F.3d 1012, 1021 (Fed. Cir. 1996)). In this case, the rate of acceptance is the lynchpin to any causation analysis.

SFI has asserted at least two distinct contract obligations allegedly imposed upon DOE. However, the NWPA contains no reference to a qualitative two-part obligation or a particular

rate of acceptance. At trial, Frank Rives, the Director of Nuclear Fuels for Entergy, testified that there was no provision of the NWPA that obligated DOE to begin acceptance of SNF in January 1998 at a rate that met any qualitative two-part obligation. Tr.1185: 15-17 (Rives). Simply stated, the NWPA is devoid of any requirement that DOE begin acceptance at any particular level, let alone a level that would obligate DOE to meet any qualitative obligation that SFI espoused at trial. See Pacific Gas & Electric, 73 Fed. Cl. at 388-91 (finding that NWPA does not contain the two-art qualitiative test or rate requirement that plaintiff promoted).

C. The Standard Contract Did Not Require Acceptance Of SNF At Any Particular Rate Or Pursuant To Any Particular Test

Mr. Rives also testified that he knew of no obligation in the Standard Contract requiring DOE to accept SNF at a rate of 3,000 MTUs per year. Tr. 1185:18-25 (Rives). Mr. Rives also testified that there was no obligation set forth in the Standard Contract requiring DOE to accept SNF to meet any qualitiative test. Tr. 1186:10-22 (Rives).

The evidence is completely contrary to SFI's assertions that DOE was required to create an acceptance rate that satisfied any two-part "test." Instead of agreeing to a specific minimum acceptance rate or creating standards that would obligate DOE to satisfy a minimum rate, the Standard Contract creates a contractual mechanism for the development of a specific acceptance schedule that establishes, in essence, a two-phase process. 10 C.F.R. § 961.11, Art. IV.B.5. (DX 1). First, the Standard Contract's schedule terms seek to obtain the agreement of the parties to a specific schedule for the acceptance of an individual contract holder's SNF and HLW. Id., Art. IV.B.5.(a). Pursuant to the terms of the Standard Contract, DOE was to issue, beginning not later than July 1, 1987, "an annual capacity report [("ACR")] for planning purposes," identifying "projected annual receiving capacity" at any DOE facilities and annual acceptance

ranking for acceptance of contract holders' SNF and/or HLW for the first 10 years "following the projected commencement of operation of the initial DOE facility." Id., Art. IV.B.5(b). Subsequently, beginning on April 1, 1991, DOE was to issue "an annual acceptance priority ranking" ("APR") for receipt of the contract holders' SNF, "based on the age of SNF and/or HLW as calculated from [its] date of discharge." Id., Art. IV.B.5(a); accord Pacific Gas & Electric, 73 Fed. Cl. 398 ("The court is able to approximate with reasonable certainty the rate at which DOE would have accepted the utilities' spent fuel had it begun performance of the Standard Contract on January 31, 1998, by using the 1991 ACR and APR.")

Second, the contract holder, "[a]fter DOE has issued its proposed acceptance priority ranking" on April 1, 1991, and no earlier than January 1, 1992, would submit a delivery commitment schedule ("DCS") identifying "all SNF and/or HLW the [contract holder] wishes to deliver to DOE beginning sixty-three (63) months thereafter," for DOE's approval or disapproval. 10 C.F.R. § 961.11, Art. V.B.1. (DX 1). If DOE approves the DCS, the parties have effectively agreed and defined the amount of SNF that DOE will accept from that contract holder 63 months later. Id. If DOE disapproves the first DCS submission, the contract holder is entitled to make a second DCS submission, again for DOE's approval or disapproval. Id. If DOE approves the second DCS submission, the parties have, as stated above, effectively defined the amount of SNF that DOE will accept from that contract holder 63 months later. Id. If DOE disapproves the second submission, DOE responds with its own proposed schedule, which the contract holder may accept or, alternatively, may attempt to negotiate with DOE, with a right to appeal to the Energy Board of Contract Appeals if the disagreement cannot be resolved through negotiation. Id., Art. V.B.2 & XVI.A; see McDonnell Douglas Corp., ASBCA No. 26747, 83-1

BCA ¶ 16,377, at 81,421 (1983) (boards of contract appeals "[h]istorically and traditionally" assumed jurisdiction over non-monetary "disputes as to the interpretation of contract provisions and determination of the rights and obligations of the parties under the provisions of the contract").

