# ATTACHMENT

**Northern States Power Company v. U.S No. 98-484C November 16, 2006**

**Heritage Reporting Corporation**

**Page 3772 to Page 4082**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 3772

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

NORTHERN STATES POWER COMPANY, )
Plaintiff,) Case No.
v. ) 98-484C
THE UNITED STATES, )
Defendant.)

National Courts Building
717 Madison Place NW
Washington, D.C.

Thursday, November 16, 2006
Volume 13

The parties met, pursuant to the notice of the Judge, at 10:43 a.m.

BEFORE: THE HONORABLE JOHN P. WIESE

Page 3773

APPEARANCES:

ON BEHALF OF THE PLAINTIFF:
ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Pillsbury Winthrop Shaw Pittman LLP
14th Floor
McLean, Virginia 22102
(703) 770-7940
and
JAY E. SILBERG, ESQ.
Pillsbury Winthrop Shaw Pittman LLP
2300 N Street, Northwest
Washington, DC 20037-1122
(202) 663-8063

Page 3774

APPEARANCES CONTINUED:

ON BEHALF OF THE DEFENDANT:
ALAN J. LO RE, ESQ.
HEIDE HERRMANN, ESQ.
JOSHUA GARDNER, ESQ.
STEPHEN FINN, ESQ.
ANDREW P. AVERBACH, ESQ.
JOHN EKMAN, ESQ.
U.S. Department of Justice
1100 L Street, Northwest
Washington, D.C. 20530
(202) 305-7562

(Index appears at end of transcript)

Page 3775

P R O C E E D I N G S

\- - - - -

THE COURT: Let us go on the record. Mr. Tomaszczuk, do we have any preliminary matters?

MR. TOMASZCZUK: Not for the Plaintiff, Your Honor. I think we sorted out the witness availability problem, and so far as Plaintiffs are concerned, we're ready to go forward.

THE COURT: Excellent. Ms. Herrmann?

MS. HERRMANN: Good morning, Your Honor, we're ready as well.

THE COURT: You're ready as well, so that brings forward Mister?

MS. SULLIVAN: Mr. Morgan, Your Honor.

THE COURT: I see we're switching from Mr. Leonard.

MS. SULLIVAN: Mr. Morgan needs to leave today.

THE COURT: We'll have Mr. Morgan on the stand very promptly and make sure he leaves today.

MS. SULLIVAN: Thank you.

THE COURT: Please be seated.

Page 3776

Mr. Morgan, I'd like you to state your name in full, spell your last name for the reporter, and give the reporter your home address.

THE WITNESS: Robert L. Morgan, M-o-r-g-a-n. My home address is 18470 Glenthorne Lane, Glenthorne is one word with an E on the end, Monument, Colorado, 80132.

THE COURT: You may question, Ms. Sullivan.

MS. SULLIVAN: Thank you, Your Honor. Good morning, Your Honor.

Whereupon–

ROBERT L. MORGAN

a witness, called for examination, having been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. SULLIVAN:

Q. Good morning, Mr. Morgan. Mr. Morgan, when did you serve as director of the Office of Civilian Radioactive Waste Management?

A. I was acting director from January of 1983 until approximately January 1984.

Q. And how were you selected to be the director?

A. I was directed by Secretary Hodel.

Page 3777

Q. And as director, to whom did you report?

A. The Secretary.

Q. How many years were you employed by DOE or its predecessor agencies?

A. I joined the Atomic Energy Commission in 1965 and retired in 1988.

Q. And when you retired, you were with DOE?

A. Yes.

Q. Do you hold a Bachelor's degree?

A. Yes.

Q. From where?

A. United States Military Academy.

Q. And what is your degree in?

A. Military engineering.

Q. And when did you receive that degree?

A. 1952.

Q. And do you also hold a Master's degree?

A. Yes, I do.

Q. From where?

A. From Massachusetts Institute of Technology.

Q. And what is your Master's degree, what subject?

Page 3778

A. I have a Master's in civil engineering and a Master's in nuclear engineering.

Q. And when did you receive those degrees?

A. 1959.

Q. Mr. Morgan, did you also serve in the Army?

A. Yes, I did.

Q. For how long?

A. 13 years.

Q. And after you left the Army, where were you first employed?

A. At Savannah River operations office.

Q. And was that as an employee of the Atomic Energy Commission at that time?

A. Yes.

Q. Would you please summarize briefly your positions from the time you joined the Atomic Energy Commission until you retired from DOE?

A. I was a director of the heavy water organic cooled reactor division at Savannah River, then I was transferred to Canoga Park in 1966. I stayed there until 1973 as a senior

Page 3779

site representative for reactor development and technology. In 1973, I was selected as deputy manager for Savannah River operations office. I held that job until 1980. Then I was selected as manager of that office and had that job until I retired.

Q. And when you served as the director, the acting director of the Office of Civilian Radioactive Waste Management, where were you – where did that fit in your history with DOE?

A. That was a detail in 1983, but I still was the manager of the Savannah River operations office, but I was located in Washington, D.C.

Q. Thank you. And I'm not sure if we gave the dates that you were acting director of the office.

A. 1983, January, until January 1984, I believe.

Q. Thank you. And what have you done since you retired from DOE in 1988?

A. I worked for – or I consulted from 1988 to 1990, then I went to work for a small 8A firm in Washington, D.C., called Meta, we were doing environmental impact statements for

Page 3780

Department of Energy, and I resigned or retired from that job in 1995, and I've been consulting since.

Q. And who do you consult with?

A. Right now, it's primarily SMSI at Los Alamos National Laboratory.

Q. Thank you. Mr. Morgan, turning now to your time as the acting director of the Office of Civilian Radioactive Waste Management, what was accomplished during the year you were acting director?

A. The first thing, we sent out letters to the appropriate governors that were affected by the Nuclear Waste Policy Act. We then dealt with the rule-making Federal Register for the contract, and then we put out the draft mission plan in December of that year, and in the meantime, we were trying to manage the program.

