**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
(Electronically Filed on March 23, 2007)

| | |
|---|---|
| **SYSTEM FUELS, INC.**,<br>**SYSTEM ENERGY RESOURCES, INC.**, and<br>**SOUTH MISSISSIPPI ELECTRIC POWER ASSOCIATION**,<br><br>Plaintiffs,<br><br>v.<br><br>**THE UNITED STATES**,<br><br>Defendant. | No. 03-2624C<br>(Judge Braden) |

**PLAINTIFFS' POST-TRIAL BRIEF**

Of Counsel:
Jay E. Silberg
Daniel S. Herzfeld
Jack Y. Chu
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
2300 N Street, N.W.
Washington, D.C. 20037
(202) 663-8000
(202) 663-8007 (fax)

L. Jager Smith, Jr.
**WISE CARTER CHILD & CARAWAY, P.A.**
1340 Echelon Parkway
Jackson, MS 39213
601-368-5572
601-368-5816 (fax)

Alex D. Tomaszczuk
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7940
(703) 770-7901 (fax)

Counsel of Record for Plaintiffs
System Fuels, Inc., System Energy Resources, Inc., and South Mississippi Electric Power Association

March 23, 2007

# TABLE OF CONTENTS


TABLE OF AUTHORITIES .......... iv

I. INTRODUCTION .......... 1

II. FINDINGS OF FACT .......... 4

A. The Nuclear Waste Policy Act Is Enacted To Codify The Federal Government's Longstanding Policy To Dispose Of Spent Nuclear Fuel And To Provide A Firm Schedule For Disposing Of The Waste .......... 4

B. Plaintiffs' Standard Contract And Their Expectations At The Time The Contract Was Signed .......... 7

1. Plaintiffs' Standard Contract And Nuclear Plant .......... 8

2. Both Parties To The Contract Expected DOE To Perform At A Rate Sufficient To Remove The Need For Utilities To Acquire Additional Storage Capacity After 1998 And To Begin To Remove The Backlog .......... 9

3. DOE's Impending Performance Failure .......... 12

4. DOE Assumes It Will Perform By 1998 By Assuming An MRS Prohibited By Statute .......... 13

C. The Government Breaches The Standard Contracts In 1998 And, To Date, Has Not Yet Begun Performance .......... 14

1. The Government Claims That It Has No Obligation To Perform Beginning In 1998 .......... 14

2. DOE's DCS Process Through The Prism Of Its Expected Non-Performance .......... 14

D. Plaintiffs Reasonably Mitigated The Effects Of The Government's Breach By Building A Dry Fuel Storage Facility At Grand Gulf .......... 17

1. Plaintiffs' Decision To Proceed with Dry Storage .......... 18

2. Work Orders And Tasks Comprising The Grand Gulf Dry Fuel Storage Project .......... 21

a. Design And Construction Of The ISFSI Storage Pad .......... 22

b. Design And Construction Of The Haul Path .......... 22

c. Design And Fabrication Of The Cask Construction Pad .....................................23

d. Auxiliary Building Modifications ..............................................................23

e. Contractor Labor And Equipment Rental Costs ..................................................24

3. Additional Entergy Labor Costs For The Dry Fuel Storage Project...........................25

4. Loader Costs Incurred For The Dry Fuel Storage Project .........................................25

5. Plaintiffs Incurred Actual Economic Cost of Capital By Financing Their Mitigation Costs ..........................................................................................28

III. CONCLUSIONS OF LAW .........................................................................................29

A. Standard Of Review For Mitigation Costs In A Breach Of Contract Claim .....................29

1. Indiana Michigan III Established Mitigation As The Paradigm For Determining Costs For Past Damages In A Partial Breach Case.....................................................30

2. Plaintiffs Need Not Prove Causation Based On The "But For" Model Of Causation Contrived By The Government .................................................31

B. Plaintiffs' Past Costs In Designing And Constructing A Dry Fuel Storage Facility Were Caused By The Government's Breach And Were Foreseeable ..............................33

1. Plaintiffs Properly Mitigated The Government's Breach By Constructing A Dry Fuel Storage Facility At Grand Gulf ...................................................................34

2. The Government's Theory Of Causation Is Untenable .............................................35

C. The Government Failed To Show That Plaintiffs' Mitigation Efforts Were Unreasonable And, Therefore, Its Asserted Offsets Are Improper ..................................36

1. Any Offsets Based On What DOE Might Do When It Picks Up SNF From Grand Gulf In The Future Are Speculative................................................................36

2. The Government Should Not Receive An Offset For Incremental Labor Costs .........41

3. The Government Should Not Receive An Offset For Loader Costs That Plaintiffs Actually Incurred Due To The Breach.........................................................................42

D. Plaintiffs Should Receive Their Economic Cost Of Capital Damages.............................44

E. The Parties Understood That DOE Would Perform At A Rate To Avoid Additional At-Reactor Storage After 1998 And To Begin Reducing The Backlog of SNF, Which Is A 3,000 MTU Steady-State Rate ....................46

1. The DCS Process Did Not Create Binding Commitments, And Is Irrelevant To A Damages Determination In This Case ....................47

2. The Parties Expected Contract Performance At A 3,000 MTU Steady-State Rate After A Five Year Ramp-Up....................50

F. Plaintiffs' Takings Claim Remains Viable ....................53

IV. CONCLUSION....................57

# TABLE OF AUTHORITIES

## Cases & Decisions

Abbott Labs. v. Brennan,
952 F.2d 1346 (Fed. Cir. 1991) ........................................................................ 33

Bluebonnet Sav. Bank, FSB v. United States,
266 F.3d 1348 (Fed. Cir. 2001)........................................................................ 43, 44

Boston Edison Co. v. United States,
64 Fed. Cl. 167 (2001) ........................................................................................ 55

Cal. Fed. Bank, FSB v. United States,
395 F.3d 1263 (Fed. Cir. 2005), *cert. denied*, 126 S. Ct. 344 (2005) .................................... 32

Centex Corp. v. United States,
55 Fed. Cl. 381 (2003) ........................................................................................45

Consolidated Edison Co. of N.Y., Inc. v. United States,
67 Fed. Cl. 285 (2005) ........................................................................................ 55

Consumers Energy Co. v. United States,
65 Fed. Cl. 364 (2005) ........................................................................................48

Detroit Edison Co. v. United States,
56 Fed. Cl. 299 (2003) ........................................................................................55

Elec. & Missile Facilities, Inc. v. United States,
416 F.2d 1345 (Ct. Cl. 1969) ........................................................................... 44

Energy Capital Corp. v. United States,
302 F.3d 1314 (Fed. Cir. 2002)........................................................................ 2, 29

Entergy Nuclear Generation Co. v. United States,
64 Fed. Cl. 336 (2005) ........................................................................................49

First Heights Bank, FSB v. United States,
422 F.3d 1311 (Fed. Cir. 2005)........................................................................ 33

Florida Power & Light Co. v. Westinghouse Elec. Corp.,
826 F.2d 239 (4th Cir. 1987) ........................................................................... 4

Home Savings of Am., FSB v. United States,
399 F.3d 1341 (Fed. Cir. 2005)........................................................................30

In re Kellett Aircraft Corp.,
186 F.2d 197 (3d Cir. 1950)....................30

Indiana Mich. Power Co. v. Dep't of Energy,
88 F.3d 1272 (D.C. Cir. 1996) ("Indiana Mich. I")....................7, 14

Indiana Mich. Power Co. v. United States,
57 Fed. Cl. 88 (2003) ("Indiana Mich. II"), *appeal dismissed*,
112 Fed. Appx. 37 (Fed. Cir. 2004)....................47, 52

Indiana Mich. Power Co. v. United States,
422 F.3d 1369 (Fed. Cir. 2005) ("Indiana Mich. III").................... *passim*

Koby v. United States,
53 Fed. Cl. 493 (2002)....................30

LaSalle Talman Bank v. United States,
317 F.3d 1363 (Fed. Cir. 2003)....................45, 46

Locke v. United States,
283 F.2d 521 (Ct. Cl. 1960)....................32

Maine Yankee Atomic Power Co. v. United States,
225 F.3d 1336 (Fed. Cir. 2000) ("Maine Yankee")....................1, 54

Northern Helex Co. v. United States,
524 F.2d 707 (Ct. Cl. 1975)....................30, 43

Northern States Power Co. v. United States Dep't of Energy,
128 F.3d 754 (D.C. Cir. 1997) ("Northern States I")....................14

Northern States Power Co. v. United States,
224 F.3d 1361 (Fed. Cir. 2000) ("Northern States II")....................1, 7

Old Stone Corp. v. United States,
450 F.3d 1360 (Fed. Cir. 2006),
*petition for cert. filed*, 75 U.S.L.W. 3333 (U.S. Dec. 14, 2006) (No. 06-837)....................2, 3, 31

Pacific Gas & Elec. Co. v. United States,
73 Fed. Cl. 333 (2006)....................32, 38, 42

Robinson v. United States,
305 F.3d 1330 (Fed. Cir. 2002)....................30

S. Cal. Fed. Sav. & Loan Ass'n v. United States,
422 F.3d 1319 (Fed. Cir. 2005),
*cert. denied, sub nom.* Martin v. United States, 126 S. Ct. 2967 (2006)....................31, 34

Sacramento Mun. Util. Dist. v. United States,
70 Fed. Cl. 332 (2006) ("SMUD I") .......... 31, 38, 42

Sacramento Mun. Util. Dist. v. United States,
74 Fed. Cl. 727 (2006) ("SMUD II") .......... 54, 55

Sys. Fuels, Inc. v. United States,
65 Fed. Cl. 163 (2005) .......... 49, 55

Sys. Fuels, Inc. v. United States,
66 Fed. Cl. 722 (2005) .......... 1, 47, 48, 53

Tenn. Valley Auth. v. United States,
69 Fed. Cl. 515 (2006) .......... *passim*

Wickham Constr. Co. v. Fischer,
12 F.3d 1574 (Fed. Cir. 1994) .......... 45

Yankee Atomic Elec. Co. v. United States,
42 Fed. Cl. 223 (1998),
*aff'd sub nom.* Maine Yankee, 225 F.3d 1336 (Fed. Cir. 2000) .......... 55

Yankee Atomic Elec. Co. v. United States,
98-126C, slip. op. (Fed. Cl. June 26, 2003) .......... 55

Yankee Atomic Elec. Co. v. United States,
73 Fed. Cl. 249 (2006) ("Yankee Atomic") .......... *passim*

**Statutes**

Nuclear Waste Policy Act of 1982,
Pub. L. No. 97-425, 96 Stat. 2201 (1983) .......... 5, 6, 7

Nuclear Waste Policy Amendments Act of 1987,
Pub. L. No. 100-203, 101 Stat. 1330-227 (1987) .......... 12

42 U.S.C. § 10131 .......... 3, 6, 51

42 U.S.C. § 10162 .......... 12, 13

42 U.S.C. § 10168 .......... 12

42 U.S.C. § 10221 .......... 7

42 U.S.C. § 10222 .......... *passim*

42 U.S.C. § 10241 .......... 13

42 U.S.C. § 10251....13

**<u>Rules, Regulations, and Draft Standard Contract</u>**

10 C.F.R. Part 50, App. F ....5

18 C.F.R. Part 101....28, 46

35 Fed. Reg. 17,530 (Nov. 14, 1970)....5

48 Fed. Reg. 16,590 (Apr. 18, 1983) ....7

Notice of Inquiry,
59 Fed. Reg. 27,007 (May 25, 1994) ....14

Final Interpretation of Nuclear Waste Acceptance Issues,
60 Fed. Reg. 21,793 (May 3, 1995) ....14

**<u>Other Authorities</u>**

13 Wkly. Comp. Pres. Doc. 502 (1977)....5

H.R. Rep. No. 97-491, pt. 1 (1982), *reprinted in* 1982 U.S.C.C.A.N. 3792 ....5

H.R. Rep. No. 97-785, pt. 1 ....5

RESTATEMENT (SECOND) OF CONTRACTS § 350 .... 30

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
(Electronically Filed on March 23, 2007)

| | | |
|---|---|---|
| **SYSTEM FUELS, INC.**, **SYSTEM ENERGY RESOURCES, INC.**, and **SOUTH MISSISSIPPI ELECTRIC POWER ASSOCIATION**, Plaintiffs, | ) | |
| v. | ) | No. 03-2624C (Judge Braden) |
| **THE UNITED STATES**, Defendant. | ) | |

**PLAINTIFFS' POST-TRIAL BRIEF**

Pursuant to this Court's Order dated January 24, 2007, Plaintiffs System Fuels, Inc., System Energy Resources, Inc., and South Mississippi Electric Power Association respectfully submit their post-trial brief in the instant action.

## I. INTRODUCTION

Before the Court is Plaintiffs' $12.18 million claim for breach of contract damages incurred through August 31, 2005, in connection with the contract between the Plaintiffs and Defendant, the United States (the "Government"), acting through the U.S. Department of Energy ("DOE"), for the disposal of spent nuclear fuel ("SNF") generated at Plaintiffs' Grand Gulf Nuclear Station ("Grand Gulf"). The Court has already determined that the Government is liable for partial breach of contract. 66 Fed. Cl. 722, 732-33 (2005); see also generally Northern States Power Co. v. United States, 224 F.3d 1361 (Fed. Cir. 2000) ("Northern States II"); Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1336, 1342 (Fed. Cir. 2000) ("Maine Yankee") ("The breach involved all the utilities that had signed the contract – the entire nuclear

electric industry"). Therefore, the sole purpose of the damages trial in this case that took place in September 2006 and January 2007 is to determine the quantum of Plaintiffs' damages for the Government's partial breach of contract. Several threshold considerations should guide the Court in assessing damages here.

The Standard For Determining Damages: The U.S. Court of Appeals for the Federal Circuit (the "Federal Circuit") has provided a legal framework for partial breach cases, in which (as here) the non-breaching party has taken steps to mitigate its damages and seeks to recover the actual past costs of such mitigation. Indiana Mich. Power Co. v. United States, 422 F.3d 1369, 1374-75 (Fed. Cir. 2005) ("Indiana Mich. III"). "Indiana Michigan altered the landscape considerably by parsing utility claims into actual expenditures and framing the inquiry as one of mitigation." Yankee Atomic Elec. Co. v. United States, 73 Fed. Cl. 249, 260 (2006) ("Yankee Atomic"). In this case, Plaintiffs must show that "(1) the damages were reasonably foreseeable by the breaching party at the time of contracting; (2) the breach is a substantial causal factor in the damages; and (3) the damages are shown with reasonable certainty." Indiana Mich. III, 422 F.3d at 1373 (citing Energy Capital Corp. v. United States, 302 F.3d 1314, 1320 (Fed. Cir. 2002)). Plaintiffs proved and discharged their burden, and therefore to avoid damages the Government must show that Plaintiffs' mitigation efforts as the non-breaching party were unreasonable.[1] See Tenn. Valley Auth. v. United States, 69 Fed. Cl. 515, 523 (2006); see also Old Stone Corp. v. United States, 450 F.3d 1360, 1370 (Fed. Cir. 2006) (noting that the

---

[1] With the exception of approximately $5,600, the Government's accounting expert has not challenged that the costs underlying Plaintiffs' $10.59 million claim in nominal dollars were incurred and are supported by sufficient documentation. Trial Transcript ("Tr.") 2351 (Testimony of Peterson). Thus, except for this small sum that remains at issue, there is no question as to the reasonable certainty of the costs in Plaintiffs' claim. Instead, the Government apparently challenges Plaintiffs' mitigation costs only on the grounds of causation. As the Court is aware, the parties disagree vigorously as to the standard of causation governing this case, and filed simultaneous briefs regarding this issue on December 20, 2006.

