IN THE UNITED STATES COURT OF FEDERAL CLAIMS

NORTHERN STATES POWER COMPANY, )
Plaintiff ) Case No.
vs. ) 98-484C
THE UNITED STATES, )
Defendant. )

Courtroom 6
National Courts Building
717 Madison Place NW
Washington, D.C.

Wednesday, November 15, 2006

VOLUME 12

The parties met, pursuant to the notice of the Judge, at 10:01 a.m.

BEFORE: THE HONORABLE JOHN P. WIESE

APPEARANCES:

ON BEHALF OF THE PLAINTIFF:
ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD,, ESQ.
Pillsbury Winthrop Shaw Pittman, LLP
1650 Tysons Boulevard, 14th Floor
McLean, Virginia 22102-4859
(703) 770-7900
and
JAY E. SILBERG, ESQ.
Pillsbury Winthrop Shaw Pittman, LLP
2300 N Street, N.W.
Washington, D.C. 20037-1122
(202) 663-8063



APPEARANCES CONTINUED:

ON BEHALF OF THE DEFENDANT:
ALAN J. LO RE, ESQ.
HEIDE HERRMANN, ESQ.
JOSHUA GARDNER, ESQ.
STEPHEN FINN, ESQ.
ANDREW P. AVERBACH, ESQ.
JOHN EKMAN, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7562

(Index appears at end of transcript)



P R O C E E D I N G S

\- - - - - -

THE COURT: We can go on the record.
Any preliminary matters? Mr. Tomaszczuk.
MR. TOMASZCZUK: None from the plaintiff, Your Honor. Good morning.
THE COURT: Ms. Herrmann, good morning.
MS. HERRMANN: Good morning, Your Honor. None from the Government.
THE COURT: Very well. Then we will move on with the Government's next witness. Is that right?
MS. SULLIVAN: Yes. Good morning, Your Honor.
THE COURT: Good morning.
MS. SULLIVAN: We'd like to call Mr. Thomas Pollog to the stand.
THE COURT: Mr. Pollog. Will you take the stand for us, please. And the reporter needs to know that the questioning will be by Ms. Sullivan.
MS. SULLIVAN: Thank you, Your Honor.
Whereupon,
THOMAS E. POLLOG



was called as a witness, and, having first been duly sworn, was examined and testified as follows:
THE COURT: Please be seated. I would like you to state your name in full, spell your last name, and give the reporter your home address.
THE WITNESS: Thomas Edward Pollog, P-O-L-L-O-G.
THE COURT: And I'm going to ask you to back away from the mic just a little bit.
THE WITNESS: My home address is 4208 40th Street North, Arlington, Virginia 22207.

DIRECT EXAMINATION

BY MS. SULLIVAN:
Q Mr. Pollog, good morning. Where are you currently employed?
A I'm employed at the Department of Energy in the Office of Civilian Radioactive Waste Management.
Q And what position do you currently hold at DOE?
A I'm a nuclear engineer in the Office of Waste Management.
Q How long have you been in your current position?



fe47c76d-fb42-4dd2-a347-fc8e597166af

what we're examining is this witness' understanding of how the fulfillment of its contract responsibilities can exist side by side with the suspension of the delivery-commitment schedule process.

MS. SULLIVAN: Understood, Your Honor. Thank you.

THE COURT: So that's where we are.

MS. SULLIVAN: That's fine, Your Honor.

MR. HERZFELD: Okay. Now I am going to hopefully introduce this into evidence because --

THE COURT: I'm not sure that we got the last question answered.

MR. HERZFELD: He did not answer. Well, then I guess I would -- if I could ask you to answer the last question. If you could read it back.

(The reporter read the record as requested.)

THE WITNESS: Well, that's what we believe we did, so yes.

BY MR. HERZFELD:

Q So the answer is, yes, that you could unilaterally cut off your obligations by no longer approving DCSs?



A That's what we try to do, yes.

Q Thank you.

THE COURT: What do you mean by obligation? What do you understand the term obligation to mean in the context of counsel's question to you?

THE WITNESS: I'm referring to a specific obligation to take a specific amount of material in a specific period. This has to be taken, these 10 metric tons of uranium in 2003 or 2007. A specific commitment to accept a specific amount of material by a specific time period. That's what I believe he's asking me.

BY MR. HERZFELD:

Q So if I understand your answer correctly, the DCS just commits you to the amount of fuel. It doesn't actually commit to the time period.

