No. 03-2624C
(Judge Braden)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

SYSTEM FUELS, INC., SYSTEM ENERGY RESOURCES, INC. and SOUTH MISSISSIPPI ELECTRIC POWER ASSOCIATION,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

---

# DEFENDANT'S POST-TRIAL BRIEF

---

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

HAROLD D. LESTER, JR.
Assistant Director

SHARON A. SNYDER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, NW, 8th Floor
Washington, D.C. 20530
Telephone: (202) 514-4325
Facsimile: (202) 514-7969

Attorneys for Defendant

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., SW
Washington, D.C. 20585

May 1, 2007

# TABLE OF CONTENTS

PAGE

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I. REGARDLESS OF WHETHER IT CHARACTERIZES ITS EXPENDITURES AS "MITIGATION DAMAGES," SFI BEARS THE BURDEN OF ESTABLISHING ALL ELEMENTS OF ITS DAMAGES CLAIM, INCLUDING CAUSATION, FORESEEABILITY, AND REASONABLE CERTAINTY . . . . 4

A. SFI's Current Effort To Characterize Its Damages As "Mitigation Damages" Does Not Eliminate Its Obligation To Prove Causation, Foreseeability and Reasonableness . . . . . . . . . . . . . . . . . . . . . 4

B. SFI's Burden Includes The Obligation To Establish A Reasonable "But For" World Against Which To Measure Whether DOE's Delay "Caused" It To Incur Incremental Costs . . . . . . . . . . . . . . . . . . . . . . . . . . 7

II. SFI FAILED AS AN INITIAL MATTER TO MEET ITS BURDEN OF PROVING THAT DOE WAS OBLIGATED TO ACCEPT SNF PURSUANT TO A TWO-PART TEST AT AN ANNUAL RATE OF 3,000 MTU . . . . . . . . 13

A. SFI Failed To Establish That DOE Was Obligated To Accept SNF At A Rate Sufficient To Preclude Additional At-Reactor Storage And To Accept Some "Backlog" Of Utility-Stored SNF . . . . . . . . . . . . . . . . . . . 13

B. The NWPA Does Not Require Acceptance Of SNF At Any Particular Rate Or Under Any Particular Qualitative Standard . . . . . . . . . . . . . . . . 16

C. The Standard Contract Did Not Require Acceptance Of SNF At Any Particular Rate Or Pursuant To Any Particular Test . . . . . . . . . . . . . . . . 16

D. SFI Mischaracterizes The Testimony of DOE Witnesses In Its Attempts To Impose Obligations On DOE . . . . . . . . . . . . . . . . . . . . . . . 19

E. SFI's Reliance Upon DOE Planning Documents To Support Its Assertion That DOE Was Obligated To Accept SNF At A Rate Of 3,000 MTUs Is Misplaced As A Matter Of Law And Fact . . . . . . . . . . . . . . . . . . . . . . . 22

1. SFI's Reliance Upon Program Documents Fails As A Matter Of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

**TABLE OF CONTENTS**
**-continued-**

**PAGE**


2. As A Matter Of Law, This Court Should Not Consider Parol Evidence In Determining DOE's Performance Obligations Under The Standard Contract . . . . . . . . . . . . . . . . . . . . . . . . . . 25

3. SFI Improperly Relies Upon The 1985 Mission Plan . . . . . . . . . 27

F. SFI's Own Documents Belie Its Assertions That It Expected DOE To Accept Fuel At a 3,000 MTU Per Year Rate . . . . . . . . . . . . . . . . . . . . . . 30

G. SFI Ignores The Contractual Mechanism For Ascertaining The Acceptance Rate Under The Standard Contract . . . . . . . . . . . . . . . . . . . . 32

1. From The Time Of Contract Formation, The Parties Expected That The DCS Process Would Be The Mechanism Through Which They Would Make Their Respective Commitments . . . . . . . . . . 32

2. SFI Actively Engaged In the DCS Process Without Objection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

3. The Suspension Of The DCS Process in 1996 Neither Undermines The Validity Of The 1991 ACR Nor Evidences Bad Faith . . . . . 37

III. SFI HAS ARGUED POSITIONS THAT WOULD RENDER THE STANDARD CONTRACT UNENFORCEABLE . . . . . . . . . . . . . . . . . . . . . . . 38

IV. SFI WOULD HAVE BUILT DRY FUEL STORAGE REGARDLESS OF DOE'S DELAY IN ACCEPTING SPENT NUCLEAR FUEL AND THEREFORE IT HAS INCURRED NO DAMAGES . . . . . . . . . . . . . . . . . . . . 39

V. EVEN ASSUMING THAT DOE WOULD HAVE ACCEPTED SNF FROM SFI AT A 3,000 MTU RATE, SFI FAILED TO ESTABLISH THE COSTS IT WOULD HAVE INCURRED IN THE "BUT FOR" WORLD, AND THEREFORE, IT HAS FAILED TO MEET ITS BURDEN OF PROVING CAUSATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

**TABLE OF CONTENTS**
**-continued-**

**PAGE**

A. Contrary To Its Representations, SFI Was Able To Analyze What Would Have Happened In A "But For" World . . . . . . . . . . . . . . . . . . . . . . . . . . 41

B. SFI Cannot Establish Causation For Numerous Plant Modifications And Activities Included In The Damages Claim . . . . . . . . . . . . . . . . . . . . . . . 44

1. The Detailed Activities And Components Of The Grand Gulf Dry Fuel Storage Project Were Developed And Provided By Entergy Personnel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

2. The Government Established That Certain Dry Fuel Storage Activities Would Be Non-Incremental Independent Of Type Or Size of DOE Cask . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

a. The Installation Of The New Auxiliary Building Railroad Bay Door Was Not Caused By The Government's Delay In Beginning Acceptance Of SNF From Grand Gulf . . . 50

b. The Equipment Operational Sequence Design Would Have Been Performed In The "But For" World . . . . . . . 56

3. Many Dry Fuel Storage Tasks Would Be Non-Incremental If DOE Provided Large Transportation Casks To Grand Gulf For Shipment of Spent Nuclear Fuel . . . . . . . . . . . . . . . . . . . . . . 56

a. The Cask Transfer Path Design And Haul Path Implementation Are Not Incremental . . . . . . . . . . . . . . . 56

b. The Relocation Of The HFTS Insert Storage Rack Would Have Been Performed In The "But For" . . . . . . . . . . . . . 58

c. The Dose Assessment Would Have Been Performed In The "But For" World . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

d. The Design Of The Auxiliary Building Railroad Bay Floor Is Not Incremental To The Government's Delay In SNF Acceptance From Grand Gulf . . . . . . . . . . . . . . . . . . . . . 60

**TABLE OF CONTENTS**
**-continued-** **PAGE**


e. The Civil Engineering Activities Involving The Auxiliary Building 208-Foot Elevation Would Have Been Needed In The "But For" World . . . . . . . . . . . . . . . 61

f. The Modifications To The Piping At The Auxiliary Building 208-Foot Elevation Would Likely Have Been Performed In The "But For" World . . . . . . . . . . . . . . . . . 63

g. Modifications To Provide Electrical Service To The Auxiliary Building Would Have Been Performed In The "But For" World . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

C. Mr. Peterson Properly Quantified The Activities That Mr. Brewer Opined Would Have Been Necessary In The "But For" World . . . . . . . 65

1. All Costs In The Damages Claim Associated With Modifications To The Auxiliary Building Should Be Removed From The Damages Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

2. All Engineering Labor Costs In The Damages Claim Associated With Should Be Removed From The Damages Claim . . . . . . . . 67

3. All Costs In The Damages Claim Associated With The Dose Assessment Should Be Removed From The Damages Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

4. All Costs In The Damages Claim Associated With The Operational Sequence Assessment Should Be Removed From The Damages Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

D. SFI Failed to Establish Causation For Certain Costs It Allegedly Incurred For External Labor And Materials Acquisition . . . . . . . . . . . . 69

E. SFI Cannot Establish Causation For Certain Costs That It Allegedly Incurred For Internal Labor And "Overheads" . . . . . . . . . . . . . . . . . . . . . 71

1. A Portion Of SFI's Internal Labor Costs Were Not Incremental . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

**TABLE OF CONTENTS**
**-continued-**

**PAGE**


2. SFI Did Not Establish That Its Materials, Capital Suspense And Some Of Its Labor Overheads Were Incremental To The Breach . . . . . . 74

a. Materials Loader . . . . . . 76

b. Payroll Loader . . . . . . 78

c. Capital Suspense Loader . . . . . . 80

F. Costs Incurred For The Purchase Of Scaffolding Were Not Incremental And Should Be Removed From The Claim . . . . . . 81

VI. AN OFFSET IS WARRANTED FOR THE COSTS THAT SFI AVOIDED OF LOADING CASKS TO DOE . . . . . . 82

VII. SFI IMPERMISSIBLY SEEKS PRE-JUDGMENT INTEREST IN ITS DAMAGES CLAIM, WHICH IS NOT ALLOWABLE AGAINST THE GOVERNMENT . . . . . . 84

A. Interest Is Not Recoverable Against The United States Government Under The Standard Contract . . . . . . 84

B. Plaintiffs' Damages Constitute Interest In Violation Of The No-Interest Rule . . . . . . 86

1. As A Matter Of Law, The No-Interest Rule Precludes Plaintiffs From Obtaining Damages In 2006 Dollars . . . . . . 86

2. Plaintiffs' Expert Confirmed That Applying WACC To The Claimed Damages Serves The Same Purpose As Applying An Interest Rate . . . . . . 90

VIII. SFI PROFFERED NO EVIDENCE AT TRIAL UPON WHICH THIS COURT COULD MAKE ANY FINDINGS REGARDING ITS DAMAGES BASED UPON ITS TAKINGS CLAIM AND THAT CLAIM SHOULD BE DISMISSED WITH PREJUDICE . . . . . . 92

**TABLE OF CONTENTS**
**-continued-**

**PAGE**

A. There Is No Support For SFI's Assertion That The Court Will Address The Takings Claim In A Separate Proceeding . . . . . . . . . . . . . . . . . . . . . 92

B. SFI Did Not Identify Any Basis For A Taking Of Its Real Property Because Any Rights To Require DOE To Accept Their SNF And/Or HLW Were Created Through The Standard Contract . . . . . . . . 93

C. Assuming That SFI Has Established A Taking Of Its Real Property, It Failed To Establish The Fair Value Of That Property . . . . . . . . . . . . . 94

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

## TABLE OF AUTHORITIES

**CASES** **PAGE(s)**

AES Tech. Sys., Inc. v. Coherent Radiation,
583 F.2d 933 (7th Cir. 1978) . . . . . . . . . . 73

Affiliated Foods, Inc. v. Puerto Rico Marine Mgmt., Inc.,
645 F. Supp. 838 (D.P.R. 1986) . . . . . . . . . . 6

Allenfield Assocs. v. United States,
40 Fed. Cl. 471 (1998) . . . . . . . . . . 94

American Pelagic Fishing Co., L.P. v. United States,
55 Fed. Cl. 575 (2003), rev'd on other grounds, 379 F.3d 1363, cert. denied,
125 S. Ct. 2963 (2005) . . . . . . . . . . 94

American Sci. & Eng'g, Inc. v. United States,
8 Cl. Ct. 129, 139 (1985) . . . . . . . . . . 11

Bell v. United States,
404 F.2d 975 (Ct. Cl. 1968) . . . . . . . . . . 90

Boyajian v. United States,
423 F.2d 1231 (Ct. Cl. 1970) . . . . . . . . . . 73

Barron Bancshares, Inc. v. United States,
366 F.3d 1360 (Fed. Cir. 2004) . . . . . . . . . . 25

Bass Enters. Prod. Co. v. United States,
48 Fed. Cl. 621 (2001) . . . . . . . . . . 94

Bass Enters. Prod. Co. v. United States,
133 F.3d 893 (Fed. Cir. 1998) . . . . . . . . . . 94

Blake v. Califano,
626 F.2d 891 (D.C. Cir. 1980) . . . . . . . . . . 84, 89

Bluebonnet Sav. Bank, FSB v. United States,
339 F.3d 1341 (Fed. Cir. 2003) . . . . . . . . . . 8, 44

**TABLE OF AUTHORITIES**
-continued-

**CASES** **PAGE(s)**

Bluebonnet Savs. Bank, FSB v. United States,
67 Fed. Cl. 231 (2005), aff'd, 466 F.3d 1349 (Fed. Cir. 2006) . . . . . . . . . . . . . . . . . . . . 8

Branch v. United States,
69 F.3d 1571 (Fed. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

Branhill Realty Co. v. Montgomery Ward & Co.,
60 F.2d 922 (2d Cir. 1932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Brookfield Constr. Co. v. United States,
228 Ct.Cl. 551, 661 F.2d 159 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

Castle v. United States,
48 Fed. Cl. 187 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85, 88, 92

Chevron U.S.A., Inc. v. United States,
71 Fed. Cl. 236 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

Citizens Fed. Bank v. United States,
474 F.3d 1314 (Fed Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Coast Fed. Bank, FSB v. United States,
48 Fed. Cl. 402 (2000), rev'd on other grounds, 309 F.3d 1353 (Fed. Cir. 2002), vacated, 320 F.3d 1338 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Columbia First Bank FSB v. United States,
60 Fed. Cl. 97 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Commercial Metals Co. v. United States,
176 Ct. Cl. 343 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Craft v. United States,
233 F.3d 358 (6th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

Department of Energy v. Westland,
565 F.2d 685 (Cust. & Pat.App. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

**TABLE OF AUTHORITIES**
-continued-

**CASES** **PAGE(s)**

District of Columbia v. United States,
67 Fed. Cl. 292 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83, 86, 87, 89

England v. Contel Advanced Sys., Inc.,
384 F.3d 1372 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83, 85

FDIC v. United States,
342 F.3d 1313 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

Florida Power & Light Co. v. United States,
64 Fed. Cl. 37 (2005), vacated on other grounds, 66 Fed. Cl. 93 (2005) . . . . . . . . . . . 18

Glendale Fed. Bank, FSB v. United States,
239 F.3d 1374 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Granite Mgt. Corp. v. United States,
74 Fed. Cl. 155 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 11

Home Sav. of America FSB v. United States,
51 Fed. Cl. 486 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

Indiana Michigan Power Co. v. United States,
60 Fed. Cl. 639 (2004), aff'd,, 422 F.3d 1369 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . passim

Indiana Michigan Power Co. v. United States,
422 F.3d 1369 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

J.D. Hedin Constr. Co. v. United States,
456 F.2d 1315 (Ct. Cl. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

Jetco, Inc. v. United States,
11 Cl. Ct. 837 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

Julius Goldman's Egg City v. United States,
697 F.2d 1051 (Fed. Cir. 1983), cert. denied, 464 U.S. 814 (1983) . . . . . . . . . . . . . . . 35

**TABLE OF AUTHORITIES**
-continued-

**CASES** **PAGE(s)**

Krauss v. Greenbarg,
137 F.2d 569 (3d Cir. 1943) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Krofft Entertainment, Inc. v. CBS Songs,
653 F. Supp. 1530 (S.D.N.Y. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

LaVan v. United States,
382 F.3d 1340 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

Library of Congress v. Shaw,
478 U.S. 310 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Maine Yankee Atomic Power Co. v. United States,
225 F.3d 1336 (Fed. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

Massengill v. Guardian Mgt. Co.,
19 F.3d 196 (5th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

McAbee Constr, Inc. v. United States,
97 F.3d 1431 (Fed. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Menne v. Celotex Corp.,
861 F.2d 1453 (10th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

National By-Prods., Inc. v. United States,
186 Ct. C 405 F.2d 1256 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Nebraska Public Power District v. United States,
73 Fed. Cl. 650 (2006), appeal certified, 74 Fed. Cl. 762 (2006),
petition for appeal granted, Misc Docket No. 843
2007 WL 779291 (Fed. Cir. Mar. 1, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Neeley v. Bankers Trust Co. of Tex.,
757 F.2d 621 (5th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 39

**TABLE OF AUTHORITIES**
-continued-

**CASES** **PAGE(s)**

Northern States Power Co. v. United States Dept. of Energy,
128 F.3d 754 (D.C. Cir. 1997) . . . . . . . . . . 3, 15

Northrop Grumman Corp. v. United States,
47 Fed. Cl. 20 (2000) . . . . . . . . . . 39

Pacific Gas & Electric Co. v. United States,
73 Fed. Cl. 333, reconsideration denied, 74 Fed. Cl. 779 (2006)
appeal pending No. 2007-5046 (Fed. Cir. docketed Jan. 24, 2007) . . . . . . . . . . passim

Pacific Gas & Electric v. United States,
58 Fed. Cl. 1 (2003) . . . . . . . . . . 88

Pettro v. United States,
47 Fed. Cl. 136 (2000) . . . . . . . . . . 94

Point Prods. A.G. v. Sony Music Entm't, Inc.,
215 F. Supp. 2d 336 (S.D.N.Y. 2002) . . . . . . . . . . 11

Rumsfeld v. Applied Cos.,
325 F.3d 1328 (Fed. Cir. 2003) . . . . . . . . . . 16

Saddler v. United States,
287 F.2d 411 (Ct. Cl. 1961) . . . . . . . . . . 73

Sacramento Mun. Util. Distr. v. United States,
74 Fed. Cl. 727, 728-729 (2006) . . . . . . . . . . 16, 24, 29, 90

Sandstrom v. Principi,
358 F.3d 1376 (Fed. Cir. 2004) . . . . . . . . . . 86, 87, 88

Selman v. United States,
204 Ct. Cl. 675, 498 F.2d 1354 (1974) . . . . . . . . . . 27

**TABLE OF AUTHORITIES**
-continued-

**CASES** **PAGE(s)**

Shyface v. Secy of Health and Human Servs.,
165 F.3d 1344 (Fed. Cir. 1999) . . . . . . . . . . 9

Singer Co. Librascope Div. v. United States,
215 Ct. Cl. 281, 568 F.2d 695 (1977) . . . . . . . . . . 84

Southern California Fed. Sav. & Loan Assoc. v. United States,
422 F.3d 1319 (Fed. Cir. 2005) . . . . . . . . . . 25

Southern Nuclear Operating Co. v. United States,
No. 98-614C (Fed. Cl. Apr. 7, 2004) . . . . . . . . . . 93

Sylvania Elec. Prods., Inc. v. United States,
198 Ct. Cl. 106, 458 F.2d 994 (1972) . . . . . . . . . . 25

System Fuels Inc. v. United States,
66 Fed. Cl. 722 (2005) . . . . . . . . . . 37

Tennessee Valley Authority v. United States,
69 Fed. Cl. 515 (2006) . . . . . . . . . . 71, 72, 90

Town of Grantwood v. United States,
55 Fed. Cl. 481 (2003) . . . . . . . . . . 88

United States Steel Corp. v. United States,
618 F. Supp. 496 (CIT 1985) . . . . . . . . . . 27

United States v. Mescalero Apache Tribe,
207 Ct. Cl. 369, 518 F.2d 1309 (1979) . . . . . . . . . . 85

United States v. Thayer-West Point Hotel Co.,
329 U.S. 585 (1947) . . . . . . . . . . 84

**TABLE OF AUTHORITIES**
-continued-

**CASES** **PAGE(s)**

Wells Fargo Bank, N.A. v. United States,
88 F.3d 1012 (Fed. Cir. 1996) . . . . . . . . . . 16

WestFed Holdings, Inc. v. United States,
52 Fed. Cl. 135, 160 (2002) . . . . . . . . . . 9

White v. Delta Constr. Int'l, Inc.,
285 F.3d 1040 (Fed. Cir. 2002) . . . . . . . . . . 44

Wickham Contracting Co. v. United States,
12 F.3d 1574 (Fed. Cir. 1994) . . . . . . . . . . 83, 90

Wilner v. United States,
23 Cl. Ct. 241 (1991) . . . . . . . . . . 73

Wilson v. Marquette Elec., Inc.,
630 F.2d 575 (8th Cir. 1980) . . . . . . . . . . 73

Yuba Natural Resources, Inc. v. United States,
904 F.2d 1577 (Fed. Cir. 1990) . . . . . . . . . . 94

## TABLE OF AUTHORITIES
-continued-

**STATUTES AND REGULATIONS** **PAGE(s)**

28 U.S.C. § 2516(a) . . . . . . . . . . 83, 84

41 U.S.C. §§ 601-613 . . . . . . . . . . 84

42 U.S.C. §§ 10101-10270 . . . . . . . . . . 84

42 U.S.C. §§ 10133, 10161-69 . . . . . . . . . . 27

42 U.S.C. § 10139 . . . . . . . . . . 3

42 U.S.C. § 10221(b)(3) . . . . . . . . . . 27

42 U.S.C. § 10222(a)(1) . . . . . . . . . . 93

10 C.F.R. §961.11, Art. IV.B.5. (DX 1) . . . . . . . . . . passim

**OTHER SOURCES**

Arthur L. Corbin, 5A Corbin on Contracts § 992, 997(1964) . . . . . . . . . . 10

Arthur L. Corbin & Joseph M. Perillo, 11 Corbin on Contracts § 53.3 (rev. ed. 2005) . . . 11,12

Robert E. Hall & Victoria A. Lazear, Reference Manual on Scientific Evidence, (Second) 481 (2000) . . . . . . . . . . 12

Keeton et al., Prosser and Keeton On The Law Of Torts (5th ed. 1984) . . . . . . . . . . 9, 10

C. McCormack, Handbook on the Law of Damages § 73 (1935) . . . . . . . . . . 10

Restatement (Second) of Contracts, § 344(a) (1981) . . . . . . . . . . 4

Restatement Second of Torts § 431, Comment a . . . . . . . . . . 10

Restatement (Third) of Torts (Proposed Final Draft) § 26 cmt. j (2006) . . . . . . . . . . 10

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| SYSTEM FUELS, INC., SYSTEM ENERGY RESOURCES, INC. and SOUTH MISSISSIPPI ELECTRIC POWER ASSOCIATION, | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 03-2624C (Judge Braden) |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**DEFENDANT'S POST-TRIAL BRIEF**

Pursuant to this Court's order dated January 24, 2007, defendant, the United States, respectfully submits the following post-trial brief.[1]

SUMMARY OF THE ARGUMENT

The three plaintiffs in this case, System Fuels, Inc., System Energy Resources, Inc. and South Mississippi Electric Power Association (collectively "SFI"), are seeking $12.2 million for damages that SFI allegedly incurred through August 31, 2005, as a result of the delay by the Department of Energy ("DOE") in accepting spent nuclear fuel ("SNF") from the nuclear

[1] Plaintiffs filed a motion in limine on September 6, 2006. Plaintiffs renewed that motion during the testimony of the Government's expert, Robert Peterson, on January 17, 2007. The Court denied the motion during the trial and suggested that plaintiffs include in the post-trial brief any objections to Mr. Peterson's testimony in light of his live testimony and pre-filed written testimony. Tr.2344:2-2345:21. Plaintiffs have not renewed the motion, and, thus, the Government has not filed any response to its objections. However, the Government does not waive its right to submit a response in the event that plaintiffs file its motion in limine as directed by the Court.

Plaintiffs' Post-Trial Brief will be referred to herein as "Pl. Br. at ____."

industry beginning in January 1998, pursuant to the Standard Contract for the acceptance of SNF. Despite its assertion that this Court can render its opinion without determining a rate of acceptance, SFI's claim is, in reality, entirely predicated upon the premise that DOE was obligated to begin accepting spent nuclear fuel at a rate of 3,000 Metric Tons Uranium ("MTUs") per year beginning January 31, 1998. As we explain in detail below, plaintiffs have failed to establish, as was their burden, that DOE was obligated to accept SNF at that rate. Indeed, there is no such obligation in the Standard Contract.

