**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
(Electronically Filed on May 22, 2007)

**SYSTEM FUELS, INC.**,
**SYSTEM ENERGY RESOURCES, INC.**, and
**SOUTH MISSISSIPPI ELECTRIC POWER ASSOCIATION**,

Plaintiffs,

v.

**THE UNITED STATES**,

Defendant.

No. 03-2624C
(Judge Braden)

# PLAINTIFFS' POST-TRIAL REPLY BRIEF

Of Counsel:
Jay E. Silberg
Daniel S. Herzfeld
Jack Y. Chu
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
2300 N Street, N.W.
Washington, D.C. 20037
(202) 663-8000
(202) 663-8007 (fax)

L. Jager Smith, Jr.
**WISE CARTER CHILD & CARAWAY, P.A.**
1340 Echelon Parkway
Jackson, MS 39213
601-368-5572
601-368-5816 (fax)

Alex D. Tomaszczuk
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7940
(703) 770-7901 (fax)

Counsel of Record for Plaintiffs
System Fuels, Inc., System Energy Resources, Inc., and South Mississippi Electric Power Association

May 22, 2007

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... iv

I. INTRODUCTION ..... 1

II. CONTRARY TO THE WELL-SETTLED LAW OF THIS CIRCUIT, THE GOVERNMENT MISCHARACTERIZES PLAINTIFFS' CLAIM IN AN EFFORT TO AVOID ITS BURDEN OF SHOWING THAT PLAINTIFFS' MITIGATION WAS UNREASONABLE ..... 3

A. Under Indiana Michigan III, This Is A Mitigation Case ..... 4

B. The Government Cannot Justifiably Characterize Its Proposed Offsets Under The Guise of "Causation" ..... 5

C. This Court May Adjudicate Plaintiffs' Damages Claim Without Any Findings On The Acceptance Rate ..... 7

III. THE GOVERNMENT HAS FAILED TO ESTABLISH THAT PLAINTIFFS MITIGATED THE EFFECTS OF THE BREACH UNREASONABLY ..... 8

A. The Government's Cask Loading And Grand Gulf Site Modification Offsets Are Speculative ..... 8

B. Mr. Peterson's Approach To Analyzing Loaders Ignores The Underlying Purpose of Overhead Costs ..... 13

C. Mr. Peterson's Other Proposed Offsets Lack Merit ..... 15

D. Plaintiffs' Weighted Average Cost of Capital Damages Are Not Prejudgment Interest ..... 18

IV. TO THE EXTENT THAT ADJUDICATION OF THE ACCEPTANCE RATE ISSUE IS NECESSARY, THE GOVERNMENT'S PROFFERED 900 MTU RATE IS UNTENABLE ..... 19

A. The Government's Contract Interpretation Ignores The NWPA And Relies On A Prohibited MRS ..... 20

B. The Standard Contract Is Not Too Indefinite To Enforce ..... 24

C. The DCSs Did Not Create Binding Commitments ..... 27

D. The Parol Evidence Rule Has No Application Here, Because The Government Also Relies On Parol Evidence ..... 30

V. ADJUDICATION OF PLAINTIFFS' TAKINGS CLAIM IS STILL PREMATURE ..........32

VI. CONCLUSION ..........34

**TABLE OF AUTHORITIES**

**Cases & Decisions**

Abbott Labs. v. Brennan,
952 F.2d 1346 (Fed. Cir. 1991) ........................................................................................ 6

Alabama Power Co. v. Dep't of Energy,
307 F.3d 1300 (11th Cir. 2002) ........................................................................................ 26

Atacs Corp. v. Trans World Communications, Inc.,
155 F.3d 659 (3d Cir. 1998)............................................................................................. 25

Aviation Contractor Employees, Inc. v. United States,
945 F.2d 1568 (Fed. Cir. 1991)................................................................................... 24, 25

Bell v. United States,
404 F.2d 975 (Ct. Cl. 1968) .............................................................................................. 18

Bluebonnet Sav. Bank, FSB v. United States,
266 F.3d 1348 (Fed. Cir. 2001)......................................................................................... 14

Bullcreek v. NRC,
359 F.3d 536 (D.C. Cir. 2004) .......................................................................................... 20

Centex Corp. v. United States,
55 Fed. Cl. 381 (2003) .........................................................................................................18

Commonwealth Edison Co. v. United States,
46 Fed. Cl. 158 (2000), *aff'd*, 271 F.3d 1327 (Fed. Cir. 2001) (*en banc*) ............................. 22

Consumers Energy Co. v. United States,
65 Fed. Cl. 364 (2005) .......................................................................................................28

Coyle's Pest Control, Inc. v. Cuomo,
154 F.3d 1302 (Fed. Cir. 1998)...........................................................................................26

Energy Capital Corp. v. United States,
302 F.3d 1314 (Fed. Cir. 2002)........................................................................................... 3

Entergy Nuclear Generation Co. v. United States,
64 Fed. Cl. 336 (2005) .......................................................................................................29

First Heights Bank, FSB v. United States,
422 F.3d 1311 (Fed. Cir. 2005)........................................................................................... 5

Indiana Mich. Power Co. v. Dep't of Energy,
88 F.3d 1272 (D.C. Cir. 1996) ("Indiana Mich. I") ..............................................................24

Indiana Mich. Power Co. v. United States,
57 Fed. Cl. 88 (2003) ("Indiana Mich. II"), *appeal dismissed*,
112 Fed. Appx. 37 (Fed. Cir. 2004) ........ *passim*

Indiana Mich. Power Co. v. United States,
422 F.3d 1369 (Fed. Cir. 2005) ("Indiana Mich. III") ........ *passim*

LaSalle Talman Bank v. United States,
317 F.3d 1363 (Fed. Cir. 2003) ........ 19

Maine Yankee Atomic Power Co. v. United States,
225 F.3d 1336 (Fed. Cir. 2000) ("Maine Yankee") ........ 20

Massengill v. Guardian Mgmt. Co.,
19 F.3d 196 (5th Cir. 1994) ........ 26

McAbee Constr., Inc. v. United States,
97 F.3d 1431 (Fed. Cir. 1996) ........ 32

Old Stone Corp. v. United States,
450 F.3d 1360 (Fed. Cir. 2006), *cert. denied*,
75 U.S.L.W. 3333, 75 U.S.L.W. 3490, 75 U.S.L.W. 3497 (U.S. Mar. 19, 2007) ........ 3, 5

Pacific Gas & Elec. Co. v. United States,
73 Fed. Cl. 333 (2006) ........ 10

Roedler v. Dep't of Energy,
255 F.3d 1347 (Fed. Cir. 2001) ........ 20

Sacramento Mun. Util. Dist. v. United States,
70 Fed. Cl. 332 (2006) ("SMUD I") ........ 8

Sacramento Mun. Util. Dist. v. United States,
74 Fed. Cl. 727 (2006) ("SMUD II") ........ 32

Shyface v. Sec'y of Health & Human Servs.,
165 F.3d 1344 (Fed. Cir. 1999) ........ 6

Sylvania Elec. Prods., Inc. v. United States,
458 F.2d 994 (Ct. Cl. 1972) ........ 30

Sys. Fuels, Inc. v. United States,
65 Fed. Cl. 163 (2005) ........ 29

Sys. Fuels, Inc. v. United States,
66 Fed. Cl. 722 (2005) ........ 29

Tenn. Valley Auth. v. United States,
69 Fed. Cl. 515 (2006) ("Tennessee Valley Authority") ............................................... *passim*

Yankee Atomic Elec. Co. v. United States,
73 Fed. Cl. 249 (2006) ("Yankee Atomic")................................................................. *passim*

**Statutes**

42 U.S.C. § 10131.................................................................................................20

42 U.S.C. § 10162.................................................................................................23

42 U.S.C. § 10168.................................................................................................22

42 U.S.C. § 10222.................................................................................20, 22, 26

**Rules and Regulations**

18 C.F.R. Part 101.................................................................................................19

48 C.F.R. 31.203....................................................................................................14

48 C.F.R. 31.204....................................................................................................14

**Other Authorities**

3 E. ALLAN FARNSWORTH, FARNSWORTH ON CONTRACTS (3d ed. 2004).......................................7

Hearing before the S. Comm. on Energy and Natural Resources,
100th Cong. 230, pt. 2 (statement of Ben C. Rusche, Director,
Office of Civilian Radioactive Waste Acceptance, Department of Energy) ...........................22

RESTATEMENT (SECOND) OF CONTRACTS § 350 ............................................................... 5

RESTATEMENT (THIRD) OF TORTS § 26 (Proposed Final Draft No. 1) ........................................... 6

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
(Electronically Filed on May 22, 2007)

| | | |
|---|---|---|
| **SYSTEM FUELS, INC.**, **SYSTEM ENERGY RESOURCES, INC.**, and **SOUTH MISSISSIPPI ELECTRIC POWER ASSOCIATION**, Plaintiffs, | ) | |
| v. | ) | No. 03-2624C (Judge Braden) |
| **THE UNITED STATES**, Defendant. | ) | |

**PLAINTIFFS' POST-TRIAL REPLY BRIEF**

Pursuant to this Court's orders dated January 24, 2007 and May 16, 2007, Plaintiffs System Fuels, Inc., System Energy Resources, Inc., and South Mississippi Electric Power Association respectfully submit their post-trial reply brief in the instant action.

