IN THE UNITED STATES COURT OF FEDERAL CLAIMS
(Electronically Filed On November 16, 2007)

| | |
|---|---|
| **SYSTEM FUELS, INC.,**<br>**SYSTEM ENERGY RESOURCES, INC.,** and<br>**SOUTH MISSISSIPPI ELECTRIC POWER ASSOCIATION,**<br><br>Plaintiffs,<br><br>v.<br><br>**THE UNITED STATES,**<br><br>Defendant. | No. 03-2624C<br>(Judge Braden) |

**SUPPLEMENTAL DIRECT TESTIMONY OF KENNETH P. METCALFE**

1. My name is Kenneth P. Metcalfe and I am the President of The Kenrich Group LLC ("The Kenrich Group" or "Kenrich"). The Kenrich Group is a national consulting firm of accounting, financial, and engineering professionals with experience and expertise in the preparation and evaluation of economic damages claims. Kenrich's professionals have substantial experience with damages, including that obtained in working on numerous matters related to the public utility industry, nuclear power plants, and government contracting. My business address is 1200 New Hampshire Avenue, NW; Suite 410; Washington, DC 20036. My hourly rate on this matter is $235. My qualifications and background were submitted as part of my previous written direct testimony provided on September 6, 2006.

2. I am submitting this testimony pursuant to the court's October 11, 2007 "Order Requesting Supplemental Expert Testimony" to explain each step

taken to arrive at the $1,587,000 amount of the cost of borrowed funds that Plaintiffs have claimed as part of their damage award.[1]

3. The $1,587,000 represents the amount that Plaintiffs System Energy Resources, Inc. ("SERI") and South Mississippi Electric Power Association ("SMEPA") incurred as the cost of capital to finance the nominal costs incurred to mitigate the effects of DOE's continuing non-performance.

4. More specifically, as of the first day of trial, September 11, 2006[2], Plaintiffs had incurred a cost of capital of $1,587,000 to finance the $10,591,000 in nominal mitigation-related expenditures that SERI and SMEPA had made through August 31, 2005 (the damages cut-off date in this case). The remainder of this supplemental testimony shall describe the steps necessary to derive that $1,587,000 amount for the cost of capital for SERI and SMEPA. All of the source documents and calculations underlying the $1,587,000 amount (and that I reference in this testimony) can be found in Binder A (PX-1-A through PX-1-C-2) of my previously-submitted work papers.[3]

---

[1] Pursuant to the October 11, 2007 Memorandum Opinion and Order in this case, I understand that the Court prefers the more proper term, "the cost of borrowed funds." For ease in explaining and referencing the amounts discussed herein, and for consistency with my testimony at trial, I have continued to use in this supplemental testimony the "cost of capital" terminology that appears in my Expert Report and supporting work papers.

[2] Per the Court's April 5, 2005 Order, the trial in this case was initially scheduled for September 11, 2006. Thus, the Kenrich report and the underlying costs discussed therein were initially prepared based on this trial date. The trial date was subsequently amended to September 18, 2006 per the Court's January 30, 2006 Order. Because significant effort would have been required to capture one additional week of cost of capital, the costs of capital in this case remained based on the then-anticipated September 11, 2006 trial date. Thus, in the interests of maintaining consistency, September 11, 2006 continues to be referenced as the "date of trial" or "first day of trial" herein.

[3] For the Court's convenience, copies of supporting documents referenced in this testimony are provided in the Appendix submitted herewith. Referenced documents are provided behind identified tabs. Tabs 1-8 of the Appendix are documents previously entered into evidence as part of the Kenrich workpapers (e.g., Binder A, PX-1-A through PX-1-C-2). Tab 9 is a copy of a Federal Register notice from May 23, 2002 in which utilities were advised of a change in the requirements for FERC Form No. 1. Tab 10 is a copy of a Federal Energy Regulatory Commission Opinion dated July 31, 2000. Both of these latter documents constitute "filings on the public record" consistent with this Court's Order dated October 11, 2007.

