# Appendix Tab 10

92 FERC ¶ 61,119

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

OPINION NO.446

System Energy Resources, Inc. Docket No. ER95-1042-000

OPINION AND ORDER AFFIRMING IN PART,
REVERSING IN PART, AND MODIFYING IN PART INITIAL DECISION

Issued: July 31, 2000

FERC-DOCKETED
JUL 3 1 2000

000801-0343-1

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

System Energy Resources, Inc. Docket No. ER95-1042-000

OPINION NO. 446

APPEARANCES

F. Franklin Amanat and Douglas G. Green for System Energy Resources, Inc.

Mary W. Cochran and Paul R. Hightower for the Arkansas Public Service Commission.

Noel J. Darce, Michael R. Fontham and Laurie B. Halpern for the Louisiana Public Service Commission.

George M. Fleming for the Mississippi Public Service Commission.

Shirley Gunthorp for the Arkansas Attorney General.

Mary Lou Lundin, Paul E. Nordstrom, and Glen L. Ortman for the City Council of New Orleans.

Earle O'Donnell and Julia Weller for Occidental Chemical Corporation.

Frank Spencer for the Mississippi Attorney General.

Zachary D. Wilson for Conway Corporation, West Memphis and the City of Osceola,and the Arkansas Utilities Commission .

Stephen Angle, Gary D. Levenson, Richard L. Miles, and Charles F. Reusch for the Trial Staff of the Federal Energy Regulatory Commission.

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners: James J. Hoecker, Chairman;
William L. Massey, and Linda Breathitt.

System Energy Resources, Inc. Docket No. ER95-1042-000

OPINION NO. 446

OPINION AND ORDER AFFIRMING IN PART, REVERSING IN PART, AND MODIFYING IN PART INITIAL DECISION

(Issued July 31, 2000)

I. Introduction

This proceeding is before the Commission on exceptions to an Initial Decision. System Energy Resources, Inc., 76 FERC ¶ 63,001 (1996). The proceeding concerns a proposed amendment to Rate Schedule FERC No. 2 (the Unit Power Sales Agreement, or UPSA) of System Energy Resources, Inc. (SERI), under which SERI sells capacity and energy from the Grand Gulf Nuclear Unit No. 1 (Grand Gulf 1) to four Entergy Corporation (Entergy) Operating Companies: Arkansas Power & Light Company (Arkansas P&L), Louisiana Power & Light Company (LP&L), Mississippi Power & Light Company (Mississippi P&L), and New Orleans Public Service, Inc. (NOPSI).[1] SERI is a nuclear generating subsidiary of Entergy whose sole asset is an 80 percent ownership and 10 percent leasehold interest in Grand Gulf 1.[2] This opinion addresses the justness and reasonableness of SERI's proposed amendments to the UPSA.[3]

---

[1] After this case was litigated, these Entergy Operating Companies were renamed Entergy Arkansas, Inc., Entergy Louisiana, Inc., Entergy Mississippi, Inc., and Entergy New Orleans, Inc. For purposes of consistency, this Opinion will refer to the company names used during litigation.

[2] The remaining 10 percent is owned by South Mississippi Electric Power Association. Ex. SERI-1 at 2-3.

[3] The proposed changes would increase annual revenues from jurisdictional sales (continued...)

II. Background

SERI currently sells capacity and energy from Grand Gulf 1 under a formula rate. the Billing Format, that is contained in the UPSA. SERI proposes to change how it recovers its costs by replacing the Billing Format with a new cost-of-service formula rate called the Power Charge Formula (PCF). The primary difference between the PCF and the Billing Format is that, under the PCF, capacity charges are redetermined on an annual basis using the prior year's costs rather than on a monthly basis using more recent cost data. The PCF then requires SERI to make an annual informational filing with the Commission showing cost data used to develop the charge for the next twelve months.

In addition to this structural change, SERI also proposes the following changes. (1) an increased rate of return on common equity from 11 percent to 12.2 percent;[4] (2) use of a new method of computing the value of debt that reduces the debt component of the cost of capital, which in turn increases the equity ratio and the overall rate of return; (3) a $14 million addition to rate base through Account 190 (Accumulated Deferred Income Taxes (ADIT)) to reflect the use in Grand Gulf 1 of spare parts from the now-canceled Grand Gulf Unit No. 2 (Grand Gulf 2);[5] (4) an increase in the depreciation accrual rate from 2.85 percent to 3.33 percent; (5) an increase in the total estimated nuclear decommissioning cost from $276 million (in 1989 dollars) to $406 million (in 1993 dollars), including $44 million for full site restoration; (6) an increase in the annual nuclear decommissioning accrual from $5.4 million to $18.9 million until 2015, and to $16.3 million thereafter; (7) adoption of the accrual method, and a 5-year optimization period, for post-employment benefits other than pensions (PBOPs); and (8) adoption of

---

[3](...continued)
and service by approximately $65.5 million.

[4]SERI originally proposed to increase the ROE to 13 percent, but later lowered its request.

[5]SERI claims that since the Internal Revenue Service has for the time being disallowed SERI's proposed abandonment tax deduction for these Grand Gulf 2 spare parts, SERI should be allowed to recover through rate base the delayed time value of the tax benefits related to these spare parts because these parts can now be used in Grand Gulf 1. However, SERI argued that if its $14 million rate base addition is rejected, then it should alternatively be allowed to remove $1.4 million (in Account 282) that is already being deducted from SERI's rate base and that is also related to Grand Gulf 2 spare parts.

an 18-month amortization period for operation and maintenance (O&M) expenses incurred during refueling outages.[6]

On July 3, 1995, the Commission accepted SERI's proposed revisions for filing, suspended them to become effective December 12, 1995, subject to refund, and established hearing procedures. 72 FERC ¶ 61,003 (1995).

Following issuance of the Initial Decision, Briefs On Exceptions were filed by SERI, the Louisiana Public Service Commission (Louisiana Commission), the Arkansas Public Service Commission (Arkansas Commission), the Mississippi Public Service Commission (Mississippi Commission), the Mississippi Attorney General, the Council for the City of New Orleans (New Orleans) and the Commission trial staff (trial staff). These same participants, along with Occidental Chemical Corporation (Occidental),[7] filed Briefs Opposing Exceptions.

III. Discussion

No participant excepts to the adoption by the presiding administrative law judge (judge) of SERI's proposals on issues (7) and (8) above (concerning PBOPs and the amortization period of O&M expenses during refueling outages) (see 76 FERC at 65,015), and we summarily affirm these rulings. The Commission also summarily affirms the Initial Decision on the following issues: (1) the rejection of the PCF;[8] and (2) the rejection of SERI's proposal to add $14 million to its rate base to recover certain tax-related costs (i.e., the time value of deferred tax deductions) associated with Grand Gulf 2

---

[6]An additional SERI proposal to remove restrictions on the types of investments its decommissioning trust funds could invest in was rendered moot by the Commission's Final Rule on that subject. See Nuclear Plant Decommissioning Trust Fund Guidelines, Order No. 580, FERC Stats. & Regs. ¶ 31,023 (1995), order on reh'g, Order No. 580-A, FERC Stats. & Regs. ¶ 31,055 (1997).

[7]Occidental is LP&L's largest retail customer.

[8]Although not addressed by the judge, we also reject SERI's request that a revised PCF be accepted if the originally proposed PCF is not adopted. SERI Brief On Exceptions at 76-77. While this revised PCF (Ex. SERI-81) remedies one problem by eliminating the annual redetermination provision, it fails to address other infirmities (e.g., it does not reflect the changes we are ordering below regarding the proper debt ratio in the capital structure).

spare parts.[9] We find that the Initial Decision properly decided these issues, and the arguments on exceptions have failed to persuade us that the Initial Decision erred or that additional discussion is necessary.[10]

1. **Return on Equity**

a. Arguments Before the Judge

SERI proposed to increase its allowed return on common equity (ROE) from 11 percent to 12.2 percent. SERI's proposed ROE was based on a combination of risk premium and Discounted Cash Flow (DCF) analyses (both two-stage and multi-stage),[11] which incorporated a flotation cost adjustment of 20 basis points. SERI claimed that in

---

[9]We also reject SERI's alternative proposal to increase its rate base by removing $1.4 million contained in Account 282 (Accumulated Deferred Income Taxes -- Other Property). (By reducing its rate base deductions, SERI's proposal would increase its rates.) SERI has provided no exhibits or workpapers showing that the $1.4 million is in fact related to Grand Gulf 2 spare parts, and thus the only support for its proposal is the unsubstantiated claim of a witness (Ex. SERI-92 at 14), which is disputed by other participants (see, e.g., Trial Staff Brief On Exceptions at 18-20).

