IN THE UNITED STATES COURT OF FEDERAL CLAIMS
(Electronically Filed On February 19, 2008)

| | | |
|---|---|---|
| SYSTEM FUELS, INC., SYSTEM ENERGY RESOURCES, INC. and SOUTH MISSISSIPPI ELECTRIC POWER ASSOCIATION, Plaintiffs, | ) | No. 03-2624 C |
| v. | ) | (Judge Braden) |
| THE UNITED STATES, Defendant. | ) | |

**SECOND SUPPLEMENTAL DIRECT TESTIMONY OF KENNETH P. METCALFE**

1. My name is Kenneth P. Metcalfe and I am the President of The Kenrich Group LLC ("The Kenrich Group" or "Kenrich"). The Kenrich Group is a national consulting firm of accounting, financial, and engineering professionals with experience and expertise in the preparation and evaluation of economic damages claims. Kenrich's professionals have substantial experience with damages, including that obtained in working on numerous matters related to the public utility industry, nuclear power plants, and government contracting. My business address is 1200 New Hampshire Avenue, NW; Suite 410; Washington, DC 20036. My hourly rate on this matter is $250. My qualifications and background were submitted as part of my previous written direct testimony provided on September 6, 2006.

2. I am submitting this testimony in response to the Court's instructions during the hearing in this matter held on January 23, 2008 ("January

23rd Hearing"). This testimony supplements my original direct testimony which was filed on September 6, 2006, as well as my supplemental direct testimony filed on November 16, 2007. This second supplemental testimony, similar to my November 16, 2007 supplemental testimony, is limited in discussion to Plaintiffs' claim for the financing costs incurred in connection with its nominal damages.[1]

3. I believe I was asked to provide two specific calculations by the Court during the January 23rd Hearing. First, I was asked by the Court to revise the original nominal dollar damages claim I had prepared and submitted on September 6, 2006 (and presented at trial) to account for certain reductions to Plaintiffs' claimed nominal dollar damages, as delineated in the Court's October 11, 2007 Memorandum Opinion And Order ("October 11th Order").

4. Second, I was instructed to recalculate Plaintiffs' financing costs on those revised nominal dollar damages through August 31, 2005 using the same method I had originally used, that is, using the Plaintiffs' Weighted Average Cost of Capital or WACC.[2]

5. Finally, the Court also asked for "standard text" citations referring to the "Weighted Average Cost of Capital." To that end, as described below, I am providing several citations and a copy of certain relevant excerpts from the cited text books in an appendix to this testimony.

6. As to any alternative financing calculations (i.e., calculating Plaintiffs' financing costs using rates other than the Weighted Average Cost of Capital), rather than specifically request such alternatives, the Court directed me

---

[1] For the Court's convenience, copies of supporting documents referenced in this testimony are provided in the Appendix submitted herewith. Referenced documents are provided behind identified tabs. The tabs of the Appendix include work papers summarizing the revised calculations to reflect the Court's nominal dollar reductions, as well as the change in the present value date, documents previously entered into evidence as part of the Kenrich workpapers (and certain previously admitted work papers of the opposing damages expert), selected excerpts from recognized treatises that discuss the Weighted Average Cost of Capital and trial exhibits.

[2] The originally-claimed financing costs were calculated through September 11, 2006, which was the anticipated first day of trial. Trial ultimately commenced on September 18, 2006.

to discuss this issue with counsel to determine if any alternatives should be provided. I have done so and, based on the record to-date, I recommend that two alternatives be provided. The alternatives I am presenting include financing based on the "Cost of Borrowed Funds" and financing based on the "Weighted Average Cost Of Debt." These alternatives are each discussed further below.

7. As to my first instruction, in its October 11th Order, the Court identified four specific reductions to Plaintiffs' nominal dollar damages claim that I previously prepared and submitted, in the amount of $10,591,045. These four Court-ordered reductions and amounts identified in the October 11th Order include: (1) removal of internal labor in the amount of $41,819, as identified on page 40; (2) removal of the payroll loader associated with Resource Code 19 in the amount of $71,959, as identified on page 42; (3) removal of costs for capital suspense in the amount of $408,000, as identified on page 43; and (4) removal of costs associated with the dose assessment and equipment operational sequencing design in the amount of $55,108, as identified on page 49. The total of these Court-ordered reductions is $576,886, as identified on page 57.[3]

8. However, in the process of performing my revised nominal dollar damages analysis based on the Court's reductions, I identified and corrected certain relatively minor discrepancies between the amounts cited by the Court and the support provided in the record.

