# In the United States Court of Federal Claims

No. 03-2624C
Filed: March 11, 2010[*]
**TO BE PUBLISHED**

| | | |
|---|---|---|
| SYSTEM FUELS, INC., on its own behalf and as an agent for SYSTEM ENERGY RESOURCES, INC. and SOUTH MISSISSIPPI ELECTRIC POWER ASSOCIATION,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | * | Causation;<br>Cost of Borrowed Funds;<br>Nuclear Waste Policy Act, 42 U.S.C. §§ 10101, *et. seq.*;<br>Prejudgment Interest;<br>RESTATEMENT (SECOND) OF CONTRACTS §§ 344, 347, 350.<br>Spent Nuclear Fuel Case;<br>Tucker Act, 28 U.S.C. § 1491(a)(1);<br>28 U.S.C. § 2516(a), (The "No Interest Rule");<br>Fed. Cir. R. 35(a);<br>Fed. R. Evid. 702, 703 (Experts);<br>Fed. R. Evid. 802, 807 (Hearsay);<br>18 C.F.R. Part 101 (Allowance For Funds Used During Construction). |

**Alex D. Tomaszczuk, Jay E. Silberg, Daniel S. Herzfeld**, **Jack Y. Chu** and **Evan D. Wesser**, Pillsbury Winthrop Shaw Pittman, L.L.P., Washington, D.C.; and **L. Jager Smith, Jr.**, Wise Carter Child & Caraway, P.A., Counsel for Plaintiffs.

**Sharon A. Snyder, Harold D. Lester, Jr., Alan J. Lo Re, Scott R. Damelin, Joshua E. Gardner,** and **Stephen P. Finn**, United States Department of Justice, Civil Division, Commercial Litigation Branch, Counsel for Defendant.

## MEMORANDUM OPINION ON RECONSIDERATION AND FINAL ORDER

**BRADEN**, ***Judge***.

---

[*] On February 26, 2010, a pre-publication draft of this Memorandum Opinion On Reconsideration was provided under seal to afford the parties an opportunity to propose redactions of any information they deemed to be confidential. On March 5, 2010, counsel for both parties advised the court that no redactions were requested. The court's analysis herein, however, also reflects two substantive developments that occurred between circulation on February 26, 2010 and issuance on this date, neither of which concern confidential information.

On August 7, 2008, the United States Court of Appeals for the Federal Circuit issued three decisions to correct the causation analysis employed by the United States Court of Federal Claims in: *Yankee Atomic Elec. Co.* v. *United States*, 536 F.3d 1268 (Fed. Cir. 2008) ("*Yankee Atomic II*"); *Pacific Gas and Elec. Co.* v. *United States,* 536 F.3d 1282 (Fed. Cir. 2008) ("*Pac. Gas & Elec.*"); and *Sacramento Mun. Util. Dist.* v. *United States*, 293 Fed. Appx. 766 (Fed. Cir. 2008) ("*SMUD IV*").

In light of these decisions, reconsideration of *System Fuels, Inc.* v. *United States*, 78 Fed. Cl. 769 (2007) ("*System Fuels II*"), is required because the court therein held that a specific acceptance rate for spent nuclear fuel ("SNF") was not required to determine causation. *Id.* at 794. Accordingly, this Memorandum Opinion and Final Order revisits the court's prior causation analysis and determines a revised amount of nominal damages to which System Fuels, Inc. ("SFI" or "Plaintiffs") is entitled. Next, the court discusses the evidence adduced, arguments advanced, and governing precedent regarding SFI's damages claim for the cost of borrowed funds as mitigation damages.

## I. THE COURT'S RECONSIDERATION REGARDING CAUSATION.

### A. Background And Relevant Procedural History.

On July 29, 2005, the United States Court of Federal Claims issued a Memorandum Opinion and Order holding that, as of January 31, 1998, the Department of Energy ("DOE") was liable for a partial breach of a June 14, 1983 Standard Contract ("Standard Contract") with SFI. *See System Fuels, Inc.* v. *United States*, 66 Fed. Cl. 722, 735 (2005). On September 9, 2005, the United States Court of Appeals for the Federal Circuit held, in *Ind. Mich. Power Co.* v. *United States*, 422 F.3d 1369 (Fed. Cir. 2005) ("*Indiana Michigan II*"), that utility-parties seeking damages for partial breach of the June 14, 1983 Standard Contract can establish their claim only if:

> (1) the damages were *reasonably foreseeable* by the breaching party at the time of *contracting*; (2) the breach is a *substantial causal factor* in the damages; *and* (3) the damages are shown with *reasonable certainty*.

*Id*. at 1373 (emphasis added) (citing *Energy Capital Corp.* v. *United States*, 302 F.3d 1314, 1320 (Fed. Cir. 2002)).

On October 11, 2007, following an eight-day evidentiary hearing, briefing, and supplemental argument, the court issued a Memorandum Opinion and Order holding that SFI established, by clear and convincing evidence, that a "substantial portion" of the $10,591,000 costs [SFI] incurred [from January 15, 1998 to August 31, 2005] should be awarded as mitigation damages. *See System Fuels II*, 78 Fed. Cl. at 809. The court also discussed the reasons why SFI may be entitled to recover the cost of borrowed funds, but requested further clarification as to how the cost of borrowed funds that SFI incurred satisfied the requirement of reasonable certainty. *Id*. A separate proceeding to address this issue followed. In the interim, the appellate court's August 7, 2008 decisions issued. In response, the court stayed further proceedings in this case. Order, *System Fuels, Inc.* v. *United States,* No. 03-2624

(Aug. 25, 2008). On January 23, 2009, SFI advised the court of its intent to file a motion for partial reconsideration of *System Fuels II*.

On March 10, 2009, SFI filed a Motion For Partial Reconsideration of *System Fuels II* ("Pl. Recon. Mot."), because of an "intervening change in controlling law." Pl. Recon. Mot. at 1. In support, SFI proffered a Supplemental Report Regarding Spent Nuclear Fuel Allocation Rights For Grand Gulf Nuclear Power Station Using The 1987 Annual Capacity Report Rate ("ACR"), prepared by Ms. Eileen M. Supko, Energy Resources International, Inc. ("PX 801") and the Third Supplemental Direct Testimony of Kenneth P. Metcalfe ("PX 803"). On March 27, 2009, the Government filed a Response ("Gov't Recon. Resp."). On April 3, 2009, Plaintiffs filed a Reply ("Pl. Recon. Reply").