Nothing in the terms of the Standard Contract creates an obligation upon DOE's part to accept SNF at a rate that (1) would eliminate the need for utilities to provide additional on-site storage after January 31, 1998, and (2) would work off the "backlog" of SNF. In fact, SFI can identify absolutely no contractual language in the Standard Contract creating any such obligation. Further, the integration clause in the Standard Contract, Article XXII.A, expressly precludes reading any unwritten "agreement" into the contract: "Any representation, promise, or condition not incorporated in this contract shall not be binding on either party," and "[n]o course of dealing or usage of trade or course of performance shall be relevant to explain or supplement any provision contained in the contract." 10 C.F.R. § 961.11, Art. XXII.A. (DX 1). SFI's proposed requirement for a rate that precludes additional at-reactor storage and reduces the "backlog" of SNF violates standard rules of contract interpretation. As this Court recently recognized in the PG&E case, in response to the same argument that SFI is raising, "DOE never . . . engaged in a rulemaking establishing a minimum spent fuel acceptance rate under the Standard Contract." Pacific Gas & Electric, 73 Fed. Cl. at 358; see also Florida Power & Light Co. v. United States, 64 Fed. Cl. 37, 48 n. 12 (2005) ("[n]one of the demanded terms is found in the contract; and it is clear that the parties shared no meeting of the minds regarding those terms, as was made clear to all during contract negotiations"), vacated on other grounds, 66 Fed. Cl. 93

(2005). SFI's "understanding" that DOE had some minimum acceptance rate obligation is a post-litigation theory, created after disputes about timely SNF acceptance began.[3]

D. SFI's Reliance Upon DOE Planning Documents To Support Its Assertion That DOE Was Obligated To Accept SNF At A Rate Of 3,000 MTUs Is Misplaced As A Matter Of Law And Fact

1. SFI's Reliance Upon Program Documents Fails As A Matter Of Law

While arguing that determining what would have happened in the "but for" world is too speculative, SFI also proposes an alternative view of the world where the rate of acceptance is not so speculative after all. In attempting to define the rate of acceptance that Entergy expected DOE would implement, plaintiff relied predominately upon the testimony of Mr. Frank Rives. While completely ignoring the Standard Contract, which clearly defines the process whereby the rate of acceptance will be developed beginning in 1991, Mr. Rives preferred to rely almost exclusively upon draft Mission Plans, planning documents, and other parol evidence to support his testimony that he "expected" DOE to use a 3,000 MTU rate of acceptance to implement its program beginning in January 1998.

For example, Mr. Rives relied upon the 1983 Draft Mission Plan to support his alleged "expectations." Tr. 1134: 6-9 (Rives); PX 275. However, this Court, in SMUD, already found

---

[3] And the PG&E Court also concluded that any judicial imposition of such an obligation on DOE would be clearly improper:

> The court concludes that for it to impose on the government an obligation to accept the utilities' spent fuel in accordance with the alleged two-part obligation or at a rate of 3,000 MTU/year would be tantamount to its enacting either legislation or regulation for the nuclear fuel industry that did not exist before this litigation.

Pacific Gas & Electric, 73 Fed. Cl. at 391.

that document to be "rank speculation." SMUD, No. 98-488C, 2006 WL 3490940 at * 2; accord Pacific Gas & Electric, 73 Fed. Cl. at 392.[4] Mr. Rives relied upon the 1984 Draft Mission Plan. Tr. 1144: 3-5 (Rives); PX 276. This Court found in the same SMUD decision that 1984 draft document to be "speculative." SMUD, No. 98-488C, 2006 WL 3490940 at 3.