Q. What was the status of the development of the standard contract when you arrived in the office?

A. As I recall, the first notice of Federal Register was published in February, early February. Due to the time lag of submittal, I had not seen that until it was

Page 3781

published.

Q. And when you say, "time lag of submittal," what do you mean?

A. From the time the Department submits a requirement to the Federal Register, there's a time delay from the time it's submitted until it's published.

Q. What happened in the development of the standard contract after you arrived?

A. We received comments from utilities, states, affected Indian tribes, and we tried to resolve those comments and issues and finally issued the final rule-making.

Q. Do you recall meeting with utility representatives prior to the publication of the final standard contract?

A. Yes.

Q. With whom did you meet?

A. I met with GE, Westinghouse, Edison Electric Institute, and there were a number of utilities represented at a meeting there, plus I met with individuals from EEI.

Q. Okay. And who were the individuals from EEI that you met with?

A. Loring Mills.

Page 3782

Q. And what do you recall regarding your conversations with Mr. Mills?

A. Mr. Mills was repeating to me the comments that they had submitted and wanted to ensure that we had an acceptance rate in the contract.

Q. And do you recall what you told Mr. Mills with regard to his request?

A. I denied his request.

Q. Why was that?

A. Primarily because of the uncertainties in the program, there were technical issues, there were licensing issues, NRC had not issued licensing requirements for the repository. We felt it was an intense process requirement. We were concerned about litigation, political activities, and potential changes in legislation, so we felt that it would be inappropriate for me to commit to any acceptance rate in the contract.

Q. Mr. Mills, you mentioned litigation – Mr. Morgan, excuse me, you mentioned litigation. Were there lawsuits filed against DOE regarding the activities of the program while you were director?

Page 3783

A. As I recall, there were three lawsuits.

Q. Mr. Morgan, I placed, before we started this morning, two binders that you see there on the desk. Would you please briefly take a look at those binders, just open them up and see what they are?

MS. SULLIVAN: Your Honor, I placed the contents of DX-2 in the binders before Mr. Morgan because of the volume. I'm not planning on providing – Plaintiff's counsel has DX-2. I plan to discuss specific parts of DX-2 with Mr. Morgan, but I'd first like to have him talk about the entire exhibit.

THE COURT: Very good.

BY MS. SULLIVAN:

Q. Mr. Morgan, did you have an opportunity to review the binders that have been placed before you –

A. Yes.

Q. – that are Defendant's Exhibit 2 before we began today?

A. Yes.

Q. What are the documents in the binders, that are in those binders?

Page 3784

A. It's the administrative record of the rule-making regarding the contract.
Q. Do you recall receiving these documents, the documents that comprised Defendant's Exhibit 2, in the course of the development of the standard contract?
A. Yes.
Q. Why did you receive these documents?
A. Why did I receive them? Because they were requested in the Federal Register notice, and they were requested to me as the acting director.
Q. Do you recall reviewing the comments submitted in response to the Federal Register notice?
A. Yes.
Q. Did you review all the comments submitted?
A. Yes.
Q. Why?
A. Because it was my responsibility to resolve these comments.
Q. Thank you.
MS. SULLIVAN: Your Honor, at this time, the government would move for the

Page 3785

admission of Defendant's Exhibit 2, which is the administrative record to the rule-making for the standard contract that is at issue in this case.
THE COURT: Are we going to go through the entirety of that record, Ms. Sullivan?
MS. SULLIVAN: No, Your Honor. There are three or four specific sets of comments that I will discuss with Mr. Morgan. However, because the record really is the record of the standard contract, it should be considered together as a complete document, and that's the bases for our seeking admission of the entire set of comments.
THE COURT: But you recall the Court's concern originally was that any requested finding, post-trial requested finding would have to be limited to either the testimony of a witness or an exhibit that was the subject of questioning in court, so I have no problem with your, with the admission of the entire record, but recognize that you won't be able later to draw upon exhibits or any part of that record that is not really the subject of testimony in court.

Page 3786

MS. SULLIVAN: We understand the Court's direction with regard to post-trial findings and briefing in this matter.
THE COURT: With that, Mr. Tomaszczuk?
MR. TOMASZCZUK: Subject to that caveat, Your Honor, that addresses one of the concerns I have, and I would just like to interpose for the record a relevance objection. A number of these comments relate to utilities whose cases may be pending before other judges of this court in other cases. Other comments are submitted by entities that we've heard absolutely nothing about. I don't know what possible relevance those comments may have to this court's interpretation of the contract. It seems to me that what's at issue in this case is the actual signed version of the contract, Plaintiff's Exhibits 56, 57, and 58, and these comments, while they may be interesting to the government, I don't think inform this court's determination of the issues in dispute here, namely, what does the contract say and what are the rights of the parties under the contract as executed by the parties.

Page 3787

This is all precontractual material which has no relevance to the Court's determination of what I believe are the central issues in the case.
THE COURT: Except for the extent, Mr. Tomaszczuk, it would inform us all as to why there was resistance on the part of DOE to include an acceptance rate. We've already been through that in brief, but if I understood Ms. Sullivan, her view was – I guess it's the sanctity of the administrative record that she wishes to preserve. I'll admit it with the understanding, however, that if it's not addressed in court, that is to say specifically addressed in court, I won't pay a very attentive eye to any requested finding based on the matter in the administrative record that is not the subject of testimony.
MS. SULLIVAN: Understood, Your Honor, we would note this is a conformed contract. It is a standardized contract with all of the parties that submitted comments. However, I would, I really do understand the Court's guidance with regard to Mr. Tomaszczuk's point,

Page 3788

that the contracts are what should guide the Court's determination, we agree. However, the Plaintiffs have put into issue what the party's expectations were regarding the contract formation, that's the only reason we're seeking to present evidence that's outside of the contract, is to respond to those allegations on behalf of Plaintiff.

MR. TOMASZCZUK: I'm sorry, Your Honor.

THE COURT: Go ahead.