Government failed to show that costs incurred were unreasonable), petition for cert. filed, 75 U.S.L.W. 3333 (U.S. Dec. 14, 2006) (No. 06-837). The Government has failed to discharge its burden of proving that Plaintiffs' mitigation efforts were unreasonable.

Acceptance Rate: Plaintiffs may prove their mitigation damages in this case without establishing a rate at which DOE was obligated to accept spent nuclear fuel under the Standard Contract (the "acceptance rate"). The primary issue now before the Court is whether Plaintiffs' mitigation efforts were reasonable under the facts that they faced in light of the Government's breach. In resolving that question, there is no need for this Court to determine an acceptance rate. Nevertheless, should the Court determine that a ruling on the acceptance rate issue is necessary here, Plaintiffs submit that the evidence overwhelmingly shows that Congress enunciated the purpose of the Nuclear Waste Policy Act of 1982 (the "NWPA"), as providing a date certain – January 31, 1998 – when the federal government, through DOE, would begin removing SNF from commercial utilities. The NWPA further stated that the commercial utilities would provide and pay for interim storage only until DOE began removal of SNF in accordance with the NWPA. 42 U.S.C. §§ 10131(a)(4) & (5). Thus, it is clear that when utilities entered contracts with DOE, all parties had the expectation (based on the purposes of the NWPA) that utilities would not have to provide for additional at-reactor storage after 1998. A 3,000 Metric Ton of Uranium ("MTU") aggregate annual steady-state rate after a five year ramp-up period would best meet that need (and begin working off the backlog of accumulated waste at utility sites).

Summary of Damages: To mitigate the effects of the Government's continuing partial breach of contract, Plaintiffs planned, designed, and constructed an independent spent fuel storage installation ("ISFSI") using dry fuel storage technology. Plaintiffs have proven their

incurred mitigation costs through August 31, 2005 under the following general categories for the dry fuel storage project at Grand Gulf:

**SUMMARY OF DAMAGES**[2]

| CATEGORY | NOMINAL DOLLARS | ADJUSTED FOR ECONOMIC WEIGHTED AVERAGE COST OF CAPITAL |
|---|---|---|
| Spent Fuel Storage Studies | $ 341,000 | $ 506,000 |
| ISFSI Design and Construction | 8,367,000 | 9,458,000 |
| Cask Fabrication Facility | 465,000 | 527,000 |
| Dry Fuel Equipment Storage Building | 798,000 | 877,000 |
| ISFSI Electrical and Security Systems | 31,000 | 34,000 |
| Auxiliary Building Door Modifications | 589,000 | 776,000 |
| TOTAL | $10,591,000 | $12,178,000 |

## II. FINDINGS OF FACT

### A. The Nuclear Waste Policy Act Is Enacted To Codify The Federal Government's Longstanding Policy To Dispose Of Spent Nuclear Fuel And To Provide A Firm Schedule For Disposing Of The Waste

Early in the history of American atomic power, the Government acknowledged a definite federal responsibility to provide for the permanent disposal of SNF and high-level waste ("HLW") resulting from the commercial use of nuclear power. See Florida Power & Light Co. v. Westinghouse Elec. Corp., 826 F.2d 239, 244 (4th Cir. 1987) (discussing President

[2] As noted above, the cut-off date for damages in this case is August 31, 2005. Damages that Plaintiffs have incurred and will have incurred after that date will be the subject of one or more future actions.

Eisenhower's Atoms-for-Peace commercial nuclear program and the passage of the Atomic Energy Act).[3]

The Government's effort to manage the disposal of SNF and HLW was redirected when President Carter announced in 1977 that the Government intended indefinitely to postpone reprocessing in the United States. 13 Wkly. Comp. Pres. Doc. 502, 503 (1977). As a result, "[t]he domestic nuclear industry was confronted not only with a shift in its technical future but with a sudden and unanticipated liability in the form of spent fuel stored at reactor sites with no near-term destination." H.R. Rep. No. 97-491, pt. 1, at 27 (1982), reprinted in 1982 U.S.C.C.A.N. 3792, 3793. The majority of spent fuel pools existing at nuclear reactor sites, including that at Grand Gulf, had been sized with the intention that SNF would be stored therein temporarily before being shipped to a reprocessing facility. Tr. 135 (McGaha) ("[W]hen Grand Gulf was being designed, the direction the country was going was to provide reprocessing capabilities where the fuel, once it's spent, would only stay in spent fuel pool for some period of time . . . then it would be removed, moved to a reprocessing facility. . . ."); see also, e.g., H.R. Rep. No. 97-785, pt. 1, at 47. The lack of reprocessing as a viable option meant that a utility's SNF had to be removed and stored somewhere outside the pool if plant operation was to continue. Id.

On January 7, 1983, President Reagan signed into law the Nuclear Waste Policy Act of 1982, Pub. L. No. 97-425, 96 Stat. 2201 (1983) (codified as amended at 42 U.S.C. §§ 10131-

---

[3] This commitment is reflected, for example, in the Atomic Energy Commission's ("AEC") statement of its "Policy Relating to the Siting of Fuel Reprocessing Plants and Related Waste Management Facilities," adopted in 1970, which provides that "[d]isposal of high-level radioactive fission product waste material will not be permitted on any land other than that owned and controlled by the Federal Government." 10 C.F.R. Part 50, App. F. In announcing this policy, the AEC reaffirmed that "high-level waste repositories should be under Federal ownership and responsibility." 35 Fed. Reg. 17,530, 17,532 (Nov. 14, 1970).

10270). The NWPA formalized the Government's long-standing policy of accepting responsibility and providing for the timely disposition of commercial SNF and HLW. See 42 U.S.C. § 10131(b)(2) (indicating that one purpose of NWPA was "to establish the Federal responsibility, and a definite Federal policy, for the disposal of such waste and spent fuel").

In the NWPA, Congress expressly acknowledged that "[a] national problem has been created by the accumulation of . . . spent nuclear fuel from nuclear reactors . . . ." 42 U.S.C. § 10131(a)(2)(A). To solve this problem, the NWPA acknowledged that one of the key purposes of the Act was to impose upon the Government a firm schedule and deadline by which the Government would assume responsibility for the disposal of commercially-generated SNF. See 42 U.S.C. § 10131(b)(1) (indicating that one purpose of the NWPA was "to establish a schedule for the siting, construction, and operation of repositories" to receive SNF and HLW).

The NWPA specified the date – January 31, 1998 – when DOE was required to begin removing SNF from commercial nuclear reactors. 42 U.S.C. § 10222(a)(5)(B); Maine Yankee, 225 F.3d at 1342 ("Congress found this objective so important when it promulgated the Act that it took the unusual action of specifying that all the contracts must contain this explicit requirement.").

While the NWPA lodged the responsibility with the utilities for paying for DOE's disposal program and to provide interim storage of SNF, the utilities only had the responsibility to provide for, and pay the costs of interim storage "until such waste and spent fuel is accepted by the Secretary of Energy in accordance with the provisions of this Act . . . ." 42 U.S.C. §§ 10131(a)(4) & (5); see also Plaintiffs' Exhibit ("PX") 275, 1983 Draft Mission Plan at 2-1

(SN045172) ("Until 1998, each utility will be responsible for providing its own additional on-site interim storage . . . .").[4]

### B. Plaintiffs' Standard Contract And Their Expectations At The Time The Contract Was Signed

The NWPA created a *quid pro quo* arrangement so that utilities such as Plaintiffs would pay fees into the Nuclear Waste Fund in exchange for the Government's performance of SNF and HLW disposal services beginning no later than January 31, 1998. See Indiana Michigan Power Co. v. Dep't of Energy, 88 F.3d 1272, 1277 (D.C. Cir. 1996) ("Indiana Mich. I"); 42 U.S.C. § 10222(a)(5)(B). The NWPA instructed DOE and commercial nuclear utilities to enter into contracts for the disposal of each utility's SNF and HLW. NWPA, Pub. L. No. 97-425, § 302, 96 Stat. 2201, 2257 (1983) (codified at 42 U.S.C. § 10222(a)(1)); see also Northern States II, 224 F.3d at 1364.

Pursuant to NWPA § 302, DOE created a "Standard Contract for the Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste" (the "Standard Contract"). Northern States II, 224 F.3d at 1364. In promulgating the terms of its Standard Contract, DOE recognized "[t]he 1998 date is called for in the Act, and we believe it to be a realistic date. Our performance will be judged by meeting this date." Defendant's Exhibit ("DX") 2.02, 48 Fed. Reg. 16590, 16598 (Apr. 18, 1983); Transcript of Designated Testimony from Northern States Power Co. v. United States, No 98-484C (Wiese, J.) ("NSP Tr.") at 3872-76 (Morgan).[5]

[4] Plaintiffs are mindful of the Court's comments at trial regarding the probative value of "draft" DOE documents, and respectfully submit that the 1983 Draft Mission Plan warrants unique treatment in this case because the NWPA explicitly required publication of "a draft mission plan" and notification of its publication in the Federal Register. See 42 U.S.C. § 10221(b).

[5] The prior trial testimony of Mr. Morgan has been designated as substantive evidence in this case. See January 8, 2007 Order (granting Defendant's unopposed motion).

Based on the NWPA, the failure of a utility to sign a contract with DOE would have led to the shut down of its reactors. NSP Tr. at 3863-64 (Morgan) ("My understanding is that [the Nuclear Regulatory Commission], which regulates reactor operation, said that or directed people that if they didn't sign the contract, they would have to shut down the reactors."); see also Indiana Mich. III, 422 F.3d at 1372; 42 U.S.C. § 10222(b)(1).

**1. Plaintiffs' Standard Contract And Nuclear Plant**

On June 30, 1983, System Fuels, Inc. entered into its "Standard Contract" with DOE for the disposal of the SNF and HLW generated at the Grand Gulf Nuclear Station. PX 188. Grand Gulf was then owned by Middle South Energy, Inc. (the predecessor entity to System Energy Resources, Inc.) and South Mississippi Electric Power Association. Supplemental Testimony Of Frank B. Rives On Agency And Rates Issues ("Rives Agency Direct") at 3-5 (Nov. 6, 2006).

Grand Gulf is a single unit, boiling water reactor located near Port Gibson, Mississippi, on the Mississippi River. Tr. 111 (McGaha). The Nuclear Regulatory Commission ("NRC") licensed Grand Gulf's reactor in 1984 and the plant began commercial operation in 1985. Tr. 125 (McGaha). Grand Gulf is currently licensed by the NRC to operate through 2024. Tr. 322 (Franklin). The Grand Gulf spent fuel pool is a stainless steel rectangular pool, approximately 40 feet wide by 70 feet long and about 40 to 42 feet deep. Tr. 129 (McGaha). The Grand Gulf spent fuel pool was reracked once prior to the plant's beginning of commercial operation – increasing the total design capacity of the pool to 4,348 assemblies. Tr. 261 (Franklin); PX 226 (2003 Spent Fuel Management Plan) at 16 (SSM0093253).

Grand Gulf is one of several plants that Entergy Corporation ("Entergy") owns (through subsidiaries) in its southern "fleet." The other plants in the southern fleet include Arkansas Nuclear One, Waterford 3, and River Bend. Tr. 83 (McGaha). These plants are subject to

regulation by the Federal Energy Regulation Commission and/or state entities, whereas plants in Entergy's northern fleet are often termed as "unregulated" (i.e., their power is sold in the unregulated market). Tr. 93-95 (McGaha). Grand Gulf's operation, in particular, is subject to FERC regulation. Tr. 94-95 (McGaha); Rives Agency Direct at 3-4.

To date, Plaintiffs have paid DOE approximately $176 million for SNF disposal services under the Standard Contract for Grand Gulf and are continuing to pay at a rate of approximately $10 million per year. Tr. 138-39 (McGaha).

**2. Both Parties To The Contract Expected DOE To Perform At A Rate Sufficient To Remove The Need For Utilities To Acquire Additional Storage Capacity After 1998 And To Begin To Remove The Backlog**

As noted in Section II.A *supra*, one of the purposes of the NWPA was to create a firm schedule for the removal of the accumulated SNF at commercial nuclear reactors. At the time the Standard Contracts were signed, both DOE and Plaintiffs expected that DOE would perform at a rate sufficient to remove the need for Plaintiffs (or any utility) to acquire additional storage capacity after 1998 – the statutorily mandated date to begin performance – and to begin removal of the accumulated backlog of SNF at Grand Gulf and other plant sites.