So, for example, if DOE didn't begin performing until 2025, it would have no obligation -- no contractual obligation?

A The DCS --

MS. SULLIVAN: One moment, Your Honor. Your Honor, we'll just let the question go. Thank you.



THE WITNESS: The DCS does contain a time period. It has a year on it. So it has a year and an amount.

BY MR. HERZFELD:

Q Okay. And I must have misunderstood your answer. Because I thought you said it was a definite commitment to the amount but not the year?

A No. I said year and amount because they're both clearly on the DCS form.

Q So let me shift gears just slightly and ask you, is your understanding of the purpose of DOE stopping the approval of DCSs was to limit DOE's liability?

MS. SULLIVAN: Objection to the extent it calls for legal conclusion. The question could be his understanding as to the effect or something. Your Honor, limiting liability, that's a province for the general counsel's office.

THE COURT: All right. With that modification --

MR. HERZFELD: I don't think -- I think I said, is it your understanding that the purpose of stopping the approval of DCSs was to limit DOE's liability?



THE COURT: You may answer that question. Yes.

THE WITNESS: Yes.

BY MR. HERZFELD:

Q Okay. If I could get you to turn your attention to Plaintiff's Exhibit 334, which is binder 62.

A This was 330? What was the number again?

Q Binder 62. Plaintiff's Exhibit 334.

Now, do you recognize this document?

A Yes.

Q And do you recognize it to be the 2004 DCS instructions that accompanied the 2004 APR/ACR?

A Yes.

Q And you drafted this document, correct?

A Yes.

Q And if I could direct your attention to page 2, paragraph 7 (a). And if I could have you read into the record the last two sentences of paragraph 7 (a).

MS. SULLIVAN: Your Honor, if I could just -- I understand the Court's ruling when this issue was discussed with Mr. Kouts yesterday. But



fe47c76d-fb42-4dd2-a347-fc8e597166af

regarding implementation of any alternative. Furthermore, the Department takes no position on the degree to which any of these alternatives may be or have been applied at Prairie Island, nor the degree to which they may be effective, alone or in combination, in extending the duration of the operation of the Prairie Island Units 1 and 2.
Q Thank you. Mr. Pollog, if you had been asked to perform a similar analysis for another plant owned by another utility, would your list of options have been different?
A Possibly, yes.
Q Could it have been the same list of options?
MR. HERZFELD: Objection. Asked and answered. And leading.
THE COURT: I sustain that objection.
BY MS. SULLIVAN:
Q Mr. Pollog, did you discuss the situation at NSP with anyone at NSP prior to the preparation of this report?
A No, we did not.
Q Okay. What is the status of PFS today?
MR. HERZFELD: Objection. Calls for speculation. And relevance.



THE COURT: I'm assuming, since the witness exhibited knowledge of the existence of a private full storage facility at the time that report was authored in '01, I'm assuming that he is able to answer the question today regarding that facility status.
MS. SULLIVAN: Your Honor, I can lay a foundation for the question and then ask it.
THE COURT: This witness has put out in his report as among the alternatives that Northern States may rely upon the availability of a private storage facility. That exhibits his knowledge of that facility and, thus, the relevance and permissibility of the question asked.
MR. HERZFELD: We withdraw our objection.
BY MS. SULLIVAN:
Q Mr. Pollog, what is the status of PFS today?
A As far as I know, it's dead right now.
THE COURT: As far as I know, it is what, Mr. Pollog?
THE WITNESS: Dead.
THE COURT: Okay.
MR. HERZFELD: Thank you. I didn't hear



him either, Your Honor.
BY MS. SULLIVAN:
Q Mr. Pollog, do you recall you testified on cross --
THE COURT: Excuse me. May I interrupt?
MS. SULLIVAN: Yes.
THE COURT: How did you learn about the private fuel storage facility in the first instance?
THE WITNESS: The initiative was in nuclear periodicals.
THE COURT: I see.
THE WITNESS: Journals. There was discussions of it in different conferences, seminars throughout the nuclear industry, seminars, symposiums, conferences concerning spent fuel management in the nuclear industry.
THE COURT: I see.
BY MS. SULLIVAN:
Q Is this the same source for your current understanding is the current status of PFS?
A Yes.
Q Mr. Pollog, during questioning by Mr. Herzfeld, there was an exchange with regard to DOE's -- whether Department of Energy was