The Government demonstrated at trial that DOE's obligation, as established through the mechanism in the Standard Contract, was to begin accepting SNF beginning in January 1998 under the acceptance rate set forth in the 1991 Annual Capacity Report ("ACR"), pursuant to approved delivery commitment schedules ("DCSs"). Applying that acceptance rate, Grand Gulf did not have any SNF allocations in the first ten years. Contemporaneous SFI documents dated in the early 1990s demonstrate that SFI did not expect DOE to accept any SNF from Grand Gulf until after 2007. The evidence at trial demonstrated that Grand Gulf had to build its dry fuel storage, and considered it the best option, because it would have run out of room to store its SNF before DOE was scheduled to begin accepting its fuel. Because SFI would have built dry fuel storage irrespective of the delay in DOE's performance, no matter what label is attached to the legal standard, any partial breach by the Government cannot be said to have "caused" the

damages that SFI claims.[2] If the Court finds that the 1991 ACR acceptance rates apply, SFI is not entitled to any damages.

Moreover, even if the Court finds that the Government was somehow bound to perform at the 3,000 MTU rate, SFI has not provided the Court with the correct damages analysis upon which to rule in its favor in any respect. SFI failed to establish, as it must, what might have been had DOE begun acceptance in January 1998. Because SFI is seeking expectation damages, it must develop that "but for" analysis, so that the Court may ensure that SFI does not recover costs here that it would have incurred even had the contract been timely performed. Thus, under either scenario, SFI had failed to meet its burden of proof, and the Government requests that the Court

---

[2] The Court has already made a finding with respect to liability in this case. However, in contesting the existence of a breach, the Government was specifically enjoined, via a writ of mandamus issued by the United States Court of Appeals for the District of Columbia Circuit, from relying upon the "Unavoidable Delays" clause of the Standard Contract to excuse its delayed performance. See Northern States Power Co. v. United States Dep't of Energy, 128 F.3d 754, 760 (D.C. Cir. 1997).

We have consistently argued that the D.C. Circuit overstepped its jurisdiction and authority in issuing this writ of mandamus (given that the judicial review provision of the NWPA, 42 U.S.C. § 10139, does not permit the D.C. Circuit to review contract administration matters). Recently, in Nebraska Public Power District v. United States,73 Fed. Cl. 650, 673 (2006) (Allegra, J.), this Court determined that the writ of mandamus was void because, in issuing the writ, the D.C. Circuit "operated in excess of its jurisdiction and, specifically, without an appropriate waiver of sovereign immunity." This Court subsequently certified its decision for interlocutory appeal to the United States Court of Appeals for the Federal Circuit, Nebraska Public Power District v. United States, 74 Fed. Cl. 762 (2006), and, on March 1, 2007, the Federal Circuit issued an order granting Nebraska Public Power's petition for permission to appeal. Nebraska Public Power District v. United States, Misc. Docket No. 843, 2007 WL 779291 (Fed. Cir. Mar. 1, 2007). The Government reserves the right to challenge any determination of liability with respect to the Standard Contract if the writ of mandamus is lifted or otherwise deemed inapplicable.

find that SFI's evidence does not provide any basis for a finding of damages here. The Court should enter judgment for defendant.

## DISCUSSION

### I. REGARDLESS OF WHETHER IT CHARACTERIZES ITS EXPENDITURES AS "MITIGATION DAMAGES," SFI BEARS THE BURDEN OF ESTABLISHING ALL ELEMENTS OF ITS DAMAGES CLAIM, INCLUDING CAUSATION, FORESEEABILITY, AND REASONABLE CERTAINTY

#### A. SFI's Current Effort To Characterize Its Damages As "Mitigation Damages" Does Not Eliminate Its Obligation To Prove Causation, Foreseeability and Reasonableness

In Indiana Michigan Power Co. v. United States, 422 F.3d 1369 (Fed. Cir. 2005), the United States Court of Appeals for the Federal Circuit unequivocally defined the scope of a spent nuclear fuel plaintiff's burden with respect to damages. In Indiana Michigan, as in this case, the plaintiff sought damages for its efforts to expand its storage capabilities and, specifically, the costs that it incurred for a rerack and expansion of its spent nuclear fuel pool. Id. at 1372. In addressing these costs, which (like SFI in this case) the plaintiff characterized as "mitigation damages,"[3] the Federal Circuit explained that "[t]he presence of a duty to mitigate

[3] The amount necessary to restore a party to the position that it would have occupied had a breach not occurred is typically referred to as the restoration of the party's "expectation interest." See Restatement (Second) of Contracts § 344(a) (1981). Although SFI refers repeatedly to "mitigation damages" in its post-trial brief, it is the damage to SFI's expectation interest (as opposed to its reliance or restitution interest) for which SFI seeks recovery. While SFI now seeks to distance itself from its earlier claim for expectancy damages, there is no doubt that SFI specifically chose expectation damages as its remedy here. See Plaintiff's Pre-Trial Memorandum of Law, filed August 18, 2006 ("Plaintiff's Pre-trial Memo"), at 1, 2, 3. In other words, plaintiff seeks to be placed in the position that it allegedly would have occupied had the contract been performed. While not invoking the term "expectation damages" in the recent post-trial brief, the very first sentence of the section of SFI's brief entitled "Conclusions of Law" invokes its entitlement to relief pursuant to an expectancy theory: "Generally, the remedy for breach of contract is damages sufficient to place the injured party in as good as a position as it would have occupied had the breaching party fully performed." Pl. Br. at 29 (emphasis added;

does not perforce make the pre-breach costs incurred by Indiana Michigan to store its SNF recompensable; appellant must prove foreseeability, causation, and reasonableness." Id. at 1376.

The Federal Circuit's holding in Indiana Michigan is binding precedent upon this Court and necessarily dictates the appropriate framework for the resolution of the issues presented in this case. For this reason, the question is not, as SFI has repeatedly and mistakenly contended both during trial and in its post-trial brief, simply whether the decision to build dry storage was a "reasonable" business judgment made in an effort to limit its damages. Indeed, characterizing the costs that it incurred as "mitigation damages" puts the cart before the horse. As a threshold matter, SFI must prove, as a means of demonstrating that the costs which it incurred were "caused" by the partial breach, and, specifically, that it would not have incurred these so-called mitigation costs even without any delay.

This requirement is apparent from Indiana Michigan itself, where the plaintiff sought to recover the cost of a rerack that it allegedly performed because of the breach but failed to make the requisite showing with respect to causation. The Federal Circuit affirmed the trial court's determination that the utility failed to meet its burden, noting that the utility's "decision to perform a full, instead of a partial, rerack in 1995 was purely a business judgment which it would have had to pursue irrespective of DOE's partial breach." Id. (emphasis added). Stated differently, the Federal Circuit affirmed the trial court's finding that the utility had failed to meet its burden of proof because the utility would have made the same business judgment to rerack its spent fuel pool even had DOE timely commenced performance and, therefore, failed to prove damages in the "but for" world.

---

quotation marks omitted).

SFI relies upon Tennessee Valley Authority v. United States, 69 Fed. Cl. 515 (2006), to bolster its argument that the Government bears some form of burden with respect to causation because its mitigation damages are "reasonable." With all due respect, the Court's decision in TVA is inconsistent with the Federal Circuit's holding in Indiana Michigan and, therefore, is not persuasive. In TVA, the Court concluded that, because the plaintiff had taken steps to mitigate its damages in response to DOE's partial breach, the expenses that it incurred as a result of its mitigation efforts were "recoverable to the extent they [we]re reasonable" and that the Government "ha[d] not met its burden of showing that TVA [would have had to incur] the costs at issue for dry storage even if DOE had performed under the contract." TVA, 69 Fed. Cl. at 523, 533 (emphasis added). However, the Court's allocation of the burden of proof to the Government with respect to the cause of these costs (as opposed to their reasonableness) in the first instance conflicts with the holding in Indiana Michigan that the utility had failed to establish causation because it failed to establish that its reracking costs would not have been incurred in the absence of a partial breach. The mere fact that SFI has labeled its costs as "mitigation costs" does not mean that they were caused by the partial breach (and would not have been incurred in the "but for" world). See Indiana Michigan, 422 F.3d at 1376 (presence of a duty to mitigate does not automatically make mitigation costs recoverable; appellant must prove foreseeability, causation, and reasonableness, and it failed to do so.); Affiliated Foods, Inc. v. Puerto Rico Marine Mgmt., Inc., 645 F. Supp. 838, 839-40 (D.P.R. 1986) ("it is a mistake to think that by merely placing the 'mitigation' label on any expense incurred an injured party is entitled to recover it. Plaintiff cannot escape the burden of proving that the losses sought to be avoided were caused, or would have been caused, by defendants' breaches.").

B. SFI's Burden Includes The Obligation To Establish A Reasonable "But For" World Against Which To Measure Whether DOE's Delay "Caused" It To Incur Incremental Costs

The Federal Circuit's holding in Indiana Michigan that the utility in that case had not met its burden with respect to causation makes clear that the plaintiff in a spent fuel case must establish that the injury which it claims to have suffered would not also have been incurred had DOE timely performed. For this reason, a plaintiff in a spent fuel case must establish the "but for" world so that the Court can identify whether its claimed damages are, in fact, incremental to DOE's partial breach.

This Court's recent decision in Pacific Gas & Electric Co. v. United States, 73 Fed. Cl. 333, reconsideration denied, 74 Fed. Cl. 779 (2006) ("PG&E"), appeal pending, No. 2007-5046 (Fed. Cir. docketed Jan. 24, 2007), recognizes the controlling nature of the Federal Circuit's decision in Indiana Michigan and the general principle that, when seeking expectancy damages, a plaintiff must establish a plausible "but for" world. In PG&E, the Court addressed the applicable legal standard by recognizing at the outset that "[t]he goal of awarding damages for breach of contract – that of placing the injured party in as good a position as it would have been had the breaching party fully performed under the contract – is well settled." PG&E, 73 Fed. Cl. at 378. Significantly, in reaching that conclusion, the Court cited to, among other authorities, the Federal Circuit's decision in Indiana Michigan. Id. Further, in addressing the issue of the DOE's contractual obligation regarding a rate of acceptance under the Standard Contract, the Court acknowledged that "[p]laintiff bears the burden of 'establishing what might have been' with reasonable certainty had defendant performed the Standard Contract." Id. at 386; see id. at 406 ("To derive the proper amount for the damages award, the cost resulting from the breach

must be reduced by the costs, if any, that the plaintiff[] would have experienced absent a breach."). The Court further clarified that the plaintiff's alleged expectancy damages could only be measured by reference to a world where DOE performed, and that without reference to a performance world, the measure of plaintiff's damages would be "irrelevant." Id. at 375 n.38.

Contrary to SFI's repeated assertions, this statement is neither "self-serving" nor a departure from existing precedent. Pl. Br. at 32. Rather, it reflects the burden imposed upon all parties seeking to be restored to the positions that they would have occupied in the absence of a breach. See, e.g., Granite Mgt. Corp. v. United States, 74 Fed. Cl. 155, 169 (2006) (plaintiffs bear burden of propounding realistic "but for" scenario); Bluebonnet Savs. Bank, FSB v. United States, 67 Fed. Cl. 231, 238-39 (2005), aff'd, 466 F.3d 1349 (Fed. Cir. 2006); Coast Fed. Bank, FSB v. United States, 48 Fed. Cl. 402, 403 n.25 (2000), rev'd on other grounds, 309 F.3d 1353 (Fed. Cir. 2002), vacated, 320 F.3d 1338 (Fed. Cir. 2003); see also Glendale Fed. Bank, FSB v. United States, 239 F.3d 1374, 1380 (Fed. Cir. 2001) (plaintiffs bear burden of demonstrating "what might have been . . . ."). A plaintiff cannot recover as damages from the Government any costs that it would have incurred in the absence of a breach. Bluebonnet Savs. Bank, FSB v. United States, 339 F.3d 1341, 1344-46 (Fed. Cir. 2003); see also Indiana Michigan, 422 F.3d at 1376. Without establishing a "but for" world in which no partial breach occurred, SFI leaves the Court with no mechanism by which to determine whether its claimed costs were incremental to the Government's partial breach, or whether they would have been incurred regardless of any delay.

Relying upon Indiana Michigan, SFI asserts that it need only establish that the partial breach was a "substantial causal factor" of the mitigation damages that it allegedly incurred.

Pl. Br. at 31 (citing Indiana Michigan, 422 F.3d at 1373). Recently, in Citizens Federal Bank v. United States, 474 F.3d 1314 (Fed. Cir. 2007),[4] this Court stated that "the selection of an appropriate causation standard depends upon the facts of the particular case and lies largely within the trial court's discretion" and that, depending upon the circumstances, the trial court may utilize the "substantial factor" causation test rather than the "but for" test. Id. at 1318-19. Yet, even under the "substantial factor" test, the plaintiff cannot avoid its obligation to establish that, absent DOE's delay, it would not have incurred the costs that it is seeking. The plaintiff attempting to establish that a breach was a "substantial factor" in causing its damages must establish that the claimed damages were "primarily the result of the breach," WestFed Holdings, Inc. v. United States, 52 Fed. Cl. 135, 160 (2002), and that the alleged breach was the predominating or primary factor that led to the claimed damages. Krauss v. Greenbarg, 137 F.2d 569, 572 (3d Cir. 1943); Shyface v. Secretary of Health & Human Servs., 165 F.3d 1344, 1353 (Fed. Cir. 1999); see Columbia First Bank, FSB v. United States, 60 Fed. Cl. 97, 105 (2004) ("Plaintiff must prove that the changes . . . that were imposed by the breaching provisions of FIRREA were a substantial factor causing the alleged loss, that is, that the breaching provisions directly and primarily caused the lost profits damages it seeks.").

Even in tort cases, where the "substantial factor" test for causation developed, that test has not "replaced the need for each liable defendant to be a but-for and substantial contributor to the indivisible injury." Menne v. Celotex Corp., 861 F.2d 1453, 1461 (10th Cir. 1988). The "substantial factor" test originated in tort law to analyze concurrent cause cases. Prosser &

[4] The Citizens Federal decision is not final, as the deadline for the Government to seek rehearing en banc has not yet expired.

Keaton, The Law of Torts 266-68 (5th ed. 1984). A concurrent causation issue was addressed in Krofft Entertainment, Inc. v. CBS Songs, 653 F. Supp. 1530 (S.D.N.Y. 1987). There, Krofft claimed that CBS breached a licensing agreement which caused Krofft to be unable to obtain financing to produce a Broadway play. CBS maintained that there could be no causation if, had CBS not breached the license agreement, Krofft would still have been unable to obtain financing. The district court agreed. In addressing the law of causation, the district court cited C. McCormack, Handbook on the Law of Damages § 73, at 261 (1935), for the proposition that, in a breach of contract case, a breaching party's act or omission ordinarily can only be considered a "substantial factor" in causing the damage "where the damage would not have occurred 'but for' the alleged wrongful act or omission . . . ." Id. at 1534. Similarly, the court cited 5A A. Corbin, Corbin on Contracts §§ 992 & 997 (1964), for the proposition that "[i]t must be shown that but for the breach" the damages would not have been incurred. Id. "Corbin concludes that a plaintiff cannot charge the other party with losses and disappointments that would have occurred in the absence of any breach by the other party, since such losses were 'not caused by the other party's breach of duty.'" Krofft, 653 F. Supp. at 1534 (quoting Corbin, supra, § 992, at 6).[5]

---

[5] Recently, the drafters of the Restatement (Third) of Torts have announced their intention to abandon the "substantial factor" test in tort cases because of its widespread misapplication by courts. They specifically represented that "some courts have accepted the proposition that, although the plaintiff cannot show the defendant's tortious conduct was a but-for cause of harm by a preponderance of the evidence, the plaintiff may still prevail by showing that the tortious conduct was a substantial factor in causing the harm," but that this "proposition is inconsistent with the substantial-factor standard adopted in Restatement Second of Torts § 431, Comment a." Restatement (Third) of Torts (Proposed Final Draft) § 26 cmt. j (2006). As the drafters recognized, "[t]he [causation] element that must be established by whatever standard of proof is the but-for or necessary-condition standard of this Section." Id. Accordingly, the proposed final draft of section 26 of the Restatement (Third) of Torts provides the following test for causation, in place of the "substantial factor" test: "Conduct is a factual cause of harm when the harm would not have occurred absent the conduct."

Accordingly, in the contract context, when claimed damages could have resulted from multiple factors, the plaintiff "must establish that the breach alone would have been sufficient" to cause the claimed damage and that it would not have occurred "but for" the breach. Point Prods. A.G. v. Sony Music Entm't, Inc., 215 F. Supp. 2d 336, 344 (S.D.N.Y. 2002). Without a "but for" world against which to compare the activities and costs that were actually required following the breach, there is no basis for determining whether a particular cost or activity is an incremental result of DOE's delay, given that there is no basis for knowing what costs and activities would have been required absent the breach. See Granite, 74 Fed. Cl. at 170 ("[b]ecause plaintiff did not present evidence on what FNB would have looked like in the 'but for' world without the $250 million from Ford, it has not demonstrated a valid claim for expectancy damages"). At a minimum, then, binding precedent compels SFI to show that "there [a]re no other substantial causes" for its alleged damages. American Sci. & Eng'g, Inc. v. United States, 8 Cl. Ct. 129, 139 (1985). Regardless of whether the test is labeled as "substantial factor" or "but for," Indiana Michigan makes clear that a utility cannot recover so-called mitigation costs to the extent those costs would have been incurred "irrespective of DOE's partial breach." 422 F.3d at 1376.

Finally, in an effort to recharacterize its burden of proof, SFI asserts that the requirement that it prove a "but for" world "represents a 'moving target' that the Government manipulates to reduce or preclude SFI's damages." Pl. Br at 32. SFI's complaints are not well founded. Notwithstanding SFI's suggestion that the "but for" world is a bizarre construct incapable of proof, courts routinely must resolve what would have happened had a breaching party performed. As Professor Corbin has explained, in language that this Court endorsed in PG&E,

"[t]he position that one would have occupied if history had been different is purely hypothetical. And yet that is the problem that the trial court . . . [is] required to solve . . . The working rules of law by which court[s] are directed are never capable of exact and perfect application." 11 Arthur L. Corbin, Corbin on Contracts, § 53.3 (rev. ed. 2005) (emphasis added), cited in PG&E, 73 Fed. Cl. at 397.[6]

If anything, SFI's view of the ethereal nature of the "but for" world is situational, depending solely upon whether it is seeking to increase its damages or to avoid decreases in its damages. When SFI seeks to increase its damages – as, for example, when it argues in favor of a 3,000 MTU rate of acceptance – the "but for" world appears to be anything but speculative. It is only when the Government challenges the inclusion of non-incremental costs in SFI's damages claim – and seeks to eliminate those costs from damages – that SFI complains that it is forced to "disprov[e] every contingency contrived by the Government." Pl. Br. at 32. Simply put, although it is true that the "but for" world has never occurred, it is true in all breach of contract

---

[6] Further, the economic analysis that is used to quantify damages also must consider what would have happened absent the breach:

> The first step in a damages study is the translation of the legal theory of the harmful event into an analysis of the economic impact of that event. In most cases, the analysis considers the difference between the plaintiff's economic position if the harmful event had not occurred and the plaintiff's actual economic position. The damages study restates the plaintiff's position "but for" the harmful event; this part is often called the "but-for analysis." Damages are the difference between the but-for value and the actual value.

Robert E. Hall & Victoria A. Lazear, Reference Guide on Estimation of Economic Losses in Damages Awards, in Reference Manual on Scientific Evidence (Second) 481 (2000) (prepared by Federal Judicial Center); see also DX 601 (Peterson Test.) at 3-4; DX 600 (Hartman Test.) at ¶ 13.

cases. Yet, absent consideration of the "but for" world, the Court will have no baseline against which to compare the expenditures that SFI claims constitute damages, and SFI will potentially be placed in a better position than had the contract been performed. See PG&E, 73 Fed. Cl. at 397. Mere evidence that it has incurred the costs that it seeks without showing that SFI would not have incurred the costs that it now seeks to recover had DOE performed under the Standard Contract, is "irrelevant." Id. at 375 n.38. To make such a showing, it is incumbent upon SFI to prove a plausible "but for" world.

SFI argues that this Court need not analyze causation at all. SFI states that it built its dry fuel storage system[7] at Grand Gulf because DOE was not going to accept SNF from the industry beginning in January 1998. However, SFI has failed to meet its burden of proof because, at bottom. it has not demonstrated that DOE's failure to begin acceptance of SNF actually caused it to build its ISFSI. As a result of its complete failure of proof, SFI has failed to establish that it has incurred any damages as a result of DOE's delay.

## II. SFI FAILED AS AN INITIAL MATTER TO MEET ITS BURDEN OF PROVING THAT DOE WAS OBLIGATED TO ACCEPT SNF PURSUANT TO A TWO-PART TEST AT AN ANNUAL RATE OF 3,000 MTU

### A. SFI Failed To Establish That DOE Was Obligated To Accept SNF At A Rate Sufficient To Preclude Additional At-Reactor Storage And To Accept Some "Backlog" Of Utility-Stored SNF

At trial, SFI argued that there was no need for this Court to determine at what acceptance rate DOE would have accepted SNF from Grand Gulf had it begun in January 1998, arguing essentially that the Court should impose a strict liability standard to its damages here. Pl. Br. 46.

[7] Defendant will use "dry fuel storage" and "ISFSI" (Independent Spent Fuel Storage Installation) interchangeably to refer to the dry fuel storage project at Grand Gulf.

As a correlation to that assertion, SFI also argued that it was not necessary for this Court to determine what would have happened in the "but for" world to calculate damages, which would, SFI asserts, be speculative. Pl. Br. at 36. Yet, in spite of SFI's repeated assertions that an acceptance rate was not necessary and the "but for" world was unknowable, SFI's complaint is based upon a breach of contract – in other words, a breach of the DOE's obligation to accept SNF beginning in January 1998. Second Amended Complaint at ¶¶ 10, 16-20. Implicit in its complaint is a requirement that the Court determine the obligations of the parties to the contract. SFI concedes this fact when it argues that the expectation of the parties to the contract was that DOE would accept SNF at a rate that would preclude at-reactor storage and work off the backlog of SNF — in other words, at a 3,000 MTU rate. See, e.g., Pl. Br. at 9-11; 50-51; Tr.1094:22-1095:10 (Rives). In fact, the fundamental assumption that underlies all of SFI's damages claims is that DOE was obligated to accept SNF beginning in 1998 at an annual rate of 3,000 MTU, after a short five-year "ramp-up" period. Pl. Br. at 50-53. Thus, while it argues that determining the acceptance rate is not necessary and that the "but for" world is unknowable, SFI argues that DOE was obligated to satisfy a 3,000 MTU rate.

Specifically, SFI contended that DOE contractually obligated itself to accept SNF at a rate that (1) would eliminate the need for utilities to provide additional on-site storage after January 31, 1998, [Tr.1094:22-1095:4 (Rives); Tr.1184:14-22 (Rives)] and (2) would work off the backlog of SNF already stored by the utilities. Pl. Br. 50-53; Tr.1137: 13-19 (Rives). SFI asserts that, to meet this goal, DOE would have to accept SNF at a rate of 3,000 MTUs per year, after a short five-year "ramp-up" period. Tr. 1093:17- 1094:18 (Rives); Tr.1184: 14-22 (Rives). At a 3,000 MTU rate, SFI contends, that DOE would have started accepting SNF from Grand

Gulf in 2005, obviating SFI's need to construct dry fuel storage at that facility. Pl Br. 17-18; 52; PX 1341 (Supko Test.) at ¶ 74. However, as this Court has already found in two other SNF cases, SFI's basic assumptions are wholly in error and unsupported by either the Standard Contract, the NWPA, or contemporaneous DOE or industry documents. See Sacramento Mun. Util. Distr. v. United States ("SMUD"), 74 Fed. Cl. 727, 728-729 (2006) (documents relied upon amounted to "rank speculation"); PG&E, 73 Fed. Cl. at 389-95 (preponderance of credible evidence showed parties expectation that acceptance rate would be far lower than 3,000 MTU per year). Further, the Government clearly demonstrated at trial that DOE was under no such obligation. See, e.g., Tr.1796:15-1798:21 (Kouts);[8] Tr.1803:4-1805:7 (Kouts); Tr.1821:4-1822:22 (Kouts); NSP Tr.3808:15-3810:7 (Morgan).[9] The 1991 ACR set forth the rates of acceptance – 400 MTUs in the first year, 600 MTUs in the second year, and 900 MTUs for the remaining eight years – for acceptance at a repository or monitored retrievable storage facility ("MRS"). DX 140 at HQR-002-0807. In that 1991 ACR, in conjunction with the 1991 Annual Priority Ranking ("APR"), DOE began the process of making firm acceptance commitments to individual utilities. Id. Under the 1991 rates, Grand Gulf did not have an allocation, or pick-up, in the first ten years of the program and, thus, would have been required to build dry fuel storage, even with a delay by DOE in accepting SNF.