## I. INTRODUCTION

Defendant's (the "Government") Post-Trial Brief, dated May 2, 2007 ("Gov't Br."), fails to recognize the proper framework for determining damages in a case where the non-breaching party seeks to recover actual past costs incurred to mitigate a breach of contract. Instead, the Government continues to attack Plaintiffs' mitigation costs under the guise of a "causation" argument. See Tenn. Valley Auth. v. United States, 69 Fed. Cl. 515, 529-30 (2005) ("Tennessee Valley Authority") ("The government frames this argument as one of causation . . . but in the circumstances of this case, it realistically is a contention aimed at limiting the amount of damages [the plaintiff] may recover as a result of its mitigation efforts."). The Government also ignores the testimony of Plaintiffs' witnesses that the Department of Energy's ("DOE")

continuing non-performance was the direct and substantial cause of the dry fuel storage project at Grand Gulf. Indeed, the Government cannot refute any of the evidence in the record that Plaintiffs mitigated reasonably in response to DOE's continuing nonperformance. Rather, the Government's theory of the case is based on construction of a hypothetical "but for" world where Plaintiffs allegedly would have built a dry fuel storage facility at Grand Gulf even if DOE had begun spent nuclear fuel ("SNF") acceptance from utilities in 1998.

As demonstrated at trial and as explained in Plaintiffs' initial brief, however, this "but for" world – where DOE begins SNF acceptance in 1998 at a Monitored Retrievable Storage ("MRS") facility – is speculative, contrived, and illegal (to the extent it is inconsistent with statutory linkages that prohibited the siting and construction of an MRS). Plaintiffs' Post-Trial Brief at 46-53 (Mar. 23, 2007). The Government failed to establish at trial any credible facts to support this "but for" world scenario. Moreover, the specific damages offsets that the Government's experts have proffered require speculation about the discrete details of how DOE would have accepted SNF from Grand Gulf in the non-breach world – speculation that judges of this Court have avoided in adjudicating several other SNF damages cases.[1] The Government's post-trial brief could not (and did not) address this deficiency. Thus, the evidentiary record

[1] The Government suggests that Plaintiffs have applied a double standard in maintaining that Mr. Brewer's proposed offsets are too speculative regarding DOE performance in a non-breach world, but that the acceptance rate issue is not speculative. Gov't Br. at 12. No such inconsistency exists. Apart from Plaintiffs' position that this Court need not adjudicate the acceptance rate to determine damages in this case, as demonstrated at trial, there is a wide array of statutory authority, case law, and evidence spanning decades that is probative of DOE's intent regarding its industry-wide performance of the Standard Contract. In stark contrast, the Government's proposed offsets in this case are based on hypothetical and unsupported conjecture about how DOE would have accepted SNF at a single plant (Grand Gulf) under a set of circumstances that never took place, and testified to by a witness who neither had responsibility for nor experience with the types of activities involved.

supports the finding that Plaintiffs have met the requirements of causation, foreseeability, and reasonable certainty for the entirety of their $12.18 million damages claim in this case.

## II. CONTRARY TO THE WELL-SETTLED LAW OF THIS CIRCUIT, THE GOVERNMENT MISCHARACTERIZES PLAINTIFFS' CLAIM IN AN EFFORT TO AVOID ITS BURDEN OF SHOWING THAT PLAINTIFFS' MITIGATION WAS UNREASONABLE

The U.S. Court of Appeals for the Federal Circuit (the "Federal Circuit") created a straightforward and practical framework for determining damages in the SNF cases based on a plaintiff utility's actual mitigation costs. Indiana Michigan Power Co. v. United States, 422 F.3d 1369, 1375 (Fed. Cir. 2005) ("Indiana Mich. III"); Yankee Atomic Elec. Co. v. United States, 73 Fed. Cl. 249, 260 (2006) ("Yankee Atomic") ("Indiana Michigan altered the landscape considerably by parsing utility claims into actual expenditures and framing the inquiry as one of mitigation."), *appeal pending*, Nos. 2007-5025, 2007-5026, 2007-5027, 2007-5031, 2007-5032, 2007-5033 (Fed. Cir.). As Plaintiffs have previously stated, the Indiana Michigan III framework requires Plaintiffs to show "(1) the damages were reasonably foreseeable by the breaching party at the time of contracting; (2) the breach is a substantial causal factor in the damages; and (3) the damages are shown with reasonable certainty." Indiana Mich. III, 422 F.3d at 1373 (citing Energy Capital Corp. v. United States, 302 F.3d 1314, 1320 (Fed. Cir. 2002)); Plaintiffs' Post-Trial Brief at 30-33. Once Plaintiffs have discharged this requirement, the Government bears the burden of showing that Plaintiffs' mitigation costs were unreasonable. See Tenn. Valley Auth., 69 Fed. Cl. at 523; see also Old Stone Corp. v. United States, 450 F.3d 1360, 1370 (Fed. Cir. 2006) (noting that the Government failed to show that costs incurred were unreasonable), *cert. denied*, 75 U.S.L.W. 3333, 75 U.S.L.W. 3490, 75 U.S.L.W. 3497 (U.S. Mar. 19, 2007).

The Government would have the Court believe that it agrees that the Federal Circuit's Indiana Michigan III decision governs this case. In actuality, the Government's arguments

would undermine the framework set forth in that case for determining damages. Govt. Br. at 4-13. Notwithstanding the Indiana Michigan III framework the Government claims to adopt, the Government incorrectly asserts that it has no burden to show the unreasonableness of Plaintiffs' mitigation costs after Plaintiffs have shown substantial causation, foreseeability, and reasonable certainty. Furthermore, the Government continues to assert that the proper standard for causation is sole causation, not substantial causation as clearly expressed in Indiana Michigan III. Gov't Br. at 11. None of the Government's contentions are valid.

### A. Under Indiana Michigan III, This Is A Mitigation Case

The Government continues to disclaim its burden to show that Plaintiffs' mitigation costs are unreasonable once Plaintiffs have shown that they incurred such costs. Govt. Br. at 4-6. In this regard, the Government erroneously asserts that the Tennessee Valley Authority trial decision incorrectly applies the Indiana Michigan III framework. However, unlike the Government's arguments, Tennessee Valley Authority and Yankee Atomic, among others, have been fully consistent with the Federal Circuit's mandate in Indiana Michigan III.

In Tennessee Valley Authority, Judge Lettow properly applied the framework in Indiana Michigan III, by requiring the utility plaintiff – Tennessee Valley Authority ("TVA") – to show that the Government caused TVA to incur mitigation expenses, TVA's expenses were foreseeable, and the expenses were proven with reasonable certainty. Tenn. Valley Auth., 69 Fed. Cl. at 526-28. Once TVA discharged its burden, under the law of mitigation, the burden shifted to the Government to prove that TVA's mitigation expenses were unreasonable. Id. at 523; see also Yankee Atomic, 73 Fed. Cl. at 264 ("Defendant has the burden of showing that plaintiffs' mitigation efforts were unreasonable.").

This burden-shifting, which the Government resists and treats as putting the "cart before the horse," Govt. Br. at 5, is consistent with the RESTATEMENT (SECOND) OF CONTRACTS and Federal Circuit precedent. See Tenn. Valley Auth., 69 Fed. Cl. at 523 ("'The amount of loss that [the non-breaching party] could reasonably have avoided by . . . making substitute arrangements or otherwise is simply subtracted from the amount that would otherwise have been recoverable as damages.'") (quoting RESTATEMENT (SECOND) OF CONTRACTS § 350 cmt. b); see also Old Stone, 450 F.3d at 1370 ("The government has not shown that it was unreasonable for OSC to replace the entire amount of regulatory capital that was eliminated by FIRREA."). Therefore, the Government bears the burden of showing that Plaintiffs' mitigation costs were unreasonable and cannot mask its claims by trying to transform them into questions of causation. See First Heights Bank, FSB v. United States, 422 F.3d 1311, 1317 (Fed. Cir. 2005) ("We thus conclude that the government's so-called causation argument is identical to the government's mitigation argument and reject it for the reasons described above.").