Protected and Confidential Material to be Disclosed only in Accordance with
U.S. Court of Federal Claims Protective Order

5. Plaintiffs' total claimed damages in this proceeding, including its cost of capital are summarized in Binder A at schedule "A2" (Bates page KRG-GG004171 at Appendix TAB 1).[4]

6. The column on schedule A2 labeled "[A]" presents the damages incurred as of August 31, 2005 in nominal dollars. Nominal dollars are the actual dollars incurred by the plaintiffs during the year in which those dollars were incurred, unadjusted for the effects of financing.

7. The column on schedule A2 labeled "[B]" and entitled "Present Value Dollars As Of 9/11/2006" presents the damages incurred as of August 31, 2005, including the effects of financing applied from the year that the nominal damages were incurred up until September 11, 2006.

8. The $1,587,000 cost of capital is therefore the difference between the claimed $10,591,000 total nominal dollar damages at the bottom of column [A] on schedule A2 and the $12,178,000 total "present value dollars as of 9/11/2006" at the bottom of column [B]. This $1,587,000 difference represents the amount that the Plaintiffs needed to incur and have incurred to finance the nominal dollar expenditures of $10,591,000 from the points in time when those nominal dollars were incurred to September 11, 2006.

9. As shown on schedule A2, financing costs are presented for each category of damages (e.g., "Long Term Spent Fuel Storage Options"). The financing costs for each damages category are calculated at schedules A3 through A8 (KRG-GG004172 through 4177 at Appendix TAB 2), with one schedule corresponding to each damages category.

[4] Plaintiffs initially claimed additional costs in this case, in particular those costs that were projected to be incurred between September 1, 2005 and August 31, 2006. Those additional costs fall under the columns on schedule A2 labeled "[C]" and "[D]." Following the U.S. Court of Appeals for the Federal Circuit's (the "Federal Circuit") decision in Indiana Michigan, however, the parties agreed upon an August 31, 2005 damages cut-off date. Thus, the costs under columns [C] and [D] are no longer at issue in this proceeding (but may be the subject of future actions).

Protected and Confidential Material to be Disclosed only in Accordance with
U.S. Court of Federal Claims Protective Order

10. For example, the first dry fuel storage project identified on schedule A2 is titled "Long Term Spent Fuel Storage Options" (Capital Work Order N31937). The nominal and present value dollar damages claimed for this work order are identified as $341,000 and $506,000, respectively.[5]

11. On schedule A3 (KRG-GG004172), entitled "Capital Work Order N31937, Long Term Spent Fuel Storage Options", the total nominal dollars are $340,887 and the total present value dollars are $506,420. Rounded to the nearest thousand, these amounts correspond to the $341,000 and $506,000 amounts previously identified on schedule A2.[6]

12. The second column on schedule A3 presents each year's nominal dollar expenditures recorded to this Capital Work Order N31937. The third column presents the multiplier ("Cost Of Capital Factor")[7] used to calculate the costs incurred by the plaintiffs to finance each year's nominal dollar expenditures up until September 11, 2006.

13. For example, on schedule A3, Plaintiffs incurred nominal dollars of $44,319 in 1998, the first year that costs were incurred against this Capital Work Order. The $44,319 in nominal dollars is multiplied by the Cost Of Capital Factor of 1.8922 from the third column to calculate financing costs, yielding a

---

[5] On schedule A2 (KRG-GG004171), all dollar amounts were rounded to the nearest thousand.

[6] Throughout our work paper schedules, it is the protocol at Kenrich to use handwritten "tickmarks" to reference information to and from supporting schedules. A tickmark to the left of a number is the schedule from which the number originates. A tickmark to the right of a number is the schedule to which the number will also be referenced. For example, at schedule A2, the nominal dollar damages of $341,000 has a handwritten reference "tickmark" of "A3" *to the left* of that dollar amount, meaning that that amount originated at schedule A3. In turn, at schedule A3, the total nominal dollar amount of $340,887 has a tickmark *to the right* of it of "A2," meaning that that amount is referenced to schedule A2.