[10]As discussed below, we also summarily affirm certain findings of the judge pertaining to the total nuclear decommissioning cost and the annual decommissioning accrual.

[11]In a DCF analysis, the expected cost of equity capital is computed as the sum of the current dividend yield (dividend/current stock price) and the expected rate of growth of dividends. The DCF method can be expressed algebraically by the formula $K=(D/P)+G$, where K is the cost of equity, D is the current annual dividend amount, P is the current market price of the stock, and G is the growth rate of the stock. See Panhandle Eastern Pipeline Co., 71 FERC ¶ 61,228 at 61,831 n.49 (1995). In this case, the participants computed the dividend yield component of the cost of equity based on SERI's parent corporation, Entergy, since SERI issues no common stock.

> The two-stage DCF method we have adopted in gas pipeline proceedings is essentially a constant growth DCF method that develops a short-term growth rate and a separate long-term growth rate, and then combines these two rates to derive a composite, "constant" growth rate (g) for the entire period of the growth rate estimate. Multi-stage DCF models combine more than two growth rate projections to derive a composite growth rate.

Ozark Gas Transmission System, 68 FERC ¶ 61,032 (1994) (Ozark), the Commission established a new generic ROE policy by deriving the ROE using a two-stage DCF analysis which uses both short- and long-term projections of the growth rate of the stock.[12]

Though not differing significantly on the dividend yield component of the DCF calculation, the intervenors and trial staff differed substantially with SERI on the appropriate growth component, with each of them disputing SERI's claim that Ozark is controlling precedent here. The Arkansas Commission recommended an ROE of 10.0 percent, the Mississippi Commission recommended 10.39 percent, the Louisiana Commission recommended 10.55 percent and trial staff advocated 10.8 percent.[13] All of the intervenors derived their recommendations using various constant growth DCF analyses based on the traditional electric approach, while trial staff derived its recommendation using a version of a constant growth analysis that attempts to take into account different short- and long-term growth expectations while relying on a single data source (i.e., Value Line projections).[14] Additionally, the participants differed on whether SERI is more or less risky than Entergy, with the Arkansas Commission proposing a downward risk differential adjustment to the ROE to reflect its view that SERI is less risky than Entergy, and trial staff proposing an upward risk differential adjustment to the ROE to reflect its view that SERI is more risky than Entergy. All the intervenors and trial staff opposed SERI's proposed flotation cost adjustment.

---

[12]To derive an overall growth rate, the short- and long-term growth projections were averaged together, with each given a 50 percent weighting.

[13]Although trial staff argued that Ozark is not controlling precedent here, it nevertheless performed an alternative DCF analysis using the Ozark method, which yielded an ROE range of 10.99-12.97 percent. See Ex. S-1 at 29; Ex. S-2 at Schs. 30, 31; and Tr. 1405-06.

[14]Trial staff proposed a DCF model wherein the overall growth rate was determined by combining a short-term growth rate (stage 1) with a long-term growth rate (stage 2). Trial staff's short-term growth rate covered a five-year period, and was based on discrete estimates of earnings per share provided by Value Line Investment Survey (Value Line). Trial staff's long-term growth rate covered a 15-year period and was developed using the constant growth model. The data inputs for stage 2 were based on the most distant Value Line data projections available at the time the testimony was proffered, i.e., an estimate five years into the future (fifth-year estimate). We rejected this approach in Southern Company Services, Inc., Opinion No. 427, 84 FERC ¶ 61,266 at 62,309-10 (1998), reh'g denied, Opinion No. 427-A, 87 FERC ¶ 61,097 (1999).

b. Initial Decision

After finding that Ozark is controlling precedent in electric ROE cases, the judge adopted an ROE of 10.8 percent that was based on a SERI two-stage DCF analysis which the judge found most closely followed the DCF method that the Commission relied on in Ozark. Specifically, the judge derived this 10.8 percent figure from: (1) his adoption of SERI's proposed dividend yield of 7.0 percent (which was based on a 6-month average performance of the common stock of SERI's parent, Entergy); (2) his adoption of a short-term, first-stage growth estimate based on 5-year growth projections that were reported by the Institutional Brokers Estimate Service (IBES); and (3) his adoption of a long-term, second stage growth estimate based on electric industry growth projections for the 2000-2015 period as reported by DRI McGraw-Hill, Inc.'s World Energy Services U.S. Outlook (DRI). 76 FERC at 65,002-004. (IBES and DRI are, respectively, the same short-term and long-term forecast data sources that were relied on by the Commission in Ozark.) In addition, the judge also rejected SERI's proposed risk premium analysis, finding that the use of such methods to establish the ROE is inconsistent with Commission precedent.[15]

c. Exceptions

On exceptions, SERI reduced its requested ROE from 12.2 percent to 12.0 percent. SERI claims that the judge erred by: (1) ignoring all but one of SERI's DCF calculations, since SERI claims that all its two-stage and multi-stage DCF analyses comport with Commission precedent;[16] (2) failing to adopt SERI's risk premium evidence, either to check the reasonableness of the judge's DCF result or, preferably, to rely on it as a primary method for computing the ROE; (3) failing to define a zone of reasonableness within which SERI's ROE should be set; and (4) failing to account for recent, significant movements in interest rates, which would have resulted in a higher ROE for SERI.

---

[15]76 FERC at 65,006 (citing Montaup Electric Co., 38 FERC ¶ 61,252 at 61,869 (1987); and Pennsylvania Power Co., 26 FERC ¶ 61,354 at 61,779 (1984)).

The judge also did not adopt SERI's proposed flotation cost adjustment, to which no party excepts, and we affirm this resolution which does not provide for a flotation cost adjustment for SERI.

[16]Specifically, SERI asserts that the judge erroneously ignored investors' long-term expectations as to growth in gross domestic product (GDP) and he also ignored SERI's multi-stage DCF models. SERI also asserts that the judge should have considered trial staff's alternative Ozark-based DCF analysis.

The Mississippi Commission excepts to the judge's adoption of SERI's method of averaging the IBES data to derive the short-term growth rate, arguing that, instead, the median of the IBES data should be used to calculate this growth rate. With this adjustment, the Mississippi Commission supports on exceptions an ROE of 10.5 percent.

While the Louisiana Commission supports the 10.8 ROE adopted by the judge, it excepts to his findings that the Commission's Ozark precedent applies to the electric industry and that long-term growth rates must be used in determining the growth factor in Commission-jurisdictional electric public utility DCF analyses. The Louisiana Commission claims that the Commission's rationale in Ozark to require the use of long-term, two-stage growth estimates for pipelines does not apply to jurisdictional electric utilities, and that reliance on this method will often lead to excessive ROEs for these companies.

While trial staff supports the 10.8 percent ROE adopted by the judge, it excepts to: (1) his rejection of trial staff's constant growth DCF methodology; (2) his finding that Ozark is controlling precedent here; (3) his rejection of trial staff's risk premium analysis, which trial staff claims should have been accepted either as a stand-alone method of calculating the ROE or as a method which could be used in conjunction with the DCF analysis; and (4) his failure to adopt trial staff's risk differential proposal (that purportedly reflects SERI's riskiness relative to Entergy).

In their Briefs Opposing Exceptions, the Arkansas Commission, New Orleans and Occidental also support the 10.8 percent ROE adopted by the judge. In addition, raising arguments similar to those made at hearing, each intervenor in this proceeding and trial staff opposes each of SERI's exceptions on ROE; the Arkansas Commission and Occidental oppose trial staff's exception to the rejection of its risk differential proposal; and SERI opposes each of the intervenor and trial staff exceptions on ROE.

d. Discussion

Although we affirm the judge's adoption of a 10.8 percent ROE, we reject his reliance on Ozark and the use of a two-stage DCF methodology as the appropriate mechanism in this case to determine a reasonable ROE for SERI. As discussed below, we believe that the circumstances of this case and the characteristics of SERI support the use of the traditional electric, constant growth DCF methodology as the more appropriate way to determine a reasonable ROE for SERI.