9. First, with respect to the payroll loader adjustment, the proper nominal dollar amount of this adjustment should be $76,561 (a difference of $4,602 in the Government's favor).[4]

[3] The Court's October 11th Order indicates that Plaintiffs' nominal damages, after these four reductions (totaling $576,886), are $10,014,114 (p. 57).

[4] The $71,959 shown at page 42 of the Court's October 11th Order appears to have inadvertently excluded $4,602, the Resource Code 19-related portion of the payroll loader associated with one of the Plaintiffs' claimed work orders, Capital Work Order N32136.

10. Second, with respect to the capital suspense adjustment, the proper nominal dollar amount of this adjustment should be $497,619 (a difference of $89,619 in the Government's favor).[5]

11. Third, with respect to the adjustment pertaining to the dose and operational sequencing assessments, the proper nominal dollar amount of this adjustment should be $55,204 (a difference of $96 in the Government's favor).[6]

12. In my revised nominal dollar damage calculations, I have accounted for (and corrected) each of these relatively minor discrepancies since they each accrue to the benefit of the Government. (The correction of these discrepancies also minimizes the complexity of the underlying analyses required to fulfill the Court's instructions and at the same time produces a more accurate damages calculation).

13. Accounting for the relatively minor discrepancies described above, the Court-ordered adjustments to Plaintiffs' nominal damages total $671,203. Accordingly, the revised nominal dollar damages are $9,919,842 (i.e., $10,591,045 of nominal dollar damages in my originally-prepared claim less the revised total reductions of $671,203).

14. As part of my testimony, I prepared a work paper schedule titled "Summary Of Claim As Of August 31, 2005 After Court-Ordered Reductions (In Nominal Dollars)" which is provided at Appendix Tab 1.

15. Referring to the work paper schedule at Appendix Tab 1 ("Summary Of Claim As Of August 31, 2005 After Court-Ordered Reductions (In Nominal Dollars)"), the first column (column "A") summarizes the Plaintiffs'

---

[5] The $408,000 shown at page 43 of the Court's October 11th Order appears to be a typographical or transcription error. The intended amount should have been $498,000 (consistent with exhibit PX403, which was cited by the Court and is provided at Appendix Tab 19). To facilitate my analysis, however, I used the more precise amount from my underlying work papers of $497,619.

[6] The $55,108 shown at page 49 of the Court's October 11th Order accounts reflects a minor rounding adjustment. However, to facilitate my analysis, I used the more precise amount of $55,204.

annual and total claimed nominal damages of $10,591,045 as presented at trial (and in my original direct testimony dated September 6, 2006). The next four columns (columns "B" through "E") contain the annual and total nominal dollar adjustments identified by the Court in its October 11th Order (after correcting for the relatively minor discrepancies described above). The sixth column (column "F") totals the four Court-ordered adjustments. The seventh and final column (column "G") summarizes Plaintiffs' annual and total adjusted nominal revised damages of $9,919,842, after accounting for all of the Court-ordered reductions.

16. In order to properly account for the financing costs associated with the Plaintiffs' adjusted nominal damages, it is necessary to account for each of the four Court-ordered adjustments in each of the years that the underlying costs were incurred.

17. I summarize the originally submitted nominal dollar claim amounts by year at Appendix Tab 5.[7] I summarize the nominal dollar amounts for each of the four Court-ordered adjustments by year at Appendix Tabs 6 (internal labor), 7 (payroll loader), 8 (capital suspense), and 9 (equipment operational sequence design and dose assessment).

18. After incorporating all of the Court-ordered adjustments and revising the Plaintiffs' nominal dollar damages claim accordingly, the Court's next instruction required me to recalculate the Plaintiffs' total damages, including the relevant economic financing costs through the cut-off date of August 31, 2005.

19. As part of my testimony, I also prepared the following three schedules to facilitate the presentation and explanation of the underlying analyses

---

[7] The amounts shown at Tab 5 are the nominal dollar damages as originally claimed (i.e., unadjusted for the Court's reductions) and are referenced from my originally-filed schedules A3 through A8 (KRG-GG004172 – KRG-GG004177).

pertaining to financing costs. These three schedules are also provided in the Appendix included with this testimony.

- "Summary Of Total Damages After Court-Ordered Reductions – In Nominal And Present Value Dollars, Based On The 'Weighted Average Cost Of Capital', As Of August 31, 2005" (Appendix Tab 2);
- "Summary Of Total Damages After Court-Ordered Reductions – In Nominal And Present Value Dollars, Based On The 'Cost Of Borrowed Funds', As Of August 31, 2005" (Appendix Tab 3); and
- "Summary Of Total Damages After Court-Ordered Reductions – In Nominal And Present Value Dollars, Based On The 'Weighted Average Cost Of Debt', As Of August 31, 2005" (Appendix Tab 4).