On July 17, 2009, the parties entered into the following Joint Stipulations of Fact:

1. The original nominal damages claimed by Plaintiffs, System Fuels, Inc., System Energy Resources, Inc., and South Mississippi Electric Power Association ("SFI" or "Plaintiffs"), in this matter, through August 31, 2005, total $10,591,000.

2. The Court ordered deductions of $576,886 in its Memorandum Opinion and Order, dated October 11, 2007.

3. In his Second Supplemental Direct Testimony, Kenneth Metcalfe, Plaintiffs' damages expert, identified minor discrepancies, in the amount of $94,317, to be deducted from the nominal damages.

4. The total nominal damages, after the downward adjustments identified in ¶¶ 2 and 3 above, total $9,919,842.

5. In this action, Plaintiffs seek, among other things, cell recovery costs of $184,208.

6. The Government does not contest that the sum of $184,208 represents the estimated cell recovery costs but does challenge whether Plaintiffs are entitled to any monies for cell recovery efforts in this action.

7/17/09 Jt. Stip. at 1-2.

On July 20, 2009, the court convened a one-day evidentiary hearing to afford the parties an opportunity to proffer additional evidence and provide argument regarding causation, applying the 1987 Annual Capacity Report Rate as required by the United States Court of Appeals for the Federal Circuit's decision in *Pacific Gas & Elec*.

On September 16, 2009, the Government filed a Post Hearing Response to Plaintiffs' March 10, 2009 Motion For Partial Reconsideration ("Gov't PH Br."). On that date, Plaintiffs also filed a Final Post Hearing Brief and Renewed Request For Entry of Judgment ("Pl. PH Brief").

**B. The Parties' Arguments.**

**1. Plaintiffs' March 10, 2009 Argument.**

Based on Ms. Supko's calculations, SFI argued that if DOE commenced performance on January 31, 1998, DOE still would not have accepted SNF from Grand Gulf until 2006. *See* Pl. Recon. Mot. at 5-6. Ms. Supko's conclusion is captured in the following table.

Projected Grand Gulf Spent Nuclear Fuel Acceptance Rights Through 2006 1998 Acceptance Under the 1987 ACR Overall Acceptance Rate

| Year | 1987 ACR Overall Acceptance Rate (MTU/Year) | Grand Gulf Spent Fuel Acceptance Rights | |
|---|---|---|---|
| | | Assemblies | MTU |
| 1998 | 1,200 | | |
| 1999 | 1,200 | | |
| 2000 | 1,200 | | |
| 2001 | 1,200 | | |
| 2002 | 1,200 | | |
| 2003 | 2,000 | | |
| 2004 | 2,650 | | |
| 2005 | 2,650 | | |
| 2006 | 2,650 | 552 | 101.46 |
| Total | | 552 | 101.46 |

PX 801 at 1.

Relying on Ms. Supko's Supplemental Report that January 1, 2006 was the earliest date when DOE would have commenced performance at Grand Gulf, Mr. Metcalfe testified that in the non-breach world SFI "would have had sufficient space in [the wet] pool to accommodate spent fuel discharges through 2006,"[1] but "would utilize some of the space in the spent fuel pool otherwise maintained to offload the core if necessary ('full core reserve') for a period of one year in 2005." PX 803 ¶ 10 at 4. In other words, if DOE had performed in 2006, SFI "would not have incurred the costs to undertake the cell recovery effort (*i.e.*, it would have operated for one year – 2005 – without full core offload capability)." *Id.* ¶ 12 at 5.

In the actual breach world, however, SFI "recovered" 180 additional cells in the wet pool before 2005, to avoid "significant capital costs." *Id.* ¶ 11 at 4. The recovery of these 180 cells before 2005 would have allowed "Grand Gulf to avoid ever losing full core reserve in the so-called non-breach world." *Id.* ¶ 12 at 4-5. Nevertheless, Mr. Metcalfe concluded that there was no change from the damages calculated in his Second Supplemental Direct

[1] Utilizing a 2,650 MTU 1987 ACR, instead of a 3,000 MTU rate SFI initially proposed, results only in a one-year delay in DOE's scheduled performance at Grand Gulf than from what SFI initially argued. Pl. Recon. Mot. at 6.

Testimony. *Id*. ¶ 13 at 5.[2] In the event that the court now determines that SFI would have performed the cell recovery project even if DOE accepted SNF at Grand Gulf in 2006, the appropriate "related" costs that should be deducted from SFI's claim are $184,208. *Id*. (citing PX-3-E, Tables 15, 17, 36).

On reconsideration, SFI also advised the court that three adjustments should be made to the prior costs claimed. Pl. Recon. Mot. at 8 (citing 2/19/08 Metcalfe Sec. Supp. Direct ("PX 802") ¶ 7 at 3). First, the court previously offset SFI's "payroll loader" by $71,959. *See System Fuels II*, 78 Fed. Cl. at 799. With the benefit of additional analysis, SFI has ascertained that the correct amount should be $76,561. *See* PX 802 ¶ 9 at 3. Likewise, the court previously offset SFI's claim for costs incurred for a "capital suspense" loader by $408,000. *See System Fuels II*, 78 Fed. Cl. at 800. With the benefit of additional analysis, SFI ascertained that the correct amount should be $497,619. *See* PX 802 ¶ 10 at 4. In addition, the court previously directed SFI to offset $55,108 for "equipment purchased, sequence design, and dose assessment." *System Fuels II*, 78 Fed. Cl. at 804. With the benefit of additional analysis, SFI ascertained that the correct amount for this adjustment should have been $55,204. *See* PX 802 ¶ 11 at 4.

Taking all of the aforementioned corrections into account, the total offsets are $671,203, instead of the $576,866. Accordingly, SFI now claims entitlement to "nominal" damages of $9,919,842. Pl. Recon. Mot. at 9.

**2. The Government's March 27, 2009 Response.**

The Government responds that the court should deny SFI's March 10, 2009 Motion For Partial Reconsideration, as "an improper attempt to reopen the record" or that "entry of a judgment in [P]laintiff's favor is premature as additional discovery will be necessary to determine the merits, if any, of [P]laintiff's motions." Gov't Recon. Resp. at 1; *see also id*. at 1-2. Assuming *arguendo* that the court is required to reopen the record in light of *Pacific Gas & Elec.*, the court "should decline" to admit Ms. Supko's Supplemental Report and Mr. Metcalfe's Third Supplemental Direct Testimony as inadmissible hearsay. *Id*. at 4-5 (citing Fed. R. Evid. 802 and 807). In the alternative, if the court determines that the appellate court's decisions require the court to reopen the record, the Government should be afforded an opportunity to "inquire about [SFI's experts'] opinions . . . and be given the opportunity to present . . . additional testimony." *Id*. at 5.