As this Court recognized in its recent SMUD decision, the draft DOE planning documents upon which SFI relies uniformly and expressly indicate that they are "not contractually binding," that they do not establish acceptance rates that create mandatory obligations, and that they were only for planning purposes. See, e.g., PX 275 at 2-2 (Dec. 1983 Draft Mission Plan) ("This Waste Acceptance Schedule will serve as a planning base which will be updated annually in response to the latest projections of nuclear power growth."); PX 276 at 2-1 (April 1984 Draft Mission Plan) ("The schedule will serve as a planning base which will be updated annually."). Other documents upon which SFI relied at trial specifically stated that they were for planning purposes and were not "contractually binding." For example, each Annual Capacity Report issued between 1987 and 1990 expressly advised contract holders that, in 1991, but not before, DOE would begin publishing firm individual utility acceptance schedules in accordance with the contracts, including shipment allocations. See, e.g., PX 308 (June 1988 ACR) at 1-2 ("the ACR is for planning purposes only and thus is not contractually binding on

---

[4] The PG&E Court found that:

> [T]he preponderance of the credible evidence, even early on, indicates that the parties contemplated that DOE's rate of acceptance of utilities' spent fuel, especially beginning in 1998, would be far lower than 3,000 MTU/year.

Pacific Gas & Electric, 73 Fed. Cl. at 392.

either DOE or the Purchasers"); PX 257 (Dec. 1990 ACR) at 2 (same). SFI has identified no language in which DOE agreed or even suggested that the acceptance rates in any planning documents which DOE issued were contractually binding or constituted anything other than DOE's hopes and goals for its program. Because DOE has never obligated itself to satisfy a 3,000 MTU acceptance rate, the Court cannot incorporate such a requirement into the Standard Contract.

SFI's reliance upon program documents that post-date the Standard Contract fails for several other reasons. First, as we explained above, reliance upon these documents is barred by the integration clause in the Standard Contract. Art. XXII(A) (DX 1). SFI's interpretation of the contract, which reads into the contract selective program hopes and goals over a 20-year period from DOE program documents, renders the integration clause meaningless and should be disregarded. See Barron Bancshares, Inc. v. United States, 366 F.3d 1360, 1375 (Fed. Cir. 2004); Southern California Fed. Sav. & Loan Assoc. v. United States, 422 F.3d 1319, 1330 (Fed. Cir. 2005). As the Court recognized in PG&E, 73 Fed. Cl. at 385, "[t]he existence of the integration clause in the Standard Contract, then, militates strongly against modifying or supplementing [the contract] by adding a specific acceptance rate term."

Second, SFI identifies no language which demonstrates that DOE agreed or suggested that the acceptance rates in planning documents were contractually binding. See National By-Prods., Inc. v. United States, 186 Ct. Cl. 546, 558-59, 405 F.2d 1256, 1263 (1969) ("[b]efore a representation can be contractually binding, it must be in the form of a promise or undertaking . . . and not a mere statement of intention, opinion, or prediction"); see also Commercial Metals Co. v. United States, 176 Ct. Cl. 343, 349 (1966); Branhill Realty Co. v. Montgomery Ward &

Co., 60 F.2d 922, 923 (2d Cir. 1932). SFI's reliance upon program documents to evidence contractual obligations is misplaced. See Pacific Gas & Electric, 73 Fed. Cl. at 392-94 (discussing National By-Products decision in context of SNF cases).

2. SFI Improperly Relies Upon The 1985 Mission Plan [5]

SFI also argued that the rate of acceptance to which DOE was obligated was the "improved performance schedule" set forth in DOE's June 1985 Mission Plan. Tr. 1146: 15-1148:12 (Rives). Mr. Rives testified that this Mission Plan was not a draft and that it reflected his reasonable expectation that DOE would begin accepting SNF in January 1998, such that SFI would not have been required to build dry fuel storage at its facility. Tr. 1147: 24-1148: 12 (Rives). However, this Court has already found that the 1985 Mission Plan is "rank speculation."[6]