MR. TOMASZCZUK: And with respect to that issue, it occurs to me to remind the Court that that evidence has been offered for purposes of giving the Court, at least the Plaintiff's view as to the missing term and the Court's appropriate interpretation of that missing term, namely the acceptance rate. However, I would note, and I think this is important, given the amount of time that we've spent on the acceptance rate issue over the last couple of days, I would call back to what Mr. Gardner said, going back to the pretrial conference, namely in this particular case, the acceptance rate does not impact the

Page 3789

determination of damages –

THE COURT: I know.

MR. TOMASZCZUK: – between the period of time in question up through and including 2004, so this court, in point of fact, can decide this case without determining the acceptance rate issue because it doesn't impact, as we will see when we get to the government's financial experts, it doesn't impact even the government's own assessment of the appropriate damages for this period. It may impact future claims, but for this particular case, for this court here today, it doesn't matter.

THE COURT: I understand that, Mr. Tomaszczuk, and I smile only because, in thinking through the problem as I am continuously doing, I wondered why we had so much attention on the acceptance rate, and I assume it's in the nature of we're all together now, we have the evidence assembled, let's put it in the record because we may need it at a future date. That's what I think we're doing, Mr. Tomaszczuk. I'm not sure yet, but that's

Page 3790

what I think we're doing.

MR. TOMASZCZUK: And we are also, from the Plaintiff's standpoint, trying to anticipate the government's oft repeated argument that we have to determine the "but-for world," and in that regard, the acceptance rate may have some importance. However, on that subject, I would like to point out to the Court that the but-for world, in our view, is a speculative and unnecessary endeavor in this particular case based on the court's ruling in Indiana Michigan. Among other problems with the but-for world is the fact that the but-for world hasn't ended, it's still going on. We can't determine the true nature of the but-for world until such time as the Department of Energy begins performance, and until such time as that occurs, and we can cap the but-for world, we're, you know, we're essentially firing darts at a moving target.

THE COURT: Well, I hesitate to move into a discussion of the but-for world, so I'll refrain.

MS. SULLIVAN: Your Honor, Mr. Lo Re,

Page 3791

because we have gone into an area that he has discussed with the Court already, he was going to address this.

MR. LO RE: And I can understand the Court's concern with respect to – we've already, obviously addressed this repeatedly, but I would, just in response, say that it's more than coincidence that we are discussing the rate.

THE COURT: The acceptance rate.

MR. LO RE: There is a component of that. Certainly, we are here, and we have the witnesses, and we plan to present our case, but I think it goes to the fundamental issue that we have, which is at the end of the day, Your Honor, the Plaintiff's burden is to establish what our contractual obligations were under the contract and whether we call that the but-for world, the what-might-have-been world, something else, doesn't matter. At the end of the day, that's what this case and all of these cases, that's how we calculate damages. I think you saw a chart that, I believe, Mr. Sieracki put up. We calculate damages by saying, we always go back

Page 3792

in this circuit to what was the obligation, what is the result of the breach of that obligation, and that informs both this case fundamentally before we can calculate any damages.
Yes, in this case, we recognize that because of a quirk of when the claims stopped, we recognized that the calculation may be the same, but I think, Your Honor, because this is the nature of a partial breach claim, we have to look back to what is our contractual obligation, and at bottom, we have to determine what was it that the parties understood when they entered into this contract.
And that's why you're hearing from Mr. Morgan, and that's why you're going to hear from other witnesses about the rate of acceptance.
THE COURT: Mr. Tomaszczuk, I'm going to cut you off only because I know this issue lies close to everybody's heart in this case. DX-2 will be admitted. If I say any more, I know I'm going to bring Mr. Lo Re back, I must have learned something in 73 years. I'll stay quiet. You may proceed.

Page 3793

MR. LO RE: Maybe I should learn that same lesson, Your Honor.
THE COURT: No, I welcome the comments I get from you and Mr. Tomaszczuk. I truly do, I truly do. I'm not saying that just to be comical.
MR. LO RE: Thank you, Your Honor.
THE COURT: DX-2 is admitted, once more with the caveat, if you do not give me a proposed finding that identifies that document in the record, either Mr. Morgan or some other witness, Plaintiff or the government has not testified.
MS. SULLIVAN: Understood, Your Honor.
THE COURT: Madam Reporter, let's receive into evidence Defendant's 2.
(Defendant Exhibit Number DX-2 was received in evidence.)
BY MS. SULLIVAN:
Q. Mr. Morgan, I am going to hand you now a comment from Defendant's Exhibit 2, 2.34.
MS. SULLIVAN: May I approach, Your Honor?
THE COURT: Didn't we give you a standing pass?

Page 3794

MS. SULLIVAN: I didn't know if that carried over from a witness.
THE COURT: As long as Mr. Gardner is not using the pass, you may use it.
MS. SULLIVAN: Your Honor, so the record is clear, this exhibit 2.34 is part of the administrative record. However, it was also marked as Plaintiff's Exhibit 531 and was admitted into evidence by the Court. I'm going to refer to it as 2.34 because of the fact that it is part of Defendant's exhibit.
THE COURT: I got it.
BY MS. SULLIVAN:
Q. Mr. Morgan, do you recognize what I've handed you that is Defendant's Exhibit 2.34?
A. Yes, I do.
Q. Could you identify it for the record, please?
A. It's the Edison Electric Institute comment that we received dated March 7th, 1983.
Q. And do you recall reviewing these comments at the time they were submitted?
A. Yes, I do.
Q. What was EEI or Edison Electric Institute?

Page 3795

A. It's an organization of utilities located in Washington, D.C., I would call it a lobbying organization.
Q. Mr. Morgan, may I direct your attention to page eight of EEI's letter? Let's look at the first paragraph on that page, and I'll read that into the record. "Although the contract is generally comprehensive and complete, there are two significant issues on which the proposed contract is silent – DOE performance standards and purchaser remedies. Article II states that the disposal services shall commence not later than January 31st, 1998, a provision consistent with the Nuclear Waste Policy Act. However, no other milestones are included, nor does the contract commit DOE to accept any given quantity of SNF/HLW, and, of most significance to utilities, the contract provides no specific remedies in the event that DOE fails to meet the 1998 deadline."
And we'll leave it – actually, let me continue. "(A related difficulty is the absence in the contract of any guidelines for DOE's approval or disapproval of delivery

commitment schedules and final delivery schedules). We recognize that these issues are complicated ones and not easily resolved. On the other hand, they deserve serious study, even if their resolution comes after the draft contract has been promulgated.