The Government's witnesses (and contemporaneous DOE documents) similarly acknowledged that DOE implemented a strategy for performance that would avoid the need for additional at-reactor storage after 1998 and work off the backlog of generated SNF. Robert Morgan, the first acting-director of DOE's Office of Civilian Radioactive Waste Management ("OCRWM"), NSP Tr. 3779, stated at a December 20, 1983 DOE-sponsored conference: "The basic strategy which we have outlined in the mission plan is that, beginning in 1998, utilities will not have to provide any additional storage facilities on-site." NSP Tr. 3882 (Morgan); PX 286, Robert Morgan, Program Overview, Proceedings of the 1983 Civilian Radioactive Waste

Management Information Meeting at 11 (SN069599) (Feb. 1984). Mr. Morgan acknowledged that this strategy was consistent with his understanding of the purposes of the NWPA. NSP Tr. 3882-83. At the same conference, Mr. Morgan also stated, "During the first year of operation of the repository in 1998, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities, either on-site or at another location." NSP Tr. 3884 (Morgan); PX 286 at 11 (SN069599). Mr. Morgan also acknowledged that DOE intended to begin working off the backlog of fuel. NSP Tr. 3884 (Morgan); PX 286 at 11-12 (SN069599-600). Similarly, DOE acknowledged the same performance strategy in its 1983 Draft Mission Plan – a document whose preparation Mr. Morgan managed. NSP Tr. 3885-87 (Morgan); see also PX 275, Civilian Radioactive Waste Management Program Mission Plan at 2-1 through 2-4 ("The waste materials will be accepted in accordance with a Waste Acceptance Schedule designed to provide an acceptance rate in the first five years such that no utility will have to provide additional storage capacity after January 31, 1998"); see also Written Direct Testimony of Eileen M. Supko ("Supko Direct") ¶ 17 (Sept. 6, 2006) (discussing PX 275).[6]

Mr. David Zabransky, DOE's current contracting officer, also understood when he worked at Wisconsin Electric Power Company that a reasonable acceptance rate would have been one that addressed the aggregate rate of utility discharges and would work off the industry backlog of SNF. Tr. 2029-30 (Zabransky). Plaintiffs had the same expectation. Mr. Frank Rives, who for over two decades has managed the Standard Contract at issue in this case (as well as Entergy's other Standard Contracts), stated that it was his understanding that under the NWPA

[6] In the subsequent DOE mission plan documents, DOE continued to use similar acceptance rates for the industry in the aggregate. See Supko Direct ¶ 56; Mission Plan for the Civilian Radioactive Waste Management Program at 381 (1985), PX 277 at 381 ("[I]f the DOE fails to meet the schedule shown in Table 9-2 or 9-3 [using a steady-state rate of 3,000 MTU after a five-year ramp-up], then the additional storage capacity needed to accommodate the delay in schedule will be provided by the DOE, possibly at reactor sites").

and Standard Contract, DOE "would take spent fuel [from Grand Gulf and other utility plant sites] at such a rate as to avoid the need for further additions of spent fuel storage after 1998." Tr. 1093-95 (Rives).

A 3,000 MTU steady-state rate after a ramp-up period of approximately five years would best meet the intent of the program and expectations of the parties as to an appropriate and reasonable acceptance rate; such a rate would be sufficient to remove the need to acquire additional at-reactor storage capacity after 1998 and to begin removal of the accumulated backlog of SNF. Supko Direct ¶ 17; Deposition of Lake Barrett at 10-11, 58-59 (Apr. 22, 2002) (deputy and one-time acting director of DOE's OCRWM acknowledged that the 3,000 MTU rate "was chosen in consideration with the production rate" of SNF and was consistent with his understanding of the intent of the NWPA); see also Deposition of Lake Barrett at 1163-64 (May 10, 2002).[7] The system design documents and total system life-cycle cost documents since 1983 repeatedly used the 3,000 MTU steady-state rate as well. Tr. 1511-13 (Supko); Deposition of Lake Barrett at 1334-35 (May 10, 2002).[8]

---

[7] Plaintiffs filed a notice of deposition and trial testimony designations on August 18, 2006 pursuant to Federal Rule of Evidence 801(d), and provided the Court with a binder containing these designations at trial in September 2006. See also Tr. 1730-31 (oral motion by Plaintiffs regarding same).

[8] For example, DOE issued annual Nuclear Waste Fund fee adequacy assessments, pursuant to NWPA § 302(a)(4), which were to determine whether the 1 mill per kilowatt hour fee charged to utilities was adequate to cover the life cycle cost of the Civilian Radioactive Waste Management system. 42 U.S.C. § 10222(a)(4). For example, the 1986 Assessment used a 3,000 MTU steady-state rate after a five year ramp-up period as one of its assumptions. Nuclear Waste Fund Fee Adequacy: An Assessment at 4 (Mar. 1986) (HQR0421240), PX 271. Additionally, similar to the fee adequacy assessments, DOE also prepared total system life cycle cost ("TSLCC") analyses of the program to project what the life cycle cost of the waste management system would be and for the purposes primarily of ensuring that the 1 mill per kilowatt hour fee would be adequate to cover the cost of the program. These assessments regularly assumed that DOE would perform at a 3,000 MTU steady-state rate (usually with a five-year ramp-up period). See, e.g., Analysis of the Total System Life Cycle Cost for the Civilian Radioactive Waste Management Program at 22, 28 (Apr. 1986), PX 302; Analysis of the

### 3. DOE's Impending Performance Failure

In 1987, DOE projected at least a five-year delay in opening a repository and instead proposed that it might be able to meet its 1998 waste acceptance obligations beginning in 1998 through the use of a monitored retrievable storage facility ("MRS"). Tr. 1808-09 (Kouts). Later that year, in its final Mission Plan Amendment to Congress, DOE detailed the need for Congress to authorize an interim storage facility – an MRS – if DOE were to be able to begin timely disposing of SNF by 1998. OCRWM Mission Plan Amendment at 63 (June 1987) (HQ0005866), PX 304. DOE stated, "If Congress does not approve the MRS facility, the transfer of waste to DOE facilities may not be able to begin in 1998." PX 304 at 63.

In December 1987, Congress passed the Nuclear Waste Policy Amendments Act, which nullified DOE's earlier proposal for an MRS at Oak Ridge, Tennessee, and authorized DOE to build an MRS facility, though with restrictive scheduling and capacity linkages to the permanent repository. Pub. L. No. 100-203, § 5021, 101 Stat. 1330-227, 1330-232, 1330-236 (1987) (codified, as amended, at 42 U.S.C. §§ 10162, 10168(d)(1)). DOE had requested that Congress include linkages between the MRS and repository over the objections of the commercial nuclear utilities. OCRWM Mission Plan Amendment at 121, DX 69 at HQR0031748 (stating DOE's strong support for a linkage between developing an MRS and repository); see also id. at 120, 414, DX 69 at HQR0031747, HQR0032039 (stating utility industry's opposition to including such a linkage). Subsequently, in September 1991, the General Accounting Office released a report that concluded that DOE would not meet the 1998 performance date, because an MRS

---

Total System Life Cycle Cost for the Civilian Radioactive Waste Management Program at 2-8 (Table 2-2) (PNL1071737), PX 262; Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program at 4-14 (May 2001) (KRG-GG000739), PX 13-J.

facility would not be ready (and no other facility was then planned or available to be ready by 1998). PX 288 at 3, 16 (Bates p. 1342, 1355).

#### 4. DOE Assumes It Will Perform By 1998 By Assuming An MRS Prohibited By Statute

While the 1987 Amendments Act authorized DOE to site, construct, and operate an MRS, DOE never actively pursued siting an MRS; instead DOE implemented a strategy that essentially left the responsibility for siting an MRS to the Nuclear Waste Negotiator – an independent position created by the 1987 Amendments Act with separate authority to negotiate an MRS site. Tr. 1834-35 (Kouts); see 42 U.S.C. § 10162(b) (discussing DOE's authorization to pursue an MRS); id. §§ 10241-10251 (discussing the creation and duties of the Nuclear Waste Negotiator to independently investigate an MRS). Three months later, in DOE's 1991 Annual Capacity Report ("ACR") (on which the Government has relied in making its acceptance rate argument in this case), DOE acknowledged that it would not be able to begin accepting utilities' SNF until 2007 at the earliest, unless Congress removed the linkages in the Amendments Act. DX 140 at 4 (HQR-002-0806) ("If the current linkages between MRS facility construction and repository construction authorization are maintained, it is estimated that the commencement of facility operations and initial acceptance of SNF by DOE could not start until at least 2007."); Tr. 1897 (Kouts) (noting the same). Nonetheless, based on the assumption that DOE would begin SNF acceptance at an MRS in 1998, the 1991 ACR contemplated performance at a 900 MTU acceptance rate following a two-year ramp-up period. DX 140 at 5 (HQR-002-0807).

### C. The Government Breaches The Standard Contracts In 1998 And, To Date, Has Not Yet Begun Performance

#### 1. The Government Claims That It Has No Obligation To Perform Beginning In 1998

In 1994, DOE published a "Notice of Inquiry" in the Federal Register stating DOE "has no statutory obligation to accept spent nuclear fuel beginning in 1998 in the absence of an operational repository or other facility constructed under the [NWPA], although the Department in implementing the Standard Contract may have created an expectation that it would begin accepting such spent nuclear fuel in 1998." Notice of Inquiry, 59 Fed. Reg. 27,007, 27,008 (May 25, 1994). A year later, DOE issued its "Final Interpretation of Nuclear Waste Acceptance Issues," which reiterated DOE's interpretation that it had no obligation under the NWPA to begin accepting SNF in 1998 absent an operating facility and that DOE's performance would not commence until 2010, at the earliest. 60 Fed. Reg. 21,793, 21,794-95 (May 3, 1995).

In 1996 and 1997, the D.C. Circuit rejected the Government's interpretation of its obligation under the NWPA. See Indiana Mich. I, 88 F.3d at 1277; see also Northern States Power Co. v. United States Dep't of Energy, 128 F.3d 754, 755 (D.C. Cir. 1997) ("Northern States I"). DOE failed to begin performance in 1998 and, to date, has not begun performance of its obligations under the contract at issue in this case (or any of the other Standard Contracts). Tr. 2048-49 (Zabransky).

#### 2. DOE's DCS Process Through The Prism Of Its Expected Non-Performance

As noted above, DOE issued an ACR in 1991, before issuing in 1992 Delivery Commitment Schedule ("DCS") instructions to the utilities, including Plaintiffs, for planning purposes. Tr. 1907-08 (Kouts); Standard Contract, Art. IV.B.5(b), PX 188 at 10 (COF0281616) ("Beginning not later than July 1, 1987, DOE shall issue an annual capacity report for planning

purposes."); 1991 ACR, DX 140 at HQR-002-0803 ("As specified in the Standard Contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or the purchasers."); see also 1992 DCS Instructions ¶ 7(c), DX 148 (SSM0076631) ("The annual acceptance rates in the 1991 ACR provide an approximation of the [Federal Waste Management System] acceptance capacity and are for planning purposes").

DOE also treated the DCSs as planning documents. See Deposition of Nancy Slater Thompson at 5, 98 (June 13, 2002) (Acting Division Director of the Regulatory Coordination Division in DOE's OCRWM stated, "In my personal opinion, they [DCSs] were for planning purposes only and in fact were completed in such a way that not much but planning could be done based on the information contained in them"); Deposition of Alan Brownstein at 9-10, 377-78 (Apr. 10, 2002) (the senior policy adviser to the Director of DOE's OCRWM acknowledging that the DCSs were for planning purposes); Deposition of Alan Brownstein at 282 (June 14, 2002) ("The way I recall it now is these go back to the broader issue of the DCSs. These were all for planning purposes").

When Entergy provided any DCSs to DOE, it similarly understood those documents to be for planning purposes only. Tr. 1319 (Rives). Even the then-deputy director of DOE's program referred to the DCSs as "administrivia." Deposition of Lake Barrett at 217 (Apr. 22, 2002). By the mid-1990's, the Government made its performance of any obligations contained in the DCSs conditional on the availability of a facility. E.g., DX 190 (March 1995 letter from B. Tomasoni to F. Rives attaching approved DCS for Entergy Arkansas). The Government also would not approve any DCS forms with allocations larger than those specified in the 1991 ACR. Tr. 2017-18 (Zabransky). The use of instructions to limit allocations appears nowhere in the Standard Contracts. Tr. 2019-20 (Zabransky) (admitting that the allocation limitations in the instructions

were based on "guidance from the contracting officer" and not on provisions of the Standard Contracts).

The 1994 Acceptance Priority Ranking/Annual Capacity Report ("APR/ACR") (issued in March 1995) continued to use the acceptance rate allocations from the 1991 ACR, even though the MRS was no longer a possibility. Tr. 1833-35 (Kouts); Tr. 2025-28 (Zabransky) (noting that to have an MRS operating by 1998 would have required the Nuclear Waste Negotiator to have an agreement with a volunteer host site by 1992 or 1993, and agreeing that by the 1994 to 1995 timeframe an MRS was a "fleeting" hope and "grinding to a halt"); 1994 APR/ACR, DX 184.[9] DOE continued to use the lower acceptance rates in the 1994 APR/ACR in an effort to minimize its obligations to utilities. Tr. 2025-26 (Zabransky). DOE no longer employed the pretense of affixing specific calendar years for the capacity projections, but instead referred to "Year 1" through "Year 10." Compare DX 140 at 5 (HQR-002-0807) (using calendar years) with DX 184 at 4 (HQR-029-0681) (using "Year 1" through "Year 10").

In December 1996, DOE stopped approving DCSs altogether, informed utilities in March 1997 that it would be unable to approve further DCSs, and "waived" the "requirement" that utilities continue submitting DCSs. Tr. 1998-2005 (Zabransky). In fact, DOE voided several DCSs that had already been approved – in some instances, just two months after its initial approval of a DCS. Tr. 2008-15 (Zabransky). In stopping the DCS process and voiding DCSs, DOE believed that it was limiting its liability for damages from the utilities. See NSP Tr. 3722-

[9] Notably, DOE included an "upper bounding rate" of 3,000 MTU per year after a five year ramp up period in its 1990 ACR, which like the 1991 ACR assumed the use of an MRS but also that the schedule and capacity linkages from the Amendments Act would both be removed. 1990 ACR, DX 116 at 5 (HQR-001-2497).



400535070v5

23 (Pollog); id. at 3739 (Pollog).[10] Since that time, it has not been possible for a utility contract holder to obtain an approved DCS. Tr. 2006 (Zabransky).

After March 1995, DOE did not issue another ACR until July 2004. Tr. 2022-23 (Zabransky). DOE attempted to revive the DCS process by issuing its 2004 APR/ACR. 2004 APR/ACR, PX 13-K; Tr. 2022-23 (Zabransky). The DCSs to be submitted in response to this 2004 APR/ACR were to "replace, rather than supplement" any previously approved DCSs. Tr. 1992-93 (Zabransky); 2004 DCS Instructions ¶ 7(a), PX 334A at 2 ("Purchasers should submit new DCSs based upon the currently planned operation date of 2010."). Soon thereafter, in December 2004, DOE cancelled the DCS process again. Tr. 2046-47 (Zabransky); PX 333 (noting that DOE sent a letter to utilities "suspending the process" and indicating that DOE "would restart it once we had a new date"). To date, DOE has not re-started the process. Tr. 2047 (Zabransky).

### D. Plaintiffs Reasonably Mitigated The Effects Of The Government's Breach By Building A Dry Fuel Storage Facility At Grand Gulf

Given DOE's impending long-term nonperformance as described above, Plaintiffs had no choice but to initiate a dry fuel storage project at Grand Gulf. Otherwise, they faced the prospect of running out of space in the Grand Gulf spent fuel pool, losing full core reserve,[11] and shutting down the plant. Tr. 247-54 (Franklin). If DOE had commenced SNF acceptance from Grand

---

[10] Plaintiffs have submitted contemporaneously with this brief a notice of supplemental designations, which notice includes transcript designations from the trial testimony of Thomas Pollog in Northern States Power. The Government included Mr. Pollog on its witness list in the instant case, but opted not to call him at trial.