attempting to limit its liability to the suspension of the DCS process. What did you mean when you testified about limiting liability?
A Well, the DCSs were an obligation the Department had entered into. If we stopped approving them, we were essentially stopping our liability -- we were not increasing it any more than we already had incurred.
Q Was the process suspended to limit or reduce DOE's liability in this case?
A I don't know the answer because I don't know what the status was of all of NSP's DCSs if they had been submitted or not, the ones that they were able to submit, that is. So if they had DCSs that they still could have submitted to the Department, then it would have done that, yes. It would, we believe, limited our liability in this case.
Q Were you trying to reduce the amount DOE would pay due to its delay in accepting the amounts covered by approved DCSs?
A Yes. When I say approved, I mean one -- if it wasn't approved, then it was -- there was no liability anymore. We would not have an obligation for that.

Q If it wasn't approved?
A Correct. So not for the ones that already were approved. We were trying to see that no more were approved.
Q Mr. Pollog, what do you understand to be the -- the -- for the DCSs that were approved, that NSP may hold, what is DOE's obligation on those DCSs?
A Whatever is contained in the delivery-commitment schedule itself, for a certain amount of fuel that we should have picked up in a time period that is indicated on that DCS. Each DCS has an allocation and a time, a year. So our liability is what is contained in those DCSs.
Q Did DOE or did you suspend the DCS process in attempt to bolster the importance of the 1991 ACR?
A No.
Q Does this -- does the suspension of the DCS process relate in any way to the issuance of the 1991 ACR?
MR. HERZFELD: Objection. Leading.
THE COURT: The objection is overruled.
THE WITNESS: No.
BY MS. SULLIVAN:



THE COURT: Mr. Pollog, what do you mean by liability? In particular, what do you mean by limit liability? You used those words. And you say: Well, we suspended the DCS process with a view to limiting our liability.
Liability means what in that sentence?
THE WITNESS: The damage caused to the plaintiff by our delay in not picking up the material that we had obligated ourselves to picking up on that DCS form.
THE COURT: Okay.
MS. SULLIVAN: One moment, Your Honor.
BY MS. SULLIVAN:
Q In suspending the DCS process, was DOE attempting to limit the obligations DOE had to begin acceptance in 1998?
MR. HERZFELD: Objection. Leading. And I believe this question has been asked and answered several times.
THE COURT: The objection is overruled. But I guess I should tell you both, this is not the witness through which to explore this particular issue. This witness believes that DOE has an ongoing obligation to render performance under this contract. And this witness sees these



DCSs as engaging that performance obligation in time periods.
To the extent there is no DCS out there, there is no then-present obligation to pick up. But the witness is not saying that this eliminates our liability for the remainder of the contract.
It's altogether inappropriate to be asking what are the essential legal questions in this case of a witness who has no legal training and who is not charged with defining the meaning of this contract from the standpoint of law. That goes both to your questions, Ms. Sullivan, and those that Mr. Herzfeld has put to this witness. This really extends to all questions of that character to any lay witness.
MS. SULLIVAN: Understood, Your Honor, thank you.
MR. HERZFELD: If I could address that.
THE COURT: You may.
MR. HERZFELD: Judge Lettow, in the TVA case, did not base his breach finding on the 1998 date. I believe he based his breach finding on this testimony and other testimony from DOE witnesses, saying they stopped the DCS process, they failed to approve the DCS process, and they



did it in an attempt to limit their liability.
THE COURT: But you have to understand the liability is a term that this witness uses in a way that lawyers in this courtroom and in this case are not using that word.
The witness is saying our responsibilities under is this contract remain in place. It's only when that responsibility arises. That's all that's going on in this witness' mind.
It's obviously the plaintiff's position that the responsibility to pick up fuel begins in 1998 and is an ongoing responsibility. And every failure to do that constitutes -- not every failure, but failure to do that beginning in 1998 begins the breach.
MR. HERZFELD: Thank you, Your Honor.
MS. SULLIVAN: Your Honor, and we completely agree with the Court's understanding of what's appropriate to ask Mr. Pollog. I was simply trying to address some of the issues that I thought Mr. Herzfeld brought up.
I agree that's central --
THE COURT: You started it.
MS. SULLIVAN: You're right. That is what the Court is being asked to decide and not --



fe47c76d-fb42-4dd2-a347-fc8e597166af