---

[8] Christopher Kouts is the current Director of the Waste Management Office, OCRWM. Tr.1788:16-22 (Kouts).

[9] The Court granted defendant's unopposed motion to designate prior trial testimony of Mr. Robert L. Morgan, on January 8, 2007. The entire Northern States trial testimony of Mr. Morgan was admitted. The Government will cite to that testimony as "NSP Tr. __" throughout the brief.

B. The NWPA Does Not Require Acceptance Of SNF At Any Particular Rate Or Under Any Particular Qualitative Standard

"Because the purpose of a damages award is to put the non-breaching party 'in as good a position as [it] would have been in had the breaching party fully performed,' the logical starting point for a damages analysis is an understanding of the breaching party's obligations under the contract." Rumsfeld v. Applied Cos., 325 F.3d 1328, 1336 (Fed. Cir. 2003) (brackets in original) (quoting Wells Fargo Bank, N.A. v. United States, 88 F.3d 1012, 1021 (Fed. Cir. 1996)). In this case, the rate of acceptance is the lynchpin to any causation analysis.

SFI has asserted at least two distinct contract obligations allegedly imposed upon DOE. However, the NWPA contains no reference to a qualitative two-part obligation or a particular rate of acceptance. At trial, Frank Rives, the Director of Nuclear Fuels for Entergy, testified that there was no provision of the NWPA that obligated DOE to begin acceptance of SNF in January 1998 at a rate that met any qualitative two-part obligation. Tr.1185: 15-17 (Rives); see also NSP Tr.3829:14-3831:4 (Morgan). Simply stated, the NWPA is devoid of any requirement that DOE begin acceptance at any particular level, let alone a level that would obligate DOE to meet the qualitative obligation that SFI espoused at trial. See PG&E, 73 Fed. Cl. at 388-91 (finding that NWPA does not contain the two-part qualitative test or rate requirement that plaintiff promoted).

C. The Standard Contract Did Not Require Acceptance Of SNF At Any Particular Rate Or Pursuant To Any Particular Test

Mr. Rives also testified that he knew of no obligation in the Standard Contract requiring DOE to accept SNF at a rate of 3,000 MTUs per year, Tr.1185:18-25 (Rives), and that there was no obligation set forth in the Standard Contract requiring DOE to accept SNF to meet any qualitative test. Tr.1186:10-22 (Rives).

The full weight of the evidence is completely contrary to SFI's assertions that DOE was required to create an acceptance rate that satisfied any two-part "test." Instead of agreeing to a specific minimum acceptance rate or creating standards that would obligate DOE to satisfy a minimum rate, the Standard Contract creates a contractual mechanism for the development of a specific acceptance schedule that establishes, in essence, a two-phase process. 10 C.F.R. § 961.11, Art. IV.B.5. (DX 1). First, the Standard Contract's schedule terms seek to obtain the agreement of the parties to a specific schedule for the acceptance of an individual contract holder's SNF and HLW. Id., Art. IV.B.5.(a). Pursuant to the terms of the Standard Contract, DOE was to issue, beginning not later than July 1, 1987, "an annual capacity report [("ACR")] for planning purposes," identifying "projected annual receiving capacity" at any DOE facilities and annual acceptance ranking for acceptance of contract holders' SNF and/or HLW for the first 10 years "following the projected commencement of operation of the initial DOE facility." Id., Art. IV.B.5(b). Subsequently, beginning on April 1, 1991, DOE was to issue "an annual acceptance priority ranking" ("APR") for receipt of the contract holders' SNF, "based on the age of SNF and/or HLW as calculated from [its] date of discharge." Id., Art. IV.B.5(a); accord PG&E, 73 Fed. Cl. 398 ("The court is able to approximate with reasonable certainty the rate at which DOE would have accepted the utilities' spent fuel had it begun performance of the Standard Contract on January 31, 1998, by using the 1991 ACR and APR.").

Second, the contract holder, "[a]fter DOE has issued its proposed acceptance priority ranking" on April 1, 1991, and no earlier than January 1, 1992, would submit a delivery commitment schedule ("DCS") identifying "all SNF and/or HLW the [contract holder] wishes to

deliver to DOE beginning sixty-three (63) months thereafter," for DOE's approval or disapproval. 10 C.F.R. § 961.11, Art. V.B.1. (DX 1).

Nothing in the terms of the Standard Contract creates an obligation upon DOE's part to accept SNF at a rate that (1) would eliminate the need for utilities to provide additional on-site storage after January 31, 1998, and (2) would work off the "backlog" of SNF. In fact, SFI can identify absolutely no contractual language in the Standard Contract creating any such obligation. Further, the integration clause in the Standard Contract, Article XXII.A, expressly precludes reading any unwritten "agreement" into the contract: "Any representation, promise, or condition not incorporated in this contract shall not be binding on either party," and "[n]o course of dealing or usage of trade or course of performance shall be relevant to explain or supplement any provision contained in the contract." 10 C.F.R. § 961.11, Art. XXII.A. (DX 1). SFI's proposed requirement for a rate that precludes additional at-reactor storage and reduces the backlog of SNF violates standard rules of contract interpretation. As this Court recently recognized in the PG&E case, in response to the same argument that SFI is raising, "DOE never . . . engaged in a rulemaking establishing a minimum spent fuel acceptance rate under the Standard Contract." PG&E, 73 Fed. Cl. at 358; see Florida Power & Light Co. v. United States, 64 Fed. Cl. 37, 48

n.12 (2005) ("[n]one of the demanded terms is found in the contract; and it is clear that the parties shared no meeting of the minds regarding those terms, as was made clear to all during contract negotiations"), vacated on other grounds, 66 Fed. Cl. 93 (2005). SFI's "understanding"

that DOE had some minimum acceptance rate obligation is a post-litigation theory, created after disputes about timely SNF acceptance began.[10]

D. SFI Mischaracterizes The Testimony of DOE Witnesses In Its Attempts To Impose Obligations Upon DOE

SFI resorts to selective, misleading quotes from DOE testimony in arguing that the parties had a clear expectation that DOE was obligated to accept fuel at a 3,000 MTU rate. For example, SFI asserts that Mr. Morgan "acknowledged that DOE intended to begin working off the backlog of fuel." Pl. Br. at 9. However, Robert Morgan, the Acting Director of the Office of Civilian Radioactive Waste Management ("OCRWM") from January 1983 until January 1984, never testified that DOE intended to begin working off the backlog of fuel. Mr. Morgan explained why he had told an industry meeting in December 1983 that the "basic strategy" outlined in the 1983 Mission Plan was to avoid at-reactor storage at the nuclear facilities:

> Q: Mr. Morgan, was DOE obligating itself to accept fuel at the rate set forth in the [1983] mission plan?
>
> A: No, the mission plan was a planning document and not a contractual document.
>
> Q: Why did you describe in this paragraph the mission plan as containing a strategy?

---

[10] The PG&E Court also concluded that any judicial imposition of such an obligation on DOE would be clearly improper:

> The court concludes that for it to impose on the government an obligation to accept the utilities' spent fuel in accordance with the alleged two-part obligation or at a rate of 3,000 MTU/year would be tantamount to its enacting either legislation or regulations for the nuclear fuel industry that did not exist before this litigation.

PG&E, 73 Fed. Cl. at 391.

A: Well, the strategy or a plan, that was what we'd like to accomplish, but because of the uncertainties of the program, we didn't know whether we'd be able to or not.

Q: Did you understand the strategy to be a contractual requirement?

A: No.

NSP Tr. 3828: 5-18 (Morgan).

Mr. Morgan explained repeatedly in his testimony that, because of the uncertainties at the time the Standard Contact was signed, there was no acceptance rate included. NSP Tr.3781:8-3782:20; 3799:8-3800:16; 3808:15-3810:7 (Morgan). Further, DOE rejected numerous and repeated requests from utilities and trade associations, such as Tennessee Valley Authority ("TVA") and Florida Power & Light, to include a specific acceptance rate in the Standard Contract. NSP Tr.3808:15-3810:7; 3810:8-18; 3819:17-3821:6 (Morgan); see DX 2.43; DX 2.63; DX 33.

Further, SFI asserted that David Zabransky, the current contracting officer for the Standard Contract at OCRWM, testified that a "reasonable rate would have been one that addressed the aggregate rate of utility discharges and would work off the industry backlog of SNF." Pl. Br. 10. This representation is false. Mr. Zabransky testified:

Q: It was your view while you were at WEPCO, was it not, that a reasonable acceptance rate would have been one that would have addressed the aggregate rate of utility discharges, plus work off the backlog?

A: I think as an industry, it was pretty much universal that we all would have like to have seen a rate that kept pace with the discharges and worked off the inventory.

* * *

Q: While you were at WEPCO, it was your opinion that an appropriate rate of acceptance under the standard contract would be a rate which kept pace with discharges and removed some of the backlog, isn't that fair?

A: I think I just answered that question that, yes, that's the rate we would like to have had, would have been a rate that would keep pace with discharges and work off the inventories.

Tr.2029:12-20; 2030:4-13 (Zabransky).

Numerous documents support Mr. Zabransky's testimony that the industry would have liked an acceptance rate included in the Standard Contract that would require DOE to avoid at-reactor storage and work off the backlog of stored SNF.[11] In fact, many utilities lobbied for the inclusion of such a clause in the Standard Contract before it was finalized, and continued to

[11] For instance, during the rulemaking process through which the Standard Contract's terms were developed, TVA submitted a comment, stating that "a commitment to do no more than start accepting deliveries by 1998 is empty and meaningless without setting forth some reasonable minimum rate of acceptance which corresponds to the purposes of the Act." DX 2.63 at ARC0010537; NSP Tr. 3819: 17-3821:6 (Morgan). TVA recognized that, "[o]f course, under the priority ranking system in the draft contract, it would be difficult at the time contracts are executed to give each Purchaser assurances of delivery acceptance at any specific rate," but suggested that "[t]his could, however, be done on an industry wide basis." Id. TVA suggested that DOE add a contract provision to provide that "DOE shall start accepting delivery of SNF or HLW not later than January 31, 1998, at not less than the annual rate [at which] SNF and/or HLW is then being produced from civilian nuclear power plants covered by contracts." Id. DOE denied that request. NSP Tr. 3819:17-3821:6 (Morgan).

lobby for such a clause after the contract had been signed.[12] However, the rate at which the utilities would have liked does not define DOE's obligations under the Standard Contract.

E. SFI's Reliance Upon DOE Planning Documents To Support Its Assertion That DOE Was Obligated To Accept SNF At A Rate Of 3,000 MTUs Is Misplaced As A Matter Of Law And Fact

1. SFI's Reliance Upon Program Documents Fails As A Matter Of Law

While arguing that determining what would have happened in the "but for" world is too speculative, SFI also proposes an alternative view of the world where the rate of acceptance is not so speculative after all. In attempting to define the rate of acceptance that Entergy expected DOE would implement, SFI relied predominately upon the testimony of Mr. Frank Rives. While completely ignoring the Standard Contract, which clearly defines the process whereby the rate of

[12] The Edison Electric Institute ("EEI"), an association of investor-owned utilities, and the Utility Nuclear Waste Management Group ("UNWMG"), a consortium of 43 utilities with specific interests relating to nuclear waste management expressly recognized that "the contract may not be the appropriate place to commit DOE to a specific, numerical receiving rate." DX 2.34 at ARC0010334. However, EEI and UNWMG requested that a term be added to the Standard Contract that would require DOE to "design its facilities with the capacity to receive SNF/HLW at a rate commensurate with the amount of SNF/HLW then being generated together with the accumulated backlog of SNF/HLW." Id. Specifically, EEI and UNWMG suggested the inclusion of the following language, intended to add an obligation upon DOE beyond that imposed by the proposed rule:

> WHEREAS, DOE recognizes that its ability to take delivery of spent nuclear fuel and/or high-level radioactive waste must be commensurate with the amount of such fuel and waste then being generated together with the amount of such fuel and waste previously generated, and consistent with its obligation to take title to such fuel and waste as expeditiously as practicable upon the request of the owner or generator of such fuel and waste.

Id. at ARC0010335. DOE did not include such a clause in the final contract. NSP Tr.3796:17-3798:16; 3800:9-22 (Morgan).

acceptance would be developed beginning in 1991, Mr. Rives preferred to rely almost exclusively upon draft Mission Plans, planning documents, and other parol evidence to support his testimony that he "expected" DOE to use a 3,000 MTU rate of acceptance to implement its program beginning in January 1998.

For example, Mr. Rives relied upon the 1983 Draft Mission Plan[13] to support his alleged "expectations." Tr.1134: 6-9 (Rives); PX 275. However, this Court, in its recent SMUD decision, already found that document to be "rank speculation." SMUD, 74 Fed. Cl. at 728-29; accord PG&E, 73 Fed. Cl. at 392.[14] Mr. Rives relied upon the 1984 Draft Mission Plan. Tr.1144: 3-5 (Rives); PX 276. This Court found in the same SMUD decision that 1984 draft document to be "speculative." SMUD, 74 Fed. Cl. at 729.

As this Court recognized in SMUD, the draft DOE planning documents upon which SFI relies uniformly and expressly indicate that they are "not contractually binding," that they do not establish acceptance rates that create mandatory obligations, and that they were only for planning purposes. See, e.g., PX 275 at 2-2 (Dec. 1983 Draft Mission Plan) ("This Waste Acceptance Schedule will serve as a planning base which will be updated annually in response to the latest

---

[13] SFI suggests that, because the NWPA specifically required the publication of a draft mission plan, the 1983 Mission Plan should receive "unique treatment." Pl. Br. at 7 n.4. However, the NWPA does not provide any support for plaintiffs' argument that the 1983 draft mission plan contained binding commitments for DOE regarding the SNF program. As Mr. Morgan testified, "the mission plan was a planning document and not a contractual document." NSP Tr.3828:8-9 (Morgan).

[14] The PG&E Court found that "the preponderance of the credible evidence, even early on, indicates that the parties contemplated that DOE's rate of acceptance of utilities' spent fuel, especially beginning in 1998, would be far lower than 3,000 MTU/year." PG&E, 73 Fed. Cl. at 392.

projections of nuclear power growth."); PX 276 at 2-1 (April 1984 Draft Mission Plan) ("The schedule will serve as a planning base which will be updated annually."). Other documents upon which SFI relied at trial specifically stated that they were for planning purposes and were not "contractually binding." For example, each Annual Capacity Report issued between 1987 and 1990 expressly advised contract holders that, in 1991, but not before, DOE would begin publishing firm individual utility acceptance schedules in accordance with the contracts, including shipment allocations. See, e.g., PX 308 (June 1988 ACR) at 1 ("the ACR is for planning purposes only and thus is not contractually binding on either DOE or the Purchasers"); PX 257 (Dec. 1990 ACR) at 2 (same). SFI has identified no language in which DOE agreed or even suggested that the acceptance rates in any planning documents which DOE issued were contractually binding or constituted anything other than DOE's hopes and goals for its program. Because DOE has never obligated itself to satisfy a 3,000 MTU acceptance rate, the Court cannot incorporate such a requirement into the Standard Contract.

Moreover, SFI identifies no language which demonstrates that DOE agreed or suggested that the acceptance rates in planning documents were contractually binding. See National By-Prods., Inc. v. United States, 186 Ct. Cl. 546, 558-59, 405 F.2d 1256, 1263 (1969) ("[b]efore a representation can be contractually binding, it must be in the form of a promise or undertaking . . . and not a mere statement of intention, opinion, or prediction"); see also Commercial Metals Co. v. United States, 176 Ct. Cl. 343, 349 (1966); Branhill Realty Co. v. Montgomery Ward & Co., 60 F.2d 922, 923 (2d Cir. 1932). SFI's reliance upon program documents to evidence contractual obligations is misplaced. See PG&E, 73 Fed. Cl. at 392-94 (discussing National By-Products decision in context of SNF cases).

2. As A Matter Of Law, This Court Should Not Consider Parol Evidence In Determining DOE's Performance Obligations Under The Standard Contract

Because the documents upon which SFI relies are not incorporated into the Standard Contract, the Court as a matter of law, should not rely upon them. SFI's argument regarding the rate of acceptance rests upon this Court's consideration of extra-contractual evidence that post-dates the formation of the Standard Contract. As a matter of law, with respect to the use of parol evidence concerning the parties' intent, the Standard Contract contains an integration clause, which expressly provides that the written language in the Standard Contract "contains the entire agreement between the parties with respect to the subject matter hereof." DX 1, Art. XXII. The contract further provides that "[a]ny representation, promise, or condition not incorporated in this contract shall not be binding on either party" and that "[n]o course of dealing or usage of trade or course of performance shall be relevant to explain or supplement any provision contained in this contract." Id. SFI's interpretation of the Standard Contract, which reads into the agreement alleged program hopes and goals over a 20-year period, completely eradicates the integration clause from the contract. See Barron Bancshares, Inc. v. United States, 366 F.3d 1360, 1375 (Fed. Cir. 2004); Southern California Fed. Sav. & Loan Assoc. v. United States, 422 F.3d 1319, 1330 (Fed. Cir. 2005). Although "parol evidence 'must be admissible on the issue of the extent to which a written agreement is integrated, for . . . the writing cannot prove its own integration,'" McAbee Constr, Inc. v. United States, 97 F.3d 1431, 1434 (Fed. Cir. 1996) (quoting Sylvania Elec. Prods., Inc. v. United States, 198 Ct. Cl. 106, 458 F.2d 994, 1006 (1972)), the fact that the Standard Contract contains an integration clause makes plaintiff's burden of establishing a lack of integration "extremely heavy." Id.; see PG&E, 73 Fed. Cl. at

385 ("The existence of the integration clause in the Standard Contract, then, militates strongly against modifying or supplementing it by adding a specific acceptance rate term."). Despite the heavy burden, SFI failed to present any evidence at trial concerning the lack of integration. As a result, it has not met its burden of proving that the Standard Contract is not fully integrated and, therefore, cannot rely upon extra-contractual evidence of the parties' alleged contractual intentions.

Additionally, because the Standard Contract was promulgated through notice-and-comment rulemaking, any parol evidence should consist solely of the record of administrative rulemaking, in accordance with the proper means of interpreting regulations. SFI's efforts to introduce extensive deposition and trial testimony and documents to identify the contractual intent evidenced by the language of the Standard Contract are legally unsupported.

Finally, part of the "evidence" upon which plaintiffs rely to support the alleged intent of the Standard Contract and the NWPA is not even admissible for that purpose. For example, SFI has designated the deposition testimony of Lake Barrett as evidence of the "intent" of Congress in promulgating the NWPA. See Pl. Br. 11, 48.[15] This method of discerning the intent of these

---

[15] Even assuming that Mr. Barrett's testimony were probative of Congress's intent, his deposition testimony adds little to SFI's argument. Contrary to SFI's characterization, Mr. Barrett did not know why the 3,000 MTU rate was chosen or whether the production rate was considered in the determination of that rate. As Mr. Barrett testified, the 3,000 MTU design rate for the repository was chosen prior to his employment at DOE and he did not know how it was developed. Barrett Dep. 57:4-17 (Apr. 22, 2002); Barrett Dep. 1333:4-7 (May 10, 2002. Further, Mr. Barrett did not testify that the 3,000 MTU rate would meet the intent of the NWPA as he understood it. Instead, in the portion of the deposition cited by SFI, Mr. Barrett testified that the "3,000 rate would be consistent with [his] understanding of the intent of the act to reduce over a reasonable period of time the backlog of spent nuclear fuel throughout the nation." Mr. Barrett also did not testify that his understanding of the NWPA was to preclude the need for additional at-reactor storage and was not asked to define what a "reasonable period of time" would be for the removal of the backlog of accumulated SNF. Mr. Barrett testified that he

documents is inadmissible, because even the opinions of individuals who actually participated in the legislative process are irrelevant to a proper interpretation of the requirements of a statute. See, e.g., Selman v. United States, 204 Ct. Cl. 675, 685 n.6, 498 F.2d 1354, 1359 n.6 (1974) (affidavit of a United States Senator concerning particular legislation was "without evidentiary value" because "no member of a legislature, outside of the legislature, is empowered to speak with authority for that body"); accord Department of Energy v. Westland, 565 F.2d 685, 690-91 (Cust. & Pat.App. 1977); United States Steel Corp. v. United States, 618 F. Supp. 496, 500 n.5 (CIT 1985). The opinions of DOE personnel are similarly inadmissible. PG& E, 73 Fed. Cl. at 390 ("The court therefore declines to afford any weight to "after-the-fact" statements made by DOE officials about the intent of Congress in passing the NWPA".).

3. SFI Improperly Relies Upon The 1985 Mission Plan [16]

---

understood that the NWPA required DOE to begin performance on January 31, 1998, but that some utilities would still have storage requirements after that time. Barrett Dep. 180:15-181:18 (Apr. 22, 2002). Mr. Barrett did not understand there to be any "legal requirement to do 3,000 tons per year." Barrett Dep. 121:1-22 (Apr. 22, 2002). Finally, as Mr. Barrett testified, he was not part of the program in 1983 when the contracts were signed, so he could not testify as to what the intent of the program was at that time. Barrett Dep. 742:14-743:1 (Apr. 26, 2002).

[16] Importantly, the 1985 Mission Plan upon which SFI relies was created pursuant to a statutory requirement for submission to Congress. 42 U.S.C. § 10221(b)(3). After DOE submitted the 1985 Mission Plan and a 1987 Mission Plan Amendment to Congress, Congress enacted the 1987 amendments to the NWPA, presumably after considering DOE's Mission Plan submissions and evaluating the state of DOE's program. As it was entitled to do, Congress significantly modified the scope of the program at that time, limiting DOE's focus for development of a repository to one site, Yucca Mountain, and establishing linkages between a Monitored Retrievable Storage ("MRS") facility and a repository. 42 U.S.C. §§ 10133, 10161-69. SFI's reliance upon documents prepared for Congress that relate to possible circumstances and scenarios that could have existed prior to congressional review of and action upon those pre-amendment planning documents does not support its argument that DOE has somehow obligated itself to accept SNF at a 3,000 MTU rate, regardless of whether a repository is available.

SFI also argued at trial that the rate of acceptance to which DOE was obligated was the "improved performance schedule" set forth in DOE's June 1985 Mission Plan. Tr.1146: 15-1148:12 (Rives). Mr. Rives testified that this Mission Plan was not a draft and that it reflected his reasonable expectation that DOE would begin accepting SNF in January 1998, such that SFI would not have been required to build dry fuel storage at its facility. Tr.1147: 24-1148: 12 (Rives). However, this Court has already found that the 1985 Mission Plan is "rank speculation." SMUD, 74 Fed. Cl. at 729.