**B. The Government Cannot Justifiably Characterize Its Proposed Offsets Under The Guise Of "Causation"**

Notwithstanding the plain language of Indiana Michigan III, the Government seeks to force-fit its "but for world" test into the requirements of that decision by pointing to a particular factual finding from the trial court – that the plaintiff there failed to show causation in that a "decision to perform a full, instead of a partial, rerack in 1995 was purely a business judgment which it would have had to pursue irrespective of DOE's partial breach." Indiana Mich. III, 422 F.3d at 1376; Govt. Br. at 5. However, the Government ignores the immediately preceding sentence of the opinion, which states that the "trial court found that Indiana Michigan's rerack schedule was not affected by 1987 and 1989 announcements projecting delays in the scheduled January 1998 acceptance start date." Id. In other words, the Federal Circuit (and trial court) said

the plaintiff in that case had failed to prove that its decision to perform a full rerack was caused by the Government's breach at all. There was no "but for world" at issue because Indiana Michigan did not, according to this Court, discharge its burden of proof that its decision to rerack was caused by DOE's impending breach. The instant case, however, relies upon different facts, different parties, different witnesses, and different facilities than those at issue in Indiana Michigan III. In this case, Plaintiffs presented documents and credible testimony that DOE's breach caused them to pursue dry fuel storage for Grand Gulf. Plaintiffs' Post-Trial Br. at 17-21.

The Government also relies on tort law to support its sole causation standard and the alleged need for Plaintiffs to prove a "but for world." Govt. Br. at 9-11. Plaintiffs submit that tort law is inapposite in this case. However, the discussion of the "but for" standard in a recent draft of the RESTATEMENT (THIRD) OF TORTS § 26 cmt. b (Proposed Final Draft No. 1) (emphasis in original), refutes the Government's position:

> An actor's tortious conduct need only be *a* factual cause of the other's harm. The existence of other causes of the harm does not affect whether specified tortious conduct was a necessary condition for the harm to occur. Those other causes may be innocent or tortious, known or unknown, influenced by tortious conduct or independent of it, but so long as the harm would not have occurred absent the tortious conduct, the tortious conduct is a factual cause. Recognition of multiple causes does not require modifying or abandoning the but-for standard in this Section. Tortious conduct by an actor need be only one of the causes of another's harm.

Nor do the Federal Circuit tort decisions that the Government cites support any sole causation standard. Shyface v. Sec'y of Health & Human Servs., 165 F.3d 1344, 1353 (Fed. Cir. 1999) ("Thus although the Shyfaces did not prove that the DPT vaccine was the only or predominant cause of his death, the requirements of the Vaccine Act are met *prima facie* upon proof of the substantial factor criterion."); see also Abbott Labs. v. Brennan, 952 F.2d 1346, 1353 (Fed. Cir. 1991) (noting in the tort context that "[c]ommentators have explained that the 'but for' and 'substantial factor' standards of causation generally yield identical results").

Here, the Government has offered no credible evidence to disprove that Plaintiffs' actual decision to mitigate using dry storage was caused by DOE's continuing nonperformance. Logic and common sense dictate that, absent the Government's breach, Plaintiffs would not have undertaken the time, effort, aggravation, and expense associated with building the dry fuel storage facility at Grand Gulf. Even if the Government can prove other causes (which it has failed to do), they are irrelevant, because the evidence in this case shows that Plaintiffs' decision to build a dry fuel storage facility at Grand Gulf was primarily, directly, and substantially caused by the Government's breach. Yankee Atomic, 73 Fed. Cl. at 298 ("That there was an independent or secondary reason for building the ISFSIs does not detract from the primary or substantial causal factor-the delay of over a decade in DOE's acceptance, transportation and disposal."); see also 3 E. ALLAN FARNSWORTH, FARNSWORTH ON CONTRACTS § 12.1, at 148-49 (3d ed. 2004) ("Breach may not be precluded, however, by the presence of other contributing causes . . . . Although the injured party's own failure to avoid loss may bar recovery for that loss, this is not thought of as a consequence of a requirement of causation but of a limitation under a 'mitigation' rule.") (footnotes omitted). For these reasons also, the Government's attempt to characterize its attack on Plaintiffs' mitigation damages as a "causation" inquiry should be rejected.

### C. This Court May Adjudicate Plaintiffs' Damages Claim Without Any Findings On The Acceptance Rate

The Government's flawed theory of "causation" further assumes that this Court cannot adjudicate damages in this case without issuing findings on a rate at which DOE was obligated to accept SNF under the Standard Contract (i.e., the "acceptance rate"). The Federal Circuit's decision to dismiss the Government's cross-appeal of the Indiana Michigan trial decision belies such contentions. In that case, Judge Hodges had granted the plaintiff's cross-motion for

summary judgment and determined the rate of acceptance to be 3,000 MTU per year after a brief ramp-up period. Indiana Mich. Power Co. v. United States, 57 Fed. Cl. 88, 97-98 (2003) ("The Department of Energy would have begun performance by collecting 400 metric tons of nuclear waste in 1998, and ramped up to 3,000 metric tons by the end of 2002. Defendant would have continued performance pursuant to the Standard Contract at a minimum rate of 3,000 tons thereafter.") ("Indiana Mich. II"), *appeal dismissed*, 112 Fed. Appx. 37 (Fed. Cir. 2004). The Government attempted to cross-appeal the acceptance rate ruling when Indiana Michigan appealed the trial decision, but the Federal Circuit dismissed the cross-appeal stating that "the trial court's rate calculation determination was not necessary to the judgment." 112 Fed. Appx. at 38. The Federal Circuit then proceeded to determine the merits of the appeal in Indiana Michigan III without any reference to the acceptance rate. More recently, this Court bypassed a determination on the rate of acceptance, finding such a determination unnecessary and speculative. Sacramento Mun. Util. Dist. v. United States, 70 Fed. Cl. 332, 375 n.40 (2006) ("SMUD I") ("The court finds that the evidence presented on the acceptance rate under the terms of the Standard Contract to be highly speculative, therefore, the court declines to make any determination of the acceptance rate based on this record."). Thus, for the same reasons, the Court need not adjudicate the acceptance rate here to determine either causation or the reasonableness of Plaintiffs' mitigation costs.

## III. THE GOVERNMENT HAS FAILED TO ESTABLISH THAT PLAINTIFFS MITIGATED THE EFFECTS OF THE BREACH UNREASONABLY

### A. The Government's Cask Loading And Grand Gulf Site Modification Offsets Are Speculative

The Government's post-trial brief recites the bulk of Mr. Warren Brewer's written direct testimony about the alleged "non-incremental" nature of certain dry fuel storage activities

associated with the Grand Gulf dry fuel storage project, but fails to demonstrate how or why Mr. Brewer's testimony supports the application of a damages offset against Plaintiffs' incurred mitigation costs in a manner consistent with this Court's approach in Tennessee Valley Authority or SMUD I.[2] Rather than establish the details of how DOE may have accepted spent fuel from Grand Gulf in a hypothetical "but for" world, Mr. Brewer's testimony hypothesizes that the type of cask that DOE could have used would fall within a "spectrum" with large rail casks and small truck casks at the two extreme ends. Tr. 2120-26 (Brewer). However, because Mr. Brewer's analysis does not cover the specifics of performance between the two ends of the "spectrum," Tr. 2125-26 (Brewer), applying the Government's proposed offsets would leave the finder of fact to engage in a "guessing game" about DOE's hypothetical performance akin to the type of speculation that this Court has consistently rejected in other SNF damages cases. See Plaintiffs' Post-Trial Brief at 37-38. In other words, the Government's theory of this case essentially requires that this Court find that the two outlier sets of damages offsets as proffered by Mr. Brewer (and monetized by Mr. Peterson) are reasonably certain and that the "actual" non-breach world would fall somewhere in-between. The Government has failed, however, to establish whether the factual scenarios underlying either of these offsets (or any scenario in-between) would have actually occurred in the non-breach world to any degree of reasonable certainty. Mr. Brewer even concedes as much. See Tr. 2125 (Brewer) ("How that spectrum is dealt with in this proceeding in terms of what's appropriate or not appropriate is something I'm not offering any

---

[2] Moreover, as established on cross-examination, Mr. Brewer lacks sufficient practical experience with the storage of commercial spent fuel or the design, construction, and operation of a dry fuel storage facility at a commercial nuclear plant. Tr. 2109-12, Tr. 2244-45 (Brewer). Thus, Plaintiffs respectfully submit that his opinions regarding the tasks associated with the Grand Gulf dry fuel storage project lack credibility and carry limited, if any, probative value.

opinion about. I'm offering opinions about what the activities would be to support the two extremes of the world.").