[7] In the Kenrich work papers, this "cost of capital factor" is also referred to as the "cost of capital multiplier" or the "NPV [Net Present Value] Multiplier". For the purpose of the damage calculations, these terms are synonymous and represent the factor or multiplier used to calculate the cost of capital on plaintiffs' nominal damages, as explained herein.

total amount of $83,860 (shown in the fourth column).[8] The difference between the $83,860 and the $44,319 represents the costs Plaintiffs have incurred to finance the $44,319 nominal dollars spent in 1998 through September 11, 2006 (again, the anticipated first day of trial). In other words, for every $100 Plaintiffs spent in 1998 in nominal dollars, Plaintiffs have incurred an additional $89.22 to finance that $100 nominal dollar expenditure until September 11, 2006 (or a total of $189.22, equal to 1.8922 multiplied by $100).

14. The Cost Of Capital Factors used for each year in schedules A3 through A8 (KRG-GG004172 through 4177) are calculated at schedule A11 (KRG-GG004180 at Appendix TAB 3). The purpose of the spreadsheet at schedule A11 is to show the calculation of the Cost Of Capital Factors for each year. A Cost Of Capital Factor was calculated for each year in which Plaintiffs incurred expenditures to mitigate DOE's continuing nonperformance.

15. For example, the 1.8922 multiplier for the year 1998 (as referenced in paragraph 13, above) is shown in the first column of schedule A11 at the row approximately two-thirds down the page entitled "NPV Multiplier." Similarly, the NPV Multipliers for the years 1999 through 2006 are also shown at schedule A11.

16. The calculation of the NPV Multiplier (i.e., Cost Of Capital Factor) at schedule A11 for any particular year accounts for the period of time from that year (i.e., the year that nominal dollars were incurred) to the first scheduled day of trial, as well as the Plaintiffs' actual weighted average rate for the financing costs (i.e., cost of capital) incurred during each year within the period.

[8] The $83,860 amount is equal to the $44,319 nominal amount plus $39,541 to finance the $44,319 expenditure up to the anticipated first day of trial. The $39,541 financing cost amount is equal to the $44,319 nominal amount multiplied by 0.8922 (Cost Of Capital Factor minus one).

17. For example, the previously referenced multiplier for 1998 of 1.8922 captures the cost of financing nominal dollars spent in 1998 for six months at Plaintiffs' 1998 cost of capital in 1998, for 12 months at Plaintiffs' 1999 cost of capital, for 12 months at Plaintiffs' 2000 cost of capital, for 12 months at Plaintiffs' 2001 cost of capital, for 12 months at Plaintiffs' 2002 cost of capital, for 12 months at Plaintiffs' 2003 cost of capital, for 12 months at Plaintiffs' 2004 cost of capital, for 12 months Plaintiffs' 2005 cost of capital, and for 254 days at Plaintiffs' 2006 cost of capital. The six month period in 1998 is based on the simplifying assumption that nominal dollars spent in any one year were incurred mid-year.[9] The 254 days in 2006 represents the time period between January 1, 2006 and September 11, 2006, the first scheduled day of trial.

18. For example, as shown under the 1998 column of schedule A11, the Plaintiffs' cost of capital in 1998 was 7.73 percent.[10] To finance $100 during the entire year would have cost Plaintiffs $7.73 (i.e., $100 multiplied by 1.0773, or $100 plus 7.73 percent of $100). However, using the mid-year convention, the cost to finance 1998 dollars for the 6-month period from June 30, 1998 until December 31, 1998 is approximately half that amount. More precisely, the cost of financing $100 for the 6-month period is $3.84. The $3.84 is based on a factor of 1.0384, which is equal to 1.0773 raised exponentially by one-half year. The 1.0384 is therefore the first in the group of numbers under the 1998 column. These numbers represent factors that account for ongoing financing costs on the nominal dollars incurred in 1998 for each subsequent year, through September 11, 2006.

19. Continuing with this example for the 1998 Cost Of Capital factor, the next step is to calculate the continuing cost of financing for the 1998 nominal

---

[9] This "mid-year convention" is a common simplifying assumption relating to the timing of annual expenditures. It has been used by Kenrich in all of our spent nuclear fuel damages calculations and, to date, has not been contested by the Government and its experts in those matters.

[10] For the derivation of the 7.73 percent figure, see paragraph 25 below.