The judge adopted SERI's argument that Ozark and its progeny[17] are controlling precedent here, and that the traditional electric, constant growth DCF should not be used to derive the ROE. As noted above, SERI sponsored both two-stage and multi-stage DCF analyses (which it claimed were each consistent with Ozark), and the judge based his ROE on one of the SERI two-stage studies. While we have on a number of occasions in recent years relied on industry or general economic data (e.g., GDP) to develop a long-term growth rate projection in gas pipeline proceedings, we have not yet found it appropriate to rely on these data sources in setting rates under the Federal Power Act (FPA) for an electric public utility, and we do not believe under the circumstances presented in this case that it is appropriate to do so here. In short, important facts which we have relied on in recent gas pipeline cases are not present in the instant proceeding, involving a company in a different industry, and these distinctions in factual circumstances warrant not adopting the gas pipeline approach here. Should circumstances change in the electric utility industry such that these distinctions no longer exist, then we will reevaluate our electric DCF methodology at that time.

First, the Commission's adoption in the Ozark line of cases of a separate long-term growth projection based on industry and general economic data was based primarily on two factors: (1) the failure of Ozark's witness to justify the use of a short-term estimate as a proxy for the long-term growth rate; and (2) the existence, in the record, of a reasonable long-term growth rate. Of particular relevance in Ozark was the testimony that the short-term growth rates in the gas pipeline industry were not expected to continue at such a high rate indefinitely, and that companies could be expected to reach a state of maturity when their growth would stabilize and eventually equate to that of the general economy over the long-run.[18] Thus, the record in Ozark (and other gas pipeline proceedings) supports our findings there that the short-term growth rate for gas pipelines was not representative of the long-term growth rate, and that consequently there was a need to develop a separate long-term growth rate estimate based on gas pipeline industry or general economic data. Specifically, the records in those proceedings showed that long-term growth projections differed significantly from short-term growth projections for the gas pipeline industry. However, the record in the instant proceeding does not support using industry or general economic data to develop a long-term growth rate for electric public utilities.

---

[17]See, e.g., Northwest Pipeline Corp., Opinion No. 396, 71 FERC ¶ 61,253 (1995), order on reh'g, Opinion No. 396-A, 76 FERC ¶ 61,068 (1996), opinion on initial decision on remand, Opinion No. 396-B, 79 FERC ¶ 61,039, reh'g denied, Opinion No. 396-C, 81 FERC ¶ 61,036 (1997) (Northwest).

[18]68 FERC at 68,105, citing Ex. S-1 at 16-17.

First, with regard to our reliance in recent gas pipeline proceedings on GDP as a proper estimate of long-term growth rates in the gas pipeline industry, we stated in Mojave Pipeline Co., 81 FERC ¶ 61,150 (1997)[19] that we have chosen to use GDP for four reasons: (1) the record in the Williston and Northwest proceedings shows that as companies reach maturity over the long-term, their growth slows and their growth rate approaches that of the economy as a whole; (2) over the long-run an expectation that a regulated firm will grow at the rate of the average firm in the economy is reasonable; (3) the purpose of using the DCF analysis in that proceeding was to approximate the rate of return an investor would reasonably expect from a pipeline company, and the record in other proceedings shows that the long-term growth of the economy is used by two large investment houses as their long-term growth figure in conducting DCF analyses for investment purposes; and (4) witnesses in those proceedings used the long-term growth of the economy as a whole as confirmation or support for their analysis. 81 FERC at 61,687.[20]

The Commission finds that these rationales do not support the use of GDP to develop a long-term growth rate estimate in this proceeding. Specifically, growth rate estimates for Entergy are not two to three times greater than GDP as were the growth rate estimates that led to the adoption of a two-stage approach for gas pipelines.[21] There is

---

[19]Our policy in the most recent cases involving gas pipeline ROE is to rely on GDP data exclusively in deriving the long-term growth rate, and to develop the overall growth rate by giving a 66 percent/34 percent weighting of the short- and long-term growth rates, respectively. See Transcontinental Gas Pipe Line Corp., Opinion No. 414-A, 84 FERC ¶ 61,084 at 61,423 (1998), (Transcontinental), order on reh'g, Opinion No. 414-B, 85 FERC 61,323 (1998), petition for review denied sub nom., Nother Carolina Utilities Commission v. FERC, 203 F.3d 53 (D.C. Cir. 2000); and Williston Basin Interstate Pipeline Co., 72 FERC ¶ 61,074 (1995), order on remanded issue, 79 FERC ¶ 61,311 (1997), order on reh'g, 81 FERC ¶ 61,033 (1997), Williston Basin Interstate Pipeline Co. v. FERC, 165 F.3d 54 (D.C. Cir. 1999), order on remand, 87 FERC ¶ 61,265 at 62,019-20 (1999) (Williston)).

[20]See also Ozark, 68 FERC at 61,105; and Wyoming Interstate Co., 69 FERC ¶ 61,259 at 61,992 (1994) (Wyoming Interstate).

[21]See, e.g., Ozark, 68 FERC at 61,104-05 (growth estimates ranging from 8.81 percent to 15.2 percent and GDP estimates of 5.4 percent); Williston, 72 FERC at 61,387 (Appendix B) and 79 FERC at 61,390 (growth estimates ranging from 8 to 15 percent and GDP estimates of 5.37 percent and 6.33 percent); and Transcontinental, 84 FERC at
(continued...)

also no evidence that Entergy's "growth rate will approach that of the economy as a whole." Id. As such, the notion that Entergy is a company with excessive growth that will decrease in the long-term as it matures and that will eventually equate to GDP is not supported by the record.[22] In addition, while the use of a two-stage approach in gas pipeline cases is supported by the fact that both Merrill Lynch and Prudential-Bache Securities Inc. (Prudential) use long-term growth estimates for the economy in their stock valuations for gas pipelines, Prudential indicates that it treats electric utilities differently from all other industrials when estimating long-term growth rates.[23]

Second, we do not regard electric industry revenue growth rate projections to be a reliable source for projecting the long-term growth rate for Entergy at this time.[24] As SERI's own ROE witness stated when asked about the reliability of long-term forecasts in the electric industry, "I am certain that analysts would agree that in this changing environment for electric utilities, anything beyond four or five years is pretty uncertain." Tr. 771-72. This same point has been made by various other parties in this proceeding.[25]

---

[21](...continued)
61,427-7 (Appendix A) (growth estimates ranging from 8 percent to 15 percent and GDP estimates of 5.45 percent). By comparison, growth estimates for SERI range from 1.91 percent to 3.4 percent (see Exs. S-20, MPSC-3A, APSC-20 and LPSC-22), while GDP estimates are from 5 percent to 5.2 percent. See Ex. SERI-75A, Sch. 3.

[22]In fact, the record shows that Entergy's projected growth is below the GDP estimates in the record, thereby demonstrating the inapplicability of this rationale to the instant proceeding.

[23]We hereby take official notice of an exhibit (Ex. S-7-R) from the Northwest proceeding where we referred to a memo from Prudential which stated that Prudential does not estimate long-term growth rates for electric utilities using the same method that it does for other industrials, and that they project lower long-term growth rates for electric utilities than for other industrials. See also, Ex. 33 in Williston, referred to at 79 FERC at 62,389 & n.16. Additionally, SERI's ROE witness admitted that large investment firms can distinguish between the electric industry and other industries and do not expect the same growth rates from both. Tr. 782-83.

[24]We have previously noted the relative unreliability of long-term projections even in the gas pipeline industry compared to short-term projections. See, e.g., Transcontinental, 84 FERC at 61,423; and Ozark, 68 FERC at 61,107.

[25]See, e.g., Mississippi Commission Initial Brief at 3-4, 11, 14; and Louisiana
(continued...)