20. Referring to the schedule at Appendix Tab 2 ("Summary Of Total Damages After Court-Ordered Reductions – In Nominal And Present Value Dollars, Based On The 'Weighted Average Cost Of Capital', As Of August 31, 2005"), the first column contains Plaintiffs' annual and total adjusted nominal damages, as calculated in the work paper schedule at Appendix Tab 1. The second column presents the multiplier ("Cost Of Capital Factor")[8] used to calculate the costs incurred by the plaintiffs to finance each year's nominal dollar expenditures up until August 31, 2005, using the economically proper Weighted Average Cost of Capital. The third and final column simply restates Plaintiffs' annual and total damages, including financing costs (i.e., nominal dollar damages multiplied by the "Cost Of Capital Factor"). Thus, incorporating all of the Court-

[8] In the Kenrich work papers, this "Cost Of Capital Factor" is also referred to as the "Cost Of Capital Multiplier" or the "NPV [Net Present Value] Multiplier". For the purpose of the damage calculations, these terms are synonymous and represent the factor or multiplier used to calculate the cost of capital on plaintiffs' nominal damages, as explained herein.

ordered adjustments, Plaintiffs' revised total damages are $10,501,916,[9] including $582,074 in revised financing costs ($10,501,916 minus $9,919,842 of total revised nominal damages), based on using the Weighted Average Cost of Capital. Again, I believe that these financing costs are required to make the Plaintiffs reasonably whole economically, through August 31, 2005, and have been incurred by Plaintiffs in connection with their having to fund the nominal dollar damages from the time those damages were incurred through August 31, 2005.

21. Referring to the schedule at Appendix Tab 3 ("Summary Of Total Damages After Court-Ordered Reductions – In Nominal And Present Value Dollars, Based On The 'Cost Of Borrowed Funds', As Of August 31, 2005"), the same three columns as described above for Appendix Tab 2 are shown. However, as an alternative to applying the Weighted Average Cost of Capital, at Tab 3 the Cost Of Capital Factors are determined based on the Plaintiffs' "Cost Of Borrowed Funds."

22. As discussed at the January 23rd Hearing, the Cost Of Borrowed Funds was prepared at the direction of and reported to the Federal Energy Regulatory Commission ("FERC"). As also discussed at the January 23rd Hearing, this rate excludes all equity capital. However, its application as a cost of capital factor, because of its FERC-mandated derivation, inherently assumes that only a portion of the Plaintiffs' nominal damages were funded by debt—that portion being essentially equal to the ratio of the Plaintiffs' total debt to its total capital (debt and equity) in each year. Applying this alternative financing cost calculation method, Plaintiffs' total damages are $10,100,652, including $180,810 in financing costs ($10,100,652 minus $9,919,842 of total revised nominal dollar damages).

[9] This amount corresponds to the $12,178,000 present value dollars as of September 11, 2006, as originally submitted as damages -- see Schedule A2 (KRG-GG004171) at Appendix Tab 20 (i.e., before the Court-ordered reductions to nominal damages and use of August 31, 2005 as the cutoff date for the weighted average cost of capital calculation.)

23. As I have testified in this case and other spent nuclear fuel cases, I believe that using the utility's Weighted Average Cost of Capital comes closest to making the utility reasonably whole for the nominal damages it has been forced by the breach to incur. However, as I have also testified, there are other potential alternatives for calculating financing costs related to the nominal dollar damages incurred by the utilities to mitigate the impacts of the DOE's breach.

24. To that end, I have also provided the workpapers which support the calculations of the relevant financing costs for Plaintiffs' using the "Cost Of Borrowed Funds", as cited by the Court in its October 11th Order (pages 52 through 56) and discussed above. These work papers are provided at Appendix Tab 11.