**3. Plaintiffs' April 3, 2009 Reply.**

SFI replies that the appellate court's August 7, 2008 decisions do not preclude the court from reopening the record to apply the 1987 ACR rate in determining causation. Pl. Recon. Reply at 2-4. Moreover, the Supplemental Report of Ms. Supko and the Supplemental

[2] SFI further argues that if it "wanted or needed to offload the core in 2005" that recovery work would have been undertaken then or other work undertaken "to maintain plant operations." Pl. Recon. Mot. at 7.

Direct Testimony of Mr. Metcalfe are not hearsay, but expert testimony admissible under Fed. R. Evid. 702 and 703. *Id*. at 4-5.

In any event, SFI does not object to the Government taking additional expert depositions, but opposes any broader discovery. *Id.* at 5-6. Specifically, SFI objects to the extent the Government intends to pursue discovery regarding potential Greater Than Class C Radioactive Waste ("GTCC"), because no damages are sought for GTCC waste in this proceeding. *Id*. at 5-6 n.1.

* * *

After the Government had the opportunity to conduct additional depositions of SFI's experts, on July 20, 2009, the court held a second evidentiary hearing regarding causation. *See* 7/20/09 TR 1-255. On September 16, 2009, the Government provided the court with a Post Reconsideration Hearing Brief ("Gov't PH Br."). On that same date, SFI also filed a Post Reconsideration Hearing Brief ("Pl. PH Br.").

**4. The Government's September 16, 2009 Post Reconsideration Hearing Argument.**

The Government's first argument was no more than a refrain of a prior argument, *i.e.*, that SFI did not "establish by a preponderance of evidence that [DOE's] failure to perform caused [Plaintiffs] to incur the costs that it seeks, and, further that those costs were foreseeable and calculated to a reasonable certainty." Gov't PH Br. at 8-17.

The Government's second argument was new, *i.e.*, because Ms. Supko's model for fuel acceptance under the 1987 ACR did not account for the acceptance of GTCC waste, SFI failed to provide the court with an accurate racking date, since "[i]f there were large quantities of GTCC generated and input into the queue early on, then the GTCC could have a ripple effect on SFI's allocations." *Id*. at 13.

Third, under the 1987 ACR rate, SFI still would have undertaken the "cell recovery effort" at Grand Gulf. *Id*. In the 2006 trial, Mr. John McGaha, President of Entergy Operations, testified that all Entergy plants maintained full core reserve storage as a matter of operational philosophy and for risk management. *Id*. (citing 9/18/06 TR 133-34 (McGaha)). Likewise, Mr. Charles Franklin, Entergy's Manager of Project Management, testified that Grand Gulf had to complete loading casks by 2007 to avoid losing full core reserves that would have shut down the facility at a loss of billions of dollars. *Id*. at 14 (citing 9/18/06 TR 242, 253 (Franklin); 9/19/06 TR 474 (Franklin)). Therefore, the record establishes that SFI would have lost full core reserve capacity in 2005, even without any expansion of the SNF storage capacity at Grand Gulf. *Id*. at 15 (citing 9/18/06 TR 255-260 (Franklin); 9/19/06 TR 474 (Franklin); PX 226 at 15 (SSM0093253)). So, to preserve full core reserves until the dry fuel storage project was ready to load casks, SFI implemented a cell recovery program to make previously unusable or inaccessible cells in the SNF pool available for storage. *Id*.

(citing 9/18/06 TR 257-59 (Franklin)).[3] Accordingly, in the "non-breach world," SFI would have engaged in the cell recovery project to maintain full core reserve, because if DOE had commenced performance in 2006, DOE would have accepted only 552 assemblies or 101.46 MTUs in 2006. *Id*. at 16 (citing PX 801 at 1). As a result, SFI would have needed 160 cells to maintain full reserve capacity, despite Mr. Metcalfe's assumption that SFI would have assumed the risk of losing full core reserve for up to 13 months. *Id*. at 16. Therefore, SFI is not entitled to include the $184,208 for the cell recovery effort as damages, because this effort was required to maintain full core reserve capacity, until SFI completed the dry fuel storage project and loaded the first four casks in November and December 2006. *Id.* (citing 9/18/06 TR 259 (Franklin); 9/19/06 TR 604 (Warren); 1/18/07 TR 2692 (Withrow)).

#### 5. Plaintiffs' September 16, 2009 Post Reconsideration Hearing Argument.

SFI made two post reconsideration hearing arguments. First, using the acceptance rate from the 1987 ACR has no effect on the damages the court previously awarded, since DOE would have commenced performance at Grand Gulf only one year later. *See* Pl. PH Br. at 6. Therefore, after conferring with Grand Gulf personnel, Mr. Metcalfe concluded that "Grand Gulf [still] would utilize some of the space in the spent fuel pool otherwise maintained to offload the core if necessary ('full core reserve') for a period of one year in 2005" and that use of the 1987 ACR acceptance rate would have no effect on Plaintiffs' damages. *Id.* at 7 (citing PX 801 ¶ 10 at 1). Second, the court should ignore the Government's new argument concerning GTCC, because it is not relevant. *Id.* at 8. In this case, SFI does not seek damages for GTCC waste. *Id*. Moreover, DOE's documents establish that 2008 was the earliest date that DOE could pick-up GTCC. *Id.* at 8-9.

### C. The Court's Determination Regarding Causation.

In *Yankee Atomic II*, the United States Court of Appeals for the Federal Circuit re-affirmed the *Indiana Michigan II* test that a plaintiff "can only sustain [a] damages claim if: (1) the damages were reasonably foreseeable by the breaching party at the time of contracting; (2) the breach is a substantial causal factor in the damages; and (3) the damages are shown with reasonable certainty." 536 F.3d at 1273.

As to the first causation requirement, the United States Court of Appeals for the Federal Circuit has held that "the law does not require that the specific method of mitigation be foreseeable. Rather, the foreseeablility prong applies to the *type of loss*, not to the means of mitigation." *SMUD IV*, 293 Fed. Appx. at 771 (emphasis added). Accordingly, the appellate court implicitly ruled that it was reasonably foreseeable to DOE that on June 14, 1983, when the Standard Contract was executed with the utility-parties, removal and storage costs could be incurred, if DOE subsequently was in breach. *Id*. Since SFI did not claim the cost of dual-purpose storage, unlike the situation in *SMUD IV*, the court determined that the

[3] Approximately 160 cells were recovered in the Grand Gulf SNF pool and 20 other cells were recovered in the upper containment pool. *See* Gov't PH Br. at 15 (citing 9/18/06 TR 259 (Franklin); 9/19/06 TR 604 (Warren)).

reasonable foreseeability element was satisfied, because: "On June 14, 1983, when DOE executed the Standard Contract with [SFI], it was a matter of public record that nuclear utilities in the United States had growing SNF and HLW inventory. In addition, by that time, dry storage was considered a viable alternative to wet storage." *Systems Fuels II*, 78 Fed. Cl. at 790 at nn.19-20 (discussing the contemporaneous public record in detail).