---

[5] Importantly, the 1985 Mission Plan upon which SFI relies was created pursuant to a statutory requirement for submission to Congress. 42 U.S.C. § 10221(b)(3). After DOE submitted the 1985 Mission Plan and a 1987 Mission Plan Amendment to Congress, Congress enacted the 1987 amendments to the NWPA, presumably after considering DOE's Mission Plan submissions and evaluating the state of DOE's program. As it was entitled to do, Congress significantly modified the scope of the program at that time, limiting DOE's focus for development of a repository to one site, Yucca Mountain, and establishing linkages between a Monitored Retrievable Storage ("MRS") facility and a repository. 42 U.S.C. §§ 10133, 10161-69. SFI's reliance upon documents prepared for Congress that relate to possible circumstances and scenarios that could have existed prior to congressional review of and action upon those pre-amendment planning documents does not support its argument that DOE has somehow obligated itself to accept SNF at a 3,000 MTU rate, regardless of whether a repository is available.

[6] In making that finding, this Court quoted from the 1985 Mission Plan, which stated:

> The contingencies identified below and shown in Figure 2-3 are limited to major areas of uncertainty and will be more fully defined as the evolving situation requires.

SMUD, No. 98-488C, 2006 WL 3490940 at * 3 (emphasis added by the Court) (quoting 1985

Further, SFI's argument suffers from several fatal factual and legal flaws. First, contrary to the testimony of Mr. Rives, the parties were well aware that the rates set forth in DOE's Mission Plan were not contractually binding. The Mission Plan expressly stated that the schedules used in the Mission Plan were "for illustrative purposes only at this time" and expressly referred to the Standard Contract, which provided the mechanism by which, in 1991, DOE would "begin to publish firm waste acceptance schedules for individual reactors, including shipment allocations." PX 277 at 29. DOE's improved performance schedule, by definition, was not a contractual obligation.

Moreover, SFI's reliance upon the terms of the improved performance schedule constitutes improper reliance upon parol evidence. "[T]he parol evidence rule, a rule of substantive law rather than evidence, bars the introduction of extrinsic evidence antecedent to or contemporaneous with contract formation for the purpose of adding to, subtracting from, varying, or contradicting the terms of a written contract, which if final, complete, unambiguous, and unaffected by mistake, fraud, or accident." California Sand & Gravel, Inc. v. United States, 22 Cl. Ct. 19, 25 (1990), aff'd, 937 F.2d 624 (Fed. Cir. 1991). SFI's reliance upon the schedule set forth in the "improved performance schedule" necessarily relies upon parol evidence. Yet, the improved performance schedule that allegedly depicts DOE's contractual obligation contemplates DOE commencing performance in 1996, and not in 1998, as the contract clearly provides. PX 277 at 26. SFI is asking the Court to accept evidence that varies the express terms of the Standard Contract, in violation of the parol evidence rule. Similarly, if this Court found that DOE was obligated to accept SNF at a rate that eliminated the need for additional at-reactor

---

Mission Plan).

storage, it would render the contractual oldest-fuel-first ("OFF") queue, exchanges, and priority provisions meaningless, as the Court found in PG&E:

> These and other examples of predictions, hopes, goals, or other aspirations adduced at trial do not amount to binding promises that can be enforced by the court through the award of contract damages.

Pacific Gas & Electric, 73 Fed. Cl. at 393. As a matter of law, such an interpretation would be improper.

E. SFI's Reliance Upon A Document That It Did Not Receive Until 2001 To Substantiate Its Expectation Of SNF Acceptance In 1998 Is Misguided

Mr. Rives also relied at trial upon an April 26, 1985 letter from Consolidated Edison Company of New York ("ConEd") to Christopher J. Jedrey, the DOE contracting officer (PX 238) and DOE's response to that letter, dated July 8, 1985 (PX 239). He testified that those letters were further evidence that his expectations that DOE would use a 3,000 MTU rate of acceptance were reasonable. Tr. 1155: 25-1157: 21 (Rives). However, putting aside whether that correspondence provides any evidence of DOE's obligation to accept SNF at a rate of 3,000 MTUs per year, Mr. Rives did not come into possession of that correspondence until sometime after September 6, 2001, the date he testified that Entergy purchased ConEd's Indian Point Unit 2 facility. Tr. 1157: 2-21 (Rives). Putting aside the evidentiary defects with the document because Mr. Rives could not provide any foundation for it, there is obviously no way that Mr. Rives could have relied upon correspondence dated 1985, to inform his expectations regarding DOE's obligation to accept SNF beginning in January 1998, when he did not review the document until sometime after September 6, 2001.