We would therefore strongly urge that DOE meet with purchasers to negotiate a mutually acceptable solution to these open items." Mr. Morgan, do you recall this concern as stated here from -- let me ask you, what did you understand the concern to be from EEI, as stated in this paragraph?

A. This was a performance standard, which they wanted an acceptance rate in the contract, which we denied.

Q. And can I direct your attention to page two of the attachment, which is another two pages into the document? And there's a paragraph marked number two on that page that continues on to the next page through the whereas clause, I'll read that into the record, "The contract should include a recognition that DOE will design its facilities with the capacity to receive SNF/HLW at a rate



commensurate with the amount of SNF/HLW then being generated together with the accumulated backlog of SNF/HLW.

We believe that DOE should be able to take delivery of SNF/HLW equal to that year's generation, plus a reasonable share of the backlog. While the contract may not be the appropriate place to commit DOE to a specific, numerical receiving rate, DOE should recognize, at least qualitatively, the need to have adequate annual receiving capacity to handle industry needs.

This would be consistent with the direction of section 302(a)(5) of the Act that DOE take title to SNF/HLW as expeditiously as practicable upon request of the generator or owner. A new clause should be added," and then it goes on to state the clause, "whereas, DOE recognizes that its ability to take delivery of spent nuclear fuel and/or high-level radioactive waste must be commensurate with the amount of such fuel and waste then being generated together with the amount of such fuel and waste previously generated and consistent with its obligation to take title to such fuel



and waste as expeditiously as practicable upon the request of the owner or generator of such fuel and waste."

Mr. Morgan, did DOE consider this request by EEI for a qualitative description of the rate of acceptance to be included in the contract?

A. Yes, we considered it.

Q. Was it rejected?

A. Yes, it was.

Q. Why?

A. Because of the uncertainties of the program. It would be unconscionable for me to commit the government to things that I felt were extremely difficult and had the potential that we might not meet them.

Q. Did DOE make any changes to the final contract in response to these comments?

A. Yes. The whereas clause was added, which stated that we would receive fuel as expeditiously as practicable.

Q. Let's look at the final standard contract.

MS. SULLIVAN: Your Honor, this is Defendant's Exhibit 2.02. However, the copy



that's there is very hard to read, so I'm going to provide the Court with a different copy. It's the Federal Register notice. It really is a public record.

THE COURT: 2?

MS. SULLIVAN: 2.02.

BY MS. SULLIVAN:

Q. Mr. Morgan, do you recognize what I've handed you to be the final Federal Register notice issued on April 18th, 1983?

A. The Federal Register notice that I have is February 4th, 1983.

Q. I gave you the wrong one. Now, do you recognize what I've given you to be the April 18th, 1983 Federal Register notice?

A. Yes, I do.

Q. Okay. And I direct your attention to the third page of this document, the left-hand column, the second full paragraph which begins, "a new second whereas clause," the third page of the document.

A. Yes.

Q. Or you can read it on the screen.

A. Yes.

Q. Mr. Morgan, I'll read this. "A new

Page 3800

second whereas clause relating to the responsibility of DOE to take title to SNF or HLW 'as expeditiously as practicable' has been added to follow the language of the Act, section 302(a)(5), 42 USC 10222(a)(5)." Mr. Morgan, is this the change you were referring to?

A. Yes, it is.

Q. And did the whereas clause that DOE added match the whereas clause language that EEI requested?

A. No, it did not.

Q. And why not?

A. Because I did not want to make a commitment to an acceptance rate or a performance standard.

Q. Why was this whereas clause added?

A. It was being responsible to what was in the Act, and we felt it was appropriate.

Q. What was your understanding of the phrase "as expeditiously as practicable" in that new clause?

A. That would be doing the best job that we could in accepting fuel from the utilities, as expeditiously as we possibly could.

Page 3801

Q. Mr. Morgan, did you understand there to be any acceptance rate associated with that phrase "as expeditiously as practicable"?

A. No.

Q. Mr. Morgan, I'd now like you to turn one more page in the Federal Register notice and direct your attention, again, to the left-hand column, the paragraph just up from the bottom that begins, "in addition at the request of a substantial," and it's also on the screen.

A. Yes.

Q. And I'll read that into the record. "In addition, at the request of a substantial number of commenters, a new provision has been added as subparagraph IV.B.5(b) which states that DOE will issue 'an annual report for planning purposes, setting forth the projected annual receiving capacity for the DOE facility.'"

A. Yes.

Q. Mr. Morgan, do you recall this addition to the contract?

A. Yes.

Q. And why was that addition made?

Page 3802

A. My recollection is that we felt that we would have, and I believe this was 1987 was the effective date of this, that that was the date that the President would select or name a repository site and that we would have a better understanding of the licensing requirements, the geological conditions of the site and any other technical and legislative. As I think everyone knows, that legislation has changed since the original Act.

Q. Mr. Morgan, I'd now like to direct your attention to nine pages into the document. The Federal Register number is 16598, and there's a paragraph beginning in the left-hand column, "Similarly, seven commenters," and that paragraph reads, "Similarly, seven commenters addressed the question of DOE performance standards and purchaser remedies with respect to performance.
In essence, these commenters pointed out that no date exists other than the January 31st, 1998 date to evaluate DOE's program performance. If that date is not met, these commenters say the contract provides no specific remedies against DOE for failing to

Page 3803

meet the date. Department of Energy has considered this comment and the suggestion that suitable language be included in the contract, but it has decided not to adopt the recommended modification.
We recognize that these issues are of concern to the utilities. However, we believe that we should be consistent with the language of the Act. The 1998 date is called for in the Act, and we believe it to be a realistic date." Would you like some more water, Mr. Morgan?