[11] Full core reserve is the amount of spent fuel pool capacity necessary in the event that the fuel in the reactor (800 assemblies at Grand Gulf) needed to be discharged. Tr. 781 (Eaton). Maintaining full core reserve is neither a written Entergy policy nor a regulatory requirement, and there are brief periods of time when Entergy has operated without its entire full core reserve. Id. Generally speaking, however, the company strives to maintain full core reserve at its plants as an operating philosophy and a risk management tool. Tr. 781-82 (Eaton).

Gulf in 2005 as Plaintiffs had understood would have happened under the Standard Contract, the dry fuel storage project at Grand Gulf would not have been necessary. Tr. 335-36 (Franklin).

**1. Plaintiffs' Decision To Proceed With Dry Storage**

DOE's failure to begin SNF acceptance in 1998 and Plaintiffs' assessment of DOE's delayed performance affected Plaintiffs' spent fuel storage decisions at Grand Gulf. Thus, although Entergy did not officially approve funding for the dry fuel storage project at Grand Gulf until 2004, Plaintiffs had already begun to incur costs related to dry storage several years earlier. First, Plaintiffs contracted with Enercon in 1998 to evaluate various options for additional on-site storage. Report On An Evaluation Of Options To Increase GGNS Spent Fuel Storage Capacity, PX 14-C-1; Written Direct Testimony of Kenneth P. Metcalfe ("Metcalfe Direct") at ¶ 61 (Sept. 6, 2006). This Enercon report assumed that DOE would not begin performance until 2010 and, based on this assumption, considered various alternatives to dry storage for expanding on-site storage capacity at Grand Gulf, such as spent fuel consolidation, increasing the number of storage locations in the wet pool, and trans-shipment of fuel. PX 14-C-1, Cover Letter (KRG-GG004736). Ultimately, Enercon concluded none of these options were viable in the long-term – at best, increasing the number of storage locations in the Grand Gulf pool would "only extend operation of the plant for approximately two fuel cycles. . . ." PX 14-C-1 at 9 (KRG-GG004745). As a result of this assessment (and a similar need for dry storage at Entergy's other plants in its southern "fleet"), Entergy contracted with Holtec International, Inc. ("Holtec") for the supply of dry fuel storage casks, canisters, and ancillary equipment for its plants. Tr. 202-04 (Franklin). Indeed, the purpose of contracting with Holtec was to mitigate the long-term effects of DOE's continuing nonperformance. Tr. 194-95 (McGaha).

In particular, Plaintiffs' decision to proceed with dry storage at Grand Gulf was initially based on the assessment of reactor engineers that the spent fuel pool would lose full core reserve in 2005 – long before Plaintiffs expected DOE to actually begin picking up SNF at the plant. Tr. 255-60; Tr. 474 (Franklin); PX 226 at 15 (SSM0093253). Entergy memorialized this assessment in an October 2003 spent fuel management plan that would "provide a snapshot to senior management of [] the spent fuel management program at Entergy, where it was at the current time and where it was headed for the future." Tr. 234 (Franklin). Mr. Ben Franklin, Manager of Project Management at Entergy, co-authored this report with Mr. Frank Rives, Director of Nuclear Fuels at Entergy. Id. The report demonstrated that Grand Gulf, given its spent fuel discharge projections and the assumption that DOE would not show up until 2020, would need a sizeable ISFSI in order for Entergy to maintain full core reserve in the spent fuel pool. Tr. 252-54 (Franklin); PX 226 at 11 (SSM0093249), Appendix of Data (SSM0093290).

Soon after Mr. Franklin issued the spent fuel management plan, he worked with Mr. Bryan Warren, project manager for the ISFSI project at Grand Gulf, on the investment proposal for Entergy's approval of the dry fuel storage project. Tr. 312-13 (Franklin); Proposal For Dry Cask Storage for Grand Gulf Nuclear Station, PX 54. This proposal stated that the project would cost $35.5 million, but actually requested approval of the lesser sum of $32 million (representing System Energy Resources Inc.'s 90 percent ownership of Grand Gulf). Tr. 316 (Franklin); PX 54 at 5 (SSM0052748). The proposal also considered other alternatives to building an ISFSI (e.g., rod consolidation, take no action), and determined that none of these options were as desirable or feasible as dry storage. Tr. 326-331 (Franklin); PX 54 at 36-38 (SSM0052779 to SSM0052781). Consistent with the earlier Enercon assessments, however, Plaintiffs did undertake efforts in 2005 to recover approximately 160 cells in the Grand Gulf spent fuel pool to

defer loss of full core reserve from 2005 to 2007. Tr. 604-05 (Warren). Plaintiffs undertook similar efforts to recover cells from the upper containment pool area. Tr. 607-09 (Warren). Deferring the completion of a dry fuel storage facility until 2006, even though DOE's nonperformance was expected to extend well beyond such a date, was desirable due to Entergy's desire to postpone large capital expenditures to the extent possible (i.e., in order to defer the required cash outlays and minimize the related financing costs). Tr. 605 (Warren). Ultimately, however, the investment proposal concluded that the construction of a dry fuel storage facility was the most practical option for solving the long-term spent fuel storage problem at the plant because dry fuel storage reflected a predictable and licensable process. Tr. 331-32 (Franklin); PX 54 at 37-38 (SSM0052780 to SSM0052781). Mr. Franklin presented this investment proposal to Entergy's corporate risk committee on August 3, 2004. Tr. 332 (Franklin). The risk committee approved the proposal following Mr. Franklin's presentation and Entergy's chief executive officer, Mr. Wayne Leonard, approved the proposal on the following day. Tr. 333-34 (Franklin).

During this time, Entergy also initiated the capital project approval process for funding the dry fuel storage project.[12] As noted above, the total funding requested was approximately $32 million. A funding request of this magnitude required approval from the office of the Chief Executive Officer at Entergy (but not from the board of directors). Tr. 790 (Eaton); see also PX 15-A-2 at KRG-GG005449 (requiring CEO approval of capital projects between $15 million and $50 million). Once Plaintiffs received approval to proceed with the dry fuel storage project at

[12] At Entergy, a capital project is one that adds a physical asset to the company meeting certain capitalization criteria. Tr. 915 (Rogers). Based on the amount of money sought for a particular capital project, certain individuals within Entergy (e.g., from supervisors to the board of directors) are required to sign off before the capital project is approved. See PX 15-A-2 (Entergy Capital Project Approval Policy); Tr. 788-90 (Eaton).

Grand Gulf, they again contracted with Enercon to assess the parameters of the project. Enercon issued several Engineering Reports for the "assessment of independent spent fuel storage installation (ISFSI) options" regarding, *inter alia*, geotechnical assessments for the siting of an ISFSI pad and for the haul path that would run from the auxiliary building containing the spent fuel pool to the proposed ISFSI pad and the proposed cask construction pad. E.g., PX 14-C-4 (Pad Location Assessment); PX 14-C-5 (Haul Path Assessment); PX 14-C-6 (Geotechnical Assessment).

### 2. Work Orders And Tasks Comprising The Grand Gulf Dry Fuel Storage Project

At Entergy, capital work orders are an accounting tool to collect costs for a capital project. Tr. 922 (Rogers). The site business services office at Grand Gulf created six capital work orders for the dry fuel storage project: (1) N31937 (Spent Fuel Storage Studies); (2) N32172 (ISFSI Design And Construction); (3) N32271 (Cask Fabrication Facility); (4) N32302 (Dry Fuel Equipment Storage Building); (5) N32350 (ISFSI Electrical And Security Systems); and (6) N32136 (Auxiliary Building Door Modification). Tr. 923 (Rogers). These work orders, taken together, capture the $10,591,000 in nominal costs that are at issue in the instant action. Metcalfe Direct ¶ 60.

According to Mr. Warren, there were several major components of the dry fuel storage project at Grand Gulf: (1) the ISFSI storage pad, (2) the haul path, (3) the cask construction pad, and (4) miscellaneous modifications to the auxiliary building. Tr. 549 (Warren).[13] The construction activities and site modifications related to these components comprised 39 tasks that generally fell under two categories – design (tasks 1 to 21) and implementation (tasks 22 to 39).

[13] Several of the tasks comprising this process were not undertaken or completed until after the August 31, 2005 damages "cut-off" date in the instant action, and are therefore not discussed in these findings of fact.

PX 3-G (Table of 39 Tasks For Grand Gulf ISFSI); Tr. 613-14 (Warren). For example, Task 1 dealt with Enercon's design assessment of the entire ISFSI area, which led to sizing the ISFSI pad and locating the haul path. Tr. 576 (Warren). Tasks 2 to 39 also dealt generally with the four project components described above. Moreover, the costs associated with each of the 39 tasks comprising the dry fuel storage project correspond to one or more of the six capital work orders listed above. Tr. 575 (Warren).

**a. Design And Construction Of The ISFSI Storage Pad**

The ISFSI storage pad at Grand Gulf is a reinforced concrete pad approximately three feet thick, and measures approximately 196 feet long and 61 feet wide. Tr. 551-52 (Warren); PX 398 (Photograph of ISFSI Pad). Initially, Plaintiffs contracted with Enercon Services, Inc. to design, size, and locate the pad. Tr. 959 (Rogers). Next, Plaintiffs contracted with Stone & Webster for the actual implementation of the pad design. Tr. 944 (Rogers). The costs for several of the tasks comprising this process were incurred prior to August 31, 2005: (1) laying of concrete, Tr. 580 (Warren), (2) design of the pad through various seismic analyses, Tr. 582 (Warren), (3) design of electrical systems, Tr. 583 (Warren), (4) design of the pad's security system, Tr. 584 (Warren), (5) implementation of the pad design, Tr. 613-14 (Warren), (6) construction of the ISFSI pad, Tr. 615 (Warren), and (7) implementation of electrical systems, Tr. 615-16 (Warren). Such costs generally "rolled into" work order N32172. E.g., Tr. 572, 581, 582 (Warren).

**b. Design And Construction Of The Haul Path**

The haul path runs from the auxiliary building and "exits the protected area, moves in front of the administration building, moves to the west of the standby service water basins, moves on up to the south corner of the Unit II warehouse and moves to [the] east, . . . goes

around the combination shop, and ends up at the ISFSI [pad]." Tr. 550-51 (Warren); PX 383-A (Schematic of Grand Gulf). The haul path also connects the ISFSI pad to the cask construction pad. Tr. 570 (Warren). The costs for the following tasks were incurred prior to August 31, 2005: (1) design of the cask transfer path, Tr. 586 (Warren) and (2) construction of the haul path, Tr. 617 (Warren). Such costs were included in work order N32172. Id.

**c. Design And Fabrication Of The Cask Construction Pad**

The cask construction pad is utilized for final construction of the storage casks for the ISFSI. Tr. 588 (Warren); PX 399 (Photograph Of Cask Construction Pad). The costs for the following tasks were incurred prior to August 31, 2005: (1) design of the cask construction pad, Tr. 588 (Warren), (2) fabrication and installation of the cask construction pad, Tr. 617 (Warren), and (3) installation of a rotor storage building for the storage of the ancillary equipment associated with the Holtec cask system, also known as the dry fuel storage equipment building. Tr. 617-18 (Warren). Such costs were included in work orders N32172, N32271, and N32302. Tr. 588-89, 617-18 (Warren).

**d. Auxiliary Building Modifications**

Various modifications to the auxiliary building at Grand Gulf were required to accommodate the loading of dry storage casks from the spent fuel pool area therein, including modifications to the building's exterior door. Tr. 599-600 (Warren). The costs for several of the tasks comprising this process were incurred prior to August 31, 2005: (1) design of the auxiliary building's railroad bay floor to accommodate the Holtec cask system, Tr. 589-90 (Warren), (2) structural evaluation of the fuel handling area of the auxiliary building at the 208-foot elevation, Tr. 592 (Warren), (3) installation of electrical systems to utilize cask handling equipment at the 133-foot and 166-foot elevations of the auxiliary building, Tr. 595 (Warren), (4) relocation of

horizontal fuel transfer system ("HFTS") insert racks[14] to accommodate the movement of fuel transfer casks in the cask loading pool area, Tr. 601-02 (Warren), (5) procurement of equipment used in the cask loading pool, Tr. 622 (Warren), (6) design and construction of the auxiliary building bay door, Tr. 623 (Warren), and (7) recovery of cells adjacent to the upper containment pool's lights, Tr. 623 (Warren). Such costs were generally included in work order N32136. E.g., Tr. 623-24 (Warren).

**e. Contractor Labor And Equipment Rental Costs**

Plaintiffs lacked the necessary personnel to perform the actual construction of the ISFSI. Tr. 947 (Rogers). Thus, Entergy contracted with Stone & Webster to construct, *inter alia*, the ISFSI pad, the dry fuel storage equipment building, and the cask construction pad. Tr. 933-34; Tr. 944 (Rogers). Based on a general services contract with Entergy, Stone & Webster provided most of the craft labor services necessary for the dry fuel storage project at Grand Gulf. Tr. 932 (Rogers). Such craft labor personnel included carpenters, iron workers, concrete finishers, and pipe fitters. Tr. 931 (Rogers). Various other contractors performed services for the dry fuel storage project at Grand Gulf such as pumping and pouring concrete, installing telecommunications cabling, and performing asbestos testing. Tr. 948 (Rogers). Through August 31, 2005, Plaintiffs had incurred approximately $2.8 million in costs through their general services contract with Stone & Webster and approximately $800,000 in costs through other contractors specifically for labor on the dry fuel storage project at Grand Gulf. Tr. 939, 970 (Rogers); PX 405 (Kenrich Summary of Contract Work Costs By Vendor).

[14] The HFTS consists of a rail and trolley that allows the movement of new fuel and spent fuel from the spent fuel pool into the containment pool for refueling the reactor. Tr. 601 (Warren). The system's insert racks, prior to their relocation, took up almost half of the cask loading pool. Id.

Additionally, in support of the construction activities for the dry fuel storage project at Grand Gulf described above, Plaintiffs needed to rent equipment such as bulldozers and cranes. Tr. 953-54 (Rogers). Such rental costs totaled nearly $500,000. Tr. 962 (Rogers); PX 403 (Kenrich Summary of Claim By Summary Resource Code). In these instances, Plaintiffs rented equipment rather than purchasing it because leasing was less costly and the equipment would have limited use independent of the dry fuel storage project. Tr. 960 (Rogers).

**3. Additional Entergy Labor Costs For The Dry Fuel Storage Project**

In addition to contracting with Stone & Webster and Enercon, Plaintiffs required the additional services of Grand Gulf employees for the dry fuel storage project who supervised contractor personnel from Enercon and Stone & Webster to execute the various tasks described in Section II.C.2 *supra*. Tr. 810-12 (Eaton). The payroll costs associated with such work are direct charges to the dry fuel storage project. Tr. 1695-96 (Metcalfe). Entergy used summary resource code PRL to capture such costs, which totaled approximately $860,000. Tr. 743-44 (Canova); PX 403.