Further, SFI's reliance upon the 1985 Mission Plan suffers from several fatal factual and legal flaws. First, contrary to the testimony of Mr. Rives, the parties were well aware that the rates set forth in DOE's Mission Plan were not contractually binding. The Mission Plan expressly stated that the schedules used in the Mission Plan were "for illustrative purposes only at this time" and expressly referred to the Standard Contract, which provided the mechanism by which, in 1991, DOE would "begin to publish firm waste acceptance schedules for individual reactors, including shipment allocations." PX 277 at 29. DOE's improved performance schedule, by definition, was not a contractual obligation.[17]

---

[17] In fact, DOE received comments during the contract formation process seeking a commitment to accept SNF at the rates set forth in the forthcoming mission plan. For instance, Florida Power & Light Company, expressly stated that DOE should create a mandatory obligation that would require DOE to accept SNF and HLW at the rates identified in the mission plan, once that plan was approved by Congress:

> The [NWPA] specifically requires the Department of Energy to prepare a Mission Plan detailing a schedule for the construction of repositories and their capacities (Section 301). It is proposed that once this Mission Plan has been approved by Congress (18 months after the enactment of the [NWPA]), it becomes the standard by which contract performance by the DOE is judged. It is suggested that Article V B (3) be modified to include the statement:

Moreover, SFI's reliance upon the terms of the improved performance schedule constitutes another instance of SFI's reliance upon parol evidence. The improved performance schedule that allegedly depicts DOE's contractual obligation contemplates DOE commencing performance in 1996, and not in 1998, as the contract clearly provides. PX 277 at 27-28. There is absolutely nothing in the record to suggest that DOE was obligated to begin acceptance before January 31, 1998. SFI seeks the Court's acceptance of evidence that varies the express terms of the Standard Contract, in violation of the parol evidence rule. Similarly, if this Court found that DOE was obligated to accept SNF at a rate that eliminated the need for additional at-reactor storage, it would render the contractual oldest-fuel-first ("OFF") queue, exchanges, and priority provisions[18] meaningless, as the Court found in PG&E:

> These and other examples of predictions, hopes, goals, or other aspirations adduced at trial do not amount to binding promises that can be enforced by the court through the award of contract damages.

PG&E, 73 Fed. Cl. at 393. As a matter of law, such an interpretation would be improper.

---

> "Should the DOE fail to meet the schedule and capacities detailed in the approved 1984 DOE Mission Plan, because of Force Majeure or other causes, DOE shall, to the extent permitted by the [NWPA], as it may be amended from time to time, bear the reasonable and necessary incremental costs of storage or alternative disposal incurred by the Purchaser."

DX 2.43 at ARC0010439; NSP Tr. 3808:15- 3810: 7 (Morgan). DOE declined to make such a commitment. Id.

[18] With respect to the order of SNF acceptance, the Standard Contract provides SNF acceptance priority among contract holders upon an "oldest fuel first" basis, 10 C.F.R. § 961.11, Art. VI.B.1, and, like the proposed rule, provided for DOE's issuance of an acceptance priority ranking beginning April 1, 1991. 10 C.F.R. § 961.11, Art. IV.B.5.a.

F. SFI's Own Documents Belie Its Assertions That It Expected DOE To Accept Fuel At A 3,000 MTU Per Year Rate

SFI's contemporaneous documents demonstrate that SFI did not, as its witnesses testified, expect that DOE would accept SNF at a rate of 3,000 MTUs per year. Those documents demonstrate also that well before the announcement of any delay, SFI knew that DOE would not accept fuel from Grand Gulf in the first ten years of operation of a repository or an MRS.

For example, Mr. Rives prepared a report, dated March 10, 1992, for Mr. Dewease, the Entergy Nuclear Vice-President of Operations Support, providing a spent fuel status report. DX 150; Tr.1290:16-1291:16 (Rives). In that report, Mr. Rives informed Mr. Dewease that "DOE intends to provide interim storage at a monitored retrievable storage (MRS) facility by 1998." DX 150. Mr. Rives also informed Mr. Dewease that the Arkansas Nuclear One (:ANO") facility would need on-site storage by 1995, while Grand Gulf would need on-site storage "by approximately 2004." Id. Mr. Rives did not report that his expectations were that DOE would, or should, accept SNF at a rate of 3,000 MTUs per year. Mr. Rives assisted in the preparation of another briefing for management, in the spring or summer of 1993, regarding spent nuclear fuel. DX 497; Tr.1294:7-1295:25 (Rives); Tr.1295:10-1296:4 (Rives). That briefing also indicated, based on the 1991 ACR, that the earliest allocations for acceptance of SNF from Grand Gulf, with an MRS, was after 2007. DX 497 at SSM0076911. Mr. Rives also testified that he prepared another summary report for management at Entergy or for business purposes, dated August 12, 1994, regarding the status of SNF storage. DX 176; Tr.1301:6-12 (Rives). That document summarized the status of DOE acceptance for Entergy's facilities:

> Under DOE's Oldest Fuel First allocation methodology, Entergy's reactors do not receive early allocations of space in DOE's repository or MRS systems. ANO-1 and ANO-2 receive their first allocations in the fourth and ninth years of facility operation, respectively, corresponding to 2001 and 2006 if an MRS becomes operable in 1998, or 2013 and 2018 if 2010 startup is assumed. Grand Gulf, River Bend, and Waterford 3 do not receive allocations in the first ten years, therefore, first offsite shipment will not occur until after 2007, even if an MRS begins operation in 1998.

DX 176 at 2-3 (emphasis added). Mr. Rives used the 1994 ACR to prepare this status report. Tr.1302:22-25 (Rives).

These documents reflect what Mr. Rives and Entergy were planning in the early 1990s. Mr. Rives did not suggest in any of these internal reports that the allocations in the 1991 ACR, in which Grand Gulf would not have SNF accepted by DOE until after 2007, were not what he expected or were somehow improper or in violation of the contract terms. In fact, he reported that those allocations were based on an oldest fuel first analysis, the methodology set forth in the Standard Contract. DX 1, Article IV.B. 5(a). Mr. Rives did not complain to Entergy management in these reports that he believed the correct acceptance rate should be 3,000 MTU per year and that management should object to DOE. In fact, the contemporaneous SFI documents reflect what the industry, including SFI and Mr. Rives, knew – that the 1991 ACR would set forth an acceptance rate based on an oldest fuel first methodology and that newer facilities like Grand Gulf would not have any early allocations.

G. SFI Ignores The Contractual Mechanism For Ascertaining The Acceptance Rate Under The Standard Contract

1. From The Time Of Contract Formation, The Parties Expected That The DCS Process Would Be The Mechanism Through Which They Would Make Their Respective Commitments

In its post-trial brief, SFI argues that the Court should ignore the rate contained in the 1991 ACR and contemplated by the parties through the completion of the DCS process and, instead, determine that DOE was required to perform at a rate sufficient to prelude the need for additional at-reactor storage after 1998, which it contends is a 3,000 MTU rate. Pl. Br. at 3; 46. SFI offered two theories in support of this argument: (1) the rates contained in the 1991 ACR and contemplated by the parties through the DCS process were not binding because DOE manipulated and suspended the DCS process; and (2) the parties expected contract performance at the rate that SFI now advocates at the time of contact formation. Pl. Br. at 9-10; 16. The Court should reject these contentions because they misconstrue the Government's argument regarding the rate of acceptance and misstate the facts surrounding the development of the Standard Contract.

SFI asks the Court to ignore the rate contained in the 1991 ACR and contemplated by its participation in the DCS process, claiming that the alleged manipulation and ultimate suspension of the DCS process somehow requires adoption of an alternate rate. This argument ignores the process contemplated by the Standard Contract for identification of a rate of acceptance, SFI's participation in that process, and SFI's complete failure to prove that the rate contained in the 1991 ACR was promulgated in bad faith.

As we established at trial, at the time of contract formation, the utilities repeatedly requested that DOE commit to a particular rate of acceptance in the Standard Contract.

NSP Tr.3793:20-3798:16; NSP Tr.3800:9-16; NSP Tr.3806:2-9; NSP Tr.3808:15-3810:20; NSP Tr. 3819:20-3821:6 (Morgan). Mr. Morgan unequivocally testified that, despite these pleas, DOE did not include any particular rate of acceptance into the Standard Contract. Id. (Morgan). As Mr. Morgan explained, uncertainties surrounding the waste acceptance program that existed in 1983 prevented DOE from committing to any particular rate of acceptance in 1998. Id. (Morgan). Those uncertainties included the licensing process for Federal waste site, potential lawsuits brought by members of nuclear fuel industry, and potential intervention in the waste management program by third parties. NSP Tr. 3782:1-20 (Morgan). For this reason, in drafting the Standard Contract, DOE included a provision that obligated DOE to issue an APR in 1987 (after some of the uncertainties Mr. Morgan identified were resolved) and an ACR in 1991 that would, in turn, lead to the development of the DCSs. Tr.1821:4-1823:9 (Kouts); Tr.1932:2-1936:1 (Zabransky); DX 1, Art. IV.B.5. These DCSs would serve as the basis for a binding commitment between DOE and the Standard Contract holders regarding the specific amount of spent fuel that DOE would begin taking from particular utilities at particular plants. DX 140; Tr.1937:19-1938:15 (Zabransky) ("as far as we [at WEPCO] were concerned, DOE committed to pick the fuel up in those quantities in those years."); Tr.1831:24-1833:3 (Zabransky); Tr.1951:15-1952:15 (Zabransky). DOE explained the process in the 1985 Mission Plan (and in the 1983 Draft Mission Plan upon which it relies) as follows: "In 1991, the DOE will begin to publish firm waste-acceptance schedules for individual reactors, including shipment allocations." PX 277 at HQR-003-1133; see also DX 145; Tr1976:3-1979:15 (Zabransky). In short, under the terms of the Standard Contract, the 1991 ACR was the document that started the process

whereby both parties would commit themselves to an acceptance schedule. Tr.1960:3-1966:12 (Zabransky).

2. SFI Actively Engaged In The DCS Process Without Objection

SFI had no allocations for its Grand Gulf facility under the 1991 ACR during the first ten years of the operation of a repository or an MRS. DX 140 at HQR-002-0811; Tr.1262:23-1263:11 (Rives). However, Mr. Rives, who administers the Standard Contract for all of Entergy's nuclear facilities, including Grand Gulf and ANO, testified that he submitted a DCS for SFI's ANO facility in 1995, 63 months prior to the date when the first allocation for its ANO facility was listed in the 1991 ACR. DX 557; Tr.1278:20-1280:11 (Rives); DX 188 (DCS for 2001 allocation of 23.2 MTU of spent fuel); Zabransky Demonstrative No. 1; Tr.1939:15-1946:2 (Zabransky). SFI never submitted any objections to DOE objecting to the the fact that Grand Gulf had no allocations in the first ten years of operation of the repository or an MRS. Tr. 1280:12-19 (Rives); Tr.1955: 5-19 (Zabransky). SFI never submitted any objections to DOE objecting to the use of the 1991 ACR to determine what order in the queue all of the utilities would be located and the fact that SFI's Grand Gulf facility had not allocations in the 1991 ACR. Tr.1955: 5-19 (Zabransky). In fact, SFI did not present any evidence reflecting any objection, whether expressed within SFI, to other utilities, or to DOE, to the allocations listed in the 1991, or subsequent, ACRs promulgated by DOE. In short, rather than objecting to the allocations in received through the 1991 ACR, SFI specifically engaged in the DCS process.

These facts alone are evidence of a "but for" scenario. If DOE performed under the rates set forth in the 1991 ACR, there is no evidence in the record to suggest that SFI would have considered that to be a breach of DOE's duty under the Standard Contract. Indeed, quite the

opposite is true. The record shows that SFI engaged in the DCS process with full knowledge of the rates set forth in the 1991 ACR and thus considered those rates to represent performance under the Standard Contract.

SFI's argument that the DCSs did not reflect binding commitments upon DOE is factually incorrect and, more importantly, misses the point of our trial presentation. As a threshold matter, we established at trial that both contract holders and DOE considered approved DCSs to be binding commitments by DOE. Tr.1937:19-1938:15; Tr.1983:2-1988:16 (Zabransky). Accordingly, it is incorrect for SFI to assert that approved DCSs were not binding commitments.

More importantly, and regardless of whether approved DCSs were or were not "binding commitments," these documents evidence SFI's willing participation in a scenario whereby DOE could have performed pursuant to its obligations under the Standard Contract. The relevant inquiry is not whether DOE in fact performed in accordance with the 1991 ACR or the rates that SFI inserted on its DCS forms but, rather, whether DOE could have performed at that rate and still satisfied its contractual obligations. The fact that SFI did not object to the process and was an active participant in it is proof that this scenario was well within the parameters of SFI's understanding of DOE's obligations under the Standard Contract. See Julius Goldman's Egg City v. United States, 697 F.2d 1051, 1058 (Fed. Cir. 1983), cert. denied, 464 U.S. 814 (1983). ("A principle of contract interpretation is that the contract must be interpreted in accordance with the parties' understanding as shown by their conduct before the controversy."). There is simply no evidence that the acceptance rates for SFI set forth in the 1991 ACR represent a breach.

Accordingly, the Court should hold SFI to those rates in identifying the "but for world."[19] In fact, absent that rate and the enforceability of the approved DCSs, SFI has not established how

---

[19] Beginning on page 50 of its post-trial brief, SFI cites to the designated deposition testimony of Alan Brownstein and Nancy Slater-Thompson regarding the role of DCSs in DOE's planning process. However, none of this testimony provides a basis for disregarding the role of DCSs in determining the scope of the Government's obligations to SFI beginning in 1998. Moreover, a full examination of the testimony from Mr. Brownstein and Ms. Slater-Thompson further explains the role of the DCSs in this planning process.

Both Mr. Brownstein and Ms. Slater-Thompson described DCSs as being part of DOE's planning process for the acceptance of SNF from utilities. Mr. Brownstein testified that the submission of a DCS was "a prerequisite to the acceptance of a purchaser's spent nuclear fuel," Brownstein Dep. 391:18-23 (Apr. 10, 2002), and that DCSs were all part of the process established in the contract for the development of a schedule of acceptance. Brownstein Dep. at 400:8-11. Mr. Brownstein further testified that DOE had agreed upon a "mutually agreeable schedule" with some of the utilities through the submission and approval of DCSs. Brownstein Dep. 549:7-14 (Apr. 11, 2002). Finally, Mr. Brownstein testified that he believed that utilities would submit Final Delivery Schedules ("FDSs") for all of the SNF described in approved DCSs. Brownstein Dep. at 167:4-15 (May 23, 2002).

Although Ms. Slater-Thompson stated her belief that "DCSs were for planning purposes only," she also testified that, if a utility failed to submit a DCS for a year in which it had an allocation, that utility would have "waived" its right to deliver SNF to DOE in that year. Slater-Thompson Dep. 150:19-24 (Jun. 13, 1002). Ms. Slater-Thompson further testified that, if DOE had begun performance in 1998, it would have received FDSs from utilities with approved DCSs for 1998 and it would have accepted fuel in accordance with those FDSs. Slater-Thompson Dep. 152:11-24 (Jun. 13, 1002). Finally, although Ms. Slater-Thompson testified that she did not believe that DCSs were very helpful in the planning of the waste management system, she acknowledged that the organization responsible for planning for the transportation of the SNF would be the group to use the DCSs and that she had never had responsibility for transportation planning. Slater-Thompson Dep. 149:17-:150:1 (Jun. 13, 1002).

SFI also cites to the testimony of Lake Barrett, former Deputy Director of OCRWM, in which he explains that DCSs were "part of the administrative details of the contract that I did not pay much management policy attention to." Barrett Dep. 217:12-14 (Apr. 23, 2002). Mr. Barrett explained that he understood the purpose of a DCS to be related to "planning for the receipt of material into our system in the future." Barrett Dep. 699:6-16 (Apr. 26, 2002). He viewed them as "administrivia" because they were not related to his "primary business, which was to determine if the repository site was suitable so we can get on to build the facility to be able to receive" SNF. Id.; see also Barrett Dep. 117:3-14 (Apr. 22, 2002).

its contract is sufficiently definitized to allow this Court to evaluate causation. Tr.1995:23-1996:23 (Zabransky).

3. The Suspension Of The DCS Process in 1996 Neither Undermines The Validity Of The 1991 ACR Nor Evidences Bad Faith

SFI also argues that DOE's suspension of the DCS process is evidence that the Court should disregard the mechanism for identifying the rate contained in the Standard Contract. Pl. Br. at 47. This argument is unavailing. As we established at trial, DOE suspended the DCS process in 1996 after it determined that it would be unable to meet its contractual obligation to begin accepting spent fuel in 1998. Tr. 2001:15-2002:17 (Zabransky). This suspension simply shows that DOE realized that it would not be able to begin performance under the terms of the Standard Contract. As Mr. Zabransky explained at trial, it made no sense for DOE to continue to commit itself to performance that it could not meet. Id. (Zabransky). The suspension of the DCS process years after the contractual mechanism was set (in the Standard Contract) and put into place (through promulgation of the 1991 ACR) in no way detracts from the use of the contractually prescribed method for identifying the "but for" world. That DOE recognized that it would not be able to timely perform the Standard Contract years after the document was executed does not mean that the mechanism which the contract sets for ascertaining the rate of acceptance should be disregarded.[20]

[20] SFI also refers to the suspension of the DCS process as "cavalier manipulation" and suggests that it amounts to bad faith by DOE. Pl. Br. at 47. However, this Court has already entered summary judgment on SFI's bad faith and fair dealing claim, finding that SFI "failed to proffer sufficient evidence to overcome the presumption that the relevant Government officials have acted in good faith." System Fuels Inc. v. United States, 66 Fed. Cl. 722,735 (2005). Thus, it is puzzling that SFI continues to make bad faith assertions, both at trial and in its brief. In any event, far from acting in bad faith with the intent of harming SFI, DOE suspended the DCS process because it recognized that it could not meet this obligation and that continuing with the

DOE's failure to perform in a timely manner in no way undermines the mountain of evidence indicating that, years prior to the suspension of the DCS process, DOE promulgated the 1991 ACR in accordance with the terms of the Standard Contract and that SFI participated in the DCS process without objection or qualification. SFI has simply offered no basis for deviating from the plain text of the Standard Contract to identify the rate of acceptance in the "but for" world.

## III. SFI HAS ARGUED POSITIONS THAT WOULD RENDER THE STANDARD CONTRACT UNENFORCEABLE

In this litigation, SFI has argued that DCSs that DOE approved are meaningless. This argument, however, leaves the contract devoid of any enforceable schedule or schedule term. As discussed above, the contractual process that generates the APR and the ACR, and that ultimately leads to the DCS submittal and approval process, is the method by which the schedule of SNF acceptance is determined. Tr.1821:4-1822:22 ( Kouts); Tr.1995:16-1996:23 (Zabransky). If this process, which was initiated in 1991 consistent with the contract and which resulted in an approved DCS for SNF at ANO, is found to be unenforceable or otherwise meaningless, the contract simply becomes too indefinite to enforce. See Massengill v. Guardian Mgt. Co., 19 F.3d 196, 202 (5th Cir. 1994). For the reasons that we have discussed, "[c]ourts refuse to enforce agreements that contain indefinite promises or terms they deem essential because judicial clarification of the uncertainty entails great danger of creating intentions and expectations that the parties themselves never entertained." Neeley v. Bankers Trust Co. of

---

DCS process would require the Government to incur obligations that it could not perform. DOE acted in good faith by informing all Standard Contract holders when it determined that it could not make any promises regarding acceptance.

Tex., 757 F.2d 621, 628-29 (5th Cir. 1985). Further, a court must ensure that it does not "inject[] itself into the contracting process to create the contract that it determines is best for the situation," rather than one actually created by mutual agreement. Northrop Grumman Corp. v. United States, 47 Fed. Cl. 20, 41 (2000). DOE initiated a process in 1991, resulting in the approval of an ANO DCS, that definitized the first SNF acceptance from ANO, and other utilities under the contract, guiding any schedule analysis in this case. Nevertheless, to the extent that the Court adopts SFI's argument that the DCS process was meaningless and that the only schedule applicable to the contract is one that the Court will have to create, SFI will have rendered one of the most significant and essential terms of the contract completely indefinite, precluding any recovery in this case. While this Court in an earlier SFI ruling, and in SMUD and PG&E, held that the 1991 ACR/APR and approved DCSs do not constitute "binding obligations for other parties," the PG&E Court found that:

> Nevertheless, the parties understood that the ACR/APR and DCS/FDS scheme was the process under the express terms of the Standard Contract by which a firm acceptance rate and delivery schedule would be determined, and the parties substantially carried out this process before DOE's breach.

PG&E, 73 Fed. Cl. at 399. This Court should likewise recognize that the DCS process, along with the 1991 ACR, is the primary mechanism identified in the Standard Contract which provides the basis for any damages analysis here.

## IV. SFI WOULD HAVE BUILT DRY FUEL STORAGE REGARDLESS OF DOE'S DELAY IN ACCEPTING SPENT NUCLEAR FUEL AND THEREFORE IT HAS INCURRED NO DAMAGES

We noted throughout trial that SFI presented no evidence that, had DOE accepted fuel from Grand Gulf at a 900 MTU rate, it would have utilized some other storage option, and not

dry fuel storage. According to Dr. Raymond Hartman's models, at a 900 MTU rate, DOE would have begun acceptance from Grand Gulf in a "but for" world, at the earliest, beginning in 2012[21] or 2014.[22] SFI's own documents dating to the early 1990s confirm that it expected, under the 1991 ACR rates, that DOE would not begin accepting fuel from Grand Gulf until after 2007. See DX 150, DX 497, DX 176, and above at pp. 30-31.

Mr. Charles Benjamin Franklin, Entergy's Manager of Project Management, testified that Grand Gulf would need to load casks by 2007 to avoid the loss of full core reserve.[23] Tr.242:3-11 (Franklin). Mr. John McGaha, the President of Entergy Operations, testified that Energy's policy is "that we will always maintain full core reserve storage capacity." Tr.133:9-134:4 (McGaha) (emphasis added). Mr. Franklin also testified that maintaining full core reserve was "prudent" and an "operational philosophy." Tr.224:18-226-6 (Franklin). Mr. Franklin explained that, if Grand Gulf were to lose full core reserve (so that not all of the fuel assemblies in the core could be removed) and needed to unload the core because of an emergency or for routine

---

[21] Under Dr. Hartman's But-For.1 scenario, DOE accepts fuel beginning in 1998 at a rate of 400 MTUs in the first year, 600 MTUs, in the second year, and then a steady state 900 MTUs for the following 15 years. DOE begins acceptance from Grand Gulf in **2014** under that scenario. DX 600 (Hartman Test.) at Table 4 and 5. Under Dr. Hartman's But-for.2 scenario, DOE accepts fuel beginning in 1998 at a rate of 400 MTUs in the first year, 600 MTUs, in the second year, and then a steady state 900 MTUs for the following ten years, followed by five years at 1,800 MTUs per year, then 3,000 MTUs per year. DOE begins acceptance from Grand Gulf in **2012** under that scenario. DX 600 (Hartman Test.) at Table 4 and 5.

[22] Under Dr. Hartman's But-for.3 scenario, DOE accepts fuel beginning in 1998 at a rate of 400 MTUs in the first year, 600 MTUs, in the second year, and then a steady state 900 MTUs for the following ten years, followed by five years at 1,800 MTUs per year, then 2,100 MTUs per year. DOE begins acceptance from Grand Gulf in **2012** under that scenario. DX 600 (Hartman Test.) at Table 4 and 5.

[23] Full core reserve means having enough storage space in the spent fuel pool for a nuclear facility to be able to unload all of the fuel in its core, or 800 fuel assemblies in the case of Grand Gulf. Tr.133:9-18 (McGaha).

maintenance, Grand Gulf would be forced to shut down because it would not be able to unload, causing Entergy to lose billions of dollars. Tr.253:16-254:1; Tr.474:24-475:9 (Franklin). There is uncontroverted testimony that Grand Gulf would have lost full core reserve by 2007 and, without dry storage in the "but for" world, it would be forced to shut-down in 2011, or earlier. Id. (Franklin). There is no evidence in the record to suggest that Grand Gulf would have operated without full core reserve at all, or even for a short time. Quite the contrary, both Messrs McGaha and Franklin indicated that Grand Gulf would not operate in such a way. Tr.133:9-134:4 (McGaha); Tr.224:18-226:6 (Franklin). There is also no evidence in the record that Grand Gulf would have or even could have used any other storage option instead of dry fuel storage had DOE begun accepting SNF from its facilities in 2012 or 2014, as the Government argues was the DOE's obligation.