The Government, in support of its position that Mr. Brewer's proffered views of the "but for" world are not speculative, relies on analysis that "requires looking back about one year." Gov't Br. at 43; Tr. 2241 (Brewer) ("My assessment is based on the world as it existed in 2005, absent Entergy or someone else taking actions to change that status."). This analysis, which appears to be based on a snapshot of how Entergy actually operated in 2005 after seven years of DOE *nonperformance*, completely disregards the notion that had DOE actually taken the steps to begin *performance* on or before January 1998, Entergy would have likely taken much different steps at Grand Gulf in anticipation of such performance. Tr. 2240-41 (Brewer) ("I've not made any assessment of any effort or changes they would have undertaken to change the but-for world"). Mr. Brewer's treatment of how Entergy operated in the actual world in 2005 as a proxy for the non-breach world is therefore incomplete, imprecise, wholly unsupported, and cannot form the basis of any damages offset that this Court might apply. See Tenn. Valley Auth., 69 Fed. Cl. at 542-43 (refusing to speculate about the contours of DOE cask loading); Yankee Atomic, 73 Fed. Cl. at 286 (same); Pac. Gas & Elec. Co. v. United States, 73 Fed. Cl. 333, 416 (2006) (same).

Additionally, as previously explained, some of Mr. Brewer's findings regarding tasks that he characterized as "non-incremental" to the Government's breach ignore the fact that even if these tasks would have been performed in some manner in the non-breach world, they will need to be performed for a second time once DOE actually performs. Plaintiffs' Post-Trial Brief at 40. The Government failed to provide any contrary evidence in its brief on this point, and limits its argument to actions that Mr. Brewer believes Plaintiffs may have undertaken at Grand Gulf

had DOE performed.[3] Indeed, under Dr. Hartman's theory of damages calculation, the activities that would take place for a second time at Grand Gulf upon actual DOE performance are not appropriate for an offset in favor of the Government, if they took place only once in the non-breach world. See Direct Testimony of Raymond S. Hartman ¶ 13 (Jan. 12, 2007) (crediting non-breach costs against actual costs). Thus, treating Mr. Brewer's non-breach world costs as an offset in this circumstance is also inappropriate.

Lastly, with respect to the installation of the auxiliary building railroad bay door, Mr. Brewer opines that installation of the door "would have been necessary to support delivery of fuel to DOE in the 'but for' world." Gov't Br. at 51.[4] This finding is flawed for the same reasons expressed above with respect to Mr. Brewer's other site modification offsets – without knowledge of the size and type of cask that DOE would have brought to Grand Gulf in the non-breach world, it would be speculative to determine what changes (if any) Plaintiffs would have needed to make to the auxiliary building for accommodating transfer of SNF to DOE. Additionally, Mr. Brewer's reliance on Grand Gulf technical specifications (specifying that secondary containment, if inoperable, must be restored within four hours) is misplaced. Without knowing what type of cask DOE would bring to the site, he cannot reasonably assert that loading

[3] The tasks Mr. Brewer identifies are the equipment operational sequence design, the cask transfer path design, the haul path implementation, the relocation of the Horizontal Fuel Transfer System insert storage rack, the radiological dose assessment, the design of the auxiliary building railroad bay floor, the civil engineering activities for the auxiliary building's 208-foot elevation level, the piping modifications for the auxiliary building's 208-foot elevation level, and the modifications to electrical service for the auxiliary building. Gov't Br. at 55-64. In some instances, Mr. Brewer opined that the site modification "tasks" would have been necessary in the non-breach world only if DOE had provided a large cask. Gov't Br. at 49. As previously explained, however, it is speculative at best to determine the specific contours of how DOE may have accepted SNF from Grand Gulf. Plaintiffs' Post-Trial Brief at 36-40.

[4] Mr. Brewer similarly lacks the necessary first-hand experience and failed to perform any analysis to conclude that Plaintiffs could not have loaded SNF from the auxiliary building to DOE during outage periods. Tr. 2217-19 (Brewer).

the DOE cask could not have been achieved in conformance with the four-hour requirement. Mr. Brewer also failed to identify any reason why Plaintiffs could not have amended – if necessary to support transfer of SNF to DOE – these technical specifications to extend the period for restoring secondary containment to eight or twelve hours. Tr. 2216-17 (Brewer).[5] Furthermore, Mr. Brewer has incorrectly opined that intentional entry into an LCO action statement would be made for "operational convenience." Gov't Br. at 53. Mr. Michael Withrow, manager of nuclear engineering at Grand Gulf, explained that any activities comprising transfer of SNF from the auxiliary building to DOE in the non-breach world would constitute maintenance. Tr. 2694-96 (Withrow). Mr. Withrow, who deals with Grand Gulf's technical specifications and the associated Nuclear Regulatory Commission ("NRC") regulations on a day-to-day basis, stated that entering an LCO period to support transfer of SNF to DOE would *not* be for operational convenience. Tr. 2694-99 (Withrow). By contrast, Mr. Brewer lacks any practical knowledge of "operational convenience" as it is applied in the commercial nuclear industry. Tr. 2211-13 (Brewer). In sum, Mr. Brewer has no basis for opining that Plaintiffs would have installed the auxiliary building railroad bay door in the non-breach world.

For the reasons explained above, the Court should reject any and all offsets that Mr. Peterson and Dr. Hartman monetized for site modification and cask loading, respectively.

[5] In actual cask loading practice at Grand Gulf, Plaintiffs were able to remove and reinstall the floor plugs at the 166-foot elevation level of the auxiliary building to accommodate the Holtec "stack-up" dry fuel storage system in a much more timely and efficient manner than previously anticipated. Tr. 2693-94 (Withrow). Thus, Mr. Brewer's conclusions about the alleged difficulties of entering a Limiting Condition for Operation ("LCO") period for transfer of SNF to DOE in the non-breach world – regardless of what type of cask DOE brought – are simply unfounded.

**B. Mr. Peterson's Approach To Analyzing Loaders Ignores The Underlying Purpose of Overhead Costs**

Rather than challenge the testimony that Plaintiffs proffered at trial that the loader costs they incurred for the dry fuel storage project at Grand Gulf were reasonable, the Government (through the testimony of Mr. Peterson) attempts to characterize its proposed offsets of these loader costs – much like it did with Plaintiffs' site modification costs – as a "causation" issue. Gov't Br. at 73-80. Once again, however, the Government fails to recognize that these loader costs were incurred as part of Plaintiffs mitigation efforts in the Grand Gulf dry fuel storage project. See, e.g., Tr. 989-92, 996-97 (Bryars) (explaining that the materials loader rate is applied to approximate the cost to Entergy of materials procured from the Grand Gulf warehouse for the dry fuel storage project).

The Government attempts to demonstrate that these loader costs were not "incremental" to its breach by theorizing that Plaintiffs would have somehow incurred the exact same loader costs even if the dry fuel storage project at Grand Gulf had never been undertaken. Gov't Br. at 74. It would be, however, a speculative exercise at best to re-create an account of the payroll, materials, and capital suspense loader costs that would have been incurred at Grand Gulf in the non-breach world. Indeed, the Government could not provide any proof of what Plaintiffs' loader costs would have been in the non-breach world. Instead, as a proxy for such evidence, Mr. Peterson attempted to show at trial (through a series of charts) that there is no "correlation" between the loader costs that Plaintiffs incurred and the dry fuel storage project at Grand Gulf. For example, Mr. Peterson testified that changes in the amount of materials drawn from the inventory at Grand Gulf do not result in a change in dollars incurred in the materials loader pool. Tr. 2354 (Peterson). He also testified that there was no relationship between capital activity levels at Grand Gulf and capital suspense pool costs. Tr. 2379-80 (Peterson).

Assuming *arguendo* that Mr. Peterson's analysis was accurate and his findings about a lack of correlation were true, it would, at most, simply suggest that the calculation of loaders at Entergy do not *perfectly* capture the costs to Plaintiffs of procuring materials from the warehouse or the supervision, engineering support, and other general and administrative costs to Plaintiffs in support of the day-to-day operations of the dry fuel storage project. Such a "deficiency" (to the extent that it can be characterized as one) is an insufficient basis for applying offsets against Plaintiffs' incurred loader costs. See Bluebonnet Sav. Bank F.S.B. v. United States, 266 F.3d 1348, 1355 (Fed. Cir. 2001) ("where responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision"). Mr. Peterson's analysis that Plaintiffs' loader costs are not "incremental" for the purposes of assessing damages is fundamentally incompatible with the concept of overhead, where the essential purpose of such an accounting structure is to appropriately allocate a corporate entity's total administrative and other costs that are typically not directly charged to specific projects across all of the projects being supported. Tr. 2359-60 (Peterson) (recognizing, for example, why materials loader costs are "spread" among the capital projects at an Entergy plant). Moreover, according to the Federal Acquisition Regulation, a wide range of indirect costs – including but not limited to overheads and inventory charges – are allowable provided such indirect costs are reasonable and allocable. See 48 C.F.R. 31.203 and 31.204. Thus, the fact that Mr. Peterson could not identify in his analyses any dollar-to-dollar relationship between Plaintiffs' loader costs and the dry fuel storage project is ultimately irrelevant.