Protected and Confidential Material to be Disclosed only in Accordance with
U.S. Court of Federal Claims Protective Order

dollars for each subsequent year of the claim period. For example, in 1999 the cost of capital is 7.75 percent (as identified at the first row of the 1999 column).[11] Thus, the multiplier used to calculate the cost of financing on the nominal dollars incurred in 1998 for the 18-month period from June 30, 1998 through December 31, 1999 is calculated as the 1.0384 factor times 1.0775 (1 plus 7.75 percent), or 1.1189. And 1.1189 is therefore the second number in the group of factors under the 1998 column. And again, the financing cost for each $100 spent in 1998 for this now 18-month period (June 30, 1998 through December 31, 1999) is $11.89. This is equivalent to multiplying the $103.84—the nominal dollars incurred in 1998 plus the financing costs incurred during the last six months of 1998—times the cost of capital in 1999.

20. Similarly, moving down the 1998 column, the multiplier to account for the continuing cost to finance the $100 incurred in 1998 for an additional year, through December 31, 2000, is 1.2081 which is equal to 1.1189 times one plus the cost of capital in 2000 or 1.0796 (referenced in the first row of the year 2000 column). Hence, the multiplier used to calculate the cost of financing the nominal dollars incurred in 1998 for the period from June 30, 1998 through December 31, 2000 is the 1.1189 (calculated above through December 31, 1999) times the 1.0796 multiplier for 2000, or 1.2081 (adjusted for rounding). The 1.2081 is therefore the next number in the group of factors under the 1998 column. And again, the financing cost for each $100 spent in 1998 for this now two and one-half year period is $20.81.

21. The process set forth in paragraphs 18 to 20 is continued for each subsequent year to capture the total cost of financing the nominal dollars incurred from 1998 through September 11, 2006, the first scheduled day of trial. The total cost of that financing of the nominal dollars incurred in 1998 through September

---

[11] The derivation of the 7.75 percent figure for the year 1999 is the same as the derivation of the 7.73 percent figure for the year 1998 (i.e., schedule A32 as explained in paragraph 25 below).

11, 2006 is represented by the last number in the group of factors under the 1998 column, or 1.8922. And again, that 1.8922 is the Cost Of Capital Factor that is used to calculate the financing costs for 1998 nominal damages plus related financing costs at schedules A3 through A8.

22. In other words, the same process described in paragraph 18 for 1998 is used to calculate the Cost Of Capital Factor for nominal damages incurred in other years. As another example, the calculation of the 2003 Cost Of Capital Factor is presented at the bottom of schedule A11.

23. Having explained the calculation method used to determine the annual Cost Of Capital Factors for 1998 to 2006 as presented at schedule A11, I will now address how the Plaintiffs' cost of capital rates for each year were determined. These rates can be found at schedule A32 in PX 1-C-1 (KRG-GG004211 at Appendix TAB 4).

24. Schedule A32 is entitled "Annual Weighted Average Cost Of Capital (After Tax)." The purpose of this schedule is to calculate the after-tax cost of capital weighted to account for the joint ownership of Grand Gulf by SERI and SMEPA.[12]

25. Starting with the 7.73 percent weighted average cost of capital for 1998, that rate references to schedule A11. As shown at schedule A32, the 7.73 percent rate is the weighted average of SERI's and SMEPA's respective cost of capital rates, based on their respective ownership percentages of Grand Gulf. SERI's 1998 cost of capital is 7.90 percent and SMEPA's 1998 cost of capital is 6.27 percent. SERI owns 90 percent of the Grand Gulf plant and SMEPA owns the remaining 10 percent. Thus, the 7.73 percent average (or combined) cost of capital rate is equal to the sum of (1) 0.90 (SERI's ownership percentage)

[12] As noted in the Court's trial decision, SERI owns 90 percent of Grand Gulf and the remaining 10 percent is owned by SMEPA.

multiplied by 7.90 percent (SERI's cost of capital) and (2) 0.10 (SMEPA's ownership percentage) multiplied by 6.27 percent (SMEPA's cost of capital). The average cost of capital rates are calculated in the same manner for each subsequent year through 2006.