Third, gas pipelines are similar to other industrial companies in that they have low dividend payout ratios (i.e., low dividend yields) and they reinvest a high proportion of their earnings into their business to promote future growth. Electric utilities, on the other hand, typically have much higher dividend payout ratios (i.e., high dividend yields) than do most other industrial companies (including most gas pipelines), and they reinvest less than half their earnings.[26] This is a critical distinction because retained earnings are a key source of dividend growth, and this helps explain why electric utilities tend to have much lower expected dividend growth rates than most other industrial companies (including most gas pipelines). For example, while the internal growth rate (the product of a company's retention rate and its earned return on equity) of gas pipelines averaged 6.05 percent during 1993-1997, and is projected to be 9.16 percent in 2002, the internal growth rate of electric utilities averaged only 2.51 percent over the 1993-1997 period, and is projected to be 3.86 percent in 2002. (See Ex. S-2, Schs. 10 and 13 in the Docket No. ER97-2355-000, et al. proceeding)[27] The growth projections in this record for Entergy for the 1995-1999 period range from around 1.9 percent to 3.4 percent. See Exs. S-20, APSC-20, LPSC-22 and MPSC-3A. Meanwhile, the 20-year GDP growth projections in the record here are 5.0 percent and 5.2 percent. See Ex. SERI-75A, Sch. 3. Thus, if the two-stage and multi-stage DCF methods proposed by SERI were used to compute its ROE, this would result in SERI being given an ROE that was based on relatively high company-specific dividend yields in combination with an artificially high dividend growth rate projection based on GDP data (which, as noted above, are significantly higher than either historical or projected growth rate estimates for the electric industry). In short, if we were to use SERI's proposed two-stage and multi-stage studies to compute its ROE, SERI could be overcompensated for its cost of equity.

---

[25](...continued)
Commission Initial Brief at 5.

[26]We take official notice of statistics found in Ex. S-2 in the Southern California Edison Co. proceeding, Docket Nos. ER97-2355-000, et al., which indicates that industrials had collectively paid out 29 percent of their earnings on average during the 1994-1997 period and had a forecasted payout ratio of 24 percent for 2002, and gas pipelines had a payout ratio of 45 percent of their earnings on average over the 1993-1997 period and had a forecasted payout ratio of 30 percent for 2002. Electric utilities, on the other hand, had an average payout ratio of 71 percent of their earnings during 1993-1997 and had a forecasted payout ratio of 68 percent in 200. (Ex. S-2, Schedules 13 and 15, from the ER97-2355-000 proceeding).

[27]We again take official notice of this exhibit.

Thus, we are not persuaded that we should rely on electric industry revenue growth projection or GDP data to derive a separate long-term growth rate for Entergy. Instead, we find that the growth rate calculations that result from using the traditional electric, constant growth DCF approach are sustainable in the long term. Indeed, we note that reliance on the electric constant growth DCF approach is consistent with past practice in electric rate proceedings. We have relied almost exclusively on this approach to set the rate of return on equity for electric public utilities for many years, and we have adopted that approach in several recent orders.[28] No party in this proceeding has demonstrated why a separate long-term growth rate -- different from short-term growth -- is appropriate based on the facts in this proceeding and the current circumstances in the electric industry. Thus, we find no reason to deviate from our policy which has yielded reasonable end results and is consistent with long-standing ratemaking principles.[29] If the ROE we set in this proceeding becomes stale because of subsequent financial developments, SERI remains free, of course, to file for a revised ROE under section 205 of the FPA (and other interested parties remain free to file to revise the ROE under section 206).[30]

Since we are not relying upon the two-stage or multi-stage DCF analyses in this record to establish the appropriate ROE, we now turn our attention to the ROE analyses from those participants that provided studies based on the electric, constant growth DCF method -- the method that we have traditionally relied on to compute electric ROEs. As

---

[28]See, e.g., Appalachian Power Co., Opinion No. 423, 83 FERC ¶ 61,335 (1998); and Consumers Energy Co., Opinion No. 429, 85 FERC ¶ 61,100 (1998) (Consumers). In these cases we continued to rely on the traditional electric, constant growth DCF method. As discussed below, our decision here reaffirms our policy of using this DCF method in electric cases.

[29]See, e.g., Boston Edison Co. v. FERC, 885 F.2d 962, 964-68, 969-70 (1st Cir. 1989) (affirming ROE developed using the electric, constant growth DCF method). See 42 FERC at 62,093-94, 62,099-100; and 34 FERC at 65,084-85, 65,086-88).

[30]We stated above our reasons for not relying on electric industry growth projections in setting a long-term growth rate for electric public utilities, but we note that even if we were to consider such evidence, the DRI industry data sponsored by SERI supports the reasonableness of our finding that short-term growth rate projections are the best proxy for the overall growth rate projections. To wit, the DRI growth rate projections that were sponsored by SERI show long-term growth rates for the electric industry of 3.8 percent (compared to the IBES short-term growth figure for Entergy of 3.3 percent and 3.8 percent for the comparable group).

noted above, the Louisiana, Mississippi and Arkansas Commissions and Occidental relied upon the electric constant growth DCF method in developing their proposed ROEs, and a trial staff witness also submitted several electric constant growth DCF analyses in his workpapers (which he used as a point of reference for other studies). See Ex. S-20. None of these participants or New Orleans take exception to the 10.8 percent ROE adopted by the Initial Decision.[31] Thus, since the 10.8 percent ROE is unchallenged by any participant except SERI (which did not sponsor an electric constant growth DCF study), and since the 10.8 percent figure is within the range of reasonableness recommended by each sponsor of an electric constant growth study in this record,[32] we find no basis for reversing the judge's adoption of 10.8 percent as a reasonable ROE in this proceeding.[33]

In addition, we summarily affirm the judge's rejection of all proposals to determine SERI's ROE through the use of risk premium analyses on a stand-alone basis. We believe that the Initial Decision correctly resolved this issue, and the arguments on exceptions do not persuade us otherwise.

Because capital market conditions often change substantially between the time an electric public utility files its case-in-chief and the date the Commission issues a final decision, it has been our policy to update the return on equity. However, our adjusted

---

[31]On exceptions, the Mississippi Commission's concern regarding the 10.8 percent figure is that if the two-stage approach is used, then the 10.8 percent ROE should be adjusted downward to 10.5 percent to reflect an adjustment to the short-term growth rate. However, since we are not relying on the two-stage method, this concern is now moot.

[32]The range of reasonableness of the Louisiana Commission witness was 10.07 percent to 11.1 percent (Ex. LPSC-22), the range of reasonableness of the Arkansas Commission witness was 10.0 percent to 11.2 percent (Ex. APSC-18 at 6), and the range of reasonableness of the Mississippi Commission witness was 9.96 percent to 10.82 percent (Ex. MPSC-3A).

[33]The reasonableness of the 10.8 percent ROE is also corroborated by the results of the electric constant growth DCF studies performed by the Louisiana and Arkansas Commissions and trial staff, which performed studies using the traditional constant growth DCF methodology (g=br+sv) that we have found appropriate for use in developing the ROE in electric rate proceedings. See, e.g., Consumers, 85 FERC at 61,361. The average ROEs of the Arkansas Commission, Louisiana Commission and trial staff studies were 10.42 percent (Exs. APSC-20 and APSC-21), 10.59 percent (Exs. LPSC-20 through LPSC-23), and 11.33 percent (Ex. S-20 at 6-15), respectively. The composite average of these three figures is 10.78 percent.

equity allowance must remain within the record-based zone of reasonableness.[34] In this regard, as we noted above the range of ROEs produced by the traditional electric constant growth DCF studies on the Entergy comparable group is from 10.42 percent to 11.33 percent, and the 10.8 percent ROE we are approving here is near the middle of that range. Thus, for purposes of updating, we will establish the zone of reasonableness from 10.42 percent to 11.33 percent. Under the Commission's updating policy, the ROE is adjusted downward to 10.58 percent for the period beginning with the effective date of the instant rates and ending with the date of this opinion.[35] In addition, the ROE is hereby adjusted upward for the prospective period beginning on the date of this opinion to 10.94 percent.[36]

2. <u>Cost of Debt</u>

a. Arguments Before the Judge

SERI proposed two changes to how it computes the debt component of the cost of capital. First, it proposed to change its calculation of the cost <u>rate</u> of debt by switching from the yield-to-maturity method to the embedded cost method.[37] Second, it proposed

---

[34]<u>See</u>, <u>e.g.</u>, Boston Edison Co., Opinion No. 299, 42 FERC ¶ 61,374 at 62,094, <u>reh'g denied</u>, Opinion No. 299-A, 43 FERC ¶ 61,309 (1988), <u>aff'd</u>, 885 F.2d 962 (1st Cir. 1989).