25. However, as discussed at the January 23rd Hearing and in my testimony above, by applying the "Cost Of Borrowed Funds", an inherent assumption is made that only a portion of the nominal damages are allowed to recover financing costs (i.e., that portion being equal to the ratio of Plaintiffs' debt to their total capital structure). For example, for the year 2000, System Energy's debt made up 43.86 percent of its total capital (see Schedule N-198 (KRG-GG003271) at Appendix Tab 15). Therefore the full cost rate of System Energy's weighted average long-term debt, as reported to FERC (7.54 percent, as identified in column "(d)"), is significantly reduced since it is multiplied by that ratio of debt to total capital of 43.86 percent to yield a cost rate for "Borrowed Funds" of 3.31 percent.[10]

26. Accordingly, I believe that a more appropriate and reasonable alternative that would still exclude the impact of all of the Plaintiffs' equity capital would be to assume that *all* of Plaintiffs' nominal damages (rather than

[10] As I indicated in my prior supplemental testimony and at the January 23rd hearing, the FERC Form 1 data is required by FERC to be based upon prior year-end cost of capital rates. In this example, the year 2000 cost of debt rates noted, as well as the percentage of debt relative to total capital, are in fact based upon the year-end cost of debt rates and capitalization ratio for the year 1999. For comparison purposes, see Kenrich Schedule A36 (KRG-GG004216) at Appendix Tab 13.

just a portion, as occurs using the "Cost Of Borrowed Funds") were financed by the debt (i.e., applying Plaintiffs' *full* "Weighted Average Cost Of Debt" rate *and excluding any of Plaintiffs' equity financing)*. So in the example for 2000 cited above, instead of using the cost rate for "Borrowed Funds" of 3.31 percent for that year, the calculation would use the weighted average rate for the full cost of debt, as reported to FERC, of 7.54 percent.

27. Referring to the schedule at Appendix Tab 4 ("Summary Of Total Damages After Court-Ordered Reductions – In Nominal And Present Value Dollars, Based On The 'Weighted Average Cost Of Debt', As Of August 31, 2005"), the same three columns as described above are again shown. For this alternative damages calculation, the Cost Of Capital Factors again reflect only the Plaintiffs' weighted average cost of their debt capital. However, the total damages, including financing costs, presented in the third column are in this alternative calculated based on the assumption that 100 percent of the Plaintiffs' nominal damages are funded with their debt capital only (i.e., again, no equity). Under this alternative approach, Plaintiffs' total damages are $10,371,933, including $452,091 in financing costs ($10,371,933 minus $9,919,842 of total revised nominal dollar damages).

28. The calculations and underlying support for the "Cost Of Borrowed Funds" and the "Weighted Average Cost Of Debt" Cost Of Capital Factors I use for purposes of the alternative damages calculations discussed above, and presented at Appendix Tabs 3 and 4, are provided at Appendix Tabs 11 and 12, respectively.

29. Finally, as mentioned above, the Court asked for cites to treatise material or other authoritative literature which references the Weighted Average Cost Of Capital. In response to this request, I am providing selected pages from the following three relevant text books at Appendix Tabs 16, 17, and 18: (1) *Accounting: A Management Approach*, 6th Edition by Gordon Shillinglaw, Myron

J. Gordon and Joshua Ronen, 1979; (2) *Montgomery's Auditing*, 11th Edition by Vincent M. O'Reilly, CPA, Murray B. Hirsch, CPA, Philip L. Defliese, CPA and Henry R. Jaenicke, Ph.D., CPA 1990; and (3) *Finance* by Ronald W. Melicher and Edgar A. Norton with Laura Town, 2007.[11] For the Court's convenience, I have underscored what I believe to be the most relevant sections of these cites.

30. Should the Court request, I can readily adjust the Kenrich Group damages model to account for any further changes desired by the Court. Also, I am available to answer any questions posed by the Court or the Government, as needed.

[signature] 2/19/08

Kenneth P. Metcalfe Date

[11] In addition to those materials I am providing in the Appendix, the Court may also be interested in other relevant publications, including the following: *Regulating Power: The Economics of Electricity in the Information Age* by Carl Pechman, 1993; *Public Utility Economics and Finance* by Keith M. Howe and Eugene F. Rasmussen, 1982; *Valuing a Business The Analysis and Appraisal Of Closely Held Companies*, 4th Edition by Shannon P. Pratt, Robert F. Reilly and Robert P. Schweihs, 2000; *Handbook Of The Economics Of Finance* Edited by George M. Constantinides, Milton Harris, and Rene M. Stulz, 2003; *America's Electric Utilities: Past, Present and Future*, 5th Edition by Leonard S. Hyman, 1994; *The Cost of Capital; Estimating the Rate of Return for Public Utilities* by A. Lawrence Kolbe and James A. Read, Jr. with George R. Hall, 1984; *The Search for Value Measuring the Company's Cost of Capital* by Michael C. Ehrhardt, 1994; United States Of America Federal Power Commission Docket No. RM75-27, Order No. 561 Issued February 2, 1977; and *2004 State Of The Markets Report* by the Office of Market Oversight and Investigations, Federal Energy Regulatory Commission, 2005.