As to the substantial causal factor requirement, the court previously discussed how SFI came to incur the costs for dry fuel storage at Grand Gulf. *System Fuels II*, 78 Fed. Cl. at 779-85. In brief review, in September 1995, all affected utility-parties were advised that DOE would not commence performance until 2010. *Id.* at 794 (citing PX 264 at HQR-025-5089-90 (Sept. 1995 DOE "Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program")); *see also* PX 13-I at KRG-GG000645-46 (Dec. 1998 DOE "Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program"). As a result, SFI engaged in an effort to research, analyze, and weigh all viable options to address SNF and HLW disposal, culminating in the 1999 Enercon Report that concluded increasing the number of storage locations in the wet pool and the trans-shipment of fuel were not long term storage options, because those options would only increase the number of storage locations in the spent fuel pool and "extend operation of the plant for approximately two fuel cycles[.]" PX 14-C-1 at KRG-GG004745.

During the next two years, DOE announced no changes to the estimated date of performance. *See* PX 13-J at KRG-GG000738-39 (May 2001 DOE "Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program"). And, as the court previously found:

> By October 2003, Entergy requested a "Spent Fuel Management Plan" that "provide[d] a snapshot to senior management of [] the spent fuel management program at Entergy, where it was at the current time and where it was headed for the future." TR 234 (Franklin). The 2003 Franklin-Rives Plan concluded that, given Grand Gulf's spent fuel discharge projections and the assumption that DOE would not commence performance until 2015 and would not accept fuel from Grand Gulf until 2022, Entergy needed to construct a dry storage facility to maintain full core reserve in the spent fuel pool. *See* PX 226 at SSM0093249; *see also* TR 252-54 (Franklin). Therefore, the necessity to proceed with dry fuel storage at Grand Gulf . . . was caused by both the partial breach and DOE's inability to guarantee the commencement of performance by 2005, when the spent fuel pool would reach capacity. *See* PX 226 at SSM0093253; *see also* TR 255-60, 474 (Franklin).
>
> * * *
>
> Of course, as the Government argues, the Standard Contract provided that the utilities could exchange delivery commitments among themselves. *See* PX 188 at COF0281618-19 (reflecting that the utilities had the right to adjust the quantities of spent fuel up or down by up to twenty percent); *see also* PX 411 ¶ 40. In addition, the Government suggests that it is reasonable to assume that, in a non-breach world, utilities early in the spent fuel acceptance queue may

> have sold or traded those rights with utilities that would not have their fuel picked up until a later date. *See* PX 188 at COF0281618-19; *see also* TR 1419 (Supko). Therefore, the Government reasons that utilities owning several nuclear power stations like Entergy, could have eliminated or at the least minimized the number of stations that had to build dry fuel storage facilities. *See* PX 226 at SSM0093240; *see also* TR 1418-29 (Supko). How Entergy may have managed spent fuel storage in a non-breach world, however, is speculative, and the court declines to hold that [SFI is] not entitled to damages simply, because [SFI] did not engage in negotiating with other utilities when that exercise may have been unproductive in the non-breach world. *See* PX 411 ¶ 43; *see also* TR 1418-29, 1444-48 (Supko); *Sacramento Mun*., 70 Fed. Cl. at 343 (in fact, other utilities were competing to advance the queue).
>
> For these reasons, the court has determined that the record contains clear and convincing evidence that certain costs incurred by [SFI] to plan, design, license, and construct the dry storage project at Grand Gulf were "substantially caused" by DOE's partial breach of the Standard Contract.

*System Fuels II*, 78 Fed. Cl. at 794-95.

But, as the Government correctly argues on reconsideration, SFI officials testified at the 2006 evidentiary hearing that maintaining full core reserve was an essential element of the operational and risk management philosophy at Grand Gulf. *See* 9/18/06 TR 133:9-134:4 (McGaha) ("[W]e will always maintain full core reserve storage capacity."); *see also* 9/18/06 TR 224:18-226-6 (Franklin) (testifying that maintaining full core reserve was "operational philosophy"). Therefore, SFI would not have abandoned the policy to maintain full core reserve capability in 2005, without an effort to expand SNF storage capacity. *See* 9/18/06 TR 255-60 (Franklin); 9/19/06 TR 474 (Franklin); PX 226 at 15 (SSM0093253).

At the July 20, 2009 evidentiary hearing, SFI presented no evidence to contradict this earlier testimony. Instead, Mr. Metcalfe testified that, based on conversations he had with Grand Gulf employees, SFI would not have engaged in cell recovery, if SFI expected DOE acceptance to begin in 2006. 7/20/09 TR 146-50 (Metcalfe). Moreover, Mr. Metcalfe testified that, Grand Gulf personnel told him they would have taken the risk of losing full core reserve for a 13-14 month period between 2005 and 2006 until DOE began accepting SNF. *Id*. Aside from Mr. Metcalfe's reliance on rank hearsay, as he admitted, Mr. Metcalfe is a CPA, not a nuclear engineer and is not qualified to testify about nuclear power plant operations. 7/20/09 TR 114, 215-16 (Metcalfe). No other evidence was proffered to explain how SFI would have handled cell recovery in the non-breach world. 7/20/09 TR 210 (Metcalfe). Therefore, in the absence of admissible evidence that SFI would not have engaged in the cell recovery effort in the non-breach world, the court has determined that SFI failed to satisfy the burden of proof as to these damages. For these reasons, SFI's damages must be reduced by the savings achieved by the cell recovery effort, *i.e.*, $184,208.

The Government's other challenge on reconsideration is that the 1987 acceptance rate fails to account for the effects of DOE's concurrent acceptance of GTCC across the industry on the overall SNF acceptance rate. Gov't PH Br. at 10. In short, in the non-breach world,

"[i]f there were large quantities of GTCC generated and input into the queue early on, then the GTCC could have a ripple effect on SFI's allocations," pushing acceptance rates out further into the future. *Id.* at 13. To date, however, SFI has not claimed any damages regarding GTCC waste. Pl. Recon. Reply at 5-6 n.1. Accordingly, the court will account for the costs of GTCC disposal if, and when, they are appropriately at issue, as our appellate court has suggested. *See Yankee Atomic II*, 536 F.3d at 1279 ("The proper valuation of GTCC disposal remains open for adjudication in further proceedings once the costs of this operation are fully realized and understood.").