## IV. EVEN ASSUMING THAT DOE WOULD HAVE ACCEPTED SNF FROM SFI AT A 3,000 MTU RATE, SFI FAILED TO ESTABLISH THE COSTS IT WOULD INCUR IN THE BUT-FOR WORLD, AND THEREFORE, IT HAS FAILED TO MEET ITS BURDEN OF PROVING CAUSATION

### A. SFI Bears The Burden Of Establishing That Its Costs Were Incurred As A Result Of The Breach And Would Not Have Been Incurred In The "But For" World

A plaintiff must establish a plausible "but for" world as part of its causation analysis. Bluebonnet, 67 Fed. Cl. at 238-39; see Coast Fed. Bank, 48 Fed. Cl. at 403 n.25; Glendale Fed. Bank, FSB v. United States, 239 F.3d 1374, 1380 (Fed. Cir. 2001). A plausible "but for" world is required because a plaintiff, to prove that a breach caused its damages, must establish what costs it would have incurred absent the breach so that the Court can determine which costs actually incurred were an incremental result of that breach. See Bluebonnet, 339 F.3d at 1345. SFI failed even to attempt to establish the costs that it would have incurred, and activities in which it would have engaged, in the "but for" world. Mr. Bryan Warren, the current Project Manager for the Grand Gulf Dry Fuel Storage project, testified that he could not estimate what certain costs might be in the "but for" world because he did not know what kind of cask DOE would have brought. See, e.g., Tr. 587: 21- 588: 9; 593: 22 -594: 8; 602: 18-603: 5; (Warren). Even if SFI established a rate at which DOE was obligated to accept SNF, it completely failed to identify the activities in which SFI would necessarily have engaged, and costs incurred, absent any delay by DOE. SFI essentially argues, in error, for strict liability and asks the Court to assume that all of its claimed costs are incremental to DOE's delay.

SFI has not simply omitted discussion of minor "but for" activities and costs, but has ignored the "but for" world altogether, leaving this Court with no basis upon which to establish causation, determine what costs are incremental to the delay, and award damages. SFI's failure

to meet its burden of proving the activities in which it would have engaged and the associated costs in the "but for" world – a burden that it has attempted to pass to the Government – should be dispositive of its entire claim.

### B. Plaintiff Mistakenly Couches Its Damages Claim As Mitigation And Attempts To Shift The Burden Of Proof To The Government

Plaintiff here argues that the costs it incurred in response to a Government breach constitutes mitigation, for which the defendant has the burden to prove the costs unreasonable or unnecessary, thus eliminating any burden on the plaintiff to establish that the defendant's breach caused the costs to be incurred in the first instance. Plaintiff at trial only provided testimony that SFI was required to build its dry fuel storage because of DOE's breach. It provided the testimony of Mr. Bryan Warren, who described what costs had been incurred and included in the damages claim submitted by plaintiff. Thus, beyond saying it was so, plaintiff never demonstrated that it would not have needed dry storage in the "but for" world, which it must to demonstrate causation and damage.

As we have explained in our brief regarding the burden of proof in this case, which is being filed today, the doctrine of mitigation[7] prevents a party from recovering damages "for loss

---

[7] The doctrine of mitigation, also called the doctrine of avoidable consequences, prevents a party from recovering damages "for loss that he could have avoided by reasonable efforts." Indiana Michigan, 422 F.3d at 1375. Courts consider failure to mitigate to be an affirmative defense which may apply when a plaintiff fails to take appropriate steps to mitigate, or avoid, certain costs:

> Failure to mitigate damages is not among the affirmative defenses enumerated in the rule, but the Eighth Circuit has joined 'the overwhelming majority of federal courts' in concluding that lack of mitigation is a Rule 8 affirmative defense.