A. No, I'm fine. Thank you.

Q. "Our performance will be judged by meeting this date. If the intent of the Act was to have intermediate performance standards or dates, they could have been specified in the Act." Mr. Morgan, why was this language put in the comments in the final Federal Register notice?

A. We were trying to be responsive to the requests for performance standards. If you look at the magnitude of rate acceptance, we could start with what's in the Nuclear Waste Policy Act, accepting the fuel in 1998, as one bounding limit, saying that's a minimum. The

Page 3804

maximum type of response or the other bookend is meeting the discharge rates from the utilities and also, in addition to that, working down the backlog.
That's the bounds that we were trying to establish relative to the program.
Q. Mr. Morgan, I'd like to look now at a different document, Defendant's Exhibit 2.12.
MS. SULLIVAN: Your Honor, this is part of 2.12, but it was previously admitted as an individual exhibit during a previous witness testimony.
BY MS. SULLIVAN:
Q. Mr. Morgan, do you recognize Defendant's Exhibit 2.12 to be the comments of Northern States Power to the proposed standard contract?
A. Yes.
Q. Could I direct your attention to the last page of this document, the last paragraph above the signature block on that page? And I'll read that into the record. "With the above comments, notable exceptions being commented 2 and 3, it says States Power," we'll assume Northern States is there, cut off,

Page 3805

"Northern States Power generally endorses the positions taken by the joint," I think it's, "submittal of the Edison Electric Institute and the Utility Nuclear Waste Management," I believe it's "Management Group."
Mr. Morgan, did you understand this reference to be a reference to the comments of the Edison Electric Institute and the Utility Waste Management Group that we just looked at?
A. Yes.
Q. Mr. Morgan, could we go back a couple pages to page three of the document? The bottom paragraph, number 11, there's a paragraph labeled, "Annual Acceptance Allocation Reports," and I'll read that into the record. "Northern States Power Company feels the Department of Energy should issue annual acceptance allocation reports starting not later than April 1st, 1984.
These reports are necessary to provide Northern States Power Company with an adequate planning horizon for interim storage."
Mr. Morgan, did DOE adopt Northern States Power request as stated in this paragraph 11?
A. Not totally, it was accepted with the

Page 3806

date of 1987, as I recall.
Q. Mr. Morgan, could I direct your attention to – let me give you another exhibit, 2.43. Mr. Morgan, I've handed you what's been marked as Defendant's Exhibit 2.43.
Do you recognize these pages to be the comments submitted by Florida Power & Light to the Federal Register notice?
A. Yes, I do.
Q. Could I direct your attention to the second page of the document? That is labeled, "Performance Standards," and specifically the language, let's bring that entire paragraph up, actually, and below that, all the way to the middle of the second paragraph, under the block quote –
MR. TOMASZCZUK: Your Honor, I'm sorry to interrupt counsel. I have to interpose an objection on relevance grounds. This set of comments relates to a different utility, Florida Power & Light Company, which does have a pending case in this court relating to the DOE's breach of its obligation to pick up spent nuclear fuel.
This document might be relevant to the

Page 3807

FP&L case, I'm not at all sure it's relevant to this particular case, namely the Northern States case.
THE COURT: What were you going to draw from this document?
MS. SULLIVAN: Your Honor, as we've seen with the EEI comments and also the comments of Northern States Power, the industry was very involved in making comments on this contract. The language that we saw in the EEI comments, which Northern States Power endorsed, contained the language with regard to performance standards.
Florida Power & Light also made a comment similar to that, and it goes to this request by industry with regard to the acceptance rate.
THE COURT: It's probably not testimony you need, but I will allow it, recognizing that since we have the industry comments in the record, it would be appropriate to see how the individual utility members are reacting to them as comments, but I do think in Northern States Power's case, it's only Northern States Power's comments that really

Page 3808

are relevant.
MS. SULLIVAN: Understood, Your Honor.
These comments also go to – we have seen a lot of testimony presented by Plaintiffs with regard to the mission plan and the role that the mission plan should – or the weight the Court should give to the mission plan, and this, representing this evidence with regard to what DOE thought about the mission plan and its role in this issue at the time of contract formation.
THE COURT: You may proceed.
MS. SULLIVAN: Thank you, Your Honor.
BY MS. SULLIVAN:
Q. Mr. Morgan, I am going to read, beginning the middle of the first paragraph, starting, "the Nuclear Waste Policy Act."
"The Nuclear Waste Policy Act specifically requires the Department of Energy to prepare a mission plan detailing a schedule for the construction of repositories and their capacities (section 301). It is proposed that once this mission plan has been approved by Congress (18 months after the enactment of the Nuclear Waste Policy Act), it becomes the

Page 3809

standard by which contract performance by the DOE is judged.
It is suggested that article V.B(3) be modified to include the statement 'should the DOE fail to meet the schedule and capacities detailed in the approved 1984 DOE mission plan because of force majeure or other causes, DOE shall, to the extent permitted by the Nuclear Waste Policy Act of 1982, as it may be amended from time-to-time, bear the reasonable and necessary incremental costs of storage or alternative disposal incurred by the purchaser.'"
And then the paragraph below continues, "The approved 1984 DOE mission plan and the annual acceptance ranking for receipt of SNF would provide utilities with a planning base which they can use in committing resources for interim storage, if necessary, in order to meet their projected requirements."
Mr. Morgan, as the recipient of this request from Florida Power & Light, how did you interpret this request?
A. That they wanted a specific acceptance rate or performance standard by DOE, and what