Additionally, as a result of this internal reallocation, there were several engineering projects at Grand Gulf that were either foregone or delayed as a result of Entergy personnel's focus on the dry fuel storage project. Tr. 812 (Eaton). For example, Plaintiffs delayed undertaking a radial well project to refurbish water supply wells that provide water needed for the Grand Gulf cooling systems. Tr. 813-14 (Eaton).

**4. Loader Costs Incurred For The Dry Fuel Storage Project**

In addition to the contract work, materials costs, internal labor costs, and equipment rental costs that were incurred for the dry fuel storage project at Grand Gulf, Plaintiffs also incurred overhead costs associated with three types of loaders – the payroll loader, the materials

loader, and the capital suspense loader. Tr. 742, 746 (Canova); Tr. 990-91 (Bryars); Tr. 1024-25, 1035 (Dabello). These loader costs were calculated at Entergy in a manner consistent with Generally Accepted Accounting Principles. Tr. 746 (Canova); Tr. 997 (Bryars); Tr. 1034 (Dabello); Tr. 1698-99 (Metcalfe).

First, the payroll loader enables Entergy to determine the "fully loaded" costs of an employee's wages (i.e., to include payroll taxes, employee benefits, and employee benefits allocations). Tr. 741-42 (Canova). Employee benefits include medical, dental, vision, and disability coverage costs. Tr. 744 (Canova). Employee benefits allocations include costs related to stock option expenses, transition obligations related to Financial Accounting Standards 87 and 106, and pension plans. Id. Three summary resource codes correspond to these particular fringe benefits: PRT for payroll taxes, EBF for employee benefits, and EBA for employee benefits allocations. Tr. 742 (Canova). Based on a payroll loader rate that Entergy determines on a quarterly basis, the costs to Plaintiffs of these payroll components are calculated. Tr. 745-46 (Canova). The approximately $314,000 claimed as payroll loader costs in this case pertain only to the payroll of those Entergy employees who actually worked on the dry fuel storage project at Grand Gulf. Tr. 746 (Canova). Moreover, payroll loaders were calculated for Plaintiffs' damages claim in this case in the same manner as payroll loaders are calculated for other capital projects at Entergy's other nuclear plants. Id.

Second, the materials loader relates to the internal costs associated with the procurement of materials or equipment at the plant, and is calculated to assign the cost of supervision, labor, and expenses incurred in the operations of a storeroom supplying tools and other materials for the dry fuel storage project at Grand Gulf. Tr. 989 (Bryars). Like other Entergy nuclear plants, Grand Gulf has a central warehouse that contains various equipment items such as tools and

consumables where employees may obtain such equipment as necessary for a particular project. For the dry fuel storage project at Grand Gulf, these items included, *inter alia*, consumables such as gloves and materials such as conduit for electrical work and reinforcing steel for concrete. Tr. 928-29 (Rogers). Materials purchased through the "supply chain" (i.e., the group at Entergy that buys materials for the warehouse) and materials that are handled through the warehouse receive a materials loader charge. Tr. 995 (Bryars). The costs to Plaintiffs of providing such materials are calculated based on a materials loader rate that Entergy determines on a monthly basis specifically for Grand Gulf. Tr. 994-96 (Bryars). At Entergy, materials loader costs correspond to summary resource code MTL. Tr. 990 (Bryars). The approximately $362,000 claimed as materials loader costs in this case are specific to the materials procured through the supply chain for the dry fuel storage project at Grand Gulf. Tr. 996-97 (Bryars). Moreover, materials loaders were calculated for the Grand Gulf dry fuel storage project in the same manner as materials loaders are calculated for all other capital projects at Grand Gulf. Tr. 999 (Bryars).

Third, the capital suspense loader captures capital costs incurred by administrative and engineering personnel at Entergy that cannot be charged directly to any particular project, because such work occurs in increments of under 30 minutes. Tr. 1024-25 (Dabello). In particular, the summary resource code CSC captures these capital suspense charges. Tr. 1025 (Dabello). More specifically, at Entergy these capital suspense costs contain two separate pools, an administrative and general ("A&G") pool and a nuclear specific pool. Tr. 1028 (Dabello). The A&G pool includes charges for personnel managing capital projects at Entergy's corporate headquarters in New Orleans, whereas the nuclear specific pool includes charges for personnel administering capital in the Entergy Nuclear South headquarters in Jackson and personnel administering capital at the Grand Gulf plant site. Tr. 1028-29 (Dabello). The costs to Plaintiffs

of providing these support services are calculated based on a capital suspense rate that Entergy determines on a quarterly basis for both the A&G pool and the nuclear specific pool for Grand Gulf. Tr. 1030 (Dabello). The approximately $498,000 claimed as capital suspense costs in this case were calculated based on the applicable FERC regulations for capital suspense, as codified at Title 18 of the Code of Federal Regulations. Tr. 1035-36 (Dabello); 18 C.F.R. Part 101.

#### 5. Plaintiffs Incurred Actual Economic Cost Of Capital By Financing Their Mitigation Costs

In determining the damages for their costs of financing the dry fuel storage project at Grand Gulf, Plaintiffs rely on the weighted average cost of capital for debt and equity in every year in which damages are being claimed. Tr. 1660-64 (Metcalfe). In particular, the "cost of capital" in this case reflects the actual financing of costs that System Energy Resources, Inc. and South Mississippi Electric Power Association have borne from the time such costs were actually incurred to mitigate the effects of DOE's continuing nonperformance. Metcalfe Direct ¶ 59. Entergy, like most regulated utilities, does not simply go to the bank to obtain financing for any particular project, but instead "borrows en masse" to operate its business. Tr. 1671 (Metcalfe).

The weighted average cost of capital is generally applied in the utility business as "AFUDC," or allowance for funds used during construction. The Federal Energy Regulatory Commission regulations permit the recovery of AFUDC. Tr. 1675 (Metcalfe); See 18 C.F.R. Part 101, Uniform System of Accounts Prescribed for Public Utilities and Licensees Subject to the Provisions of the Federal Power Act ("Uniform Systems of Accounts"), Electric Plant Instructions, ¶ 3.A(17) (stating that AFUDC "includes the net cost for the period of construction of borrowed funds used for construction purposes and a reasonable rate on other funds when so used" and listing "average short-term debt," "long-term debt," "preferred stock," and "common equity" as elements that may be included in the AFUDC calculation – i.e., the utility's weighted

average cost of capital applied under specific FERC rules). The rates used to calculate Plaintiffs' cost of capital vary from year-to-year and the yearly rate comes directly from figures computed in the ordinary course of business for System Energy Resources, Inc. and South Mississippi Electric Power Association. Tr. 1701-02 (Metcalfe). Unlike pre-judgment interest, which is calculated from the time a claim is submitted and is "a creature of the state," weighted average cost of capital is a real economic cost to Plaintiffs reflecting the impact of dollars that would not have been incurred in the past, but for the breach. Tr. 1676-77 (Metcalfe).

## III. CONCLUSIONS OF LAW

### A. Standard Of Review For Mitigation Costs In A Breach Of Contract Claim

Generally, the "remedy for breach of contract is damages sufficient to place the injured party in as good a position as it would have been had the breaching party fully performed." Indiana Mich. Power Co. v. United States, 422 F.3d 1369, 1373 (Fed. Cir. 2005) ("Indiana Mich. III"). As noted above, "[d]amages for a breach of contract are recoverable where: (1) the damages were reasonably foreseeable by the breaching party at the time of contracting; (2) the breach is a substantial causal factor in the damages; and (3) the damages are shown with reasonable certainty." Id. (citing Energy Capital Corp. v. United States, 302 F.3d 1314, 1320 (Fed. Cir. 2002)). "Indiana Michigan altered the landscape considerably by parsing utility claims into actual expenditures and framing the inquiry as one of mitigation." Yankee Atomic Elec. Co. v. United States, 73 Fed. Cl. 249, 260 (2006).

Having completed an audit of Plaintiffs' claim, with the exception of approximately $5,600, the Government's accounting expert has not challenged that the costs underlying Plaintiffs' $10.59 million claim in nominal dollars have been incurred and are adequately supported by sufficient documentation. Tr. 2351 (Peterson). In other words, "reasonable

certainty" is not an issue here. Instead, the Government ostensibly challenges Plaintiffs' incurred mitigation costs based on an alleged lack of causation. As discussed below, however, the Government caused Plaintiffs' damages, which were foreseeable both at the time of contract formation and at the time of the breach. Thus, the Government bears the burden of showing the unreasonableness of Plaintiffs' actions, which it failed to do at trial.

### 1. Indiana Michigan III Established Mitigation As The Paradigm For Determining Costs For Past Damages In A Partial Breach Case

Generally, "'[o]nce a party has reason to know that performance by the other party will not be forthcoming, . . . he is expected to take such affirmative steps as are appropriate in the circumstances to avoid loss by making substitute arrangements or otherwise.'" Indiana Mich. III, 422 F.3d at 1375 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 350, cmt. b). "Mitigation is appropriate where a reasonable person, in light of the known facts and circumstances, would have taken steps to avoid damage." Id. (citing Robinson v. United States, 305 F.3d 1330, 1334 (Fed. Cir. 2002)).

The "guiding principle" in determining mitigation damages is grounded in whether a plaintiff acted with "reasonable commercial judgment." Northern Helex Co. v. United States, 524 F.2d 707, 718 (Ct. Cl. 1975) (citations omitted); see also Yankee Atomic, 73 Fed. Cl. at 264. Generally, "fair and reasonable efforts to mitigate are all that the law requires." Home Savings of Am., FSB v. United States, 399 F.3d 1341, 1353 (Fed. Cir. 2005); Indiana Mich. III, 422 F.3d at 1375. "The rule of mitigation of damages may not be invoked by a contract breaker as a basis for hypercritical examination of the conduct of the injured party, or merely for the purpose of showing that the injured person might have taken steps which seemed wiser or would have been more advantageous to the defaulter." Koby v. United States, 53 Fed. Cl. 493, 497 (2002) (quoting In re Kellett Aircraft Corp., 186 F.2d 197, 198-99 (3d Cir. 1950)).

The breaching party – here the Government – failed to meet its burden of proving that *any* of the mitigation efforts of the non-breaching parties – Plaintiffs – were unreasonable. Tenn. Valley Auth., 69 Fed. Cl. at 523 ("To eliminate or reduce [the utility's] mitigation-related damages, the government bears the burden of showing that [the utility's] mitigation efforts were unreasonable."); see also Old Stone Corp. v. United States, 450 F.3d 1360, 1370 (Fed. Cir. 2006) (noting that the Government failed to show that costs incurred were unreasonable), petition for cert. filed, 75 U.S.L.W. 3333 (U.S. Dec. 14, 2006) (No. 06-837); Yankee Atomic, 73 Fed. Cl. at 264 ("Defendant has the burden of showing that plaintiffs' mitigation efforts were unreasonable.").

### 2. Plaintiffs Need Not Prove Causation Based On The "But For" Model Of Causation Contrived By The Government

In Indiana Michigan III, the Federal Circuit enunciated the causation test generally appropriate for a case involving mitigation, stating that a utility had to show that the breach was a "substantial causal factor" in mitigating damages. 422 F.3d at 1373; see also S. Cal. Fed. Sav. & Loan Ass'n v. United States, 422 F.3d 1319, 1337 (Fed. Cir. 2005) (affirming the Court of Federal Claims' conclusion that "FIRREA was the principal cause of SoCal's recapitalization and was the substantial factor in SoCal's incurring higher costs of funds after the breach"), *cert. denied, sub nom.* Martin v. United States, 126 S. Ct. 2967 (2006). This Court has likewise adopted the Federal Circuit's "substantial causal factor" standard in determining mitigation damages in SNF cases. See, e.g., Yankee Atomic, 73 Fed. Cl. at 267-68 (applying the substantial causal factor test); see also Sacramento Mun. Util. Dist. v. United States, 70 Fed. Cl. 332, 365 (2006) ("SMUD I") (decision to incur pre-breach mitigation costs "was made in anticipation of [DOE's] subsequent January 31, 1998 breach of the Standard Contract, and, therefore, was a

substantial causal factor in this decision" ); Pac. Gas & Elec. Co. v. United States, 73 Fed. Cl. 333, 405 (2006) (employing the "substantial causal factor" test from Indiana Michigan III).

The Government has argued that this Court should employ a self-serving "but for" standard of causation that bears little support in law and represents a "moving target" that the Government manipulates to reduce or preclude Plaintiffs' damages. The Government also seeks to require Plaintiffs to create a hypothetical alternative universe in which Plaintiffs would be charged with disproving every contingency contrived by the Government in this mythical "but for world" with any one failure leading to a failure to show causation. The law, whether termed "substantial factor" or "but for" causation, does not require such proof. See Locke v. United States, 283 F.2d 521, 524 (Ct. Cl. 1960) ("The defendant who has wrongfully broken a contract should not be permitted to reap advantage from his own wrong by insisting on proof which by reason of his breach is unobtainable.").

The Federal Circuit has employed a "but for" standard of causation in lost profits cases, but this case is not a lost profits case and that standard bears little resemblance to the standard the Government proposes in this case and, in fact, more closely resembles Plaintiffs' approach to causation. Cal. Fed. Bank, FSB v. United States, 395 F.3d 1263, 1268 (Fed. Cir. 2005) ("Cal. Fed."), cert. denied, 126 S. Ct. 344 (2005). In particular, the Federal Circuit's decision in Cal. Fed. makes clear that a plaintiff need not prove that the breach was the "the sole factor or sole cause" of damages (as the Government's proposed standard in this case would require). Id. "The existence of other factors operating in confluence with the breach will not necessarily preclude recovery based on the breach." Id. Thus, whether this Court employs the Federal Circuit's "substantial factor" test as enunciated in Indiana Michigan III or the "but for" test in Cal. Fed., the same result will issue; neither test requires that a plaintiff demonstrate sole

causation. See Abbott Labs. v. Brennan, 952 F.2d 1346, 1353 (Fed. Cir. 1991) (noting in the tort context that "[c]ommentators have explained that the 'but for' and 'substantial factor' standards of causation generally yield identical results"). Under either standard, DOE's nonperformance caused Plaintiffs to incur their mitigation costs of building a dry fuel storage facility at Grand Gulf.

Ultimately, this is a mitigation case. The Government should not be allowed to avoid its burden of proving the unreasonableness of Plaintiffs' actions, which it cannot do on these facts, by attempting to cloak its argument as one of causation. Tenn. Valley Auth., 69 Fed. Cl. at 529-30 ("The government frames this argument as one of causation . . . but in the circumstances of this case, it realistically is a contention aimed at limiting the amount of damages [the plaintiff] may recover as a result of its mitigation efforts. The government contends that [the plaintiff's] damages should be constrained to the difference between the costs of building the dry storage facilities in the present (breach) world versus the costs of building the facilities later in the but-for, non-breach world . . . Because the government seeks to limit the non-breaching party's recovery for mitigation, the government bears the burden of proof."); cf. also First Heights Bank, FSB v. United States, 422 F.3d 1311, 1317 (Fed. Cir. 2005) ("We thus conclude that the government's so-called causation argument is identical to the government's mitigation argument and reject it for the reasons described above.").