SFI has completely failed its burden of proof and, therefore, under the 900 MTU per year rate that is set forth in the 1991 ACR, SFI's damages here are zero, because the DOE delay in accepting SNF from Grand Gulf did not cause its damages.

## V. EVEN ASSUMING THAT DOE WOULD HAVE ACCEPTED SNF FROM SFI AT A 3,000 MTU RATE, SFI FAILED TO ESTABLISH THE COSTS THAT IT WOULD HAVE INCURRED IN THE "BUT FOR" WORLD AND, THEREFORE, HAS FAILED TO MEET ITS BURDEN OF PROVING CAUSATION

### A. Contrary To Its Representations, SFI Was Able To Analyze What Would Have Happened In A But-For World

Assuming that DOE was obligated to accept SNF at a 3,000 MTU rate, SFI argues that there should be no offsets or adjustments to its damages claim because "it is not possible to ascertain with any level of certainty the size and type of casks that DOE will ultimately use." Pl. Br. at 39. Plaintiffs' assertion is incorrect for two reasons. First, the task is not to determine

what DOE will ultimately use, but rather what DOE would have used had it begun accepting SNF from Grand Gulf starting in 2005. This is not an analysis of what might happen in the future. Nor is it an analysis of what happened in the past. An analysis of the "but for" world in this case is actually a look at the present. Second, contrary to SFI's assertions, it is possible to purposes of a damages analysis to determine what casks might have been used in 2005.

Based upon the testimony of SFI's fact witnesses and the expert opinion of Warren Brewer, from an engineering and technical perspective, the "but for" world analysis can and should be evaluated now, and any adjustments to SFI's damages claim for non-incremental "but for" world activities should be accounted for in this case. Mr. Brewer, the Government's technical expert, testified that the "but for" world analysis can and should be conducted at this time because (1) engineering analysis and judgment are needed regardless of whether the but-for assessment is performed now or in the future, as both involve a retrospective analysis, but the one in the future would span many more years; and (2) waiting until the future to assess the "but for" world can require consideration of additional factors and events that would not come into play were the analysis performed today, which may only add to the uncertainty of the assessment. DX 602 (Brewer Test.) at ¶18. Although the "but for" world by definition did not and never will happen, performing a reasonable "but for" world analysis now – temporally closer to the time when DOE was expected to begin SNF acceptance – is easier and less complicated from an engineering perspective and eliminates future events that may simply confuse the analysis. Id. at ¶19. Although Mr. Brewer acknowledged that it may not be possible to state with absolute certainty what the activities would have been, it is possible and reasonable to determine the bounding range of activities. Id. Based upon SFI's claim that, if DOE had

begun acceptance of fuel from the industry in 1998 under a 3,000 MTU annual rate and that the first pickup from Grand Gulf would have been in 2005, the assessment in this case of the "but for" world only requires looking back about one year. Id. at ¶20.

Furthermore, SFI witnesses acknowledged that they had evaluated the "but for" world. For example, Mr. Franklin testified that, sometime in 2005, he prepared an analysis regarding shipment of SNF from Grand Gulf to DOE. PX 214; DX 376; Deposition Designation of Charles Ben Franklin,[24] April 20, 2006 ("Franklin Dep. Desig. (4-20-06)") at 115:2-6; 115:20-25; 116:21-117:5. Mr. Franklin testified that he had analyzed and modeled the "but for" world in which DOE would have performed and begun acceptance of SNF beginning in 1998. Tr.438:4-15 (Franklin). He testified that he assumed the use of a Holtec Hi-Star cask in his analysis, Id. at 275:19-279:23, he analyzed what path a cask would take to exit the Grand Gulf site, and he determined that shipment would be by barge from the barge slip at the Grand Gulf site. Id. at 291:8-292:15. Mr. Franklin indicated that part of the haul path to the barge would be the same path used to take SNF from the auxiliary building to the ISFSI today. Id.

Michael Withrow, the Manager of Nuclear Engineering at Grand Gulf, also testified regarding possible options for the shipment of SNF from Grand Gulf had DOE begun accepting SNF in 1998. Deposition of Michael Withrow, April 13, 2006 ("Withrow Dep. Desig.") at 163:20-165:22. He testified that modifications would be necessary to the path from the Grand Gulf facility to the barge slip, assuming that a rail cask would be shipped by barge to the nearest

---

[24] The Court granted the Government's "Motion for the Admission of Deposition Testimony As Substantive Evidence Pursuant To Federal Rule Of Evidence 801(d)(2)" on January 12, 2007. In its motion, the Government attached the deposition designations of Mr. Franklin, Michael Withrow, David Wright, and Joseph Simpson, all employees of Entergy Corporation or one of its subsidiaries.

rail head. Withrow Dep. Desig. at 163:20-165:22. Mr. Withrow also explained that a portion of the current haul path that is being used to transport SNF out of the Grand Gulf auxiliary building to the ISFSI would be the same path used to transport the SNF from the building to the barge slip for transport to DOE. Id. at 170:13 -171:23.

Finally, Dr. Hartman, the Government's economics and damages expert, agreed with respect to the economic analysis of damages, that the "but for" world should be determined now, and not at sometime in the future. Tr.2616:11-2617:24 (Hartman). Dr. Hartman explained that the analysis will only "become more and more speculative the further out you go." Id.

B. SFI Cannot Establish Causation For Numerous Plant Modifications And Activities Included In The Damages Claim

Assuming that the Court adopts SFI's 3,000 MTU acceptance rate and finds that DOE was obligated to begin acceptance of SNF from Grand Gulf beginning in 2005, SFI cannot recover any of its alleged damages unless it establishes that it would not have incurred those costs had DOE timely begun SNF acceptance. See Bluebonnet, 339 F.3d at 1344-45 (citing White v. Delta Constr. Int'l, Inc., 285 F.3d 1040, 1043 (Fed. Cir. 2002)). To the contrary, "the non-breaching party 'should on no account get more than would have accrued if the contract had been performed.'" White, 285 F.3d at 1043 (quoting DPJ Co. v. FDIC, 30 F.3d 247, 250 (1st Cir. 1994)).

While SFI personnel conceded that a "but for" world could be described, SFI failed to present any "but for" world analysis in this case in order to make the proper adjustments to its damages claim. In direct contrast to SFI, the Government presented substantial and detailed testimony that the "but for" world analysis necessary to evaluate and determine any damages resulting from the Government's partial breach can be plausibly defined. SFI's argument – to

delay any consideration of the "but for" world until there is actual DOE performance – does not inform or assist the Court in understanding and analyzing the "but for" world.

In addition to the factual testimony of SFI's witnesses concerning site modifications and activities related to the dry fuel storage project, Warren Brewer conducted a detailed analysis of the technical and engineering aspects of SFI's claim.[25] Mr. Brewer's evaluation of SFI's claim focused on technical issues associated with the handling, storage, and transportation of SNF assemblies. DX 602 (Brewer Test.) at ¶¶2-4. Mr. Brewer, based upon his independent analysis, SFI's documents, and the testimony of SFI's fact witnesses, identified two types of errors in SFI's damages claim. The first error is the improper identification of activities that are not incremental[26] to the breach. The second error is SFI's failure to appropriately adjust the damages

---

[25] Mr. Brewer is one of the owners of ABZ, Incorporated, an engineering consulting company performing work for the commercial nuclear power industry. His qualifications as an expert in nuclear engineering, including the handling and storage of SNF, are based on working in the nuclear industry for over 30 years. He has experience in the design, construction, testing and operation of nuclear reactors and reactor systems and, as a consultant, has performed activities relating to regulatory interpretation and compliance. Mr. Brewer estimated the cost of decommissioning nuclear power plants, including SNF management. DX 602 (Brewer Test.) at ¶¶1-2.

[26] Mr. Brewer testified that the term "incremental" with respect to dry fuel storage project activities means that the activity is the result of the failure of DOE to begin SNF acceptance from the nuclear industry in 1998, and that but-for this delay, the subject activities would not have been performed. DX 602 (Brewer Test.) at ¶7, n.3.

Kenneth Metcalfe, plaintiffs' damages expert, similarly testified that "incremental" means costs "that [ ] would not have been incurred, but-for the breach." Tr.1549:25-1550:20 (Metcalfe). Mr. Metcalfe uses the concept of incremental costs in his analysis. Id. In the retention letter sent by Tucker Alan Inc., the precursor to Kenrich LLC, to Entergy Services on October 8, 2003, a work plan is set-out that preliminarily provides a list of activities that will be accomplished for a draft expert report. DX 279 at 1. The work plan identifies one task as "[v]erify nature of internal company costs incurred and recorded for Entergy. Determine if all costs recorded are incremental." Id. Attachment A at 3 (emphasis added) (SSM007 8969).

for activities that would have occurred in the "but for" world, but which the delay rendered unnecessary in the actual world. DX 602 (Brewer Test.) at ¶ 7.

In reviewing the Grand Gulf dry fuel storage project from a technical and engineering perspective, Mr. Brewer explained that a dry fuel storage project activity could be determined to be not incremental for either of two reasons. DX 602 (Brewer Test.) at ¶¶13-15. First, the activities and corresponding costs would be not incremental if it is not required for the storage of SNF. In such a situation, the cost might be incurred as part of normal plant operation but not directly, specifically, or solely for the storage of SNF. Id. at ¶14. Second, the activities and corresponding costs could be determined to be non-incremental because the same costs[27] would be incurred for the same or essentially the same work in the "but for" world. Id. Such a determination that a cost is not incremental does not necessarily mean that the identical work would be required in the "but for" world, although that is possible. Id. More precisely, such a determination means that there will be an effort in the "but for" world that is of the same general scope, for the same general purpose and of sufficiently similar scope, that there is no reason to assume a difference in level of effort or cost between the actual world and the "but for" world.[28] Id. Mr. Brewer opined that activities where actions or work would have been required in the

[27] Mr. Brewer explained that, in discussing costs as being the same in this context, it does not mean that the costs would be identical to the last penny. More precisely, by costs being the same, the costs in the two situations (either "but for" world compared to the actual world or loading to an ISFSI compared to loading to DOE) would be sufficiently equal that there is no practical difference or ability to determine a supportable difference. DX 602 (Brewer Test.) at ¶14, n.5.

[28] Mr. Brewer testified that, as a general methodology, for activities considered to be incremental, the cost and the basis of the cost are evaluated and that such cost analysis is largely based upon his experience in decommissioning costs estimating, which includes a variety of activities such as SNF storage. DX 602 (Brewer Test.) at ¶14, n.6.

"but for" world without some direct corresponding actual world costs can be identified. Id. at ¶15. Mr. Brewer explained, that in making such determinations, the range of possibilities for how DOE would have accepted fuel in the "but for" world based on Grand Gulf's site capabilities was considered and, because it is not possible to define the specifics of the "but for" world, his technical and engineering evaluation focused on a range of "but for" world activities. Id.

1. The Detailed Activities And Components Of The Grand Gulf Dry Fuel Storage Project Were Developed And Provided By Entergy Personnel

Mr. Warren testified that Grand Gulf's dry fuel storage project involved 39 separate "tasks," the first 21 tasks are evaluation, analysis, and design tasks, and the remaining 18 tasks are the implementation tasks. Tr.687:4-7 (Warren); DX 460 at 1-10 (list of 21 design tasks and detailed sub-tasks); DX 478 (lists of 39 tasks). Engineering Requests ("ERs") were developed (e.g., ER-GG-2003-0018-XYZ) for various tasks, and the 39 tasks and ERs define the Grand Gulf dry fuel storage project from the technical and project management perspective. DX 602 (Brewer Test.) at ¶16.

Mr. Brewer conducted a detailed assessment of the 39 tasks and concluded that there are some tasks that would have been necessarily performed to support the transfer of fuel to DOE in the "but for" world independent of the type or size of cask that DOE would have provided. DX 602 (Brewer Test.) at ¶17. Mr. Brewer also concluded that additional tasks would have been

necessary if it is assumed (as Grand Gulf personnel have suggested)[29] that DOE would have provided a large rail cask in the "but for" world, but would not likely have been performed if DOE had provided a smaller truck cask. Id.[30] A summary of the dry fuel storage project tasks

[29] Mr. Franklin testified that, in the "but for" world, he would have expected DOE to provide a transportation cask similar to a Holtec Hi-Star transportation cask, which is a large transportation cask weighing about 130 tons. Franklin Dep. Desig. (Apr. 20, 2006) at Tr.275:19-282:8.

[30] Large casks, commonly referred to as rail casks, are those that are too heavy to be transported by legal weight or slightly over-weight capacity trucks over common roadways. As such, cask weighing 25 tons to as much as 40 tons are routinely referred to as truck casks, with anything heavier being referred to as a rail cask. DX 602 (Brewer Test.) at ¶17, n.9.

and activities that would have been needed in the "but for" world, depending on whether DOE provided a large or small transportation cask, is provided below:

**DFS Tasks Needed in But-For World Based on Cask Size**

| GGNS Dry Fuel Storage Project | | Needed For Transfer To DOE | |
|---|---|---|---|
| **Task** | **Description** | **Large Cask** | **Small Cask** |
| **Design Tasks** | | | |
| 1 | Design Assessment | | |
| 2 | Pad Site Prep Design | | |
| 3 | ISFSI Pad Civil Design | | |
| 4 | ISFSI Pad Electrical Design | | |
| 5 | ISFSI Pad Security Design | | |
| 6 | Cask Transfer Path Design | Cask Transfer Path Design | |
| 7 | Cask Construction Pad Design | | |
| 8 | Aux Bldg RR Bay Floor Design | Aux Bldg RR Bay Floor Design | |
| 9 | Aux Bldg 208 El. Civil Design | Aux Bldg 208 El. Civil Design | |
| 10 | Aux Bldg 208 El. Piping Design | Aux Bldg 208 El. Piping Design | |
| 11 | Aux Bldg Electrical Design | Aux Bldg Electrical Design | |
| 12 | Aux Bldg Ext. Door Mod. Design | Aux Bldg Ext. Door Mod. Design | Aux Bldg Ext. Door Mod. Design |
| 13 | Relocate HFTS Insert Rack Design | Relocate HFTS Insert Rack Design | |
| 14 | FP Cell Recovery - FHP Trolley | | |
| 15 | FP Cell Recovery - Work Table | | |
| 16 | FP Cell Recovery - New Fuel | | |
| 17 | UCP Cell Recovery - Ctmnt Lights | | |
| 18 | Dose Assessment | Dose Assessment | |
| 19 | Aux Bldg 208 El. Storage/Office | | |
| 20 | Equip. Operational Seq. Design | Equip. Operational Seq. Design | Equip. Operational Seq. Design |
| 21 | Cask Crane Remote Control Design | | |
| **Implementation Tasks** | | | |
| 22 | Pad Site Prep Installation | | |
| 23 | ISFSI Pad Civil Implementation | | |
| 24 | ISFSI Pad Electrical Implementation | | |
| 25 | ISFSI Security Implementation | | |
| 26 | Haul Path Implementation | Haul Path Implementation | |
| 27 | Cask Construction Pad Installation | | |
| 28 | Aux Bldg RR Bay Floor Installation | Aux Bldg RR Bay Floor Installation | |
| 29 | Aux Bldg 208 El. Civil Construction | Aux Bldg 208 El. Civil Construction | |
| 30 | Aux Bldg 208 El. Piping Construction | Aux Bldg 208 El. Piping Construction | |
| 31 | Aux Bldg Electrical Construction | Aux Bldg Electrical Construction | |
| 32 | Aux Bldg Exterior Door Mod Const. | Aux Bldg Exterior Door Mod Const. | Aux Bldg Exterior Door Mod Const. |
| 33 | Relocate HFTS Insert Rack | Relocate HFTS Insert Rack | |
| 34 | FP Cell Recovery - FHP Construction | | |
| 35 | FP Cell Recovery - New Fuel Const. | | |
| 36 | UCP Cell Recovery Implementation | | |
| 37 | Aux Bldg 208 El. Storage Const. | | |
| 38 | Cask Crane Remote Control Implem. | | |
| 39 | Equipment Procurement | | |

DX 602 (Brewer Test.) at Exh. 3.

2. The Government Established That Certain Dry Fuel Storage Activities Would Be Non-Incremental Independent Of Type Or Size of DOE Cask

a. The Installation Of The New Auxiliary Building Railroad Bay Door Was Not Caused By The Government's Delay In Beginning Acceptance Of SNF From Grand Gulf

The trial testimony of SFI's fact witnesses and the Government's expert witnesses established that certain activities and tasks identified in SFI's damages claim – independent of the type or size of the DOE transportation casks and even under the 3,000 MTU rate – are not incremental to the Government's delay in beginning acceptance of SNF from Grand Gulf.

SFI's installation of a new auxiliary building railroad bay door, and the subsequent modifications to the door to correct deficiencies in the door's operation, were not caused by the DOE's delay in beginning acceptance of SNF and are not incremental to the breach.[31] The original design of the Grand Gulf auxiliary building included a single roll-up type door for the railroad bay which was not designed nor capable of being used as a containment boundary. DX 602 (Brewer Test.) at ¶24. In the original design, the building floor at an elevation above the railroad bay (the 166 foot elevation and the plugs in that floor) formed the secondary containment boundary – a design feature required by Grand Gulf's operating license (technical specifications) to protect against radiological release to the environment in the event of an accident and failure of the primary containment. Id. As a result, the railroad bay was outside the secondary containment boundary.[32]

[31] The auxiliary building railroad bay door installation and modification (identified as tasks 12 and 32) and the costs for these tasks are included in SFI's damages claim.

[32] The door opening of the railroad bay is, and always was, more than adequate to accommodate any large cask that would be provided by DOE. The change to the railroad bay opening was the addition of an external air-tight door, to provide secondary containment when

Prior to the start of the dry fuel storage project, Grand Gulf added a new door to the auxiliary building railroad bay. DX 602 (Brewer Test.) at ¶26. The door, in fact, supported a refueling outage unrelated to SNF storage. DX 137; Tr.876:14-879:3 (Eaton). SFI's witnesses explained that this new door was designed to serve as an alternate secondary containment boundary while the floor plugs were removed to allow movement of SNF and other radioactive waste from the spent fuel pool level of the auxiliary building to the railroad bay as part of the process of ultimately transporting the waste to another location on site or off site.[33] DX 602 (Brewer Test.) at ¶26; PX 96; Tr.865:11-866:12; 868:23-871:11 (Eaton).

The auxiliary building railroad bay door installation and modification work is not unique to the transfer of SNF to dry storage, and would have been necessary to support delivery of fuel to DOE in the "but for" world. DX 602 (Brewer Test.) at ¶¶27-34. SFI's own documents explain that the door addition and modifications were not being done solely to support the dry storage project. See, e.g., DX 454 at SSM0040793 (auxiliary building door modifications were started in 2002 to support fuel pool cleanup over the next two cycles, years before any SNF was loaded to dry storage); DX 602 (Brewer Test.) at ¶28. Moreover, an Entergy assessment of fuel storage options for Grand Gulf, completed in 2000, stated that "a new auxiliary building railroad bay door capable of maintaining secondary containment will have to be installed to support any

---

the floor hatches at the 166 floor elevation are removed. This modification had no effect on the size of the door opening. DX 602 (Brewer Test.) at ¶25 and Exh. 4 (Grand Gulf Auxiliary Building Diagram).

[33] Starting in 2003, Grand Gulf recognized the need to move casks filled with cut control blades, SNF, and other high level radioactive waste out of the auxiliary building into storage. This movement – which involved wastes other than SNF – required removal of the floor plugs during plant operations. DX 491 at SSM0030318; see DX 439; Tr.817:21-878:10 (Eaton).

form of non-outage spent fuel removal . . . ." DX 214 at SSM0038274. Thus, SFI's position is that a new door would have been needed to support transfer of spent fuel to DOE unless all transfers were limited to periods when the plant was shutdown.[34]

Secondary containment must be maintained when the plant is operating. The Grand Gulf technical specifications, which are part of the NRC license to operate the plant, require that the secondary containment be operable whenever the plant is in operation.[35] DX 602 (Brewer Test.) at ¶30. For secondary containment to be operable, the removable floor plugs in the 166- foot elevation of the auxiliary building must be in place, but these plugs must be removed to permit the transfer of any large package or component (including radioactive waste, SNF, and storage racks) from the refueling floor and out of the auxiliary building regardless of the destination.[36] Id. The technical specifications also include what are referred to as Limiting Condition for Operation ("LCO") action statements, which identify the required actions and allowed time

---

[34] Withrow Dep. Desig. at Tr.171:24-173:16. Mr. Withrow testified that, without the added door, movement of SNF from the auxiliary building, whether to DOE or to dry storage, would have to be conducted only during plant shutdowns.

[35] DX 208, Grand Gulf Technical Specifications, Section 3.6.4.1. The technical specification requirement is, in fact, broader. Specifically, the requirement is that secondary containment be operable any time that the plant is in modes 1, 2 or 3, any time that recently irradiated fuel is being moved in the primary or secondary containment, and any time operations are being conducted which have the potential to drain the reactor vessel. Modes 1, 2 and 3 include not only power operation of the reactor, but any time that the reactor vessel head is fully installed and the plant is at a temperature of 200 degrees Fahrenheit or higher. Thus, even with the plant shutdown, unless the reactor vessel head is partially uninstalled or the plant has been cooled down to less than 200 degrees, secondary containment must be operable.

[36] The fact that removal of the floor plugs would result in loss of secondary containment is acknowledged in DX 491, Engineering Request ER-GG-2000-0072-001, Section 1.2.1 (SSM0030318 to SSM0030327).

limits for completing these actions if the basic requirements, such as secondary containment, are not met. Id.

The secondary containment LCO action statement for Grand Gulf specifies that, if secondary containment becomes inoperable during operation, it must be restored within four hours or the plant must be shutdown within 12 hours and cooled down (less than 200 degrees) within 48 hours.[37] DX 602 (Brewer Test.) at ¶31. Finally, the bases for the technical specifications make clear that intentional entry into an LCO action statement (for example, intentionally making the secondary containment inoperable) "should not be made for operational convenience" and also state that the allowed time limits are not "intended to be used as an operation convenience that permits routine voluntary removal of redundant systems or components from service . . . ."[38] Id. Mr. Brewer opined that making the secondary containment inoperable for the purpose of transferring fuel during plant operation would be a matter of operational convenience. Id.

SFI argues that secondary containment can be voluntarily compromised for up to four hours, but that due to the "stack-up" evolution of the Holtec Hi-Storm system requiring greater than four hours, the door is necessary. By adding the air-tight railroad bay door, SNF may be loaded from the spent fuel pool, the new door closed to establish an operable secondary containment boundary, the floor plugs removed, the fuel transferred to the railroad bay along with any necessary overpack, the floor plugs replaced, and, finally, the railroad bay door opened.

---

[37] DX 208, Grand Gulf Technical Specification Limiting Condition For Operation (LCO) Applicability.

[38] Id.; see also DX 485.

DX 602 (Brewer Test.) at ¶32. Therefore, the entire process can be performed during plant operation without ever creating a situation where the secondary containment is inoperable or entering the LCO action statement. Id.; see also DX 105, Facilities Interface Capability Assessment ("FICA"), Grand Gulf Nuclear Station, March 1990 at SSM0010059 (FICA report identifies the floor plugs must be in place during operation and that this requirement limits SNF transfer to periods when the reactor is shutdown); DX 602 (Brewer Test.) at ¶33.