At the very least, the Government has provided absolutely no basis for the exclusion of Plaintiffs loader costs *in their entirety*. Mr. Peterson did not dispute, for example, that Entergy employees would charge time to the capital suspense pool for actual work performed on the dry

fuel storage project in increments of time under 30 minutes (or that such a policy was inappropriate). Tr. 2383 (Peterson). Nor did Mr. Peterson dispute that there were employees at the Grand Gulf warehouse working to procure materials specifically in support of the dry fuel storage project. Tr. 2358-60 (Peterson). It makes no sense for Mr. Peterson to conclude, as he has, that Plaintiffs incurred zero loader damages in undertaking the dry fuel storage project at Grand Gulf. His findings, if adopted, would effectively "penalize" Plaintiffs for their use of internal resources and associated loaders to mitigate the effects of the Government's breach (through the dry fuel storage project) in a cost-effective manner that complies with the regulatory scrutiny that the plant faces. See Tr. 1698-1700 (Metcalfe). Plaintiffs would be left, if loader costs are not recoverable as damages (1) to contract out all internal work, and (2) to pay their contractors' loader costs as part of their increased contract prices.

**C. Mr. Peterson's Other Proposed Offsets Lack Merit**

The Government's post-trial brief addresses additional offsets (other than those for Grand Gulf site modifications and Plaintiffs' loader costs) that Mr. Peterson opined were not "incremental" to the breach. Specifically, Mr. Peterson testified that Plaintiffs' damages should be offset by $94,113 for Stone & Webster "non-manual" charges, $31,773 for Rexel Southern contract support costs, $41,819 in internal labor costs, and $24,500 in scaffolding costs. Gov't Br. 69-73, 80-81. For reasons explained below and in Plaintiffs' Post-Trial Brief, these offsets should be rejected.

First, with respect to the Stone & Webster "non-manual" charges, the Government has misinterpreted Plaintiffs' initial brief. Plaintiffs do not maintain that Mr. Peterson himself "assert[ed]" that Stone & Webster non-manual charges could be recoverable by hiring a separate site superintendent. Rather, Plaintiffs' point is that by applying the standards for incrementality

that Mr. Peterson expressed at trial through his comparison of "fixed" and "variable" costs, the only way that the work covered by the Stone & Webster non-manual costs could be deemed "incremental" would be if Plaintiffs hired a site superintendent specifically to perform such work. Just as a payroll, materials, or capital suspense loader pool captures the pertinent overhead costs for the wide range of projects at Grand Gulf, a Stone & Webster site superintendent performs duties at Grand Gulf for all Stone & Webster projects at the plant. Tr. 973 (Rogers). Thus, claiming as damages the costs specifically allocated for the dry fuel storage project is equally reasonable for Stone & Webster's site superintendent costs as for Entergy's loader costs. Mr. Peterson's proposed $94,113 offset should be rejected.

Second, Mr. Peterson's criticism that there is no correlation between certain expenses to be reimbursed and the amount of materials invoiced by Rexel Southern is akin to his analyses finding a lack of correlation between, for example, capital suspense pool costs and capital activity levels at Grand Gulf. Such analyses are beside the point – Rexel Southern's charges fairly reflect the costs that Plaintiffs incurred for supplies from the company for the dry fuel storage project. Mr. Peterson does not dispute that Plaintiffs have incurred and paid costs associated with these supplies. Tr. 2388 (Peterson). He simply opines that a portion of the Rexel Southern costs associated with the dry fuel storage project is not recoverable. It would be impractical, however, for Plaintiffs to account for their costs of gloves, hard hats, safety supplies, and other small consumables – as with their loader costs – in any other way. See Tr. 990-97 (Bryars) (explaining purpose and mechanics of the materials loader at Grand Gulf). Mr. Peterson suggests no alternative mechanism, let alone one that comports with recognized regulatory standards. Thus, for the same reasons as stated in Section III.B *supra*, Mr. Peterson's $31,773 offset for Rexel Southern charges lacks merit.

Third, the Government's assertion of internal labor offsets is based on the notion that if less than ten percent of an Entergy employee's time in any given month was charged to the dry fuel storage project, that time could have been "absorb[ed]" as uncompensated overtime based on an alleged Entergy "policy" that 10 percent of an employee's overtime is unpaid. Gov't Br. at 70-71. Such reliance is misplaced, and fails to inquire into the specific nature and timing of the work performed. For example, if a Grand Gulf employee spent nine consecutive hours in a given day working on the dry fuel storage project, and those nine hours constituted the entirety of that employee's work on the project in a given month, that time would be deemed as non-incremental and unpaid "casual overtime" by Mr. Peterson's application of his 10 percent standard for that month. Tr. 2412-13 (Peterson). Casual overtime at Entergy, however, is considered as time spent where an exempt employee "might need to work *a couple of hours extra in a particular day* or maybe come in on a Saturday morning or stay late on a Friday afternoon to finish a particular task . . . ." Tr. 834-35 (Eaton) (emphasis added). Mr. Peterson's analysis of Entergy employees' *monthly* labor hours, which apparently fails to consider whether labor hours falling under the 10 percent threshold (and excluded from the claim) were indeed "a couple of hours extra in a particular day" as Mr. Eaton described, is fatally incomplete, arbitrary, and therefore cannot form the basis of any valid damages offset.

Lastly, with respect to scaffolding, as Plaintiffs previously explained, the evidence in the record does not support the bases for Mr. Peterson's offset. Plaintiffs' Post-Trial Brief at 44 n.19. Rather than address the points raised in Plaintiffs' initial brief, the Government simply states without explanation that "it was clear from the testimony of SFI employees that there was a useful life for the scaffolding outside of the dry fuel storage project." Gov't Br. at 80. Nor does the Government explain the inconsistency between Mr. Peterson's stated approach for

calculating his offset for scaffolding on written direct and his testimony on cross-examination. See Plaintiffs' Post-Trial Brief at 44 n.19. In sum, Plaintiffs' purchase of scaffolding for the dry fuel storage project that Mr. Peterson questioned was reasonable, and there is no evidence to support any contrary conclusion.

### D. Plaintiffs' Weighted Average Cost Of Capital Damages Are Not Prejudgment Interest

Contrary to the Government's assertions, Plaintiffs may recover their costs of capital. The Government maintains that Plaintiffs' costs of capital are nothing more than interest. Govt. Br. at 83-85. However, interest *as* a claim is recoverable. See Centex Corp. v. United States, 55 Fed. Cl. 381, 390 (2003) ("Courts frequently distinguish, however, between 'interest *on* a claim,' generally precluded by the statute, and 'interest *as* a claim' which courts may treat as an element of compensation. For that reason, it has been held that foreseeable financing costs can be an element of expectancy damages.") (emphasis in original), *aff'd*, 395 F.3d 1283 (Fed. Cir. 2005); see also Bell v. United States, 404 F.2d 975, 984 (Ct. Cl. 1968). Plaintiffs proved that they actually incurred these costs of capital. Tr. 1664-65, 1676-77 (Metcalfe) (noting that costs of capital include the actual debt and equity components that the utility actually has on its books and incurs for expenditures that it made due to the breach).

The Government attempts to distinguish Judge Lettow's ruling in Tennessee Valley Authority by asserting that the plaintiff there recovered only because it used borrowed funds earmarked as an Allowance for Funds Used During Construction ("AFUDC"). Govt. Br. at 89-90. However, Judge Lettow awarded AFUDC costs to TVA without TVA showing that it made specific borrowings for its mitigation efforts. Tenn. Valley Auth., 69 Fed. Cl. at 542 ("TVA does not operate in a manner that allows a 'one-to-one' correspondence between specific debt instruments and specific capital projects . . . ."). Similarly, utilities do not ordinarily go to a bank

to acquire funds for specific projects but rely instead on their existing capital base (including both equity and debt). Tr. 1670-71 (Metcalfe). Moreover, as part of the Federal Energy Regulatory Commission's and state utility commissions' regulations governing recovery of AFUDC, a utility may incur its costs of financing construction through both equity and debt. See 18 C.F.R. pt. 101, Uniform System of Accounts Prescribed for Public Utilities and Licensees Subject to the Provisions of the Federal Power Act ("Uniform Systems of Accounts"), Electric Plant Instructions, ¶ 3.A(17) (stating that AFUDC "includes the net cost for the period of construction of borrowed funds used for construction purposes and a reasonable rate on other funds when so used" and listing "average short-term debt," "long-term debt," "preferred stock," and "common equity" as elements that may be included in the AFUDC calculation). The Federal Circuit has determined that the equity component of the cost of capital may be recovered. LaSalle Talman Bank v. United States, 317 F.3d 1363, 1375 (Fed. Cir. 2003) (concluding that trial court erred in not allowing recovery of costs derived from equity, because "the cost of capital does not depend on whether payment is made as debt, or out of anticipated future earnings").[6]

## IV. TO THE EXTENT THAT ADJUDICATION OF THE ACCEPTANCE RATE ISSUE IS NECESSARY, THE GOVERNMENT'S PROFFERED 900 MTU RATE IS UNTENABLE

The Government's theory of the acceptance rate – that the 1991 Annual Capacity Report is a "stake in the ground" forming the basis of DOE's contractual obligations – is necessarily based upon several false premises: (1) SNF acceptance at a 900 MTU rate is consistent with the purposes of the Nuclear Waste Policy Act; (2) the delivery commitment schedules that utilities

[6] To the extent the Court declines to provide Plaintiffs their full cost of capital and concludes that any such recovery is limited to debt-related costs, the record includes Plaintiffs' debt from which their costs can readily be re-calculated. See PX 1-C-1 and 1-C-2.

submitted are contractually binding; (3) the MRS program was a viable option for DOE. For reasons demonstrated at trial and explained below, these premises are contrary to both the Standard Contract and the evidence at hand.