26. I will now address the source of SERI's and SMEPA's respective cost of capital rates from 1998 to 2006.

27. Schedule A33 (KRG-GG004212 at Appendix TAB 5) summarizes SERI's cost of capital rates. Schedule A33 is titled "System Energy Resources, Inc. (SERI) Weighted Average Cost Of Capital (After-Tax)." The purpose of schedule A33 is to calculate SERI's average cost of capital rates for each year in the claim period, based on the official year-end rates provided by SERI's Regulatory Accounting Department. For example, the cost of capital applicable to 1998 is the average of the 1997 and 1998 year-end rates (i.e., 7.90 percent is equal to 7.85 percent plus 7.94 percent divided by 2). Again, the average of the two year-end amounts is calculated to approximate a mid-year weighted average cost of capital, consistent with the assumption that costs are incurred mid-year. The average cost of capital rate was similarly calculated for each subsequent year.[13]

28. The source of SERI's year-end cost of capital rates are official SERI business records prepared for Entergy Operations, Inc. (EOI) in the normal course of business under the direction of J. David Wright, the Director of Regulatory Accounting at Entergy Services Inc. (ESI). These cost of capital rate documents are entitled "Monthly Capacity Charge Formula, Development of Cost Of Capital" and can be found at schedules A34 through A41 (KRG-GG004214

---

[13] As the report and work papers in support of Plaintiffs' damages were submitted in November 2005, and year-end data for 2005 was not yet available, for the purposes of the damages calculation, I assumed that the year-end 2005 and 2006 cost of capital rates were equal to the 2004 year-end cost of capital rate.

through 4221 at Appendix TAB 6).[14] These documents are prepared in the first instance for the purposes of pricing the electricity that is generated at the Grand Gulf plant and sold by SERI to other Entergy subsidiaries, including Entergy Arkansas, Entergy Louisiana, Entergy New Orleans and Entergy Mississippi.[15] I understand that FERC, as well as the commissions for the jurisdictions in which SERI sells its power, has review and intervention authority with regard to the rates of return proposed and ultimately charged by SERI.

29. For example, the 7.85 percent 1998 year-end weighted average cost of capital shown at schedule A33 originates from the "Monthly Capacity Charge Formula, Development of Cost Of Capital, At December 31, 1998 at schedule A35 (KRG-GG004215), where the same 7.85 percent figure is shown at the lower right hand corner of the table.

30. The components used in calculating the 1998 7.85 percent year-end rate are also represented in schedule A35. In column "[A]" of that schedule, SERI's total debt and equity capital amounts are presented. Column "[B]" presents the capitalization ratio, or debt and equity as a percentage of SERI's total capital. The applicable cost rates for SERI's debt and equity (allowed rate of return on equity) are presented in column "[C]." The weighted cost rates presented in column "[D]" reflect the weighted cost rates for the respective ratios of debt and equity. Specifically, the weighted cost rate for debt capital equals the cost of debt multiplied by the debt-to-total capital ratio and the weighted cost for equity capital equals the cost of equity multiplied by the ratio of equity-to-total capital. The total weighted cost rate for all capital, debt and equity, is presented at

[14] At my request, the version of these documents provided by Entergy to me included an additional column (the column labeled "[E]"), showing an "after-tax" adjustment. This adjustment was made for the sole purpose of developing SERI's after-tax weighted average cost of capital for my damages calculations. The Federal Energy Regulatory Commission ("FERC") requires debt rates to be maintained on a "before- or pre-tax" basis.

[15] Per agreement, SERI sells all of its capacity and energy from Grand Gulf at wholesale to SERI's only customers, Entergy Arkansas, Entergy Louisiana, Entergy New Orleans and Entergy Mississippi. SERI's wholesale power sales are subject to the jurisdiction of FERC.

Protected and Confidential Material to be Disclosed only in Accordance with
U.S. Court of Federal Claims Protective Order

line 6 in column "[D]." Finally, the tax effect on the debt portion of the cost of capital is accounted for in column "[E]." Because debt-related interest costs are generally tax-deductible, the after-tax debt cost rate is multiplied by one minus SERI's combined federal and state income tax rate. The after-tax weighted average cost of debt and equity capital is shown in column [E] and totals the 7.85 percent referenced to schedule A33.