[35]The DCF in this case was based on the six-month period ending November 1995. Federal Reserve Bulletins indicate that during this time the average yield on ten-year constant maturity U.S. Treasury Bonds was 6.19 percent. The average yield on these same bonds during the effective period of these rates is 5.97 percent. Under the Commission's updating policy, the 22 basis point differential is subtracted from the ROE of 10.8 percent, producing an ROE of 10.58 percent for this period.

[36]Federal Reserve Bulletins indicate that the average yield on ten-year constant maturity U.S. Treasury Bonds during the six months ending June 2000 was 6.33 percent. Under the Commission's updating policy, the 14 basis point differential from 6.19 percent (<u>see</u> n.<u>35</u> <u>supra</u>) is added to the ROE of 10.8 percent, producing an ROE of 10.94 percent for the prospective period.

[37]Under the yield-to-maturity method, the effective cost rate of debt is constant through the life of the debt, but the nominal dollars recovered each year for interest payments and for amortization of debt issuance costs changes from year to year. Conversely, under the embedded cost method, the nominal dollars recovered each year
(continued...)

to change its calculation of the long-term debt ratio by switching from use of the gross proceeds of debt method (i.e., the total principal outstanding of long-term debt) to the net proceeds of debt method (i.e., gross proceeds less unamortized premium, discount, expenses, and losses). The former change would increase the cost of debt in the test period, the latter change would decrease the debt ratio in the capital structure (and thereby increase the equity ratio), and thus each of the changes would act to increase the overall rate of return. SERI claimed that its historic methods of computing these components have caused it to significantly underrecover its true cost of capital.

The Louisiana Commission and trial staff opposed both of these changes, arguing that (1) it is the face amount of the total principal outstanding of long-term debt that SERI owes to bondholders, and it is thus this amount that should be used to compute a weighted overall return allowance, and (2) SERI had failed to justify the rate increase that would result from its proposed "accounting" changes.

b. Initial Decision

The judge rejected SERI's proposed changes to the cost of debt, finding that there was a dearth of Commission precedent supporting those "accounting" changes and that there was no justification for them other than to increase SERI's rates. 76 FERC at 65,007.

c. Exceptions

SERI excepts to the Initial Decision, arguing that the judge treated SERI's two proposals as one and thus failed to address the proper issues. The Louisiana Commission and trial staff oppose SERI's exceptions. Each of these participants reiterate the arguments they made before the judge.

d. Discussion

We agree with SERI that the Initial Decision appears to have treated these two issues as one. We approve SERI's proposed switch to the embedded cost method for determining the cost rate of long-term debt, but we affirm the judge's rejection of the proposed switch to a net proceeds method for deriving the long-term debt ratio.

---

[37](...continued)
for interest payments and for amortization of debt issuance costs remain unchanged, but the cost rate of debt applicable to the net proceeds changes each year. See Ex. SERI-93 at 2-4; and SERI Brief On Exceptions at 34.

Regarding the switch from the yield-to-maturity (YTM) method to the embedded cost method, in Minnesota Power & Light Co., Opinion No. 155, 21 FERC ¶ 61,233 (1982), we summarily affirmed a judge's finding that the embedded cost approach was just and reasonable. Specifically, the judge found that: "By spreading the effect of the 'discount' over the life of the debt, [under the embedded cost approach] consumers at each point in the life of the debt are treated similarly." 16 FERC ¶ 63,012 at 65,053 (1981).[38] Finally, no party disputes SERI's claim that, "On average, over the life of the plant, SERI's embedded cost calculation produces the same overall results as the YTM calculation does." (SERI Brief on Exceptions at 35.[39] Thus, it is undisputed on this record that this proposed switch will not harm ratepayers over the long-term.

However, we reject SERI's proposal to compute the long-term debt ratio by using the net proceeds of debt (i.e., gross proceeds less unamortized premium, discount, expenses, and losses) instead of the gross proceeds of debt. SERI argues that the gross proceeds should not be used in the capital structure because it includes unamortized debt issuance costs and premium expenses that are not available to invest in rate base. Thus, SERI claims that the net proceeds, which excludes these costs, should be used instead. We disagree. It is the gross proceeds of a company's long-term debt, i.e., the total principal outstanding, that belong in the capital structure because this reflects the company's total obligation with respect to long-term debt. In addition, our regulations expressly provide that the weighted cost of debt capital is to be computed, in part, by "[m]ultiplying the cost of money . . . by the principal amount outstanding for each issue" of debt.[40] The principal amount outstanding is the face value of the debt, which is the amount used under the gross proceeds method. SERI has failed to adequately justify its proposal to change to net proceeds, and its proposal is thus rejected.

---

[38]We also note SERI's claim that allowing this switch would make our treatment consistent with the treatment adopted by New Orleans and the Arkansas, Louisiana and Mississippi Commissions, which have already approved the embedded cost methodology in setting the retail tariffs for the Grand Gulf Purchasers -- a fact which no party disputes in this proceeding.

[39]The Louisiana Commission acknowledges that the YTM and embedded cost methods produce the same overall results. Louisiana Commission Brief Opposing Exceptions at 16.

[40]18 C.F.R. § 35.13(h)(22)(ii).

3. **Depreciation Accrual Rate**

a. Arguments Before the Judge

SERI proposed an increase in the depreciation accrual rate for Grand Gulf 1 from 2.85 percent to 3.33 percent. The proposed increase is based on a depreciation study which: (1) used an estimated average service life based on the then-current Nuclear Regulatory Commission (NRC) license life (as extended to June 16, 2022), as adjusted for interim retirements; (2) developed an interim retirement rate of 0.786 percent by applying Iowa Survivor Curves to the nuclear production plant of an allegedly comparable Entergy nuclear plant;[41] and (3) estimated a negative 10 percent net salvage value for interim retirements. Trial staff supported SERI's proposed increase based on a separate analysis of Grand Gulf 1's actual interim retirement experience.

The Mississippi and Louisiana Commissions and Occidental argued that SERI's depreciation rate should remain at 2.85 percent, while New Orleans and the Mississippi Attorney General proposed that SERI's depreciation rate be reduced to 2.72 percent Each of these intervenors disputed each aspect of SERI's analysis that is listed above. Specifically, these intervenors argued that: (1) the plant service life assumed for purposes of the depreciation calculation should be adjusted to reflect SERI's then-pending application to the NRC for an extension in Grand Gulf 1's operating license to November 1, 2024; (2) the use of Iowa Survivor Curves does not accurately predict interim retirements for plant that is non-homogenous in nature (i.e., plant that has physically diverse components, such as a nuclear plant); (3) ANO is a poor proxy for Grand Gulf 1 because ANO has a pressurized water reactor which has at least one major component (a steam generator) that is not found in the type of reactor that Grand Gulf 1 uses (a boiling water reactor); and (4) Grand Gulf 1's interim retirements should be assumed to have a net salvage value of zero.

b. Initial Decision

The judge approved SERI's request to increase its depreciation accrual rate to 3.33 percent, agreeing with the primary components of SERI's analysis. First, citing Boston Edison,[42] the judge found that it is Commission policy not to adjust nuclear plant

---

[41] The nuclear units SERI used as proxies for Grand Gulf 1 were ANO-1 and ANO-2 (collectively, ANO), which are owned by Arkansas P&L.