The court also has determined that SFI established with reasonable certainty that the following costs were incurred to mitigate DOE's January 31, 1998 partial breach of the Standard Contract.

| | CAPITAL WORK ORDERS | COSTS INCURRED |
|---|---|---|
| N31937: | Spent Nuclear Studies | $ 341,000 |
| N32172: | ISFI Design & Construction | $ 8,367,000 |
| N32350: | Cast Fabrication Facility | $ 465,000 |
| N32302: | Dry Fuel Equipment Storage Building | $ 798,000 |
| N32350: | ISFI Electrical & Security Systems | $ 31,000 |
| N32136: | Auxiliary Building Door Modifications | $ 589,000 |
| | **TOTAL COSTS INCURRED** | $ 10,591,000 |

PX 410 ¶ 49; *see also* 9/22/06 TR 1661 (Metcalfe).

From the $10,591,000 costs incurred, the court has made the following offsets, previously discussed in *System Fuels II*, with the additional corrections SFI has made on reconsideration:

| | | |
|---|---|---|
| - Internal Labor (78 Fed. Cl. at 797-98) | (-) | $ 41,819 |
| - Loader Costs | | |
| Payroll Loader (78 Fed. Cl. at 799) $71,959, as corrected by SFI | (-) | $ 76,561 |
| Capital Suspense Loader (78 Fed. Cl. at 800) $408,000, as corrected by SFI | (-) | $ 497,619 |
| Equipment Operational Sequence Design and Dose Assessment (78 Fed. Cl. at 804) $55,108, as corrected by SFI | (-) | $ 55,204 |
| **TOTAL OFFSETS** | | $ 671,203 |

Since the court also has determined that DOE's January 31, 1998 partial breach of the Standard Contract was not a substantial factor in the $184,208 costs that SFI incurred for the cell recovery effort, SFI is entitled to nominal damages in the total amount of $9,735,634.

## II. THE COURT'S RECONSIDERATION REGARDING THE COST OF BORROWED FUNDS.

### A. Background And Relevant Procedural History.

The court previously observed that: "if causation is established, a private party to a government contract may recover *an* amount charged by a lender for borrowed funds that were [obtained] to mitigate a breach of contract." *System Fuels II*, 78 Fed. Cl. at 807. Although SFI had proffered two charts showing that the "Annual Weighted Average Cost of Capital" (*see* Pl. Ex. #1 CKRG-GG004211-12) was $1,587,000, the court could not readily ascertain from the testimony of Mr. Metcalfe, how that amount was derived. *See System Fuels II*, 78 Fed. Cl. at 809. As a result, the court issued a separate order requesting supplemental expert testimony to explain "*each step taken* to arrive at the $1,587,000 amount of the cost of borrowed funds that [SFI has] requested as part of [the] damage award." Order, *System Fuels, Inc.* v. *United States*, No. 03-2624 (Oct. 11, 2007) (emphasis added).

On November 16, 2007, SFI filed the Supplemental Direct Testimony of Mr. Metcalfe, explaining in detail how the $1,587,000 amount was calculated ("PX 701"). On January 23, 2008, the court held another evidentiary hearing to allow the Government to cross examine Mr. Metcalfe. *See* 1/23/08 TR 1-98. In response to additional questions raised by the court during the hearing,[4] on February 19, 2008, SFI proffered the Second Supplemental Direct Testimony of Mr. Metcalfe ("PX 802"), including a chart that shows SFI's total damages, adjusted per the court's offsets in *System Fuels II*, as further corrected by SFI, and how SFI's cost of borrowed funds was determined. PX 802 (TAB 3).

On March 12, 2008, the court entered a Scheduling Order in response to the Government's request for further briefing on the cost of borrowed funds. On April 11, 2008, the Government filed a Brief In Opposition To Plaintiffs' Claim For The Costs Of Borrowed Funds ("Gov't Br."). On April 25, 2008, SFI filed a Supplemental Brief In Support Of Their Claim For Recovery Of The Cost Of Borrowed Funds ("Pl. Br."). On May 12, 2008, the Government filed a Reply ("Gov't Reply").

---

[4] The court requested that Mr. Metcalfe revise his September 6, 2006 nominal damages to account for the offsets discussed in *System Fuels II*. *See* 1/23/08 TR 44-47. In addition, the court requested that Mr. Metcalfe recalculate SFI's cost of borrowed funds on the revised nominal damages through August 31, 2005, using the Weighted Average Cost of Capital. *See* 1/23/08 TR 94-95. The court also requested any standard text references that explained the term "Weighted Average Cost of Capital." *See* 1/23/08 TR 90.

**B. The Parties' Arguments.**

**1. The Government's Argument.**

The Government's principal argument is that, as a matter of law, SFI may not recover the cost of borrowed funds as damages in this case, because "a party may not recover interest upon a claim against the United States in the Court of Federal Claims, unless specifically permitted under a contract or Act of Congress." Gov't Br. at 5. The "cost of borrowed funds" is "interest," and SFI has not shown a contractual or congressional waiver of sovereign immunity that authorizes such a claim. *Id.* at 6.

**2. Plaintiffs' Response.**

The Government improperly characterizes the cost of borrowed funds as one for prejudgment interest. *See* Pl. Br. at 10. "Prejudgment interest" is defined as "*statutorily prescribed interest* accrued either from the date of the loss or from the date when the complaint was filed up to the date the final judgment is entered." BLACKS LAW DICTIONARY 887 (9th ed. 2009) (emphasis added). Mr. Metcalfe's calculations and testimony "did not originate from statutory prescriptions like prejudgment interest does, but rather from FERC documents and Plaintiffs' business records." Pl. Br. at 10-11; *see also* Pl. PH Br. at 8-11. Moreover, Mr. Metcalfe provided "ample grounds" for the court to award SFI the cost of borrowed funds. *See* Pl. Br. at 7. The cost of borrowed funds was recognized more than a decade ago as recoverable by the United States Court of Appeals for the Federal Circuit. *Id.* at 9. Therefore, to satisfy SFI's burden to establish a claim for cost of borrowed funds, SFI need only satisfy the *Indiana Michigan II* three-part test. *Id.* at 10.