Modern Leasing, Inc. v. Falcon Man. Of California, Inc., 888 F.2d 59, 62 (8th Cir. 1989); see

that he could have avoided by reasonable efforts." Indiana Michigan, 422 F.3d at 1375. "Mitigation is appropriate where a reasonable person, in light of the known facts and circumstances, would have taken steps to avoid damage." Id. The doctrine only requires a plaintiff "to make fair and reasonable efforts under the circumstances, and the government has the burden of proving that [the plaintiffs] efforts were anything other than fair and reasonable." Home Savings of America, FSB v. United States, 339 F.3d 1341, 1352-53 (Fed. Cir. 2005). The result of the plaintiff's characterization of its damages was to place upon the Government the burden of proving that SFI's dry storage decision and incurred costs were unreasonable.

By relying upon a theory of mitigation, plaintiff completely rejects any responsibility for proving its case. There may be situations in which an argument straddles the line between causation and mitigation. For instance, in First Heights Bank FSB v. United States, 422 F.3d 1311 (Fed. Cir. 2005), this Court rejected the causation label that the Government assigned to a plaintiff's decision not to take tax charge-offs following the Government's breach, explaining that "[t]he sole allegation underlying the government's argument is that plaintiffs failed to take actions that would have eliminated some of the damages from the breach. Such an allegation is covered by the mitigation doctrine and its reasonability element." Id. at 1317; see also Fleet Nat'l Bank v. Anchor Media Television, Inc., 45 F.3d 546, 560-62 (1st Cir. 1995) (the fact that an entity entitles its damages as "mitigation damages" does not somehow eliminate the requirement that the entity prove, "as an element of its case, the extent to which it was *damaged* by the . . . breach.") However, in this case, the Government has not questioned the method by which SFI responded to DOE's delay – contending, for instance, that SFI should have employed

---

generally 22 Am. Jur. 2d Damages § 698 (2006).

some method other than dry cask storage. Instead, the Government questions whether SFI should recover costs that, in the "but for" world, it would have incurred regardless of DOE's delay, albeit at a later date.

## V. SFI PROFFERED NO EVIDENCE AT TRIAL UPON WHICH THIS COURT COULD MAKE ANY FINDINGS REGARDING ITS DAMAGES BASED UPON ITS TAKINGS CLAIM

### A. SFI Did Not Identify Any Basis For A Taking Of Its Real Property Because Any Rights To Require DOE To Accept Their SNF And/Or HLW Were Created Through The Standard Contract

SFI asserted a takings claim against the Government in its complaint and its first amended complaint. Amended Complaint at ¶ 28. However, SFI did not brief its takings claim in its pre-trial memorandum, and it did not offer any evidence of damages based upon a takings theory at trial. As such, SFI's takings claim should be dismissed because there is no evidence in the record to support the claim.

SFI has asserted a claim in its complaint for a temporary taking, as follows :

> [T]he Government's failure to honor its commitments under the Standard Contract will prevent System Energy and SMEPA from being able to decommission their nuclear plant site and devote that site to commercial uses as soon as it otherwise would have been able to do so. The Government's conduct has deprived, and will continue to deprive, System Energy and SMEPA of the full valuable economic use of that site, as well as the real property on which the SNF is stored and from which it cannot lawfully be removed.

First Amended Complaint and Supplemental Complaint, ¶ 28.

"The Court of Claims taught that the concept of a taking has limited application when rights have been voluntarily created by contract." Home Sav., 51 Fed. Cl. at 494. "Interference with contract rights generally gives rise to a breach claim because the parties' rights emanate

from the contract, and not from a 'taking' for public use." Id. (citing Sun Oil Co. v. United States, 215 Ct. Cl. 716, 572 F.2d 786, 818 (1978)). "[W]hen the government is a party to a contract, . . . the contract 'gives rise to the expectation either that the contract will be performed or that the non-breaching party will have available to it a contract-based remedy.'" Id. at 495 (quoting Castle, 48 Fed. Cl. at 218; see LaVan v. United States, 382 F.3d 1340, 1351-52 (Fed. Cir. 2004) (dismissing takings claim arising from contract); FDIC v. United States, 342 F.3d 1313, 1320 (Fed. Cir. 2003) (same) (affirming Bailey v. United States, 53 Fed. Cl. 251, 256-57 (2002)).