Page 3810

they would reference in there is the mission plan as that performance standard.
Q. And did DOE accept this request?
A. No, we did not.
Q. Why not?
A. Because, again, it was of the uncertainties of the program.
Q. Mr. Morgan, I'd like to provide you a copy of 2.063. Mr. Morgan, I've handed you what's been marked as Defendant's Exhibit 2.063. Do you recognize these to be TVA's comments submitted in response to the draft contract in the Federal Register notice?
A. Well, with no cover letter on this stating it's from TVA, but in reading the general comments, yes, I would say that these are TVA's comments to the Federal Register notice.
Q. Okay. I'd like to direct your attention to page five of this document?
MR. TOMASZCZUK: Excuse me, and, Your Honor, here, again, I need to impose a relevance objection. Now, we're dealing with yet another entity, TVA, that's not before this court. Indeed, that case has already been

Page 3811

litigated before Judge Lettow, and judgment has been rendered in that case.
THE COURT: Yes, I understand.
MR. TOMASZCZUK: So I think we're getting further and further away from what is at issue before the Court in this case, namely, the claims of Northern States Power Company, and there's no document that the government has shown to-date that Northern States Power Company in any way endorsed the comments of TVA or, for that matter, Florida Power & Light Company.
THE COURT: That's a very good point.
MS. SULLIVAN: May I respond, Your Honor?
THE COURT: Yes.
MS. SULLIVAN: Or provide the Court with an idea as to why I'd like to discuss this with Mr. Morgan? TVA's comments also go to this issue of inserting a performance standard into the contract and concern the documents that NSP also requested with regard to the annual allocation report that we discussed with Mr. Morgan in paragraph 11 of NSP's comments. So these are in line with the same

Page 3812

types of things that Northern States Power was requesting, as well as EEI, in the comments that we've already discussed with Mr. Morgan.

MR. TOMASZCZUK: With all due respect, Your Honor, I don't see that nexus between what Northern States Power has commented upon and what TVA has commented upon. Where is the nexus between the comments that the government counsel previously used, which were the Northern States comments, which are fair game to which I have no objection, versus those of other entities which NSP does not control? And those entities have their own separate contract with the government, and those contracts are the separate litigation in this court. It has absolutely no relevance to the Northern States case, absent some showing by the government that my client endorsed the comments of TVA, FPL, or some other entity.

THE COURT: Well, you raise a difficult question, Mr. Tomaszczuk. I've never had to deal before with a "standard contract," and by that, I mean one that was formed through a regulatory process of the sort we have here and then literally is imposed upon an entire

Page 3813

industry.

I'm not, in that context, I'm simply not sure whether one can separate the industry reaction to the proposed contract from the individual members, individual industry members comments. To some extent, I would say that Northern States Power is bound to share, by being a party to this contract, is bound to share and have attributed to it industry's comments to the contract, but I'm not sure why we need to battle all this because, as I see these comments by, first, Florida Power & Light and, now, the next exhibit you handed me –

MS. SULLIVAN: TVA.

THE COURT: TVA, I don't see them differing from those being commented upon by Northern States Power.

MS. SULLIVAN: That is true, Your Honor. Our purpose in offering them is, as you have noted, this is a standard contract. The views of parties to that standard contract are properly considered by the Court in analyzing the contract obligations, to the extent the Court goes beyond what is actually in the contract.

Page 3814

MR. TOMASZCZUK: Your Honor, I felt like we're relitigating the administrative rule-making of 25 years ago. That's not what this case is about. This case is about Northern States Power's damages under the three contracts which are before this court, and with respect to the FP&L document, we just discussed dealing with the mission plan, I don't see any reference to that in Northern States Power Company's comments.

And, you know, if the government had wanted to proceed by administrative rule-making or some other methodology, they may well have done so, but they proceeded by contract, and individual utilities have contracts, and we can hold ours up. There are three exhibits which are already admitted in this case, and the issue in the case is our damages, not FP&L's or TVA's or EEI's or any other entities.

It seems to me that it's fair game to talk about what NSP said, but when we start talking about others, particularly where we haven't endorsed them, that seems to me a stretch and certainly does not meet the test of relevance, as I understand it.

Page 3815

THE COURT: But we have, earlier in this case, gone through the analytical route that attributes to Northern States Power the comments of the industry groups of which Northern States Power is a member and that, therefore, would take into account what we are now going through, would it not?

MR. TOMASZCZUK: I don't think so, Your Honor. That would take into account EEI comments perhaps, but I don't know that it takes into account FP&L or TVA. I mean, TVA is even a greater stretch. I mean, as I understand TVA, that's a quasi-governmental entity, and how we could be possibly bound by that is beyond me.

THE COURT: I don't have an answer. I don't know the answer to this, so let's accept this conditionally, as I said to you yesterday, or perhaps the day before, my view of calling this a contract is quite a stretch of imagination, and to apply some modified rule of damages is in itself an exercise in twisted analysis.

So I'm very uncomfortable with the setting in which I'm required to resolve this

Page 3816

problem. It doesn't correspond to the contract, as far as I know, simply doesn't.

MS. SULLIVAN: Understood, Your Honor, and we are putting this on.

THE COURT: So let's go back then and recognize that with respect to the comments of Florida Power & Light found in 2.43 and TVA's comments found in 2.63, we will accept that evidence conditionally as an offer of proof. If it turns out to be critical in the briefing, then I think we'll have to have a separate argument. We'll have to address it separately in the briefing. I don't think it's going to turn out to be critical.

MR. LO RE: Your Honor, just one small issue, I'd just like to put this in context as to why we're showing these documents. There are certainly comments from the industry, but even more importantly, Your Honor, is the response from DOE. That's what we're about here.

THE COURT: Oh, I see that very clearly, but what Mr. Tomaszczuk is talking about is what you, Mr. Morgan say Florida Power & Light may well affect Florida Power & Light's

Page 3817

contract, but it certainly doesn't affect Northern States contract. That's his argument, and I don't have the answer.

MR. LO RE: And we would disagree with that, Your Honor, because when Mr. Morgan is speaking, Mr. Morgan issues his comments in a rule-making. That speaks to every utility.

THE COURT: That's a very good point, but I think – I protected Plaintiff's interest here by saying we'll accept this conditionally.