### B. Plaintiffs' Past Costs In Designing And Constructing A Dry Fuel Storage Facility Were Caused By The Government's Breach And Were Foreseeable

At trial, Plaintiffs proved their damages for constructing a dry fuel storage facility at Grand Gulf. These were reasonable mitigation costs, eminently foreseeable, and directly caused by the Government's breach.



400535070v5

### 1. Plaintiffs Properly Mitigated The Government's Breach By Constructing A Dry Fuel Storage Facility At Grand Gulf

It was clearly foreseeable at the time of contract formation that a utility would need to provide alternative storage facilities for SNF if DOE failed to pick-up the fuel. As noted above, one of the primary objectives of the NWPA was to assure that utilities would not have to build additional at-reactor storage after 1998. See Yankee Atomic, 73 Fed. Cl. at 265 ("[T]he intent of the NWPA and the parties to the Standard Contract was to avoid the construction by utilities of additional at-reactor storage after January 31, 1998. DOE's failure to perform under the Standard Contract thus has led to the very thing the NWPA and the Standard Contract were designed to forestall, i.e., the construction of dry storage facilities for spent nuclear fuel at nuclear power electricity generating plants throughout the United States") (internal quotations omitted); see also Tenn. Valley Auth., 69 Fed. Cl. at 519. Thus, it was foreseeable that Plaintiffs would have to find alternative storage for the SNF at Grand Gulf given DOE's failure to begin performance under the Standard Contract. Indiana Mich. III, 422 F.3d at 1375 ("Having been placed in a position where they are required to find alternate storage for SNF, the utilities must *de facto* accept responsibility to guard against the environmental impact of improperly-disposed and maintained SNF, a situation which the NWPA was enacted to avoid").

As several of Plaintiffs' fact witnesses testified, DOE's failure to begin SNF acceptance was the principal and driving factor in the decision to build a dry fuel storage facility at Grand Gulf. See S. Cal. Sav. & Loan, 422 F.3d at 1337 (affirming trial court's determination that the breach was the "principal" and "substantial factor" causing damages). It was reasonable for Plaintiffs to assume, for example, that DOE would not actually begin SNF acceptance at Grand Gulf prior to 2020. Faced with this prospect, the only feasible and cost-effective long-term option to mitigate the effects of running out of space in the spent fuel pool at Grand Gulf (i.e.,



400535070v5

losing full core reserve and facing possible plant shutdown) was to implement dry storage. As Mr. Franklin testified, none of the other options (e.g., rod consolidation, do nothing, etc.) were realistic or financially viable. Thus, Plaintiffs substantially completed the construction of the ISFSI at Grand Gulf prior to August 31, 2005 to mitigate the effects of DOE's nonperformance. Simply put, there was no reason other than DOE's breach which caused Plaintiffs to build the ISFSI at Grand Gulf.

**2. The Government's Theory Of Causation Is Untenable**

The Government, through its economic expert, Dr. Raymond Hartman, maintains that if DOE had begun SNF acceptance in 1998, Plaintiffs would still have needed (and chosen) to build a dry fuel storage facility at Grand Gulf. Direct Testimony of Raymond S. Hartman ("Hartman Direct") ¶ 29. This position is flawed for at least two significant reasons.

First and foremost, Dr. Hartman's analysis is based solely on various DOE acceptance scenarios that counsel for the Government directed him to assume. Hartman Direct ¶ 25; Tr. 2538-44 (Hartman). As explained in Section III.E *infra*, however, the Government's alternative scenarios are unsupported by the vast majority of DOE program documents or are premised upon, *inter alia*, a change in federal law that never occurred and an approach to storing SNF using a facility that never existed. For this reason alone, Dr. Hartman's "zero damages" position requires undue speculation and has no credible evidentiary support.

Moreover, the Government has provided no evidence that even under a scenario where DOE could have begun SNF acceptance in 1998 at an annual rate of 900 MTU (which Plaintiffs maintain was unrealistic in any event), it was reasonably certain that Plaintiffs would have built a dry fuel storage facility at Grand Gulf. Dr. Hartman apparently relies on two Entergy documents stating that Grand Gulf was expected to have SNF storage shortfalls in 2005 prior to DOE

pickup. Hartman Direct ¶ 12 n.24. These documents were issued in the early 1990s, however – several years before DOE would have actually begun SNF acceptance from any plant and long before Plaintiffs would have taken any steps towards a hypothetical decision to build an ISFSI in a non-breach world. Thus, one cannot credibly conclude from these two documents – or any other evidence in the record – that Plaintiffs would have chosen to build a dry fuel storage facility to address any projected SNF storage shortfall after 2005. Indeed, common sense suggests that Plaintiffs would have avoided pursuing dry storage if they had any reasonable basis for believing that DOE would perform its contractual obligations in a timely manner.

In summary, any scenario that the Government has proffered under which Plaintiffs would have built a dry fuel storage facility at Grand Gulf in the non-breach world is speculative, contrived, or illegal (to the extent it is inconsistent with the statutory linkages that prohibited the siting and construction of an MRS). As explained above, Plaintiffs built a dry fuel storage facility at Grand Gulf solely due to the Government's breach.[15]

### C. The Government Failed To Show That Plaintiffs' Mitigation Efforts Were Unreasonable And, Therefore, Its Asserted Offsets Are Improper

#### 1. Any Offsets Based On What DOE Might Do When It Picks Up SNF From Grand Gulf In The Future Are Speculative

The Government has taken the position through its technical expert, Mr. Warren Brewer, that Plaintiffs' damages should be reduced because Plaintiffs allegedly benefited from DOE's failure to perform. For example, the Government posits that Plaintiffs hypothetically benefited from not incurring cask loading costs – in other words, the costs Plaintiffs would have had to expend had DOE timely arrived at Grand Gulf and had DOE containers been loaded per the

[15] Even though Plaintiffs provided sufficient evidence to meet a more rigorous standard of causation, it bears noting that "substantial causal factor" remains the governing standard of causation in this case.

Standard Contract. Dr. Hartman has opined that under the Kenrich model of SNF acceptance in the non-breach world (i.e., a 3,000 MTU acceptance rate after a short ramp-up period), Grand Gulf would have loaded and DOE would have taken 9 DOE containers from Grand Gulf as of the damages cut-off date in 2005. Hartman Direct ¶ 31. Based on this opinion and the assumption of a $300,000 cost for loading one cask to DOE (plus escalation of approximately $12,000 per cask to convert the estimate, prepared in 2004, to nominal dollars in the year the cask loadings would have occurred), Dr. Hartman calculated a $2.81 million offset for cask loading in the "but-for" world against Plaintiffs' damages claim.[16] Id. n.47.

While these types of loading costs may eventually be incurred in the future if and when DOE actually takes SNF from Grand Gulf, what those discrete costs might have been in a hypothetical, non-breach world is too speculative to consider in a partial breach case. See Indiana Mich. III, 422 F.3d at 1376-77 (noting that a claim for partial breach precludes future damages). In other SNF damages cases, this Court has rejected the Government's contentions regarding such offsets as speculative. Faced with this exact issue, Judge Lettow concluded:

> [T]he government claims that in the non-breach, but-for world, [the utility] would have had to incur costs in loading casks with SNF for delivery to DOE. As a result of DOE's breach, the government claims that [the utility] has temporarily avoided these costs, that [the utility] has received a benefit as a result, and that

[16] To the extent that the Court finds any merit in the Government's theory of cask loading offsets, the $300,000 per cask loading estimate that Dr. Hartman adopts is derived from Mr. Brewer's reliance on an Entergy investment proposal outlining the estimated operational costs of loading dry fuel storage casks to the ISFSI to be built at Grand Gulf. Prefiled Direct Testimony of Warren K. Brewer ("Brewer Direct") at ¶ 79 n.71; PX 54 at 33 (SSM0052776). Mr. Brewer could not, however, establish the cost of loading casks to DOE in the non-breach world with any reasonable certainty. In this regard, he conceded that "[t]he effort and cost can vary significantly depending on the type of cask assumed. It is not possible to say with certainty what type and size of cask DOE would have provided to Entergy Grand Gulf in the but-for world." Brewer Direct ¶ 70. Thus, at best, Mr. Brewer's analysis is non-scientific and imprecise (and at worst requires rank speculation).

> the government should be credited with an offset to [the utility's] damages to reflect this benefit.
>
> The alleged benefit stems purely from timing; both DOE and [the utility] contemplate that DOE will still perform under the contract at some future date. As matters now stand, any benefit inhering in [the utility] because of delayed loading costs would be entirely speculative. It is not possible to ascertain the method DOE will ultimately use for SNF acceptance. The size and type of casks to be used to transport the SNF are not known; no casks have been approved for the purpose. The mode of transport has not been determined. Additionally, the date at which DOE will begin to perform in the future cannot even be estimated, let alone determined with reasonable certainty.

Tenn. Valley Auth., 69 Fed. Cl. at 542-43 (citations omitted); see also Yankee Atomic, 73 Fed. Cl. at 286 (calling future potential offsets speculative and citing to Tenn. Valley Auth.); Pac. Gas & Elec., 73 Fed. Cl. at 416 ("[I]t would be entirely speculative to offset plaintiff's damages because of a purported benefit it will receive from loading large rail casks in the future rather than 25-ton truck casks in the non-breach world. Plaintiff's loading costs have been deferred rather than avoided, and the court declines to engage in a guessing game as to whether such deferred costs will have increased or decreased by the time (if ever) defendant performs the parties' Standard Contract"). Similarly, the Court has held that because "DOE and [the plaintiff] both contemplate that DOE will still perform under the Standard Contract at some future date, any benefit to [the utility], because of delayed loading costs, would be entirely speculative." SMUD I, 70 Fed. Cl. at 372. For these reasons, Plaintiffs respectfully submit that the Government's proposed offsets with respect to cask loading should be rejected.

Moreover, Mr. Brewer has testified generally that several types of plant modifications performed at Grand Gulf for the dry fuel storage project – the costs of some of which are included in Plaintiffs' damages claim – would allegedly have been performed by Plaintiffs in the non-breach world anyway (i.e., to accommodate SNF acceptance by DOE). Brewer Direct ¶ 17.

He characterizes such modifications as not "incremental" to the Government's breach. Brewer Direct ¶ 14. Based on Mr. Brewer's technical opinions, the Government's accounting expert, Mr. Robert Peterson, determined the costs associated with such allegedly "non-incremental" tasks. Tr. 2334-35 (Peterson) (his staff at LitCon performed a "monetization of the activities that were questioned by Mr. Brewer"). The alleged damages offsets derived from Mr. Brewer's findings total approximately $2.3 million. Direct Testimony of Robert Peterson ("Peterson Direct") at 28 (LIT0010031). None of these offsets are appropriate, for several different reasons.

First, some of the alleged offsets upon which Mr. Brewer has opined are for costs related to activities that were incurred at Grand Gulf *after* the damages cut-off date in this case. For example, the dose assessments performed for the ISFSI were completed after August 31, 2005. Tr. 609-11 (Warren). Moreover, in some instances, the allegedly non-incremental activities that Mr. Brewer discussed reflect efforts that were not actually undertaken at Grand Gulf for the dry fuel storage project. Compare Tr. 594-95, 619 (Warren) (explaining that the 208-foot elevation piping design and implementation was not pursued) with Brewer Direct ¶¶ 63-65. Thus, notwithstanding the merits of Mr. Brewer's opinions on whether these particular tasks were "incremental," such testimony is irrelevant to the instant action and should be disregarded, because the offsets are for activities not encompassed by the claim period or for activities that were never undertaken.

Just as importantly, Mr. Brewer has opined that a variety of plant modifications that Plaintiffs performed for the dry fuel storage project at Grand Gulf would not be "incremental" to the Government's breach had DOE shown up at the plant with a large cask to accept SNF in the non-breach world. Brewer Direct ¶¶ 39-69. As noted above, however, it is not possible to ascertain with any level of certainty the size and type of casks that DOE will ultimately use for

SNF acceptance. Tenn. Valley. Auth., 69 Fed. Cl. 542-43. Given the lack of progress on the program by DOE, it would be equally speculative (if not more so) to ascertain the size and type of casks that DOE would have used to perform in the hypothetical non-breach world. Mr. Brewer's testimony that one can choose among a "range" of possible casks that DOE would use in the non-breach world, Brewer Direct ¶¶ 12-15, does not render the analysis any less of a "guessing game." This Court, as the finder of fact, is still left with no reasonable certainty regarding the *specific* type of cask to be used by DOE in the "but for" world – the underlying requirement for any such offset against Plaintiffs' claim. For this reason, the testimony of the Government's experts regarding Plaintiffs' plant modifications in a hypothetical, non-breach world carries no probative value.

Mr. Brewer has also incorrectly characterized certain tasks as not "incremental" to the breach by failing to recognize that these tasks, even if they had been performed in the non-breach world, will need to be performed again if and when DOE actually begins SNF acceptance at Grand Gulf. Mr. Brewer's opinion in this regard assumes that the cask-specific tasks performed in the non-breach world would match the details of tasks that Plaintiffs actually performed with the Holtec system for the dry fuel storage project at Grand Gulf. As noted above, however, such a conclusion is speculative without knowledge of what cask DOE would have used in the non-breach world. Examples of such cask-specific tasks include the installation of electrical systems for the auxiliary building and the dose assessment discussed above. Tr. 2204-07, 2231 (Brewer).[17] In other words, for these tasks, Mr. Brewer has effectively conceded that Plaintiffs

[17] Plaintiffs maintain that it would be similarly speculative to determine whether the way in which such tasks would have been performed in the non-breach world is the same as the way in which they were actually done at Grand Gulf for the dry fuel storage project. To the extent that the Court agrees with Mr. Brewer that such tasks were not "incremental," however, it is necessary to consider that Plaintiffs will need to incur costs associated with such tasks again if

will have to perform them twice in the "actual" world as compared to once in the "non-breach" world. Thus, allowing the breaching party to reap the benefits of any damages offset now for such tasks is also inappropriate.

Because Mr. Brewer's opinions regarding cask loading to DOE in the non-breach world are speculative for the reasons explained above, and because Mr. Peterson admitted that he has no independent basis for excluding such costs beyond Mr. Brewer's technical assessment, Tr. 2349-50 (Peterson), the entirety of Mr. Peterson's $2.33 million proposed offset on technical grounds should be rejected.