The addition of the new Auxiliary Building railroad bay door, which was installed to support dry fuel storage in the actual world, would have been necessary in the "but for" world to support transfer of SNF to DOE as well. Further, Mr. Brewer explained that, in either the actual or "but for" worlds, a decision not to add the door could have been made, but there would be offsetting costs. DX 602 (Brewer Test.) at ¶34, fn.25. In either world, limiting fuel transfers to plant shutdown (outage) periods would make scheduling of the activities more difficult to avoid conflicts with the extensive work being conducted during any outage, and almost certainly necessitate the lengthening of the outage by some amount to allow for the SNF transfer as well as the normal outage work. Id. This would result in greater outage costs that could, over time, exceed the cost of the door. Id.; Tr.876:14-879:17 (Eaton). Given the decision in the actual world to add the new door and avoid the limitations on when fuel transfers could take place at Grand Gulf, there is no evidence to support the conclusion that the "but for" world decision would be any different.

b. The Equipment Operational Sequence Design Would Have Been Performed In The "But For" World

As part of the Grand Gulf dry fuel storage project, SFI designed an equipment operational sequence to determine the sequence of operations and activities from the on-site receipt of casks and other equipment to the transfer of the loaded casks to the ISFSI. DX 602 (Brewer Test.) at ¶35. Regardless of the ultimate destination, to the ISFSI or to DOE, or the size or type of cask used, the operational sequence - - from the receipt of the equipment through loading the cask onto whatever form of conveyance is to be used to move the cask out of the auxiliary building railroad bay - would need to be developed. DX 602 (Brewer Test.) at ¶¶36-38. Bryan Warren, the Grand Gulf dry fuel storage project manager, agreed in his testimony that some form of procedures and training would have been required had DOE started accepting SNF from Grand Gulf in 2005. Tr.685:19-686:2 (Warren).

As a result, the equipment operational design activities at Grand Gulf are not incremental because this task would have been necessary to support the transfer of SNF to DOE in the "but for" world independent of the size of the DOE transportation cask.

3. Many Dry Fuel Storage Tasks Would Be Non-Incremental If DOE Provided Large Transportation Casks To Grand Gulf For Shipment Of Spent Nuclear Fuel

a. The Cask Transfer Path Design and Haul Path Implementation Are Not Incremental

Under a 3,000 MTU rate, the design and implementation of the cask haul path at Grand Gulf (tasks 6 and 25) are not incremental to DOE's delay, assuming a large DOE transportation cask is used to transfer SNF from the site. These tasks include the analysis, design, and construction of the path to transport the loaded Hi-Storm cask containing the multi-purpose

canister loaded with SNF from the auxiliary building railroad bay to the ISFSI. Tr.550-551, 570, 586, 617 (Warren); DX 602 (Brewer Test.) at ¶39.

In transferring SNF to the ISFSI, the cask will be loaded in the auxiliary building, moved out of the auxiliary building through the protected area gate located near the auxiliary building (Gate 2), moved past the security and administration buildings, and then turned to the right and proceed to the ISFSI. DX 602 (Brewer Test.) at ¶40. Mr. Brewer opined that, in the "but for" world, it is likely that, based upon the Grand Gulf facility configuration, DOE would provide a transportation cask that would be loaded in the auxiliary building, transported out of the protected area through Gate 2 to the point where dry storage casks would turn right to go to the ISFSI and then moved off-site.[39] SFI's own witnesses supported this conclusion. Mr. Withrow agreed that the part of the haul path from the auxiliary building to the location where the right turn is made outside the protected area would be used for the transfer of fuel to DOE. Withrow Dep. Desig. Tr.170:13-171:1. Therefore, the same analyses and modifications would be required for the portion of the haul path that is common to both the actual and "but for"worlds, that is, the portion up to the point where dry storage casks would turn right and pass in front of the administration building.[40] DX 602 (Brewer Test.) at ¶¶40-42.

---

[39] As Mr. Brewer explained, it appears unreasonable that a different path would be used to exit the plant security boundary (protected area). The SNF cask would certainly exit the auxiliary building through the railroad bay, as a large gate (Gate 2) providing egress from the protected area is a very short distance almost directly in front of the auxiliary building railroad bay door. Any other path out of the protected area would be much more complicated, difficult and ultimately costly. Dx 602 (Brewer Test.) at ¶40, n.32 and Exh. 5 (Grand Gulf Dry Fuel Storage Haul Path Diagram).

[40] Mr. Brewer also testified that it is possible in the "but for" world that additional haul path analyses and modifications would be needed to support the transfer of SNF to DOE, but that this would depend on the size and type of cask provided by DOE, the route taken off-site, and

b. The Relocation Of The HFTS Insert Storage Rack Would Have Been Performed In The "But For" World

The relocation of the Horizontal Fuel Transfer System ("HFTS") insert rack would have been performed in the "but for" world assuming a 3,000 MTU rate. The HFTS is a conveyer system used to transfer fuel and control blades from the spent fuel pool into or out of primary containment and provides storage for the various inserts used with the HFTS. It is located in the cask loading pit, which is connected to the spent fuel pool. Tr.601:1-602:2 (Warren); DX 602 (Brewer Test.) at ¶43. The cask loading pit does not have sufficient room to accommodate the original single HFTS insert storage rack at the same time that the Holtec Hi-Trac transfer cask is in the loading pit. Prior to its relocation, the rack occupied almost one-half of the cask loading pit. Id. Tasks 13 and 33 included the evaluation and implementation of designs to remove or relocate the HFTS insert storage rack from the cask loading pit, and those costs are included in SFI's damages claim. Pl. Br. at 23-24; Tr.602:3-13 (Warren).

The HFTS rack needed to be moved because of the physical size of the Holtec transfer cask. Tr.602:3-8 (Warren); DX 602 (Brewer Test.) at ¶45. Other licensed transport casks of a similar capacity to the Holtec system, are of similar physical size and, in some cases, even

the point at which DOE takes over responsibility for the transport. DX 602 (Brewer Test.) at ¶40, n.33. Thus, it is possible that the "but for" effort could equal or exceed the costs for the ISFSI haul path. Id.

larger.[41] DX 602 (Brewer Test.) at ¶45, n.37. Mr. Brewer testified that he could not identify any reason

that, in the "but for" world, the original configuration and location of the HFTS insert storage racks would not likely create the same interference and lack of available space to accommodate a DOE transportation cask, and therefore necessitate similar plant modifications as were performed to support the dry fuel storage project in the actual world. DX 602 (Brewer Test.) at ¶¶45-47. SFI failed to explain or demonstrate anything to the contrary.[42]

c. The Dose Assessment Would Have Been Performed In The "But For" World

SFI's performance of a radiological dose assessment for loading SNF to dry storage would have been performed in the "but for" world for loading SNF to a large cask. The dose assessment activity (task 18) evaluated the radiological impacts to personnel, equipment, and systems

---

[41] DX 372 at WXE0015263-5269. The TN-68 cask is a little over three inches larger in diameter than the Holtec transfer cask (98 inches compared to 94.6). The TN-68 cask has been used for transport of fuel in the United States. There are other casks that have been licensed, but not used for transport in the United States, that have a somewhat smaller size than the Holtec transfer cask (i.e., the transfer cask for NUHOMS systems and the NAC UMS system transfer cask). However, these other casks all have a smaller capacity (fewer assemblies) than the Holtec system or the TN-68. There are other casks, such as the CONSTOR casks, which are in the process of being licensed, but these casks have diameters larger than the Holtec transfer cask.

Mr. Brewer testified that he was not aware of any evidence that these differences in size would have eliminated the need for the removal or relocation of the HFTS insert storage rack. DX 602 (Brewer Test.) at ¶45 n.37. Mr. Brewer also testified that the use of lower capacity casks would result in higher loading costs, which would offset any savings from not having to relocate the storage rack. Id.

[42] Mr. Warren testified that the relocation of the HFTS rack would not have been needed if SFI had not built a dry storage facility. However, when asked if this work would have been needed if DOE had begun accepting SNF as required under the Standard Contract, Mr. Warren responded that he did not know. Tr.602:14-603:5 (Warren).

associated with SNF loading into the Hi-Trac transfer cask, subsequent transfer into the Hi-Storm storage cask, transfer of the Hi-Storm storage cask from the auxiliary building railroad bay to the ISFSI, and final placement of the storage casks on the ISFSI pad. DX 602 (Brewer Test.) at ¶48.

Mr. Brewer testified that any activity involving the handling, working with, or movement of radioactive material requires analysis of the possible personnel exposure to ensure that the work will not result in unnecessary or unacceptable personnel exposure, and that the work will conform to the general principal of maintaining personnel exposure as low as reasonably achievable.[43] DX 602 (Brewer Test.) at ¶50. Mr. Warren agreed and further testified that Entergy, as the licensee of Grand Gulf, is responsible for ensuring that radiation exposure is as low as reasonably achievable. Tr.701:20-702:9 (Warren). These types of radiological dose analyses would necessarily have to be performed for the work to load large casks and transfer fuel to DOE. DX 602 (Brewer Test.) at ¶50.

d. The Design Of The Auxiliary Building Railroad Bay Floor Is Not Incremental To The Government's Delay In SNF Acceptance From Grand Gulf

Under SFI's proposed 3,000 MTU rate, the design of the auxiliary building railroad bay floor at the 133 foot elevation would still have been performed in the "but for" world, assuming a large cask. Tasks 8 and 28 involved the evaluation, design and installation of modifications to the auxiliary building railroad bay floor at the 133-foot elevation to accommodate the Holtec Hi-Storm system components. Tr.589:18-591:2 (Warren); DX 602 (Brewer Test.) at ¶51.

Assuming a large DOE transportation cask in the "but for" world, essentially the same analyses and modifications would be required, and, therefore, these tasks would not be

43 See 10 CFR Part 20, Standards for Protection Against Radiation.

incremental to DOE's delay in SNF acceptance. DX 602 (Brewer Test.) at ¶53. The weight of a loaded Holtec Hi-Star Cask, which can serve as a proxy for a large DOE cask, is about 130 tons, which would exceed the cask weight stated to have been used in the plant design. DX 372 at WXE0015263-5269. Mr. Warren testified that the Grand Gulf plant design is based on a specific cask, and that any cask used at Grand Gulf other than this specific cask design could require additional analysis or modifications. Tr.703:8-707:11 (Warren); see DX 602 (Brewer Test.) at ¶¶52-55.

e. The Civil Engineering Activities Involving The Auxiliary Building 208-Foot Elevation Would Have Been Needed In The "But For" World

The design and implementation of modifications at the auxiliary building's 208 foot elevation level to accommodate the loaded Holtec Hi-Trac transfer cask (tasks 9 and 29) would have been necessary in the "but for" world and are not incremental to the Government's delay in SNF acceptance from Grand Gulf. Tr.592:14593:17 (Warren); DX 602 (Brewer Test.) at ¶56. Assuming DOE provided a large cask in the "but for"world, essentially the same analyses and modifications would be required. DX 602 (Brewer Test.) at ¶57. The Grand Gulf Final Safety Analysis Report ("UFSAR") states that the plant design was based on a 125-ton cask, 21-feet tall and 10-feet in diameter. DX 534 at Section 9.1.4.2.1 (SXM0010618-619); Tr.705:3-22 (Warren). The UFSAR identifies the maximum weight, length, and diameter, but it does not cite a specific cask design or provide any drawing of the assumed cask. Id. Thus, other than the weight, length, and height, no detail about the cask is identified. The Holtec Hi-Trac transfer cask used for moving fuel to dry storage weighs 125 tons and is about 17-feet tall and about 8-feet in diameter, and is, therefore, within the weight and dimensional limits specified as the plant's

design basis. DX 602 (Brewer Test.) at ¶58. Nonetheless, tasks 9 and 29 were performed as part of the dry storage project based on use of the Hi-Trac transfer cask. Id. Mr. Warren testified that, even though the Hi-Trac cask had weight and dimensions within the bounds of the plant design basis, details other than those listed in the UFSAR could be important. Tr.709:4-21 (Warren).

Furthermore, Grand Gulf's own engineering report concerning these tasks states that the analysis for the Hi-Trac cask was needed because the design details of the casks and shipment methods were not finalized during design and construction of the plant. DX 456 at Sections 1.1.1, 1.1.2 (SXM0010579). Thus, that analysis was needed to demonstrate the plant structures would perform satisfactorily. DX 602 (Brewer Test.) at ¶59.

Additionally, the Holtec Hi-Star, which could serve as a reasonable proxy for a large DOE transportation cask in the "but for" world, weighs over 125 tons when loaded (more than the Hi-Trac weight).[44] DX 602 (Brewer Test.) at ¶60; accord Franklin Dep. Desig. (Apr. 20, 2006) at Tr.272-286 (Franklin assumed a large cask similar to the Holtec Hi-Star for purposes of his "but for" world analysis). Mr. Brewer testified that, in light of the variation in details of the transportation cask that DOE could have or might have used in the "but for" world, and in the absence of documentation or explanation to the contrary, it is unlikely that any transportation cask could have been utilized for transfer of SNF to DOE without additional analysis. DX 602 (Brewer Test.) at ¶¶60-62. Finally, given that at least one large transportation cask that could be used (the Hi-Star) exceeds the weight of the Hi-Trac, which resulted in the needed modifications,

---

[44] DX 372; DX 450, Hi-Star Safety Analysis Report, Report HI-951251, Chapter 7, Table 7.1.1 (SXM0010466). The weight of the loaded Hi-Star is about 128 tons.

there is no reason to believe that the modifications made would not also have been needed in the "but for" world. Id.

f. The Modifications To The Piping At The Auxiliary Building 208-Foot Elevation Would Likely Have Been Performed In The "But For" World

The modifications to the auxiliary building piping at the 208-foot level, tasks 10 and 30, including design and implementation of piping systems to supply air, demineralized water, and gases (helium and argon) would likely have been performed in the "but for" world to load SNF to a DOE transportation cask. Those modifications are not incremental to the Government's delay in SNF acceptance. DX 602 (Brewer Test.) at ¶63. In addition, a cask loading pit wall wetting system and removable spray spargers in the cask wash down pit were originally included in this task. The wetting systems aid in cask surface decontamination, the gases enable drying and leak testing, and the air provides power for pneumatic tools. Id.

Mr. Brewer explained that the process for loading all large SNF casks is similar, and the type of services (like water and gases) being provided by tasks 10 and 30 would be needed for loading any large cask.[45] DX 602 (Brewer Test.) at ¶64. Mr. Brewer noted that, while it might be possible to provide the required services by temporary systems, he could not identify any reason why this would be advantageous in the "but for" world but not in the actual world, and SFI failed to present any evidence to the contrary. Id. Further, even if the use of temporary systems were assumed in the "but for" world, there would be effort and costs associated with providing these temporary supplies that would offset any actual world efforts. Id. Again, SFI failed to present

[45] Water supplies would be needed for filling and decontamination. Gases would be needed for welding (if a welded system) and for draining and drying. DX 602 (Brewer Test.) at ¶64, fn.54.

any evidence of the effort and cost associated with any temporary supply systems. The work involved in these tasks is not unique to loading SNF to dry storage, and the same work would also be likely for loading casks for transfer to DOE.

g. Modifications To Provide Electrical Service To The Auxiliary Building Would Have Been Performed In The "But For" World

The modifications to provide certain electrical service to the auxiliary building at the 208, 166 and 133-foot elevations (tasks 11 and 13) would have been performed in the "but for" world, and are not incremental to the Government's delay in SNF acceptance. The purpose for the new electrical utilities was to provide power to the ancillary equipment supplied by Holtec for the draining, cooling, drying, prepping, sealing, and inspection of the internal canister for loading with SNF or any miscellaneous activity required at the time of spent fuel loading. DX 602 (Brewer Test.) at ¶66; DX 457 (SXM0010583) at section 1.2. Mr. Warren also testified that the electrical supplies were needed for equipment such as torque wrenches and radiation monitors. Tr.713:7-17 (Warren). These activities are not unique to the Holtec equipment, and the majority of activities are common to large cask loading.[46] DX 602 (Brewer Test.) at ¶67. In fact, some of the items, such as radiation monitoring equipment, would be needed for any cask loading. Id. Although the exact location, specific type, and number of electrical power supplies may be different for different casks, Mr. Brewer stated that there is sufficient reason to conclude that the scope of electrical modifications would not be substantively or measurably different for casks that would be provided for transfer of SNF to DOE. Id.

---

[46] Some of the functions identified, such as welding, would be unique to any welded cask system. However, there are many welded cask systems available other than the Holtec system being used for dry storage at Grand Gulf. DX 602 (Brewer Test.) at ¶67, fn.59.

SFI failed to present any evidence that these same electrical modifications would not have been needed to load any large DOE transportation cask, and Mr. Warren generally testified that he did not know whether this work would have been needed if DOE had begun accepting SNF from Grand Gulf as required by the Standard Contract. Tr.597:6-16 (Warren); DX 602 (Brewer Test.) at ¶¶68-69. Therefore, the electrical modifications would have been implemented in the "but for"-world to support the transfer of SNF to large DOE transportation casks, as well as in the actual world to support the transfer of SNF to dry storage, and are thus not incremental.[47]

C. Robert Peterson Properly Quantified The Activities That Mr. Brewer Opined Would Have Been Necessary In The "But For" World

1. All Costs In The Damages Claim Associated With Modifications To The Auxiliary Building Should Be Removed From The Damages Claim

Robert Peterson, the Government's accounting and damages expert, quantified the costs of the activities that Mr. Brewer determined would have been necessary at Grand Gulf had DOE begun accepting SNF from Grand Gulf in 2005. With a single exception, SFI did not challenge Mr. Peterson's quantification of those costs.[48] Pl. Br. at 38-41.

Mr. Peterson determined that SFI's damages claim should be reduced by $2.3 million, which included removal of the costs for the replacement of the auxiliary building railroad by door

[47] Similar to the piping modifications discussed above, Mr. Brewer noted that it might be possible to use temporary supplies to provide electrical services for cask loading in either the "but for" or actual worlds. DX 602 (Brewer Test.) at ¶67 n.60. However, while providing temporary services might be less costly or require less effort for a single cask loading, the need to set up and dismantle these temporary supplies for each loading campaign could result in greater total effort and cost. Id.

[48] SFI challenged the adjustment of the damages claim for the dose assessment because SFI asserts it is a cost that is not included in the damages claim. Pl. Br. at 39. Mr. Peterson determined that assertion is incorrect.

and for auxiliary building modifications, the design of the haul path from the auxiliary building to the turning pad past Gate 2, the dose assessment, and the operational sequence assessment. See DX 601 (Peterson Test.), Summary Chart at 28. While plaintiffs did not mount any defense in the post-trial brief against the methodology utilized by Mr. Peterson, we summarize Mr. Peterson's analysis for the Court's ease of review.

Mr. Peterson determined that there was $2,184,123 million included in plaintiffs' damages claim that accounted for modifications to the auxiliary building door[49] and the auxiliary building. DX 601 (Peterson Test.) at ¶¶ 50-55; see Tab H for an accounting of costs. to determine the amount that must be removed from the claim, Mr. Peterson reviewed invoices, contracts, capital work orders, the deposition testimony of relevant Entergy personnel, and other materials. DX 601 (Peterson Test.) at ¶¶ 12-16. He determined that the costs for the modifications were included in two Entergy capital work orders, N32136 and N32172, and included costs associated with contract services from Enercon, Emerald Coast, Stone & Webster, and Hoist & Crane, as well as Entergy labor and materials. Id. at LIT 001 0058-0068; LIT001 0155-0157. The costs that Mr. Peterson removed for Entergy labor were estimated portions of the actual costs. Tr.2425:8-2426:12 (Peterson); Tr.2479:5-2480:2 (Peterson). Mr. Peterson was required to estimate Entergy labor costs because Mr. Metcalfe did not separately identify any Entergy labor in the damages claim. Tr.2481:9-2482:2 (Peterson); DX 601 (Peterson Test.) at LIT 001 0072-0082. All costs removed for the auxiliary building door were in the plaintiffs' damages claim. Tr.643:23-644:1.

[49] Of this total, the new auxiliary building door, and later modifications to it, account for at least $589,00 in nominal dollars. See LIT001 0059-63.

Based upon Mr. Peterson's analysis and quantification, an adjustment to SFI's claim of $2,184,123 million, removing the costs for replacing the auxiliary building door and other auxiliary building modifications, is warranted. DX 601 (Peterson Test.) at ¶ 55.

2. All Engineering Labor Costs In The Damages Claim Associated With The Design Of A Portion Of The Haul Path Should Be Removed From The Damages Claim

Mr. Peterson quantified the costs for the design of the haul path at Grand Gulf from the auxiliary building to the turning pad at Gate No. 2, and opined that the damages claim should be adjusted by removing Enercon contract and Entergy labor costs related to the design work (Task 6). Mr. Peterson determined that there was $90,357 included in plaintiffs' damages claim that accounted for design of the portion of the haul path challenged by Mr. Brewer as non-incremental. Tr.2430:1-2434:23 (Peterson); DX 601 (Peterson Test.) at ¶¶ 56-57; see Tab 12-I for an accounting of costs (LIT 001 0065-0066; LIT 001 0159-001 0161. Mr. Peterson found that the costs for the haul path were commingled with other costs in capital work order N32172. While the Entergy labor costs were estimated, all challenged costs are in the damages claim. Tr.2484:7-22 (Peterson); DX 601 (Peterson Test.) at LIT 001 0065-0067; LIT 001 0082-0094. Based upon his analysis of capital work order N32172, and numerous other documents, Mr. Peterson removed from the damages claim $74,194 for Enercon engineering costs and $16,163 for Entergy labor. DX 601 (Peterson Test.) at ¶¶ 57.

Based upon Mr. Peterson's analysis and quantification, a total adjustment to SFI's claim of $90,357, removing a portion of the costs for the design of the haul path, is warranted. DX 601 (Peterson Test.) at ¶ 57.

3. All Costs In The Damages Claim Associated With The Dose Assessment Should Be Removed From The Damages Claim

Mr. Peterson quantified the costs for the dose assessment (Task 18)[50] at Grand Gulf as $39,096. DX 601 (Peterson Test.) at ¶¶ 58-59; see Tab J (LIT001 0069) for an accounting of costs. Mr. Warren testified that Grand Gulf contracted with Nisys to accomplish the dose assessment. Tr.702:10-703:7 (Warren); DX 546; DX 547. Mr. Peterson concluded that there were five invoices associated with the dose assessment that had been incurred prior to August 2005, and, therefore, he determined that those costs were in the damages claim. DX 601 (Peterson Test.) at LIT 001 0069. Plaintiffs challenged the removal of these costs because, they asserted, costs for the dose assessment were not included in the damages claim. However, Mr. Peterson testified that each of the five invoices that he identified as involving the dose assessment work were dated before August 31, 2005, the cut-off date for damages. Id. Mr. Peterson determined that these costs had been included in the damages claim. Id. Based upon Mr. Peterson's analysis and quantification, an adjustment to SFI's claim of $39,096, removing the costs expended through August 2005 for the dose assessment, is warranted. DX 601 (Peterson Test.) at ¶ 59.

4. All Costs In The Damages Claim Associated With The Equipment Operational Sequence Assessment Should Be Removed From The Damages Claim

Mr. Peterson quantified the costs for the equipment operational sequence assessment (Task 20) at Grand Gulf as $16,108. DX 601 (Peterson Test.) at ¶¶ 60-61; see also LIT001 0071-

[50] The dose assessment included an evaluation of the Hi-Storm cask at the ISFSI pad, evaluation of the Hi-Star cask in the auxiliary building, and analysis of the movement of the Hi-Storm along the haul path. Tr.610:3-10 (Warren).

80; LIT 001 0155. Mr. Peterson used invoices and other documentation from outside contractors Enercon and Emerald Coast to determine the cost of the operational sequence assessment. Tr.2437:18-2440:15 (Peterson). Mr. Peterson found that some of the costs for Task 20 were included in the damages claim. Id. Because no single Enercon document identified the total cost for the operational sequence assessment, Mr. Peterson derived the cost from multiple Enercon documents produced. Id.

Based upon Mr. Peterson's analysis and quantification, an adjustment to SFI's claim of $16,108, removing the costs expended through August 2005 for the operational sequence assessment, is warranted. DX 601 (Peterson Test.) at ¶ 60.