**A. The Government's Contract Interpretation Ignores The NWPA And Relies On A Prohibited MRS**

The Federal Circuit has instructed that in interpreting the Standard Contracts, it is appropriate to inquire into the Nuclear Waste Policy Act (the "NWPA") and its purpose. Roedler v. Dep't of Energy, 255 F.3d 1347, 1352 (Fed. Cir. 2001) (interpreting the NWPA and stating that "[f]or determination of contractual and beneficial intent when, as here, the contract implements a statutory enactment, it is appropriate to inquire into the governing statute and its purpose"). In the NWPA, Congress expressly acknowledged that "[a] national problem has been created by the accumulation of . . . spent nuclear fuel from nuclear reactors . . . ." 42 U.S.C. § 10131(a)(2)(A); Bullcreek v. NRC, 359 F.3d 536, 538 (D.C. Cir. 2004) (noting that Congress enacted the NWPA, *inter alia*, "in response to 'a national problem' created by the accumulation of spent nuclear fuel from private nuclear generators"). Moreover, while the NWPA lodged the responsibility with the utilities for paying for DOE's disposal program and to provide interim storage of SNF, the utilities only had the responsibility for the costs of interim storage "until such waste and spent fuel is accepted by the Secretary of Energy in accordance with the provisions of this Act . . . ." 42 U.S.C. §§ 10131(a)(4) & (5). The Government's theory of the acceptance rate ignores these bed-rock principles.

The NWPA specified the date – January 31, 1998 – when DOE was required to begin removing SNF from commercial nuclear reactors. 42 U.S.C. § 10222 (a)(5)(B); Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1336, 1342 (Fed. Cir. 2000) ("Congress found this objective so important when it promulgated the Act that it took the unusual action of specifying

that all the contracts must contain this explicit requirement.”). That same date is unequivocally set forth in Article II of Plaintiffs’ contract with DOE. PX 188 (Standard Contract for Grand Gulf) at 6 (COF0281612).

A wealth of evidence supports the view that DOE was expected to perform its contractual obligations at a rate sufficient to avoid adding at-reactor storage after 1998, consistent with the fundamental purpose of the NWPA. Perhaps most compelling is that the first acting director of the waste program, Mr. Robert Morgan, has testified that DOE intended to implement its program to assure that utilities would not have to provide additional at-reactor storage after 1998. Transcript of Designated Testimony from Northern States Power Co. v. United States, No. 98-484C (Wiese, J.) (“NSP Tr.”), at 3882 (Morgan) (“The basic strategy which we have outlined in the mission plan is that, beginning in 1998, utilities will not have to provide any additional storage facilities on-site.”); PX 286 (Robert Morgan, “Program Overview,” Proceedings of the 1983 Civilian Radioactive Waste Management Information Meeting) at 11 (SN069599) (Feb. 1984). Mr. Morgan acknowledged that this strategy was consistent with his understanding of the purposes of the NWPA. NSP Tr. 3882-83 (Morgan). The 900 MTU rate advocated by the Government is substantially less than the annual spent fuel discharge rate of the industry (approximately 2,000 MTU), and thus cannot meet the intent of the NWPA to solve the spent fuel problem. Written Direct Testimony of Eileen M. Supko ¶ 8 n.2 (Sept. 6, 2006). By contrast, a 3,000 MTU rate meets the discharge rate and begins to work off the backlog. Id. ¶ 8.

The Government, on the other hand, apparently contends that Congress’s 1987 determination to include schedule and capacity linkages between the MRS and the repository somehow shows that Congress repudiated the NWPA’s original intent that DOE will accept waste so as to avoid utilities having to add storage after 1998. Gov’t Br. at 28 n.16. DOE

proposed to Congress that an MRS would allow DOE to begin accepting fuel in 1998, with that fuel transferred to a repository beginning in 2003 using rates of acceptance comparable to the 1985 Mission Plan. DX 69 (1987 OCRWM Mission Plan Amendment) at 12 (HQR0031640); see also Hearing before the S. Comm. on Energy and Natural Resources, 100th Cong. 230, pt. 2 (statement of Ben. C. Rusche, Director, Office of Civilian Radioactive Waste Acceptance, Department of Energy) at 213 ("The 10,000 metric tons that we talked about was the amount of at-reactor storage that could be avoided in the five year period between 1998 and 2003. . . . That is the time between [when] the MRS would come into operation, if the proposal is accepted, and 2003, the date in which we project the first repository would be in operation. That is the origin of those numbers.").[7] The Amendments Act was consistent with DOE's proposal, including leaving the 1998 date intact. 42 U.S.C. § 10222(a)(5)(B) (still including 1998 date); id. § 10168(d) (adopting linkages between MRS and repository and accompanying limitations on the amount of SNF that may be accepted at an MRS). Thus, the 10,000 MTU capacity limitation proposed by DOE and accepted by Congress in 1987 was simply meant to bridge the gap between 1998 to 2003.

By 1989, DOE issued a report to Congress and signaled a further retreat from its prior representations to Congress and concluded that a repository would not be able to receive SNF at a repository until 2010 (and not until 2007 at an MRS, unless the Amendments Act linkages were removed). See PX 13-F (1989 Report to Congress on Reassessment of the Civilian Radioactive Waste Management Program) at 12 (KRG-GG000591). Subsequently, in the 1991 Annual Capacity Report ("1991 ACR"), the Government simply stretched that 10,000 MTU

[7] The Court may take judicial notice of legislative history. See Commonwealth Edison Co. v. United States, 46 Fed. Cl. 158, 160 n.3 (2000), *aff'd*, 271 F.3d 1327 (Fed. Cir. 2001) (*en banc*).

limitation out over 12 years (from 1998 through 2010) instead of the original five years as Congress expected (1998 to 2003). See Indiana Mich. II, 57 Fed. Cl. at 99 n.24; see also Yankee Atomic, 73 Fed. Cl. at 273-74 (discussing testimony that the lower rates in the 1991 ACR were used to limit liability); DX 140 at 4 (HQR-002-0806) ("The acceptance rates in Table 2.1 do not reflect the MRS facility schedule linkages with the repository development that were imposed by the NWPA, but are consistent with the 10,000 MTU storage capacity limit contained in the NWPA for an MRS facility before a repository starts operation."). DOE also acknowledged it could not even perform at these stretched-out rates without a change in the law. DX 140 at 4 ("If the current linkages between MRS facility construction and repository construction authorization are maintained, it is estimated that the commencement of facility operations and initial acceptance of SNF by DOE could not start until at least 2007.").[8] In other words, the MRS that DOE relies upon to support its 900 MTU acceptance rate would have been illegal for DOE to build and operate in 1991, illegal for DOE to build or operate in 1998, and remains prohibited by law even to this day.

Despite the Government's *post hoc* arguments in the instant case that DOE intended to site an MRS, DOE never began the process of siting an MRS despite the authority in the NWPA to do so, 42 U.S.C. § 10162(b), and instead DOE relied on the Nuclear Waste Negotiator, who was not bound by the same schedule to have a facility ready by 1998. Tr. 1902-04 (Kouts); PX 288 (1991 General Accounting Office Report on MRS) at 22. In September 1991, several months before publication of the 1991 ACR, the General Accounting Office ("GAO") concluded that an MRS would not be available by 1998. PX 288 at 3 ("For a number of reasons . . . an

[8] Lest the Government argue otherwise, there was no technical impediment to an MRS running at a steady-state rate of 3,000 MTU per year after a five year ramp-up period. The 1990 ACR adopted this rate in its "upper bounding" scenario for performance using an MRS starting in 1998. DX 116 at 5, 7 (HQR-001-2497 & HQR-001-2499).

MRS facility is unlikely to be operating by 1998."). Thus, the Government's use of the 900 MTU rate from the 1991 ACR in this case is contrary to DOE's actions at the time and was prohibited by the NWPA.

Finally, the Government argues that the Standard Contracts are too indefinite to enforce, that the DCSs constituted binding commitments, and that the parol evidence rule somehow prevents this Court from considering Plaintiffs' extrinsic evidence, but not the Government's. These additional arguments do not bear scrutiny and are addressed below. They also bring to mind the D.C. Circuit's comparison of the Government's position to the Yiddish proverb, "Here is air; give me money." Indiana Michigan Power Co. v. Dep't of Energy, 88 F.3d 1272, 1276 (D.C. Cir. 1996) ("Indiana Mich. I"). The proverb is unfortunately as appropriate today as it was in 1997.