31. As a further illustration, I will step through the specific calculations on schedule A35. The "capitalization ratio" in column [B] (i.e., the respective percentages of debt and equity to total capital) are calculated by taking the total dollar amounts of each "capital source" (i.e., debt and equity), and dividing each by the total capitalization. The total capitalization at the end of 1998 is equal to $1,740,708,819, which is the sum of $856,600,000 (total debt) and $884,108,819 (common equity).

32. Specifically, the debt capitalization ratio for 1998 is calculated by taking the total debt of $856,600,000, and dividing it by the total capitalization of $1,740,708,819, which results in the debt capitalization ratio of 49.21 percent in column [B]. Similarly, the common equity capitalization ratio is calculated by taking the common equity amount of $884,108,819 and dividing it by the total capitalization of $1,740,708,819, which results in the common equity capitalization ratio in column [B] of 50.79 percent.

33. Next, the debt capitalization ratio at the end of 1998 of 49.21 percent, is multiplied by the debt "cost rate" of 8.15 percent, to yield a "weighted cost rate" for debt (pre-tax effected) of 4.01 percent in column [D]. Similarly, the equity capitalization ratio of 50.79 percent is multiplied by the equity cost rate of 10.58 percent to yield a weighted cost of equity rate of 5.37 percent. These calculations result in a "weighted cost rate" for SERI's total capital of 9.38 percent, as reflected at the bottom of column [D].

Protected and Confidential Material to be Disclosed only in Accordance with
U.S. Court of Federal Claims Protective Order

34. For the final step in the SERI calculation, the 2.48 percent after-tax weighted rate for the SERI's year end 1998 weighted cost rate for debt is calculated by multiplying the 4.01 percent weighted pre-tax cost rate for debt by one minus a composite tax rate for state and federal income taxes (i.e., 61.75 percent which is equal to one minus the combined tax rate of 38.25 percent as provided by SERI and referenced at schedule A35).[16]

35. Since there is no corresponding after-tax benefit for common equity (i.e., dividend payments are not a tax deductible expense), the after-tax rate for the weighted cost of equity is equal to its weighted cost rate. Thus, the total after-tax rate at the end of 1998 of 7.85 percent for SERI's weighted average cost of capital is the sum of the 2.48 percent after-tax rate for SERI's weighted average cost of debt and the 5.37 percent after-tax rate for SERI's weighted average cost of common equity.

36. Returning to SMEPA, the annual average cost of capital rates summarized on schedule A32 (KRG-GG004211) are referenced directly from SMEPA's filed Annual Reports. The relevant excerpts from SMEPA's Annual Reports for each applicable year may be found in pages A42 through A55, (KRG-GG004223 through KRG-GG004243 at Appendix TAB 7). For example, as shown at schedule A32, SMEPA's average cost of capital rate in 1998 was 6.27 percent, the figure set forth as the "Average Cost Of Debt" in SMEPA's 1998 Annual Report, an excerpt of which may be found at page A43 (KRG-GG004224).[17]

[16] Again, under FERC regulations, and in accordance with the Financial Accounting Standards Board (FASB) Statement of Financial Accounting Standards No. 109), the weighted average cost of debt is a pre-tax rate.

[17] SMEPA is financed entirely by debt, with no equity. As such, its weighted average cost of capital is equal to its average cost of debt, as listed in its Annual Reports from 1998 through 2004. As indicated in its Annual Reports (e.g., schedule A43a (KRG-GG004225)), SMEPA is exempt from U.S. income taxes. Accordingly, there is no corresponding after-tax adjustment for SMEPA's debt rates.