[42] Boston Edison Co., Opinion No. 350, 52 FERC ¶ 61,010 at 61,078 (1990), reh'g (continued...)

depreciation rates to reflect possible service life changes that are pending before the NRC. Second, the judge rejected intervenor arguments that the use of Iowa survivor curves was inappropriate for estimating nuclear plant interim retirements. Third, the judge dismissed intervenor claims that ANO was not a reasonable proxy for Grand Gulf 1, and that even if ANO were rejected as a reasonable proxy, the alternative would be to adopt SERI's alternative depreciation accrual rate of 4.10 percent that is based on Grand Gulf 1's actual interim retirement history.[43] Finally, the judge found that SERI had justified a negative 10 percent net salvage value. 76 FERC at 65,013-014.)

c. Exceptions

Raising arguments nearly identical to those they raised before the judge, New Orleans, the Mississippi Attorney General and the Mississippi Commission except to the Initial Decision on this issue. SERI and trial staff oppose these exceptions, and defend the 3.33 percent depreciation accrual rate approved by the judge.

d. Discussion

We reverse the judge, and find that the record in this proceeding does not justify changing the current Grand Gulf 1 depreciation rate of 2.85 percent. Regarding the effect on the depreciation rate of SERI's then-pending request to the NRC to extend the Grand Gulf 1 service life, we take official notice of the NRC's Amendment No. 137 to the Grand Gulf 1 operating license, issued April 26, 1999, which extends the effectiveness of that license until November 1, 2024. Thus, we find that the depreciation rate should reflect this update in the Grand Gulf 1 license life -- a point which even SERI's depreciation witness recognizes as appropriate. Tr. 645, 651. The record indicates that reflecting this extension in the Grand Gulf 1 service life will reduce the otherwise applicable depreciation rate by 0.22 percent. Ex. CNO/MAG-1 at 15.

---

[42](...continued)
denied, Opinion No. 350-A, 59 FERC ¶ 61,062 (1992), rev'd and remanded, Town of Boylston, et al., v. FERC, 21 F.3d 1130 (D.C. Cir. 1994); order on remand directing refunds, 80 FERC ¶ 61,395 (1997), order denying rehearing, 84 FERC ¶ 61,168 (1998).

[43]Citing Indiana Michigan Power Company, Opinion No. 373, 59 FERC ¶ 61,260 (1992), the judge concluded that the Commission allows depreciation accrual rates to be calculated on the basis of the actual interim retirement experience at the nuclear plant at issue if the plant has been in operation a sufficient period of time.

We also find that the record does not support SERI's proposed increase in the interim retirement rate. SERI's principle study in support of this proposed increase uses ANO as a proxy for Grand Gulf 1's interim retirements. However, nearly every other participant in this proceeding has challenged SERI's claim that ANO is a suitable proxy for determining Grand Gulf 1 interim retirement rates[44] since ANO differs from Grand Gulf 1 as to basic design, age, construction, operating history and some major components. Tr. 678-82, 1271.[45] (We find particularly persuasive the fact that ANO, which uses a pressurized water reactor, does not even have the same basic type of reactor as Grand Gulf 1, which uses a boiling water reactor.)[46] Significantly, in the face of this strong challenge, SERI's briefs both before the Commission and before the judge are virtually silent as to the suitability of ANO as a proxy for Grand Gulf 1. As the proponent of the proposed increase in the depreciation rate, it is SERI that bears the burden of proof that the basis for its new depreciation rate (i.e., using ANO as a proxy for Grand Gulf 1) is appropriate. We find that SERI has failed to meet that burden.

We also find unavailing SERI's claim that if its proxy study is not adopted, then by default one of the alternative depreciation studies that is based on actual Grand Gulf 1 interim retirement results must be adopted.[47] While we agree with the claims of SERI

[44]See, e.g., Ex. CNO/MAG-1 at 19, 21-22; Ex. MPSC-1 at 6; New Orleans Brief On Exceptions at 16-18; Mississippi Commission Initial Brief at 39-40; Louisiana Commission Initial Brief at 20-22; and Occidental Initial Brief at 27. (The Mississippi Attorney General and the Mississippi Commission incorporate and adopt the exceptions of New Orleans on this issue.) Even trial staff, which supports SERI's proposed 3.33 percent depreciation rate, concludes that it is inappropriate to use ANO data to develop interim retirement rates for Grand Gulf 1. See Ex. S-16 at 3; and Trial Staff Brief Opposing Exceptions at 35, 38.

[45]The colloquy between counsel for New Orleans and SERI's depreciation witness, along with the testimony of New Orleans' depreciation witness (Exs. CNO/MAG 1-12), indicates that ANO and Grand Gulf 1 are different types of nuclear plants, have different models of turbine generators, and have different manufacturers and different component parts. See Tr. 678-82; see also, Tr. 1271.

[46]There are two basic types of nuclear reactors: those with pressurized water reactors and those with boiling water reactors.

[47]SERI's study based on Grand Gulf 1 actual interim retirements concluded that a depreciation rate of 4.19 percent could be justified (Ex. SERI-89 at 5), while trial staff's study, based on Grand Gulf 1 actual interim retirements, concluded that a rate over 4.0 (continued...)

and trial staff that on several prior occasions we have supported the calculation of depreciation accrual rates based on the actual interim retirement experience at the nuclear plant at issue, here SERI's own expert witness on depreciation has characterized Grand Gulf 1's historical interim retirements as unreliable. For example, the depreciation study (Ex. SERI-46) submitted with this witness' pre-filed testimony (Ex. SERI-44) found that:

> The Grand Gulf interim retirement experience to date is not considered to be truly representative of the future; therefore, we analyzed the interim retirement history at ANO to permit a realistic assessment based on actual sustained operating experience.
>
> Ex. SERI-46 at 4, emphasis added.

Trial staff sponsored no evidence to dispute this claim. Moreover, SERI's depreciation witness also testified at hearing that Grand Gulf 1's interim retirement experience to that point in time was "not predictive" of future interim retirement experience. Tr. 708. Faced with this uncontroverted evidence, in this instance we cannot rely on the actual interim retirement experience of the plant at issue to develop the proper depreciation accrual rate. In this circumstance, it is appropriate to use a proxy for the interim retirement experience of the plant at issue, but no suitable proxy has been established on this record. Thus, there is no basis for adjusting SERI's current depreciation rate to reflect a changed interim retirements projection.

With regard to the issue of whether a net salvage value of negative 10 percent should be assumed in deriving the depreciation rate, we believe that the evidence supports SERI's claim. The record here shows that the experience within the nuclear industry is that the net salvage values of nuclear plants can be expected to be negative 10 percent or greater. See Ex. CNO/MAG-1 at 34. We are persuaded by SERI's explanation that it is the use of spare parts from the canceled Grand Gulf 2 unit that have temporarily caused the bookkeeping anomaly of a positive net salvage on Grand Gulf 1's interim retirements. See Ex. SERI-89 at 21; see also the judge's statement at Tr. 1461.[48] Intervenors provide

---

[47](...continued)
percent could be justified. Ex. S-16 at 3; and S-17.

[48]Intervenors rely on the positive net salvage experience at Grand Gulf 1 to date in support of their position. However, this is inconsistent with their claims that historical Grand Gulf 1 data are unreliable for use in developing the Grand Gulf 1 interim retirement rates.

no evidence demonstrating that the net salvage value of Grand Gulf 1 should be assumed to be zero.

In summary, while SERI has shown that it is reasonable to assume a net negative salvage value associated with Grand Gulf 1 (which, other things being equal, would justify a higher depreciation rate), this consideration is offset by the fact that SERI must now reflect the NRC's recently-revised operating license life for Grand Gulf 1. Finally, since the record does not provide an adequate basis for revising the interim retirement rate, we find that there is no basis for revising the depreciation rate from the current level of 2.85 percent.

**4. Decommissioning Cost and Annual Revenue Requirement**

a. Arguments Before the Judge

SERI proposed an increase in the estimate for the total cost of decommissioning Grand Gulf 1, as well as an increase in the annual revenue requirement related to decommissioning, based on: (1) the results of a decommissioning study which projected a $44 million cost for Grand Gulf 1 site restoration;[49] (2) an increase in the annual escalation factor for decommissioning costs from 5 percent to 5.5 percent;[50] (3) switching the method of calculating the annual decommissioning revenue requirement from a levelized-real basis to a levelized-nominal basis;[51] (4) a 21 percent contingency factor;[52]

---

[49]This $44 million covers the cost of demolishing and/or removing the formerly contaminated structures, removing non-contaminated buildings that will be approximately 50 years old at the end of Grand Gulf 1's service life (and which may be damaged by the decontamination of adjacent buildings), and regrading and adding topsoil to the site.

[50]The purpose of the decommissioning cost escalator is to convert the decommissioning estimate from 1993 dollars to dollars for years to 2022, which was the year when SERI's license to operate Grand Gulf was scheduled to terminate at the time of SERI's application in this proceeding.