**3. The Government's Reply.**

The core of the Government's reply is that, even if SFI's claim is not one for prejudgment interest, the United States Court of Appeals for the Federal Circuit has held that "the no-interest rule" also bars "'interest costs incurred on money borrowed as a result of the Government's breach[.]'" Gov't PH Resp. at 21.

**C. The Court's Determination Regarding The Cost Of Borrowed Funds.**

The common law regarding breach of contract damages recognizes at least two types of "interest." The first concerns *interest to be paid on damages*. *See* DOBBS, LAW OF REMEDIES § 3.2 (2d ed. 1993) ("DOBBS"). Such damages have been characterized as *interest on a claim*, because they represent the "lost opportunity" of not having the use of money, on which additional money may have been earned. The rationale for awarding interest to be paid as damages has been explained, in this way:

> When the defendant litigates his liability, ultimate payment to the plaintiff always comes long after the original loss or injury. The defendant has the use of money during the litigation period that, it turns out, properly should have been paid to the plaintiff when the loss occurred. And, correspondingly, the

> plaintiff has lost the use of the money. The use value of the money can be represented by interest[.]

*Id*.

A second concerns *money expended to borrow funds*. *Id*.; *see also* JOEL G. SIEGEL & JAE K. SHIM, DICTIONARY OF ACCOUNTING TERMS 232 (3d ed. 2000) (defining "interest" as an "amount charged by a lender to a borrower *for the use of funds*. The interest rate is typically expressed on an annual basis. Interest equals principal × interest rate × period of time.") (emphasis added); JAMES E. GAERTNER & S. KERRY COOPER, FINANCIAL ACCOUNTING: AN INTRODUCTION 50 (1987) (explaining that the "amount charged by a lender" is treated by accountants as an unrecovered cost, accrued as a liability); PAUL A. SAMUELSON, ECONOMICS 575 (1958) (defining "interest" as the determination of the "special price" of capital); ARMEN ALCHIAN & WILLIAM R. ALLEN, EXCHANGE AND PRODUCTION 364 (2d. ed. 1977) ("The price of capital is the rate of interest.").

The court's authority to award the first type of interest as damages is governed by the Judiciary and Judicial Procedure Rules of Decision Act that provides, "[*i*]*nterest on a claim* against the United States shall be allowed in a judgment of the United States Court of Federal Claims *only* under a contract or Act of Congress expressly providing for payment thereof." 28 U.S.C. § 2516(a) (emphasis added). Although Congress did not define the term "interest" or "interest on a claim" in that statute or in legislative history,[5] *Library of Congress* v. *Shaw*, 478 U.S. 310 (1986), the seminal case interpreting 28 U.S.C. § 2516(a), denied an award of interest on a claim for attorney fees awarded in the context of a successful Title VII Civil Rights Act of 1964 action, because it represented "increased compensation . . . *for the delay* in receiving payment." *Id.* (emphasis added). In other words, interest was a substitute for lost opportunity or use value of money. The Court observed that this decision simply mirrored the common law or "historical view that interest is an element of damages separate from damages on the substantive claim." *Id.* In economic terms, the Court further explained that, "[i]nterest

---

[5] *See* Cong. Globe, 37th Cong. 2nd Sess. 2-1677 (1861); Sen. Rpt. 1-8, 3rd. Sess. (March 11, 1911); *but see S. Nuclear Operating Co.* v. *United States*, 77 Fed. Cl. 396, 448 (2007) ("There is a difference between interest *on* a claim (*i.e.*, prejudgment interest which begins accruing when a claim arises and continues through the pendency of the action) [versus] interest *as* a claim--such as interest actually paid to obtain capital to mitigate a breach or as a consequence of a breach.") (emphasis in original); *Westfed Holdings, Inc.* v. *United States*, 52 Fed. Cl. 135, 163 (2002) ("[The] distinction 'between interest as an element of damages and interest on a claim' is well recognized."), *aff'd in relevant part*, 407 F.3d 1352 (Fed. Cir. 2005); Ralph C. Nash, *Interest on Borrowings: A Legitimate Cost in Damages Calculations*, 21 NASH & CIBINIC REP., No. 12 ¶ 69 (Dec. 2007) ("28 USCA § 2516 doesn't deal with costs. It bars recover[y] of interest on *claims*. Such interest is an entirely different matter-being an imputed amount that is added to recovery on a claim to compensate the contractor for the fact that recovery of the amount found owed has been delayed while the claim is being adjudicated. If some court would articulate the difference between interest on borrowings as a cost and interest on a claim in this way, we might end the litigation on this issue.") (emphasis in original).

and a delay factor share an identical function. They are designed to compensate for the belated receipt of money. The no-interest rule has been applied to prevent parties from holding the United States liable on claims grounded on the *belated receipt of funds*, even when characterized as *compensation for delay*." *Id*. at 322 (emphasis added). Despite the precise holding in *Shaw*, this case usually is cited for its inclusion of the following dicta from *United States* v. *Mescalero Apache Tribe*, 518 F.2d 1309, 1322 (Ct. Cl. 1975): "The character or nature of 'interest' cannot be changed by calling it 'damages,' 'loss,' 'earned increment,' 'just compensation,' 'discount,' 'offset,' or 'penalty,' or any other term, because it is still interest and the no-interest rule applies to it." *Shaw*, 478 U.S. at 321. The court will return to the impact of this dicta on the pending case.

In the specific context of the spent nuclear fuel partial breach of contract cases, the United States Court of Appeals for the Federal Circuit has emphasized that the "general principle is that *all losses, however described*, are recoverable." *Indiana Michigan II*, 422 F.3d at 1373 (emphasis added) (quoting RESTATEMENT (SECOND) OF CONTRACTS ("RESTATEMENT") § 347 cmt. c (1981)); *see also Anchor Sav. Bank, FSB* v. *United States*, No. 2008-5175, 2008-5182, 2010 WL 786578, at *3 (Fed. Cir. Mar. 10, 2010) ("Damages for breach of contract are designed to make the non-breaching party whole."). Previously, in a *Winstar* case, the appellate court allowed the recovery of $5.4 million for increased "financing costs" caused by the Government's total breach of contract. *See Bluebonnet Sav. Bank, FSB* v. *United States*, 266 F.3d 1348, 1355-57 (Fed. Cir. 2001); *see also Centex Corp* v. *United States*, 55 Fed. Cl. 381, 390 (2003) ("It has been held that foreseeable financing costs can be an element of expectancy damages."), *aff'd* 395 F.3d 1283 (Fed. Cir. 2005). *Bluebonnet Savings* built on the precedent established in another breach of contract case. *See Wells Fargo Bank, N.A.* v. *United States*, 88 F.3d 1012, 1021 (Fed. Cir. 1996) (adopting the common law rule that a non-breaching party is entitled to damages that will put it "in as good a position as [it] would have been in had the breaching party fully performed.") (citation and quotation omitted); *see also* RESTATEMENT § 344. Therefore, the court reads *Indiana Michigan II*, *Bluebonnet Savings*, and *Wells Fargo Bank* together to authorize the award of the cost of borrowed funds to mitigate a breach of contract, but only if foreseeability, substantial causal factor, and reasonable certainty are established *and* where the plaintiff could not have mitigated the breach without incurring the cost of borrowed funds.[6] *See Indiana Michigan II*, 422 F.3d at 1373; *see also id*. at 1375 (quoting RESTATEMENT § 350 cmt. b ("A party cannot recover damages for loss that he would have avoided by reasonable efforts. Once a party has reason to know that performance by the other party will not be forthcoming, . . . he is expected to take such affirmative steps as are appropriate in the circumstances to avoid loss by making substitute arrangements or otherwise[.]")).