"In analyzing a takings claim, a court must first determine what [property right] was taken." Branch v. United States, 69 F.3d 1571, 1575 (Fed. Cir. 1995). Here, despite its attempt to categorize its takings claim as a taking of its real property, the "property right" about which SFI actually complains is its "right" to have DOE begin acceptance of SNF by January 31, 1998. The NWPA does not create any such obligation upon DOE to accept or dispose of any particular utility's SNF, but, instead, authorized the Secretary of Energy "to enter into contracts with any person who generates or holds title to [SNF] of domestic origin," through which the Secretary would create such an obligation towards a particular utility's SNF. See 42 U.S.C. § 10222(a)(1) (emphasis added). SFI did not introduce any evidence at trial that it had any "right" to SNF acceptance outside the context of the Standard Contract. Accordingly, any remedy for the Government's delay in accepting SFI's SNF must be pursued through the remedies provided through SFI's contracts. SFI's apparent argument that its current takings claims – for a taking of its "real property" – is unrelated to their Standard Contracts with DOE is meritless. Like the

SNF-related takings claim in Southern Nuclear Operating Co. v. United States, No. 98-614C, slip op. at 5 (Fed. Cl. Apr. 7, 2004) (unpublished opinion), this claim should be dismissed.

B. Assuming That SFI Has Established A Taking Of Its Real Property, It Failed To Establish The Fair Value Of That Property

Even if SFI had established a taking of its real property, it has failed to establish any recoverable damages for that taking. The appropriate measure of just compensation for a temporary taking is the fair rental value of the property for the period of the taking, as opposed to the fair market value which is the compensation for a permanent taking. Bass Enters. Prod. Co. v. United States, 48 Fed. Cl. 621, 622 (2001) (quoting Yuba Natural Resources, Inc. v. United States, 904 F.2d 1577, 1581 (Fed. Cir. 1990)); see Bass Enters. Prod. Co. v. United States, 133 F.3d 893, 895 (Fed. Cir. 1998) ("just compensation for a permanent taking is generally the fair market value of the property, whereas the recovery for a temporary taking is generally the rental value of the property"); American Pelagic Fishing Co., L.P. v. United States, 55 Fed. Cl. 575, 592-93 (2003) ("for a temporary taking it is well settled that the appropriate measure of compensation is the fair rental value of property"), rev'd on other grounds, 379 F.3d 1363, cert. denied, 125 S. Ct. 2963 (2005); Allenfield Associates v. United States, 40 Fed. Cl. 471, 487 (1998) (temporary taking requires compensation in form of FRV). "In the temporary takings situation, rental value is seen as an appropriate measure because the property is returned to the owner when the takings ends, and the Government, therefore, should only pay for its use of the property." Pettro v. United States, 47 Fed. Cl. 136, 151 (2000).

SFI claims that DOE has taken its land because SFI will not be able to decommision its nuclear site and devote it to other commercial uses due to DOE's delay in accepting spent nuclear fuel. First Amended Complaint, ¶ 33. However, SFI did not proffer any facts to support

its temporary takings claim. It did not provide any exhibits that purported to demonstrate any valuation analysis of its Grand Gulf facility and property. Nor did it proffer any fact or expert testimony at trial identifying damages based on a fair rental value. In short, there is no evidence in the record for this Court to make any finding as to damages based on SFI's takings claim. Thus, SFI has failed to meet its burden of proving this claim.

CONCLUSION

For the reasons outlined above, the Government respectfully requests that the Court grant its Rule 52(c) motion and enter judgment in the Government's favor.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

ALAN LO RE
Senior Trial Counsel

SCOTT R. DAMELIN
JOHN EKMAN
STEPHEN FINN
Trial Attorneys
Department of Justice

s/Sharon A. Snyder

SHARON A. SNYDER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street N.W.
Washington, D.C. 20530
Tele: (202) 616-0347
Fax: (202) 307-2503

December 20, 2006

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that on this 20th day of December, 2006, a copy of foregoing "DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS RULE 52(c) MOTION" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Sharon A. Snyder