MR. LO RE: Thank you, Your Honor. And, again, this is simply because, among other things, we're trying to – the Plaintiff's allegation is there's an open term. There's something you need to fit in. Mr. Morgan is here to tell you there is no open term, and why is that? Because there were a series of comments, and our response to them was stalwart.

THE COURT: Was?

MR. LO RE: Was stalwart, was consistent and stalwart, we are not including in this contract a rate of acceptance that is now 20 years later being tried to be inserted in the contract by the Plaintiff. That's why

Page 3818

we're doing this.

THE COURT: Yes, but you know that argument.

MR. LO RE: Thank you, Your Honor.

THE COURT: Mr. Tomaszczuk, do you understand the Court's ruling with regard to 2.43 and 2.63, as those exhibits have conditionally been admitted?

MR. TOMASZCZUK: I do understand, Your Honor, and just so the argument is clear, I think that the circuit held in the PSEG case that the government did not have to proceed by rule-making, and in point of fact, we do have separate contracts which are separate exhibits in the record, and we would respectfully submit that those are the documents that the Court ought to consider in adjudicating this particular case.

THE COURT: All right. The Act itself did not specify the creation of contract through rule-making procedures.

MR. TOMASZCZUK: It did not, and the Federal Circuit has decided that question, and in point of fact, we have written, signed contracts dated from June –

Page 3819

THE COURT: Yes, I know.

MR. TOMASZCZUK: – which are separately signed. So it's not a rule-making contract. It's a separate written –

THE COURT: These arguments are like a giant wave washing over me. I'm gasping for air here. I understand. I think the point, as I said when you first raised the objection, very valid point. I hope, in the future, we don't approach the business of doing our business through contracts when they are formed in the manner which this contract was. But let us go on, Ms. Sullivan. We have before us the comments of TVA.

MS. SULLIVAN: Yes, Your Honor.

BY MS. SULLIVAN:

Q. And I have gone to page five of the document and I'd like to read, excuse me, I'd like to read the portion of that page that begins, "In addition, a commitment to do no more than start accepting deliveries by 1998 is empty and meaningless without setting forth some reasonable minimum rate of acceptance which corresponds with the purposes of the Act. Of course, under the priority ranking

Page 3820

system in the draft contract, it would be difficult at the time contracts are executed to give each purchaser assurances of delivery acceptance at any specific rate. This could, however, be done on an industry wide basis. Accordingly, the following DOE responsibilities should also be added to section B of article V." And there are two paragraphs.

One, "DOE shall start accepting delivery of SNF or HLW not later than January 31st, 1998, at not less than the annual rate SNF and/or HLW is then being produced from civilian nuclear power plants covered by contracts with DOE for disposal of SNF and/or HLW.

After January 31st, 1998, DOE shall be prepared to accept delivery of SNF and/or HLW produced prior to said date on a schedule sufficient to provide for delivery consistent with decommissioning plans for purchaser's nuclear power plants specified in appendix A."

Mr. Morgan, did DOE consider this request by TVA to include specific requirements for the acceptance rate in the contract?

A. Yes, we considered it.

Page 3821

Q. Was TVA's request rejected?

A. Yes, it was.

Q. Why is that?

A. The uncertainties of the program and the fact it was not required by the Nuclear Waste Policy Act.

Q. Mr. Morgan, I'd now like to move to Defendant's Exhibit 32.

MS. SULLIVAN: Your Honor, Defendant's Exhibit 32 was admitted during the testimony of Ms. Supko.

BY MS. SULLIVAN:

Q. Mr. Morgan, Defendant's Exhibit 32 was an internal TVA memorandum dated May 24th, 1983, regarding the contract with DOE required by the Nuclear Waste Policy Act of 1982, and I'd like to direct your attention to the fifth page of the document Bates-numbered TV-1471, and you'll see a comment stated there on that page and then a response, and I'd like to read the response into the record.

MR. TOMASZCZUK: And, Counsel, before you do, I'm sorry to interrupt, I need to interpose my objection again on relevance grounds to documents relating to TVA in its

Page 3822

separate case against the government, which has already been litigated by Judge Lettow.

THE COURT: Did we say this has already been previously admitted?

MS. SULLIVAN: Yes, Your Honor, during Ms. Supko's testimony.

MR. TOMASZCZUK: I'm asking Mr. Herzfeld to confirm that.

MS. SULLIVAN: I can provide the transcript cite, 2384.

THE COURT: Well, let us proceed, and if it has not been previously admitted, it'll be the subject of the same conditional offering or same conditional receipt as the prior two exhibits.

MS. SULLIVAN: Yes, Your Honor. Thank you.

MR. TOMASZCZUK: And, Your Honor, if it was admitted during Ms. Supko's examination, it was at the request of the government, not at the request of Plaintiff Northern States Power.

MS. SULLIVAN: Thank you, Your Honor.

THE COURT: If it's in, it's in.

BY MS. SULLIVAN:

Q. Mr. Morgan, let me read the paragraph

Page 3823

that has the heading, "Response." "DOE did not accept TVA's suggestion that DOE should start accepting delivery of SNF and HLW in 1998 at a rate not less than that which they are being produced by the civilian nuclear power industry as a whole. The final contract does obligate DOE to issue, not later than July 1st, 1987, an annual capacity report for planning purposes and, beginning April 1st, 1991, annual acceptance priority rankings (the oldest SNF and HLW having priority) for receipt by the DOE repository.

DOE is also obligated to provide annual reports giving the waste disposal programs plans and cost projections."

Mr. Morgan, I'd just like to ask you, does this statement or comment or response I've just read comport with your recollection of DOE's consideration of TVA's comment regarding the acceptance rate?

A. Yes, it does.

MR. TOMASZCZUK: Objection, leading.

MS. SULLIVAN: Let me ask a better question, Your Honor.

THE COURT: Okay.