### 2. The Government Should Not Receive An Offset For Incremental Labor Costs

The Government, through Mr. Peterson, also challenged approximately $42,000 of Plaintiffs' "fixed managerial and administrative" labor costs under the theory that such costs are not "incremental" to the breach in this case. Peterson Direct ¶¶ 44-47. These costs represent direct labor charges by Entergy personnel to the dry fuel storage project. Mr. Peterson essentially opines that, because such employees were not dedicated to the project full-time, their labor costs for time spent on the project are not a proper element of damages.

This exact argument has been rejected by other judges in this Court, and should be rejected here. For example, Judge Lettow conducted an exhaustive review of precedents regarding the recoverability of internal labor and concluded:

> [T]he fact that [the utility] used its own internal resources to support is mitigation is not fatal to its claim for damages in mitigating a breach of contract. Rather, the test for recovery is a targeted one: whether use of the internal resources by [the utility] deprived it of the ability to employ those resources on other

---

and when DOE actually performs in the future – in effect, "cancelling" any damages offset proposed by Messrs. Brewer and Peterson.

> projects. That [the utility] would have paid its employees in all events is not material to this inquiry.

Tenn. Valley Auth., 69 Fed. Cl. at 539; see also SMUD I, 70 Fed. Cl. at 376 ("The fact that an injured party has used internal resources to mitigate a breach does not foreclose the injured party from recovering such costs"); cf. Yankee Atomic, 73 Fed. Cl. at 322 ("It is concluded that defendant did not establish that the labor cost cited was not incurred."); Pac. Gas & Elec., 73 Fed. Cl. at 408 ("To the extent that the costs of [the utility's] internal labor were in fact performed on a 'breach-related project,' . . . the court finds that such labor costs should properly be awarded to plaintiff"). Plaintiffs respectfully submit that this Court's prior reasoning for rejecting internal labor offsets applies with equal force here.

### 3. The Government Should Not Receive An Offset For Loader Costs That Plaintiffs Actually Incurred Due To The Breach

Through the testimony of Mr. Peterson, the Government has further challenged the recoverability of Plaintiffs' loader costs as damages – specifically, $325,000 for the materials loader, $72,000 for the payroll loader, and $469,000 for the capital suspense loader. Generally speaking, Mr. Peterson takes the position that these loaders essentially operate as "fixed" costs that either would have been incurred by Plaintiffs regardless of the existence of the dry fuel storage project at Grand Gulf, or do not correlate with the activities comprising the project. Tr. 2356 (Peterson) (materials loader); Tr. 2372 (Peterson) (payroll loader); Tr. 2379 (Peterson) (capital suspense loader).

Assuming *arguendo* that Mr. Peterson's testimony about how Entergy accounts for loader costs is factually true, such criticisms are ultimately irrelevant. The Government overlooks the fact that the use of loaders at Grand Gulf (a highly regulated plant) to manage personnel and material costs for capital activities such as the dry fuel storage project is much more cost-effective and less time-consuming for Entergy than the alternative – purchasing tools on an *ad*

*hoc* basis and hiring contractors to manage the project, for example. See Tr. 1698 (Metcalfe) (describing the scrutiny that regulated utilities face of not only "federal regulators, but also state commissions who are responsible for determining whether every single dollar is prudent or not and therefore allowed it to [the] rate base"). Allowing Plaintiffs to recover such costs only by hiring more expensive contractors for the dry fuel storage project – solely for the purpose of meeting Mr. Peterson's narrow view of an "incremental" breach cost – makes little practical sense for a non-breaching party seeking to mitigate damages in a reasonable and cost-effective manner.[18] As noted in Section III.A.1 *supra*, exercising "reasonable commercial judgment" is the standard for a mitigating party. Northern Helex, 524 F.2d at 718.

Thus, by using loader rates (akin to overhead) to approximate the true cost to Plaintiffs of the dry fuel storage project, Plaintiffs are accounting for the project in a manner that is consistent with FERC and state regulations as well as Generally Accepted Accounting Principles. Tr. 1699 (Metcalfe). Moreover, "the ascertainment of damages is not an exact science, and where responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision: 'It is enough if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation.'" Bluebonnet Sav. Bank

[18] In this regard, Mr. Peterson also characterized various "non-manual labor" charges for Plaintiffs' contractors (specifically, Stone & Webster and Rexel Southern) as fixed costs that are allegedly not "incremental" to the Government's breach. Peterson Direct ¶¶ 25-27. Based on this opinion, Mr. Peterson deducted approximately $126,000 in "fixed allocations to subcontracts" from Plaintiffs' claim. Id. at 28 (LIT0010031). As with the recovery of loader costs, however, Mr. Peterson's narrow view of incremental breach costs, taken to its logical end, is contrary to the principles of reasonable mitigation here. For example, under Mr. Peterson's standard, Plaintiffs could recover such "non-manual labor" charges for Stone & Webster *only* by hiring a separate site superintendent at Grand Gulf specifically for the dry fuel storage project. Thus, because Mr. Peterson has not challenged the reasonableness of Plaintiffs' mitigation in using a site superintendent from Stone & Webster at Grand Gulf (or the use of Rexel Southern corporate support) for the dry fuel storage project, Tr. 2395-96 (Peterson), his proposed $126,000 offset for non-manual labor charges should be rejected.

F.S.B. v. United States, 266 F.3d 1348, 1355 (Fed. Cir. 2001) (quoting Elec. & Missile Facilities, Inc. v. United States, 416 F.2d 1345, 1358 (Ct. Cl. 1969) (internal quotation marks and citation omitted)). Plaintiffs respectfully submit that the manner in which Entergy calculated loader costs for the dry fuel storage project at Grand Gulf permits the Court to make such a reasonable approximation. Indeed, recognizing that such loader calculation methods conform to Generally Accepted Accounting Principles and relevant regulations, Mr. Peterson does not appear to challenge the manner in which Entergy's accounting department determined its loader costs or adjusted the loader rates on a periodic basis for the project. Tr. 2356, 2364, 2381 (Peterson). For these reasons, the Government has failed to show that Plaintiffs calculated their loader costs unreasonably. Because the Government has failed to meet this burden, Plaintiffs' loader costs should be recoverable as damages.[19]

### D. Plaintiffs Should Receive Their Economic Cost Of Capital Damages

Contrary to the Government assertions, Plaintiffs' costs of capital are appropriate and reasonable damages and do not constitute forbidden "pre-judgment" interest. As noted above,

[19] Apart from his proposed offsets for Plaintiffs' non-manual labor charges, internal labor costs, and loader costs (and those based on Mr. Brewer's technical opinions), Mr. Peterson also opined that a $24,500 offset for scaffolding that Plaintiffs purchased for the dry fuel storage project at Grand Gulf was appropriate based on his interpretation of testimony from Mr. Rogers that such scaffolding had useful life beyond the dry fuel storage project. Peterson Direct ¶ 48 (citing Tr. 977 (Rogers)). Mr. Peterson's offset is inappropriate for multiple reasons. First, Mr. Peterson's decision to offset the entire cost claimed for the purchased scaffolding contradicts his testimony at trial that it would be more appropriate to calculate an offset based on the use of the scaffolding for the dry fuel storage project as a fraction of its useful life. Tr. 2417 (Peterson). Second, the testimony from Mr. Rogers that scaffolding was erected and remained in the "radiologically controlled area" (upon which Mr. Peterson relied) does not, by itself, establish that the scaffolding had useful life beyond the dry fuel storage project. Third, there is no evidence in the record that for the specific purchase of scaffolding that Mr. Peterson chose to offset from Plaintiffs' claim, rental would have been the more cost-effective mitigation. On the contrary, Mr. Rogers specifically testified based on his personal knowledge that in the instance where Plaintiffs purchased scaffolding, it was cheaper than rental. Tr. 960-62 (Rogers). Thus, for these reasons, Mr. Peterson's $24,500 proposed offset for scaffolding costs should be rejected.

even the Government's expert – Dr. Hartman – recognized that as an economic matter, the costs of capital represent actual costs to Plaintiffs that, if not included in a damages award, would not make them whole. Tr. 2591-93 (Hartman). See LaSalle Talman Bank v. United States, 317 F.3d 1363, 1374-75 (Fed. Cir. 2003) (noting that "capital is not 'costless'"). This Court and the Federal Circuit have allowed recovery of costs of capital where the costs relate to actually incurred financing costs – in other words interest as a component of a claim. See Centex Corp. v. United States, 55 Fed. Cl. 381, 390 (2003) ("Courts frequently distinguish, however, between 'interest *on* a claim,' generally precluded by the statute, and 'interest *as* a claim' which courts may treat as an element of compensation. For that reason, it has been held that foreseeable financing costs can be an element of expectancy damages.") (emphasis in original), aff'd, 395 F.3d 1283 (Fed. Cir. 2005).

In particular, Judge Lettow ruled that an Allowance for Funds Used During Construction ("AFUDC") may be recovered against the Government in a SNF damages case, despite the general prohibition against recovery of interest against the Government set forth in 28 U.S.C. § 2516(a). See Tenn. Valley Auth., 69 Fed. Cl. at 541-42. The Federal Circuit recognized the recovery of AFUDC-like financing costs in Wickham Constr. Co. v. Fischer, 12 F.3d 1574 (Fed. Cir. 1994), stating that 28 U.S.C. § 2516(a) "does not bar an interest award as part of an equitable adjustment under a fixed-price contract if the contractor has actually paid interest because of the government's delay in payment." Wickham, 12 F.3d at 1582-83. In Tennessee Valley Authority, Judge Lettow, relying on this principle in Wickham, and because the plaintiff utility established "its use of a widely-accepted, FERC-mandated standard for calculating the cost of the funds used in building the dry storage facilities," its AFUDC costs were recoverable as damages against the Government. Tenn. Valley Auth., 69 Fed. Cl. at 542.

Here, Plaintiffs' incurred cost of capital in building the ISFSI at Grand Gulf, like the AFUDC costs in Tennessee Valley Authority, is akin to the type of interest award that the Federal Circuit stated was permitted in Wickham. Plaintiffs' economic costs of capital are based on the actual weighted average of debt and equity for System Energy Resources, Inc. and South Mississippi Electric Power Association. Their weighted average cost of capital rates – used to calculate AFUDC – are similarly subject to FERC-accounting requirements and are approved by the state public utility commissions. See 18 C.F.R. Part 101, Uniform System of Accounts Prescribed for Public Utilities and Licensees Subject to the Provisions of the Federal Power Act ("Uniform Systems of Accounts"), Electric Plant Instructions, ¶ 3.A(17) (stating that AFUDC "includes the net cost for the period of construction of borrowed funds used for construction purposes and a reasonable rate on other funds when so used" and listing "average short-term debt," "long-term debt, " "preferred stock," and "common equity" as elements that may be included in the AFUDC calculation). Furthermore, Plaintiffs' actual costs of capital do not become impermissible merely because they are formed both by debt and equity. See LaSalle Talman, 317 F.3d at 1375 (concluding that trial court erred in not allowing recovery of costs derived from equity, because "the cost of capital does not depend on whether payment is made as debt, or out of anticipated future earnings"). Therefore, Plaintiffs may recover their economic costs of capital damages for each category of nominal damages as delineated in the table of its total damages in the Introduction of this brief and as proven at trial.

### E. The Parties Understood That DOE Would Perform At A Rate To Avoid Additional At-Reactor Storage After 1998 And To Begin Reducing The Backlog Of SNF, Which Is A 3,000 MTU Steady-State Rate

Lastly, as explained in Section I *supra*, Plaintiffs may prove their mitigation damages in this case without establishing an acceptance rate. The primary issue in this case is whether

Plaintiffs' mitigation efforts were reasonable under the facts that they faced in light of the Government's breach. Nevertheless, should the Court determine that a ruling on the acceptance rate issue is necessary, Plaintiffs submit that the evidence overwhelmingly shows that (1) DOE's DCS process was for planning purposes only, rather than to create binding contractual commitments, and was not treated by DOE as a binding contractual process; and (2) the parties' expectations of DOE's performance were that it would be sufficient to avoid additional at-reactor storage after DOE began performance and to begin reduction of the industry-wide backlog of SNF.

**1. The DCS Process Did Not Create Binding Commitments, And Is Irrelevant To A Damages Determination In This Case**

Contrary to the Government's keystone argument in this (and every other SNF case), the DCS process did not create binding contractual commitments between DOE and Plaintiffs, as the Court has already recognized in this case. See 66 Fed. Cl. at 732 ("Therefore, the court has determined that, as a matter of law, the Annual Capacity Reports ("ACR") and DCSs did not amend the Standard Contract and SFI's failure to submit a DCS is irrelevant and does not alter the Government's obligation under the Standard Contract to accept and store SNF"); Indiana Mich. Power Co. v. United States, 57 Fed. Cl. 88, 97-98 (2003) ("Indiana Mich. II"), appeal dismissed, 112 Fed. Appx. 37 (Fed. Cir. 2004). DOE's cavalier manipulation of the process and its belief that it could unilaterally stop and start the process belie the Government's assertion that the DCSs were meant to be, or were in fact, contractually binding commitments. As discussed above, the process as implemented by DOE through the 1991 ACR was premised on (1) a change in law that never occurred (and that GAO concluded was unlikely to happen), (2) an approach to storing SNF using a facility that never existed, (3) a site that was never selected, (4) a design that was never licensed, and (5) an MRS that DOE never actively pursued (leaving the

success or failure of the entire nuclear waste program to an independent Nuclear Waste Negotiator that was not bound by DOE's schedule). As the Government's own witnesses acknowledged and as stated in the 1991 ACR, absent a change in law, no MRS facility could have been available prior to 2007.

Mr. Barrett (Deputy Director of OCRWM in 2002) referred to the DCSs as "administrivia." Senior DOE officials such as Mr. Brownstein (senior policy advisor to the OCRWM Director) and Ms. Slater Thompson (Acting Division Director of the Regulatory Coordination Division in DOE's OCRWM) both stated that the DCSs were for planning purposes only.

Furthermore, the implementation of the DCS process by DOE belies its stated position now that DCSs somehow constitute binding commitments. As established by one of the Government's own exhibits, DOE conditioned the use (and enforceability) of the DCSs based on the availability of a facility. DX 190 (approved DCS form for the Arkansas Nuclear One plant, attached to letter from DOE to Entergy). Indeed, after some utilities submitted their DCSs, DOE unilaterally added language to the DCSs conditioning performance on the availability of a facility: "The proposed delivery date is dependent on the existence of an operational repository or an interim storage facility constructed under the Act."