### D. SFI Failed To Establish Causation For Certain Costs That It Allegedly Incurred For External Labor And Materials Acquisition

SFI did not prove that certain costs that it incurred for contractor labor and materials were caused by DOE's delay. Mr. Peterson also opined that portions of the costs incurred for contractors Stone & Webster and Rexel Southern ("Rexel") should be removed from the damages claim.

Stone & Webster provided craft labor to Grand Gulf for the dry fuel storage project, such as carpenters, iron workers, equipment operators, laborers, concrete finishers, and pipe fitters, pursuant to a general services agreement. Tr.929:10-932:1; Tr.931:4-932:1 (Rogers). The Government is not challenging the costs of labor from Stone & Webster, except to the extent that it relates to activities questioned by Mr. Brewer. However, Mr. Peterson has challenged the "non-manual costs" that Stone & Webster includes in its weekly invoice to Entergy. DX 601 at ¶ 26 (Peterson Test.). The non-manual Stone & Webster costs include allocations for Time, Office and Accounting charges and a site superintendent. Id. Edwin Rogers, the Grand Gulf

maintenance superintendent, testified that the Stone & Webster non-manual charge is included on the weekly invoice regardless of the work on the dry fuel storage project. Tr.973:14-18 (Rogers). Mr. Peterson's analysis revealed the same outcome – that the Stone & Webster non-manual charge is a fixed cost that is not incremental to the DOE's breach. DX 601 (Peterson Test.) at ¶ 26; see also LIT 001 0041-0050; LIT 001 0051-0052; LIT 001 0095-0109. Mr. Peterson does not assert, as plaintiffs suggest, that SFI could recover non-manual charges for Stone & Webster only by hiring a separate site superintendent specifically for the dry fuel storage project. Pl. Br. at 43 n.18. Rather, Mr. Peterson established that a single site superintendent had always been present before and during the dry fuel storage work, and also during lulls in the project. No additional superintendent costs were incurred during the dry fuel storage project, and, therefore, none should be recovered.

The effect of SFI's failure to prove that the Stone & Webster non-manual charge is not fixed is quantified in the testimony and demonstrative exhibits of Mr. Peterson, and an adjustment to SFI's claim of $94,113, removing the non-manual charges, is warranted. DX 601 (Peterson Test.) at ¶ 26.

Rexel provides items such as hardware, conduit, conduit fittings, wire, hard hats, and safety supplies to Grand Gulf. Deposition Designation of Joseph Simpson, June 22, 2006 ("Simpson Dep. Desig.") at 122:3-11; see also Peterson Demonstrative 1 (detailing items from Rexel Southern Invoice #012505). Rexel invoices SFI for materials and for reimbursement of expenses, which includes Rexel labor, benefits, and corporate support. Because Mr. Peterson found no relationship between the amount of materials invoiced and the expenses to be reimbursed, he concluded that the expenses are fixed and, therefore, not incremental to DOE's

breach. See DX 601(Peterson Test.) at ¶ 27 (see chart on p. 12); see also Tab 12B (LIT 0051-0055);Tr.2388:6-2390:14 (Peterson).

SFI failed to provide any proof that the reimbursement of Rexel expenses were incremental to DOE's breach. Moreover, Mr. Metcalfe, SFI's expert who determined which costs should be included in the damages claim, testified that he undertook no analysis of the Rexel materials purchased and expenses reimbursed. Tr.1593:8-25 (Metcalfe). The effect of SFI's failure to prove that the Rexel expense reimbursement is incremental to DOE's breach is quantified in the testimony and demonstrative exhibits of Mr. Peterson. An adjustment to SFI's claim of $31,773, removing that Rexel reimbursement charge, is warranted. DX 601 (Peterson Test.) at ¶ 27.

E. SFI Cannot Establish Causation For Certain Costs That It Allegedly Incurred For Internal Labor And "Overheads"

1. A Portion Of SFI's Internal Labor Costs Were Not Incremental

Mr. Peterson found that $41,819 of internal labor costs that were charged to the dry fuel storage project were not incremental, or caused by, the DOE delay in accepting SNF from Grand Gulf. DX 601 (Peterson Test.) at ¶¶ 44-47; DX 601 at LIT 001 0153; Tr.2410:20-2411:10 (Peterson). Mr. Peterson determined that there were a number of Entergy employees who had charged minimal time to the project, especially in the period from October 1998 to October 2004. DX 601 (Peterson Test.) at ¶ 44 and p. 21 (chart); Tr.2460:18-2461:14 (Peterson). Mr. Peterson discovered that a few Entergy employees accounted for the majority of labor time on the project. Id. at ¶ 45. He also learned that it was common practice for Entergy's professional employees to work as much as 10 percent per week of overtime on an unpaid basis. Id. at ¶ 46. Mr. Peterson explained that:

> There's an Entergy policy that there is the expectation that professional salaried employees should be able to absorb some degree or some amount of uncompensated overtime within their normal course of business and still be able to accomplish the duties to which they've otherwise been assigned.

Tr. 2413:9-15 (Peterson). William Eaton, vice president of operations at Energy Operations, Inc., concurred that up to 10 percent of a professional employee's overtime would be considered casual and generally unpaid. Tr. 834:19-836:14 (Eaton).

SFI mischaracterized Mr. Peterson's position by stating that he opined that, because such employees were not "dedicated to the project full-time, their labor costs for time spent on the project are not a proper element of damages." Pl. Br. at 41. As he testified, Mr. Peterson set a very low threshold of direct labor that he questioned -- the claimed hours were questioned only when they fell below 10 percent of the hours in a month, for example, a level that "could have been absorbed within their normal course of duties." Tr.2412:20-24 (Peterson); Tr.2486:17-2488:12 (Peterson); Tr.2494:2496:14 (Peterson).

SFI also misapprehended the TVA decision, upon which it relies. Pl. Br. at 41-42. Plaintiffs cite to the TVA decision regarding internal resources for support. In TVA, the Court held that the test for recovery of internal resources is to determine if the use of internal resources by the utility deprived it of the ability to employ those resources on other projects. TVA, 69 Fed. Cl. at 539. However, plaintiffs' cite relates to internal resources in general. The TVA Court separates internal resources into two sections: 1) "[c]harge-backs from TVA internal service organizations," and 2) "[c]harge-backs for use of salaried staff at Sequoyah and Browns Ferry." Id. at 539-40. Here, the TVA analysis of salaried staff would apply. With respect to salaried staff, the Court found that "TVA did not indicate the actual services provided by most of the

pertinent salaried staff at the two facilities, nor does the evidence disclose the extent to which most of the employees were committed to the dry storage projects." Id. at 540. Further, the Court found that ". . . the evidence does not indicate what function these persons performed on the dry storage projects or what they were otherwise doing." Id. at n.21. Ultimately, the Court allowed an offset of $663,429 because TVA had failed to prove that work on the dry fuel storage project deprived the utility of its ability to use those employees on other projects. Id. at 540.

Mr. Peterson has concluded that Entergy employees could absorb up to four hours of labor per week on the ISFSI project, without limiting the ability of those employees to complete their remaining assignments. Entergy claims that, as a result of using internal labor resources for the dry fuel storage project, certain engineering projects at Grand Gulf were "forgone or delayed." Pl. Br. at 25. Entergy specifically cites the alleged delay of a "radial wells" refurbishment project as a example. Id. Entergy's claim is incorrect and unsupported by the evidence. Entergy neglects to mention that from 1998 through 2005, the number of employees in the Grand Gulf engineering department, as well as Entergy's central engineering group, decreased due to both attrition and a voluntary separation program in effect beginning in 2003. Tr.825:2-827:21 (Eaton). The radial wells project cited by Entergy was, in fact, identified as a necessary project back in 1996, years before DOE acceptance of SNF from Grand Gulf was to begin. Tr.844:9-847:9 (Eaton). Simply put, the evidence does not support Entergy's assertion that engineering projects were delayed or forgone due to DOE's delay in SNF acceptance.

SFI cannot meet its burden of establishing causation with respect to these costs associated with internal labor because the costs would have been incurred even if DOE had performed under the Standard Contract, so that they are not incremental to the breach and, therefore, are not

appropriately included as damages. See, e.g., Boyajian v. United States, 423 F.2d 1231, 1236 (Ct. Cl. 1970) (quoting Saddler v. United States, 287 F.2d 411, 415 (Ct. Cl. 1961)) ("It is settled . . . that a [party] is not entitled to recover 'expenses which would properly have been incurred regardless of the [breach].'"); Wilner v. United States, 23 Cl. Ct. 241, 258, 262-63 (1991) (allowing recovery for hours that would not have been worked "but for" the delay); Wilson v. Marquette Elec., Inc., 630 F.2d 575, 586 (8th Cir. 1980) (rejecting claim that $40,000 in "lost time" for employee labor was recoverable because no showing that company lost any money because of time employee was forced to spend upon project); AES Tech. Sys., Inc. v. Coherent Radiation, 583 F.2d 933, 942 (7th Cir. 1978) (plaintiff not entitled to damages where breach did not "prohibit . . . employees from working on other projects").

The effect of SFI's failure to prove that its internal labor costs were incremental to the partial breach is quantified in the testimony and demonstrative exhibits of Robert Peterson. An adjustment to SFI's claim of $41,819 is warranted for non-incremental internal labor costs. DX 601 (Peterson Test.) at ¶ 47.

2. SFI Did Not Establish That Its Materials, Its Capital Suspense, And Some Of Its Labor Overheads Were Incremental To The Breach

In its post-trial brief, SFI's primary argument opposing the exclusion of its loader costs that the Government has challenged appears to be that including payroll, materials, and capital suspense loaders in the damages claim encouraged SFI to use more cost-effective internal labor and materials, instead of using contractor labor. Pl Br. at 42-43. Mr. Metcalfe made a similar argument:

> Q: And why did you include loaders in the claim that you've prepared here?

* * *

> A: That to do so, again, incentivizes the utility to use its lower costs internal labor to perform services for the government in these cases, assuming a breach, and avoids them going to higher cost resources.

Tr.1699:3-16 (Metcalfe).

In addition to the flaws in SFI's rationale that we set forth below, the basic premise of this argument is completely belied by the facts in this case. As we demonstrated at trial, SFI actually used a majority of contract labor in its dry fuel storage project. DX 601 (Peterson) at 21-22 (charts showing percent of outside labor used on ISFSI); Tr. 1588:11-25 (Metcalfe). Thus, whether it is more cost-effective to use internal SFI labor is irrelevant here because SFI relied primarily upon contractor labor for its dry fuel storage project, using only 17 percent of its own labor on the project.

SFI also seems to suggest that the highly regulated nature of the industry is another justification for inclusion of its loaders in damages. Pl. Br. at 26, 28. Plaintiffs' reliance upon General Accepted Accounting Principles ("GAAP") and accounting standards set forth by the Federal Energy Regulatory Commission is misplaced. Id. We are not challenging the loaders on the basis of any accounting error. Rather, the loaders would have been incurred by SFI even absent the dry fuel storage project, thus, to include them in the damages claim is to place SFI in a better position than it would have been in absent the breach. SFI made no effort to demonstrate how the loaders are actually related to or incremental to the breach here. Indeed, Mr. Metcalfe conceded repeatedly that he had conducted no analysis of the loaders to support his conclusion that they should be included in the damages claim. See, e.g., Tr.1589:1-1590: 2-12 (Metcalfe); Tr.2454:12-2455:1 (Peterson). SFI relies upon summary conclusions and fails to produce any

evidence that would support this Court's determination that the materials, capital suspense and some of the payroll loaders were caused by DOE's failure to timely accept SNF from Grand Gulf. As such, those costs must be removed from any damages award in this case.

a. Materials Loader

SFI included a materials loader in its damages claim by allocating materials loader expenses to draws from inventory. The materials loader is a method of assigning indirect costs associated with operating a warehouse to the materials that are drawn from that warehouse. Tr.989:14-21 (Bryars). The majority of materials loader costs are attributed to labor charges, including benefits. Tr.1000:18-25 (Bryars). Ms. Bryars, the Entergy Services, Inc. Manager of Source Systems Accounting, testified that there had been no change in personnel in her Department as a result of the dry fuel storage project at Grand Gulf. Tr.1001:16- 21 (Bryars). Joseph Simpson, the Materials Project Coordinator at Grand Gulf, testified that employees associated with the materials loader pool had not been affected by the dry fuel storage project at Grand Gulf. Simpson Dep. Desig. at 80-84; 93-94. Another significant cost associated with the materials loader pool is ad valorem or property tax on inventory. Tr.1009:12-25 (Bryars). Property tax constitutes a large portion of the materials loader pool because the inventory carried by nuclear plants is expensive, and property tax is assessed on the value of the property remaining in the warehouse at the end of each year. Tr.1010:16-20 (Bryars).

Mr. Peterson determined that the entire claim for materials loader, $325,264, should be removed from the damages claim for the following reasons. First, the applied materials loader rate, as SFI conceded, does not accurately reflect the actual costs incurred in the materials loader pool. Tr.1012:3-1013:22 (Bryars); DX 601 (Peterson Test.) at LIT 001 0124-0137. Second, with

respect to ad valorem taxes, those property taxes are based upon the value of the materials left in inventory at the end of the year, (Tr. 1012:16-20(Bryars)), and that tax is heavily based upon the plant's inventory of spare parts and is not related to the materials used by SFI for the dry fuel storage project. DX 601 (Peterson Test.) at ¶ 31. Moreover, materials actually purchased and used in the dry fuel storage project are not included in the inventory at the end of the year. Tr.1011:18-1012:2 (Bryars). Third, Mr. Peterson found, after extensive analysis, that labor and other components of the materials loader pool did not correlate to the volume of materials drawn from the inventory. See DX 601 at p. 14 (Peterson chart); Tr.2447:3-2448:8 (Peterson). Fourth, Mr. Peterson found no correlation between the labor necessary to operate the warehouse where the inventory is located and the materials related to the dry fuel storage project drawn from the inventory. Tr.2448:8-19 (Peterson). Finally, many of the materials that were used on the dry fuel storage project, such as concrete, aggregate, rebar, and fencing, were never even stored or placed in the Grand Gulf warehouse at all, Simpson Dep. Desig. at 107:6-18; 107:21-108:4; Tr.979:6-13 (Rogers), and yet, the materials loader was applied to those materials as if they had been warehoused.[51]

Turning to plaintiffs' "proof" that the materials loader was incurred as a result of the DOE delay in accepting spent nuclear fuel, there is none. Mr. Metcalfe admitted that he never analyzed the materials loader, depending instead on his understanding that general accounting practices were followed by Entergy. Tr.1590: 3-12 (Metcalfe); Tr.2454:12-24 (Peterson). However, in

[51] Mr. Simpson explained that much of the inventory kept at Grand Gulf include items unique to the plant that have long lead time and are critical to the safe operation of a nuclear facility. Simpson Dep. Desig. at 131:18-132:23.

order to find that these costs are recoverable, plaintiffs must make some showing that they were incremental to the breach. SFI failed to do that.

The effect of SFI's failure to prove that its materials loader costs were incremental to the breach is quantified in the testimony and demonstrative exhibits of Robert Peterson. An adjustment to SFI's claim of $325,264, removing the materials loaders, is warranted. DX 601 (Peterson Test.) at ¶ 35.

b. Payroll Loader

SFI also included payroll loaders in its damages claim, such as health benefits, pension benefits, pension plan interest costs, and stock option expense allocations. Tr.740:22-741:12 (Canova). The payroll loader is mathematically applied only to the payroll of active employees of Entergy, but a portion of it represents the costs related to retired persons [Tr. 752:8-10 (Canova)], pension plan interest costs, gains and losses on plan assets, and past costs of plan amendments. Tr. 744:15-20 (Canova). Ms. Lee Canova, Manager of Intra-system Billings at Entergy Services, testified that Resource Code 19, "Benefits Allocation Non-Responsibility View" ("Resource Code 19"), includes a component of costs associated with people who are already retired. Tr 752:8-10 (Canova). It also includes stock options for key personnel who are out of the control of the dry fuel storage project manager. Tr.756:18 – 757:6 (Canova).

Mr. Peterson challenged only those payroll loader costs captured by SFI in Resource Code 19. DX 601 (Peterson Test.) at ¶¶ 36-38; see also DX 601 at LIT 001 0114-0123; Tr.2450:5-22 (Peterson); Tr.2452:20-2453:23 (Peterson). Mr. Peterson challenged those costs, in part, because they relate to post-employment benefits for retired employees, or for costs incurred prior to the start of the ISFSI. Id.; see also DX 589. Furthermore, Mr. Peterson found no relation between

the dry fuel storage costs at SFI and the costs associated with Resource Code 19. Tr.2372:1-9 ("It's not that these costs aren't real and weren't incurred. It's that the costs you're seeking to recover here were not driven by any of the activities associated with the dry fuel storage project."). Mr. Peterson explained, referring to the chart on page 17 of his Direct Testimony, that there were significant variations over time in the percentages of Resource Code 19 benefits and that those variations did not correlate to any of the dry fuel storage project activities. Tr.2369:10-2371:1 (Peterson).

As with the materials loader, Mr. Metcalfe never analyzed any of SFI's payroll loaders and had no basis for including them in the damages calculation. Tr.1589:1- 1590:2 (Metcalfe); Tr.2454:12-24 (Peterson). Nor is this, as SFI would ask the Court to believe, a question of certainty in the damages amount. Pl. Br. at 43. Rather, the issue is whether the damages that SFI has claimed have been incurred as a result of DOE's delay in accepting spent fuel from Grand Gulf. With respect to the Resource Code 19 payroll loaders, Mr. Peterson found that they were not incurred as a result of the DOE's delay. Tr.2372:10-2373:23 (Peterson describes analysis of payroll loader).

The effect of SFI's failure to prove that its payroll loader costs were incremental to the breach is quantified in the testimony and demonstrative exhibits of Robert Peterson. An adjustment to SFI's claim of $71,959, removing the Resource Code 19 payroll loader, is warranted. DX 601 (Peterson Test.) at ¶ 38.

c. Capital Suspense Loader

The Government challenged the inclusion in SFI's damages claim of capital suspense loader charges, including wages and benefits for individuals involved in capital projects but whose specific efforts could not be associated directly with a single work order or project. DX 601 (Peterson Test.) at 17-21; DX 601 at LIT 001 0138-0149. The capital suspense costs include capital charges, like engineering or administrative costs, that cannot be identified with a specific capital project.[52] Tr.1024:4-1025:45 (Saragusa); Tr.2455:2-2456:11 (Peterson). An employee who works less than 30 minutes on a project charges that time to the general capital suspense pool, which captures more generalized activities. Tr.2378:7-14; Tr.1024:4-1025:4 (Saragusa); Tr.2455:2-2456:11 (Peterson). Part of the capital suspense loader pool is for Administrative and General services ("A&G") which benefit capital projects throughout Entergy. Tr.1027:19-1029:3 (Saragusa). The loader pool also includes nuclear specific costs, such as Entergy Operations Inc. headquarters employees who manage or administer nuclear projects, as well as individuals at Grand Gulf who manage capital nuclear projects there. Tr.1029:4-23 (Saragusa).

Mr. Peterson found no quantitative relationship between the the amount in the capital suspense pool and the capital projects activity at Grand Gulf. Tr.2378:15-2379: 1-19 (Peterson); see also DX 601 at p. 20 (Chart entitled Capital Suspense Pool and Capital Activity). Much of the claimed capital suspense costs represent allocations of allocations, and thus have no direct connection to the dry fuel storage project. DX 601 (Peterson Test.) at ¶ 41. Further, capital

[52] An employee who works less than 30 minutes on a project charges that time to the general capital suspense pool, which captures more generalized activities. Tr.2378:7-14 (Peterson).

suspense rates vary widely indicating a fixed cost allocation, incurred vs. applied rates were often very different, and rates were skewed. Mr. Peterson concluded that the capital suspense loader is a fixed cost that is not related in any direct way to the dry fuel storage project at Grand Gulf. SFI never provided any evidence to suggest otherwise, and Mr. Metcalfe never analyzed the capital suspense loader to determine if DOE's delay in accepting SNF caused SFI to incur the costs associated with the capital suspense loader. Tr.2454:12-2455:1 (Peterson).

The effect of SFI's failure to prove that its capital suspense loader costs were incremental to the breach is quantified in the testimony and demonstrative exhibits of Robert Peterson. An adjustment to SFI's claim of $469,011, removing the payroll loaders, is warranted. DX 601 (Peterson Test.) at ¶ 43.

F. Costs Incurred For The Purchase Of Scaffolding Were Not Incremental And Should Be Removed From The Claim

Mr. Peterson opined that SFI's damages claim should be adjusted by $24,500 to exclude the cost of scaffolding. DX 601 (Peterson Test.) at ¶ 48. The scaffolding had originally been rented but was then purchased by Grand Gulf for $196,000. Id. at LIT 001 0057. A portion of the purchase price was allocated to the dry fuel storage project. Id. Mr. Peterson adjusted the damages claim by that amount because it was clear from the testimony of SFI employees that there was a useful life for the scaffolding outside of the dry fuel storage project. Tr.977:15-21 (Rogers). Mr. Peterson found that it was a cost that was not incremental to the breach and, therefore, should not be recovered. SFI did not prove otherwise.

The effect of SFI's failure to prove that the cost of scaffolding was incremental to the breach is quantified in the testimony and demonstrative exhibits of Robert Peterson. An

adjustment to SFI's claim of $24,500, removing the scaffolding, is warranted. DX 601 (Peterson Test.) at ¶ 48.

## VI. AN OFFSET IS WARRANTED FOR THE COSTS THAT SFI AVOIDED OF LOADING CASKS TO DOE

An offset to plaintiffs' damages claim for the cost of loading SNF to DOE transportation casks in the "but for" world (a task that SFI would have been required to perform in the event of performance by DOE in 2005 , as SFI alleges, but, as a result of DOE's delay, it was not required to perform in the actual world) is warranted under the proper damages analysis.

In the "but for" world, under the plaintiffs' assumed 3,000 MTU annual rate of acceptance, Grand Gulf would have loaded 573 SNF assemblies to DOE in 2005. PX 410 (Metcalfe Test.) at App. C2; PX 1-B-1 at KRG-GG004183-84. The Court should deduct $2.81 million from the claimed damages, to account properly for SFI's costs to load SNF to DOE casks, because it is an appropriate "but for" world adjustment that should be accounted for in the instant case. Plaintiffs' damages claim, premised upon a "but for" world assuming a 3,000 MTU acceptance rate, is overstated because it fails to properly account for "but for" world costs that have been avoided and are calculable. DX 600 (Hartman Test.) at ¶30.

SFI does not dispute that, in the "but for" world, Grand Gulf would have incurred costs to load SNF to DOE in 2005. Mr. Metcalfe testified that, "had DOE performed under the Standard Contract beginning in 1998, Entergy Grand Gulf would have incurred costs related to the loading of DOE-supplied containers starting in 2005." PX 410 (Metcalfe Test.) at ¶58.

Dr. Hartman calculated that Grand Gulf would have loaded the 573 assemblies into nine DOE transportation casks in 2005, at a total cask loading cost of $2.81 million. DX 600 (Hartman Test.) at ¶31. Dr. Hartman relied upon Mr. Brewer's conclusion that Grand Gulf would

have loaded large DOE casks capable of holding 68 BWR assemblies.[53] DX 602 (Brewer Test.) at ¶¶79-80. Dr. Hartman based his calculation upon the assumption that the cost to load each 68-assembly cask would have been $300,000. DX 600 (Hartman Test.) at ¶31, fn.47. The $300,000 loading cost per cask is based upon SFI's own investment proposal for the Grand Gulf dry fuel storage project, and is an estimate for loading the 68-assembly Holtec Hi-Storm casks in use at Grand Gulf. PX 54 at 17, 33 (SSM0052769; SSM0052776); Tr.428:8-20 (Franklin). Mr. Brewer opined that the use of the $300,000 cost figure was a reasonable assumption for "but for" world loading costs. DX 602 (Brewer Test.) at ¶¶77-81; Tr.2473:5-2574:1 (Dr. Hartman used an arguably conservative loading cost based upon Mr. Brewer testimony). Since the investment proposal was prepared and approved by Entergy in 2004, the $300,000 is assumed to be in 2004 dollars and Dr. Hartman, using a four-percent escalation rate, calculated that the loading cost per cask, in 2005 dollars, would be $312,000. DX 600 (Hartman Test.) at ¶31, n.47.