**B. The Standard Contract Is Not Too Indefinite To Enforce**

In support of its position that the ACR and Delivery Commitment Schedule ("DCS") process is somehow binding in this case, the Government suggests that a contract devoid of any "schedule term" (i.e., the acceptance rate) would render the Standard Contract too indefinite to enforce. Govt. Br. 38-40. Here, the Government has rehashed arguments raised repeatedly in briefing on liability issues and the acceptance rate in various other SNF cases. As explained above, however, the NWPA specifically provides how the parties are to perform their obligations under the Standard Contract, and utilities such as Plaintiffs have continued to follow faithfully such guidance. In other words, the Standard Contract remains as enforceable today as it was in 1983.

When determining whether a contract is too indefinite to be enforced, a court first looks to whether the parties intended to create a contract. Aviation Contractor Employees, Inc. v.

United States, 945 F.2d 1568, 1572 (Fed. Cir. 1991) (noting that "once it is determined that the parties did indeed intend to create a contract, courts should be slow to deny enforcement on the basis of indefiniteness in the contract") (citation and quotation omitted). Thus, even the omission of the contract's price, usually a contract's most essential term, "does not vitiate contract formation if the parties otherwise manifested their mutual assent to the agreement and the terms of that agreement are sufficiently definite." Atacs Corp. v. Trans World Communications, Inc., 155 F.3d 659, 667 (3d Cir. 1998). Although the acceptance rate term is missing from the Contract, the critical obligations – Plaintiffs' obligation to pay money into the Nuclear Waste Fund and DOE's corresponding obligation to begin disposing of SNF as of January 31, 1998 – are clearly set forth in the Standard Contract and are sufficiently definite to make the contract enforceable. See Indiana Mich. II, 57 Fed. Cl. at 95 ("The Standard Contract and the statute are clear on these points: (1) the Department of Energy must remove all nuclear materials (Standard Contract Art. III); (2) the consideration for removal is 'the payment of fees established by [42 U.S.C. § 10222 (a)(5)(B)];' and (3) the process must begin 'not later than January 31, 1998 . . . .'"); NSP Tr. 3852 (Morgan) (agreeing that the parties have a "binding contract" even though the Standard Contracts do not have an acceptance rate).

Plaintiffs have not argued that the Contract's written provisions are to be ignored in any way. Instead, they are merely advocating implementation of the rate expected by the parties and NWPA, which means an acceptance rate sufficient to avoid the need for at-reactor storage after 1998 (which points towards a 3,000 MTU steady-state rate of acceptance after a five-year ramp up rather than the artificially low rate DOE concocted based on the non-existent MRS). Indiana Mich. II, 57 Fed. Cl. at 98. The Government has cited two inapposite cases for the principle that the contract is unenforceable, absent the use of the Government's artificially low acceptance rate

from the 1991 ACR and 1994 APR/ACR. Massengill v. Guardian Mgmt. Co., 19 F.3d 196, 202, 205 (5th Cir. 1994) (finding that various contract formation documents were too contradictory to allow the court to conclude a contract between the parties was formed); Coyle's Pest Control, Inc. v. Cuomo, 154 F.3d 1302, 1305-06 (Fed. Cir. 1998) (concluding that the parties entered into a contract that was neither a requirements contract nor an indefinite quantity contract and, thus, the Court would not insert Federal Acquisition Regulation standard clauses to transform the contract into either a requirements contract or indefinite quantity contract). Those cases are simply irrelevant because here Plaintiffs and DOE clearly intended to enter into a contract, and there is uncontradicted evidence that the intent of the parties and the NWPA was to use a rate of acceptance sufficient to avoid the industry-wide need for additional at-reactor storage. See Plaintiffs' Post-Trial Brief at 9-11.

There is no plausible basis for this Court to find that the parties to the Standard Contract did not intend to enter into a contract, or that the parties' obligations thereunder were too indefinite to be enforceable. The NWPA directed the parties to enter into contracts to formalize the Government's obligation to dispose of SNF. Contracts were required in order for the utilities to continue to operate their nuclear power plants. See Indiana Mich. III, 422 F.3d at 1372; 42 U.S.C. § 10222(b)(1). Accordingly, every commercial nuclear utility in the United States did just that. For more than 20 years, utilities have paid, and continue to pay, billions of dollars into the Nuclear Waste Fund pursuant to the Standard Contract. See Alabama Power Co. v. Dep't of Energy, 307 F.3d 1300, 1303 (11th Cir. 2002). Moreover, as previously demonstrated, it is clear that the parties entered into a bargain sufficiently defined to be a contract. Plaintiffs' Post-Trial Brief at 7-11. Thus, this Court should find that the expectations of the parties to the Standard Contracts was that DOE would perform at a rate sufficient to avoid additional at-reactor storage,

which would be achieved by a steady-state acceptance rate of 3,000 MTU after a five year ramp-up period. See Indiana Mich. II, 57 Fed. Cl. at 99.

### C. The DCSs Did Not Create Binding Commitments

In support of its 900 MTU theory, the Government continues to assert that the submission and approval of DCSs created binding commitments, notwithstanding the overwhelming evidence that the parties never intended any such thing and the absence of support for that position in the Standard Contracts or other contractual documents. Govt. Br. at 32-38. The Government's manipulation of that process further undercuts this position. It is a classic "heads I win, tails you lose" scheme for the Government to argue that only an approved DCS obligates the Government when DOE twice suspended the DCS process, voided DCSs, refused to process submitted DCSs, and unilaterally modified submitted DCSs.

Nowhere in the NWPA, the Standard Contracts, ACRs, DCSs, DCS instructions, or any DOE communications to utilities did DOE ever assert that the DCS constituted a contractually binding document. The evidence in this case overwhelmingly indicates the opposite. The Standard Contracts stated that the ACR was to be issued "for planning purposes." Standard Contract, Art. IV.B.5(b), PX 188 at 10 ("Beginning not later than July 1, 1987, DOE shall issue an annual capacity report for planning purposes."). Each ACR, starting with the first in 1987, explicitly stated that it was for planning purposes only and not contractually binding. See, e.g., PX 254 (1987 ACR) at 2 (HQR-001-2713) ("As specified in the contract, the ACR is for planning purposes only and, thus, is not contractually binding on either DOE or the Purchasers."); DX 140 (1991 ACR) at 1 ("As specified in the Standard Contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or the purchasers."); DX 184 (1994 APR/ACR) at 1 (HQR-029-0678); PX 13-K (2004 APR/ACR) at 1 (KRG-GG000784) (same). The 1992 and 2004 DCS instructions also state they are for planning

purposes. DX 148 (1992 DCS Instructions) ¶ 7(c) (SSM0076631) ("The annual acceptance rates in the 1991 ACR provide an approximation of the [Federal Waste Management System] acceptance capacity and are for planning purposes."); 2004 DCS Instructions ¶ 7(a), PX 334A at 2 ("The annual acceptance rates in the 2004 APR/ACR provide an approximation of the [Civilian Radioactive Waste Management System] acceptance capacity and are for planning purposes.").

The DCSs themselves include no language that they are binding. See DX 190 (March 1995 letter from B. Tomasoni to F. Rives attaching approved DCS). High-level DOE employees Alan Brownstein, Nancy Slater-Thompson, and former acting director Lake Barrett all acknowledged that DCSs were for planning purposes and not binding. Plaintiffs' Post-Trial Brief at 14-15; see also Indiana Mich. II, 57 Fed. Cl. at 98 ("The Contract does not use Annual Capacity Reports and Delivery Commitment Schedules to determine an Acceptance Rate. The Department of Energy did not consider these forms to be binding.").

Moreover, contrary to the Government's assertion, Govt. Br. at 37-38, the Government's manipulation of the DCS process further speaks directly to DOE's belief of the lack of a binding nature of the DCSs. In late 1996 to early 1997, DOE suspended the DCS process and refused to process DCSs submitted by utilities. Tr. 2006 (Zabransky); see Tenn. Valley Auth., 69 Fed. Cl. at 521 ("DOE effectively short-circuited this process by its failure to perform under TVA's Standard Contract."); see also Consumers Energy Co. v. United States, 65 Fed. Cl. 364, 370-71 (2005) (concluding that DOE "abandoned" the DCS process in 1997). Even before suspending the process, DOE believed that absent a facility, its obligations to utilities were conditional, and placed statements on DCSs stating just that. See DX 190 (asterisked language indicating that the "proposed delivery date is dependent upon the existence of an operational repository or an interim storage facility constructed under the [NWPA]"). In conjunction with this suspension of

the DCS process, DOE voided previously approved DCSs. Tr. 2010-17 (Zabransky); Sys. Fuels, Inc. v. United States, 66 Fed. Cl. 722, 731 (2005) ("In fact, DOE unilaterally refused in 1996 to approve or disapprove any new DCSs and voided the DCSs from utilities that previously had been approved.").