37. As the Court recognized in its October 11, 2007 Memorandum Opinion and Order, SERI's cost of capital-related information can also be found in SERI's FERC Form No. 1 filings ("FERC Form No. 1: Annual Report[s] Of Major Electric Utilities, Licensees and Others") for certain years. (The applicable FERC Form No. 1 filing pages are N178 (KRG-GG003249), N188 (KRG-GG003260), N198 (KRG-GG003271) and N209 (KRG-GG003283) at Appendix TAB 8).[18] However, after 2001 FERC eliminated the need for utilities to file this and various other information as part of their FERC Form No. 1 filings.[19]

38. The cost of capital related information (e.g., Allowance for Funds Used During Construction or "AFUDC") presented in the FERC Form No. 1 is substantively identical to the comparable data provided in SERI's official "Monthly Capacity Charge Formula, Development Of Cost Of Capital" schedules previously identified and referenced herein. As described above, I used SERI's "Monthly Capacity Charge Formula, Development Of Cost Of Capital" documents as the source for my cost of capital damages calculations.

39. While the information contained at FERC Form No. 1 page 218 is substantively the same as that provided in the "Monthly Capacity Charge Formula, Development Of Cost Of Capital" documents, there are certain minor differences, which I will briefly address below.

40. AFUDC is applied based on the prior year-end cost of capital rates (e.g., the AFUDC rate applied in 1998 is based upon the balances and cost rates in effect at the end of 1997). So, for example, on SERI's 1998 FERC Form No. 1,

[18] The Court-referenced cost of capital information presented in the FERC Form No. 1 actually represents those amounts for the calendar year *prior to* the FERC Form No. 1 filing year. For example, the FERC Form No. 1 "Year of Report December 31, 1999" for SERI actually provides SERI's 1998 cost of capital-related data.

[19] FERC notified utilities in May 2002 (see 67 Fed. Reg. 36093, 36094 (May 23, 2002) at Appendix TAB 9) that beginning with the report for calendar year 2002, the need for page 218 of the FERC Form 1 was eliminated. Prior to this change, FERC Form 1, page 218 contained "General Description Of Overhead Procedure" and "Computation Of Allowance For Funds Used During Construction Rates."

page 218 at N178 (KRG-GG003249), the year-end balances for 1997 are presented for debt and equity are $926,600,000 and $849,932,594, respectively. These year-end balances are identical to the amounts shown on the December 31, 1997 "Monthly Capacity Charge Formula, Development Of Cost Of Capital" at A34 (KRG-GG004214).

41. In July 2000, there was a FERC ratemaking decision (or "rate case") wherein SERI had requested a change to its allowed return on equity, which had been previously set at 11.00 percent.[20] FERC ultimately ruled that SERI's return on equity should be reduced to 10.58 percent for the period of time prior to the ruling and 10.94 percent for subsequent period. Accordingly, the "Monthly Capacity Charge Formula, Development Of Cost Of Capital" schedules contained in my work papers reflect the 10.58 percent rate for the years 1997 through 1999 and 10.94 percent for the years 2000 through 2004. The FERC Form No. 1 continued to include an 11.00 percent cost of equity through 2001. (Again, the 2001 FERC Form No. 1 presents year-end 2000 balances and cost rates and was the last year in which SERI presented cost of capital information in its FERC Form No. 1.)

42. In addition, there are minor differences between the SERI debt cost rates presented in its FERC Form No. 1 and the "Monthly Capacity Charge Formula, Development Of Cost Of Capital" schedules. These differences relate to a change to the method used by SERI to calculate its debt costs as approved by FERC in its July 31, 2000 opinion (see Appendix TAB 10). The FERC-approved change in method is accounted for in the "Monthly Capacity Charge Formula, Development Of Cost Of Capital" schedules and not in the FERC Form No. 1. The method change reflected in those schedules show debt cost rates lower or equal to those contained in the relevant FERC Form No. 1.

---

[20] See United States Of America Federal Energy Regulatory Commission Opinion No. 446, dated July 31, 2000 at Appendix TAB 10.

Protected and Confidential Material to be Disclosed only in Accordance with
U.S. Court of Federal Claims Protective Order

43. Should the Court request, I can readily adjust the Kenrich Group damages model to account for the Court's October 11, 2007 decision by (a) reducing nominal damages for those amounts determined not allowable by the Court and (b) properly applying to the remaining damages whatever rate the Court deems appropriate for the cost of borrowed funds.

Kenneth P. Metcalfe — 11/16/07
Kenneth P. Metcalfe — Date