[51]On a levelized-real basis, the revenue requirement is escalated annually to reflect the effects of inflation on the purchasing power of the dollar as those effects occur. On a levelized-nominal basis, the same nominal dollar amount is recovered from the ratepayers each year. See 76 FERC at 65,010. SERI indicated that, over the life of Grand Gulf 1, both methods would return the same amount; only the timing differs such that the levelized-nominal method will front-load the returns and allow SERI to recoup past under
(continued...)

and (5) an assumption that average after-tax earnings rates will be 6.14 percent on SERI's non-tax qualified (NTQ) decommissioning fund and 6.75 percent for SERI's tax qualified (TQ) decommissioning fund.[53]

New Orleans and the Mississippi and Louisiana Commissions raised issues in opposition to each of these five factors. Occidental and the Arkansas Commission joined these parties in opposing SERI's proposed switch to the levelized-nominal method, and Occidental also objected to SERI's proposed escalation factor. Finally, New Orleans and the Mississippi Commission oppose SERI's continued accelerated recovery of decommissioning expenses (until 2015) associated with the leased portion of Grand Gulf 1 (pursuant to a 1991 settlement agreement in Docket Nos. ER89-678-000, et al.).[54]

---

[51](...continued)
funding of its decommissioning trusts. This change, in conjunction with the revised escalation factor, would result in an increase in the current annual decommissioning revenue requirement from $5.4 million to $18.9 million for the current floating revenue requirement which increases annually for inflation.

[52]Id. at 65,011. Contingency factors are used in cost estimates for future events to allow for uncertainties and problems which are likely to occur, but which cannot be predicted accurately and that are thus not included in, or inaccurately estimated in, basic cost estimates. Id.

[53]SERI's decommissioning funds are invested in two external trust funds, one of which is recognized by the Internal Revenue Service (IRS) as tax qualified while the other is not recognized as tax qualified by the IRS. See 76 FERC at 65,009.

[54]In 1989 SERI entered into a sale/leaseback transaction affecting 12.77 percent of its ownership interest in Grand Gulf 1. In an effort to reduce costs, SERI sold a portion of the plant to the Grand Gulf 1 Owner-Participants, who leased it back to SERI. In the Participation Agreement governing that transaction, SERI agreed to fund the decommissioning of the leased portion of the plant by July 2015 at the lease termination. SERI filed a rate case requesting accelerated funding whereby ratepayers from 1989 through July 2015 would pay for decommissioning the leased portion. The Commission accepted that methodology as the result of a settlement. Since SERI collects the total decommissioning expenses for the leased portion over a period which ends before the Grand Gulf 1 license terminates, the parties refer to the procedure as an accelerated collection. See System Energy Resources, Inc., 56 FERC ¶ 61,465 (1991).

b. Initial Decision

The judge accepted SERI's $44 million estimate of site restoration costs for Grand Gulf 1. As to the decommissioning revenue requirement, the judge rejected SERI's 5.5 percent escalation factor as unsupported, and, instead, adopted trial staff's proposed 4.0 percent escalation factor. Next, the judge rejected SERI's proposal to change the method for calculating the decommissioning revenue requirement from a levelized-real basis to a levelized-nominal basis. The judge accepted SERI's proposed 21 percent contingency factor, and also accepted SERI's proposal to continue accelerated recovery of decommissioning expense for the leased portion of Grand Gulf 1. The judge accepted SERI's proposed 6.14 percent after-tax earnings rate for the NTQ Fund. However, he rejected SERI's proposed 6.75 percent after-tax earnings rate for the TQ Fund, adopting, instead, trial staff's proposal of an after-tax earnings rate of 5.9 percent. 76 FERC at 65,008-013.

c. Exceptions

SERI excepts to the judge's rejection of its proposal to switch to a levelized-nominal basis for computing its decommissioning revenue requirement. SERI and the Louisiana and Arkansas Commissions except to the judge's ruling adopting a 4.0 percent escalation factor. New Orleans, the Mississippi AG and the Louisiana and Mississippi Commissions except to the judge's decision to allow SERI to accelerate the recovery of decommissioning expenses related to the leased potion of Grand Gulf 1. The Louisiana, Mississippi and Arkansas Commissions except to the judge's adoption of an earnings rate of 5.91 percent for SERI's TQ fund; instead, these intervenors support SERI's proposed rate of 6.75 percent. Finally, New Orleans and the Mississippi AG except to the judge's adoption of SERI's site restoration cost estimates. Each of these participants raise arguments on and opposing exceptions that are nearly identical to those they raised before the judge.

d. Discussion

We summarily affirm the judge's findings regarding: (1) the contingency factor; (2) the use of a levelized-real decommissioning cost methodology; and (3) the after-tax earnings rate of 6.14 percent for the NTQ fund. We find that the Initial Decision properly decided these issues and the arguments on exceptions have failed to persuade us that the Initial Decision erred or that additional discussion is necessary. The remaining decommissioning issues are discussed below.

1. TQ Fund

The Louisiana, Mississippi and Arkansas Commissions except to the judge's adoption of trial staff's proposal of 5.9 percent as the earnings rate for the decommissioning TQ fund. These parties claim that SERI justified its proposal of 6.75 percent based on earnings projections of its expected actual investment portfolio. These parties also argue that since municipal bonds are less risky than stocks, the NTQ fund, which is based on average municipal bond returns, should not be projected to produce a higher return (6.14 percent) than the TQ fund, which, under trial staff's proposal, would be based on a portfolio that included not only bonds, but also stocks and cash. Because trial staff's method produces the allegedly absurd result of a bonds-only fund being projected to earn a higher return than a fund consisting of bonds and stocks, these parties claim that trial staff's method should be discarded and the Commission should instead rely on SERI's proposal.

SERI requests clarification that the judge's adoption of trial staff's TQ fund earnings rate does not dictate that the fund manager must follow a particular diversification of the investment portfolio. The Louisiana Commission opposes the request for clarification.

We will reverse the judge. We agree with the state commissions that the projection of a lower earnings rate for the TQ fund (that includes stocks and bonds) than for the NTQ fund (whose return is based on bonds only) is unrealistic since a bond portfolio would generally be presumed to be less risky (and thus enjoy a lower return) than a more diversified portfolio that included stocks. Neither trial staff nor the judge provide an explanation of this anomalous result. Furthermore, SERI's study assumes that the portfolio cannot be shifted to the new configuration instantly (without incurring undue losses) and that, as the time for decommissioning approaches, the level of investment in stocks will need be reduced to increase fund safety. See SERI Ex. 87 at 20. On the other hand, trial staff's analysis assumes that the portfolio will change instantly and that adjustments will not need to be made as the time for decommissioning nears. We believe that SERI's assumptions on this matter are more realistic. Accordingly, we adopt the 6.75 percent earnings rate that was proposed by SERI and that is supported by the three state commissions on exceptions.

In addition, as requested by SERI, we clarify that our approval of earnings rate estimates for the decommissioning funds does not dictate how the portfolios of those funds must be configured.

2. Escalation Factor

SERI argues that the judge erred in adopting trial staff's 4.0 percent escalation factor, instead of the 5.5 percent escalation factor SERI proposed. SERI argues that it demonstrated that the price for low-level radioactive waste disposal, a significant cost component, is out pacing general inflation and that the judge failed to consider evidence indicating that the 25-year average of historical inflation is 5.5 percent. SERI Brief On Exceptions at 42-48. The Louisiana Commission argues that the judge erred in failing to adopt a 3.5 percent escalation factor based on projected inflation, rather than on historical trends. Louisiana Commission Brief On Exceptions at 3-4.

We reverse the judge. The 4.0 percent escalator the judge adopted was derived from a series of 5-year averages of historical inflation over a 12-year period.[55] In previous cases we have established, as reasonable, escalation factors that were based on a 20- to 25-year average of historical inflation rates, finding that it is reasonable to assume that longer time periods will be more reliable indicators of the general inflation rate because they incorporate a wider range of variations in the Consumer Price Index.[56] The record here indicates that the 25-year average of historical inflation was 5.5 percent. See Exs. SERI-34 and SERI-87. Accordingly, we adopt SERI's proposed 5.5 percent escalator.