The United States Court of Appeals for the Federal Circuit, however, first directly addressed the "no-interest rule" in the context of a contract case where the recovery of "interest [that a contractor] paid on the extra money it was forced to borrow as a result of the [Government's] delay" was denied. *See England* v. *Contel Advanced Sys., Inc.*, 384 F.3d

[6] If the court is subsequently authorized to award the cost of borrowed funds, the court is prepared to explain how the record in this case establishes that SFI has satisfied this burden.

1372, 1379 (Fed. Cir. 2004).[7] In support, four precedential Court of Claims cases were cited, all of which concerned interest paid to borrow money caused by *the Government's delay* in making a contractually obligated payment.[8] Accordingly, *England* held that the "no-interest" rule applies to costs incurred to borrow money, where there is a "delay in payment." *Id.* at 1379. But, *England* went even further to hold that "[t]he [no-interest] rule . . . *also* [*bars*] *interest costs incurred on money borrowed as a result of the* [*G*]*overnment's breach*." *Id.* at 1379 (emphasis added). The Government argues that this language stands as a precedential bar to the court awarding SFI the cost of borrowed funds. Since *Indiana Michigan II* did not discuss *England's* holding and *Bluebonnet Savings* and *Wells Fargo* preceded *England*, this court reads *Texas Am. Oil Co.* v. *United States*, 44 F.3d 1557 (Fed. Cir. 1995) (*en banc*) and *Strickland* v. *United States*, 423 F.3d 1335, 1338 n.3 (Fed. Cir. 2005) to support the Government's position.

A recent decision by the United States Court of Federal Claims in a different spent nuclear fuel partial breach of contract case, however, viewed *England* in a different light. On February 26, 2010, the same day that the court circulated a prior version of this Memorandum Opinion to the parties for the redaction of confidential information, *Energy Northwest* v. *United States*, No. 04-10C, 2010 WL 724019 (Fed. Cl. Feb. 26, 2010) was issued awarding the plaintiff $6,068,909 for the "cost of financing" the dry cask storage project at issue in that case. *Energy Northwest*, 2010 WL 724019, at *22-*29.[9] The *Energy Northwest* court independently reached the same conclusion as the court has in this case, *i.e.*, the award of the cost of borrowed funds *to mitigate a breach of contract* is supported by

---

[7] The predecessor Court of Claims, however, previously considered the "no-interest" rule in similar cases. *See, e.g.*, *infra* n.8.

[8] *See J.D. Hedin Constr. Co.* v. *United States*, 456 F.2d 1315, 1330 (Ct. Cl. 1972) ("*Interest paid on bank loans* made *because of financial stringency* resulting from a breach by the Government of a contract between it and the borrower is not recoverable as an item of damage.") (emphasis added); *Komatsu Mfg. Co.* v. *United States*, 131 F. Supp. 949, 950 (Ct. Cl. 1955) ("The general doctrine [is] that the United States is not liable for interest on its *failure to pay money* at the time it contracted to pay it[.]") (emphasis added); *Ramsey* v. *United States*, 101 F. Supp. 353, 356-57 (Ct. Cl. 1951) ("The law is well-settled that, as a general rule, *special damages*, beyond the amount recognized as legal interest, cannot be recovered for a breach of contract to pay money which results only in a *delay in payment*.") (emphasis added); *Myerle* v. *United States*, 33 Ct. Cl. 1, 25 (1897) ("As to the interest on the *borrowed money*: *The delay* forced the contractor to borrow money to carry on his contract; for this he was forced to pay interest, an extra expense. The recovery of this sum in this court is forbidden by statute: whether it be claimed in the guise of a damage caused by delay, or in some other form, it remains in fact a claim for interest and such a claim we are prohibited from allowing.") (emphasis added).

[9] In an earlier spent nuclear fuel case, the United States Court of Federal Claims also has awarded mitigating damages including the cost of borrowed funds. *See Tennessee Valley Auth.* v. *United States*, 69 Fed. Cl. 515 (2006). The Government did not appeal this decision, although TVA is not the "United States." 28 U.S.C. § 2516(a).

precedent of our appellate court. *Compare id*. with *supra* at 14. These opinions, however, employed different rationales to reach the same end. This court relied on precedent that has held the Government in breach of contract cases to the same standards as private parties, including where the cost of borrowed funds awarded was one of the components of contract damages. *Supra*. at 14. The *Energy Northwest* court, however, relied on the nuanced "interplay" between *England*, where the award of "excess interest costs" incurred to borrow funds used to complete a contract was denied, and *Wickham Contracting Co.* v. *Fischer*, 12 F.3d 1574, 1582-83 (Fed. Cir. 1994), where the court allowed award of interest as part of an "equitable adjustment," as support for its holding that "interest claims on borrowings *directly traceable to the Government's breach*, incurred not simply as a result of a delay in payments due from the Government or to 'carry on' its end of the contract, are outside the reach of the no-interest rule[.]" *Energy Northwest*, 2010 WL 724019, at *29 (emphasis added). As the *Energy Northwest* court astutely observed, "[i]n tracking the precedent upon which *Wickham* relied, this Court is struck not so much to references . . . to Changes clauses and equitable adjustments *per se* as to the significance of a requirement of traceability." *Id*. at *27; *see also Tennessee Valley Auth.*, 69 Fed. Cl. at 1583 (relying on *Wickham* in awarding the cost of borrowed funds).

Circuit Judge Newman's dissent in *England*, however, confronted the problem with *England* directly:

> The panel majority's holding that damages cannot be assessed because they are measured by the cost of money is contrary to fundamental principles of commercial relationships, and outside the scope of the "no-interest rule."