Page 3824

BY MS. SULLIVAN:
Q. Mr. Morgan, do you agree with the paragraph that I've just read?
A. Yes.
Q. Why is that?
A. Because that's basically what we have resolved in the rule-making, the '87 and the '91 date, and it shows that TVA understood that.
Q. Thank you, Mr. Morgan. I'd like to now hand you an excerpt of Plaintiff's Exhibit 286.
MS. SULLIVAN: Your Honor, Plaintiff's Exhibit 286 has been previously admitted. It is a much larger, I think a 300-page document. I have just provided Mr. Morgan with an excerpt of that document.
BY MS. SULLIVAN:
Q. Mr. Morgan, do you recognize Plaintiff's Exhibit 286 to be the compendium of the proceedings of the 1983 Civilian Radioactive Waste Management information meeting –
A. Yes.
Q. – held in December of 1983?

Page 3825

A. Yes, I do.
Q. And if I could turn your attention to the second page of the excerpt, which I've handed you, which is marked as pages 11 and 12 of that document, could you identify these pages for the record?
A. Yes. This is the program overview that I gave at that proceeding.
Q. Okay. Let me ask you, first of all, Mr. Morgan, after the contract was issued in the Federal Register and the contracts were signed, what did you next focus upon as the director of the Office of Civilian Radioactive Waste Management?
A. The mission plan.
Q. And do you recall this meeting in December of 1983?
A. Yes, I do.
Q. What was the purpose of the meeting?
A. It was an information meeting for the utilities and interested parties.
Q. And who do you recall attended the meeting? Actually, let me ask you, did you attend the meeting?
A. Yes, I did.

Page 3826

Q. Who else do you recall attended the meeting?
A. Several utilities, I believe States attended it and some private individuals.
Q. I'd like to direct your attention to the paragraph in the second column, the right-hand column that begins, "I would like to talk a little bit," and I'll read that into the record. "I would like to talk a little bit about the strategy as laid out in the mission plan and what we intend to do or do. I think most of you know that the Act requires that we receive waste from the utilities by January 1st, 1998. Technically, the Act does not specify how much waste or spent fuel we must begin receiving at that time. In fact, if we accepted one spent fuel element in 1998, we would technically be in accordance with the Act. However, we do not believe that that meets the intent of the Act. The basic strategy which we've outlined in the mission plan is that, beginning in 1998, utilities will not have to provide any additional storage facilities on-site. During

Page 3827

the first year of operation of the repository in 1998, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on-site or at another location."
Mr. Morgan, do you recall this portion of your statement?
A. Yes, I do.
Q. Why did you make this statement?
A. What we were trying to do is outline, again, the bounds of what was in the Nuclear Waste Policy Act of the one bookend being accepting a fuel element and then the other, outside of that, would be accepting fuel at a rate that would be in requirement for further storage facilities at a site.
Q. Mr. Morgan, why was the draft mission plan prepared?
A. It was, I believe, issued in December of 1993.
Q. I'm sorry. I asked you why it was prepared.
A. Oh, it's required by the Nuclear Waste Policy Act.
Q. And what was the purpose of the

Page 3828

mission plan?
A. It was to outline the plan that we were going to proceed on to try to accomplish the intent of the Nuclear Waste Policy Act.
Q. Mr. Morgan, was DOE obligating itself to accept fuel at the rate set forth in the mission plan?
A. No, the mission plan was a planning document and not a contractual document.
Q. Why did you describe in this paragraph the mission plan as containing a strategy?
A. Well, the strategy or a plan, that was what we'd like to accomplish, but because of the uncertainties of the program, we didn't know whether we'd be able to or not.
Q. Did you understand the strategy to be a contractual requirement?
A. No.
Q. Your statement contains, the portion of your statement I just read contains a statement regarding the intent of the NWPA. How did you determine what you believed to be the intent of the NWPA?
A. That's a difficult question because, in the passage of the Act, there was no

Page 3829

conference report that reflected the changes between the House and Senate version, and depending on who you would talk to on the Hill, you would get different answers as to what the intent was, some going from the status of committing to an MRS solely and others saying not to consider an MRS, but to go for a repository only.
So there was a concern as to what the intent was, and so we tried to strike a middle ground to where we wouldn't be too far out of line and hopefully get any correction from Congress.
Q. Mr. Morgan, did you have an understanding from your review of the NWPA that the Act contained specific requirements regarding the rate at which DOE would accept spent nuclear fuel?
A. It had no requirement.
Q. Did you have any understanding with regard to what the Act required regarding the need to preclude the utilities from adding further storage facilities on-site?
MR. TOMASZCZUK: Objection, I'm sorry, Counsel, objection to the extent it calls for a

Page 3830

legal conclusion.
THE COURT: The objection is overruled. Given his position as the administrator of the program, in fact, the first administrator or director, I presume is the title, I would expect that he would have to have looked into this question. So you may answer, Mr. Morgan.
THE WITNESS: Could you repeat the question, please?
BY MS. SULLIVAN:
Q. Sure. Did you understand that the Act required DOE to accept spent nuclear fuel at a rate that would preclude utilities from adding further storage utilities on-site?
A. No.
MS. SULLIVAN: And, Your Honor, just to be clear, we're not asking that Mr. Morgan draw any legal conclusions.
THE COURT: No, I understood that.
MS. SULLIVAN: We understand that's the province of the Court really just asking for his understanding.
BY MS. SULLIVAN:
Q. Mr. Morgan, did you understand that

Page 3831

the NWPA required DOE to accept spent nuclear fuel at a rate that would work down the backlog in a specific amount of time?
A. No.
Q. Mr. Morgan, you talked about your conversations with members of Congress or their staff members. Were you ever told by Congress you were not meeting the intent of the Act?
A. No.
Q. Mr. Morgan, I'd like to direct your attention to the next paragraph of your statement that begins on that page and continues on the next, and I'll read that into the record. "After the initial operation of the repository through the first few years, we would accept that the weight of acceptance of fuel," I believe that should be rate, "should be the rate of discharge from the reactors that are in operation at the time.
So by the year 2000 or 2001, we should be accepting in the repository the amount of fuel as being discharged from the reactors. It is anticipated that at that point, it would look at bringing home the second repository.
According to the Act, the second repository