Beginning in December 1996, DOE unilaterally suspended the DCS process and began voiding DCSs. See System Fuels, Inc., 66 Fed. Cl. at 731 ("In fact, DOE unilaterally refused in 1996 to approve or disapprove any new DCSs and voided the DCSs from utilities that previously had been approved"); Tenn. Valley Auth., 69 Fed. Cl. at 521 ("DOE effectively short-circuited this process by its failure to perform under TVA's Standard Contract"); see also Consumers Energy Co. v. United States, 65 Fed. Cl. 364, 370-71 (2005) (concluding that DOE "abandoned"

the DCS process in 1997). In March 1997, DOE wrote all utilities with approved DCSs and advised them formally that the DCS process was suspended. After a seven-year hiatus, in July 2004, as Mr. Zabransky acknowledged in his testimony at trial, DOE re-started the DCS process and informed the utilities that any new DCSs submitted in that process would replace rather than supplement previously submitted and approved DCSs. Approximately six months later, in December 2004, DOE again unilaterally suspended the DCS process. It remains suspended today. See Sys. Fuels, Inc. v. United States, 65 Fed. Cl. 163, 167 (2005); see also Entergy Nuclear Generation Co. v. United States, 64 Fed. Cl. 336, 340 n.4 (2005) (discussing the 2004 DCS process and that newly submitted DCSs were meant to replace, rather than supplement prior submitted DCSs).

Here, Plaintiffs had not yet submitted any DCS forms for potential SNF acceptance at Grand Gulf. In each of the annual capacity reports that DOE issued – whether in 1991, 1995, or 2004 – the first projected allocations for SNF acceptance at Grand Gulf were not to occur until at least the eighth year of DOE performance (and in some instances would not have taken place in the first ten years of DOE performance). Tr. 1180-81 (Rives); see also PX 13-K at 3 (allocations for "System Energy Resources, Inc."); DX 140 at 9 (allocations for "Mississippi Power & Light"). Thus, because DOE had suspended the DCS process in 1997, and the Standard Contract did not require any utility contract holder to submit DCS forms until 63 months in advance of the desired pick-up date, it was reasonable for Plaintiffs not to have submitted any DCS forms for Grand Gulf. Tr. 1323-24 (Rives) ("Grand Gulf did not have an allocation at that point in time, so there was no DCS to submit according to . . . the lead times of the contract"). For these reasons, Plaintiffs respectfully submit that the DCS process has no bearing on the adjudication of their damages claim in this case.

Nonetheless, at trial, the Government sought to elicit testimony from Plaintiffs regarding Entergy's submission of DCS forms for the Arkansas Nuclear One plant (pertaining to a contract not at issue in this case). In particular, the Government apparently tried to establish that Entergy willingly participated in the DCS process during the mid-1990s regarding some of its plants and did so without protest. Tr. 1277-80 (Rives). Notwithstanding the fact that Entergy's submission of DCS forms at that time were completely unrelated to Grand Gulf, it always treated DOE's publication of APRs/ACRs and DCS submissions as a planning activity, and did not view the process as somehow creating binding commitments. Tr. 1258 (quoting from the 1991 ACR that the document "is for planning purposes only and thus is not contractually binding on either DOE or the purchasers"). See also Yankee Atomic, 73 Fed. Cl. at 298 ("Parroting DOE's delays and acceptance rates did not and does not evidence acquiesce[nce] in them."). In other words, despite DOE's impending nonperformance, Entergy submitted a DCS for Arkansas Nuclear One strictly to protect against the possibility of Entergy losing its SNF acceptance rights if DOE chose to interpret a utility's failure to submit DCSs as a waiver of allocated rights. Tr. 1323 (Rives) ("I did the DCS in Arkansas to protect whatever contract rights DOE may interpret there. I had to prudently make sure I got at least what DOE said in the [1991 APR/ACR]"). Thus, the Government's reliance on submitted DCS forms from Entergy for non-Grand Gulf plants is unavailing. Moreover, any contractual significance to the process (to the extent there was any) had long since been extinguished by DOE's performance failures and repeated suspension of the process.

### 2. The Parties Expected Contract Performance At A 3,000 MTU Steady-State Rate After A Five Year Ramp-Up

The NWPA and the Standard Contract specified the date – January 31, 1998 – when DOE was required to begin removing SNF from commercial nuclear reactors. 42 U.S.C. §

10222(a)(5)(B); Maine Yankee, 225 F.3d at 1342 ("Congress found this objective so important when it promulgated the Act that it took the unusual action of specifying that all the contracts must contain this explicit requirement"). While the NWPA and the Standard Contract lodged the responsibility with the utilities for paying for DOE's disposal program and to provide interim storage of SNF, the utilities only had the responsibility for the costs of interim storage "until such waste and spent fuel is accepted by the Secretary of Energy in accordance with the provisions of this Act . . . ." 42 U.S.C. §§ 10131(a)(4) & (5); see also Indiana Mich. II, 57 Fed. Cl. at 99-100 ("The parties understood that utilities were not to store additional waste on site after 1998. This was Congress' purpose in passing the Nuclear Waste Policy Act, and it was the parties' intent in signing the Standard Contract. The Department of Energy would have begun performance by collecting 400 metric tons of nuclear waste in 1998, and ramped up to 3,000 metric tons by the end of 2002. Defendant would have continued performance pursuant to the Standard Contract at a minimum rate of 3,000 tons thereafter"). And in carrying out its obligations, DOE was supposed to remedy the "national problem . . . created by the accumulation of . . . spent nuclear fuel from nuclear reactors . . . ." 42 U.S.C. § 10131(a)(2)(A).

Testimony at trial regarding the expectations of the parties buttresses the plain meaning of the NWPA and the Standard Contract. As noted during the testimony of Mr. Morgan (DOE's first acting director of the spent fuel program) and Mr. Zabransky (DOE's current contracting officer), the parties expected DOE to perform at a rate sufficient to avoid the need for Plaintiffs to provide additional at-reactor storage after DOE began performance in 1998 and to begin working off the backlog. See also Tenn. Valley Auth., 69 Fed. Cl. at 519 ("One of the goals of the Nuclear Waste Policy Act was to reduce the backlog of spent nuclear fuel that had accumulated at nuclear power facilities around the nation. Another goal of the waste disposal

program was to preclude utilities need to provide for storage of spent fuel outside the pools attendant to their reactors") (citations omitted). Mr. Barrett – at the time of his deposition, the Deputy Director of OCRWM – also acknowledged that the 3,000 MTU steady-state rate was the one that DOE used for planning the system. Ms. Supko opined that a steady-state rate of 3,000 MTU after a five year ramp-up period would allow utilities to avoid at-reactor storage and reduce the SNF backlog, and noted that DOE's program documents regularly referenced the 3,000 MTU steady-state rate as the rate expected for performance. See Indiana Mich. II, 57 Fed. Cl. at 99; see also Tenn. Valley Auth., 69 Fed. Cl. at 519-20.

The 900 MTU rate that DOE used in the 1991 ACR, the acceptance rate that the Government insists is contractually obligated, is wholly speculative.[20] The "fairy tale" nature of the 900 MTU rate is demonstrated by the fact that in 1991 (and, in fact, from 1989 to the present) utilization of that MRS-based rate would violate the NWPA. See November 1989 Report To Congress On Reassessment Of The Civilian Radioactive Waste Management Program at vii, PX 13-F (KRG-GG000576) ("This schedule shows a significant slip for the expected start of repository operations – from the year 2003 to approximately 2010"). The 900 MTU rate is based on an assumed congressional amendment of the NWPA, removing the linkage between the MRS construction and the licensing of Yucca Mountain, but leaving untouched the capacity linkage between Yucca Mountain operation and the amount of spent fuel stored at the MRS. Just a year earlier, DOE had used a 3,000 MTU "upper bounding rate" (for performance at an MRS

[20] This 900 MTU rate corresponds to "But-For.1" in Dr. Hartman's modeling of spent fuel management at Grand Gulf. Hartman Direct ¶ 25. The Government failed to provide any factual evidence supporting the viability or reasonableness of the other two alternative SNF acceptance scenarios proffered through Dr. Hartman, "But-For.2" and "But.For.3." "But-For.2," which is a 3,000 MTU acceptance rate after a 17-year ramp-up period, has been found in only two out of dozens of DOE program documents over the past few decades. "But-For.3," which is a 2,100 MTU acceptance rate after a 17-year ramp-up period, cannot be found in *any* DOE program documents.

beginning in 1998), which assumed that Congress would remove both the schedule and capacity linkages from the Amendments Act. DOE's acknowledgment of the mythological nature of the 900 MTU rate becomes plain in the 1994 APR/ACR (issued in March 1995), where DOE no longer even bothered to use actual calendar years for performance, but instead simply used "Year 1" through "Year 10." In these circumstances, force-fitting the 900 MTU rate into a contractually binding obligation would elevate a speculative, hypothetical construct over the actual mitigation costs that Plaintiffs have incurred in the real world.

**F. Plaintiffs' Takings Claim Remains Viable**

In its December 20, 2006 "Memorandum In Support Of Its Rule 52(c) Motion" ("Rule 52(c) Brief"), the Government maintains that there is no evidence in the trial record supporting Count III of Plaintiffs' Complaint, which count alleges a taking without just compensation. Rule 52(c) Brief at 19. The Government's position is untenable for two reasons. First, testimony from Entergy witnesses and Mr. Zabransky at trial belies the Government's characterization of the record. For example, in discussing Entergy's 2003 Spent Fuel Management Plan (PX 226), Mr. Franklin explained the effect of DOE's projected nonperformance on the accumulating backlog of SNF in the wet pool at Grand Gulf. Tr. 266-67, 299-300 (Franklin). In this regard, DOE's current position is that the commencement of SNF acceptance will not begin until 2017 at the earliest. Tr. 2050 (Zabransky). Thus, the Court has indeed heard testimony establishing that, because of DOE's continuing nonperformance, a substantial amount of SNF will remain on-site at Grand Gulf for the foreseeable future. Second, and just as importantly, Plaintiffs have always understood (based on the Court's July 2005 ruling on liability) that the scope of the trial that occurred in this case was to address specifically the *damages* resulting from the Government's partial breach of the Standard Contract. See 66 Fed. Cl. at 735 ("Whether any specific damages

were caused by the Government's partial breach and the final determination of damages due, if any, has not been adjudicated and can only be determined after an evidentiary hearing"). The damages resulting from Plaintiffs' partial breach claim largely overlap with those resulting from Plaintiffs' takings claim. While Plaintiffs do not seek a double recovery, until the damages from Plaintiffs' partial breach claim are adjudicated, it is inappropriate to resolve the merits of Plaintiffs' takings claim. See, e.g., Sacramento Mun. Util. Dist. v. United States, 74 Fed. Cl. 727, 736 (2006) ("SMUD II") ("[T]he allocation of costs associated with the failure of this commercial agreement first must be adjudicated under contract law").

Moreover, the Government's suggestion that Plaintiffs may not maintain both a breach of contract claim and a takings claim, Rule 52(c) Brief at 19-20, is incorrect. The Federal Circuit has allowed a plaintiff utility in the SNF cases to maintain both a breach of contract claim and a takings claim. In Maine Yankee, the Federal Circuit expressly allowed another utility with a Standard Contract to proceed on both its breach of contract claim and takings claim. See Maine Yankee, 225 F.3d at 1342 ("Our conclusion that Yankee may maintain its breach of contract claim in Count I also results in affirmance of the Court of Federal Claims' denial of the government's motion to dismiss Counts II [breach of duty of good faith and fair dealing] and III [taking of property without just compensation]"). Plaintiffs' action is materially identical to that in Maine Yankee; both cases involve the Standard Contract and both utilities have alleged a breach of contract and a taking without just compensation. Thus, in the very case holding that the Government breached the Standard Contract, the Federal Circuit rejected the Government's assertion that a breach claim cannot co-exist with a takings claim. That assertion should likewise be rejected here.

Consistent with the Federal Circuit's ruling in Maine Yankee, this Court on numerous occasions has found that a utility may maintain both a breach of contract and a takings claim. In Detroit Edison, Judge Miller denied the Government's motion to dismiss the plaintiff's takings claim, pointing out that the Federal Circuit in Maine Yankee "allowed plaintiff utilities . . . to maintain both a contract and a takings claim." Detroit Edison Co. v. United States, 56 Fed. Cl. 299, 301 (2003). According to Detroit Edison, "[i]f the right at issue is not governed by the terms of the parties' contract, plaintiff may pursue a takings remedy to vindicate that right." Id. at 302. Thus, in Detroit Edison, Judge Miller allowed the plaintiff's takings claim to proceed, refusing to "make an early ruling that could prevent plaintiff from vindicating its rights – whether under the Standard Contract or takings jurisprudence. . . ." Id. at 303. In similar circumstances, Judge Merow in Yankee Atomic denied the Government's motion for summary judgment on a plaintiff's takings claim, allowing trial proceedings to go forward on both breach of contract and takings claims. Yankee Atomic Elec. Co. v. United States, No. 98-126C, slip op. at 4-5 (Fed. Cl. June 26, 2003). Previously, this Court in Yankee Atomic had denied a motion to dismiss the takings count that had led to the Federal Circuit appeal. See Yankee Atomic Elec. Co. v. United States, 42 Fed. Cl. 223, 236 (1998), *aff'd sub. nom.*, Maine Yankee, 225 F.3d at 1342. Other Judges of this Court likewise have denied the Government's attempts to dispose of a plaintiff's takings claim in materially identical circumstances. See SMUD II, 74 Fed. Cl. at 736 (disposing of takings claim only after directing entry of judgment on partial breach of contract claim in SNF case); see also Sys. Fuels, Inc., 65 Fed. Cl. at 172-73; cf. also Consolidated Edison Co. of N.Y., Inc. v. United States, 67 Fed. Cl. 285, 291 (2005); Boston Edison Co. v. United States, 64 Fed. Cl. 167, 187-88 (2005).

Thus, for the reasons explained above, Plaintiffs' takings claim remains viable in this case and any final disposition of that claim is premature. The Government's motion to dismiss Count III of Plaintiffs' Complaint should be denied.

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that this Court enter judgment on their breach of contract claim in the amount of $12.18 million.

Dated: March 23, 2007

Respectfully submitted,

s/ Alex D. Tomaszczuk by s/ Jack Y. Chu
Alex D. Tomaszczuk
**PILLSBURY WINTHROP**
**SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7940
(703) 770-7901 (fax)

Counsel of Record for Plaintiffs
System Fuels, Inc., System Energy Resources, Inc., and South Mississippi Electric Power Association

OF COUNSEL:
Jay E. Silberg
Daniel S. Herzfeld
Jack Y. Chu
**PILLSBURY WINTHROP**
**SHAW PITTMAN LLP**
2300 N Street, N.W.
Washington, D.C. 20037
(202) 663-8000
(202) 663-8007 (fax)

L. Jager Smith, Jr.
**WISE CARTER CHILD**
**& CARAWAY, P.A.**
1340 Echelon Parkway
Jackson, MS 39213
601-368-5572
601-368-5816 (fax)