Because SFI avoided the cost of loading SNF to DOE casks that it would have incurred in the "but for" world, DOE is entitled to an offset of $2.81 million. DX 600 (Hartman Test.) at ¶31; Tr.2571:5-2572:12 (Hartman).

[53] Mr. Brewer noted that the 68-assembly capacity is the capacity of the Hi-Storm cask being used for dry storage at Grand Gulf and is also the capacity for the Hi-Star transportation cask. DX 602 (Brewer Test.) at ¶79, n.72. He further stated that not all large rail casks for boiling water reactors have a 68-assembly capacity, and that some have capacities as low as 52 assemblies. Id. Therefore, while the capacity of the DOE transportation casks may be less than 68 assemblies, the use of the 68-assembly capacity cask is a reasonable proxy and potentially makes the estimated "but for" world loading costs conservatively low because, if SFI were to load smaller casks, the loading costs would increase. Id.

## VII. SFI IMPERMISSIBLY SEEKS PRE-JUDGMENT INTEREST IN ITS DAMAGES CLAIM, WHICH IS NOT ALLOWABLE AGAINST THE GOVERNMENT

### A. Interest Is Not Recoverable Against The United States Government Under The Standard Contract

Plaintiffs seek $1.58 million to recover what they categorize as their "cost of capital." Pl. Br. 44. Relying primarily upon the TVA decision and Wickham Contracting Co. v. United States, 12 F.3d 1574 (Fed. Cir. 1994), plaintiffs assert that inclusion of their "cost of capital" in their damages recovery is required to make them whole. As we will demonstrate, because plaintiffs' "cost of capital" is nothing more than prejudgment interest, it is not recoverable from the Government.

Pursuant to 28 U.S.C. § 2516(a), a party may not recover interest upon a claim against the United States in the Court of Federal Claims unless specifically permitted under a contract or Act of Congress. The "no-interest rule is an aspect of the basic rule of sovereign immunity." England v. Contel Advanced Sys., Inc., 384 F.3d 1372, 1379 (Fed. Cir. 2004). Therefore, "[i]nterest is not recoverable in a suit against the government unless it has expressly provided for its recovery." Jetco, Inc. v. United States, 11 Cl. Ct. 837, 850 (1987); see Craft v. United States, 233 F.3d 358, 374 (6th Cir. 2000) ("A plaintiff may not recover interest from the federal government in the absence of an express waiver of sovereign immunity from suit."); District of Columbia v. United States, 67 Fed. Cl. 292, 340 (2005) ("[s]tatutory entitlement to prejudgment interest or a cost escalation factor must be established for the United States to be held liable for these types of claimed costs.").

"There is no doubt as to the historical existence of an entrenched immunity of the Government from prejudgment interest . . . ." Blake v. Califano, 626 F.2d 891, 893 (D.C. Cir.

1980). In fact, the prohibition on awarding interest against the Government is so well established in this Court that it has been referred to as "the ancient doctrine disallowing interest against the Government." Singer Co. Librascope Div. v. United States, 215 Ct. Cl. 281, 568 F.2d 695, 698 (1977). "In creating the Court of Claims, Congress retained the Government's immunity from award of interest, permitting it only where expressly agreed to under contract or statute." Library of Congress v. Shaw, 478 U.S. 310, 317 (1986). Thus, a provision requiring the Government to pay interest "must be affirmative, clear-cut, [and] unambiguous." United States v. Thayer-West Point Hotel Co., 329 U.S. 585, 590 (1947).

Neither the Nuclear Waste Policy Act of 1982, 42 U.S.C. §§ 10101-10270, nor any other Act of Congress has mandated that the United States pay interest on damages claims.[54] Further, no provision of the Standard Contract provides for the payment of interest on damages claims. See Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1336, 1340 (Fed. Cir. 2000). Since there has been no contractual or congressional waiver of sovereign immunity, as a matter of law, plaintiffs here are subject to the no-interest rule.

[54] Although the Contract Disputes Act ("CDA"), 41 U.S.C. §§ 601-613, waives the Government's sovereign immunity with regard to interest on certain claims, see Brookfield Constr. Co. v. United States, 228 Ct.Cl. 551, 559, 661 F.2d 159, 165 (1981) ("Because there can be no award of interest against the United States in the absence of a 'contract . . . or Act of Congress expressly providing for payment thereof,' 28 U.S.C. § 2516(a) (1976), the only way plaintiff can recover interest is if the Contract Disputes Act provides for it."), the Standard Contract is not subject to the CDA. Maine Yankee Power Co. v. United States, 225 F.3d 1336, 1340 (Fed. Cir. 2000).

B. Plaintiffs' Damages Constitute Interest In Violation Of The No-Interest Rule

1. As A Matter Of Law, The No-Interest Rule Precludes Plaintiffs From Obtaining Damages In 2006 Dollars

The no-interest rule applies "broadly to claims for interest," Contel Advanced Sys., Inc., 384 F.3d at 1379, and "extends to any form of award for the time value of money that has not been authorized by the express terms of the transaction sued on." Castle v. United States, 48 Fed. Cl. 187, 217 (2000) (emphasis added), aff'd in relevant part, 301 F.3d 1328 (Fed. Cir. 2002). In apparent violation of the no-interest rule, plaintiffs claim $1.58 million of damages which are attributable solely to an economic adjustment utilizing Entergy's "weighted average cost of capital" ("WACC"). This adjustment is an interest calculation which accounts for the period of time that elapsed between the incurrence of plaintiffs' claimed damages, through August 31, 2005, and September 2006, the month in which trial was scheduled to begin. Plaintiffs contend that the DOE must pay this WACC in order to make plaintiffs whole (Tr. 1659:5-12 (Metcalfe)), implying that the money attributable to the WACC should be considered as part of damages and not interest. However, "the 'No-Interest Rule' precludes circumvention through re-characterizing a claim for interest as a claim for damages." Chevron U.S.A., Inc. v. United States, 71 Fed. Cl. 236, 269 n.19 (2006). Indeed, "the character or nature of 'interest' cannot be changed by calling it 'damages,' 'loss,' 'earned increment,' 'just compensation,' 'discount,' 'offset,' or 'penalty,' or any other term, because it is still interest and the no-interest rule applies to it." United States v. Mescalero Apache Tribe, 207 Ct. Cl. 369, 518 F.2d 1309, 1322 (1975). Applicable case law and trial testimony of plaintiffs' expert make clear that, when plaintiffs claim Entergy's WACC as part of their damages, they assert a claim for interest in violation of the no-interest rule.

In Library of Congress v. Shaw, the Supreme Court held that a court-ordered 30-percent increase to the lodestar rate for attorney's fees constituted interest under the no-interest rule. 478 U.S. 310, 321 (1986). In that case, the trial court awarded the respondent attorney's fees and, in so doing, increased the lodestar by 30-percent "to compensate counsel for the delay in receiving payment for the legal services rendered." Id. at 313. On appeal, respondent asserted that the 30- percent increase in attorney's fees did not constitute interest, because an adjustment to damages to account for a delay in payment serves a different purpose from interest. Id. at 322. According to the respondent, interest "compensates for loss in the use of money, while [a delay factor] compensates for loss in the value of money." Id. at 322 (emphasis added). The Supreme Court rejected that contention and determined that "[i]nterest and a delay factor share an identical function. They are designed to compensate for the belated receipt of money." Id. at 322. As a result, the Supreme Court held that both economic mechanisms were precluded by the no-interest rule. Id. at 322; see also Sandstrom v. Principi, 358 F.3d 1376, 1377 (Fed. Cir. 2004) ( "the United States government . . . pays all judgments and amounts due in what economists call 'nominal dollars' rather than in economic 'real dollars' . . . .").[55]

This Court also has determined that a claim for damages in "real" dollars violates the no-interest rule absent a statutory waiver of sovereign immunity. In District of Columbia v. United States, 67 Fed. Cl. 292 (2005), plaintiff, the District of Columbia ("District"), sued the United States, alleging in part that the United States failed to provide it with the necessary funds to repair

[55] "Nominal dollars retain their number over time, while real dollars retain their value." Sandstrom v. Principi, 358 F.3d 1376, 1377 n.1 (Fed. Cir. 2004). For example, ". . . one nominal dollar in 1969 . . . remained one nominal dollar in 1996 . . . One real dollar in 1969, however, would retain its purchasing power, and would have been worth between four and five nominal dollars by 1996." Id.

and renovate Saint Elizabeth's Hospital. The District originally sought approximately $12 million in damages in 1986 dollars, but increased that figure to approximately $19 million to account for inflation. Id. at 344. The District asserted that, because of inflation, it required more money in 2003 to repair the hospital than it required in 1986. Id. at 342. Thus, the District asserted that the escalation costs were "not meant to compensate the District for either a 'loss in the use of money or the value of money,' but rather functions to update the 1986 AEPA cost estimate to a 2003 cost estimate." Id. at 342. This Court disagreed and held that "[t]he inflationary factor sought by plaintiff is precisely the type of award barred by the no-interest rule unless there has been an express waiver of sovereign immunity." Id. at 344.

In another spent fuel case – litigated by the same plaintiffs' counsel – this Court considered, and rejected, a claim for interest identical to plaintiffs' claim here. Indiana Michigan Power Co. v. United States, 60 Fed. Cl. 639 (2004), aff'd, 422 F.3d 1369 (Fed. Cir. 2005). In Indiana Michigan, the plaintiff stated all costs "both in nominal terms, as of the day the costs were or will be incurred, and in present value," with present value "add[ing] an escalation factor for past costs." Id. at 653. This Court found that the application of "plaintiff's average after-tax cost of capital to damages incurred each year . . . is prejudgment interest, which is not allowable against the United States absent a specific waiver of sovereign immunity." Id. at 660.

The cost calculation of plaintiffs' expert, The Kenrich Group LLC ("Kenrich"), is precisely the kind of economic calculation that the no-interest rule precluded in Library of Congress, Sandstrom, District of Columbia, and Indiana Michigan. When calculating the

plaintiffs' alleged damages, Kenrich first determined the alleged dollar amount in nominal dollars[56] for each year in which the plaintiffs claim they incurred damages – $10.6 million. DX 410 (Metcalfe Test.) at ¶ 30. Then, Kenrich "grossed-up" those cost figures to $12.1 million in 2006 dollars, also known as "real" dollars or present value dollars. Id. n. 12 and ¶ 59. Kenrich performed the WACC calculation and restated the plaintiffs' damages in present value to take into account the time value of money for damages." Id. ¶ 48. (emphasis added). As a matter of law, such "time value of money" claims are equivalent to claims for interest and are not allowable against the Government. Castle, 48 Fed. Cl. at 217; see Sandstrom, 358 F.3d at 1379-80 (2004); Town of Grantwood v. United States, 55 Fed. Cl. 481, 488 (2003); Pacific Gas & Electric v. United States, 58 Fed. Cl. 1, 2 (2003).

Plaintiffs here contend that, to be fully compensated, DOE must pay them their claimed damages in 2006 dollars (real dollars), because the value of money has changed over time. Tr. 1662: 23-1664:10 (Metcalfe). Plaintiffs cannot avoid the no-interest rule "by identifying interest as part of the judgment as opposed to interest on the judgment." Castle, 48 Fed. Cl. at 217; see Sandstrom, 358 F.3d at 1380 ("Economists . . . may apply different labels at different times, but the purpose of all such adjustment mechanisms is identical. The government relies on its sovereign immunity shield to deny all prejudgment-type interest payments."). "It is clear from the jurisprudence of this court and higher courts that no matter what term plaintiff[s] use [ ], compensation for the belated receipt of money violates the no-interest rule absent an express

---

[56] Nominal dollars were the actual dollars expended on the dry fuel storage project at Grand Gulf in the year they were expended. Tr. 1660:17-24 (Metcalfe); DX 410 (Metcalfe Test.) at n.12.

statutory waiver of sovereign immunity from liability for interest." District of Columbia, 67 Fed. Cl. at 341.

2. Plaintiffs' Expert Confirmed That Applying WACC To The Claimed Damages Serves The Same Purpose As Applying An Interest Rate

Plaintiffs' expert agrees that, from an economic perspective, the purpose of applying the WACC to plaintiffs' claimed damages is the same as applying an interest rate – to compensate plaintiffs for DOE's delay in payment of damages. Tr.1676:22025; Tr.1681:10-11 (Metcalfe). As a result, the $1.58 million of plaintiffs' damages attributable to the WACC calculation are not recoverable as a matter of law. See Library of Congress, 478 U.S. at 321 ("The force of the no-interest rule cannot be avoided simply by devising a new name for an old institution."); see also Blake, 626 F.2d at 895 (because the application of interest and an inflation adjustment serve the same purpose, "[i]f one is barred the other should also be . . . .").

Testimony from the plaintiffs' representatives makes clear that the WACC adjustment and interest serve exactly the same purpose. Deposition Designation of David Wright, Aug. 10, 2006 (Wright Dep. Desig.), 23:14-25; 30:22-24; 53:8-18. David Wright, Entergy Director of Regulatory Accounting, describes the WACC as "[l]ike an interest rate." Id.. at 53: 8-18.

Not only did Mr. Metcalfe and Mr. Wright equate the WACC to interest, but Mr. Metcalfe's use of the WACC to adjust plaintiffs' damages mimics the function of an interest adjustment. According to the Supreme Court, "[t]he no-interest rule has been applied to prevent parties from holding the United States liable on claims grounded on the belated receipt of funds, even when characterized as compensation for delay." Library of Congress, 478 U.S. at 322. This case should be no exception. The adjustment upward by $1.58 million is an interest calculation that accounts for the period of time that elapsed between the incurrence of plaintiff's claimed

damages, beginning in 1998, and September 11, 2006, or near the time when trial was originally scheduled. However, the damage cut-off date in this case is August 31, 2005. The mere fact that SFI has assigned a different date for the recovery of its cost of capital illustrates that this component of its damages is different than the rest of the damages that it seeks, and that it simply seeks compensation for the time value of money, as a litigant would seek in litigation between private parties.

SFI relies upon the Court's decision in TVA for the proposition that funds designated as allowance for funds used during construction ("AFUDC") are recoverable against the Government.[57] Pl. Br. at 45. However, in TVA, the Court awarded AFUDC costs based upon the premise that "a contractor may recover interest actually paid on funds borrowed." TVA, 69 Fed. Cl. at 541 (citing Wickham Contracting Co. v. United States, 12 F.3d 1574, 1582-83 (1994)). Unlike TVA, where the utility owner was a public quasi-governmental corporation that had no equity and therefore was required to fund all capital projects through cash flows or debt, id., SFI conceded that it did not borrow any money to fund the cost of construction. Tr. 1670:25-1671:16 (Metcalfe).[58]

---

[57] Plaintiffs also seem to assert that because the WACC rates are subject to FERC-accounting requirements and approved by the state utility commissions, recovery is proper. However, as we indicated above, we are not challenging the accounting of the cost of capital. Rather, the cost of capital is not a proper component of SFI's damages, and whether or not it is approved by FERC or the state public utility commission is irrelevant for purposes of its inclusion in the damages calculation here.

[58] In any event, the trial court erred in finding that TVA could recover interest on funds actually borrowed in a case in which the contract at issue does not contain a "Charges" clause waiving the Government's immunity from such claims. See J.D. Hedin, 456 F.2d at 1320; Bell v. United States, 404 F.2d 975, 984 (Ct. Cl. 1968).

SFI has not identified any waiver of sovereign immunity, either in statute or the Standard Contract that would allow it to recover its cost of capital. As such, the $1.58 million must be excluded from its damages claim. Dr. Hartman quantified the adjustment that was necessary in his Direct Testimony. DX 600 at 16 and Table 6.[59]

## VIII. SFI PROFFERED NO EVIDENCE AT TRIAL UPON WHICH THIS COURT COULD MAKE ANY FINDINGS REGARDING ITS DAMAGES BASED UPON ITS TAKINGS CLAIM, AND THAT CLAIM SHOULD BE DISMISSED WITH PREJUDICE

### A. There Is No Support For SFI's Assertion That The Court Will Address The Takings Claim In A Separate Proceeding

SFI asserted a takings claim against the Government in its complaint and its first amended complaint. Amended Complaint at ¶ 28. However, SFI did not brief its takings claim in its pre-trial memorandum, and SFI offered no evidence at trial supporting its takings claim, including any evidence of its damages based upon a takings theory. As such, SFI's takings claim should be dismissed because there is no evidence in the record to support it.

SFI seems to argue two points regarding its takings claim in its post-trial brief. First, SFI asserts that it indeed offered evidence of its takings claim apparently through Messrs. Franklin and Zabransky. Pl. Br. 53. SFI asserts that the evidence of the takings was the fact that there will be SNF at the Grand Gulf site "for the foreseeable future." Id. Alternatively, if the Court finds that evidence to be insufficient, SFI suggests that the trial in this case was only focused on the breach of contract claim that SFI asserted, and that SFI will apparently have another opportunity

[59] In the event that the Court adopts the 3,000 MTU rate put forth by SFI, Dr. Hartman summarizes the adjustments and offsets that should be made to SFI's damages claim. Those adjustments and offsets reduce SFI's damages claim to no more than $4.39 million. DX 600 (Hartman Test.) at Table 6, GMA001 0025.

to present evidence of its takings claim in another, completely separate trial. Id. As to the first point, SFI offered no evidence during the trial upon which this Court could make a finding that there had been a taking, and, thus, the claim should be dismissed with prejudice. As to the second point, we are aware of no order from this Court bifurcating the takings claim from the breach of contract claim. In fact, SFI never proposed any such bifurcation of the claims or suggested that a separate proceeding to address its takings claim would be appropriate procedurally. See Plaintiff's Status Report, filed April 23, 2004; Joint Preliminary Status Report, filed May 7, 2004. Indeed, the Government understood that the trial conducted by the Court would resolve all claims brought by SFI in its complaint, and there is nothing in the record that could provide otherwise.

B. SFI Did Not Identify Any Basis For A Taking Of Its Real Property Because Any Rights To Require DOE To Accept Their SNF And/Or HLW Were Created Through The Standard Contract

"In analyzing a takings claim, a court must first determine what was taken." Branch v. United States, 69 F.3d 1571, 1575 (Fed. Cir. 1995).[60] Here, despite its attempt to categorize its takings claim as a taking of its real property, the "property right" about which SFI actually complains is its "right" to have DOE begin acceptance of SNF by January 31, 1998. The NWPA

[60] As we have discussed in other pleading, the facts pled by SFI give rise to a breach of contract claim, and not a takings claim. "The Court of Claims taught that the concept of a taking has limited application when rights have been voluntarily created by contract." Home Sav. of America F.S.B. v. United States, 51 Fed. Cl. 486, 494 (2002). "Interference with contract rights generally gives rise to a breach claim because the parties' rights emanate from the contract, and not from a 'taking' for public use." Id. (citing Sun Oil Co. v. United States, 215 Ct. Cl. 716, 572 F.2d 786, 818 (1978)). "[W]hen the government is a party to a contract, . . . the contract 'gives rise to the expectation either that the contract will be performed or that the non-breaching party will have available to it a contract-based remedy.'" Id. at 495 (quoting Castle, 48 Fed. Cl. at 218; see LaVan v. United States, 382 F.3d 1340, 1351-52 (Fed. Cir. 2004) (dismissing takings claim arising from contract); FDIC v. United States, 342 F.3d 1313, 1320 (Fed. Cir. 2003) (same) (affirming Bailey v. United States, 53 Fed. Cl. 251, 256-57 (2002)).

does not create any such obligation upon DOE to accept or dispose of any particular utility's SNF, but, instead, authorized the Secretary of Energy "to enter into contracts with any person who generates or holds title to [SNF] of domestic origin," through which the Secretary would create such an obligation towards a particular utility's SNF. See 42 U.S.C. § 10222(a)(1) (emphasis added). SFI did not introduce any evidence at trial that it had any "right" to SNF acceptance outside the context of the Standard Contract. SFI's alleged "fact" that SNF will be on its property into the future proves nothing. Any remedy for the Government's delay in accepting SFI's SNF must be pursued through the remedies provided through SFI's contracts. SFI's apparent argument that its current takings claims – for a taking of its "real property" – is unrelated to the Standard Contract with DOE is meritless. Like the SNF-related takings claim in Southern Nuclear Operating Co. v. United States, No. 98-614C, slip op. at 5 (Fed. Cl. Apr. 7, 2004) (unpublished opinion), and PG&E, 70 Fed. Cl. at 777-80, this claim should be dismissed.

### C. Assuming That SFI Has Established A Taking Of Its Real Property, It Failed To Establish The Fair Value Of That Property

Even if SFI had established a taking of its real property, it has failed to establish any recoverable damages for that taking. In fact, SFI conceded that it never offered any evidence of damages caused by the takings claim at trial. Pl. Br. at 53-54. While SFI has not specifically characterized its takings claim as a temporary taking, the Second Amended Complaint implies a temporary, as opposed to a permanent taking, because SFI alleges that DOE's delay in accepting SNF from its Grand Gulf site has delayed its ability to decommission that site, a temporary, as opposed to a permanent, taking. Second Amended Complaint ¶ 28.

The appropriate measure of just compensation for a temporary taking is the fair rental value of the property for the period of the taking, as opposed to the fair market value which is the

compensation for a permanent taking. Bass Enters. Prod. Co. v. United States, 48 Fed. Cl. 621, 622 (2001) (quoting Yuba Natural Resources, Inc. v. United States, 904 F.2d 1577, 1581 (Fed. Cir. 1990)); see Bass Enters. Prod. Co. v. United States, 133 F.3d 893, 895 (Fed. Cir. 1998) ("just compensation for a permanent taking is generally the fair market value of the property, whereas the recovery for a temporary taking is generally the rental value of the property"); American Pelagic Fishing Co., L.P. v. United States, 55 Fed. Cl. 575, 592-93 (2003) ("for a temporary taking it is well settled that the appropriate measure of compensation is the fair rental value of property"), rev'd on other grounds, 379 F.3d 1363, cert. denied, 125 S. Ct. 2963 (2005); Allenfield Associates v. United States, 40 Fed. Cl. 471, 487 (1998) (temporary taking requires compensation in form of FRV). "In the temporary takings situation, rental value is seen as an appropriate measure because the property is returned to the owner when the takings ends, and the Government, therefore, should only pay for its use of the property." Pettro v. United States, 47 Fed. Cl. 136, 151 (2000).

SFI seems to claim that by asserting that there will be SNF at the Grand Gulf site "for the foreseeable future," it has proven a takings claim here. Pl. Br 53. However, even if the Court accepts that proof as adequate, SFI did not provide any evidence that it incurred any damages as a result of the so-called takings. SFI did not proffer exhibits that purported to demonstrate any valuation analysis of its Grand Gulf facility and property. Nor did it proffer any fact or expert testimony at trial identifying a fair rental value. In short, there is no evidence in the record for this Court to make any finding as to damages based on SFI's takings claim. SFI has failed to meet its burden of proving this claim.

**CONCLUSION**

For the reasons outlined above, the Government requests that the Court enter judgment in the Government's favor.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

ALAN LO RE
Senior Trial Counsel

SCOTT R. DAMELIN
STEPHEN FINN
Trial Attorneys
Department of Justice

s/Sharon A. Snyder
SHARON A. SNYDER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street N.W.
Washington, D.C. 20530
Tele: (202) 616-0347

May 1, 2007

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that on this 1st day of May, 2007, a copy of foregoing "DEFENDANT'S POST-TRIAL BRIEF" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Sharon A. Snyder