DOE re-started the DCS process in or about July 2004 (where new DCSs would replace, not supplement previous DCSs) and then six-months later re-suspended the process. Tr. 1992-93, 2022 (Zabransky); 2004 DCS Instructions ¶ 7(a), PX 334A at 2 ("Purchasers should submit new DCSs based upon the currently planned operation date of 2010."); see also Sys. Fuels, Inc. v. United States, 65 Fed. Cl. 163, 167 (2005); Entergy Nuclear Generation Co. v. United States, 64 Fed. Cl. 336, 340 n.4 (2005) (discussing the 2004 DCS process and that new DCSs were meant to replace, rather than supplement prior submitted DCSs).

The Government also asserts that because Plaintiffs never objected to the allocations set forth in the 1991 ACR and because affiliates of Plaintiffs submitted a DCS for the Arkansas Nuclear One plant – a facility that is not at issue in this case – that DOE approved, Plaintiffs considered DOE's schedule in the 1991 ACR as possible or actual "performance under the Standard Contract." Govt. Br. at 34-36. However, neither Plaintiffs nor DOE treated such a process as practically meaningful. See Yankee Atomic, 73 Fed. Cl. at 298 ("Parroting DOE's delays and acceptance rates did not and does not evidence acquiesce[nce] in them"). The Government also cannot cite any testimony or documents showing that Plaintiffs believed these DCSs to be contractually binding. In sum, neither the record nor well-settled opinions of this Court support in any way the Government's position regarding the ACR and DCS process. Plaintiffs' Post-Trial Brief at 15, 50.

### D. The Parol Evidence Rule Has No Application Here, Because The Government Also Relies On Parol Evidence

The Government also asserts that any evidence regarding the parties' expectations under the contract (or the NWPA) constitutes banned extrinsic evidence under the parol evidence rule. Govt. Br. at 25-27. However, this argument inherently presumes that the ACR-DCS process was meant to define the rate of acceptance, which it was not. See also Indiana Mich. II, 57 Fed. Cl. at 98. Even assuming *arguendo* that the ACR-DCS process was meant to determine the acceptance rate, there is no basis for this Court to simply accept the Government's argument that the 900 MTU rate would have been the one used by DOE in the so-called "but for world." Yankee Atomic, 73 Fed. Cl. at 302-06 (rejecting the Government's attempt to limit its damages based on parol evidence argument).

Furthermore, while the Government decries Plaintiffs' use of evidence around the time of contract formation (and thereafter) as prohibited parol evidence, the Government explicitly relies on similar extrinsic evidence. E.g., Gov't Br. at 33-34. And, unlike Plaintiffs' interpretation of such evidence, the Government's interpretation of such evidence creates inconsistencies and varies the plain meaning of the Standard Contracts. Sylvania Elec. Prods., Inc. v. United States, 458 F.2d 994, 1005 (Ct. Cl. 1972) ("Except as preventing the contradiction of written agreements, moreover, the parol evidence rule is no bar, too, to extrinsic, parol evidence supplementing the terms of even a final written agreement by *consistent* additional terms, unless, in the words of the Uniform Commercial Code, 'the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.'") (emphasis in original). For example, the Government relies on the 1985 Mission Plan to assert that DOE intended to use the 1991 ACR to begin publishing firm waste-acceptance schedules and

shipment allocations. Govt. Br. at 33-34.[9] Yet, the Government decries Plaintiffs' citation to the 1985 Mission Plan to show that, notwithstanding what was in the acceptance schedules, DOE recognized its liability to utilities to provide post-1998 at-reactor storage. PX 277 at 381.

Moreover, by conflating the terms "APR" and "ACR," the Government has incorrectly asserted that the 1991 ACR was contemplated to provide a firm acceptance schedule and serve as the basis for DCSs. The Standard Contracts, however, say nothing about the use of the 1991 ACR (or any other document) to set forth any firm acceptance schedule; instead the Standard Contracts only discuss the use of the 1991 Acceptance Priority Ranking ("APR"), which was to be a "priority ranking . . . based on the age of the SNF and/or HLW as calculated from the date of discharge" and noting that generally the "oldest fuel or waste will have the highest priority for acceptance . . . ." Standard Contract, Art. IV.5(a), PX 188 at 10; see also Standard Contract, Art. V.B.1, PX 188 at 11 (linking the submittal of DCSs to the "acceptance priority ranking"). Based on the APR, the Standard Contracts contemplated that Plaintiffs (and other utilities) "shall identify all SNF and/or HLW the Purchaser wishes to deliver to DOE" with the option to increase that amount by plus or minus 20 percent. See Standard Contract, Arts. V.B.1 & 2, PX 188 at 11. While the Government sees the question of acceptance capacity as a zero-sum game, the Standard Contract explicitly recognized that DOE might receive DCSs including "more material than the annual capacity of the DOE disposal facility (or facilities) can accommodate." Standard Contract, Art. VI.B.1, PX 188 at 14. Furthermore, the Government's interpretation relegates the provision regarding Final Delivery Schedules (which DOE never approved for any utility) to mere surplussage. Standard Contract, Art. V.C, PX 188 at 11-12. The contract at issue in this case should be interpreted to give meaning to all terms and conditions, something this

[9] Yet, we know from the ACRs and DCS Instructions described above that the schedules and allocations were anything but "firm."

Court cannot do under the Government's reading of the Standard Contracts. See McAbee Constr., Inc. v. United States, 97 F.3d 1431, 1435 (Fed. Cir. 1996); Indiana Mich. II, 57 Fed. Cl. at 98-99.

Finally, the Government refused to approve DCSs with larger allocations than those specified in the 1991 ACR based on extra-contractual DCS Instructions, notwithstanding the clear language of the Standard Contracts contemplating a possibility that utilities might request greater allocations than a facility could hold and other provisions allowing a utility to identify "all SNF" it wishes to deliver and increase its allocation by 20 percent. DX 148 at 2 (SSM0076631); Tr. 2020-22 (Zabransky). The use of instructions to limit allocations appears nowhere in the Standard Contracts. Tr. 2019-20 (Zabransky) (admitting that the limitation of allocations from the instructions was the contracting officer's own interpretation and not in the Standard Contracts); Indiana Mich. II, 57 Fed. Cl. at 98 ("The Standard Contract does not permit defendant to limit plaintiff's substantive rights in the guise of 'instructions.'").

Thus, for all the reasons stated above, the Government's arguments about the acceptance rate must fail.

## V. ADJUDICATION OF PLAINTIFFS' TAKINGS CLAIM IS STILL PREMATURE

The Court's ruling on liability plainly set forth the scope of the damages trial that took place in this case. 66 Fed. Cl. at 735 ("Whether any specific damages were caused by the Government's partial breach and the final determination of damages due, if any, has not been adjudicated and can only be determined after an evidentiary hearing"). This opinion is noticeably silent on the adjudication of Plaintiffs' takings claim, based on the recognition that this Court must first determine damages associated with the Government's breach of contract. See, e.g., Sacramento Mun. Util. Dist. v. United States, 74 Fed. Cl. 727, 736 (2006) ("SMUD

II") ("[T]he allocation of costs associated with the failure of this commercial agreement first must be adjudicated under contract law").[10] Because the Government fails to explain why the facts of this case are distinguishable from SMUD II for purposes of adjudicating the plaintiff's breach claim prior to its takings claim, its motion to dismiss Count III of Plaintiffs' Complaint should be denied.

[10] The Government's post-trial brief, in large part, repeats the same points and cites the same authority regarding takings as in its December 20, 2006 "Memorandum In Support Of Its Rule 52(c) Motion." For reasons previously explained, these arguments lack merit. Plaintiffs' Post-Trial Brief at 54-55.

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that this Court enter judgment on their breach of contract claim in the amount of $12.18 million.

Dated: May 22, 2007

Respectfully submitted,

s/ Alex D. Tomaszczuk by s/ Jack Y. Chu
Alex D. Tomaszczuk
**PILLSBURY WINTHROP**
**SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7940
(703) 770-7901 (fax)

Counsel of Record for Plaintiffs
System Fuels, Inc., System Energy Resources, Inc., and South Mississippi Electric Power Association

OF COUNSEL:
Jay E. Silberg
Daniel S. Herzfeld
Jack Y. Chu
**PILLSBURY WINTHROP**
**SHAW PITTMAN LLP**
2300 N Street, N.W.
Washington, D.C. 20037
(202) 663-8000
(202) 663-8007 (fax)

L. Jager Smith, Jr.
**WISE CARTER CHILD**
**& CARAWAY, P.A.**
1340 Echelon Parkway
Jackson, MS 39213
601-368-5572
601-368-5816 (fax)