3. Accelerated Collection of Decommissioning Expense for the Leased Portion of Grand Gulf

Intervenors except to the judge's finding that SERI should be allowed accelerated decommissioning expenses on the leased portion of Grand Gulf 1. Instead, intervenors argue that SERI should be required to recover its decommissioning expenses for the entire plant over the remaining life of the plant. In support of their position, intervenors

---

[55]Trial staff found that the 25-year average of historical inflation was 5.5 percent and the 10-year average was 3.3 percent. With such variability demonstrated over the two time periods, and because trial staff recommended a 5-year true-up funding methodology, trial staff chose to use the 5-year average methodology discussed in the text above. See Ex. S-1 at 29.

[56]See, e.g., Indiana & Michigan Power Co., Opinion No. 373, 59 FERC ¶ 61,260 at 61,971 (1992); and Boston Edison Company, Opinion No. 350, 52 FERC ¶ 61,010 (1990), reh'g denied and opinion clarified, Opinion No. 350-A, 59 FERC ¶ 61,062 (1992), order on remand, 80 FERC ¶ 61,395 (1997), reh'g denied, 84 FERC ¶ 61,168 (1998).

claim that: (1) Commission precedent requires the collection of decommissioning expenses over the service life of the plant in question in accordance with the principal of intergenerational ratepayer equity;[57] (2) the only study showing net benefits to ratepayers from the accelerated recovery (Exs. S-8 through S-13) was proffered by trial staff so late in the proceeding that there was no opportunity for intervenor rebuttal (and thus the assumptions underlying that study are untested); and (3) even if there were net benefits resulting from the accelerated recovery, this is of no consequence since SERI is already obligated as a regulated public utility to lower its costs.

We reject intervenor arguments on this issue, and affirm the Initial Decision. First, there is no certainty that when the lease ends in 2015 that SERI will have ownership or a leasehold on the plant, even though as the NRC licensee it would still be responsible for the entire amount of the costs of decommissioning. Thus, if SERI no longer has ownership or a leasehold interest after 2015, and it has not recovered these decommissioning costs prior to that time, it may be unable to recover those costs. Second, since SERI has already been recovering decommissioning expenses on the leased portion of Grand Gulf 1 on an accelerated basis since 1991, we find that, as the proponent of a change in the status quo, it is intervenors that bear the burden of proof that their proposed change is necessary to make SERI's rates just, reasonable and not unduly discriminatory. Intervenors have failed to meet that burden by presenting evidence that ratepayers will be harmed by the current arrangement.[58]

In addition, although intervenors are correct that in prior cases we have found it appropriate for decommissioning expenses to be recovered over the life of the plant in question, we have never faced the particular question we are confronted with here involving a sale/leaseback arrangement affording substantial savings to ratepayers. We

---

[57]Citing, e.g., Boston Edison, 52 FERC at 61,083; Indiana Michigan, 59 FERC at 61,969; and Columbia Gulf Transmission Co., 23 FERC ¶ 61,396 at 61,850, reh'g denied, 24 FERC ¶ 61,258 (1983).

[58]Indeed, the uncontroverted evidence presented in trial staff's study indicates that ratepayers will be better off because the benefits of the sale/leaseback arrangement outweigh the costs of accelerated recovery by approximately $30 million. Intervenors err in their claim that they were not afforded an opportunity to rebut this evidence; intervenors had an opportunity to file cross-answering testimony six weeks after trial staff's study was sponsored. Intervenors not only did not file responsive testimony, but at trial the intervenor experts on this subject admitted that they had not even performed an extensive analysis of the study. Tr. 1114-15, 1126-27. In any event, intervenors have not shown that the existing practice is improper.

are not inclined to ignore these net savings, and there has been no showing of harm to ratepayers from the existing arrangement.

4. Site Restoration Costs

Site restoration costs are the costs associated with returning a plant site to its pre-construction condition, after decommissioning is complete. Tr. 83, 86-87, 110. The judge allowed SERI to collect $44 million for full restoration of the Grand Gulf 1 site, finding that only SERI presented evidence estimating the costs of site restoration. 76 FERC at 65,008-09. This figure includes approximately $1.1 million for backfill, grading, and landscaping of the site with most of the balance put toward removal of non-contaminated equipment and demolition of non-contaminated structures remaining after the NRC-mandated decommissioning activities have been completed. New Orleans and the Mississippi AG except to the judge's ruling, arguing that, since full site restoration is not required by law and the possibility exists that SERI could reuse or resell some portion of the Grand Gulf 1 facilities or that the site might be commercially valuable, SERI should not be permitted to collect any of the proposed $44 million for site restoration. SERI replies that nuclear facilities are generally unsuitable for reuse, that a large portion of the $44 million covers the demolition of structures damaged during decontamination of adjacent structures, and that the remaining structures will be 50 years old and thus well past their expected useful lives.

We find that the record does not support the judge's finding, and we will modify the ruling of the Initial Decision accordingly. First, we reject SERI's claim that it has adequately supported the full amount of its requested site restoration costs of $44 million. SERI's expert witness on this matter testified that he did not undertake an independent analysis as to whether the Grand Gulf site would be reused or sold; rather, Entergy management merely asked him to assume for purposes of his study that the site would have to be fully restored. (Tr. 106). This assumption is inconsistent with this same witness' testimony that not all of the site restoration costs would need to be incurred because some of the facilities could be reused.[59] Thus, the testimony of SERI's own

[59]SERI's witness testified that the Grand Gulf site will retain its value as a generation site after the existing plant is decommissioned, and that Entergy could reuse or resell the site. (Ex. SERI-76 at 19; and Tr. 105-107, 114-15). This witness also acknowledges the future value of the site because his study assumes that after the site restoration is complete the switchyard, transmission towers, water intake facilities, administration building, guard building and warehouses will remain, they will be uncontaminated, and they could be used by another power plant or by an industrial
(continued...)

witness undermines the reasonableness of SERI's estimate. Moreover, SERI's study also fails to address the subsequent questions of whether SERI will reuse the site or to what extent the costs of site restoration should be considered along with the proceeds from a sale of the site. Id. For these reasons, we reject the judge's finding that SERI's site restoration estimate is reasonable.

Although SERI has failed to adequately justify the full amount of site restoration costs it seeks, we also reject intervenors' claim that SERI is entitled to nothing for site restoration. SERI has repeatedly noted that its current rates already reflect approximately $17 million in costs for site restoration that the Commission has previously approved, which no participant disputes.[60] Here, intervenors have not demonstrated that SERI's recovery of site restoration costs should be reduced from the current level that is reflected in rates. Indeed, New Orleans' witness on this issue even admitted that while some portion of the site would need to be restored after decommissioning, he nevertheless recommended "taking out the entire $44 million [as] a reasonable and appropriate proxy . . . ." Tr. 1353. This reasoning is rejected as inconsistent. If some portion of the site needs to be restored, then SERI should be entitled to recover the costs associated with these efforts. No such showing has been made here.[61]

In summary, SERI has not demonstrated that it is entitled to recover more than its current level of its site restoration costs, and intervenors have not demonstrated that SERI

---

[59](...continued)
facility. Tr. 86-88, 112-116. See also, Ex. CNO/MAG-1 at 42-43.

[60]See SERI Initial Brief at 128; SERI Reply Brief at 66; and SERI Brief Opposing Exceptions at 43, citing Middle South Energy, Inc., 26 FERC ¶ 63,044 at 65,134 (1984), affirmed in relevant part, Opinion No. 234, 31 FERC ¶ 61,305, reh'g denied, Opinion No. 234-A, 32 FERC ¶ 61,425 (1985); aff'd, Mississippi Industries v. FERC, 808 F.2d 1525 (D.C. Cir. 1987), reh'g granted in part, 822 F.2d 1104 (D.C. Cir. 1987), cert. Denied, 425 U.S. 985 (1987), opinion on remand, System Energy Resources, Inc., Opinion No. 292, 41 FERC ¶ 61,238 (1987), order denying reh'g, Opinion No. 292-A, 42 FERC ¶ 61,091 (1988), aff'd sub nom., City of New Orleans v. FERC, 875 F.2d 903 (D.C. Cir. 1989), cert denied, 494 U.S. 1078 (1990).

[61]We also note that the Mississippi Commission, which earlier had opposed any recovery for site restoration, had a witness testify here that, SERI should not even leave behind any vacant buildings, but only rubble, at the end of the decommissioning process. Tr. 1281-82. This admission by the Mississippi Commission's witness supports SERI's claim that it will incur costs for site restoration.