384 F.3d at 1381.

* * *

> These damages are *not interest on a claim* against the [G]overnment, whereby interest on a monetary obligation of the government is not available unless authorized by statute or agreed by contract. *See Library of Congress* v. *Shaw*, 478 U.S. 310, 317, 106 S. Ct. 2957, 92 L.Ed.2d 250 (1986) (interest does not run on a judgment against the United States, absent consent or authorization); *Komatsu Mfg. Co., Ltd*. v. *United States*, 132 Ct. Cl. 314, 131 F. Supp. 949 (1955) (same). The damages here at issue are the *direct cost* to the contractor of the government's breach of contract.

*Id*. at 1382 (emphasis added).

If Judge Newman's dissent is correct, as this court believes, then *en banc* review would be required to determine whether SFI has been unlawfully prohibited from receiving an award for the cost of borrowed funds as a component of mitigation damages in this case, because *England* misconstrued the term "interest on a claim" in 28 U.S.C. § 2516(a). *See* Fed. Cir. R. 35(a). The "exceptional importance" of this question was highlighted last week, when on March 3, 2010, DOE filed a motion with the Nuclear Regulatory Commission (Docket No. 63-001) to withdraw the pending license application for a permanent geologic

repository at Yucca Mountain, in light of the President's recent decision to appoint a "Blue Ribbon Commission on America's Nuclear Future" to conduct a comprehensive review and consider alternatives for spent nuclear fuel disposition. U.S. Department Of Energy's Motion To Withdraw, *In the Matter of U.S. Department Of Energy* (High-Level Waste Repository), 63-001 (N.R.C. Mar. 3, 2010). While this review is under way, the nuclear utility industry has not been relieved of the legal responsibility under the Standard Contract to continue to pay into the Nuclear Waste Fund, which currently has accumulated a $22 billion surplus *and* earns annual interest in excess of $1 billion. *See* Kimberly Johnson, *Nuclear Waste Won't Go To Yucca Mountain*, AOL NEWS, Mar. 4, 2010, http://www.aolnews.com/nation/article/nuclear-waste-wont-go-to-yucca-mountain/19383204. Nor has the nuclear utility industry been relieved of the additional burden of incurring the cost of borrowed funds to mitigate the Government's partial breach of the Standard Contract, which could well continue for decades to come.

The United States Supreme Court increasingly has criticized federal appellate courts for construing statutes by "rel[ying] on 'formalistic' legal doctrine, rather than 'demonstrable economic effect.'" *Leegin Creative Leather Products, Inc.* v. *PSKS, Inc.*, 551 U.S. 877, 888 (2007) (quoting *Continental T.V., Inc.* v. *GTE Sylvania, Inc.*, 433 U.S. 36, 49 (1977));[10] *see also* ANTONIN SCALIA, A MATTER OF INTERPRETATION 27-28 (1997) (criticizing the "rule that waivers of sovereign immunity are to be narrowly construed . . . [because of the risk of] increas[ing] the unpredictability, if not arbitrariness of judicial decisions."). The cost of borrowed funds in this case represents the direct cost of planning, constructing, and implementing the capital projects required to mitigate the Government's partial breach of the Standard Contract and has had a "demonstrable economic effect" on SFI. And, that effect can be ascertained with reasonable certainty.[11] In the court's view, *England's* citation to the

---

[10] Justice Kennedy delivered the opinion of the Court in *Leegin*, in which Chief Justice Roberts and Justices Scalia, Thomas, and Alito joined.

[11] The Federal Energy Regulatory Commission ("FERC") authorizes regulated utilities to finance capital projects through the rate making process and recognizes the cost of borrowed funds should not be borne by the utility alone. It does so through the Allowance for Funds Used During Construction ("AFUDC"). *See* Uniform System of Accounts Prescribed for Public Utilities and Licensees Subject to the Provisions of the Federal Power Act, Electric Plant Instructions, 18 C.F.R. Part 101 ¶ 3.A(17) (AFUDC includes "*the net cost for the period of construction of borrowed funds used for construction purposes and a reasonable rate on other funds when so used," and listing "average short-term debt," "long-term debt," "preferred stock," and "common equity*" which are factors used to determine a utility's weighted average cost of capital and considered by regulators in determining the reasonableness of rates) (emphasis added); *see also* 1/23/08 TR 54-55 (Metcalfe). Although the Plaintiffs in *Energy Northwest* utilized bank loan financing to pay for mitigation costs, there is no reason why utilizing AFUDC or a FERC-recognized surrogate also cannot satisfy the "direct correlation or tracing of interest costs" requirement discussed in *Dravo* v. *United States*, 594 F.2d 842, 847 (Ct. Cl. 1979). *See Tennessee Valley Auth.*, 69 Fed. Cl. at 542 ("TVA has . . . shown by its capital structure and its use of a widely-accepted, FERC-mandated standard for calculating the cost of the funds used in building the dry storage facilities . . . Thus, the court allows TVA to recover its AFUDC costs."); *see also* KERMIT D.

*Mescalero Apache Tribe* dicta, that attempts to capture an all-inclusive definition of "interest," *without* recognition of the fact that the word "interest" was specifically modified and limited in 28 U.S.C. § 2516(a) only to interest "on a claim" led to misinterpretation of the statute. *See England*, 384 F.3d at 1379. As a result, the different economic effect between the cost of borrowed funds, which represents an economic loss, and interest on a claim, which represents an economic gain, was obscured. Although *Shaw* also cited this dicta with approval, the Court's holding was limited to shielding the Government only from paying for the lost opportunity or use value of money, without its consent. Nothing more. As Circuit Court Judge Newman plainly put, *England* misconstrued the scope of the "no-interest rule." *Id*. at 1381. *England* also conflicts with prior precedent awarding interest as a component of breach of contract damages. *See Bluebonnet Savings*, 266 F.3d at 1355-57. This court, however, does not have the authority to resolve either of these issues. The proper venue is the United States Court of Appeals for the Federal Circuit *en banc*.

## III. CONCLUSION.

For the reasons discussed herein, the Clerk of the United States Court of Federal Claims is directed to enter final judgment in favor of Plaintiffs in the amount of $9,735,634, excluding the claimed costs of borrowed funds.

**IT IS SO ORDERED.**

s/ Susan G. Braden
**SUSAN G. BRADEN**
**Judge**

---

LARSON & PAUL B. W. MILLER, FUNDAMENTAL ACCOUNTING PRINCIPLES 32 (13th ed. 1993) (stating that borrowing funds may be accomplished either by debt or equity financing).